## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **PAUL A. EKNES-TUCKER, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION & ORDER

Several individuals and the United States challenge the constitutionality of the Alabama Vulnerable Child Compassion and Protection Act.[1] In part, the Act restricts transgender minors from utilizing puberty blockers and hormone therapies. Because the Supreme Court and the Court of Appeals for the Eleventh Circuit have made clear that: (1) parents have a fundamental right to direct the medical care of their children subject to accepted medical standards; and (2) discrimination based on gender-nonconformity equates to sex discrimination, the Court finds that there is a substantial likelihood that Section 4(a)(1)–(3) of the Act is unconstitutional and, thus, enjoins Defendants from enforcing that portion of the Act pending trial. However, all other provisions of the Act remain in effect, specifically: (1) the

---

[1] Based on their oral representations during a May 4, 2022 hearing, Plaintiffs seek to enjoin only Section 4(a)(1)–(3) of the Act. For purposes of this opinion, all references to "the Act" refer to these subdivisions unless noted otherwise.

provision that bans sex-altering surgeries on minors; (2) the provision prohibiting school officials from keeping certain gender-identity information of children secret from their parents; and (3) the provision that prohibits school officials from encouraging or compelling children to keep certain gender-identity information secret from their parents.

## I.      BACKGROUND

Regarding a child's belief that they might be transgender, Merriam-Webster's Dictionary defines a "transgender" person as one whose gender identity is different from the sex the person had or was identified as having at birth. *Transgender*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). The Dictionary defines "gender identity" as a person's internal sense of being a male or a female. *Gender Identity*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). These terms and definitions are largely consistent with those used by the parties. Accordingly, the Court relies on these terms throughout this opinion, but recognizes that they might mean different things to different people and in different contexts.

According to the uncontradicted record evidence, some transgender minors suffer from a mental health condition known as gender dysphoria. *Tr.* at 30.[2] Gender dysphoria is a clinically diagnosed incongruence between one's gender identity and

---

[2] "*Tr.*" is a consecutively paginated transcript of the two-day preliminary injunction hearing the Court held on May 5–6, 2022. For clarity, the Court cites to the internal pagination of the transcript rather than the ECF pagination.

assigned gender. *DSM-5* (Doc. 69-17) at 4. If untreated, gender dysphoria may cause or lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. *Tr.* at 20. According to the World Professional Association for Transgender Health (WPATH), an organization whose mission is to promote education and research about transgender healthcare, gender dysphoria in adolescents (minors twelve and over) is more likely to persist into adulthood than gender dysphoria in children (minors under twelve). *WPATH Standards of Care* (Doc. 69-18) at 17.[3]

In some cases, physicians treat gender dysphoria in minors with a family of medications known as GnRH agonists, commonly referred to as puberty blockers. *Id.* at 24; *Tr.* at 103. After a minor has been on puberty blockers for one to three years, doctors may then use hormone therapies to masculinize or feminize his or her body. *Tr.* at 108–11, 131. The primary effect of these treatments is to delay physical maturation, allowing transgender minors to socially transition their gender while they await adulthood. *Id.* at 105–06, 110–11. For clarity and conciseness, the Court refers to puberty blockers and hormone therapies used for these purposes as "transitioning medications."

Like all medications, transitioning medications come with risks. *Tr.* at 121–22. Known risks, for example, include loss of fertility and sexual function. *Id.*

---

[3] Plaintiffs, the State, and the United States individually introduced the WPATH standards into evidence during the May 5–6 preliminary injunction hearing.

at 132–33. Nevertheless, WPATH recognizes transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications. *WPATH Standards of Care* (Doc. 69-18) at 19. The American Medical Association, the American Pediatric Society, the American Psychiatric Association, the Association of American Medical Colleges, and at least eighteen additional major medical associations endorse these guidelines as evidence-based methods for treating gender dysphoria in minors. *Tr.* at 97–98; *Healthcare Amici Br.* (Doc. 91-1) at 15.[4]

The Alabama Vulnerable Child Compassion and Protection Act states in pertinent part:

> Section 4. (a) . . . [N]o person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3) Prescribing or administering supraphysiologic doses of estrogen to males.

---

[4] For a full list of the twenty-two major medical associations that endorse these guidelines, see *infra* note 12.

(4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

. . .

(c) A violation of this section is a Class C felony.

Section 5. No nurse, counselor, teacher, principal, or other administrative official at a public or private school attended by a minor shall do either of the following:

(1) Encourage or coerce a minor to withhold from the minor's parent or legal guardian the fact that the minor's perception of his or her gender or sex is inconsistent with the minor's sex.

(2) Withhold from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex.

S.B. 184, ALA. 2022 REG. SESS. §§ 4–5 (Ala. 2022). The Act defines a "minor" as anyone under the age of nineteen. *Id.* § 3(1); ALA. CODE § 43-8-1(18). The Act defines "sex" as "[t]he biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." S.B. 184, ALA. 2022 REG. SESS. § 3(3) (Ala. 2022).

In support of these prohibitions, the Legislature made several legislative findings. *Id.* § 2. The Legislature found in part that "[s]ome in the medical community are aggressively pushing" minors to take transitioning medications, which the Act describes as "unproven, poorly studied . . . interventions" that cause "numerous harmful effects for minors, as well as risks of effects simply unknown due to the new and experimental nature of these interventions." *Id.* § 2(6), (11). The Legislature went on to find that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications" of these treatments. *Id.* § 2(15). Thus, the Legislature concluded, "the decision to pursue" these treatments "should not be presented to or determined for minors[.]" *Id.* § 2(16).

Alabama legislators passed the Act on April 7, 2022.[5] Governor Kay Ivey signed the Act into law the following day.[6] In the week that followed, civil rights groups filed two lawsuits challenging the Act's constitutionality.[7] In *Ladinsky v. Ivey*, Case No. 2:22-cv-447 (N.D. Ala. 2022), several plaintiffs challenged the Act in the United States District Court of the Northern District of Alabama. The case

---

[5] Jo Yurcaba, *Alabama Passes Bills to Target Trans Minors and LGBTQ Classroom Discussion*, NBCNEWS.COM (Apr. 7, 2022, 4:22 PM), https://www.nbcnews.com/nbc-out/out-politics-and-policy/alabama-passes-bills-targeting-trans-minors-lgbtq-classroom-discussion-rcna23444.

[6] Madeleine Carlisle, *Alabama's Wave of Anti-LGBTQ Legislation Could Have National Consequences*, TIME.COM (Apr. 15, 2022, 11:40 AM), https://time.com/6167472/alabama-anti-lgbtq-legislation/.

[7] *Alabama Law Banning Transgender Medication Challenged in Two Lawsuits*, CBSNEWS.COM (Apr. 11, 2022, 10:05 PM), https://www.cbsnews.com/news/alabama-transgender-law-lawsuits/.

was randomly assigned to United States District Judge Anna M. Manasco. Judge
Manasco recused, and the case was randomly reassigned to United States Magistrate
Judge Staci G. Cornelius. After the parties declined to proceed before Judge
Cornelius in accordance with 28 U.S.C. § 636(c), the case was randomly reassigned
to the Honorable Annemarie C. Axon.

With *Ladinsky* pending, a separate set of plaintiffs challenged the Act in the
United States District Court of the Middle District of Alabama. That case, styled
*Walker v. Marshall*, Case No. 2:22-cv-167 (M.D. Ala. 2022), was randomly assigned
to Chief United States District Judge Emily C. Marks. The *Walker* plaintiffs moved
to enjoin enforcement of the Act and moved to reassign the case to United States
District Judge Myron H. Thompson, alleging that he had previously presided over a
similar case. The parties, however, later consented to transferring the case to the
Northern District of Alabama for consolidation with *Ladinsky*. At that time, the
*Walker* plaintiffs withdrew their motion to reassign.

On April 15, 2022, Chief Judge Marks transferred *Walker* to the Northern
District of Alabama in accordance with the "first-filed" rule and 28 U.S.C. § 1404(a).
The case was randomly assigned to this Court. Judge Axon then transferred *Ladinsky*
to this Court for consolidation with *Walker*. That same day, at 6:24 p.m. CDT, the
*Walker* plaintiffs filed a notice of voluntary dismissal without prejudice under
Federal Rule of Civil Procedure 41(a)(1)(A)(i). The *Ladinsky* plaintiffs voluntarily

dismissed their case nine minutes later. Neither the *Walker* plaintiffs nor the *Ladinsky* plaintiffs explained their respective dismissals, but counsel for *Ladinsky* informed the press: "We do plan to refile imminently[.]"[8]

Sure enough, on April 19, four transgender minors (Minor Plaintiffs), their parents (Parent Plaintiffs), a child psychologist and a pediatrician (Healthcare Plaintiffs), and Reverend Paul A. Eknes-Tucker filed this suit in the United States District Court of the Middle District of Alabama and moved to enjoin the Act's enforcement pending trial. The case was randomly assigned to United States District Judge R. Austin Huffaker, Jr. Due to this Court's familiarity with *Ladinsky* and *Walker*, Judge Huffaker reassigned the case to this Court to expedite disposition of Plaintiffs' motion for preliminary injunction. With the Act set to take effect on May 8, the Court entered an abbreviated briefing schedule and set a hearing on Plaintiffs' motion for May 5–6.

Just days before the hearing, the United States moved to intervene on behalf of Plaintiffs under Federal Rule of Civil Procedure 24.[9] In the process, the United States filed its own motion to enjoin enforcement of the Act and requested to

---

[8] Paul Gattis, *Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could be Refiled*, AL.COM, https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html (last updated Apr. 16, 2022, 9:22 PM).

[9] The United States's amended intervenor complaint does not add any additional claims, name any new defendants, or seek to expand the relief sought by Plaintiffs. *Compare Am. Intervenor Compl.* (Doc. 92) at 4–5, 13–14, *with Compl.* (Doc. 1) at 6–8, 28–35.

participate in the preliminary injunction hearing. Additionally, fifteen states moved for leave to proceed as *amici curiae*[10] and to file a brief in support of Defendants.[11] Twenty-two healthcare organizations also moved for leave to proceed as *amici curiae* and to file a brief in support of Plaintiffs.[12] Ultimately, the Court granted these motions in full, took the *amici* briefs under advisement, and gave the United States leave to participate during the preliminary injunction hearing.

During that hearing, the parties submitted hundreds of pages of medical evidence and called several live witnesses. Plaintiffs tendered Dr. Linda Hawkins and Dr. Morissa Ladinsky as experts in the treatment of gender dysphoria in minors. *Tr.* at 16, 92. Dr. Hawkins and Dr. Ladinsky testified that at least twenty-two major

---

[10] *Amici curiae*, Latin for "friends of the court," refers to a group of people or institutions who are not parties to a lawsuit, but petition the court (or are requested by the court) to file a brief in the action because they have "a strong interest in the subject matter." *Amicus Curiae*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] The State *Amici* are the States of Arkansas, Alaska, Arizona, Georgia, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

[12] The Healthcare *Amici* are the American Academy of Pediatrics; the Alabama Chapter of the American Academy of Pediatrics; the Academic Pediatric Association; the American Academy of Child and Adolescent Psychiatry; the American Academy of Family Physicians; the American Academy of Nursing; the American Association of Physicians for Human Rights, Inc. *d/b/a* Health Professionals Advancing LGBTQ Equality; the American College of Obstetricians and Gynecologists; the American College of Osteopathic Pediatricians; the American College of Physicians; the American Medical Association; the American Pediatric Society; the American Psychiatric Association; the Association of American Medical Colleges; the Association of Medical School Pediatric Department Chairs; the Endocrine Society; the National Association of Pediatric Nurse Practitioners; the Pediatric Endocrine Society; the Society for Adolescent Health and Medicine; the Society for Pediatric Research; the Society of Pediatric Nurses; the Societies for Pediatric Urology; and the World Professional Association for Transgender Health.

medical associations in the United States endorse transitioning medications as well-established, evidence-based methods for treating gender dysphoria in minors. *Id.* at 25, 97–98, 126–27. They opined that there are risks associated with transitioning medications, but that the benefits of treating minors with these medications outweigh these risks in certain cases. *Id.* at 57–58, 121–22, 136, 170. They also explained that minors and their parents undergo a thorough screening process and give informed consent before any treatment regimen begins. *Id.* at 41, 59, 132; *see also Consent Form* (Doc. 78-41) at 1–14. Finally, they testified that, without these medications, minors with gender dysphoria suffer significant deterioration in their familial relationships and educational performance. *Tr.* at 35, 112–13.

Plaintiffs also called Healthcare Plaintiff Dr. Rachel Koe (a licensed pediatrician), Plaintiff Eknes-Tucker, and Parent Plaintiff Megan Poe to testify about their personal knowledge and experiences regarding the treatment of gender dysphoria in minors. *Id.* at 150–51, 170–71, 195. Parent Plaintiff Megan Poe specifically described the positive effects transitioning treatments have had on her fifteen-year-old transgender daughter, Minor Plaintiff Allison Poe. *Id.* at 157–68.

According to Megan, Allison was born a male, but has shown evidence of identifying as a female since she was two-years-old. *Id.* at 153–54. During her early adolescent years, Allisson suffered from severe depression and suicidality due to gender dysphoria. *Id.* at 156–57. She began taking transitioning medications at the

end of her sixth-grade year, and her health significantly improved as a result. *Id.* at 163. Megan explained that the medications have had no adverse effects on Allison and that Allison is now happy and "thriving." *Id.* at 166–67. When asked what would occur if her daughter stopped taking the medications, Megan responded that she feared her daughter would commit suicide. *Id.* at 167.

Intervening on behalf of Plaintiffs, the United States tendered Dr. Armand H. Antommaria as an expert in bioethics and treatment protocols for adolescents suffering from gender dysphoria. *Id.* at 213–26. He reiterated that transitioning medications are well-established, evidence-based methods for treating gender dysphoria in minors. *Id.* at 120–21.

Defendants called two witnesses. *Id.* at 253, 337. First, Defendants tendered Dr. James Cantor—a private psychologist in Toronto, Canada—to testify as an expert on psychology, human sexuality, research methodology, and the state of the research literature on gender dysphoria and its treatment. *Id.* at 253–54. Dr. Cantor opined that, due to the risks of transitioning medications, doctors should use a "watchful waiting" approach to treat gender dysphoria in minors. *Id.* at 281. That approach, according to Dr. Cantor, "refers specifically to withholding any decision about medical interventions until [doctors] have a better idea or feel more confident" that the minor's gender dysphoria will persist without medical intervention other than counseling. *Id.* Dr. Cantor further testified that several European countries have

restricted treating minors with transitioning medications due to growing concern about the medications' risks. *Id.* at 296–97.

On cross examination, however, Dr. Cantor admitted that: (1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitioning medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic. *Id.* at 306–09. Accordingly, the Court gave his testimony regarding the treatment of gender dysphoria in minors very little weight. Dr. Cantor also testified that no country in Europe (or elsewhere) has categorically banned treating gender dysphoria in minors with transitioning medications. *Id.* at 326–28. Unlike the Act, Dr. Cantor added, those countries allow such treatments under certain circumstances and for research purposes. *Id.* at 327–28.

Defendants' other witness was Sydney Wright, a twenty-three-year-old woman who took hormone therapies for gender dysphoria for roughly a year beginning when she was nineteen. *Id.* at 338, 351, 357. She testified that she now believes taking the medication was a mistake and that she no longer believes gender dysphoria is a legitimate medical diagnosis. *Id.* at 348–49, 355. She also testified

that she received her treatments in Georgia and never visited a gender clinic in Alabama. *Id.* at 359–61.

## II.   LEGAL STANDARDS

The purpose of a preliminary injunction "is to preserve the positions of the parties" pending trial. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). When a federal court preliminarily enjoins a state law passed by duly elected officials, the court effectively overrules a decision "of the people and, thus, in a sense interferes with the processes of democratic government." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). This is an extraordinary and drastic remedy. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

To receive a preliminary injunction, a movant must show that: (1) he or she has a substantial likelihood of success on the merits; (2) he or she will suffer irreparable injury absent injunctive relief; (3) the threatened injury to him or her "outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The movant bears the burden of persuasion on each element. *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021).

## III.   DISCUSSION

Plaintiffs and the United States seek to enjoin Section 4(a)(1)–(3) of the Act pending trial under Federal Rule of Civil Procedure 65. *Pls.' Mot.* (Doc. 7) at 2; *Intervenor Pl.'s Mot.* (Doc. 62) at 2. Under this rule, a court may issue a preliminary injunction only after giving notice to the adverse party. FED. R. CIV. P. 65(a)(1). Where injunctive relief is appropriate, the movant must give security "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.* at 65(c). Here, Defendants have received proper notice. The Court addresses whether Plaintiffs are entitled to preliminary injunctive relief before turning to the issue of security.

### A.   Substantial Likelihood of Success on the Merits

The Court first considers whether Plaintiffs are substantially likely to succeed on their claims. When a plaintiff brings multiple claims, a reviewing court must consider the plaintiff's likelihood of success on each claim. *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008). Here, Plaintiffs bring five causes of action: four constitutional claims and one preemption claim. The Court begins with Plaintiffs' constitutional claims.

### 1.   *Plaintiffs' Constitutional Claims*

Plaintiffs' constitutional claims arise under the Civil Rights Act of 1871, 42 U.S.C. § 1983. *Compl.* (Doc. 1) at 28–30, 33–35. That statute guarantees "a

federal forum for claims of unconstitutional treatment at the hands of state officials[.]" *Heck v. Humphrey*, 512 U.S. 477, 480 (1994). To state a claim under § 1983, a plaintiff must allege: (1) the defendant deprived him of a right secured under federal law or the Constitution; and (2) such deprivation occurred under color of state law. *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

Parent Plaintiffs claim that the Act violates their constitutional right to direct the medical care of their children under the Due Process Clause of the Fourteenth Amendment. *Compl.* (Doc. 1) at 28–29. Minor Plaintiffs assert that the Act discriminates against them based on their sex in violation of the Fourteenth Amendment. *Id.* at 29–30. Plaintiffs collectively allege that the Act is void for vagueness under the Fifth and Fourteenth Amendments. *Id.* at 34–35. Finally, Plaintiffs collectively claim that the Act unlawfully restricts their speech under the First Amendment. *Id.* at 33–34. The Court addresses Plaintiffs' claims in that order.

i.    *Substantive Due Process Claim*

Parent Plaintiffs assert that the Act violates their constitutional right to direct the medical care of their children under the Fourteenth Amendment. *Compl.* (Doc. 1) at 28–29.[13] The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV.

---

[13] Based on the record evidence, the Court finds that Parent Plaintiffs have standing to bring their Substantive Due Process Claim. Defendants raise no opposition to this conclusion.

The Clause protects against governmental violations of "certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). Fundamental rights are "those guaranteed by the Bill of Rights as well as certain 'liberty' and privacy interests implicit in the [D]ue [P]rocess [C]lause and the penumbra of constitutional rights." *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005).

A parent's right "to make decisions concerning the care, custody, and control of their children" is one of "the oldest of the fundamental liberty interests" recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). Encompassed within this right is the more specific right to direct a child's medical care. *See Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990) (recognizing "the right of parents to generally make decisions concerning the treatment to be given to their children").[14] Accordingly, parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Parham v. J.R.*, 442 U.S. 584, 604 (1979).

Against this backdrop, Parent Plaintiffs are substantially likely to show that they have a fundamental right to treat their children with transitioning medications subject to medically accepted standards and that the Act infringes on that right. The

---

[14] *See also PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (explaining that "the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care").

Act prevents Parent Plaintiffs from choosing that course of treatment for their children by criminalizing the use of transitioning medications to treat gender dysphoria in minors, even at the independent recommendation of a licensed pediatrician. Accordingly, Parent Plaintiffs are substantially likely to show that the Act infringes on their fundamental right to treat their children with transitioning medications subject to medically accepted standards.

The State counters that parents have no fundamental right to treat their children with experimental medications. *Defs.' Br.* (Doc. 74) at 120. To be sure, the parental right to autonomy is not limitless; the State may limit the right and intercede on a child's behalf when the child's health or safety is in jeopardy. *Bendiburg*, 909 F.2d at 470. But the fact that a pediatric treatment "involves risks does not automatically transfer the power" to choose that treatment "from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.

Defendants produce no credible evidence to show that transitioning medications are "experimental." While Defendants offer some evidence that transitioning medications pose certain risks, the uncontradicted record evidence is that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. Indeed, according to Defendants' own expert, no country or state in the world categorically bans their use as Alabama

has. Certainly, the science is quickly evolving and will likely continue to do so. But this is true of almost every medical treatment regimen. Risk alone does not make a medication experimental.

Moreover, the record shows that medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria, such as central precocious puberty, a condition in which a child enters puberty at a young age. Doctors have also long used hormone therapies for patients whose natural hormone levels are below normal. Based on the current record, Defendants fail to show that transitioning medications are experimental. Thus, Parent Plaintiffs are substantially likely to show that the Act violates their fundamental right to treat their children with transitioning medications subject to medically accepted standards.

Statutes that infringe on fundamental rights are constitutional only when they satisfy the most demanding standard of judicial review, strict scrutiny. *Williams v. Pryor*, 240 F.3d 944, 947 (11th Cir. 2001). To satisfy strict scrutiny, a statute must be "narrowly tailored" to achieve "a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). The State's interest in "safeguarding the physical and psychological well-being of a minor is a compelling one." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) (cleaned up).

Defendants proffer that the purpose of the Act is "to protect children from experimental medical procedures," the consequences of which neither they nor their parents often fully appreciate or understand. *Defs.' Br.* (Doc. 74) at 129; *see also* S.B. 184, ALA. 2022 REG. SESS. § 2(13)–(15) (Ala. 2022). Defendants also allege that the Act halts medical associations from "aggressively pushing" transitioning medications on minors. *Defs.' Br.* (Doc. 74) at 114; *see also* S.B. 184, ALA. 2022 REG. SESS. § 2(6) (Ala. 2022).

But as explained above, Defendants fail to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria. Nor do Defendants offer evidence to suggest that healthcare associations are aggressively pushing these medications on minors. Instead, the record shows that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. The record also indicates that parents undergo a thorough screening and consent process before they may choose these medications for their children.

Undoubtedly, transitioning medications carry risks. But again, the fact that pediatric medication "involves risks does not automatically transfer the power" to choose that medication "from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Parents, pediatricians, and psychologists—not the State or

this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis. Defendants' proffered purposes— which amount to speculative, future concerns about the health and safety of unidentified children—are not genuinely compelling justifications based on the record evidence. For this reason alone, the Act cannot survive strict scrutiny at this stage of litigation.

But even if Defendants' proffered purposes are genuinely compelling, the Act is not narrowly tailored to achieve those interests. A narrowly tailored statute employs the "least restrictive means" necessary to achieve its purpose. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). A statute is not narrowly tailored when "numerous and less-burdensome alternatives" are available to advance the statute's purpose. *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017). Put differently, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000).

Defendants applaud the efforts of several European countries to restrict minors from taking transitioning medications, but unlike Alabama's Act, these countries allow minors to take transitioning medications in exceptional circumstances on a case-by-case basis. *Defs.' Br.* (Doc. 74) at 76–82. According to Dr. Cantor, Defendants' own expert witness, no state or country in the entire world

has enacted a blanket ban of these medications other than Alabama. *Tr.* at 328. The Act, unlike the cited European regulations, does not even permit minors to take transitioning medications for research purposes, even though Defendants adamantly maintain that more research on them is needed. *Id.* at 326–27; *Defs.' Br.* (Doc. 74) at 116. Because Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored at this stage of litigation.

In sum, Parent Plaintiffs have a fundamental right to direct the medical care of their children. This right includes the more specific right to treat their children with transitioning medications subject to medically accepted standards. The Act infringes on that right and, as such, is subject to strict scrutiny. At this stage of litigation, the Act falls short of that standard because it is not narrowly tailored to achieve a compelling government interest. Accordingly, Parent Plaintiffs are substantially likely to succeed on their Substantive Due Process claim.

*ii.   Equal Protection Claim*

Minor Plaintiffs claim that the Act discriminates against them based on their sex in violation of the Fourteenth Amendment. *Compl.* (Doc. 1) at 29–30.[15] The Equal Protection Clause provides that no State shall "deny to any person within its

---

[15] Based on the record evidence, the Court finds that Minor Plaintiffs have standing to bring their Equal Protection claim. Defendants raise no opposition to this conclusion. However, Parent Plaintiffs, Healthcare Plaintiffs, and Plaintiff Eknes-Tucker do not explain—nor is it readily apparent—how they have standing to bring an Equal Protection claim and, thus, are not substantially likely to succeed on the merits of their claim.

jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The Clause's chief purpose "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).

As the Supreme Court recently explained, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020). Governmental classification based on an individual's gender nonconformity equates to a sex-based classification for purposes of the Equal Protection Clause. *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011). Here, the Act prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity. *See* S.B. 184, ALA. 2022 REG. SESS. § 4(a)(1)–(3) (Ala. 2022). The Act therefore constitutes a sex-based classification for purposes of the Fourteenth Amendment.

The State views things differently. The State argues that the Act creates two categories of people: (1) minors who seek transitioning medications "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex";

and (2) "all other minors." *Defs.' Br.* (Doc. 74) at 93. (quoting S.B. 184, ALA. 2022 REG. SESS. § 4(a) (Ala. 2022)). Because transgender minors fall into both categories, the State reasons, the Act is not a sex-based classification. *Id.* at 94.

The fundamental flaw in this argument is that the first category consists entirely of transgender minors. The Act categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity. In this way, the Act places a special burden on transgender minors because their gender identity does not match their birth sex. The Act therefore amounts to a sex-based classification for purposes of the Equal Protection Clause. *See Glenn*, 663 F.3d at 1317 (explaining that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination").

Sex-based classifications are constitutional only when they satisfy a heightened standard of review known as intermediate scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). To satisfy this standard, a classification must substantially relate to an important government interest. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The State bears the burden to proffer an exceedingly persuasive justification for the classification. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). An exceedingly persuasive justification is one that is "genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The State again argues that the Act's purpose is to protect minors from experimental medications and to stop medical providers from "aggressively pushing" these medications on minors. *Defs.' Br.* (Doc. 74) at 109–120. As explained above, the State puts on no evidence to show that transitioning medications are "experimental." The record indicates that at least twenty-two major medical associations in the United States endorse these medications as well-established, evidence-based methods for treating gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. Finally, nothing in the record shows that medical providers are pushing transitioning medications on minors. Accordingly, the State's proffered justifications are hypothesized, not exceedingly persuasive. Thus, Minor Plaintiffs are substantially likely to succeed on their Equal Protection claim.

### iii.   *Void-for-Vagueness Claim*

Plaintiffs collectively claim that the Act is void for vagueness under the Fifth and Fourteenth Amendments because it does not sufficiently define "what actions constitute 'caus[ing]' any of the proscribed activities upon a minor." *Compl.* (Doc. 1) at 34–35. Under the void-for-vagueness doctrine, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004) (quoting *United States v. Fisher*, 289 F.3d 1329, 1333

(11th Cir. 2002)). A federal court reviews a void-for-vagueness claim only when the litigant alleges a constitutional harm. *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349–50 (11th Cir. 2011).

In this context, constitutional harm comes in two forms: (1) where a criminal defendant violates a vague statute, comes under prosecution, and then moves to dismiss the charges on the grounds that he or she lacked notice that his or her conduct was unlawful; and (2) where a civil plaintiff is "chilled from engaging in constitutional activity" due to a vague statute. *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1241 (11th Cir. 2015). Here, Plaintiffs' void-for-vagueness claim falls into the second category.

Plaintiffs, however, are not substantially likely to succeed on their claim. Under ALA. CODE § 13A-2-5(a), a person is liable for causing a crime "if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." The fact that the Act has a scienter requirement greatly weighs against Plaintiffs' void-for-vagueness claim. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a

vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea.").

Also weighing against Plaintiffs' claim is the State's interpretation of the Act. During the preliminary injunction hearing, Alabama Solicitor General Edmund LaCour explained that a person must administer or prescribe transitioning medications to violate the Act. *Tr.* at 409–11. General LaCour opined that a person cannot violate the Act simply by advising a minor to take transitioning medications or by driving a minor to a gender clinic where transitioning medications are administered. *Id.* at 410.

Additionally, the statutory scienter requirement and the State's interpretation both align with the modern, plain-language definition of the word cause. According to Merriam-Webster's Dictionary, "cause" means to "effect by command, authority, or force" or "bring into existence" an action. *Cause*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). Based on the record evidence, Plaintiffs do not show that they have been chilled from engaging in constitutional activity due to the Act. Plaintiffs are therefore not substantially likely to succeed on their void-for-vagueness claim at this stage of litigation.

### iv.   *Free Speech Claim*

Plaintiffs collectively claim that the Act violates their First Amendment right to free speech by prohibiting "any 'person,' including physicians, healthcare

professionals, or even parents, from engaging in speech that would 'cause' a
transgender minor to receive medical treatment for gender dysphoria." *Compl.*
(Doc. 1) at 33–34. The First Amendment provides that "Congress shall make no law
. . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I. At its core, "the First
Amendment means that government" generally "has no power to restrict expression
because of its message, its ideas, its subject matter, or its content." *Police Dep't of
City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

The Amendment, however, offers no protection to words that incite or
constitute criminal activity. For example, sexually derogatory remarks may violate
Title VII's general prohibition of sexual discrimination in the workplace. 42 U.S.C.
§ 2000-e2; *see also* 29 C.F.R. § 1604.11(a) (explaining that, under certain
circumstances, "[u]nwelcome sexual advances, *requests* for sexual favors, and other
*verbal* or physical conduct of a sexual nature" are actionable as sexual harassment
under Title VII (emphasis added)). Likewise, "[s]peech attempting to arrange the
sexual abuse of children is no more constitutionally protected than speech attempting
to arrange any other type of crime." *United States v. Hornaday*, 392 F.3d 1306, 1311
(11th Cir. 2004). More examples abound, but the point is this: Where the State "does
not target conduct on the basis of its expressive content, acts are not shielded from
regulation merely because they express a discriminatory idea or philosophy." *R.A.V.
v. City of St. Paul*, 505 U.S. 377, 390 (1992).

As explained *supra* Section III.A.1.iii, the Act does not criminalize speech that could indirectly lead to a minor taking transitioning medications. Rather, the only speech criminalized by Act is that which compels the administration or prescription of transitioning medications to minors. Accordingly, the Act targets conduct (administration and prescription), not speech. Plaintiffs are therefore not substantially likely to succeed on their First Amendment claim.

2. ***Plaintiffs' Preemption Claim***

Parent Plaintiffs, Minor Plaintiffs, and Healthcare Plaintiffs bring their preemption claim under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. *Compl.* (Doc. 1) at 31. Section 1557, through its incorporation of the Title IX, prohibits discrimination based on sex and the denial of benefits based on sex in any health program or activity that receives federal funding. 42 U.S.C. § 18116(a); 20 U.S.C. § 1681 *et seq.* Here, Plaintiffs generally rely on the same arguments Minor Plaintiffs made in support of their Equal Protection claim. *Pls.' Br.* (Doc. 8) at 49–52; *Tr.* at 379.

At this stage of litigation, Plaintiffs' preemption claim fails. As explained *supra* Section III.A.1.ii, only Minor Plaintiffs are substantially likely to succeed on their Equal Protection claim. Additionally, Section 1557—by incorporating the enforcement mechanism of Title IX—"is enforceable against institutions and programs that receive federal funds, but does not authorize suits against individuals."

*Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015). It is presently unclear how Plaintiffs may bring their preemption claim against Defendants who are state officials, not institutions. Due to these concerns, Plaintiffs are not substantially likely to succeed on their preemption claim.

### B.   Irreparable Harm

The Court next considers whether Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm absent injunctive relief.[16] Harm "is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. An irreparable harm is one that is "actual and imminent, not remote or speculative." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013). The risk of suffering severe medical harm constitutes irreparable harm. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (explaining that a risk of suffering "a severe medical setback" is an irreparable injury); *Blaine v. N. Brevard Cnty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1306 (M.D. Fla. 2018) (finding irreparable harm where doctor plaintiffs could not provide necessary medical care to their patients).

The Act prevents Parent Plaintiffs from treating their children with transitioning medications subject to medically accepted standards. S.B. 184, ALA.

---

[16] *See Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (explaining that a court need not consider whether a plaintiff shows irreparable harm if he or she does not show a substantial likelihood of success on his or her claims).

2022 REG. SESS. § 4(a)(1)–(3) (Ala. 2022). The record shows that, without these medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality. *Tr.* at 20, 167. Additionally, the evidence shows that Minor Plaintiffs will suffer significant deterioration in their familial relationships and educational performance. *Id.* at 35, 112–13. The Court therefore concludes that Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm absent injunctive relief.

C.   **Balance of Harms & Public Interests**

The Court now considers the final two elements together. To satisfy the third and fourth elements of a preliminary injunction, a plaintiff must show that the harm she will likely suffer without an injunction outweighs any harm that her opponent will suffer from the injunction and that the injunction would not disserve (or be adverse to) the public interest. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). These factors merge when the State is the opponent. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (per curiam).

This case largely presents two competing interests. On one hand, "preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other

strict legal and equitable principles that restrain courts." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. On the other hand, "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince v. Massachusetts*, 321 U.S. 158, 168–69 (1944).

Based on the record evidence, the Court finds that the imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from an injunction. The Court further finds that an injunction is not adverse to the public interest. To the contrary, enjoining the Act upholds and reaffirms the "enduring American tradition" that parents—not the States or federal courts—play the primary role in nurturing and caring for their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Accordingly, the final two factors favor injunctive relief.

## IV.   SECURITY

Defendants argue that, if injunctive relief is appropriate, the Court should require each Healthcare Plaintiff to post a $1 million security. *Defs.' Br.* (Doc. 74) at 159–60.[17] Calculating the "amount of an injunction bond is within the sound discretion of the district court." *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp.*,

---

[17] According to Defendants, this amount represents that "by which [Healthcare] Plaintiffs will be unjustly enriched should they be allowed to administer profitable (and illegal) medical procedures to kids." *Defs.' Br.* (Doc. 74) at 160.

112 F.3d 1125, 1127 (11th Cir. 1997) (per curiam). Here, the Court finds that a security bond is not necessary for three reasons. First, as explained *supra* Part III, Healthcare Plaintiffs themselves are not entitled to preliminary injunctive relief. Second, Federal Rule of Civil Procedure 65 does not require the United States to pay security. FED. R. CIV. P. 65(c). Finally, Defendants do not allege that they will suffer any cost or economic harm if they are wrongly enjoined from enforcing the Act. *Defs.' Br.* (Doc. 74) at 159–60. The Court therefore relieves Plaintiffs from posting security under Rule 65.

## V.    CONCLUSION

For these reasons, the Court **GRANTS** in part Plaintiffs' motion for preliminary injunction (Doc. 7) and **ENJOINS** Defendants from enforcing Section 4(a)(1)–(3) of the Act pending trial. The Court **GRANTS** in part the United States's motion for preliminary injunction (Doc. 62) to the same degree and effect. All other provisions of the Act remain enforceable.

**DONE** and **ORDERED** May 13, 2022.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE