No. 22-11707

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

## OPENING BRIEF OF STATE DEFENDANTS

Christopher Mills
SPERO LAW LLC
557 East Bay St.,
#22251
Charleston, SC 29451
(843) 606-0640
cmills@spero.law

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
Thomas A. Wilson
  *Deputy Solicitors General*
James W. Davis
  *Deputy Attorney General*
Benjamin M. Seiss
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

June 27, 2022

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Academic Pediatric Association – Amicus Curiae;

2. Alabama Chapter of the American Academy of Pediatrics – Amicus Curiae;

3. Alaska, State of – Amicus Curiae;

4. American First Legal Foundation – Amicus Curiae;

5. American Academy of Child and Adolescent Psychiatry – Amicus Curiae;

6. American Academy of Family Physicians – Amicus Curiae;

7. American Academy of Pediatrics – Amicus Curiae;

8. American Academy of Nursing – Amicus Curiae;

9. American Association of Physicians for Human Rights, Inc. – Amicus Curiae;

10. American College of Obstetricians and Gynecologists – Amicus Curiae;

11. American College of Osteopathic Pediatricians – Amicus Curiae;

12. American College of Physicians – Amicus Curiae;

13. American Medical Association – Amicus Curiae;

14. American Pediatric Society – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

15. American Psychiatric Association – Amicus Curiae;

16. Association of American Medical Colleges – Amicus Curiae;

17. Association of Medical School Pediatric Department Chairs – Amicus Curiae;

18. Anderson, Tom – Defendant;

19. Arizona, State of – Amicus Curiae;

20. Arkansas, State of – Amicus Curiae;

21. Baia, Elizabeth – Counsel for Amici Curiae;

22. Bailey, Daryl D. – Defendant;

23. Blaylock, C. Wilson – Defendant;

24. Boe, Brianna – Plaintiff (pseudonym);

25. Bowdre, Alexander Barrett – Counsel for Defendants;

26. Burke, Liles C. – U.S. District Court Judge;

27. Cantrell, Michael A. – Counsel for Amici Curiae;

28. Carr, Danny – Defendant;

29. Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

30. Davis, James William – Counsel for Defendants;

31. Dermody, Eliza – Counsel for Intervenor-Plaintiff;

32. Doss, Jeffrey P. – Counsel for Plaintiffs;

33. Eagan, Melody Hurdle – Counsel for Plaintiffs;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

34.  Endocrine Society (The) – Amicus Curiae;

35.  Eknes-Tucker, Paul A. – Plaintiff;

36.  Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

37.  Georgia, State of – Amicus Curiae;

38.  Hamilton, Gene – Counsel for Amicus Curiae;

39.  Hecker, Elizabeth P. – Appellate Counsel for Intervenor-Plaintiff;

40.  Indiana, State of – Amicus Curiae;

41.  Isasi, William – Counsel for Amici Curiae;

42.  Ivey, Kay – Defendant;

43.  Koe, Rachel – Plaintiff (pseudonym);

44.  Krishna, Praveen S. – Counsel for Intervenor-Plaintiff;

45.  LaCour, Edmund G. (Jr.) – Counsel for Defendants;

46.  Lannin, Cortlin H. – Counsel for Amici Curiae;

47.  Lanosa, Michael – Counsel for Amici Curiae;

48.  Lareau, Alyssa C. – Counsel for Intervenor-Plaintiff;

49.  Levi, Jennifer L. – Counsel for Plaintiffs;

50.  Louisiana, State of – Amicus Curiae;

51.  Marshall, Steve – Defendant;

52.  Mattern, David P. – Counsel for Plaintiffs;

53.  McCoy, Scott D. – Counsel for Plaintiffs;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

54.    Medical Association of Pediatric Nurse Practitioners – Amicus Curiae;

55.    Mills, Christopher Ernest – Counsel for Defendants;

56.    Mississippi, State of – Amicus Curiae;

57.    Missouri, State of – Amicus Curiae;

58.    Mitchell, Jonathan F. – Counsel for Amicus Curiae;

59.    Moe, Jane – Plaintiff (pseudonym);

60.    Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

61.    Montana, State of – Amicus Curiae;

62.    Nebraska, State of – Amicus Curiae;

63.    Noe, Kathy – Plaintiff (pseudonym);

64.    Oklahoma, State of – Amicus Curiae;

65.    Oladeinbo, Gilbert Olusengun – Counsel for Plaintiffs;

66.    Orr, Asaf – Counsel for Plaintiffs;

67.    Pediatric Endocrine Society – Amicus Curiae;

68.    Perigoe, Kelly – Counsel for Plaintiffs;

69.    Peterson, Misty L. – Counsel for Plaintiffs;

70.    Poe, Megan – Plaintiff (pseudonym);

71.    Powers, John Michael – Counsel for Intervenor-Plaintiff;

72.    Pratt, James Andrew – Counsel for Plaintiffs;

73.    Ragsdale, Barry Alan – Counsel for Amici Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

74.    Ray, Brent P. – Counsel for Plaintiffs;

75.    Reinke, Adam – Counsel for Plaintiffs;

76.    Robin-Vergeer, Bonnie – Appellate Counsel for Intervenor-Plaintiff;

77.    Seiss, Benjamin Matthew – Counsel for Defendants;

78.    Shortnacy, Michael B. – Counsel for Plaintiffs;

79.    Schwabauer, Barbara – Appellate Counsel Intervenor-Plaintiff;

80.    Societies for Pediatric Urology – Amicus Curiae;

81.    Society of Adolescent Health and Medicine – Amicus Curiae;

82.    Society for Pediatric Research – Amicus Curiae;

83.    Society of Pediatric Nurses – Amicus Curiae;

84.    Soto, Diego Armando – Counsel for Plaintiffs;

85.    South Carolina, State of – Amicus Curiae;

86.    Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

87.    Stone, Jessica Lynn – Counsel for Plaintiffs;

88.    Terry, Abigail Hoverman – Counsel for Plaintiffs;

89.    Texas, State of – Amicus Curiae;

90.    Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

91.    United States of America – Intervenor-Plaintiff;

92.    Utah, State of – Amicus Curiae;

93.    Voights, Anne M. – Counsel for Plaintiffs;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

94.     Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

95.     Warbelow, Sarah – Counsel for Plaintiffs;

96.     West Virginia, State of – Amicus Curiae;

97.     Wilkerson, Mark Douglas – Counsel for Amici Curiae;

98.     Williams, Renee – Counsel for Intervenor-Plaintiff;

99.     Wilson, Thomas Alexander – Counsel for Defendants;

100.    Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

101.    World Professional Association for Transgender Health – Amicus Curiae;

102.    Vague, Amie A. – Counsel for Plaintiffs;

103.    Vance, Robert S. (III) – Counsel for Amici Curiae;

104.    Ventiere, Jessica – Defendant;

105.    Veta, D. Jean – Counsel for Amici Curiae;

106.    Walker, Susan Russ – Magistrate Judge;

107.    Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

108.    Zoe, James – Plaintiff (pseudonym).


Respectfully submitted this 27th day of June 2022.


                         s/ Edmund G. LaCour Jr.
                         Edmund G. LaCour Jr.
                         *Counsel for Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This Court has ordered the Clerk's Office to specially set oral argument in this case. *See* Order (11th Cir. June 7, 2022).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ................................................................. v

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 6

STATEMENT OF THE ISSUES ........................................................... 7

STATEMENT OF THE CASE .............................................................. 7

    A.    Sex, Gender, and Gender Discordance ............................... 9

    B.    Gender Dysphoria ......................................................... 10

    C.    Treatment Options ......................................................... 14

        1.    Watchful Waiting ................................................... 14

        2.    Transitioning ......................................................... 15

    D.    Assessing the Evidence .................................................. 18

        1.    The Dutch Studies .................................................. 18

        2.    Beyond the Dutch Protocol ..................................... 20

    E.    The Problem of Informed Consent .................................. 22

    F.    An International Reckoning ............................................ 23

    G.    The Alabama Vulnerable Child Compassion and Protection Act .......................................................... 25

    H.    Plaintiffs' Challenge and the District Court's Injunction ................................................................ 25

SUMMARY OF ARGUMENT ...................................................... 27

STANDARD OF REVIEW ......................................................... 29

ARGUMENT ........................................................................ 30

    I.    The District Court Erred When It Found In The Due Process Clause A Right For Parents "To Treat Their Children With Transitioning Medications." ...................................... 30

        A.    No Substantive Due Process Right Exists for Parents to Access Transitioning Treatments for Their Children. ........................................................ 31

            1.    Accessing Transitioning Treatments is Not a Fundamental Personal Right .......................... 32

            2.    Parents Cannot Obtain Transitioning Treatments That Neither They Nor Their Children Have a Fundamental Right to Obtain For Themselves ................................. 36

        B.    The Act Satisfies Any Level of Scrutiny. .............................. 39

    II.    The District Court Erred When It Determined That Banning Sterilizing Transitioning Treatments Likely Violates The Equal Protection Clause ............................................. 45

        A.    The Act Does Not Discriminate Based on Sex or Transgender Status. ................................................ 47

        B.    Even Assuming a Distinction Based on Transgender Status, Rational Basis Review Still Applies. ............................................................. 50

    III.    The District Court Abused Its Discretion In Rewarding Plaintiffs' Misconduct. ......................................................... 55

    IV.    The District Court Abused Its Discretion By Entering A Universal Injunction. .......................................................... 57

CONCLUSION ...................................................................... 58

CERTIFICATE OF COMPLIANCE ................................................................... 59

CERTIFICATE OF SERVICE ........................................................................ 60

# TABLE OF AUTHORITIES

## Cases

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) ...................................................................... 33, 34

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  3 F.4th 1299 (11th Cir. 2021) ................................................................................49

*Andino v. Middleton*,
  141 S. Ct. 9 (2020) ................................................................................................27

*Bendiburg v. Dempsey*,
  909 F.2d 463 (11th Cir. 1990) .............................................................................38

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ....................................................................... 51, 53, 54

*Brandt v. Rutledge*,
  No. 21-2875 (8th Cir.)...........................................................................................24

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ......................................................................................... 49, 50

*Buck v. Bell*,
  274 U.S. 200 (1927)..............................................................................................36

*Clark v. Jeter*,
  486 U.S. 456 (1988)...............................................................................................47

*Cleburne Living Ctr. v. Cleburne*,
  726 F.2d 191 (5th Cir. 1984)............................................................................ 53, 54

*Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)...............................................................................................52

*Dobbs v. Jackson Women's Health Org.*,
  No. 19-1392 (U.S. June 24, 2022) ............................................................. passim

*Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*,
    696 F.2d 901 (11th Cir. 1983) .............................................................. 30, 32, 37

*Doe v. Moore*,
    410 F.3d 1337 (11th Cir. 2005) ...........................................................31

*Echols v. Lawton*,
    913 F.3d 1313 (11th Cir. 2019) ...........................................................31

*Ga. Advoc. Off. v. Jackson*,
    4 F.4th 1200 (11th Cir. 2021) ...................................................... 57, 58

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)............................................................ 46, 49, 50

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ...................................................... 51, 52

*Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*,
    503 U.S. 653 (1992)............................................................56

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)............................................................40

*Gonzalez v. Governor of Ga.*,
    978 F.3d 1266 (11th Cir. 2020) ...........................................................29

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)............................................................47

*In re Amie Vague*,
    2:22-mc-03977-WKW (M.D. Ala. inquiry initiated May 10, 2022)...................26

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
    358 F.3d 804 (11th Cir. 2004) ...........................................................37

*Lyng v. Castillo*,
    477 U.S. 635 (1986)............................................................54

*Morrissey v. United States*,
    871 F.3d 1260 (11th Cir. 2017) ............................................... passim

*New York v. Ferber*,
   458 U.S. 747 (1982) ........................................................................40

*Nguyen v. I.N.S.*,
   533 U.S. 53 (2001) ................................................................... 53, 54

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) .......................................................40

*Parham v. J.R.*,
   442 U.S. 584 (1979) ........................................................................38

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ........................................................................49

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ........................................................................37

*Raich v. Gonzales*,
   500 F.3d 850 (9th Cir. 2007) .........................................................33

*Reno v. Flores*,
   507 U.S. 292 (1993) ........................................................................39

*Robertson v. Hecksel*,
   420 F.3d 1254 (11th Cir. 2005) .....................................................37

*Rutherford v. United States*,
   616 F.2d 455 (10th Cir. 1980) .......................................................34

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) .....................................................29

*United States v. Virginia*,
   518 U.S. 515 (1996) ........................................................................54

*Walker v. Marshall*,
   2:22-cv-167 (M.D. Ala. 2022) .......................................................26

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ........................................................................32

*Whalen v. Roe*,
   429 U.S. 589 (1977) .......................................................................32

*Williams v. Att'y Gen. of Ala.*,
   378 F.3d 1232 (11th Cir. 2004) ................................................ 32, 34

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ......................................................56

**Statutes**

28 U.S.C. §1292(a)(1) ..........................................................................6

28 U.S.C. §1331 ...................................................................................6

28 U.S.C. §1343 ...................................................................................6

Alabama Vulnerable Child Compassion and Protection Act,
   Ala. Code §§22-12E-1 *et seq.* .................................................. passim

Ala. Code §§20-2A-1 *et seq* ...............................................................1

Ala. Code §20-2A-2(2) ........................................................................1

Ala. Code §20-2A-3(21) ......................................................................1

Ala. Code §22-12E-2 ..................................................................... 25, 40

Ala. Code §22-12E-4(a) ............................................................ 25, 47, 53

Ala. Code §22-12E-4(b) .....................................................................45

Ala. Code §22-12E-6 ..................................................................... 25, 45

**Other Authorities**

David W. Baker, *The Joint Commission's Pain Standards:
   Origins and Evolution* (May 5, 2017), https://perma.cc/RZ42-YNRC .............36

Ann M. Becker, *Smallpox in Washington's Army: Strategic Implications
   of the Disease During the American Revolutionary War*,
   68 J. Mɪʟ. Hɪsᴛ. 381 (2004) ..................................................................35

Juliana Bunim, *First U.S. Study of Transgender Youth Funded by NIH*, U.C. San Francisco (Aug. 17, 2015), https://perma.cc/URA6-CERX ...............34

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2016).....................................................................36

Division of Florida Medicaid, *Generally Accepted Professional Medical Standard Determination on the Treatment of Gender Dysphoria* (June 2022), https://ahca.myflorida.com/letkidsbekids/ ..........................................................24

Claudio Violato, *A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners*, 2 J. Sci. & Med. 122 (2016) ................................................................................35

**INTRODUCTION**

The Alabama Legislature recently enacted a medical marijuana law. Ala. Code §§20-2A-1 *et seq*. Based on new medical research, the Legislature determined that the benefits of medical cannabis outweighed the risks and authorized the "administration of medical cannabis products if used in a controlled setting under the supervision of a physician." *Id.* §§20-2A-2(2), -3(21). Prior to the passage of the law, possessing or using marijuana was flatly illegal. Patients had no right to access it, and doctors had no right to prescribe it—no matter what the illness was, no matter how much help the physician thought it might provide.

The Alabama Legislature also recently enacted a law prohibiting the administration of puberty blockers, cross-sex hormones, and surgeries to a minor for the purpose of "transitioning" the child to appear as another sex. *See* Alabama Vulnerable Child Compassion and Protection Act, Ala. Code §§22-12E-1 *et seq.* Why? Because the Legislature found that the research regarding these novel interventions is poor, that the interventions are unproven to offer lasting relief to children suffering from gender-related distress, and that what research does exist is already outdated— a remarkable fact given that the seminal study on transitioning children was published less than a decade ago (and has not been replicated).

In that short time, what was once a trickle of children presenting with gender-related distress has become a tsunami. Clinics performing these "transitioning"

1

treatments on kids are seeing their patient loads increase by thousands of percent. Meanwhile, the average patient has shifted from a young, pre-pubescent boy with a long history of gender distress and a cross-sex gender identification to a teenaged girl whose gender identification seemed to appear out of nowhere. These teens are often autistic, often identify as "non-binary," and often have their discordance arise in association with increased social media use and in clusters with other adolescent girls also experiencing gender distress for the first time. This trend is new and troubling.

It is also dangerous. The Legislature found that transitioning interventions pose significant risks: permanent sterilization, loss of sexual function, "diminished bone density," "increased risks of cardiovascular disease, thromboembolic stroke, asthma, COPD, and cancer," "as well as risks of effects simply unknown due to the new and experimental nature of these interventions." *Id.* Given these risks, and that "numerous studies have shown that a substantial majority of children who experience discordance between their sex and [gender] identity will outgrow the discordance once they go through puberty" if they do *not* transition, *id.*, the Legislature determined that the risks outweigh the benefits and that children cannot give meaningful "consent" to such sterilizing treatments. It thus banned them for children 18 and under.

Alabama is not alone in turning a critical eye toward medical transitions for minors. In just the past few years, healthcare authorities or medical organizations in the United Kingdom, Finland, Sweden, France, Australia, and New Zealand have all urged caution due to the low quality of the existing research, the unexplained explosion in gender discordance among young people (particularly in adolescent girls), and the dramatic increase in the number of patients who regret transitioning and are forever harmed. In 2020, the UK National Health Service commissioned a comprehensive evidence review in which it examined the results of every relevant study since the first one was published only a decade ago. It found that *every* study conducted thus far has been a "small, uncontrolled observational stud[y]," "subject to bias and confounding," with "results … of very low certainty." DE69-9:13, DE69-10:13.[1] Based on a similar review, Sweden's National Board of Health and Welfare forbade the use of transitioning treatments in youth except in "exceptional cases" or future research settings. DE69-11:4. It concluded: "[T]he risks of puberty suppressing treatments with GnRH-analogues and gender-affirming hormonal treatments currently outweigh the possible benefits." *Id.* at 3. Below, the State presented ample evidence confirming this conclusion.

---

[1] "DE" refers to "docket entry." The number immediately following "DE" is the specific entry, and the number following the colon indicates the pin cite based on the ECF-stamped pagination.

The district court weighed these policy considerations differently. A group of plaintiffs sought to preliminarily enjoin enforcement of Alabama's law, alleging (as relevant here) that it violated (1) a substantive-due-process right of parents to obtain puberty blockers and cross-sex hormones to transition their children, and (2) an equal protection right of transgender minors to obtain the interventions for themselves. The United States joined the second claim, and the district court issued a universal injunction. DE112-1.[2] While acknowledging that the "[k]nown risks" of transitioning treatments "include loss of fertility and sexual function," the court brushed aside the Legislature's concerns: "All medications," after all, "come with risks." *Id.* at 3. Then, rather than deferring to the Legislature on how best to govern Alabamians' health and safety in this area of uncertainty, the court made Plaintiffs' *amici*—medical interest groups—arbiters of the State's police powers, deferring to their claim that transitioning treatments are safe and well established. *Id.* at 4. The court held that the Act likely violates a "fundamental right" of parents "to treat their children with transitioning medications," and likely constitutes an unlawful sex-based classification. *Id.* at 21-22.

The court's errors are obvious and abundant. The Due Process Clause does not forbid States from regulating medicine, be it medical marijuana, abortion, or

---

[2] Docket entry 112-1 is the district court's second amended opinion and order, which contains non-substantive changes to its original order, DE107.

transitioning treatments. The district court reasoned that parents "have a fundamental right to direct the medical care of their children," *id.* at 21, but that defines the right far too broadly. The Legislature determined that transitioning treatments *in particular* are too risky to authorize, so it is *those* treatments Plaintiffs must show the Constitution protects. But no one—adult or child—has a right to transitioning treatments that is deeply rooted in our Nation's history and tradition. The State can thus regulate or prohibit those interventions for children, even if an adult wants the drugs for his child. Just as the parental relationship does not unlock a Due Process right allowing parents to obtain medical marijuana or abortions for their children, neither does it unlock a right to transitioning treatments. The Constitution reserves to the State—not courts or medical interest groups—the authority to determine that these sterilizing interventions are too dangerous for minors.

Nor does the Equal Protection Clause forbid Alabama from banning these dangerous and unproven interventions on minors, particularly when, as here, the State bans them for *everyone*, boys and girls alike, without regard to transgender status (which is not a protected class under the Constitution in any event). Plaintiffs' case hinges on the proposition that providing natural amounts of testosterone to a boy with a testosterone deficiency while declining to give unnatural amounts of testosterone to a girl seeking to transition denies the girl equal protection. But the argument fails because these are different treatments for different conditions with

dramatically different risks. The fact that a patient's sex affects the nature of a treatment does not mean anyone is denied equal protection. A doctor offering testicular exams only to boys or pap smears only to girls does not violate the Constitution, nor does a fertility clinic that refuses to implant fertilized eggs inside biological males. Likewise, Alabama's law permissibly accounts for the reality that certain interventions are different treatments depending on the patient's sex.

The court also weighed the equities wrong. It discounted the State's interest in protecting children from harmful medical experimentation. It rewarded Plaintiffs' intentional delay in filing suit as their lawyers engaged in judge shopping. And it enjoined enforcement of the Act as to *everyone*, simultaneously discounting the State's interests and violating Article III by granting a universal injunction even though Plaintiffs represent no class. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court exercised subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. It entered a preliminary injunction on May 13, 2022, DE107, which the State Defendants appealed three days later, DE108. This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Alabama banned transitioning treatments for children based on the Legislature's determination that the risks of the interventions outweigh their proven benefits. Does the Due Process Clause provide parents a fundamental right to obtain these sterilizing treatments for their children?

2.      Does the Equal Protection Clause forbid States from banning transitioning treatments for all minors?

3.      Did the district court abuse its discretion by entering a universal injunction?

## STATEMENT OF THE CASE

This case is about whether the Constitution forbids Alabama from banning sterilizing transitioning treatments for minors. The legal issues are thus straightforward (it doesn't). But the factual issues can be complicated, particularly since Plaintiffs seek to obfuscate the state of the science for treating youth suffering from gender-related psychological distress. To provide an accurate understanding, Defendants submitted, and the district court admitted, hundreds of pages of evidence, Tr.7,[3] which Defendants discussed extensively in their briefing, DE74:26-86. Given the space limitations here, this Court would benefit from reading that discussion as well.

---

[3] "Tr." refers to the consecutively paginated transcript of the preliminary injunction hearing held May 5 and 6, which is not yet publicly available on the docket—*see* DE104 & 105.

First, Defendants submitted declarations from six medical experts: a clinical psychologist; three endocrinologists (two specializing in pediatric endocrinology); a pediatrician and bioethicist; and a psychotherapist. DE69-2 through 69-7.

Second, Defendants submitted declarations from parents of gender dysphoric youth and from "detransitioners"—individuals who once identified as transgender, received transitioning treatments, and later regretted the interventions. DE69-26 through 69-39 & DE81-1.

Third, Defendants submitted several important primary documents. These included studies repeatedly referenced in the literature, as well as statements and literature reviews from healthcare authorities across the globe. DE69-8 through 69-25.

Last, Defendants offered live testimony of two witnesses: Dr. James Cantor, Ph.D., a clinical psychologist and Director of the Toronto Sexuality Centre who the court admitted as "an expert on psychology, human sexuality, research methodology, and the state of the research literature on gender dysphoria and its treatment," Tr.254[4]; and Sydney Wright, a young woman who in her late teens was diagnosed

---

[4] The district court discounted Dr. Cantor's testimony because (1) he does not personally "provide[] care to transgender minor[s] under the age of 16," and (2) "he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic." DE112-1:12. Those criticisms are irrelevant to his expertise and testimony on the state of the scientific research evidence. For good measure, though, Defendants will not rely in this brief on any of Dr. Cantor's testimony that depends on his personal care of minors or knowledge of gender clinics in Alabama.

with gender dysphoria, was prescribed testosterone to transition, suffered serious harms from the drugs, and later detransitioned. Tr.351.

### A.    Sex, Gender, and Gender Discordance

Sex and gender are distinct. Sex is biological, encoded in our DNA. DE69-4:2-3. Gender is psychological and sociological—"the psychological and cultural characteristics associated with biological sex." *Id.* at 5. Gender identity, then, "refer[s] to an individual's mental and emotional sense of being male or female." *Id.* Most children—until very recently more than 99%—identify with their biological sex. *Id.* A very small minority do not; their gender is said to be "incongruent" with their sex. *Id.*

There are a number of ways to speak about individuals experiencing gender incongruence. Most broadly is "gender incongruent," "gender discordant," or "gender nonconformant," all of which "refer[] to the extent to which a person's gender identity, role, or expression differs from cultural norms." DE69-18:11. "Transgender" has a similarly broad meaning. The World Professional Association for Transgender Health (WPATH)—the organization Plaintiffs and the district court relied on most, *see* DE112-1:3—uses "transgender" to "describe a diverse group of individuals who cross or transcend culturally defined categories of gender." DE69-18:103. The Endocrine Society, also relied on by Plaintiffs, treats "transgender" as

"an umbrella term for people whose gender identity and/or gender expression differs from what is typically associated with their sex designated at birth." DE69-19:7.

As one of Plaintiffs' *amici*, the American Academy of Pediatrics (AAP) points out, "transgender" is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience." DE78-32:3. According to the AAP, "gender identity can be fluid, shifting in different contexts." *Id.* at 2. The American Psychological Association even reports that some people "experience their gender identity *as* fluid." DE69-25:5 (emphasis added).

## B.    Gender Dysphoria

Unlike "transgender," "gender dysphoria"—formerly called "gender identity disorder"—is a psychiatric diagnosis. According to the current edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), individuals with gender dysphoria (1) "have a marked incongruence" between their biological sex "and their experienced/expressed gender," and (2) experience clinical levels of "distress about this incongruence." DE69-17:4. Until recently, gender dysphoria was typically seen only in (1) a small number of adult men, and (2) a small number of young children, mostly boys.

The two groups represent distinct phenomena. Tr.272-75. "People with adult-onset gender dysphoria typically attend clinics requesting transition services in mid-

adulthood" and "are nearly exclusively male." DE69-2:14-15. They are typically heterosexual, attracted to females. Tr.274.

There is more diversity among sufferers of childhood-onset gender dysphoria. Until recently, they were mostly boys, but not entirely; clinics traditionally reported "2-6 biological male children to each female." DE69-2:17. Many, if not most, of these children also suffer from "significant comorbid mental health disorders, have neurocognitive difficulties such as ADHD or autism[,] or have a history of trauma." DE69-8:4; *see* DE69-2:28-29.

If not given medical interventions to transition—and that is an important "if"—most children with gender dysphoria grow up to identify as gay or lesbian and do not suffer from gender dysphoria as adults. DE69-6:14; DE69-17:7. This fact of desistance—that "[g]ender dysphoria during childhood does not inevitably continue into adulthood," as WPATH puts it, DE69-18:17—is well established in the medical literature. The DSM-5 reports that rates of persistence (that is, non-desistance) range "from 2.2% to 30%" for boys and from "12% to 50%" for girls—meaning that between 97.8% and 70% of gender dysphoric boys and 88% and 50% of gender dysphoric girls will have their dysphoria resolve by adulthood. DE69-17:7. WPATH and the Endocrine Society report similar numbers. DE69-18:17; DE69-19:11.

Despite this robust literature, Plaintiffs made the extraordinary claim below that "the likelihood of [gender dysphoric youth] 'outgrowing' their transgender

11

identity in adolescence or adulthood is virtually nil." DE8:37. None of their experts who testified could support the claim. Dr. Linda Hawkins, who co-directs the Gender & Sexuality Development Program at Children's Hospital of Philadelphia, did not "feel comfortable giving a rate or a percentage" of what she thought "the rate of desistance in childhood dysphoria is." Tr.67. And Dr. Armand H. Antommaria, a pediatrician, agreed that he was "not aware of a study" to support the claim that "[t]he likelihood of" desistance for gender dysphoric youth not given puberty blockers is "infrequent." Tr.228-29.

The corollary consideration to high rates of desistance is whether a clinician can accurately identify the minority of "persisters." The answer is that "[t]here is currently no way to predict who will desist and who will remain dysphoric." DE69-3:6. As Dr. Cantor testified, while "[t]here have been some attempts to develop" a test to determine "which kids will desist and which kids will persist," researchers "have never been able to find a good characteristic, a feature, a pattern, a test result in which the majority continued to want to persist." Tr.276; DE69-2:18-19. The Endocrine Society puts it this way: "With current knowledge, we cannot predict the psychosexual outcome for any specific child." DE69-19:8. Nonetheless—again—Plaintiffs claimed below that persisters are "clearly identifiable." DE8:37. When asked to point to a study to substantiate the claim, Dr. Hawkins could not: "Hopefully soon we will have one from us. I can't point to one [now]." Tr.69.

12

Recently, a new and rapidly growing group of gender dysphoric youth has emerged: adolescents presenting with gender discordance for the first time. Four aspects make this group unique. First, it is composed predominantly of teenaged girls who "lack[] the history of cross-gender behavior in childhood like the childhood-onset cases have." DE69-2:30. Their discordance seems to appear out of nowhere. DE69-20. Second, "[t]he majority of cases appear to occur within clusters of peers and in association with increased social media use and especially among people with autism or other neurodevelopmental or mental health issues." DE69-2:30. Third, whereas childhood-onset is associated with a cross-sex identification, many adolescents identify as "non-binary," "neither male nor female, or both as male and female." DE69-6:26-28. Fourth, this group appeared only within the last decade or so. Gender clinics across the globe have seen the sex and age ratios of their patients flip, while the overall number of patients has skyrocketed. DE69-5:75-76. As Dr. Hawkins put it, clinics like hers are "seeing an increase in youth across the sex spectrum and gender spectrum who are exploring gender…. [T]hat is something that is gaining popularity right now." Tr.75. Below (and at DE69-6:29) is the change at the Gender Identity Service clinic in England, for instance, between 2009 and 2016:



AFAB = assigned female at birth; AMAB = assigned male at birth

\* Indicates $p < .05$ which shows a significant increase of referrals compared to the previous year

## C.    Treatment Options

### 1.    Watchful Waiting

Because desistance is probable, though not inevitable, many clinicians traditionally adopted a "watchful waiting" approach. DE69-2:18. "Watchful waiting does not mean do nothing but passively observe the child," but includes providing therapy to resolve other issues that "may be exacerbating psychological stress or dysphoria." *Id.* at 21. The paradigm recognizes that "[t]he balance of potential risks to potential benefits is very different for groups likely to desist versus groups unlikely to desist: If a child is very likely to persist, then taking on the risks of medical transition might be more worthwhile than if that child is very likely to desist in transgender feelings."

*Id.* at 18. But because there is no diagnostic tool to determine whose gender dysphoria will *persist*—and because we know that most will *desist*—watchful waiting provides treatment while waiting to see whether the dysphoria will continue before experimenting with irreversible interventions. Tr.282. The Alabama Legislature adopted this approach.

## 2. Transitioning

Plaintiffs support a newer, riskier approach: physically transitioning the child, *before* adulthood, to appear as the opposite sex. *See* DE8:12. Transitioning occurs in three main steps. First is the administration of gonadotrophin releasing hormone (GnRH) agonists—puberty blockers—that block signals from the pituitary gland to cause underproduction of sex hormones. DE69-3:12-13. Puberty blockers are traditionally used to treat conditions such as central precocious puberty, when a child begins pubertal development at an abnormally young age; blockers are provided to halt puberty until a normal time. *Id.* The FDA has approved puberty blockers for this use.

The FDA has *not* approved puberty blockers to treat gender dysphoria. When they are used for this purpose, it is not like treating a child with precocious puberty. Although practice varies widely, Plaintiffs' experts agreed that puberty blockers should be administered at the earliest sign of puberty, "Tanner Stage 2." Tr.58, 105, 227. As the WPATH Standards recognize, that can occur in children at "9 years of

15

age." DE69-18:24. So administered, puberty blockers *impose* a diseased state (hypogonadotropic hypogonadism) and disrupt the healthy functioning of the pituitary gland and sex organs. DE69-3:13-15. If followed by cross-sex hormones (which they almost always are), the blockers will permanently disrupt natural puberty. *Id.*

That disruption is significant. A girl at Tanner Stage 2 has not yet menstruated or ovulated, and a boy has not yet produced sperm. *Id.* at 9. Thus, if natural puberty is permanently blocked at this stage (as happens when a child moves on to cross-sex hormones), "the sex glands will be locked in a premature state and incapable of fertility." *Id.*; *see* DE69-8:9 ("[P]uberty blockade followed by cross-sex hormones leads to infertility and sterility."). Sexual function will also be impaired. DE69-3:14.

The second stage of transitioning is the administration of cross-sex hormones. Tr.110. This means providing supraphysiologic doses of testosterone to girls and estrogen to boys. DE69-3:16-19. The intended result is the development of secondary sex characteristics of the opposite sex—girls grow facial hair and their voices deepen; boys develop breasts and softer features.[5] Here again, while the FDA has approved the use of hormonal medications for certain purposes—such as to raise a

---

[5] The district court found that "[t]he primary effect of these treatments"—puberty blockers and cross-sex hormones together—"is to delay physical maturation, allowing transgender minors to socially transition their gender while they await adulthood." DE112-1:3. This is clearly erroneous. As the United States's expert, Dr. Antommaria, testified, "the use of cross-sex hormones [is] to promote the development of secondary sexual characteristics that are consistent with an individual's gender identity." Tr.245.

boy's level of testosterone to a natural range—it has not approved them to treat gender dysphoria. *Id.*

Cross-sex hormones come with significant risks. As even Plaintiffs' preferred gender clinic acknowledges, providing girls with testosterone can lead to infertility, inflamed liver, heart disease, blood clots, hypertension, increased red-blood-cell count, male-pattern baldness, mood changes, and swelling of hands, feet, and legs. DE78-41:9-12. Other effects include irreversible changes to the vocal cords, polycystic ovaries, atrophy of the lining of the uterus, increase in fibrous breast tissue, decrease in normal glandular tissue, and an increased risk of ovarian and breast cancers. DE69-3:17-18. Boys taking estrogen and androgen blockers may experience permanent sterility, the development of breasts, loss of muscle mass, and an increased risk of myocardial infarction, cardiovascular disease, thromboembolism, and breast cancer. DE78-41:1-6; DE69-3:18-19. Nearly all patients who start puberty blockers later receive cross-sex hormones, causing one court in the UK to comment that the treatments are "two stages of one clinical pathway." DE69-15:35. (Dr. Antommaria, who oversees the informed-consent process at his clinic, didn't think it "would be useful and informative to patients" to disclose this information. Tr.228-30.)

The final stage of transition is surgery. Though the district court determined that Plaintiffs did not challenge the State's surgery prohibition, DE112-1:1, 32, it is

important to understand that (1) the use of puberty blockers and cross-sex hormones sets children on a pathway to surgical interventions, DE69-3:20-21, and (2) at least some transition surgeries are performed on minors in America, Tr.235. Transitioning surgeries include mastectomies, metoidioplasty, phalloplasty, and vaginoplasty. DE69-3:19-21. Most of these procedures cannot be reversed, and many cause permanent sterility. *Id.*

### D.  Assessing the Evidence

The first study examining the use of puberty blockers to treat gender dysphoric youth was published in 2011 by a group of Dutch clinicians. Three years later, the clinicians published a follow-up study examining the use of cross-sex hormones and surgical interventions. DE78-33. These studies form the basis of all that has come since. DE69-8:10; DE69-2:20-22.

#### 1.  The Dutch Studies

Though an in-depth look at the Dutch studies is warranted (and provided below, *see* DE74:46-51; DE69-2:20-25; DE69-8:11-13), a few points are worth highlighting. First, the protocol the Dutch studies followed was to use watchful waiting, without social transition, for youth under 12; then to administer puberty blockers when puberty began but not before age 12, cross-sex hormones after age 16, and cross-sex surgeries after age 18. DE69-2:20-21. The participants were questioned about a year-and-a-half after surgery.

Second, the participants were chosen carefully and did not reflect a random sample of gender dysphoric youth. They had childhood-onset gender dysphoria (not adolescent-onset, the norm today), and the clinicians excluded any child with a poor mental-health evaluation. Only 70 children began the study, and only 55 completed it. All the children were given extensive mental health counseling throughout. DE78-33:2-5. Though good for the children, the counseling posed a scientific problem: because there was no control group who received therapy but *not* transitioning treatments, any conclusion that the treatments "improved the mental health of the treated children" cannot be "justified by the data." DE69-2:21-22.

Third, the authors reported that the children given puberty blockers improved slightly on several variables, including depressive symptoms and general functioning. No changes were detected for anxiety, anger, or gender dysphoria. DE69-2:23. As for the participants who went on to cross-sex hormones and surgery, the authors reported that (1) gender dysphoria had resolved for the participants when they were surveyed a year later, and (2) the participants reported psychological well-being outcomes comparable to their peers—just as they had *before* transitioning. DE78-33:6-7; DE69-6:25.

Fourth, there are additional limitations to the study. We do not know, for instance, the participants' long-term outcomes, whether the outcomes would have been different if the participants were not already psychologically healthy before

beginning treatment, or what the outcomes would have been with mental health counseling alone. There are also many unanswered questions regarding the methods the clinicians used that may have skewed the results. *See* DE69-8:10-13. These and other questions called for further research.

### 2.    Beyond the Dutch Protocol

Instead, following publication of the Dutch studies, many clinics and clinicians "proceeded on the basis of the positives only, broadened the range of people beyond those represented in the research findings, and removed the protections applied in the procedures that led to those outcomes." DE69-2:25. The number of gender clinics exploded, DE69-7:31, and many began prescribing hormones to children at younger ages with less mental-health gatekeeping, DE69-2:25. Many of the parents who submitted declarations to the district court experienced this change firsthand, detailing how clinicians ignored their child's comorbidities, urged transition as a cure-all, and raised the specter of suicide *in front of the child* to coerce treatment. *See* DE69-29 through 69-39.

In 2012, the WPATH Standards of Care v.7 departed from the Dutch protocol and endorsed the use of puberty blockers at Tanner Stage 2, even if that meant giving puberty blockers to children at "9 years of age." DE69-18:24. It also devoted two very short paragraphs to cross-sex hormones, which, it said, should "preferably" be given "with parental consent." *Id.* at 26. Five years later, the Endocrine Society

endorsed the treatments in its suggested guidelines. DE78-14:2. In 2018, the AAP weighed in, forcefully rejecting watchful waiting as "outdated." DE78-32:5-6. As Dr. Cantor wrote in a peer-reviewed response, the AAP's statements were particularly egregious, as "the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing watchful waiting." DE69-2:100 (emphasis omitted); Tr.264-67. "AAP has never responded." Tr.266. Other American medical organizations have since chimed in, invoking these guidelines and each other's policy statements as support for transitioning treatments. *E.g.*, DE78-15 & 78-21 through 78-32.

The scientific evidence did not keep up with the zeitgeist. "The latter phases of the Dutch protocol (following puberty blockers with cross-sex hormones and surgery) have never been attempted to be replicated," while all attempts to replicate the minimally positive results of the puberty-blocker study failed. DE69-6:25. In 2020, Britain's National Institute for Health and Care Excellence (NICE) identified nine observational studies concerning puberty blockers and ten for cross-sex hormones. *Every* study was a "small, uncontrolled observational stud[y]," "subject to bias and confounding" with results "of very low certainty." DE69-9:13; *see* DE69-10:13. The puberty-blocker studies suggested "little change" in depression, anger, anxiety, and global and psychosocial functioning. DE69-9:13. As for cross-sex hormones, while some studies reported some improvements, the report emphasized that "[a]ny

potential benefits … must be weighed against the largely unknown long-term safety profile of these treatments." DE69-10:14.

### E.    The Problem of Informed Consent

With the rise of transitioning treatments has come a tragic rise in detransitioners—patients who were prescribed the hormones, altered their bodies (often permanently), and later sought to *de*transition to the extent they could. *See* DE74:67-76. One detransitioner, Sydney Wright, testified that she had been diagnosed with gender dysphoria in her late teens, prescribed testosterone, and suffered immense physical harms as a result. Tr.338. After a year on the treatments, she detransitioned and now identifies with her biological sex. She still suffers health problems: a permanently deep voice, tachycardia, and possible infertility. When asked to identify what she needed when she first presented at a gender clinic, she was clear: "I needed counseling," not large doses of testosterone. Tr.349.

Wright is not alone. Others with similar experiences, like Corinna Cohn, KathyGrace Duncan, and Carol Frietas, provided written testimony to the court. DE69-26; DE69-35; DE69-28. Many parents of gender dysphoric children did so as well, detailing how they felt betrayed by doctors' rush to medically transition their children. *See* DE69-29 through 69-39. Recent studies bear these experiences out. One in the UK "showed that over 10% of young people treated with gender-affirm-ative interventions detransitioned within 16 months of starting treatment." DE69-

6:22. A recent survey of detransitioners found that only about a quarter told their gender doctors that they had detransitioned. DE69-21:11. The district court some-how missed all this evidence, declaring that "nothing in the record shows that medical providers are pushing transitioning medications on minors." DE112-1:24.

### F.    An International Reckoning

As American medical interest groups continue to push transitioning treatments, other countries are responding to the science. *See* DE69-11 through 69-15. In addition to the UK's system-wide evaluation and overhaul of its pediatric gender identity services, Sweden's National Board of Health and Welfare has reviewed the literature and determined that "the risk of puberty suppression treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." DE69-11:3-4. It banned the interventions except in "exceptional cases" or future research settings. *Id.*

Likewise, Finland's Council for Choices in Healthcare has suggested changes to its treatment protocols. DE69-2:51-52; DE69-12. Though allowing for some hormonal interventions under certain conditions, the Council urged caution: "The reliability of the existing studies with no control groups is highly uncertain, and because of this uncertainty, no decisions should be made that can permanently alter a still-maturing minor's mental and physical development." DE69-12:7.

The Royal Australian & New Zealand College of Psychiatrists issued a similar statement in August 2021, recognizing the "paucity of quality evidence on the outcomes of those presenting with Gender Dysphoria." DE69-14:4. France's Académie Nationale de Médecine weighed in this February, urging "great medical caution" when treating gender dysphoric youth "given the vulnerability, particularly psychological, of this population and the many undesirable effects, and even serious complications, that some of the available therapies can cause." DE69-13:1.

Other States are also concerned. Last year, Arkansas banned the administration of transitioning treatments to minors. *See Brandt v. Rutledge*, No. 21-2875 (8th Cir.). And after the district court ruled in this case, Florida's Agency for Health Care Administration released an extensive literature review. *See* Division of Florida Medicaid, *Generally Accepted Professional Medical Standard Determination on the Treatment of Gender Dysphoria* (June 2022), https://ahca.myflorida.com/letkidsbekids/. It concluded: "Considering the weak evidence supporting the use of puberty suppression, cross-sex hormones, and surgical procedures when compared to the stronger research demonstrating the permanent effects they cause, these treatments do not conform to [generally accepted professional medical standards] and are experimental and investigational." *Id.*

### G.    The Alabama Vulnerable Child Compassion and Protection Act

On April 8, 2022, Alabama added its voice to the growing chorus of concern. The Legislature recognized that most children with gender dysphoria grow up to identify with their biological sex; that transitioning interventions are unproven, poorly studied, and carry serious risks; and that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications, including permanent sterility," that may result. Ala. Code §22-12E-2. Accordingly, the Legislature prohibited the administration of transitioning treatments "upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex." *Id.* §22-12E-4(a). The Act does not limit "mental health professionals from rendering the services for which they are qualified." *Id.* §22-12E-6.

### H.    Plaintiffs' Challenge and the District Court's Injunction

Governor Ivey signed the Act on April 8, 2022, and it was set to take effect one month later. Two sets of plaintiffs immediately filed suit, one in the Middle District of Alabama and one in the Northern District. DE112-1:6-8. The Middle District case was transferred to the Northern District, and both cases were assigned to Judge Burke. About two hours later, both sets of plaintiffs dismissed their actions. The lawyers here informed the press: "We do plan to refile imminently." *Id.* at 8.

Judge Burke then noted: "At the risk of stating the obvious, Plaintiffs' course of conduct could give the appearance of judge shopping." *Walker v. Marshall*, 2:22-cv-167 (M.D. Ala. 2022), DE24:3.[6]

Sure enough, on April 19, the lawyers for the Northern District plaintiffs found new plaintiffs—four minors and their parents, two medical professionals, and a Birmingham pastor—"refiled" in the Middle District, and moved for a preliminary injunction. The case was reassigned to Judge Burke, who entered an abbreviated briefing schedule and set a hearing for May 5-6. DE112-1:8. Shortly before Defendants' response brief was due, the United States moved to intervene as a plaintiff. DE58 & 62. The court granted that motion and allowed the United States to participate in the hearing.

On May 19, the district court granted Plaintiffs' motions in part, enjoining enforcement of the Act's ban on administering puberty blockers and cross-sex hormones to transition minors because "at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors." DE112-1:17; *see also* DE112-1:24. This appeal followed. DE108.

---

[6] A panel of three district court judges is currently investigating the lawyers' conduct. *See In re Amie Vague*, 2:22-mc-03977-WKW (M.D. Ala.).

## SUMMARY OF ARGUMENT

This case is about whether Alabama has the authority to weigh the risks and benefits of sterilizing transitioning treatments for minors or whether it must instead seek preclearance from federal judges and interest groups. The answer is clear. "[T]he Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States"—not WPATH or a federal court. *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring) (quotation marks omitted). "That respect for a legislature's judgment applies even when the laws at issue concern matters of great social significance and moral substance." *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, slip op. 77 (U.S. June 24, 2022). "[L]ike other health and welfare laws," Alabama's regulation "is entitled to a 'strong presumption of validity.'" *Id.* (citation omitted).

The district court thus erred when it found in the Due Process Clause a fundamental right for parents "to treat their children with transitioning medications." DE112-1:21. Neither the district court nor Plaintiffs even attempted to show how such a right is deeply rooted in our nation's history and traditions, which it obviously is not. Indeed, courts are in one accord that there is no personal substantive-due-process right for anyone—adult or child—to obtain medical treatments deemed dangerous or experimental by the government, so there is no reason to think that parents have a right to obtain those same treatments for their children. And even if some

novel right to obtain transitioning treatments existed, the Act passes any level of scrutiny: It serves the compelling interest of protecting children from unproven, life-altering medical interventions, and no other approach would offer children in Alabama adequate protection.

The district court likewise erred when it determined that Alabama's ban on sterilizing transitioning treatments violates the Equal Protection Clause. The court reasoned that the Act creates an unlawful, sex-based classification because it "prohibits transgender minors—and only transgender minors—from taking transitioning medications." DE112-1:22. This is wrong on several fronts. For one, Supreme Court and circuit precedent establish that as long as some transgender individuals do *not* seek these treatments, regulating the treatments is not a proxy for discrimination. Two, many gender dysphoric youth will *not* identify as transgender as adults, and an increasing number of youth who receive the interventions will halt them and reidentify with their birth sex, so the Act does not ban the interventions "only [for] transgender minors." Three, "transgender" is not a suspect classification under the Constitution, nor a particularly helpful label in this context; according to Plaintiffs and their *amici*, its amorphous definition encompasses everyone from the mere "gender nonconforming" to those who see their gender identity as "fluid." Four, in any event, it is not an Equal Protection problem to recognize that certain treatments depend on a patient's biological sex. Implanting a fertilized egg in a woman is a

28

treatment for infertility; implanting it in a man is something quite different. And blocking puberty in a four-year-old is not the same as giving puberty blockers to a 13-year-old boy who wants to appear more feminine. Such commonsense, medically necessary distinctions are not barred by the Constitution.

Last, the court abused its discretion in how it weighed the equities. Plaintiffs delayed in suing so their lawyers could judge shop, which should have barred them from equitable relief. And the public interest clearly lies with the people of Alabama in protecting the most vulnerable among us from irreversible damage caused by unproven, sterilizing medical interventions. This Court should reverse.

## STANDARD OF REVIEW

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

This Court "review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). "A district court abuses its discretion if it applies an incorrect legal standard, applies

the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Id.*

## ARGUMENT

I.    **The District Court Erred When It Found In The Due Process Clause A Right For Parents "To Treat Their Children With Transitioning Medications."**

Invoking the Due Process Clause, the district court held that Plaintiffs were "substantially likely" to succeed in their lead argument: "that they have a fundamental right to treat their children with transitioning medications subject to medically accepted standards." DE112-1:16. But the court identified no evidence that such a purported right is deeply rooted in our history or traditions, much less that the Constitution outsources the parameters of such a right to medical interest groups. Though precedent holds that substantive due process extends defined rights to parents in, for example, how to educate their children, this Court has recognized that a parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself." *Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983). Because no adult or child has a fundamental right to transitioning treatments, it necessarily follows that no parent has a right to those treatments for his child. The district court's contrary logic would subject to strict scrutiny every medical regulation, including every FDA decision to

withhold approval of new drugs, whenever a parent takes a contrary view. The Constitution does not require this absurd result.

### A. No Substantive Due Process Right Exists for Parents to Access Transitioning Treatments for Their Children.

"A fundamental right is one that is explicitly or implicitly guaranteed by the Constitution." *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017) (cleaned up). "[O]n its face," "the Due Process Clause guarantees no substantive rights, but only (as it says) process." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (cleaned up). "For that reason, the Supreme Court has been reluctant to expand the concept of substantive due process." *Id*. Courts must "exercise the utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of" the judiciary. *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) (cleaned up).

Courts "analyze a substantive due process claim by first crafting a careful description of the asserted right." *Id.* (cleaned up). "[A] careful description of the fundamental interest at issue" allows courts to "narrowly frame the specific facts" so that they "do not stray into broader constitutional vistas than are called for by the facts of the case at hand." *Id.* at 1344. Once the right has been carefully defined, courts analyze whether the claimed right is "(1) 'objectively, deeply rooted in this Nation's history and tradition' and (2) 'implicit in the concept of ordered liberty,

31

such that neither liberty nor justice would exist if [it] were sacrificed.'" *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1242 (11th Cir. 2004) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

### 1.    Accessing Transitioning Treatments is Not a Fundamental Personal Right.

As an initial matter, neither Plaintiffs nor the district court suggested that a child, a parent, or anyone else has a *personal* substantive due process right to transitioning treatments. That matters because a parental-rights claim is "derivative from, and therefore no stronger than" a personal claim. *Whalen v. Roe*, 429 U.S. 589, 604 (1977); *see Doe*, 696 F.2d at 903. Plaintiffs' claim thus turns on whether the Fourteenth Amendment protects an individual, personal right to sterilizing transitioning treatments.

It does not. Federal courts of appeal have spoken with one voice in rejecting claims of affirmative access to specific medical procedures. This Court, for instance, has rejected the assertion of "a fundamental right to father a child through the use of advanced IVF procedures." *Morrissey*, 871 F.3d at 1269. Notably, the Court first rejected the plaintiff's effort to describe the right broadly as a "fundamental right to reproduce" because "[t]he pertinent question," the Court said, "is not whether the Constitution protects a right to 'procreation' generally," "but rather, more specifically, whether a man has a fundamental right to procreate via an IVF process that necessarily entails the participation of an unrelated third-party egg donor and a

gestational surrogate." *Id.* at 1268-69. Having defined the right, the Court empha-sized that the procedures are "decidedly modern phenomena"; "it wasn't until the mid to late 1980s that doctors began to use gestational surrogates in conjunction with IVF procedures." *Id.* The procedures thus lacked a "deep rooting" in "this Nation's history and tradition." *Id.* (cleaned up).

Likewise, the Supreme Court recently rejected the claim that a fundamental right to abortion could be derived from a broadly defined right to "privacy," which, in turn, could be derived from the Fourteenth Amendment's protection of "liberty." *Dobbs*, slip op. 13-14, 30-31. The Court explained that "[h]istorical inquiries" of the *specific* right in question "are essential whenever [a court is] asked to recognize a new component of the 'liberty' protected by the Due Process Clause because the term 'liberty' alone provides little guidance." *Id.* at 13. Because abortion *specifically* did not have a long lineage in the "history and tradition that map the essential com-ponents of our Nation's concept of ordered liberty," the Court held that the Four-teenth Amendment does not protect it. *Id.* at 14-15.

Every court of appeals to consider whether the Constitution recognizes a fun-damental right to a particular medical treatment has held the same. *See Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (en banc) (no "right to procure and use experimental drugs"); *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007) (no right to medical marijuana);

*Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (no right for termi-
nally ill patients "to take whatever treatment they wished"). In doing so, courts have
recognized a critical distinction between the fundamental right to *reject* "life-saving,
but forced, medical treatment" and a purported right to "*access*" a "potentially harm-
ful" intervention of one's choosing. *Abigail All.*, 495 F.3d at 711 n.19. The former
is deeply rooted in our Nation's history and tradition; the latter is not. *Id.*

Transitioning treatments are neither "deeply rooted" nor "implicit in the con-
cept of ordered liberty." *Williams*, 378 F.3d at 1242. Like the IVF procedures in
*Morrissey*, they are "decidedly modern phenomena." 871 F.3d at 1269. And when
applied to children, they are outright *experimental*: In 2015, for instance, the Na-
tional Institutes of Health began funding a five-year *experiment* to study, for the first
time in the United States, transitioning treatments for transgender youth. *See* Juliana
Bunim, *First U.S. Study of Transgender Youth Funded by NIH*, U.C. San Francisco
(Aug. 17, 2015), https://perma.cc/URA6-CERX.

The district court thought that the treatments are not experimental because the
same drugs have been used "to treat medical conditions other than gender dyspho-
ria." DE112-1:18. To be sure, puberty blockers are FDA approved to treat children
with precocious puberty, and doctors regularly prescribe estrogen to girls with es-
trogen deficiencies. But that does not mean every *treatment* using these drugs is the
same. As Plaintiffs' expert Dr. Ladinsky agreed, providing a dose of testosterone to

a boy suffering from a testosterone deficiency is "a different treatment altogether" from providing the same dose to a boy wanting testosterone for body building. Tr.143-44. So with the transitioning treatments here.

The district court also repeatedly emphasized that "at least twenty-two major medical associations" endorse transitioning treatments. DE112-1:17; *see also* DE112-1:4 & n.4, 9-10, 19, 24. That information could be relevant to a "legislative committee" crafting the law, but "[t]he [c]ourt did not explain why" the "position of the American Medical Association" and other interest groups "shed[s] light on the meaning of the Constitution." *Dobbs*, slip op. 48 (cleaned up). States are not required to forfeit their right to regulate medicine whenever a parent and some critical mass of medical interest groups have a different opinion.

Governments have regulated medicine since at least Hammurabi. *See* Claudio Violato, *A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners*, 2 J. Sci. & Med. 122, 122-23 (2016). That remained true at the founding. Ann M. Becker, *Smallpox in Washington's Army: Strategic Implications of the Disease During the American Revolutionary War*, 68 J. Mil. Hist. 381, 387-88 (2004). And it has remained true in modern times, when States have been forced to protect their citizens from medical interest groups that dismissed as "opiodphobic" concerns about "overreliance on opioids." David W.

35

Baker, *The Joint Commission's Pain Standards: Origins and Evolution* 4 (May 5, 2017) (footnotes omitted), https://perma.cc/RZ42-YNRC.

In fact, as examples like eugenics and lobotomies show, we should *want* States to do their homework rather than blindly following the self-proclaimed consensus of "major medical associations." DE112-1:4 & n.4, 9-10, 17, 19, 24. Not long ago, "[t]he most important elite advocating eugenic sterilization was the medical establishment," "with near unanimity"; "every article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice." Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 66 (2016). While federal courts were apparently swayed by these major medical associations, *see Buck v. Bell*, 274 U.S. 200, 207 (1927), States today need not defer to a medical establishment that is once again advocating for sterilizing interventions. Tr.134. "The Constitution does not prohibit the citizens of each State from regulating or prohibiting" these treatments. *Dobbs*, slip op. 79.

> **2.    Parents Cannot Obtain Transitioning Treatments for Their Children That Neither They Nor Their Children Have a Fundamental Right to Obtain for Themselves.**

In an attempt to get around the above precedent, the district court reversed the analysis. Rather than viewing the parental-right claim as "derivative from, and therefore no stronger than" a personal claim, *Whalen*, 429 U.S. at 604, the court said that the "more specific right" of parents to "treat their children with transitioning

medications" flowed from their general "right to direct the medical care of their children." DE112-1:21. This cannot be right. *Dobbs*, slip op. 32. If neither the parent nor the child has a personal, fundamental right to access the interventions, then the parent acting on the child's behalf cannot access them, either. *Doe*, 696 F.2d at 903.

This understanding comports with parental rights more generally. "Although the text of the Constitution contains no reference to familial or parental rights," "Supreme Court precedent" recognizes that parents have a fundamental right to make certain "decisions concerning the care, custody, and control of their children." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 816 (11th Cir. 2004) (cleaned up). Though "care, custody, and control" is a convenient shorthand, parents do not have a right over everything bearing on a child's care, custody, and control. The Supreme Court has made clear that "rights of parenthood" are "not beyond regulation in the public interest" or in matters "affecting the child's welfare." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). And this Court has repeatedly refused to find new "alleged parental liberty interests" in "the murky area of unenumerated constitutional rights," *Robertson v. Hecksel*, 420 F.3d 1254, 1256 (11th Cir. 2005) (citation omitted), and has defined those alleged rights narrowly, *e.g.*, *id.* at 1258 (no "right to companionship with an adult child"); *Lofton*, 358 F.3d at 815 (no "fundamental right to family integrity for groups of individuals").

The district court eschewed this precedent, hanging its entire analysis on dicta from two cases assuming a general right of parents to "make decisions concerning the treatment to be given to their children." DE112-1:16 (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990)). Neither case supports the district court's drive-by reliance.

The first, *Parham v. J.R.*, 442 U.S. 584 (1979), was a *procedural* due process case involving forced institutionalization founded on a child's "protectible interest" in "being free of unnecessary bodily restraints … because of an improper decision by the state hospital superintendent." 442 U.S. at 601. The parent's rights were implicated only to the extent that the state procedures for enabling the child to exercise her rights limited the parent's authority. *Id.* at 604. The Court emphasized that "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized," *id.* at 602-03 (cleaned up), and that parents "cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized," *id.* at 604.

The second case, *Bendiburg*, concerned a lawsuit brought by a father whose child had been temporarily removed from his custody after the father refused to consent to major surgery. The State then authorized the surgery, which *led to the child's death*. 909 F.2d at 467. This Court rejected the father's substantive-due-process claim: "Parental autonomy may be limited when parental decisions jeopardize the

health or safety of a child, and the state can intercede on the child's behalf." *Id.* at 470. Both *Parham* and *Bendiburg* thus reject the district court's vision of unrestrained parental authority.

"Particularly in view of the ethical issues" and ongoing public controversy, the district court erred by recognizing a new fundamental right that would "place the matter outside the arena of public debate and legislative action." *Morrissey*, 871 F.3d at 1270. Parents have an important role in directing the medical care of their children, but that does not mean they have a fundamental right *as parents* to obtain interventions for their children that neither they nor their children have a personal, fundamental right to access—particularly where the novel interventions threaten children's "health and safety." *Dobbs*, slip op. 78. "The mere novelty of [Plaintiffs'] claim is reason enough to doubt that 'substantive due process' sustains it," and "the alleged right certainly cannot be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Reno v. Flores*, 507 U.S. 292, 303 (1993) (cleaned up).

## B.    The Act Satisfies Any Level of Scrutiny.

Because no fundamental right is at stake, Alabama's law, "like other health and welfare laws, is entitled to a 'strong presumption of validity.'" *Dobbs*, slip op. 77 (citation omitted). "It must be sustained if there is a rational basis on which the

legislature could have thought that it would serve legitimate state interests." *Id.* The Act easily survives such scrutiny.

The district court instead erroneously subjected the Act to strict scrutiny. DE112-1:21. The Act survives this standard, too.

First, the State has several compelling interests served by the Act. "It is indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756-57 (1982)). The State also has an interest in regulating medicine and experimental medical treatments on minors in Alabama. *See Dobbs*, slip op. 50 ("[C]ourts [generally] defer to the judgments of legislature in areas fraught with medical and scientific uncertainties.") (cleaned up); *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (States have "a significant role to play in regulating the medical profession").

The Alabama Legislature determined that transitioning treatments for minors are poorly studied, unproven, and dangerous—inflicting many potential harms, several of which are already known too well. Ala. Code §22-12E-2. Yet the district court believed that the State's interest in protecting children is not "genuinely compelling" because, it said, "Defendants fail[ed] to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria." DE112-1:19-20. This is a jaw-dropping conclusion when the court

40

itself recognized that "[k]nown risks" of these interventions "include loss of fertility and sexual function." *Id.* at 3. As Sydney Wright told the court: "It took my right away to have children." Tr.351; *see also, e.g.*, DE69-26:4.

The court also said that Defendants did not "offer evidence to suggest that healthcare associations are aggressively pushing these medications on minors." DE112-1:19. The most this finding shows is that the court failed to consider the evidence before it. Martha S. explained how her child was recommended for hormones after *one* visit with a psychologist. DE69-34:3-4. John Roe recounted how his son's therapist ignored his comorbidities, fixated solely on gender dysphoria, and threatened the parents that children who do not transition are likely to attempt suicide. DE69-31:4. Other parents submitted similar stories. *See* DE69-29 through 69-39. There can be little doubt that life-altering transition treatments implicate the State's compelling interest in protecting children.

Next, the Legislature determined that it had no less-burdensome way to protect children than to ban the interventions altogether. This determination makes sense given the nature of transitioning treatments.

Start with diagnosis. Though a doctor can determine whether a child reports to be in distress due to the incongruence he feels between his sex and his still-forming gender identity, the doctor cannot determine whether the child's dysphoria will persist into adulthood. DE69-2:19. Thus, even if the treatments at issue were

41

beneficial to youth whose gender dysphoria persisted into adulthood (which has not been proven), the Legislature would still have every reason to ban them because there is no way to tell who those children are—and guessing wrong would be catastrophic.

But it's worse than that. Not only is there no way to accurately predict persistence, but we know that the majority of gender dysphoric youth will *not* persist. DE69-2:17; DE69-17:7; DE69-18:17; DE69-19:11. So it is more likely that a clinician will guess *wrong* and provide transitioning interventions to a child whose dysphoria would otherwise desist than that she will guess *right* and correctly pick out the persister. Plaintiffs attempted to get around these statistics by emphasizing a "three-dimensional assessment," Tr.366, to assure the court that their doctors—unlike those at the leading gender clinics in the world, and unlike those who treated Sydney Wright—guess correctly. *See also* Tr.372 (Plaintiffs' lawyer lamenting: "if only Ms. Wright had had a doctor like Dr. Hawkins…"). But when pressed to cite a study to back up their extraordinary claims, neither Dr. Hawkins nor Dr. Antommaria could do so. Tr.67, 228-29. Not having to accept their say-so over the published literature, the Legislature had every reason to ban interventions that rely on roulette-like odds.

Moreover, those odds are for the traditional patient profile that we know the most about—the childhood-onset gender dysphoria that occurs most often in boys.

But adolescent girls have now become the default patient, and their dysphoria is associated with peer clusters and social media use. DE69-6:24; DE69-2:30; DE69-7:5-37. Given these significant differences, until more research occurs, "one cannot apply findings from the other types of gender dysphoria to this type." DE69-2:30-31.

It gets worse still. Not only is it impossible to tell who would benefit from the interventions if they worked the way Plaintiffs and their *amici* say, but the evidence does not even show that the treatments offer long-term benefits when they are administered under the most conservative conditions. The initial promise of the Dutch experiments has not borne fruit, as efforts to replicate their negligible success have failed. DE69-2:25-28. And the evidentiary basis for using puberty blockers or cross-sex hormones has not grown otherwise. *E.g.*, DE69-9:12; DE69-10:14.

So much for the benefits. Turning to the risks, everyone agrees that the treatments come with significant risks of irreversible harm: permanent sterility, loss of sexual function, loss of bone density, myocardial infarction, cancer, the list goes on. DE69-3:12-19; DE78-41. Weighing the risks and benefits, Alabama could reasonably determine, as did Sweden, that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." DE69-11:3.

43

The district court fixated on the fact that European countries have not banned the treatments, instead "allow[ing] minors to take transitioning medications in exceptional circumstances." DE112-1:20. But neither Plaintiffs nor the United States could articulate how the State could write such a law, Tr.88-90, and Alabama did not have to regulate in the same way treatments whose risks exceed their benefits. Nor are "bans" unusual in this context: as Plaintiff Dr. Koe agreed, when the FDA refuses to approve a drug with severe side effects in a tiny fraction of the population, it prohibits the vast majority of the population—who would benefit from the drug— from obtaining it. Tr.186. Alabama can take the more modest step of prohibiting treatments whose risks likely exceed their benefits for *most* (if not all) children.

The district court also offered the extraordinary criticism that the Act "does not even permit minors to take transitioning medications for research purposes, even though Defendants adamantly maintain that more research on them is needed." DE112-1:21. Of course more research is needed, but Alabama is not required to volunteer its children as guinea pigs to be sterilized.

The Act survives strict scrutiny. The Legislature's interest in protecting children is compelling and is served by a narrowly tailored ban on providing transitioning treatments to minors. Notably, given the State's particular interest in protecting children, the State did *not* ban the procedures for consenting adults (though it could have done that, too, given the medical uncertainties and harms involved). Nor did it

44

restrict other, safer, and more effective treatments for treating gender dysphoria, such as exploratory psychotherapy; it expressly *protected* those treatments. *See* Ala. Code §22-12E-6. Finally, the Act carefully exempts minors born with certain "medically verifiable disorder[s] of sex development," recognizing that these unique cases may involve different treatment considerations. *Id.* §22-12E-4(b).

Instead of deferring to the Legislature, the court credited Plaintiffs' *amici*—"twenty-two major medical associations in the United States [that] endorse transitioning treatments as well-established, evidence-based treatments for gender dysphoria in minors." DE112-1:19. But if government by consensus is the rule, the Constitution cares about the consensus of legislators, not medical interest groups. And to the extent the district court simply thought it lacked time to grapple with all the studies and expert evidence Defendants presented, *see* Tr.287-89, the answer at the preliminary injunction stage was to defer to the Legislature, not to require the State to seek preclearance from Plaintiffs' self-interested *amici*. Alabama's law does not violate the Due Process Clause.

## II.    The District Court Erred When It Determined That Banning Sterilizing Transitioning Treatments Likely Violates The Equal Protection Clause.

Turning to Plaintiffs' Equal Protection claim, the district court justified its application of heightened scrutiny on the ground that the Act "constitutes a sex-based classification" by "prohibit[ing] transgender minors—and only transgender

minors—from taking transitioning medications due to their gender nonconformity."
DE112-1:22. This understanding badly confuses both the Act and relevant Equal
Protection precedents. The Act does not discriminate based on sex or gender iden-
tity: no male or female can be subjected to the regulated experimental procedures.
Nor are these discrete and defined procedures a proxy for transgender status: many
transgender youth do not seek them, and youth who are *not* transgender are regularly
subjected to them.

Even if the district court were right that only transgender minors seek these
procedures, it would not matter. "The regulation of a medical procedure that only
one sex can undergo does not trigger heightened constitutional scrutiny unless the
regulation is a 'mere pretex[t] designed to effect an invidious discrimination against
members of one sex or the other.'" *Dobbs*, slip op. 11 (quoting *Geduldig v. Aiello*,
417 U.S. 484, 496 n.20 (1974)). So, in *Dobbs*, the Supreme Court applied rational-
basis review to uphold Mississippi's abortion regulation, even though only women
can have abortions. *Id.* at 77. As the Court explained in *Geduldig*, the "group" of
*non*-pregnant people "includes members of both sexes," demonstrating a "lack of
identity" between pregnancy and sex. 417 U.S. at 496 n.20. The same "lack of iden-
tity" exists here between the Act and transgender status because many transgender
minors do not seek these transitioning treatments. Regardless, even if heightened

46

scrutiny applies, the Act survives by advancing the State's compelling interest in protecting children from dangerous, experimental treatments.

### A.    The Act Does Not Discriminate Based on Sex or Transgender Status.

On its face, the Act draws distinctions on two bases: age and procedure. Neither is among the suspect classifications that courts have identified for Equal Protection purposes. *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991); *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Act does not discriminate based on sex. No minor, regardless of sex, can obtain the transitioning treatments. Yet the district court held that the Act discriminates based on sex because "[g]overnmental classification based on an individual's gender nonconformity" always "equates to a sex-based classification." DE112-1:22. And, according to the district court, the Act discriminates based on "gender nonconformity" because "only transgender minors" "tak[e] transitioning medications." *Id.* Both holdings are in error.

Starting with the latter, the claim that "only transgender minors" seek the regulated treatments is both factually wrong and legally irrelevant. Under the Act, two categories exist. The first category is minors who seek certain experimental procedures "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex." Ala. Code §22-12E-4(a). The second category is all other minors.

Transgender individuals may be in either category. As even Plaintiffs and their *amici* recognize, there are both transgender people and non-transgender people who choose not to undergo gender transition procedures. *See, e.g.*, DE1:12; DE78-11:21; DE69-18:11, 14-15. The DSM-5 recognizes that only *some* transgender people suffer from gender dysphoria because not all transgender people experience clinical levels of distress caused by their gender incongruence. DE69-17:4-5. And according to WPATH, some individuals who suffer from gender dysphoria "do not feel the need to feminize or masculinize their body" and find that "changes in gender role and expression are sufficient to alleviate gender dysphoria." DE69-18:14-15. Accordingly, the Act's regulation of experimental procedures is not a proxy for transgender status.

This conclusion is bolstered by the fact that non-transgender individuals may be in either category, too. As noted above, many—perhaps most—children and adolescents that may seek the experimental procedures (and identify as transgender now) will likely *not* identify as transgender as adults. That was the case for Sydney Wright, Tr.357, and KathyGrace Duncan, DE69-35. In a field where so much is unknown, at least this fact is well established: the vast majority of youth suffering from gender dysphoria will not identify as transgender as adults. DE69-2:17; DE69-18:17; DE69-19:11; DE69-17:7.

Because the two categories created by the Act both include transgender and non-transgender minors, the Act does not discriminate based on transgender status. Indeed, the Supreme Court has repeatedly rejected the uneven-impact analysis on which the district court's transgender-discrimination-by-proxy theory rests. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979) ("[M]any [laws] affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law.").

In *Geduldig*, for example, the Court held that a state insurance policy that excluded coverage for pregnancies did not classify on the basis of sex. 417 U.S. at 495-97. The Court explained that the classification at issue created two groups: pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively female, the second includes members of both sexes," revealing a "lack of identity" between pregnancy and sex. *Id.*; *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1331-32 (11th Cir. 2021) (Pryor, C.J., dissenting) (applying *Geduldig* to law that "does not facially classify on the basis of transgender status"), *vacated pending reh'g en banc*, 9 F.4th 1369.

The Supreme Court has applied the same analysis in the context of abortion regulations, explaining that "'[w]omen seeking abortion' is not a qualifying class." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993). The Court instead has recognized that, even though "only one sex can undergo" the procedure,

"laws regulating or prohibiting abortion are … governed by the same standard of review as other health and safety measures": rational basis. *Dobbs*, slip op. 11.

Likewise here. The Act protects against certain experimental procedures, regardless of who is subjected to them. The district court's rejoinder—that the "category" of "minors who seek transitioning medications" "consists entirely of transgender minors," DE112-1:22-23—misses the point entirely. Just as some women are in the nonpregnant class (*Geduldig*) and many women do not seek abortions (*Bray* and *Dobbs*), some transgender minors do *not* seek these experimental procedures. That means there is a "lack of identity" between the Act's medical-procedure distinction and transgender status. Plus, the identity between regulated practice and class is even more detached here because (*contra* the district court) not all children seeking these interventions are transgender. So it makes even less sense to say that this Act discriminates based on transgender status than it would to say that the laws in *Geduldig*, *Bray*, and *Dobbs* discriminated based on sex.

## B.    Even Assuming a Distinction Based on Transgender Status, Rational Basis Review Still Applies.

The district court believed that *all* "[g]overnmental classification[s] based on an individual's gender nonconformity equate[] to a sex-based classification for purposes of the Equal Protection Clause." DE112-1:22. But even assuming the Act discriminates based on transgender status, any such discrimination would not be equivalent to discrimination based on sex. The Act focuses on meaningful and

unavoidable biological differences between sexes, and neither precedent nor logic supports applying equal protection principles where individuals are not similarly situated.

The district court assumed that *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), together subject all transgender classifications to heightened scrutiny. But these decisions are more limited in scope than the district court suggested, and they do not govern situations where the law's classifications are tied to meaningful biological differences between the sexes. *Bostock* interpreted Title VII, reading that statute to mean that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." 140 S. Ct. at 1741. The core of *Bostock*'s reasoning was that an employer that "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" discriminates based on sex under Title VII because those persons are "similarly situated" for employment purposes. *Id.* at 1740-41. *Bostock* did not resolve the construction of any other statute, much less the Equal Protection Clause, and it expressly reserved answering "[w]hether other policies and practices might or might not qualify as unlawful discrimination." *Id.* at 1753.

Likewise, this Court in *Brumby* subjected to intermediate scrutiny governmental employment decisions "based upon gender stereotypes," stating that "we are

beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group." 663 F.3d at 1316, 1320 (cleaned up).

This reasoning does not translate to the medical context when males and females are *not* similarly situated. *See Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause … is essentially a direction that all persons similarly situated should be treated alike."). Take in vitro fertilization. A fertility clinic would not discriminate on the basis of sex by deciding to implant fertilized eggs only in females. There is no stereotype or inequality in that policy because implanting the egg in a male would be a different procedure. Similarly, screening women for ovarian cancer while screening men for testicular cancer is not discrimination. As Plaintiff Dr. Koe recognized, she does not discriminate based on sex when she performs testicular exams only on males or when she looks for different signs of puberty in males versus females. Tr.187-89. If the law were otherwise, even WPATH's vaunted standards would be considered discriminatory; they depend on sex-based differences to determine which hormones to administer. DE69-18:25-26; *see also* Tr.188-89.

Transitioning treatments are also unavoidably tied to meaningful biological differences between the sexes. For instance, ensuring that a boy has testosterone levels within a normal range is not the same treatment as ramping up a young girl's

testosterone levels to that of a healthy boy—or, for that matter, as providing the hormone to a Tour de France cyclist seeking a yellow jersey. The Act uses sex only to determine who would benefit from certain drugs and who would not. To put it in *Bostock*'s terms, it is *not* true that but for a child's sex, he or she could be given cross-sex hormones to transition. While a boy may be prescribed testosterone to treat his delayed puberty, the prescription is not "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex." Ala. Code §22-12E-4(a). Different purposes and different risks make these different procedures. *See* Tr.143-44; DE69-4:11-12.

Laws premised on such biological differences are "consistent with the constitutional guarantee of equal protection." *Nguyen v. I.N.S.*, 533 U.S. 53, 59 (2001). In *Nguyen*, for example, the Supreme Court confronted a law that "impose[d] different requirements for the child's acquisition of citizenship depending upon whether the citizen parent is the mother or the father." *Id.* at 56-57. The Court upheld the law, emphasizing that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63. Where the law "takes into account a biological difference between the parents," "differential treatment is inherent in a sensible statutory scheme" and "is neither surprising nor troublesome from a constitutional perspective." *Id.* at 63-64. The Court emphasized that "[m]echanistic classification of all our differences as stereotypes would operate to obscure those

53

misconceptions and prejudices that are real." *Id.* at 73; *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The two sexes are not fungible.").

Though the Court in *Nguyen* applied heightened scrutiny, its teachings are relevant here to show that where a law focuses on biological differences between males and females, *Bostock*'s equivalence between transgender distinctions and sex discrimination does not hold. While "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock*, 140 S. Ct. at 1741, an individual's sex is often critically relevant to medical treatments. To the extent that the range of experimental medical procedures regulated by the Act discriminate in any way, it is only "as a matter of biological inevitability." *Nguyen*, 533 U.S. at 65. "To fail to acknowledge even our most basic biological differences … risks making the guarantee of equal protection superficial, and so disserving it." *Id.* at 73. "The difference between" girls and boys "is a real one, and the principle of equal protection does not forbid [a State] to address the problem at hand in a manner specific to each gender." *Id.*[7]

---

[7] The district court did not find that transgender status itself is a suspect or quasi-suspect classification. For good reason: as Defendants explained below, DE74:103-108, Plaintiffs did not even attempt to establish *with evidence* that the class of transgender individuals (1) has "been subjected to discrimination" "[a]s a historical matter," (2) exhibits "immutable" "characteristics that define them as a discrete group," and (3) is "politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). Such a claim is not plausible, particularly given that the Supreme Court has held that even the mentally disabled—who had been "subjected to … grotesque

In short, the Act does not rely on an impermissible sex classification or on sex stereotypes. Rather, it is doctors administering transitioning treatments who prioritize stereotypes by permanently altering children to bring their appearances in line with stereotypes associated with the opposite sex. The State simply seeks to protect children from the harms that accompany those interventions. And the line the Act draws reflects the fact that biological males are not the same as biological females. A boy who can't be castrated for transition purposes cannot be compared to a girl, because a girl could *never* be castrated. A girl who can't be given testosterone for transition purposes is not similarly situated to a boy being treated for delayed puberty. Because the Act does not discriminate based on sex, heightened scrutiny does not apply. And even if it did, the Act's classifications easily pass intermediate scrutiny for the reasons explained above. *See supra* pp. 39-45. The State has a compelling interest in protecting children from dangerous, unproven treatments that threaten permanent bodily harm and sterilization.

### III.    The District Court Abused Its Discretion In Rewarding Plaintiffs' Misconduct.

Besides getting the law wrong, the district court also abused its discretion when it came to weighing the equities. First, Plaintiffs prioritized judge shopping

---

mistreatment," including compulsory sterilization in at least 32 states—did not constitute a quasi-suspect class. *Cleburne Living Ctr. v. Cleburne*, 726 F.2d 191, 197 (5th Cir. 1984), *aff'd in part and vacated in part*, 473 U.S. 432 (1985).

over timely adjudication, which should have barred them from obtaining equitable relief. As Defendants detailed below, *see* DE74:148-54, Plaintiffs' counsel engaged in dilatory, manipulative judge-shopping when they: initially filed suit representing a different set of plaintiffs in the Northern District; agreed to consolidate their case with a similar one from the Middle District when both sets of plaintiffs thought Judge Axon would be presiding; dismissed their suit when it was assigned to Judge Burke; told media they planned to "refile" imminently; sought out a new set of plaintiffs (Tr.200-01); and "refile[d]" in the Middle District to try to get a new judge. Plaintiffs' attempt "to manipulate the judicial process" should have barred their claim for injunctive relief. *Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992).

Second, Plaintiffs' judge shopping delayed their current suit, undermining any claim that they needed emergency relief. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Third, Plaintiffs did not carry their burden of showing that minors would be irreparably harmed absent an injunction. On the contrary, the Legislature found, and both Plaintiffs and the district court agreed, that transitioning treatments can cause significant harms, "includ[ing] loss of fertility and sexual function." DE112-1:3. And even if the transitioning treatment could theoretically benefit *some* child, practitioners have no way of knowing *ex ante* whether the treatments would benefit any

*particular* child because (among other things) there is no proven way for a clinician to separate the minority of persisters from the majority of desisters.

Fourth, the district court erroneously discounted the public interest, which is in enforcing the law its representatives enacted to protect children in Alabama. Because of the district court's order, more children will begin taking puberty blockers that weaken their bones and stunt the growth of their sex organs. Almost all of those children will go on to cross-sex hormones and risk permanent sterility. That cannot be the "enduring American tradition" the district court sought to affirm. DE112-1:31.

## IV.    The District Court Abused Its Discretion By Entering A Universal Injunction.

Even if the court below were right to grant some form of preliminary relief, it abused its discretion when it barred Defendants from enforcing the Act against *anyone*. Whatever risks or benefits the court thinks these Plaintiffs proved cannot be extrapolated to every doctor or child in the State, so relief should not have extended statewide.

More fundamentally, the court went beyond its authority to adjudicate an Article III "case or controversy" when it granted Plaintiffs a universal injunction even though they represented no class (and even though its injunction benefitted former plaintiffs like Dr. Ladinsky who abandoned their claims in furtherance of judge shopping, *see* Tr.119). "The fundamental principle of equity guiding the court" when

it issues an injunction "is that injunctive relief should be limited in scope to the extent necessary to protect the interests *of the parties*." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021) (cleaned up, emphasis added). Because the "district court fail[ed] to follow this principle and draft[ed] an unnecessarily broad injunction, the district court abuse[d] its discretion." *Id*.

## CONCLUSION

The Court should reverse the district court's preliminary injunction.

Respectfully submitted,

Steve Marshall
   *Alabama Attorney General*

<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
   *Solicitor General*

Christopher Mills

SPERO LAW LLC
557 East Bay Street
#22251
Charleston, SC 29451
Telephone: (843) 606-0640
cmills@spero.law

A. Barrett Bowdre
Thomas A. Wilson
   *Deputy Solicitors General*

James W. Davis
   *Deputy Attorney General*

Benjamin M. Seiss
   *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

JUNE 27, 2022

*Counsel for State Defendants*

58

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i). This brief contains 12,991 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.      In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I certify that on June 27, 2022, I electronically filed this document using the

Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for State Defendants*