No. 22-11707

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

BRIEF FOR AMICI CURIAE DETRANSITIONERS
IN SUPPORT OF DEFENDANTS-APPELLANTS SEEKING REVERSAL

Vernadette R. Broyles
Mary E. McAlister
Joel H. Thornton
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org
mmcalister@childparentrights.org
jthornton@childparentrights.org
Attorneys for Amici Curiae

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.    Academic Pediatric Association – Amicus Curiae;

2.    Alabama Chapter of the American Academy of Pediatrics – Amicus Curiae;

3.    Alaska, State of – Amicus Curiae;

4.    American Academy of Child and Adolescent Psychiatry – Amicus Curiae;

5.    American Academy of Family Physicians – Amicus Curiae;

6.    American Academy of Pediatrics  – Amicus Curiae;

7.    American Academy of Nursing – Amicus Curiae;

8.    American Association of Physicians for Human Rights, Inc. – Amicus Curiae;

9.    American College of Obstetricians and Gynecologists – Amicus Curiae;

10.    American College of Osteopathic Pediatricians – Amicus Curiae;

11.    American College of Physicians – Amicus Curiae;

12.    American Medical Association – Amicus Curiae;

13.    American Pediatric Society – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

14.    American Psychiatric Association – Amicus Curiae;

15.    Association of American Medical Colleges – Amicus Curiae;

16.    Association of Medical School Pediatric Department Chairs – Amicus
       Curiae;

17.    Anderson, Tom – Defendant;

18.    Arizona, State of – Amicus Curiae;

19.    Arkansas, State of – Amicus Curiae;

20.    Baia, Elizabeth – Counsel for Medical Amici;

21.    Bailey, Daryl D. – Defendant;

22.    Baylock, C. Wilson – Defendant;

23.    Becker, Laura – Detransitioner Amicus

24.    Boe, Brianna – Plaintiff (pseudonym);

25.    Bowdre, Alexander Barrett – Counsel for Defendants;

26.    Broyles, Vernadette R.– Counsel for Detransitioner Amici

27.    Burke, Liles C. – U.S. District Court Judge;

28.    Burleigh, Billy – Detransitioner Amicus

29.    Cantrell, Michael A. – Counsel for Amici States;

30.    Carr, Danny – Defendant;

31.    Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

32.    Davis, James William – Counsel for Defendants;

33.    Doss, Jeffrey P. – Counsel for Plaintiffs;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

34.  Eagan, Melody Hurdle – Counsel for Plaintiffs;

35.  Endocrine Society (The) – Amicus Curiae;

36.  Eknes-Tucker, Paul A. – Plaintiff;

37.  Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

38.  G., C. (pseudonym) – Detransitioner Amicus

39.  Georgia, State of – Amicus Curiae;

40.  Indiana, State of – Amicus Curiae;

41.  Isasi, William – Counsel for Medical Amici Curiae;

42.  Ivey, Kay – Defendant;

43.  Kerschner, Helena – Detransitioner Amicus

44.  Koe, Rachel – Plaintiff (pseudonym);

45.  LaCour, Edmund G. (Jr.) – Counsel for Defendants;

46.  Lannin, Cortlin H. – Counsel for Medical Amici Curiae;

47.  Lanosa, Michael – Counsel for Medical Amici Curiae;

48.  Lareau, Alyssa C. – Counsel for Intervenor-Plaintiff;

49.  Levi, Jennifer L. – Counsel for Plaintiffs;

50.  Louisiana, State of – Amicus Curiae;

51.  Marshall, Steve – Defendant;

52.  McAlister, Mary E. – Counsel for Detransitioner Amici

53.  McCoy, Scott D. – Counsel for Plaintiffs;

54.  Medical Association of Pediatric Nurse Practitioners – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

55.     Mills, Christopher Ernest – Counsel for Defendants;

56.     Mississippi, State of – Amicus Curiae;

57.     Missouri, State of – Amicus Curiae;

58.     Moe, Jane – Plaintiff (pseudonym);

59.     Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

60.     Montana, State of – Amicus Curiae;

61.     Nebraska, State of – Amicus Curiae;

62.     Noe, Kathy – Plaintiff (pseudonym);

63.     Oklahoma, State of – Amicus Curiae;

64.     Oladeinbo, Gilbert Olusengun – Counsel for Plaintiffs;

65.     Orr, Asaf – Counsel for Plaintiffs;

66.     Pediatric Endocrine Society – Amicus Curiae;

67.     Peterson, Misty L. – Counsel for Plaintiffs;

68.     Poe, Megan – Plaintiff (pseudonym);

69.     Powers, John Michael – Counsel for Intervenor-Plaintiff;

70.     Pratt, James Andrew – Counsel for Plaintiffs;

71.     Ragsdale, Barry Alan – Counsel for Medical Amici;

72.     Ray, Brent P. – Counsel for Plaintiffs;

73.     Reinke, Adam – Counsel for Plaintiffs;

74.     Reynolds, Laura – Detransitioner Amicus

75.     Schwabauer, Barbara– Counsel for Intervenor Plaintiff USA

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

76.   Seiss, Benjamin Matthew – Counsel for Defendants;

77.   Shortnacy, Michael B. – Counsel for Plaintiffs;

78.   Smalts, Laura Perry – Detransitioner Amicus

79.   Smith, John (pseudonym) – Detransitioner Amicus

80.   Societies for Pediatric Urology – Amicus Curiae;

81.   Society of Adolescent Health and Medicine – Amicus Curiae;

82.   Society for Pediatric Research – Amicus Curiae;

83.   Society of Pediatric Nurses – Amicus Curiae;

84.   Soto, Diego Armando – Counsel for Plaintiffs;

85.   South Carolina, State of – Amicus Curiae;

86.   Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

87.   Stone, Jessica Lynn – Counsel for Plaintiffs;

88.   Terry, Abigail Hoverman – Counsel for Plaintiffs;

89.   Texas, State of – Amicus Curiae;

90.   Thornton, Joel H. – Counsel for Detransitioner Amici

91.   Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

92.   United States of America – Intervenor-Plaintiff;

93.   Utah, State of – Amicus Curiae;

94.   Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

95.   Warbelow, Sarah – Counsel for Plaintiffs;

96.   West Virginia, State of – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

97.   Wilkerson, Mark Douglas – Counsel for Amici States;

98.   Williams, Renee – Counsel for Intervenor-Plaintiff;

99.   Wilson, Thomas Alexander – Counsel for Defendants;

100.  Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

101.  World Professional Association for Transgender Health – Amicus Curiae;

102.  Vague, Amie A. – Counsel for Plaintiffs;

103.  Vance, Robert S. (III) – Counsel for Medical Amici;

104.  Ventiere, Jessica – Defendant;

105.  Veta, D. Jean – Counsel for Medical Amici;

106.  Walker, Susan Russ – Magistrate Judge;

107.  Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

108.  Zoe, James – Plaintiff (pseudonym).

Respectfully submitted this 5th day of July 2022.

*/s/ Mary E. McAlister*
Mary E. McAlister
*Counsel for Detransitioner Amici Curiae*

**TABLE OF CONTENTS**

**CERTIFICATE OF INTERESTED PERSONS**...................................................**1**

**TABLE OF CONTENTS** ......................................................................**i**

**TABLE OF AUTHORITIES** ...............................................................**ii**

**STATEMENT OF INTEREST** ..........................................................**1**

**SUMMARY OF ARGUMENT** ..........................................................**2**

**ARGUMENT** ........................................................................................**3**

    **I.**    **The District Court Erred When It Disregarded Evidence of Harm and Coercive Practices**.......................**3**

        **A.**    **Evidence That Interventions Are Harmful** ..........................**4**

        **B.**    **Evidence of Coercion by Providers** .......................................**6**

        **C.**    **Evidence of Rising Numbers of Detransitioners** .........................................................................**7**

        **D.**    **Statements from the "22 Professional Associations" Relied on by the District Court Are Ideologically, Not Scientifically, Based.**..........................**9**

    **II.**    **Amici's Lived Experiences Point To Harm, Not Medical Necessity.** ...........................................................................**11**

**CONCLUSION**...................................................................................**28**

**CERTIFICATE OF COMPLIANCE** ..............................................**29**

**CERTIFICATE OF SERVICE** .........................................................**30**

# TABLE OF AUTHORITIES

**Other Authorities**

Entwistle*, Debate: Reality Check – Detransitioners Testimonies Require Us to Rethink Gender Dysphoria*. 26 CHILD AND ADOLESCENT MENTAL HEALTH (May 14, 2021). ........................................................................................................11

I.L. Boyd, T. Hackett & S. Bewley, *Care of Transgender Patients: A General Practice Quality Improvement Approach.* SSRN JOURNAL, p. 12 (Online 2021) doi:10.3390/healthcare10010121 ..........................................................................8

L. Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners.* 50 ARCH SEX BEHAV. 3353–3369 (2021) https://doi.org/10.1007/s10508-021-02163-w. ............................................................................................................7

R. Hall, L. Mitchell & J. Sachdeva, *Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: Retrospective case-note review.* 7 BRIT. J. PSYCH, e184 (Open 2021)..................8

S.B. Levine, E. Abbruzzese & J.M. Mason, *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults.* JOURNAL OF SEX & MARITAL THERAPY, 1-22. (Online March 17, 2022). doi:10.1080/0092623X.2022.2046221, (DE 69-8)...............................................7

## STATEMENT OF INTEREST

Amici, Laura Becker, Billy Burleigh, C.G. (pseudonym), Helena Kerschner, Laura Perry Smalts, Laura Reynolds, and John Smith (pseudonym) respectfully submit this brief in support of Defendants. All parties have consented to this filing.[1,2]

Amici experienced gender dysphoria when they were adolescents and young adults. They were led to believe that "gender- transition" care would resolve their gender dysphoria ("GD") and permit them to live healthy, well-adjusted lives. Amici learned that such treatments did not resolve the psychological issues underlying their GD, but only increased their distress and caused physical harm as they realized they had irreversibly altered their bodies based upon ideology.

Amici respectfully submit this brief to provide this Court with a balanced perspective about the absence of any objective standard of care, the attendant absence of efficacy, safety, and scientific foundation for so-called gender-transition treatments, and the growing body of research concerning people detransitioning from these treatments. Amici believe it is critical that this Court hear their stories

---

[1]    *Amici* affirm that no counsel for a party authored this brief in whole or in part and no one other than *amici,* its members, or its counsel contributed any money to fund its preparation or submission.
[2]    Some of the amici are using pseudonyms in order to protect their identity and the identities of family members.

as men and women who have experienced loss, physical harm, and increased emotional distress from treatments that were supposed to benefit them.

## STATEMENT OF THE ISSUES

1.    Alabama banned transitioning treatments for children based on the Legislature's determination that the risks of these interventions outweigh their proven benefits. Does the Due Process Clause provide parents a fundamental right to obtain these sterilizing treatments for their children?

2.    Does the Equal Protection Clause forbid States from banning transitioning treatments for all minors?

3.    Did the district court abuse its discretion by entering a universal injunction?

## SUMMARY OF ARGUMENT

Alabama's Legislature properly acted to protect its most vulnerable citizens from harmful and unproven medical experimentation when it enacted the Vulnerable Child Compassion and Protection Act, Ala. Code §§22-12E-1 *et seq.* (the "Act"). Research analyzed by and evidence presented to the Legislature amply demonstrated that "gender-transition" medical interventions posed a grave threat to Alabama's children and their parents who were being manipulated into approving experimental and harmful interventions with threats that their children otherwise would commit suicide. The district court mentioned but gave no deference to the extensive findings

of the Alabama Legislature, a co-equal branch of government, that prompted passage of this child protective legislation. (DE 69-1).

Inexplicably, the district court completely disregarded hundreds of pages of testimonial and documentary evidence from Defendants, going so far as to claim that there was no evidence, and found that Plaintiffs were entitled to a preliminary injunction. That finding was based on statements from professional associations which Defendants had demonstrated were little more than ideological talking points.

The district court's ruling is legally insufficient and factually unsupportable. It is also a slap in the face to men and women like Amici whose lived experiences demonstrate the harm posed by "gender-transition" medical interventions. Amici add their stories to the testimony provided to the district court and respectfully ask this Court to overrule the decision.

## ARGUMENT

### I.    The District Court Erred When It Disregarded Evidence of Harm and Coercive Practices.

As men and women who have experienced the harm and coercion of "gender-transition" medical interventions as described in hundreds of pages of testimony provided to the district court, Amici are particularly disturbed by the district court's unfathomable statements that:

> Defendants **fail to produce evidence** showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria. Nor do Defendants offer evidence to suggest that healthcare

3

associations are aggressively pushing these medications on minors. (DE 112-1 at 19).

The State puts on **no evidence** to show that transitioning medications are "experimental." .... Finally, **nothing in the record** shows that medical providers are pushing transitioning medications on minors. (*Id.* at 24) (emphasis added).

To the contrary, the State presented exhaustive evidence from detransitioners, parents of children who were subject to the interventions and medical professionals detailing that "gender transition" medical interventions are harmful to minors, ideologically instead of scientifically based, and are pushed onto parents, often with threats that children will kill themselves if they do not receive the medications. (DE 69-2 through 8 and 69-20 through 39).

## A.    Evidence That Interventions Are Harmful

The district court record is replete with evidence from detransitioners, parents and physicians that "[t]he risks of 'gender-affirmative care' in youth are real and the harms are considerable." (Declaration of Dr. Patrick Hunter, DE 69-6 at 5). "The most self-evident risk is that the treatment frequently leads to infertility." (*Id.*). Other risks include adverse effects on developing brains, cardiovascular complications of cross-sex hormones, increased risk for cancer, impairment of sexual function, and deterioration of bone health. (*Id.*).

Physicians with decades of experience in pediatrics and endocrinology testified that puberty suppression leads to irreversible bone loss, something parent Jeanne

Crowley testified had happened with her teenage daughter. (DE 69-36 at 4-5). Dr. Michael Laidlaw testified, "[a]ny abnormal lowering of sex hormones occurring during this critical time [puberty] will stop the rapid accumulation of bone and therefore lower ultimate adult bone density." (DE 69-3 at 15). "Allowing a "pause" in puberty for any period of time leads to an inability to attain peak bone density." (*Id.*). Dr. Quentin Van Meter, a pediatric endocrinologist, testified, "[w]e have definite evidence of the need for estrogen in females to store calcium in their skeleton in their teen years. That physiologic event can't be put off successfully to a later date." (DE 69-4 at 10-11). "After an extended period of pubertal suppression one cannot 'turn back the clock' and reverse changes in the normal coordinated pattern of adolescent psychological development and puberty." (Declaration of Dr. Paul Hruz, DE 69-6 at 69). This contradicts misleading claims presented to parents like Ms. Crowley that the puberty blockers are a reversible "pause button." (DE 69-36 at 4-5).

Physicians also testified that long-term consequences of use of cross-sex hormones include increased risk of heart attacks and death due to cardiovascular disease, sexual dysfunction, sterility, and, for men taking estrogen, a five-fold increase in venous thromboembolism and 46 times greater chance of breast cancer. (Laidlaw declaration, DE 69-3 at 19). Detransitioners substantiated that testimony in their declarations detailing the long-term debilitating consequences they have experienced as a result of the medical interventions prohibited for minors under the Act. (Sydney

Wright, Tr. 338-349, DE 69-27; Corinna Cohn, DE 69-26; KathyGrace Duncan, DE 69-35; Carol Frietas, DE 69-28 and Ted Halley DE 69-37). Amici offer similar evidence *infra.*

Far from there being no evidence that the medical interventions prohibited by the Act are harmful, there in fact was substantial evidence of significant and irreversible harms caused by the treatments. The district court's disregard of that evidence is reversible error.

### B.    Evidence of Coercion by Providers

Similarly, there was a preponderance of evidence from physicians and parents that "gender-transition" care providers push the treatments on children and their parents, even using threats of having a dead child if treatments are not provided. (DE 69-5, 69-8; DE 69-29 to 34; 69-36, 69-38 to 39). Dr. Hruz testified that "[p]arents are often manipulated and coerced by misinformed political activists or providers who threaten them with dire warnings that the only two options are 'treatment or suicide.' These 'threats' ignore data that challenge this biased assumption." (DE 69-5 at 66). Parent Kristine W. testified that she was told on numerous occasions, "You must affirm or she will kill herself. Do you want live son or dead daughter?" (69-32 at 3).

In a peer reviewed article provided to the district court, Dr. Stephen Levine said:

> The "transition or die" narrative, whereby parents are told that their only choice is between a "live trans daughter or a dead son" (or vice-versa), is both factually inaccurate and ethically fraught. Disseminating such alarmist messages hurts the majority of trans-identified youth who are not at risk for suicide. It also hurts the minority who are at risk, and who, as a result of such misinformation, may forgo evidence-based suicide prevention intervention in the false hopes that transition will prevent suicide. (69-8 at 9).

Indeed, as parents Yacov Sheinfeld and Gary Warner testified, such alarmist talk by practitioners treating their daughters gave false hope that transition would prevent suicide, yet their children committed suicide after transition. (DE 69-33, 69-39).

## C.    Evidence of Rising Numbers of Detransitioners

The district court also disregarded significant research introduced by Defendants which points to an increasing number of youth and adults who have detransitioned, indicating harm and/or lack of efficacy of the interventions. (Levine report, 69-8 at 23; Hunter Declaration, 69-6, at 22). Dr. Lisa Littman surveyed 100 people who had undertaken "gender re-assignment" interventions and detransitioned. (69-21).[3] Dr. Littman found that, as is true of Amici and the detransitioners who provided testimony to the district court, a majority of the study subjects felt that they

---

[3]    L. Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners.* 50 ARCH SEX BEHAV. 3353–3369 (2021) https://doi.org/10.1007/s10508-021-02163-w. *See also,* S.B. Levine, E. Abbruzzese & J.M. Mason, *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults.* JOURNAL OF SEX & MARITAL THERAPY, 1-22. (Online March 17, 2022). doi:10.1080/0092623X.2022.2046221, (DE 69-8).

7

had been rushed to medical gender-affirmative interventions with irreversible effects without the benefit of adequate psychologic evaluation. (DE 69-8 at 23; DE 69-21 at 3364-3366). Dr. Littman also found, in keeping with the testimony of parents, that several of the participants in her study felt pressured to transition from their doctors or therapists. (DE 69-21 at 3366). Thirty-eight percent of participants in Dr. Littman's study said that their gender dysphoria was caused by trauma or mental health issues, and more than half said that transitioning delayed or prevented them from getting treatment for their trauma or mental health issues. (*Id.* at 3362).

A recent study from a UK adult gender clinic showed that **6.9%** percent of young people treated with gender-affirmative interventions detransitioned within 16 months of starting treatment. (DE 69-6 at 22, DE 69-8 at 23).[4] Another U.K. clinic population study found that more than 12 percent of those who had started hormonal treatments either detransitioned or documented regret, while 20 percent stopped the treatments for a wider range of reasons. (*Id.*).[5] The UK researchers commented that "the detransition rate found in this population is novel and questions may be raised

---

[4]        *Citing* R. Hall, L. Mitchell & J. Sachdeva, *Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: Retrospective case-note review.* 7 BRIT. J. PSYCH, e184 (Open 2021).
[5]        *Citing* I.L. Boyd, T. Hackett & S. Bewley, *Care of Transgender Patients: A General Practice Quality Improvement Approach.* SSRN JOURNAL, p. 12 (Online 2021) doi:10.3390/healthcare10010121.

about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields." (*Id.*).

This evidence substantiates the lived experiences of Amici and detransitioners who provided testimony to the district court. The court's disregard of that evidence is reversible error.

### D.    Statements from the "22 Professional Associations" Relied on by the District Court Are Ideologically, Not Scientifically, Based.

The district court found that Plaintiffs were entitled to a preliminary injunction because "the record shows that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors." (DE 112-1 at 19, 24). Implicit in that statement are assumptions that the 22 major medical associations made their endorsements based on scientifically credible evidence and the "treatments" represented accepted standards of care. Evidence proffered by Defendants but disregarded by the court demonstrated neither assumption is valid. Rather than being rigorously reviewed standards of care endorsed by the membership of the professional associations, the "endorsements" relied on by the court are ideologically driven opinions written by activists and supported by weak or no evidence. (DE 69-4 to 69-6, 69-8).

9

Dr. Van Meter testified that the guidelines published by WPATH and the other professional associations "are solely the opinions of like-minded practitioners who excluded any contrary opinion." (DE 69-4 at 12, 19). Dr. Hruz similarly testified:

> The committee that drafted the Endocrine Society guidelines was composed of less than a dozen self-selected members. The guidelines were never submitted to the entire membership for comment and approval prior to publication. They also did not undergo external review. Such political methodologies are common in association "statements" and "endorsement" and not at all scientific nor reliable nor valid. (69-5 at 20).

In fact, "[t]here are no standards of care for transgender health. Standards of care established by broad consensus are reached by inclusion of the whole spectrum of opinions, clinical experience and published science in the formation thereof." (Van Meter Declaration, DE 69-4, at 12). Standards of care should provide practitioners with evidence-based standards by which they may reliably inform the patient of projected outcomes and do so with a known error rate. That is not the case with these guidelines. (Hruz Declaration, DE 69-5, at 15-16).

In light of this evidence, the court's reliance on the "endorsements" by 22 professional associations, including WPATH and Endocrine Society, to issue a preliminary injunction is unjustified. The court's statements that the State presented no evidence demonstrates that the court chose to disregard Defendants' evidence. That failure to even acknowledge, let alone analyze and rely on the State's evidence was an egregious reversible error. Amici's lived experiences described *infra*, offer

further proof of the harmful and coercive nature of "gender transition" treatments and further reason to overturn the district court's decision.

## II. Amici's Lived Experiences Point To Harm, Not Medical Necessity.

Amici initially mistakenly believed that medical transition would be empowering, satisfying and lifesaving. However, they realized that what they had believed was true—that they were "trapped in the wrong bodies"—was in fact a feeling brought about by trauma and other underlying issues. Altering their bodies to satisfy that feeling was ultimately ineffective and harmful.

Amici are but a small sample of detransitioners now telling their stories.[6] Evidence submitted to the district court demonstrated that clinicians and researchers worldwide have called for rejection of the gender-transition care model for minors.[7] Alabama's Legislature has rationally joined with these researchers to reject the model that has proven harmful to thousands of young people, including Amici and witness declarants, through passage of the Act.

---

[6]    Reddit's "detrans" forum (http://www.reddit.com/r/detrans/) has over 34,000 members. Seventy-five detransitioners tell their stories in Post Trans Booklet available at https://post-trans.com/Detransition-Booklet, and many more on https://sexchangeregret.com/ voices/ and https://www.detransvoices.org.

[7]    DE 69-9 to 69-16. *See also,* Entwistle*, Debate: Reality Check – Detransitioners Testimonies Require Us to Rethink Gender Dysphoria*. 26 CHILD AND ADOLESCENT MENTAL HEALTH (May 14, 2021).

**John Smith, New York (pseudonym)**

John Smith's (pseudonym) story cogently illustrates the error in the district court's claim that there is no evidence that the medical and surgical interventions are harmful or that medical providers are pushing the interventions on children. (DE 112-1 at 19, 24). This is particularly true when his story, and the other Amici's stories, are viewed in context with the testimony of detransitioners provided to but disregarded by the district court.

John was naturally androgynous and had a feminine appearance to the point that he was often mistaken for a girl. He did not relate well with his male peers and fit in better with the girls.  He was taunted and bullied for being unlike the other guys and because he was gay. He suffered from anxiety and depression. At age 14 he began to hear about being transgender and the idea that a person could be "born in the wrong body" in the media. He believed that idea explained his social discomfort with being part of the male sex. Prior to this time he had not felt discomfort about being male.

When John was 15 or 16 he made an appointment with a "transgender affirming" doctor with whom a family member was acquainted. He made the appointment to discuss treatment for anxiety and depression, which was the story he told his parents as they drove him to the appointments. The doctor immediately affirmed John as a girl and continued to talk with him about transgender treatments at each biennial

12

appointment. John did not tell his parents that he and the doctor were discussing gender transition. Soon after John started seeing the doctor, he started encouraging John to go on cross-sex hormones. The doctor would say things like "Why are you moving through the world as a boy?"

When John was about 16, without his parents' knowledge, John and the doctor made a plan to get John on cross-sex hormones as soon as he turned 18. John had told his parents he was "trans," but they did not consent to treatments. John began estrogen and spironolactone (a testosterone suppressor) at age 18 when he moved away to college. He was also working with a therapist who affirmed his decision, saying "You're going to look so beautiful as a woman." John later discovered that this therapist had told his parents that if he did not transition he would be at risk of suicide, despite the fact that John was never suicidal and never discussed feeling suicidal with the therapist.[8]

John went on to have his testicles surgically removed and underwent a vaginoplasty. None of John's health care providers informed him of the potential negative repercussions of these interventions. A physician mentioned the potential for

---

[8]     This further evidences the coercive practices by "gender-transition" providers, of which the district court said there was no evidence, despite testimony of parents, Alabamans John Roe, DE 69-31, and Gary Warner, DE 69-39; Barbara F. DE 69-29; John Doe, DE69-30; Kristine W., DE 69-34; Jeanne Crowley, 69-37 and Kellie C., 69-38.

blood clots from estrogen but downplayed the risk. John began to feel quite unwell. He experienced fatigue, brain fog and loss of the ability to think clearly. After three or four years it became unsustainable. John sought help from various physicians, but none of them identified a root cause for the symptoms, prescribing only anti-depressants. While still taking estrogen he began taking some testosterone. He began feeling better than he had been for a very long time. John then stopped the estrogen and began to feel better very quickly. It was like parts of his body that were dormant went back online. He was able to think more clearly, had more energy and his depression lifted. He concluded that "a male body without testosterone does not do well." He began de-transitioning about a year ago.

John began to explore the transgender issue therapeutically. He realized he was using it to run from internalized homophobia.  Looking back, John realizes that it was obvious that his ill feeling and mental inability to think was caused by the cross-sex hormones. He understands that the mind invents things to protect the person so that one can feel "normal." He thinks that is what happened to him, that ultimately his belief that he needed to change his body and "become female" was a trauma-induced delusion. That delusion has irreversibly altered his body. He can no longer produce his own testosterone and so will have to inject testosterone into his body for the rest of his life. He is unable to have sexual intimacy because that part

14

of his body is a source of great trauma. He has had numerous complications, including severe urinary tract infections.

John believes laws like Alabama's are necessary to protect minors from these interventions. John recognizes that minors need thoughtful therapy that explores the reasons they are feeling conflicted with their body. A whole confluence of factors leads someone to reject their sex and convinces them they are the opposite sex. Those factors are different for each person and should be examined individually instead of the dominant narrative, which claims there is only one explanation and fails to take into account myriad others. He observes that may therapists are ideologically captured by the prevailing narrative. John believes he was lied to, misguided, and harmed in many ways. He supports Alabama's efforts to prevent its children from being similarly harmed.

### C.G., Rhode Island (pseudonym)

Had a law like Alabama's been in place in Rhode Island in 2016, then C.G.'s parent would not have been able to place him on the fast track to medical and surgical interventions, and he would not, at age 21, be facing a lifetime of sterility with a mutilated body. Like many detransitioning young people, C.G. was a gender nonconforming child who is on the autism spectrum and suffered with depression and anxiety. When he was about 8 years old, C.G. began to think that he did not like stereotypical "boy stuff," such as athletics and rough play. Instead, he liked the ways

15

girls behaved and was drawn to stereotypical "girl stuff." He did not socialize well with male peers and believed that if the behavior and habits of his male peers were what it meant to be a boy then maybe he was not a boy. Those feelings were confirmed by postings on transgender websites that told him he was a girl if he liked "girl things." He also began conversing with trans-identifying people through phone apps.

At age 14, C.G. told a friend he was "trans" and wanted to be a girl, claiming that he was "a girl trapped in a boy's body." C.G. told his parent who celebrated his "trans" identity and immediately arranged for him to see a "gender affirming" therapist. The therapist immediately affirmed C.G.'s "trans" identity without any psychological testing or exploration as to why he believed he was "trans." C.G. also saw an endocrinologist who runs a gender clinic for children and young adults within a hospital in Providence. The endocrinologist diagnosed C.G. with GD based on his statements alone and immediately prescribed estrodial (estrogen) and spironolactone (a testosterone blocker) on the first visit. The doctor downplayed side effects, saying things like, "There is a minor risk of blood clots, but it's not a big deal because you don't see cis women dropping dead of blood clots every day."

C.G. began the hormone regimen at age 15. C.G. experienced significant psychological complications from the hormones. He became depressed to the point that he was not getting out of bed. He became too anxious to go anywhere or talk to

16

people and skipped school for months on end. He ended up dropping out of school. He also developed an eating disorder and addiction to the internet. C.G. was not functioning healthfully, but his parent continued to move him along the "gender affirmation path," scheduling surgery at age 17. Soon after turning 18 his parent flew him to Washington DC where C.G.'s testicles and penis were removed, he was given a vaginoplasty to create an artificial vagina, and he received plastic surgery on his face.

At no point in time was C.G. offered any alternatives to medication and surgery, and no one attempted to explore any underlying reasons for his depression and discomfort with his sex. He soon realized that the treatments had not improved his life and he discontinued them at age 18. Now at age 21 C.G. has a body that "is completely ruined." He does not have any good options and believes that his "body is going to be a 'freak' no matter what I do." Based on his experiences, C.G. warns that even with parental consent these treatments are putting kids on a path of harm. He was not able to grow up in a healthy way and as a result has been deeply scarred by these treatments and his relationship with his parent, whom he wished had protected him, is deeply strained. He does not want to see other kids similarly harmed.

**Laura Perry Smalts, Oklahoma**

Laura Perry Smalts will never experience giving birth to or breastfeeding a child because she became convinced that she was "born in the wrong body" and that

17

her body needed to be altered to conform to her belief that she was really male. She now realizes that there are far better and healthier ways to assist a child who is distressed with her body that bring long-term resolution, and her story is living proof of that truth.

Like many detransitioners, Laura did not conform to gender stereotypes and experienced sexual abuse by a neighbor and family dysfunction during childhood that contributed to her believing that she was really a boy. From an early age she fantasized about being a boy and wrote stories of herself as a male character but was not aware of the concept of transgenderism until age 25. The desire to become male had become so strong that she began searching on the internet and was shocked to find numerous stories, websites and support groups related to being transgender.

Laura went to a support group which immediately affirmed her as "transgender." From that point on, she was absolutely convinced that she was a "man trapped in a woman's body" and her body needed to be fixed. She started taking testosterone at age 25 after receiving a diagnosis of gender identity disorder and letter from a therapist. The physician, who was aware of a history of chronic hormone imbalance, nevertheless prescribed the hormones on the same day. During nine years on testosterone, Laura experienced her voice getting lower, her jaw becoming more masculinized, her body shape changing, more hair growing on her body and hair receding on her scalp. Her blood became very thick so that she became

18

in danger of a stroke.[9] Laura had to undergo therapeutic blood withdrawals to thin her blood.

With the treatments Laura fully passed as male and would have described herself as happy for the first few years. However, she also began to have problems with her memory and cognitive functioning. She became anxious, depressed, and neurotic about talking to people, becoming obsessed with "every detail of life fitting a male narrative." She couldn't function at work. Still Laura was convinced that she wanted the treatments and underwent a double mastectomy at age 27 and complete hysterectomy, sending her into menopause at age 30.

During the time that she lived as a man, Laura was constantly reminded of the truth, but had to constantly override it, which she found to be exhausting. She entered a support group that helped her process the pain of her life and talk openly about the sexual trauma, issues with her mother, and rejection by others. She received counseling that helped her see the broken patterns, process negative thinking towards herself, and understand healthy womanhood. She began to realize that she was not a man, but had fixated on becoming a person who would be loved. She credits faith in Jesus Christ and the "positive message of love in God's Word," working through a healing community, with restoring her emotionally and psychologically as a

---

[9]    Detransitioner Sydney Wright, who testified at the district court hearing and submitted a Declaration, reported the same side effect from the supra-physiologic doses of testosterone. *See* Tr. 338-349, DE 69-27 at 5.

woman. In 2016 she detransitioned. In May 2022 Laura got married and no longer experiences any gender dysphoria.

Laura believes that laws like Alabama's are important because minors do not have the capacity to appreciate the gravity of these decisions, the complications of medical transition and what they are giving up, including sexual function and parenting. Nor does she believe a parent should be allowed to radically alter their child's body or allow their child to be sterilized because their child is experiencing a mental ailment. Transition treatments do not solve anything but only give temporary relief, like taking a pain killer for a broken bone. From personal experience she knows there are far healthier ways to help children resolve their distress with their body.

**Helena Kershner, Ohio**

Helena Kershner believed that asserting a transgender identity and taking testosterone would give her an attractive androgynous body and a more acceptable social profile as a transgender man, instead of a vilified white "cisgender" woman. She also believed it was an explanation of and solution for her mental health issues. Like so many others, endless hours on the internet had convinced her that her discomfort with her female body was because she was a "boy born in girl's body." Her therapist and high school psychologist immediately affirmed her decision at age 15 that she was "transgender." Neither professional explored the reasons for her "trans" identity

or discomfort with her body. The psychologist told Helena's mother that if her parents did not affirm Helena's "trans" identity then Helena would commit suicide.

Initially Helena identified as non-binary, then as a demi-boy, and finally by age 17 she was identifying as a boy. Each time she made a change to affirm her "trans" identity—changing her pronouns, cutting her hair, wearing male clothing—she was celebrated by her "friends" on the internet. Social justice sites that she followed cast being transgender as a way to become more desirable and accepted than she could be as a white "cisgender" person, which was seen as a source of all the pain in the world. She also now recognizes trans-identifying became a way to exert misguided control and to get attention in an immature way.

After finding internet sites on eating disorders Helena developed an eating disorder. She was obsessed about her weight and wore over-sized clothes to hide her body. She believed that taking testosterone would transform her body into a thin, more sporty looking androgenous version of herself. She began taking testosterone at age 18. She experienced a sharp increase in her libido such that she felt out of control over her body and got into dangerous sexual situations. She became irritable and found that being around other people became unbearable. She lost the ability to cry and express emotion. She began to get overwhelmed with blinding rage so that she resorted to harming herself so as to not harm others. The blinding rage and self-

harm led to her to be hospitalized twice. Once she stopped taking testosterone she never again experienced the blinding rage and impulse to self-harm.

The testosterone-induced rage and hospitalizations helped Helena realize that the promise of living a happy transgender life would not materialize – that "this is not who I am." One day she saw a photo montage of her younger self and observed how she had gone from looking healthy and normal to unhealthy and unhappy. This made her realize that she was not on the right path, and she started detransitioning. She now accepts herself as a woman, but it's been a very difficult three-year process with a relapsed eating disorder and another hospitalization.

Helena realizes that the process of growing up and becoming more mature was instrumental in her returning to her natural self. She laments that internet influencers label biology and reality as "transphobic" and dismiss those who do not affirm the transgender identity as not worth listening to. She understands now that every young person deserves the chance to grow into and have a healthy relationship with his/her natural body. Giving children medications that disconnect them from their body before even having the chance to experience their full- grown natural body is robbing them of something fundamental to the human experience. She believes that laws like Alabama's are important to give children the chance to mature and have that relationship.

**Laura Becker, Wisconsin**

Laura Becker was a gender-nonconforming child who had an emotionally abusive childhood. She was diagnosed with depression and anxiety and being on the autism spectrum at age 11. Laura was hospitalized numerous times suffering from undiagnosed post-traumatic stress disorder and suicidal ideation, beginning at age 15. On Tumblr she found out about trans identities and a community of kids like herself who did not fit in with traditional cultural gender stereotypes. She began to wonder if she was transgender or agender.

At age 17, Laura started experiencing severe body dysphoria and began binding her breasts and wearing men's clothes. However, she had difficulty finding social acceptance as either a masculine girl or an effeminate boy. She saw a therapist who diagnosed her with GD and affirmed her trans-identification but did not offer any psychotherapeutic alternatives for her significant mental health issues.

Believing that she could only be "happy" if she medically transitioned, Laura began taking testosterone at age 19 after a single visit to a clinic. The testosterone exacerbated her depression and anxiety, made her more aggressive, and caused her to engage in increased risky behaviors. After another hospitalization for suicidal ideation, Laura decided her only option was a mastectomy to fully transition and resolve her gender distress. Laura obtained the required letters of recommendation for the surgery from her general practitioner and psychiatrist, but neither questioned her

23

about her mental health issues or how they may be contributing to her desire for gender-transition medical treatments.

After the surgery, Laura initially felt "happy" and relieved. However, as with the testosterone, there was no improvement in her mental health, self-esteem, anxiety, or depression, and she was again hospitalized. She began to get therapy that started to get at the causes for her dysphoria and provided tools to begin to practice self-love. She received a psychiatric evaluation which diagnosed her as having PTSD resulting from childhood emotional abuse. Once she received the proper diagnosis, she improved and began to detransition.

With greater maturity and improved mental health, Laura realized the gravity of what she had done. She felt ashamed, sad, angry at herself, and angry at the mental health professionals who failed her. She realized that she had undergone unnecessary medical treatments to address a mental health condition better treated with appropriate psychotherapy. Her health was compromised and her body disfigured because of false hopes that obscured powerful underlying causal issues. She cautions that the notion of allowing teens to obtain medical transition treatments is incredibly irresponsible, destructive, and unethical without providing these young people with the intensive psychotherapy necessary to overcome the underlying issues.

24

**Billy Burleigh, Idaho**

Billy Burleigh grew up in a good family with supportive parents. But in the first grade he began experiencing intrusive thoughts that "God made a mistake. I'm a girl." Through elementary school he had learning and emotional difficulties. He was in emotional pain and he withdrew from others trying to cope. He was sexually abused in sixth grade by a male diving coach.

Looking for answers to his distress, the prevailing information he received was that the only way to overcome the disconnect was to change his body to conform to what his mind was telling him. Driven by depression and thoughts of suicide, Billy was willing to try anything to relieve his suffering. He told his therapist he wanted to transition, and she provided him a letter to begin cross-sex hormones. Billy was prescribed spirolactone and estrogen. He underwent multiple surgeries. At age 29 and 30 he had vaginoplasty, labioplasty, an Adams apple shave, facial plastic surgery, and voice feminization surgery.

However, no matter how many surgeries he had, every time Billy looked in the mirror he saw a man staring back at him. Despite a successful professional career and passing well as a woman he still had all the same problems and mental distress he had before transitioning. After seven years, he began to detransition. What helped him come to terms with his male body was finding peace with God and a wonderful faith community. With the help of healthy relationships with other men and a

community that loved and supported him he was able to make the journey back to embracing his male self. Billy got married in 2011 and is currently living happily as a male, a husband, and father, although he still must live with the consequences of a scarred body and the inability to engage sexually with his wife.

Billy says that even with parental consent the medical and surgical interventions aimed at "affirming" a discordant gender identity are harmful to children. They are putting a band-aid on the underlying issues that the child is having. Children are looking for acceptance, significance, and security. Gender affirmative treatments are offered to satisfy those needs, but from his own painful experience Billy warns they cannot do that long term. Billy has spoken with many detransitioned young people. Many have trauma and/or sexual abuse. These kids need therapy and a safe environment to work through what else is really going on. Children facing the struggle Billy faced need help with their thoughts, not a body "fix" with hormones and surgery. Alabama's law promotes that more effective therapeutic option.

**Laura Reynolds, American living in Austria**

Laura Reynolds was a gender non-conforming child who was diagnosed with ADHD, depression, and anxiety. Later she learned she had undiagnosed autism. When she learned that ADHD was more common in boys, she began to think she had a "male brain." This seemed to account for why she did not fit in socially and wanted to have more freedom to be active like boys. When changes to her body

26

brought sexual harassment, she experienced a sense of panic about her female body and she became dysphoric. At 15, Laura learned about transitioning on the internet. She thought it was possible to change sex, and she began binding her breasts and socially transitioning.

At 18, Laura went to a gender clinic and was diagnosed with GD and started on testosterone. The psychologist never explored why she had dysphoria and wanted to transition or reviewed her neurological deficits. A year later, Laura scheduled a double mastectomy. At the time, she believed it was possible that she could become a man, that breast removal was necessary to be a "transman," and that she would never want to have children. Two rounds of breast removal surgery were traumatic and resulted in increased body dysphoria. She was left with large amounts of scar tissue and permanent disfigurement. She realized that she could not change her sex and that it would not be possible to actually become a man. She decided to detransition and get off testosterone for health reasons, including painful vaginal atrophy.

Laura became a single parent. Laura had gestational diabetes while pregnant and was told her baby should breast feed in order to reduce his chances of becoming diabetic. This was impossible because she had been affirmed along the pathway to medical transition and surgery while in her youth. Laura believes that due to her autism she was neurologically immature as a young person and had a very limited

27

sense of the world and of what it meant to be transgender. The many complex reasons for her dysphoria were never addressed.

## CONCLUSION

The district court erred when it determined that Plaintiffs were entitled to a preliminary injunction. This Court should reverse the district court's order.

Dated: July 5, 2022.

> */s/ Mary E. McAlister*
> Vernadette R. Broyles
> Mary E. McAlister
> Joel H. Thornton
> CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
> 5805 State Bridge Rd., Suite G310
> Johns Creek, GA 30097
> 770.448.4525
> vbroyles@childparentrights.org
> mmcalister@childparentrights.org
> jthornton@childparentrights.org
> Attorneys for Amici Curiae

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i). This brief contains 6,497 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.      In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Mary E. McAlister*
Mary E. McAlister
*Counsel for Detransitioner Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 5, 2022, I electronically filed this document using the

Court's CM/ECF system, which will serve counsel of record.

> */s/ Mary E. McAlister*
> Mary E. McAlister
> *Counsel for Detransitioner Amici Curiae*