No. 22-11707

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
_____

PAUL A. EKNES-TUCKER, et al.,

*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-Appellee,*

*v.*

GOVERNOR OF THE STATE OF ALABAMA, et al.

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

_____

## BRIEF OF AMICUS CURIAE
## ALABAMA CENTER FOR LAW AND LIBERTY
## IN SUPPORT OF DEFENDANTS-APPELLANTS SEEKING REVERSAL

_____

Matthew J. Clark
ALABAMA CENTER FOR LAW AND LIBERTY
2213 Morris Ave., Floor 1
Birmingham, AL 35203
Tel.: (256) 510-1828
matt@alabamalawandliberty.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, counsel for *Amicus Curiae* Alabama Center for Law and Liberty represents that this organizations does not issue stock but has one parent company, the Alabama Policy Institute.

For the sake of ease, Counsel for *Amicus Curiae* will first list persons or entities that he knows has an interest in this appeal that have not yet been listed in the parties CIP's. Those people are:

1. Alabama Center for Law and Liberty LLC – *Amicus Curiae*

2. Alabama Policy Institute – Parent company of *Amicus Curiae*

3. Clark, Matthew James – Counsel for *Amicus Curiae*

Counsel further certifies that, to the best of his knowledge, the following persons and entities, which have already been listed in Defendants-Appellants' opening brief, have an interest in this appeal:

1. Academic Pediatric Association – Amicus Curiae;

2. Alabama Chapter of the American Academy of Pediatrics – Amicus Curiae;

3. Alaska, State of – Amicus Curiae;

4. American First Legal Foundation – Amicus Curiae;

5. American Academy of Child and Adolescent Psychiatry – Amicus Curiae;

6. American Academy of Family Physicians – Amicus Curiae;

7. American Academy of Pediatrics – Amicus Curiae;

8. American Academy of Nursing – Amicus Curiae;

9. American Association of Physicians for Human Rights, Inc. – Amicus Curiae;

10. American College of Obstetricians and Gynecologists – Amicus Curiae;

11. American College of Osteopathic Pediatricians – Amicus Curiae;

12. American College of Physicians – Amicus Curiae;

13. American Medical Association – Amicus Curiae;

14. American Pediatric Society – Amicus Curiae;

15. American Psychiatric Association – Amicus Curiae;

16. Association of American Medical Colleges – Amicus Curiae;

17. Association of Medical School Pediatric Department Chairs – Amicus Curiae;

18. Anderson, Tom – Defendant;

19. Arizona, State of – Amicus Curiae;

20. Arkansas, State of – Amicus Curiae;

21. Baia, Elizabeth – Counsel for Amici Curiae;

22. Bailey, Daryl D. – Defendant;

23. Blaylock, C. Wilson – Defendant;

24. Boe, Brianna – Plaintiff (pseudonym);

25. Bowdre, Alexander Barrett – Counsel for Defendants;

26. Burke, Liles C. – U.S. District Court Judge;

27. Cantrell, Michael A. – Counsel for Amici Curiae;

28. Carr, Danny – Defendant;

29. Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

30. Davis, James William – Counsel for Defendants;

31. Dermody, Eliza – Counsel for Intervenor-Plaintiff;

32. Doss, Jeffrey P. – Counsel for Plaintiffs;

33. Eagan, Melody Hurdle – Counsel for Plaintiffs;

34. Endocrine Society (The) – Amicus Curiae;

35. Eknes-Tucker, Paul A. – Plaintiff;

36. Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

37. Georgia, State of – Amicus Curiae;

38. Hamilton, Gene – Counsel for Amicus Curiae;

39. Hecker, Elizabeth P. – Appellate Counsel for Intervenor-Plaintiff;

40. Indiana, State of – Amicus Curiae;

41. Isasi, William – Counsel for Amici Curiae;

42. Ivey, Kay – Defendant;

43. Koe, Rachel – Plaintiff (pseudonym);

44. Krishna, Praveen S. – Counsel for Intervenor-Plaintiff;

45. LaCour, Edmund G. (Jr.) – Counsel for Defendants;

46. Lannin, Cortlin H. – Counsel for Amici Curiae;

47. Lanosa, Michael – Counsel for Amici Curiae;

48. Lareau, Alyssa C. – Counsel for Intervenor-Plaintiff;

49. Levi, Jennifer L. – Counsel for Plaintiffs;

50. Louisiana, State of – Amicus Curiae;

51. Marshall, Steve – Defendant;

52. Mattern, David P. – Counsel for Plaintiffs;

53. McCoy, Scott D. – Counsel for Plaintiffs;

54. Medical Association of Pediatric Nurse Practitioners – Amicus Curiae;

55. Mills, Christopher Ernest – Counsel for Defendants;

56. Mississippi, State of – Amicus Curiae;

57. Missouri, State of – Amicus Curiae;

58. Mitchell, Jonathan F. – Counsel for Amicus Curiae;

59. Moe, Jane – Plaintiff (pseudonym);

60. Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

61. Montana, State of – Amicus Curiae;

62. Nebraska, State of – Amicus Curiae;

63. Noe, Kathy – Plaintiff (pseudonym);

64. Oklahoma, State of – Amicus Curiae;

65. Oladeinbo, Gilbert Olusengun – Counsel for Plaintiffs;

66. Orr, Asaf – Counsel for Plaintiffs;

67. Pediatric Endocrine Society – Amicus Curiae;

68. Perigoe, Kelly – Counsel for Plaintiffs;

69. Peterson, Misty L. – Counsel for Plaintiffs;

70. Poe, Megan – Plaintiff (pseudonym);

71. Powers, John Michael – Counsel for Intervenor-Plaintiff;

72. Pratt, James Andrew – Counsel for Plaintiffs;

73. Ragsdale, Barry Alan – Counsel for Amici Curiae;

74. Ray, Brent P. – Counsel for Plaintiffs;

75. Reinke, Adam – Counsel for Plaintiffs;

76. Robin-Vergeer, Bonnie – Appellate Counsel for Intervenor-Plaintiff;

77. Seiss, Benjamin Matthew – Counsel for Defendants;

78. Shortnacy, Michael B. – Counsel for Plaintiffs;

79. Schwabauer, Barbara – Appellate Counsel Intervenor-Plaintiff;

80. Societies for Pediatric Urology – Amicus Curiae;

81. Society of Adolescent Health and Medicine – Amicus Curiae;

82. Society for Pediatric Research – Amicus Curiae;

83. Society of Pediatric Nurses – Amicus Curiae;

84. Soto, Diego Armando – Counsel for Plaintiffs;

85. South Carolina, State of – Amicus Curiae;

86. Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

87. Stone, Jessica Lynn – Counsel for Plaintiffs;

88. Terry, Abigail Hoverman – Counsel for Plaintiffs;

89. Texas, State of – Amicus Curiae;

90. Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

91. United States of America – Intervenor-Plaintiff;

92. Utah, State of – Amicus Curiae;

93. Voights, Anne M. – Counsel for Plaintiffs;

94. Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

95. Warbelow, Sarah – Counsel for Plaintiffs;

96. West Virginia, State of – Amicus Curiae;

97. Wilkerson, Mark Douglas – Counsel for Amici Curiae;

98. Williams, Renee – Counsel for Intervenor-Plaintiff;

99. Wilson, Thomas Alexander – Counsel for Defendants;

100. Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

101. World Professional Association for Transgender Health – Amicus Curiae;

102. Vague, Amie A. – Counsel for Plaintiffs;

103. Vance, Robert S. (III) – Counsel for Amici Curiae;

104. Ventiere, Jessica – Defendant;

105. Veta, D. Jean – Counsel for Amici Curiae;

106. Walker, Susan Russ – Magistrate Judge;

107. Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

108. Zoe, James – Plaintiff (pseudonym).


Respectfully submitted,

/s/ Matthew J. Clark
Matthew J. Clark
ALABAMA CENTER FOR LAW AND LIBERTY
2213 Morris Avenue, Floor 1
Birmingham, AL 35203
(256) 510-1828
matt@alabamalawandliberty.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................C-1

TABLE OF AUTHORITIES ................................................................ ii

IDENTITY AND INTEREST OF AMICUS CURIAE ...........................................1

SUMMARY OF THE ARGUMENT ....................................................................1

ARGUMENT.............................................................................................................3

I.     Common Law Parental Rights, Which the Supreme Court Has Held Are Protected by the Fourteenth Amendment, Did Not Include the Right to Change a Child's Sex or Gender ................................................................3

     A.     Neither the Text of the Constitution Nor the *Glucksberg* Test Support a Constitutional Right to Change a Child's Sex or Gender ..............................................................................................3

     B.     A Historical Understanding of Parental Rights Does Not Include the Right to Change a Child's Sex or Gender....................................6

          1.     Blackstone's *Commentaries*....................................................7

          2.     The Importance of Natural Law in Common Law Analysis ................................................................................10

          3.     Parental Rights in the Early 19th Century ...............................14

          4.     Parental Rights in 1868...........................................................15

          5.     Conclusion: A Historical Analysis of Parental Rights Does Not Support Plaintiffs' Position ...............................................16

II.    The District Court's Interpretation of the Equal Protection Clause Does Not Comport with the Fourteenth Amendment's Original Meaning or Controlling Supreme Court Precedent.........................................................16

A.    Original Meaning ..................................................................16

    1.    The Fourteenth Amendment's Framers ...................................17

    2.    Public Response and Ratification .............................................20

    3.    Conclusion and Application ....................................................21

B.    Controlling Precedent ........................................................21

CONCLUSION ..................................................................................25

CERTIFICATE OF COMPLIANCE.................................................................

CERTIFICATE OF SERVICE.......................................................................

## TABLE OF AUTHORITIES

**Cases**                                                                   **Pages**

*Adams v. Sch. Bd. of St. John's Cnty.*, 3 F. 4th 1299 (11th Cir. 2021) ..................24

*Adams v. Sch. Bd. of St. John's Cnty.*, 9 F. 4th 1369 (11th Cir. 2021) (en banc)........................................................................................................24

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2019) ....................................5, 22-23

*Bridges v. California*, 314 U.S. 252 (1941)............................................................8

*Church of Holy Trinity v. United States*, 143 U.S. 457 (1892) .............................13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... 8-9

*Dobbs v. Jackson Women's Health Org.*, No. 19-139 (U.S. June 24, 2022) ...........................................................................4-5, 16, 25

*Evans v. Ga. Reg. Hosp.*, 850 F.3d 1248 (11th Cir. 2017)....................................24

*Frontiero v. Richardson*, 411 U.S. 677 (1973).....................................................21

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ......................................... 23-24

*Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257 (11th Cir. 2020)..........................25

*Kennedy v. Bremerton Sch. Dist.*, No. 21-418 (U.S. June 27, 2022)...............11, 13

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .............................................................11

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ...........................................2, 6-7, 14, 16

*N.Y. St. Rife & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. June 23, 2022) .......... 3, 7-8

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925).....................................................6

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ............................25

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality) ............................25

*Schick v. United States*, 195 U.S. 65 (1904) ........................................................ 7-8

*Troxel v. Granville*, 530 U.S. 57 (2000) .................................................................6

*Washington v. Glucksberg*, 521 U.S. 702 (1997)......................................3-5, 7, 10

*West Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018) ..............22

## Constitutions and Statutes

U.S. Const., amend. IX ...........................................................................................6

U.S. Const., amend. X.............................................................................................5

U.S. Const., amend. XIV ................................................................................*passim*

U.S. Const. art. VI, cl. 2........................................................................................25

## Other Authorities

Aaron J. Walker, *"No Distinction Would Be Tolerated": Thaddeus Stevens,*
   *Disability, and the Original Intent of the Equal Protection Clause*, 19
   Yale L. & Pol'y Rev. 265 (2000) ............................................................. 18-19

Adrian Vermule, *Common Good Constitutionalism* (2022)..................................14

Antonin Scalia, *A Matter of Interpretation* (new ed. 2018) ..................................23

*Cong. Globe*, 39th Cong., 1st Sess. (1866)........................................................ 18-20

David Smolin, *Equal Protection*, in *The Heritage Guide to the Constitution*
   400 (1st ed. 2005)...............................................................................17-18, 20

*Genesis* 1:27 .........................................................................................................11

James Kent, *Commentaries on American Law* (1827)...................................... 14-15

Joseph Story, *A Discourse Pronounced Upon the Inauguration of the Author as Dane Professor of Law in Harvard University* (1829)................................12

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................................................................................................ 10-11

Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J. of L. & Liberty 44 (2019) ......................................................... 24-25

Noah Webster, *Webster's American 1828 Dictionary of the English Language* (Compact ed., Walking Lion Press 2010) (1828) ............................................15

Ryan T. Anderson, *When Harry Became Sally: Responding to the Transgender Movement* (2019)....................................................................4, 11

Steven G. Calabresi & Julia T. Rickert, *Originalism and Sex Discrimination*, 90 Tex. L. Rev. 1 (2011).................................................................................17

*The Declaration of Independence* (U.S. 1776) ................................................ 17-21

*The Reconstruction Amendments: The Essential Documents* (Kurt T. Lash, ed., Univ. of Chicago Press 2021)............................................................... 18-20

Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (6th ed. 1890) ....................................................................................................8, 12-15

William Blackstone, *Commentaries*................................................................. 7-10

William H. Pryor Jr., *Against Living Common Goodism*, 23 Federalist Soc'y Rev. 24 (2022).................................................................................................14

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Alabama Center for Law and Liberty is a nonprofit law organization based in Birmingham, Alabama, that advocates for limited government, free markets, and strong families. ACLL has an interest in this case because it believes that construing the Constitution according to the original meaning is key to preserving limited government. It also believes that there are only two sexes, male and female, and that tampering with that fundamental law of nature hurts children who are subjected to hormone treatments. ACLL believes that this Court will find the brief desirable because of its historical analysis of parental rights under the common law and of the Equal Protection Clause, especially since the Supreme Court has recently been emphasizing the need to interpret the Constitution in light of history and its original meaning.

## SUMMARY OF THE ARGUMENT

At the outset, ACLL agrees with the State Defendants that Plaintiffs are not seeking the vindication of an old constitutional right but instead are seeking to invent a new right that is supported neither by the Constitution's text nor history. However, because the Supreme Court has held that parental rights are protected by the

---

[1] All parties have consented to the filing of this brief. Rule 29, Fed. R. App. P. Counsel for a party did not author this brief in whole or in part, and no such counsel or party made any monetary contribution to fund the preparation or submission of this brief. No person or entity other than *Amicus Curiae* and their counsel made a monetary contribution to fund the preparation or submission of this brief.

Constitution, a more thorough historical analysis of parental rights may be necessary for the Court to arrive at that conclusion. The Court held in *Meyer v. Nebraska* that the common law was the key to understanding the scope of parental rights recognized by the Fourteenth Amendment. Thus, ACLL seeks to provide the Court with the historical analysis of the common law necessary to make that determination.

Sir William Blackstone recognized three types of parental duties: maintenance, protection, and education. Those duties were based on natural law and gave rise to natural rights that protected parents' abilities to carry out those duties. Blackstone provided a list of particular parental rights and duties corresponding to those three categories. Nothing in that list looks like the right to change a child's sex or gender. Additionally, Blackstone held that the key to understanding parental rights was natural law. With that interpretational key in mind, common-law parental rights could never be construed to protect the right to change a child's sex or gender.

Blackstone's view of parental rights and natural law continued in America throughout the nineteenth century, as the writings of Chancellor James Kent and Justice Joseph Story illustrate. They were still the prevailing views when America adopted the Fourteenth Amendment in 1868, as Thomas Cooley's famous 1868 treatise demonstrates. Thus, at the time of the Fourteenth Amendment's ratification, it could not be understood to protect the right to change one's sex or gender.

2

A historical analysis of the Equal Protection Clause yields the same result. The Framers of the Equal Protection Clause believed that equal protection of the laws was a principle of natural law, and they therefore enshrined it in positive law. The public's ratification of the Republican platform, which touted that principle, reflects the view that the People agreed with the Framers. Controlling precedent from the United States Supreme Court and this Court does not stand in the way of holding that the Equal Protection Clause, as originally understood, does not protect the right to change one's gender or sex, because doing so would violate natural law.

## ARGUMENT

**I.    Common Law Parental Rights, Which the Supreme Court Has Held Are Protected by the Fourteenth Amendment, Did Not Include the Right to Change a Child's Sex or Gender**

*A.    Neither the Text of the Constitution Nor the* Glucksberg *Test Support a Constitutional Right to Change a Child's Sex or Gender*

At the outset, *Amicus Curiae* agrees with the arguments advanced by the State Defendants that the right sought to transition sex or gender, either as an individual or as the parent of a child, is not really a longstanding right that is deeply rooted in this Nation's history and traditions but is really a new substantive due process right that this Court should not recognize. *See* State Defs. Br. 30-39. The Supreme Court has recently emphasized that when an issue like this is not encumbered by precedent, then the matter should be analyzed according to the Constitution's words as informed by history. *See N.Y. St. Rife & Pistol Ass'n v. Bruen*, No. 20-843, slip op.

3

at 16 (holding that a sound analysis of the Second Amendment "demands a test rooted in the Second Amendment's text, as informed by history"), 21 (applying that principle and setting a standard for analyzing the Second Amendment) (U.S. June 23, 2022).[2] Nothing in the text of the Fourteenth Amendment's Due Process Clause suggests that there is a right to change one's sex or gender, either in one's individual capacity or as a parent making that decision for a child. *See* U.S. Const. amend. XIV, § 1; *see also Dobbs v. Jackson Women's Health Org.*, No. 19-1392, slip op. at 117-23 (U.S. June 24, 2022) (Thomas, J., concurring) (focusing on the text of the Due Process Clause and warning that substantive due process is an "oxymoron"). The right to "due process" is procedural, not substantive, and therefore cannot be construed to protect a substantive right to change genders. *Id.* at 118.

However, the Supreme Court has long held that the Fourteenth Amendment protects rights that are not enumerated in the Constitution. In such cases, only rights that are "deeply rooted in this Nation's history and tradition" and bear a "careful description" so as to avoid judicial activism are recognized as protected. *Wash. v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (cleaned up); *accord Dobbs*, slip op. at 13 (citing *Glucksberg* and holding that *Roe v. Wade* was wrongly decided because there

---

[2] In this brief, *Amicus Curiae* will count the page numbers of the Supreme Court's slip opinions as numbered by the entire PDF document, not as they appear in the upper right-hand corner of the Court's opinion.

is no deeply rooted right to abortion in this Nation's history and tradition).[3] It is beyond dispute that the right to change one's sex or gender is not deeply rooted in this Nation's history and tradition. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1733 (2020) (Alito, J., dissenting) (noting that "[n]othing resembling what is now called gender dysphoria appeared" in the DSM until 1980, that sex-reassignment surgeries were not performed until 1966, and that the great majority of physicians at the time thought that people who sought such surgeries were "severely neurotic" or "psychotic").

Since such a right can be found neither in the Constitution's text nor deeply rooted in this Nation's history and traditions, the Tenth Amendment leaves the matter to the States. U.S. Const., amend. X. The Supreme Court has held in such cases that rational-basis review applies. *Glucksberg*, 521 U.S. at 728. Alabama has undoubtedly met that standard. State Defs. Br. 39-45.

---

[3] One may object that *Dobbs* is inapposite here because the Supreme Court itself distinguished the issue of abortion from other substantive-due-process precedents. *See Dobbs*, slip op. at 74. There are two problems with that argument. First, there is no Supreme Court precedent addressing a substantive-due-process right to change one's sex or gender. Second, even if *Dobbs* is inapposite, it reiterated that *Glucksberg* is the gold standard for evaluating substantive-due-process cases, which it already had been since 1997.

B.    *A Historical Understanding of Parental Rights Does Not Include the Right to Change a Child's Sex or Gender*

In 1923, the United States Supreme Court held that the Due Process Clause protected "not merely freedom from bodily restraint" but also "to enjoy those privileges *long recognized at common law* as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (emphasis added). Consequently, it recognized the right of parents to control the education of their children. *Id.* at 400. Two years later, the Court cited *Meyer* for the proposition that the Fourteenth Amendment protects "the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925). The Court continued to affirm that the Fourteenth Amendment protects parental rights in more recent decisions. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion of four justices) (holding that the Fourteenth Amendment protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *id.* at 77 (Souter, J., concurring in judgment) (aggreging with that aspect of the plurality opinion).[4]

---

[4] In *Troxel*, the Court's foremost originalists disagreed as to how to view parental rights. Justice Thomas thought that they might be protected under the Privileges and Immunities Clause. *Troxel*, 530 U.S. at 80 (Thomas, J., concurring in judgment). Justice Scalia dissented, conceding that parental rights are actual God-given rights recognized by the Ninth Amendment but arguing they are not protected by the Fourteenth. *Id.* at 91 (Scalia, J., dissenting).

6

ACLL agrees with the State Defendants that this right did not include the right of a parent to change one's gender. State Defs. Br. 36-39. But in light of the Supreme Court's recent decisions emphasizing the need for historical analysis, if this Court requires more of a historical analysis of parental rights to make that determination, then *Amicus Curiae* will provide it here. The key, as the Court stated in *Meyer*, is the understanding parental rights as "long recognized at common law." *Meyer*, 262 U.S. at 399; *cf. Glucksberg*, 521 U.S. at 720-21 (focusing on rights deeply rooted in this Nation's history and traditions).

1. Blackstone's *Commentaries*

As the Supreme Court recently reminded the Nation, when it comes to historical analysis, "not all history is created equal." *Bruen*, slip op. at 31. What the common law held at the time of Bracton may not necessarily be the same as what it held when the Constitution was adopted. *See id.*, slip op. at 31-32. Instead, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.*, slip op. at 31 (cleaned up; emphasis in original).

The Supreme Court has long held that the best source for understanding the common law at the time the Constitution was adopted was Sir William Blackstone's *Commentaries on the Laws of England*.

> Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution it had been published about twenty years, and it has been said that more copies of the work had been sold in this

7

> country than in England, so that undoubtedly the framers of the
> Constitution were familiar with it.

*Schick v. United States*, 195 U.S. 65, 69 (1904). Thus, as a general rule, when

evaluating the state of the common law at the time of the Constitution's ratification,

Blackstone's *Commentaries* should be viewed as the gold standard.

When evaluating the original understanding of the Fourteenth Amendment

(which supposedly protects parental rights), the inquiry may have to focus on what

the understanding of the common law was in 1868. *See Bruen*, slip op. at 35. Thus,

*Amicus*'s inquiry will not end with Blackstone but will also examine the learned

treatises and writings of Chancellor Kent, Justice Story, and Thomas Cooley to see

if the understanding of parental rights had changed by 1868. *See Bridges v.*

*California*, 314 U.S. 252, 285-86 (1941) (holding that the works of Chancellor Kent

and Joseph Story had a similar effect as Blackstone in shaping American law);

*District of Columbia v. Heller*, 554 U.S. 570, 616 (2008) (noting the significance of

Cooley's 1868 treatise *Constitutional Limitations*).

First, Blackstone undoubtedly recognized that parents had rights over their

children that sprung from duties imposed on them by natural law. *See* 1 William

Blackstone, *Commentaries* *446. Blackstone held that there were three principal

duties that parents owed to their children: maintenance, protection, and education.

*Id.* "The duty of parents to provide for the *maintenance* of their children, is a

principal of natural law." *Id.* Although the "municipal laws of all well-regulated

states have taken care to enforce this duty … Providence has done it more effectually than any laws, by planting in the breast of every parent that natural … affection ….” *Id.* at \*447. The second duty was “protection, which was also a natural duty” that likewise was permitted by municipal law but was thought not needed to be compelled because of parents’ natural inclination to protect their children. *Id.* at \*450. The final duty was the duty to educate children. *Id.*

Parental rights arose from these natural duties. *Id.* at \*452. Yet Blackstone noted that parental power was not limitless. He noted that in Rome, parents had the power to kill their children. *Id.* The English law rejected that sweeping assertion of power and moderated it. *Id.* at \*452. Parents had the power to use reasonable force to correct their children, to direct their education, to consent to marriage contracts while the children were minors, to protect their estates, and to compel their labor while living at home, and to delegate some of their authority to schoolmasters. *Id.* at \*452-54.

Several observations must be made. First, among the enumerated parental powers that Blackstone listed, none of them involved the right to change a child’s sex or gender. Thus, as the State Defendants’ argue, Plaintiffs are not seeking to vindicate an old right but to invent a new right. *Cf. Heller*, 554 U.S. at 592 (holding that the Second Amendment codified a “pre-existing right,” but such a pre-existing right does not appear in the historical record here). The only colorable argument

9

Plaintiffs can make is that hormone therapy is a part of providing for the child's maintenance. But as *Glucksberg* warned, the rights recognized under the Court's substantive-due-process doctrine must bear a "careful description" to be valid. *Glucksberg*, 521 U.S. at 721. Any attempt to fit gender-transitioning under "maintenance" is not a careful description of the liberty interest in light of the historical record. It's not a close fit; it's a big stretch.

### 2.    The Importance of Natural Law in Common Law Analysis

Second, even assuming that one could try to invoke the duty of parental maintenance to justify gender transitions, the key to interpreting the scope of parental rights was understanding where they came from: natural law. According to Blackstone, the "law of nature," which is used interchangeably with natural law, is "the will of man's Maker." *Id.* at *39. Human law derived validity only if it comported with this law. *See id.* at *40-41. Natural law was discernable by use of reason. *Id.* at *39. But because man's reason is corrupt, God gave us the precepts of the law of nature in writing, which are found in the Scriptures. *Id.* at *41. Because man's reason is full of error but the Scriptures are not, Blackstone considered the Scriptures to be a better guide to the law of nature than reason alone. *Id.* at *42.

Taking into account these two epistemological methods of knowing the law of nature, both reason and Scripture teach that there are two sexes, that divorcing sex from gender is madness, and that neither one's sex nor gender can be changed.

*See Genesis* 1:27 ("male and female He created them"); Ryan T. Anderson, *When Harry Became Sally: Responding to the Transgender Movement* 78 (2019) (citing sources and concluding that sex is based on chromosomes and that this was always the understanding before politics got involved). Since natural law determines the scope of parental rights, the parental rights recognized by the common law and protected by the Court's Fourteenth Amendment's jurisprudence cannot include the use of hormone therapy to change a child's sex or gender.

One could argue that this analysis is based on an impermissible mingling of religion and the Constitution, which in turn would be based on the Supreme Court's twentieth-century Establishment Clause decisions. But this past term, the Court held that its prior ahistorical tests such as *Lemon v. Kurtzman*, 403 U.S. 602 (1971), have officially been abandoned. *Kennedy v. Bremerton Sch. Dist.*, No. 21-418, slip op. at 22 (U.S. June 27, 2022). "In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by reference to historical practice and understandings" that "accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* at 28 (cleaned up).

At the time of the Framing, the understanding was that Christianity laid at the foundation of our system of government and should even receive encouragement from the state as long as it did not result in the establishment of a national church or the use of force against religious dissenters. *See* 3 Joseph Story, *Commentaries on*

11

*the Constitution of the United States* §§ 1864-73 (1833). Justice Story even went so far as to say:

> One of the beautiful boasts of our municipal jurisprudence is, that Christianity is a part of the common law, from which it seeks the sanction of its rights, and by which it endeavours to regulate its doctrines. And, notwithstanding the specious objection of one of our distinguished statesman [Thomas Jefferson], the boast is as true as it is beautiful. There has never been a period, in which the common law did not recognize Christianity as lying at its foundations.

Joseph Story, *A Discourse Pronounced Upon the Inauguration of the Author as Dane Professor of Law in Harvard University* 20-21 (1829). Justice Story held that the error in the common-law system was recognizing Christianity only "as taught by its own established church," which led to violations of religious freedom. *Id.* But apart from that defect, Story believed that it was good. *See id.* Story agreed with Blackstone that Christianity clarified any doubts as to what natural law is. *See id.* at 42-44.

This view of natural law was still in effect in 1868 when the Fourteenth Amendment was ratified. Thomas Cooley writes, "It is frequently said that Christianity is a part of the law of the land. In a certain sense and for certain purposes this is true. The best features of the common law, and *especially those which regard the family and social relations; which compel the parent to support the child* … if not derived from, have at least been improved and strengthened by the prevailing religion and the teachings of its sacred Book." Thomas Cooley, *A Treatise on the*

12

*Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 579 (6th ed. 1890) (emphasis added) (hereinafter *Constitutional Limitations*). Thus, Cooley viewed Christianity as having the most influence on American law in the realm of family law. Therefore, if there was any doubt that natural law should inform the meaning of common law parental rights in 1868, Cooley dispelled them.

In light of the historical evidence of the influence of Christianity on the United States, it should be no surprise that the Supreme Court held in 1892 that "this is a Christian nation." *Church of Holy Trinity v. United States*, 143 U.S. 457, 471 (1892); *accord Constitutional Limitations*, *supra*, at 579 ("Nor, while recognizing a superintending Providence, are we always precluded from recognizing also, in the rules prescribed for the conduct of the citizen, the notorious fact that the prevailing religion in the States is Christian."). It seems strange to say so only because of the Supreme Court's decades of bad Establishment Clause jurisprudence, which is just abandoned in *Kennedy*. Following *Kennedy*'s command to "focus on original meaning and history," *Kennedy*, slip op. at 29, the time for the shift in how the courts consider Christianity's relationship to the Constitution has come. Christianity had a huge effect on the common law rights of parents, and this Court is bound to take that key fact into consideration.

13

To be clear, by urging this Court to consider the backdrop of natural law in constitutional interpretation, *Amicus Curiae* is not asking the Court to engage in results-based adjudication that lines up with individual judges' view of the common good. *Cf.* Adrian Vermule, *Common Good Constitutionalism* (2022). As Chief Judge Pryor has argued, "Replace 'common good' with 'human dignity' and Vermule's living common goodism sounds a lot like Brennan's living constitutionalism." William H. Pryor Jr., *Against Living Common Goodism*, 23 Federalist Soc'y Rev. 24, 26 (2022). On the contrary, *Amicus Curiae* is asking the Court to examine the scope of parental rights in light of what the common law held, as *Meyer* instructed. It is simply an undisputable fact that natural law is a part of that analysis, and *Amicus Curiae* is asking the Court to examine it in light of what it meant historically.

### 3.    Parental Rights in the Early 19th Century

Chancellor James Kent followed in Blackstone's footsteps by summarizing the state of the common law, except that he summarized how it stood in America. "The duties that reciprocally result from this connexion [between parent and child], are prescribed, as well by those feelings of parental love and filial reverence which Providence has implanted in the human breast, as by the positive precepts of religion, and of our municipal law." 2 James Kent, *Commentaries on American Law* 159 (1827). "The duties of parents to their children … consists in maintaining and educating them during the season of infancy and youth, and in making reasonable

14

provision for their future usefulness and happiness in life, by a situation suited to their habits, and a competent provision for the exigencies of that situation." *Id.*[5] It does not appear that American law deviated from the English in any material way. *See id.* at 160-73. Thus, it appears that both the letter and spirit of the common law as articulated by Blackstone were in effect in the American states in the early 19th Century.

    4.     <u>Parental Rights in 1868</u>

When Thomas Cooley published *Constitutional Limitations* in 1868, he wrote: "The father of an infant, being obliged by law to support his child, has a corresponding right to control his actions, and to employ his services during the continuance of legal infancy." *Constitutional Limitations*, *supra*, at 414. Nothing in this restatement of American law deviates from what the common law or Chancellor Kent taught. In light of what he taught about Christianity's effect on the laws of domestic relations, *id.* at 579, there is no reason to think that either the scope or spirit of the law had changed.

---

[5] One might argue that giving children cross-sex hormones *is* fulfilling the duty for their future happiness. But at the time of the founding, "happiness" meant that one "only can be esteemed really and permanently *happy*, who enjoys peace of mind in the favor of God." Noah Webster, *Webster's American 1828 Dictionary of the English Language* 393 (Compact ed., Walking Lion Press 2010) (1828).

5.      Conclusion: A Historical Analysis of Parental Rights Does
        Not Support Plaintiffs' Position

In light of the foregoing, the common law understanding of parental rights never included the right to attempt to change a child's gender. Nothing in the historical record even comes close to the right that Plaintiffs ask this Court to recognize. If any doubt remains, then we should look to the common law's rationale for recognizing parental rights: the law of nature. Under that framework, then there is no way that common law parental rights could be interpreted to reach the conclusion that Plaintiffs pursue.

As *Meyer* taught, if the statute at issue does not infringe on common law parental rights, then the law will be sustained if it bears a rational relationship to the state's police powers. *See Meyer*, 262 U.S. at 400. The issue of transgenderism is hotly debated, and giving children hormone therapy could undoubtedly have long-lasting effects on them. Thus, Alabama's law undoubtedly bears a rational relationship to the legitimate interest protecting the health of its children, and that is where the inquiry must end. *Dobbs*, slip op. at 85-86.

## II.    The District Court's Interpretation of the Equal Protection Clause Does Not Comport with the Fourteenth Amendment's Original Meaning or Controlling Precedent

### A.  Original Meaning

The Fourteenth Amendment's Equal Protection Clause states, "nor shall any State … deny to any person within its jurisdiction the equal protection of the laws."

16

U.S. Const. amend. XIV, § 1. There is nearly universal agreement that the immediate object of the Fourteenth Amendment was to outlaw the Black Codes and constitutionalize the Civil Rights Act of 1866. *See* Steven G. Calabresi & Julia T. Rickert, *Originalism and Sex Discrimination*, 90 Tex. L. Rev. 1, 5 & n.16 (2011). However, the text of the Equal Protection Clause does not limit the denial of equal protection only to black people; it instead provides that no state may "deny to any *person* within its jurisdiction the equal protection of the laws." Thus, it becomes necessary to inquire as to what its framers meant to determine its scope.

1.    The Fourteenth Amendment's Framers

The Heritage Foundation described the jurisprudence of the Fourteenth Amendment's framers this way:

> "The framers' jurisprudence tended to lump together rights flowing from citizenship and personhood under the rubric of 'civil rights,' and to speak of them in religious or natural law and natural rights terms. In Section 1 of the Fourteenth Amendment, the framers attempted to create a legal bridge between their understanding of the Declaration of Independence, with its grand declarations of equality and rights endowed by a Creator God, and constitutional jurisprudence."

David Smolin, *Equal Protection*, in *The Heritage Guide to the Constitution* 400 (1st ed. 2005). The Heritage Foundation says further:

> "[T]his general language [in the Equal Protection Clause] reflected anti-slavery Republican jurisprudence, which drew links between the Declaration of Independence, natural law and natural rights, and constitutional jurisprudence. From an originalist constitutional perspective, application of the Equal Protection Clause to rights or

> issues beyond the scope of the 1866 Civil Rights Act can rest upon the broader principles enacted by the framers—their jurisprudence of equality linking the Declaration of Independence to the Constitution."

*Id.* at 401.

Thaddeus Stevens, the "most powerful politician in America" at the time of the Fourteenth Amendment's framing, has been described as its primary framer. Aaron J. Walker, *"No Distinction Would Be Tolerated": Thaddeus Stevens, Disability, and the Original Intent of the Equal Protection Clause*, 19 Yale L. & Pol'y Rev. 265, 269, 273-74 (2000). Stevens looked both to the Bible and to the Declaration of Independence to inform his views of what constituted discrimination. *Id.* at 278.[6]

Stevens introduced the first draft of the Fourteenth Amendment to the House of Representatives on April 30, 1866. 2 *The Reconstruction Amendments: The Essential Documents* 10 (Kurt T. Lash, ed., Univ. of Chicago Press 2021). On the day he introduced the Amendment, Stevens said, "Our fathers had been compelled to postpone the principles of their great Declaration, and wait for their full establishment till a more proprietous time. That time ought to be present now." *Id.* at 158 (reproducing *Cong. Globe*, 39th Cong., 1st Sess., 2458-59 (May 8, 1866)). Commenting on the rights protected by Section 1, Stevens said,

---

[6] Even on his tombstone, he declared that the principle that he had advocated throughout his life was "EQUALITY OF MAN BEFORE HIS CREATOR." *Id.* at 285.

I can hardly believe that any person can be found who will not admit that every one of these provisions is just. They are all asserted, in some form or other, in our DECLARATION or organic law. But the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States, so far that the law which operates upon one man shall operate *equally* upon all.

*Id.* at 159. Thus, as for Thaddeus Stevens, the principal framer of the Fourteenth Amendment, there is no question that he believed he was taking the principle of God-given rights enunciated in *The Declaration of Independence* to their logical conclusion.

John Bingham is often the subject of Fourteenth Amendment analysis, with Justice Hugo Black even calling him the "Madison of the first section of the Fourteenth Amendment." Walker, *supra*, at 268-69 (cleaned up). In debating what would become Section 2 of the Fourteenth Amendment, which would require blacks to be taken fully into account in apportioning representatives, Bingham explained, "I am for the proposed amendment from a sense of right—that absolute, eternal verity which underlies your Constitution. So it was proclaimed in your imperishable Declaration by the words, all men are created equal; that they are endowed by their Creator with the rights of life and liberty…." *The Reconstruction Amendments*, *supra*, at 59 (reproducing *Cong. Globe*, 39th Cong., 1st Sess., 422-35 (Jan. 25, 1866)). Thus, like Stevens, Bingham believed he was taking the principle of God-given equality stated in the Declaration of Independence to its logical conclusion.

19

Finally, Senator Jacob Howard introduced the Fourteenth Amendment in the Senate. *Id.* at 185. As to the Equal Protection Clause, Senator Howard explained that it "protects the black man in his fundamental rights as a citizen with the same shield which it throws over the white man" and that such protection was necessary because whites and blacks were "both equally responsible to justice and to God for the deeds done in the body[.]" *Id.* at 188 (reproducing *Cong. Globe*, 39th Cong., 1st Sess., 2764-67 (May 23, 1866). Senator Howard's comments reflect the view that all men are equal under God and therefore should be treated equally, a fundamental principle from *The Declaration of Independence*.

### 2.  Public Response and Ratification

In the 1866 elections, the Republicans "prevailed in a landslide election and received what they viewed as a mandate to secure the ratification of the Fourteenth Amendment." *The Reconstruction Amendments, supra,* at 228. Given that the Fourteenth Amendment was a product of Republican jurisprudence that linked the natural rights of the individual to the Constitution itself, Smolin, *supra*, at 401, their landslide victories probably were a mandate for those Republican ideas. Given the wide-spread knowledge that the Republicans were trying to take the principles in *The Declaration of Independence* to their logical conclusion, there is no reason to believe that the People viewed the Equal Protection Clause as anything less than what Stevens, Bingham, and Howard did.

20

3. Conclusion and Application

The Framers of the Fourteenth Amendment intended to take *The Declaration of Independence's* principle of equality under God to its logical conclusion. It is impossible to understand the scope of the Equal Protection Clause without that backdrop. Various theories of "equality" dominate today's debates, not only in political circles but also in legal circles. But without a proper understanding of what "equal protection" meant to those who wrote it and those who ratified it, the concept of equal protection can become whatever the judiciary wants it to mean.

Consequently, the district court's interpretation of the Equal Protection Clause cannot be sustained. The Framers of the Fourteenth Amendment intended for the judiciary to interpret it against the backdrop of natural law, which the district court failed to do. *See* Part I.B., *supra*. Because the district court's interpretation of the Equal Protection Clause is incongruent with the Amendment's original meaning, this Court should reverse it.

B. *Controlling Precedent*

The district court's holding cannot be reconciled with the precedents of the United States Supreme Court or the Eleventh Circuit, either. The district court's opinion rests on the premise that sex is fluid rather than fixed. But the Supreme Court has held that "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth[.]" *Frontiero v. Richardson*, 411 U.S. 677,

21

686 (1973). Departing from this principle would require overruling Supreme Court precedent, which this Court has held that is obviously not at liberty to do. *See W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1329-30 (11th Cir. 2018).

The Supreme Court's recent decision in *Bostock*, which is the only case in which the Supreme Court has recognized some level of transgender rights, does not warrant a different result. In that case, the Supreme Court held that an employer violates Title VII's prohibition of sex discrimination when it fires an employee because they are transgender. *Bostock*, 140 S. Ct. at 1737. Purportedly relying on the textualist theory of statutory interpretation, Justice Gorsuch, writing for the Court, reasoned that firing a transgender person involves firing him or her "for traits or actions [the employer] would not have questioned in members of a different sex," which necessarily means the employer ran afoul of Title VII's prohibition of sex discrimination. *Id.*; *see also id. at* 1755-56 (Alito, J., dissenting) (describing the Court's opinion as a "pirate ship" sailing "under a textualist flag" but actually representing "a theory of statutory interpretation that Justice Scalia excoriated—the theory that courts should 'update' old statutes so that they better reflect the current values of society.").

*Bostock* is distinguishable because the rules of statutory analysis and constitutional analysis are different. As Justice Scalia explained, because the Constitution lacks the specificity and length of a statutory code, the object of

constitutional interpretation is to determine "the original meaning of the text." Antonin Scalia, *A Matter of Interpretation* 37-38 (new ed. 2018). This is different than statutory interpretation, where the court should "not inquire what the legislature meant" but rather "only what the statute means." *Id.* at 23 (cleaned up). Thus, while the Supreme Court essentially conceded that Congress did not mean for Title VII to apply to gender identity, it held that the statute so applied anyway. *Bostock*, 140 S. Ct. at 1737. Constitutional analysis, in contrast, is much different. In light of the views of the Fourteenth Amendment's framers, the Equal Protection Clause could not protect a right to change one's sex or gender.

This Court's decision in *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), is distinguishable. In *Glenn*, this Court held that a government violates the Equal Protection Clause when it fires a person "on the basis of his or her gender non-conformity." 663 F.3d at 1316. The Court reasoned that *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality) held that discriminating against a person because their behavior did not comport with sex-stereotypes violates the Equal Protection Clause. Applying *Price Waterhouse* to the case before it, this Court reasoned that "[a] person is defined as transgender precisely because of the perception that his or her *behavior* transgresses gender stereotypes," and therefore *Price Waterhouse* prohibits discrimination against transgender people. *Glenn*, 663 F.3d at 1316 (emphasis added).

23

*Amicus* respectfully submits that, in light of the Equal Protection Clause's original meaning, *Glenn* should be reconsidered at an opportune time. In the meantime, however, *Glenn* held only that the government violates the Equal Protection Clause when it discriminates against a person for gender non-conforming *behavior*. But a person's *status* of actually being one biological sex or the other is completely different. As Chief Judge Pryor noted in a later case, "The doctrine of gender nonconformity is, and always has been, behavior based. Status-based protections must stem from a separate doctrine …." *Evans v. Ga. Reg. Hosp.*, 850 F.3d 1248, 1260 (11th Cir. 2017) (William Pryor, J., concurring). Thus, under this Court's precedent, the Equal Protection Clause protects a transgender person's right to *behave* in a certain way, but it does not protect the right to change their *status*, which is exactly what Plaintiffs seek to do in this case. While *Glenn* requires Alabama to let Plaintiffs *behave* like the opposite sex, it does not require Alabama to let them *become* the opposite sex.[7]

Thus, the precedents from the Supreme Court and this Court that appear to cut the other way are distinguishable. If this Court recognized the difference but felt like it should nevertheless affirm the district court's decision because doing so would be

---

[7] One may argue that *Adams v. Sch. Bd. of St. John's Cnty.*, 3 F. 4th 1299 (11th Cir. 2021) cuts the other way. However, at the time this brief was filed, this Court had vacated *Adams* pending en banc review. *Adams v. Sch. Bd. of St. John's Cnty.*, 9 F. 4th 1369 (11th Cir. 2021) (en banc).

consistent with the "spirit" of those precedents, then it should consider that its duty is to the Constitution itself. *See* U.S. Const., amend. VI, cl. 2. Because of that, "lower court judges can still decline to *extend* a constitutional rule to brand new circumstances, if the binding precedent is completely unmoored from the Constitution's original public meaning." Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J. of L. & Liberty 44, 46 (2019). This Court should listen to Professor Blackman's advice and rule in this case according to the Constitution's original meaning instead of extending precedents that do not comport with it.

## CONCLUSION

Neither the Due Process Clause nor the Equal Protection Clause of the Fourteenth Amendment protect the right that Plaintiffs ask the courts to recognize. The issue of "gender dysphoria is a sensitive one, on both sides of the 'v.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F. 3d 1257, 1278 (11th Cir. 2020).  For this reason, this issue is "'to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting.'" *Dobbs*, slip op. at 14 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 979 (1992) (Scalia, J., concurring in judgment in part and dissenting in part)). But as for this Court, its "first obligation … is to get the law right." *Keohane*, 952 F. 3d at 1278. And in light of what history teaches, the "best understanding of the law is that … it simply does

not entitle" Plaintiffs to the relief they seek. *Id.* Therefore, the district court's judgment should be reversed.

Respectfully submitted,

/s/ Matthew J. Clark
Matthew J. Clark
ALABAMA CENTER FOR LAW AND LIBERTY
2213 Morris Avenue, Floor 1
Birmingham, AL 35203
(256) 510-1828
matt@alabamalawandliberty.org
*Counsel for Amicus Curiae*

July 5, 2022

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. Rule 32-4, this brief contains 6,352 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ Matthew J. Clark
Matthew J. Clark
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 5, 2022, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

/s/ Matthew J. Clark
Matthew J. Clark
Counsel for *Amicus Curiae*