No. 22-11707

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

## APPELLANTS' APPENDIX VOLUME I OF XIII

Christopher Mills
SPERO LAW LLC
557 East Bay St.,
#22251
Charleston, SC 29451
(843) 606-0640
cmills@spero.law

July 5, 2022

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
Thomas A. Wilson
  *Deputy Solicitors General*
James W. Davis
  *Deputy Attorney General*
Benjamin M. Seiss
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

# INDEX

**TAB**

**VOLUME I**

Civil Docket Sheet ......................................................................................A

Individual Plaintiffs' Complaint (April 19, 2022)....................................................1

Order Reassigning Case to Judge Liles C. Burke (April 20, 2022)...........................3

Individual Plaintiffs' Motion for Preliminary Injunction (April 21, 2022)...............7

Individual Plaintiffs' Brief in Support of Motion for Preliminary Injunction
(April 21, 2022).....................................................................................8

    Exhibit 1 – Declaration of Linda A. Hawkins, Ph.D. ................................... 8-1

    Exhibit 2 – Declaration of Morissa J. Ladinsky, M.D. ................................. 8-2

**VOLUME II**

    Exhibit 3 – Declaration of Stephen M. Rosenthal, M.D. ............................. 8-3

    Exhibit 4 – Declaration of Rev. Paul A. Eknes-Tucker................................. 8-4

    Exhibit 5 – Declaration of Brianna Boe ...................................................... 8-5

    Exhibit 6 – Declaration of James Zoe ........................................................ 8-6

    Exhibit 7 – Declaration of Megan Poe ....................................................... 8-7

    Exhibit 8 – Declaration of Kathy Noe ........................................................ 8-8

    Exhibit 9 – Declaration of Jane Moe, Ph.D. ............................................... 8-9

    Exhibit 10 – Declaration of Rachel Koe, M.D. ......................................... 8-10

Answer of Defendants (April 21, 2022) .................................................................20

Order Setting Evidentiary Hearing (April 22, 2022) ............................................ 34

United States of America's Motion for Temporary Restraining Order and
    Preliminary Injunction (April 29, 2022) .......................................................62

United States of America's Brief in Support of Motion for Temporary
    Restraining Order and Preliminary Injunction (April 29, 2022) ................ 62-1

## VOLUME III

Exhibit 1 – Declaration of Armand H. Antommaria, M.D. ....................... 62-2

Defendants' Exhibit List and Notice of Filing of Evidence in Opposition
    to Plaintiffs' Motion for Preliminary Injunction (May 2, 2022) ....................69

Exhibit 1 – Alabama Vulnerable Child Compassion and
        Protection Act ......................................................... 69-1

Exhibit 2 – Expert Report of James Cantor, Ph.D.,
        Clinical Psychologist and Director of Toronto
        Sexuality Centre......................................................... 69-2

Exhibit 3 – Expert Report of Michael K. Laidlaw, M.D.,
        Endocrinologist................................................... 69-3

Exhibit 4 – Expert Report of Quentin L. Van Meter, M.D.,
        Pediatric Endocrinologist and Associate Professor of
        Pediatrics at Emory University.................................... 69-4

## VOLUME IV

Exhibit 5 – Expert Report of Paul W. Hruz, M.D., Ph.D.,
        Associate Professor of Pediatrics in the Division of Pediatric
        Endocrinology and Diabetes at Washington University
        School of Medicine.................................................. 69-5

Exhibit 6 – Expert Report of Patrick Hunter, M.D.,
        Pediatrician, Bioethicist, and Former Chair of the Pediatric
        Department at Scotland Memorial Hospital ............................ 69-6

Exhibit 7 – Expert Report of Dianna Kenny, Ph.D.,
Psychotherapist and Former Professor of Psychology at
University of Sydney .................................................................. 69-7

**VOLUME V**

Exhibit 8 – Stephen B. Levine, E. Abbruzzese & Julia M. Mason,
*Reconsidering Informed Consent for Trans-Identified
Children, Adolescents, and Young Adults*,
J. OF SEX & MARITAL THERAPY (Mar. 17, 2022)....................... 69-8

Exhibit 9 – *Evidence Review: Gonadotropin Releasing Hormone
Analogues for Children and Adolescents with Gender
Dysphoria*, Nat'l Inst. for Health & Care Excellence (NICE)
(Mar. 11, 2021) ...................................................................... 69-9

**VOLUME VI**

Exhibit 10 – *Evidence Review: Gender-Affirming Hormones for
Children and Adolescents with Gender Dysphoria*,
Nat'l Inst. for Health & Care Excellence (NICE) (Mar. 11,
2021) ...................................................................................... 69-10

Exhibit 11 – Sweden National Board of Health and Welfare Policy
Statement, Socialstyrelsen, *Care of Children and
Adolescents with Gender Dysphoria: Summary* (2022) .......... 69-11

Exhibit 12 – Finland's Council for Choices in Healthcare Policy
Statement, Palveluvalikoima, *Recommendation of the
Council for Choices in Health Care in Finland (PALKO /
COHERE Finland)* ................................................................. 69-12

Exhibit 13 – Académie Nationale de Médecine, *Medicine and Gender
Transidentity in Children and Adolescents* (Feb. 25, 2022).... 69-13

Exhibit 14 – The Royal Australian & New Zealand College of
Psychiatrists, *Recognising and Addressing the Mental
Health Needs of People Experiencing Gender Dysphoria /
Gender Incongruence*, Position Statement 103 (Aug. 2021) .. 69-14

Exhibit 15 – *Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.* [2020] EWHC (Admin) 3274 .................................................. 69-15

**VOLUME VII**

Exhibit 16 – Centers for Medicare & Medicaid Services, Tamara Syrek Jensen, et al., *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (CAG-00446N) (Aug. 30, 2016)........................................................................ 69-16

Exhibit 17 – Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) (excerpts) .............................................................................. 69-17

Exhibit 18 – World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012) (pp. 1-112)................................. 69-18

**VOLUME VIII**

Exhibit 18 (cont.) – World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012) (pp. 113-120) ............................ 69-18

Exhibit 19 – Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017).............. 69-19

Exhibit 20 – Lisa Littman, *Parent Reports of Adolescents & Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, PLOS ONE 13(8):e0202330 .................................. 69-20

Exhibit 21 – Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR No. 50, 3353-54 (Oct. 2021) ........................................................... 69-21

Exhibit 22 – Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, J. OF HOMOSEXUALITY (Apr. 30, 2021)............................................ 69-22

Exhibit 23 – Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696-704 (Oct. 2014).......................... 69-23

Exhibit 24 – Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 PEDIATRICS no. 4 (Oct. 2018) .......................................... 69-24

Exhibit 25 – Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 832 (Dec. 2015)................................... 69-25

Exhibit 26 – Declaration of Corinna Cohn ............................... 69-26

Exhibit 27 – Declaration of Sydney Wright .............................. 69-27

Exhibit 28 – Declaration of Carol Frietas ............................... 69-28

Exhibit 29 – Declaration of Barbara F. .................................... 69-29

Exhibit 30 – Declaration of John Doe ..................................... 69-30

Exhibit 31 – Declaration of John Roe ..................................... 69-31

**VOLUME IX**

Exhibit 32 – Declaration of Kristine W. .................................. 69-32

Exhibit 33 – Declaration of Yaacov Sheinfeld ......................... 69-33

Exhibit 34 – Declaration of Martha S. ....................................................... 69-34

Exhibit 35 – Declaration of KathyGrace Duncan .................................... 69-35

Exhibit 36 – Declaration of Jeanne Crowley ........................................... 69-36

Exhibit 37 – Declaration of Ted H. Halley ................................................ 69-37

Exhibit 38 – Declaration of Kellie C. ....................................................... 69-38

Exhibit 39 – Declaration of Gary Warner ................................................ 69-39

Exhibit 40 – April 15, 2022 emails regarding *Ladinsky v. Ivy*
          litigation.................................................................. 69-40

Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary
          Injunction (May 2, 2022) ...................................................74

**VOLUME X**

UAB Patient Information and Consent Form (May 3, 2022) .......................... 78-41

Defendants' Notice of Filing Corrected Exhibit 41 (May 3, 2022).......................87

Exhibit 1 – Corrected Exhibit 41 – Sydney Wright, *I Spent a Year as a
          Trans Man. Doctors Failed Me at Every Turn*, DAILY
          SIGNAL (Oct. 7, 2019). ............................................................. 87-1

Amended Intervenor Complaint (May 4, 2022) .....................................92

Procedural Orders and Status of Forthcoming Opinion (May 8, 2022) ................94

Transcript of Preliminary Injunction Hearing - Volume I (pp. 1-149)
          (May 5, 2022) ...............................................................104

**VOLUME XI**

Transcript of Preliminary Injunction Hearing – Volume I (cont.) (pp.195-206)
          (May 5, 2022).............................................................. 104

Transcript of Preliminary Injunction Hearing - Volume II (May 6, 2022) ..........105

**VOLUME XII**

Transcript of Preliminary Injunction Hearing - Volume I (pp. 150-170)
(May 5, 2022) (SEALED) .............................................................................106

**VOLUME XIII**

Opinion and Order (May 13, 2022) ......................................................................107

Defendants' Notice of Appeal of Order Granting Preliminary Injunction
(May 16, 2022) ...........................................................................................108

Notice of Correction re: Opinion and Order (May 19, 2022) ..............................112

Corrected Opinion and Order (May 19, 2022) ................................................. 112-1

Transcript of Preliminary Injunction Hearing - Volume I (cont.) (pp. 170-94)
(May 5, 2022) .............................................................................................129

Certificate of Service

# TAB A

APPEAL

# U.S. District Court
## Alabama Middle District (Montgomery)
## CIVIL DOCKET FOR CASE #: 2:22-cv-00184-LCB-SRW

Eknes-Tucker et al v. Marshall et al
Assigned to: Honorable Judge Liles C. Burke
Referred to: Honorable Judge Susan Russ Walker
Case in other court: 22-11707-JJ
Cause: 42:1983 Civil Rights Act

Date Filed: 04/19/2022
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Paul A. Eknes-Tucker**
*Rev.*

represented by **Abigail Hoverman Terry**
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Suite 3800
Chicago, IL 60606
312-764-6931
Email: ahoverman@kslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Reinke**
King & Spalding
1180 Peachtree St
Atlanta, GA 30309
404-572-4600
Fax: 404-572-5100
Email: areinke@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie A. Vague**
Lightfoot Franklin & White LLC
400 20th Street North
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: avague@lightfootlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Asaf Orr**
National Center for Lesbian Rights
870 Market St.
Suite 370

San Francisco, CA 94102
415-365-1326
Email: aorr@nclrights.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent P. Ray**
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Suite 3800
Chicago, IL 60606
312-764-6925
Fax: 312-995-6330
Email: bray@kslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
Human Rights Campaign Foundation
1640 Rhode Island Ave NW
Washington, DC 20036-3200
202-527-3669
Email: cynthia.weaver@hrc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
Southern Poverty Law Center
LGBT Rights & Special Litigation
400 Washington Ave
Montgomery, AL 36104
334-956-8200
Fax: 334-956-8481
Email: diego.soto@splcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gilbert Olusegun Oladeinbo**
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
657-246-9960
Email: goladeinbo@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
King & Spalding
1180 Peachtree St - Ste 1700

Atlanta, GA 30309
404-572-3576
Email: apratt@kslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
Lightfoot, Franklin & White LLC
The Clark Bldg - 400 20th St N
Birmingham, AL 35203
205-581-0773
Fax: 205-581-0799
Email: jdoss@lightfootlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
GLBTQ Advocates & Defenders
19 Tremont Street, Suite 950
Boston, MA 02108
617-426-1350
Email: jlevi@glad.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
Southern Poverty Law Center
400 Washington Ave
Montgomery, AL 36104
404-807-0969
Email: jessica.stone@splcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
Lightfoot Franklin & White LLC
400 20th Street North; The Clark Building
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: meagan@lightfootlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
King & Spalding LLP
633 W 5th Street
Suite 1600
Los Angeles, CA 90071

213-443-4344
Email: mshortnacy@kslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404-572-4939
Email: mpeterson@kslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Warbelow**
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
202-628-4160
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
Southern Poverty Law Center
2 S. Biscayne Blvd.
Ste 3750
Miami, FL 33131
334-224-4309
Fax: 786-237-2949
Email: scott.mccoy@splcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brianna Boe**
*individually and on behalf of her minor son,*
*Michael Boe*

represented by **Abigail Hoverman Terry**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Reinke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie A. Vague**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Asaf Orr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent P. Ray**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gilbert Olusegun Oladeinbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Warbelow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**James Zoe**                              represented by   **Abigail Hoverman Terry**
*individually and on behalf of his minor son,*                (See above for address)
*Zachary Zoe*                                                 *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Adam Reinke**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Amie A. Vague**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Asaf Orr**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Brent P. Ray**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gilbert Olusegun Oladeinbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Warbelow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Megan Poe**                                         represented by    **Abigail Hoverman Terry**
*individually and on behalf of her minor*                              (See above for address)
*daughter, Allison Poe*                                               *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Adam Reinke**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Amie A. Vague**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Asaf Orr**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Brent P. Ray**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gilbert Olusegun Oladeinbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Warbelow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Kathy Noe**<br>*individually and on behalf of her minor son,*<br>*Christopher Noe* | represented by | **Abigail Hoverman Terry**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Adam Reinke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie A. Vague**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Asaf Orr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent P. Ray**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gilbert Olusegun Oladeinbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**Sarah Warbelow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Moe**                     represented by   **Abigail Hoverman Terry**
*Ph.D.*                                          (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *PRO HAC VICE*
                                                 *ATTORNEY TO BE NOTICED*

**Adam Reinke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie A. Vague**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Asaf Orr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent P. Ray**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**Gilbert Olusegun Oladeinbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Warbelow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Rachel Koe**                                    represented by    **Abigail Hoverman Terry**
*M.D.*                                                                                  (See above for address)
                                                                                              *LEAD ATTORNEY*
                                                                                              *PRO HAC VICE*
                                                                                              *ATTORNEY TO BE NOTICED*

**Adam Reinke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie A. Vague**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Asaf Orr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent P. Ray**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Cheng-Wun Weaver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diego Armando Soto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gilbert Olusegun Oladeinbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**James Andrew Pratt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Doss**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L. Levi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Stone**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melody Hurdle Eagan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Shortnacy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Misty L. Peterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Warbelow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Daniel McCoy**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**United States of America**                    represented by    **Alyssa C. Lareau**
DOJ-Crt
Civil Rights Division
Poc Dalton, Dennis
1425 New York Ave
Nya 5066
Washington, DC 20005
202-514-6360
Email: alyssa.lareau@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Coty Rae Montag**
DOJ-Crt
Civil Rights Division
150 M Street NE
4con
Washington, DC 20002
202-598-1580
Email: coty.montag@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eliza Dermody**
DOJ-Crt
950 Pennsylvania Ave., NW
Washington, DC 20530
202-305-0463
Email: eliza.dermody@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Prim Formby Escalona**
Maynard Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
205-254-1988
Fax: 205-254-1999
Email: pescalona@maynardcooper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason R. Cheek**
U S Atty Office - NDAL
1801 Fourth Ave N
Birmingham, AL 35203

205-244-2104
Email: jason.cheek@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Michael Powers**
DOJ-Crt
Civil Rights Division
950 Pennsylvania Avenue
Washington, DC 20530
202-514-1055
Email: john.powers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kaitlin N Toyama**
Department of Justice
Civil Rights Division
950 Pennsylvania Avenue NW
Washington, DC 20530
202-353-5311
Email: kaitlin.toyama@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lane Hines Woodke**
DOJ-USAO
Ndal
United States Attorney's Office
1801 Fourth Ave., N
Birmingham, AL 35203-2101
205-244-2001
Email: lane.woodke@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Renee Michelle Williams**
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-598-3210
Email: renee.williams3@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Jean Stewart**
United States Attorney Office
131 Clayton Street
Montgomery, AL 36104
334-551-1705
Fax: 334-223-7135
Email: sandra.stewart@usdoj.gov
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Stephen D Wadsworth**
US Attorney's Office for the Middle District
of Alabama
131 Clayton Street
Montgomery, AL 36104
334-223-7280
Fax: 334-223-7560
Email: stephen.wadsworth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kay Ivey**
*in her official capacity as Governor of the*
*State of Alabama*
*TERMINATED: 05/05/2022*

represented by **Benjamin Matthew Seiss**
Alabama Attorney General's Office
501 Washington Avenue
Montgomery, AL 36104
334-353-8917
Email: ben.seiss@alabamaag.gov
*TERMINATED: 05/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**
Spero Law LLC
557 East Bay Street
Charleston, SC 29413
843-606-0640
Email: cmills@spero.law
*TERMINATED: 05/05/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
Office of the Attorney General
501 Washington Ave
Montgomery, AL 36130
334-353-2196
Fax: 334-242-4891
Email: edmund.lacour@alabamaag.gov
*TERMINATED: 05/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Davis**
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130

334-242-7300
Fax: 334-353-8400
Email: Jim.Davis@AlabamaAG.gov
*TERMINATED: 05/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Barrett Bowdre**
Office of the Alabama Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
334-353-8892
Fax: 334-353-8400
Email: barrett.bowdre@alabamaag.gov
*TERMINATED: 05/05/2022*
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
Office of The Attorney General - Alabama
501 Washington Ave
Montgomery, AL 36104
334-353-8931
Email: thomas.wilson@alabamaag.gov
*TERMINATED: 05/05/2022*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steve Marshall**
*in his official capacity as Attorney General
of the State of Alabama*

represented by **Benjamin Matthew Seiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Barrett Bowdre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**

*(See above for address)*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daryl D. Bailey**
*in his official capacity as District Attorney*
*for Montgomery County*

represented by **Alexander Barrett Bowdre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Matthew Seiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**C. Wilson Baylock**
*in his official capacity as District Attorney*
*for Cullman County*

represented by **Alexander Barrett Bowdre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Matthew Seiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**James William Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Jessica Ventiere**<br>*in her official capacity as District Attorney*<br>*for Lee County* | represented by | **Alexander Barrett Bowdre**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Benjamin Matthew Seiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Tom Anderson**<br>*in his official capacity District Attorney for*<br>*the 12th Judicial Circuit* | represented by | **Alexander Barrett Bowdre**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Benjamin Matthew Seiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Danny Carr**
*in his official capacity as District Attorney for Jefferson County*

represented by **Alexander Barrett Bowdre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Matthew Seiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ernest Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Arkansas**

represented by **Mark Douglas Wilkerson**
Wilkerson & Bryan, P.C.
P.O. Box 830

Montgomery, AL 36104
334-265-1500
Email: mark@wilkersonbryan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
Office of the Arkansas Attorney General
Office of the Arkansas Attorney General
323 Center Street
Suite 200
Little Rock, AR 72201
501-682-2401
Email: michael.cantrell@arkansasag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**State of West Virginia**             represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**State of Indiana**             represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**State of Nebraska**             represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Louisiana**                         represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Texas**                             represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Mississippi**                       represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Georgia**                           represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of South Carolina**                    represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Oklahoma**                    represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Alaska**                    represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Utah**                    represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Montana**                    represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Arizona**                                represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Missouri**                               represented by **Mark Douglas Wilkerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Academy of Pediatrics**                  represented by **Barry Alan Ragsdale**
Dominick Feld Hyde, P.C.
Litigation
1130 22nd St S - Ste 4000
Birmingham, AL 35205
205-536-8888
Fax: 205-271-9696
Email: BRagsdale@dfhlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
415 Mission Street
Suite 5400
San Francisco, CA 94105
415-591-7078
Email: clannin@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
COVINGTON & BURLING, LLP

One CityCenter
850 Tenth St., N.W.
850 Tenth Street, NW
Washington, DC 20001
202-662-5294
Email: jveta@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001
202-662-6000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
Covington & Burling LLP
1999 Avenue of the Stars
1999 Avenue of the Stars
Ste 35th Floor
Los Angeles, CA 90067
424-332-4780
Email: mlanosa@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
Dominick Feld Hyde
1130 22nd St S
Ste 4000
Birmingham, AL 35205
205-536-8888
Email: RVANCE@DFHLAW.COM
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001
202-662-5102
Email: wisasi@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Alabama Chapter of the American**            represented by  **Barry Alan Ragsdale**
**Academy of Pediatrics**                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Academic Pediatric Association**          represented by  **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**American Academy of Child and
Adolescent Psychiatry**      represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**American Academy of Family Physicians**     represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Academy of Nursing**        represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**American Association of Physicians for Human Rights, Inc.**
*doing business as*
GLMA: Health Professionals Advancing LGBTQ Equality

represented by **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**American College of Obstetricians and Gynecologists**

represented by **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American College of Osteopathic Pediatricians**                    represented by **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**American College of Physicians**                   represented by   **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**American Medical Association**                   represented by   **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Psychiatric Association**          represented by  **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Association of American Medical Colleges**     represented by   **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Association of Medical School Pediatric Department Chairs**     represented by   **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Endocrine Society**                represented by **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**National Association of Pediatric Nurse Practitioners**                    represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Pediatric Endocrine Society**                    represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Society for Adolescent Health and Medicine**    represented by **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Society for Pediatric Research**                represented by   **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Society of Pediatric Nurses**                represented by   **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Societies for Pediatric Urology**    represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**World Professional Association for Transgender Health**    represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**American Pediatric Society**    represented by    **Barry Alan Ragsdale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cortlin Hall Lannin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Jean Veta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Lanosa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Smith Vance , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Isasi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/19/2022 | 1 | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF against Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere (Filing fee $ 402.00 receipt number 4602066590.), filed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. (Attachments: # 1 Civil Cover Sheet, # 2 Receipt) (wcl, ) (Entered: 04/20/2022) |
| 04/20/2022 | 2 | Summons Issued as to Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere and returned to counsel for personal service by process server. (wcl, ) (Entered: 04/20/2022) |
| 04/20/2022 | 3 | **ORDER: The Honorable Liles C. Burke, United States District Judge for the Northern District of Alabama, was previously assigned two cases substantially similar to the above-captioned case, both of which were voluntarily dismissed on April 15, 2022. By order of the Chief Judge of the United States Court of Appeals for the Eleventh Circuit, all United States District Judges in the State of Alabama may preside over cases in any of the State's three federal judicial districts. In accordance with that order, and by the authority of the Court to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case, this case is REASSIGNED to Judge Burke. Judge Burke shall sit by designation and preside over this case in** |

| | | |
|---|---|---|
| | | **the United States District Court for the Middle District of Alabama. Signed by Honorable Judge R. Austin Huffaker, Jr on 4/20/2022. (wcl, )** (Entered: 04/20/2022) |
| 04/20/2022 | 4 | Case Reassigned to Honorable Judge Liles C. Burke as presiding judge; Honorable Judge R. Austin Huffaker, Jr no longer assigned to the case. (wcl, ) (Entered: 04/20/2022) |
| 04/20/2022 | 5 | **ORDER setting Status Conference for Friday, 4/22/2022, at 10:00 AM CDT in Courtroom 2F before Honorable Judge Liles C. Burke; Local counsel for Plaintiffs shall electronically serve a copy of this order on all non-local counsel for Plaintiffs and on all counsel for Defendants. Signed by Honorable Judge Liles C. Burke on 4/20/2022. (furn: calendar, dh) (wcl, )** (Entered: 04/20/2022) |
| 04/20/2022 | 6 | MOTION for Leave to File *(Motion for Leave to Proceed Pseudonymously)* by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) (Entered: 04/20/2022) |
| 04/21/2022 | 7 | MOTION for Preliminary Injunction , MOTION for Temporary Restraining Order by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Attachments: # 1 Text of Proposed Order - Temporary Restraining Order, # 2 Text of Proposed Order - Preliminary Injunction)(Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 8 | BRIEF/MEMORANDUM in Support re 7 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order filed by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Attachments: # 1 Exhibit 1 - Hawkins Declaration, # 2 Exhibit 2 - Ladinsky Declaration, # 3 Exhibit 3 - Rosenthal Declaration, # 4 Exhibit 4 - Eknes-Tucker Declaration, # 5 Exhibit 5 - Boe Declaration, # 6 Exhibit 6 - Zoe Declaration, # 7 Exhibit 7 - Poe Declaration, # 8 Exhibit 8 - Noe Declaration, # 9 Exhibit 9 - Moe Declaration, # 10 Exhibit 10 - Koe Declaration)(Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 9 | Alias Summons issued as to Daryl D. Bailey and returned to Counsel for service via Process Server. (cwl, ) (Entered: 04/21/2022) |
| 04/21/2022 | 10 | NOTICE of Appearance by Edmund Gerard LaCour, Jr on behalf of Kay Ivey, Steve Marshall (LaCour, Edmund) (Entered: 04/21/2022) |
| 04/21/2022 | 11 | NOTICE of Appearance by Thomas Alexander Wilson on behalf of Kay Ivey, Steve Marshall (Wilson, Thomas) (Entered: 04/21/2022) |
| 04/21/2022 | 12 | NOTICE of Appearance by Alexander Barrett Bowdre on behalf of Kay Ivey, Steve Marshall (Bowdre, Alexander) (Entered: 04/21/2022) |
| 04/21/2022 | 13 | SUMMONS Returned Executed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. Danny Carr served on 4/21/2022, answer due 5/12/2022. (Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 14 | NOTICE of Appearance by Benjamin Matthew Seiss on behalf of Kay Ivey, Steve Marshall (Seiss, Benjamin) (Main Document 14 replaced on 4/21/2022 to attach the correct main PDF document to correct the style of the case) (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 15 | NOTICE of Correction re 14 Notice of Appearance, to attach the correct main PDF document to correct the style of the case. (Attachments: # 1 Correct Main doc entry 14 ) (cwl, ) (Entered: 04/21/2022) |
| 04/21/2022 | 16 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. Corporate Disclosures due by 5/2/2022. (Attachments: # 1 Conflict Statement Standing Order & Sample Format)(cwl, ) (Entered: 04/21/2022) |

| 04/21/2022 | 17 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Steve Marshall & Kay Ivey. Corporate Disclosures due by 5/2/2022. (Attachments: # 1 Conflict Statement Standing Order & Sample Format)(cwl, ) (Entered: 04/21/2022) |
| --- | --- | --- |
| 04/21/2022 | 18 | NOTICE of Appearance by James William Davis on behalf of All Defendants (Davis, James) (Entered: 04/21/2022) |
| 04/21/2022 | 19 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Danny Carr, Tom Anderson, Jessica Ventiere, C. Wilson Baylock & Daryl D. Bailey. Corporate Disclosures due by 5/2/2022. (Attachments: # 1 Conflict Statement Standing Order & Sample Format)(cwl, ) (Entered: 04/21/2022) |
| 04/21/2022 | 20 | ANSWER to 1 Complaint, by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Steve Marshall, Jessica Ventiere.(Davis, James) (Entered: 04/21/2022) |
| 04/21/2022 | 21 | Corporate/Conflict Disclosure Statement re 19 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Tom Anderson. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 22 | Corporate/Conflict Disclosure Statement re 19 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Daryl D. Bailey. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 23 | Corporate/Conflict Disclosure Statement re 19 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by C. Wilson Baylock. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 24 | Corporate/Conflict Disclosure Statement re 19 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Danny Carr. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 25 | Corporate/Conflict Disclosure Statement re 17 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Kay Ivey. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 26 | Corporate/Conflict Disclosure Statement re 17 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Steve Marshall. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 27 | Corporate/Conflict Disclosure Statement re 19 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Jessica Ventiere. (Davis, James) Modified on 4/22/2022 to add link to def notice (cwl, ). (Entered: 04/21/2022) |
| 04/21/2022 | 28 | SUMMONS Returned Executed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. Daryl D. Bailey served on 4/21/2022, answer due 5/12/2022. (Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 29 | SUMMONS Returned Executed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. Tom Anderson served on 4/21/2022, answer due 5/12/2022. (Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 30 | SUMMONS Returned Executed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. Jessica Ventiere served on 4/21/2022, answer due 5/12/2022. (Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 31 | SUMMONS Returned Executed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Megan Poe, James Zoe, Jane Moe. Steve Marshall served on 4/21/2022, answer due 5/12/2022. (Eagan, Melody) (Entered: 04/21/2022) |
| 04/21/2022 | 32 | SUMMONS Returned Executed by Kathy Noe, Brianna Boe, Paul A. Eknes-Tucker, |

| | | Rachel Koe, Megan Poe, James Zoe, Jane Moe, Kay Ivey served on 4/21/2022, answer due 5/12/2022. (Eagan, Melody) (Entered: 04/21/2022) |
|---|---|---|
| 04/21/2022 | | ***PURSUANT TO THE [20] ANSWER - Attorney Edmund Gerard LaCour, Jr, Alexander Barrett Bowdre, Benjamin Matthew Seiss for Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Jessica Ventiere added. (NO pdf attached to this entry) (cwl, ) (Entered: 04/22/2022) |
| 04/22/2022 | 33 | Minute Entry for proceedings held before Honorable Judge Liles C. Burke: Status Conference held on 4/22/2022 (PDF available for court use only). (Court Reporter Christina Decker w/ND AL.) (dh) (Entered: 04/22/2022) |
| 04/22/2022 | 34 | **ORDER Setting Hearing on Motion: Evidentiary Hearing on Plfs' [7] motion for a temporary restraining order and/or a preliminary injunction is set for Thursday, 5/5/2022, at 9:00 a.m. CDT in Courtroom 2F before Honorable Judge Liles C. Burke; The hearing is scheduled to last no longer than two days with the time allotted strictly as represented by the parties during today's status conference; Forty-eight hours before the hearing begins, the parties shall file their proposed exhibits and a list of expected witnesses; On or before 4/27/2022, Dfts shall file a response to Plfs' [6] motion to proceed pseudonymously; Plfs' reply is due thirty-six hours after Dfts file their response; On or before 5/2/2022, Dfts shall file a response to Plfs' [7] motion for a temporary restraining order and/or a preliminary injunction; Plfs' reply is due thirty-six hours after Dfts file their response. Signed by Honorable Judge Liles C. Burke on 4/22/2022. (furn: calendar, dh) (wcl, ) (Entered: 04/22/2022)** |
| 04/25/2022 | 35 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Paul A. Eknes-Tucker. (Eagan, Melody) Modified on 4/26/2022 to add link (cwl, ). (Main Document 35 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/25/2022 | 36 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Rachel Koe. (Eagan, Melody) Modified on 4/26/2022 to add link (cwl, ). (Main Document 36 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/25/2022 | 37 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Jane Moe. (Eagan, Melody) Modified on 4/26/2022 to add link (cwl, ). (Main Document 37 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/25/2022 | 38 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Kathy Noe. (Eagan, Melody) Modified on 4/26/2022 to add link (cwl, ). (Main Document 38 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/25/2022 | 39 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Megan Poe. (Eagan, Melody) Modified on 4/26/2022 to add link (cwl, ). (Main Document 39 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/25/2022 | 40 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by Brianna Boe. (Eagan, Melody) Modified on 4/26/2022 to add link (cwl, ). (Main Document 40 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/25/2022 | 41 | Corporate/Conflict Disclosure Statement re [16] Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement by James Zoe. (Eagan, Melody) Modified on |

| | | |
|---|---|---|
| | | 4/26/2022 to add link (cwl, ). (Main Document 41 replaced on 4/26/2022 to lock down fillable PDF) (cwl, ). (Entered: 04/25/2022) |
| 04/26/2022 | 42 | Motion for Michael B. Shortnacy to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210502.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify that exhibit A is contained within the main PDF document (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 43 | Motion for Brent P. Ray to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210505.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify that exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 44 | Motion for Abigail Hoverman Terry to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210507.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify that exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 45 | Motion for Misty L. Peterson to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210508.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 46 | Motion for Gilbert Olusegun Oladeinbo to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number CALMDC-3210509.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 47 | Motion for Adam Reinke to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210527.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify exhibit A is contain within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 48 | Motion for Asaf Orr to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210529.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify that exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 49 | Motion for Jessica Lynn Stone to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210531.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify that exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 50 | Motion for Jennifer L. Levi to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210536.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify that exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 51 | Motion for Cynthia Cheng-Wun Weaver to Appear Pro Hac Vice ( Filing fee $ 75.00 |

| | | receipt number AALMDC-3200537.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF(cwl, ). (Entered: 04/26/2022) |
|---|---|---|
| 04/26/2022 | 52 | Motion for Scott D. McCoy to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210538.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/26/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/26/2022 | 53 | Motion for Sarah Warbelow to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3210892.) by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 4/27/2022 to add attorney's name to text & to clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 04/26/2022) |
| 04/27/2022 | 54 | RESPONSE *in Partial Opposition* to Motion re 6 MOTION for Leave to File *(Motion for Leave to Proceed Pseudonymously)* filed by Kay Ivey, Steve Marshall, Danny Carr, Tom Anderson, Jessica Ventiere, C. Wilson Baylock, Daryl D. Bailey, . (LaCour, Edmund) Modified on 4/27/2022 to clarify text (cwl, ). Modified on 4/27/2022 to add additional defs as filers (cwl, ). (Entered: 04/27/2022) |
| 04/27/2022 | 55 | NOTICE of Appearance by Thomas Alexander Wilson on behalf of Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Jessica Ventiere (Wilson, Thomas) (Entered: 04/27/2022) |
| 04/28/2022 | 56 | Motion for Christopher E. Mills to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3212297.) by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere. (Attachments: # 1 Exhibit Certificate of Good Standing)(LaCour, Edmund) Modified on 4/28/2022 to add attorney's name to text (cwl, ). (Entered: 04/28/2022) |
| 04/28/2022 | | ***PURSUANT TO THE 56 MOTION - Attorney Christopher Ernest Mills for Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere added. (NO pdf attached to this entry) (cwl, ) (Entered: 04/28/2022) |
| 04/28/2022 | 57 | REPLY to Response to Motion re 6 MOTION for Leave to File *(Motion for Leave to Proceed Pseudonymously)* filed by Brianna Boe, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe, Paul A. Eknes-Tucker. (Attachments: # 1 Exhibit A - Supplemental Declaration of Rachel Koe, MD)(Eagan, Melody) Modified on 4/29/2022 to add additional PLF as filer (cwl, ). (Entered: 04/28/2022) |
| 04/29/2022 | 58 | MOTION to Intervene by United States of America. (Attachments: # 1 Memorandum of Law, # 2 Exhibit Attorney Generals Certification, # 3 Exhibit Complaint in Intervention) (Cheek, Jason) (Entered: 04/29/2022) |
| 04/29/2022 | 59 | Corporate/Conflict Disclosure Statement by United States of America. (Cheek, Jason) (Entered: 04/29/2022) |
| 04/29/2022 | 60 | MOTION for Leave to File Excess Pages *(for Forthcoming Motion for a Temporary Restraining Order and a Preliminary Injunction)* by United States of America. (Cheek, Jason) (Entered: 04/29/2022) |
| 04/29/2022 | 61 | **TEXT ORDER: If any party has opposition to either the Government's 58 motion to intervene or 60 motion for leave to file excess pages, they shall file a response no later than 5/2/2022, at 12:00 p.m. CDT. Signed by Honorable Judge Liles C. Burke on 4/29/2022. (No pdf attached to this entry) (wcl, )** (Entered: 04/29/2022) |

| 04/29/2022 | 62 | MOTION for Preliminary Injunction , MOTION for Temporary Restraining Order by United States of America. (Attachments: # 1 Memorandum of Law, # 2 Antommaria Declaration)(Cheek, Jason) (Entered: 04/29/2022) |
|---|---|---|
| 04/29/2022 | | MEMORANDUM in Support re 62 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order filed by United States of America. (No pdf attached to this entry - see doc 62 for pdf) (cwl, ) (Entered: 05/02/2022) |
| 04/29/2022 | | ***PURSUANT TO THE 58 MOTION - Attorney Sandra Jean Stewart, Lane H. Woodke, Stephen D Wadsworth, Alyssa C. Lareau, Renee Williams, Kaitlin Toyama for United States of America added. (No pdf attached to this entry) (cwl, ) (Entered: 05/02/2022) |
| 04/29/2022 | | ***PURSUANT TO THE 58 MOTION - Attorney Elizabeth Prim Formby Escalona, John Michael Powers, Coty Rae Montag for United States of America added. (No pdf attached to this entry) (cwl, ) (Entered: 05/02/2022) |
| 05/02/2022 | 63 | RESPONSE *in Partial Opposition* to Motion re 60 MOTION for Leave to File Excess Pages *(for Forthcoming Motion for a Temporary Restraining Order and a Preliminary Injunction)*, 58 MOTION to Intervene filed by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere. (Attachments: # 1 Exhibit Harris Declaration)(LaCour, Edmund) Modified on 5/2/2022 to clarify text (cwl, ). (Entered: 05/02/2022) |
| 05/02/2022 | 64 | RESPONSE to Motion re 58 MOTION to Intervene *(PLAINTIFFS' RESPONSE TO THE UNITED STATES MOTION TO INTERVENE AND DEFENDANTS' RESPONSE* filed by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) (Entered: 05/02/2022) |
| 05/02/2022 | 65 | REPLY to Response to Motion re 60 MOTION for Leave to File Excess Pages *(for Forthcoming Motion for a Temporary Restraining Order and a Preliminary Injunction)*, 58 MOTION to Intervene filed by United States of America. (Cheek, Jason) (Entered: 05/02/2022) |
| 05/02/2022 | 66 | NOTICE of Appearance by Lane Hines Woodke on behalf of United States of America (Woodke, Lane) (Entered: 05/02/2022) |
| 05/02/2022 | 67 | NOTICE of Appearance by Coty Rae Montag on behalf of United States of America (Montag, Coty) (Entered: 05/02/2022) |
| 05/02/2022 | 68 | NOTICE of Appearance by John Michael Powers on behalf of United States of America (Powers, John) (Entered: 05/02/2022) |
| 05/02/2022 | 69 | NOTICE *of Filing of Evidence in Opposition to Plaintiffs' Motion for Preliminary Injunction* by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40)(Davis, James) Modified on 5/3/2022 to clarify text (cwl, ). (Entered: 05/02/2022) |
| 05/02/2022 | 70 | Motion for Michael A. Cantrell to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3214501.) by State of Arkansas, State of Alaska, State of Arizona, |

| | | |
|---|---|---|
| | | State of Georgia, State of Indiana, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah, State of West Virginia . (Wilkerson, Mark) Modified on 5/3/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). Modified on 5/3/2022 to add additional filers (cwl, ). (Entered: 05/02/2022) |
| 05/02/2022 | 71 | First MOTION for Leave to File *Amici Brief* by State of Arkansas, State of Alaska, State of Arizona, State of Georgia, State of Indiana, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah and State of West Virginia . (Wilkerson, Mark) Modified on 5/3/2022 to add additional filers (cwl, ). (Entered: 05/02/2022) |
| 05/02/2022 | 72 | BRIEF/MEMORANDUM in Support re 71 First MOTION for Leave to File *Amici Brief* filed by State of Arkansas, State of Alaska, State of Arizona, State of Georgia, State of Indiana, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah and State of West Virginia . (Wilkerson, Mark) Modified on 5/3/2022 to add additional filers (cwl, ). (Entered: 05/02/2022) |
| 05/02/2022 | 73 | Corporate/Conflict Disclosure Statement by State of Arkansas, State of Alaska, State of Arizona, State of Georgia, State of Indiana, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah and State of West Virginia . (Wilkerson, Mark) Modified on 5/3/2022 to remove erroneous link (cwl, ). Modified on 5/3/2022 to add additional filers (cwl, ). (Entered: 05/02/2022) |
| 05/02/2022 | 74 | RESPONSE in Opposition re 7 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order filed by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere. (LaCour, Edmund) (Entered: 05/02/2022) |
| 05/02/2022 | 75 | **ORDER: A hearing on the United States's 58 motion to intervene is set for Wednesday, 5/4/2022, at 1:15 p.m. CDT; The hearing will occur in Courtroom 2F of the Frank M. Johnson, Jr., United States Courthouse Complex; Since the State of Alabama has no opposition to the United States's 60 motion to file excess pages, the Court will grant that motion should the Court grant the United States's motion to intervene. Signed by Honorable Judge Liles C. Burke on 5/2/2022. (Furnished: Calendar & All CRDs)(amf, )** (Entered: 05/02/2022) |
| 05/02/2022 | 76 | **ORDER: the Court ORDERS as follows: 1. Court guests, including the press and non-participants, are prohibited from possessing and using any electronic devices in Courtroom 2F during the upcoming hearings in this case; The attorneys and members of their respective staffs may possess and use electronic or photographic technology in Courtroom 2F for the sole purpose of presenting evidence; 2. Members of the press and media shall be allowed to possess cellular phones, laptop computers, and/or tablets in Courtroom 2E and the media lounge provided that these electronic devices shall be allowed: (1) for the purposes of taking notes, personal communication unrelated to the proceedings, and accessing information only; and (2) on the condition that no photographs, audio or video recording, or live broadcasting, including digitally sharing, posting, or microblogging via a social or other media site, be conducted in the courthouse; All devices shall be registered with court security upon entry into the building; All are reminded of the prohibitions regarding photographing, recording, and/or broadcasting court proceedings, as further set out in order. Signed by Honorable Judge Liles C. Burke on 5/2/2022. (amf, )** (Entered: 05/02/2022) |

| | | |
|---|---|---|
| 05/02/2022 | | Exhibit List by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere. (No pdf attached to this entry - see doc [69](#) for pdf) (cwl, ) (Entered: 05/03/2022) |
| 05/02/2022 | [102](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of STATUS CONFERENCE (PDF ACCESS RESTRICTED FOR 90 DAYS) held on 4/22/2022, before Judge Liles C. Burke. Court Reporter/Transcriber Christina K. Decker, Telephone number 256-506-0085. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE OF INTENT TO REQUEST REDACTION DUE WITHIN 7 BUSINESS DAYS. Redaction Request due 5/23/2022. Redacted Transcript Deadline set for 6/2/2022. Release of Transcript Restriction set for 8/1/2022. (cwl, ) (Entered: 05/12/2022) |
| 05/03/2022 | [77](#) | Witness List by Kay Ivey, Steve Marshall, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Tom Anderson, Jessica Ventiere. (Davis, James) Modified on 5/3/2022 to add additional filers left off by e-filer (cwl, ). (Entered: 05/03/2022) |
| 05/03/2022 | [78](#) | Exhibit List by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe.. (Attachments: # [1](#) Exhibit 1 Boe, Brianna, # [2](#) Exhibit 2. Eknes-Ticker, Paul, # [3](#) Exhibit 3. Hawkins, Linda, # [4](#) Exhibit 4. Koe, Rachel, # [5](#) Exhibit 5. Koe, Rachel Supp, # [6](#) Exhibit 6. Ladinsky, Morissa, # [7](#) Exhibit 7. Ladinsky CV 11 1 21, # [8](#) Exhibit 8. Moe, Jane, # [9](#) Exhibit 9. Noe, Kathy, # [10](#) Exhibit 10. Poe, Megan, # [11](#) Exhibit 11. Rosenthal, Stephen, # [12](#) Exhibit 12. Zoe, James, # [13](#) Exhibit 13. A. Declaration, # [14](#) Exhibit 14. E. Guidelines, # [15](#) Exhibit 15. AACAP Statement, # [16](#) Exhibit 16. E. Society 2020 Statement, # [17](#) Exhibit 17. WPATH, # [18](#) Exhibit 18. USPATH, # [19](#) Exhibit 19. Yale Report, # [20](#) Exhibit 20. ACP, # [21](#) Exhibit 21. AMA, # [22](#) Exhibit 22. Amer Academy Peds, # [23](#) Exhibit 23. APA Position Statement, # [24](#) Exhibit 24. Endocrine Ped Statement, # [25](#) Exhibit 25. Trans Youth Fact Sheet, # [26](#) Exhibit 26. WPATH Joint Statement, # [27](#) Exhibit 27. Joint Statement, # [28](#) Exhibit 28. Statement re AL Law, # [29](#) Exhibit 29. TURBAN, # [30](#) Exhibit 30. Am Academy Peds, # [31](#) Exhibit 31. Ala Psych, # [32](#) Exhibit 32. Am Academy Peds, # [33](#) Exhibit 33. De VRIES, # [34](#) Exhibit 34. COSTA Support, # [35](#) Exhibit 35. DELARA, # [36](#) Exhibit 36. TURBAN, # [37](#) Exhibit 37. TURBAN, # [38](#) Exhibit 38. Judgment, # [39](#) Exhibit 39. AB v CV, # [40](#) Exhibit 40. Photos Under Seal, # [41](#) Exhibit 41. UAB Consent Form, # [42](#) Exhibit 42. ACHILLE, # [43](#) Exhibit 43. TORDOFF, # [44](#) Exhibit 44. Allen)(Eagan, Melody) (Attachment 40 replaced on 5/16/2022 TO ADD SEALED EXHIBIT TO THE DOCKET) (cwl, ). (Entered: 05/03/2022) |
| 05/03/2022 | [79](#) | Witness List by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) (Entered: 05/03/2022) |
| 05/03/2022 | [80](#) | Exhibit List *and Witness List* by United States of America.. (Attachments: # [1](#) Exhibit Diagnostic & Statistical Manual of Mental Disorders, # [2](#) Exhibit American Academy of Pediatrics 2018 Policy Statement, # [3](#) Exhibit Endocrine Society Clinical Practice Guideline, # [4](#) Exhibit WPATH Standards of Care, # [5](#) Exhibit Alabama Psychological Association Statement, # [6](#) Exhibit American Academy of Pediatrics 2022 Statement, # [7](#) Exhibit Antommaria Decl., # [8](#) Exhibit Antommaria Bibliography, # [9](#) Exhibit Antommaria Curriculum Vitae, # [10](#) Exhibit FDA Article, # [11](#) Exhibit Article: Biased Science, # [12](#) Exhibit ABC News Article)(Cheek, Jason) (Entered: 05/03/2022) |
| 05/03/2022 | [81](#) | *Supplemental* Exhibit List by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere. (Attachments: # [1](#) Exhibit D41)(Davis, James) Modified on 5/3/2022 to clean up text (cwl, ). (Additional attachment(s) added on 5/3/2022: # [2](#) Corrected Certificate of Service) (cwl, ). (Entered: 05/03/2022) |
| 05/03/2022 | | Witness List by United States of America. (NO pdf attached to this entry - see doc [80](#) for |

| 05/03/2022 | 82 | **TEXT ORDER: granting 42 Motion for Michael B. Shortnacy to Appear Pro Hac Vice; granting 43 Motion for Brent P. Ray to Appear Pro Hac Vice; granting 44 Motion for Abigail Hoverman Terry to Appear Pro Hac Vice; granting 45 Motion for Misty L. Peterson to Appear Pro Hac Vice; granting 46 Motion for Gilbert Olusegun Oladeinbo to Appear Pro Hac Vice; granting 47 Motion for Adam Reinke to Appear Pro Hac Vice; granting 48 Motion for Asaf Orr to Appear Pro Hac Vice; granting 49 Motion for Jessica Lynn Stone to Appear Pro Hac Vice; granting 50 Motion for Jennifer L. Levi to Appear Pro Hac Vice; granting 51 Motion for Cynthia Cheng-Wun Weaver to Appear Pro Hac Vice; granting 52 Motion for Scott D. McCoy to Appear Pro Hac Vice; granting 53 Motion for Sarah Warbelow to Appear Pro Hac Vice; granting 56 Motion for Christopher E. Mills to Appear Pro Hac Vice; granting 70 Motion for Michael A. Cantrell to Appear Pro Hac Vice. Signed by Honorable Judge Liles C. Burke on 5/3/2022. (NO pdf attached to this entry) (cwl, )** (Entered: 05/03/2022) |
| 05/03/2022 | 83 | **ORDER: the Plaintiffs' Motion for Leave to Proceed Pseudonymously (Doc. 6 ) is GRANTED. The Plaintiffs identified as Brianna Boe, Michael Boe, James Zoe, Zachary Zoe, Megan Poe, Allison Poe, Kathy Noe, Christopher Noe, and Rachel Koe, M.D. may proceed under pseudonyms. Signed by Honorable Judge Liles C. Burke on 5/3/2022. (cwl, )** (Entered: 05/03/2022) |
| 05/03/2022 | 84 | Unopposed MOTION for Leave to File Exhibit Under Seal re 78 Exhibit List by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eagan, Melody) Modified on 5/3/2022 to add link & clean up text (cwl, ). (Entered: 05/03/2022) |
| 05/03/2022 | 85 | Joint MOTION to Dismiss *Defendant Kay Ivey* by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe, Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere. (Eagan, Melody) Modified on 5/3/2022 to add defs as filers (cwl, ). (Entered: 05/03/2022) |
| 05/03/2022 | 86 | NOTICE of Appearance by Alyssa C. Lareau on behalf of United States of America (Lareau, Alyssa) (Entered: 05/03/2022) |
| 05/03/2022 | 87 | NOTICE *of Filing Correct Defense Exhibit 41* re 81 Supplemental Exhibit List by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere (Attachments: # 1 Exhibit)(Davis, James) Modified on 5/4/2022 to clean up text & to add link (cwl, ). (Entered: 05/03/2022) |
| 05/03/2022 | 88 | **TEXT ORDER: At the end of tomorrow's proceedings, the parties should be prepared to give their opening statements on Plaintiffs' motion for preliminary injunction. The parties' arguments shall not exceed 25 minutes each. Signed by Honorable Judge Liles C. Burke on 5/3/2022. (NO pdf attached to this entry) (cwl, )** (Entered: 05/03/2022) |
| 05/04/2022 | 89 | REPLY BRIEF *IN SUPPORT OF PLAINTIFFS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION* re 7 MOTION for Preliminary Injunction , MOTION for Temporary Restraining Order filed by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Eagan, Melody) Modified on 5/4/2022 to clarify text & add link (cwl, ). (Entered: 05/04/2022) |
| 05/04/2022 | 90 | UNOPPOSED MOTION to Seal *PORTIONS OF PRELIMINARY INJUNCTION HEARING* by Rachel Koe, Megan Poe. (Attachments: # 1 Text of Proposed Order |

| | | Proposed Order)(Eagan, Melody) Modified on 5/4/2022 to remove Brianna Boe, Paul A. Eknes-Tucker, Jane Moe, Kathy Noe, James Zoe as filers & clean up text (cwl, ). (Entered: 05/04/2022) |
|---|---|---|
| 05/04/2022 | 91 | MOTION for Leave to File Brief of Amici Curiae by American Academy of Pediatrics, Alabama Chapter of the American Academy of Pediatrics, Academic Pediatric Association, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, The Endocrine Society, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, Societies for Pediatric Urology, World Professional Association for Transgender Health, American Pediatric Society. (Attachments: # 1 Exhibit Proposed Amicus Brief)(Ragsdale, Barry) Modified on 5/5/2022 to add as also filed on behalf of American Pediatric Society (amf, ). (Entered: 05/04/2022) |
| 05/04/2022 | 92 | Amended Intervenor COMPLAINT , filed by United States of America. (Attachments: # 1 Certificate of the Attorney General)(Cheek, Jason) (Additional attachment(s) added on 5/5/2022: # 2 Certificate of Service) (amf, ). (Entered: 05/04/2022) |
| 05/04/2022 | | ***PURSUANT TO THE 91 MOTION - Attorneys Cortlin H. Lannin, D. Jean Veta, William Isasi, Elizabeth Baia, Michael Lanosa, & Robert S. Vance, III for Academic Pediatric Association, Alabama Chapter of the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing,Cortlin H. Lannin,D. Jean Veta,William Isasi,Elizabeth Baia,Michael Lanosa,Robert S. Vance, III for American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, The Endocrine Society & World Professional Association for Transgender Health added. (No PDF attached to this entry) (amf, ) (Entered: 05/05/2022) |
| 05/04/2022 | 93 | Minute Entry for proceedings held before Honorable Judge Liles C. Burke: Motion Hearing held on 5/4/2022 re 58 MOTION to Intervene filed by United States of America (PDF available for court use only). (Court Reporter Christine Decker.) (kcf, ) (Entered: 05/05/2022) |
| 05/05/2022 | | **ORAL ORDER granting 85 Joint Motion to Dismiss Defendant Kay Ivey. Entered by Honorable Judge Liles C. Burke on 5/5/22. (dh)** (Entered: 05/05/2022) |
| 05/05/2022 | | Minute Entry for proceedings held before Honorable Judge Liles C. Burke: Evidentiary Hearing began on 5/5/2022 (NO PDF available; see final minute entry). (Court Reporter Christina Decker w/ND AL.) (dh) (Entered: 05/05/2022) |
| 05/06/2022 | 96 | Minute Entry for proceedings held before Honorable Judge Liles C. Burke: Evidentiary Hearing held on 5/6/2022 (PDF available for court use only). (Court Reporter Christina Decker w/ND AL.) (Attachments: # 1 Witness List, # 2 Pl. Exhibit List, # 3 PX1, # 4 |

PX2, # 5 PX3, # 6 PX4, # 7 PX5, # 8 PX6, # 9 PX7, # 10 PX8, # 11 PX9, # 12 PX10, # 13 PX11, # 14 PX12, # 15 PX13, # 16 PX14, # 17 PX15, # 18 PX16, # 19 PX17, # 20 PX18, # 21 PX19, # 22 PX20, # 23 PX21, # 24 PX22, # 25 PX23, # 26 PX24, # 27 PX25, # 28 PX26, # 29 PX27, # 30 PX28, # 31 PX29, # 32 PX30, # 33 PX31, # 34 PX32, # 35 PX33, # 36 PX34, # 37 PX35, # 38 PX36, # 39 PX37, # 40 PX38, # 41 PX39, # 42 PX40, # 43 PX41, # 44 PX42, # 45 PX43, # 46 PX44, # 47 PX45, # 48 Intervenor (USA) Exhibit List, # 49 USA X1, # 50 USA X2, # 51 USA X3, # 52 USA X4, # 53 USA X5, # 54 USA X6, # 55 USA X7, # 56 USA X8, # 57 USA X9, # 58 USA X10, # 59 USA X11, # 60 USA X12, # 61 Def. Exhibit List, # 62 DX1, # 63 DX2, # 64 DX3, # 65 DX4, # 66 DX5, # 67 DX6, # 68 DX7, # 69 DX8, # 70 DX9, # 71 DX10, # 72 DX11, # 73 DX12, # 74 DX13, # 75 DX14, # 76 DX15, # 77 DX16, # 78 DX17, # 79 DX18, # 80 DX19, # 81 DX20, # 82 DX21, # 83 DX22, # 84 DX23, # 85 DX24, # 86 DX25, # 87 DX26, # 88 DX27, # 89 DX28, # 90 DX29, # 91 DX30, # 92 DX31, # 93 DX32, # 94 DX33, # 95 DX34, # 96 DX35, # 97 DX36, # 98 DX37, # 99 DX38, # 100 DX39, # 101 DX40, # 102 DX41, # 103 DX42 - CD Conventionally Filed) (dh) Modified on 6/8/2022 to reflect exhibits returned to counsel at conclusion of hearing. USB DRIVES (3) with all admitted exhibits to remain in court record. USB Drives and CD placed in accordion folder with file in Clerk's office. (dmn, ) (Entered: 05/10/2022)

| 05/08/2022 | 94 | **PROCEDURAL ORDERS & STATUS OF FORTHCOMING OPINION: the United States's 58 motion to intervene is GRANTED; the 71 & 91 motions for leave to proceed as amici curiae are GRANTED; The Court will consider the briefs in ruling on the motions for a preliminary injunction; the 84 & 90 motions to seal are GRANTED; The Court has made very substantial progress toward crafting an opinion in this matter and expects to file the opinion by the end of this week, if not sooner. Signed by Honorable Judge Liles C. Burke on 5/8/2022. (amf, )** (Entered: 05/08/2022) |
| --- | --- | --- |
| 05/08/2022 | 104 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of PRELIMINARY INJUNCTION HEARING VOLUME I (PDF ACCESS RESTRICTED FOR 90 DAYS) held on 5/5/2022, before Judge Liles C. Burke. Court Reporter/Transcriber Christina K. Decker, Telephone number 256-506-0085. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE OF INTENT TO REQUEST REDACTION DUE WITHIN 7 BUSINESS DAYS. Redaction Request due 5/31/2022. Redacted Transcript Deadline set for 6/8/2022. Release of Transcript Restriction set for 8/8/2022. (cwl, ) (Entered: 05/12/2022) |
| 05/08/2022 | 105 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of PRELIMINARY INJUNCTION HEARING VOLUME II (PDF ACCESS RESTRICTED FOR 90 DAYS) held on 5/6/2022, before Judge Liles C. Burke. Court Reporter/Transcriber Christina K. Decker, Telephone number 256-506-0085. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE OF INTENT TO REQUEST REDACTION DUE WITHIN 7 BUSINESS DAYS. Redaction Request due 5/31/2022. Redacted Transcript Deadline set for 6/8/2022. Release of Transcript Restriction set for 8/8/2022. (cwl, ) (Entered: 05/12/2022) |
| 05/08/2022 | 106 | (SEALED TRANSCRIPT) NOTICE OF FILING OF OFFICIAL TRANSCRIPT of PRELIMINARY INJUNCTION HEARING VOLUME I held on 5/5/2022, before Judge Liles C. Burke. Court Reporter/Transcriber Christina K. Decker, Telephone number 256-506-0085. (cwl, ) (Entered: 05/12/2022) |
| 05/09/2022 | 95 | BRIEF/MEMORANDUM in Opposition re 7 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order *BRIEF OF 15 STATES AS AMICI CURIAE* filed by State of Alaska, State of Arizona, State of Arkansas, State of Georgia, State of |

| | | Indiana, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah, State of West Virginia. (Cantrell, Michael) (Entered: 05/09/2022) |
|---|---|---|
| 05/11/2022 | 97 | Motion for Robert S. Vance III to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3219952.) by Academic Pediatric Association, Alabama Chapter of the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, The Endocrine Society, World Professional Association for Transgender Health. (Ragsdale, Barry) Modified on 5/12/2022 to add attorney's name to text & clarify that Exhibit A is contained within the main PDF (cwl, ). (Entered: 05/11/2022) |
| 05/11/2022 | 98 | Motion for D. Jean Veta to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3219954.) by Academic Pediatric Association, Alabama Chapter of the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, The Endocrine Society, World Professional Association for Transgender Health. (Ragsdale, Barry) Modified on 5/12/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 05/11/2022) |
| 05/11/2022 | 99 | Motion for Cortlin H. Lannin to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3219955.) by Academic Pediatric Association, Alabama Chapter of the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, The Endocrine Society, World Professional Association for Transgender Health. (Ragsdale, Barry) Modified on 5/12/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 05/11/2022) |
| 05/11/2022 | 100 | Motion for William Isasi to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3219959.) by Academic Pediatric Association, Alabama Chapter of the American Academy of Pediatrics, American Academy of Child and Adolescent |

| | | |
|---|---|---|
| | | Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, The Endocrine Society, World Professional Association for Transgender Health. (Ragsdale, Barry) Modified on 5/12/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 05/11/2022) |
| 05/11/2022 | 101 | Motion for Michael Lanosa to Appear Pro Hac Vice ( Filing fee $ 75.00 receipt number AALMDC-3219970.) by Academic Pediatric Association, Alabama Chapter of the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, The Endocrine Society, World Professional Association for Transgender Health. (Ragsdale, Barry) Modified on 5/12/2022 to add attorney's name to text & clarify exhibit A is contained within the main PDF (cwl, ). (Entered: 05/11/2022) |
| 05/11/2022 | 103 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of HEARING (PDF ACCESS RESTRICTED FOR 90 DAYS) held on 5/4/2022, before Judge Liles C. Burke. Court Reporter/Transcriber Christina K. Decker, Telephone number 256-506-0085. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE OF INTENT TO REQUEST REDACTION DUE WITHIN 7 BUSINESS DAYS. Redaction Request due 6/1/2022. Redacted Transcript Deadline set for 6/13/2022. Release of Transcript Restriction set for 8/9/2022. (cwl, ) (Entered: 05/12/2022) |
| 05/13/2022 | 107 | **OPINION AND ORDER: the Court GRANTS in part Plfs' 7 motion for preliminary injunction and ENJOINS Dfts from enforcing Section 4(a)(1)-(3) of the Act pending trial. The Court GRANTS in part the United States's 62 motion for preliminary injunction to the same degree and effect. All other provisions of the Act remain enforceable. Signed by Honorable Judge Liles C. Burke on 5/13/2022. (wcl, )** (Main Document 107 replaced on 5/17/2022 to correct a case number referenced in the PDF) (cwl, ). (Main Document 107 replaced on 5/19/2022 to correct syntax) (cwl, ). (Entered: 05/13/2022) |
| 05/16/2022 | 108 | NOTICE OF APPEAL by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere of Order Granting Preliminary Injunction (Doc. 107 ) entered on 5/13/2022. ( Filing fee $ 505.00 receipt number AALMDC-3221733.) (LaCour, Edmund) Modified on 5/17/2022 to create link. (dmn, ) (Entered: 05/16/2022) |
| 05/17/2022 | 109 | Appeal Instructions re 108 Notice of Appeal sent to Edmund LaCour, counsel for Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, |

| | | |
|---|---|---|
| | | Jessica Ventiere. A copy of the Transcript Information Form must be mailed to each court reporter from whom you are requesting a transcript. (Attachments: # 1 Transcript Information Form)(dmn, ) (Entered: 05/17/2022) |
| 05/17/2022 | 110 | NOTICE of Correction re 107 OPINION AND ORDER, to attach the correct main PDF document to correct a case number referenced in the PDF. (Attachments: # 1 Correct Main doc entry 107 )(cwl, ) (Entered: 05/17/2022) |
| 05/18/2022 | 111 | Transmission of 108 Notice of Appeal, 107 Order, and Docket Sheet to US Court of Appeals. (Attachments: # 1 Docket Sheet and Appeal Record)(dmn, ) (Entered: 05/18/2022) |
| 05/19/2022 | 112 | NOTICE of Correction re 107 OPINION AND ORDER, to attach the correct main PDF document to correct syntax. (Attachments: # 1 Correct Main doc entry 107 )(cwl, ) (Entered: 05/19/2022) |
| 05/20/2022 | 113 | Joint MOTION to Dismiss *Governor Kay Ivey* by United States of America, Jessica Ventiere, Steve Marshall, Danny Carr, C. Wilson Baylock, Daryl D. Bailey, Tom Anderson. (Cheek, Jason) Modified on 5/23/2022 to add DFTs as filers (bes, ). (Entered: 05/20/2022) |
| 05/23/2022 | 114 | USCA Case Number 22-11707-JJ for 108 Notice of Appeal, filed by Appellants Jessica Ventiere, Kay Ivey, C. Wilson Baylock, Tom Anderson, Daryl D. Bailey, Steve Marshall, Danny Carr. Fee Status: Fee Paid. No hearings to be transcribed. The appellant's brief is due on or before 6/27/2022. The appendix is due no later than 7 days from the filing of the appellant's brief. Awaiting Appellant's Certificate of Interested Persons due on or before 6/6/2022 as to Appellant Attorney General, State of Alabama. Awaiting Appellee's Certificate of Interested Persons due on or before 6/21/2022 as to Appellee Paul A. Eknes-Tucker. (dmn, ) (Entered: 05/23/2022) |
| 05/23/2022 | 115 | TRANSCRIPT INFORMATION FORM re 108 Notice of Appeal by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Kay Ivey, Steve Marshall, Jessica Ventiere with the following notation, "All necessary transcript(s) on file." (LaCour, Edmund) Modified on 5/24/2022 to include additional text. (dmn, ) (Entered: 05/23/2022) |
| 05/25/2022 | 116 | ANSWER to 92 Intervenor Complaint, by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Steve Marshall, Jessica Ventiere.(Seiss, Benjamin) (Entered: 05/25/2022) |
| 05/31/2022 | 117 | **TEXT ORDER granting 113 Joint Motion to Dismiss Governor Kay Ivey. Signed by Honorable Judge Liles C. Burke on 5/31/2022. (No PDF attached to this entry) (bes, )** (Entered: 05/31/2022) |
| 06/06/2022 | 118 | ORDER of USCA addressed to Jennifer Levi as to 108 Notice of Appeal, filed by Jessica Ventiere, Kay Ivey, C. Wilson Baylock, Tom Anderson, Daryl D. Bailey, Steve Marshall, Danny Carr, 11th Circuit Appeal No. 22-11707-JJ: Jennifer Levi is permitted to appear pro hac vice in this appeal, representing the Appellees, contingent upon her payment of the $50.00 pro hac vice fee within 14 days of the date of this order. (dmn, ) (Entered: 06/06/2022) |
| 06/07/2022 | 120 | ORDER of USCA as to 108 Notice of Appeal, filed by Jessica Ventiere, Kay Ivey, C. Wilson Baylock, Tom Anderson, Daryl D. Bailey, Steve Marshall, Danny Carr, 11th Circuit Appeal No. 22-11707-JJ: Appellants' "Unopposed Motion for Expedited Briefing and Appellate Review" is GRANTED. The Court DIRECTS the Clerk's Office to expedite the appeal for merits disposition purposes and place this appeal on the next available oral argument calendar. Briefing in this appeal shall proceed as follows: Appellants' initial brief is due by 6/27/2022, with the appendix due 7 days from the filing |

of the initial brief. Appellees' response briefs are due by 8/10/2022. Appellants' reply brief, if any, is due by 8/31/2022. (dmn, ) (no pdf) (Entered: 06/08/2022)

| 06/08/2022 | 119 | **TEXT ORDER: On or before 6/22/2022, the parties shall file their Rule 26(f) report or the court will set the schedule for them on 6/23/2022. Signed by Honorable Judge Liles C. Burke on 6/8/2022. (No PDF attached to this entry) (bes, )** (Entered: 06/08/2022) |
| 06/08/2022 | | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Alabama certifies that the record is complete for purposes of this appeal re: 108 Notice of Appeal, Appeal No. 22-11707-JJ. The entire record on appeal is available electronically with the exception of: Doc. 96 , Exhibit DX42 CD, VIDEO. (dmn, ) (Entered: 06/08/2022) |
| 06/09/2022 | 121 | NOTICE of Appearance by Eliza Dermody on behalf of United States of America (Dermody, Eliza) (Entered: 06/09/2022) |
| 06/16/2022 | 122 | NOTICE of Appearance by Kaitlin N Toyama on behalf of United States of America (Toyama, Kaitlin) (Entered: 06/16/2022) |
| 06/16/2022 | 123 | NOTICE of Appearance by Renee Michelle Williams on behalf of United States of America (Williams, Renee) (Entered: 06/16/2022) |
| 06/21/2022 | 124 | Consent MOTION to unseal Dr. Koe's testimony from the preliminary injunction hearing re 106 Transcript by Tom Anderson, Daryl D. Bailey, C. Wilson Baylock, Danny Carr, Steve Marshall, Jessica Ventiere. (Attachments: # 1 Text of Proposed Order)(Bowdre, Alexander) (Entered: 06/21/2022) |
| 06/22/2022 | 125 | REPORT of Rule 26(f) Planning Meeting. (Eagan, Melody) (Entered: 06/22/2022) |
| 06/24/2022 | 126 | MOTION to Withdraw as Attorney *for Attorney Gilbert Olusegun Oladeinbo* by Brianna Boe, Paul A. Eknes-Tucker, Rachel Koe, Jane Moe, Kathy Noe, Megan Poe, James Zoe. (Attachments: # 1 Text of Proposed Order)(Oladeinbo, Gilbert) Modified on 6/25/2022 to clarify the docket text (bes, ). (Entered: 06/24/2022) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 06/29/2022 08:20:29 | | |
| **PACER Login:** | Rawhyard | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-00184-LCB-SRW |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# DOC. 1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

*FILED*

2022 APR 19  P 4: 13

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D. | |
| *Plaintiffs,* | Civil Action No. 2:22-cv-184-RAH-SRW |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County. | |
| *Defendants.* | |

## COMPLAINT

Reverend Paul A. Eknes-Tucker; Brianna Boe, individually and on behalf of her minor son, Michael Boe; James Zoe, individually and on behalf of his minor son, Zachary Zoe; Megan Poe, individually and on behalf of her minor daughter, Allison Poe; Kathy Noe, individually and on behalf of her minor son, Christopher Noe; Jane Moe, Ph.D.; and Rachel Koe, M.D. (collectively, "Plaintiffs"), bring this Action for Declaratory and Injunctive Relief against Defendants Kay Ivey, in her official capacity as Governor of the State of Alabama; Steve Marshall, in his official capacity as Attorney General of the State of Alabama; Daryl D. Bailey, in his official capacity as District Attorney for Montgomery County; C. Wilson Baylock, in his official capacity as District Attorney for Cullman County; Jessica Ventiere, in her official capacity as District Attorney for Lee County; Tom Anderson, in his official capacity as District Attorney for the 12th Judicial Circuit; and Danny Carr, in his official capacity as District Attorney for Jefferson County (collectively, "Defendants"), respectfully stating as follows:

## PRELIMINARY STATEMENT

1.    This Action is a federal constitutional challenge to the State of Alabama's Vulnerable Child Compassion and Protection Act (the "Act"), passed by the Alabama Legislature on April 7, 2022, and signed into law by Governor Kay Ivey on April 8, 2022. Unless enjoined, the Act takes effect May 8, 2022.

2.     The Act intrudes into the right of parents to make medical decisions to ensure the health and wellbeing of their children. It does so by prohibiting parents from seeking and obtaining appropriate medical care for their children and subjecting them to criminal prosecution if they do so.

3.     The Act also targets transgender minors by imposing criminal penalties on any individuals, including parents and health care providers, who obtain or provide medical treatments essential to the minors' health care needs.

4.     Further, the Act is worded broadly, criminalizing anyone who "causes" an individual to receive the prohibited medical treatments, so that doctors, parents, and even clergy cannot discuss, advise, or counsel parents of transgender minors about how to address their children's medical needs.

5.     Plaintiffs seek declaratory and injunctive relief to enjoin the enforcement of the Act. Without the injunctive relief sought, Plaintiffs will experience irreparable injury.

## **PARTIES**

### I.     *Transgender Plaintiffs and Their Parents*

6.     Plaintiff Brianna Boe is and has at all relevant times been a resident of Montgomery County, Alabama. She is the mother of Plaintiff Michael Boe, a 12-year-old transgender boy for whom she also appears in this case as his next friend. Because of concerns about potential criminal liability, as well as her and her child's

privacy and safety, Brianna Boe and Michael Boe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

7.   Plaintiff James Zoe is and has at all relevant times been a resident of Jefferson County, Alabama. James is the father of Plaintiff Zachary Zoe, a 13-year-old transgender boy for whom he also appears in this case as his next friend. Because of concerns about potential criminal liability, as well as his and his child's privacy and safety, James Zoe and Zachary Zoe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, concurrently filed herewith.

8.   Plaintiff Megan Poe is and has at all relevant times been a resident of Cullman County, Alabama. She is the mother of Plaintiff Allison Poe, a 15-year-old transgender girl, for whom she also appears in this case as her next friend. Because of concerns about potential criminal liability, as well as her and her child's privacy and safety, Megan Poe and Allison Poe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

9.   Plaintiff Kathy Noe is and has at all relevant times been a resident of Lee County, Alabama. She is the mother of Plaintiff Christopher Noe, a 17-year-old transgender boy, for whom she also appears in this case as his next friend. Because of concerns about potential criminal liability, as well as her and her child's privacy and safety, Kathy Noe and Christopher Noe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

## II.   *Healthcare Provider Plaintiffs*

10.   Plaintiff Jane Moe is a Ph.D. level, licensed clinical child psychologist with over 20 years of experience who maintains a practice in Jefferson County, Alabama. Dr. Moe works in a hospital setting within the University of Alabama at Birmingham ("UAB") system where she regularly provides mental health care to children and adolescents, including transgender youth. Dr. Moe also resides in Jefferson County, Alabama. Because of concerns about potential criminal liability, as well as the privacy and safety of her patients, Dr. Moe seeks to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

11.   Plaintiff Rachel Koe, M.D., is a board-certified pediatrician with over 10 years of experience. Dr. Koe is a pediatrician in southeast Alabama where she regularly treats children and adolescents. She also refers transgender patients and their parents to healthcare providers who specialize in working with transgender patients, including to the Children's Hospital of Alabama and medical staff at UAB Hospital, which are both located in Jefferson County, Alabama. Dr. Koe resides and works in the 12th Judicial Circuit of Alabama. Because of concerns about potential criminal liability, as well as the privacy and safety of her patients, Dr. Koe seeks to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

### III.   *Reverend Paul A. Eknes-Tucker*

12.    Plaintiff Reverend Paul A. Eknes-Tucker is a Senior Pastor at Pilgrim Church in Birmingham, Alabama. In his role as Senior Pastor, Reverend Eknes-Tucker has provided pastoral counseling to parents of transgender children who are congregants at his church as well as members of the Birmingham community. Reverend Eknes-Tucker counsels parents of transgender children about religious faith-based teachings about love, support, and respect for all persons. He also supports parents who are seeking medical treatment for their child's gender dysphoria.

### IV.   *Defendants*

13.    Defendant Kay Ivey is the Governor of the State of Alabama. Governor Ivey is sued in her official capacity as Governor of Alabama.

14.    Defendant Steve Marshall is the Attorney General of the State of Alabama. He is the chief law enforcement officer of the State with the power to initiate criminal action to enforce the Act. In his capacity as Attorney General, Mr. Marshall has the ability to enforce the Act. Mr. Marshall is sued in his official capacity as Attorney General of Alabama.

15.    Defendant Daryl D. Bailey is the District Attorney of Montgomery County, Alabama. He is the chief law enforcement officer of Montgomery County, who prosecutes all felony and some misdemeanor criminal cases which occur within

Montgomery County. In his capacity as District Attorney, Mr. Bailey has the ability to enforce the Act. Mr. Bailey is sued in his official capacity as District Attorney of Montgomery County, Alabama.

16.   Defendant C. Wilson Baylock is the District Attorney for the 32nd Judicial Circuit overseeing Cullman County, Alabama. He is the chief law enforcement officer of Cullman County who prosecutes all felony criminal cases that occur within Cullman County. His prosecutorial authority extends to the enforcement of the Act within Cullman County. Defendant Baylock is sued in his official capacity as District Attorney of Cullman County, Alabama.

17.   Defendant Jessica Ventiere is the District Attorney for Lee County, Alabama. She is the chief law enforcement officer of Lee County, who prosecutes all felony and some misdemeanor criminal cases which occur within Lee County. In her capacity as District Attorney, Ms. Ventiere has the ability to enforce the Act. Ms. Ventiere is sued in her official capacity as District Attorney of Lee County, Alabama.

18.   Defendant Tom Anderson is the District Attorney for the 12th Judicial Circuit overseeing Coffee County and Pike County, Alabama. He is the chief law enforcement officer of Coffee and Pike Counties, who prosecutes all felony and some misdemeanor criminal cases which occur within Coffee and Pike Counties. In his capacity of District Attorney, Mr. Anderson has the ability to enforce the Act.

Mr. Anderson is sued in his official capacity as the District Attorney of the 12th Judicial Circuit.

19.    Defendant Danny Carr is the District Attorney of Jefferson County, Alabama. He is the chief law enforcement officer of Jefferson County who prosecutes all felony criminal cases that occur within the Birmingham Division of Jefferson County, including the City of Birmingham. In his capacity as District Attorney, Mr. Carr has the ability to enforce the Act. Mr. Carr is sued in his official capacity as District Attorney of Jefferson County, Alabama.

20.    Defendants each have separate and independent authority to enforce the Act within their respective jurisdictions.

## JURISDICTION AND VENUE

21.    Plaintiffs seek redress for the deprivation of their rights secured by Section 1557 of the Affordable Care Act, the United States Constitution, and the equitable powers of this Court to enjoin unlawful official conduct. This action is instituted pursuant to 42 U.S.C. § 18116 and 42 U.S.C. § 1983 to enjoin Defendants from enforcing the Act and for a declaration that the Act violates federal law. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

22.    This Court has personal jurisdiction over Defendants because Defendants are domiciled in Alabama and the denial of Plaintiffs' rights guaranteed by federal law occurred within Alabama.

23.    All Defendants reside in Alabama, and, upon information and belief, Defendants Ivey, Marshall, Bailey, Ventiere, and Anderson reside in this judicial district. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

24.    If enforced, the Act would violate the federal statutory and constitutional rights of Plaintiffs in this judicial district. Therefore, venue is also proper in this district pursuant to 28 U.S.C § 1391(b)(2).

25.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 57 and 65, 28 U.S.C. §§ 2201 and 2202, and this Court's inherent equitable powers.

## **FACTUAL ALLEGATIONS**

### I.    *Gender Identity and Gender Dysphoria*

26.    Gender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity. Everyone has a gender identity. Most people's gender identity is consistent with their birth sex. Transgender people, however, have a gender identity that differs from their birth sex.

27.    Gender dysphoria is the clinical diagnosis for the distress that arises when a person's gender identity does not match their birth sex. To receive a

diagnosis of gender dysphoria, a young person must meet the criteria set forth in the Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[1] If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

28.     In fact, 56% of transgender youth reported a previous suicide attempt and 86% of them reported suicidality. *See* Austin, Ashley, Shelley L. Craig, Sandra D. Souza, and Lauren B. McInroy (2022), *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*. J. of Interpersonal Violence. Vol. 37 (5–6) NP2696-NP2718.

29.     Research has shown that an individual's gender identity is biologically based and cannot be changed. In the past, mental health professionals sought to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms. Today, the medical profession generally recognizes that such efforts put minors at risk of serious harm, including dramatically increased rates of suicidality.

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*. Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012).

30.   Gender dysphoria is highly treatable. Healthcare providers who specialize in the treatment of gender dysphoria follow a well-established standard of care that has been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

31.   The standards of care for treatment of transgender people, including transgender youth, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the most recent edition of the Standards of Care for the treatment of gender dysphoria in minors and adults in 2011 and is in the process of finalizing a revised edition of the Standards of Care, which will likely be published later this year.

32.   The Endocrine Society has also promulgated a standard of care for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults. *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-*

*Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinol. Metab. 3869 (2017).

33.   The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations also follow the WPATH and Endocrine Society standards of care.

34.   The treatment of gender dysphoria is designed to reduce a transgender person's psychological distress by permitting them to live in alignment with their gender identity. Undergoing treatment for gender dysphoria is commonly referred to as transition. There are several components to the transition process: social, legal, medical, and surgical. Each of these components is part of the medically approved process for transition, some or all of which a transgender person may undertake as part of their transition.

35.   Social transition typically involves adopting a new name, pronouns, hairstyle, and clothing that match that person's gender identity, and treating that person consistent with their gender identity in all aspects of their life, including home, school, and everyday life. Following those steps, transgender people often obtain a court order legally changing their name and, where possible, changing the sex listed on their birth certificate and other identity documents.

36.     For transgender people who have begun puberty, it may be appropriate for them to start taking puberty-blocking medication and later hormone-replacement therapy to ensure their body develops in a manner consistent with their gender identity.

37.     Finally, surgical treatment may in some cases be part of essential medical care for a transgender individual. The only surgical treatment available to transgender minors is male chest reconstruction surgery, a procedure to remove existing breast tissue and create a male chest contour for transgender males. Like all treatments for gender dysphoria, male chest reconstruction surgery is safe and effective in treating gender dysphoria. The medical necessity of surgical care is determined on a case-by-case basis that considers the age of the patient, medical need, and appropriateness of the procedure relative to the psychological development of the individual.

38.     Longitudinal studies have shown that children with gender dysphoria who receive essential medical care show levels of mental health and stability consistent with those of non-transgender children. Lily Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson, et al., *Mental Health of Transgender Children who are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, children with gender dysphoria who do not receive appropriate

13

medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

## II.   *The Alabama Vulnerable Child Compassion and Protection Act*

39.   On April 8, 2022, Defendant Kay Ivey signed the Act into law, and the Act is scheduled to become effective on May 8, 2022.

40.   The Act prevents parents from consenting to, and healthcare professionals from providing, well-established medically necessary care. The Act also applies to any individual who "cause[s]" such care to be provided to a transgender minor.

41.   Specifically, subsection 4(a) of the Act provides that:

> Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
> (1)   Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2)   Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3)   Prescribing or administering supraphysiologic doses of estrogen to males.
>
> (4)   Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

14

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

42. A violation of subsection 4(a) of the Act is a Class C felony, punishable upon conviction by up to 10 years imprisonment or a fine of up to $15,000.

43. As a result of subsection 4(a) of the Act, medical professionals, including the Healthcare Provider Plaintiffs, and parents of transgender minors, including the Parent Plaintiffs, are forced to choose between withholding medically necessary treatment from their minor transgender patients or children, on the one hand, or facing criminal prosecution, on the other. Moreover, the broad language of the Act imposes content-based restrictions on discussions, counseling, or referrals regarding gender dysphoria treatments for well-recognized in the medical community that may result in such care being provided to a transgender minor.

**III.   *The Act Will Irreparably Harm the Plaintiffs***

<u>Brianna Boe and her son Michael Boe</u>

44. Michael Boe is a 12-year-old transgender boy who resides with his mother in Montgomery County, Alabama.

45.   In his early years, Michael was a happy, outgoing child. But at nine years old, Michael became depressed and anxious. Michael also started struggling academically and socially.

46.   Michael eventually confided in his mother that he felt as though he was not like other girls and was worried about being judged by his classmates. He also reported that he was being bullied in school. Brianna placed Michael in a new school for the following school year and brought him to a therapist to help him with his depression.

47.   Michael began to talk with Brianna about his male gender identity and the distress and discomfort he was experiencing as he entered puberty, as his body began to develop in ways that were inconsistent with his sense of self.

48.   In June 2021, Michael told his mother that he is transgender. With support from his family and a mental health provider experienced in working with transgender youth, Michael began to socially transition, including adopting a male name and pronouns and generally living as a boy in all aspects of his life.

49.   Since Michael began to socially transition, his mood has improved greatly. His therapist recently recommended that Michael be evaluated for additional medical treatment to address the mismatch between his body and his gender identity.

50.   In February 2022, Brianna reached out to the Children's Hospital of Alabama to make an initial appointment for Michael. If this law goes into effect,

16

however, that appointment will be cancelled, and Michael will have to further delay his assessment for critical medical care.

#### James Zoe and his son Zachary Zoe

51. James Zoe was born and raised in Alabama and attended the University of Alabama at Birmingham. Like his dad, Zachary was born in Alabama and has lived in the state his entire life. Zachary resides half-time with James and his stepmother in Jefferson County, and half-time with his biological mother and stepfather in St. Clair County.

52. Zachary is a 13-year-old transgender boy in seventh grade. He is a bright boy with a close group of friends, and is interested in video games and art.

53. Zachary was assigned female sex at birth. As a younger child, Zachary was shy and reserved. Around the age of 8, Zachary began to express his dislike of wearing dresses and bright clothing, especially pink. Over time, Zachary started dressing in more masculine attire and became upset if people identified him as a girl.

54. Around a year later, he started puberty. Zachary was distressed that he was developing breasts and had to deal with his period. This caused him to become even more withdrawn. Around the age of 10, Zachary became uncomfortable wearing any kind of clothing that revealed his body. For example, he started to wear boys' athletic shorts and t-shirts instead of girls' bathing suits when going to swim.

James and Zachary's other parents did not initially understand why he was withdrawn or why he was uncomfortable with his body.

55.   When Zachary was 11 years old, he began referring to himself using "he" and "him" pronouns. In response, some of his friends mirrored his use of male pronouns, which brought Zachary a greater sense of self-awareness and self-acceptance, allowing him to feel more at ease and happy. It also gave him the confidence he needed to tell his parents that he is transgender. Both sets of parents were supportive of Zachary, using his chosen name and male pronouns.

56.   Zachary's social transition has been very positive for him. He uses a chest binder and appears and dresses like other boys his age. Since he came out, Zachary has blossomed into a happier and more outgoing child.

57.   In October 2021, after completing appropriate mental health and other medical evaluations, Zachary began puberty-blocking medication prescribed by his pediatrician with the support of both sets of plaintiffs. He recently had an appointment to start the assessment process for hormone therapy at Children's Hospital of Alabama in Birmingham.

58.   Continuing to receive puberty-blockers and progressing with medical treatments for his gender dysphoria, as deemed appropriate by his treating providers, is essential for Zachary's mental health. If the Act were enforced, Zachary's parents would no longer be able to rely on—or follow—the advice of qualified and trusted

healthcare providers to make decisions that keep Zachary healthy and safe. Zachary's parents know that if Zachary is not able to receive the medications or treatments necessary to treat his gender dysphoria, his life will be disrupted, and his physical and mental health will suffer.

Megan Poe and Allison Poe

59.     Allison Poe is a 15-year-old transgender girl who resides with her mother, Megan Poe, in Cullman County, Alabama.

60.     As a young child, Allison showed interest in girls' toys and clothing. Thinking this was a phase, her parents initially refused to buy Allison any girl toys. Without asking, Allison's grandmother bought Allison a Barbie doll. Allison was so happy and carried it everywhere.

61.     When the family returned to the United States from her father's military deployment abroad, Allison would become very upset when her mother refused to buy her girls' clothes. As a compromise, Megan bought Allison a few girls' toys. Eventually, Allison's father found them and attempted to throw them away, but Allison's brother snuck them back into the house.

62.     When Allison was around nine years old, her personality began to change significantly. She became withdrawn, quiet, showed signs of depression, and regularly commented that she wanted to die. She also stopped eating regularly. Allison's actions became so worrisome to Megan that she consulted with a

pediatrician. The pediatrician suggested that Allison may be transgender and referred them to the gender clinic at UAB Hospital.

63.    After evaluating Allison, the team of clinicians educated Megan about what Allison was experiencing and gave her advice about how to support Allison. That visit was a turning point for Megan. She became supportive of Allison, helping her redecorate her room and buying her girls' clothes. The first time Allison came out of her room in girls' clothes, she was beaming with joy.

64.    By fifth grade, many of Allison's peers had started showing the first signs of puberty, and Allison became scared about going through a male puberty.  In anticipation of her starting puberty, Allison started the process to be evaluated for puberty-blocking medication.

65.    About seven months ago, just as Allison was beginning high school, she was evaluated for and eventually started on estrogen.  Her mental health has improved dramatically; she is confident, social, and doing well in school.

66.    If the Act is allowed to go into effect, Allison's medical care will be disrupted, which would cause Allison extreme anxiety and distress. She will develop physical traits that are inconsistent with her identity as a girl that will require her to undergo otherwise avoidable surgeries in the future as an adult.

Kathy Noe and Christopher Noe

67.    Christopher Noe is a 17-year-old transgender boy who resides with his

mother, Kathy Noe, in Lee County, Alabama. Christopher and Kathy have deep roots

in Alabama, having moved to the State just before Christopher turned 4 years old.

Kathy is former active-duty military, while Christopher's father is still active-duty

military and is deployed abroad.

68.    Since Christopher was a toddler, he resisted attempts to dress him as a

girl. For example, he refused to attend his sixth-grade graduation because doing so

meant he would have to wear a dress.

69.    As Christopher began to enter puberty, his distress at the changes his

body was undergoing and at being made to present as female intensified.

70.    When Christopher was 14, he told his mother he is transgender. Kathy

found Christopher a therapist experienced in working with transgender young

people. The therapist helped both Christopher and Kathy navigate the beginning

stages of Christopher's transition.

71.    About a year later, Christopher came out to his father as transgender.

Christopher's father struggled initially, but because of his love for Christopher, his

father began to accept Christopher for who he is.

72.    With his father's support, Kathy took Christopher to a physician to

begin the evaluation for hormone-replacement therapy. Because Kathy and

Christopher live close to the Alabama-Georgia state line, Christopher's doctors are in Columbus, Georgia. Christopher's prescriptions, however, are filled at a pharmacy in Alabama.

73.    Christopher began hormone replacement therapy in March 2022. Christopher has been noticeably happier. He is bubbly and more outgoing and is confident at work and around other people.

74.    If the Act is allowed to go into effect, Christopher's medical care will be disrupted, which will have devastating and irreversible physical and psychological consequences.

Dr. Rachel Koe

75.    Dr. Rachel Koe is a board-certified pediatrician in southeast Alabama. Over the past decade, Dr. Koe has treated a handful of transgender patients, including one current patient for whom she provides primary care.

76.    Depending on the needs of the patient, Dr. Koe has referred patients and their parents to local mental health providers as well as the gender clinic at UAB Hospital. Even after referral, Dr. Koe remains involved with her patients' care. For example, Dr. Koe's office draws blood for their patient's regular blood work in advance of appointments with the gender clinic. Additionally, she and her staff provide support to patients who need assistance in self-administering injectable medications like testosterone.

77.    Dr. Koe is familiar with the standards of care for the treatment of gender dysphoria and the medical literature regarding those treatments. She has also seen the significant positive effects medical treatment for gender dysphoria has had on the health and wellbeing of her patients.

78.    If the Act goes into effect, Dr. Koe would be forced to choose between complying with the Act and the medical needs of her current and any future transgender patients whose mental and physical health will deteriorate if denied ongoing medical treatment for their gender dysphoria. The Act forces Dr. Koe to violate her professional and ethical obligations as a physician by denying her patients access to a course of treatment that is evidence-based and consistent with the established standards of care.

79.    Dr. Koe would also be required to curtail her speech as she would no longer be allowed to provide accurate and comprehensive information to parents and about medically necessary treatment options for gender dysphoria and would be prohibited from making referrals to specialists who could prescribe those treatments.

80.    Changing her practice in those ways would also require Dr. Koe to violate her legal obligation as a Medicaid provider to not discriminate in the provision of medical care to her transgender patients. Ignoring that obligation would jeopardize her ability to provide primary medical care in rural southeast Alabama.

<u>Jane Moe, Ph.D.</u>

81.     Dr. Jane Moe is a doctoral-level clinical child psychologist with a specialty in child development who currently practices in a hospital setting within the UAB System. Dr. Moe has been a practicing clinical psychologist for twenty years and has experience working with children and adolescents with a variety of mental health issues. For the past two years, part of Dr. Moe's practice has been dedicated to mental health treatment and evaluation of transgender young people.

82.     Dr. Moe's work with transgender patients is guided by the well-established standards of care and the hospital's informed-consent protocol. Her assessment process engages both the patient and the patient's parents and requires a minimum of three to four visits. It is quite common for the assessment to require additional visits, but that determination is made on a case-by-case basis and dependent on the needs of the patient and the patient's family.

83.     In order to conduct her assessment, Dr. Moe gathers information about the patient from questionnaires, rating scales, and discussions with the patient and the patient's family. Pulling from multiple sources provides Dr. Moe with the information she needs to determine whether the patient meets the diagnostic criteria for gender dysphoria as outlined in the DSM-5.

84.     Once she has made, or confirmed, the diagnosis, Dr. Moe then begins taking the patient and the patient's parents through the informed-consent protocol.

As required by the protocol, she has detailed discussions about the risks and benefits of the particular medical treatment being considered by the patient and their medical provider. Because of the large amount of information that is reviewed as part of the informed-consent protocol, this discussion can occur over multiple sessions and sometimes Dr. Moe will have separate sessions with the patient and the parent(s) to give each person an opportunity to ask questions and engage with the information being provided.

85.     After completing the informed-consent protocol, Dr. Moe writes a letter to the patient's medical provider detailing the results of her assessment. That letter will include, for example, an overview of the patient's mental health and, if needed, recommendations on follow up mental health care. Although the letter discusses a patient's readiness to proceed with treatment, Dr. Moe always recommends in the letter that the medical provider conduct a further assessment before initiating treatment.

86.     If enforced, the Act will prevent Dr. Moe from continuing to treat transgender patients in a manner that is consistent with the applicable standards of care. She would not be able to provide the level of detailed information or engage in in-depth conversations with her transgender patients or the patient's parents about medical treatments for gender dysphoria. Practicing this way would require Dr. Moe

25

to violate her professional and ethical obligations. Unwilling to do so, Dr. Moe fears

that she will be subject to criminal prosecution under the Act.

87.    Dr. Moe is also concerned for the health and wellbeing of her patients

should the Act go into effect. She has witnessed the significant distress her patients

experience before starting medical treatment and the tremendous positive effects

those treatments have on her patients' mental health. Without access to that critical

care, Dr. Moe worries that her patients' mental health will deteriorate in ways that

will interfere with their ability to function and cause lasting harm to their health and

wellbeing, including developing substance use issues and increased suicidality.

Reverend Paul A. Eknes-Tucker

88.    Reverend Eknes-Tucker is the Senior Pastor at Pilgrim Church in

Birmingham, Alabama. The church was established in 1903 and is part of the United

Church of Christ. The core tenet of the congregation is to love and support all people

to be their true and authentic selves. As such, his faith compels him to support and

encourage parents to love and affirm their transgender children.

89.    As a pastor, Reverend Eknes-Tucker provides pastoral counseling to

families of transgender children who are often uncertain about what guidance their

faith can provide, as they try to figure out how to support their children who are

experiencing gender dysphoria.

90.    During these pastoral counseling sessions, parents of transgender children share their worries and fears as well as hopes and aspirations for their transgender children's future. Reverend Eknes-Tucker and the parents extensively discuss the application of their faith's teachings to each family's unique circumstances. He also strives to answer questions and provide information to help parents make decisions about what is best for their children, including whether to consent to particular medical treatments, by accounting for their child's spiritual wellbeing in that decision-making process.

91.    This includes counseling parents to seek the advice of other professionals, such as medical providers and mental health professionals, as needed, to further assist their children.

92.    If this Act comes into effect, Reverend Eknes-Tucker is concerned for the spiritual and mental wellbeing of families he has counseled because he has seen the benefits that pastoral counseling has provided the families he has worked with. Because of the content of Reverend Eknes-Tucker's pastoral counseling sessions with parents raising transgender children, he will face criminal penalties for his pastoral work as it could "cause" a transgender minor to begin medical treatments for their gender dysphoria.

## **CLAIMS FOR RELIEF**

### **COUNT I**
Deprivation of Substantive Due Process
Parent Plaintiffs Against Defendants in Their Official Capacities
Violation of Parent Plaintiffs' Right to Direct the Upbringing of Their Children
U.S. Const. Amend. XIV

93.    Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

94.    The Parent Plaintiffs bring this Count against all Defendants.

95.    The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000). That fundamental right includes the liberty to make medical decisions for their minor children, including the right to obtain medical treatments that are recognized to be safe, effective, and medically necessary to protect their children's health and well-being.

96.    The Act violates this fundamental right by preventing the Parent Plaintiffs from obtaining medically necessary care for their minor children.

97.    By intruding upon parents' fundamental right to direct the upbringing of their children, the Act is subject to strict scrutiny.

98.     Defendants have no compelling justification for preventing parents from ensuring their children can receive essential medical care. The Act does not advance any legitimate interest, much less a compelling one.

## COUNT II
Deprivation of Equal Protection
All Plaintiffs Against Defendants in Their Official Capacities
U.S. Const. Amend. XIV

99.     Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

100.    All Plaintiffs bring this Count against all Defendants.

101.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

102.    The Act singles out transgender minors and prohibits them from obtaining medically necessary treatment based on their sex and transgender status.

103.    The Act also treats transgender minors differently and less favorably than non-transgender minors by allowing minors who are not transgender to obtain the same medical treatments that are prohibited when medically necessary for transgender minors.

104.    Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

105.  Transgender-based government classifications are subject, at a minimum, to heightened scrutiny because they are also sex-based classifications.

106.  Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different than their birth sex, they comprise a discrete group. This defining characteristic bears no relation to a transgender person's ability to contribute to society. Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.

107.  As such, transgender classifications are subject to strict scrutiny.

108.  The Act does nothing to protect the health or well-being of minors. To the contrary, the Act undermines the health and well-being of transgender minors by denying them essential medical care.

109.  The Act is not narrowly tailored to further a compelling government interest and is not substantially related to any important governmental interest. Moreover, the Act is not even rationally related to a governmental interest. Accordingly, the Act violates the Equal Protection Clause of the Fourteenth Amendment.

## COUNT III
Preemption
Healthcare Provider Plaintiffs, Parent Plaintiffs, and Transgender Plaintiffs Against
Defendants in Their Official Capacities
42 U.S.C. § 18116

110.   Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

111.   Healthcare Provider Plaintiffs, Parent Plaintiffs, and Transgender Plaintiffs bring this Count against all Defendants.

112.   Under Section 1557 of the Affordable Care Act, "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

113.   The prohibition on sex discrimination in Section 1557 of the Affordable Care Act protects transgender individuals from discrimination by healthcare providers, including physicians and hospitals.

114.   The Parent Plaintiffs obtain medical care for their children, the Transgender Plaintiffs, from providers who are recipients of federal financial assistance and therefore subject to the non-discrimination requirements of Section 1557 of the Affordable Care Act.

115.   The Act subjects the Transgender Plaintiffs and the Parent Plaintiffs to unlawful sex discrimination by preventing Plaintiff Parents from obtaining

medically necessary care for their children, the Transgender Plaintiffs, because of the children's transgender status and by requiring their healthcare providers to discriminate against the children because they are transgender. As such, the Act conflicts with the non-discrimination requirements of Section 1557. It also conflicts with and undermines the purposes and goals of Section 1557.

116.   In addition, as providers for transgender beneficiaries of Alabama Medicaid, the Healthcare Provider Plaintiffs are recipients of federal financial assistance and therefore subject to the non-discrimination requirements of Section 1557 of the Affordable Care Act.

117.   It is impossible for the Healthcare Provider Plaintiffs to continue to comply with their obligations under Section 1557 and also comply with the restrictions imposed by the Act. On the one hand, refusing to comply with the Act would bring them into compliance with Section 1557, but subject them to criminal penalties under the Act. On the other hand, complying with the Act would subject the Healthcare Plaintiffs to civil liability for discrimination under Section 1557.

118.   The Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the objective of preventing discrimination in the provision of healthcare based on sex.

119.   The Healthcare Provider Plaintiffs, Parent Plaintiffs, and Transgender Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause them irreparable harm.

120.   Accordingly, the Healthcare Provider Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT IV
### Deprivation of Free Speech
### All Plaintiffs Against Defendants in Their Official Capacities
### U.S. Const. Amend. I

121.   Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

122.   All Plaintiffs bring this Count against all Defendants.

123.   The Free Speech Clause of the First Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "Congress shall make no law . . . abridging the freedom of speech."

124.   The First Amendment is applicable to the State of Alabama under the Fourteenth Amendment to the United States Constitution.

125.   The Act creates an unlawful restriction on speech. By imposing criminal penalties on anyone who "cause[s]" any of the proscribed treatments to be performed on a minor, Defendants are punishing the Healthcare Provider Plaintiffs, the Parent Plaintiffs, and Reverend Eknes-Tucker for any speech that can be pointed to as resulting in a minor receiving any of the proscribed treatments – *e.g.*, referrals,

counseling, or discussions relating to well-established care recognized in the medical community as appropriate, safe treatment for gender dysphoria in transgender minors.

126. There is no constitutionally sufficient justification for the Act's restriction of speech. The Act is not rationally related to the furtherance of any legitimate government interest, let alone narrowly tailored to substantially advance any compelling or important government interest.

**COUNT V**
Deprivation of Procedural Due Process
All Plaintiffs Against Defendants in Their Official Capacities
Void for Vagueness
U.S. Const. Amend. V and XIV

127. Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

128. All Plaintiffs bring this Count against all Defendants.

129. Under the Due Process Clause, a criminal statue is void for vagueness if it either: (1) fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) authorizes or encourages "arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

130. Section 4(a) of the Act states, in relevant part, that "no person shall . . . cause any of the following practices to be performed upon a minor . . . ."

131.  As written, the Act does not provide sufficient definiteness to ordinary people, including Plaintiffs, of what actions constitute "caus[ing]" any of the proscribed activities upon a minor.

132.  The lack of definiteness in the Act encourages arbitrary and discriminatory enforcement against anyone who is aware of, refers to, discusses, talks about, recommends, or gives an opinion on a transgender person's healthcare.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

(1)  issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that the Act violates federal law for the reasons and on the Counts set forth above;

(2)  temporarily, preliminarily, and permanently enjoin Defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the Act;

(3)  declare that the Act violates the First, Fifth, and Fourteenth Amendments to the United States Constitution;

(4)  award Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(5)  grant such other relief as the Court finds just and proper.

Respectfully submitted this 19th day of April, 2022.

Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
205.581.0700
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (ASB-3507-J56P)
Misty L. Peterson (GA Bar No. 243715) (*pro hac vice* application forthcoming)
Adam Reinke (GA Bar No. 510426) (*pro hac vice* application forthcoming)
Gilbert Oladeinbo (GA Bar No. 669340) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com
goladeinbo@kslaw.com

Brent P. Ray (IL Bar No. 6291911) (*pro hac vice* application forthcoming)
Abigail Hoverman Terry (IL Bar No. 6327057) (*pro hac vice* application forthcoming)
KING & SPALDING LLP

110 North Wacker Drive, Suite 3800
Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (CA Bar No. 277035) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355
mshortnacy@kslaw.com

Asaf Orr (CA Bar No. 261650) (*pro hac vice* application forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (MA Bar No. 562298) (*pro hac vice* application forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (FL Bar No. 1004965) (*pro hac vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101

334.224.4309
scott.mccoy@splcenter.org

Diego A. Soto (AL Bar No. ASB-3626-Y61S)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
334.604.1414
diego.soto@splcenter.org

Jessica L. Stone (GA Bar No. 275567) (*pro hac vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
404.221.5837
jessica.stone@splcenter.org

Sarah Warbelow (MI Bar No. P66690) (*pro hac vice* application forthcoming)
Cynthia Weaver (NY Bar No. 5091848) (*pro hac vice* application forthcoming)
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
202.628.4160
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

# DOC. 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PAUL A. EKNES-TUCKER, )
*Rev.*, *et al.*, )
)
Plaintiffs, )
)
v. ) CASE NO. 2:22cv184-RAH-SRW
)
KAY IVEY, *in her official capacity as* )
*Governor of the State of Alabama*, *et al.*, )
)
Defendants. )

## ORDER

The Honorable Liles C. Burke, United States District Judge for the Northern District of Alabama, was previously assigned two cases substantially similar to the above-captioned case, both of which were voluntarily dismissed on April 15, 2022. By order of the Chief Judge of the United States Court of Appeals for the Eleventh Circuit, all United States District Judges in the State of Alabama may preside over cases in any of the State's three federal judicial districts. In accordance with that order, and by the authority of the Court to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case, this case is **REASSIGNED** to Judge Burke. Judge Burke shall sit by designation and preside over this case in the United States District Court for the Middle District of Alabama.

DONE, on this the 20th day of April, 2022.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE

# DOC. 7

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D., | Civil Action No. 2:22-cv-184-LCB <br><br> **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** |
| *Plaintiffs*, | |
| v. | |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County, | |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiffs Reverend Paul A. Eknes-Tucker; Brianna Boe, individually and on behalf of her minor son, Michael Boe; James Zoe, individually and on behalf of his minor son, Zachary Zoe; Megan Poe, individually and on behalf of her minor daughter, Allison Poe; Kathy Noe, individually and on behalf of her minor son, Christopher Noe; Jane Moe, Ph.D.; and Rachel Koe, M.D. (collectively "Plaintiffs"), hereby move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for preliminary injunctive relief and/or a temporary restraining order preventing the enforcement of Alabama's Vulnerable Child Compassion and Protection Act (the "Act"), prior to its May 8, 2022 effective date. In addition, Plaintiffs respectfully request this Court exercise its discretion to waive the Federal Rule of Civil Procedure 65(c) security requirement. *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

The Act makes it a Class C felony for any "person" to "engage in or cause" the performance of certain medical treatments on any minor, "if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined by [the] act." This prohibition infringes upon the fundamental constitutional rights to parental autonomy and equal

protection, violates the right to freedom of speech, is void for vagueness, and conflicts with the Affordable Care Act.

First, the Act deprives parents of the fundamental right to obtain essential medical care for their children, in violation of the Fourteenth Amendment to the United States Constitution. Second, the Act violates the Equal Protection Clause of the Fourteenth Amendment by discriminating based on transgender status and sex. Third, the Act violates the First Amendment by criminalizing speech that would "cause" a transgender minor to receive medical treatment for gender dysphoria, thereby enacting a speech restriction that is not narrowly tailored to advance a compelling, or even legitimate, state interest. Fourth,, the Act deprives Plaintiffs of due process and violates the Fifth and Fourteenth Amendments because it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" and encourages "arbitrary and discriminatory enforcement" by the government. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Fifth, the Act is preempted by Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, because compliance with the Act would force covered health care providers to violate Section 1557.

As detailed more fully in the accompanying Memorandum of Law, Plaintiffs satisfy the requirements for preliminary injunctive relief and a temporary restraining order. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

If the Act is not enjoined, Plaintiffs will suffer immediate and irreparable constitutional, medical, emotional, psychological, and other harm, for which there is no adequate remedy at law. The balance of hardships also favors Plaintiffs because a preliminary injunction and temporary restraining order would preserve the status quo; the harm imposed through enforcement of the felony health care ban is far greater than any harm that could result from the preliminary injunction or temporary restraining order. In addition, the entry of a preliminary injunction and/or temporary restraining order is in the public interest.

Accordingly, and for the reasons set forth in the accompanying Memorandum of Law, Plaintiffs respectfully request that this Motion for a Temporary Restraining Order and/or Preliminary Injunction be granted without security. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981) (recognizing "an exception to the Rule 65 security requirement" for "public-interest litigation"); *BellSouth*, 425 F.3d at 971 (citing *City of Atlanta* with approval).

Respectfully submitted this 21st day of April, 2022.

*/s/ Melody H. Eagan*
Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203

205.581.0700
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (ASB-3507-J56P)
Misty L. Peterson (GA Bar No. 243715) (*pro hac
vice* application forthcoming)
Adam Reinke (GA Bar No. 510426) (*pro hac vice*
application forthcoming)
Gilbert Oladeinbo (GA Bar No. 669340) (*pro hac
vice* application forthcoming)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com
goladeinbo@kslaw.com

Brent P. Ray (IL Bar No. 6291911) (*pro hac vice*
application forthcoming)
Abigail Hoverman Terry (IL Bar No. 6327057)
(*pro hac vice* application forthcoming)
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (CA Bar No. 277035) (*pro
hac vice* application forthcoming)
KING & SPALDING LLP

633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355
mshortnacy@kslaw.com

Asaf Orr (CA Bar No. 261650) (*pro hac vice*
application forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (MA Bar No. 562298) (*pro hac
vice* application forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (FL Bar No. 1004965) (*pro hac
vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
334.224.4309
scott.mccoy@splcenter.org

Diego A. Soto (AL Bar No. ASB-3626-Y61S)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
334.604.1414
diego.soto@splcenter.org

Jessica L. Stone (GA Bar No. 275567) (*pro hac vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
404.221.5837
jessica.stone@splcenter.org

Sarah Warbelow (MI Bar No. P66690) (*pro hac vice* application forthcoming)
Cynthia Weaver (NY Bar No. 5091848) (*pro hac vice* application forthcoming)
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
202.628.4160
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 21st day of April, 2022, I filed the foregoing with the Clerk of Court. I further certify that I will cause a copy of this Motion and accompanying Memorandum and Exhibits to be served along with a copy of the Summons and Complaint by delivering a copy to the following Defendants, or to their respective agents who are authorized by law to receive service of process, pursuant to Fed. R. Civ. P. 4:

Kay Ivey
The Office of Alabama Governor
600 Dexter Avenue
Montgomery, Alabama 36130

C. Wilson Baylock
District Attorney for Cullman County
500 2nd Avenue SW
Cullman, Alabama 35055

Daryl D. Bailey
District Attorney for Montgomery County
251 South Lawrence Street
Montgomery, Alabama 36014

Steve Marshall
Attorney General, State of Alabama
501 Washington Avenue
Montgomery, Alabama 36104

Jessica Venitere
District Attorney for Lee County
2311 Gateway Drive #111
Opelika, Alabama 36801

Tom Anderson
District Attorney for 12th Judicial Circuit
1065 E. McKinnon Street
New Brockton, Alabama 36351

Danny Carr
District Attorney for Jefferson County
810 Richard Arrington, Jr. Blvd. N., Suite 105
Birmingham, AL 35203

*/s/ Melody H. Eagan*
*Attorney for Plaintiffs*

# DOC. 8

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.,

     *Plaintiffs*,

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County,

     *Defendants*.

Civil Action No.
2:22-cv-00184-184-LCB

Hon. Liles C. Burke

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR TEMPORARY
## <u>RESTRAINING ORDER & PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS ......................................................................2

   A. The Act Prevents the Parent Plaintiffs from Receiving the Support
     They Need to Make Important Medical Decisions for their Children's
     Health and Well-Being. ...................................................................2

   1. Reverend Paul Eknes-Tucker.............................................................2

   2. Brianna Boe and Her Son Michael Boe .............................................2

   3. Megan Poe and Her Daughter Allison Poe.........................................4

   4. James Zoe and His Son Zachary Zoe .................................................6

   5. Kathy Noe and Her Son Christopher Noe...........................................7

   6. Dr. Jane Moe .....................................................................................9

   7. Dr. Rachel Koe ................................................................................10

   B. Transition Is the Established Course of Care for Gender Dysphoria............12

   C. The Alabama Vulnerable Child Compassion and Protection Act................17

III.ARGUMENT ......................................................................................18

   A. Plaintiffs Will Likely Succeed on the Merits of Their Claims Because
     the Act Is Unconstitutional. ...........................................................19

   1. The Act Infringes on Parental Autonomy by Preventing Parents from
     Obtaining Essential Medical Care for their Children (Count I). ......................19

   2. The Act Violates Equal Protection by Barring Medical Treatments for
     Transgender Minors (Count II). .....................................................22

       a. The Act is Subject to Heightened Scrutiny Under
          Well-Established Precedent...................................................22

b. Defendants Cannot Establish the State's Asserted Interest Serves Important Governmental Objectives or the Act Is Substantially Related to the Achievement of those Objectives ............ 26

i.   The treatments are effective and well-established. ........................... 27

ii.  The treatments are necessary. ................................................................ 28

iii. The treatments are safe. .......................................................................... 30

iv.  Minors who stop taking puberty blocking medication or hormone therapy will resume puberty in their birth sex. ................. 34

3. Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim (Count IV). ................................................................... 35

4. The Act Is Unconstitutionally Vague (Count V). ................................. 39

B. The Affordable Care Act Preempts the Act Because the Act Mandates Sex Discrimination by Healthcare Providers (Count III). ............................ 41

IV. The Act Will Cause Immediate, Irreparable Harm to Plaintiffs ........................ 44

V. Injuries to Plaintiffs Outweigh Any Damage to the State, Which Has No Interest in Enforcing an Unconstitutional Law .................................................... 48

VI. CONCLUSION ..................................................................................................... 50

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) ................................................25

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)...........................................................................41

*Bendiburg v. Dempsey*,
   909 F.2d 463 (11th Cir. 1990) ....................................................20, 21

*Board of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of
   Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) .............................................24

*Bostock v. Clayton Cty.*,
   140 S. Ct. 1731 (2020)................................................................24, 42

*Bowen v. City of New York*,
   476 U.S. 467 (1986)...........................................................................45

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021), *appeal docketed*, No. 21-
   2875 (8th Cir. Apr. 19, 2022) ....................................................*passim*

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)...........................................................................23

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011)...........................................................................38

*Campbell v. Kallas*,
   No. 16-CV-261-JDP, 2020 WL 7230235 (W.D. Wis. Dec. 8, 2020) ...............47

*Cate v. Oldham*,
   707 F.2d 1176 (11th Cir. 1983) .........................................................48

*Christian Legal Soc'y v. Martinez*,
   561 U.S. 661 (2010)...........................................................................23

*City of Chi. v. Morales*,
   527 U.S. 41 (1999)..................................................................40

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) .................................................37

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972)..................................................................33

*Elrod v. Burns*,
   427 U.S. 347 (1976)..........................................................18, 48

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) ................................24

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) .............................................41

*Flack v. Wis. Dep't of Health Servs.*,
   331 F.R.D. 361 (W.D. Wis. 2019).........................................45

*Fresenius Med. Care Holdings, Inc. v. Tucker*,
   704 F.3d 935 (11th Cir. 2013) ...............................................42

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)..................................................................24

*Gayle v. Meade*,
   -- F.Supp.3d --, No. 20-21553-CIV, 2020 WL 3041326
   (S.D. Fla. June 6, 2020) .........................................................45

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ................................24, 25, 43

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
   551 F. Supp. 3d 567 (D. Md. 2021)......................................43

*Ingram v. Ault*,
   50 F.3d 898 (11th Cir. 1995) .................................................19

*Jolley v. Riverwoods Behav. Health, LLC*,
   No. 1:21-CV-00561-WMR, 2021 WL 6752161
   (N.D. Ga. Aug. 30, 2021) ......................................................43

*Jones v. Governor of Fla.*,
 950 F.3d 795 (11th Cir. 2020) ........................................................18

*Karnoski v. Trump*,
 No. C17-1297-MJP, 2017 WL 6311305
 (W.D. Wash. Dec. 11, 2017) ..........................................................46

*KH Outdoor, LLC v. City of Trussville*,
 458 F.3d 1261 (11th Cir. 2006) ......................................................49

*King v. Burwell*,
 576 U.S. 473 (2015)........................................................................44

*Kolender v. Lawson*,
 461 U.S. 352 (1983)........................................................................39

*Lanzetta v. New Jersey*,
 306 U.S. 451 (1939)........................................................................41

*Lawrence v. Texas*,
 539 U.S. 558 (2003)........................................................................23

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
 358 F.3d 804 (11th Cir. 2004) ........................................................20

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
 286 F. Supp. 3d 704 (D. Md. 2018)................................................24

*May v. Anderson*,
 345 U.S. 528 (1953)........................................................................20

*McCullen v. Coakley*,
 573 U.S. 464 (2014)...................................................................36, 38

*Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*,
 896 F.2d 1283 (11th Cir. 1990) ......................................................48

*Nken v. Holder*,
 556 U.S. 418 (2009)........................................................................49

*Norsworthy v. Beard*,
 87 F. Supp. 3d 1104 (N.D. Cal. 2015)............................................25

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ............................................................49

*Papachristou v. City of Jacksonville*,
   405 U.S. 156 (1972)........................................................................39

*Parham v. J.R.*,
   442 U.S. 584 (1979)........................................................................20

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
   268 U.S. 510 (1925)........................................................................20

*Planned Parenthood Se., Inc. v. Bentley*,
   951 F. Supp. 2d 1280 (M.D. Ala. 2013)............................................19

*Prince v. Massachusetts*,
   321 U.S. 158 (1944)........................................................................20

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)........................................................................36

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015).................................................................36, 37

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017)....................................................................25

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) ..........................................................24

*Stone v. Trump*,
   400 F. Supp. 3d 317 (D. Md. 2019)..................................................24

*Taylor v. Polhill*,
   964 F.3d 975 (11th Cir. 2020) ........................................................41

*Toomey v. Arizona*,
   No. CV-19-00035-TUC-RM, 2019 WL 7172144
   (D. Ariz. Dec. 23, 2019) .................................................................24

*Troxel v. Granville*,
   530 U.S. 57 (2000)..........................................................................20

*United States v. Eckhardt*,
    466 F.3d 938 (11th Cir. 2006) ........................................................40

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000).......................................................................37

*United States v. Virginia*,
    518 U.S. 515 (1996)........................................................................25

*W. Ala. Women's Ctr. v. Williamson*,
    120 F. Supp. 3d 1296 (M.D. Ala. 2015)..........................................18

*Whitaker v. Kenosha Unified Sch. Dist. No. 1*,
    858 F. 3d 1034 (7th Cir. 2017) .......................................................24

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) .............................................36, 38, 39

## Statutes

20 U.S.C. § 1682 ...................................................................................43

Affordable Care Act, 42 U.S.C. § 18001, *et seq*. (2010)........................19

ALA. CODE §§ 13A-5-6, 13A-5-11 .......................................................18

ALA. CODE § 22-8-4 .............................................................................34

## Other Authorities

U.S. Const. Amend. I ........................................................................*passim*

U.S. Const. Amend. XIV ......................................................................19

"Cause," Black's Law Dictionary (11th ed. 2019)...............................40

Letter from Kristen Clarke, Assistant Attorney General at U.S. Dep't
    of Justice Civil Rights Div., to State Attorneys General (Mar. 31,
    2022), *available at* https://www.justice.gov/opa/press-
    release/file/1489066/download..................................................44

## I.    INTRODUCTION

Plaintiffs are a church pastor, parents, and healthcare providers who seek to ensure that the Plaintiff children in this case receive necessary medical care. The Reverend Paul Eknes-Tucker is the Senior Pastor at a Birmingham church who has provided pastoral counseling to congregants and community members who are parents of transgender children. Brianna Boe, James Zoe, Megan Poe, and Kathy Noe (together, "Parent Plaintiffs") are parents of children who are currently receiving medical care for gender dysphoria; they are suing individually and on behalf of their children. Michael Boe, Zachary Zoe, Allison Poe, and Christopher Noe (together, "Transgender Plaintiffs") are transgender minors whose medical care will be halted or precluded by the Act. Dr. Jane Moe and Dr. Rachel Koe (together, "Healthcare Provider Plaintiffs") are healthcare providers who will be subjected to felony arrest and potential imprisonment for providing recommended medical care to their patients—care recognized as medically appropriate and necessary by every major expert medical association—if the Alabama Vulnerable Child Compassion and Protection Act (the "Act") goes into effect on May 8, 2022.

## II.   STATEMENT OF FACTS

### A.   The Act Prevents the Parent Plaintiffs from Receiving the Support They Need to Make Important Medical Decisions for their Children's Health and Well-Being.

#### 1.   *Reverend Paul Eknes-Tucker*

Rev. Paul Eknes-Tucker is the Senior Pastor at Pilgrim Church in Birmingham, Alabama where he has served for seven years. (*See* Declaration of Rev. Paul Eknes-Tucker ("Rev. Eknes-Tucker Decl.") ¶ 1.) A core tenet of his faith is love, respect, and support for all persons. (*Id.* ¶ 4.) In his pastoral role, he has provided counseling to congregants and community members who are the parents of transgender children. (*Id.* ¶ 5.) In those discussions, parents are often uncertain about what guidance their faith can provide as they figure out how to support their child. (*Id.*) Parents often share with Rev. Eknes-Tucker their worries and fears as well as hopes and aspirations for their transgender child's future. (*Id.* ¶ 6.) His religious faith compels him to support parents in accepting their transgender children. (*Id.*) This includes counseling parents to get help from medical and mental health professionals, when needed, to assist and care for their children and to embrace who they are. (*Id.*)

#### 2.   *Brianna Boe and Her Son Michael Boe*

Michael Boe is a twelve-year-old transgender boy who resides with his mother, Brianna, in Montgomery County, Alabama. (*See* Declaration of Brianna Boe ("Boe Decl.") ¶¶ 1-2.) In his early years, Michael was a happy, outgoing child.

2

(*Id.* ¶ 3.) At nine years old, however, Michael became depressed and anxious. (*Id.*) Michael also started struggling academically and socially. (*Id.*) Michael eventually confided in his mother that he felt as though he was not like other girls and was worried about being judged by his classmates. (*Id.* ¶ 4.) He also reported that he was being bullied in school. (*Id.*) Brianna placed Michael in a new school for the following school year and brought him to a therapist to help him with his depression. (*Id.* ¶ 5.)

Michael began to talk with his mother about his male gender identity and the distress and discomfort he was experiencing as he entered puberty and his body began to develop in ways that were inconsistent with his sense of self. (*Id.* ¶¶ 5-6.) In June 2021, Michael told his mother that he is transgender. (*Id.* ¶ 7.) With support from his family and a mental health provider experienced in working with transgender youth, Michael began to socially transition, including adopting a male name and pronouns and generally living as a boy in all aspects of his life. (*Id.* ¶¶ 7-9.)

Since Michael began to socially transition, his mood has improved greatly. (*Id.* ¶ 9.) His therapist recently recommended that Michael be evaluated for additional medical treatment to address the distress he continues to experience due to the mismatch between his body and his gender identity. (*Id.* ¶¶ 9-12.)

In February 2022, Brianna made an initial appointment for Michael at the Children's Hospital of Alabama. (*Id.* ¶ 14.) If this law goes into effect, that

3

appointment will be cancelled, and Michael cannot be assessed for critical medical care. (*Id.* ¶¶ 14-15.) In addition, he will continue to experience the effects of female puberty which will cause him to develop additional physical traits inconsistent with his identity as a boy and will severely exacerbate his distress. (*Id.* ¶¶ 9-12, 15.)

### 3.   *Megan Poe and Her Daughter Allison Poe*

Allison Poe is a fifteen-year-old transgender girl who resides with her mother, Megan Poe, in Cullman County, Alabama. (*See* Declaration of Megan Poe ("Poe Decl.") ¶¶ 1-3.) As a young child, Allison showed interest in girls' toys and clothing. (*Id.* ¶ 4.) Thinking this was a phase, her parents initially refused to buy Allison any girl toys. (*Id.*) Without asking, Allison's grandmother bought Allison a Barbie doll. (*Id.*) Allison was so happy and carried it everywhere. (*Id.*)

When the family returned to the United States from her father's deployment abroad, Allison would become very upset when her mother refused to buy her girls' clothes. (*Id.* ¶ 5.) As a compromise and remembering Allison's response to the grandmother buying her a doll, Megan bought Allison a few girls' toys, again providing Allison some short-term relief from the despair she was experiencing. (*Id.*) When Allison was around nine years old, her personality began to change significantly. (*Id.* ¶ 9.) She became withdrawn and quiet, showed signs of depression, and regularly commented that she wanted to die. (*Id.*) Allison's actions became so worrisome to Megan that she consulted with a pediatrician. (*Id.* ¶ 10.)

The pediatrician suggested that Allison may be transgender and referred them to the gender clinic at the University of Alabama at Birmingham ("UAB") Hospital. (*Id.*)

After evaluating Allison, a team of clinicians educated Megan about what Allison was experiencing and gave her professional advice about how to support Allison. (*Id.* ¶¶ 11-12.) That visit was a turning point for Megan. (*Id.* ¶ 13.) Having a better understanding of what Allison was experiencing and receiving guidance about how to support her child's ability to thrive, Megan helped Allison redecorate her room and began buying girls' clothes for her. (*Id.* ¶ 14.) The first time Allison emerged from her room in girls' clothes she was beaming with joy. (*Id.*)

During fifth grade, in anticipation of her starting puberty, Allison was evaluated for puberty-blocking medication, which she started taking at the end of sixth grade. (*Id.* ¶¶ 18-19.) About seven months ago, just as Allison was beginning high school, she was evaluated for and eventually started on estrogen. (*Id.* ¶ 21.) Her mental health has improved dramatically; she is confident, social, and doing well in school. (*Id.* ¶ 22.) If the Act is allowed to go into effect, Allison's medical care will be disrupted, which will cause her body to start producing male hormones resulting in changes to her body inconsistent with her female identity. (*Id.* ¶ 23.) Should that happen, Allison will again experience severe distress and anxiety. (*Id.*)

### 4.      *James Zoe and His Son Zachary Zoe*

James Zoe lives with his wife and son Zachary in Jefferson County, Alabama. (*See* Declaration of James Zoe ("Zoe Decl.") ¶¶ 1-2.) He is the parent of Zachary Zoe, a thirteen-year-old transgender boy who is currently in the seventh grade. (*Id.* ¶ 2.) Zachary lives part-time with his father and stepmother in Jefferson County, and part-time with his mother and stepfather in St. Clair County. (*Id.* ¶ 5.) Zachary is a bright boy with a close group of friends who is interested in video games and art. (*Id.*)

Zachary was assigned female at birth. (*Id.* ¶ 6.) As a young child, Zachary was shy and reserved. (*Id.*) Around the age of eight, Zachary began to express his dislike of wearing dresses and bright clothing. (*Id.*) Over time, Zachary started dressing in more masculine attire and became upset if people identified him as a girl. (*Id.*)

As Zachary entered puberty, the physical changes he started to experience, including breast development and menstruation, caused him to become distressed and withdrawn. (*Id.* ¶ 7.) When Zachary was eleven years old, he began referring to himself using "he" and "him" pronouns. (*Id.* ¶ 8.) As his friends began to refer to him in this way, he experienced relief from the distress he had been experiencing as well as a greater sense of self-awareness and self-acceptance. (*Id.*) Both sets of parents supported him in socially transitioning to live as a boy. (*Id.*) Since he came

6

out as transgender and received support from friends and family, Zachary has blossomed into a happier and more outgoing child. (*Id*. ¶ 9.)

In October 2021, after completing appropriate mental health evaluations, and with the support of his pediatrician and both sets of parents, Zachary began puberty-blockers. (*Id*. ¶ 10.) He recently had an appointment to be assessed for hormone therapy at Children's Hospital of Alabama at Birmingham. (*Id*.)

If the Act is enforced, Zachary's parents will no longer be able to rely on—or follow—the advice of qualified and trusted healthcare providers to make decisions that keep Zachary healthy and safe. (*Id*. ¶ 11.) Zachary's life will also be disrupted, and his physical and mental health will suffer. (*Id*. ¶ 13.) If he cannot remain on puberty blocking medication, Zachary's body will begin to develop in ways that are inconsistent with his identity as a boy, which will cause him severe distress. (*Id.*) It will also mean that he may have to take more serious steps in the future as an adult to treat his gender dysphoria, including, for example, having to undergo otherwise avoidable surgery. (*Id.*)

### 5. *Kathy Noe and Her Son Christopher Noe*

Christopher Noe is a seventeen-year-old transgender boy who resides with his mother, Kathy Noe, in Lee County, Alabama. (*See* Declaration of Kathy Noe ("Noe Decl.") ¶¶ 1-2.) Christopher and Kathy moved to Alabama when Christopher was

three years old. (*Id*. ¶¶ 3-4.) Kathy is former active-duty military, while Christopher's father is still active-duty military and is deployed abroad. (*Id.* ¶ 3.)

Since Christopher was a toddler, he resisted anyone's attempts to dress him as a girl. (*Id*. ¶¶ 5-6.) He even refused to attend his sixth-grade graduation because doing so meant he would have to wear a dress. (*Id*. ¶ 6.) As Christopher began to enter puberty, his distress at the changes his body was undergoing and at being made to present as female intensified. (*Id*. ¶ 12.) When Christopher was fourteen, he told his mother he is transgender. (*Id*. ¶ 8.) Kathy found Christopher a therapist experienced in working with transgender young people. (*Id*. ¶ 9.) The therapist helped both Christopher and Kathy navigate the beginning stages of Christopher's transition. (*Id*.)

About a year later, Christopher came out to his father as transgender. (*Id*. ¶ 10.) Christopher's father struggled initially, but because of his love for Christopher, his father began to accept Christopher for who he is. (*Id.*) With his father's support, Kathy took Christopher to a physician to begin the evaluation for hormone therapy. (*Id*. ¶¶ 10, 14.) Because Kathy and Christopher live close to the Alabama-Georgia state line, Christopher's doctors are in Columbus, Georgia. (*Id*. ¶ 16.) Christopher's prescriptions, however, are filled in Alabama, and Kathy gives Christopher his hormone injections at home. (*Id.* ¶¶ 15-16.)

8

Christopher began hormone therapy in March 2022. (*Id*. ¶ 15.) Since then, Christopher has been noticeably happier. (*Id*. ¶ 17.) He is more outgoing and confident at work and around other people. (*Id.*) If the Act is allowed to go into effect, Christopher's medical care will be disrupted, which will have devastating and irreversible physical and psychological consequences. (*Id*. ¶ 18.)

### 6.   *Dr. Jane Moe*

Dr. Jane Moe is a licensed clinical psychologist who has been practicing in Alabama for twenty years and works in a hospital setting within the UAB system providing direct mental health care to children and adolescents. (*See* Declaration of Dr. Jane Moe ("Moe Decl.") ¶¶ 1-4.) For the past two years, Dr. Moe has treated approximately forty transgender young people, ranging in age from five to nineteen. (*Id*. ¶ 4.)

She follows the standard of care developed by the World Professional Association for Transgender Health ("WPATH") and a comprehensive informed-consent protocol. (*Id*. ¶ 5.) Her assessment of transgender youth involves parents as well as the patient. (*Id*. ¶¶ 5-6.) The process requires a minimum of three to four visits, which typically take place over the course of two to three months. (*Id*. ¶ 6.) The assessment is comprehensive and involves many different methods of gathering information on the patient, including discussions with the parents, to determine whether they meet the diagnostic criteria for gender dysphoria. (*Id*. ¶¶ 7-8.)

Dr. Moe also reviews with the patient and the patient's parents the risks, benefits, and ranges of medical treatment available and appropriate for treating any patient's condition. (*Id*. ¶ 9.) Dr. Moe then writes a letter to the patient's doctor detailing the results of her assessment and recommendations for continued care. (*Id*. ¶¶ 9, 11.)

For Dr. Moe, the Act means that she must either abandon her professional and ethical obligations when treating transgender patients or risk criminal penalty for providing mental health care consistent with the prevailing standards of care. (*Id*. ¶ 14.) She is deeply concerned about the effects this law will have on her patients' mental health, many of whom already experience bullying and harassment in their schools and communities. (*Id*. ¶ 15.) She is concerned that if healthcare providers are required to comply with the Act, transgender youth will be denied essential care. (*Id*. ¶ 13.) Their mental health will deteriorate, impairing their ability to function in their day-to-day lives. (*Id*. ¶ 16.) That decline in mental health will cause a cascade of negative health outcomes, including exacerbating co-occurring mental health issues, increased reliance on maladaptive coping mechanisms (*e.g.*, cutting, substance abuse), and suicidality. (*Id*.)

### 7.   *Dr. Rachel Koe*

Dr. Rachel Koe is a board-certified pediatrician in southeast Alabama. (*See* Declaration of Dr. Rachel Koe ("Koe Decl.") ¶¶ 1-3.) Over the past decade, Dr. Koe

has treated a handful of transgender patients, including one current patient for whom she provides primary care. (*Id.* ¶¶ 4, 9-10.) Depending on need, Dr. Koe has referred transgender patients and their parents to local mental health providers as well as the gender clinic at UAB Hospital. (*Id.* ¶¶ 5, 9.) Even after referral, Dr. Koe remains involved with her transgender patients' care, as she does for other patients referred for specialty treatments. (*Id.* ¶¶ 6, 9.) For example, Dr. Koe's office draws blood for their transgender patient's regular blood work in advance of appointments with the gender clinic. (*Id.*) Additionally, she and her staff provide support to patients who need assistance in self-administering injectable hormone medications like testosterone. (*Id.*)

If the Act goes into effect, Dr. Koe will be forced to choose between complying with the Act and providing for the medical needs of her current and any future transgender patients. (*Id.* ¶¶ 11-13.) She knows that if she does not provide the medical treatments they need, her transgender patients' mental and physical health will deteriorate. (*Id.* ¶ 11.) Because of the Act, Dr. Koe will also be required to curtail her speech as she will no longer be allowed to provide accurate and comprehensive information to parents of transgender children and will be prohibited from making appropriate referrals. (*Id.* ¶ 12.) Changing her practice in these ways would also put Dr. Koe in jeopardy of violating her legal obligation as a Medicaid

provider not to discriminate in the provision of medical care to her transgender patients. (*Id*. ¶ 13.)

###   B.   Transition Is the Established Course of Care for Gender Dysphoria.

Gender dysphoria is a serious medical condition that has been recognized for decades (*See* Declaration of Dr. Linda Hawkins ("Hawkins Decl.") ¶ 25; Declaration of Dr. Stephen Rosenthal ("Rosenthal Decl.") ¶¶ 23-24.) The diagnosis describes the clinical distress a transgender person feels from being made to live without any way to resolve the conflict between their assigned sex and their gender identity. (Hawkins Decl. ¶ 24; Rosenthal Decl. ¶¶ 26-27.) Gender dysphoria is a rare condition that can be experienced by both adults and youth. (Rosenthal Decl. ¶ 24.) If untreated, gender dysphoria leads to serious negative health outcomes including anxiety, severe distress, thoughts or attempts at self-harm, and in many cases, suicide. (Hawkins Decl. ¶ 39; Rosenthal Decl. ¶¶ 26, 45, 55.)

Gender dysphoria, however, is highly treatable. (Rosenthal Decl. ¶ 26.) When individuals with gender dysphoria are diagnosed and medically treated so they live consistent with their gender identity, they can survive and thrive. (Hawkins Decl. ¶ 26; Rosenthal Decl. ¶ 36.) The overall course of treatment that allows a transgender person to live consistent with their gender identity is called transition. (Rosenthal Decl. ¶ 32.) While few minors experience gender dysphoria, for those who do, being

able to transition and to receive appropriate medical care is lifesaving. (Hawkins Decl. ¶ 41; Rosenthal Decl. ¶ 45.)

For more than four decades, medical organizations have studied and created an evidence-based standard for the medical treatment of transgender patients. (*See* Declaration of Dr. Morissa Ladinsky ("Ladinsky Decl.") ¶ 7; Rosenthal Decl. ¶¶ 2-24, 27-31.) This standard confirms that transition, including puberty blockers and hormone therapy where appropriate, is the only safe and effective treatment for gender dysphoria. (Hawkins Decl. ¶ 38; Rosenthal Decl. ¶ 23.)

The specific components of a patient's transition and treatment plan are based on that individual's medical and mental health needs after comprehensive evaluation by a multidisciplinary team. (Ladinsky Decl. ¶¶ 10-12; Rosenthal Decl. ¶¶ 5, 33, 46.) Qualified professionals manage these treatments, often in a multidisciplinary setting with endocrinologists, pediatricians, and clinical psychologists. (Hawkins Decl. ¶ 29; Ladinsky Decl. ¶ 10; Rosenthal Decl. ¶¶ 5, 47-48.) The American Academy of Pediatrics has adopted this treatment protocol as safe and effective for the health and wellbeing of children and adolescents suffering from gender dysphoria. (Hawkins Decl. ¶ 25; Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶ 30.)

Before a minor begins any treatment for gender dysphoria, health care providers undertake a rigorous informed consent process. (Hawkins Decl. ¶ 36; Ladinsky Decl. ¶¶ 9-10; Rosenthal Decl. ¶¶ 48-51.) Once informed consent is

obtained, there is also a great deal of parent education, counseling of parents, and communication among physicians in the treatment of transgender adolescents. (Hawkins Decl. ¶¶ 36-37; Ladinsky Decl. ¶¶ 10-12; Rosenthal Decl. ¶ 47.)

The standard of care for the treatment of gender dysphoria in minors consists of social transition and related medical interventions that allow transgender youth to live comfortably consistent with their gender identity. (Hawkins Decl. ¶¶ 27-29; Rosenthal Decl. ¶ 32.) A young person's social transition can include adopting a new name and pronouns, changing clothes and physical appearance, and correcting identity documents. (Hawkins Decl. ¶¶ 27-29; Rosenthal Decl. ¶ 32.) Medical interventions, which may be pursued concurrently with a social transition, can involve the use of puberty-blocking medication, and for older adolescents, hormone therapy. (Hawkins Decl. ¶ 29; Rosenthal Decl. ¶¶ 35-41.) Although transgender adults may pursue surgical treatment, surgery is rarely indicated for transgender minors. (Rosenthal Decl. ¶ 46.)

After the onset of puberty, minors diagnosed with gender dysphoria may be prescribed puberty-blocking medications to prevent them from continuing to undergo puberty in their birth sex and developing permanent physical characteristics that conflict with their gender identity. (*Id*. ¶¶ 35-38.) Puberty-blocking medications work by pausing endogenous puberty at whatever stage it is when the treatment begins, limiting the influence of a person's endogenous hormones on their body.

(*Id.* ¶ 36.) For example, a transgender girl on puberty-blocking medications would not experience the physical changes caused by testosterone, including facial and body hair, male muscular development, an Adam's apple, or masculinized facial structures. (*Id.*) Similarly, a transgender boy would not experience breast development, menstruation, or widening of the hips. (*Id.*)

Treatment with puberty-blocking medications is reversible, meaning that if a minor stops taking the medication, puberty in the minor's birth sex resumes. (*Id.* ¶¶ 38-39.) In addition to alleviating gender dysphoria and supporting a child's social transition, puberty-blocking medications may eliminate the need for future surgical treatments to treat ongoing gender dysphoria as an adult, such as male chest reconstruction surgery, electrolysis of facial and body hair, and feminizing facial surgeries. (*Id.* ¶¶ 36-37, 44.) Banning puberty-blocking medications for these youth may require them to undergo future surgeries as adults that they could otherwise avoid. (*Id.*).

Later in adolescence, a transgender young person may be prescribed hormone therapy when doing so is medically indicated. (*Id.* ¶ 39.) Before such therapy begins, a mental health professional must: (1) confirm the persistence of gender dysphoria; (2) assess any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed and the minor's situation and functioning are stable enough to start treatment; and (3) verify that the minor has

sufficient mental capacity to understand the consequences of the treatment. (*Id*. ¶¶ 48-51; Hawkins Decl. ¶ 36; Ladinsky Decl. ¶¶ 9-11.) A pediatric endocrinologist or other medical doctor must also consent to and monitor the treatment plan. (Ladinsky Decl. ¶ 13.) With this treatment, a transgender minor would have the same typical levels of testosterone/estrogen as a non-transgender peer. (Rosenthal Decl. ¶ 39.)

The World Professional Association for Transgender Health developed the standard of care, which represents an expert consensus based on the best available science, on transgender healthcare. (Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶¶ 28-29.) The American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Psychological Association, Pediatric Endocrine Society, and the Endocrine Society all follow the World Professional Association for Transgender Health Standards of Care. (Ladinsky Decl. ¶ 7; Dr. Rosenthal Decl. ¶ 30.)

The diagnosis and treatment of gender dysphoria is an established part of the curriculum in medical schools across the United States. (Ladinsky Decl. ¶ 8.) Alabama, for example, requires all physicians to be knowledgeable about transgender medicine to pass medical board exams. (*Id*.)

### C.     The Alabama Vulnerable Child Compassion and Protection Act

On April 8, 2022, Defendant Governor Kay Ivey signed the Alabama Vulnerable Child Compassion and Protection Act (the "Act") into law. The Act prohibits any person, including a parent or a doctor, from obtaining or providing medical treatments consistent with the current medical standard of care, for a transgender minor. Unless enjoined, the Act will become effective on May 8, 2022.

The Act states in relevant part:

Section 4. (a) Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that perception is inconsistent with the minor's sex as defined in this act:

    (1)  Prescribing or administering puberty blocking medication to stop or delay normal puberty.

    (2)  Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.

    (3)  Prescribing or administering supraphysiologic doses of estrogen to males.

    (4)  Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

    (5)  Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's biological sex, including metoidioplasty, phalloplasty, and vaginoplasty.

    (6)  Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

Ala. Vulnerable Child Compassion and Protection Act, S.B. 184, No. 2022-289, § 4(a) (Ala. 2022). A violation of this provision is a Class C felony punishable by up to 10 years imprisonment and fines up to $15,000. *Id.* § 4(c); ALA. CODE §§ 13A-5-6, 13A-5-11.

## III.   ARGUMENT

To obtain a preliminary injunction, a movant must show: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). "[A]ll of the well-pleaded allegations of [the] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

A temporary restraining order may be imposed "to preserve the court's ability to make a meaningful ruling on the merits," which "often requires preserving the status quo." *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1320 (M.D. Ala. 2015). To obtain a temporary restraining order, the movant must show: "(1) a substantial likelihood of ultimate success on the merits; (2) the TRO is necessary to

prevent irreparable injury; (3) the threatened injury outweighs the harm the TRO would inflict on the non-movant; and (4) the TRO would serve the public interest." *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995).

These factors strongly support entry of a preliminary injunction in this case. In the event that the Court is unable to make a ruling on the merits of Plaintiffs' preliminary injunction motion before the May 8, 2022 effective date of the Act, these factors also warrant entry of a temporary restraining order because "it is in the public interest to preserve the status quo and give the court an opportunity to evaluate fully the lawfulness of [the Act] without subjecting the plaintiffs, their patients, or the public at large to any of its potential harms." *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013).

### A.  Plaintiffs Will Likely Succeed on the Merits of Their Claims Because the Act Is Unconstitutional.

Plaintiffs have a substantial likelihood of success on the merits of their claims. The Act infringes upon their constitutional rights to parental autonomy and equal protection, violates the right to freedom of speech, and is void for vagueness. It also conflicts with the Affordable Care Act ("ACA"), 42 U.S.C. § 18001, *et seq*. (2010).

### 1.  *The Act Infringes on Parental Autonomy by Preventing Parents from Obtaining Essential Medical Care for their Children (Count I).*

The Act violates the fundamental right of the Parent Plaintiffs to obtain essential medical care for their children. The Fourteenth Amendment to the United

States Constitution protects parents' rights to make decisions "concerning the care, custody, and control of their children," based on a "presumption" that "fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 68-69 (2000). This right is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id*. at 65; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (collecting cases to demonstrate that the Court has long recognized the importance of parental rights, including *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), *and Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925)); *May v. Anderson*, 345 U.S. 528, 533 (1953) (recognizing that parental rights are "far more precious . . . than property rights"). Because this right is fundamental, any substantial infringement of parental autonomy is subject to strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004); *see also Troxel*, 530 U.S. at 80 (Thomas, J., concurring).

A parent's ability to seek and obtain appropriate medical treatment to ensure the health and wellbeing of their child is a core aspect of this fundamental right. The Eleventh Circuit has explained that the Due Process Clause prohibits a state, "concerned for the medical needs of a child," from "willfully disregard[ing] the right of parents to generally make decisions concerning the treatment to be given to their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990). "[P]arents have the right to decide free from unjustified governmental interference in matters

concerning the growth, development and upbringing of their children." *Id.* (quoting *Arnold v. Bd. of Educ. of Escambia Cty.*, 880 F.2d 305, 313 (11th Cir. 1989)).

The Act fails constitutional review because it negates, without justification, parents' fundamental right to seek established medical care for their transgender children. Indeed, the Act criminalizes medical care: (1) recommended to the Parent Plaintiffs as appropriate for their children by their medical providers, and (2) recognized by the American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Psychological Association, Pediatric Endocrine Society, and the Endocrine Society as the only effective treatment for their children. *See Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *appeal docketed*, No. 21-2875 (8th Cir. Apr. 19, 2022) (finding that "Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary"). The Act prevents parents even from *seeking* expert medical advice by imposing criminal penalties on anyone who "causes" the proscribed treatments to be performed on a transgender minor—language that would encompass consultations with healthcare providers who recommend transition if doing so results in a parent obtaining medical care for their child. SB 184 § 4(a). This categorical, sweeping ban—like any ban on

parents' ability to seek established medical care for a serious medical condition—is unconstitutional.

As set forth below, none of the State's asserted justifications for this intrusion on parental rights has merit. Contrary to the State's assertion, the Act jeopardizes children's health and safety; it does not protect it. *Brandt*, 551 F. Supp. 3d at 893 (holding that a similar Arkansas law likely violated "a fundamental parental right" and likely would fail strict scrutiny because the State could not show that the law served the stated goal of protecting children).

### 2. *The Act Violates Equal Protection by Barring Medical Treatments for Transgender Minors (Count II).*

The Act singles out transgender minors in order to deny them medical care, including denying them the very same medications available to non-transgender minors. Because the Act discriminates on the basis of transgender status and sex, heightened scrutiny is required. Because the State's asserted rationales for the ban lack merit, Plaintiffs have a substantial likelihood of proving that the Act violates the Equal Protection Clause.

### a.   The Act is Subject to Heightened Scrutiny Under Well-Established Precedent.

The Act's discrimination against transgender people is apparent on its face. The Act bans medical care for minors whose "perception of [their] gender or sex . . . is inconsistent with the minor's sex" at birth—*i.e.*, for minors who are transgender.

SB 184 § 4(a). Elsewhere the Act refers to "individuals, including minors, who experience discordance between their sex and their internal sense of identity." *Id.* § 2(2)-(4). The Act's description of its targeted group—those whose perception or internal sense of their sex differs from their sex at birth—coincides exactly with the definition of a transgender person. It matters not that the Act does not use the word "transgender," any more than it would matter if a law criminalizing same-sex intimacy did not use the word "lesbian" or "gay." Under settled law, a statute that classifies based on conduct or characteristics that either define or are closely correlated with a particular group facially discriminates against that group. *See, e.g.*, *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010) (holding that a club's exclusion of people because they engaged in same-sex conduct was discrimination based on sexual orientation); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination . . . ."); *id.* at 583 (O'Connor, J., concurring in judgment) (stating that a law targeting conduct "closely correlated with being homosexual" is "directed toward gay persons as a class"); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

By discriminating against transgender people, the Act also discriminates based on sex. Without question, the Act singles out transgender minors for disparate

treatment. Both the Supreme Court and the Eleventh Circuit have held that discrimination because a person is transgender is based on sex. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020) (holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (holding that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause").

Because the Act discriminates based on transgender status and sex, it is subject to heightened scrutiny under the Equal Protection Clause. Federal courts across the country have held that discrimination based on transgender status warrants heightened scrutiny, as it meets the criteria for suspect classification established in *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973): transgender people have suffered a history of discrimination; being transgender is an immutable trait and one that is unrelated to a person's ability to participate in or contribute to society; and transgender people lack the political power to achieve full equality through the political process.[1]

---

[1] *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F. 3d 1034, 1051 (7th Cir. 2017); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004); *Toomey v. Arizona*, No. CV-19-00035-TUC-RM, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019); *Stone v. Trump*, 400 F. Supp. 3d 317, 355 (D. Md. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704 (D. Md. 2018); *Board of Educ. of the Highland*

In *Brumby*, the Eleventh Circuit held that discrimination because a person is transgender is discrimination based on sex and warrants heightened scrutiny for that reason. As the court explained: "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." 663. F.3d at 1316. Accordingly, "discrimination on this basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause." *Id*. at 1319.

Whether the Act is analyzed as discrimination based on transgender status or sex, the State, at a minimum, "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 516 (1996) (quotations omitted) (modifications in original). The justification must be "exceedingly persuasive." *Id*. The "burden of justification is demanding, and it rests entirely on the State." *Id*. Neither the State's asserted interest nor the alleged relationship between the interest and the discriminatory classification may "rely on overbroad generalizations." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689, 1692 (2017). Nor may the State "hypothesiz[e] or inven[t]" its interests "*post hoc* in response to litigation"—they

---

*Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

must be the actual goals the policy was intended to advance at the time it was created.

*Id.* at 1696–97 (quoting *Virginia*, 518 U.S. at 533).

> b.  <u>Defendants Cannot Establish the State's Asserted Interest Serves Important Governmental Objectives or the Act Is Substantially Related to the Achievement of those Objectives.</u>

The Act prohibits parents from obtaining treatments for their children that are the standard of care for gender dysphoria. Decades of evidence support the safety and efficacy of transition, including the use of puberty-blocking medication and hormone therapy, for treating gender dysphoria in adolescents. (Hawkins Decl. ¶ 25; Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶¶ 17, 27-31.) Barring those treatments for transgender youth deprives them of medically necessary care and puts them at serious risk of mental health issues, self-harm, and suicide. *See Brandt*, 551 F. Supp. 3d at 891-92 (finding similar bill banning medical treatment for transgender adolescents did not meet heightened scrutiny review, and "would not even withstand rational basis scrutiny" because "[g]ender-affirming treatment is supported by medical evidence that has been subject to rigorous study" and "[e]very major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people"); *see also* Hawkins Decl. ¶ 46; Ladinsky Decl. ¶ 15; Rosenthal Decl. ¶¶ 45, 55, 57. The Act also increases the likelihood that transgender adolescents will eventually require major surgeries to

reverse bodily changes that could have been avoided by the well-established non-surgical treatments the Act criminalizes. (Rosenthal Decl. ¶ 37.)

The Act purports to advance the objective of protecting transgender minors. Nevertheless, the State's asserted justifications for the Act have no basis in medical science and undermine, rather than advance, the Act's purported goals. They cannot survive even a cursory review, much less the demanding scrutiny required by this case.

> i. *The treatments are effective and well-established.*

Contrary to the Act's assertion, the treatments provided to transgender adolescents with gender dysphoria are effective and based on an established standard of care. As the Act recognizes, there are youth who "experience discordance between their sex and their internal sense of identity," and who, as a result, "experience severe psychological distress," known as "gender dysphoria." SB 184 § 2(2). As the Act also acknowledges, there is an established course of care and treatment for these young people that includes social transition and, where appropriate, puberty blocking medication and hormone therapy. *Id.* § 2(7)-(8).

The Act claims that these treatments are ineffective, but that is incorrect. The Act cites unnamed "studies" that purportedly show that "hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual." *Id.* § 2(14). In fact, decades of substantial scientific evidence show that

treatment dramatically improves mental health outcomes for transgender youth, including reducing rates of suicidal ideation and suicide attempts, which are significantly higher among transgender adolescents when compared to their non-transgender peers. (Hawkins Decl. ¶¶ 38, 41; Ladinsky Decl. ¶ 15; Rosenthal Decl. ¶¶ 26, 53-55.)

Transition, including puberty blocking medication and hormone therapy where appropriate, is the standard of care for treating gender dysphoria and has been endorsed by the mainstream medical community in the United States, including the American Medical Association, the American Academy of Pediatrics, and the Endocrine Society, all of which have determined that the care is safe and effective. (Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶ 30.) The Act's assertions that the treatment is "unproven," "poorly studied," and "experimental," SB 184 § 2(11), are unfounded. (Hawkins Decl. ¶¶ 38, 41; Ladinsky Decl. ¶¶ 7-8; Rosenthal Decl. ¶¶ 26, 53-55.)

### ii.    *The treatments are necessary.*

The Act's claim that most adolescents with gender dysphoria will "outgrow" their transgender identities is incorrect. *Id.* § 2(4). In contrast, the evidence overwhelmingly shows that transgender adolescents who are appropriately identified, diagnosed, and prescribed treatment continue to live consistent with their gender identity as adults and lead happy and fulfilling lives. (Hawkins Decl. ¶ 26;

Rosenthal Decl. ¶¶ 53-54, 36; Moe Decl. ¶ 16; Koe Decl. ¶¶ 5-7.) In the past, research tracking a wide range of gender-nonconforming children (including tomboyish girls and feminine boys) found that many of these children grew up to identify as lesbian or gay rather than transgender. (Hawkins Decl. ¶ 22.) However, none of these older studies focused on the much smaller, discrete, and clearly identifiable group of children with gender dysphoria whose persistent, insistent, and consistent cross-gender identification continues into adolescence. (*Id.*) More recent research has focused on this specific group of children and found that the likelihood of this group "outgrowing" their transgender identity in adolescence or adulthood is virtually nil. (*Id.*)

The Act also asserts that "[t]he cause of the individual's impression of a discordance between sex and identity is unknown," SB 184 § 2(3), but that is incorrect. In fact, substantial evidence has shown that gender identity has a strong biological foundation and is impervious to external factors. (Rosenthal Decl. ¶ 15.)

Contrary to the Act's assertion, doctors take great care in making a diagnosis of gender dysphoria and follow detailed procedures for both confirming the diagnosis and prescribing a treatment plan, taking a multidisciplinary approach that includes both medical and mental health specialists. The Act incorrectly states that the diagnosis is based "exclusively on the individual's self-report of feelings and beliefs." SB 184 § 2(3). In fact, mental health providers who diagnose youth with

29

gender dysphoria do so based on a comprehensive evaluation. (Ladinsky Decl. ¶ 10; Rosenthal Decl. ¶ 48; Moe Decl. ¶¶ 6-8.) Any prescribed treatments, including puberty blocking medication and hormone therapy, are undertaken only after thorough assessment and discussion with parents and youth patients, and only after ensuring that all persons involved understand the need for treatment along with any attendant risks, just as in other medical situations where medication may be required to treat a condition. (Ladinsky Decl. ¶¶ 9-11; Rosenthal Decl. ¶¶ 48-51.)

In sum, the Act's claim that the banned treatments are not necessary for the affected children ignores the consensus of medical experts and overwhelming evidence to the contrary. It is inappropriate for the legislature to look at the entire gender-nonconforming youth population, many of whom do not and will never experience gender dysphoria, and bar a medically discrete subset of them from receiving essential medical care. Doing so is like denying life-saving brain cancer treatment recommended by the medical community because most headaches resolve with aspirin. For adolescent patients properly identified as being transgender, a "wait-and-see approach" is harmful and may even be lethal. (Hawkins Decl. ¶ 41; Rosenthal Decl. ¶ 55.)

### iii.    *The treatments are safe.*

The Act incorrectly claims that the treatments it bans are unsafe and that transgender adolescents and their parents are unable to assess their risks and benefits.

First, the State's assertion that the treatments are unsafe because they involve off-label use of medications approved by the Food and Drug Administration ("FDA") is unfounded. In fact, many established medical treatments involve off-label uses of FDA-approved medications. (Rosenthal Decl. ¶ 49.) "Off-label" refers to use of medication that has been FDA approved, but not for all condition for which it may be effective. [2] The off-label use of medications for children is quite common and sometimes necessary, because an "overwhelming number of [FDA-approved] drugs" have no FDA-approved instructions for use in pediatric patients.[3]

The American Academy of Pediatrics specifically approves the off-label use of drugs:

> The purpose of off-label use is to benefit the individual patient. Practitioners use their professional judgment to determine these uses. As such, the term "off-label" does not imply an improper, illegal, contraindicated, or investigational use. Therapeutic decision-making must always rely on the best available evidence and the importance of the benefit for the individual patient.[4]

This asserted rationale for the ban also conflicts with the established public policy of this State. On April 1, 2021, the Alabama Senate passed a resolution endorsing the widespread practice of prescribing FDA-approved medications for

---

[2] *See* Am. Acad. Pediatrics Comm. Drugs, Off-Label Use of Drugs in Children, 133 Pediatrics 563-67 (2014).

[3] *Id*.

[4] *Id.*

off-label uses to treat COVID-19. In contrast to the alleged justifications for the Act, the Senate Resolution states: "we hereby recognize the sanctity of the physician/patient relationship and that a duly licensed physician should be allowed to prescribe any FDA approved medication for any condition that the physician and patient agree would be beneficial for treatment of the patient without interference by government or private parties." AL SJR 82 (2021). This policy affirms the ability of medical providers to prescribe FDA-approved mediation for "any condition." There is no legitimate reason, much less an important one, to adopt a different rule for medications used to treat transgender patients.

Second, contrary to the Act's assertion, the medications used to treat gender dysphoria, including puberty blockers and hormones, are safe. (Rosenthal Decl. ¶¶ 23, 31, 55.) Puberty-blocking medication has been used for decades to treat a medical condition known as "precocious puberty." (*Id.* ¶ 42.) Hormone therapy is often used to treat medical conditions experienced by adolescents including painful menstruation, amenorrhea, and even serious acne conditions. As the Act itself acknowledges, puberty blocking medication is also used to treat "verified disorder[s] of sexual developments," SB 184 § 4(b)(2), often referred to as intersex conditions. Although no medication can be shown to have zero risks, puberty blocking medication and hormones are considered very safe and well within acceptable risk factors for approved medication for minors. (Rosenthal Decl. ¶¶ 23. 31, 55.)

To the extent there are low-level risks, as there are with any medication, Alabama can offer no justification why puberty blocking medication and hormone therapy should be banned for use by transgender minors as "unsafe" but permitted for treatment of minors with other medical conditions. If the State believed these treatments to be unsafe, it would have banned them for all minors, not just the Transgender Plaintiffs. As the Eastern District of Arkansas found in *Brandt*, this insistency strongly suggests that the State's "goal in passing [the Act] was not to ban a treatment" but rather "to ban an outcome [the provision of supportive care to transgender minors] that the State deems undesirable." *Brandt*, 551 F. Supp. 3d at 891. The Act violates the Equal Protection clause under even the lowest standard of review. *Id*. (finding Arkansas' "health concerns regarding the risks of gender transition procedures . . . pretextual" because Arkansas did not prohibit the same procedures "for all patients under 18 regardless of gender identity"); *Eisenstadt v. Baird*, 405 U.S. 438, 454-55 (1972) (holding law that barred prescription of contraceptives to unmarried people violated the Equal Protection Clause because the law provided "dissimilar treatment for married and unmarried persons who are similarly situated").

The Act's claim that transgender adolescents and their parents are unable to assess the risks of these treatments, *see* SB 184 § 2(10), is similarly arbitrary and without support. As discussed previously, doctors who prescribe puberty blocking

medication or hormone therapy do so only after ensuring that the young person and their parents understand both the risks and benefits of the treatments and are able to make an informed choice, as doctors do when they prescribe any medication. (Hawkins ¶ 36; Ladinsky ¶¶ 9-10; Rosenthal Decl. ¶¶ 47-51.) Alabama law acknowledges that minors fourteen and older are generally able to consent to medical treatment. ALA. CODE § 22-8-4. There is no reason to impose a different rule simply because the minors are transgender.

> iv.   *Minors who stop taking puberty blocking medication or hormone therapy will resume puberty in their birth sex.*

The Act also mischaracterizes the effects of puberty blocking medication and hormone therapy. Contrary to the unsupported assertion in the findings, if an adolescent stops taking puberty blocking medication or hormone therapy, the production of endogenous hormones and puberty in the child's birth sex will resume. (Rosenthal Decl. ¶¶ 38, 40.). That is a primary reason why the Plaintiffs are so distressed about the law: Without the treatment they need, their physical development will revert to that associated with their birth sex.

To be sure, promoting the health and safety of minors is an important governmental interest. The Act, however, undermines, rather than promotes, that goal. Barring transgender minors from safe, effective, and established medical care determined to be necessary by their medical providers will destroy lives, including

those of the minor Plaintiffs in this case. Alabama cannot demonstrate that the Act promotes health and safety in even a rational, much less a substantial, way. Accordingly, the Plaintiffs are likely to prevail on their claim that the Act violates the Equal Protection Clause.

### 3.   *Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim (Count IV).*

The Act also violates the First Amendment by prohibiting any "person," including physicians, healthcare professionals, or even parents, from engaging in speech that would "cause" a transgender minor to receive medical treatment for gender dysphoria. By the Act's plain terms, prohibited speech would include, among many other things: (1) a doctor detailing the benefits of medical treatment for gender dysphoria or expressing the professional opinion that a young person would likely benefit from such treatment, if such discussions result in the minor obtaining treatment; (2) a doctor or therapist referring a patient to an out-of-state provider who can offer medical care; (3) a parent facilitating or expressing support for their child's transition, or any other speech by a parent that results in a minor obtaining medical treatment, such as consenting to treatment; (4) a transgender adolescent engaging in discussions or receiving information that leads them to undergo transition-related care; and (5) a minister or religious counselor engaging in speech that leads to the minor obtaining care. By barring such speech, the Act prevents any person in the State of Alabama from speaking about medically accepted treatments for gender

dysphoria based on the content of those conversations. As a content-based and viewpoint discriminatory regulation of speech, the Act is subject to strict scrutiny, which it fails.

Courts ordinarily apply strict scrutiny when analyzing the constitutionality of content or viewpoint-based restrictions on speech. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1308 (11th Cir. 2017). Content-based laws "target speech based on its communicative content." *Reed*, 576 U.S. at 163. If enforcement authorities must "examine the content of the message that is conveyed" to know whether the law has been violated, a restriction is content-based. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014). "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

Prohibiting parents, healthcare providers, and others from engaging in speech that would "cause" a transgender young person to receive medical treatment for gender dysphoria is a content-based regulation, as the content of the speech—support of medical care—drives whether it was the "cause" of a minor obtaining treatment. It is also a viewpoint-based restriction because only speech that encourages medical care for the minor is targeted; speech that forbids or expresses disapproval of such medical care is not punished. *Brandt*, 551 F. Supp. 3d at 893 (finding that similar Arkansas statute was "a content and viewpoint-based regulation

because it restricts healthcare professionals only from making referrals for 'gender transition procedures,' not for other purposes"); *see also Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (invalidating policy that punished doctor-patient discussions concerning medical marijuana and holding that "the policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient"). Such speech regulations require application of strict scrutiny, which the Act cannot withstand.

To survive First Amendment review, content-based restrictions on speech must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 818 (2000).

The Act cannot satisfy this demanding test. First, preventing individuals from speaking, and minors from discussing or hearing about medically necessary care does not advance Alabama's stated interest in health and safety. The Act claims to further an interest in protecting minors, yet disregards the long-standing and well-established treatment of gender dysphoria recommended by every major medical association. No court has ever held that a state advances a compelling interest by denying minors—a vulnerable group—medical treatment that is deemed necessary, safe, and effective under the relevant medical standard of care. The State's claimed

37

interests collapse under strict scrutiny. *See Wollschlaeger*, 848 F.3d at 1317 (holding that state's asserted interest in protecting public health by prohibiting doctors from asking patients about firearm ownership could not satisfy heightened scrutiny where "the applicable standard of care encourages doctors to ask questions about firearms").

Second, the Act is not "narrowly tailored" to advance any asserted interest in health and safety. It prohibits speaking about certain treatments only with respect to transgender youth with gender dysphoria while allowing discussion or recommendations of the same or similar treatments for non-transgender youth for any other purpose or medical condition. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Third, the Act cannot withstand strict scrutiny because it is not the "least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478. Banning every "person" in Alabama from engaging in an entire category of protected speech—speech that is consistent with established standards of medical care and with the Parent Plaintiffs' view of what is best for their own children's health and wellbeing—is not a constitutionally permissible means of protecting health and safety. The State cannot show that its enactment of "provisions broadly

restricting truthful speech based on content" are the least restrictive means available to achieve a compelling need. *Wollschlaeger*, 848 F.3d at 1316.

Lacking a narrowly tailored means to achieve any compelling or even legitimate interest, the Act's restrictions on speech cannot satisfy even rational basis review, much less strict scrutiny. Plaintiffs have a substantial likelihood of prevailing on their free speech claim.

### 4.    *The Act Is Unconstitutionally Vague (Count V).*

Under the Due Process Clause, a criminal statute like the Act is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" and encourages "arbitrary and discriminatory enforcement" by the government. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (holding all persons "are entitled to be informed as to what the State commands or forbids") (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)).

Section 4(a) of the Act states that "no person shall . . . cause any of the following practices to be performed upon a minor" and criminalizes any such act as a felony. Yet, the Act fails to provide *any* standard to determine what an individual must do to "cause" a treatment "to be performed upon a minor." *See Kolender*, 461 U.S. at 358.

"Cause" has an incredibly broad definition: "To bring about or effect." Black's Law Dictionary (11th ed. 2019); *cf. United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006) (directing courts to consider, among other things, "dictionaries" and the "common and generally accepted meaning" of words when considering vagueness of a statute).

Therefore, the Act, as worded, could subject anyone who is aware of, refers to, discusses, talks about, recommends, or expresses an opinion about a transgender minor's healthcare to a class C felony and up to ten years imprisonment, no matter how indirect the involvement, so long as the speech or behavior has *any* effect on a minor taking a prohibited medication to treat gender dysphoria. For example, the Act could impose criminal liability on a doctor or therapist in Alabama who recommends that a transgender adolescent start or continue puberty blocking medication or hormones. It could impose criminal liability on a pastor, like Rev. Eknes-Tucker, who counsels parents to seek medical care supporting their transgender children. It could impose criminal liability on a school nurse who dispenses a puberty-blocking medication to an adolescent, or a pharmacist who fills a prescription for estrogen or testosterone for a minor—even if the nurse or pharmacist did not know the child was taking the medication to treat gender dysphoria. *See City of Chi. v. Morales*, 527 U.S. 41, 55 (1999) (finding criminal

statute that "contains no *mens rea* requirement" and "infringes on constitutionally protected rights" to be "subject to facial attack" for vagueness).

Due to this vagueness, the Act encourages arbitrary enforcement and fails to describe what one must do to avoid criminal liability. *See Lanzetta*, 306 U.S. at 453 ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.").

### B. The Affordable Care Act Preempts the Act Because the Act Mandates Sex Discrimination by Healthcare Providers (Count III).

The Act is preempted by Section 1557 of the ACA. When a federal law and a state law conflict, the state law is preempted. *See, e.g.*, *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020) (citing *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)). For example, states may not impose criminal penalties or "hold a civil defendant liable under state law for conduct federal law requires." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Federal courts are empowered to "issue an injunction upon finding the state regulatory actions preempted." *Id.*

Federal courts recognize three categories of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). This case involves the third category, conflict preemption. "Conflict preemption . . . arises in instances

where (1) 'compliance with both federal and state regulations is a physical impossibility,' or (2) 'the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citations and internal quotation marks omitted)). The Act is preempted because compliance would force covered health care providers to violate Section 1557. Because compliance with both statutes is impossible, and because enforcement of the Act would thwart the fundamental purpose of Congress in prohibiting sex discrimination by covered healthcare providers, federal law preempts the Act.

The Act prohibits Alabama doctors from providing medical care to transgender minors. But Section 1557 of the ACA prohibits such sex discrimination by health care providers receiving federal funds, including plaintiff doctors and other providers from whom plaintiff children receive their care. Section 1557 provides that no individual shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" on the basis of sex. 42 U.S.C. § 18116(a). As explained above, the Act's ban and criminalization of medications and surgeries only when provided to a transgender individual is discrimination based on sex. *See Bostock,*

42

140 S. Ct. at 1741; *Brumby*, 663 F.3d at 1316. Violators of Section 1557 risk losing federal funding, civil enforcement proceedings brought by the federal government, civil lawsuits, debarment from doing business with the federal government, False Claims Act lawsuits, and criminal penalties. *See*, *e.g.*, 20 U.S.C. § 1682; *see also Jolley v. Riverwoods Behav. Health, LLC*, No. 1:21-CV-00561-WMR, 2021 WL 6752161, at *5-6 (N.D. Ga. Aug. 30, 2021) (slip op.) (denying motion to dismiss private claim of Section 1557 ACA discrimination based on transgender status); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 592 (D. Md. 2021) (finding plaintiff pled Section 1557 discrimination where hospital refused to perform hysterectomy to treat gender dysphoria).

The Transgender Plaintiffs receive their medical care from providers who receive federal financial assistance and funding and who are subject to the non-discrimination provisions of Section 1557 of the ACA. *See* 42 U.S.C. § 18116(a). (*See also* Koe Decl ¶ 13.) In addition, the Healthcare Provider Plaintiffs are subject to Section 1557 of the ACA because they receive federal financial assistance as providers of medical care for transgender beneficiaries of Alabama Medicaid. (*See id.* ¶ 13.)

Healthcare Provider Plaintiffs cannot comply with both Section 1557 of the ACA and the Act. They are put in the impossible position of complying with Section 1557 by providing medical care to transgender minors consistent with the standard

of care, and risking criminal penalties under the Act, or complying with the Act and being subject to federal enforcement proceedings and private lawsuits for discrimination under Section 1557. *See* Letter from Kristen Clarke, Assistant Attorney General at U.S. Dep't of Justice Civil Rights Div., to State Attorneys General (Mar. 31, 2022), *available at* https://www.justice.gov/opa/press-release/file/1489066/download (reminding state attorneys general that Section 1557 of the Affordable Care Act prohibits state laws that discriminate against transgender people). As such, the ACA preempts the Act's requirement that healthcare providers must deny certain types of medical care to transgender minors based on their transgender status. The Act puts healthcare providers in an impossible position and also contravenes the overall goal of the ACA—to broaden access to healthcare in the United States—as well as the specific purpose of Section 1557 to prevent discrimination in the provision of healthcare. *See King v. Burwell*, 576 U.S. 473, 478-79 (2015). Because the Act conflicts with the ACA, it is preempted by federal law and may not be enforced.

## IV.   The Act Will Cause Immediate, Irreparable Harm to Plaintiffs.

Without the injunctive relief sought, the Act will cause Plaintiffs to suffer serious irreparable harms.

First, if the Act is not enjoined, the Parent Plaintiffs will be forced to helplessly watch the harm to their children unfold because the Act deprives them of

the fundamental constitutional right to obtain essential medical care for their children. *See Brandt*, 551 F. Supp. 3d at 892-93 (finding parent plaintiffs demonstrated irreparable harm where act banning transition-related care for minors infringed on their fundamental right to parent their children). Like other parents, these Parent Plaintiffs want to be able to care for their children—to get their children the medical care doctors have told them, and they have seen for themselves, is essential to their children's ability to thrive. The Act inflicts serious, irreparable harm by barring the Parent Plaintiffs from acting in the best interests of their children in an area that lies at the heart of parental responsibilities and rights.

Second, the Act also inflicts irreparable harm by depriving the Transgender Plaintiffs of necessary medical care for a serious medical condition. This denial will cause irreversible and harmful physical changes and irreparable mental harm, including the reemergence of gender dysphoria which untreated will predictably cause them to suffer anxiety, depression, and severe psychological distress. Denial of medically necessary medical care is sufficient to show immediate and irreparable harm. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483-84 (1986) (finding denial of benefits caused irreparable injury by exposing plaintiffs to "severe medical setback[s]" or hospitalization); *Gayle v. Meade*, -- F.Supp.3d --, No. 20-21553-CIV, 2020 WL 3041326, at *20-21 (S.D. Fla. June 6, 2020) (holding that increased likelihood of serious illness constitutes an irreparable injury); *Flack v. Wis. Dep't of*

45

*Health Servs.*, 331 F.R.D. 361, 373 (W.D. Wis. 2019) (denying coverage for medical treatment for gender dysphoria is irreparable harm); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017) (finding that denial of "transition-related medical care" constituted irreparable harm).

Without the essential treatment Zachary needs, he will resume going through an unwanted female puberty that conflicts with his male identity, and he will suffer devastating and irreversible physical and psychological consequences as a result. (Zoe Decl. ¶¶ 11-13.) Michael, whose mental health providers have recommended that he be assessed for medical treatment of gender dysphoria, will be unable to obtain that care, which will exacerbate his gender dysphoria and force him to undergo harmful and unwanted physical changes that will be devastating to his physical and mental health. (Boe Decl. ¶¶ 9, 15.) Christopher and Allison, who both are currently on hormone therapy and thriving as a result, will be cut off from this essential care. (Noe Decl. ¶¶ 15, 17-18; Poe Decl. ¶¶ 21-22.) Their bodies will undergo extremely distressing and unwanted physical changes that will cause them to suffer severe emotional and psychological distress. (*See* Noe Decl. ¶¶ 12, 18; Poe Decl. ¶¶ 23-25.) These harms are serious, irreparable, and potentially life-threatening. (Ladinsky Decl. ¶¶ 15-16; Rosenthal Decl. ¶¶ 37, 44-45, 55, 57; *see also* Moe. Decl. ¶¶ 15-16.)

As the district court found in *Brandt* when enjoining a similar Arkansas law, barring transgender youth from essential medical care forces them to "undergo endogenous puberty," causing them to "live with physical characteristics that do not conform to their gender identity, putting them at high risk of gender dysphoria and lifelong physical and emotional pain." 551 F. Supp. 3d at 892; *see also Campbell v. Kallas*, No. 16-CV-261-JDP, 2020 WL 7230235, at *8 (W.D. Wis. Dec. 8, 2020) (slip op.) (finding plaintiff demonstrated "irreparable injury" required for an injunction where plaintiff "continues to suffer from gender dysphoria, which causes her anguish and puts her at risk of self-harm or suicide").

Third, enforcement of the Act will also inflict irreparable harm on Drs. Koe and Moe, who will face the ever-present threat of criminal prosecution and penalties if they continue to provide medically necessary and appropriate referrals and treatments to their minor transgender patients, and who will be put to the untenable choice of either risking arrest or harming their patients. *See Brandt*, 551 F. Supp. 3d at 891-92 (finding healthcare provider plaintiffs proved irreparable harm when Arkansas medical ban would force them to "choos[e] between breaking the law and providing appropriate guidance and interventions for their transgender patients").

And finally, enforcement of the Act will irreparably harm Rev. Eknes-Tucker by criminalizing his pastoral speech. "The loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

As the Eleventh Circuit has explained, constitutional violations constitute irreparable harm when they cannot "be compensated for by monetary damages." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir. 1983) (holding that the directly penalizing free speech constitutes irreparable injury for purposes of a preliminary injunction). No amount of money can compensate for the Act's infringement on a parents' right to seek and obtain essential medical care for their child. Nor can money compensate for the imposition of criminal penalties on parents' First Amendment right to seek information and recommendations from healthcare providers, on doctors' constitutionally protected freedom to share their opinions and expertise with their patients, or on a pastor's rights to counsel families consistent with his faith-based beliefs. The enforcement of the Act in violation of these fundamental rights inflicts irreparable harm and warrants entry of a preliminary injunction.

## V.   Injuries to Plaintiffs Outweigh Any Damage to the State, Which Has No Interest in Enforcing an Unconstitutional Law.

The serious irreparable harms that Plaintiffs will experience if the Act takes effect outweigh any countervailing government interest. When "the nonmovant is the government, . . . the third and fourth requirements [for an injunction]—'damage

to the opposing party' and 'public interest'—can be consolidated." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (same). Moreover, there is no "legitimate interest in enforcing an unconstitutional ordinance." *Otto*, 981 F.3d at 870; *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

The balance of the equities strongly favors an injunction here. On the one side, the State is seeking to enforce an injurious, unconstitutional, and discriminatory law. In sharp contrast, the Act will impose significant irreparable harms on transgender young people, their parents, healthcare providers, and faith leaders like Rev. Eknes-Tucker. Plaintiffs will be forced to watch their children suffer the harm of losing the medical care they need and of experiencing the mental anguish and pain of untreated gender dysphoria. The Transgender Plaintiffs will abruptly lose essential medical care, be forced to undergo irreversible physical changes, and suffer intense suffering and distress. The Healthcare Provider Plaintiffs will be forced to choose between imprisonment and inflicting harm on vulnerable patients, as they cannot provide the medical care consistent with the recognized standard of care that they believe to be in their patients' best interest.

To be sure, the balance of the equities strongly favors an injunction here. An injunction would maintain the status quo while Plaintiffs pursue their claims. Plaintiffs can continue to meet their children's medical needs, transgender young

people can continue to receive recommended, medically necessary treatment for their gender dysphoria, healthcare providers can continue to treat their patients without fear of prosecution, and faith leaders can continue to counsel families consistent with their religious beliefs while this case is litigated.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin the State from implementing Act while this lawsuit is pending. Plaintiffs further request the Court to enter a temporary restraining order if the Court is unable to rule on Plaintiffs' preliminary injunction motion before May 8, 2022, when the law is scheduled to go into effect.

Respectfully submitted this 21st day of April, 2022.

*/s/ Melody H. Eagan*
Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
205.581.0700
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (ASB-3507-J56P)

Misty L. Peterson (GA Bar No. 243715) (*pro hac vice* application forthcoming)
Adam Reinke (GA Bar No. 510426) (*pro hac vice* application forthcoming)
Gilbert Oladeinbo (GA Bar No. 669340) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com
goladeinbo@kslaw.com

Brent P. Ray (IL Bar No. 6291911) (*pro hac vice* application forthcoming)
Abigail Hoverman Terry (IL Bar No. 6327057) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (CA Bar No. 277035) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355
mshortnacy@kslaw.com

Asaf Orr (CA Bar No. 261650) (*pro hac vice*
application forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (MA Bar No. 562298) (*pro hac
vice* application forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (FL Bar No. 1004965) (*pro hac
vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
334.224.4309
scott.mccoy@splcenter.org

Diego A. Soto (ASB-3626-Y61S)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
334.604.1414
diego.soto@splcenter.org

Jessica L. Stone (GA Bar No. 275567) (*pro hac
vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340

Decatur, GA 30030

404.221.5837

jessica.stone@splcenter.org

Sarah Warbelow (MI Bar No. P66690) (*pro hac vice* application forthcoming)

Cynthia Weaver (NY Bar No. 5091848) (*pro hac vice* application forthcoming)

HUMAN RIGHTS CAMPAIGN FOUNDATION

1640 Rhode Island Ave., NW

Washington, DC 20036

202.628.4160

sarah.warbelow@hrc.org

cynthia.weaver@hrc.org

## CERTIFICATE OF SERVICE

I certify that on this 21st day of April, 2022, I filed the foregoing with the Clerk of Court. I further certify that I will cause a copy of this Memorandum and accompanying Motion and Exhibits to be served along with a copy of the Summons and Complaint by delivering a copy to the following Defendants, or to their respective agents who are authorized by law to receive service of process, pursuant to Fed. R. Civ. P. 4:

Kay Ivey
The Office of Alabama Governor
600 Dexter Avenue
Montgomery, Alabama 36130

C. Wilson Baylock
District Attorney for Cullman County
500 2nd Avenue SW
Cullman, Alabama 35055

Daryl D. Bailey
District Attorney for Montgomery County
251 South Lawrence Street
Montgomery, Alabama 36014

Steve Marshall
Attorney General, State of Alabama
501 Washington Avenue
Montgomery, Alabama 36104

Jessica Venitere
District Attorney for Lee County
2311 Gateway Drive #111
Opelika, Alabama 36801

Tom Anderson
District Attorney for 12th Judicial Circuit
1065 E. McKinnon Street
New Brockton, Alabama 36351

Danny Carr
District Attorney for Jefferson County
810 Richard Arrington, Jr. Blvd. N., Suite 105
Birmingham, AL 35203

*/s/ Melody H. Eagan*
*Attorney for Plaintiffs*

# DOC. 8-1

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on
behalf of her minor son, MICHAEL
BOE; JAMES ZOE, individually and on
behalf of his minor son, ZACHARY
ZOE; MEGAN POE, individually and
on behalf of her minor daughter,
ALLISON POE; KATHY NOE,
individually and on behalf of her minor
son, CHRISTOPHER NOE; JANE
MOE, Ph.D.; and RACHEL KOE,
M.D.,

     *Plaintiffs*,

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama;
STEVE MARSHALL, in his official
capacity as Attorney General of the
State of Alabama; DARYL D.
BAILEY, in his official capacity as
District Attorney for Montgomery
County; C. WILSON BAYLOCK, in
his official capacity as District Attorney
for Cullman County; JESSICA
VENTIERE, in her official capacity as
District Attorney for Lee County; TOM
ANDERSON, in his official capacity as
District Attorney for the 12th Judicial
Circuit; and DANNY CARR, in his
official capacity as District Attorney for
Jefferson County,

     *Defendants*.

Civil Action No. 2:22-cv-184-LCB

Hon. Liles C. Burke

**DECLARATION OF LINDA A.
HAWKINS, PH.D., LPC IN
SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY
RESTRAINING ORDER &
PRELIMINARY INJUNCTION**

I, Linda A. Hawkins, Ph.D., M.S.Ed., LPC, declare as follows:

1.      I submit this expert declaration based upon my personal knowledge.

2.      If called to testify in this matter, I would testify truthfully based on my expert opinion.

### Qualifications and Experience

3.      I am a Licensed Professional Counselor with a M.S.Ed. in Psychological Services from the University of Pennsylvania in 1998, and a Ph.D. in Human Development and Human Sexuality from Widener University in 2009, specializing in working with children and adolescents experiencing gender dysphoria and their families. A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

4.      I have over two decades of experience in supporting lesbian, gay, bisexual, transgender, and queer (LGBTQ) youth and their families, both in private practice and through my work with hospitals and clinics. During that time, I have individually worked with more than 4,000 LGBTQ children, adolescents, and families from around the world.

5.      In January 2014, I helped found and co-direct the Gender & Sexuality Development Program at The Children's Hospital of Philadelphia, which now operates from two clinics: Philadelphia, Pennsylvania and Voorhees, New Jersey. As Program Director, I oversee the care of nearly 3,000 families and field an average of

twenty new referrals a week. I also lead and participate in research for developing best care practices for LGBTQ children and their families, train health care and mental health providers on best care practices, establish gender-affirming hospital policies, and advise local, regional, and national organizations as they create and update guidelines for the care of transgender and gender-expansive children, youth, and their families. This includes direct trainings and policy review with schools, churches, social service agencies, mental health centers, and juvenile correction centers and insurance companies.

6.     In January 2018, I helped found the Advanced Training Program in Affirmative Therapy for Transgender Communities, which is a year-long national professional training course for therapists to train them in supporting transgender clients across their clients' lifespans, that now has sites based in Seattle, Washington and Philadelphia, Pennsylvania. I have served as the Founder and Director since the program's inception, which includes both teaching duties and supervising the eight employees who implement the training and supervise the program on a daily basis. The American Psychological Association, U.S. Professional Association of Transgender Health, American Counseling Association, and American Association of Sexuality Educators, Counselors and Therapists are currently considering endorsing the program.

7.     My recent publications include *Experience of Chest Dysphoria and Masculinizing Chest Surgery in Transmasculine Youth*, Pediatrics, 147(3) (2021); *Transgender Youth Experiences with Implantable GnRH Agonists for Puberty Suppression*, Liebert (https://doi.org/10.1089/trgh.2021.0006) (2021); *Sexual and Gender Minority Adolescents: Meeting the Needs of Our LGBTQ Patients and Their Families*, Clinical Pediatric Emergency Medicine, 20(1), 9–16 (2019); *Sexual Orientation/Gender Identity Cultural Competence: A Simulation Pilot Study*, Clinical Simulation in Nursing, 16, 2–5 (2018); *Barriers to Care for Gender Non-Conforming Youth: Perspectives of Experienced Care Providers, Transgender Youth and Their Parents*, Journal of Adolescent Health, Vol. 62, Issue 2 (2018); *Effective Treatment of Depressive Disorders in Medical Clinics for Adolescents and Young Adults Living with HIV: A Controlled Trial*, Journal of Acquired Immune Deficiency Syndrome, 71(1), 38–46 (2017); *Policy Perspective: Ensuring Comprehensive Care and Support for Gender Nonconforming Children and Adolescents*, Transgender Health, 1(1), 75–86 (2016); and *Creating Welcoming Spaces for Lesbian, Gay, Bisexual and Transgender (LGBT) Patients: An Evaluation of the Healthcare Environment*, Journal of Homosexuality, 63(3), 387–93 (2016). I have also authored chapters of textbooks, including "Sexual Disorders and Transgender Health" in *Fundamentals in Consultation Psychiatry: Principles and Practice*, Eds. Lavakumar, M., Rosenthal, L., & Rabinowitz, T. Nova Medicine & Health: New

4

York, NY (2019). A listing of my publications is included in my Curriculum Vitae in **Exhibit A**.

8.      I belong to a number of professional organizations and associations relating to (i) the overall mental health and well-being of all children, youth and their families; (ii) the health and well-being of children and adolescents, including those who are transgender; and (iii) to appropriate medical treatments for transgender individuals. For example, since 2005, I have been a member of the World Professional Association for Transgender Health ("WPATH"), an international multidisciplinary professional association to promote evidence-based care, education, research, advocacy, public policy and respect in transgender health. I was also elected as a Fellow of the College of Physicians of Philadelphia, invited to join based on my local, regional, national, and international contributions to the medical and mental health and wellness of transgender and gender non-binary children and youth, as well as my contributions to the education of medical professionals as part of this care. A complete list of my involvement in various professional associations is located in my Curriculum Vitae in **Exhibit A**.

9.      From 2010-present, I have served as an Editorial Reviewer for Academic Pediatrics and the Society for the Scientific Study of Sexuality.

10.     I have previously testified two times at trial or in deposition as an expert witness.

11.     My opinions contained in this declaration are based on: (i) my years of experience as a Licensed Counselor and PhD training in treating transgender patients, including children, adolescents and young adults; (ii) my knowledge of the peer-reviewed research, including my own, regarding the treatment of LGBTQ patients and those suffering from gender dysphoria; and (iii) my review of the various declarations submitted in support of the motions. I generally rely on these types of materials when I provide expert testimony, and they include the documents specifically cited as supportive examples in particular sections of this declaration. The materials I have relied on in preparing this declaration are the same type of materials that experts in my field of study regularly rely upon when forming opinions on the subject.

12.     I was provided with and reviewed the following case-specific materials: (i) the expert declaration of Stephen Rosenthal, M.D. ("Dr. Rosenthal Decl."), and (ii) Senate Bill 184, as enacted ("the Act").

13.     I have not met or spoken with the Plaintiffs or their parents for purposes of this declaration. My opinions are based solely on the information that I have been provided by Plaintiffs' attorneys as well as my extensive experience studying gender dysphoria and treating transgender patients.

14.     I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $300 per hour for any review of records, preparation

of reports or declarations, and deposition and trial testimony. My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

## Gender Identity Development and Gender Dysphoria

15.     Because a person's gender identity is unknowable at birth, doctors assign sex based on the appearance of a newborn's external genitalia. For most people, that assignment also turns out to be a consistent reflection of their gender identity. However, for transgender people, their assigned sex does not match their gender identity.

16.     Gender identity is a person's innate, inner sense of belonging to a particular gender, such as male or female.

17.     Medical, mental health and human development research has repeatedly shown that gender identity is hard wired and a core component of human identity. Every person has a gender identity. Dr. Rosenthal's declaration provides a comprehensive overview of the research demonstrating that gender identity has strong biological ties. (Dr. Rosenthal Decl. at ¶¶ 14-17.)

18.     A person's gender identity is not a personal decision, preference, or belief. Like nontransgender people, transgender people do not simply have a "preference" to live consistent with their gender identity; trying to live as a gender they are not feels viscerally wrong and can cause a range of psychological outcomes

from minor distress to overwhelming daily anxiety and depression that can culminate in thoughts of self-harm or death.

19.     A key milestone of child development is a child becoming aware of their gender identity. My declaration will focus on that process and the psychological distress young people experience when their assigned sex and gender identity do not match.

20.     Children typically become aware of their gender identity between the ages of three and five years old. During these young years, individuals will often gravitate toward toys, clothing, activities, and peer relationships that most typically align with their gender identity. At the same time, those children are also surrounded by gender rules, regulations and expectations in their families, the media, and community. Children assigned male at birth are typically rewarded for following the male-based expectations set out for them and the children assigned female at birth are equally rewarded for following the female-based expectations set out for them, regardless of the child's gender identity.

21.     Transgender individuals who become aware in childhood that those expectations do not match with who they are often begin to express their cross-gender identity to their family members and caregivers. The statements and actions transgender children use to communicate their cross-gender identity differ significantly from age-appropriate imaginative play. Transgender children are

insistent, persistent, and consistent over time in their cross-gender identification. Transgender children will also manifest psychological distress as a result of the mismatch between their assigned sex and their gender identity if they are not allowed to live consistent with their gender identity.

22.     This sets the experience of transgender children apart from non-transgender children. While non-transgender children may also experience some gender exploration, and some girls will be "tomboys" and some boys will live as feminine boys, the intensity and persistence of the cross-gender identification that transgender children express is of a different order. Historically, earlier studies included a wide range of gender nonconforming children, rather than differentiating between transgender and non-transgender children, and also suffered from other serious methodological flaws that make them unreliable. Today, based on current scientific knowledge and clinical practice, researchers and clinicians are much better equipped to differentiate transgender from non-transgender children and adolescents. Recent studies have found that, when following the standard of care for diagnosing gender dysphoria, the rate of "desistance" for transgender adolescents who are properly diagnosed, evaluated, and treated is virtually nonexistent.

23.     A significant proportion of transgender children do not have the ability to clearly understand, state or share the distress they are experiencing. Those children can experience a wide range of psychological distress from difficulty

sleeping to anxiety at school or severe depression and may not fully realize that this distress is linked to being transgender. Over time, their inability to understand the root of their distress and/or to express themselves further exacerbates their psychological distress.

24.     Yet another significant proportion of young transgender children may have had an underlying feeling of not fully aligning with the sex they were assigned at birth, but felt "good enough" being supported and perceived as a female identified as a tomboy or a feminine presenting gay male. However, as puberty starts and a young person begins to experience the physical changes associated with their birth sex including developing secondary-sex characteristics (*e.g.*, breast development, menstruation, testicular and penile expansion, and deepening of voice) these youth experience intense distress that cannot be explained as simply being upset about puberty. That distress is caused by gender dysphoria, which is exacerbated by puberty for youth who are transgender, not simply gender nonconforming. These youth share a strong and real awareness of their gender identity not as a female identified as a tomboy, but as male, and not as a feminine male, but a female.

25.     Gender Dysphoria is the diagnosis characterized by the severe and unremitting emotional pain resulting from the incongruity between a person's assigned sex and their gender identity. It is a serious condition and is listed in the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") of the American

Psychiatric Association and has been for decades. Because Gender Dysphoria also has significant implications for a transgender young person's physical health that require medical care, there is also a companion diagnosis in the World Health Organization's International Classification of Diseases (ICD-10). Major medical and behavioral health associations recognize the validity and seriousness of the condition of gender dysphoria and support its treatment consistent with established standards of care. These include the American Medical Association, the Endocrine Society, the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, National Association of Social Workers, and others.

## Standards of Care for Working with Transgender Children

26.    When loved, supported, and treated consistent with their gender identity by their parents and caretakers and in their social, medical and educational environments, transgender children—like all children—can thrive, grow into healthy adults and have the same capacity for happiness, achievement, and contribution to society as others. For transgender children and youth, that means supporting them to live in a manner consistent with their gender identity.

27.    Getting treatment for Gender Dysphoria and ensuring that a transgender child is in an environment that does not undermine that treatment are critical to a transgender child's healthy development and well-being. For young transgender

children, the treatment of Gender Dysphoria consists of social transition, which involves changes that bring the child's outer appearance and lived experience into alignment with the child's gender identity. Changes often associated with a social transition include changes in clothing, name, pronouns, hairstyle, and updating government-issued identity documents to reflect the child's new name and correct the sex listed on those documents so that others interact with them in a manner that affirms and supports their gender identity.

28.   Research and clinical experience have shown that social transition for a child with Gender Dysphoria improves that child's mental health and greatly reduces the risk that the child will experience anxiety, depression and possibly engage in self-harming behaviors. *See Kristina Olson, et al., Mental Health of Transgender Children who are Supported in Their Identities*, 137 Pediatrics 1 (2016). In fact, longitudinal studies demonstrate that undergoing a social transition before puberty often provides tremendous and immediate relief because there are few, if any, observable physical differences between boys and girls at that age.

29.   A social transition is often eventually coupled with other treatments for Gender Dysphoria once a young person enters adolescence including puberty blockers and hormone therapy to bring a person's body into alignment with their gender identity. The availability and effects of those treatments are discussed in detail in Dr. Rosenthal's declaration. (Dr. Rosenthal Decl. ¶¶ 32-55.) As with social

transition those treatments occur within a context of treatment and assessment by qualified professionals, often in a single multidisciplinary setting meaning that a patient's multiple providers (endocrine, primary care, mental health specialist) all work in consultation and coordination with one another to provide care for the patient.

30.    Mental health counseling can have a tremendous positive effect on a patient's mental health.   Not only can counseling reduce a young person's psychological distress, but it can help reduce their reliance on harmful coping strategies, if not replace them all together.   I have seen many patients make significant progress through counseling to address many, but not all, areas of distress a transgender child or youth may be experiencing with their own identity as well as coping with how others around them may be reacting to their transgender identity.

31.    For transgender young people approaching or going through puberty, however, counseling by itself is not sufficient to fully manage their Gender Dysphoria.   The physical changes associated with puberty greatly exacerbate a transgender young person's psychological distress because their bodies are becoming more incongruent with their gender identity every day.   More importantly, counseling is unable to stop those changes from occurring, nor can it help bring a patient's body into alignment with their gender identity.   For many transgender youth, medical care is crucial and vital for survival.

### The Role of Mental Health Providers in Assessing Necessity of Medical Treatments for Gender Dysphoria

32.     When a child or adolescent experiencing Gender Dysphoria starts to see a mental health provider such as myself, that provider's first objective is assessment, including diagnosis. As with any assessment, the provider must gather a detailed history of the patient and their psychological distress surrounding their gender identity, including its sources and manifestations. To appropriately conduct that assessment, the mental health provider must draw from their professional training and experience in working with transgender young people, exercise professional judgment, and tailor the assessment to each individual patient and their family. The number of sessions that assessment requires will vary greatly depending on the patient's presentation and the complexity of the issues the patient is navigating.

33.     In addition to meeting with the patient and family, this assessment process typically includes gathering and reviewing additional information from the child's Primary Care Provider, local therapist and psychiatrist and any additional adult professionals who are part of the patient's care team. Without this thorough and comprehensive assessment, a mental health provider could not accurately diagnose a patient with Gender Dysphoria and provide the recommendations for treatment and care.

34.     Once the mental health provider has confirmed that the patient is experiencing Gender Dysphoria, the provider develops a treatment plan, which can

14

include referrals to medical providers for treatments like puberty-blocking medications and hormone therapy.

35.    Over the course of their initial assessment—and subsequent treatment—mental health providers will engage their patients in many discussions about the aspects of the patient's life and appearance that exacerbate their Gender Dysphoria. The purpose of those conversations is two-fold: identify the areas where the patient needs to develop resilience and coping strategies to minimize the effects of their Gender Dysphoria; and evaluate the mental health benefits of future social changes and medical treatment. For example, those discussions may reveal that a transgender patient's distress about the onset of puberty is impairing their ability to engage in peer relationships or routine self-care (*e.g.,* avoiding showering), as well as impairing their ability to focus at school. The mental health provider can then work with the patient to develop psychological and social strategies to reducing the functional limitations caused by the Gender Dysphoria. While this level of care can prove fully beneficial for some young people diagnosed with Gender Dysphoria, in other cases the treatment plan strongly indicates that puberty-blocking medications is necessary to prevent that patient's mental health from deteriorating at the onset of puberty.

36.    If the patient and their family decide to pursue medical treatment, the mental health provider will build on those discussions to also assess the patient's

appropriateness and readiness for that treatment. As mentioned above, the appropriateness of any medical treatment is determined by a multidisciplinary team of expert mental and medical care providers. A patient's readiness to begin a particular course of medical treatment requires an evaluation of the patient's understanding of the goals and potential limitations of the contemplated treatment. For example, for puberty-blocking medication, the provider will gauge the patient's ability to comprehend the effects of puberty on their body and mental health. An integral part of that discussion is evaluating a patient's grasp of the consequences of stopping those physical changes from occurring and alternatives to puberty-blocking treatment. And, in cases of the addition of hormone therapy in adolescence, the review of physical impact, including benefits and limitations, is explored over multiple meetings with the patient and parents.[1] The provider will have those discussions with the patient and their parents both individually and together. As with the initial diagnosis, the amount of time required to complete this evaluation will depend on numerous factors including the length of their existing therapist-patient relationship and the complexity of the issues facing that patient.

---

[1] *See*, *e.g.*, *"This Wasn't a Split-Second Decision": An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, Clark, BA, Bioethical Inquiry (2021) https://doi.org/10.1007/s11673-020-10086-9.

37.     The mental health provider will then document the results of their assessment in a letter to the patient's treating physician. The letter details the provider's diagnostic analysis as well as any professional opinions regarding the benefits of and readiness for the contemplated treatment. The medical provider uses that letter as one piece of their own independent assessment. It is not uncommon for a medical provider to contact the patient's mental health provider to discuss the details of the letter.

### Medical Treatment for Gender Dysphoria is Critical to the Mental Health of Transgender Youth

38.     Scientific literature and clinical experience consistently find that, like social transition, medical treatment for Gender Dysphoria offers significant psychological benefit to transgender young people. For example, one longitudinal study found that transgender young adults who received the full range of medical and mental health treatments for their gender dysphoria had a mental health profile that was indistinguishable from their non-transgender peers. Annelou L.C. de Vries, et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014). Medical treatments for gender dysphoria are effective because they keep a transgender person's body in alignment with their gender identity, either by stopping that incongruence from growing or by changing the person's body to be more congruent with their gender identity, which in turn help reduce a person's Gender Dysphoria.

39.     Conversely, however, the denial of medical treatment will severely hinder a transgender young person's development and well-being. Even if not initially visible to the public, the physical changes associated with puberty widen the incongruence between a transgender young person's body and their gender identity. The permanence of those physical changes can result in distress that is significant and acute because the changes brought on by puberty become constant triggers for Gender Dysphoria, such as monthly menstruation, chest development, deepening of voice and unwanted erections.

40.     As puberty progresses, those physical changes become more obvious and will undermine a transgender young person's ability to live in a manner consistent with their gender identity. Their appearance will cause them to be repeatedly referred to by their birth sex, which is different than their gender identity. The incongruence between their gender identity and appearance will also subject them to ridicule, harassment, and discrimination. In either situation, a transgender young person will experience that mistreatment as a rejection of their core self and identity, which will further exacerbate their Gender Dysphoria.

41.     If left unaddressed, as under the wait-and-see approach, a transgender young person is likely to develop co-occurring mental health conditions, such as major depression, anxiety or obsessive-compulsive disorders, eating disorders, self-harm, and thoughts of suicide. Transgender young people can also experience

difficulties focusing on schoolwork, building and maintaining friendships, among other serious functional limitations.

42.     Those harms are exponentially compounded for a transgender young person living at the intersection of minority identities based on the layered ways in which peers and adults can stigmatize identified differences in race, ethnicity, religion/faith and socioeconomic status. Multiply marginalized children and youth face vastly higher levels of anxiety and depression that are more likely to lead to self-harm and even death by suicide. In the last few years, as individuals in these multiply marginalized communities are coming under direct and indirect attack from political and religious groups, these children are becoming gravely aware that they are not safe in their own neighborhoods and are constantly exposed to negative messages that profoundly state that they do not matter, are not important parts of our community, and otherwise do not belong.

43.     Chronic exposure to those levels of sustained stress results in persistent surges of cortisol in the brain for children and youth. This leads to a wide array of short and long-term detrimental consequences, all of which can permanently affect development, emotional, physical and mental health, and quality of life. For example, research has shown that it leads to increased difficulty in differentiating between threatening and safe situations, impaired short-term and long-term memory, struggles with decision-making and attention, and issues with mood control, even in

adulthood. Studies have also shown that chronic stress in childhood and adolescence results in a higher likelihood of developing a myriad of physical health issues, including diabetes, heart disease, and cancer.

44.   Once an area of clear and consistent stress and distress has been identified for any child, it should be addressed in a way that provides clear, consistent and safe relief. This is vital based on the research on both the negative health impact of chronic stress/distress on human bodies as well as the clear, safe and consistent guidelines for relieving this stress and distress for transgender children and youth.

## Conclusion

45.   Criminalizing the provision of medical treatment for Gender Dysphoria will inflict immeasurable harm on transgender young people throughout Alabama that will have long-lasting implications for the mental health of this already vulnerable population and the many family members who support them. Transgender young people will have proven effective, life sustaining medical care dangerously delayed between five and ten years to obtain what are considered time-sensitive medical treatments for gender dysphoria. Not only will their mental health decompensate during that time, but their ability to treat and manage their Gender Dysphoria will be greatly diminished with some body changes being irreversible. For many transgender children, the inability to access essential time-sensitive medical treatment will result in irreparable damage to their physical and

psychological health.

46.    Those harms will significantly compound the inability of transgender young people to live in a manner consistent with their gender identity due to body changes that negate their ability to keep private, for those who wish to do so, the deeply personal fact that they are transgender. Additionally, the social and educational harms resulting from profound and debilitating bullying and harassment of transgender children in local social settings (clubs, sports, after school programs, churches) and school settings will frequently result in out of school placements, online schooling and/or complete removal from academic efforts overall.  All of these negative outcomes in childhood have far-reaching and exponentially impacting effects on overall health and wellbeing, typically resulting in a significant increase in anxiety, depression, self-harm and death by suicide.

47.    Despite claiming to protect transgender children, the Act will have the exact opposite effect.

This declaration was executed this 17th day of April, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

Linda Hawkins, Ph.D., M.S.Ed., LPC

# EXHIBIT A

Curriculum Vitae

Name: **Linda Aline Hawkins, PhD, LPC**
Address: 7153 Anderson Street, Philadelphia, PA 19119
Phone: **215-280-7128**
Email: drlahawkins@gmail.com

**Education & Licensure**
Licensed Professional Counselor, Pennsylvania – PA #006287 - March, 2012
Ph.D., Human Development & Human Sexuality, Clinical Counseling Focus – Widener
     University, Chester, PA, October, 2009
     Linda Lehnert Memorial Award – Excellence in Academics & Research (4.0 GPA)
     Distinguished Dissertation Nomination – Gender Identity Development among Gender
     Variant Adolescents: A Qualitative Analysis
M.S.Ed., Psychological Services – University of Pennsylvania, Philadelphia, PA, August, 1998
B.S., Speech and Hearing Sciences – University of Washington, Seattle, WA, June, 1993

**Current Employment**
**Founder & Director:** **Gender & Sexuality Development Program, The Children's Hospital
of Philadelphia, Philadelphia, PA, January 2014 to present.**
*This clinic was one of the nation's first four pediatric gender clinics to support children and
youth who are gender non-conforming, gender explorative and/or transgender.*
*Accomplishments as part of achieving this include:*

- Developed the business plan and founded the Philadelphia clinic at the Hospital in
January, 2014 and expanded to include a Voorhees, NJ clinic in January of 2020.
- Established needed gender affirming policies within the Hospital to support the clinic
patients and families, including updating the employee non-discrimination policy and the
patient bill of rights.
- Currently running a clinic of nearly 1500 families within first three years of opening;
fielding 10-15 referrals weekly.
- Securing nearly 100% rate of insurance coverage for puberty blockers through advocacy
and education between hospital physicians and insurance adjustors.
- Secured multiple internal and externa funding for patient and family needs, including full
funding for the family support group, giving library of books to support family
exploration and childhood learning on gender, and training support.
- Supervise and coordinate staff and scheduling.
- Lead and participate in research development as it pertains to the development of best
care practices for our patients and families.
- Assure the Hospital and all affiliates are performing at the highest level possible in the
overarching support for all LGBTQ staff, employees and providers.
- Providing state and regional trainings for health care and mental health providers.
- Mentoring hospitals nationwide in developing gender affirming care clinics with
practices, policies, training and advocacy.
- Advising local, regional and national guidelines for the care of transgender and gender
expansive children, youth and their families.

**Family Services Specialist: Department of Patient & Family Services, The Children's Hospital of Philadelphia, January, 2014 to present.**
***Goal is to provide on-going assessment of the Hospital policies and practices to assure at every point of contact with patients, families and staff, LGBT individuals are treated with respect, competence and the best practices in health care and employment experience.***

- Conducting annual training seminars and lectures throughout the CHOP Network and affiliates to increase their LGBT competence in supporting patients and families.
- Conducted numerous Grand Rounds presentations and private sessions to assist multiple hospitals to both increase their LGBT patient and family competence, as well as increase specific competence with transgender child/youth patient care.
- Establishing first pediatric plans for Transgender Child & Youth Policy & Practice.
- As a result of all of the above, successfully supported the Hospital in achieving the Human Rights Campaign Endorsement as a Leader in LGBT Healthcare Equality for The Children's Hospital of Philadelphia from 2014 to present..

**Director & Trainer: Advanced Training in Affirmative Therapy for Transgender Communities, Widener University, 2018 to present.**
***Designed and implemented a one-year professional training program for mental health providers based at Widener University.  Expanded to bi-coastal in-person offering in Philadelphia and Seattle, shifted to online during pandemic.***

- Designed year-long curriculum that includes two, in-person weekends and weekly on-line supervision as well as monthly readings.
- Supervise 6 training staff to implement the above training and supervision needs.
- Develop promotion materials to reach a national audience of potential participants.

**Additional Program Development & Management Experience**

Interim Director, Gender Affirming Care Clinic: Johns Hopkins All Children's Hospital, St. Petersburg, FL, September 2019 to September 2021. Accomplishments: Completed comprehensive needs assessment of the hospital network to determine existing strengths and areas for growth in providing gender affirming care. Completed comprehensive needs assessment of patient and family care needs.  Developed and implemented program expansion plan resulting in the first fully staffed, interdisciplinary care program for transgender and gender nonbinary children, youth and families in the state of Florida.

Interim Director, Center for Gender Affirming Care: Rady Children's Hospital, San Diego, CA, January 2017 to January 2019. Accomplishments: Completed comprehensive needs assessment of the hospital network to determine existing strengths and areas for growth in providing gender affirming care. Completed comprehensive needs assessment of patient and family care needs. Developed and implemented program expansion plan resulting in the rebuilt interdisciplinary care program for transgender and gender nonbinary children, youth and families in San Diego.

Director of Counseling Services: The Attic Youth Center, Philadelphia, PA, May, 2004 to September, 2011. Accomplishments: Expanded program from 2 therapists to 7 therapists with psychiatry partnership and insurance funding.  Supervised therapists (MSW, MEd, PsyD and

PhD level clinicians) to provide complete counseling and psychosocial services to sexual and gender minority youth (ages 14-24 years old). Built collaboration with Community Behavioral Health (CBH) to ensure funding for services.  Developed annual student training program. Clinical team awarded the Association of Gay & Lesbian Psychiatrists Honor of Mental Health for Youth in 2011.   Supervisors: Carrie Jacobs, PhD, Executive Director and Cornelius Furgesson, PhD, Licensed Psychologist.

Program Manager, HIV Counseling and Testing:  Adolescent Medicine, The Children's Hospital of Philadelphia, Philadelphia, PA, October, 2004 to March, 2008.  Accomplishments:  Organized and coordinated all adolescent sexual health and HIV counseling within the Hospital network. Expanded program from 2 testing sites to 9 sites including multiple community events throughout Philadelphia. Developed testing protocols that met and exceeded best practice for testing with youth and young adults.  Led strategic grant writing to fund existing and expanded programming, securing annual funding for 4 full time health educators/testers and partial supervision/management salaries.  Supervisor: Christine Ambrose, LSW, Program Manager.

Program Coordinator: The Injury Free Coalition for Kids of Philadelphia, The Children's Hospital of Philadelphia, Philadelphia, PA, February, 1999 to February, 2004. Accomplishments: Developed a community based coalition of medical, education, public health, government, and faith based leaders to address the crisis of unintentional injury to children in West and Southwest Philadelphia. Led research and interventions to assess needs, build partnerships and strategize solutions with and for the community. Provided training and guidance to MD, MPH, SW, MEd, and PhD students interested in community based wellness and public health promotion. Led strategic grant writing to secure initial and sustainable funding for core coalition staff and all projects through sources including: Robert Wood Johnson Foundation, DHHS, Ronald McDonald House Philadelphia, Philadelphia Foundation, PEW Charitable Trust, and multiple local funding groups.  Successfully funded a $300,000 playground through grassroots, faith-based and competitive matching funds.  Supervisors: Flaura Winston, MD, PhD, Center for Pediatric Injury Prevention, and Marla Vanore, MSEd, Trauma Program Manager.

**Additional Clinical Experience**
Private Practice: Hawkins LifeWorks LLC, Philadelphia, PA, September, 2012 to January, 2014. *Private practice offering clinical support to children and youth who identify as LGBTQ and their families (no new clients as of 2014).  Currently offering training for schools, churches and community agencies.  Also providing clinical supervision to trainees seeking clinical training needs in these specific areas.*
- Supported numerous children, youth and families in their mental health care needs.
- Supervised 12 clinical trainees, to date, in their clinical training hours.
- Continue to clinically supervise 4 trainees seeking licensure and a dozen clinicians within private practice.
- Providing trainings at colleges and hospitals throughout the nation to increase their competency in supporting the needs of LGBT children, youth and families.

Lead Mental Health Counselor:  Adolescent HIV Initiative, Adolescent Medicine, The Children's Hospital of Philadelphia, Philadelphia, PA, February, 2004 to December, 2013.  Duties:

3/2022, Linda A. Hawkins    4

Providing one on one, couples, family, and group counseling to youth diagnosed with HIV. Train and supervise intern, extern and practicum students in clinical counseling.  Build partnerships with community-based counseling and psychiatry services to provide comprehensive seamless care to patients.  Lead and assist in grant writing to fund psychosocial support team members (social work, nursing and wellness counselor) with successful awards from the AIDS Activities Coordinating Office (AACO), NIH, NIMH, and DHHS. <u>Supervisor</u>: Tracy DiFonzo, LCSW, Program Manager and Benoit Dube, MD, Psychiatrist.

<u>Adolescent Counselor</u>: The Attic Youth Center, Philadelphia, PA, February, 1999 to December, 2006. <u>Duties</u>: Providing one on one, couples, and group counseling to gay, lesbian, bisexual, transgender, and questioning youth.  <u>Supervisor</u>: Cornelius Furgesson, PhD, Licensed Psychologist

<u>Adolescent Counselor</u>: The Open Door, Philadelphia Community Health Alternatives, Philadelphia, PA, March, 1999 to March, 2001.  <u>Duties</u>: Providing one on one, couples, and group counseling to gay, lesbian, bisexual, transgender, and questioning youth.  <u>Supervisor</u>: Phillip Rutter, PhD, Program Director.

<u>Child Clinical Therapist Intern</u>: Philadelphia Child Guidance Center – Department of Child & Adolescent Psychiatry at the Children's Hospital of Philadelphia, Philadelphia, PA, September, 1997 to May, 1998.  <u>Duties</u>: Conducted individual and group counseling with behaviorally challenged children and their families.  Collaborated with multidisciplinary team to devise and implement treatment plans.  <u>Supervisor</u>: Dr. Brenda Pemberton, Director.

**Additional Teaching Experience**
<u>Adjunct Associate Professor</u>: Widener University Center for Human Sexuality Studies, Chester, PA, Summer, 2008 to Spring, 2017.
*The Center for Human Sexuality Studies at Widener University is the only nationally accredited program in sexuality education and clinical sexuality training in the United States.  Students come from across the nation and Canada to train within this program.*
Courses Taught as Lead Instructor:
- *HSED 645 – Sexual Minorities*
- *HSED 624 - Education and Training Methods for the Clinical Sexologist*
- *HSED 695 & 696 - Practicum Supervision (2 semesters)*
- *HSED 588(elective) – Clinical Implications of HIV*
- *HSED 588(elective) - Sexually Transmitted Infections & HIV/AIDS*
- *HSED 593 - Behavioral Foundations of Human Sexuality*
- *HSED 645 - Sexual Minorities*
- *ED652 - Group Process and Dynamics*
- *PY 622 – Trauma, Advocacy & Social Justice*
- *CFTP 511 – Introduction to Sex Therapy: Concepts in Human Sexuality*

Consistently achieving exceptional ranking in all course evaluations, on both content, communication and expertise.

4

Awarded the 2015 Widener Points of Pride Award – awarded annually to the faculty member for exceptional scholarship in the field of sexuality to support the students, faculty and overall profession in the field.

<u>Adjunct Professor:</u> Arcadia University Masters in Psychology Program, Glenside, PA, Fall, 2013 to Spring, 2014. <u>Duties:</u> Design, instruct and evaluate courses for Masters level students. <u>Supervisor:</u> Dr. Eleonora Bartoli, Program Director.

**Additional Research Experience**
<u>Study Coordinator & Behavioral Study Interventionist:</u> Adolescent Trials Network (ATN), The Children's Hospital of Philadelphia, Philadelphia, PA, January, 2008 to December, 2013.  <u>Duties:</u> Implement NIH funded research protocols as designed and designated through the ATN. As coordinator, assure all subject selection, protocol procedure, documentation, data entry, and quality assurance meets and exceeds study requirements.  As interventionist, assure all aspects of intervention procedures meet the dynamic needs of the subjects and the study protocol. <u>Supervisor:</u> Mary Tanney, RN, MPH, Research Nurse.

2010 – 2013: Study Interventionist & Coordinator for *Treatment for Depression Among HIV-Infected Youth – (ATN 080)*

2008 – 2013:  Study Coordinator for *Neurocognitive Assessment in Youth Initiating HAART, A Multi-Center Study of the Adolescent Medicine Trails Network for HIV/AIDS Interventions (ATN 071)*

2009 – 2012: Study Coordinator & Supervisor for *Mindfulness Approaches to Increasing Wellness Among Youth Living with HIV – Partnership with The Johns Hopkins School of Medicine*

2008 – 2010:  Study Interventionist & Coordinator for *Integrated Treatment of Alcohol and/or Marijuana Abuse for HIV-Infected Youth – Focus Groups, Phase I & Phase II (ATN 069)*

2008 – 2009:  Co-Investigator for *Sexual Health Risk Among Adolescent and Young Adult African Americans Living with HIV who have Sex with Men – Adolescent Initiative Study, The Children's Hospital of Philadelphia*

2005 - 2006:  Primary Investigator for *Internal Validation of OraQuick Advance Rapid HIV 1-2 Antibody Test Kit on Oral Fluids Compared to Standard ELISA Serum Screening – Point of Care Testing, The Children's Hospital of Philadelphia*

2004 – 2005: Co-Investigator for *Post-Traumatic Stress Reactions in HIV-positive Youth: An exploratory study to identify life stressors and impact of diagnosis - Adolescent Initiative Study, The Children's Hospital of Philadelphia*

**Peer-reviewed Publications**
2021                    Hobson, B., Lett, E., **Hawkins, L**., Swediman, R., Nance, M., & Dowshen, N. Transgender Youth Experiences with Implant GnRH

|      | Agonists for Puberty Suppression. *Transgender Health*, 16 Sep 2021https://doi.org/10.1089/trgh.2021.0006 |
|------|------|
| 2021 | Experiences of Chest Dysphoria and Masculinizing Chest Surgery in Transmasculine Youth. Mehringer, J., Harrison, J., Quain, K., Sea, J., **Hawkins, L**., & Dowshen, N. *Pediatrics*, 147(3). |
| 2020 | Schlupp, A., Dowshen, N., **Hawkins, L.,** & Stallings, V. The Prevalence and Patterns of Food and Beverage Restriction for Bathroom Avoidance in Transgender and Gender-Diverse Youth: A Retrospective Chart Review. *Journal of Adolescent Health Research Poster Symposia*, 66(2), S29. |
| 2019 | Libby, B., Miller, V., Regan, K., Gruschow, S., Hawkins, L., & Dowshen, N. Communication of Acceptance and Support In Families Who Have Gender-Variant Youth. *Journal of Adolescent Health*, 64(2), S101-S102. |
| 2019 | House, H., Gaines, S., **Hawkins, L**., Sexual and Gender Minority Adolescents: Meeting the Needs of Our LGBTQ Patients and Their Families. *Clinical Pediatric Emergency Medicine*, 20(1), 9-16. |
| 2018 | Dowshen, N., Gruschow, S., Taylor, S., Lee, S., & **Hawkins, L**. Barriers to Care for Gender Non-Conforming Youth: Perspectives of Experienced Care Providers, Transgender Youth and Their Parents. *Journal of Adolescent Health*, 62(2), S42. |
| 2018 | Hickerson, K., **Hawkins, L.,** & Hoyt-Brennan, A. Sexual Orientation/Gender Identity Cultural Competence: A Simulation Pilot Study. *Clinical Simulation in Nursing,* 16, 2-5. |
| 2017 | Brown, L., Kennard, B., Emslie, G.,…**Hawkins, L**. Effective Treatment of Depressive Disorders in Medical Clinics for Adolescents and Young Adults living with HIV: A controlled trial. *Journal of Acquired Immune Deficiency Syndrom*, 71(1), 38-46. |
| 2016 | Contributing author. Supporting & Caring for Transgender Children. *Human Rights Campaign*. |
| 2016 | Dowshen, N., Lee, S., Castillo, M., **Hawkins, L.,** & Barg, F. Barriers and Facilitators to HIV Prevention, Testing, and Treatment among Young Transgender Women. *Journal of Adolescent Health*, 58(2, Supp), S81-82. |
| 2016 | Dowshen, N., Meadows, R., Bymes, M., **Hawkins, L.,** Eder, J., & Noonan, K. Policy Perspective: Ensuring comprehensive care and support for gender nonconforming children and adolescents. *Transgender Health*, 1(1), 75-86. http://online.liebertpub.com/doi/pdfplus/10.1089/trgh.2016.0002 |

6

| | |
|---|---|
| 2016 | McClain, Z., **Hawkins, L.A.**, & Yehai, B. Creating Welcoming Spaces for Lesbian, Gay, Bisexual, and Transgender (LGBT) Patients: An Evaluation of the Healthcare Environment. *Journal of Homosexuality*, 63(3). |
| 2015 | Dowshen, N., Meadows, R., Bynes, M., **Hawkins, L.,** Eder, J., & Noonan, K. Ensuring Comprehensive Care and Support for Gender Non-Conforming Children and Adolescents. *Policy Lab: Evidence To Action*, Fall 2015. |
| 2014 | Kennard, B., Brown, L., T., **Hawkins, L**., Risi, A., Radcliffe, J., Emslie, G., Mayes, T., King, J., Foxwell, A., Buyukdura, J., Bethel, J., Naar-King, S., Safran, S., Xu, J., Lee, S., Garvie, P., London, C., Tanney, M., Thornton, S., and the Adolescent Trials Network for HIV/AIDS Interventions. Development of Health and Wellness CBT for Individuals with Depression and HIV: Feasibility and Acceptability.   Journal of Cognitive & Behavioral Practice, pp 237-246. |
| 2011 | Radcliffe, J., Beidas, R., **Hawkins, L**. & Doty, N. Trauma and Sexual Risk Among Sexual Minority African American HIV Positive Young Adults. *Traumatology*, June 2011. |
| August, 2010 | Radcliffe, J., Doty, N., **Hawkins, L.A.,** Smith, C. Beidas, R., and Rudy, BJ.  Stigma and Sexual Health Risk in HIV-Positive African American Young Men who have Sex with Men.  AIDS Patient Care and STDs, 24(8). |
| May, 2010 | Radcliffe, J., Beidas, R., **Hawkins, L.A.**, and Doty, N. Trauma and Sexual Risk Among Sexual Minority African-American HIV+ Young Adults. Traumatology. May 7, 2010 as doi:10.1177/1534765610365911 |
| June, 2009 | Valenzuela, J., Buchanan, C., Radcliffe, J., Ambrose, C., **Hawkins, L.A.,** Tanney, M. and Rudy, BJ.  Transition to Adult Services Among Behaviorally Infected Adolescents with HIV – A Qualitative Study. Journal of Pediatric Psychology, Advanced Access published June 19, 2009 |
| June, 2008 | Mollen, CJ, Lavelle, J., **Hawkins, LA**, Ambrose, C. and Rudy, BJ. Description of a Novel Pediatric Emergency Department-Based HIV Screening Program for Adolescents. *AIDS Patient Care and STDs,* 22(6), 505-512. |
| July, 2007 | Radcliffe, J, Fleisher, C.L., **Hawkins, LA**, Tanney, M, Kassam-Adams, N, Ambrose, C, and Rudy, BJ. Posttraumatic Stress and Trauma History in Adolescents and Young Adults with HIV.  *AIDS Patient Care and STDs*, 21(7), 501-508. |

| June, 2004 | Posner,J., **Hawkins, LA**, Garcia-Espana, F., & Durbin, D. A randomized controlled trial of a home safety intervention based in an emergency department setting. *Pediatrics*, 113(6), 1603-1608. |
|---|---|
| September, 2004 | Nance, ML, **Hawkins, LA**, Branas, CC, Vivarelli-O'Neill, C, and Winston, FK.  Optimal driving conditions are the most common injury conditions for child pedestrians.  *Pediatric Emergency Care*, 20(9), 569-573. |
| December, 2001 | Kodman-Jones, C., **Hawkins, L.**, Schulman, S.L. Behavioral characteristics of children with daytime wetting. *Journal of Urology*, 166(6);2392-2395. |

**Book chapters and other publications**

| 2019 | Dube, B, & **Hawkins, L.A** (2019). Sexual Disorders and Transgender Health. Chapter 11 in Fundamentals in Consultation Psychiatry: Principles and Practice. Eds Lavakumar, M., Rosenthal, L., & Rabinowitz, T. Nova Medicine & Health: New York, NY |
|---|---|
| 2018 | Hickerson, K., **Hawkins, LA**., Hoyt-Brennan, A. (2018). Sexual Orientation/Gender Identity Cultural Competence: A simulation pilot study. Clinical Simulation in Nursing, 16, 2-5. |
| 2016 | McClain, Z., **Hawkins, LA**, Yehia, BR. (2016). Creating Welcoming Spaces for Lesbian, Gay, Bisexual and Transgender (LGBT) Patients: An evaluation of health care environment.  Journal of Homosexuality, 63(3), 387-393. |
| 2016 | **Linda A. Hawkins,** Nadia Dowshen, Susan Lee. The Bathroom Debate: A legal argument that is causing a public health crisis, PolicyLab, Children's Hospital of Philadelphia http://policylab.chop.edu/blog/bathroom-debate-legal-argument-causing-public-health-crisis |
| 2015 | Ensuring Comprehensive Care and Support for Gender Non-Conforming Children and Adolescents. http://policylab.chop.edu/evidence-action-brief/ensuring-comprehensive-care-and-support-gender-non-conforming-children-and |
| 2015 | Simms, S., & **Hawkins, L.A.**, *Families with Chronic Medical Issues*, book chapter in Browning, S (Ed.), Contemporary Families: Translating Research into Practice. Routledge: New York, NY. |

| 2014 | **Hawkins, L.A.**, & Ginsburg, K.R., *Core Principles in Communicating with Adolescents*, in Ginsburg KR and Kinsman SB.  Reaching Teens: Wisdom from Adolescent Medicine.  Elks Grove Village IL; American Academy of Pediatrics; (A Textbook and Video Product) |
|------|------|
| 2014 | Dowshen, N., **Hawkins, L.A.**, Arrington-Saunders, R., Reirden, D.H., & Garofalo, R*, Sexual and Gender Minority Youth*, in Ginsburg KR and Kinsman SB.  Reaching Teens: Wisdom from Adolescent Medicine.  Elks Grove Village IL; American Academy of Pediatrics; (A Textbook and Video Product) |
| 2014 | Dowshen, N., **Hawkins, L.A.**, Arrington-Saunders, R., Reirden, D.H., & Garofalo, R, *HIV-Infected Youth*, in Ginsburg KR and Kinsman SB.  Reaching Teens: Wisdom from Adolescent Medicine.  Elks Grove Village IL; American Academy of Pediatrics; (A Textbook and Video Product) |
| 2014 | Radcliffe, J., **Hawkins, L.A.,** & Buchanan, C. Pediatric HIV, book chapter in Clinical Practice of Pediatric Psychology: Cases and service delivery. Guilford Press. |

## Professional Organizations & Appointments

| 2019 – Present | College of Physicians of Philadelphia - Fellow |
|------|------|
| 2018 – Present | Pennsylvania Transgender Task Force – Appointed by Dr. Rachel Levine and Governor Tom Wolfe - Member |
| 2017 – Present | Human Rights Campaign Transgender Working Group - Member |
| 2012 – Present | American Counseling Association – Member |
| 2012 – Present | Pennsylvania Counseling Association - Member |
| 2011 – 2017 | Sexuality Information and Education Council of the United States – Board Member |
| 2010 – Present | Academic Pediatrics – Reviewer |
| 2010 – Present | Society for the Scientific Study of Sexuality – Member & Reviewer |
| 2008 – 2010 | Equality Advocates (now Equality Pennsylvania) – Board Member |
| 2005 – Present | World Professional Association for Transgender Health (formerly HBIGDA) - member |
| 2005 – Present | Society for the Scientific Study of Sexuality – Member |
| 2005 – Present | American Association of Sexuality Educators, Counselors and Therapists – Member |

## Invited Lectures

| February 2020 | Supporting Transgender, Gender Non-Conforming and Gender Expansive Children & Youth
Department of Social Work
Johns Hopkins All Children's Hospital, St. Petersburg, FL |
|------|------|
| January 2020 | It Starts With You: Promoting LGBTQ Competence among Colleagues |

3/2022, Linda A. Hawkins    10

|  | Lecture Series: Office of Diversity & Inclusion<br>The Children's Hospital of Philadelphia, Philadelphia, PA |
|---|---|
| October 2019 | Expanding Care for All to Include Transgender Children & Youth<br>Keynote: New Jersey Physicians Advisory Committee, Cherry Hill, NJ |
| September 2019 | Supporting Transgender Children & Youth<br>Keynote: Cooper Pediatrics Group, Moorestown, NJ |
| September 2019 | Collaborating for Care: Models of Gender Clinic Collaboratoin &<br>Mentorship Across the US<br>National Conference, United States Professional Association for<br>Transgender Health (USPATH), Washington, DC |
| July 2019 | Building Knowledge, Skills and Community to Support Transgender<br>Communities: A training program for mental health professionals<br>2019 Trans Wellness Conference, Philadelphia, PA |
| July 2019 | Non-Binary Youth: Clinical Complexities of Supporting Gender<br>Creativity in a Binary World<br>Gender Spectrum Conference, Moraga, CA |
| June 2019 | Transforming Systems: Creating the Ideal Trans Care Experience<br>National Conference, Canadian Professional Association for Transgender<br>Health (CanPATH), Toronto, Canada |
| December 2018 | Foundational Aspects of Gender Development & Gender Identity<br>Emergence across the Lifespan<br>Hospital of the University of Pennsylvania, Philadelphia, PA |
| September 2018 | Understanding Gender Identity & Development in 2018: Professional,<br>parental and personal perspectives<br>The College of Physicians of Philadelphia, Philadelphia, PA |
| February 2018 | Creating the Ideal LGBTQ Patient & Family Experience: From Policy to<br>Practice<br>Boston Children's Hospital, Boston, MA |
| February 2017 | Creating Systemic Change for Transgender Children & Youth:<br>Establishing a multidisciplinary pediatric practice that supports patients<br>and families within a hospital network and beyond<br>National Conference, United States Professional Association for<br>Transgender Health (USPATH), Los Angeles, CA |
| March 2016 | Pennsylvania College of Physicians |

|  | Supporting Transgender, Gender Non-Conforming and Gender Expansive Children & Youth, Philadelphia, PA |
|---|---|
| March 2016 | Children's Hospital Association National Conference<br>Creating an Inclusive Experience for LGBT Patients & Families: Policy to Practice, New Orleans, LA |
| September 2015 | Supporting Transgender, Gender Non-Conforming and Gender Expansive Children & Youth<br>Keynote speaker, MSW Field Faculty Orientation<br>University of Pennsylvania School of Social Policy & Practice |
| April, 2015 | Understanding Transgender & Gender Expansive Children & Youth<br>Psychiatry Grand Rounds<br>Baystate Medical Center, Springfield, MA |
| March, 2015 | Creating an Inclusive Experience for LGBT Patients & Families<br>**Human Rights Campaign Endorsed Training*<br>Family Centered Care Grand Rounds<br>The Children's Hospital of Philadelphia, Philadelphia, PA |
| March, 2015 | Supporting Gender Non-Conforming Children & Youth in Primary Care<br>CHOP at Virtua Care Center, Voorhees, NJ |
| March, 2015 | Creating a Supportive Campus for All Students<br>William Penn Charter School, Middle School, Philadelphia, PA |
| December, 2014 | Understanding & Supporting Your Transgender Patient<br>Family Practice Resident Training<br>Hospital of the University of Pennsylvania, Philadelphia, PA |
| December, 2014 | LGBT Inclusive Research Practice<br>**Human Rights Campaign Endorsed Training*<br>PROSPER Research Training<br>Children's Hospital of Philadelphia Research Institute, Philadelphia, PA |
| December, 2014 | Creating Child Abuse Investigations Inclusive of Sexual Orientation & Gender Identity<br>Philadelphia Children's Alliance Annual Conference, Philadelphia, PA |
| November, 2014 | Affirmative Clinical Work with Gender-Expansive Children & Youth: Common Issues & Considerations<br>Gender Spectrum East Conference, Baltimore, MD |
| October, 2014 | Supporting Lesbian, Gay, Bisexual and/or Transgender Individuals & Families |

|                   | Montgomery Behavioral Health Provider Training Series, Norristown, PA |
|-------------------|------------------------------------------------------------------------|
| September, 2014   | Creating a Supportive Campus for All Students<br>William Penn Charter School, Upper School, Philadelphia, PA |
| June, 2014        | Multidisciplinary Best Practice: Medical, Mental Health & Legal Perspectives<br>13th Annual Trans Health Conference, Philadelphia, PA |
| June, 2014        | Supporting Non-Binary Children & Youth: A partnership between mental health and medical providers<br>13th Annual Trans Health Conference, Philadelphia, PA |
| February, 2014    | Supporting LGBT Families in the NIICU<br>**Human Rights Campaign Endorsed Training*<br>NIICU Medical Professional Day of Learning<br>The Children's Hospital of Philadelphia, Philadelphia, PA |
| June, 2013        | Contemporary Counseling with Transgender Children, Youth & Families<br>12th Annual Philadelphia Trans-Health Conference, Philadelphia, PA |
| April, 2013       | Supporting Youth & Young Adults who are Living with HIV<br>Marriage & Family Therapy Program<br>Jefferson University, Philadelphia, PA |
| March, 2013       | LGBT Child & Youth Update: Coming out, therapy needs & family support<br>Marriage & Family Therapy Program<br>Jefferson University, Philadelphia, PA |
| November, 2012    | Creating the Ideal Patient Experience: Serving our Lesbian, Gay, Bisexual and/or Transgender Patients & Families<br>Pride at CHOP Staff Training Seminar Series<br>The Children's Hospital of Philadelphia |
| November, 2012    | The Internet as a Factor in Gender Identity Development for Transgender and Gender Variant Adolescents<br>Society for the Scientific Study of Sexuality<br>Annual National Conference, Tampa, Florida |
| September, 2012   | Building on Classroom Inclusion:  Adding a Layer on Gender<br>School-wide Training<br>Greene Street Friends School, Philadelphia, Pennsylvania |

# DOC. 8-2

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.

     *Plaintiffs*,

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County.

     *Defendants*.

Civil Action No. 2:22-cv-184-LCB

**DECLARATION OF MORISSA J. LADINSKY, MD, FAAP, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**

I, Morissa J. Ladinsky, declare as follows:

1.      I am an Associate Professor of Pediatrics at the University of Alabama at Birmingham ("UAB") School of Medicine.

2.      I am a practicing physician and a member of the medical staff at the Children's Hospital of Alabama and UAB Hospital, both in Birmingham.  I am co-lead of the multi-disciplinary gender clinic at UAB Hospital.

3.      I obtained a bachelor's degree (magna cum laude) in Human Biology from Brown University in 1985.  I obtained my medical degree (with honors) from Baylor University in 1990.

4.      I was certified by the American Board of Pediatrics in 1993.  I am licensed to practice medicine in Alabama.  I have past licensure in Ohio, Maryland, and Texas when I previously practiced and resided in these states.

5.      For the last 31 years, I have dedicated my practice to the medical care of young people.  Throughout my career, my patients included transgender young people.  Presently, those transgender patients live in Alabama, Mississippi, Florida, and Georgia.

6.      Since starting at the gender clinic at UAB, I have treated approximately 250 transgender young people for gender dysphoria.

7.     The treatment of gender dysphoria is well-established in the medical profession.  This is not a pioneering or experimental area of medicine.  There are comprehensive standards of care governing the treatment of gender dysphoria that were developed by the World Professional Association for Transgender Health (WPATH), founded in 1979, and Endocrine Society, in collaboration with the Pediatric Endocrine Society.  These guidelines are recognized as the prevailing standard of care by the major associations of medical professionals, including the American Medical Association, American Academy of Pediatrics, and the Society for Adolescent Health and Medicine, to name a few.  The current version of the WPATH standards of care have been in place for more than a decade.

8.     The treatment of gender dysphoria is also part of medical school curricula across the country and world.  In fact, this subject is taught as part of the endocrine module to all students at the UAB School of Medicine.  The broader topic of transgender medicine is also found on every state board medical exam, including in Alabama.

9.     Incorporated within the standards of care is a process each patient must follow before beginning any treatment for gender dysphoria. And, as with any treatment, we also follow a protocol for obtaining informed consent as part of that process.  Standard protocol requires that medical treatment for gender dysphoria is

not prescribed until a patient meets the rigorous requirements outlined in the standards of care and consistent with an informed-consent process.

10.     The informed consent procedures used by the gender clinic at UAB are very comprehensive.  Patients at the clinic begin that process with their primary care provider and often community based mental health provider before they even have an initial appointment with a doctor like me.  The patient's mental health provider thoroughly assesses the patient's mental health, maturity, presence and acuity of dysphoria and if indicated, ultimate readiness to undergo medical treatment for gender dysphoria.  Using those assessments as our baseline, our multidisciplinary team begins its evaluation. We meet with the patient and their parents/legal guardians, review the risks, benefits, and alternatives of treatment, as medical and mental health providers do for all treatments.  After that initial meeting, we meet with our patients at regular intervals for follow up, allowing us to monitor the patient's gender dysphoria as well as their overall physical and mental health over time.  The team also provides families with materials to review and community-based supports and resources to connect with in the time between appointments.

11.     Most of our patients are in the care of the gender clinic for one to three years before initiating medical treatment for gender dysphoria, depending on when they first come to the clinic and their individual healthcare needs.  Even after that extended observation and assessment period, we will not prescribe any treatment

4

unless the full multidisciplinary team agrees that treatment is appropriate, and the patient and the patient's parents fully understand, have the capacity to consent, and sign the informed-consent forms.  This process is intentionally set up to ensure all involved are making an informed, measured decision, from the healthcare providers to the patients and their parents.

12.     Throughout this evaluation information-sharing process, patients are encouraged to avail themselves of the various services offered as part of our multidisciplinary clinic, including pastoral care. The purpose of these services is to get a full picture of a patient's health, wellbeing, household support, and functioning. Each of those data points help determine whether a potential treatment option may be appropriate for any given patient.

13.     Once a patient begins medical treatment, their progress is monitored at regular intervals, typically every six months, to assess the efficacy of the prescribed treatment through a physical examination or laboratory tests. This ongoing monitoring also ensures ongoing evaluation of a patient's mental health and the chance to address any questions the patient or their parents may have.

14.     I understand that Governor Ivey signed the Vulnerable Child Compassion and Protection Act (the "Act").  My understanding is that the Act expressly prohibits physicians, and others, from doing or saying anything that could cause a transgender young person, under age 19, in Alabama to undergo medical

5

treatment for gender dysphoria.  I further understand that violating the Act exposes Alabama healthcare providers and others to criminal prosecution, which could result in a prison sentence or substantial fine.

15.     Puberty-blocking medication and hormone-replacement therapy have greatly improved the physical and mental health and wellbeing of my patients. Denying my patients access to these well-established medical treatments will cause the mental health of many of my patients to regress, including increasing their suicidality and likelihood of attempting suicide.  To cease ongoing care, without a medical basis, would violate my professional, ethical, and legal obligations by forcing me to harm my patient.

16.     In the days since the Act was signed into law, I have met with numerous patients who are experiencing significant psychological distress due to the prospect of the Act going into effect.  One teenage patient was visibly trembling in fear. Parents are regularly calling the clinic in tears.  The uncertainty weighs heavily on the minds of my patients and their parents.  And, for some, their worst fears have already started to materialize: several of my patients have reported to me that their pharmacies are refusing to fill prescriptions relating to the treatment of their gender dysphoria, including for menstrual suppression medications which are supposedly not criminalized by the Act.



20