No. 22-11707

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

## APPELLANTS' APPENDIX VOLUME II OF XIII

Christopher Mills
SPERO LAW LLC
557 East Bay St.,
#22251
Charleston, SC 29451
(843) 606-0640
cmills@spero.law

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
Thomas A. Wilson
  *Deputy Solicitors General*
James W. Davis
  *Deputy Attorney General*
Benjamin M. Seiss
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

July 5, 2022

# INDEX

**TAB**

**VOLUME I**

Civil Docket Sheet ...................................................................................A

Individual Plaintiffs' Complaint (April 19, 2022)......................................1

Order Reassigning Case to Judge Liles C. Burke (April 20, 2022).........................3

Individual Plaintiffs' Motion for Preliminary Injunction (April 21, 2022)..............7

Individual Plaintiffs' Brief in Support of Motion for Preliminary Injunction (April 21, 2022)...............................................................................8

    Exhibit 1 – Declaration of Linda A. Hawkins, Ph.D. ................................... 8-1

    Exhibit 2 – Declaration of Morissa J. Ladinsky, M.D. ................................. 8-2

**VOLUME II**

    Exhibit 3 – Declaration of Stephen M. Rosenthal, M.D. ............................. 8-3

    Exhibit 4 – Declaration of Rev. Paul A. Eknes-Tucker................................ 8-4

    Exhibit 5 – Declaration of Brianna Boe ...................................................... 8-5

    Exhibit 6 – Declaration of James Zoe ......................................................... 8-6

    Exhibit 7 – Declaration of Megan Poe ........................................................ 8-7

    Exhibit 8 – Declaration of Kathy Noe ......................................................... 8-8

    Exhibit 9 – Declaration of Jane Moe, Ph.D. ................................................ 8-9

    Exhibit 10 – Declaration of Rachel Koe, M.D. ......................................... 8-10

Answer of Defendants (April 21, 2022) ..................................................................20

Order Setting Evidentiary Hearing (April 22, 2022) ............................................. 34

United States of America's Motion for Temporary Restraining Order and
Preliminary Injunction (April 29, 2022) ........................................................62

United States of America's Brief in Support of Motion for Temporary
Restraining Order and Preliminary Injunction (April 29, 2022) ................ 62-1

## VOLUME III

Exhibit 1 – Declaration of Armand H. Antommaria, M.D. ........................ 62-2

Defendants' Exhibit List and Notice of Filing of Evidence in Opposition
to Plaintiffs' Motion for Preliminary Injunction (May 2, 2022) ....................69

Exhibit 1 – Alabama Vulnerable Child Compassion and
Protection Act ......................................................... 69-1

Exhibit 2 – Expert Report of James Cantor, Ph.D.,
Clinical Psychologist and Director of Toronto
Sexuality Centre......................................................... 69-2

Exhibit 3 – Expert Report of Michael K. Laidlaw, M.D.,
Endocrinologist......................................................... 69-3

Exhibit 4 – Expert Report of Quentin L. Van Meter, M.D.,
Pediatric Endocrinologist and Associate Professor of
Pediatrics at Emory University................................... 69-4

## VOLUME IV

Exhibit 5 – Expert Report of Paul W. Hruz, M.D., Ph.D.,
Associate Professor of Pediatrics in the Division of Pediatric
Endocrinology and Diabetes at Washington University
School of Medicine................................................... 69-5

Exhibit 6 – Expert Report of Patrick Hunter, M.D.,
Pediatrician, Bioethicist, and Former Chair of the Pediatric
Department at Scotland Memorial Hospital ............................. 69-6

Order Setting Evidentiary Hearing (April 22, 2022) ............................................. 34

United States of America's Motion for Temporary Restraining Order and
    Preliminary Injunction (April 29, 2022) .........................................................62

United States of America's Brief in Support of Motion for Temporary
    Restraining Order and Preliminary Injunction (April 29, 2022) ................ 62-1

**VOLUME III**

    Exhibit 1 – Declaration of Armand H. Antommaria, M.D. ....................... 62-2

Defendants' Exhibit List and Notice of Filing of Evidence in Opposition
    to Plaintiffs' Motion for Preliminary Injunction (May 2, 2022) ....................69

    Exhibit 1 – Alabama Vulnerable Child Compassion and
        Protection Act .......................................................................... 69-1

    Exhibit 2 – Expert Report of James Cantor, Ph.D.,
        Clinical Psychologist and Director of Toronto
        Sexuality Centre......................................................................... 69-2

    Exhibit 3 – Expert Report of Michael K. Laidlaw, M.D.,
        Endocrinologist........................................................................ 69-3

    Exhibit 4 – Expert Report of Quentin L. Van Meter, M.D.,
        Pediatric Endocrinologist and Associate Professor of
        Pediatrics at Emory University................................................. 69-4

**VOLUME IV**

    Exhibit 5 – Expert Report of Paul W. Hruz, M.D., Ph.D.,
        Associate Professor of Pediatrics in the Division of Pediatric
        Endocrinology and Diabetes at Washington University
        School of Medicine.................................................................... 69-5

    Exhibit 6 – Expert Report of Patrick Hunter, M.D.,
        Pediatrician, Bioethicist, and Former Chair of the Pediatric
        Department at Scotland Memorial Hospital ............................. 69-6

Order Setting Evidentiary Hearing (April 22, 2022) ............................................. 34

United States of America's Motion for Temporary Restraining Order and
    Preliminary Injunction (April 29, 2022) ........................................................62

United States of America's Brief in Support of Motion for Temporary
    Restraining Order and Preliminary Injunction (April 29, 2022) ................ 62-1

**VOLUME III**

Exhibit 1 – Declaration of Armand H. Antommaria, M.D. ........................ 62-2

Defendants' Exhibit List and Notice of Filing of Evidence in Opposition
    to Plaintiffs' Motion for Preliminary Injunction (May 2, 2022) ....................69

Exhibit 1 – Alabama Vulnerable Child Compassion and
            Protection Act ......................................................... 69-1

Exhibit 2 – Expert Report of James Cantor, Ph.D.,
            Clinical Psychologist and Director of Toronto
            Sexuality Centre........................................................ 69-2

Exhibit 3 – Expert Report of Michael K. Laidlaw, M.D.,
            Endocrinologist................................................... 69-3

Exhibit 4 – Expert Report of Quentin L. Van Meter, M.D.,
            Pediatric Endocrinologist and Associate Professor of
            Pediatrics at Emory University................................... 69-4

**VOLUME IV**

Exhibit 5 – Expert Report of Paul W. Hruz, M.D., Ph.D.,
            Associate Professor of Pediatrics in the Division of Pediatric
            Endocrinology and Diabetes at Washington University
            School of Medicine.................................................. 69-5

Exhibit 6 – Expert Report of Patrick Hunter, M.D.,
            Pediatrician, Bioethicist, and Former Chair of the Pediatric
            Department at Scotland Memorial Hospital............................. 69-6

Exhibit 7 – Expert Report of Dianna Kenny, Ph.D.,
           Psychotherapist and Former Professor of Psychology at
           University of Sydney ................................................................. 69-7

**VOLUME V**

Exhibit 8 – Stephen B. Levine, E. Abbruzzese & Julia M. Mason,
           *Reconsidering Informed Consent for Trans-Identified
           Children, Adolescents, and Young Adults*,
           J. OF SEX & MARITAL THERAPY (Mar. 17, 2022) ....................... 69-8

Exhibit 9 – *Evidence Review: Gonadotropin Releasing Hormone
           Analogues for Children and Adolescents with Gender
           Dysphoria*, Nat'l Inst. for Health & Care Excellence (NICE)
           (Mar. 11, 2021) ....................................................................... 69-9

**VOLUME VI**

Exhibit 10 – *Evidence Review: Gender-Affirming Hormones for
            Children and Adolescents with Gender Dysphoria*,
            Nat'l Inst. for Health & Care Excellence (NICE) (Mar. 11,
            2021) ...................................................................................... 69-10

Exhibit 11 – Sweden National Board of Health and Welfare Policy
            Statement, Socialstyrelsen, *Care of Children and
            Adolescents with Gender Dysphoria: Summary* (2022) .......... 69-11

Exhibit 12 – Finland's Council for Choices in Healthcare Policy
            Statement, Palveluvalikoima, *Recommendation of the
            Council for Choices in Health Care in Finland (PALKO /
            COHERE Finland)* ................................................................. 69-12

Exhibit 13 – Académie Nationale de Médecine, *Medicine and Gender
            Transidentity in Children and Adolescents* (Feb. 25, 2022).... 69-13

Exhibit 14 – The Royal Australian & New Zealand College of
            Psychiatrists, *Recognising and Addressing the Mental
            Health Needs of People Experiencing Gender Dysphoria /
            Gender Incongruence*, Position Statement 103 (Aug. 2021) .. 69-14

Exhibit 15 – *Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.*
[2020] EWHC (Admin) 3274 ................................................. 69-15

**VOLUME VII**

Exhibit 16 – Centers for Medicare & Medicaid Services, Tamara Syrek
Jensen, et al., *Decision Memo for Gender Dysphoria and
Gender Reassignment Surgery* (CAG-00446N)
(Aug. 30, 2016) ...................................................................... 69-16

Exhibit 17 – Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL
MANUAL OF MENTAL DISORDERS (5th ed. 2013)
(excerpts) .............................................................................. 69-17

Exhibit 18 – World Professional Ass'n for Transgender Health
(WPATH), *Standards of Care for the Health of
Transsexual, Transgender, and Gender-Conforming
People* (7th Version) (2012) (pp. 1-112) ................................ 69-18

**VOLUME VIII**

Exhibit 18 (cont.) – World Professional Ass'n for Transgender Health
(WPATH), *Standards of Care for the Health of
Transsexual, Transgender, and Gender-Conforming
People* (7th Version) (2012) (pp. 113-120) ............................ 69-18

Exhibit 19 – Wylie C. Hembree et al., *Endocrine Treatment of Gender-
Dysphoric/Gender-Incongruent Persons: An Endocrine
Society Clinical Practice Guidelines*, 102 J. CLINICAL
ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017).............. 69-19

Exhibit 20 – Lisa Littman, *Parent Reports of Adolescents & Young
Adults Perceived to Show Signs of a Rapid Onset of Gender
Dysphoria*, PLOS ONE 13(8):e0202330 ................................. 69-20

Exhibit 21 – Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR No. 50, 3353-54 (Oct. 2021) ........................................................................... 69-21

Exhibit 22 – Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, J. OF HOMOSEXUALITY (Apr. 30, 2021)............................................ 69-22

Exhibit 23 – Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696-704 (Oct. 2014).......................... 69-23

Exhibit 24 – Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 PEDIATRICS no. 4 (Oct. 2018) ......................................... 69-24

Exhibit 25 – Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 832 (Dec. 2015).................................. 69-25

Exhibit 26 – Declaration of Corinna Cohn  .............................................. 69-26

Exhibit 27 – Declaration of Sydney Wright  ............................................. 69-27

Exhibit 28 – Declaration of Carol Frietas  ................................................ 69-28

Exhibit 29 – Declaration of Barbara F.  .................................................... 69-29

Exhibit 30 – Declaration of John Doe ...................................................... 69-30

Exhibit 31 – Declaration of John Roe ...................................................... 69-31

## VOLUME IX

Exhibit 32 – Declaration of Kristine W.  .................................................. 69-32

Exhibit 33 – Declaration of Yaacov Sheinfeld  ........................................ 69-33

Exhibit 34 – Declaration of Martha S. ...................................................... 69-34

Exhibit 35 – Declaration of KathyGrace Duncan ..................................... 69-35

Exhibit 36 – Declaration of Jeanne Crowley ............................................ 69-36

Exhibit 37 – Declaration of Ted H. Halley ................................................ 69-37

Exhibit 38 – Declaration of Kellie C. ....................................................... 69-38

Exhibit 39 – Declaration of Gary Warner ................................................. 69-39

Exhibit 40 – April 15, 2022 emails regarding *Ladinsky v. Ivy*
      litigation.................................................................... 69-40

Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary
      Injunction (May 2, 2022) ...................................................................74

**VOLUME X**

UAB Patient Information and Consent Form (May 3, 2022) .......................... 78-41

Defendants' Notice of Filing Corrected Exhibit 41 (May 3, 2022)........................87

Exhibit 1 – Corrected Exhibit 41 – Sydney Wright, *I Spent a Year as a
      Trans Man. Doctors Failed Me at Every Turn*, DAILY
      SIGNAL (Oct. 7, 2019). ............................................................. 87-1

Amended Intervenor Complaint (May 4, 2022) ....................................................92

Procedural Orders and Status of Forthcoming Opinion (May 8, 2022) .................94

Transcript of Preliminary Injunction Hearing - Volume I (pp. 1-149)
      (May 5, 2022) ...............................................................................104

**VOLUME XI**

Transcript of Preliminary Injunction Hearing – Volume I (cont.) (pp.195-206)
      (May 5, 2022) ............................................................................. 104

Transcript of Preliminary Injunction Hearing - Volume II (May 6, 2022) ..........105

**VOLUME XII**

Transcript of Preliminary Injunction Hearing - Volume I (pp. 150-170)
(May 5, 2022) (SEALED) .............................................................106

**VOLUME XIII**

Opinion and Order (May 13, 2022) .......................................................107

Defendants' Notice of Appeal of Order Granting Preliminary Injunction
(May 16, 2022) ...................................................................108

Notice of Correction re: Opinion and Order (May 19, 2022) ..............................112

Corrected Opinion and Order (May 19, 2022) ................................................ 112-1

Transcript of Preliminary Injunction Hearing - Volume I (cont.) (pp. 170-94)
(May 5, 2022) ...................................................................129

Certificate of Service

# DOC. 8-3

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.

     *Plaintiffs*,

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County.

     *Defendants*.

Civil Action No.
2:22-cv-184-LCB

**DECLARATION OF
STEPHEN
ROSENTHAL, MD, IN
SUPPORT OF
PLAINTIFFS' MOTION
FOR TEMPORARY
RESTRAINING ORDER
& PRELIMINARY
INJUNCTION**

I, Stephen M. Rosenthal, M.D., declare as follows:

1.      I submit this expert declaration based upon my personal knowledge.

2.      If called to testify in this matter, I would testify truthfully based on my expert opinion.

## Qualifications and Experience

3.      I am a pediatric endocrinologist and have been practicing medicine for over forty years. I received my medical degree from Columbia University, College of Physicians & Surgeons, in 1976, and completed a residency in Pediatrics there. I also completed a fellowship in Pediatric Endocrinology at the University of California, San Francisco ("UCSF").

4.      In 2012, I co-founded the Child & Adolescent Gender Center ("CAGC") at UCSF. I am the Medical Director at the Center, as well as a Professor of Clinical Pediatrics at UCSF. A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

5.      The Child and Adolescent Gender Center (CAGC) is a multidisciplinary program that provides comprehensive medical and mental health care, as well as education and advocacy services for transgender youth and adolescents. Since 2012, the CAGC has seen close to 2,000 transgender young people with gender dysphoria, with an average of 15-20 new patients per month, ranging in age from 3 to 25 years old. As Medical Director of the CAGC, I oversee

the medical portion of the multidisciplinary program, which currently includes two other physicians, a doctor of nursing practice, one psychologist, a clinical social worker, nursing, and administrative staff.

6.      As of the date of this declaration, I have published 27 scientific research papers in leading peer-reviewed medical journals and authored seven chapters in authoritative textbooks on the topic of medical treatment for gender dysphoria in children and adolescents. Those publications include "Challenges in the Care of Transgender and Gender-Diverse Youth: An Endocrinologist's View," published in Nature Reviews Endocrinology[1] on August 10, 2021, "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," a guide detailing the standard of medical care for gender dysphoria, and a chapter in the forthcoming standards of care being developed by WPATH. A listing of my publications is included in my Curriculum Vitae in **Exhibit A**.

7.      I am also actively serving as a Principal Investigator or Co-Investigator on numerous research projects on the physical and mental health of transgender young people, including a national multi-site study on medical care for transgender young people funded by the NIH.

---

[1] Nature Reviews Endocrinology received an impact factor of 43.33 for the 2021-2022 publication year.

8.    I am a member and recent past president (2016-2017) of the Pediatric Endocrine Society and, as of March, 2021, have just completed a three-year term as a member of the Board of Directors for the Endocrine Society, and one-year term as Endocrine Society Vice President, Clinical Scientist Position. I am also an elected member of the Board of Directors of the World Professional Association for Transgender Health ("WPATH"), an international multidisciplinary professional association founded in 1979 to promote evidence-based care, education, research, advocacy, public policy and respect in transgender health. A complete list of my professional associations is included in my Curriculum Vitae in **Exhibit A**.

9.    In addition to my work with transgender children and adolescents, I have treated children and adolescents with differences of sex development ("DSD"), commonly referred to as intersex conditions, as well as with a variety of other endocrine conditions, including growth disorders, pubertal disorders, and diabetes. I previously served as Program Director for Pediatric Endocrinology, Director of the Endocrine Clinics, and Co-Director of the Disorders of Sex Development Clinic, a multi-disciplinary program involving pediatric endocrinology, pediatric urology, psychiatry, and social work at UCSF Benioff Children's Hospital.

10.    My opinions contained in this declaration are based on: (i) my clinical experience as a pediatric endocrinologist treating transgender patients, including adolescents and young adults; (ii) my knowledge of the peer-reviewed research,

including my own, regarding the treatment of gender dysphoria, which reflects the clinical advancements in the field of transgender health; and (iii) my review of the expert declaration of Linda A. Hawkins, Ph.D., M.S.Ed., LPC ("Dr. Hawkins Decl.") submitted in support of the motions. I generally rely on these types of materials when I provide expert testimony, and they include the documents specifically cited as supportive examples in particular sections of this declaration. The materials I have relied on in preparing this declaration are the same type of materials that experts in my field of study regularly rely upon when forming opinions on the subject.

11.    I was provided with and reviewed the following case-specific materials: the Dr. Hawkins Decl.

12.    In the past four years, I have not provided expert testimony.

13.    I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $350 per hour for any review of records, preparation of reports or declarations. I will be compensated with a day rate (6 hours) of $2,100 for deposition and trial testimony. My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

### Scientific and Medical Understanding of Sex

14.    By the beginning of the twentieth century, scientific research had established that external genitalia alone are not always an accurate indicator of a person's sex. Instead, a person's sex is comprised of several components, including,

among others, internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics. Diversity and incongruence in these components of a person's sex are a naturally occurring source of human biological diversity.

15.     Scientific research and medical literature across disciplines demonstrate each component of sex has strong biological ties, including gender identity. For example, there are numerous studies detailing similarities in the brain structure and function of transgender and nontransgender people with the same gender identity. In one such study, the volume of the bed nucleus of the stria terminalis (a collection of cells in the central brain) in transgender women was equivalent to the volume found in nontransgender women. There are also studies highlighting the genetic components of gender identity. A study of identical twins found that if one twin was transgender that the other twin was far more likely to be transgender, as compared to the general population.

16.     The above studies are representative examples of the growing body of scientific research and medical literature in this area of study. There is also ongoing research on the effects of the hormonal milieu in utero, and genetic sources for gender identity, among others.

17.     Although the specific determinants of gender identity remain unknown, treatment to bring a person's physical characteristics into alignment with their

gender identity is widely accepted as the standard in medical practice.

### Determination of an Individual's Sex

18.    At birth, newborns are assigned a sex, either male or female, typically based solely on the appearance of their external genitalia. For most people, that assignment turns out to be accurate and their assigned sex matches that person's gender identity. However, for transgender people, their assigned sex does not align with their gender identity. This lack of alignment can create significant distress for transgender individuals.

19.    When there is a divergence between these factors, medical science and the well-established standards of care recognize that treating a person consistent with their gender identity—and prescribing medical treatment to align their body with their gender identity—is essential to that person's health and wellbeing.

20.    Gender identity is a person's inner sense of belonging to a particular gender, such as male or female. It is a deeply felt and core component of human identity. Everyone has a gender identity. Children usually become aware of their gender identity early in life.

21.    A person's gender identity is innate, cannot be voluntarily changed, and is not undermined by the existence of other sex-related characteristics that do not align with it.

22.    Any attempts to "cure" transgender individuals by forcing their gender

identity into alignment with their assigned sex are harmful, dangerous, and ineffective. Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as WPATH, the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association.

23.    For more than four decades, the goal of medical treatment for transgender patients has been to alleviate their distress by bringing their lives into closer alignment with their gender identity. The specific treatments prescribed are based on individualized assessment conducted by medical providers in consultation with the patient's treating mental health provider. As discussed in more detail in the following section, and in the declaration of Dr. Hawkins, research and clinical experience have consistently shown those treatments to be safe, effective, and critical to the health and well-being of transgender patients.

**Standards of Care for the Treatment of Gender Dysphoria**

24.    Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of "gender dysphoria," a serious condition listed in both the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and the World Health Organization's International Classification of Diseases ("ICD-10"), and has been

recognized as such for decades. It is a condition that affects a small percentage of youth and adults.

25.     Gender dysphoria is the diagnostic term for the clinically significant distress resulting from the incongruence between a person's gender identity and the sex they are assigned at birth. In order to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment.

26.     Gender dysphoria is highly treatable and can be effectively managed. If left untreated, however, it can result in severe anxiety and depression, self-harm, and suicidality. Spack NP, Edwards-Leeper L, Feldmain HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012; 129(3):418-425. Olson KR, Durwood L, DeMeules M, McLaughlin KA. Mental health of transgender children who are supported in their identities. *Pediatrics*. 2016; 137:1-8.

27.     The prevailing standards of care for the treatment of gender dysphoria are developed by WPATH, which has been recognized as the standard-setting organization for the treatment of gender dysphoria for more than forty years.

28.     The Endocrine Society is a 100-year-old global membership organization representing professionals in the field of adult and pediatric endocrinology. In 2017, the Endocrine Society published its second clinical practice

guidelines on treatment recommendations for the medical management of gender dysphoria, in collaboration with Pediatric Endocrine Society, the European Societies for Endocrinology and Pediatric Endocrinology, and WPATH, among others. Hembree WC, Rosenthal SM, et al. Endocrine Treatment of Gender Dysphoria/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *J Clin Endocrinol Metab* 2017; 102: 3869–3903.

29.    Together, the SOC and the Endocrine Society's clinical practice guidelines constitute the prevailing standards guiding the healthcare and treatment of gender dysphoria. The process for writing those standard-setting documents followed well-established methods for developing standards of care, beginning with the convening a core group of experts in the relevant field(s) who are tasked with conducting a comprehensive literature review and preparing a draft document. That draft is then circulated to a larger cross-section of practitioners in the relevant field(s) for review and comment, much like the peer-review process for journals. Those edits and comments are incorporated and compiled into a final document that is reviewed and ratified in a manner consistent with the organization's bylaws. As a result, the SOC and the Endocrine Society's clinical practice guidelines reflect the consensus of experts in the field of transgender medicine, based on the best available science and clinical experience.

30.    The major professional associations of medical and mental health providers in the United States, including the American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Psychological Association, and Pediatric Endocrine Society, treat those documents as the prevailing standards guiding the healthcare and treatment of gender dysphoria.

31.    Those documents help ensure that healthcare providers, especially those unfamiliar with transgender medicine, know which treatments are safe and effective for the treatment of gender dysphoria, and are able to deliver that necessary medical care to maximize their patients' overall health and wellbeing.

**Transition and Medical Treatments for Gender Dysphoria**

32.    Undergoing treatment to alleviate gender dysphoria is commonly referred to as a transition. The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and hormone-replacement therapy; and (iii) surgical transition, including surgeries to alter the appearance and functioning of primary- and secondary-sex characteristics.

33.    The steps that make up a person's transition will depend on that individual's medical and mental health needs, as well as the person's stage of pubertal development.

34.     Dr. Hawkins provides an extensive discussion of social transition in her expert declaration. (Dr. Hawkins Decl. at ¶¶ 26–31.) My declaration will discuss the medications and surgical care used to treat gender dysphoria.

35.     There are no drug interventions for gender dysphoria until after the onset of puberty. Medical providers evaluate a patient's level of pubertal development through a physical examination and testing the hormone levels in the patient's blood. Once a provider has determined that a transgender patient has begun puberty, the patient may be prescribed puberty-blocking medications.

36.     Those medications work by temporarily pausing endogenous puberty and, therefore, limiting the influence of a person's endogenous sex hormones on their body. For example, a transgender girl (someone designated male at birth with a female gender identity) will experience no progression of physical changes caused by testosterone, including facial and body hair, an Adam's apple, a deepened voice, or masculinized facial structures. And in a transgender boy (someone designated female at birth with a male gender identity), those medications would prevent progression of breast development, menstruation, and widening of the hips. This prevents a transgender adolescent from experiencing the severe psychological distress of developing permanent, unwanted physical characteristics that do not align with the adolescent's gender identity.

37.    Temporarily halting a transgender adolescent's pubertal development can also obviate the need for future surgical treatments to address any ongoing gender dysphoria. Avoiding the scarring associated with surgery—and the added stresses of surgery itself—further improve a transgender person's overall health and wellbeing.

38.    A transgender adolescent will remain on those puberty-blocking medications until their providers determine, in consultation with the patient, the patient's family, and consistent with the prevailing standards of care, whether additional medical treatment is necessary to treat their gender dysphoria. If the decision is to stop taking puberty blockers, the patient's endogenous puberty will resume.

39.    For many transgender youth, it is medically necessary for them to begin hormone-replacement therapy with either testosterone or estrogen. That treatment induces the physical changes of the puberty associated with the patient's gender identity. The result of this treatment is that a transgender boy has the same typical levels of circulating testosterone as his nontransgender male peers. Similarly, a transgender girl will have the same typical levels of circulating estrogen as her nontransgender female peers. Those hormones cause transgender adolescents to undergo the same significant and permanent sex-specific physical changes as their nontransgender peers. For example, a transgender boy will develop a lower voice as

well as facial and body hair, while a transgender girl will experience breast growth, female fat distribution, and softer skin.

40.    If a transgender youth who is on puberty blockers and hormone-replacement therapy ceases these medications, the production of endogenous hormones and puberty consistent with the individual's birth sex will resume.

41.    Puberty-delaying medication and hormone-replacement therapy—both individually and in combination—also significantly improve a transgender young person's mental health because those medications ensure their physical appearance more closely aligns with their gender identity. This also decreases the likelihood that a transgender young person will be incorrectly identified with their birth sex, further alleviating their gender dysphoria and bolstering the effectiveness of their social transition.

42.    The puberty-delaying medications that are used for treating transgender children are the same medications that have been used for decades and are continued to be used to treat a condition in children often referred to as "precocious puberty," a condition that causes a child's body to begin pubertal development too early. In other words, the hormone therapy used to treat transgender adolescents is often used to treat non-transgender adolescents for other medical reasons.

43.    Social transition and hormone therapy are often sufficient to treat gender dysphoria for many transgender people.

44.    Based on my clinical experience, there are transgender young people for whom getting on puberty blockers and hormones before the age of majority will reduce the likelihood of their needing surgical intervention later in life relating to gender dysphoria.

45.    Further, recent studies have observed findings that gender-affirming hormone therapy usage is significantly related to lower rates of depression and suicidality among transgender youth. Green AE et al. Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. *J Adolescent Health* 1-7 (2021); Turban JL et al. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS ONE 17(1) 2021; https://doi.org/10.1371/journal. pone.0261039.

46.    For transgender people who require surgery to treat their gender dysphoria, the SOC do not recommend surgical treatment until the age of majority, except for male chest reconstruction surgery. Like any other treatment, the medical necessity of surgical procedures to treat gender dysphoria is based on an individualized assessment of the patient's needs.

**Assessing Medical Necessity of Medical Treatment for Gender Dysphoria**

47.    As with the initial diagnosis of gender dysphoria, determining whether a particular treatment is medically necessary for a transgender patient follows a

thorough, well-established process that requires healthcare providers to exercise professional judgment. Contrary to what some believe, prescriptions for puberty-blocking medication and hormone-replacement or referrals for surgery are not made on a whim. Every step of a transgender patient's treatment and care is planned out in consultation with the patient's care team, which includes both medical and mental health providers.

48.    Prior to considering starting a course of puberty-blockers or hormone-replacement therapy, a transgender patient undergoes an extensive assessment by a mental health provider. The purpose of that assessment is three-fold: (1) obtaining a complete picture of the patient's mental health, including whether the patient has gender dysphoria; (2) determine the patient's psychological readiness to begin the contemplated treatment; and (3) provide the patient and their family the information they need to make an informed decision about whether to proceed with the treatment. If, after that assessment, the mental health provider determines that the patient should be considered for the contemplated treatment, that professional opinion is documented in a letter to the patient's medical provider.

49.    The medical provider then conducts their own separate assessment of the patient, including a physical examination and any necessary laboratory testing. In addition to determining the medical necessity of the contemplated treatment and a patient's medical readiness for that treatment, the medical provider will also

discuss the risks, benefits, and alternatives for the contemplated treatment. Medical providers also discuss with parents that the medications are being prescribed for an off-label use, which is particularly common for medications being used in pediatric patients. That discussion occurs with the patient and their family to ensure that everyone involved in the decision-making process has the information they need to make an informed decision.

50.    Once the medical provider has finished addressing any questions or concerns raised by the patient and family, the parents/legal guardians and the patient are provided with a detailed informed consent/assent form that outlines in writing the information the medical provider reviewed with them. The patient and family are encouraged to carefully review that paperwork and sign if they choose to consent/assent to treatment.

51.    It is only at the end of that intensive assessment and informed-consent process that a patient is prescribed a particular medical treatment for gender dysphoria.

**Medical Treatment for Gender Dysphoria is Evidence-Based Medicine**

52.    Research and clinical experience repeatedly reaffirm that transition significantly improves the mental and physical health of transgender young people.

53.    This is true of each stage of a transgender young person's transition. Transgender young people who underwent a social transition in childhood

demonstrated better mental health profiles than prior studies of gender nonconforming children. *See* Lily Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. of Child & Adol. Psychiatry 116 (2017); Kristina Olson, et al., *Mental Health of Transgender Children who are Supported in Their Identities*, 137 Pediatrics 1 (2016). This same outcome has also been seen in a longitudinal study of transgender young people who underwent each of the three stages of transition outlined above. Annelou L.C. de Vries, et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014). In a study specifically about male chest reconstruction surgery, post-operative transgender young people demonstrated significant psychological and functional improvements, from a greater willingness to plan for their future and to engage activities of daily living (e.g., bathing, buying clothing). Johanna Olson-Kennedy, et al., *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults Comparisons of Nonsurgical and Postsurgical Cohorts*, 172 JAMA Pediatrics 431, 434 (2018)

54.   Transition also can—and often does—alleviate co-occurring mental health issues a transgender young person experienced prior to transition. Following transition, transgender young people typically see significant improvements in functioning and quality of life. Treating their gender dysphoria also increases a

transgender young person's capacity to develop and maintain better coping strategies to manage any co-occurring conditions.

55.    Conversely, delaying or denying transgender young people safe and effective treatment for gender dysphoria—as contemplated by the wait-and-see approach—can have severe consequences on their physical and mental health. Without those medically necessary treatments, transgender young people are likely to develop serious co-occurring mental health conditions (*i.e.* anxiety, depression, suicidality) that will interfere with their ability to learn and impede their psychosocial development.

## Conclusion

56.    Alabama's law criminalizing the provision of medical treatment for gender dysphoria is contrary to well-established standards of care, peer-reviewed medical literature, and clinical experience. Medical care for transgender young people in Alabama would be guided by fear of criminal penalty, forcing medical providers to abandon their professional and ethical obligations to follow the prevailing standards of care when treating patients with gender dysphoria.

57.    Contrary to its stated purpose, this bill will endanger the health and wellbeing of transgender young people experiencing gender dysphoria by creating significant barriers to their receiving medically necessary care. The lack of access to

that time-sensitive care will have lifelong implications for their quality of life and their ability to effectively treat their gender dysphoria.

This declaration was executed this 19th day of April, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _Stephen M. Rosenthal_

Stephen M. Rosenthal, M.D.

# EXHIBIT A

Prepared: May 26, 2020

## University of California, San Francisco
# CURRICULUM VITAE

**Name:**       Stephen M Rosenthal, MD

**Position:**   Recalled Faculty
Pediatrics
School of Medicine

**Address:**    Mission Hall, Box 0434
550 16th Street, 4th Floor
University of California, San Francisco
San Francisco, CA 94143
Voice: 415-476-2266
Fax: 415-476-5356
Email: Stephen.Rosenthal@ucsf.edu

## EDUCATION

| | | | |
|---|---|---|---|
| 1968 - 1972 | Yale University | BA | Psychology |
| 1972 - 1976 | Columbia University, Colege of Physicians & Surgeons | MD | |
| 1976 - 1977 | Columbia University, Presbyterian Hospital | Intern | Pediatrics |
| 1977 - 1979 | Columbia University, Presbyterian Hospital | Resident | Pediatrics |
| 1979 - 1982 | University of California, San Francisco | Fellow | Pediatric Endocrinology |

## LICENSES, CERTIFICATION

| | |
|---|---|
| 1980 | Medical License, California, #G42045 |
| 1982 | American Board of Pediatrics |
| 1983 | American Board of Pediatric Endocrinology |

## PRINCIPAL POSITIONS HELD

| | | | |
|---|---|---|---|
| 1982 - 1983 | University of California, San Francisco | Instructor | Pediatrics |
| 1983 - 1992 | University of California, San Francisco | Assistant Professor in Residence | Pediatrics |
| 1992 - 1998 | University of California, San Francisco | Associate Professor in Residence | Pediatrics |

Prepared: May 26, 2020

| 1998 - 2012 | University of California, San Francisco | Professor in Residence | Pediatrics |
| 2012 - present | University of California, San Francisco | Professor of Clinical Pediatrics | Pediatrics |

**OTHER POSITIONS HELD CONCURRENTLY**

| 2006 - 2015 | University of California, San Francisco | Director, Pediatric Endocrine Outpatient Services | Pediatrics |
| 2008 - 2011 | University of California, San Francisco | Associate Program Director, Pediatric Endocrinology | Pediatrics |
| 2008 - 2018 | University of California, San Francisco | Pediatric Endocrine Director, Disorders of Sex Development (DSD) Clinic | Pediatrics |
| 2011 - present | University of California, San Francisco | Medical Director, Child & Adolescent Gender Center | Pediatrics |
| 2012 - 2015 | University of California, San Francisco | Program Director, Pediatric Endocrinology | Pediatrics |

**HONORS AND AWARDS**

| 2011 | Nominated for the Chancellor's Award for Gay, Lesbian, Bisexual, and/or Transgender Leadership for a faculty member | University of California, San Francisco |
| 2012 | Nominated for the Chancellor's Award for Gay, Lesbian, Bisexual, and/or Transgender Leadership for a faculty member | University of California, San Francisco |
| 2012 | Family Advisory Council Caring Tree Award | UCSF Benioff Children's Hospital |
| 2013 | Chancellor's Award for Gay, Lesbian, Bisexual, and Transgender (GLBT) Leadership in the faculty category | University of California, San Francisco |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 2014 | Haile T. Debas Academy of Medical Educators Excellence in Teaching Award | University of California, San Francisco |
| 2018 | Harry Benjamin Lectureship, World Professional Association for Transgender Health, for significant contributions to the field of transgender health through research, healthcare provision and medical education | World Professional Association for Transgender Health |

**KEYWORDS/AREAS OF INTEREST**

Biology of gender, transgender, Disorders of Sex Development (DSD),  Insulin-like Growth Factors (IGFs), neuroblastoma, water balance disorders, Type 1 Diabetes, medical education, fellowship training.

## CLINICAL ACTIVITIES

**CLINICAL ACTIVITIES SUMMARY**

I currently serve as Medical Director, Child and Adolescent Gender Center, a UCSF/ Community partnership designed to provide multidisciplinary services for pediatric and adolescent gender nonconforming/ transgender patients.  I have served as Pediatric Endocrine Director, Disorders of Sex Development (DSD) monthly clinic, a multi-disciplinary program involving Pediatric Endocrinology, Pediatric Urology, Psychiatry, and Social Work.  I currently Attend in the out-Patient clinics:  Currently, 2 clinics/ week.

## PROFESSIONAL ACTIVITIES

**MEMBERSHIPS**

1983 - present   The Endocrine Society

1983 - present   The Pediatric Endocrine Society (formerly known as the Lawson Wilkins Pediatric Endocrine Society)

1983 - 2000   Western Society for Pediatric Research

1986 - present   The Society for Pediatric Research

2011 - present   World Professional Association for Transgender Health (WPATH)

**SERVICE TO PROFESSIONAL ORGANIZATIONS**

| | | |
|---|---|---|
| 1990 - 1993 | Pediatric Endocrine Society | Member, Organizing Committee for the Combined Lawson Wilkins Pediatric Endocrine Society and the European Endocrine Society IV International Meeting |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 1999 - 1999 | Society for Insulin-like Growth Factor Research | Member, Scientific Planning Committee, 5th International Symposium on Insulin-Like Growth Factors, Brighton, UK |
| 2000 - 2005 | Pediatric Endocrine Society | Member, Drug and Therapeutics Committee |
| 2002 - 2005 | The Endocrine Society | Member, Special Programs Committee |
| 2003 - 2004 | Pediatric Endocrine Society | Chair, Drug and Therapeutics Committee |
| 2005 - 2008 | The Endocrine Society | Member, Science and Educational Programs Core Committee |
| 2006 - 2006 | Eli Lilly Co. | Member, National Growth Hormone Clinical Physicians Advisory Panel |
| 2007 - 2013 | Pediatric Endocrine Society | Member, Ethics Committee |
| 2007 - 2007 | Pediatric Endocrine Society, Growth Hormone Research Society, and European Society of Pediatric Endocrinology | Member, Consensus Workshop Committee on Diagnosis and Management of Idiopathic Short Stature |
| 2008 - present | The Endocrine Society | Abstract Reviewer/Grader |
| 2008 - 2011 | The Endocrine Society | Member, Annual Meeting Steering Committee |
| 2009 - 2009 | Pediatric Endocrine Society and European Society of Pediatric Endocrinology | Abstract Reviewer/Grader |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 2009 - 2011 | The Endocrine Society | Team Leader, Annual Meeting Steering Committee |
| 2010 - 2013 | Pediatric Endocrine Society | Elected to Board of Directors |
| 2012 - 2012 | The Endocrine Society | ENDO 2012 Presidential Poster Competition Judge |
| 2012 - 2015 | Pfizer, Inc. | Review Committee: ASPIRE Young Investigator Awards in Endocrine Research |
| 2012 - 2015 | The Endocrine Society | Member, Clinical Endocrine Education Committee |
| 2012 - present | Pediatric Endocrine Society | Member, Honors Committee |
| 2013 - 2017 | Pediatric Endocrine Society | Member, Maintenance of Certification Committee |
| 2014 - 2017 | Endocrine Society and Pediatric Endocrine Society | Official representative of Pediatric Endocrine Society to Endocrine Society's Clinical Practice Guidelines Revision Task Force for the Care of Transgender Individuals |
| 2015 - 2016 | Pediatric Endocrine Society | President-elect |
| 2016 - 2017 | Pediatric Endocrine Society | President |
| 2017 - 2018 | Pediatric Endocrine Society | Immediate Past President |
| 2017 - 2018 | Pediatric Endocrine Society | Chair, Honors and Awards Committee |
| 2018 - 2019 | Endocrine Society | Vice President, Clinical Scientist Position |

Prepared: May 26, 2020

| 2019 - present | Endocrine Society | Member, Board of Directors |

## SERVICE TO PROFESSIONAL PUBLICATIONS

| 1986 - present | Reviewer, Journal of Clinical Endocrinology and Metabolism |
| 1987 - present | Reviewer, Endocrinology |
| 1991 - 1993 | Reviewer, DNA and Cell Biology |
| 1991 - 2000 | Reviewer, Life Sciences |
| 1992 - present | Reviewer, Diabetes |
| 1993 - 2008 | Reviewer, Cancer Research |
| 1994 - present | Reviewer, Molecular Endocrinology |
| 1995 - present | Reviewer Journal of Cell Physiology |
| 1996 - 2000 | Reviewer, Journal of Cell Biology |
| 1998 - 2008 | Reviewer, Journal of Biological Chemistry |
| 2006 - present | Reviewer, Journal of Pediatric Endocrinology and Metabolism |
| 2010 - present | Reviewer, International Journal of Pediatric Endocrinology |
| 2015 - 2018 | Associate Editor, Transgender health |
| 2015 - present | Editorial Board Member, International Journal of Transgenderism |

## INVITED PRESENTATIONS - INTERNATIONAL

| 1984 | 7th International Congress of Endocrinology, Quebec, Canada | Lecture |
| 1985 | Symposium "Therapeutic Agents Produced by Genetic Engineering: Quo Vadis? - The Example of Growth Hormone and Its Releasing Factor", Toulouse, France, | Invited lectures (2) |
| 1985 | 28 emes Journees Internationales Henri-Pierre Klotz D'Endocrinologie Clinique, Paris, France | Invited lecture |
| 1986 | 1st International Congress of Neuroendocrinology, San Francisco | Invited lecture |
| 1988 | GRF Symposium, Sanofi Group, Paris, France | Invited lecture |
| 1990 | Serono Symposium "Major Advances in Human Female Reproduction", Rome, Italy | Invited lecture and Session chair |
| 1990 | 3rd International Symposium on Molecular and Cellular Biology of Insulin and IGFs, Gainesville, FL | Poster |
| 1991 | 2nd International Symposium on Insulin-Like Growth Factors/Somatomedins, San Francisco, | Posters (2) |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 1992 | 9th International Congress of Endocrinology, Nice, France | Poster |
| 1993 | 4th International Symposium on Insulin, IGFs, and Their Receptors, Marine Biological Laboratory, Woods Hole, MA | Poster |
| 1993 | LWPES/ESPE Fourth Joint Meeting, San Francisco, CA | lecture, Poster, & Session chair |
| 1994 | The Third International Symposium on Insulin-Like Growth Factors, Sydney, Australia | Invited lecture |
| 1994 | AgResearch, Hamilton, New Zealand (lecture title: "Insulin-like Growth factors and Skeletal Muscle Differentiation") | Invited lecture and Visiting Professor |
| 1994 | Jacques Ducharme Annual Lectureship, University of Montreal, Canada | Invited lecture |
| 1995 | 5th International Symposium on Insulin and IGFs, Gainesville, FL | Poster |
| 1996 | 10th International Congress of Endocrinology, San Francisco, CA | Platform |
| 1997 | 5th Joint Meeting of the European Society for Pediatric Endocrinology and the Lawson Wilkins Pediatric Endocrine Society, Stockholm, Sweden | Platform |
| 1997 | 4th International Symposium on Insulin-like Growth Factors, Tokyo, Japan | Platform |
| 1999 | 5th International Symposium on Insulin-like Growth Factors, Brighton, UK | Platform, Session chair, Member, Scientific Planning Committee |
| 2000 | Symposium Medicus Conference on Adolescent Medicine, Ixtapa, Mexico | Invited lectures (3) |
| 2001 | 6th Joint Meeting of the European Society for Pediatric Endocrinology and the Lawson Wilkins Pediatric Endocrine Society, Montreal, Canada | Platform |
| 2001 | William Soler Children's Hospital, Havana, Cuba | Invited lecture and Visiting Professor |
| 2002 | First Joint Symposium GH-IGF 2002, Boston, MA | Platform |
| 2002 | 2nd Cuban Symposium on Immunology of Diabetes, Havana, Cuba | Invited lecture |

Prepared: May 26, 2020

| 2005 | Canadian Society of Endocrinology and Metabolism and Canadian Diabetes Association Annual Meeting, Edmonton, Alberta, Canada, (Pediatric Symposium on: Activating Mutations: Genetic Basis and Therapeutic Implications) | Invited lecture |
|---|---|---|
| 2006 | 38th International Symposium: GH and Growth Factors in Endocrinology and Metabolism, Granada Spain, ["Hot Topics" session: Lecture title: "Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD): A Paradigm for Activating Mutations Causing Endocrine Dysfunction] | Invited lecture |
| 2006 | Sanofi-Aventis, Paris, France, (Lecture title: "Potential Use of Selective V2 Vasopressin Receptor Antagonists as Inverse Agonists in the Treatment of Nephrogenic Syndrome of Inappropriate Antidiuresis") | Invited lecture |
| 2006 | Primary Insulin-like Growth Factor-I Deficiency (IGFD) International Advisory Board Meeting, Tercica, Inc., San Francisco, CA, | Invited speaker |
| 2007 | 1er Simposio Argentino Noditropin Simplex en Endocrinologia Pediatrica, Punta del Este, Uruguay, ( Lecture titles: "Primary IGF-I Deficiency"; and "Activating Mutations of the V2 Vasopressin Receptor") | Invited Plenary Lectures (2) |
| 2007 | GeNeSIS Investigators Meeting, Paris, France, (Panel : "Growth Attenuation: Current Concepts and Controversies") | Invited Panel Member |
| 2007 | Idiopathic Short Stature (ISS) Consensus Conference/International Meeting, Santa Monica, CA | Invited participant and Session chair |
| 2008 | 5th Biennial Scientific Meeting of the Asia Pacific Pediatric Endocrine Society, Seoul, Korea, [Lecture title: "Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD): Recent Insights"] | Invited Plenary Lecture |
| 2009 | Nordiscience Forum (Novo Nordisk's International Scientific Meeting), Kyoto, Japan, (Lecture title: "Disorders of Water Balance and the Nephrogenic Syndrome of Inappropriate Antidiuresis") | Invited Plenary Lecture |
| 2009 | Osaka University, Osaka, Japan (Lecture title: "IGFs: Links to Cancer and Longevity") | Invited Lecture/Visiting Professor |
| 2009 | National Center for Child Health and Development, Tokyo, Japan (Lecture title: "Growth as a Barometer of Health") | Invited Lecture |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 2010 | The Society for Pediatric Research/ Lawson Wilkins Pediatric Endocrine Society, Vancouver, Canada, ("Meet-the Professor" title: "Career Development: What's Next After Fellowship?") | Invited speaker/ "Meet-the Professor" |
| 2011 | 9th Winter Symposium, Department of Child Health, Christian Medical College, Vellore, India (Lecture title: "Water & Sodium Balance: Current Concepts & Clinical Implications") | Invited Plenary Lecture |
| 2011 | World Professional Association for Transgender Health (WPATH) Biennial Symposium (International), Atlanta, GA | Invited speaker/ panel presentation |
| 2012 | 1st St. Luke's International Conference on Pediatrics: Enhancing Pediatric Care with the Experts, Global City, Taguig City (Manila), Philippines (2 Lectures: "Gender Non-Conforming/Transgender Youth: Endocrine Considerations"; "Abnormalities of Puberty"; Case Discussant: "Disorders of Sex Development") | Invited Plenary Lectures |
| 2013 | World Professional Association for Transgender Health (WPATH) ICD-11 Consensus Meeting, San Francisco, CA | Invited Participant |
| 2014 | World Professional Association for Transgender Health (WPATH) Biennial Symposium, Bangkok, Thailand | Invited Symposium speaker |
| 2014 | Chulalongkorn University, Bangkok, Thailand (Lecture title: "Gender Nonconforming Transgender Youth: Endocrine Considerations") | Invited Lecture/Visiting Professor |

## INVITED PRESENTATIONS - NATIONAL

| | | |
|---|---|---|
| 1983 | The Endocrine Society Annual Meeting | Platform |
| 1985 | Endocrine Days, Seattle Washington | Invited lecture |
| 1986 | The Endocrine Society Annual Meeting | Platform |
| 1987 | The Clinical Research Center Program Directors' Biennial Meeting, NIH, Williamsburg, VA | Lecture |
| 1987 | Growth Disorders: Diagnostic and Therapeutic Dilemmas, Eli Lilly, Boston, MA | Invited lecture |
| 1989 | Society for Pediatric Research Annual Meeting | Poster |
| 1990 | Society for Pediatric Research Annual Meeting | Poster |
| 1990 | The Endocrine Society Annual Meeting | Poster |
| 1990 | American Academy of Pediatrics Postgraduate Course "Recent Advances in Endocrinology", Seattle, WA | Invited lectures (2) |

| 1990 | Eli Lilly Symposium "Roundtable Discussion Group on Current Issues in Pediatric Endocrinology", Dallas, TX | Invited lecture and Session chair |
|------|------|------|
| 1991 | NIH Workshop on Biological Consequences of Early Placental Loss, San Juan, Puerto Rico | Invited lecture |
| 1991 | The Endocrine Society Annual Meeting | Poster |
| 1992 | American Academy of Pediatrics Annual Meeting, San Francisco, CA | Invited lecture |
| 1992 | The Endocrine Society Annual Meeting | Poster |
| 1994 | The Endocrine Society Annual Meeting | Poster and Session chair |
| 1994 | Genentech National Cooperative Growth Study Symposium, Orlando, FL | Session Chair |
| 1995 | American Academy of Pediatrics, PREP: The Course, Santa Monica, CA | Invited lectures (2) |
| 1995 | The Endocrine Society Annual Meeting | Poster |
| 1995 | American Academy of Pediatrics, PREP: The Course, Minneapolis, MN | Invited lectures (2) |
| 1997 | The Endocrine Society Annual Meeting | Poster |
| 1998 | The Endocrine Society Annual Meeting | Poster |
| 1999 | The Endocrine Society Annual Meeting | Poster |
| 2000 | The Endocrine Society Annual Meeting | Poster and Session chair |
| 2001 | The Endocrine Society Annual Meeting | Poster |
| 2002 | The Endocrine Society Annual Meeting | Poster |
| 2004 | The Endocrine Society Annual Meeting | Poster |
| 2003 | Society for Women's Health Research: Fourth Annual Conference on Sex and Gene Expression, Winston-Salem, NC | Invited lecture and Session chair |
| 2004 | Society for Pediatric Research Annual Meeting | Poster |
| 2005 | The Endocrine Society Annual Meeting | Poster |
| 2005 | American Academy of Pediatrics, PREP: The Course, Miami, FL | Invited lectures (2) |
| 2005 | American Academy of Pediatrics, PREP: The Course, Portland, OR | Invited lectures (2) |
| 2005 | GeNeSIS Symposium and Investigators Meeting, Washington, D.C. | Session chair |

| | | |
|---|---|---|
| 2006 | The Endocrine Society Annual Meeting, Boston, MA (Symposium lecture title: "How We Define IGF-I Deficiency") | Invited lecture |
| 2006 | The Endocrine Society's Clinical Endocrinology Update Course, San Francisco, CA (Lecture title/ "Meet-the-Professor": "Management of Type 2 Diabetes in Adolescence") | Invited lecture/ "Meet-the-Professor" |
| 2006 | Serono GH Monitor Investigator Meeting, Symposium on Disorders of Water Balance, San Francisco, CA, 2006 | Invited Plenary Lecture |
| 2007 | The Endocrine Society Annual Meeting | Poster |
| 2008 | American Academy of Pediatrics, PREP: The Course, Tempe, AZ, 2008 | Invited lectures (2) |
| 2008 | The Endocrine Society Annual Meeting | Poster |
| 2008 | Society for Pediatric Research Annual Meeting | Session Co-Chair |
| 2008 | Lawson Wilkins Pediatric Endocrine Society Annual Meeting | Session Co-Chair |
| 2009 | American Academy of Pediatrics, PREP: The Course, Savannah, GA | Invited lectures (2) |
| 2009 | The Endocrine Society Annual Meeting, Washington, DC (Lecture title/ "Meet-the-Professor": "Hyponatremia in Infants & Children") | Invited speaker/ "Meet-the-Professor" |
| 2009 | The Endocrine Society Annual Meeting | Poster |
| 2009 | American Academy of Pediatrics, PREP: The Course, Portland, OR | Invited lectures (2) |
| 2009 | Disorders of Sex Development (DSD) Research and Quality Improvement Symposium, University of Michigan Initiative on Rare Disease Research, Ann Arbor, MI | Invited participant |
| 2010 | The Endocrine Society Annual Meeting, San Diego, CA (Lecture title/ "Meet-the-Professor": "Hyponatremia in Infants & Children") | Invited speaker/ "Meet-the-Professor" |
| 2010 | American Academy of Pediatrics, NeoPREP, Newport Beach, CA | Invited lectures (2) |
| 2012 | 45th Annual Advances & Controversies in Clinical Pediatrics, UCSF, San Francisco, CA (Lecture title: "Gender-Variant/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2012 | The Endocrine Society Annual Meeting | Session Co-Chair |
| 2012 | American Academy of Pediatrics, PREP: The Course, San Diego, CA | Invited Lecture and Case Presentations |

Prepared: May 26, 2020

| 2013 | Miami Children's Hospital 16th Annual Pediatric Board Review Course | Invited Lecture and Case Presentations |
|------|------|------|
| 2013 | National Transgender Health Summit (sponsored by UCSF), Oakland, CA (Lecture title/"The Biology of Gender") | Invited Lecture and Panel Presentations |
| 2013 | Pediatric Endocrine Society Annual Meeting: Plenary Ethics Debate: "Approach to the Prepubertal Gender Non-Conforming Child: Should Intervention Attempt to Support the Assigned or Affirmed Gender?" | Program Chair and Speaker |
| 2013 | American Academy of Pediatrics, PREP: The Course, Portland, OR | Invited Lecture and Case Presentations |
| 2013 | The Endocrine Society Annual Meeting | Symposium Chair |
| 2013 | American Academy of Pediatrics: "Mind Matters for Pediatric Practitioners", San Francisco, CA (Lecture title: "Gender Nonconforming/ Transgender Youth: Endocrine Considerations") | Invited Lecture |
| 2014 | American Academy of Pediatrics, NeoPREP: An Intensive Review and Update of Neonatal/Perinatal Medicine, San Diego, CA (Lecture title: "Neontal Thyroid Disorders") | Invited lecture |
| 2014 | UCSF CME: Diabetes Update and Advances in Endocrinology and Metabolism (Lecture title: "Gender Nonconforming/ Transgender Youth: Endocrine Considerations") | Invited Lecture |
| 2014 | 1st Annual Disorders of Sex Development-Translational Research Network (DSD-TRN)) and Accord Alliance (AAN) Workshop, Phoenix Children's Hospital, Phoenix, AZ | Invited participant |
| 2014 | Endocrine Society Annual Meeting | Symposia (2) Chair |
| 2014 | UCSF CME: Current Trends in DSD Management | Course Chair and Lecturer |

## INVITED PRESENTATIONS - REGIONAL AND OTHER INVITED PRESENTATIONS

| 1983 | Pediatric Grand Rounds, John Muir Hospital, Veterans Administration Hospital, San Francisco, Santa Rosa Community Hospital, Fresno Valley Children's Hospital, University of the Pacific, Mt. Zion Hospital, Oak Knoll Naval Hospital | Invited lectures |
|------|------|------|
| 1984 | Pediatric Grand Rounds, UCSF | Invited lecture |
| 1985 | Pediatric Grand Rounds, UCSF | Invited lecture |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 1985 | Western Socity for Pediatric Research Annual Meeting | Platform |
| 1986 | Pediatric Grand Rounds, UCSF | Invited lecture |
| 1987 | Pediatric Grand Rounds, UCSF | Invited lecture |
| 1989 | Visiting Professor, University of Florida, Gainesville, FL | Invited lecture |
| 1989 | Visiting Professor, University of Pittsburgh, Pittsburgh, PA | Invited lecture |
| 1989 | Pediatric Grand Rounds, UCSF | Invited lecture |
| 1990 | Pediatric Grand Rounds, UCSF | Invited lecture |
| 1992 | Rocky Mountain Endocrine Society, Salt Lake City, UT | Invited lectures (2) |
| 1993 | Western Socity for Pediatric Research Annual Meeting | Session Co-Chair |
| 1993 | Organization of Pediatric Endocrinologists of California, Sonoma, CA | Invited lecture |
| 1993 | Pediatric Grand Rounds, San Francisco General Hospital | Invited lecture |
| 1994 | Organization of Pediatric Endocrinologists of California, Yosemite, CA | Meeting Chair |
| 1995 | Pediatric Grand Rounds, San Francisco General Hospital | Invited lecture |
| 1997 | Visiting Professor, University of Utah, Salt Lake City, UT | Invited lecture |
| 1998 | Visiting Professor, University of Washington, Seattle, WA | Invited lecture |
| 1998 | American Academy of Pediatrics Annual Meeting, St. Petersburg, Florida | Invited lecture |
| 1998 | Genentech, Inc., South San Francisco, CA | Invited lecture |
| 1998 | Pediatric Grand Rounds, Fresno Medical Education Program | Invited lecture |
| 1999 | Pediatric Grand Rounds, UCSF | Invited lecture |
| 2000 | Natural Cooperative Growth Study (co-sponsored by University of Oregon and Genentech, Inc.), San Francisco, CA | Invited lecture |
| 2000 | "Advances and Changing Trends" (Pediatrics), The Lloyd Noland Foundation, Orlando, FL | Invited lectures (2) |
| 2000 | Michigan State Medical Society Annual Scientific Meeting, Detroit, MI | Invited Plenary Lecture |
| 2000 | Pediatric Grand Rounds, San Francisco General Hospital | Invited lecture |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 2001 | UCSF Diabetes Center (Lecture title: "Insulin-like Growth Factors and Skeletal Muscle Differentiation") | Invited lecture |
| 2002 | "Ninth Annual Pediatrics Update", The Lloyd Noland Foundation, Hilton Head Island, SC | Invited lectures (3) |
| 2003 | Symposium Medicus Conference on Adolescent Medicine, Puerto Rico | Invited lectures (3) |
| 2004 | Pediatric Grand Rounds, UCSF (Lecture title: "Insulin-like Growth Factors: Not Really Like Insulin") | Invited lecture |
| 2005 | Endocrine Grand Rounds, UCSF (Lecture title: "Nephrogenic Syndrome of Inappropriate Antidiuresis") | Invited lecture |
| 2005 | Symposium Medicus Conference on Pediatrics, Yosemite, CA | Invited lectures (3) |
| 2006 | Pediatric Grand Rounds, Childrens Hospital Los Angeles, University of Southern California (Lecture title: "Nephrogenic Syndrome of Inappropriate Antidiuresis") | Invited lecture |
| 2006 | UCSF Diabetes Update and Advances in Endocrinology and Metabolism, "Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD): A Paradigm for Activating Mutations Causing Endocrine Disease", San Francisco, CA | Invited lecture |
| 2006 | "Childhood Matters" Radio Show, "Diabetes in Childhood: Who's at Risk?", KISS-FM, San Francisco, CA | Invited speaker (radio) |
| 2006 | Pediatric Grand Rounds, Sutter Medical Center, Santa Rosa, CA (Lecture title: "Growth as a Barometer of Health") | Invited lecture |
| 2006 | Pediatric Grand Rounds, California Pacific Medical Center, San Francisco, CA (Lecture title: "Growth Hormone and IGF-I Treatment for Short Stature: Current Concepts and Controversies") | Invited lecture |
| 2007 | Pediatric Endocrine Grand Rounds, University of California Los Angeles (Lecture title: "Activating V2 Vasopressin Receptor Mutations") | Invited lecture |
| 2007 | UCSF Pediatric Diabetes Symposium: "Type 1 Diabetes: Primary and Secondary Prevention" | Invited lecture |
| 2008 | Pediatric Grand Rounds, University of Massachusetts, Baystate Children's Hospital: "Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD): A Paradigm for Activating Mutations Causing Endocrine Dysfunction" | Invited lecture |

Prepared: May 26, 2020

| 2008 | UCSF Pediatric Diabetes Symposium: "Can We Prevent Type 1 Diabetes? : Research Update" | Invited lecture |
|------|------|------|
| 2008 | Juvenile Diabetes Research Foundation, Hawaii Chapter, Honolulu, HI: "Update in Type I Diabetes Research: Honeymoon Prolongation and Primary Prevention" | Invited lecture |
| 2009 | Organization of Pediatric Endocrinologists of California, San Francisco, CA, "IGFs: Links to Cancer and Longevity" | Invited lecture |
| 2009 | Pediatric Grand Rounds, Marin General Hospital, San Francisco, CA, (Lecture title: "Growth Disorders: Current Concepts and Management") | Invited lecture |
| 2009 | Pediatric Grand Rounds, San Francisco General Hospital (Lecture title: "Gender Identity Disorder in Pre-Adolescents & Adolescents") | Invited lecture |
| 2009 | UCSF School of Medicine, Pediatric Interest Group: "Career Development in Pediatric Endocrinology" | Invited speaker |
| 2010 | Pediatric Grand Rounds, UCSF (Lecture title: "Gender Variant/ Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2010 | Children's Hospital Oakland Research Institute, Oakland, CA, "Gender Variant/ Transgender Youth: Endocrine Considerations" | Invited lecture |
| 2010 | Symposium Medicus Conference on Pediatrics (Lecture titles: "Abnormalities of Puberty", "Update in Type 1 Diabetes", "Growth as a Barometer of Health") Kauai, Hawaii | Invited lectures (3) |
| 2010 | Gender Spectrum 4th Annual Family Conference (Lecture title: "The Use of Pubertal Blockers in Gender Variant Youth", Berkeley, CA | Invited lecture |
| 2010 | UCSF School of Medicine, Pediatric Interest Group: "Career Development in Pediatric Endocrinology" | Invited speaker |
| 2010 | UCSF Pediatric Noon Cnference Series (Lecture title: "Neonatal Thyroid Disorders") | Invited lecture |
| 2011 | Pediatric Grand Rounds, Riley Hospital, University of Indiana, Indianapolis, IN, (Lecture title: "Gender Variant/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2011 | Pediatric Grand Rounds, Lucile Packard Children's Hospital, Stanford University, Stanford, CA, (Lecture title: "Gender Variant/Transgender Youth: Endocrine Considerations") | Invited lecture |

Prepared: May 26, 2020

| 2011 | UCSF Pediatric Noon Cnference Series (Lecture title: "Abnormalities of Puberty") | Invited lecture |
|------|------|------|
| 2011 | Gender Spectrum 5th Annual Family Conference (Lecture title: "The Biology of Gender"), Berkeley, CA | Invited lecture |
| 2011 | Gender Spectrum Professional's Workshop, Berkeley, CA ("The Use of Pubertal Blockers in Gender Variant Youth") | Invited speaker, panel presentation |
| 2011 | "Mind-the-GAP" Mental Health Professionals Workshop, Oakland, CA (Lecture title: "The Use of Pubertal Blockers in Gender Variant Youth") | Invited lecture |
| 2011 | 8th Annual Great Plains Pediatric Endocrine Symposium (Lecture title: "Gender Variant/Transgender Youth: Endocrine Considerations") | Invited Plenary Lecture |
| 2011 | American Psychiatric Association (APA) Institutes on Psychiatric Services Annual Meeting (Presentation title: "The Child and Adolescent Gender Center: A UCSF/ Community Collaborative") | Invited speaker, panel presentation |
| 2011 | UCSF School of Medicine, Pediatric Interest Group: "Career Development in Pediatric Endocrinology" | Invited speaker |
| 2012 | Warren Alpert Medical School of Brown University Adult and Pediatric Grand Rounds, Providence, RI (Lecture title: "Gender Variant/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2012 | Endocrine Grand Rounds, UCSF School of Medicine, Department of Medicine, Division of Endocrinology, San Francisco, CA (Lecture title: "Gender Non-Conforming/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2012 | Gender Spectrum 6th Annual Family Conference (Lecture title: "The Biology of Gender"), Berkeley, CA | Invited lecture |
| 2012 | Gender Spectrum 6th Annual Family Conference ("Safe Sports for Transgender Youth"; "Medical Panel: Concerns for Transgender Youth"), Berkeley, CA | Invited speaker, panel presentations |
| 2012 | Gender Spectrum Professional's Workshop, Berkeley, CA ("The Use of Pubertal Blockers in Gender Variant Youth") | Invited speaker |
| 2012 | UCSF School of Medicine, Pediatric Interest Group: "Career Development in Pediatric Endocrinology" | Invited speaker |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 2012 | Pediatric Grand Rounds, Santa Clara Valley Medical Center, San Jose, CA (Lecture title: "Gender Non-Conforming/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2013 | Pediatric Grand Rounds, Children's Hospital of Philadelphia (CHOP), Philadelphia, PA, (Lecture title: "Gender Non-Conforming/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2013 | CHOP-Hospitals of the University of Pennsylvania (HUP) Combined Endocrine Grand Rounds, Philadelphia, PA, (Lecture title: "The Biology of Gender") | Invited lecture |
| 2013 | Pediatric Grand Rounds, Marin General Hospital, Greenbrae, CA (Lecture title: "Gender Nonconforming/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2013 | UCSF Trans Health Seminar | Invited lecture |
| 2013 | Pediatric Grand Rounds, John Muir Medical Center, Walnut Creek, CA (Lecture title: "Gender Nonconforming/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2013 | Grand Rounds, Children's Hospital & Research Center Oakland, Oakland, CA (Lecture title: "Gender Nonconforming/Transgender Youth: Endocrine Considerations") | Invited lecture |
| 2013 | Gender Spectrum 7th Annual Family Conference (Lecture title: "The Biology of Gender"), Berkeley, CA | Invited lecture |
| 2013 | Gender Spectrum Professional's Workshop, Berkeley, CA | Invited Lecture, Panel Presentations |
| 2013 | PFLAG, San Francisco Chapter | Invited speaker |
| 2013 | Expert Panel on Transgender Health for Adolescent Clients, Callen-Lorde Community Health Center, New York, NY | Invited speaker/panelist |
| 2013 | 43rd Annual Fall Conference, Children's Hospital & Research Center Oakland, Monterey, CA (Lecture title: "Gender nonconforming/Transgender Youth: Endocrine Considerations") | Invited Lecture |
| 2014 | Medicine Grand Rounds, Beth Israel Medical Center, New York, NY (Lecture title: "Transgender Youth: Endocrine Considerations") | Invited Lecture |
| 2014 | UCSF Trans Health Seminar | Invited lecture |

Prepared: May 26, 2020

| | | |
|---|---|---|
| 2014 | Pediatric Grand Rounds and Visiting Professor, University of Wisconsin, Madison, WI (Lecture title: "Gender Nonconforming/Transgender Youth: Endocrine Considerations") | Invited Lecture and Visiting Professor |
| 2014 | Combined Adult/Pediatric Endocrine Grand Rounds, University of Wisconsin, Madison, WI (Lecture title; "The Biology of Gender") | Invited Lecture |
| 2014 | Kaiser Permanente CME: Transgender Care for the Pediatric Mental Health Provider (Lecture title: The Biology of Gender") | Invited Lecture/ Panelist |
| 2014 | Gender Spectrum 8th Annual Family Conference (Lecture title: "The Biology of Gender"), Moraga, CA | Invited lecture |
| 2014 | Gender Spectrum Professional's Workshop, Moraga, CA | Invited Lecture, Panel Presentations |
| 2014 | PFLAG Regional Convention, Napa, CA | Invited speaker |
| 2014 | 47th Annual Clinical Advances in Pediatrics Symposium, Children's Mercy Hospital, Kansas City, MO (Lecture title: "Gender nonconforming/Transgender Youth: Endocrine Considerations") | Invited Keynote Address |
| 2014 | Endocrine Grand Rounds and Visiting Professor, University of Cincinnati Hospital Medical Center, Cincinnati, OH (Lecture title: Gender Nonconforming/Transgender Youth: Endocrine Considerations") | Invited Lecture and Visiting Professor |

## CONTINUING EDUCATION AND PROFESSIONAL DEVELOPMENT ACTIVITIES

| | |
|---|---|
| 2006 | The Endocrine Society Annual Meeting |
| 2006 | The Lawson Wilkins Pediatric Endocrine Society Annual Meeting |
| 2007 | The Endocrine Society Annual Meeting |
| 2007 | The Lawson Wilkins Pediatric Endocrine Society Annual Meeting |
| 2008 | The Endocrine Society Annual Meeting |
| 2008 | The Lawson Wilkins Pediatric Endocrine Society Annual Meeting |
| 2009 | The Endocrine Society Annual Meeting |
| 2009 | The Lawson Wilkins Pediatric Endocrine Society Annual Meeting |
| 2010 | The Endocrine Society Annual Meeting |
| 2010 | The Pediatric Endocrine Society Annual Meeting |
| 2011 | The Endocrine Society Annual Meeting |
| 2011 | The Pediatric Endocrine Society Annual Meeting |

Prepared: May 26, 2020

| 2012 | The Endocrine Society Annual Meeting |
|------|--------------------------------------|
| 2012 | The Pediatric Endocrine Society Annual Meeting |
| 2013 | The Pediatric Endocrine Society Annual Meeting |
| 2013 | The Endocrine Society Annual Meeting |
| 2014 | The Pediatric Endocrine Society Annual Meeting |
| 2014 | Endocrine Society Annual Meeting |
| 2015 | Endocrine Society Annual Meeting |
| 2015 | The Pediatric Endocrine Society Annual Meeting |

**GOVERNMENT AND OTHER PROFESSIONAL SERVICE**

| 1995 - 1995 | USDA | Grant Review Panel |
|-------------|------|--------------------|
| 2006 - 2012 | NIH/NIDDK, TrialNet Eligibility Committee | Member |

# UNIVERSITY AND PUBLIC SERVICE

## SERVICE ACTIVITIES SUMMARY

As detailed above, the highlights of my service activities include the following:  a) UCSF Campus-wide:  I have served on the Committee for Human Research for 3 years was appointed to the UCSF LGBT Center of Excellence Task Force; b) School of Medicine:  I was an inaugural lecturer in the 2nd year LifeCycle course and PISCES Preceptor for the 3rd year Pediatrics curriculum; c) Departmental Service:  I have served on a variety of committees, most notably the Pediatric Ambulatory Clinic Operations Committee and the Pediatric Clinical Enterprise Committee.  I served as the Pediatric Endocrine Clinic Director, the Pediatric Endocrine Director of the multi-disciplinary Disorders of Sex Development Clinic, and currently serve as Medical Director of the Child and Adolescent Gender Center.  I  also served as the Program Director for Pediatric Endocrinology Fellowship Training; and d) Public Service:  My activities have focused on volunteering for the Visiting Nurses and Hospice program, volunteering for various Diabetes programs (family support groups, Diabetes camp, etc.), speaking at family conferences and professional workshops focused on the care of gender variant/ transgender youth and adolescents, and helping to raise money for financially challenged, promising figure skaters in the Bay Area.

## UCSF CAMPUSWIDE

| 2000 - 2000 | Search Committee for Division Chief, Reproductive Endocrinology | Member |
|-------------|----------------------------------------------------------------|--------|
| 2002 - 2003 | Committee on Human Research | Member |
| 2004 - 2006 | Committee on Human Research | Member |
| 2010 - 2010 | Search Committee for Director, Mass Spectrometry Program | Member |
| 2011 - present | UCSF LGBT Center of Excellence Task Force | Member |

| | | |
|---|---|---|
| 2012 - 2013 | 2013 National Trans Health Summit Planning Committee | Member |
| 2014 - present | UCSF LGBT Leadership Collaborative on Education, Research, and Clinical Care | Member |

**SCHOOL OF MEDICINE**

| | | |
|---|---|---|
| 1994 - 2015 | Various Ad hoc Promotion Review Committees | Member |
| 1997 - 1999 | Diabetes Center Planning Committee | Member |
| 2002 - 2003 | Life Cycle course, 2nd year Curriculum | Team Leader, Small Group Designer and Leader |
| 2002 - 2015 | Life Cycle course, 2nd year Curriculum | Lecturer (2) |
| 2003 - 2007 | Life Cycle course, 2nd year Curriculum | Small Group Designer and Leader |
| 2004 - 2009 | Foundations of Patient Care | Preceptor |
| 2006 - 2007 | UCSF Intersex Task Force | Member |
| 2007 - 2014 | Parnassus Integrated Student Clinical Experiences (PISCES), 3rd year Curriculum | Preceptor in Pediatrics (20 clinics/year) |

**SCHOOL OF DENTISTRY**

| | | |
|---|---|---|
| 2003 - 2015 | Craniofacial Anomalies CFA 206 | Lecturer |

**DEPARTMENTAL SERVICE**

| | | |
|---|---|---|
| 1986 - 1987 | Intern Selection Committee | Member |
| 1992 - 1993 | Moffitt Ward Education Committee | Member |
| 1993 - 1994 | Endocrinology/Neurology/Neurosurgery/Hematology/Oncology, Panel A, Subspecialty Outpatient Rotation | Director |
| 1993 - 2014 | Intern Selection Committee | Member |
| 2000 - 2000 | Search Committee, Faculty Member, Division of Pediatric Endocrinology | Member |
| 2006 - 2007 | UCSF High School Summer Internship program | Preceptor/ Mentor |
| 2006 - 2015 | Pediatric Endocrine Outpatient Services | Director |
| 2008 - 2009 | Karlsberger Steering Committee | Member |

| | | |
|---|---|---|
| 2008 - 2011 | Pediatric Endocrinolgy FellowshipTraining Program | Associate Program Director |
| 2008 - present | Disorders of Sexual Development (DSD) Clinic | Pediatric Director |
| 2009 - 2009 | Ward Revision Task Force | Member |
| 2009 - 2012 | Outpatient Re-engineering Steering Committee | Member |
| 2009 - 2010 | Clinical Excellence Task Force, UCSF Pediatric Residency Program | Member |
| 2010 - present | Child and Adolescent Gender Center | Medical Director and Steering Committee co-Chair |
| 2011 - 2015 | EPIC | "Superuser" |
| 2012 - 2015 | Pediatric Endocrinolgy FellowshipTraining Program | Program Director |
| 2012 - 2015 | Pediatric Ambulatory Clinic Operations Committee | Member |
| 2012 - 2015 | Pediatric Clinical Enterprise Committee | Member |

## COMMUNITY AND PUBLIC SERVICE

| | | |
|---|---|---|
| 1991 - 2000 | Visiting Nurses and Hospice of San Francisco | Volunteer, 1 evening/week |
| 1995 - 2013 | Diabetes Youth Foundation's Bearskin Meadow Summer Camp | Medical volunteer, 1 week/ year |
| 1995 - 2002 | Adult Skating Program Committee, US Figure Skating Association | Member |
| 1996 - 1996 | March of Dimes Walk Steering Committee, San Francisco, CA | Member |
| 2000 - 2001 | Skating Club of San Francisco | Member, Board of Directors, and Vice-President |
| 2002 - 2012 | Numerous Bay Area Diabetes Family Support Groups | Invited speaker |
| 2007 - present | Skate San Francsco (Figure Skating Competition) | Medical volunteer |
| 2008 - 2012 | Diabetes Youth Foundation Annual Figure Skating event | Medical volunteer and Skating Instructor |

Prepared: May 26, 2020

| 2009 - present | Ice Bridges, a non-profit corporation which assists financially challenged, promising figure skaters in the San Francisco Bay Area | Member, Board of Directors |
| 2010 - present | Bay Area Family Support Groups and Mental Health Professional Workshops for Gender Variant/ Transgender Youth and Adolescents | Invited speaker |

## CONTRIBUTIONS TO DIVERSITY

### CONTRIBUTIONS TO DIVERSITY
I began my work with the care of gender nonconforming/transgender youth in January, 2009, and led efforts to create the multi-disciplinary Child and Adolescent Gender Center (CAGC), which formally opened its doors in May, 2012.  I serve as Medical Director of the CAGC, serving >1300 gender nonconforming/ transgender youth, and oversee all clinical and research activities of the CAGC.

## TEACHING AND MENTORING

### TEACHING SUMMARY
In my current role as Emeritus Professor on Recall, I supervise postdoctoral fellows, residents, and medical students during one clinic/week (5-6 hr/wk).  In addition, my current teaching responsibilities include: Lecturer in the Medicine/Pediatrics combined Endocrinology Fellows Course (2 hr); In addition to my UCSF teaching responsibilities, my teaching includes lecturing at a number of symposia on transgender health.

### FORMAL TEACHING

| | Academic Yr | Course No. & Title | Teaching Contribution | School | Class Size |
|---|---|---|---|---|---|
| | 1986 - 2017 | Adolescent Core Seminar Series 180.01C | Lecturer | | |
| | 2002 - 2015 | Life Cycle, 2nd yr Med. Sch. Curr | Lecturer | | Entire 2nd yr class |
| | 2002 - 2007 | Life Cycle, 2nd yr Med. Sch. Curr | Small Group Designer and Leader | | 25 |
| | 2003 - 2015 | Craniofacial Anomalies CFA 206 | Lecturer | | |
| | 2007 - 2014 | Parnassus Integrated Student Clinical Experiences (PISCES), 3rd yr Med Sch Curr | Preceptor | | 1 studen t/ year |

| | Academic Yr | Course No. & Title | Teaching Contribution | School | Class Size |
|---|---|---|---|---|---|
| | 2000 - 2009 | Foundations of Patient Care IDS 132A | Preceptor | | |

## INFORMAL TEACHING

1983 - 2015   Clinical: Weekly inpatient Pediatric Endocrine teaching conference: 1.5 hr/week x 48 weeks = 72 hr/year

1994 - present  Clinical: Outpatient: Supervising/teaching: One clinic/week (5-6 hr) is a teaching clinic = 5-6 hr/week (including outpatient follow-up teaching) = 275 hr/year

## MENTORING SUMMARY

I mentored Dr. Adi during his NIH K-08 Award in studies focused on understanding the molecular mechanisms through which Insulin-like Growth Factors influence the decision of skeletal myoblasts to proliferate or differentiate.

I mentored Dr. Cheung in clinical/translational studies investigating Aquaporin-2 excretion in the recently described Nephrogenic Syndrome of Inappropriate Antidiuresis.

## PREDOCTORAL STUDENTS SUPERVISED OR MENTORED

| Dates | Name | Program or School | Mentor Type | Role | Current Position |
|---|---|---|---|---|---|
| 2003 - 2004 | Dandan Liu | University of California, Berkeley | | Supervised student for her Senior Honors Thesis | MD, Resident, UCSF |
| 2007 - 2011 | Linda Zhou, BS | Pre-doctoral student | | Preceptor | Attending graduate school |
| 2012 - 2012 | Meaghan Pugh, RN, PNP | UCSF Advanced Practice Pediatric Nurse Practitioner Program | | Clinical Preceptor | Clinical Practice |
| 2013 - 2015 | Tara Gonzalez | UC Berkeley-UCSF Joint Medical Program PRIME-US Program | | Research Mentor | MS Class of 2015; MD Class of 2017 |

## POSTDOCTORAL FELLOWS AND RESIDENTS MENTORED

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1983 - 1984 | Elizabeth Schriock, M.D | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice, San Francisco, CA |
| 1983 - 1984 | David Harris, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Clin Prof Pediatrics, U. of Utah, Salt Lake City |
| 1983 - 1984 | Leona Cuttler, M.D | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Professor and Chief of Pediatric Endocrinology, Case Western Reserve U., Cleveland, OH |
| 1983 - 1984 | Berthold Hauffa, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Professor of Pediatrics, Universitat Essen, Germany |
| 1983 - 1984 | Robert Lustig, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Professor of Clinical Pediatrics, UCSF |
| 1983 - 1984 | Klaus Rodens, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Prof Pediatrics, U. of Ulm, Germany |
| 1983 - 1984 | J. Anthony Hulse, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Consultant Endocrinologist, St. Thomas Hospital, London |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1983 - 1985 | Catherine Egli, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Chief of Pediatric Endocrinology, San Francisco Kaiser Hospital |
| 1984 - 1985 | David Stephure, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Prof Pediatrics and Chief of Pediatric Endocrinology, U. of Calgary, Canada |
| 1984 - 1987 | Bernard Silverman, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Former Assoc Prof and Chief of Ped Endo, Northwestern U., now Medical Director, Alkemes Inc., |
| 1984 - 1987 | Jorge Daaboul, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Associate Professor of Pediatrics, U. of Florida, Gainesville, FL |
| 1985 - 1987 | Sharyn Solish, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice |
| 1985 - 1988 | Kenneth Attie, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Former Medical Director, Insmed Inc., Glen Allen, VA |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1986 - 1988 | Norbert Albers, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Prof, Children's Hospital, U. of Bonn, Germany |
| 1986 - 1989 | Carol Hart, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Clin Prof Pediatrics, UC, San Diego, CA |
| 1987 - 1989 | Nelson Ramirez, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Deceased during fellowship |
| 1987 - 1989 | Stephen Gitelman, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Professor of Clinical Pediatrics, UCSF |
| 1988 - 1988 | Gregory Glasscock, Ph.D., M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Neonatologist |
| 1988 - 1989 | Carol Ishimatsu, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice, Downey, CA |
| 1988 - 1989 | Wen-Yu Tsai, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Prof of Pediatrics, Director, Pediatric Endocrinology, National Taiwan U. |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1988 - 1988 | Sushma Kaul, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Clin Prof Pediatrics, Hackensack Medical Center, New Jersey |
| 1989 - 1991 | Klaus Hartmann, M.D. | Post-Doc Research Fellow | | Laboratory Research Preceptor | Asst Prof Pediatrics, U. of Frankfurt, Germany |
| 1989 - 1992 | Juan Sanchez, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Prof Pediatrics, Indiana U. Medical Center, Indianapolis |
| 1990 - 1992 | Henry Rodriguez, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Associate Professor |
| 1990 - 1993 | David Paul, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Chief of Pediatric Endocrinology, David Grant Medical Center, Travis AFB, Sacramento, CA; Asst Clin Prof Pediatrics, UC, Davis |
| 1990 - 1993 | Lawrence Silverman, M.D. | Clinical and Research Fellow | | Clinical and Laboratory Preceptor | Asst Prof Pediatrics, RWJ-UMDNJ, Chief of Ped Endo, Morristown Mem. Hosp. |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1991 - 1994 | Floyd Barry, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Training Chief for Pediatrics, McLennan Family Practice Residency Program, Waco, TX |
| 1991 - 1994 | Pat Mahachoklertwattana, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assoc Prof Pediatrics; Chief of Pediatric Endocrinology, Mahidol U., Bangkok, Thailand |
| 1993 - 1996 | Debra Devoe, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Clin Prof Pediatrics, U. Southern California and Los Angeles Children's Hospital, CA |
| 1993 - 1996 | David Geller, M.D., Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Prof Pediatrics, UCLA Cedars-Sinai Medical Center, Los Angeles, CA |
| 1994 - 1996 | Sudha Mootha, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Prof Clin Pediatrics, U. Texas Southwestern Medical Center, Dallas |
| 1994 - 1997 | Saleh Adi, M.D. | Clinical and Research Fellow | | Clinical and Laboratory Preceptor | H. S. Professor of Pediatrics, UCSF |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1996 - 1999 | Valérie Schwitzgebel, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Professor of Pediatrics, U of Geneva, Switzerland |
| 1996 - 1998 | Bassam Bin-Abbas, M.D. | Clinical and Research Fellow | | Clinical and Laboratory Preceptor | Asst Prof Pediatrics, King Faisal U, Riyadh, Saudi Arabia |
| 1998 - 1999 | Peter Contini, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice, Moraga, CA |
| 1998 - 2001 | Louise Greenspan, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Pediatric Endocrinology, San Francisco Kaiser Hospital; Asst Clin Prof Pediatrics, UCSF |
| 1998 - 2001 | Jane Lee, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Clinical Research Scientist, Genentech Inc., South San Francisco, CA |
| 1999 - 2002 | Susan Conrad, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Formerly Attending Endocrinologist, Oakland Children's Hospital, Oakland, CA; Now in Private Practice |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 2000 - 2002 | Chaluntorn Preeyasombat, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Prof Pediatrics, Ramathibadi Hospital, Mahidol U., Bangkok Thailand |
| 2001 - 2003 | Nicola Tiffin, Ph.D. | Post-Doc Research Fellow | | Laboratory Research Preceptor | Research Scientist, University of Western Cape, South Africa |
| 2001 - 2004 | Heidi Gassner, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Chief of Pediatric Endocrinology, Sacramento Kaiser Hospital |
| 2002 - 2005 | Qing Dong, M.D., Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Chief of Pediatric Endocrinology, Chinese Hospital, San Francisco; Clinical Assistant Professor of Pediatrics, UCSF |
| 2003 - 2007 | Gary Meyer, Ph.D. | Post-Doc Research Fellow | | Laboratory Research Preceptor | Private Industry |
| 2003 - 2006 | Eric Huang, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Attending Physician, Pediatric Endocrinology, Morristown Hospital, New Jersey |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|---|---|---|---|---|---|
| 2004 - 2006 | Brian J. Feldman, M.D.,Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assist. Prof of Pediatrics, Stanford U |
| 2004 - 2006 | Clement Cheung, M.D., Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Adjunct Professor of Pediatrics, UCSF |
| 2004 - 2007 | Maureen A. Su, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Professor, Dept. of Pediatrics, U. of North Carolina |
| 2005 - 2007 | Andrew Bremer, M.D., Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Professor of Pediatrics, Vanderbilt University, Nashville, TN |
| 2005 - 2008 | Sayali Ranadive, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Attending Formerly Endocrinologist, Oakland Children's Hospital, Oakland, CA; Now in Private Practice |
| 2005 - 2007 | Roger Long, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Asst Clinical Professor, UC Davis Medical Cntr |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 2006 - 2009 | Alison Reed, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Attending Pediatric Endocrinologist, California Pacific Medical Center, San Francisco, CA |
| 2007 - 2010 | William Charlton, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Attending Physician, Joe DiMaggio Children's Hospital, Broward County, FL |
| 2007 - 2010 | Ivy Aslan, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Attending Endocrinologist, Oakland Children's Hospital, Oakland, CA |
| 2008 - 2009 | Jennifer Cordier, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice |
| 2008 - 2010 | Taninee Sahakitrungruang, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Prof of Pediatrics, Chuylalongkorn U, Bangkok, Thailand |
| 2009 - 2011 | Jenise Wong, M.D., Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Instructor, UCSF |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 2009 - 2012 | Thu Ho, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice |
| 2009 - 2012 | Anjali Jain, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice |
| 2010 - 2013 | Andrea Gerard Gonzalez, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Professor of Pediatrics, Barbara Davis Diabetes Center, Denver, CO |
| 2010 - 2013 | Lisa Taylor, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Private Practice |
| 2010 - 2016 | Stanley Vance, Jr., MD | Resident in Pediatrics; then Clinical Fellow, Adolescent Medicine | | Research Mentor | Assistant Professor, UCSF |
| 2011 - 2014 | Amy Mugg, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2011 - 2014 | Sara Moassesfar, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 2012 - 2015 | Priya Prahalad, M.D., Ph.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Professor, Stanford University |
| 2012 - 2015 | Joshua Tarkoff, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Clinical practice |
| 2012 - 2015 | Paula Jossan, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Clinical practice |
| 2013 - 2014 | Vanita Jindal, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Clinical practice |
| 2013 - 2016 | Nicholas Heiniger, M.D. | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Clinical practice |
| 2013 - 2016 | Stanley Vance, Jr., M.D. | Clinical Fellow, Adolescent Medicine | | Research Mentor | Assistant Professor, UCSF |
| 2014 - present | Eric Bomberg, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2015 - 2019 | Janet Lee, MD, MPH | Clinical Fellow, Pediatric Endocrinology | | Clinical and Research Mentor | Instructor, UCSF |

Prepared: May 26, 2020

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 2015 - 2017 | Liat Perl, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical and Research Mentor | In Training, Israel |
| 2016 - 2019 | Ayca Cakmak, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2016 - 2019 | Alyssa Huang, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | Assistant Professor, University of Washington |
| 2017 - present | Armaiti Mody, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2017 - present | Jenny Zabinsky, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2018 - present | Fatema Abdul Hussein, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2018 - present | Hannah Chesser, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2018 - present | Caroline Schulmeister, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor and Research Mentor | In Training |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|---|---|---|---|---|---|
| 2019 - present | Isabella Niu, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor | In Training |
| 2019 - present | Abby Cobb-Walch, MD | Clinical Fellow, Pediatric Endocrinology | | Clinical Preceptor and Research Mentor | In Training |

## FACULTY MENTORING

| Dates | Name | Position while Mentored | Mentor Type | Mentoring Role | Current Position |
|---|---|---|---|---|---|
| 2010 - 2011 | Clement Cheung, M.D., Ph.D. | Assistant Professor | | Preceptor/ mentor for Aquaporin-2 research project and manuscript preparation | Assistant Adjunct Professor of Pediatrics, UCSF |
| 2016 - 2017 | Ensile Lee, MD | Assistant Professor, Korea | | Preceptor/mentor in Child and Adolescent Gender Center | Assistant Professor, Korea |
| 2016 - present | Stanley Vance, Jr., MD | Assistant Professor | | Research Mentor | Assistant Professor, UCSF |
| 2019 - present | Janet Lee, MD | Instructor | | Research Mentor | Instructor, UCSF |

# RESEARCH AND CREATIVE ACTIVITIES

## RESEARCH AND CREATIVE ACTIVITIES SUMMARY

My current research is focused on optimizing multidisciplinary care for transgender youth.  I am currently serving as Principal Investigator (Multiple PI format) of an NIH/NICHD R01 focused on Early Medical Treatment of Transgender Youth, and as co-Investigator on two additional NIH R01's focused on transgender youth.

My prior research has included both basic science and clinical investigation.  My laboratory work has focused on two aspects of hormone receptor signaling. First, we extended our work in Insulin-like Growth Factor (IGF)-I receptor signaling to studies in human neuroblastoma (NBL).  Specifically, we have explored the role of IGF signaling in the growth, motility, and invasiveness of human NBL cells.  In collaborative studies with UCSF investigators from Pediatric Oncology, Neurology, Internal Medicine, and Radiation Oncology, we have observed

that small molecule inhibitors of the IGF-I receptor block growth, survival, and motility of NBL cells, and inhibit NBL growth in vivo in a xenograft model in nude mice.  A manuscript summarizing portions of this work has  been published in the Journal of Cellular Biochemistry. This work has been supported by a grant from the Thrasher Research Fund with matching funds from the UCSF Cancer Center.  I  also received, as Principal Investigator, a Basic Research grant for our work regarding IGF-I signaling in neuroblastoma from the John A. Kerner, M.D. Research Foundation.  Also as Principal Investigator, I have received a Basic Research grant from ImClone Systems, Inc., to examine the therapeutic potential of a humanized monoclonal anti-IGF-I receptor antibody and radiation in neuroblastoma.

In addition, we have recently identified and characterized novel activating mutations in the vasopressin V2 receptor (V2R) that cause a Syndrome of Inappropriate Antidiuretic Hormone (SIADH)-like phenotype, yet without detectable ADH.  We have named this syndrome "Nephrogenic Syndrome of Inappropriate Antidiuresis" (NSIAD), and have reported our findings in New England Journal of Medicine 352:34-40, 2005 (co-first-author).  I have been engaged in collaborative studies to extend our characterization of NSIAD, with three specific aims: 1) explore further the molecular mechanisms responsible for the constitutive activity of the vasopressin V2R mutants, 2) further characterize the clinical phenotype of NSIAD patients and heterozygous carriers, and 3) explore the potential role of selective vasopressin V2R "inverse agonists" as a targeted treatment for this condition. This work has been carried out in collaboration with investigators from the Departments of Psychiatry and Cellular and Molecular Pharmacology at UCSF, the Department of Biochemistry, Division of Cell Signaling and Molecular Pharmacology, at the University of Montreal, and the Department of Medicine, University of Colorado School of Medicine.  A manuscript summarizing this work with respect to V2R trafficking waspublished in Molecular Pharmacology, 2010, and a manuscript summarizing this work with respect to urinary aquaporin-2 excretion in this syndrome has just been submitted for publication.

With respect to clinical investigation, I have been an investigator in studies related to Type 1 Diabetes, studies related to growth disorders, and studies related to disorders of sex development (DSD).  With respect to Type 1 Diabetes, I served as co-Investigator for TrialNet, a multi-center NIH-sponsored study focused on developing therapies to prevent Type 1 Diabetes Mellitus in high risk individuals.  I have been co-Investigator on the TrialNet Natural History of Type 1 Diabetes study and on five intervention studies for patients with newly diagnosed Type 1 Diabetes : 1) TrialNet Mycophenolate Mofetil-Dacluzimab (MMF-DZB), 2) TrialNet Rituximab, 3) TrialNet CTLA-4 Ig, 4) Immune Tolerance Network Phase II trial of hOKT3 gamma1 (Ala-Ala), and 5) Immune Tolerance Network trial of thymoglobulin.  In addition, I have been Principal Investigator at UCSF for the TrialNet Nutritional Intervention to Prevent (NIP) Type 1 Diabetes study examining the therapeutic potential of docosahexaenoic acid, an omega-3 fatty acid, in individuals at high-risk for developing this disorder, and am co-Investigator in the TrialNet Oral Insulin Prevention Trial.

With respect to growth disorders, I have served as the UCSF-site Principal Investigator for a multi-center trial investigating the therapeutic potential of recombinant human IGF-I for prepubertal children with Growth Hormone (GH) resistance.

With respect to studies of DSD, I have served as co-Principal Investigator for a NIH/ NICHD R01 multi-center study entitled "Disorders of Sex Development:  Platform for Basic and Translational Research".  The focus of this project has been to develop a multi-site infrastructure to support hypothesis-based research on the mechanisms of sexual development and evidence-based care for patients with DSD and their families.

Effective April 1, 2011, I completed my basic laboratory work, shifting my research focus exclusively to clinical research.  As noted above, my current research is focused on optimizing medical care of transgender youth, with particular emphasis on mental health and skeletal health outcomes of current treatment models.

## RESEARCH AWARDS - CURRENT

| 1. 1R01HD082554-01A1 | Principal Investigator (Multiple PI format) | 20 % effort | Rosenthal (PI) |
|---|---|---|---|
| NIH/ NICHD | | 08/01/2015 | 06/30/2020 |
| The Impact of Early Medical Treatment in Transgender Youth | | $ 952,542 direct/yr 1 | $ 5,732,531 total |

This is a multicenter study which will be the first in the U.S. to evaluate the long-term outcomes of medical treatment for transgender youth. This study will provide essential, evidence-based information on the physiological and psychosocial impact, as well as safety, of hormone blockers and cross-sex hormones use in this population.

| 2. | Principal Investigator | 5 % effort | Rosenthal (PI) |
|---|---|---|---|
| San Francisco Department of Public Health | | 07/01/2017 | 06/30/2022 |
| UCSF Child and Adolescent Gender Center Transgender Youth Support Program | | $ 325,000 direct/yr 1 | $ 1,625,000 total |

To develop outreach and provide multidisciplinary services for transgender youth in the city of San Francisco

Overall supervisor and consultant

| 3. R01MH115349 | Co-Investigator | 10 % effort | Hong (PI) |
|---|---|---|---|
| NIH/ NIMH | | 07/01/2018 | 06/30/2023 |
| Sex Hormone effect on Neurodevelopment: Controlled puberty in transgender adolescents | | | |

This will be the first study of its kind to directly investigate longitudinal brain anatomy in young adolescents with gender dysphoria (GD). The study will utilize an innovative, cross-disciplinary approach that takes advantage of sophisticated imaging modalities to elucidate the interaction between sex hormone therapies and brain anatomy and connectivity in youth. Results from this interdisciplinary proposal will directly impact clinical care for individuals with GD and provide a much-needed empirical foundation for understanding the longitudinal impact of treatments that are already being used in clinical settings.

Co-Investigator

| 4. R01HD097122 | Co-Investigator | 3 % effort | Ehrensaft (PI) |
|---|---|---|---|
| NIH/ NICHD | | 03/21/2019 | 02/29/2024 |
| Gender Nonconformity in Prepubescent Children: A Longitudinal Study | | | |

This project is a prospective longitudinal observational study of pre-pubertal children who are gender-nonconforming and their care. It is a four-site study involving U.S.-based university affiliated pediatric gender clinics. With a targeted N of 320 subjects, the objective of the proposed research is to provide evidence-based data to inform clinical care for prepubescent transgender and gender-nonconforming children (TGNC).

Co-Investigator

## RESEARCH AWARDS - PAST

1.                                        Site Principal investigator

   NIH: Clinical Associate Physician, General Clinical Research   1984          1987
   Center

   Growth Hormone Releasing Hormone in Hypopituitarism

2.                                        Principal investigator

   Academic Senate Committee on Research, University of   1987          1988
   California San Francisco

   Insulin-like Growth Factors and Childhood Growth Disorders

3.                                        Principal Investigator

   Grant Award, School of Medicine, Research Evaluation and   1987          1988
   Allocation Committee, University of California San Francisco

   Insulin-like Growth Factors and Childhood Growth Disorders

4.                                        Principal Investigator

   NIH/NICHD: Clinical Investigator Award   1988          1991

   Insulin-like Growth Factors and Childhood Growth Disorders

5.                                        Principal Investigator

   March of Dimes: Basil O'Connor Starter Scholar Research   1989          1992
   Award

   Insulin-like Growth Factors and Childhood Growth Disorders

6.                                        Principal Investigator

   Academic Senate Committee on Research, University of   1991          1992
   California San Francisco

   Insulin-like Growth Factors and Skeletal Muscle Differentiation

Prepared: May 26, 2020

| | | | |
|---|---|---|---|
| 7. | Principal Investigator | | |
| March of Dimes: Basic Research Grant | | 1992 | 1994 |
| Insulin-like Growth Factors and Skeletal Muscle Differentiation | | | |

| | | | |
|---|---|---|---|
| 8. | Principal Investigator | | |
| NIH/NIDDK: FIRST Award | | 1992 | 1997 |
| Insulin-like Growth Factors and Skeletal Muscle Differentiation | | | $ 350,000 total |

| | | | |
|---|---|---|---|
| 9. | Principal Investigator | | |
| March of Dimes: Basic Research Grant | | 1995 | 1997 |
| Insulin-like Growth Factors and Skeletal Muscle Differentiation | | | $ 101,150 total |

| | | | |
|---|---|---|---|
| 10. | Principal Investigator | | |
| March of Dimes: Basic Research Grant | | 1997 | 1999 |
| Insulin-like Growth Factors and Skeletal Muscle Differentiation | | | $ 106,396 total |

| | | | |
|---|---|---|---|
| 11. R01 DK44181 | Principal investigator | | |
| NIH/NIDDK | | 1998 | 2003 |
| IGFs and Skeletal Muscle Differentiation | | | $ 659,648 total |

| | | | |
|---|---|---|---|
| 12. HOE 9011/4030 | Co-Principal Investigator | | |
| Aventis | | 2003 | 2004 |
| Morning Lantus vs. Intermediate-Acting Insulin in Adolescents with Type1 DM | | | $ 58,316 total |

| | | | |
|---|---|---|---|
| 13. | Principal Investigator | | |
| Pfizer: Translational Basic Research Award | | 2003 | 2004 |

Prepared: May 26, 2020

IGFs and Skeletal Muscle: Implications for Myotherapy $ 15,000 total

---

14. Co-Principal Investigator

Thrasher Research Fund 2005 2009

Targeted agents that synergize with radiation in high risk neuroblastoma
$ 300,000 total

---

15. Principal Investigator

Tercica, Inc. 2005 2009

Recombinant Human Insulin-Like Growth Factor-I (rhIGF-I) Treatment of Short Stature Associated with Primary IGF-I Deficiency: A Multicenter, Open-Label, Randomized Concentration Controlled Trial
$ 57,000 total

---

16. Principal Investigator

John A. Kerner, M.D. Foundation: Basic Research Award 2005 2009

Small Molecule Inhibitors of the IGF-I Receptor as a Potential Treatment for Neuroblastoma
$ 41,500 total

---

17. 556830-26226 co-PI

NIH/NIAID 2005 2013

Thymoglobulin for treatment of new onset Type 1 Diabetes

---

18. Basic Research Award Principal Investigator

ImClone Systems, Inc. 2009 2011

The Therapeutic Potential of A12 Anti-IGF-IR Antibody and Radiation in Neuroblastoma
$ 84,000 direct/yr 1

---

19. 23988-10 co-PI

NIH/NIDDK 2009 2013

UCSF TrialNet

Prepared: May 26, 2020

| | | | |
|---|---|---|---|
| 20. 1R01HD068138-01A1 | Site Principal Investigator | 5 % effort | Vilain, Sandberg (PI) |
| NIH/NICHD | | 09/26/2111 | 06/30/2016 |
| Disorders of Sex Development: Platform for Basic and Translational Research | | $ 639,688 direct/yr 1 | $ 3,198,340 total |

| | | | |
|---|---|---|---|
| 21. | Principal Investigator | 0 (See description, below) % effort | Rosenthal (PI) |
| NIH/CTSI; Internal Award UCSF | | 06/01/2018 | 05/31/2019 |

Bone Density, Structure, and Estimated Strength in Transgender Youth Receiving Pubertal Suppression in Early Puberty

Minimal data exist on the skeletal effects of puberty suppression in early pubertal transgender youth. This longitudinal cohort study assessed bone mineral density by dual-energy x-ray absorptiometry and bone microarchitecture and strength by high-resolution peripheral quantitative computed tomography, as well as bone turnover markers, body composition, vitamin D status, weight-bearing exercise, and dietary calcium intake. These data will lead to longer-term studies and investigations of interventions to mitigate the expected lag in skeletal development during pubertal suppression. Ultimately, this research should positively contribute to the clinical care of transgender youth. This funding supported the above-noted studies carried out by postdoctoral fellow, Janet Y. Lee, MD, MPH.

Principal Investigator

## PEER REVIEWED PUBLICATIONS

1. Rosenthal SM, Reid IA, Kaplan SL, Grumbach MM: Renin substrate depletion in salt-losing congenital virilizing adrenal hyperplasia: low plasma renin activity despite increased renin concentration.. J Pediatr l02:80-82, l983.

2. Rosenthal SM, Grumbach MM, Kaplan SL: Gonadotropin-independent familial sexual precocity with premature Leydig and germinal cell maturation ("familial testotoxicosis"): effects of a potent luteinizing hormone-releasing factor agonist and medroxyprogesterone acetate therapy in four cases. J Clin Endocrinol Metab 57:57l-579, l983.

3. Rosenthal SM, Schriock EA, Kaplan SL, Guillemin R, Grumbach MM: Synthetic human pancreas growth hormone-releasing factor (hpGRF 1-44-NH2) stimulates growth hormone secretion in normal men. J Clin Endocrinol Metab 57:677-679, l983.

4. Schriock EA, Lustig RH, Rosenthal SM, Kaplan SL, Grumbach MM: Effect of growth hormone (GH)-releasing hormone (GRH) on plasma GH in relation to magnitude and duration of GH deficiency in 26 children and adults with isolated GH deficiency or multiple pituitary hormone deficiencies: evidence for hypothalamic GRH deficiency. J Clin Endocrinol Metab 58:l043-l049, l984.

5.  Egli CA, Rosenthal SM, Grumbach MM, Montalvo JM, Gondos B: Pituitary gonadotropin-independent male-limited autosomal dominant sexual precocity in nine generations: familial testotoxicosis. J Pediatr 106:33-40, 1985.

6.  Gondos B, Egli CA, Rosenthal SM, Grumbach MM: Testicular changes in gonadotropin-independent familial male sexual precocity. Arch Pathol Lab Med 109:990-995, 1985.

7.  Rosenthal SM, Hulse JA, Kaplan SL, Grumbach MM: Exogenous growth hormone inhibits growth hormone-releasing factor-induced growth hormone secretion in normal men. J Clin Invest 77:176-180, 1986.

8.  Hulse JA, Rosenthal SM, Cuttler L, Kaplan SL, Grumbach MM: The effect of pulsatile administration, continuous infusion, and diurnal variation on the growth hormone (GH) response to GH-releasing hormone in normal men. J Clin Endocrinol Metab 63:872-878, 1986.

9.  Rosenthal SM, Kaplan SL, Grumbach MM: Short-term continuous intravenous infusion of growth hormone (GH) inhibits GH-releasing hormone-induced GH secretion: a time-dependent effect. J Clin Endocrinol Metab 68:1101-1105, 1989.

10. Hartmann K, Papa V, Brown EJ, Rosenthal SM, Goldfine ID: A rapid and simple one-step method for isolation of Poly (A)+ RNA from cells in monolayer. Endocrinology 127:2038-2040, 1990.

11. Rabinovici J, Dandekar P, Angle M, Rosenthal SM, Martin M: Insulin-like growth factor I (IGF-I) levels in follicular fluid from human preovulatory follicles: correlation with serum IGF-I levels. Fertil Steril 54:428-433, 1990.

12. Rosenthal SM, Brunetti A, Brown EJ, Mamula PW, Goldfine ID: Regulation of insulin-like growth factor I (IGF-I) receptor expression during muscle cell differentiation: potential autocrine role of IGF-II. J Clin Invest 87:1212-1219, 1991.

13. Rosenthal SM, Silverman BL, Wehrenberg WB: Exogenous growth hormone (GH) inhibits bovine but not murine pituitary GH secretion in vitro: evidence for a direct effect of GH on the pituitary. Neuroendocrinology 53:597-600, 1991.

14. Rosenthal SM, Brown EJ, Brunetti A, Goldfine ID: Fibroblast growth factor inhibits insulin-like growth factor (IGF)-II gene expression and increases IGF-I receptor expression in BC3H-I myoblasts. Mol Endocrinol 5:678-684, 1991.

15. Papa V, Hartmann K, Rosenthal SM, Maddux BA, Siiteri PK, Goldfine ID: Progestins induce downregulation of insulin-like growth factor I receptors in human breast cancer cells: potential autocrine role of IGF-II. Mol Endocrinol 5:709-717, 1991.

16. Hartmann KKP, Baier TG, Papa V, Kronenwett M, Brown EJ, Goldfine ID, Rosenthal SM: A monoclonal anntibody to the T-cell receptor increases IGF-I receptor content in normal T-lymphocytes:  Comparison with phytohemagglutinin.  J Cell Biochem 48:81-85, 1992.

17. Brown EJ, Hsiao D, Rosenthal SM: Induction and peak gene expression of insulin-like growth factor II follow that of myogenin during differentiation of BC3H-1 muscle cells. Biochem Biophys Res Commun 183:1084-1089, 1992.

18. Goodman PA, Sbraccia P, Brunetti A, Wong KY, Carter JD, Rosenthal SM, Goldfine ID: Growth factor receptor regulation in the Minn-1 Leprechaun: defects in both insulin receptor and epidermal growth factor receptor gene expression. Metabolism 41:504-509, 1992.

19. Goldfine ID, Papa V, Vigneri R, Siiteri P, Rosenthal SM: Progestin regulation of insulin and insulin-like growth factor I receptors in cultured human breast cancer cells. Breast Cancer Res Treat 22:69-79, 1992.

20. Uyeki T, Barry FL, Rosenthal SM, Mathias RS: Successful treatment with hydrochlorothiazide and amiloride in an infant with congenital nephrogenic diabetes insipidus. Pediatric Nephrology 7:554-556, 1993.

21. Rosenthal SM, Brown EJ: Mechanisms of insulin-like growth factor (IGF)-II-induced IGF-I receptor down-regulation in BC3H-1 muscle cells. J Endocrinology 141:69-74, 1994.

22. Rosenthal SM, Hsiao D, Silverman LA: An insulin-like growth factor (IGF)-II analog with highly selective affinity for IGF-II receptors stimulates differentiation but not IGF-I receptor down-regulation in muscle cells. Endocrinology 135:38-44, 1994.

23. Silverman LA, Cheng Z-Q, Hsiao D, Rosenthal SM: Skeletal muscle cell-derived insulin-like growth factor (IGF) binding proteins inhibit IGF-I-induced myogenesis in rat L6E9 cells. Endocrinology 136:720-726, 1995.

24. Rosenthal SM, Cheng Z-Q: Opposing early and late effects of insulin-like growth factor-I on differentiation and the cell cycle regulatory retinoblastoma protein in skeletal myoblasts. Proc Natl Acad Sci USA 92:10307-10311, 1995.

25. Burch GH, Bedolli MA, McDonough S, Rosenthal SM, Bristow J: Embryonic expression of Tenascin-X suggests a role in limb, muscle, and heart development.  Dev Dyn 203:491-504, 1995.

26. Hernández-Sánchez C, Werner H, Roberts Jr CY, Woo EJ, Hum D, Rosenthal SM, LeRoith D: Differential regulation of insulin-like growth factor-I (IGF-I) receptor gene expression by IGF-I and basic fibroblast growth factor.  JBiol Chem 272:4663-4670, 1997.

27. Rabinovici J, Cataldo NA, Dandekar P, Rosenthal SM, Gargosky SE, Gesundheit N, Martin MC: Adjunctive growth hormone during ovarian hyperstimulation increases levels of insulin-like growth factor binding proteins in follicular fluid:  A randomized, placebo-controlled, crossover study.  J Clin Endocrinol Metab 82:1171-1176, 1997.

28. Devoe DJ, Miller WL, Conte FA, Kaplan SL, Grumbach MM, Rosenthal SM, Wilson CB, Gitelman SE: Long-term outcome in children and adolescents following transsphenoidal surgery for Cushing disease. J Clin Endocrinol Metab 82:3196-3202,1997.

29. Adi S, Cheng Z-Q, Zhang P-L, Wu NY, Mellon SH, Rosenthal SM: Opposing early inhibitory and late stimulatory effects of insulin-like growth factor-I on myogenin gene transcription.  J Cell Biochem 78:617-626, 2000.

30. Cheng Z-Q, Adi S, Hsiao D, Woo EJ, Filvaroff EH, Gustafson TA, Rosenthal SM: Functional inactivation of the insulin-like growth factor-I receptor delays differentiation of skeletal muscle cells. J Endocrinology 167:177-184, 2000.

31. Roll U, Turek CW, Gitelman SE, Rosenthal SM, Nolte MS, Masharani U, Ziegler A-G, Baekkeskov S: Peptide mapping and characterization of glycation patterns of the glima 38 antigen recognized by autoantibodies in Type I diabetic patients. Diabetologia 43:598-608, 2000.

32. Adi S, Wu NY, Rosenthal SM: Growth factor-stimulated phosphorylation of Akt and p70S6K is differentially inhibited by LY294002 and wortmannin.  Endocrinology 142:498-501, 2001.

33. Adi S, Bin-Abbas B, Wu NY, Rosenthal SM: Early stimulation and late inhibition of Erk ½ phosphorylation by IGF-I:  a potential mechanism mediating the switch in IGF-I action on skeletal muscle differentiation.  Endocrinology 143:511-516, 2002.

34. Wilson TA, Rose SR, Cohen P, Rogol AD, Backeljauw P, Brown R, Hardin DS, Kemp SF, Lawson M, Radovick S, Rosenthal SM, Silverman L, Speiser P.  Update of guidelines for the use of growth  hormone in children:  The Lawson Wilkins Pediatric Endocrinology Society Drug and Therapeutics  Committee.  J Pediatr 143:415-421, 2003.

35. Tiffin N, Adi S, Stokoe D, Wu NY, Rosenthal SM: Akt phosphorylation is not sufficient for IGF-stimulated myogenin expression, but must be accompanied by downregualtion of Erk 1/2 phosphorylation.  Endocrinology 145:4991-4996, 2004.

36. Feldman BJ*, Rosenthal SM*, Vargas GA, Fenwick RG, Huang EA, Matsuda-Abedini M, Lustig RH, Mathias RS, Portale AA, Miller WL, Gitelman SG:  Nephrogenic syndrome of inappropriate anitdiuresis.  N Engl J Med 352:34-40, 2005.
     * Denotes co-first author

37. Huang EA, Feldman BJ, Schwartz ID, Geller DH, Rosenthal SM, Gitelman SE:  Oral urea for the   treatment of chronic syndromes of inappropriate antidiuresis in children.  J Pediatr 148:128-131, 2006.

38. Meyer GE, Chesler L, Liu D, Youngren J, Goldfine ID, Weiss WA, Matthay KK, Rosenthal SM:  Nordihydroguaiaretic acid inhibits insulin-like growth factor signaling, growth and survival in human neuroblastoma cells.  J Cell Biochem 102:1529-1541, 2007.

39. Bremer AA, Feldman BJ, Clark OH, Rosenthal SM:  Report of a Hurthle cell thyroid neoplasm in a peripubertal girl.  Thyroid 17:175-178, 2007.

40. Bremer AA, Ranadive S, Conrad SC, Vallette-Kasic S, Rosenthal SM:  Isolated adrenocorticotrophin deficiency presenting as an acute neurologic emergency in a prepubertal girl.  J Ped Endocrinol Metab 21:799-803, 2008.

41. Cohen P, Rogol AD, Deal CL, Saenger P, Reiter EO, Ross JL, Chernausek SD, Savage MO, Wit JM on behalf of the 2007 ISS Consensus Workshop participants (SM Rosenthal included among named participants in this group):  Consensus Guidelines for the Diagnosis and Treatment of Children with Idiopathic Short Stature: A Summary Statement of the Growth Hormone Research Society in Association with the Lawson Wilkins Pediatric Endocrine Society and the European Society for Pediatric Endocrinology.  J Clin Endocrinol Metab 93:4210-4217, 2008.

42. Ranadive SA, Ersoy E, Favre H, Cheung CC, Rosenthal SM, Miller WL, Vaisse C: Identification, characterization and rescue of a novel vasopressin-2 receptor mutation causing nephrogenic diabetes insipidus. Clin Endocrinol 71:388-393, 2009.

43. Chase HP, Lescheck E, Rafkin-Mervis L, Krause-Steinrauf H, Chritton S, Asare SM, Adams S, Skyler JS, Clare-Salzler M and the Type 1 Diabetes TrialNet NIP Study Group (Rosenthal SM  included among participants in this group):  Nutritional Intervention to prevent (NIP) Type 1 Diabetes:  A Pilot Trial.  ICAN:  Infant, Child, & Adolescent Nutrition 1:98-107, 2009.

44. Pescovitz MD, Greenbaum CJ, Krause-Steinrauf H, Becker DJ, Gitelman SE, Goland R, Gottlieb P, Marls JB, McGee PF, Moran AM, Raskin P, Rodriguez H, Schatz DA, Wherrett D, Wilson DM, Lachin JM, Skyler JS, for the Type 1 Diabetes TrialNet Anti-CD20 Study Group (Rosenthal SM included among named participants in this group):  Rituximab, B-

lymphocyte depletion, and preservation of beta-cell function. N Engl J Med 361:2143-2152, 2009.

45. Rochdi MD, Vargas GA, Carpentier E, Oligny-Longpre G, Chen S, Kavoor, A, Gitelman SE, Rosenthal SM, von Zastrow M, Bouvier M: Functional characterization of vasopressin type 2 receptor substitutions (R137H/C/L) leading to nephrogenic diabetes insipidus and nephrogenic syndrome of inappropriate antidiuresis: Implications for treatments. Mol Pharmacol 77:836-845, 2010.

46. Cho YH, Gitelman S, Rosenthal S, Ambler G. Long-term outcomes in a family with nephrogenic syndrome of inappropriate antidiuresis. Int J Pediatr Endocrinol 2009:431527. Epub 2010 Jan 28.

47. Aslan IR, Baca EA, Charlton W, Rosenthal SM: Respiratory syncytial virus (RSV) infection as a precipitant of thyroid storm in a previously undiagnosed case of Graves disease in a prepubertal girl. Int J Pediatr Endocrinol 2011:138903. Epub 2011 Mar 22.

48. Wherrett DK, Bundy B, Becker DJ, MiMeglio LA, Gitelman SE, Goland R, Gottlieb PA, Greenbaum CJ, Herold KC, Marks JB, Monzavi R, Moran A, Orban T, Palmer JP, Raskin P, Rodriguez H, Schatz D, Wilson DM, Krischer JP, Skyler JS, Type 1 Diabetes TrialNet GAD Study Group (Rosenthal SM included among named participants in this group): Antigen-based therapy with glutamic acid decarboxylase (GAD) vaccine in patients with recent onset type 1 diabetes: a randomized double-blind trial. Lancet 378(9788):319-327, 2011.

49. Orban T, Bundy B, Becker DJ, DiMeglio LA, Gitelman SE, Goland R, Gottlieb PA, Greenbaum CJ, Marks JB, Monzavi R, Moran A, Raskin P, Rodriguez H, Russell WE, Schatz D, Wherrett D, Wilson DM, Krischer JP, Skyler JS; Type 1 Diabetes TrialNet Study Group (Rosenthal SM included among named participants in this group): Co-stimulation modulation with abatacept in patients with recent-onset type 1 diabetes: a ranomized, double-blind, placebo-controlled trial. Lancet 378(9789):412-419, 2011.

50. Pescovitz MD, Torgerson TR, Ochs HD, Ocheltree E, McGee P, Krause-Steinrauf H, Lachin JM, Canniff J, Greenbaum C, Herold KC, Skyler JS, Weinberg A; Type 1 Diabetes trialNet Study Group (Rosenthal SM included among named participants in this group): Effect or rituximab on human in vivo antibody immune responses. J Allergy Clin Immunol 128 (6):1295-1302, 2011

51. Cheung CC, Cadnapaphornchai MA, Ranadive SA, Gitelman SE, Rosenthal SM: Persistent elevation of urine Aquaporin-2 during water loading in a child with Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD) caused by a R137L mutation in the V2 Vasopressin receptor. Int J Pediatr Endocrinol 3:1-6, 2012

52. Yu L, Boulware DC, Beam CA, Hutton JC, Wenzlau JM, Greenbaum CJ, Bingley PJ, Krischer JP, Sosenko JM, Skyler JS, Eisenbarth GS, Mahon JL; Type 1 Diabetes TrialNet Study Group (Rosenthal SM included among named participants in this group): Zinc transporter-8 autoantibodies improve prediction of type 1 diabetes in relatives positive for the standard biochemical antibodies. Diabetes Care 35 (6):1213-1218, 2012

53. Herold KC, Gitelman SE, Willi SM, Gottlieb PA, Waldron-Lynch F, Devine L, Sherr J, Rosenthal SM, Adi S, Jalaludin MY, Michels AW, Dziura J, Bluestone JA: Teplizumab treatment may improve C-peptide responses in participants with type 1 diabetes after the new onset period: a randomized controlled trial. Diabetologia 56 (2):391-400, 2013

54. Kroll JL, Beam C, Li S, Viscidi R, Dighero B, Cho A, Boulware D, Pescovitz M, Weinberg A; Type 1 Diabetes TrialNet Anti CD-20 Study Group (Rosenthal SM included among named particpants in this group):  Reactivation of latent viruses in individuals receiving rituximab for new onset type 1 diabetes.  J Clin Virol 57 (2):115-119, 2013

55. Moran A, Bundy B, Becker DJ, DiMeglio LA, Gitelman SE, Goland R, Greenbaum CJ, Herold KC, Marks JB, Raskin P, Sanda S, Schatz D, Wherett DK, Wiolson DM, Krischer JP, Skyler JS; Type 1 Diabetes Trialnet Canakinumab Study Group (Rosenthal SM included among named participants in this group), Pickersgilol L, de Koning E, Ziegler AG, Boehm B, Badenhoop K, Schloot N, Bak JF, Pozzilli P, Mauricio D, Donath MY, Castano L, Wagner A, Lervang HH, Perrild H, Mandrup-Poulsen T; AIDA Study Group.  Interleukin-1 antagonism in type 1 diabetes of recent onset:  two multicentre, randomised, double-blind, placebo-controlled trials.  Lancet 381 (9881):1905-1915, 2013

56. Sosenko JM, Skyler JS, Palmer JP, Krischer JP, Yu L, Mahon J, Beam CA, Boulware DC, Rafkin L, Schatz D, Eisenbarth G; Type 1 Diabetes TrialNet Study Group (Rosenthal SM included among named participants in this group); Diabetes Prevention Trial-Type 1 Study Group.  The prediction of type 1 diabetes by multiple autoantibody levels and their incorporation into an autoantibody risk score in relatives of type 1 diabetic patients. Diabetes Care 36 (9):2615-2620, 2013

57. Sosenko JM, Skyler JS, Beam CA, Krischer JP, Greenbaum CJ, Mahon J, Rafkin LE, Matheson D, Herold KC, Palmer JP; Type 1 Diabetes TrialNet and Diabetes Prevention Trial-Type 1 Study Groups (Rosenthal SM included among named participants in this group).  Acceleration of the loss of the first-phase insulin response during the progression to type 1 diabetes in diabetes prevention trial-type 1 participants.  Diabetes 62 (12):4179-4183, 2013

58. Hidalgo MA, Ehrensaft D, Tishelman AC, Clark LF, Garofalo R, Rosenthal SM, Spack NP, Olson J.  The gender affirmative model:  What we know and what we aim to learn.  Human Development 56:285-290, 2013

59. Vance S, Ehrensaft D, Rosenthal SM.  Psychological and medical care of gender nonconforming youth.  Pediatrics 134 (6):1184-1192, 2014

60. Lazure P, Bartel RC, Biller BMK, Molitch ME, Rosenthal SM, Ross JL, Bernsten BD, Hayes SM.  Contextualized analysis of a needs assessment using the Theoretical Domains Framework:  A case example in endocrinology.  BMC Health Services Research 14:319-332, 2014

61. Rosenthal SM.  Approach to the Patient:  Transgender Youth:  Endocrine Considerations.  J Clin Endocrinol Metab 99 (12):4379-4389, 2014

62. Lee PA, Wisniewski A, Baskin L, Vogiatzi MG, Vilain E, Rosenthal SM, Houk C.  Advances in diagnosis and care of persons with DSD over the last decade. Int J Pediatr Endocrinol, 2014, in press.

63. Vance S, Halpern-Felsher B, Rosenthal SM.  Health care providers' comfort with and barriers to care of transgender youth.  J Adolesc Health 56 (2):251-253, 2015

64. Haller M, Gitelman S, Gottlieb P, Michels A, Rosenthal SM, Shuster J, Zou B, Brusko T, Hulme M, Wasserfall C, Mathews C, Atkinson M, Schatz D.  ATG and G-CSF Preserve Beta Cell Function in Established Type 1 Diabetes.  J Clin Invest 125 (1):448-455, 2015

65. Sherer I, Baum J, Ehrensaft D, Rosenthal SM.  Affirming gender:  Caring for gender-atypical children and adolescents.  Contemporary Pediatrics 32 (1):16-19, 2015

66. Olson-Kennedy J, Cohen-Kettenis PT, Kreukels BP, Meyer-Balburg HF, Garofalo R, Meyer W, Rosenthal SM.  Research priorities for gender nonconforming/transgender youth:  Gender identity development and biopsychosocial outcomes.  Curr Opin Endocrinol Diabetes Obes 23 (2):172-179., 2016

67. Rosenthal SM.  Transgender Youth:  Current concepts.  Ann Pediatr Endocrine Metab 21 (4):185-192, 2016

68. Vance SR Jr, Deutsch MB, Rosenthal SM, Buckelew SM.  Enhancing pediatric trainees' and students' knowledge in providing care to transgender youth.  J Adolesc Health 60 (4):425-430, 2017

69. Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, Rosenthal SM, Safer JD, Tangpricha V, T'Sjoen GG.  Endocrine treatment of gender-dysphoric/gender-incongruent persons:  An Endocrine Society Clinical Practice Guideline. J Clin Endocrine Metab 102 (11):3869-3903, 2017

70. Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, Rosenthal SM, Safer JD, Tangpricha V, T'Sjoen GG.  Endocrine treatment of gender-dysphoric/gender-incongruent persons:  An Endocrine Society Clinical Practice Guideline. Endocr Practice 23 (12):1437, 2017

71. Vance SR, Rosenthal SM. A Closer Look at the Psychosocial Realities of LGBTQ Youth. Pediatrics. 2018 05; 141(5). PMID: 29661942

72. Ehrensaft D, Rosenthal SM. Sexual Assault Risk and School Facility Restrictions in Gender Minority Youth. Pediatrics. 2019 06; 143(6). PMID: 31061221

73. Rosenthal SM, Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, Safer JD, Tangpricha V, T'Sjoen GG. Response to Letter to the Editor: PMID: 31046093

74. Olson-Kennedy J, Chan YM, Garofalo R, Spack N, Chen D, Clark L, Ehrensaft D, Hidalgo M, Tishelman A, Rosenthal S. Impact of Early Medical Treatment for Transgender Youth: Protocol for the Longitudinal, Observational Trans Youth Care Study. JMIR Res Protoc. 2019 Jul 09; 8(7):e14434. PMID: 31290407. PMCID: PMC6647755

75. Bangalore Krishna K, Fuqua JS, Rogol AD, Klein KO, Popovic J, Houk CP, Charmandari E, Lee PA, Freire AV, Ropelato MG, Yazid Jalaludin M, Mbogo J, Kanaka-Gantenbein C, Luo X, Eugster EA, Klein KO, Vogiatzi MG, Reifschneider K, Bamba V, Garcia Rudaz C, Kaplowitz P, Backeljauw P, Allen DB, Palmert MR, Harrington J, Guerra-Junior G, Stanley T, Torres Tamayo M, Miranda Lora AL, Bajpai A, Silverman LA, Miller BS, Dayal A, Horikawa R, Oberfield S, Rogol AD, Tajima T, Popovic J, Witchel SF, Rosenthal SM, Finlayson C, Hannema SE, Castilla-Peon MF, Mericq V, Medina Bravo PG. Use of Gonadotropin-Releasing Hormone Analogs in Children: Update by an International Consortium. Horm Res Paediatr. 2019; 91(6):357-372. PMID: 31319416

76. Olson-Kennedy J, Chan YM, Rosenthal S, Hidalgo MA, Chen D, Clark L, Ehrensaft D, Tishelman A, Garofalo R. Creating the Trans Youth Research Network: A Collaborative Research Endeavor. Transgend Health. 2019; 4(1):304-312. PMID: 31701011. PMCID: PMC6830532

Prepared: May 26, 2020

## REVIEW ARTICLES

1. Gitelman SE, Feldman BJ, Rosenthal SM:  Nephrogenic syndrome of inappropriate antidiuresis:  A novel disorder in water balance in pediatric patients.  Am J Med 119:S54-S58, 2006.

2. Rosenthal SM, Feldman BJ, Vargas GA, Gitelman SE:  Nephrogenic syndrome of inappropriate antidiuresis (NSIAD):  A paradigm for activating mutations causing endocrine disease.  Pediatr Endocrinol Rev Volume 4, Suppl 1:66-70, 2006

3. Rosenthal SM, Gitelman SE, Vargas GA, Feldman BJ:  Gain-of-function mutations in the V2 vasopressin receptor.  Horm Res 67: Suppl. 1: 121-125, 2007.

4. Rosenthal S, Cohen P, Clayton P, Backeljauw P, Bang P, Ten S:  Treatment perspectives in Idiopathic Short Stature with a focus on IGF-I deficiency (Guest Editor:  Rosenfeld RG).  Pediatr Endocrinol Rev Volume 4, Suppl 2:  251-271, 2007.

5. Rosenthal SM:  Treatment approaches for growth failure:  Statement 4:  Therapy should be offered to children with idiopathic short stature (ISS) whose heights are <-2.25 standard deviation (SD) score:   Evidence pro and con.  Pediatr Endocrinol Rev Volume 5, Suppl 3:847-52, 2008.

6. Sherer I, Rosenthal, SM, Ehrensaft D, Baum J:  Child and Adolescent Gender Center:  A multidisciplinary collaboration to improve the lives of gender nonconforming children and teens. Pediatrics in Review 33:273-275, 2012

## BOOKS AND CHAPTERS

1. Rosenthal SM, Schriock EA, Van Vliet G, Silverman BL, Kaplan SL, Grumbach MM:  Growth hormone-responsive short stature: current and prospective treatment.  In: Therapeutic Agents Produced by Genetic Engineering: Quo Vadis? The Example of Growth Hormone and Its Releasing Factor. Joyeau A, Leygue G, Morre M, Roncucci R, Schmelck PH (eds). Quo Vadis? Symposium, Toulouse-Labege, France. Sanofi Recherche, Montpellier, France, 1986, pp 325-334.

2. Schriock EA, Rosenthal SM, Egli CA, Harris DA, Hauffa BP, Hulse JA, Lustig RH, Kaplan SL, Grumbach MM: Studies with growth hormone releasing factor (GRF) in the human: effect of a single pulse, continuous infusion or multiple pulses of GRF on growth hormone (GH) release in normal and GH deficient children and adults.  In:   Human Growth Hormone. Raiti S and Tolman RA (eds), Plenum NY, 1986, pp 387-403.

3. Rosenthal SM, Grumbach MM: The Neuroendocrinology of Puberty: Recent Advances. In:   Major Advances in Human Female Reproduction. Adashi EY, Mancuso S (eds), Raven Press, NY, 1990, pp 25-34.

4. Rosenthal SM, Wilson DW: Pediatric Endocrinology.  In:   Rudolph's Fundamentals of Pediatrics, Rudolph AM, Kamei R (eds), Appleton & Lange, Norwalk, 1994, Chapt 19, pp 583-615.

5. Rosenthal SM, Hsiao D, Cheng Z-Q, Silverman LA: Insulin-like growth factors and muscle cell differentiation.  In:  The Insulin-like Growth Factors and Their Regulatory Proteins, Baxter RC, Gluckman PD, Rosenfeld RG (eds), Excerpta Medica, Amsterdam, 1994, pp 275-282.

6.  Rosenthal SM, Gitelman SE: Pediatric Endocrinology.  In:  Rudolph's Fundamentals of Pediatrics, Rudolph AM, Kamei R (eds), Appleton & Lange, Stamford, Connecticut,1998, Chapt 20, pp 641-683.

7.  Rosenthal SM: Insulin-like growth factors and skeletal muscle.  In:   The IGF System: Molecular Biology, Physiology and Clinical Applications, Rosenfeld RG, Roberts Jr. CT (eds), Humana Press, Inc.,Totowa,1999, pp 497-516.

8.  Rosenthal SM, Gitelman SE: Pediatric Endocrinology.  In:   Rudolph's Fundamentals of Pediatrics, Rudolph AM, Kamei R, Overby KJ (eds), McGraw-Hill, NY, 2002, Chapt 19, pp 747-795.

9.  Dong Q, Rosenthal SM:  Endocrine Disorders of the Hypothalamus and Pituitary.  In: Pediatric Neurology, Fourth Edition, Swaiman KF, Ashwal S, Ferriero DM (eds), Mosby, Inc. (Elsevier, Inc.), Philadelphia, PA, 2006, pp. 2113-2127.

10. Ranadive S, Rosenthal SM:  Pediatric Disorders of Water Balance.  Endocrinol Metab Clin North Am 38:663-672, 2009.

11. Ranadive S, Rosenthal SM:  Pediatric Disorders of Water Balance.  Pediatr Clin North Am 58:1271-1280, 2011.

12. Dong Q, Rosenthal SM:  Endocrine Disorders of the Hypothalamus and Pituitary in Childhood and Adolescence.  In:   Swaiman's Pediatric Neurology, Fifth Edition, Swaiman KF, Ashwal S, Ferriero DM, Schor NF (eds), (Saunders), Elsevier, Inc., Philadelphia, PA, p. 1690-1702, 2012.

13. Masters SB, Rosenthal SM:  Hypothalamic & Pituitary Hormones.  In:  Basic and Clinical Pharmacology, Twelfth Edition, (Lange), The McGraw-Hill Companies, Inc., New York, NY, p. 659-679, 2012.

14. Bonifacio HJ, Rosenthal SM:  Gender Variance and Dysphoria in Children and Adolescents.  Pediatr Clin Noth Am 62 (4):1001-1016, 2015

15. Rosenthal SM.  Transgender Youth:  Endocrine Management.  In Principles of Transgender Medicine and Surgery, 2nd Ed., Ettner R, Monastery S, Coleman E, eds., p. 208-221, 2016

16. Rosenthal SM, Hembree WC.  Transgender Endocrinology.  In Greenspan's Basic & Clinical Endocrinology, 10th Ed., Gardner DG, Shoback D, eds., p. 771-782, 2018

17. Lee JY, Perl L, Rosenthal SM.  Care of Gender Nonconforming/ Transgender Youth.  In Radovick and Misra's Pediatric Endocrinology:  A Practical Clinical Guide, 3rd Ed., Misra M, Radovick S, eds., 2018, in press

18. Perl L, Lee JY, Rosenthal SM.  Medical Side Effects of GnRH Agonists.  In Pubertal Suppression in Transgender Youth, Finlayson C, ed. 2018, in press

**OTHER PUBLICATIONS**

1.  Gitelman SE, Feldman BJ, Rosenthal SM:  Nephrogenic syndrome of inappropriate antidiuresis – Reply (Letter).  N Engl J Med 355:530, 2005.

2.  Vance SR Jr, Ehrensaft D, Rosenthal SM.  Authors' response.  Pediatrics 135 (5):1366-1367, 2015

3. Vance SR, Jr, Rosenthal SM.  Treating transgender youth:  Pushing the dialog forward.  J Adolesc Health 57 (4):357-358, 2015.

4. Lopez X, Marinkovic, Eimicke T, Rosenthal SM, Olshan JS; Pediatric Endocrine Society Transgender Health Special Interest Group.  Statement on gender-affirmative approach to care from the Pediatric Endocrine Society Special Interest Group on Transgender Health.  Curt Opin Pediatric 29 (4):475-480, 2017.

## SIGNIFICANT PUBLICATIONS

1. Feldman BJ*, Rosenthal SM*, Vargas GA, Fenwick RG, Huang EA, Matsuda-Abedini M, Lustig RH, Mathias RS, Portale AA, Miller WL, Gitelman SE:  Nephrogenic syndrome of inappropriate antidiuresis.  N Engl J Med 352:34-40, 2005.
   * Denotes co-first author

   I was co-first author on this publication. I recognized that a child, suspected to have a primary renal salt-losing condition, instead had a problem of disordered water balance, and oversaw an evaluation (clinical and laboratory) which ultimately led to the discovery of a novel activating mutation of the V2 vasopressin receptor (V2R) in one of the first of two patients with this previously undescribed disorder. In addition, I co-supervised the data analysis and co-wrote the manuscript.

2. Huang EA, Feldman BJ, Schwartz ID, Geller DH, Rosenthal SM, Gitelman SE:  Oral urea for the reatment of chronic syndromes of inappropriate antidiuresis in children.  J Pediatr 148:128-131, 2006.

   I co-supervised the study design and data analysis and co-wrote the manuscript.

3. Meyer GE, Chesler L, Liu D, Youngren J, Goldfine ID, Weiss WA, Matthay KK, Rosenthal SM:  M Nordihydroguaiaretic acid inhibits insulin-like growth factor signaling, growth and survival in human neuroblastoma cells.  J Cell Biochem 102:1529-1541, 2007.

   I co-designed the studies, supervised the experiments in my laboratory, oversaw the data analysis, and co-wrote the manuscript.

4. Rosenthal S, Cohen P, Clayton P, Backeljauw P, Bang P, Ten S:  Treatment perspectives in Idiopathic Short Stature with a focus on IGF-I deficiency (Guest Editor:  Rosenfeld RG).  Pediatr Endocrinol Rev Volume 4, Suppl 2:  251-271, 2007

   I was the principal author in the data analysis and in the writing of the manuscript.

5. Ranadive SA, Ersoy E, Favre H, Cheung CC, Rosenthal SM, Miller WL, Vaisse C:  Identification, characterization and rescue of a novel vasopressin-2 receptor mutation causing nephrogenic diabetes insipidus. Clin Endocrinol epub ahead of print: 2008, Dec. 18.

   I contributed to experimental study design and co-wrote the manuscript.

6. Rochdi MD, Vargas GA, Carpentier E, Oligny-Longpre G, Chen S, Kavoor, A, Gitelman SE, Rosenthal SM, von Zastrow M,  Bouvier M:  Functional characterization of vasopressin type 2  receptor substitutions (R137H/C/L) leading to nephrogenic diabetes insipidus and nephrogenic syndrome of inappropriate antidiuresis:  Implications for treatments.  Mol Pharmacol 77:836-845, 2010.

I proposed the collaboration and contributed to the experimental design and the writing of the manuscript.

7. Cheung CC, Cadnaphaporhornchai MA, Ranadive SA, Gitelman SE, Rosenthal SM.  Persistent elevation of urine aquaporin-2 during water loading in a child with Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD) caused by a R137L mutation in the V2 vasopressin receptor.  /> Int J Pediatr Endocrinol 3:1-6, 2012

I proposed the study, co-designed the experiments, oversaw the data analysis, and co-wrote the manuscript.

## CONFERENCE ABSTRACTS

1. Note:  The following are abstracts from the year 2000 onward:

   Wu,NY, Adi S, Rosenthal SM: The proliferative and differentiation responses to IGF-I in skeletal myoblasts are influenced by cell density. The Endocrine Society, 2000.

2. Adi S, Wu NY, Rosenthal SM: Early stimulation and late inhibition of Erk1/2 phosphorylation mediate, at least in part, the time-dependent opposing effects of IGF-I on myogenin gene expression. The Endocrine Society, 2001.

3. Adi S, Wu NY, Rosenthal SM: The Role of the MAPK(Erk1/2) Pathway in mediating the switch in IGF-I action from inhibition to stimulation of myogenic differentiation. Sixth Joint Meeting of the European Society for Pediatric Endocrinology and the Lawson Wilkins Pediatric Endocrine Society, Montreal, Canada. 2001.

4. Tiffin N, Rosenthal SM: Upregulation of serum response factor expression by IGF-I is mediated by Erk1/2 phosphorylation in skeletal myoblasts. The Endocrine Society, 2002.

5. Tiffin N, Adi S, Wu NY, Rosenthal SM: Akt phophorylation is insufficient and Erk1/2 dephosphorylation is necessary for IGF-induced myogenesis. First Joint Symposium GH-IGF 2002, Boston, MA, 2002.

6. Meyer GE, Gable K, Liu D, Youngren J, Goldfine ID, Rosenthal SM: Small molecule inhibitors of the insulin-like growth factor I receptor block neuroblastome growth, survival, and motility.  The Endocrine Society, 2004.

7. Feldman BJ, Rosenthal SM, Vargas GA, Fenwick RG, Huang EA, Matsuda-Abedini M, Miller WI, Gitelman SE:  Pseudo-SIADH:  Identification of novel activating mutations in the V2 Vasopressin receptor causing a new genetic disease.  The European Society of Pediatric Endocrinology, 2004.

8. Meyer GE, Chesler L, Liu D, Bach LA, Bar RS, Youngren J, Kerner J, Goldfine ID, Weiss WA, Matthay KK, Rosenthal SM:  Small molecule inhibitors of the Insulin-like Growth Factor I receptor are pro-apoptotic and inhibit neuroblastoma growth in vivo.  The Endocrine Society, 2005.

Prepared: May 26, 2020

9.  Vargas G, Chen S, Feldman B, Rosenthal S, Gitelman S, von Zastrow M: Characterization of a novel activating mutation in the V2 Vasopressin receptor causing the Nephrogenic Syndrome of Inappropriate Antidiuresis.  The Endocrine Society, 2005.

10. Cheung CC, Cadnapaphornchai MA, Ranadive SA, Gitelman SE, Rosenthal SM: Persistent elevation of urine Aquaporin-2 during water loading in a child with Nephrogenic Syndrome of Inappropriate Antidiuresis (NSIAD).  The Endocrine Society, 2007.

11. Meyer GE and Rosenthal SM:  Combined anti-proliferative effects of Insulin-like Growth Factor Binding Protein-3 and Nordihydroguaiaretic acid on neuroblastoma cells in vitro. The Endocrine Society, 2007.

12. Ranadive SA, Ersoy B, Favre H, Cheung CC, Rosenthal SM, Miller WL, Vaisse C:  A novel V2 vasopressin receptor (V2R) mutation causing X-linked Nephrogenic Diabetes Insipidus (NDI).  The Endocrine Society, 2008.

13. Aslan IPR, Davis KR, Baca E, Charlton W, Kussmaul S, Winnicki E, Arnold T, Chan A, Rosenthal SM:  Respiratory Syncytial Virus (RSV) Infection as a precipitant of thyroid storm in a previously undiagnosed case of Graves' disease in a prepubertal girl.  The Endocrine Society, 2008.

14. Zhou L, Maddux BA, Goldfine ID, Yang X, Haas-Kogan DA, Ludwig DL, Rosenthal SM: Insulin-like Growth Factor-I receptor signaling blockade combined with radiation inhibits human neuroblastoma proliferation.  The Endocrine Society, 2009.

# DOC. 8-4

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.

     *Plaintiffs,*

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County.

     *Defendants.*

Civil Action No.

_____


**DECLARATION OF
REV. PAUL A. EKNES-
TUCKER IN SUPPORT
OF PLAINTIFFS'
MOTION FOR
TEMPORARY
RESTRAINING ORDER
& PRELIMINARY
INJUNCTION**

I, Paul A. Eknes-Tucker, declare as follows:

1.     I am the Senior Pastor at Pilgrim Church in Birmingham, Alabama. I have been a pastor for forty-five years and worked in congregations across the United States.

2.     Seven years ago, I was honored to be called to serve the congregation at Pilgrim Church. This calling also allowed me to return to Alabama, the state where I was born and raised.

3.     Pilgrim Church was established in Birmingham in 1903 and is part of the United Church of Christ. We hold services every Sunday and open our church during the week for events and community gatherings.

4.     A core tenet of this congregation is to love and support all people to be their true selves. This is a belief that I talk about while performing my duties as a Senior Pastor. In fact, my sermon on Easter Sunday this year touched on supporting and caring for the transgender young people in our communities.

5.     In my role as Senior Pastor, I have also provided pastoral counseling to parents of transgender children who are church congregants as well as to members of the Birmingham community. In those counseling discussions, parents are often uncertain about what guidance their religious faith can provide as they figure out how to support their child and how their faith can sustain them through that process.

We often talk about their children being made in the image of God and about the role of parents in helping and supporting their children.

6.      While providing pastoral counseling, parents of transgender children will often share their worries and fears as well as hopes and aspirations for their transgender child's future. Some of the questions they have relate to the application of our faith's teachings to and the spiritual effects of medical treatments for gender dysphoria. My goal in those conversations is to answer their questions and provide information that the parents would find useful in guiding their decisions about their child's medical care. My religious faith compels me to support parents to love and affirm their transgender children. This includes counseling parents to get help from medical and mental health professionals, when needed, to assist and care for their children and to embrace who they are.

7.      I have been fortunate to continue working with the families of transgender children for whom I have provided pastoral counseling. Watching parents support their child, I have seen improvements in the mental health and wellbeing of their children, but also as a family unit; their commitment to one another and their faith only grew stronger.

8.      Given my understanding of Alabama's Vulnerable Child Compassion and Protection Act (SB 184), I am concerned that I could face criminal penalties or

3

fines for my work as a pastoral counselor, which could "cause" a transgender minor to begin receiving medical treatment for their gender dysphoria.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __17__ th day of April, 2022.

Rev. Paul A. Eknes-Tucker

# DOC. 8-5

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D. | Civil Action No. _____ |
| *Plaintiffs*, | |
| v. | **DECLARATION OF BRIANNA BOE, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County. | |
| *Defendants*. | |

I, Brianna Boe,[1] declare as follows:

1.      I am plaintiff to this action and the mother of Michael Boe, a twelve-year-old transgender boy and another plaintiff in this action.

2.      I am a citizen of Alabama and reside with Michael in Montgomery County, Alabama.

3.      As a young child, Michael was very care-free and outgoing. He was just a happy kid. Then, when Michael was about nine years old, I noticed a significant change in his behavior. He became depressed, withdrew from his friends, and became more anxious and impatient. He also started acting out in school and struggled academically. Some mornings he would beg not to go to school. Although I still took him, I could see that he was both sad and afraid.

4.      I talked with him to try to figure out what was going on. He told me that he was starting to feel different and like he didn't belong, and that he was not like other girls.  Michael worried that other kids were judging him, and he told me that he was getting bullied a lot at school.

5.      Worried that his stress and anxiety was interfering with this ability to learn, I placed him in a new school the following year and started taking him to see

---

[1] Because of concerns about criminal liability and my child's privacy and safety, I am seeking to proceed in this case under a pseudonym.  *See Motion to Proceed Pseudonymously*, filed concurrently herewith.  In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration.  My attorneys have a copy of that separate declaration.

a therapist, who helped Michael begin untangling what was causing his depression. Seeing this therapist helped Michael, but he had still not returned to his old self. Over the following year, he regularly talked to me about his growing awareness of his male gender identity. I could see that this was something that occupied a lot of his mental energy and that navigating the mismatch between his inner sense of who he is and the way others saw him was very stressful for him.

6.     At the same time, Michael started going through puberty. His chest, and eventually his period, caused him a lot of anxiety and further fueled his depression. Michael would dread getting his period every month—and still does. He finds it very difficult to go to school—let alone pay attention—during the first few days of his period every month. For Michael, this discomfort is far beyond any sort of normal adjustment or discomfort that a non-transgender adolescent might experience. He is anguished, and often debilitated, by these physical reminders that his body does not match who he knows himself to be.

7.     About a year ago, in June 2021, Michael disclosed to me that he is transgender. I was happy that he felt comfortable sharing this with me, and I let him know that I love and support him in being who he is. I also was scared because I saw what the bullying had done to him before and knew that his peers may not be accepting of him. Setting that fear aside, I looked for resources to learn what I needed to know to best support Michael, including making sure that he was seen by

3

healthcare providers with experience working with kids like him. I wanted to be sure that Michael was getting the best possible treatment and that I would have experts who could answer my questions and advise me about treatment options.

8.     Soon after Michael came out as transgender to me, I told Michael's father, his siblings, and extended family that Michael is transgender. As I expected, his father was initially taken aback, but we talked about it, and he took the time to learn about transgender children and the importance of supporting them. After that, he came around quickly and has been supportive of Michael ever since. Michael's siblings and grandparents have been equally supportive.

9.     I also started taking Michael to see a second therapist who specializes in working with adolescents experiencing gender dysphoria. The therapist confirmed that Michael has gender dysphoria and recommended that he be evaluated for medical treatment. At the same time, with the support of his therapist and family, Michael began to socially transition. Coming out as transgender and socially transition had a remarkably positive effect on Michael, but because he has not yet been able to start any medical treatments for his gender dysphoria, the conflict between his male identity and his body causes him a lot of distress.

10.     Although he doesn't have a large chest, his breasts cause him significant distress. He wears a binder everyday to flatten his chest as much as possible, which he couples with baggy clothes to further hide the contour of his

chest. If he could, he would wear his binder all the time, but it is not recommended to wear a binder more than 8-10 hours each day. As a compromise, I bought him numerous sports bras with different levels of compression for him to wear when he takes the binder off. He relies on those sports bras almost as much as his binder. Michael cannot sleep without wearing a sports bra.

11.     Michael's period also continues to be a source of significant distress for him. We keep track of his cycles in hopes that he will be mentally prepared, but no amount of preparation or notice is enough. Every month his depression and anxiety spikes, like clockwork.

12.     Michael is working hard to manage his depression and recently started taking medication to treat his mental health. Still, there are days that those coping mechanisms fail him due to the intense distress caused by his gender dysphoria. He has engaged in self-harm, such as cutting, and has had suicidal ideation, which I have learned is common among transgender adolescents who are unable to receive the medical treatments they need.

13.     Unfortunately, his school environment has become unwelcoming. Recently, he was cornered by a group of students who insisted that Michael was not a boy. Although his teacher addressed the situation afterwards, most of his teachers have not been that supportive, regularly referring to him by the wrong name or pronouns.

14.     In February 2022, I called the gender clinic at Children's Hospital to make an initial appointment for Michael. The first availability they had was in December 2022. If this law goes into effect, Michael will not even be able to be evaluated for medical treatment for his gender dysphoria.

15.     I am worried that if law prevents Michael from receiving medical evaluation and care for his gender dysphoria that the hormones in his body will continue to change his body in ways that are inconsistent with his gender identity and that his mental health will decline rapidly. Knowing that he has an appointment at the gender clinic has given him hope. Taking that way will leave him with therapy and mental health medications, which we have already seen are not able to adequately address his gender dysphoria. The fact that Michael has a history of cutting and prior suicidal ideation makes even more worried for his safety and wellbeing. One of my other children lost a transgender friend to suicide and I cannot let that happen to Michael.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of April, 2022.

Brianna Boe

6

# DOC. 8-6

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D. | Civil Action No. _____ |
| | **DECLARATION OF JAMES ZOE IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| *Plaintiffs,* | |
| v. | |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County;; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County TOM ANDERSON, in his official capacity as | |

1

District Attorney for Coffee County;
and DANNY CARR, in his official
capacity as District Attorney for
Jefferson County.

      *Defendants.*

I, James Zoe,[1] hereby declares as follows:

1.    I am a citizen of Alabama and reside with my wife and our son in Jefferson County, Alabama.

2.    My son, Zachary Zoe, is a thirteen-year-old transgender boy and is another plaintiff in this action. He is in the seventh grade, a bright boy with a close group of friends, and is interested in video games and art. He hopes to become a mental health professional one day.

3.    I was born and raised in Alabama, attended the University of Alabama at Birmingham, and have been living in Birmingham my entire life. My wife resided in Alabama from 2009 to 2011, and she returned in 2018. We met that year and married in 2020. Alabama is our family's home and we want to stay here.

---

[1] Because of concerns about criminal liability and my child's privacy and safety, I am seeking to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed contemporaneously herewith. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

2

4.      When my wife and I married, my wife became Zachary's stepmother, and she has been his champion ever since they met. We share custody and co-parent with Zachary's biological mother and stepfather who also live in Alabama. They fully support the decision to fight for Zachary in court.

5.      Zachary was born in Alabama and, like me, has lived in this state for his entire life. Zachary resides half-time with me and my wife in Jefferson County, and half-time with his biological mother and stepfather in St. Clair County. Alabama is Zachary's home and he too, plans to continue residing here.

6.      Zachary was assigned female at birth. As a younger child, Zachary was shy and reserved. Around the age of 8, Zachary began to dislike wearing dresses and bright clothing, especially if the clothing was pink. Over time, Zachary started to prefer dressing in masculine attire more and more strongly. He became distressed if people identified him as a girl.

7.      Around a year later when Zachary was 9 years old, he started female puberty. Zachary was distressed that he was developing breasts and had to confront menstrual cycles. This caused him to become withdrawn. Around the age of 10, Zachary became uncomfortable wearing any kind of clothing that revealed his body. For example, he started to wear boys' athletic shorts and t-shirts instead of girls' bathing suits when going to swim. As his parents, we did not initially understand why he was withdrawn or why he was so uncomfortable with his body.

8.     When Zachary was 11 years old, he began referring to himself using "he" and "him" pronouns. In response, some of his friends mirrored his use of male pronouns. Identifying with male pronouns brought Zachary a greater sense of self-awareness, self-acceptance, allowing him to feel more at ease and happy. It was also when Zachary was 11 years old that he formally told me, my wife, his biological mother, and his stepfather that he is a transgender boy. He declared to us that he did not want to be identified as female. He told us that he uses he/him pronouns and wants us to call him by his chosen name. We all love our Zachary and were supportive of him.

9.     Zachary's social transition has been very positive for him. He uses a chest binder and appears and dresses like other boys his age. His friends and his teachers refer to him using "he" and "him" pronouns. It is important to his mental health and well-being that others around him see him as the boy he is. After he came out, Zachary has blossomed into a happier and more outgoing child.

10.    In October 2021, after completing appropriate mental health evaluations, Zachary began taking puberty-blocking medication, prescribed by his pediatrician with the support of both sets of parents. He just recently had an appointment to start the assessment process for hormone therapy at the Children's Hospital of Alabama at Birmingham.

11.     Continued access to puberty-blockers is essential to maintain Zachary's current state of mental health. It is also critical that he continues on a steady path of receiving future treatments that are age-appropriate and medically necessary to address gender dysphoria. This law has caused my family enormous anxiety. If it goes into effect, we will be forced to choose between harming our son by denying him medically necessary care or facing criminal prosecution. I know the rates of suicide that run through the transgender population due to discrimination and harassment, and I am terrified that this law will exacerbate my son's anxiety and push him into self-harm.

12.     None of the decisions surrounding Zachary's medical care have been easy. But the one decision that has not been difficult is to listen and talk to Zachary and engage in regular conversations with medical professionals to determine what course of treatment would be appropriately tailored for my son.

13.     I am concerned for Zachary's mental health and well-being if his gender-affirming treatments are disrupted, suspended, or discontinued. No parent should have to watch their child experience severe, unnecessary distress, and this law will do just that because its enforcement and implementation will cause Zachary to develop irreversible physical traits that are inconsistent with his male identity. I am concerned that being forced to undergo this harmful experience will have a

lasting negative effect on Zachary's future and irreparably jeopardize his chance to lead a healthy, happy life as an adult.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of April, 2022 in Jefferson County, Alabama.

James Zoe

# DOC. 8-7

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D. | Civil Action No. _____ |
| *Plaintiffs*, | |
| v. | **DECLARATION OF MEGAN POE IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County. | |
| *Defendants*. | |

1

I, Meagan Poe,[1] hereby declare as follows:

1.     I am a plaintiff to this action and the mother of Allison Poe, another plaintiff in this action.

2.     I was born and raised in Cullman County, Alabama. Other than the years that my ex-husband, Allison's father, was a member of the United States Army and stationed outside Alabama, I have lived in Cullman County along with my extended family.

3.     Allison is a fifteen-year-old transgender girl. Allison was identified as male at birth, but, as her father and I have come to understand, she has a female gender identity. I know that if she could force herself to live as a boy, she would, but that is simply not possible for her. It is who she is.

4.     Allison started showing an interest in girls' toys around the age of two. We were stationed overseas at the time and most of her friends were girls because most kids her age on the army base were girls. As a result, she would regularly play with her friends' typical "girls' toys" and wear princess dresses, but we would not buy her girls' toys or clothing. She begged us to buy her a Barbie doll and we refused. Without consulting us, however, her grandmother eventually bought her a Barbie

---

[1] Because of concerns about criminal liability and my child's privacy and safety, I am seeking to proceed in this case under a pseudonym. *See Motion to Proceed Pseudonymously*, filed concurrently herewith. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

doll. Allison carried that Barbie everywhere she went; it was like a teddy bear to her. Although we were not happy that Allison's grandmother bought the Barbie, we figured this was phase that would pass after we left that base. At most, we thought this was a clear sign that Allison would grow up to be gay.

5.      We returned to the United States when Allison was approximately four years old. While stationed at the new base, Allison's interest in girls' clothing and toys persisted. Every time we went shopping for clothes, she would cry that I would not buy her clothes from the girls' section. Because Allison's grandmother already bought her a doll, I figured it would be okay to allow her to have some girls' toys. Knowing that her father wouldn't approve, I bought her a few small dolls and other toys that she could play with while her father was at work. Allison's father eventually found the toys and threw them all away, but her older brother then snuck outside and pulled them out of the garbage for Allison.

6.      I eventually started working as a babysitter for a local family with kids close to Allison's age. The mother of that family was nurse and after observing Allison over time, she commented to me that Allison might be transgender. Before that day, I had never heard the word transgender. I did a little research into it but did not follow up much further because Allison's father was not accepting of her, and I still strongly believed that Allison would grow up to be gay.

7.     After completing his assignment, Allison's father decided to leave the Army and was honorably discharged. We returned to Cullman County, Alabama to be closer to family. Unfortunately, soon after relocating, we legally separated and I was left to raise two kids on my own as a single working parent.

8.     While around her cousins, Allison started doing more boys' activities, like playing video games. I thought maybe Allison was just growing up and that her girl phase was coming to an end. But that could not have been further from the truth.

9.     Over the next few years, Allison's personality changed significantly. She became very quiet, showed signs of depression, and regularly commented that she wanted to die. She also stopped eating regularly. All of that was very concerning to me, but Allison would not share with me what was causing that change. Then, towards the end of Allison's fourth-grade year, when she was nine years old, I found a drawing she made of herself. On one side of the drawing was a crying boy and on the other was a happy girl. Around that same time, one of my family members pointed out to me that Allison was not really playing video games; she had been spending the majority of the time perfecting her female avatars on each of the games she was "playing."

10.     Not sure what to make of all this, and at my wits end about how to help Allison, I took her to see her pediatrician. After evaluating Allison and talking with us about what had been going on, the pediatrician reiterated what I had heard from

that nurse years prior: Allison may be transgender. She then referred Allison to the gender clinic at UAB in Birmingham for specialized care and assessment.

11.     While Allison was being evaluated by a team of clinicians at UAB, I finally got a sense of the emotional issues Allison had been trying to deal with on her own. For example, Allison earnestly asked Dr. Abdul-Latif why God hates her. Faith has always been a very important part of my life and that of our family. Hearing her ask that question broke my heart, both because I wanted Allison to have a strong tie to her faith and because I recognized that my actions as her parent likely contributed to her feeling that way.

12.     Because Allison had not yet started puberty, there was no medical treatment for Allison's gender dysphoria, but Dr. Abdul-Latif and the other medical and mental health providers at the clinic gave me information about my options and recommendations about how to support Allison and treat her gender dysphoria. The clinic also connected Allison with regular mental health treatment.

13.     That was a turning point for me. I had been very nervous about publicly supporting Allison's transition because I was worried about how our family—and the broader community—would respond. But, I quickly pushed those feelings aside, knowing that I had to do what was right for my child based on the advice of experts.

14.     After returning from the appointment at UAB, I made an appointment for Allison to fix her hair into more of a girls' style while she grew it out. We also

cleaned out Allison's room of all boys' clothes, toys, bedding, and decorations, and I took Allison shopping to entirely redo her bedroom and wardrobe. Once we finished setting up her new room, I left her in the room so she could change into one of her new outfits. It is not an exaggeration to say that I saw a totally different child come out of that bedroom moments later. Allison was beaming. She was smiling and happy in a way that I had not seen for a long time.

15.    The following night I e-mailed my family to update them about Allison's transition. My family took a long time to process that announcement and some family members initially cut ties with us.

16.    The remaining few weeks of Allison's fourth-grade year were equally challenging. She experienced bullying from her classmates who were confused or did not understand Allison's transition and why it was so critical to her health and wellbeing. It was a painful time, but even through all those challenges, Allison remained resilient, further confirming that supporting her in this way was the right decision.

17.    Over the summer between Allison's fourth and fifth grade, I had multiple meetings with school administrators and Allison's teachers regarding Allison's transition. We worked together to ensure that she received the supports she needed when she returned to school for fifth grade to prevent further bullying and

allow her to focus on learning. Those efforts largely worked; Allison was generally accepted by her peers and had a much better school experience than in prior years.

18.     During Allison's fifth-grade year, some of her peers started showing the first signs of puberty. Allison became very scared about what would happen when she began puberty. Around that same time, we had a follow up appointment at the gender clinic at UAB. The purpose of the visit was to assess whether Allison had begun puberty and to gather more information about possible treatments for Allison's gender dysphoria once she begins puberty. I came to the appointment prepared with a list of questions and notebook to take notes. Allison and I asked many questions about puberty-blocking medications. As the providers answered our questions, I could see the relief in Allison's face when she realized that there was a solution to her worries about puberty. Given the distress Allison was already having around puberty, it was important to me that I got all the information I needed to make an informed decision so that I was prepared with my decision when that time came.

19.     The providers at the UAB clinic patiently answered each of our questions during that initial follow up visit. We had several more follow up visits at UAB and in each of those visits, we asked any additional questions about puberty-blocking medications that had come to mind in the months between visits. Thus, when the doctors determined that Allison had started puberty at the end of sixth

grade, I had all the information I needed to consent to Allison starting puberty-blocking medication and did so without hesitation.

20.     Because of the puberty-blockers, Allison has been able to have a typical childhood. Allison loves art and is creative. She is also an avid gamer, playing both for the entertainment and camaraderie with fellow gamers.

21.     Approximately seven months ago, Allison started taking estrogen. As with puberty-blockers, the clinic at UAB answered all our questions and made sure that we understood the risks, benefits, and alternatives of hormone-replacement therapy. Allison self-administers her dose of estrogen and medication to suppress her testosterone.

22.     Allison's mental health has improved dramatically since starting estrogen. She used to be very self-conscious, but now she is confident in herself and excited by all the changes in her body. She has grown new friendships and is doing well in school.

23.     Without medical treatment all Allison's fears around developing an Adam's apple, facial hair, and other defining features of male puberty would become her reality. Her appearance would not align with who she is and would likely disclose to everyone that she is transgender, causing her extreme anxiety and distress and exposing her to more ridicule and harassment.

24.     Seeing Allison's response to the Alabama legislature's consideration of the Act and knowing how afraid she is of male puberty, I am very worried that Allison's mental health would quickly deteriorate if the Act goes into effect. As much as I want to assure Allison that we would find a way to get her the medications she needs to treat her gender dysphoria—medications that are critical to her ability to function—I don't know if it would be possible. We receive our health insurance coverage through Alabama Medicaid. Although I would drive Allison anywhere so that she could get those medications, we cannot afford to pay for them out of pocket and I don't know if Alabama Medicaid would cover out-of-state providers or prescriptions written by those providers.

25.     Stopping or delaying Allison's medical treatments for her gender dysphoria will be devastating to her overall health and wellbeing. I worry that Allison will be inconsolable and retreat into herself. Once the medications wear off, I have little doubt that I will have to bring Allison back to UAB and that she will have to be admitted for in-patient psychiatric care to prevent her from harming herself or worse. And I know that will only be the beginning, it is hard to imagine what the long-term effects will be on her day-to-day life, but I am certain that she will no longer be the same happy child that she is today.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 th day of April, 2022.

Megan Poe

10

# DOC. 8-8

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.

     *Plaintiffs*,

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County.

     *Defendants*.

Civil Action No.
_____


**DECLARATION OF
KATHY NOE, IN
SUPPORT OF
PLAINTIFFS' MOTION
FOR TEMPORARY
RESTRAINING ORDER
& PRELIMINARY
INJUNCTION**

I, Kathy Noe,[1] hereby declare as follows:

1.      My son, Christopher Noe, and I are plaintiffs in this action. We are citizens of Alabama and reside in Lee County, Alabama.

2.      Christopher is a seventeen-year-old transgender boy. He is very passionate about music. He loves listening to all genres of music and plays the trumpet.

3.      Christopher and I have resided in Lee County since we moved to Alabama just before Christopher's fourth birthday. We moved to Alabama when my now-former husband was stationed at Fort Benning, Georgia. It is common for families stationed at Fort Benning to live in Phenix City, Alabama, like we do. I also am former active-duty military. Christopher's father is still active-duty military and is currently stationed abroad.

4.      Although Christopher was born on a military base in Oklahoma, Alabama is the only home he has known. He has gone to school in Alabama since kindergarten and still has friends he has known since kindergarten.

5.      Although Christopher was assigned female at birth, I always knew he was not a typical girl. When Christopher was two and three years old, he had long,

---

[1] Because of concerns about criminal liability and my child's privacy and safety, I am seeking to proceed in this case under a pseudonym. *See Motion to Proceed Pseudonymously*, filed concurrently herewith.  In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration.  My attorneys have a copy of that separate declaration.

pretty hair, which I would put bows in and do in other traditionally girl hairstyles. He always hated it and pulled the bows out. When he was four years old, he asked to cut it short, and I agreed. Christopher loved his new, short haircut immediately.

6.     When Christopher was in day care before he was old enough for school, he never played dress up with the other girls. He always wanted to wear pants and shorts. When his kindergarten tried to force Christopher to wear a skirt for their graduation ceremony, Christopher refused, and I fought the school and won the right for him to wear pants. The same thing happened in sixth grade, but this time, when the school refused to let him wear pants instead of a dress for the graduation ceremony, Christopher chose not to attend the ceremony rather than wear a dress.

7.     As Christopher got older, he kept wanting his hair cut even shorter, to the point where his hair was shorter than his friends who were assigned male at birth. He also gravitated towards blues and darker colors.

8.     When Christopher was around thirteen or fourteen and in his first romantic relationship, he realized that he felt more masculine than his boyfriend and identified more as a boy than a girl. That is when he told me he was transgender. Partly because it did not surprise me, I was immediately supportive.

9.      After Christopher came out to me, I put him in counseling so he could talk about it with someone who had experience with transgender children and make sure he was doing what he thought was best for him.

10.     About a year later, when Christopher was fifteen, he told his father he is transgender. Christopher's father needed some time to accept that Christopher is transgender, which really hurt Christopher. His father's initial hesitance also delayed Christopher starting hormone replacement therapy because it was important to me to have his father's approval first. Christopher's father ultimately came to accept Christopher's gender identity, which was a relief to Christopher and enabled him to start hormone replacement therapy. When Christopher's father came to support him at the Columbus, Georgia pride parade, Christopher was overjoyed.

11.     When Christopher first came out as transgender, he continued to use his birth name, which is unisex. It was also at that time that he started using "he/him" pronouns. Recently, he expressed an interest in being referred to as Christopher instead. All his teachers at school began calling him Christopher and using "he/him" pronouns. Christopher also hopes to legally change his name, but it is difficult to do so while his father is stationed abroad.

12.     Despite his social transition, when Christopher started going through female puberty it was a very hard time for both of us. He started his period at age nine, which immediately caused him extreme distress and anxiety. Christopher has never accepted the physical changes that came with female puberty and is particularly distressed by his breasts. Despite having naturally small breasts, Christopher wore a binder for nearly three years. He now prefers TransTape, which

4

he wears almost daily. He prefers the TransTape because it is more comfortable and looks more like skin than a bra. With the TransTape, he feels more like who he really is.

13.     Christopher knows he is different because he is transgender, but counseling and seeing his family and his peers accept him has helped. His family— including me, his father, his aunt, and his siblings—and other longtime family friends have strived to support him. It was hard for Christopher when one of his longtime best friends rejected his transition, but he has many other supportive friends, and he strongly stands up to anyone who bullies him or other kids.

14.     Christopher's counselor first recommended him for hormone therapy when he was sixteen. I discussed it several times with Christopher and his counselor, and we decided to pursue hormone treatment for him when he was seventeen. After being provided with a letter of recommendation from his counselor, Christopher's pediatrician referred him to an endocrinologist in November 2021. I took Christopher to his initial visit with the endocrinologist in February 2022. The endocrinologist reviewed Christopher's medical history, the recommendation of Christopher's counselor, and Christopher's lab results. He also asked how long Christopher had been seeing a counselor and how often and asked Christopher to see a psychologist as well, which he did, before he started hormone treatment.

15.     Christopher received his first testosterone injection in March 2022, and

since then I have given him his injections at home every other week. His current prescription is valid until June, at which time we will have to go back to the endocrinologist for a follow up appointment, more lab testing, and a new prescription.

16.    Christopher's care team includes his pediatrician, endocrinologist, mental health counselor, and psychiatrist. I consult with all of them on his care. Because we live in such a small town, so close to the Alabama–Georgia state line, all Christopher's doctors are in Columbus, Georgia. Both his endocrinologist and his psychiatrist have offices in both Georgia and Alabama, but we go to the Columbus, Georgia locations because they are closer. I fill his testosterone prescription at a pharmacy in Alabama.

17.    Even though it has only been a short time since starting hormones, Christopher is already significantly and noticeably happier. He is bubbly, more outgoing, and more confident in himself. I have noticed it myself and have spoken about it with Christopher's counselor, who also has noticed these positive changes. Christopher's co-workers at the local pizza place have also noticed that Christopher is more excited to go to work and be around other people. He loves showing off his new facial hair and deeper voice.

18.    Although we travel to Georgia for Christopher's care, because we live in Alabama, I am afraid of what would happen to Christopher if there were an

interference or disruption in his counseling or hormone schedule because of this law.

I also fear criminal prosecution for helping my son get the care he needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of April, 2022.

Kathy Noe

7

# DOC. 8-9

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D. | Civil Action No. _____ |
| *Plaintiffs,* | |
| v. | **DECLARATION OF JANE MOE, PhD, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County. | |
| *Defendants.* | |

1

I, Jane Moe,[1] declare as follows:

1.     I am a licensed clinical psychologist and have been practicing in Alabama for twenty years. I am licensed to practice by the State of Alabama and I work and reside in Jefferson County, Alabama.

2.     I obtained my PhD in clinical child psychology with a specialization in child development from a major university in Alabama. After completing my post-doctoral work and clinical intern hours, I received my license to practice in Alabama.

3.     Since I started my practice twenty years ago, I have worked exclusively with patients under the age of 24.  Over that time, I have treated patients with a variety of mental health issues ranging from anxiety and depression to attention deficit hyperactivity disorder or "ADHD."

4.     I currently work in a hospital setting within the University of Alabama at Birmingham (UAB) system providing direct mental health care to children and adolescents as well as training other medical providers to work with young patients. For the past two years, I have dedicated part of my practice to working with transgender young people. During that time, I have treated approximately forty transgender young people, ranging in age from five to nineteen.

---

[1] Because of concerns about criminal liability and my privacy and safety, I am seeking to proceed in this case under a pseudonym.  See Motion to Proceed Pseudonymously, filed concurrently herewith.  In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration.  My attorneys have a copy of that separate declaration.

5.     My work with transgender patients is guided by the well-established standard of care developed by the World Professional Association for Transgender Health (WPATH) and a comprehensive informed-consent protocol.

6.     When I start seeing a transgender patient who presents for a mental health assessment, I make clear that the assessment is a process that engages both the patient and their parents. The process requires a minimum of three to four visits, which typically take place over the course of two to three months, depending on the needs of the patient and their family. It is not uncommon for the assessment process to require more visits and take place over a longer period of time.

7.     The assessment begins with gathering background information on the patient through questionnaires, rating scales, and talking with the patient and their parents. Through those methods I build a profile of the patient: their level of adjustment and overall functioning, available coping mechanisms, and an understanding of their strengths and weaknesses.

8.     As the assessment proceeds, I continue to gather information from multiple sources, including the parents, that will help me determine whether the patient meets the diagnostic criteria for gender dysphoria as outlined in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5").

9.     As part of the assessment, consistent with the informed-consent protocol, I review with the patient and the patient's parents the risks, benefits, and

ranges of medical treatment available and appropriate for treating any particular patient's condition. These discussions often happen over more than one session. Based on the needs of the patient and the patient's family, I may have separate meetings with the patient and parent(s), which gives each the opportunity to ask questions or talk about issues they may not initially feel comfortable discussing in front of the other.

10.     I also encourage families to seek out other services that they may find helpful, such as talking with a religious leader, either in the hospital or the community.

11.     Once I have completed the informed-consent protocol and am confident that the patient and their parents understand the risk, benefits, and range of medical treatments for gender dysphoria, I write a letter to the patient's doctor detailing the results of my assessment. In addition to the diagnosis, I discuss the patient's overall mental health and functioning as well as recommendations for continued mental health care, as needed. Although my letters detail a patient's readiness from a mental health perspective, I always recommend that the patient's medical provider undertake a further assessment of the patient before initiating any medical treatment.

12.     Given that I work in a hospital setting, it is not uncommon for me to see patients again after they have already begun medical treatment for their gender dysphoria. During those sessions, we often talk about how their treatment is

progressing and the effects it is having on their mental health. In those discussions, we often return to our prior conversations that we had in connection with the informed-consent protocol.

13.    I understand that Governor Ivey signed the Vulnerable Child Compassion and Protection Act (the "Act").  My understanding is that the Act expressly prohibits anyone from doing or saying anything that could cause a transgender young person, under the age 19 in Alabama to undergo medical treatment for gender dysphoria.  I further understand that violating the Act exposes Alabama healthcare providers and others to criminal prosecution, which could result in me or others being sentenced to prison or a fine.  Effectively, the Act prevents transgender young people in Alabama from obtaining medically necessary, safe, effective, and established treatments for their gender dysphoria.

14.    For me, the Act means that I would have to abandon my professional and ethical obligations when treating transgender patients or risk criminal penalty for providing mental health care consistent with the prevailing standards of care. I also will be prevented from educating my patients about treatment options for gender dysphoria or referring my patients to medical providers for further evaluation and possibly prescriptions for this essential medical care. I cannot imagine doing that and, as a result, I am very afraid that I will be subject to criminal prosecution and face criminal penalties under the Act.

15.     I also am deeply concerned about the effects this law will have on my patients' mental health. Before SB 184 was debated—let alone signed into law—my patients were regularly bullied and harassed in their schools and communities. Because of the dangerous message the Act sends to Alabamians about transgender young people, many of my patients are bracing for an increase in bullying and harassment from those who would feel emboldened by the Act.

16.     Receiving medical treatment for gender dysphoria has also significantly improved the mental health and wellbeing of all the patients I have seen. If healthcare providers were required to comply with the Act, it would force transgender young people to put their health-related goals on hold. Their mental health would deteriorate and impair their ability to function in their day-to-day lives. That decline in mental health will cause a cascade of negative health outcomes, including exacerbating co-occurring mental health issues, increased reliance on maladaptive coping mechanisms (*e.g.* cutting, substance abuse), and suicidality. In fact, in the days following the signing of the Act, I had to work with two patients to develop safety plans to prevent them from attempting suicide, a risk that is well-documented and disproportionately affects transgender young people. Talking with them, I could see that the hope they had for the future had been replaced with distress, anxiety and sadness.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this  19  th day of April, 2022.

_Jane Moe, PhD_
_____
Dr. Jane Moe, PhD

# DOC. 8-10

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.

     *Plaintiffs,*

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County.

     *Defendants.*

Civil Action No.
_____


**DECLARATION OF
RACHEL KOE, MD, IN
SUPPORT OF
PLAINTIFFS' MOTION
FOR TEMPORARY
RESTRAINING ORDER
& PRELIMINARY
INJUNCTION**

1

I, Rachel Koe,[1] declare as follows:

1.     I am a physician licensed to practice by the State of Alabama. I work in southeast Alabama.

2.     I attended medical school in Alabama and, since completing my pediatrics residency, have provided care to patients in rural southeast Alabama. I have been practicing for approximately ten years.

3.     As a board-certified pediatrician, I treat patients from birth to nineteen years of age. Because I provide primary medical care, my patients present with a wide range of physical and mental health conditions. That also means that I have a wide network of medical and mental health providers that I rely on to refer patients who require subspecialty care. I am very careful with my referrals, ensuring that I am referring my patients to providers who offer quality care and follow evidence-based medicine.

4.     About eight years ago, I started treating my first transgender patient. I had learned about gender dysphoria during my medical residency, but had never treated a transgender patient. When the patient first came under my care, he was seeing a therapist, a psychiatrist, and pastoral counselor, but his health and wellbeing

---

[1] Because of concerns about criminal liability and my privacy and safety, I am seeking to proceed in this case under a pseudonym. *See Motion to Proceed Pseudonymously*, filed concurrently herewith. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

were not improving despite this care. His mother knew that her son, who had been assigned female at birth, was struggling with gender dysphoria, but the only answer she had been given to that point was more psychiatric medication. She came to me scared that her son's declining mental health was placing him at serious risk for self-harm or even suicide.

5.      Because of my involvement in pediatrics community in Alabama, I had heard of the gender clinic at UAB and referred this patient to the clinic. The referral was life changing for my patient. After about six months, he started puberty-blocking medications and approximately eighteen months later began taking testosterone. Over that time, my patient became a totally different child. He blossomed in ways that neither I nor his mother could have anticipated.

6.      Due to the distance between my patient's home and the gender clinic in Birmingham, he would come to my office for regular blood work. I would always review the test results to make sure there wasn't something urgently wrong and would then pass the results along to his medical providers at the UAB gender clinic. Once my patient started testosterone, he did not feel comfortable self-administering the medication so he came to my office every other week to have my medical staff give him his medication.

7.     This patient has graduated from my practice, but his mother keeps me updated on his life. According to his mother, he continues to thrive as a healthy and well-adjusted adult.

8.     After seeing the difference in my patient once he received care at the gender clinic, I started to learn more about medical treatments for gender dysphoria so that I would be better able to answer questions posed to me by future patients and their parents. As part of my self-study, I familiarized myself with the medical literature including publications by the World Professional Association for Transgender Health and the Endocrine Society detailing the standards of care for medical treatment for gender dysphoria.

9.     Since then, I have treated four more transgender patients. When those patients first came to see me, most had just started expressing that they were transgender. Given that, I referred them to local mental health providers for support. Once the patient was diagnosed with gender dysphoria and reached an age where medical treatment may be appropriate, I referred them to the gender clinic for further evaluation and specialty care. As with my first patient eight years ago, these patients would come to me for regular blood tests and lab work, the results of which would be sent to the UAB gender clinic so their medical providers could monitor their progress.

10.     Unfortunately, not all those patients were fortunate enough to have supportive parents to take them for treatment at the UAB gender clinic, but those who did were able to lead the happy and healthy lives that every parent wants for their child. One of those patients is still under my care to this day.

11.     As a pediatrician, I see my purpose as increasing access to quality, evidence-based care for children throughout Alabama. If allowed to go into effect, the Vulnerable Child Compassion and Protection Act (the "Act") would do the opposite. My transgender patient, and every other transgender young person across Alabama, would be denied evidence-based medical treatment for gender dysphoria. As a medical provider, this situation is very concerning to me. I am certain that my transgender patient's mental health will suffer significantly if she is denied ongoing medical treatment for her gender dysphoria. If I were to comply with the Act, I would be limited to referring her to counseling and a psychiatrist. Doing so would be a violation of my professional and ethical duties as a physician for two reasons: (1) talk therapy and psychiatric medication alone will not be effective in treating her gender dysphoria; and (2) I would be refusing to provide proven effective treatments, namely puberty-blocking medications and estrogen. That course of treatment is consistent with the standards of care and is well-supported in the medical literature by data published in reputable and peer-reviewed medical journals.

12. This Act also would criminalize me for making appropriate referrals to providers, such as the UAB gender clinic, who can offer the specialized care that transgender young people need. The Act would prevent me from answering parent questions and educating them about the literature underpinning the current standards of care. Without primary care providers who can share that critical information with transgender youth and their parents and connect them with healthcare providers who treat gender dysphoria, families raising transgender children will experience even greater isolation and barriers to medical providers with the necessary expertise to offer quality medical care. Even my support staff are concerned that the broad language used in the Act could result in them violating the Act simply by helping to provide competent quality care.

13. The Act places me in an impossible situation on multiple fronts. If I comply with the Act to avoid criminal penalties, I am abandoning my current transgender patient by not providing medical care consistent with the accepted standard of care. Further, as a medical provider who accepts Alabama Medicaid, and thus receives federal funds, complying with the act would require me to discriminate against transgender patients, jeopardizing all of my patients' access to care by violating federal antidiscrimination laws.

14. This Act also sets a dangerous precedent for interfering with the sanctity of the doctor-patient relationship. If the Alabama legislature can criminalize

evidence-based medical treatment for gender dysphoria, the Act may have a chilling

effect on the treatment of many other conditions where public opinion may not align

with medical treatments grounded in evidence-based standards of care.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed this __19__ th day of April, 2022.

_____, MD

Dr. Rachel Koe, MD

# DOC. 20

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| REV. PAUL A. EKNES-TUCKER, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No.: 2:22-cv-184-LCB-SRW |
| KAY IVEY, in her official capacity as Governor of the State of Alabama, et al., | ) ) ) ) | |
| *Defendants*. | ) ) | |

## <u>ANSWER OF DEFENDANTS STEVE MARSHALL, DARYL D. BAILEY, C. WILSON BLAYLOCK, JESSICA VENTIERE, TOM ANDERSON, AND DANNY CARR</u>

Defendants Steve Marshall, sued in his official capacity as Attorney General for the State of Alabama, and District Attorneys Darryl D. Bailey, C. Wilson Blaylock, Jessica Ventiere, Tom Anderson, and Danny Carr, each sued in his or her official capacity, state as follows for their Answer to the Plaintiffs' Complaint:[1]

1.     Admitted.

2.     Denied.

3.     Admitted that the Act prohibits certain harmful treatments administered "for the purpose of attempting to alter the appearance of or affirm the

---

[1] Defendant Kay Ivey, sued in her official capacity as Governor, will also be represented by the undersigned. She will respond separately to the Plaintiffs' Complaint.

minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in th[e] act." Denied that the Act "targets transgender minors" and denied that the proscribed treatments are "essential to the minors' health care needs."

4.      Denied.

5.      Admitted that Plaintiffs seek declaratory and injunctive relief to enjoin enforcement of the Act. Denied that they are entitled to any relief.

6.      Denied that there are valid grounds for Plaintiffs to proceed anonymously. Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

7.      Denied that there are valid grounds for Plaintiffs to proceed anonymously. Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

8.      Denied that there are valid grounds for Plaintiffs to proceed anonymously. Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

9.      Denied that there are valid grounds for Plaintiffs to proceed anonymously. Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

10.     Denied that there are valid grounds for Plaintiffs to proceed anonymously. Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

11.     Denied that there are valid grounds for Plaintiffs to proceed anonymously. Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

12.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

13.     Admitted.

14.     Admitted.

15.     Admitted that Defendant Bailey is the District Attorney of Montgomery County with authority to prosecute criminal cases within the applicable judicial circuit.

16.     Admitted that Defendant Blaylock is the District Attorney for the 32nd Judicial Circuit with authority to prosecute criminal cases within the circuit.

17.     Admitted that Defendant Ventiere is the District Attorney for Lee County with authority to prosecute criminal cases within the applicable judicial circuit.

18.     Admitted that Defendant Anderson is the District Attorney for the 12th Judicial Circuit with authority to prosecute criminal cases within the circuit.

19.     Admitted that Defendant Carr is the District Attorney for Jefferson County, Alabama, with authority to prosecute criminal cases within the circuit.

20.     Admitted that the Attorney General and District Attorneys have authority to enforce the Act. Denied that Governor Ivey possesses any authority to enforce the Act.

21.     Admitted that Plaintiffs seek relief under the United States Constitution, the equitable powers of the Court, and a preemption claim related to Section 1557 of the Affordable Care Act. Denied that they are entitled to any relief.

22.     Defendant does not contest personal jurisdiction.

23.     Admitted that venue is proper in the Middle District of Alabama.

24.     Denied.

25.     Admitted that this Court has the authority to enter a declaratory judgment and provide equitable relief in a proper case. Denied that the Plaintiffs in this case are entitled to any relief.

26.     Denied.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Admitted that WPATH has published purported "Standards of Care" for treatment of transgender people. Denied that WPATH is qualified to do so or that the resulting "Standards of Care" are based upon sound medical science.

32.     Admitted that the Endocrine Society has promulgated a "guideline" for the provision of hormone therapy as a treatment of gender dysphoria in minors and adults. Denied that the "guideline" is based upon sound medical science.

33.     Denied.

34.     Denied that the described course of treatment generally reduces psychological distress of minors with gender dysphoria. Averred that the described course of treatment is experimental, harmful, and irreversible.

35.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Admitted.

40.     Denied.

41.     Admitted.

42.     Admitted.

43.     Denied.

44.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

45.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

46.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

47.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

48.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

49.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

50.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

51.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

52.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

53.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

54.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

55.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

56.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

57.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

58.     Admitted that under the challenged Act, the described experimental, harmful, irreversible treatments will not be available to minors in Alabama if administered "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in th[e] act."  Denied that such treatments are essential to Plaintiff Zachary's mental health, and denied that stopping such treatments will cause a person's physical and mental health to suffer.

59.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

60.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

61.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

62.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

63.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

64.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

65.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

66.     Admitted that under the challenged Act, the described experimental, harmful, irreversible treatments will not be available to minors in Alabama if administered "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in th[e] act."  Otherwise denied.

67.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

68.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

69.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

70.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

71.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

72.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

73.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

74.     Denied.

75.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

76.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

77.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

82.     Denied that Dr. Moe's work with transgender patients is guided by "well-established standards of care." Otherwise, Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

83.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

84.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

85.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

86.     Denied.

87.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

88.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

89.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

90.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

91.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

92.     Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

## Count I

93.     Defendants incorporate the foregoing paragraphs as if set forth fully herein.

94.     Admitted.

95.     The cases cited by Plaintiffs speak for themselves. Otherwise denied.

96.     Denied.

97.     Denied.

98.     Denied.

## Count II

99.     Defendants incorporate the foregoing paragraphs as if set forth fully herein.

100.    Admitted.

101.    Admitted.

102.    Denied.

103.   Denied.

104.   Denied.

105.   Admitted that some classifications based on sex are subject to intermediate scrutiny. Denied that the Act discriminates on the basis of sex.

106.   Denied.

107.   Denied.

108.   Denied.

109.   Denied.

## Count III

110.   Defendants incorporate the foregoing paragraphs as if set forth fully herein.

111.   Admitted.

112.   The cited statute speaks for itself. Otherwise denied.

113.   Denied.

114.   Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

115.   Denied.

116.   Defendants lack sufficient information to admit or deny the allegations in this paragraph, and therefore denies the same.

117.   Denied.

118.   Denied.

119.   Denied.

120.   Denied.

## Count IV

121.   Defendants incorporate the foregoing paragraphs as if set forth fully

herein.

122.   Admitted.

123.   Admitted.

124.   Admitted.

125.   Denied.

126.   Denied.

## Count V

127.   Defendants incorporate the foregoing paragraphs as if set forth fully

herein.

128.   Admitted.

129.   The cited case speaks for itself.

130.   Admitted that Plaintiffs have quoted a portion of the challenged Act.

131.   Denied.

132.   Denied.

**Prayer for Relief**

Defendants deny that Plaintiffs are entitled to any relief.

**General Denial**

Defendants deny each allegation in Plaintiffs' Complaint that is not

expressly admitted above.

**Additional Defenses**

1.      Defendants preserve the defense of sovereign immunity.

2.      There is medical uncertainty concerning the proper treatment of

gender dysphoria, and the Alabama Legislature has legal authority to regulate such

treatment.

3.      Plaintiffs have no private right of action under the Affordable Care

Act.

4.      The equities do not favor injunctive or declaratory relief.

5.      The equities do not favor emergency injunctive relief.

6.      Plaintiffs are not likely to prevail on the merits.

7.      Plaintiffs have unclean hands.

8.      One or more Plaintiffs lack standing to assert some or all of their

claims.

9.      Plaintiffs fail to state a claim on which relief may be granted.

10.     Governor Ivey, who will file a separate motion to dismiss, did not cause any injury to Plaintiffs and cannot redress any alleged injury suffered by Plaintiffs.

Respectfully submitted,

Steve Marshall
  *Attorney General*

/s/ James W. Davis
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
A. Barrett Bowdre (ASB-2087-K29V)
  *Deputy Solicitor General*
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

***Counsel for Defendants Steve Marshall, Daryl D. Bailey, C. Wilson Blaylock, Jessica Ventiere, Tome Anderson, and Danny Carr***

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ James W. Davis
*Counsel for Defendants Steve Marshall,*
*Daryl D. Bailey, C. Wilson Blaylock, Jessica*
*Ventiere, Tome Anderson, and Danny Carr*

# DOC. 34

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **PAUL A. EKNES-TUCKER,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )      **Case No. 2:22-cv-184-LCB** |
| | ) |
| **KAY IVEY,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## <u>ORDER</u>

Upon consideration of Plaintiffs' motion to proceed pseudonymously (Doc. 6) and motion for a temporary restraining order and/or a preliminary injunction (Doc. 7), the Court ORDERS as follows:

An evidentiary hearing on Plaintiffs' motion for a temporary restraining order and/or a preliminary injunction is set for Thursday, May 5, 2022, at 9:00 a.m. CDT. The hearing is scheduled to last no longer than two days with the time allotted strictly as represented by the parties during today's status conference. The hearing will occur in Courtroom 2F of the Frank M. Johnson, Jr., United States Courthouse Complex. Forty-eight hours before the hearing begins, the parties shall file their proposed exhibits and a list of expected witnesses.

On or before April 27, 2022, Defendants shall file a response to Plaintiffs' motion to proceed pseudonymously. Plaintiffs' reply is due thirty-six hours after Defendants file their response.

On or before May 2, 2022, Defendants shall file a response to Plaintiffs' motion for a temporary restraining order and/or a preliminary injunction. Plaintiffs' reply is due thirty-six hours after Defendants file their response.

**DONE** and **ORDERED** April 22, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

# DOC. 62

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D. | Case No. 2:22-cv-184-LCB-SRW  Honorable Liles C. Burke  Opposed |
| Plaintiffs, | |
| and | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |
| v. | |
| STATE OF ALABAMA; KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for | |

1

the 12th Judicial Circuit; and DANNY
CARR, in his official capacity as District
Attorney for Jefferson County.

Defendants.

## PLAINTIFF-INTERVENOR UNITED STATES' MOTION FOR TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Plaintiff-Intervenor the United States of America ("United States"), pursuant

to Rule 65 of the Federal Rules of Civil Procedure, hereby moves for a temporary

restraining order and preliminary injunction to enjoin Defendants' enforcement of

Section 4 of Alabama Senate Bill ("S.B.") 184. Counsel for the United States has

spoken to counsel in the Alabama Attorney General's Office, who indicated that

the Defendants oppose the relief requested in this motion.

The felony ban on various forms of gender-affirming medical care for

transgender minors contained in Section 4 of S.B. 184 discriminates on the basis of

sex and transgender status in violation of the Equal Protection Clause of the

Fourteenth Amendment of the United States Constitution. The factual and legal

bases for the United States' motion are set forth in the accompanying

Memorandum in Support of Plaintiff-Intervenor United States' Motion for a

Temporary Restraining Order and a Preliminary Injunction. The United States

acknowledges that its Motion to Intervene [Dkt. No. 58], and Motion for Leave to

File Excess pages [Dkt. No. 60], are still pending and have not been ruled on by the Court [Dkt. No. 61].

In filing this motion, the United States does not seek to delay the case or the already-scheduled proceedings. The United States recognizes that S.B. 184 will go into effect on May 8, 2022 and that the *Eknes-Tucker* Plaintiffs previously filed a motion for a temporary restraining order and preliminary injunction, and that the Court has set a hearing on that motion, which is scheduled to begin on May 5, 2022. The United States' complaint in intervention and this motion do not raise any new claims and the government is prepared to argue and present evidence in support of this motion at the upcoming hearing, if permitted by the Court. The United States is also willing to forego filing a reply brief to prevent prejudice to the other parties.

Dated: April 29, 2022

SANDRA J. STEWART
United States Attorney
Middle District of Alabama

PRIM F. ESCALONA
United States Attorney
Northern District of Alabama

LANE H. WOODKE
Chief, Civil Division
Northern District of Alabama

*s/Jason R. Cheek*
JASON R. CHEEK
Deputy Chief, Civil Division
U.S. Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203
Tel.: (205) 244-2104
Jason.Cheek@usdoj.gov

STEPHEN D. WADSWORTH
Assistant United States Attorney
U.S. Attorney's Office
Middle District of Alabama
Post Office Box 197
Montgomery, Alabama 36101-0197
Tel.: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

JOHN POWERS (DC Bar No. 1024831)
Counsel to the Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief, Federal Coordination and
Compliance Section

COTY MONTAG (DC Bar No. 498357)
Deputy Chief, Federal Coordination and
Compliance Section

*s/Alyssa C. Lareau*
ALYSSA C. LAREAU (DC Bar No. 494881)
RENEE WILLIAMS (CA Bar No. 284855)
KAITLIN TOYAMA (CA Bar No. 318993)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Federal Coordination and Compliance
Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 305-2994
Alyssa.Lareau@usdoj.gov
Renee.Williams3@usdoj.gov
Kaitlin.Toyama@usdoj.gov

*Attorneys for Plaintiff-Intervenor United States of America*

4

CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to counsel of record.

Respectfully submitted,

s/ *Jason R. Cheek*
Jason R. Cheek
Assistant U.S. Attorney

# DOC. 62-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on
behalf of her minor son, MICHAEL BOE;
JAMES ZOE, individually and on behalf
of his minor son, ZACHARY ZOE;
MEGAN POE, individually and on behalf
of her minor daughter, ALLISON POE;
KATHY NOE, individually and on behalf
of her minor son, CHRISTOPHER NOE;
JANE MOE, Ph.D.; and RACHEL KOE,
M.D.

                    Plaintiffs,

and

UNITED STATES OF AMERICA,

                    Plaintiff-Intervenor,

    v.

STATE OF ALABAMA; KAY IVEY, in
her official capacity as Governor of the
State of Alabama; STEVE MARSHALL,
in his official capacity as Attorney General
of the State of Alabama; DARYL D.
BAILEY, in his official capacity as
District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her
official capacity as District Attorney for
Lee County; TOM ANDERSON, in his
official capacity as District Attorney for

Case No.
2:22-cv-184-LCB-SRW

Honorable Liles C. Burke

the 12th Judicial Circuit; and DANNY
CARR, in his official capacity as District
Attorney for Jefferson County.

Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFF-INTERVENOR UNITED STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................... 1

BACKGROUND ................................................... 2

I.   Transgender Youth and Their Need for Medically Necessary and
      Appropriate Gender-Affirming Care..................................... 2

II.  The Legislative Debate Regarding Senate Bill 184 ........................ 6

III. Senate Bill 184 ...................................................... 8

ARGUMENT ...................................................... 10

I.   The United States is Likely to Succeed on the Merits of its
      Equal Protection Claim .............................................. 10

     A.   S.B. 184's Ban on Gender-Affirming Medical Care
           Warrants Heightened Scrutiny Under the Equal
           Protection Clause ............................................ 10

           1.   S.B. 184's Ban on Gender-Affirming Care
                 Discriminates on the Basis of Sex and Therefore
                 Triggers Intermediate Scrutiny..................................... 11

           2.   S. B. 184's Ban on Gender-Affirming Medical
                 Care Discriminates Against Transgender
                 Individuals, And Therefore Triggers Intermediate
                 Scrutiny........................................................ 13

     B.   S.B. 184 Fails Heightened Scrutiny Because it is Not
           Substantially Related to Achieving Alabama's
           Articulated Governmental Interests ........................... 16

           1.   Alabama's Stated Interest of Protecting Children
                 is Pretextual ................................................. 18

           2.   S.B. 184 is Not Substantially Related to Protecting
                 Children from "Harmful" Effects of Gender-
                 Affirming Care................................................ 19

# TABLE OF CONTENTS

**TABLE OF CONTENTS (continued):**                                    **PAGE**

       3.    S.B. 184's Ban on Gender-Affirming Care Fails
            Even Rational Basis Review............................................ 24

  II.    S.B. 184 Will Cause Irreparable Harm Absent an Injunction............ 25

  III.   The Balance of the Equities and the Public Interest Both
         Weigh in the United States' Favor ..................................... 27

CONCLUSION ...................................................................... 28

CERTIFICATION OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE**

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) ....................................................14, 15

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016)...................................................14, 15

*Blaine v. North Brevard County Hospital District*,
   312 F. Supp. 3d 1295 (M.D. Fla. 2018) ......................................................26

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021) ........................................................26

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)....................................................................................13

*Bostock v. Clayton County, Ga.*,
   140 S. Ct. 1731 (2020)..........................................................................11, 13

*Bowen v. Gilliard*,
   483 U.S. 587 (1987)..............................................................................14, 15

*Cent. Alabama Fair Hous. Ctr. v. Magee*,
   No. 2:11-cv-982-MHT, 2011 WL 5878363 (M.D. Ala. Nov. 23, 2011) ......26

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)....................................................................................19

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..............................................................................14, 25

*City of El Cenizo v. Texas*,
   264 F. Supp. 3d 744 (W.D. Tex. 2017) .......................................................27

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989)....................................................................................17

**CASES (continued)**                                                    **PAGE**

*Craig v. Boren*,
    429 U.S. 190 (1976)........................................................16

*Corbitt v. Taylor*,
    513 F. Supp. 3d 1309 (M.D. Ala. 2021)........................................16

*Dep't of Agriculture v. Moreno*,
    413 U.S. 528 (1973)........................................................18, 25

*D.T. v. Christ*,
    552 F. Supp. 3d 888 (D. Ariz. 2021)........................................11, 14

*Evancho v. Pine-Richland Sch. Dist.*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017) ........................................14, 15

*Flack v. Wisconsin Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018)........................................11, 14

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018),
    *decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144
    (D. Idaho 2020)........................................................14

*Georgia Latino All. for Hum. Rts. v. Deal*,
    793 F. Supp. 2d 1317 (N.D. Ga. 2011),
    *Aff'd in part, rev'd in part and remanded sub nom. Georgia Latino
    All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir.
    2012)........................................................25

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ........................................11, 13, 17

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ............11, 14, 15

*Heller v. Doe*,
    509 U.S. 312 (1993)........................................................24

**CASES (continued)**                                                      **PAGE**

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) .......................................................14

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) .....................................................28

*Kirchberg v. Feenstra,*
    609 F.2d 727 (5th Cir. 1979) ...................................................20, 24

*Lyng v. Castillo,*
    477 U.S. 635 (1986)...............................................................14, 15

*M.A.B. v. Bd. of Educ. of Talbot Cnty.,*
    286 F. Supp. 3d 704 (D. Md. 2018)..........................................14, 15

*Mississippi Univ. for Women v. Hogan,*
    458 U.S. 718 (1982).........................................................16, 17, 19

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989).....................................................................26

*Nken v. Holder,*
    556 U.S. 418 (2009).....................................................................27

*Norsworthy v. Beard,*
    87 F. Supp. 3d 1104 (N.D. Cal. 2015).......................................14, 15

*Palmore v. Sidoti,*
    466 U.S. 429 (1984).....................................................................18

*Planned Parenthood Southeast, Inc. v. Bentley,*
    951 F. Supp. 2d 1280 (N.D. Ala. 2013) ..................................26, 27

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016)......................................................27

*Romer v. Evans,*
    517 U.S. 620 (1996)................................................................24, 25

**CASES (continued)**                                                   **PAGE**

*SmithKline Beecham Corp. v. Abbott Labs.*,
    740 F.3d 471 (9th Cir. 2014) .........................................................................17

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ...............................................................10, 28

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) .......................................................................26

*United States v. Virginia*,
    518 U.S. 515 (1996)............................................................................*passim*

*United States v. Windsor*,
    570 U.S. 744 (2013)....................................................................................17

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...............................................................11, 14

**STATUTES**

Ala. Crim. Code § 13-A-5-6(a)(3) .........................................................................9, 25

Ala. Crim. Code § 13A-5-11(a)(3) ....................................................................9, 25

Ala. Crim. Code § 26-1-1(a) ...............................................................................9

Ala. Code § 22-171A-2(a) ...................................................................................8

S.B. 184 (Ala. 2022) ................................................................................*passim*

**MISCELLANEOUS**

Alabama House Judiciary Committee,
    *House Judy Committee – 3/2/2022, 1:34:28 PM*, Vimeo (Mar. 2,
    2022), https://vimeo.com/683940881/4edaeefda2 .........................................7

Alabama House of Representatives,
    *House Part 1 – 4/7/2022, 9:32:05 AM*, Vimeo (April 7, 2022),
    https://vimeo.com/697000650/59a642f5d4....................................................8

**MISCELLANEOUS (continued)**                                          **PAGE**

American Psychiatric Association,
 Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition,
 Text Revision (2022), https://perma.cc/FM78-QMZ2 ...................................2

APA Assembly and Board of Trustees,
 *Position Statement on Discrimination Against Transgender and
 Gender Diverse Individuals* (2012, 2018),
 https://perma.cc/ES7D-YVG2 .......................................................................15

Department of Health & Human Servs., Office of Population Affairs,
 *Gender Affirming Care and Young People*, https://go.usa.gov/xuR8E.........20

Jason Rafferty,
 *Ensuring Comprehensive Care and Support for Transgender and
 Gender-Diverse Children and Adolescents*, American Academy of
 Pediatrics Policy Statement (Oct. 1, 2018),
 https://perma.cc/D4R6-GP6C...................................................................4, 20

Kiara Alfonseca,
 *Alabama Governor Signs 'Don't Say Gay,' Trans Care, and
 Bathroom Ban Bills*, ABC News (Apr. 8, 2022),
 https://perma.cc/6ESP-A8E9.................................................................7, 8, 16

Sandy E. James et al., Nat'l Ctr. for Transgender Equal.,
 *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016),
 https://perma.cc/5CL3-RG9E .......................................................................14

The Trevor Project,
 *Research Brief: LGBTQ Youth in the Workplace* (Mar. 30, 2021),
 https://perma.cc/TG7W-E4J3 .......................................................................15

Tony Perkins,
 *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable
 Child Compassion and Protection Act*, YouTube (Feb. 15, 2021),
 https://www.youtube.com/watch?v=E9Q_b22cUWw ....................................7

**MISCELLANEOUS (continued)**                                    **PAGE**

Letter from Kristen Clarke, Assistant Attorney General for Civil Rights,
U.S. Dep't of Justice, to State Attorneys General (March 31, 2022),
https://go.usa.gov/xuR8w ..............................................................................27

Wylie Hembree, Peggy Cohen-Kettenis, & Louis Gooren et al.,
*Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent
Persons: An Endocrine Society Clinical Practice Guideline*, The
Journal of Clinical Endocrinology & Metabolism 3869-3903, Vol. 102,
Issue 11 (Nov. 2017), https://perma.cc/8R3P-6NQY......................................6

## INTRODUCTION

This lawsuit challenges a state statute that denies necessary medical care to children based solely on who they are. The "Alabama Vulnerable Child Compassion and Protection Act," No. 2022-289, Senate Bill ("S.B.") 184 (2022), conditions whether a minor can receive certain forms of medical care on the sex that young person was assigned at birth. Section 4 of S.B. 184 makes it a felony for any person to "engage in or cause" medically necessary gender-affirming procedures and treatments for transgender minors, while leaving other minors free to receive the same procedures and treatments.

By denying transgender minors—and only transgender minors—access to gender-affirming care, S.B. 184 violates the Equal Protection Clause of the Fourteenth Amendment. The law unjustifiably prohibits transgender minors from accessing medically necessary and appropriate care, while imposing no such limitation on cisgender minors. S.B. 184 discriminates on the basis of both sex and transgender status, and it fails intermediate scrutiny. The law's ban on medically necessary gender-affirming care for transgender minors is not substantially related to serving an important government objective. To the contrary: the law actually harms the health of transgender youth. And it reflects a bias against transgender individuals that can never provide a legitimate basis for legislation. Indeed, S.B. 184 would not even survive rational-basis review.

Implementation of S.B. 184 will have immediate, drastic, and often traumatic physical and psychological impacts on vulnerable transgender children and will cause irreparable harm to medical professionals, parents and caregivers, transgender minors, and the interests of the United States. The balance of the equities and the public interest also justify preliminary relief. Therefore, the United States respectfully requests that this Court grant this motion.

## BACKGROUND

## I.    <u>Transgender Youth and Their Need for Medically Necessary and Appropriate Gender-Affirming Care</u>

Transgender people are individuals whose gender identity does not conform with the sex they were assigned at birth. A transgender boy is a child or youth who was assigned a female sex at birth but whose gender identity is male; a transgender girl is a child or youth who was assigned a male sex at birth but whose gender identity is female. By contrast, a cisgender child has a gender identity that corresponds with the sex the child was assigned at birth. A person's gender identity is innate.

According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders,[1] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant

---

[1] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, Text Revision (2022), https://perma.cc/FM78-QMZ2.

distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth. Declaration of Dr. Stephen Rosenthal, MD, in Support of Plaintiffs' Motion for a Temporary Restraining Order & Preliminary Injunction, Dkt. 8-3 ("Rosenthal Decl.") ¶¶ 24-25; Declaration of Dr. Linda A. Hawkins, Ph.D., LPC, in Support of Plaintiffs' Motion for a Temporary Restraining Order & Preliminary Injunction, Dkt. 8-1 ("Hawkins Decl.") ¶ 25.

To be diagnosed with gender dysphoria, the incongruence between sex assigned at birth and gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning. Rosenthal Decl. ¶ 25. The inability of transgender youth to live consistent with their gender identity due to irreversible physical changes in their bodies has significant negative impacts on their overall health and well-being. *See* Hawkins Decl. ¶¶ 45-46. The delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality. Rosenthal Decl. ¶¶ 26, 55; *see also* Hawkins Decl. ¶ 41.

Gender dysphoria is highly treatable with the use of medical treatments that address the clinically significant distress by helping people who are transgender live in alignment with their gender identity. *See* Rosenthal Decl. ¶¶ 23, 26. The

precise treatments for gender dysphoria depend on each person's individualized needs. *Id*. ¶ 23; Hawkins Decl. ¶¶ 32-37. The types of treatments provided differ depending on the patient's age. Rosenthal Decl. ¶ 33.

Medical treatment standards for gender dysphoria, including for minors, are well-established. Declaration of Dr. Armand Antommaria in Support of Plaintiff-Intervenor United States' Motion for a Temporary Restraining Order and a Preliminary Injunction ("Antommaria Decl."), attached hereto as Exhibit 1, ¶¶ 17, 23-38. The American Academy of Pediatrics agrees that gender-affirming care is safe, effective, and necessary for the health and wellbeing of minors suffering from gender dysphoria.[2] *Id*. ¶¶ 34-35. Before puberty, treatment for gender dysphoria does not include pharmaceutical or surgical intervention and is limited to "social transition." Hawkins Decl. ¶ 27. Social transition refers to allowing a transgender child to live and express themselves in ways consistent with their gender identity. *See id*. ¶¶ 27-29.

The Endocrine Society's clinical practice guidelines recognize that as transgender youth reach puberty, puberty-delaying hormone therapy may become medically necessary and appropriate. *See* Antommaria Decl. ¶¶ 27, 35. This treatment allows transgender youth to avoid going through endogenous puberty

---

[2] Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, American Academy of Pediatrics Policy Statement (Oct. 1, 2018), https://perma.cc/D4R6-GP6C.

and the heightened gender dysphoria and permanent physical changes that puberty would cause. *See* Rosenthal Decl. ¶¶ 36-37. This treatment is not experimental: medications that delay the onset of puberty have been used for decades to treat early onset or "precocious puberty" for cisgender adolescents. Antommaria Decl. ¶¶ 23, 33.

Interventions such as prescribing puberty-blocking medication and hormone replacement therapy require substantial planning and consultation with medical and mental health providers. *See id*. ¶¶ 16, 42; Rosenthal Decl. ¶ 47. Under the Endocrine Society's clinical guidelines, transgender adolescents may be eligible for puberty-blocking hormone therapy only if the following steps have been taken:

- A qualified mental health professional confirms the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria, gender dysphoria worsened with the onset of puberty, and any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed, such that the patient's situation and functioning are stable enough to start treatment;

- The adolescent has sufficient mental capacity to give informed consent to this treatment, has been informed of the effects and side effects of treatment (including potential loss of fertility) and options to preserve fertility; and has given informed consent and the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process; and

- A pediatric endocrinologist or other clinician experienced in pubertal assessment agrees with the indication for treatment, has confirmed that puberty has started in the adolescent, and has confirmed that there are no medical contraindications to treatment.

*See* Antommaria Decl. ¶¶ 41-42.[3]

For some transgender adolescents, it may also be medically necessary and appropriate to provide hormone therapy to initiate puberty consistent with their gender identity. *Id*. ¶¶ 28, 35. Evaluation for this treatment generally occurs starting around age 14; transgender adolescents are only eligible for hormone therapy if the steps above are satisfied. *Id*. ¶ 42. Under the World Professional Association for Transgender Health clinical guidelines, adolescents who are transgender may receive chest reconstructive surgery prior to the age of majority if they have severe gender dysphoria, provided they have been living consistent with their gender identity for a significant period of time. *See id*. ¶ 42. Other types of surgical interventions, including genital surgery, are not recommended until a patient has reached the age of majority. *Id*. ¶ 35.

## II.     The Legislative Debate Regarding Senate Bill 184

The process that produced S.B. 184 is replete with expressions of skepticism about and hostility to the needs of transgender youth. In 2021 statement, for example, Representative Wes Allen, a sponsor of S.B. 184, explained that a motivation behind legislation banning gender-affirming care for transgender youth

---

[3] Wylie Hembree, Peggy Cohen-Kettenis, & Louis Gooren et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, The Journal of Clinical Endocrinology & Metabolism 3869-3903, Vol. 102, Issue 11 (Nov. 2017), https://perma.cc/8R3P-6NQY.

is to affirm that if children "are born male, that they're a male and if they're born female, they're a female."[4]

During legislative debates, proponents of S.B. 184, including Representative Allen[5] and another bill sponsor, Senator Shay Shelnutt,[6] referred to gender-affirming care, when provided to transgender youths as "child abuse" without explaining why gender-affirming care for all other youth is entirely appropriate.

Furthermore, during a March 2, 2022 House Judiciary Committee hearing held on Alabama House Bill 266 (a companion bill to S.B. 184), Representative Allen compared gender-affirming medical care to "vaping," "dealing with cigarettes," and "dealing with drinking"—each of them a form of voluntary activity that he characterized as antisocial.[7] Representative Allen also compared prescribing medications in the context of gender-affirming care to giving "anabolic steroids" to young boys who believe they are a "Division I athlete" or a "professional athlete."[8] And later, during debate on April 7, 2022, Representative Allen not only analogized gender-affirming care to another often-criticized practice

---

[4] Tony Perkins, *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable Child Compassion and Protection Act*, YouTube (Feb. 15, 2021), https://www.youtube.com/watch?v=E9Q_b22cUWw.

[5] Alabama House Judiciary Committee, *House Judy Committee – 3/2/2022, 1:34:28 PM*, Vimeo (Mar. 2, 2022), https://vimeo.com/683940881/4edaeefda2.

[6] Kiara Alfonseca, *Alabama Governor Signs 'Don't Say Gay,' Trans Care, and Bathroom Ban Bills*, ABC News (Apr. 8, 2022), https://perma.cc/6ESP-A8E9.

[7] Alabama House Judiciary Committee, *supra* note 5.

[8] *Id.*

but criticized parents who seek it for their children, stating, "We do not allow children to get tattoos even with parental permission. And why not? Because we do not allow parents to permanently alter the bodies of their children."[9] Even on its own terms, this statement is inaccurate; in fact, Alabama law does permit minors to obtain a tattoo with prior written informed consent of the parent or legal guardian. Ala. Code § 22-17A-2(a).

In signing S.B. 184 into law, Governor Kay Ivey also expressed moral disapproval of gender-affirming care for transgender youth: "I believe very strongly that if the Good Lord made you a boy, you are a boy, and if He made you a girl, you are a girl . . . [L]et us all focus on helping them to properly develop into the adults God intended them to be."[10]

## III.  <u>Senate Bill 184</u>

Governor Ivey signed S.B. 184 into law on April 8, 2022. The law becomes effective on May 8, 2022. *See* S.B. 184, § 11.

Section 3 of the bill defines "sex" as the "biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* at § 3(3). S.B. 184's legislative findings reject the need for interventions to treat gender dysphoria, describing such treatments as "unproven"

---

[9] Alabama House of Representatives, *House Part 1 – 4/7/2022, 9:32:05 AM*, Vimeo (April 7, 2022), https://vimeo.com/697000650/59a642f5d4.

[10] Alfonseca, *supra* note 6.

and "experimental" and causing "numerous harmful effects." *Id*. at § 2(11). The findings characterize a "discordance between their sex and identity" as a phase that resolves itself over time in most cases. *Id*. at § 2(4)-(5).

Section 4 of S.B. 184 states that "no person shall engage in or cause" specified types of medical care to be performed on a minor[11] with "the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent" with their sex assigned at birth. *Id*. at § 4(a). The practices prohibited by Section 4 of S.B. 184 include administering puberty blockers, administering hormone therapy, and surgical interventions (including the removal of "any healthy or non-diseased body part or tissue, except for a male circumcision"). *Id*. at § 4(a)(1)-(6). Notably, there is an exception for procedures "undertaken to treat a minor born with a medically verifiable disorder of sex development." *Id.* at § 4(b).

A violation of Section 4 of S.B. 184 is a Class C felony, *id*. at § 4(c), which is punishable by up to 10 years of imprisonment and a fine of up to $15,000. *See* Ala. Crim. Code §§ 13-A-5-6(a)(3), 13A-5-11(a)(3).

By its very terms, Section 4 of S.B. 184 means that parents of transgender youth, transgender minors old enough to make their own medial decisions, health

---

[11] In Alabama, the age of majority is nineteen. Ala Crim. Code § 26-1-1(a).

care professionals, and others are forced to choose between forgoing medically necessary procedures and treatments or facing criminal prosecution.

## ARGUMENT

For a court to issue a preliminary injunction, the plaintiff must establish the following: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). Each of these factors is satisfied here.

## I.  The United States is Likely to Succeed on the Merits of its Equal Protection Claim

The United States is likely to succeed on the merits because Section 4 of S.B. 184 violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against transgender minors on the basis of their sex and their membership in a quasi-suspect class. Not only does Section 4 fail the heightened scrutiny applicable to such laws; it would fail even rationality review.

### A. S.B. 184's Ban on Gender-Affirming Medical Care Warrants Heightened Scrutiny Under the Equal Protection Clause

Section 4 of S.B. 184 is subject to heightened scrutiny because, in forbidding transgender youth to obtain medically necessary gender-affirming care while

leaving all other minors eligible for such care, it discriminates on the basis of sex and transgender status.

### 1. S.B. 184's Ban on Gender-Affirming Care Discriminates on the Basis of Sex and Therefore Triggers Intermediate Scrutiny

S.B. 184 bans gender-affirming care only when that care is being provided to transgender individuals. As the Supreme Court instructed, treating an individual differently because that person is transgender "unavoidably" constitutes sex discrimination because it rests on a person's having "one sex identified at birth" but identifying with a different sex or gender "today." *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731, 1746 (2020). Similarly, the Eleventh Circuit has held that differential treatment based on "gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011). Other circuits have held the same. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-10 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (school policy requiring students to use bathroom in accordance with the sex on the student's birth certificate "is inherently based upon a sex-classification"); *D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021); *Flack v. Wisconsin Dep't of Health Servs.*, 328 F. Supp. 3d 931, 948 (W.D. Wis. 2018).

Section 4 of S.B. 184 discriminates against transgender minors by

unjustifiably denying them access to certain forms of medically necessary care. The law prohibits transgender minors from obtaining care that has been well established as medically appropriate and necessary, while imposing no comparable limitation on cisgender minors for obtaining the same forms of care.

In addition, Section 4 of S.B. 184 expressly discriminates on the basis of sex because the medical treatments available to an Alabama minor under S.B. 184 depend on the sex that minor was assigned at birth based on "the individual's sex organs, chromosomes, and endogenous hormone profiles." S.B. 184, § 3. Under S.B. 184, if a minor was assigned male at birth, that minor cannot receive any of the treatments or procedures identified in Section 4 that would "alter the appearance of" the minor in a way that is "inconsistent" with being male or that would "affirm" the minor's "perception" of being female. *See* S.B. 184, § 4(a). Similarly, if a minor was assigned female at birth, that minor cannot receive any of the treatments or procedures identified in Section 4 that would "alter the appearance of" the minor in a way that is "inconsistent" with being female or that would "affirm" the minor's "perception" of being male. *See id* at § 4(a). By contrast, all other minors can access the covered treatments because those treatments are, for them, consistent with the sex the minor was assigned at birth. *See id.* at § 4(a). S.B. 184 also discriminates on the basis of sex because it conditions the availability of particular medical procedures on a sex stereotype:

that an individual's gender identity should match the sex that individual was assigned at birth. *See Glenn*, 663 F.3d at 1316, 1319-20; *see also United States v. Virginia*, 518 U.S. 515, 549-50 (1996).

Sex-based classifications like S.B. 184 are subject to heightened constitutional scrutiny, specifically intermediate scrutiny. *Virginia*, 518 U.S. at 555; *Glenn*, 663 F.3d at 1315-16 (citations and quotations omitted).

### 2. S.B. 184's Ban on Gender-Affirming Medical Care Discriminates Against Transgender Individuals, And Therefore Triggers Intermediate Scrutiny

S.B. 184 also warrants heightened scrutiny because it discriminates on the basis of transgender status. Its legislative findings reflect an intent to target transgender minors—and only transgender minors—by expressing a commitment to preventing medical care that addresses youth who experience "discordance between their sex and their internal sense of identity" and "reveal signs of gender nonconformity," including those designated with "gender dysphoria." *Compare* S.B. 184 § 2(2), 2(5), *with* Antommaria Decl. ¶¶ 43-45.[12]

A law that criminalizes access to particular medical treatments based on

---

[12] It does not matter that S.B. 184 never expressly uses the word "transgender," since it is clear beyond doubt that transgender minors are the focus on the bill. "Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *see also Bostock*, 140 S. Ct. at 1741 (noting that it is "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"); *Christ*, 552 F. Supp. 3d at 895-96.

individuals' transgender status demands heightened scrutiny because transgender people are a quasi-suspect class, as the two circuits to have squarely addressed the question have held. *See Grimm*, 972 F.3d at 611; *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019). Several district courts have concluded the same.[13]

An analysis of the factors used by the Supreme Court confirms that classifications based on transgender status warrant heightened scrutiny.[14] First, transgender people, as a class, have historically been subject to discrimination and continue to "face discrimination, harassment, and violence because of their gender identity." *Whitaker*, 858 F.3d at 1051; *see also Grimm*, 972 F.3d at 611-12; *Flack*, 328 F. Supp. 3d at 953; *M.A.B.*, 286 F. Supp. 3d at 720; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139.[15]

---

[13] *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), *decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack*, 328 F. Supp. 3d at 951-53; *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-140 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

[14] Those factors include whether the class (1) has historically been subjected to discrimination, *see Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986); (2) has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-441 (1985); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) is a minority lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).

[15] Ample evidence indicates that transgender people experience higher levels of physical and sexual violence, harassment, and discrimination in the workplace, housing, healthcare, and school than their non-transgender counterparts. Nearly half (47%) of respondents to the 2015 U.S. Transgender Survey reported being sexually assaulted. Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016), https://perma.cc/5CL3-RG9E (hereinafter USTS Report). Over 77% of respondents to the 2015

Second, no "data or argument suggest[s] that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F. Supp. 3d at 139.[16] The American Psychiatric Association has concluded that "[b]eing transgender or gender diverse implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[17]

Third, transgender individuals share "obvious, immutable, *or* distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638) (emphasis added). Specifically, transgender individuals' "gender identity does not align with the gender they were assigned at birth." *M.A.B.*, 286 F. Supp. 3d at 721. Multiple courts have held that transgender status is immutable, and "being transgender is not a choice[,] [r]ather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-613.[18]

Fourth, people who are transgender lack political power. *See id*. at 613. While the number of openly transgender elected officials is growing, they still

U.S. Transgender Survey who were out or perceived as transgender in kindergarten through twelfth grade reported having one or more negative experiences (such as verbal harassment or physical attacks) in K-12 because people thought they were transgender. *Id*. at 132, 133. Another recent study found 61% of employed transgender respondents between the ages of thirteen to twenty-four reported experiencing discrimination in the workplace. The Trevor Project, *Research Brief: LGBTQ Youth in the Workplace* (Mar. 30, 2021), https://perma.cc/TG7W-E4J3.

[16] *Accord Grimm*, 972 F.3d at 612; *M.A.B.*, 286 F. Supp. 3d at 720; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Norsworthy*, 87 F. Supp. 3d at 1119 n.8.

[17] APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2012, 2018), https://perma.cc/ES7D-YVG2.

[18] *See also M.A.B.*, 286 F. Supp. 3d at 720-721; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Norsworthy*, 87 F. Supp. 3d at 1119 n.8; *Adkins*, 143 F. Supp. 3d at 139-40.

15

represent a fraction of office holders. *Id.* The proliferation of enacted legislation

aimed at restricting the rights of transgender individuals, particularly transgender

minors, is further evidence of the limited political power of the transgender

community.[19]

Because Section 4 of S.B. 184 discriminates against transgender persons and

they constitute a quasi-suspect class, the statute is subject to intermediate scrutiny.

### B. S.B. 184 Fails Heightened Scrutiny Because it is Not Substantially Related to Achieving Alabama's Articulated Governmental Interests

To survive heightened scrutiny, the State must show that Section 4 of S.B.

184 "serves important governmental objectives" and that the "discriminatory

means employed are substantially related to achievement of those objectives." *See*

*Virginia*, 518 U.S. at 524 (quoting *Mississippi Univ. for Women v. Hogan*, 458

U.S. 718, 724 (1982)); *see also Craig v. Boren*, 429 U.S. 190, 197 (1976). "The

burden of justification is demanding and it rests entirely on the State." *Virginia*,

518 U.S. at 533 (quoting *Mississippi Univ. for Women*, 458 U.S. at 724).

Heightened scrutiny requires that the justification proffered be "exceedingly

---

[19] The very same day Governor Ivey signed S.B. 184 into law, she also signed H.B. 322 into law. Alfonseca, *supra* note 6. H.B. 322 requires students in public K-12 schools to only use bathrooms and locker rooms that correspond with the sex listed on their original birth certificate; it also bans classroom instruction regarding sexual orientation and gender identity that is not age or developmentally "appropriate." Alabama has also issued Policy Order 63, which requires transgender individuals to undergo "gender reassignment surgery" before they may amend the sex designation on their driver's licenses. *See Corbitt v. Taylor*, 513 F. Supp. 3d 1309 (M.D. Ala. 2021).

persuasive." *Id*. at 531. The required inquiry provides an enhanced measure of

protection in circumstances where there is a greater danger that the legal

classification results from impermissible prejudice or stereotypes. *See City of*

*Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, when intermediate scrutiny applies, the "justification must be

genuine, not hypothesized or invented post hoc in response to litigation," and

"must not rely on overbroad generalizations." *Virginia*, 518 U.S. at 533; *see also*

*Glenn*, 663 F.3d at 1321; *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d

471, 482 (9th Cir. 2014) (noting that the court must examine the law's "actual

purposes and carefully consider the resulting inequality to ensure that our most

fundamental institutions neither send nor reinforce messages of stigma or second-

class status.") (citing *United States v. Windsor*, 570 U.S. 744 (2013)). A

classification does not withstand heightened scrutiny when "the alleged

objective" of the classification differs from the "actual purpose." *Mississippi Univ.*

*for Women*, 458 U.S. at 730.

S.B. 184's ban on medically necessary gender-affirming care for transgender

youth does not survive the rigorous analysis that heightened scrutiny demands for

two reasons. First, the State's articulated objectives are pretextual justifications

that mask the true purpose of the law: to express moral disapproval of a vulnerable

and unpopular group. That desire is not legitimate, let alone important or

exceedingly persuasive. Second, even assuming the State's asserted interest of protecting children is genuine, S.B. 184 is not substantially related to that interest because S.B. 184's ban on various forms of gender-affirming care is harmful, not beneficial, to children.

### 1.  Alabama's Stated Interest of Protecting Children is Pretextual

S.B. 184's stated purpose is to protect youth. The legislation's text and its legislative history, however, belie the State's stated purpose. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean" that the desire to express moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest." *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). Unfortunately, S.B. 184's real purpose is that forbidden desire.

The text and legislative history of S.B. 184 are marbled with expressions of moral disapproval of transgender status. So, too, its suggestion that transgender minors will "outgrow" their gender identity. S.B. 184, § 2(4).

Furthermore, S.B. 184's legislative history, including statements from Governor Ivey and co-sponsor Representative Allen, *see* pp. 7-8, *supra*, reflect profound disapproval of people whose gender identity is inconsistent with the sex they were assigned at birth.

S.B. 184 bans particular treatments and procedures only when they are being

used to affirm a gender identity that is "inconsistent with the minor's sex" as assigned at birth. S.B. 184, § 4. As such, S.B. 184 singles out transgender minors for discriminatory treatment. Those same procedures that S.B. 184 prohibits for transgender minors, remain as permissible as before for all other purposes, including gender-affirming care for anyone who is not transgender. Puberty blockers and surgical treatments can have "life implications," S.B. 184, § 2(15), for cisgender and intersex minors too, and yet Alabama leaves the decisions whether to obtain such treatments to treating physicians, parents, and minors. The law's selective concern undercuts the state's profession of a legitimate purpose. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (a state undermines its stated interest "when it leaves appreciable damage to that supposedly vital interest unprohibited.") (cleaned up).

### 2. S.B. 184 is Not Substantially Related to Protecting Children from "Harmful" Effects of Gender-Affirming Care

But even if the State's asserted interest of protecting children were genuine, S.B. 184's felony ban on certain forms of gender-affirming care would violate the Equal Protection Clause because the ban is not "substantially related" to achieving that objective. *Virginia*, 518 U.S. at 533 (quoting *Mississippi Univ. for Women*, 458 U.S. at 724) (internal quotations omitted). Quite the opposite: banning the forms of gender-affirming care criminalized by S.B. 184 will have devastating effects on many transgender youths while providing no countervailing benefit to

19

them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979) (courts must "weigh[] the state interest sought to be furthered against the character of the discrimination caused by the statutory classification").

The empirical propositions upon which S.B. 184 rests are in fact untrue.

First, gender-affirming care for gender dysphoria is safe and effective. Contrary to the State's assertion that gender-affirming care for transgender youth has "numerous harmful effects," *see* S.B. 184 § 11, the overwhelming weight of medical evidence confirms that the medical care that S.B. 184 forbids is safe, effective, and medically necessary treatment for the health and wellbeing of children and adolescents suffering from gender dysphoria. Antommaria Decl. ¶¶ 34-35; Rosenthal Decl. ¶¶ 23, 27-30; *see generally* pp. 4, 21-22, *supra*.[20] Moreover, delaying or denying gender-affirming care to transgender youth experiencing gender dysphoria can result in numerous harms, including depression, anxiety, and suicidality. *See* Hawkins Decl. ¶¶ 41, 45-46.[21] The medical evidence shows that trying to "cure" a transgender individual with a gender dysphoria diagnosis by forcing them to live in alignment with their sex assigned at birth, and

---

[20] Rafferty, *supra* note 2.
[21] *See* Dep't of Health & Human Servs., Office of Population Affairs, *Gender Affirming Care and Young People*, at 1, https://go.usa.gov/xuR8E ("Medical and psychosocial gender affirming healthcare practices have been demonstrated to yield lower rates of adverse mental health outcomes, build self-esteem, and improve overall quality of life for transgender and gender diverse youth.").

not their gender identity, is severely harmful and ineffective. *See* Antommaria

Decl. ¶ 47; Rosenthal Decl. ¶ 22.

Second, the medical research supporting gender-affirming care is

substantial. Alabama is simply mistaken when it asserts that gender-affirming

medical treatment for patients experiencing gender dysphoria is new, unproven,

and poorly studied. *See* S.B. 184 § 2(11). To the contrary. Antommaria Decl. ¶ 23.

Leading medical associations, including the American Psychiatric Association, the

World Professional Association for Transgender Health, the American Academy of

Pediatrics, and the Endocrine Society, have all recognized that gender-affirming

care is safe, effective, and medically necessary treatment for the health and

wellbeing of some children and adolescents suffering from gender dysphoria. *Id.* ¶

35. Hormone treatment for gender dysphoria began soon after estrogen and

testosterone became commercially available in the 1930s and puberty blockers

have been in use for over 20 years. *Id*. ¶ 23.

The assertions in S.B. 184's legislative findings that the use of puberty

blockers for youths experiencing gender dysphoria is "experimental" and not

"FDA-approved," *see* S.B. 184 § 2(7), is misleading. Antommaria Decl. ¶¶ 17, 19.

There have been ample observational studies, including federally funded trials,

supporting the use of puberty blockers and other gender-affirming hormone

therapy for adolescents. *Id*. ¶¶ 27-29.

The safety and effectiveness of the treatments and procedures used to treat minors experiencing gender dysphoria is not undermined because there have not been randomized, placebo-based trials for those treatments and procedures. *Id*. ¶¶ 24-30. And the absence of such trials does not render them "experimental." *Id*. ¶¶ 14, 17, 23-30. In fact, such trials would be unethical because insufficient participants are likely to enroll, and investigators and participants cannot be "blind" since they would know if they were receiving the active treatment or a placebo due to changes in their bodies or the absence thereof. *Id*. ¶¶ 30-31. The lack of randomized trials is common for pediatrics. *Id*. ¶¶ 31-32. Relevant here, there is the same absence of randomized trials supporting the use of puberty blockers to treat precocious puberty (the premature initiation of puberty), *id*. ¶ 31, a practice Alabama law continues to permit. There is no medical or research basis for distinguishing the use of puberty blockers to treat precocious puberty from using them to treat gender dysphoria. *Id*. ¶¶ 3, 47.

Likewise, lack of FDA approval for a specific use does not bear on a treatment's efficacy. FDA approval is not required for all uses of a medication and off-label use is in fact common in many areas of medicine, including pediatrics. *Id*. ¶¶ 20, 22. Once the FDA has approved a medication for one indication, thereby agreeing that it is safe (*i.e.*, its benefits outweigh its potential risks) and effective for this intended use, prescribers are generally free to prescribe it for other

indications. *Id.* ¶ 21. For example, nafcillin, an antibiotic commonly used to treat lung or joint infections, lacks a pediatric indication. *Id.* ¶ 22. There are many reasons, wholly unrelated to a drug's safety or efficacy why its manufacturer might not seek FDA approval for an additional use or patient group; it may already be approved for adults but not for minors even though studies indicate it is safe when used by both groups. *Id.* ¶¶ 20 & n.2, 21.

Third, parents and many minors are able to comprehend the risks involved. S.B. 184's legislative findings assert that minors and their parents "are unable to comprehend and fully appreciate the risk and life implications" of the treatments banned by Section 4. S.B. 184 § 2(15). This is incorrect. Antommaria Decl. ¶ 39. To begin, parental consent is required before providing gender-affirming care to minors, as it is before medical providers render treatments with comparable risks, uncertainty, and levels of evidence. *Id.* ¶ 40. For example, the evidence indicates that most adolescents with gender dysphoria "have sufficient medical decision-making capacity to make decisions regarding puberty blockers." *Id.* ¶ 41. And minors must be informed about all potential effects, including implications for fertility and options for fertility preservation, as a predicate step. *Id.* ¶ 42.

Moreover, S.B. 184 operates under the faulty presumption that parents, in consultation with their medical providers, cannot make reasoned, informed decisions about appropriate care for their children. In fact, parents "are frequently

23

asked to consent to medical treatments for minors with comparable risks, uncertainty, and levels of evidence." *Id*. ¶¶ 40, 47. S.B. 184's legislative findings offer no compelling reason why parents would be unable to do so only when these treatments are being provided to transgender youths.

Because the medical evidence demonstrates that S.B. 184's prohibition on transgender youth who experience gender dysphoria receiving the specified forms of care when their physicians and parents agree that such care is appropriate simply does not substantially achieve the interest of protecting children, the statute violates the Equal Protection Clause. *See Feenstra*, 609 F.2d at 734.

### 3. S.B. 184's Ban on Gender-Affirming Care Fails Even Rational Basis Review

Even if this Court were to apply only rational-basis review, S.B. 184's ban on gender-affirming medical care could not survive. The ban lacks even a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). By requiring that the "classification bear a rational relationship to an independent and legitimate legislative end," courts ensure that "classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

As explained above, *see* pp. 18-19, *supra*, S.B. 184 in fact reflects a desire to express moral disapproval of transgender status. Given the law's targeting of

transgender minors, its passage indeed "seems inexplicable by anything but animus toward" transgender people. *See id.* S.B. 184 is "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests . . . ." *Romer*, 517 U.S. at 635. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean" that the desire to express moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534. S.B. 184 is motivated by prejudice toward a particular group, transgender individuals, bearing no rational relationship to the law's stated purpose and thus cannot survive even the lowest level of review. *See Cleburne*, 473 U.S. at 450.

Thus, the United States is likely to succeed on the merits of its equal protection claim regardless of the level of scrutiny applied.

## II.     S.B. 184 Will Cause Irreparable Harm Absent an Injunction

If Section 4 of S.B. 184 is permitted to go into effect, the provision of certain types of medically necessary gender-affirming care to transgender minors will constitute a felony, punishable by up to 10 years in prison and a fine of up to $15,000. S.B. 184 § 4(c); *see also* Ala. Crim. Code §§ 13-A-5-6(a)(3), 13A-5-11(a)(3). Courts have repeatedly recognized that the risk of criminal penalties constitutes an immediate and irreparable harm. *See, e.g.*, *Georgia Latino All. for Hum. Rts. v. Deal*, 793 F. Supp. 2d 1317, 1340 (N.D. Ga. 2011), *aff'd in relevant*

*part*, *Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250

(11th Cir. 2012); *Planned Parenthood Southeast, Inc. v. Bentley*, 951 F. Supp. 2d

1280, 1288-89 (N.D. Ala. 2013); *Cent. Alabama Fair Hous. Ctr. v. Magee*, No.

2:11-cv-982-MHT, 2011 WL 5878363, at *3 (M.D. Ala. Nov. 23, 2011).

That is especially true given the court of action S.B. 184 compels individuals

to forgo. S.B. 184 will cause immense and irreparable physical and psychological

harm to many transgender minors by terminating their access to necessary medical

treatment and impose severe harm on their parents and medical providers. *See*

Antommaria Decl. ¶ 47; Hawkins Decl. ¶¶ 45-47; Rosenthal Decl. ¶¶ 56-57. As

one district court explained, the following forms of irreparable harm can ensue: (1)

transgender youths face "high risk of gender dysphoria and lifelong physical and

emotional pain," (2) parents must choose between watching their children suffer or

uprooting their familiar to move to another state, and (3) physicians must choose

between breaking the law and providing appropriate medical care. *Brandt v.

Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021); *see also Blaine v. North

Brevard County Hospital District*, 312 F. Supp. 3d 1295, 1306 (M.D. Fla. 2018).[22]

---

[22] The Supreme Court and other courts have held that irreparable harm results from the
enforcement of a state law that violates the Constitution. *See New Orleans Pub. Serv., Inc. v.
Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (assuming that irreparable injury
may be established "by a showing that the challenged state statute is flagrantly and patently
violative of . . . the express constitutional prescription of the Supremacy Clause") (citation and
internal quotation marks omitted); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)
("We have 'stated that an alleged constitutional infringement will often alone constitute

### III.   The Balance of the Equities and the Public Interest Both Weigh in the United States' Favor

The final two factors governing the issuance of preliminary relief—the balance of equities and the public interest—merge where the federal government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (Government's "harm and the public interest are one and the same, because the government's interest is the public interest"). Here, these factors manifestly favor the United States. The United States has a strong and legitimate interest in ensuring that states respect their obligations under the Constitution, and in fulfilling the United States' responsibilities under Federal law.[23] If this Court does not grant preliminary relief, the lives of many transgender youth in Alabama and their families will be upended while the court continues to evaluate the lawfulness of S.B. 184 during the pendency of the litigation. *See Planned Parenthood Southeast, Inc.*, 951 F. Supp. 2d at 1290.

By contrast, Alabama will suffer no harm if the preliminary relief sought by the United States is granted; as discussed above, S.B. 184 fails to protect the health of minors notwithstanding its purported motivations. *See* pp. 19-20, *supra*.

---

irreparable harm.'"); *see also City of El Cenizo v. Texas*, 264 F. Supp. 3d 744, 809 (W.D. Tex. 2017).

[23] *See* Letter from Kristen Clarke, Assistant Attorney General for Civil Rights, U.S. Dep't of Justice, to State Attorneys General (March 31, 2022), https://go.usa.gov/xuR8w.

Moreover, because the United States has demonstrated that it is likely to prevail on the merits, an injunction preventing the enforcement of the unconstitutional legislation poses no harm. *Alabama*, 691 F.3d at 1301 ("Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) ("the city has no legitimate interest in enforcing an unconstitutional ordinance."). In sum, the balance of the equities and the public interest weigh in the United States' favor.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a temporary restraining order and a preliminary injunction.

Dated: April 29, 2022                    Respectfully submitted,

SANDRA J. STEWART                    KRISTEN CLARKE
United States Attorney                   Assistant Attorney General
Middle District of Alabama               Civil Rights Division

PRIM F. ESCALONA                     JOHN POWERS (DC Bar No. 1024831)
United States Attorney                   Counsel to the Assistant Attorney General
Northern District of Alabama             Civil Rights Division

LANE H. WOODKE                       CHRISTINE STONEMAN
Chief, Civil Division                    Chief, Federal Coordination and
Northern District of Alabama             Compliance Section

JASON R. CHEEK                       COTY MONTAG (DC Bar No. 498357)
Deputy Chief, Civil Division             Deputy Chief, Federal Coordination and
U.S. Attorney's Office                   Compliance Section
Northern District of Alabama

1801 Fourth Avenue North
Birmingham, Alabama 35203
Tel.: (205) 244-2104
Jason.Cheek@usdoj.gov

STEPHEN D. WADSWORTH
Assistant United States Attorney
U.S. Attorney's Office
Middle District of Alabama
Post Office Box 197
Montgomery, Alabama 36101-0197
Tel.: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

*s/Alyssa C. Lareau*
ALYSSA C. LAREAU (DC Bar No. 494881)
RENEE WILLIAMS (CA Bar No. 284855)
KAITLIN TOYAMA (CA Bar No. 318993)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Federal Coordination and Compliance
Section
950 Pennsylvania Avenue NW - 4CON
Washington, DC 20530
Tel.: (202) 305-2994
Alyssa.Lareau@usdoj.gov
Renee.Williams3@usdoj.gov
Kaitlin.Toyama@usdoj.gov

*Attorneys for Plaintiff-Intervenor United
States of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to counsel of record, in accordance with Rules 24(c) and 5(b)(2)(E).

Respectfully submitted,

<u>s/ *Jason R. Cheek*</u>
Jason R. Cheek
Assistant U.S. Attorney