No. 22-11707

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

## APPELLANTS' APPENDIX VOLUME XI OF XIII

Christopher Mills
SPERO LAW LLC
557 East Bay St.,
#22251
Charleston, SC 29451
(843) 606-0640
cmills@spero.law

July 5, 2022

Steve Marshall
   *Attorney General*
Edmund G. LaCour Jr.
   *Solicitor General*
A. Barrett Bowdre
Thomas A. Wilson
   *Deputy Solicitors General*
James W. Davis
   *Deputy Attorney General*
Benjamin M. Seiss
   *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

# INDEX

**TAB**

**VOLUME I**

Civil Docket Sheet ..........................................................................................A

Individual Plaintiffs' Complaint (April 19, 2022) ........................................1

Order Reassigning Case to Judge Liles C. Burke (April 20, 2022)..........................3

Individual Plaintiffs' Motion for Preliminary Injunction (April 21, 2022)...............7

Individual Plaintiffs' Brief in Support of Motion for Preliminary Injunction (April 21, 2022)....................................................................................8

    Exhibit 1 – Declaration of Linda A. Hawkins, Ph.D. .................................. 8-1

    Exhibit 2 – Declaration of Morissa J. Ladinsky, M.D. ................................. 8-2

**VOLUME II**

    Exhibit 3 – Declaration of Stephen M. Rosenthal, M.D. ............................ 8-3

    Exhibit 4 – Declaration of Rev. Paul A. Eknes-Tucker................................. 8-4

    Exhibit 5 – Declaration of Brianna Boe ...................................................... 8-5

    Exhibit 6 – Declaration of James Zoe ......................................................... 8-6

    Exhibit 7 – Declaration of Megan Poe ........................................................ 8-7

    Exhibit 8 – Declaration of Kathy Noe ......................................................... 8-8

    Exhibit 9 – Declaration of Jane Moe, Ph.D. ................................................ 8-9

    Exhibit 10 – Declaration of Rachel Koe, M.D. .......................................... 8-10

Answer of Defendants (April 21, 2022) .................................................................20

Order Setting Evidentiary Hearing (April 22, 2022) ............................................ 34

United States of America's Motion for Temporary Restraining Order and
    Preliminary Injunction (April 29, 2022) .........................................................62

United States of America's Brief in Support of Motion for Temporary
    Restraining Order and Preliminary Injunction (April 29, 2022) ................ 62-1

**VOLUME III**

    Exhibit 1 – Declaration of Armand H. Antommaria, M.D. ........................ 62-2

Defendants' Exhibit List and Notice of Filing of Evidence in Opposition
    to Plaintiffs' Motion for Preliminary Injunction (May 2, 2022) ....................69

    Exhibit 1 – Alabama Vulnerable Child Compassion and
                    Protection Act ......................................................................... 69-1

    Exhibit 2 – Expert Report of James Cantor, Ph.D.,
                    Clinical Psychologist and Director of Toronto
                    Sexuality Centre...................................................................... 69-2

    Exhibit 3 – Expert Report of Michael K. Laidlaw, M.D.,
                    Endocrinologist...................................................................... 69-3

    Exhibit 4 – Expert Report of Quentin L. Van Meter, M.D.,
                    Pediatric Endocrinologist and Associate Professor of
                    Pediatrics at Emory University................................................. 69-4

**VOLUME IV**

    Exhibit 5 – Expert Report of Paul W. Hruz, M.D., Ph.D.,
                    Associate Professor of Pediatrics in the Division of Pediatric
                    Endocrinology and Diabetes at Washington University
                    School of Medicine.................................................................. 69-5

    Exhibit 6 – Expert Report of Patrick Hunter, M.D.,
                    Pediatrician, Bioethicist, and Former Chair of the Pediatric
                    Department at Scotland Memorial Hospital ............................. 69-6

Exhibit 7 – Expert Report of Dianna Kenny, Ph.D.,
         Psychotherapist and Former Professor of Psychology at
         University of Sydney .................................................................. 69-7

**VOLUME V**

Exhibit 8 – Stephen B. Levine, E. Abbruzzese & Julia M. Mason,
         *Reconsidering Informed Consent for Trans-Identified
         Children, Adolescents, and Young Adults*,
         J. OF SEX & MARITAL THERAPY (Mar. 17, 2022)....................... 69-8

Exhibit 9 – *Evidence Review: Gonadotropin Releasing Hormone
         Analogues for Children and Adolescents with Gender
         Dysphoria*, Nat'l Inst. for Health & Care Excellence (NICE)
         (Mar. 11, 2021) ....................................................................... 69-9

**VOLUME VI**

Exhibit 10 – *Evidence Review: Gender-Affirming Hormones for
         Children and Adolescents with Gender Dysphoria*,
         Nat'l Inst. for Health & Care Excellence (NICE) (Mar. 11,
         2021) ....................................................................................... 69-10

Exhibit 11 – Sweden National Board of Health and Welfare Policy
         Statement, Socialstyrelsen, *Care of Children and
         Adolescents with Gender Dysphoria: Summary* (2022) .......... 69-11

Exhibit 12 – Finland's Council for Choices in Healthcare Policy
         Statement, Palveluvalikoima, *Recommendation of the
         Council for Choices in Health Care in Finland (PALKO /
         COHERE Finland)* ................................................................. 69-12

Exhibit 13 – Académie Nationale de Médecine, *Medicine and Gender
         Transidentity in Children and Adolescents* (Feb. 25, 2022).... 69-13

Exhibit 14 – The Royal Australian & New Zealand College of
         Psychiatrists, *Recognising and Addressing the Mental
         Health Needs of People Experiencing Gender Dysphoria /
         Gender Incongruence*, Position Statement 103 (Aug. 2021) .. 69-14

Exhibit 15 – *Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.* [2020] EWHC (Admin) 3274 .................................................. 69-15

## VOLUME VII

Exhibit 16 – Centers for Medicare & Medicaid Services, Tamara Syrek Jensen, et al., *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (CAG-00446N) (Aug. 30, 2016)........................................................................ 69-16

Exhibit 17 – Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) (excerpts) .............................................................................. 69-17

Exhibit 18 – World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012) (pp. 1-112)................................. 69-18

## VOLUME VIII

Exhibit 18 (cont.) – World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012) (pp. 113-120) ............................ 69-18

Exhibit 19 – Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017).............. 69-19

Exhibit 20 – Lisa Littman, *Parent Reports of Adolescents & Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, PLOS ONE 13(8):e0202330 .................................. 69-20

Exhibit 21 – Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR No. 50, 3353-54 (Oct. 2021) ............................................................... 69-21

Exhibit 22 – Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, J. OF HOMOSEXUALITY (Apr. 30, 2021)............................................. 69-22

Exhibit 23 – Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696-704 (Oct. 2014)........................... 69-23

Exhibit 24 – Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 PEDIATRICS no. 4 (Oct. 2018) ........................................... 69-24

Exhibit 25 – Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 832 (Dec. 2015)................................... 69-25

Exhibit 26 – Declaration of Corinna Cohn ............................... 69-26

Exhibit 27 – Declaration of Sydney Wright ............................ 69-27

Exhibit 28 – Declaration of Carol Frietas ................................ 69-28

Exhibit 29 – Declaration of Barbara F. .................................... 69-29

Exhibit 30 – Declaration of John Doe ..................................... 69-30

Exhibit 31 – Declaration of John Roe ..................................... 69-31

## VOLUME IX

Exhibit 32 – Declaration of Kristine W. .................................. 69-32

Exhibit 33 – Declaration of Yaacov Sheinfeld ......................... 69-33

Exhibit 34 – Declaration of Martha S. ...................................................... 69-34

Exhibit 35 – Declaration of KathyGrace Duncan ..................................... 69-35

Exhibit 36 – Declaration of Jeanne Crowley ............................................ 69-36

Exhibit 37 – Declaration of Ted H. Halley ................................................ 69-37

Exhibit 38 – Declaration of Kellie C. ....................................................... 69-38

Exhibit 39 – Declaration of Gary Warner ................................................. 69-39

Exhibit 40 – April 15, 2022 emails regarding *Ladinsky v. Ivy*
        litigation.................................................................................. 69-40

Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary
    Injunction (May 2, 2022) ....................................................................74

## VOLUME X

UAB Patient Information and Consent Form (May 3, 2022) .......................... 78-41

Defendants' Notice of Filing Corrected Exhibit 41 (May 3, 2022).........................87

Exhibit 1 – Corrected Exhibit 41 – Sydney Wright, *I Spent a Year as a*
        *Trans Man. Doctors Failed Me at Every Turn*, DAILY
        SIGNAL (Oct. 7, 2019). ............................................................. 87-1

Amended Intervenor Complaint (May 4, 2022) ....................................................92

Procedural Orders and Status of Forthcoming Opinion (May 8, 2022) ................94

Transcript of Preliminary Injunction Hearing - Volume I (pp. 1-149)
    (May 5, 2022) ...............................................................................104

## VOLUME XI

Transcript of Preliminary Injunction Hearing – Volume I (cont.) (pp.195-206)
    (May 5, 2022)................................................................................ 104

Transcript of Preliminary Injunction Hearing - Volume II (May 6, 2022) ..........105

**VOLUME XII**

Transcript of Preliminary Injunction Hearing - Volume I (pp. 150-170)
(May 5, 2022) (SEALED) ..............................................................................106

**VOLUME XIII**

Opinion and Order (May 13, 2022) .......................................................................107

Defendants' Notice of Appeal of Order Granting Preliminary Injunction
(May 16, 2022) ...........................................................................................108

Notice of Correction re: Opinion and Order (May 19, 2022) ...............................112

Corrected Opinion and Order (May 19, 2022) ................................................ 112-1

Transcript of Preliminary Injunction Hearing - Volume I (cont.) (pp. 170-94)
(May 5, 2022) ............................................................................................129

Certificate of Service

# DOC. 104
# (continued)

```
 1

 2

 3

 4

 5

 6

 7

 8

 9            (End of in-camera examination.)

10            (Recess.)

11            THE COURT:  All right.  Did I hear 15 or 20 minutes?

12            MR. DOSS:  That is my aim, Your Honor.

13            THE COURT:  All right.  Let's proceed.

14            MR. DOSS:  Your Honor, plaintiffs call Pastor Paul

15    Eknes-Tucker.

16                       PAUL EKNES-TUCKER,

17    having been first duly sworn by the courtroom deputy clerk, was

18    examined and testified as follows:

19                       DIRECT EXAMINATION

20    BY MR. DOSS:

21    Q    Would you mind stating your name for the record, please,

22    sir?

23    A    Paul Eknes-Tucker.

24    Q    What's your occupation?

25    A    I am pastor of Pilgrim Church in Birmingham.
```

```
 1  Q    And sometimes people all you Pastor Paul?

 2  A    They call me Pastor Paul, yeah.

 3  Q    How long have you been a pastor at Pilgrim Church?

 4  A    Seven years.

 5  Q    What kind of church is it?

 6  A    It's part of the United Church of Christ denomination.

 7  Q    For how long have you been a pastor?

 8  A    I've been a pastor for 45 years.

 9  Q    Did you grow up in Alabama?

10  A    I was born in Alabama, grew up here until I finished

11  college at Birmingham-Southern.

12  Q    Did you obtain any education after Birmingham-Southern?

13  A    Moved to Atlanta to go to seminar at Candler School of

14  Theology at Emory University.

15  Q    Have you always been with United Church of Christ?

16  A    No.  I started out as a United Methodist.  That's my birth

17  denomination.

18  Q    All right.  And were you always United Methodist before

19  you became United Church of Christ?

20  A    No.  I was part of the Metropolitan Community Churches for

21  the interim part between those two.

22  Q    Over the course of your 40-plus year career as a pastor,

23  have you had occasions where parents have come to talk to you

24  about their child who is transgender?

25  A    In every congregation I have served in those -- the last
```

1  40 of the 45 years, there has been either persons in my

2  congregation that were transgender, or people in the community

3  I served at that sought me out about issues around their

4  transgender children or relatives.

5  Q    And those sorts of circumstances when folks are coming to

6  you to talk to you about their transgender children, what kind

7  of concerns are the parents voicing to you?

8  A    All kinds of things.  Primarily, there would be religious

9  issues.  Often parents felt they could not talk to their

10  pastors of their home churches because they weren't sure

11  exactly how to -- this would play in their home churches, how

12  they would feel about their child identifying this way.

13       THE COURT:  Mr. LaCour, just to give you fair notice,

14  I am likely to ask you the same question at the conclusion of

15  his testimony that I asked at the conclusion of Dr. Koe.

16       MR. DOSS:  Thank you, Your Honor.

17  BY MR. DOSS:

18  Q    When parents come to you about these issues, Pastor Paul,

19  what kind of advice do you give them?

20  A    I try to talk about their questions, particularly around

21  religious issues.  Those are the things I feel like I can talk

22  about.  And then I try to connect them to resources in the

23  community to whatever kinds of things they are looking to find,

24  we try make sure they can get those resources.

25  Q    Those resources sometimes include medical help?

```
 1  A     They do.

 2  Q     In the past, Pastor Paul, have you helped connect parents

 3  with transgender minors to doctors who provide gender-affirming

 4  care for patients?

 5  A     I have.

 6  Q     And generally speaking, do you understand that

 7  gender-affirming care for minors can include, for example,

 8  puberty blockers and hormone treatments?

 9  A     Yes.

10  Q     Are you familiar with UAB's gender clinic for children?

11  A     I am.

12  Q     And since becoming aware of the UAB gender clinic, if you

13  had a parent come to you telling you I have a transgender

14  minor, would you consider recommending to that parent that the

15  parent take the kid to that clinic?

16  A     I would.

17  Q     Having seen the law that we're here about today, do you

18  have concerns that doing what you just described would run

19  afoul of that law?

20  A     I do.  Having read the part that says that anyone who is

21  accused of having a cause for connecting someone with a medical

22  professional could be criminalized through this law.  And that

23  could include someone like me.

24  Q     Have you had an occasion over your years of being a pastor

25  to see kids who have been transgender and have received medical
```

```
 1  help and who have flourished?
 2  A    Yes.
 3  Q    Are you aware of other clergy in the state of Alabama who
 4  share your concerns that you have expressed to me today about
 5  this particular law?
 6  A    Yes.  In fact, after I was contacted to be a part of this
 7  case, I told other clergy friends and colleagues in Birmingham
 8  area, and word began to spread.  And we created a letter for
 9  other clergy to sign on to about this issue, about supporting
10  families with transgender members.  And as of today, there are
11  over 80 clergy from across Alabama who, if I couldn't have been
12  here today, would have been willing to step into my place.
13             MR. DOSS:  One moment, Your Honor.
14        All right.  I appreciate your time here today, Pastor
15  Paul.  Attorneys for the State defendants may have some
16  questions for you now.
17             THE WITNESS:  Thank you.
18                        CROSS-EXAMINATION
19  BY MR. MILLS:
20  Q    Good afternoon, Pastor.
21  A    Good afternoon.
22  Q    My name is Christopher Mills, and I represent the State
23  defendants.  I thank you for being here today.
24        Could an individual obtain from you a puberty blocker
25  medication?
```

```
 1  A     No.

 2  Q     Could they obtain a cross-sex hormone?

 3  A     No.

 4  Q     Could they obtain a surgery for gender transition

 5  purposes?

 6  A     No.

 7  Q     Have you advised minors or their parents that a minor

 8  should submit to any of those specific procedures?

 9  A     No.

10  Q     Have you advised minors or their parents that their

11  religion requires them to submit to any of those specific

12  procedures?

13  A     No.

14  Q     Your medical advice is limited to suggesting that those

15  you counsel seek professional help; is that right?

16  A     I don't give medical advice.  I try to connect folks to

17  where the resources are.

18  Q     You mentioned just a minute ago, when I was contacted

19  before this lawsuit.  What did you mean?

20  A     When the attorneys asked me if I would be interested in

21  being a part of this lawsuit.

22  Q     And when did that happen?

23  A     The Monday after Easter.

24  Q     That was April 18th; is that right?

25  A     That sounds right.  I think so.
```

```
 1   Q    And before you were contacted by the attorneys, had you
 2   considered filing a lawsuit against this law?
 3   A    I was not sure how in the world to be -- to make a
 4   difference.  So this was a great opportunity that I felt
 5   honored to be a part of.
 6   Q    Before you were contacted by them, you didn't think the
 7   law criminalized your ministry, did you?
 8   A    I didn't know.
 9   Q    And when the attorneys called you, what did they say?
10        MR. DOSS:  Your Honor, I am going to object, to the
11   extent this calls for privileged communications between counsel
12   and him.  It is privileged, attorney-client communication.
13        MR. MILLS:  Your Honor, there was no attorney-client
14   relationship at this point.
15        MR. DOSS:  Communications in anticipation of creating
16   that relationship.
17      For example, if I go meet with an attorney and discuss
18   generally my problems, that can include privileged
19   communications.
20        MR. MILLS:  But this client wasn't seeking an
21   attorney.  The attorneys contacted him.
22        THE COURT:  From what I have heard right now, we have
23   got privilege.  If you want to voir dire him some more and see,
24   but from what I see, we have got privilege.
25        MR. MILLS:  That's fine, Your Honor.  I will move on.
```

```
 1  BY MR. MILLS:

 2  Q    So after they contacted you, you agreed to become a

 3  plaintiff in this lawsuit; is that right?

 4  A    Yes.

 5          MR. MILLS:  Thank you.  No further questions.

 6          THE WITNESS:  Thank you.

 7          MR. DOSS:  Nothing further, Your Honor.

 8          THE COURT:  All right.  And does that conclude your

 9  witnesses?

10          MR. DOSS:  It does, Your Honor.

11          THE COURT:  The United States has a witness; is that

12  correct?

13          MR. CHEEK:  Your Honor, if I may.

14          THE COURT:  Uh-huh.

15          MR. CHEEK:  Throughout today, we have been trying to

16  streamline our presentation.  And so we may not have a witness.

17  We just need to go over the evidence from today and confer with

18  our group, if that's okay, and then make that determination.

19  So...

20          THE COURT:  If you are telling me you are speeding my

21  trial up, that's always going to be okay.

22          MR. CHEEK:  Can we have at least 30 minutes, or do we

23  want to...

24          THE COURT:  Is that a decision you just want to make

25  in the morning?
```

```
 1              MR. CHEEK:  That's fine with us.  Whatever the Court
 2    prefers, obviously.
 3              THE COURT:  And y'all correct me if I am wrong.  It
 4    does seem like we're back on track with time.  Everybody agree
 5    with that?
 6         You know, if I take 30 minutes and then you say, no, we've
 7    waited here 30 minutes.  If I take 30 minutes, and then we do
 8    call a witness, then we're here at 6:00 o'clock.  I'd say it's
 9    a better use of everybody's time.
10         We'll call it a day today.  Come back at 9:00 o'clock in
11    the morning.
12         I appreciate what you have said, and that will give you
13    plenty of time to make your mind up.
14              MR. CHEEK:  Thank you, Your Honor.
15              THE COURT:  So I know we have had just up and down and
16    off and on air conditioning today.  And so Judge Thompson has
17    graciously offered to let us use his courtroom tomorrow.  On
18    the off chance that GSA gets this normalized by 8:00 o'clock in
19    the morning, we will come back here.  If they don't, we are
20    going to go to 68-degree air and not have to suffer anymore.
21         So stand by, and I'm sure that my courtroom deputy will
22    find a way to get the word out if we decide to change things in
23    the morning.
24              MR. CHEEK:  That is a welcome change.
25              MR. DAVIS:  May I ask one thing?
```

```
 1              THE COURT:  Absolutely.

 2              MR. DAVIS:  If the United States does not call a

 3   witness, we are certainly prepared to begin with Dr. Cantor at

 4   9:00 in the morning.  I do not know that he will last all

 5   morning.  He very well may.  I think probably would.

 6         If he doesn't, our next witness, I do not expect to be

 7   here before about 12:30.  We had anticipated it would be later

 8   in the afternoon.

 9         She's driving.  She is the individual, Sydney Wright, who

10   detransitioned.  She's driving from her home near the Georgia

11   line.  I don't think I could get her here any earlier.

12         I'm asking the Court if it would be okay if there happens

13   to be a gap between Cantor and this next witness of -- it

14   should not be long.

15              THE COURT:  How long a witness do you think that your

16   last witness would be?

17              MR. DAVIS:  I think my direct will be probably about a

18   half an hour.

19              THE COURT:  Okay.  So, yeah, if you -- if we're

20   leaving room for the United States in the event they do have a

21   witness, and then your first witness, I think that probably

22   works out about right, and we're still finished by 1:30 or 2:00

23   o'clock.

24              MR. DAVIS:  It sounds like if the United States does

25   call a witness, there is zero risk -- we are great with time
```

```
 1   with both of our witnesses going tomorrow.

 2        If the United States does not call a witness, when Cantor

 3   finishes, our second witness may not be here, but it won't be

 4   long before she does arrive.

 5             THE COURT:  That's okay.  We can always slide lunch up

 6   a little bit if we need to.

 7             MR. DAVIS:  We appreciate the courtesy.

 8             THE COURT:  Absolutely.

 9        Any other procedural matters we ought to take up today in

10   anticipation of tomorrow?

11             MS. EAGAN:  No, Your Honor.

12             THE COURT:  Okay.  All right.  Excellent.

13        Well, then, I will see everybody at 9:00 o'clock again in

14   the morning.

15        We will make the decision early about moving courtrooms.

16   We won't make that decision at 8:59.

17        All right.  Anyway, thank you.  Have a good day.

18             (Whereupon, the above proceedings were concluded at

19        4:50 p.m.)

20

21

22

23

24

25
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                        CERTIFICATE

 2

 3

 4          I certify that the foregoing is a correct

 5     transcript from the record of proceedings in the

 6     above-entitled matter.

 7

 8

 9

10

11                                        05-08-2022

12     Christina K. Decker, RMR, CRR           Date

13     Federal Official Court Reporter

14     ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25
```

# DOC. 105

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF ALABAMA
2                            NORTHERN DIVISION

3

4        REV. PAUL A. EKNES-TUCKER,    *
         et al.,                       *
5                                      *
                   Plaintiffs,         *   2:22-cv-00184-LCB
6                                      *   May 6, 2022
         vs.                           *   Montgomery, Alabama
7                                      *   9:00 a.m.
         KAY IVEY, in her official     *
8        capacity as Governor of the   *
         State of Alabama, et al.,     *
9              Defendant.              *
         *****************************

10

11

12           TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                            VOLUME II
13            BEFORE THE HONORABLE LILES C. BURKE
                   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
         and Procedures Vol. VI, Chapter III, D.2.  Transcript
24              produced by computerized stenotype.

25

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                          APPEARANCES

 2
           FOR THE PLAINTIFFS:
 3         Melody Eagan, Esq.
           Jeff Doss, Esq.
 4         Amie Vague, Esq.
           LIGHTFOOT, FRANKLIN & WHITE, LLC
 5         The Clark Building
           400 20th Street North
 6         Birmingham, Alabama 35203

 7         Brent Ray, Esq.
           KING & SPALDING
 8         353 N. Clark Street
           12th Floor
 9         Chicago, Illinois 60654

10         Michael Shortnacy, Esq.
           KING & SPALDING
11         633 W. Fifth Street
           Suite 1600
12         Los Angeles, California 90071

13         Jason R. Cheek, Esq.
           US ATTORNEYS OFFICE, NDAL
14         1801 Fourth Avenue North
           Birmingham, Alabama 35203
15
           John Michael Powers, Esq.
16         Coty Montag, Esq.
           DOJ-Crt
17         Civil Rights Division
           950 Pennsylvania Avenue
18         Washington, DC  20530

19

20         FOR THE DEFENDANT:
           James W. Davis, Esq.
21         Edmund LaCour, Esq.
           Barrett Bowdre, Esq.
22         Benjamin Seiss, Esq.
           Christopher Mills, Esq.
23         OFFICE OF THE ATTORNEY GENERAL
           501 Washington Avenue
24         P.O. Box 300152
           Montgomery, Alabama 36130-0152
25         (334) 242-7300
```

1

2          COURTROOM DEPUTY:  Deena Harris

3

4          COURT REPORTER:  Christina K. Decker, RMR, CRR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3      ARMAND ANTOMMARIA                                        213
       DIRECT EXAMINATION                                       213
4      BY MR. POWERS
       CROSS-EXAMINATION                                        225
5      BY MR. BOWDRE

6

       JAMES CANTOR, MD                                         253
7      DIRECT EXAMINATION                                       253
       BY MR. DAVIS
8      CROSS-EXAMINATION                                        305
       BY MS. EAGAN
9      REDIRECT EXAMINATION                                     332
       BY MR. DAVIS

10

11     SYDNEY WRIGHT                                            337
       DIRECT EXAMINATION                                       338
12     BY MR. DAVIS
       CROSS-EXAMINATION                                        355
13     BY MR. DOSS
       REDIRECT EXAMINATION                                     362
14     BY MR. DAVIS

15

16

17

18

19

20

21

22

23

24

25

                      *Christina K. Decker, RMR, CRR*
                       Federal Official Court Reporter
                          101 Holmes Avenue, NE
                         Huntsville, Alabama 35801
                   256-506-0085/ChristinaDecker.rmr.crr@aol.com

27

**P R O C E E D I N G S**

1 
2                  (In open court.)

3          THE COURT:  Good morning.  Please be seated.

4      All right.  I am going to aim my question at you,

09:08:27  5  Mr. LaCour.

6      You heard the testimony of Pastor Eknes-Tucker.  What, if

7  anything, in his testimony would trip the Alabama statute?

8          MR. LACOUR:  Your Honor, we don't think anything in

9  his testimony would trip the statute, as you said.  The key

09:08:45 10  language is does he engage in or causing the prescription or

11  administration of puberty blockers?  Is he engaging or causing

12  the prescription or administration of the cross-sex hormones?

13      Clearly, he is not under the plain text of the statute, so

14  we don't think he has standing, which I think is probably good

09:09:06 15  news and bad news for him.  But the good news is he is not

16  going to be prosecuted.  The bad news is he doesn't get to --

17  in his words -- make a difference by continuing in this case.

18      But that's the State's answer.

19          THE COURT:  All right.  Since he has addressed

09:09:23 20  standing, anybody want to touch on that from the plaintiffs'

21  side?

22          MR. DOSS:  Yes, Your Honor.

23      Our concern remains that under this Act's language, it

24  does capture speech for referrals, for actions by people who

09:09:42 25  are counseling patients, or people who are counseling anyone to

```
 1  put them in touch with medical providers knowing full well what
 2  those medical provisions may or may not be.
 3      I think this does also feed into the void for vagueness
 4  argument, Your Honor, because the State is making these
 5  post-hoc decisions about when the statute does apply, despite
 6  its plain language and when it does not apply.
 7      So we still think that the statute on its face is
 8  triggered.  We appreciate the State's statement on the record
 9  that it doesn't think that the statute is triggered.
10      On the other hand, it shows just how vague the statute is,
11  that we can't know just by reading it, which violates the Fifth
12  Amendment rights' notice.
13          THE COURT:  All right.  One other thing that I will
14  put the parties on notice about when we get to closings.
15      So I assume everybody has read the Arkansas order and
16  transcript.  Would that be a correct statement?
17      All right.  So I would like everybody to be able to
18  address at the conclusion of these proceedings what parts of
19  that order, if any, that they disagree with, why, and to what
20  degree those -- that legal reasoning is applicable here.  And I
21  know that we do have some differences in that statute.
22      So just put that in your back pocket, and let's be
23  prepared to talk about that.
24      Okay.  So I understand the United States has a witness
25  this morning; is that correct?
```

```
 1              MR. POWERS:  Yes, Your Honor.

 2          Before we get started, I have a quick bit of housekeeping.

 3   The United States moves to admit United States Exhibit Numbers

 4   1 through 12.

 5              MR. BOWDRE:  No objection, Your Honor.

 6              THE COURT:  Be admitted.

 7              MR. POWERS:  Thank you.  Now, the United States would

 8   like to call Dr. Armand Antommaria to the stand.

 9              THE COURT:  All right.

10                    ARMAND ANTOMMARIA,

11   having been first duly sworn by the courtroom deputy clerk, was

12   examined and testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. POWERS:

15   Q    Good morning.

16   A    Good morning.

17   Q    Doctor, could you please introduce yourself for the Court?

18   A    My name is Armand Herbert Matheny Antommaria.  I am a

19   pediatrician and bioethicist.  I am employed by Cincinnati

20   Children's Hospital Medical Center where I direct its ethics

21   center.  I'm the Lee Ault Carter chair of pediatric ethics and

22   an attending physician in the division of hospital medicine.

23              THE COURT:  Mr. Powers, I neglected to ask you how

24   long you think this witness will be.

25              MR. POWERS:  Well under half an hour.
```

```
 1              THE COURT:  Okay.  All right.
 2  BY MR. POWERS:
 3  Q    Doctor, do you hold an MD from the Washington University
 4  School of Medicine?
 5  A    I do.
 6  Q    Do you hold a Ph.D. from the University of Chicago
 7  Divinity School?
 8  A    Yes.
 9  Q    Doctor, what are your areas of specialty?
10  A    As a physician, my area of specialty is pediatric hospital
11  medicine.  So I take care of general pediatric patients,
12  patients with asthma or pneumonia, who are admitted to the
13  hospital.  And I'm also a bioethicist and specialize in
14  pediatric clinical ethics.
15  Q    Thank you.
16       Can you please explain what a bioethicist is?
17  A    Bioethics is a multidisciplinary field that addresses the
18  ethical issues that arise in medicine and the life sciences.
19  Q    Doctor, are you board certified?
20  A    I am.  I am board certified in pediatrics and in pediatric
21  hospital medicine.  And I'm also certified as a health-care
22  ethics consultant.
23  Q    Are you part of a multidisciplinary team that provides
24  treatment to adolescent patients with gender dysphoria?
25  A    Yes.  Cincinnati Children's has a clinic that provides
```

Timestamps: 09:13:01 (line 5), 09:13:09 (line 10), 09:13:31 (line 15), 09:13:48 (line 20), 09:14:07 (line 25)

1  care for children and adolescents with gender dysphoria, and I

2  participate in their monthly multidisciplinary team meetings,

3  as well as consult on an as-needed basis when special ethical

4  issues arise in the care of the patients that they treat.

09:14:34 5  Q    And are the sorts of ethical issues that do arise when

6  you're consulted regarding the care of transgender patients?

7  A    At times, there are issues regarding who is able to

8  provide informed consent, whether adult patients have medical

9  decision-making capacity or ethical issues when there are

09:14:55 10  unusual risks or benefits involved in the care of a particular

11  patient.

12  Q    Are you involved in the development of treatment protocols

13  related to treating adolescent patients with gender dysphoria?

14  A    Yes, to the extent that they have ethical issues in

09:15:10 15  particular.  I participated in the development and the periodic

16  review of the clinic's informed consent documents.

17  Q    Thank you, Doctor.

18       As part of your duties, do you consult with medical

19  providers on the treatment of infants and children with

09:15:28 20  differences in sex development?

21  A    Yes.  Cincinnati Children's also has a clinic that

22  provides care to individuals with differences of sex

23  development.  And I participate in similar ways in that

24  multidisciplinary's team meetings both in terms of patient care

09:15:50 25  and in terms of gender policies.

```
 1   Q     Thank you.
 2            MR. POWERS:  Your Honor, the United States moves to
 3   have Dr. Antommaria qualified as an expert in bioethics and
 4   treatment protocols for adolescents with gender dysphoria.
09:16:05 5            MR. BOWDRE:  No objection, Your Honor.
 6            THE COURT:  All right.  He will be accepted for that
 7   purpose.
 8            MR. POWERS:  Thank you.
 9   BY MR. POWERS:
09:16:11 10  Q     Dr. Antommaria, is a diagnosis of gender dysphoria made by
11   physicians and other medical professionals, or is it made by
12   the patient or the parents?
13   A     A diagnosis of gender dysphoria is made by clinicians.
14   Q     And are there external indicators that can be evaluated as
09:16:29 15  part of that process?
16   A     Yes.  There are patient behaviors that can be observed
17   that support the diagnosis such as, you know, missing school or
18   other behaviors which can be observed that support that
19   diagnosis.
09:16:48 20  Q     Doctor, as part of your work, are you familiar with
21   research studies, systematic reviews, and clinical practice
22   guidelines in a variety of areas related to pediatric care?
23   A     Yes, I am.
24   Q     And are you familiar with studies, reviews, and guidelines
09:17:06 25  regarding treatment specifically for adolescents experiencing
```

```
 1  gender dysphoria?
 2  A     Yes.
 3  Q     And what is the difference between research and clinical
 4  care?
 5  A     Research and clinical care are differentiated both in
 6  terms of their goals and their methods.  So the goal of
 7  research is to generate generalizable knowledge.  And the
 8  methods are the use of a protocol that defines the steps in a
 9  study.
10        Clinical care's goal is to provide benefit to individual
11  patients, and its procedures are individualized decision
12  making.
13  Q     And what is the difference between observational studies
14  and randomly controlled trials?
15  A     So the two big categories of studies are observational and
16  experimental.
17        In observational studies, the investigators don't control
18  who's exposed to the intervention.  The most -- one of the
19  common forms of an observational study would be a prospective
20  observational study in which individuals who receive a
21  treatment are followed over time to see the effects of that
22  treatment.
23        In experimental studies, the investigators control who
24  receives the intervention.  Commonly in a randomized controlled
25  trial, neither the participant nor the investigator controls
```

```
 1  who receives the treatment or the intervention or the control.
 2  People analogize randomization to a coin flip in terms of
 3  determining who receives which.
 4  Q    And, Doctor, do you have an opinion about the viability of
 5  conducting randomly controlled trials testing the use of
 6  treatment, like puberty blockers and hormone therapy, for
 7  adolescents with gender dysphoria?
 8  A    Yes, I do.  I would have concerns that randomized
 9  controlled trials of these interventions would be unethical,
10  and even if they could be ethically performed, they would have
11  substantial methodological limitations.
12  Q    And what are the ethical concerns first?
13  A    In order for a research study to be ethical, particularly
14  a randomized controlled trial, there must exist something
15  called equipoise.  The investigator must believe that the
16  intervention and the control are each likely to be equally
17  efficacious.  And many investigators in this field would
18  believe that there is sufficient evidence of the benefit of the
19  use of puberty blockers or gender-affirming hormone therapy
20  that a randomized controlled trial would not be ethical.
21       In addition, you would need to be sure that the study
22  could be completed.  For example, that you would have enough
23  participants sign up to be in the study to make exposing them
24  to the risks of the study to be beneficial.  And there would be
25  concerns that not enough participants could be recruited to
```

```
 1  such a trial to be ethical.
 2  Q    And do you have any additional methodological concerns
 3  regarding randomly controlled trials?
 4  A    Yes.  One of the key factors in a randomized controlled
 5  trial is they're what's called blinded, but neither the
 6  participants nor the investigators know whether the
 7  participants is receiving the intervention or the control.
 8       And in a randomized control trial of this nature, it would
 9  be -- not be possible to blind investigators that are
10  participants because they would know which -- what's called an
11  arm, which arm the participant is in by the development or lack
12  of development of secondary sexual characteristics.  So such a
13  randomized controlled trial would be of substantially less
14  value.
15  Q    Thank you.
16       Now, what's the difference between a systematic review of
17  the literature and a clinical practice guideline?
18  A    So in a systematic review of the literature, the
19  individual will collect all of the evidence and -- relevant to
20  a particular outcome and grade the quality of that evidence.
21       Systematic reviews of the literature, however, do not make
22  treatment recommendations.  Just because the level of evidence
23  for intervention might be low doesn't mean that that
24  intervention should not be used.
25       A clinical practice guideline both evaluates the quality
```

1    of the evidence, makes treatment recommendations, and grades

2    the quality of those recommendations, because there are many

3    other factors rather than in addition to the quality of the

4    evidence that need to be considered in making treatment

09:22:09    5    recommendations.

6    Q    Doctor, can a clinical practice guideline be based on the

7    results of observational studies?

8    A    Yes, they can.  And frequently in pediatrics, clinical

9    practice guidelines are based on observational studies, because

09:22:27   10    unfortunately there are fewer randomized controlled trials

11    available in pediatrics than in adult medicine.

12         So other Endocrine Society guidelines for other pediatric

13    conditions like congenital adrenal hyperplasia or obesity are

14    largely based on observational studies.  And even treatment

09:22:50   15    guidelines for important crucial things, such as the American

16    Heart Association's guidelines for performing CPR in children,

17    are largely based on observational studies.

18    Q    I think you might have mentioned one of them already, but

19    what guidelines help establish the standard of care when

09:23:08   20    treating adolescents with gender dysphoria?

21    A    The two predominant clinical practice guidelines for

22    treating adolescents with gender dysphoria would be the

23    Endocrine Society's and WPATH's.

24    Q    Thank you.

09:23:23   25         Is the level of evidence supporting these puberty blockers

       1  and hormone therapy in these guidelines comparable to the level

       2  of evidence for other treatments in pediatrics?

       3  A    Yes.

       4  Q    Doctor, are you familiar with the European policies, with

09:23:41 5  respect to treating adolescents diagnosed with gender

       6  dysphoria?

       7  A    I am.

       8  Q    And could you please summarize your understanding of that?

       9  A    So in part, particularly reference has been made to the

09:23:56 10  Swedish policy.  That policy is only available in an official

      11  English translation of a three-page summary.

      12       So it's difficult to fully evaluate these policies, given

      13  the limited amount of material that's available in official

      14  English translation.

09:24:17 15       But my understanding of the policies are that they have

      16  reviewed the literature, but they use less robust methods than

      17  the Endocrine Society, because they neither grade the evidence

      18  nor the strength of their recommendations, and that none of the

      19  policies instantiate a ban on gender-affirming health care, the

09:24:40 20  use of puberty blockers or gender-affirming hormone treatment.

      21  Q    Thank you.

      22       Doctor, are you familiar with the provisions of Senate

      23  Bill 184?

      24  A    I am.

09:24:49 25  Q    Are the provisions of Senate Bill 184 consistent with the

```
 1  guidelines issued by any country in Europe?
 2  A    No.
 3  Q    Doctor, once a diagnosis of gender dysphoria has been
 4  made, how does the informed content process work in the
 5  pediatric context?
 6  A    In the pediatric context, parental consent is required --
 7  in general, parental consent is required for treatment.
 8       Adolescents should participate in medical decision making
 9  to the extent that it is appropriate, and for adolescents,
10  their assent should also be sought.
11       And the informed consent process requires a discussion of
12  the potential benefits, risks, and alternatives of the
13  treatment.
14  Q    Doctor, do you have an opinion as to whether puberty
15  blockers and hormone therapy treatments have benefits to some
16  adolescents diagnosed with gender dysphoria that outweigh the
17  potential risks?
18  A    Yes.  That for some individuals with gender dysphoria the
19  benefits of treatment outweigh the risks.
20  Q    And what role does desistance play, or what our friends
21  have referred to as desistance play in your analysis?
22  A    So in evaluation of the risk, if treatments are
23  discontinued, there may be effects of those treatments, which
24  are only partially reversible.  But that is only one of the
25  factors that needs to be weighed in the risks and benefit
```

```
 1   analysis.  And that the evidence about the current rates of

 2   desistance are that it is sufficiently low, that that would not

 3   be in general a reason not to proceed with treatment.

 4   Q    Thank you.

 5        Is there high quality evidence supporting the alternative

 6   of psychotherapy alone, so without the assistance of puberty

 7   blockers and hormone therapy?  Is there high quality evidence

 8   supporting that as a treatment for gender dysphoria in

 9   adolescents?

10   A    I am not aware of any randomized controlled trials of

11   psychotherapy alone for the treatment of adolescents with

12   gender dysphoria.

13   Q    As an ethicist, do you have an opinion regarding parents

14   and adolescents' ability to adequately understand the potential

15   cause and benefits in giving informed consent to the provision

16   of puberty blockers and hormone therapy?

17   A    Although this decision involves a complex set of risks,

18   benefits, and alternatives, it is comparable to other decisions

19   that parents and their children make in pediatric health care

20   on a frequent basis.

21   Q    And in the instance that there was a medical provider who

22   violated their ethical obligations to their patients with

23   respect to obtaining informed content, are there forms of

24   oversight in place?

25   A    There would be multiple mechanisms to address those
```

Timestamps in left margin:
09:26:43 (line 5)
09:27:03 (line 10)
09:27:23 (line 15)
09:27:42 (line 20)
09:27:57 (line 25)

```
 1   potential shortcomings.  If that provider worked for a

 2   health-care institution, they would be credentialed by that

 3   institution.  The institution would have a responsibility for

 4   oversight of their practice.

 5       The state medical board could review their practice and

 6   potentially discipline them or withdraw their license.

 7       And although I am not a lawyer, it's my understanding that

 8   there would be the potential for malpractice claims for

 9   inadequate informed consent.

10       So there are multiple mechanisms that exist to address the

11   case in which somebody obtained inadequate informed consent.

12   Q   So there are other mechanisms in place other than a direct

13   ban on the treatment itself?

14   A   Yes.  I'm sorry.  You're correct.

15   Q   Doctor, I would like you to consider a circumstance where

16   adolescents no longer have access to puberty blockers or

17   hormone treatments.  Are there any equally effective

18   alternative medical treatments for adolescents with gender

19   dysphoria?

20   A   There are not.

21   Q   Is there an ethical basis for distinguishing the provision

22   of treatment to minors experiencing precocious puberty, from

23   transgender minors experiencing gender dysphoria?

24   A   There is not.

25       So in particular, the type of evidence for both treatments
```

```
 1  are the same.  The evidence supporting the use of puberty

 2  blockers for the treatment of central precocious puberty are

 3  also prospective observational trials with relatively small

 4  numbers of participants.

 5      There are no randomized controlled trials to support the

 6  use of puberty blockers for central precocious puberty.

 7  Q    Compared to treatments in other contexts, is there

 8  anything about treatments for adolescents with gender dysphoria

 9  that would require prohibition by the State from an ethical

10  perspective?

11  A    No.

12  Q    And last question, Doctor.  What are the ethical

13  implications for medical providers treating minors diagnosed

14  with gender dysphoria if Senate Bill 184 is implemented?

15  A    They would be unfortunately placed in the untenable

16  position of either violating their ethical obligations to their

17  patients to conform with the law, or fulfilling their

18  professional duties to their patients and being criminally

19  charged.

20          MR. POWERS:  Thank you.  No further questions.

21          THE COURT:  Cross?

22                    CROSS-EXAMINATION

23  BY MR. BOWDRE:

24  Q    Good morning, Dr. Antommaria.  My name is Barrett Bowdre.

25  I represent the State defendants.
```

09:29:42 (line 5)
09:29:58 (line 10)
09:30:11 (line 15)
09:30:28 (line 20)
09:30:53 (line 25)

1    A    Good morning.

2    Q    You agree, don't you, that most individuals who experience

3    gender dysphoria in childhood desist?

4    A    The evidence would support that individuals who experience

09:31:18 5    gender dysphoria at young ages such as three or four, that the

6    majority of them do desist.

7    Q    You noted that the goal of clinical practice is the

8    individualized assessment in providing care for the individual

9    patient that you're treating.  But no clinician can accurately

09:31:45 10    predict whether the patient sitting in front of him will

11    persist in their gender dysphoria or will, as the majority do,

12    desist; isn't that correct?

13    A    So at the point of evaluating an adolescent, the

14    desistance rate is substantially smaller than it is for the

09:32:11 15    desistance rate of young children, and that there would be the

16    ability to be fairly certain that they are unlikely to desist.

17    But expecting perfection in the practice of medicine and being

18    able to predict with 100 percent certainty is unrealistic

19    because there's nothing in health care that can occur with 100

09:32:36 20    percent certainty.

21    Q    Can you predict with 80 percent certainty whether the

22    individual patient sitting in front of you will persist or

23    desist in his or her gender dysphoria?

24    A    The evidence of which I am aware would suggest that the

09:32:53 25    desistance rate is -- for adolescents is substantially less

1   than 80 percent.  If the desistance rate for adolescents -- I

2   apologize -- is substantially less than 20 percent.

3   Q    Is that for adolescents who are treated with puberty

4   blockers, or adolescents who are not treated with medical

09:33:11 5   interventions?

6   A    The most robust data that is available are adolescents who

7   are treated with gender-affirming health care.

8   Q    So can you tell with 80 percent certainty whether an

9   individual patient, an adolescent who is not treated with

09:33:30 10  puberty blockers, would desist or persist in the gender

11  dysphoria?

12  A    So the evidence base in that area is less robust, but the

13  evidence of which I'm aware would still suggest that the

14  desistance rate for individuals who are adolescents is less

09:33:52 15  than 20 percent.

16  Q    And what studies do you rely on to say that it's -- I

17  mean, for adolescents -- we're talking about a 12 or 13 year

18  old who has entered what, Tanner Stage 2 of puberty; is that

19  correct?

09:34:04 20  A    Correct.

21  Q    Okay.  So what evidence do you rely on to say that without

22  treating with puberty blockers the group who are not treated

23  there's a more than 80 percent likelihood that the individual

24  patient is going to desist to that point?

09:34:19 25  A    So I would say that that is based on -- so I am not aware

```
 1  of a specific prospective observational trial that answers your

 2  question, but that experience in the field would suggest that

 3  that -- the desistance rate is low.

 4  Q    And what is that experience?

 5  A    Of the clinicians who provide care to this patient

 6  population.

 7  Q    I guess my question is -- I'm trying to figure out -- I

 8  understand that the majority of children who are started on

 9  puberty blockers go on to cross-sex hormones.  Is that true?

10  A    Can you restate your question?

11  Q    The majority of children who are -- who start on puberty

12  blockers will then go on to take cross-sex hormones; isn't that

13  right?

14  A    Correct.

15  Q    Okay.  And so my question is:  If a child does not start

16  on puberty blockers, what degree of certainty can we say that

17  the gender dysphoria would go away?  And we are talking about a

18  Tanner Stage 2 adolescent.

19  A    So I would differentiate the likelihood of them desisting

20  from the quality of evidence that supports that claim.  The

21  likelihood of them desisting based on the available evidence

22  would be that it would still be infrequent, the evidence is --

23  would currently be based on expert opinion of individuals who

24  provide that care.

25  Q    Okay.  So there are no studies to support that claim; is
```

09:34:47  (line 5)
09:35:02  (line 10)
09:35:16  (line 15)
09:35:42  (line 20)
09:36:01  (line 25)

```
 1  that right?

 2  A    I'm not aware of a study on that specific question.

 3  Q    Okay.  Would you agree that the combination of puberty

 4  blockers and cross-sex hormones -- let me start over.

 5       Because you testified that most children who begin on

 6  puberty blockers go on to cross-sex hormones, wouldn't it be

 7  reasonable when we're talking about the risks to view those

 8  together?

 9  A    No.

10  Q    Why is that?

11  A    Because they occur at separate periods of time.  So that

12  informed consent is obtained for the use of puberty blockers,

13  there are ongoing conversations about the efficacy of that

14  treatment and the individual symptomology, and a separate

15  detailed informed consent process is obtained prior to the

16  start of gender-affirming health care.

17  Q    But wouldn't it be relevant to a parent or a child

18  determining whether to start puberty blockers to know that

19  almost everyone who starts on this treatment goes on to

20  cross-sex hormones?

21  A    It would be relevant for parents to know that the clinical

22  practice guidelines for the treatment of gender dysphoria

23  generally recommend treatment with puberty blockers followed by

24  treatment with gender-affirming hormone therapy.

25  Q    Okay.  My question was:  Wouldn't it be relevant for them
```

09:36:24  5
09:36:42 10
09:37:01 15
09:37:18 20
09:37:42 25

```
      1   to know that almost everyone who starts on puberty blockers
      2   then goes on to cross-sex hormones?
      3   A    I don't believe that that would -- that category of
      4   information would be relevant.  I don't know that that specific
09:38:08 5   framing would be useful and informative to patients.
      6   Q    Okay.  So you do not think that the --
      7           THE COURT:  Hold on a minute, Mr. Bowdre.
      8        Ladies and gentlemen, let me say this:  If you are sitting
      9   in the audience and you're head nodding or you're mouthing
09:38:23 10  words and looking at the witness, please stop that, because
     11   that could give the appearance that you are trying to influence
     12   the witness.
     13        So let me just put that out there.  Please follow my
     14   guidelines on that.
09:38:38 15       I am not suggesting that you are being influenced by
     16   anyone out here, but it's possible that someone might want to
     17   influence you.
     18        So go ahead, Mr. Bowdre.
     19           MR. BOWDRE:  Thank you, Your Honor.
09:38:47 20       Could you read the last question?  I'm sorry.
     21        (Whereupon, the Court Reporter read back the pending
     22   question.)
     23   BY MR. BOWDRE:
     24   Q    Would you agree that there are substantial risks involved
09:39:26 25  in someone starting puberty blockers and going on to cross-sex
```

47

1  hormones?

2  A    There are risks involved in the treatment course for the

3  treatment of gender dysphoria.

4  Q    What are some of those risks?

09:39:39 5  A    Can you be more specific?  Of the entire course of

6  treatment, or particular parts of the treatment?

7  Q    The entire course of treatment.

8  A    So I would disaggregate the risks of puberty blockers from

9  the risks of gender-affirming hormone therapy and the risks of

09:40:06 10  testosterone therapy are different from the -- or are somewhat

11  different than the risks of estrogen therapy.

12       Would you like me to review all of that.

13  Q    Let me just ask you a couple of those.

14       Would you agree that some of the risks of puberty blockers

09:40:18 15  and cross-sex hormones would be loss of fertility?

16  A    There is a risk of impaired fertility.

17  Q    Okay.  Would you agree that a risk would be loss of sexual

18  function?

19  A    Particularly the use of testosterone therapy has a risk of

09:40:42 20  changes in sexual function.  I apologize.  The use of estrogen

21  therapy in -- has a risk of alterations in sexual function.

22  Q    So if someone cannot predict with very much accuracy

23  whether gender dysphoria will desist, then you cannot predict

24  whether the interventions will help or harm that person; is

09:41:20 25  that true?

```
 1  A     No, that is not true.

 2  Q     Why is that not true?

 3  A     Because there is sufficient certainty that gender

 4  dysphoria will persist to have a discussion about the potential

 5  benefits and risks of treatment.

 6  Q     Okay.  So if it were the case that one could not tell with

 7  much accuracy whether the, you know, 11 or 12 year old at

 8  Tanner Stage 2 sitting in front of you, whether that person's

 9  gender dysphoria would desist, assuming that, then is it true

10  that you would not be able to know whether the intervention

11  treatments of puberty blockers and the cross-sex hormones would

12  be helpful or harmful to that person?

13  A     So it would depend on how much uncertainty there was, and

14  that would likely be information that was relevant to the

15  informed assent discussion and the parents' decision about

16  whether to proceed with treatment.

17  Q     What if you were 40 percent sure that the -- that the

18  child would persist, then could you tell whether the

19  interventions would be helpful or harmful?

20  A     It -- so part of -- so do you mean 40 percent sure that

21  your prediction of their likelihood of persisting was accurate,

22  or do you mean that their likelihood of persisting was

23  40 percent?

24  Q     I'm sorry.  Let's assume that you are -- that you -- that

25  it is 40 percent accurate that the person sitting in front of
```

```
 1   you is going to persist.  The person has a 40 percent chance of
 2   persisting.
 3   A    Then in that hypothetical case, there would be less
 4   justification for proceeding with that course of treatment.
 5   But that is a hypothetical case and not the decision that
 6   patients and their families are currently facing.
 7   Q    Okay.  Dr. Antommaria, what is a detransitioner?
 8   A    So I don't know that there's a technical -- currently a
 9   widely accepted technical definition of that term, because
10   people -- individuals use that term in a variety of different
11   ways to mean different things.
12   Q    Okay.  Would one definition, sort of a common definition
13   be someone who identifies or has been diagnosed with gender
14   dysphoria, has begun puberty blockers, cross-sex hormones, and
15   then the dysphoria desists, or for whatever other reason they
16   realign with their biological sex and they stop the medical
17   interventions; is that a fair overall description?
18   A    So that is a potential definition.  The one qualification
19   I would make is if it's defined in terms of an individual who
20   discontinues medical therapy, there may be a wide variety of
21   reasons for individuals to discontinue their medical therapy
22   beyond change in their gender identity.
23   Q    And have you reviewed the literature -- let me be more
24   specific.
25        Have you reviewed recent surveys of people who identify as
```

09:43:40
09:44:05
09:44:27
09:44:53
09:45:14

```
 1  detransitioners, specifically Lisa Littman's and Elie
 2  Vandenbussche's?  Have you reviewed those two?
 3  A    No, I have not reviewed those two.
 4  Q    Are you -- do -- let me -- I will strike that.
 5       Are you aware that at least, according to one of those
 6  studies, only 25 percent of people who detransition ever tell
 7  their gender-affirming care doctors that they have
 8  detransitioned?
 9  A    I heard you state that yesterday in court.  But, no, as I
10  said, I'm not aware of those particular studies.
11       I would say that, for example, our clinic's informed
12  consent documents emphasize if individuals discontinue their
13  treatment, it's very important for them to provide that
14  information to their health-care providers.
15  Q    Okay.  Does the fact that some people who are diagnosed
16  with gender dysphoria, given puberty blockers and cross-sex
17  hormones, dramatically change their bodies, sometimes
18  permanently, and then divert to identifying with their
19  biological sex give you any pause that we might not be so good
20  at identifying who are good candidates for these medical
21  interventions and who might not be good candidates?
22  A    Can I ask what you mean by give me pause?
23  Q    Does it give you concern?
24  A    So I think that in this field, all the available data and
25  information should be considered in making treatment decisions.
```

09:45:34 5
09:45:54 10
09:46:11 15
09:46:32 20
09:46:46 25

                                                                      125

1   That would be potentially relevant information that should be

2   incorporated in an ongoing basis in treatment decisions and

3   revisions of clinical guidelines when they're revised.

4   Q    But you have not reviewed at least these studies on

09:47:09 5   detransitioners to consider whether those would impact your

6   clinical standards; is that true?

7   A    So those -- so I am aware of the discussion about

8   detransition, including the stories of individual patients who

9   have detransitioned.  The body of literature is large.

09:47:38 10       And at this point in time, no, I have not reviewed those

11  two specific studies.  If it became relevant, I would make

12  effort to review those studies.

13  Q    Thank you.

14       You do not touch on this in your testimony, but in your

09:47:56 15  declaration, you spent a couple of pages talking about access

16  to top surgery for gender dysphoric minors; is that right?

17  A    Yes.  There's reference to top surgery in my declaration.

18  Q    Okay.  In such surgeries -- we're talking about

19  mastectomies usually; is that right?

09:48:14 20  A    That's one way to characterize the procedure.

21  Q    Okay.  And they are performed on minors in at least some

22  states in the United States; isn't that true?

23  A    That is true.

24  Q    Okay.  At what age do you think that a -- someone can

09:48:36 25  consent to a double mastectomy as part of the gender-affirming

```
 1  care?
 2  A     So I would be unable to answer that in terms of an age.
 3  The relevant factor is their decision-making capacity, which
 4  only has a correlation with age, but is not specific to age.
 5  Q     Okay.  You said in your declaration that adolescents
 6  generally possess comparable medical decision-making capacity
 7  to adults; is that right?
 8  A     So part of the question is how you define adolescents.
 9  But, yes, older adolescents generally have comparable medical
10  decision-making capacity to adults.
11  Q     So what age are we talking about?
12  A     So the specific study that I cited in my declaration
13  compared 14 year olds to older adults.
14  Q     Okay.
15  A     Or to adults.
16  Q     And you would agree that Tanner Stage 2 puberty normally
17  occurs before age 14?
18  A     Correct.
19  Q     Okay.  So given that adults can consent to both top and
20  bottom sex-change surgeries, why can't a 14 year old not?
21  A     Can you restate the question?
22  Q     Yeah.  Given that adults can consent to both top and
23  bottom sex-change surgeries, why should a 14 year old not be
24  able to consent to those procedures?
25  A     Because in general, adolescents are not permitted to
```

09:48:56  (line 5)
09:49:22  (line 10)
09:49:35  (line 15)
09:49:51  (line 20)
09:50:15  (line 25)

                                                                        327

 1   consent to medical treatment, and we rely on their parents or

 2   legal guardians to consent.

 3   Q    But why is that?  If they -- you just testified that 14

 4   year olds have comparable medical decision-making abilities to

 5   adults, is it simply a matter of law that they cannot consent,

 6   or is there some basis in the literature that would require the

 7   parental consent for 14 year olds?

 8   A    So at a minimum, the legal requirement -- so informed

 9   consent is in part a legal requirement.  And although there are

10   exceptions to permit minor -- some minors to provide consent

11   for certain forms of medical treatment, parental consent is

12   required for a variety of different reasons, not a single

13   reason.

14   Q    I want to read to you a paragraph -- I will go -- I want

15   to read to you a paragraph on an amicus brief to the American

16   Psychological Association, the American Psychiatric

17   Association, and the National Association of Social Workers did

18   in a case called Miller vs. Alabama.

19        All right.  And so this is the amicus brief.  And I am

20   going to flip to page 12.

21        In highlighted portion, paragraph 3, it says, Finally,

22   juveniles differ from adults in their ability to foresee and

23   take into account the consequences of their behavior.  By

24   definition, adolescents have less life experience on which to

25   draw, making it less likely that they will fully apprehend the

1  potential negative consequences of their actions.  Moreover,

2  adolescents are less able than adults to envision and plan for

3  the future, a capacity still developing during adolescence.

4  The study of maturity of judgment discussed above found that

09:52:39 5  adolescents' future orientation is weaker than adults'.

6       I will skip the sentence about the specific subjects.

7       Then it says, Similarly, studies have shown that among 15

8  to 17 year olds, realism in thinking about the future increases

9  with age, and that the skills required for future planning

09:53:03 10  continue to develop until the early 20s.  The ability to resist

11  and control emotional impulses, to gauge risks and benefits in

12  an adult manner, and to envision the future consequences of

13  one's actions -- even in the case of environmental or peer

14  pressures are critical components of social and emotional

09:53:21 15  maturity necessary in order to make mature, fully considered

16  decisions.  Empirical research confirms that even older

17  adolescents have not fully developed these abilities and hence

18  lack an adult's capacity for mature judgment.

19       Do you disagree with that?

09:53:40 20  A  So you would appreciate having seen this for the first

21  time and not being able to review the evidence on which it's

22  based, it's difficult for me to form a full opinion, but I am

23  happy to provide my initial reaction.

24       And that would be that informed consent is generally

09:54:04 25  considered to be a threshold at which people need to meet.  The

```
 1  language that I see here refers to optimal capacities which
 2  might far exceed that threshold.  If you read the language that
 3  it continues to mature into the 20s, I don't take it that
 4  that's justifying that the age of consent should be moved to 20
 5  or 22 instead of 18.
 6       So I think it's consistent to say that individuals'
 7  medical decision-making capacity may continue to mature over
 8  time without saying that adolescents lack the sufficient
 9  capacity to assent to treatment.
10  Q    Thank you.
11            THE COURT:  How much longer do we have with our cross?
12            MR. BOWDRE:  20 minutes, maybe 30.
13  BY MR. BOWDRE:
14  Q    Do you agree that more research is needed to study the
15  efficacy and the cost and benefits of providing
16  gender-affirming care to minors?
17  A    I would say that more research is needed in all areas of
18  health care, and that the State's legislation would prohibit
19  such research.
20  Q    And what are the questions that would need to be answered
21  that the research needs to answer in this area that are left
22  open?
23  A    There are a range of questions that might benefit from
24  further refinement, including issues about the timing of the
25  initiation of therapy, dosing.  There are a variety of
```

Timestamps in left margin: 09:54:30 (line 5), 09:54:49 (line 10), 09:55:23 (line 15), 09:55:44 (line 20), 09:56:10 (line 25)

```
 1  considerations that could be further refined and developed.

 2  But further refining those treatment protocols would be a

 3  refinement.

 4  Q    In your declaration, you noted that once the FDA has

 5  approved a medication for one indication, thereby agreeing that

 6  it is safe and effective for this intended use, prescribers are

 7  generally free to prescribe that for other indications; is that

 8  correct?

 9  A    That is correct.

10  Q    Okay.  But that does not mean that an off-label use would

11  always be safe to prescribe to an individual simply because it

12  is an FDA-approved medication for some purpose?

13  A    Correct.

14  Q    So, for instance, a nine-year-old boy with diabetes, the

15  FDA has approved the use of insulin for that purpose, but

16  providing insulin to a nine-year-old boy without diabetes would

17  be very dangerous, wouldn't it?

18  A    Yes.

19  Q    So whether an off-label use is appropriate depends on the

20  proven risks and benefits of that particular use that we're

21  looking at?

22  A    Yes.  But the fact that a medication is used off label

23  does not intrinsically mean that that evidence does not exist.

24  Q    Okay.  In your direct testimony, you said -- I think you

25  said -- correct me if I'm wrong -- that randomized controlled
```

09:56:41  5
09:56:54  10
09:57:14  15
09:57:33  20
09:58:02  25

```
 1  trials in this area would be unethical because no equipoise

 2  exists between treating someone simply with psychotherapy

 3  versus treating someone with psychotherapy and puberty blockers

 4  and cross-sex hormones; is that fair?

 5  A    Correct.

 6  Q    When did that equipoise come into existence?

 7  A    I don't know that I can provide you a particular date as

 8  to when that lack of equipoise came into existence.

 9  Q    For that equipoise or lack of equipoise to come into

10  existence, wouldn't we need studies that, you know -- doesn't

11  there need to be at least one study that shows -- that looks at

12  a group treated only with psychotherapy and one group treated

13  with the medical interventions?

14  A    Can you restate your question?

15  Q    For the lack of equipoise to come into existence, for us

16  to know that, you know, psychotherapy plus puberty blockers and

17  cross-sex hormones are the way to go and that any other

18  treatment would be unethical, don't we first need to have a

19  study that treats someone with psychotherapy and has a

20  controlled group that way versus someone who is treated with

21  all of those interventions?

22  A    No.  There are prospective observational trials that

23  demonstrate the efficacy of puberty blockers and

24  gender-affirming hormone therapy, and withhold those treatments

25  from an individual may be considered unethical.
```

Timestamps: 09:58:21 (line 5), 09:58:48 (line 10), 09:59:09 (line 15), 09:59:30 (line 20), 09:59:48 (line 25)

1  Q     Okay.  So you were asked whether there were any high

2  quality randomized controlled studies looking only at

3  psychotherapy, which I will note is not the level of evidence

4  that you are relying on.

10:00:29  5     But doesn't that concern you that we have no idea whether

6  psychotherapy alone versus psychotherapy plus puberty blockers

7  plus cross-sex hormones is doing the work in creating any

8  benefits that we see?

9  A     So there is substantial clinical experience that -- so I

10:00:53 10  will differentiate psychotherapy from psychological and

11  psychiatric treatment given that psychotherapy is a distinct

12  entity.  But that there is substantial experience that

13  providing mental health care to adolescents with gender

14  dysphoria in and of itself is not sufficient to resolve

10:01:21 15  individuals' dysphoria and hence the reason for proceeding with

16  medical interventions.

17     If a patient had gender dysphoria and was -- their gender

18  dysphoria was adequately treated with mental health care, they

19  would not proceed to medical therapy.

10:01:40 20  Q     Do you contend that the Endocrine Society's practice

21  guidelines that were released in 2017 provides a more robust

22  overview of the literature than the UK's recent literature

23  review of looking at puberty blockers and cross-sex hormones?

24  A     Can you be specific as to which British report you're

10:02:16 25  referring to?

```
 1  Q    Yes.  And if you want to look at them, they are
 2  Defendants' Exhibits 9 and 10.  I think you do have the right
 3  binder.
 4  A    So I can't answer your question because it's asking me
 5  what in effect are apples and oranges.  One is a systematic
 6  review of the literature, and one is a clinical practice
 7  guideline, which are different types of material.
 8  Q    Okay.  I believe you testified that the -- I mean, the
 9  clinical practice guidelines you said does a comprehensive
10  review of the literature and then suggests -- suggests, you
11  know, practices.  Is that fair?
12  A    So a clinical practice guideline will be based on a
13  systematic review of the literature and grades the quality of
14  the evidence and the strengths and recommendations.
15  Q    Okay.  So for that part of the practice guideline
16  analysis, the literature review part, would you say that the
17  Endocrine Society's review was more extensive and is more
18  accurate than the UK's more recent literature reviews that
19  you're looking at in Defendants' Exhibits 9 and 10?
20  A    So I can't answer your question in detail without more
21  thoroughly reviewing the documents.
22       Based on my understanding of the Endocrine Society's
23  methodology, I would expect them to be comparable, but I can't
24  form a formed opinion based on the information that I currently
25  have.
```

1  Q    Okay.  You have not reviewed closely the UK's recent

2  literature reviews?

3  A    So I've reviewed their conclusions.  I haven't reviewed

4  them in the degree of methodological detail that your question

10:04:33 5  would require.

6       There are a large number of systematic reviews available

7  in the literature.  Some of which I know in detail, and others

8  of which I know at less -- a lesser level of detail.

9  Q    What are the prospective observational studies that you

10:05:02 10  claim demonstrate the efficacy of puberty blockers and

11  gender-affirming care?

12  A    So the specific references are included in my report.  But

13  in general, they're the studies that are conducted by the Dutch

14  group.

10:05:19 15  Q    And in that study, both the 2011 study that looks only at

16  puberty blockers and then the 2014 report that reported on

17  people who then went on to cross-sex hormones and total

18  surgical interventions, those studies -- so everyone in those

19  studies got psychotherapy and psychiatric help the entire time;

10:05:47 20  is that true?

21  A    Correct.

22  Q    Is it also true that people who had psychological

23  comorbidities, depression, things like that, were excluded from

24  the treatments from the medical interventions?

10:05:59 25  A    So I would have to review their specific inclusion and

```
 1  exclusion criteria to be able to answer your question.
 2  Q    Okay.  Do you know if everyone in that study, whether
 3  their psychological functioning and improvements went to a new
 4  clinical range or not?
```
10:06:29
```
 5  A    So there were a variety of different outcome variables
 6  that were examined in the study, some of which were unchanged,
 7  but some -- but others of which showed statistically
 8  significant improvement.  And so can you clarify what you mean
 9  by a new range?
```
10:06:52
```
10  Q    I think I will move on, given our time.
11       If parents of a 14 year old can consent to cross-sex
12  hormones, why cannot parents of -- and the 14 year old consent
13  to a double mastectomy?
14  A    As a legal matter -- can you clarify your question?
```
10:07:28
```
15  Q    As a medical ethical matter.
16  A    So I don't believe that there would be an indication to
17  perform a mastectomy on a 14 year old.
18  Q    Why not?  Isn't mastectomy a gender-affirming care for a
19  transgender man?
```
10:07:52
```
20  A    So in general, the purpose of utilizing puberty blockers
21  would be to prevent the development of those secondary sexual
22  characteristics, and the use of cross-sex hormones would be to
23  promote the development of secondary sexual characteristics
24  that are consistent with an individual's gender identity.  And
```
10:08:19
```
25  there would be a period of time in which it would be required
```

```
 1   for the gender-affirming hormone therapy to take an effect.
 2        The effects develop over a period of years.  So it's hard
 3   for me to understand the clinical scenario that you're
 4   presenting.
10:08:37 5   Q    Well, what if someone did not start on puberty blockers
 6   and comes to the clinic as a 14 year old already having
 7   developed?
 8   A    So in -- so it would be my general understanding that that
 9   individual -- would they be -- presumably may be pursuing
10:08:59 10   gender-affirming hormone therapy and would not -- so I'm having
11   trouble understanding.
12        Are you suggesting that they're not starting
13   gender-affirming hormone therapy and are simply moving to top
14   surgery?
10:09:12 15   Q    Either that, or -- I mean, my understanding is that if,
16   you know, if a biological woman has already developed breasts,
17   then providing testosterone, you know, doesn't make the breasts
18   go away, right?  You still need the double mastectomy.  So why
19   could not that person, a 14 year old, not -- her and her
10:09:31 20   parents not consent to that?
21   A    So I'm having trouble with your construction, particularly
22   related to the age.
23        But I would say that I think that parents and their
24   adolescent children who are less than 18 potentially are
10:09:54 25   capable of consenting to top surgery.  And it would depend,
```

1  then, on the specific clinical circumstance.

2        It's hard for me to answer your abstract formulation.

3  Q    You provided an example in your declaration on -- I guess

4  as an example of how the medical community often relies on

10:10:22  5  low-quality evidence.  And your example was that a doctor might

6  prescribe, you know, 20 minutes of exercise and a low-calorie

7  diet as a way to treat obesity.  And I guess your point was

8  there were no randomized controlled studies showing that

9  20 minutes of exercise and a good diet, you know, is always

10:10:47 10  going to treat obesity.

11        But in that example, the risks of following that protocol

12  are pretty low, aren't they?

13  A    Yes.

14  Q    Yeah.  And would you agree that it might make sense to

10:11:04 15  follow minimal low-quality evidence for low risks for high

16  reward endeavors, such as exercising for 20 minutes, but that

17  we might want higher quality of evidence or more robust mound

18  of it before relying on it for something where the risks were

19  quite high?

10:11:24 20  A    That assumes that we cannot make decisions until some

21  speculative future in which that evidence is available.

22  Unfortunately, clinicians have to make decisions based on the

23  evidence that is currently available to them.

24  Q    Okay.

10:11:48 25        MR. BOWDRE:  May have just a moment to confer with

```
 1  counsel?
 2            THE COURT:  Yes.
 3            MR. BOWDRE:  Thank you, Dr. Antommaria.
 4            THE WITNESS:  Thank you.
 5            MR. POWERS:  No further questions.
 6            THE COURT:  All right.  May the witness be excused?
 7       Sir, you can step down.  Thank you.
 8            THE WITNESS:  Thank you, sir.
 9            THE COURT:  All right.  In the interim -- do you have
10  something you want to say?
11            MR. DAVIS:  No, Judge.  I wanted to see how you wanted
12  to proceed.
13            THE COURT:  All right.  Well, I thought -- I know we
14  have several parties seeking leave to file briefs, including
15  several states and several professional organizations.  I just
16  wanted to see if the parties wanted to address that very
17  quickly, whether there are any objections or not.
18            MR. LACOUR:  I will go first, if that's all right,
19  Your Honor.
20            THE COURT:  That's fine.
21            MR. LACOUR:  Would you like me to approach the podium?
22            THE COURT:  Yes, please.
23            MR. LACOUR:  Your Honor, we think that the brief from
24  states should come in.  It was filed in a timely manner, indeed
25  before Alabama's brief was even on file, which gave plaintiffs
```

 1   time to assess those arguments before their brief was filed.

 2       We do not -- for similar reasons, we do not think that the

 3   brief from the AAP should come in.  They did not file it until

 4   we were actually here about the beginning of opening

 5   statements.  So there was not time to look it over.

 6       I will be candid.  I have not even had time to read it

 7   myself.  I think some people on the team have, but there has

 8   been a lot to do in a very short amount of time.

 9       And so I think for that reason the Court would -- we would

10   oppose that brief coming in at this moment.

11           THE COURT:  All right.  What about original

12   plaintiffs?

13           MR. DOSS:  Your Honor, we think both sets of amicus

14   briefs are another data point that Your Honor could consider in

15   looking at all of the evidence and thinking through all the

16   arguments.

17       We have no opposition to the several states, their amicus

18   brief, provided that the amicus brief of the professional

19   organizations is also allowed to be filed in.

20       This has been a long week.  I think, if I remember

21   correctly, the states' brief was filed on Tuesday, the

22   professional organizations' brief was filed on Wednesday.  I

23   don't think the timing makes any difference one way or the

24   other.

25       But to the extent Your Honor is wishing to consider any

```
 1  amicus brief, I would submit that both should be considered,
 2  Your Honor.
 3          THE COURT:  Well, I certainly will consider them all,
 4  you know, on final merits.  The issue is whether we consider
 5  them now.  Obviously, if I do consider them now, we are looking
 6  at this deadline.
 7      Does anyone have any thoughts on that, just the
 8  practicality of me trying to take that in and consider it with
 9  all this evidence under a time crunch?  I think that's worth
10  addressing by both sides.
11          MR. DOSS:  As I read the states' brief, Your Honor, it
12  expresses general criticism as to what it -- what they refer to
13  as consensus-based medicine.  I don't really see the states'
14  amicus brief is presenting really any legal argument, as best I
15  could tell.  The only legal citations were two citations to
16  dissenting opinions from the U.S. Supreme Court.  It seemed to
17  me more of a policy statement rather than really much of
18  evidence or legal argument.
19      As to the professional organizations, their amicus brief,
20  I think we have gotten a sense of what those positions are over
21  the past day and a half from Dr. Ladinsky and Dr. Hawkins.  If
22  consideration of any brief is going to delay consideration of
23  the merits for present purposes, I would say -- I would submit
24  defer consideration of those amicus briefs until later.  We're
25  just trying to get the preliminary relief at this point.
```

```
 1              THE COURT:  A very practical position.

 2         How about the United States?

 3              MR. CHEEK:  We would concur with the plaintiffs on

 4    that.

10:16:16 5              THE COURT:  Do you want another bite at the apple,

 6    Mr. LaCour?

 7              MR. LACOUR:  Your Honor, I would just note -- sorry --

 8    point out the ECF notice.  The Arkansas brief was on file by

 9    5:23 p.m. or 5:30 p.m. on Monday.  So just for the record, that

10:16:43 10    is when it came in.

11         And, of course, the brief from the medical organizations

12    did not come in until the hearings were essentially already

13    begun, so...

14              THE COURT:  All right.  All right.  Last question that

10:17:00 15    I have, and it won't offend me if nobody wants to address this,

16    but it's possible I have missed this in the briefing or the

17    filings, but I certainly know who sponsored this bill.  Where

18    did this bill come from?  Who wrote this bill?  Is that

19    something any party wants to address?

10:17:27 20              MR. LACOUR:  Your Honor, it was a bill introduced into

21    the Legislature, considered by the Legislature, enacted, so

22    this is the work product of the Legislature.

23         If there are more detailed questions, we can certainly try

24    to answer them.

10:17:58 25              THE COURT:  I'm just throwing the door open for any
```

```
 1  party to say what they want to.
 2            MR. LACOUR:  That's what we have to say, Your Honor.
 3            THE COURT:  All right.
 4            MR. CHEEK:  Your Honor, the United States does not
10:18:13  5  know, but we are happy to get some people to work on it.  And
 6  if we can find it out during the course of, you know, the next
 7  couple of hours, would it be permissible for us to revisit that
 8  question or submit a one-page notice to the Court if we can pin
 9  that down?
10:18:31 10       THE COURT:  We have got more time.  We can take it up
11  again if somebody wants to.
12       Mr. Doss, is this something that you want to address?
13  Again, nobody has to.  I am just asking the question.
14            MR. DOSS:  I don't know, Your Honor.
10:18:45 15       THE COURT:  All right.  Who is our next witness?
16            MR. DAVIS:  Your Honor, we are going to call Dr. James
17  Cantor.  I don't know if you want us to begin now.  We're
18  prepared.
19            THE COURT:  I think this is a great time to have a
10:18:58 20  short break.
21       So why don't we come back in 12 minutes?
22            (Recess.)
23            THE COURT:  Thank you.  Please be seated.
24       All right.  Any further witnesses from either of the
10:39:14 25  plaintiffs?
```

```
 1              MS. EAGAN:  No, Your Honor.
 2              THE COURT:  All right.  State's case.
 3              MR. DAVIS:  Your Honor, the State calls Dr. James
 4    Cantor when you are ready.
 5              THE COURT:  I'm ready.
 6                        JAMES CANTOR, MD,
 7    having been first duly sworn by the courtroom deputy clerk, was
 8    examined and testified as follows:
 9                        DIRECT EXAMINATION
10    BY MR. DAVIS:
11    Q    Good morning, Dr. Cantor.
12    A    Good morning.
13    Q    Would you state your full name?
14    A    James Michael Cantor.
15    Q    What is your profession, Dr. Cantor?
16    A    I am a clinical psychologist and neuroscientist.
17    Q    What degrees do you have?  Academic degrees.
18    A    Bachelor's degree in computer science and mathematics, a
19    master's degree in applied psychology, and a Ph.D in clinical
20    psychology.
21    Q    Where do you work?
22    A    I am currently in private practice in Toronto, Canada.
23    Q    And what is the nature -- are there any particular focuses
24    of the counseling you provide or the research that you have
25    performed?
```

```
 1   A      Human sexuality and atypical sexualities.

 2   Q      Would that include studies of gender identity?

 3   A      Yes, it is.  Yes, it does.

 4   Q      Are you knowledgeable about the research surrounding

 5   gender dysphoria?

 6   A      Yes, I am.

 7   Q      Have you analyzed research concerning the benefits and

 8   harms of different ways of treating gender dysphoria?

 9   A      Yes, I have.

10   Q      Do you have skills and expertise assessing the strengths

11   and weaknesses of scientific studies?

12   A      Yes, I do.

13   Q      And do these skills and expertise include judging what

14   those studies do and do not prove as a matter of science?

15   A      Yes.

16   Q      Have you treated people who presented with gender

17   dysphoria?

18   A      Yes.

19          MR. DAVIS:  Your Honor, we proffer Dr. Cantor as an

20   expert on psychology, human sexuality, research methodology,

21   and the state of the research literature on gender dysphoria

22   and its treatment.

23          THE COURT:  Any objection?

24          MS. EAGAN:  No, Your Honor.

25          THE COURT:  All right.  He will be accepted for that
```

```
          1  purpose.

          2  BY MR. DAVIS:

          3  Q    Dr. Cantor, there is a notebook in front of you with a

          4  blue cover.  Would you please turn to the second tab?

10:41:51  5  A    I'm sorry.  It just occurs to me I didn't bring my reading

          6  glasses.  They're in my brief case.

          7           MR. DAVIS:  Your Honor, can the witness get his

          8  glasses?

          9           THE COURT:  Absolutely.

10:42:43 10           THE WITNESS:  Part 2, you said?

         11  BY MR. DAVIS:

         12  Q    Yes.  Tab 2, which is Defendants' Exhibit 2.

         13       Can you identify that document, Dr. Cantor?

         14  A    Yes.  That is my report, which I submitted for these

10:42:54 15  proceedings.

         16  Q    Thank you.

         17       I think actually, since we just heard Dr. Antommaria, I

         18  would like to begin with addressing some things that we heard

         19  this morning.

10:43:02 20       Did you have the opportunity hear this morning's testimony

         21  by Dr. Antommaria?

         22  A    Yes, I did.

         23  Q    Did you understand Dr. Antommaria to testify that randomly

         24  controlled studies are not available in this area of medicine?

10:43:16 25  A    Yes.
```

```
 1  Q    Did he then say, if you understand -- as you understand,
 2  that because the randomly controlled trials are not available,
 3  we can rely on observational trials?
 4  A    That is roughly what I understood him to say, yes.
 5  Q    Do you have any response to that?
 6  A    Yes.  That's not -- it is true that none of the existing
 7  studies are randomized, but it is entirely untrue that we
 8  therefore can rely -- can make decisions based on the least
 9  reliable kinds of studies.
10       There is a wide, wide range of studies in between, and
11  there's a wide, wide, range of different scientific
12  methodologies that we can employ in order to minimize the laws
13  that we get from completely randomized studies.
14       It's also actually possible if we wanted to conduct such
15  studies such as by allowing people to undergo different parts
16  of a treatment at different times, so we can compare the
17  differences between them when one group has started on that
18  type of treatment and the other hadn't yet.
19  Q    Okay.  So the randomized trials would be considered like
20  the gold standard, the top-tier level of scientific research?
21  A    Randomization is one factor in determining how high
22  quality a study is.  It is not a -- it's neither an all or
23  nothing.
24  Q    I understand.  But did I understand you to say that if you
25  assume that's not available, that's no reason to drop down to
```

```
     1   the lowest quality of evidence?

     2   A     That is correct.

     3   Q     I understood Dr. Antommaria to testify that the level of

     4   evidence supporting the WPATH and Endocrine Society guidelines

10:45:05  5   is comparable to the level of evidence supporting other

     6   treatments in pediatrics.  Can you respond to that?

     7   A     I am not aware, of course, of all the other treatments in

     8   pediatrics.  However, there are no studies yielding positive

     9   effects of either the Endocrine Society standards or the WPATH

10:45:24 10   standards.

    11         The studies which have shown effects have used the Dutch

    12   model, which uses a higher set of standards than either the

    13   Endocrine Society or the WPATH group.

    14   Q     Speaking of the Dutch study, I also understood

10:45:42 15   Dr. Antommaria to say there is no high quality evidence

    16   supporting the use of psychotherapy alone for gender dysphoria.

    17   Do you agree with that?

    18   A     No, I do not.

    19   Q     What would you say in response?  What's the countervailing

10:45:56 20   evidence?

    21   A     There exists roughly 15'ish studies following up these

    22   kids at all.  All of the studies, which without exception that

    23   used medical interventions also used psychological --

    24   psychotherapy at the same time.  So all of the studies which

10:46:17 25   could seem to show a benefit for medical interventions are
```

1    unable to distinguish that it was the medical intervention

2    causing the benefit, versus the psychotherapy causing the

3    benefit.

4        Of those studies, two were designed in a way that it was

10:46:33 5    possible to peel apart the effects of psychotherapy versus

6    medicine -- the Costa study and the Achille study.  The full

7    references are in my report.

8        In the Costa study, there was a -- there were two phases.

9    There was a phase that people went through when they received

10:46:52 10    psychotherapy alone.  And then in the subsequent phase, they

11    received both psychotherapy and medical interventions.

12        There were no significant differences between the group.

13    Both groups improved, and there were no significant differences

14    between the group that received psychotherapy alone and the

10:47:08 15    group that received psychotherapy plus medical interventions.

16        The other study, the Achille study, used a statistical

17    method to control for the effects of psychotherapy.  That group

18    also improved after medical intervention, but when the effects

19    of psychotherapy were statistically controlled, there was no

10:47:28 20    additional benefit of the medical interventions after that.

21    Q    I want to break some of that down.  You mentioned studies

22    where all the participants were receiving both psychotherapy

23    and medical-affirming care at the same time, right?

24    A    Correct.

10:47:48 25    Q    Is that the Dutch -- oh, is the Dutch protocol, the Dutch

```
 1   study an example of such a study?
 2   A    Both Dutch studies, the 2011 and the 2014, yes.
 3   Q    If, at the end of that trial, you look and see the people
 4   that were receiving both psychotherapy and medical-affirming
 5   care at the same time, improved in mental health at the end of
 6   the trial, can you as a scientist tell whether the improvement
 7   is the result of the pharmaceuticals or the psychotherapy?
 8   A    Not in the design of those studies, no.  That's what in
 9   science is called a confound.
10   Q    Confound?
11   A    Correct.
12   Q    What does that mean, confound?
13   A    It describes exactly that situation.  When two things are
14   done at once, when you see the result, you can't peel apart
15   which -- which of those two interventions was responsible or
16   the interaction between those two interventions was
17   responsible.
18   Q    Okay.  But the Costa and Achille study, on the other hand,
19   they do provide scientific evidence that psychotherapy alone is
20   helpful, did --
21   A    That's correct.
22   Q    Okay.
23   A    That psychotherapy is helpful and not the medical
24   interventions.
25   Q    I also understood Dr. Antommaria to say that he had not
```

```
 1  read studies about detransitioning.  But if it ever became
 2  relevant, he would make an effort to review such studies.
 3       You are familiar with the body of the literature
 4  concerning gender dysphoria, correct?
 5  A    Yes.
 6  Q    In your opinion, are the studies of detransitioning
 7  relevant to someone trying to assess the benefits and harms of
 8  these treatments?
 9  A    Yes, of course.  It's very difficult -- detransition would
10  be the situation that one is trying to avoid.  The best way to
11  avoid a situation is to understand that situation.
12  Q    Dr. Antommaria said that there are prospective
13  observational trials that demonstrate the efficacy of puberty
14  blockers in gender-affirming care, and then later said the
15  trials he is referring to were primarily the Dutch group
16  studies.
17       Are those the studies you just mentioned, the 2011, 2014
18  studies?
19  A    Those are the Dutch studies that usually we use.  I can't
20  know if he is referring to some other study that I didn't make
21  a specific reference to.
22  Q    That's fair.
23       In this area of medicine, when someone's talking about the
24  Dutch studies, the Dutch group studies, is it your
25  understanding they're generally referring to these 2011 and
```

```
 1  2014 studies from the Dutch project?

 2  A    Almost always, yes.

 3  Q    Okay.  And those are the studies you just mentioned that

 4  have the confound problem, right?

 5  A    Correct.

 6  Q    You can't unpack whether it's the psychotherapy or -- not

 7  from that study, you can't unpack whether it is the

 8  psychotherapy or the pharmaceuticals that are making the

 9  difference?

10  A    That's correct.

11  Q    Okay.  More generally, I'd like to read for you a

12  statement from the plaintiffs' brief in support of their

13  preliminary injunction motion.

14        For the record, it's Doc 8 at page 18.

15        Dr. Cantor, the plaintiffs wrote in that brief, For more

16  than four decades, medical organizations have studied and

17  created an evidence-based standard for the medical treatment of

18  transgender patients.  This standard confirms that transition,

19  including puberty blockers and hormone therapy where

20  appropriate, is the only safe and effective treatment for

21  gender dysphoria?

22        Dr. Cantor, does the research literature support that

23  statement?

24  A    No, it does not.

25  Q    Do you understand the plaintiffs primarily to be pointing
```

Timestamps in left margin: 10:50:36 (line 5), 10:50:47 (line 10), 10:51:07 (line 15), 10:51:26 (line 20), 10:51:37 (line 25)

1  to the guidelines of medical organizations such at WPATH and

2  the Endocrine Society and the American Academy of Pediatrics to

3  support their positions that wish to continue giving these

4  treatments to children?

10:51:52  5  A    Yes.  They cited those repeatedly.

6  Q    Okay.  What observations have you had about the WPATH

7  guidelines and whether they have support in evidence?

8  A    The WPATH guidelines and the Endocrine Society guidelines

9  have been tested among the set of -- as I say, roughly 15

10:52:13 10  outcome studies, some of them have used the WPATH guidelines or

11  Endocrine Society guidelines instead of the Dutch protocol.

12  And those studies demonstrated that there was no improvement at

13  all.

14    I shouldn't say none at all.  One of them used several

10:52:36 15  kinds of measures of improvement, and I think it was all but

16  one demonstrated no differences at all.  And one small one gave

17  an indication that suggested the possibility.

18  Q    Have these organizations acknowledged anything about

19  desistance rates -- these organizations, I'm referring

10:52:57 20  specifically to WPATH and the Endocrine Society?

21  A    I can't say that they've never addressed it, but to the

22  extent if it was ever addressed, they are grossly, grossly

23  minimized.

24  Q    Can I refer you to paragraph 12 of your report on page 4?

10:53:33 25  A    I got it.

                                                                    83

 1  Q     You say in that paragraph that the plaintiffs'
 2  documentation -- and I assume by documentation, you mean
 3  their -- the pleadings in this case and the briefs that you had
 4  seen?
10:53:50 5  A     That's correct.
 6  Q     You said the plaintiffs' documentation misrepresents the
 7  contents of the associations' policies themselves.
 8        Which associations were you speaking of there?
 9  A     They mentioned several other societies which made short
10:54:04 10  statements in general support of sexual diversity, but without
11  actually issuing specific standards about how to treat people
12  in that community with what or at what ages.
13  Q     And what inconsistencies did you see between what those
14  organizations have said and the arguments you saw in
10:54:23 15  plaintiffs' briefing?
16  A     The plaintiffs referred to the societies as if they were
17  providing very specific support for very specific policies
18  rather than general recommendations to provide, for example,
19  respect and values for diversity, but no specific guidelines.
10:54:48 20  Q     Okay.  Well, looking at paragraph 12, is one of your
21  points here looking at the bullet points that even WPATH and
22  Endocrine Society acknowledge as you write, that desistance of
23  gender dysphoria occurs in the majority of prepubescent
24  children?
10:55:04 25  A     That is correct.

```
        1   Q    And then turning the page, were there other issues you saw
        2   that the statements -- that these organizations believed and
        3   plaintiffs' briefing was inconsistent with what the
        4   organizations had stated?
10:55:16 5  A    That the issue of mental health and that mental illnesses
        6   and similar concerns need to be resolved before considering
        7   transition rather than depending on transition to be the
        8   resolution of, for example, depression and anxiety.
        9   Q    And have any of these organizations acknowledged that
10:55:42 10 puberty-blocking medication is an experimental not a routine
       11   treatment?
       12   A    Yes, they have used that phrase.
       13   Q    Which organization?
       14   A    Again, I would have to look up to see exactly who used
10:55:52 15 which word.  I believe it was WPATH, but I again have to go
       16   back and check to make sure that it was they.
       17   Q    And let's turn to the American Academy of Pediatrics.  And
       18   I will refer you to your appendix.
       19        And, Dr. Cantor, if you look at the top of the page, you
10:56:12 20 will see a line of blue figures.  And it's page X out of 106.
       21   The appendix I am referring to is page 100 out of 106.
       22   A    Got it.
       23   Q    What does the American Academy of Pediatrics or AAP, what
       24   do they recommend in this area of care?
10:56:42 25 A    They recommend what I can best describe as affirmation on
```

         1   demand.

         2   Q    Okay.  Did you review their recommendation when it came

         3   out?

         4   A    Specifically I reviewed the sources on which they based

10:56:58 5   their recommendations.

         6   Q    Okay.  Did you write about that?

         7   A    Yes, I did.

         8   Q    And does that appear as an appendix to your report

         9   beginning at page 100 of that pdf?

10:57:09 10  A    That is correct.  I summarized all of my comments.  I

        11   submitted them to a journal where they underwent peer review.

        12   And it's an official published peer-reviewed paper.

        13   Q    This is not a letter to the editor?

        14   A    That is correct.  This is part of a scientific -- now part

10:57:22 15  of the scientific literature.

        16   Q    What did you comment upon?

        17   A    I really just checked what the authors of the AAP policy,

        18   Dr. Rafferty, what their claims were, what they said was in

        19   their references versus what was actually in their references.

10:57:43 20       And not only did their sources not contain what they were

        21   alleged to have obtained, they often contained the very

        22   opposite of what the AAP policy said they contained.

        23   Q    Did you have an agenda to disprove -- to prove or disprove

        24   anybody when you undertook that review of the evidence?

10:58:01 25  A    I wouldn't say an agenda other than to set the record --

1    pardon the pun -- straight.

2        This was a situation where these sources I had known for

3    many years.  I had read them when they had first came out.

4        And when AAP came out with its policy, I was stunned by

10:58:21  5    its content.  And as I read what they were basing it on, my

6    recollection was immediately this is not what those sources

7    said.

8        So immediately I just started double checking myself.  Did

9    I misread something?  Am I misremembering something?

10:58:36 10        And as I just checked in my own files with copies of these

11    papers -- most of these papers already in it, my memory was

12    correct.  They said as -- the kinds of things I recalled them

13    to be saying.

14        Because we were now talking a major medical association

10:58:51 15    rather than an individual other scientist.  This was different

16    from just one scientist like me disagreeing with another

17    scientist.  This was now -- now had the potential to cause a

18    great deal of damage to a great number of people.

19        So because I had the ability to do it, I simply summarized

10:59:11 20    the contents of the original paper and contrasted point by

21    point the claims being made by AAP and simply quoting verbatim

22    what was in the original studies.

23        That entire thing was published, and the AAP has never

24    responded.  They were approached by the media, and they just

10:59:33 25    would refuse to talk even to the media.  They have yet to have

```
        1  any response.

        2  Q    So to date, the AAP has not responded to the criticisms

        3  that you raised?

        4  A    That is correct.

10:59:42 5  Q    I will refer you now to page 6 of your report.  Going by

        6  the numbers at the bottom of the pages.

        7  A    Yep.

        8  Q    As you noted in your review of the plaintiffs' expert

        9  report -- well, first off, did you review the expert reports

11:00:08 10 submitted by the plaintiffs by Dr. Hawkins and Dr. Ladinsky?

       11  A    Yes, I did.

       12  Q    And did you note that they studied a 2016 Olsen study

       13  claiming that it proves that transition reduces the risk of

       14  mental illness?  That that was their claim?

11:00:23 15 A    Correct.

       16  Q    Does the Olsen study show that?

       17  A    Just referring to my own report.  Ultimately, no, it did

       18  not.  There was several statistical errors in the Olsen study.

       19  The data were obtained then by the -- they -- upon request, and

11:00:45 20 Olsen provided their data to another author who reanalyzed -- I

       21  should say, correctly analyzed the Olsen data, who demonstrated

       22  that Olsen's data did not contain evidence of improvement.  In

       23  fact, it contained evidence of deterioration.

       24  Q    So in your opinion, does the 2016 Olsen study support

11:01:04 25 plaintiffs' position that children need these affirming --
```

```
 1  these medicalized affirming treatments in order to improve

 2  their mental health?

 3  A    No, it does not.  Making such a claim is a half truth.  It

 4  would ignore the subsequent entries in the scientific

 5  literature.

 6  Q    And what about the de Vries study that plaintiffs cited in

 7  which you address on page 9 of your report?  And does it show

 8  that medical transition of minors improves mental health?

 9  A    No.  It contains part of the confound.  The de Vries study

10  as part of a Dutch group also included psychotherapy during

11  transition.  So it is not possible to differentiate which type

12  of therapy, medical or psychotherapy, is responsible for the

13  benefits reported in that study.

14  Q    I see.  So participants in that study did have improved

15  mental health, correct?

16  A    Yes.

17  Q    But it's just not possible scientifically to tell what

18  caused the improvement?

19  A    Correct.

20  Q    And what about the Greene and Turbin studies plaintiffs'

21  experts cited which you discuss in paragraph 24 of your report?

22  A    Yep.

23  Q    Do those studies show that medical transition improves

24  mental health?

25  A    No, they do not.  These are retrospective correlational
```

1    studies.  They are not able of describing any causal effect

2    coming to any causal conclusion.

3    Q    Okay.  Now, you mentioned there that -- you say this very

4    pattern is what one would predict from clinical gatekeeping.

11:02:43  5    What do you mean by clinical gatekeeping?

6    A    One of -- across the various clinical standards are to

7    prevent somebody with mental illness from undergoing

8    transition.  So such people are being held back.  They're being

9    filtered out of groups who do undergo transition.

11:03:03 10        So when a clinic then compares the people who underwent

11    transition to the people in their files who did not undergo

12    transition, they are necessarily comparing a group of people

13    from whom the mental illness was removed and comparing them to

14    a group of people from whom the mental illnesses were not

11:03:22 15    removed.

16        So when you see better mental health amongst the people

17    who had transitioned, the improvement is not because of the

18    transition, the improvement is because you have removed the

19    people with the worst mental health from the group in the first

11:03:40 20    place.

21    Q    Okay.  So is it correct, then, that one thing you might

22    see in these studies is by picking out the people with the best

23    mental health, and giving them the treatment, then comparing

24    them to the people with lower mental health, then, of course,

11:03:57 25    the people who went through the study would do better?

```
 1   A     That is correct.

 2   Q     Did you review any of the other studies that plaintiffs

 3   have submitted into evidence such as the Allen study, the

 4   Turban articles, the Biggs (phonetic) study, the Lopez de Lara

 5   study, Tordoff?

 6   A     Yes, I have.

 7   Q     Do you have any comments on those studies and whether they

 8   support plaintiffs' position?

 9   A     They suffered from the same methodological problems as the

10   other studies.

11   Q     Did any of those studies support the position that medical

12   transition improves mental health?

13   A     No, they did not.

14   Q     In minors with gender dysphoria?

15   A     Correct.  No, they do not.

16   Q     Oh.  What has been called the Yale study by Brouware,

17   B-R-O-U-W-A-R-E, was the first named author.  Did you review

18   that one?

19   A     Yes, I did, but it wasn't a study.

20   Q     What was --

21   A     Apparently, that was a report submitted by those authors

22   for another -- or for a combined set of court cases.

23   Q     Okay.  But you would not refer to that document as a

24   scientific study?

25   A     From the Yale group with -- again, the name I don't -- I
```

1  hesitate to try to pronounce, but, no, it was not a study at

2  all.  It was those authors' report reviewing the literature and

3  providing their opinions.

4  Q    Okay.  As a matter of fact, Dr. Ladinsky was asked about

11:05:39  5  that study yesterday.  And for the record, that testimony

6  appears on page 116 of the rough transcript.

7        The question was:  In this document, do the authors also

8  cite a number of peer-reviewed studies that contradict some of

9  the supports or the principles that the State articulated as

11:06:00  10  the reasons for SB 184?  And Dr. Ladinsky responded, They do, a

11  considerable compendium of them.

12        Is she right?  Did those authors show that there are

13  studies that contradict the State's position in this case?

14  A    There was such a statement.  There was no meaningful way

11:06:21  15  to try to put together what claim went together with what

16  source.  Rather than -- what's done more typically either in

17  science or in pause, best as I understand, is here the claim

18  and here is the source justifying it.  Here is next claim, here

19  the source justifying it.

11:06:38  20        Instead, that document made a long series of unsourced

21  claims and then provided a long series -- a series of very

22  large footnotes with 20 and 30 references.  And there was just

23  no way to see what fact was alleged to have come from what

24  source.

11:06:56  25  Q    So we've talked about whether the literature the

1    plaintiffs' -- the studies that plaintiffs cite to support

2    their position.  Let's talk about whether the literature

3    supports the State's position.  But a little background first.

4        Could you describe from your review of the literature just

11:07:17 5    what's the difference between adult onset gender dysphoria,

6    child onset, and adolescent onset?  And I know this is a broad

7    question, but I just mean like age groups.

8    A    Usually we would be referring to these as a prepubescent

9    onset.  Then the literature is very, very long, but reported on

11:07:37 10    adult onset.  And by adult, on average, these were people in

11    their 20s and in their 30s and 40s.  It was very, very

12    distinct.  It was not, you know, a bell-shaped curve with some

13    midpoint around 18 or 19 years old.

14        It's only within the past --

11:08:02 15        THE COURT:  Hold on one second.

16        Go ahead.  Sorry.

17        THE WITNESS:  It's only within the past ten years or

18    so that a different profile has begun to emerge and was noticed

19    by clinicians.  And that now is being called either adolescent

11:08:20 20    onset or rapid onset.

21        Now, all three of these groups have in common that they're

22    complaining about the same thing.  Doc, I feel like I am in the

23    wrong body.  Doc, I am the brain of one, but in the body of the

24    other.

11:08:34 25        So the way that they describe it is similar.  But every

 1  objective way we have of measuring these people shows that

 2  these are independent phenomena.  They are not related except

 3  in the way that people describe the situation, describe what

 4  they're experiencing.

11:08:50  5      The best analogy I have would be if somebody came to a

 6  doctor saying I have a headache.  Okay.  I got it.  Got that's

 7  a symptom.  I have some more questions.  But we cannot from

 8  that say that a migraine headache is the same thing as a

 9  tension headache is the same thing as having just suffered a

11:09:08 10  head injury.

11      The causes are different.  How we respond to them is

12  different.  And the other characteristics about each of these

13  are different.  They only resemble each other in the most

14  superficial ways.

11:09:19 15      Childhood onset or prepubescent onset gender dysphoria

16  appears to be entirely unrelated to adult onset gender

17  dysphoria.  And the two of those appear to be entirely

18  unrelated to the rapid onset or adolescent onset gender

19  dysphoria.

11:09:40 20  BY MR. DAVIS:

21  Q    Well, let's break that down.  Adult onset, typically

22  people who present with what you're referring to adult onset

23  gender dysphoria, what age are they when they come into the

24  doctors' office and say, something's wrong?

11:09:50 25  A    On average, in their 30s and 40s.

```
 1   Q    Okay.  Has there been research considering whether
 2   those -- that universe, the adult onset universe does well
 3   after transitioning?
 4   A    Those who are mentally healthy by and large do, do well
 5   after transition.
 6   Q    Can you apply those studies to consider whether someone
 7   with child onset gender dysphoria is going to do well after
 8   transitioning?
 9   A    No.  Because these are independent phenomena.  The
10   information from one does not -- from one group does not
11   generalize to the other.
12   Q    Comparing the adult and the child onset, what is the
13   difference that makes the studies of one, you know, it's not
14   apples to apples?
15   A    Correct.
16   Q    Okay.  What is the difference between those patients?
17   A    The -- they -- as I say, differed in just about every
18   objective measure we've been able to apply to them.
19        There are, of course, the ages themselves.  Something --
20   the sex ratios in them are different.  The adults are almost
21   100 percent biological male.  There's more of a mix amongst the
22   childhood onset.
23        The adults are almost always attracted to females.  That
24   is to say, relative to being biological male, they are almost
25   always heterosexual.
```

Timestamps in left margin:
- 11:10:08 (line 5)
- 11:10:23 (line 10)
- 11:10:35 (line 15)
- 11:10:53 (line 20)
- 11:11:13 (line 25)

```
 1          The childhood onset almost always are attracted to the
 2     same biological sex.  They are almost always homosexual.
 3     Q     Talking about the child onset, is that a new phenomenon,
 4     child onset gender dysphoria?
11:11:31  5  A     I wouldn't say new.  It's been systematically studied for
 6     20 to 30 years'ish.
 7     Q     From the literature that you reviewed, do most of these
 8     kids, if not socially transitioned and given hormones, will
 9     they want to transition after reaching puberty?
11:11:52 10  A     Generally not.
11     Q     And page 36 -- excuse me -- paragraph 36 of your report,
12     Dr. Cantor, what statistics do you provide about the rates of
13     desistance among those presenting with childhood onset gender
14     dysphoria?
11:12:15 15  A     The exact numbers are between 61 to 88 percent of them
16     desist.  In the appendix in my report, I list all of the
17     studies that have ever been conducted with that group, all the
18     outcome studies that have been conducted with that group.
19     Q     We probably both need to slow down just a little bit
11:12:37 20  for...
21     A     I'm from New York.  It just happens.
22     Q     We'll do our best.
23          Dr. Hawkins was asked about your paragraph 36 yesterday.
24     And I will represent that on page 30 of the rough transcript,
11:12:54 25  she said that when the study such as the ones you're citing
```

```
 1  offers this elevated rate of desisters, quote, what we tend to
 2  find is that the initial cohort that was given the diagnosis of
 3  gender dysphoria is actually false.
 4      My question, Dr. Cantor, is:  Does the research literature
 5  support Dr. Hawkins's statement?
 6  A    No.  As I say, I listed every single such study.
 7  Q    Do we have any tools today that reliably tell us which
 8  kids will desist and which kids will persist?
 9  A    No, we do not.  There have been some attempts to develop
10  such a test, but they have never been able to find a good
11  characteristic, a feature, a pattern, a test result in which
12  the majority continued to want to persist.
13      The best that they have ever been able to do was find a
14  tool which distinguished unlikely to want to persist versus
15  even less likely to want to persist.
16  Q    There's been testimony about something called the DSM-5.
17  Do you know what that is?
18  A    Yes, I do.
19  Q    What is it?
20  A    The full name is the Diagnostic and Statistical Manual of
21  Mental Illnesses, published by the American Psychiatric
22  Association.
23  Q    If someone were to claim that now that we have the DSM-5
24  we may be able to do a lot better with identifying who's the
25  desister and who is the persister, is there any research on
```

11:13:15  (line 5)
11:13:34  (line 10)
11:13:54  (line 15)
11:14:04  (line 20)
11:14:24  (line 25)

```
 1  that?
 2  A    No.  Nobody's ever tried to differentiating any of the
 3  DSMs from DSM-I through its various versions to the current
 4  one.
```
11:14:38
```
 5  Q    So there have been at least five?
 6  A    There was a I, a II, a III, III-R, IV, IV then had a text
 7  revision.  They switched some of the commentary around the
 8  diagnoses, but they didn't change any of the diagnostic
 9  criteria themselves.  There was then the 5.  And there is as of
```
11:15:01
```
10  last month a 5 again with a text revision, but no changes to
11  any of the actual diagnostic criteria.
12          THE COURT:  Mr. Davis, how much longer do you think we
13  will be?
14          MR. DAVIS:  Your Honor, direct will take us up to
```
11:15:14
```
15  about noon, I would predict.  There's just a lot to cover with
16  Dr. Cantor.
17          THE COURT:  I am not rushing you.  I am just trying to
18  get a road map of that.
19      So how long do we think cross might be?
```
11:15:25
```
20          MS. EAGAN:  It's difficult to predict because I am not
21  sure what else he may say, but maybe an hour, hour or less, I
22  would think.
23          THE COURT:  All right.  I am leaning toward an earlier
24  lunch than we did yesterday.  So maybe -- if it's okay with
```
11:15:45
```
25  you, let's just go ahead and find a stopping point at your
```

```
 1   leisure, and we will just pick back up after lunch.

 2              MR. DAVIS:  Thank you, Your Honor.  This is as good as

 3   any.

 4              THE COURT:  Is it?

 5              MR. DAVIS:  Yes.  We have just talked about DSM-5.

 6   Going to watchful waiting next.  This is as good a place as

 7   any.

 8              THE COURT:  Okay.  Good.  Good.  With that said, then

 9   are we still on target with your last witness?

10              MR. DAVIS:  Yes, Your Honor.  Ms. Wright is here.  I

11   don't know if she is in the courtroom yet or not, but she is in

12   Montgomery, and she will be ready to go when we finish with

13   Dr. Cantor.

14              THE COURT:  We think the length of that witness would

15   be what?

16              MR. DAVIS:  Oh, I would say direct would be well under

17   30 minutes, but I don't know about cross.

18              THE COURT:  Okay.  All right.  Okay.  Well, I think

19   we're on target.

20         Let's take a good long lunch today.  Let's see here.

21   Let's come back at 12:45.

22              MR. DAVIS:  Thank you, Judge.

23              THE COURT:  Thank you.

24              MR. DOSS:  Judge?

25              THE COURT:  Yes?
```

```
 1              MR. DOSS:  Closing, how long would you like?
 2              THE COURT:  You know, I mean, this is important.  I'm
 3    not going to, you know, jack everybody up on this, but to the
 4    extent you can hold it to around 25, I think would probably be
11:17:07  5   a good thing.
 6         And in your openings, I think you really road mapped it
 7    very well, both sides did.
 8         So, you know, again, I know the arguments.  I'm really
 9    interested in, you know, some analysis with case law.  And I am
11:17:22 10   going to be directly asking about a few cases.  I'm very
11    interested to know parallels between the Arkansas decision and
12    that law.  And then I may give you some hypotheticals that you
13    won't like.
14         See you after lunch.
11:17:40 15        (Recess.)
16              THE COURT:  All yours, Mr. Davis.
17              MR. DAVIS:  Thank you, Judge.
18    BY MR. DAVIS:
19    Q    Welcome back, Dr. Cantor.
12:51:00 20        We spoke earlier about the Dutch protocol.  Did the
21    participants in those Dutch studies have psychotherapy before
22    beginning treatment?  Before that study?
23    A    They were receiving treatment as part of their
24    participation in the study.  I don't think they reported
12:51:21 25   whether anybody happened to have attempted psychotherapy before
```

```
 1  approaching the clinic at all.
 2  Q    Okay.  Forgive me if I'm mistaking which study is which.
 3  I was reading about a study that described the psychotherapy
 4  that was available to the participants as extensive.  And that
 5  that extensive psychotherapy was at least two years.  Which
 6  study am I thinking of?
 7  A    That wouldn't have been a particular study so much as what
 8  they use in their process in general.
 9       And then the Dutch group was reporting the results, you
10  know, of -- periodically over the course of the study.
11  Q    I see.
12  A    But by the time the first set of results, their earlier
13  study, the 2011 study, the participants in it will have already
14  been through a substantial amount of therapy.
15  Q    Okay.
16  A    They also emphasize that in assessing the children that
17  it's a very extensive assessment, and the assessment itself was
18  also ongoing over the course of the study.
19       So even before deciding who might be eligible for
20  hormones, they have now many, many months to years' experience
21  with the particular case even with a particular child even
22  before making a decision.  That's very, very different from
23  just having an appointment, taking a test, and then having a
24  diagnostic decision an hour later.
25  Q    That is exactly what I was meaning to ask you about.  I
```

1  was using sloppy language.

2      So this extensive assessment that happened before some of

3  these children began treatments, they were assessed, you said,

4  over a course of a couple of years?

12:52:59 5  A   Correct.

6  Q   Okay.  So does literature support having such an extensive

7  assessment period before subjecting someone to these

8  treatments?

9  A   I don't know if I would say support it, but all of the

12:53:16 10  conclusions that come from the literature depend on it.

11  Q   Thank you.

12      Is there a way of treating gender dysphoria that some

13  practitioners refer to as a watchful waiting approach?

14  A   Yes.  Watchful waiting usually refers specifically to

12:53:40 15  withholding any decision about medical interventions until they

16  have a better idea or feel more confident for a particular case

17  about whether that kid is going to be a persister or desister.

18  It is given the knowledge that that's available that the

19  majority of these kids do desist.  Nobody wants to make a

12:54:00 20  decision upon first appointment.

21      And so -- so they tend to provide psychotherapy, whatever

22  kind of care, whatever is appropriate to the individual kid

23  until enough time has gone by to give -- to suggest is this a

24  kid whose feelings like they're feelings are slowing down and

12:54:19 25  they just need more time, are they building up, or are they

1    staying steady?

2        So the watchful waiting period would be postponing any

3    decision about medical interventions until the clinicians had

4    some confidence.

12:54:31 5    Q    While you are watching and while you are waiting, are you

6    just leaving him alone, or her?

7    A    No.  That would be the time during which one would be

8    supplying a therapy for whatever else is going on in the kid's

9    life.

12:54:42 10    Q    Okay.

11    A    Usually they're associated with -- there's a great deal of

12    what we call comorbidity.  They're also suffering from other

13    problems at the same time, either depressions, anxieties, early

14    evidence of personality disorders, for example.  And it's never

12:55:00 15    clear whether their gender dysphoria is a result of those other

16    psychological problems.

17        So by helping them develop the tools to deal with those

18    other problems, if they remain dysphoric afterwards, we know

19    that the dysphoria wasn't the result of those other problems.

12:55:17 20    So rather than just leaving them alone, they're still receiving

21    support, and the family is still receiving support over that

22    period.

23    Q    So I believe you pointed out in your report that clinical

24    guidelines suggest that mental health issues such as the

12:55:33 25    comorbidities you mentioned should be resolved before

1  transition; is that correct?

2  A    Yes.

3  Q    Okay.  Why?

4  A    Because it's never clear what's causing what.  We cannot

12:55:44  5  from a correlation conclude anything about a causation.  It's

6  very possible, and it's been frequently observed that a lot of

7  these kids are using gender issues as an explanation for the

8  unhappiness that they're experiencing elsewhere in their life.

9      So rather than developing the skills to -- for example --

12:56:04  10  better social skills.  If a person feels awkward and they're

11  withdrawing from kids their own age, we are not sure if they

12  want to transition because they're blaming gender dysphoria for

13  why they feel unpopular or uncomfortable, and we're not --

14  versus we can't tell if anxiety or depression is a result of

12:56:27  15  how they're being treated by the rest of society.

16      So it's only by helping them deal with and by giving them

17  the skills to overcome those other disorders that we can see if

18  the gender dysphoria itself resolves just as a result of that.

19  Q    So if a person is suffering from depression, or is

12:56:48  20  struggling with their own sexual identity, or some type of

21  abuse, or any of these other comorbidities, explain how this

22  psychotherapy process would work, how a psychotherapist such as

23  yourself would try to dig down into the issue and see if that

24  is something that's generating these feelings that are being

12:57:08  25  mistaken as gender dysphoria, or whether the gender dysphoria

1 is its own thing.

2 A    Just to be specific, I'm specifically an adult clinical

3 psychologist.  I see clients ages 16 and up.  So it wouldn't be

4 me personally.

12:57:23 5    What the literature shows about these kids is that they

6 can be very, very diverse.  It certainly is feasible that they

7 are experiencing, for example, depression or anxiety as a

8 result of social transphobia, but that doesn't explain the

9 other things that we're observing.

12:57:41 10    For example, a transphobia doesn't cause autism, which is

11 another very, very common disorder in that group.  Transphobia

12 wouldn't cause the development of borderline personality

13 disorder, which we're seeing in very, very, large proportions

14 among the teenagers.

12:57:58 15    So although certain symptoms like anxiety and depression

16 can feasibly be the result of social reactions to being trans,

17 but that does not explain the overall phenomenon.  What does

18 better explain the overall phenomenon is that there is some

19 thing troubling this kid, and it is resulting in both the

12:58:20 20 psychological symptoms, depression, anxiety in someone, and

21 also producing the gender dysphoria, that discomfort with being

22 their natural sex.

23 Q    I would expect this could vary wildly from patient to

24 patient, but if you -- and I recognize and thank you for

12:58:37 25 clarifying that you deal with a more adult-age group.

```
 1        But if you're helping someone, an adolescent, work through
 2   some of these issues, how often do you think a psychotherapist
 3   would want to see the patient and over what period of time?
 4   A    It does vary widely.  And the kind of disorders that
 5   they're reporting do tend to be the kinds that require very
 6   long-term interventions.
 7        As I say, autism, and related Asperger's syndrome, and
 8   also very, very high rates of borderline personality disorders,
 9   which, again, is a very, very long-term disorder to help
10   somebody deal with.
11   Q    Fair to say this would not be two or three sessions?
12   A    Correct.  This would be over the course of months or
13   years.
14   Q    Does the research literature show that there are risks
15   associated with medical transitioning?
16   A    Yes, quite substantial, including both loss of --
17   primarily loss of function, and depending on the person's point
18   of view, whatever the cosmetic effects are.
19   Q    What are the risks of the watchful waiting approach in
20   providing psychotherapy in helping the child deal with any
21   underlying emotional issues?
22   A    There don't appear to be any, at least any concrete.
23   Q    I will refer you to paragraph 68 of your report,
24   Dr. Cantor.
25        Tell me what the advantages there are to a patient, what
```

Timestamps: 12:58:57 (line 5), 12:59:14 (line 10), 12:59:30 (line 15), 12:59:48 (line 20), 13:00:06 (line 25)

126

1    opportunities it opens up to him or her if any emotional issues

2    are dealt with before the decision to transition.

3    A    If a person fails to deal with whatever emotional issues

4    before it transition, and then transitions and discovers that

13:00:30  5    they continue with whatever psychological issues are pervading

6    them, they have gone through the entire transition process

7    entirely unnecessarily.  They haven't been helped.  They have

8    now lost whatever -- they have now been sterilized, lost

9    whatever sexual -- or other functions, but it hasn't actually

13:00:49 10    resulted in any improvement in their psychological function.

11        If you go the other way around and you help the person

12    deal with psychologically whatever it is that's going on, they

13    still retain the option for transition after that.  And it's

14    that situation that the professional societies have

13:01:05 15    repeatedly -- that the standards of care have repeatedly

16    pointed out.

17    Q    So watchful waiting approach does not eliminate a person's

18    ability to transition to the opposite sex later in life if they

19    so choose?

13:01:19 20    A    Correct.

21    Q    Does the research literature show there's any relationship

22    between children who present with gender dysphoria and those

23    who later in life turn out to identify as gay?

24    A    Yes.  The large majority of the ones who believe that they

13:01:42 25    were born the wrong sex turn out to be gay or lesbian.

```
 1              To a prepubescent child who doesn't yet have a sex drive,
 2     they have no way to interpret why they feel different from
 3     other boys or other girls their age.  It's only with the onset
 4     of sex drive that they start -- and start developing crushes
13:01:58 5     and physical attractions that they now have the information
 6     they need to realize why they're different.  But to an eight
 7     year old or to prepubescent children, the only explanation they
 8     have for why they're not like other boys or not like other
 9     girls is they must be the wrong sex.  They're misinterpreting
13:02:18 10     their feelings.
11              THE COURT:  Let's take a quick time out.
12          So, you know, I guess I'm wondering how both sides are
13     wanting me to use all this expert testimony.  I mean, the
14     Eleventh Circuit has said more than one time that, you know,
13:02:31 15     medical psychiatric professionals are in a far better position
16     to make decisions about medical and psychiatric issues than
17     judges are.
18          So I guess I want to know from each side real quickly, how
19     do y'all envision that I use these experts?  I mean, are you
13:02:48 20     asking me to say, well, this guy's science is junk and this
21     guy's science is perfect; or something in between?  What am
22     I -- tell me how you envision me using this.
23              MR. LACOUR:  May I?
24              THE COURT:  Perfect.  Absolutely.
13:03:05 25              MR. LACOUR:  Your Honor, as we began the opening
```

```
      1  statements, when there's an area of medical uncertainty, the
      2  State has wide discretion to regulate.  So if it's not so clear
      3  to you as to which side's experts have it right, if you see
      4  that uncertainty, then under Supreme Court precedent, the State
13:03:29  5  is allowed to regulate.
      6      The State has to think about all 5 million Alabamians.  We
      7  have to take all that into account when regulating in these
      8  areas where it is not certain.
      9      The judge has an important but a limited role in our
13:03:45 10  federal system to see whether those judgments the State has
     11  reached in those areas of uncertainty somehow conflict with the
     12  Constitution.
     13      And we submit we have come forward with evidence to at
     14  least put into question whether there is this consensus that
13:04:03 15  has been proclaimed by the plaintiffs here.
     16      Again, I think the bar on the plaintiffs is quite high, to
     17  show an absence of uncertainty, or to show some great
     18  certainty.
     19      And when you look at the international studies and the
13:04:19 20  literature reviews, when you hear from very qualified experts
     21  like Dr. Cantor, who have applied great rigor to these studies
     22  that are being relied upon by the plaintiffs, by their experts,
     23  by the AAP, for example, then I think that is enough to create
     24  that doubt to create that space for uncertainty.  And when that
13:04:45 25  is there, the State can step in.
```

```
 1          So that's how we see it.  We don't think that you sit here
 2     as an independent medical board to assess whether a particular
 3     treatment is going to be the best for any particular
 4     individual.  The role of the federal courts in our federal
13:05:01 5     system, the laboratories of democracy is to see if we have done
 6     something that is somewhat inexplicable.
 7          I think there is ample evidence to explain why the State
 8     has done what it's done in addition to the lengthy legislative
 9     findings in SB 184.
13:05:22 10          We have come forward with multiple experts from fields of
 11    endocrinology, psychology, and pediatrics, and have brought
 12    forward substantial amount of other peer-reviewed research and
 13    literature reviews to show that this very novel area of the
 14    law -- keep in mind the UAB clinic didn't open until
13:05:44 15    seven years ago.  This is a novel area of medicine, rather --
 16    is just, in the State's judgment, too risky.  And if that's a
 17    reasonable judgment for the State to make, then that's the end
 18    of the case.
 19               THE COURT:  All right.  Mr. Doss.
13:06:03 20               MR. DOSS:  Your Honor, I'm unaware of a case that
 21    establishes that principle that's so long as there's
 22    uncertainty and a reasonable judgment, then that alone is
 23    sufficient for the State to violate constitutional protections.
 24          The standard of review is what I think helps frame some of
13:06:23 25    this testimony.  So, for example, if strict scrutiny applies,
```

```
 1  it is the State's burden to establish a compelling state
 2  interest.  And that its infringement on the constitutional
 3  protection has been narrowly tailored.
 4      And I guess to preview Your Honor for closing, that is a
13:06:40 5  key focus that I plan to spend some time with in closing on why
 6  this testimony we've heard yesterday and today, number one,
 7  does not establish a compelling State interest.  But number
 8  two, even if you assume that it does establish some interest by
 9  the State, the interest that the State has identified and the
13:06:58 10 regulation that it has imposed are mismatched.  It's not
11  narrowly tailored for the very reasons offered by the State
12  through its witnesses.
13      And based on the standard of review, it is not a reasoned
14  judgment.  That's not the test for when a constitutional
13:07:13 15 violation has occurred.  The test is whether there is
16  satisfaction of this demanding standard for the law's
17  viability.
18      And so as I mentioned in opening, I don't think that Your
19  Honor's job for the purpose of this hearing is deciding
13:07:31 20 ultimately maybe even who is right.  It's to show that there is
21  scientific -- there are standards of care that exist, there are
22  approved approaches to dealing with these issues.  These are
23  real medical diagnoses.  These are real medical treatments.
24      And though the State may disagree them, that's not enough
13:07:50 25 to establish the violation of the constitutional rights, Your
```

```
 1  Honor.

 2          THE COURT:  And on that note, at least from what I can

 3  tell from both sides, State and government, and original

 4  plaintiffs, am I correct to say that everybody agrees that

 5  these are real diagnoses?  Or no?

 6          MR. LACOUR:  Your Honor, could you --

 7          THE COURT:  And I am going to say this one more time.

 8  I don't need head nods.  It is out of hand.  This is not

 9  entertainment.  This is the real world and the law.  So we're

10  not in a movie theater.  I don't need head nods.  I don't need

11  approval or disapproval.  If you want to do that, take it

12  outside.

13      Go ahead.

14          MR. LACOUR:  Your Honor, I think -- Your Honor, we

15  agree that gender dysphoria is a psychological diagnosis, but

16  as we have shown in both our written evidence and through

17  witness testimony from both defense witnesses and plaintiffs'

18  witnesses, we don't know whose gender dysphoria is likely to

19  persist.  And that's very important.

20      Even Dr. Antommaria this morning said that if you -- the

21  level of certainty you have --

22          THE COURT:  You are giving me more detail than I want.

23  I just need you to answer my question.

24          MR. LACOUR:  Okay.  Can I respond to something

25  Mr. Doss said before?
```

1         THE COURT:  Very quickly.

2         MR. LACOUR:  He is unaware of the standard.  We cited

3    it multiple times in our P.I. response.  It's Gonzales vs.

4    Carhart, a 2007 decision from the Supreme Court where the

13:09:32 5    federal government had regulated partial birth abortion.  That

6    was an area of medical uncertainty.

7         There were -- I will go back and I will look at the

8    filings in that case, but I would be shocked if the AMA did not

9    chime in, in favor of the plaintiffs who were challenging the

13:09:46 10   ban on partial birth abortion there saying that it was a safe

11   or necessary -- medically necessary treatment for some people.

12        It was enough that Congress found medical uncertainty

13   there.  And there were values, as well, in unborn life that

14   Congress was able to promote even though there were medical

13:10:04 15   organizations.

16        I will confirm this before closing, but I am fairly

17   certain there were medical organizations who were not fans of

18   Congress's action there.

19        Even so, and even in an area like abortion where there is

13:10:16 20   more law at least for the last 49 years in that space,

21   addressing some right to abortion, even then, that ban was

22   upheld by the Supreme Court.

23        THE COURT:  And I'm sure you can get into that on

24   closing.

13:10:31 25        Let's go back to my original question.  Just answer it

```
 1  succinctly for me.

 2          MR. LACOUR:  And that would be are these real

 3  diagnoses?

 4          THE COURT:  Yes.  Just answer my question in two

 5  sentences.

 6          MR. LACOUR:  Gender dysphoria is a diagnosis.  I think

 7  the debate is how should it be treated.  And SB 184 is

 8  expressed in Section 6.

 9      There's no ban on psychotherapy whatsoever.  The ban only

10  applies to these novel risky potentially long-term

11  harm-inducing or causing medications.

12          THE COURT:  So no argument from the State on status,

13  diagnosis, any of that?  You are only -- your only issue is

14  treatment; is that correct?

15          MR. LACOUR:  Correct, Your Honor.

16          THE COURT:  Got it.  Thank you.

17      Anything else, Mr. Doss?  And I will give the government a

18  shot --

19          MR. DOSS:  No, Your Honor.

20          THE COURT:  -- if they want to be heard.

21          MR. CHEEK:  Nothing else to add that hasn't already

22  been said, Your Honor.  Thank you.

23          THE COURT:  Okay.  All right.

24      Mr. Davis, I have gotten right in the middle of your

25  witness again.  Sorry.  Pick it back up.
```

```
 1            MR. DAVIS:  I certainly understand, Judge.
 2  BY MR. DAVIS:
 3  Q    Okay.  Dr. Cantor, we to try to pick up where we were.
 4            Let's take two young boys, eight years old, say.  So
13:11:52 5  puberty hasn't started yet.  They both have gender dysphoria,
 6  even though they may not really understand it yet.
 7            And I know I'm asking you to assume some things that an
 8  outside observer may not be able to confirm just by looking at
 9  that child.
13:12:06 10           And let's assume that both those young boys would, if not
11  intervened with transitioning care, would both grow up to
12  identify as gay.
13           So the boy who is left alone to go through natural
14  puberty, what does he come to understand once puberty kicks in?
13:12:24 15 A    Once he -- as puberty kicks in, of course, sex drive comes
16  in as a part of that, and he starts experiencing sexual
17  attractions and sexual arousal.
18           That, then, because he is experiencing it towards other
19  men, teachers, peers, whoever it is, he can now -- he now has
13:12:41 20 the opportunity to understand the nature of his experiences and
21  why he doesn't feel quite like other boys, why he doesn't feel
22  as masculine, and why he doesn't feel as masculine.
23           Now, in otherwise healthy circumstances, he will grow up
24  to be a healthy gay man.
13:12:57 25 Q    Now, the other boy is given puberty blockers.  What
```

```
 1  happens in his case?
 2  A    Such a person who does not develop sexual -- the capacity
 3  for sexual arousal and sexual attractions because the very
 4  biological features which produce that have been held from him,
 5  he never experiences an orgasm.  He never experiences sexual
 6  arousal, and doesn't have the opportunity to understand the
 7  other potential explanations for why he feels the way he does,
 8  and go from a child's understanding of why he doesn't feel like
 9  other boys, to an adult's understanding of why he doesn't feel
10  like other boys.
11       By blocking puberty, you are blocking the very information
12  that he needs to understand his own situation.
13  Q    And you are not claiming to describe every person who is
14  experiencing gender dysphoria, I take it?
15  A    Correct.
16  Q    Does the evidence show that sexual orientation changes
17  after a person identifies as gay or lesbian?
18  A    No.  There is no evidence to suggest that sexual
19  orientation is unstable or changes.
20  Q    What does the evidence show about whether a person's
21  gender identity can change?
22  A    That shows the very opposite.  Among the children, it
23  changes in the majority of them.
24       They're even people who identify and describe themselves,
25  for example, as being fluid, the very definition of which is
```

```
     1  that their gender identity changes on a constant basis.
     2  Q    Are you familiar with the argument that if we do not allow
     3  minors to transition medically, the result will be increased
     4  suicides within these group of young people?
13:14:38 5  A    I've heard that said, yes.
     6  Q    Does the research literature support the argument that
     7  denying these treatments will lead to an increase in
     8  suicidality?
     9  A    No, it does not.
13:14:50 10  Q    Are you familiar with what other countries are doing, with
    11  respect to treatment of gender dysphoria?
    12  A    Yes, I am.
    13  Q    Are there any changes going on in recent years?
    14  A    Very much.  In fact, things -- it's almost as if the
13:15:10 15  pendulum has reached its far point, and it's now coming back to
    16  a much more moderate evidence-based tone.
    17      There was really -- sparking off of the social media age
    18  more than anything else, we're able to identify a greatly,
    19  greatly accelerated, great and greatly expanded number and type
13:15:31 20  of person who was potentially going to go through transition
    21  entirely, unlike the groups which we had previously studied.
    22      Several countries, especially in Europe, permitted them
    23  with lower and lower standards.  And then once the reports
    24  started coming out that that was failing greatly, they're now
13:15:53 25  restricting very, very quickly and very, very greatly.
```

1        The two most substantial bans have been in Sweden and in

2   Finland.  And there are also now very, very strong statements

3   urging the medical field to pull things back in the UK and in

4   France.

13:16:08 5   Q    Dr. Ladinsky testified yesterday that -- I don't have her

6   exact words in front of me -- but she said that what's going on

7   in the UK and Sweden and Finland isn't as relevant here because

8   those countries have a centralized health-care system, whereas

9   we have a less centralized health-care system, and all these

13:16:35 10  experts unrelated can see the same child.

11       That's a poor paraphrase.  The record will speak for

12  itself.  But assume she made that type of testimony.  Would you

13  agree with her?

14  A    No.  I can't see the logic of it.  It's certainly

13:16:53 15  feasible, in fact, more than likely that decisions are made

16  differently when there are centralized boards and a centralized

17  authority charged specifically with reviewing the evidence that

18  will be the basis of the medical procedures of that country,

19  and the U.S. lacks that.

13:17:11 20       But there's no reason to think that that situation would

21  change the actual outcomes of the actual children getting the

22  actual interventions.

23  Q    So is it possible, then, that a more centralized

24  health-care system may provide the ability -- an even greater

13:17:24 25  ability to study and evaluate the risks and benefits of

```
  1  gender-affirming care?
  2  A    That's demonstrably true.  That is exactly the process
  3  they have gone through.  They have published the results of
  4  exactly their reviews, and that is how their health-care
  5  systems -- that is what their health-care systems are
  6  responding to.
  7       The American professional associations have not gone
  8  through such a comprehensive process.  They're merely coming up
  9  with policies and citing only individual pieces of studies that
 10  appear to support it, rather than a comprehensive review.
 11  Q    I want to close a loop on adolescent onset gender
 12  dysphoria.  We talked about ways different groups are
 13  different.
 14       What's unique about this group of adolescent onset, or you
 15  referred to it also as rapid onset gender dysphoria?
 16  A    Yeah.  It's been called both.
 17       Where both the childhood onset and the adult onset are
 18  primarily male, the adolescent -- the adult onset and childhood
 19  onset are primarily male.  The adolescent onset is primarily is
 20  female.  They present with a different set -- it's a different
 21  epidemiological set of characteristics, and the evidence that
 22  we have about both adults and children don't seem to apply to
 23  that middle group.
 24  Q    Does this group of people presenting with gender dysphoria
 25  in their adolescence -- you said primarily female?
```

13:17:40  (line 5)
13:17:54  (line 10)
13:18:11  (line 15)
13:18:28  (line 20)
13:18:45  (line 25)

```
 1   A     Yes.
 2   Q     Do they tend to have any issues or comorbidities in common
 3   with each other?
 4   A     The most common one of those would be borderline
 5   personality disorders and other difficulties with integrating
 6   socially into their environments.  As I say, such as autism and
 7   Asperger's syndrome.
 8   Q     You are not saying that's true for everyone presenting
 9   with gender dysphoria for the first time in their adolescence?
10   A     Correct.
11   Q     But many?
12   A     Correct.
13   Q     What does the research literature show about the
14   desistance or detransition rates of people who transition after
15   first presenting with gender dysphoria in their adolescence?
16   A     There has never been any such study.
17   Q     Did you review the plaintiffs' reply brief, Dr. Cantor?
18   A     Yes, I did.
19   Q     Did you see any response to your report in plaintiffs'
20   reply?
21   A     Not a single comment.  My name was never mentioned.  None
22   of the studies that I cited were referred to.  None of the
23   arguments were addressed.  I don't believe I was quoted
24   anywhere in it, unlike the other experts.
25   Q     I did note a line that the plaintiffs criticized the
```

```
  1  defendants' experts in general for relying on older studies.

  2  A    Yes.  I saw that claim.  I was a bit confused by it.

  3       In my report, I provided a comprehensive list of every

  4  single study.  There were 11 in total.  So the old studies were

13:20:18 5  listed, the new studies were listed.  It was comprehensive.

  6       It was also a tangential argument.  As I said, the 11

  7  studies which have been conducted were unanimous in their

  8  findings.  They all found the same thing.  The majority

  9  desists.

13:20:33 10       So it doesn't matter even if one did rely only on the

 11  older studies, the newer studies showed exactly the same thing

 12  as the older studies.

 13  Q    We spoke a little bit about some of the things we heard

 14  from Dr. Antommaria this morning.  I want to turn to some of

13:20:55 15  the things in his report.

 16       You reviewed his written expert report, did you not?

 17  A    Yes, I did.

 18  Q    He -- Dr. Antommaria wrote on -- in paragraph 17 of his

 19  report -- and I will find a copy if you need it, but this is

13:21:07 20  one sentence.

 21       Quote, gender-affirming medical care is supported by

 22  clinical studies.  Is he right?

 23  A    That's true for adults, but that's not true for the other

 24  groups.

13:21:21 25  Q    And Dr. Antommaria spoke about how if a drug is FDA
```

```
 1  approved in one area, it's okay to use it off label in another
 2  area?
 3  A    That's what he said, yes.
 4  Q    What does the research literature say, or what opinion do
13:21:44  5  you have about using the same drug, a puberty-blocker in the
 6  case of a person who's six, seven, eight, the purpose is to --
 7  precocious puberty, what about the cases of precocious puberty
 8  and using puberty-blockers to help someone medically transition
 9  at the beginning of normal puberty?
13:22:03 10  A    Well, the ability to use a medication off label is not a
11  blanket permission to give any drug you want for any reasons
12  you want or for any conditions you want.
13        Ultimately, it's going to depend on what the scientific
14  literature itself says, which in turn is what the various
13:22:22 15  regulatory bodies use to make their decisions to decide what's
16  off label or on label to begin with.
17        So because a medication would be useful for some people in
18  some situations and some circumstances, does not mean it's
19  automatically going to be useful for other people in other
13:22:37 20  circumstances.  Indeed it could be deleterious.
21        If you use a puberty-blocker in somebody with precocious
22  puberty, you are pushing somebody who is far below the average
23  age of puberty, and you are bringing them closer to the
24  species-typical range of puberty.
13:22:55 25        If you give that same drug to somebody who is already
```

```
 1  having a typical age of puberty, you are now pushing them

 2  outside of the species-typical age.

 3  Q      Thank you, Dr. Cantor.

 4         I am going to sum up.  Does the research literature

13:23:21 5  support plaintiffs' claims that we need to treat children and

 6  adolescents with gender dysphoria with social transition

 7  puberty-blockers and cross-sex hormones?

 8  A      I'm sorry.  Could you say that -- I missed the first half

 9  of that sentence.

13:23:33 10  Q      My apologies.

11         Does the research literature support plaintiffs' claims

12  that we need to treat children and adolescents with gender

13  dysphoria with social transition, puberty-blockers, and

14  cross-sex hormones?

13:23:46 15  A      No.  That's terrible overstatement.

16  Q      Does the research literature support Alabama's description

17  of these treatments as experimental?

18  A      Yes.  They're fairly called experimental.

19  Q      When does a drug or a course of treatment stop being

13:24:02 20  experimental?

21  A      That's an excellent question.  There is no real test for

22  it.  There is no objective way to decide something is one

23  versus the other.

24         Science is never finished.  It's always possible for there

13:24:14 25  always to be some future piece of information that changes what
```

```
  1   we know.

  2        There are, of course, you know, different situations --

  3   drugs, issues under active investigation, where it's very clear

  4   that it's still experimental, and others where, you know, there

  5   is only very little question left.

  6        For this particular situation, we have a very small number

  7   of studies that in certain situations might look like they

  8   might be helping, but a much larger body of better performed

  9   studies showing that the improvement is not actually coming

 10   from the transition itself.

 11        Indeed, there were other areas of the report that were

 12   referred to already ongoing studies testing exactly these

 13   interventions.  Well, that there exists ongoing tests of these

 14   interventions is pretty much the definition of calling

 15   something experimental.

 16   Q    If scientists are eventually able to replicate the same

 17   results under the same conditions over and over again, can you

 18   then pretty much say something is established?

 19   A    Yes.

 20   Q    Has anybody been able to replicate the results of, say,

 21   the Dutch study that showed at least some positive results with

 22   a combination of treatments?

 23   A    No.  Most of the studies have demonstrated no improvement

 24   in these children from medical transition.

 25   Q    Do you understand plaintiffs to argue that Alabama is out
```

```
 1  of step with groups like the American Academy of Pediatrics?
 2  A    Yes, I've heard them say that.
 3  Q    What's your response?
 4  A    Well, it's actually the American Academy of Pediatrics
 5  which is out of step with the international standards.
 6  Q    Is there a consensus, a medical consensus internationally
 7  in support of these treatments?
 8  A    There is now a very quickly developing one.  It is still
 9  ongoing debate, so I would hesitate to describe it -- describe
10  that there is a solid consensus.
11       As I say, really what we have seen is a pendulum swing
12  which is overswung and now is substantially and very quickly
13  correcting itself.
14  Q    Is the pendulum swinging in favor of medical transition
15  use of puberty-blockers and cross-sex hormones for children and
16  adolescents?
17  A    No.  It's swinging now against that.
18  Q    Is there a medical consensus in the United States for the
19  best way to treat gender dysphoria?
20  A    No, there is not.
21            MR. DAVIS:  Thank you, Dr. Cantor.
22            THE COURT:  So I do have a question myself.
23       Dr. Cantor, you said that an adult should be affirmed in
24  their transgender status.
25            THE WITNESS:  An otherwise mentally healthy adult,
```

13:25:54  (line 5)
13:26:12  (line 10)
13:26:27  (line 15)
13:26:39  (line 20)
13:26:58  (line 25)

1  yes.

2          THE COURT:  All right.  So make it clear to me, then,

3  when should an adolescent or a child be affirmed in that

4  status?

13:27:10  5          THE WITNESS:  That, to me, is an empirical question.

6      We are not sure actually when the best time do that is.

7  Every time we check, we keep finding that, no, that's not

8  exactly the right way.  No, that's not exactly quite working.

9      And when we do think we have run into a clue that gives us

13:27:26 10  an idea of when, we are not able to recreate that situation.

11          THE COURT:  Is that case by case, then?

12          THE WITNESS:  I would hesitate to say case by case

13  exactly because --

14          THE COURT:  Let me rephrase it.  Under what

13:27:44 15  circumstances would you affirm a child or an adolescent?

16          THE WITNESS:  I can't say that there's a situation --

17  all of the situations will be gray.  I can't think of any

18  evidence that would give us the kind of certainty in any case

19  that would outweigh the potential risks.

13:28:19 20          THE COURT:  So you would never affirm a child or an

21  adolescent?

22          THE WITNESS:  Not with the current evidence available,

23  no.

24          THE COURT:  Okay.  All right.  Cross?

13:28:28 25                      CROSS-EXAMINATION

```
 1  BY MS. EAGAN:

 2  Q     Good afternoon, Dr. Cantor.

 3  A     Good afternoon.

 4  Q     Dr. Cantor, you are an adult clinical psychologist,

 5  correct?

 6  A     Yes.

 7  Q     You are not a medical doctor?

 8  A     Correct.

 9  Q     Your private practice -- in your private practice in

10  Toronto, the average age of your patients is 30 to 35 years

11  old?

12  A     Average, that would be about right, yes.

13  Q     You've not ever provided clinical care to transgender

14  prepubertal children?

15  A     Correct.

16  Q     You have not provided care to a transgender adolescent

17  under the age of 16?

18  A     Correct.

19  Q     The extent of your experience, Dr. Cantor, working with

20  transgender adolescents consists of counseling six to eight

21  transgender patients between the ages of 16 and 18; isn't that

22  correct?

23  A     Yes.

24  Q     So your clinical experience with gender dysphoria really

25  lies in the counseling of adult patients?
```

```
 1   A    Correct.

 2   Q    And you acknowledge that gender dysphoria in children does

 3   not represent the same phenomenon as adult gender dysphoria,

 4   correct?

13:30:24  5   A    Correct.

 6   Q    And, in fact, to use your words, they differ in every

 7   known regard, from sexual interest patterns to responses to

 8   treatments?

 9   A    Correct.

13:30:36 10  Q    Dr. Cantor, you have never diagnosed a child or an

11   adolescent with gender dysphoria?

12   A    Correct.

13   Q    Never treated a child or an adolescent for gender

14   dysphoria?

13:30:48 15  A    Correct.

16   Q    You have no experience personally with monitoring patients

17   who are undergoing puberty-blocking treatment?

18   A    Correct.

19   Q    You don't know what type of monitoring is typically done

13:31:04 20  or not done on those types of patients; isn't that fair?

21   A    No.

22   Q    No, that's not fair?

23   A    Well, you -- I personally didn't do it, but I am aware of

24   the procedures that are done.

13:31:15 25  Q    Okay.  But you have no experience with that?
```

```
 1   A    That's correct.

 2   Q    Similarly, you have never monitored -- or you have not

 3   monitored an adolescent or teenage patient on hormone therapy?

 4   A    Correct.  Until -- well, I wouldn't be monitoring the

 5   status in any case, so, yes, that's correct.

 6   Q    I am going to switch to UAB Children's, the gender clinic

 7   here in Alabama.

 8        Have you ever spoken to a child or adolescent who was

 9   treated at the gender clinic here in Alabama?

10   A    No.

11   Q    Have you ever spoken to any former patients of the clinic?

12   A    No.

13   Q    You weren't here yesterday to hear Dr. Ladinsky talk about

14   the treatment protocols they have at children's UAB, were you?

15   A    Correct.

16   Q    You weren't here to listen to the results of treatments

17   provided to adolescent patients at UAB's Children's in the

18   gender clinic; fair?

19   A    Yes.  They have never published them.

20   Q    And you weren't here to hear them?

21   A    Correct.

22   Q    Dr. Cantor, you have no personal knowledge of the

23   assessment or the treatment methodologies that are used here in

24   Alabama at UAB Children's Hospital, correct?

25   A    Correct.  Correct.
```

The time stamps in the left margin are: 13:31:34 (line 5), 13:32:00 (line 10), 13:32:12 (line 15), 13:32:27 (line 20), 13:32:42 (line 25).

```
          1   Q    You do not know the disciplines of the medical providers

          2   who are part of the treatment team involved in that assessment

          3   at UAB Hospital?

          4   A    Correct.

13:32:56  5   Q    Now, I heard your opinion that it's important to assess

          6   the mental health issues of an adolescent patient to see

          7   whether that is a potentially contributing factor to gender

          8   dysphoria and whether there's a need to address.  That's a fair

          9   statement of your opinion?

13:33:17 10   A    I'm sorry.  Would you repeat that, please?

         11   Q    Sure.  It's your belief that mental health issues need to

         12   be assessed and addressed before a transition occurs?

         13   A    Correct.

         14   Q    Do you know what assessment protocols at UAB Children's

13:33:31 15   are to address mental health issues before a child is put on

         16   any transitioning medication?

         17   A    No, I do not.

         18   Q    Do you have any idea or do you know what the doctors at

         19   UAB Children's discuss with their adolescent patients about the

13:33:48 20   risks and the benefits of medical treatments at UAB?

         21   A    No.

         22   Q    Wouldn't you agree -- well, never mind.  I am going to

         23   move on.

         24        Dr. Cantor, I want to talk with you a minute about -- or a

13:34:18 25   little bit about your criticisms of the various studies
```

```
 1  regarding the efficacy of puberty blockers and hormone
 2  treatments, okay?
 3  A    Yep.
 4  Q    As I understand your report and your testimony today, one
 5  of the criticisms you have of some of those studies is that it
 6  relies on participant's self-assessment I believe is the
 7  language that you used.
 8       Essentially, it is based upon what socially transitioned
 9  youth and their family is reporting about their mental health
10  in these studies?
11  A    I would say that's incomplete.  My criticisms would be
12  relying on such subjective accounts entirely for all the
13  decision making rather than using it as one part of the
14  decision making.
15  Q    In other words, basing your study based upon what the
16  participants in the study tell you how they're feeling at
17  different points in the study?
18  A    Being limited to that is a problem, yes.
19  Q    And I believe the way that you phrased it, you said,
20  subjective self-reports about how one is doing may not be
21  reflecting reality objectively.
22  A    Correct.
23  Q    But, Dr. Cantor, self-reports about how one is doing may
24  reflect reality, fair?
25  A    That's correct.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1  Q    So when somebody says, I am doing well, my mental state is
 2  better, that very well may be the case?
 3  A    May be the case, yes.
 4  Q    Another complaint that you have, I believe, is what you
13:35:58  5  call confounded data.  And I believe you referred to the de
 6  Vries study for that?
 7  A    The two de Vries's studies, yes.  As a matter of fact,
 8  it's all but two of all papers in that set of literature.
 9  Q    And by confounded data, the way that I am understanding
13:36:13 10  it, what you're saying is that you are not able to tell because
11  the data is, quote, confounded, whether one's improved mental
12  health for a minor who has socially transitioned, whether that
13  came from the actual medical services, whether it came from the
14  psychotherapy, or whether it came from the combination of both?
13:36:34 15  A    Correct.
16  Q    But one thing, Doctor, that you do have to admit is when
17  adolescents with gender dysphoria have transitioned through a
18  combination of medical services and psychotherapy, you have to
19  admit that based upon the studies, their mental health
13:36:55 20  improved, correct?
21  A    No.  There were several studies that showed no improvement
22  even though -- even though they were receiving both.  I've
23  listed them in my report.
24  Q    Can you direct me to where in your report those are,
13:37:11 25  please, sir?
```

```
 1  A     Sure.

 2          THE COURT:  While he is looking, did you say your

 3  target is an hour; is that right?

 4          MS. EAGAN:  Yes, sir.  I believe I should be able to

 5  be done in an hour.

 6          THE WITNESS:  Page 20, footnote 40.

 7  BY MS. EAGAN:

 8  Q    I'm sorry, sir?

 9  A    Page 20, footnote 40.  The Carmichael study, the

10  Hisle-Gorman, et al, study, and Kaltiala.

11        My full sentence was, New studies continue to appear at an

12  accelerating rate, repeatedly reporting deteriorations or lacks

13  of improvement in mental health, footnote 40 -- or again, those

14  were the specific studies -- and then or lack of improvement

15  beyond psychotherapy alone, footnote 41.

16  Q    Certainly, Dr. Cantor, though, there are many study -- or

17  there are studies that indicate when adolescents with the

18  combination of medical service and psychotherapy transition,

19  their mental health has improved.  You agree with that

20  statement?

21  A    I would have to check to see if the number is zero or a

22  handful.  There have been reports of there having been such

23  improvement, such as the Branstom study, which once it was

24  reanalyzed, discovered to have problems, and the finding was

25  withdrawn.
```

1          So there -- again, I would have to go through and check to

2     be sure that it's not zero.  It would be fair to say that there

3     might have been a study which found such a thing.  But the

4     majority of studies are finding either no improvements or

13:39:17  5     deteriorations, or it's a situation that we call a failure to

6     replicate.

7     Q    Sir, I am a little bit confused, because I want to go to

8     two of your studies that you have actually talked about today,

9     the Costa study and the Achille study.

13:39:33 10          Now, as I understand your testimony today, in those

11     studies, there was -- the studies reported that there was an

12     improvement in mental state for adolescents who were treated

13     with medication and psychological treatment in transition that

14     there was an improvement, but in those, you said you can't tell

13:39:58 15     whether it's from the medication or from the psychological

16     treatment?

17     A    No.  The Costa study and the Achille study associated the

18     improvement specifically with the psychotherapy and ruled out

19     that the effects were due to the medical interventions.

13:40:13 20     Q    Okay.  Well, let's pull those studies, Doctor, and let's

21     look at those.

22          If you could, there should be a notebook up there that has

23     plaintiffs' exhibits in it.  Is that one plaintiff, sir?

24          If you could please, sir, turn to Plaintiffs' Exhibit 34.

13:40:55 25     A    Yes.

```
 1  Q    All right.  Plaintiffs' Exhibit 34, is this the -- do you
 2  say Costa or Costa?
 3  A    I'm sorry?
 4  Q    Do you say Costa?
 5  A    My guess is Costa.  I have never met the person.
 6  Q    All right.  Exhibit 34 that you have in front of you, is
 7  that the Costa study?
 8  A    Yes, it is.
 9  Q    All right.  So, Doctor, I first want to focus in on --
10  well, let me ask this:  This study was aimed at assessing
11  gender dysphoric adolescents' global functioning after
12  psychological support and after puberty suppression, correct?
13  A    Yes.
14  Q    Bear with me.  I am going to take this out so I can put it
15  up on the Elmo, sir.
16       All right, sir.  I am going to direct your attention to
17  results that I have highlighted on my copy.  Okay?  According
18  to the abstract here, the results?
19  A    Yes.
20  Q    At baseline, gender dysphoric adolescents showed poor
21  functioning with -- it defines the mean scores.  So baseline
22  means at the start of the study, correct?
23  A    Usually it does.  I would have to check that that's
24  exactly how they used the term.
25  Q    All right.  We will get to the details of that in a
```

```
 1   minute.
 2        Okay.  Gender dysphoric adolescents' global functioning
 3   improved significantly after six months after psychological
 4   support.  And then it goes on to say, Moreover, gender
 5   dysphoric adolescents receiving also puberty suppression had
 6   significantly better psychosocial functioning after 12 months
 7   of puberty suppression compared to when they had received only
 8   psychological support.
 9        Did I read that right, sir?
10   A    Yes.
11   Q    Do you remember the methodology that was used for this
12   study, sir?
13   A    Roughly.
14   Q    Pardon?
15   A    Yes.  Roughly.
16   Q    Sorry.  I meant to -- all right.  And do you recall that
17   the methodology was everybody started at baseline.  For the
18   first six months all of the adolescents received psychological
19   counseling.  And then for the next 12 months beyond that, one
20   group received puberty blockers, and one group just continued
21   to receive psychological counseling.  Do you recall that?
22   A    Yes.
23   Q    All right.  And then I am going to direct you, sir, to
24   page 2211 of the -- if you look at the blue writing on the top,
25   it's page 6 of 9.
```

13:42:49 (line 5)
13:43:07 (line 10)
13:43:14 (line 15)
13:43:36 (line 20)
13:44:12 (line 25)

```
 1  A    Yes.
 2  Q    All right.  And I am going to direct you, sir, to on the
 3  CGAS on follow-up?
 4  A    Yes.
13:44:32 5  Q    All right.  And I am going to start at the second
 6  paragraph where it says delayed eligible.  Do you see where I
 7  am talking about?
 8  A    Yes.
 9  Q    This is talking about there were three follow-ups, right,
13:44:43 10  at 6 months, at 12 months, and at 18 months for this study; is
11  that correct?
12  A    That sounds familiar to me, yes.
13  Q    And let's read through that together.
14       Delayed eligible gender dysphoric adolescents, who
13:44:55 15  received only -- and gender delayed, GD adolescents, is your
16  recollection that those were adolescents who were eligible to
17  receive puberty blockers, but they delayed them for six months
18  so that they had everybody at a -- doing psychological study?
19  Do you remember this is the group that gets the puberty
13:45:17 20  blockers?
21  A    Yes, that sounds correct.
22  Q    Okay.  The delayed eligible gender dysphoric adolescents
23  who received only psychological support for the entire duration
24  of the study -- excuse me -- I take that back.
13:45:29 25       This was actually the group that just got the
```

```
 1  psychological -- had significantly better psychosocial

 2  functioning after six months of psychological support, okay?

 3       However, despite scoring better at the following

 4  evaluations, they did not show any further significant

 5  improvement in their psychosocial functioning.

 6       Did I read that right?

 7  A    Yes.

 8  Q    Also, the delayed eligible group continued to score lower

 9  than a sample of children adolescents without observed

10  psychological psychiatric symptoms even after 18 months of

11  being in psychological support.

12       So what that's saying is after 18 months, they were still

13  below a group that did not have psychological therapy or

14  issues, correct?

15  A    Yes.

16  Q    On the contrary, the immediately eligible group, who at

17  baseline had a higher, but not significantly different

18  psychosocial functioning than the delayed eligible group, did

19  not show any significant improvement after six months of

20  psychological support.  However -- and this is the key --

21  immediately eligible adolescents had a significantly higher

22  psychosocial functioning after 12 months of puberty suppression

23  compared to when they had received only psychological support.

24       Did I read that correctly?

25  A    Yes.
```

```
        1   Q    Then you see at the top of this, there is a chart.  And

        2   when you look at this chart, the bottom is actually the three

        3   different check-ins.  Time zero is baseline, when the study

        4   started, right?

13:47:18 5   A    Yes.

        6   Q    Time one is the six-month check-in, correct?

        7   A    Yes.

        8   Q    And during that six months, both groups are getting just

        9   psychotherapy, correct?

13:47:31 10  A    Yes, I believe so.

        11  Q    The rest -- and just to orient us.

        12       The red group, the red line is the group of adolescents

        13  who only got psychotherapy or psychotherapy through the entire

        14  18-month study, right?

13:47:46 15  A    Yes.

        16  Q    The green line that you see that goes up -- goes up and

        17  keeps going up, that is the line of adolescents who receive

        18  puberty blockers; fair?

        19  A    Yes.

13:47:59 20  Q    And so, Doctor, to get to the ultimate conclusion of this

        21  study that you say shows that puberty blockers don't work or

        22  don't give any improvement in mental condition over

        23  psychotherapy, the conclusion, this study confirms the

        24  effectiveness of puberty suppression for gender dysphoric

13:48:37 25  adolescents.  Recently, a long-term follow-up evaluation of
```

```
       1  puberty suppression among gender dysphoric adolescents after
       2  that CSHT, which is hormone therapy and GRS, which is puberty
       3  blockers, has demonstrated that gender dysphoric adolescents
       4  are able to maintain a good functioning into their adult years.
13:49:00 5  This present study, together with this previous research,
       6  indicate that both psychological support and puberty
       7  suppression enable young gender dysphoric individuals to reach
       8  a psychosocial functioning comparable with their peers.
       9      Did I read that conclusion correctly?
13:49:17 10  A    Yes.
      11          THE COURT:  Ms. Eagan, when you reach a comfortable
      12  spot, let's take a post-lunch break.
      13          MS. EAGAN:  Perfect.  We're good, Judge.  We can go
      14  ahead and break now.
13:49:35 15          THE COURT:  Okay.  I will see you in 15 minutes.
      16          (Recess.)
      17          THE COURT:  Go ahead, Ms. Eagan.
      18          MS. EAGAN:  Thank you, Your Honor.
      19  BY MS. EAGAN:
14:09:00 20  Q    Dr. Cantor, my understanding from paragraph 63 of your
      21  declaration is that the other study that you point to in
      22  support of your assertion that testing revealed that puberty
      23  blockers did not improve mental health any more than mental
      24  health does on its own is the Achille study you mentioned
14:09:29 25  earlier today; is that right?
```

```
 1  A    Yes.

 2  Q    If you, please, sir, could turn to Plaintiffs' Exhibit 42

 3  in that binder in front of you, and this would be the

 4  plaintiffs' exhibits that we were looking at earlier.

 5  A    Yep.  Got it.

 6  Q    All right.  Is Plaintiffs' Exhibit 42 the Achille study

 7  that we just mentioned?

 8  A    Yes.

 9  Q    All right.

10       MS. EAGAN:  Your Honor, do you mind if I take this off

11  of this?

12       THE COURT:  That's fine.

13  BY MS. EAGAN:

14  Q    All right.  I am going to -- so this is Plaintiffs'

15  Exhibit 42.

16       And the Achille study, again, was -- in this case if we

17  look at the abstract, the background of the study or the

18  purpose of the study was to examine the associations of

19  endocrine intervention puberty suppression and/or cross-sex

20  hormones therapy with depression and quality of life scores

21  over time in transgender youths.

22       That was the purpose of the study, correct?

23  A    Yes.

24  Q    And looking down to the results section, between 2013 and

25  2018 -- so this went over a five-year period, right?
```

14:09:42 (line 5)
14:09:59 (line 10)
14:10:15 (line 15)
14:10:35 (line 20)
14:10:56 (line 25)

```
 1   A     Yes.
 2   Q     And there were 50 participants in the study, correct?
 3   A     That sounds right, yes.
 4   Q     All right.  And that they received endocrine intervention
 5   both -- some were in the form of puberty blockers, and some
 6   were in the form of cross-sex hormones, but endocrine -- and
 7   over that time period and completed three waves of
 8   questionnaires.
 9         Is that your recollection of this study?
10   A     Yes, roughly.
11   Q     Okay.  And when that was -- with those treatments, mean
12   depression scores and suicidal ideation decreased over time,
13   which means their depression was -- went down, or they got
14   better.  Suicidal ideation went down, which is improvement,
15   correct?
16   A     Yes.
17   Q     While mean quality of life scores improved over time.
18         And then it goes on to say, When controlling for
19   psychiatric medications and engagement in counseling,
20   regression analysis suggested improvement with endocrine
21   intervention.  And then it goes on to say that this reached
22   significance in male to female participants.  And the male to
23   female participants, those are ones that were receiving hormone
24   therapy, correct?
25   A     I believe they were both receiving hormone therapy.  It
```

          1    was not significant in one group, and so they're just reporting
          2    the successful in the other and not reporting the nonsuccessful
          3    group.
          4    Q    Well, let's talk about that.  Let me pull up paragraph 63
14:12:39  5    of your declaration.
          6        When you're discussing this study, here is what you said.
          7    You said that upon follow-up, some incremental improvements
          8    were noted; however, after -- so, in other words, upon
          9    follow-up, they saw improvements.
14:13:07 10        But after statistically adjusting for psychiatric
         11    medication and engagement and counseling, quote, most
         12    predictors did not reach statistical significance.
         13        And that's your basis -- that statement is your basis to
         14    say there was not a statistical significance of difference
14:13:26 15    between just counseling versus with meds; is that right?
         16    A    I'm sorry.  Could you say that part again?
         17    Q    The language that you seize onto, to say that puberty
         18    blockers did not improve mental health more than mental
         19    healthcare did on its own --
14:13:43 20    A    Right.
         21    Q    -- was the statement in the study that most predictors did
         22    not reach statistical significance.
         23    A    Well, I wouldn't say that I derived that just from that
         24    sentence.  It's just easier to convey that idea to readers by
14:13:56 25    using the sentence.  My evaluation of the study is by those

1  statistics directly.

2  Q    All right.  Let's go to the language in the study that

3  they talk about, the regression analysis that you were just

4  referencing there.

14:14:11  5        Okay.  And this is here in the regression analysis.

6        Let me first say this:  The mean changes over time.  And

7  it does say, Mean depression scores decreased.  Quality of life

8  improved, but did not reach statistical significance.

9        But then when you go on to the regression analysis, here

14:14:39 10  is what it says.  It says, Given our modest sample size --

11  which in this case was 50 people, right?

12  A    Yes.

13  Q    Given our modest sample size, particularly when stratified

14  by gender, most predictors did not reach statistical

14:14:57 15  significance.

16        So one of the contributing factors to that, of course, was

17  the size of the number of participants, correct?

18  A    Yes.  In statistics, that's a truism.  The precision of

19  the statistics is the direct -- direct result of the sample

14:15:20 20  size.

21  Q    Okay.  And then it goes on to say, That being said, effect

22  sizes values were notably large in many models.  In the male to

23  female participants, only puberty suppression reached a

24  significance level.  And it gives the number in one of the

14:15:43 25  sample -- one of the tests, and associations with the two other

1    scores approached significance.

2         And then it goes on to say, For female to male

3    participants, only cross-sex hormone therapy approached

4    statistical significance.

14:15:57  5         All right.  Statistical significance are not -- on all

6    planes, the numbers improved, correct?

7    A    No.  That's -- the very meaning of determining --

8    factoring in whether something is statistically significant or

9    not.

14:16:15 10   Q    Ultimately, the writers of this study stated, if you look

11   at the next paragraph -- or look on the discussion part if you

12   want -- can you see the screen up here?

13   A    Oh, I have the same thing on this screen.

14   Q    Oh.  You have got one.  Okay, good.

14:16:31 15        Our results suggest that endocrine intervention is

16   associated with improved mental health among transgender youth.

17        Did I read that right?

18   A    Yes.  Those are their words.

19   Q    Doctor, to be clear, you agree that the U.S.-based medical

14:17:15 20   association guidelines and position statements are in support

21   for the use of medical treatment combined with mental health

22   treatment for adolescents with gender dysphoria, correct?

23   A    I don't think I would phrase it quite that strongly.  Most

24   of the associations are using relatively vague terms.  And it's

14:17:35 25   not clear when they're talking about adults or children, when

```
 1  they're talking about transition, medical services versus
 2  psychotherapy, or a relatively blanket statement of
 3  demonstrating respect.  I can only accept that they're
 4  endorsing a particular treatment when they're endorsing a
 5  particular treatment.
 6       So is there a specific association or specific statement
 7  you have in mind?
 8  Q    The major medical associations that were involved in this
 9  space endorse the use of medications to treat gender dysphoria
10  in children -- excuse me -- gender dysphoric adolescents once
11  they reach puberty when appropriate?
12  A    I can think of two medical associations, one
13  interdisciplinary association, and the other -- and all of the
14  others are, as I say relatively, vague words of support, and
15  it's not clear exactly what it is that they're recommending.
16  Q    Well, my understanding is what you like to look at is the
17  international standards.  That's what you're talking about
18  today in support of your opinions?
19  A    Oh, I looked at each of them, and I think I described each
20  of them.  I did my best not to leave any out.
21  Q    So, and according to you, the Dutch approach is
22  internationally the most widely-respected and utilized method
23  for the treatment of children who present with gender
24  dysphoria?
25  A    Yes.
```

```
 1   Q    And the Dutch approach is also, I believe, what you call
 2   that watchful waiting approach?
 3   A    No.
 4   Q    Okay.  The Dutch approach is what is accepted -- I have
 5   already said what you said.
 6        The Dutch approach says social transition can happen at
 7   age 12, puberty blockers may be prescribed at age 12, hormones
 8   at age 16, and then resolve other mental health issues before
 9   transition.  That's the Dutch method?
10   A    Yes.
11   Q    Do you know how that approach aligns with protocols that
12   are utilized at UAB Children's in Alabama?
13   A    I don't know.
14   Q    In any event, what you say is internationally the most
15   widely-respected and utilized method for treatment of children
16   who present with gender dysphoria, you would agree that that
17   approach would be a felony in Alabama with this new law,
18   correct?
19   A    Yes.  It's true that the Alabama law didn't leave an
20   exception for research purposes.
21   Q    Okay.  So let's talk about the European countries that you
22   mentioned very briefly, the UK, Finland, Sweden and France.
23        When you look at those four European countries, Doctor,
24   not one of them has enacted a ban to puberty blockers and
25   hormone treatments as Alabama has done here, correct?
```

Timestamps in left margin:
- 14:19:24 (line 5)
- 14:19:43 (line 10)
- 14:20:03 (line 15)
- 14:20:26 (line 20)
- 14:20:46 (line 25)

```
 1  A     No.

 2  Q     That's not correct?

 3  A     Correct.  That is not correct.

 4  Q     UK has not fully banned puberty blockers and hormone

 5  treatments in youth 18 and younger?

 6  A     That's correct.

 7  Q     Finland has not banned -- let me ask it this way:  Has

 8  Finland banned blockers and hormone treatments in youth ages 18

 9  and under for gender dysphoria?

10  A     Yes, I believe it has.

11  Q     It has?

12  A     I believe so.

13  Q     A blanket ban?  Should I refer you to paragraph 131 of

14  your declaration, sir?

15  A     Hang on.  That's just where I am now.

16  Q     Okay.

17  A     Oh, yes, they did leave an exception for hormones.  The

18  total ban was on surgery.

19  Q     Thank you, sir.

20        Sweden, has Sweden put an absolute ban on puberty

21  blockers?

22  A     Yes.

23  Q     And bear with me.  Have they put a ban on puberty blockers

24  and hormone treatments in youth ages 18 and under for gender

25  dysphoria in Sweden?
```

```
        1   A    18 and under?

        2   Q    Yes, sir.

        3   A    No.  They allowed exceptions for 16 year olds -- 16 year

        4   olds within research circumstances.

14:22:32 5   Q    Has France banned the use of puberty blockers and hormone

        6   treatments for adolescents ages 18 and under?

        7   A    No.

        8   Q    Can you point me to a single country, Doctor, in Europe

        9   that has put a blanket ban on the use of puberty blockers or

14:22:50 10  hormone treatments for youth ages 18 and under for gender

       11   dysphoria?

       12   A    Blanket ban in the way you're describing it, no.

       13            THE COURT:  How about any country?

       14            THE WITNESS:  No, not that I know of.

14:23:04 15  BY MS. EAGAN:

       16   Q    I want to turn very briefly to the subject of -- I will

       17   use your word desistance.

       18        If you turn to paragraph 36 of your declaration.

       19   A    Yes.

14:23:36 20  Q    In that -- you state, Among prepubescent children who feel

       21   gender dysphoric, the majority cease to want to be the other

       22   gender over the course of puberty ranging from 61 to 80 percent

       23   desistance across the large prospective studies.

       24        I know that's a point that you also raised earlier today.

14:23:59 25      So I want to ask this question:  Of those that number, do
```

```
 1  you know, Doctor, what percentage of those kids cease to want

 2  to be the other gender -- that's using your words -- before or

 3  as they enter puberty, in other words, before they actually get

 4  into puberty?  Do you know how many of those desisters are in
```
14:24:27 ` 5  that window?`
```
 6  A    I must not be understanding your question, because it

 7  makes me want to say the same number that's in the report, 61

 8  to 88 percent.  What's different from what I said and what

 9  you're asking?
```
14:24:39 `10  Q    The 61 to 88 percent, is that children that realign with`
```
11  their birth sex before -- or as they're entering into puberty,

12  that's that number?

13  A    Yes.

14  Q    Okay.  All right.  So I want to focus on a different
```
14:25:01 `15  category of youth.  Let me ask you this:  The medications in`
```
16  the United States, puberty blockers and hormone treatments

17  cannot be given to kids for gender dysphoria until after

18  they've actually entered into puberty, correct?

19  A    Very many clinics are doing it as close to the beginning
```
14:25:23 `20  as soon as puberty starts as they are able.`
```
21  Q    But it's once they have entered puberty?

22  A    Yes.

23  Q    So let me ask you about that category of youth.

24        And that is adolescents who have entered into puberty,
```
14:25:38 `25  okay, and who have been -- have suffered from gender dysphoria`

```
 1  persistently, consistently, and insistently in childhood
 2  leading up to puberty, okay?
 3  A    Okay.
 4  Q    Do you have any data regarding what percentage of those
14:25:58 5  individuals desist after they enter into puberty?
 6  A    No.  I don't think that level of follow-up has yet been
 7  conducted.
 8  Q    And, Doctor, in fact, it's your belief that the
 9  majority -- that while the majority of prepubescent kids cease
14:26:35 10  to feel trans, you know, to puberty or during puberty, in other
11  words, as they enter into puberty, the majority of kids who
12  continue to feel trans after puberty rarely cease?
13  A    That does seem to be the case, yes.
14  Q    Okay.  Doctor, are you being paid to be here to testify
14:27:10 15  today?
16  A    Yes.
17  Q    What's your rate?
18  A    400 an hour.
19  Q    Who is paying your fees?
14:27:14 20  A    The Alabama state -- State of Alabama.
21  Q    Okay.  Dr. Cantor, have you attempted to recruit parents
22  in Alabama whose children have gender dysphoria and were
23  prescribed or referred to gender-affirmative treatments, have
24  you tried to recruit them to give a witness statement in this
14:27:38 25  case that they believe the treatments are harmful?
```

```
 1  A     No.

 2  Q     Do you tweet?

 3  A     Yes.

 4         MS. EAGAN:  Your Honor, may I approach?

 5         THE COURT:  Yes.

 6  BY MS. EAGAN:

 7  Q     Doctor, I've marked as Plaintiffs' Exhibit 45 a tweet

 8  Dr. James Cantor retweeted.  And it's -- let me say this:  Is

 9  this a tweet that you actually did?

10  A     No.  I --

11  Q     You retweeted?

12  A     Retweeted, exactly.

13  Q     From a group called Genspect, or what's -- I don't tweet.

14  Would you call that a group?  I guess it's a group called

15  Genspect?

16  A     It's there is a group called Genspect, and this is their

17  Twitter account.

18  Q     All right.  And then you retweeted it?

19  A     Yes.

20  Q     And it says, Urgent.  Attention.  Alabama parents, if your

21  child experienced gender dysphoria and was prescribed or

22  referred to gender-affirmative treatments and you believe these

23  treatments are harmful, please direct message, e-mail us at

24  once.  We are looking for witness statements.  Can be anon.

25         By anon, I guess that means anonymous, correct?
```

```
 1  A     That would be my reading, yes.

 2  Q     All right.  Doctor, have you seen a sworn statement under

 3  penalty of perjury for any Alabama parent whose kid received

 4  puberty blockers or hormones and the parent said the

 5  medications hurt their kid more than they helped them?

 6  A     I'm sorry.  Did you ask have I seen such a statement?

 7  Q     Yes, sir.

 8  A     Not that I recall.

 9          MS. EAGAN:  Nothing further.

10          THE COURT:  Any redirect?

11          MR. DAVIS:  Short.

12          THE COURT:  Ms. Eagan, did you intend to offer that

13  into evidence or no?

14          MS. EAGAN:  Oh, yes.  Thank you, Judge.  I offer

15  Plaintiffs' Exhibit 45.

16          THE COURT:  It will be admitted.

17                    REDIRECT EXAMINATION

18  BY MR. DAVIS:

19  Q     Dr. Cantor?

20  A     Hi.

21  Q     Is it true as a clinician you are not treating anyone who

22  has presented with gender dysphoria as an adult or as a child?

23  A     I treat adults with gender dysphoria, not children.

24  Q     You are not treating them while they are adolescents or

25  children, you are not currently treating someone who is like
```

```
 1  under age 16?
 2  A    Correct.
 3  Q    Okay.  But you are familiar with the research literature
 4  on these issues, correct?
14:31:19 5  A    Yes, quite.
 6  Q    And even those that are studying -- or children in
 7  adolescents?
 8  A    Of course.
 9  Q    You're knowledgeable about the treatment they're
14:31:29 10  receiving?
11  A    Yes, very.
12  Q    And are you knowledgeable about what the research shows
13  about the efficacy of these treatments?
14  A    Yes.
14:31:35 15  Q    You had an exchange with Ms. Eagan where you admitted that
16  a fact that is self-reported by a participant may be true?
17  A    Correct.
18  Q    What's the rest of that sentence?
19  A    It is certainly not necessarily true.  We need something
14:31:53 20  objective before we can make any decisions upon it.
21  Q    Let's turn to the Costa study.  That's at Tab 38 of the
22  book of plaintiffs' exhibits.
23          MR. DAVIS:  Your Honor, I'm sorry.  I left a notebook.
24  May I step over?
14:32:40 25          THE COURT:  Certainly.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                THE WITNESS:  I'm sorry.  You said Tab 38?
 2   BY MR. DAVIS:
 3   Q     I was mistaken, Dr. Cantor.  It was 34.
 4   A     34 of the defendants'?
14:33:02  5   Q     No.  Of the plaintiffs' book.
 6   A     Yes.  Now I'm back there.
 7   Q     Okay.  Now, you have a line in your report in paragraph 57
 8   of your report that I will just read to you.
 9         It says, Both groups improved in psychological functioning
14:33:25 10   over the course of the study, but no statistically significant
11   differences between the groups was detected at any point?
12   A     Correct.
13   Q     Okay.  Are the three groups represented by the three
14   colored lines -- the three groups you're talking about, the
14:33:41 15   three groups on the three colored lines on this chart I'm
16   showing you?
17   A     Part of the information is contained in that graph, yes.
18   Q     Okay.  Does this table tell us more about the statistical
19   significance or lack thereof shown in the Costa study?
14:34:02 20   A     Yes, it does.  The results of this table, although much
21   harder to read, indicate that there was no statistical
22   significance between the groups.
23   Q     Okay.
24   A     What was changing in the groups was change over time
14:34:13 25   within the group relative to the same group previously.  But
```

1  there were no changes -- no significant differences between the

2  groups themselves.

3  Q    Okay.  What does it mean in a study if a finding lacks

4  statistical significance?

14:34:29 5  A    That there was a substantial probability of getting a

6  pattern like that just by random chance.

7  Q    And are there any reasons other than puberty suppression

8  that the delayed group did not have the same change over time

9  as the immediately eligible group?

14:34:45 10  A    It's not exactly clear if they didn't change just as much.

11  That's one of the ambiguities that, again, comes from

12  statistics.  When you look at it in different ways, you can see

13  different aspects, different aspects of it.

14  Q    And the authors actually noted statistical significance or

14:35:11 15  lack thereof, did they not, in the language that are bracketed

16  there?  It says, this difference failed to reach significance

17  possibly because of sample size?

18  A    That is correct.

19  Q    Have you said anything about the Costa study in your

14:35:24 20  report that you need to withdraw after your exchange with

21  Ms. Eagan?

22  A    No.  Everything I said is accurate.

23  Q    Okay.  Is the same true for everything that you have said

24  about the Achille study?

14:35:39 25  A    Yes.  Everything I said was accurate.  Nothing in the

```
 1  prior discussion changed it.
 2  Q    The UK is still reviewing these treatments, are they not?
 3  A    They are in the middle of deciding what to do with what
 4  they have now discovered from their comprehensive review of the
 5  literature, which showed what they were doing was wrong.
 6  Q    What did they discover?
 7  A    They discovered that they said exactly what I said, that
 8  there is no evidence to support the medical transition of these
 9  children.
10  Q    And they have not yet decided how to respond to that
11  revelation, correct?
12  A    Correct.  They have now taken that report, and they're now
13  reorganizing and deciding exactly what it is that they're going
14  to do.
15  Q    And in France, is it not correct that they've said about
16  hormones that the greatest reserve is required for their use?
17  A    That is correct.
18  Q    And is it true that, quote, they have said that speaking
19  of hormones, they're irreversible nature must be emphasized?
20  A    That is correct.
21  Q    And in Sweden, is anyone under 16 getting puberty blockers
22  or hormone treatments?
23  A    No.  That is banned.
24  Q    And what about over 16?  Youth -- like --
25  A    Between 16 and 18, they're permitted to do it, but only
```

```
 1  within recognized research programs.  A regular physician
 2  can't.
 3  Q    And how many such research programs are going on at
 4  present?
 5  A    Oh, in Sweden?
 6  Q    Are you aware of any?
 7  A    I am aware of one lab that has two locations.  I don't
 8  know what its current status is with its current research
 9  program.
10  Q    Okay.  Can you say whether a single child under 18 is
11  currently receiving hormones for the purpose of transitioning
12  in Sweden?
13  A    I don't know.
14          MR. DAVIS:  Thank you, Dr. Cantor.
15          THE COURT:  Any recross?
16          MS. EAGAN:  No, Your Honor.
17          THE COURT:  May this witness be excused?
18          MR. DAVIS:  Yes, of course, Your Honor.
19          THE COURT:  All right.  You can step down, sir.
20          THE WITNESS:  Thank you.
21          THE COURT:  All right.  Call your next witness.
22          MR. DAVIS:  Your Honor, the State calls Ms. Sydney
23  Wright.
24          THE COURT:  All right.
25                      SYDNEY WRIGHT,
```

Timestamps in left margin: 14:37:04 (line 5), 14:37:20 (line 10), 14:37:39 (line 15), 14:37:48 (line 20), 14:37:54 (line 25)

```
 1  having been first duly sworn by the courtroom deputy clerk, was
 2  examined and testified as follows:
 3              THE COURT:  And we think this will be how long, again?
 4              MR. DAVIS:  Less than 30 minutes on direct.
 5              THE COURT:  Good afternoon, ma'am.
 6                          DIRECT EXAMINATION
 7  BY MR. DAVIS:
 8  Q    Good afternoon, Ms. Wright.
 9  A    Good afternoon.
10  Q    Would you state your name for the record, please?
11  A    Yes.  It is Sydney Wright.
12  Q    Can you pull that mic up a little closer to you?
13  A    Yes.  Will that work a little bit better?
14  Q    Yes.  Where do you live?
15  A    I live in Cedar Bluff, Alabama.
16  Q    And how old are you?
17  A    I am 23.
18  Q    What do you do for a living?
19  A    Me and my wife own a business together.
20  Q    What kind of business?
21  A    We own a cleaning company.
22  Q    Do you have any children?
23  A    Yes.  We have two.
24  Q    What is your biological sex, Ms. Wright?
25  A    It is female.
```

```
 1   Q    Did you at any time in your life seek medical treatment to
 2   try to appear more like a male?
 3   A    Yes, sir, for many years.
 4   Q    How old were you when you first decided to seek some type
 5   of transitioning care?
 6   A    I was 17 when I first started.
 7   Q    I've put a picture on the screen, Ms. Wright.  This, for
 8   the record, is page 2 of Defendants' Exhibit 41.  Is this you?
 9   A    Yes, sir, it is.
10   Q    How old were you in this picture?
11   A    This is my graduation pictures.
12   Q    Were you about 17 when these were taken?
13   A    Yes, I was.  The summer before.
14   Q    At the time -- at the time of this picture -- well, is
15   this before you started receiving any cross-sex hormones?
16   A    Yes.  Yes.  Yes.
17   Q    To be clear for the record, at some point, you did receive
18   testosterone, a cross-sex hormone in order to transition to
19   male?
20   A    Yes, I did.
21   Q    What was going on in your life at the time that you
22   decided that you were -- that you wanted to transition or to at
23   least explore that?
24   A    In my mind, there was this confusion inside of me that I
25   was not matching with what was in my head, and what I saw in
```

```
 1  the mirror with how I looked in the mirror.  Like I felt like I
 2  was not the person I was supposed to be.
 3  Q    Had you been dating by the time you were 17?
 4  A    Yes.
 5  Q    Had you dated boys?
 6  A    Yes.  I had -- I dated one man, yes.
 7  Q    Had you also dated girls?
 8  A    Yes.
 9  Q    Did you decide you would rather date girls?
10  A    I sure did.
11  Q    Did you at first struggle with coming to peace with the
12  desire you had to date girls?
13  A    I did.  Both of my parents are very religious, as am I,
14  and I struggled with being seen as being a lesbian and holding
15  my partner's hand and being seen that way, yes, sir.
16  Q    When you started feeling that way, did having a feminine
17  body cause you distress?
18  A    Yes, sir.
19  Q    What clicked for you?  What first made you think that you
20  were living in the wrong body?  What gave you the belief that
21  you wanted your body to be more masculine?
22  A    I first saw -- I never knew much about it until I got on
23  Instagram, and I saw that others were transitioning.
24       And everything that I read up on it seemed to be so
25  positive, in that -- like that would fix the problems that I
```

```
  1  was feeling inside, and it would fix my current problem of

  2  feeling like I shouldn't have been a woman.

  3  Q    Was it -- was most of what you learned about transitioning

  4  and gender-affirming care at first at least from social media?

14:42:03 5  A    Yes.  Yes, sir, most of it.  Uh-huh.

  6  Q    Where did you turn for treatment when you decided, I

  7  really want to look into this?

  8  A    I turned to a psychologist at first.  And then I turned to

  9  a gender clinic, as well.

14:42:16 10 Q    Let's talk about the psychologist.  How many times did you

  11 visit this psychologist?

  12 A    The psychologist, I visited them about six to eight times.

  13 I did keep going after I got my testosterone letter.

  14 Q    All right.  How many times had you seen the psychologist

14:42:32 15 before you got the testosterone letter?

  16 A    I saw her one hour five times.

  17 Q    Okay.  And I guess we need to make clear for the record

  18 what a testosterone letter is.  What are you talking about?

  19 A    You have to have a letter to present to your gender clinic

14:42:49 20 doctor in order to be approved for hormones.

  21 Q    Now, understand I'm asking you to talk only about the

  22 experience that you had, not what anybody else going through

  23 this has had or what happened in any other clinics.

  24      But for you, how deeply did you think this psychologist

14:43:13 25 delved into what was going on in your life before he or she
```

1  said, let's get you some testosterone?

2  A    Looking back, she did not dive in deep.  I was -- I

3  went -- I had let known that I had been through trauma and that

4  my parents went through a really bad divorce, and there was

14:43:30 5  some very rough things in my childhood that was not dived into.

6  Q    Did she also refer you to a mastectomy?

7  A    Yes, she did.

8  Q    Now, after you got your letters, did you go to a medical

9  doctor to try to get these treatments?

14:43:46 10  A    Yes, I did.

11  Q    And where did you go?  Is that the gender clinic you're

12  referring to?

13  A    Yes.  I did go to the gender clinic.

14  Q    All right.  Tell me about your experience at the gender

14:43:59 15  clinic.

16  A    The gender clinic, they want to move you in and move you

17  out as fast as they can with as little as talking to you as

18  they can.  The gender clinic I went to -- I went to two

19  different ones, and they both acted the same.

14:44:12 20      The doctor that I gave my hormone letter to never even

21  opened the letter.  He kind of scoffed at me.  And it was very

22  belittling.

23      And I could tell right off the bat these people didn't

24  care about me.  And it -- and then you keep going.  And I had

14:44:29 25  read on my blood work on a couple lines, and he told me

1   everything was fine.  And I started looking things up, and they

2   were not so fine.

3   Q    What do you mean you started looking things up?

4   A    My blood work was showing signs that had never been shown

14:44:45 5  in any of my blood work all through my life.  And all of a

6   sudden, they're off the charts.  Like everything's going

7   everywhere.  And I'm starting to panic.  I've committed my life

8   to something, you know, and here I am now I -- you don't know

9   what's happening.  You're scared.  So I was -- I was really

14:45:07 10  scared at the time.

11  Q    Did you seek medical treatment for these things that were

12  going on?

13  A    Yes.  I ended up in the ER like four times.

14  Q    Let's -- before we get further into that, let's talk more

14:45:22 15  about these gender clinics.  Where were they?

16  A    In Atlanta, Georgia.

17  Q    Okay.  So you have never visited a gender clinic in

18  Alabama?

19  A    No.  But they do, do them here at Planned Parenthood, and

14:45:34 20  there is a couple of different places.

21  Q    You don't have personal knowledge about those clinics?

22  A    No, sir.  Huh-uh.

23  Q    So you saw the two clinics in Alabama (sic).

24       That first time you went, you said the doctor didn't even

14:45:47 25  open your testosterone letter?

1  A      No, sir, he did not.

2  Q      Did you get the prescription for testosterone?

3  A      He gave it to me without opening the letter.  He -- I

4  handed it to him, and he goes, great, here.  You can go pick

14:45:58 5  your prescription up.

6  Q      Okay.  What do you do then?  What do you do with your

7  prescription?

8  A      Well, I asked him, I said, am I -- what do I do?  Like how

9  do I -- are you going to give me my first shot today?  And he

14:46:08 10  was like -- he kind of laughed at me.  And he goes, no, not

11  unless you are going to go pick it up from Rome and drive back

12  to Atlanta, which was two hours, and bring it back to me.  And

13  I said, no, I can't do that.  And he said, well, you can go

14  home and figure it out.  Watch YouTube videos.  He said, you

14:46:24 15  can't kill yourself.  So...

16  Q      But you don't get the testosterone shot at the gender

17  clinic.  You get a prescription that you go get filled, and

18  then you self-administer the shots?

19  A      You can do it either way.

14:46:36 20  Q      Okay.  What were you told about the effects of

21  testosterone?

22  A      At the time, I was told everything you want to hear is

23  going to happen.  And I was told that there was going to be

24  muscle mass increased, and that you are going to get facial

14:46:57 25  hair, and that your voice is going to deepen.  You know,

```
 1  everything that you are thinking is going to fix you.
 2  Q    Did your voice deepen?
 3  A    Yes, very much so.
 4  Q    Is it still deeper than it was when you were 17?
 5  A    Yes.
 6  Q    Is that likely a permanent effect?
 7  A    It is a permanent effect.
 8  Q    What were the other effects on your body from taking
 9  testosterone?
10  A    Permanently?
11  Q    Any.
12  A    Any?
13  Q    Let's start with when you were actually taking it.  How
14  did your body change?
15  A    When I started taking it, the first couple things was my
16  voice did drop.  I did start to gain slight weight.  And then
17  after more months of being on it, the weight gain got very,
18  very excessive.  And I became prediabetic from my blood work
19  and from the hormones.  And then also my digestive system
20  started to not fail, but they were not working properly.
21  Q    This picture, this picture is printed over two different
22  pages, so I am trying to put it together now.  Is that you?
23  A    Yes, sir, it is.
24  Q    And this is for the record pages 7 and 8 of Exhibit 42.
25        Where in the course of your treatment were you about this
```

```
 1  time this picture was taken?
 2  A    A little under a year.
 3  Q    So you said weight gain.  And then did you say
 4  prediabetic?
 5  A    Yes.  I have become prediabetic.
 6  Q    And were you told that that was the result of the
 7  testosterone?
 8  A    Yes, sir, it was.
 9  Q    And this picture is from pages 9 and 10 of Exhibit 41, and
10  I will represent to you that the caption on this picture says
11  that it was after a year on hormones?
12  A    Okay.  Yes.  That one, yeah.  That one.
13  Q    That's you?
14  A    Yes, it is.
15  Q    And is that about a year after you were on hormones?
16  A    Yes, sir.
17  Q    How were you feeling physically?
18  A    Physically, exhausted.  I felt drained of life.  Every bit
19  of it.
20  Q    Were you at least at first pleased with your body becoming
21  more masculine?
22  A    Absolutely.  It was -- it was what I was wanting.  That's
23  why I can see both sides of everything.
24       And I was on the complete other side at the beginning.  I
25  was all for this.  This is everything I ever wanted.  That's
```

```
 1  why I did not want to -- I would have rather died than quit at
 2  the time.
 3  Q    Were you telling people you were a male?
 4  A    Yes.
 5  Q    Were you presenting yourself as a male?
 6  A    Yes.  At the time, I worked for a very large corporation,
 7  and everybody referred to me as male.
 8  Q    Did you make any other changes in your life to reflect
 9  your change and identity from female to male?
10  A    Yes.  My driver's license and a lot of documents did
11  reflect.
12  Q    At the time, you were sure, weren't you --
13  A    Oh --
14  Q    -- that you wanted to be a male?
15  A    -- 100 percent.
16  Q    Were there any changes with your blood counts, like your
17  red blood counts?
18  A    Yes.  My red blood cell count went sky high.  That's when
19  they started warning me of a heart attack or a stroke.  That's
20  when things started getting way more intense.
21  Q    Other than you mentioned being tired, feeling tired, did
22  any of this -- any of the rest of this just make you feel bad
23  in any way?
24  A    Yes.  So the red blood cell count -- I had no idea, but I
25  started itching very badly around my legs and my arms.  It was
```

Timestamps in left margin: 14:49:46 (line 5), 14:50:01 (line 10), 14:50:12 (line 15), 14:50:35 (line 20), 14:50:48 (line 25)

1  from the red blood cell count going up.  My blood was starting

2  to thicken.  So it was putting me at a risk of heart attack or

3  stroke.

4      They thought at one point I was developing a blood clot in

14:51:02  5  my lung.  And I was in the ER.  And we had to do a couple of

6  different painful tests.  And they came to find out that it

7  wasn't the blood clot, but that it was tachycardia, which was

8  also caused by the hormones.

9  Q    After you went to the emergency room, did you decide then,

14:51:19 10  oh, I have made a mistake, I am going to get off these

11  hormones?

12  A    No.  I was still determined.

13  Q    Are you living as a male today?

14  A    No, sir.

14:51:28 15  Q    Are you a male?

16  A    No, sir.

17  Q    You are a woman, right?

18  A    Yes, sir.

19  Q    What changed?  What made you at some point decide, I'm

14:51:39 20  going back, and I am going to present myself as a woman and be

21  the woman that I am?

22  A    Well, one day my grandfather, who is the most important

23  man in my life, like we had a down-to-earth talk.  And we -- he

24  made me realize a couple of things.  And he said, if you will

14:51:57 25  just quit, just for three years, just, you know, take a step

```
 1  back, look at this at a couple of things.  And so I did.  I
 2  said, all right.  You know what?  You are not asking me to quit
 3  permanently.  You are not asking anything outrageous.  So, yes,
 4  of course.  And so I quit.  And that's where we went from
 5  there.
 6  Q    Let me show you the picture that's page 11 of Exhibit 41.
 7  Who is in this picture?
 8  A    My granddad.
 9  Q    And you?
10  A    (Nodded head.)  Yes.  He -- he is the one that helped me
11  and saved my life.  And, gah, he's been a blessing.
12  Q    That's you with your grandfather, though, right?
13  A    Yes.  He's never cared how I looked or anything, as long
14  as I came to see him.
15  Q    So he was suggesting that you get off the hormones long
16  enough to look at things clearly?
17  A    Yes.  He was worried about my health.
18  Q    Looking back, when you were going to the gender clinic,
19  what did you need?  Did you need medicine to try to make you
20  look like a man?  Or did you need counseling?
21  A    I needed counseling.
22  Q    You gave a written declaration in this case, did you not?
23  A    Yes, sir, I did.
24  Q    You had a line in there that I am going to read to you.
25  For the record, this is Exhibit 27 and paragraph 23 of that
```

1  exhibit.

2  A    Uh-huh.

3  Q    You said, Unfortunately, there are more and more young

4  people like me being deceived every day, being told that the

14:53:41 5  solution to their insecurity and identity problems is to get a

6  sex change.

7       Do you think the people telling those young people that

8  are right, that that's what they need?  They need a sex change?

9  A    No.

14:53:52 10  Q    Why not?

11  A    Well, I believe that unfortunately that the doctors are

12  out for the money, because there's a huge market on it.

13  Because once you get somebody hooked on some medicine like

14  this, you can never get off.  It is a lifelong commitment.  You

14:54:12 15  have a lifelong patient.

16       But I also believe that at the end of every single day, I

17  remember how I felt.  At the end of every single day, I was a

18  woman.  You can't change it.  There's no way -- like I could

19  not change it.  I could not escape what I was trying to escape.

14:54:26 20  And eventually, you have to come to terms with that.

21       There's no -- I couldn't -- there was no way.  And I lived

22  it.  I wanted it to be true.  I wanted it so bad.  But, no.  At

23  the end of every day, it's not.

24  Q    What was your biological sex after you had been taking

14:54:43 25  testosterone for a year?

```
 1  A    It was a female.
 2  Q    What was your biological sex when it said male on your
 3  driver's license?
 4  A    It was a female.  I mean, every time.
14:54:52  5  Q    So how long have you been off the testosterone and decided
 6  you're not going to go that course anymore, I am going to live
 7  my life as a female?
 8  A    I think I've been off for about three-and-a-half years, I
 9  would say.
14:55:09 10  Q    Is there any way that you're different today physically --
11  still today as a result of having taken hormones
12  three-and-a-half years ago?
13  A    Yes.  Yes.  I still have to go to the doctor.  I'm still
14  having -- my digestive system is still messed up.  I have
14:55:28 15  tachycardia still.  I still have to get my blood work done
16  because they're worried about my red blood cell count.
17       And some doctors -- my gynecologist isn't even sure if I
18  am ever going to be ever be able to have children.  It took my
19  right away to have children.
14:55:45 20  Q    Did you ever consider making a claim against the doctors
21  who gave you these treatments?
22  A    I tried to do a malpractice suit.  And I couldn't find a
23  single attorney to take the case.
24  Q    Why not?
14:56:00 25  A    They were afraid.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   Q      Afraid of what?
 2   A      They were afraid against the standard of code.
 3   Q      Was there any concern that you heard from any of the
 4   lawyers you spoke with about how long it had been since you had
 5   received treatments?
 6   A      They were worried about the statute of limitations.
 7   Q      How long did it take you to realize that -- bad question.
 8   Let me start over.
 9          How long did it take, from the day you set off on the
10   course of this treatment, to come to believe that the doctors
11   had mistreated you?
12   A      From starting it?
13   Q      Yes.
14   A      Okay.  Half -- I would say around six to seven months I
15   started getting a little shaky feeling because I could -- I
16   could -- I have common sense.  I can see when people care and
17   don't care about me.  And when you're just being, you know.  So
18   I started seeing how they treated people.  And I started
19   watching the others at the gender clinics.  And I -- it raised
20   more and more concerns as I went on.
21   Q      Maybe some inkling.  But I mean when you were -- when your
22   eyes were opened --
23   A      Oh.
24   Q      -- and you realized oh, this was wrong?  And you needed to
25   do something about it and possibly even seek recourse against
```

14:56:15 (line 5)
14:56:37 (line 10)
14:56:51 (line 15)
14:57:13 (line 20)
14:57:24 (line 25)

```
      1  these doctors?

      2  A    That was -- when I was very much so in the hospital all

      3  the time was when I knew that I had to probably do a

      4  malpractice suit, or do something, or fight it.  Because I

14:57:44  5  didn't want anybody else to go through this at all.

      6  Q    It wasn't overnight.  It took a while for you to come to

      7  that realization, right?

      8  A    Yes.  It took months, years, like very, very time

      9  consuming.  It took time.

14:57:57 10  Q    Did you support Alabama's bill that affects these

     11  treatments?

     12  A    Yes, I did.

     13  Q    In what way did you support it?

     14  A    I spoke in support of the bill at the committee hearing.

14:58:13 15  Q    The committee hearing.  You mean the committee at the

     16  Legislature?

     17  A    Yes.

     18  Q    So you were a witness there?

     19  A    I was, yes.

14:58:21 20  Q    Did you tell them that you hoped they would vote in favor

     21  of this bill?

     22  A    I did, yes.

     23  Q    What would you tell a young person who is struggling with

     24  gender dysphoria, feels like they were born in the wrong body,

14:58:43 25  and they're wondering if the answer to their problems is to see
```

```
 1  a doctor and get some hormones that will help them transition
 2  to the other sex?  What would you advise that person?
 3  A    I would advise them to take a lot of time.  Take a lot of
 4  time.
 5        And you're going to realize in life that there is so many
 6  more important things than this.  You are going to see that,
 7  you know, the people that care and love you.  And just time
 8  will show you and open your eyes that it's not necessarily --
 9  you will slowly see how you'll learn to love yourself.  It
10  takes a lot of time.
11        And we can't fix who we are.  But we are stuck who we are.
12  And you should just love yourself.
13        And it doesn't matter if you are a girl.  You can do guy
14  things.  And I can dress like a tomboy if I want.  And it
15  doesn't have to be a certain way.
16        I've learned to love myself and love -- hold my wife's
17  hand in front of other people.  And it doesn't have to -- I
18  don't have to transition for it.
19  Q    Now, you have been through these treatments yourself,
20  Ms. Wright?
21  A    Yes, sir.
22  Q    Do you think doctors should be allowed to give minor
23  children hormone treatments to try to make that person appear
24  to be the other sex?
25  A    Absolutely not.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1              MR. DAVIS:  Thank you.  I pass the witness, Your
 2    Honor.
 3                          CROSS-EXAMINATION
 4    BY MR. DOSS:
 5    Q    Good afternoon, Ms. Wright.
 6    A    Good afternoon.
 7    Q    My name is Jeff Doss.  I'm one of the attorneys
 8    representing the plaintiffs.  We haven't met before.
 9         Just to be clear, you don't know which of my clients,
10    Michael Boe, Zachary Zoe, Allison Poe, and Christopher Noe, all
11    of whom are children, you don't know which of those children
12    are, in fact, transgender, do you?
13    A    No, sir.  I would have no way of knowing.
14    Q    Exactly.  You don't know any of these kids, do you?
15    A    No, sir.
16    Q    And so you don't know whether any of my clients have been
17    correctly diagnosed with gender dysphoria, do you?
18    A    I don't believe in that diagnosis, sir.
19    Q    I appreciate that clarification.
20         So, in your opinion, you don't think any medical
21    treatments should be provided for anyone with gender dysphoria,
22    do you?
23    A    I believe that that's your own decision after the age of
24    21 or 18.
25    Q    Another good point.
```

```
 1          When you were testifying on direct examination, you kept
 2   using the expression young people, right?
 3   A    Okay.  Uh-huh.
 4   Q    Now, you wrote an article in October of 2019 for the Daily
 5   Signal, correct?
 6   A    Yes, sir.
 7   Q    And that's marked as Defendants' Exhibit 41.  And I will
 8   show you page 3 of that article.
 9          You wrote, At age 18, I started seeing a bunch of
10   transgender men's success stories on Instagram, right?
11   A    Okay.  Yes.
12   Q    And you went on to write, I resented that and began to
13   envy the transgenders.  I looked into it for myself.  Correct?
14   A    Right.
15   Q    So you were a legal adult at the time that you began
16   considering that perhaps you were transgender, right?
17   A    No, sir.  I was 17.  And then I turned 18 when I got the
18   hormones.
19   Q    Well, let's talk about that.  On page 4 of the article,
20   you wrote, I soon found a therapist who said she would help me,
21   and I took her -- I told her I wanted to start the hormones on
22   my 19th birthday, which was only five weeks off.  She required
23   only a one-hour appointment each week.  Right?
24   A    Right.  Yes.
25   Q    So did you start the hormones on your 19th birthday or
```

```
      1  before?

      2  A     Started questioning at 17.  18, I started taking action to

      3  get a psychologist.  And then I wanted to have the hormones by

      4  my birthday.

15:02:47 5  Q     Okay.  Did you, in fact, get your hormones by your 19th

      6  birthday?

      7  A     I was a couple of weeks off, but right at it.

      8  Q     Okay.  So is it fair to say that when you received the

      9  diagnosis and you received the hormones, you were an adult?

15:03:00 10  A     At the time, yes, uh-huh.

     11  Q     Ms. Wright, you are not and never have been transgender,

     12  right?

     13  A     I was transgender at some point, yes.

     14  Q     You considered yourself to be transgender?

15:03:22 15  A     Yes.

     16  Q     Do you believe that you are, in fact, transgender?

     17  A     I am not now, no.

     18  Q     But at the time, did you believe you were transgender?

     19  A     Yes.  When I believed it was something that could happen.

15:03:34 20  Q     Okay.  I believe you received a diagnosis of gender

     21  dysphoria; is that right?

     22  A     Yes, I did.

     23  Q     But sitting here today, you don't think that you really

     24  had gender dysphoria, right?

15:03:44 25  A     No.  I think it was a mental delusion.
```

```
 1  Q     So you did not think -- sitting here today, you don't
 2  think you had a diagnosis of gender dysphoria?
 3  A     No.  I think I had mental problems.
 4  Q     Okay.  And what was the name of the doctor who prescribed
 5  the testosterone for you?
 6  A     Katrina Jensen.
 7  Q     What practice was the doctor with?
 8  A     Balanced Living.
 9  Q     Okay.  And that was in Georgia, right?
10  A     Correct.
11  Q     And, in your opinion, your counselor misdiagnosed with you
12  gender dysphoria, right?
13  A     Not that she misdiagnosed me.  Because at the time, I did
14  believe in gender dysphoria.  That is why I was there.
15  Q     Sitting here today, you believe that your counselor
16  misdiagnosed you with gender dysphoria?
17  A     Looking back, I don't think it was a misdiagnosis.  I
18  think it is a problem with gender dysphoria.
19  Q     Okay.  So do you think at the time you, in fact, did have
20  gender dysphoria?
21  A     You can think that the symptoms are similar and not
22  necessarily the same as -- gender dysphoria, it's a mental
23  problem.  Like you don't see yourself as who you want to be,
24  but it's probably caused from other issues coming in your life.
25        So necessarily, gender dysphoria is probably caused from
```

```
 1  some other things coming from your life.

 2      So I mean, I guess that she could have summed it up as

 3  that, yes, and whatever she put at the time was what she had

 4  thought.  I -- I don't want to say I believe in it or don't

 5  believe in what she put at the time.  She has since resigned

 6  counseling.

 7  Q   Okay.  And to be clear, you have had no academic training,

 8  in terms of psychological diagnoses, right?

 9  A   No.

10  Q   Okay.  You testified that you tried to file a medical

11  malpractice lawsuit against this doctor, but no attorney would

12  take the case.

13      Did you report the doctor who prescribed the testosterone

14  to you to any sort of state regulatory board in Georgia?

15  A   I did not -- I reported -- I reported the counselor.  The

16  counselor has -- had her license removed, I believe.  So that's

17  the only one.

18      And then I tried to handle the doctor, but I could not

19  make progress with the actual gender doctor.

20  Q   When you say you tried to handle the doctor, what do you

21  mean by that?

22  A   I tried to -- I tried to do a malpractice suit and tried

23  to report him anywhere I could.

24  Q   So did you report the doctor to the state regulatory board

25  concerning doctors?
```

Timestamps: 15:05:15 (line 5), 15:05:27 (line 10), 15:05:46 (line 15), 15:06:07 (line 20), 15:06:18 (line 25)

```
 1   A    No.  At the time, I didn't know how to do that.
 2   Q    All right.  Ms. Wright, because you don't know any of my
 3   clients, you can't say whether or not they have benefitted or
 4   will benefit from puberty blockers or hormone treatments,
15:06:36 5   right?
 6   A    Can I give a response?  I can --
 7   Q    That's what I am looking for.
 8   A    Right.  The only thing is I can say that it could harm
 9   them in the future if they change their mind.  It's permanent.
15:06:48 10  Q    But sitting here today, you don't know what benefits that
11   they have experienced as a result of these medical
12   interventions, correct?
13   A    I don't know the benefits, but I do know the cons.
14   Q    Absolutely.  So you don't know what benefits they have
15:06:59 15  experienced, right?
16   A    Sure.
17   Q    All right.  In your article that we looked at a second ago
18   on page 14, you closed with, Until we do something, until the
19   medical community puts up serious guardrails and begins to do
15:07:34 20  its due diligence, and until politicians grow a spine and step
21   in, expect to see more young people scarred for life.
22        Did I read that correctly?
23   A    Yes, sir.
24   Q    Do you know what guardrails exist at the UAB Children's
15:07:48 25  health clinic?
```

```
 1   A     Please do tell me.
 2   Q     I am asking if you know.
 3   A     I don't.  I want to know.
 4   Q     And then getting ready for today, I noticed -- I am not
 5   marking this as an exhibit, but I noticed, is this your
 6   LinkedIn page, Ms. Wright?
 7   A     I don't have it any longer, but at one point, yes.
 8   Q     Okay.  And that's a photo of you when you appeared at the
 9   Alabama State House while testifying against this particular
10   law, right?
11   A     Yes, sir.
12   Q     And if we go down a little bit, the about section, you
13   wrote, I also speak as a child advocate in very large court
14   cases all around the U.S.
15        Did I read that correctly?
16   A     Yes.
17   Q     Other than this case, what other court cases have you
18   testified in?
19   A     I have spoken for the VCCAP bills, the Vulnerable Child
20   Protection Act.  And I have spoke for South Dakota.  I have
21   spoke for Alabama a couple of times.  And I think that's all at
22   the moment.
23   Q     And let me clarify.  You wrote court cases.
24   A     Oh, well --
25   Q     Have you ever testified in court before?
```

```
 1  A    No.  I'm -- I might not be the brightest on lawyer terms.

 2  Q    Likewise, under volunteer experience, you wrote that you

 3  are a public speaker for Compassion Coalition, and you said, I

 4  travel and speak at very -- all caps -- large court cases that

 5  change laws and standards of care and health, as well as make

 6  new laws.  Right?

 7  A    That was what I helped with at one point.

 8       I was trying to build my resume to try to look good for a

 9  position that I had put some experience that I did on there.

10  So this is what I have experienced, not what I have done or any

11  positions that I hold.

12  Q    Okay.

13  A    What does my past have to do with -- my past work have to

14  do with the court case -- or not court case, but today?

15            MR. DOSS:  One moment, Your Honor.

16            THE COURT:  Uh-huh.

17            MR. DOSS:  Thank you, Ms. Wright.  That's all the

18  questions I have for you.

19            THE WITNESS:  Perfect.  Thank you.

20                    REDIRECT EXAMINATION

21  BY MR. DAVIS:

22  Q    Ms. Wright, were you just mistaken when you referred to

23  other events as court cases?

24  A    Yes.  1,000 percent.  I was -- and that was probably

25  three years ago when I spoke at my first one and was extremely
```

```
 1  excited.
 2  Q    Now, you said you do not support medical treatment for
 3  folks with seeking to transition.  Let's be clear about that.
 4       You mean -- did you mean by that like puberty blockers and
15:10:28 5  cross-sex hormones, that's what you're against?
 6  A    Right.  Yes.
 7  Q    Are you in favor of those folks getting counseling?
 8  A    Yes, 1,000 percent.  I want all the children to be helped.
 9  Q    Do you consider yourself to have been mature enough to
15:10:46 10  make the decision to transition to male and to take the
11  hormones?
12  A    No.
13  Q    And you were how old at that time?
14  A    At the time, I was 19.  I still probably wouldn't have
15:10:56 15  been good by 21.
16  Q    Do you think under any circumstances a 13, 14, 15 year old
17  would be mature enough to take these drugs?
18  A    Absolutely not.  If you would have told me that I could
19  have become an animal or something at 12, you know, you would
15:11:11 20  have taken that leap or something?  No.
21  Q    Thank you, Ms. Wright.
22  A    You're welcome.
23            THE COURT:  May this witness be excused?
24       You can step down, ma'am.  Thank you.
15:11:23 25            THE WITNESS:  Thank you.
```

```
 1          MR. DAVIS:  Your Honor, the State defendants have no
 2     other witnesses.
 3          THE COURT:  Okay.  All right.  Well, then, why don't I
 4     give everybody 20 minutes to get ready for their closing.
15:11:38 5     You know, again, I will give everybody 25 minutes.  I
 6     think that's probably too long.  I'm really interested in you
 7     giving me your analysis and tying in your evidence here at the
 8     end.
 9          You know, to the United States, you know, I would say
15:11:51 10 since you are only arguing one issue and not five, to the
11     extent you can limit yourself to ten, that would be
12     appreciated, as well.
13          Does that sound reasonable to everybody?
14          All right.  And by the way, if anybody just, you know,
15:12:04 15 needs five minutes, that's okay, too.  So don't be compelled to
16     use all your time.
17          Okay.  Well, let's take 20 minutes so you have time to
18     kind of recap, and we will come back and knock those out.
19     Thank you.
15:12:17 20          (Recess.)
21          THE COURT:  Please be seated.  Thank you.
22          All right.  Let's go ahead and get started.
23          Tell me how you think your time usage is going to run,
24     Mr. Doss.
15:33:26 25          MR. DOSS:  Hoping well below 25 minutes, Your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  Excellent.  Excellent. |
| 2 | So instead of asking any hypotheticals and putting anybody |
| 3 | on the spot too hard, let me just say, you know, and I think |
| 4 | you probably will do this anyway, but I would like everybody to |
| 15:33:43 5 | directly address how to read Bostock and Brumby together. |
| 6 | I get it that Fourth Circuit precedent is not binding |
| 7 | here, but I also want to see what you think the interplay is |
| 8 | with Grimm.  And then anything else you want to tell me. |
| 9 | But that would kind of be at the front of my mind. |
| 15:34:05 10 | Everybody read those together for me. |
| 11 | So all right.  Go ahead. |
| 12 | MR. DOSS:  May it please the Court. |
| 13 | First, Your Honor, thank you for your time the past |
| 14 | two days. |
| 15:34:22 15 | The State has spent the last two days, Your Honor, |
| 16 | answering a question that is not dispositive of anything. |
| 17 | The State has focused and questioned our witnesses and |
| 18 | introduced its own evidence to prove that there exists medical |
| 19 | risks associated with the treatments that this particular Act |
| 15:34:45 20 | aims at banning.  We don't dispute that premise, Your Honor. |
| 21 | We haven't disputed it since the beginning. |
| 22 | There is no such thing as a risk-free medical treatment. |
| 23 | No one has come forward into this courthouse and identified |
| 24 | what that risk-free treatment would be. |
| 15:35:03 25 | Mr. Bowdre, I thought it was telling when he was |

1  questioning the United States' expert this morning,

2  Dr. Antommaria about what if a person has a 40 percent chance

3  of persisting, would it be appropriate to prescribe

4  gender-affirming treatments?  But that is simply not how

15:35:22  5  clinical practice works, Your Honor.

6       No doctor in the state of Alabama that Your Honor has

7  heard about is making these sorts of sterile clinical judgments

8  based on statistics alone.  It is a three-dimensional

9  assessment that takes into account the parents, the child, the

15:35:41 10  network, the child's background, the history of gender

11  dysphoria that the child may have presented with.  All of these

12  issues are taken into account.  It's never as easy as opening a

13  book and looking at statistics and basing a medical judgment

14  upon it.  It requires individualized attention and

15:36:04 15  individualized treatment.

16       Even Dr. Cantor suggests that multiyear diagnoses

17  preceding medication ought to be the widely-accepted approach

18  in this area.  But this Act, Your Honor, strips doctors of that

19  ability, and it strips the parents of the ability to weigh

15:36:27 20  those risks.  It is a fundamental freedom in this country, Your

21  Honor, that parents have control over the care and custody and

22  medical matters affecting that parent's child.

23       But the State replaces that right to weigh the risks.

24  With its categorical prohibition, it supplants parental

15:36:54 25  judgment and replaces it with the State's sole unchallengeable

1   without exception judgment that no child should receive these.

2       There was a question this morning by the State to one of

3   the witnesses that if a nine year old with diabetes receives

4   insulin, that would be effective, but if a nine year old

15:37:19 5   without diabetes receives insulin, it would be, quote, very

6   dangerous.  That hypothetical illustrates exactly what the

7   problem the State is concerned about.  Whether the diagnosis is

8   accurate, and if it's not accurate, the treatment.

9       It makes sense that if you don't have diabetes, you

15:37:41 10   shouldn't be prescribed insulin.  In the same way, if you don't

11   have gender dysphoria, it may cause issues if you're prescribed

12   these gender-affirming treatments.

13       That becomes relevant, Your Honor, because of the standard

14   of review applicable to our due process claim on behalf of the

15:37:56 15   parents.  Because the State is interfering in a fundamental

16   right, the State must show a compelling State interest, and the

17   State must show that these laws are narrowly tailored to meet

18   that interest.  This Act fails on both levels.

19       First, even if the Court were to credit all of the

15:38:22 20   evidence in the State's favor and find that the evidence

21   demonstrates a compelling interest, that alone does not save

22   this law.  If we take a step back and look at the evidence

23   offered by the State, the principal concern, as I understand

24   it, is that there's a strong possibility of desistance, as the

15:38:43 25   State says.  So this idea of watchful waiting is better than

1  medical intervention.

2      But that's a problem with the diagnosis, Your Honor.  By

3  definition, the obliteration of choice, the obliteration of

4  treatment cannot be narrowly tailored.

15:39:05  5      Perhaps if the State had implemented regulations that set

6  forth concrete guidelines that a clinician must follow before

7  prescribing these medications, maybe that would present a

8  closer question.  Maybe we wouldn't be here today.

9      But the State didn't do that.  The State took all

15:39:28  10  treatments off the table and made it a felony to follow these

11  widely-regarded medical approaches.

12      A concern for misdiagnosis does not call for the

13  obliteration of choice and treatment.  I expect the State will

14  cite to the Carhart vs. Gonzales opinion for the proposition

15:39:56  15  that medical uncertainty gives the government wider discretion

16  in terms of regulating medical treatment.

17      Carhart, Your Honor, was an abortion case.  It concerned

18  the federal so-called partial birth abortion ban.  And as Your

19  Honor might expect, there's a very different analysis

15:40:17  20  associated when you're considering an abortion regulation, as

21  opposed to when you're considering the deprivation of a

22  fundamental freedom like parental choice.

23      Setting aside that difference, even assuming we can draw

24  some meaning from the Carhart decision, the language that the

15:40:36  25  State is seizing upon, this issue of medical uncertainty, was

1  only part of the analysis.  That may have given the State some

2  interest in regulation, but that alone was not the end of the

3  inquiry.

4      The Supreme Court went on to consider whether the

15:40:58  5  regulation imposed an undue burden, including whether the

6  regulation would cause harm.  We have shown, Your Honor, that

7  this Act will undisputedly cause harm.

8      Our four plaintiff parents have very similar stories.  You

9  heard from one of them live, Ms. Poe.  I don't think anyone can

15:41:27 10  hear her testimony and think that she is not sincere, that she

11  doesn't have the best interest of her child in mind, and that

12  she's -- she is seeing positive transformative, amazing

13  benefits from these treatments that the State has dubbed risky.

14      Our other parents share similar stories.  And those are

15:41:53 15  reflected in the declarations which we've submitted for Your

16  Honor's consideration.

17      In this case, even if Your Honor were to apply that

18  Carhart standard, which the State seems to be proposing, this

19  law still fails.  It undisputedly causes harm to those it is

15:42:14 20  seeking to supposedly protect.  It is stripping them of

21  positive medical treatments that exist.

22      Over the past day and a half, Your Honor, we have heard a

23  refrain that these treatments are experimental.  We've heard

24  one -- two witnesses now define what that means.

15:42:40 25      Dr. Ladinsky gave an explanation.  It doesn't fit these

1    treatments.

2         Dr. Cantor gave a definition I thought was interesting.

3    As Dr. Cantor noted, it's very difficult to say when it no

4    longer is experimental and it's established.

15:42:56 5         Under the State's logic, simply by dubbing a treatment

6    experimental until we've reached some unknowable and

7    undefinable level of certainty, that alone should be sufficient

8    to override parental choice.

9         The problem, though, Your Honor, is that there are risks

15:43:15 10   with every medical treatment, and there are always unknowable

11   risks.  That's what makes them unknowable.

12        I can think of many commercials I have seen over the years

13   where medications that have been on the market for years, some

14   studies begin to associate them with adverse risks.  And

15:43:32 15   plaintiffs' attorneys are soliciting clients because of these

16   newfound risks.

17        In that regard, Your Honor, if we were to be as risk

18   averse as the State is proposing, I submit with the

19   introduction of antibiotics, the State likely wouldn't have

15:43:48 20   been on board because it had unknowable risks, despite our now

21   knowledge that they are life saving.

22        At some point, medical treatment is going to be new.  But

23   newness on its own doesn't make it bad.  And it certainly

24   doesn't justify the State's interest in obliterating it and

15:44:06 25   criminalizing it.

1      And that is exactly what the Arkansas -- Eastern District
2  of Arkansas found in the Brandt case.  In that case, Your
3  Honor, it didn't criminalize the parents.  It only criminalized
4  the physicians.

15:44:26  5      The Arkansas Court there still recognized that the
6  physicians -- because this so intimately implicates parental
7  choice, the physicians even had standing to assert those
8  fundamental protections on behalf of their patients' parents.

9      The Eastern District of Arkansas found that the law in
15:44:47 10  Arkansas, which again didn't criminalize anything, it applied
11  civil penalties.  It was less egregious than the law here.
12  Even the Arkansas law violated these fundamental protections
13  and failed at strict scrutiny.

14      But we also challenge the compelling interest piece of the
15:45:13 15  strict scrutiny analysis, Your Honor.  The State's compelling
16  interest is, at best, that there's a concern for this
17  desistance.  But we have presented evidence suggesting that
18  that concern is overblown.

19      Dr. Ladinsky testified that the standard of care endorsed
15:45:32 20  by every major medical association in the United States
21  recognizes that the use of puberty blockers and hormone
22  treatments can be appropriate in some adolescents with gender
23  dysphoria.

24      Dr. Hawkins testified that the standard of care requires a
15:45:48 25  360 assessment that takes several months, and in some cases,

1    years before prescribing medical intervention such as puberty

2    blockers.  The standard of care allows time for adolescents to

3    explore their gender identity, and not all adolescents receive

4    medical intervention.

15:46:09 5         Recall, Your Honor, Ms. Poe's testimony.  It took

6    two years from the time that she and her daughter first visited

7    the UAB Children's clinic until any medication was prescribed.

8         It is telling, Your Honor, that the State has been unable

9    to identify a single doctor in the state of Alabama who has

15:46:38 10   ever run afoul of these kind of guardrails.  It is equally

11   telling, Your Honor, that the State has identified not one

12   child who has received these treatments ever in the state of

13   Alabama who later regretted them.

14        What we heard this afternoon was from Ms. Sydney Wright, a

15:47:03 15  Georgia resident who was an adult.  Even if Georgia had had

16   this exact same law in place, it would not have prevented her

17   from obtaining the treatments she obtained.  Ms. Wright's story

18   is an unfortunate one.  And if only Ms. Wright had had a doctor

19   like Dr. Hawkins or a doctor like Dr. Ladinsky who was

15:47:31 20  committed to a deep meaningful evaluation of the child.

21        In Alabama, children receiving these treatments from the

22   University of Alabama -- from UAB's clinic, they walk hand in

23   hand with these physicians.  That informs their choice.

24        We have introduced into the record, Your Honor, the

15:48:04 25  informed consents that parents are provided with, in addition

 1  to loads of information.  The parents still sign off on these

 2  treatments.

 3       As Ms. Poe testified, she is terrified of what would

 4  happen if these treatments are prohibited.  She knows well the

15:48:26 5  risks, and she's weighed those risks against the benefits of

 6  receiving the treatment, and the devastating effects of not.

 7  And in light of that constellation, she exercised her freedom

 8  as a parent to make that decision in consultation with her

 9  child's team of doctors.

15:48:59 10       Indeed, Your Honor, even the study that the defendants

11  have cited as the leading study, it recognizes the benefit of

12  multidisciplinary approaches, including medical treatments in

13  appropriate cases.  The Dutch model that we heard about, it is

14  the well-regarded standard nationally.  It, too, would be

15:49:19 15  illegal under this law.

16       So to the extent the State expresses some concern in

17  support of its compelling interests, we submit that concern is

18  hollow.

19       Even in the Carhart decision, Your Honor, the Supreme

15:49:37 20  Court acknowledged that a federal court's review of the

21  constitutionality of a state statute looks at that underlying

22  evidence, not just the State's stated concern.

23       In addition, as to the desistance risk, we've put in the

24  Yale statement, Plaintiffs' Exhibit 19.  There are two

15:50:06 25  footnotes that are important:  43 and 45.  In that statement,

1  which is a literature review, it's a summary of the available

2  scientific literature concerning this matter.  It debunks this

3  notion that there's widespread concern about desistance for the

4  children who are receiving or eligible for treatment in the UAB

15:50:30 5  clinic.

6      As I mentioned in my opening, Your Honor, at base, this

7  law criminalizes a parent's concern and love for a child.

8  There can be no clearer example of a violation of fundamental

9  parental freedom.

15:50:57 10      So as to the other compelling interests that the State

11  cites, the kids can't understand because they haven't had sex

12  and don't know if they will want kids.  These are difficult

13  questions, Your Honor, admittedly.

14      And if I were a parent of a child going through this, I

15:51:13 15  don't know how I would weigh it.  But that's the point.  I

16  don't.  And it's not my job to weigh it for someone else.

17  These are highly personal, intimate considerations.

18      There are risks of fertility with other medications.  A

19  child with cancer going through chemotherapy faces such a risk.

15:51:40 20  Under the State's logic, we ought to ban that.  Of course, we

21  don't do that.

22      In the same way, these treatments have proven, as

23  Dr. Ladinsky testified, to be life saving.  And they haven't

24  been handed out like candy, as Dr. Cantor has tried to suggest.

15:51:56 25      There's no transition on demand in Alabama.  It is not a

 1   documented concern.  I haven't even heard of it being a

 2   documented concern in the last day and a half anywhere in the

 3   United States.

 4        The studies cited by the defendants in support of this

15:52:15  5   concern for transition on demand, they all originate in Europe.

 6   Whereas, Dr. Ladinsky explained, regulation of hospitals,

 7   clinics in Europe, very different than it is in the United

 8   States.

 9        The United States, the standard is clinics will have these

15:52:30 10   robust protocols and procedures in place.  They have these

11   professional organizations that are providing this sort of

12   oversight and input.  We don't see that in Europe.  So perhaps

13   they may have been getting a little lax in Europe.  But that's

14   not happening in Alabama.

15:52:50 15        The defendants have suggested another compelling State

16   interest is that the majority of kids ultimately align with

17   their gender identity.  But we've disproven that.

18        As Dr. Hawkins testified, gender identity is hardwired.

19   It's unlikely to change.  And once an adolescent reaches

15:53:12 20   puberty, it's unlikely that they'll grow out of their gender

21   dysphoria.

22        They suggest that a European pause is better than

23   America's rush to treatment, but they have identified no

24   country in Europe, in fact, no country in the world that has

15:53:32 25   enacted a law like this one.

```
 1        So for being a compelling State interest, I find it
 2   interesting that no other country has enacted a solution like
 3   Alabama proposes.
 4        What does the State propose instead?  Do nothing.  Counsel
 5   them.  That's an untested proposal.  The State proposes an
 6   experiment on a grand scale.  All transgender youth in the
 7   state of Alabama suffering from gender dysphoria should be
 8   guinea pigs.
 9             THE COURT:  I notice you're rolling through your time
10   pretty good.  Are you leaving some time to talk about your
11   legal arguments?
12             MR. DOSS:  Yes, Your Honor.
13             THE COURT:  All right.
14             MR. DOSS:  What's my time so far?
15             THE COURT:  I think you are just about there, but I
16   might spot you a little bit.
17             MR. DOSS:  In terms of the equal protection, I am
18   going to defer to the government -- the United States because
19   they're arguing that one.  But I do want to make a couple of
20   points.
21        The Eleventh Circuit has recognized that a violation of
22   the Equal Protection Clause occurs when you discriminate on the
23   basis of transgender people on transgender status, gender
24   identity.
25        In the State's opening, the argument I heard was that
```

15:54:01  (line 5)
15:54:21  (line 10)
15:54:30  (line 15)
15:54:44  (line 20)
15:54:56  (line 25)

1  that's in the employment context, and for employment, it may

2  make a difference as to whether someone -- it should make no

3  difference as to whether someone is male or female; whereas in

4  the medical context, it does make a difference, and, therefore,

15:55:12  5  it doesn't ultimately matter.

6      But it's not the Equal Protection Clause for an employment

7  agreement.  It's the Equal Protection Clause which ensures that

8  no law forces the discrimination on the basis of sex.  That

9  that case concerned an employment issue is not the ultimate

15:55:31  10  disposition.  The issue is does the Equal Protection Clause

11  recognize the discrimination on the basis of being transgender

12  is, in fact, a violation?  The Eleventh Circuit has said yes.

13      So in light of that ruling, this law does, in fact, do

14  that.  It defines the scope of the law, in terms of people who

15:55:49  15  are transgender, of obtaining a medical treatment in order to

16  align one's gender identity with one's sense of self.

17      By definition, the State tries to say not everyone with

18  gender dysphoria is transgender, and not everyone who is

19  transgender has gender dysphoria.  But as Justice Scalia once

15:56:10  20  noted, if you put a tax on yamakas, it's a tax on Jews.  In the

21  same way, not everybody may who has a yamaka may be Jewish, not

22  every Jewish person may have a yamaka.  But these things are so

23  closely related that it's impossible to differentiate them and

24  separate them out.

15:56:30  25      And in that regard, we think it does violate the Equal

1    Protection Clause.  The State doesn't meet the standard of

2    review for the same reasons outlined, with respect to the

3    fundamental right to parental choice.

4         In terms of the First Amendment claim, I have appreciated

15:56:47 5    the State's concessions, that they don't think that these

6    things like referrals and mentioning the opportunities violates

7    the First Amendment because of science or requirement.

8         But the problem is if you're making a referral for

9    treatment as a doctor, you know full well what treatments are

15:57:05 10    available, and you could, in fact, be construed as causing the

11    receipt of those treatments.  So it does criminalize speech.

12         THE COURT:  So, you know, Alabama's criminal statute

13    has a "but-for" in the definition of cause.  So you think that

14    overcomes the "but-for"?

15:57:24 15         MR. DOSS:  I think the problem, Your Honor, it is not

16    a proximate cause requirement.  It's not the closest in time

17    cause of treatment, but it is a "but-for" cause.  It is a

18    cause.

19         So had the child not received the referral, Dr. Ladinsky

15:57:39 20    testified that 80 percent of her patients come to her through

21    referrals.  Had the patient not received the referral from the

22    pediatrician, it's questionable whether or not the child would

23    have been ultimately seen at the UAB clinic.

24         So it does raise a problematic chain of events.  I mean,

15:57:56 25    if it is a "but-for" cause, then that's all the -- alone that

1    is required.

2            THE COURT:  I really like your chances in court in

3    front of a jury if it comes down to just that.

4            MR. DOSS:  As someone who primarily does criminal

15:58:08 5    defense work, it's a little odd for me to be in court

6    suggesting that something my client may do is a crime.

7        However, for purposes of this, I will say the way the

8    statute's written, it's so broad.  As the State argued in

9    opening, a referral is both speech and an act.

15:58:27 10        So it is speech.  In the same way the pastor's conduct

11    could be swept under, that's enough to trigger First Amendment

12    scrutiny.

13        As to the preemption claim, Your Honor, I will be brief.

14    It's going to be primarily the same reasons as the Equal

15:58:46 15    Protection Claim.  There's at least the Northern District of

16    Georgia case which recognizes that under the ACA,

17    discrimination on the basis of sex can include discrimination

18    due to transgender status.

19        It forces doctors to have to decide between compliance

15:58:59 20    with federal law and compliance with state law.  And,

21    therefore, it should be viewed as preempted.

22        As to the void for vagueness argument, Your Honor, I think

23    the State's responses to your questions throughout the past day

24    and a half have illustrated the vagueness of this law.

15:59:18 25        When asked who is the primary defendant that the State

```
     1   would charge, who is defendant number one that the State would

     2   charge under this law, the State hesitated.  And you asked

     3   if -- Your Honor asked if it would only be doctors.  The State

     4   hesitated.

15:59:36 5       The problem with this law, Your Honor, is no one can read

     6   this statute and get fair notice of what is and is not covered

     7   by the statute.

     8       If I am a parent like the Noes, and I drive my child

     9   across state lines to get these treatments in Georgia where it

15:59:52 10  is legal, I've arguably caused.  But I don't know.  Maybe the

    11   State says that isn't covered.

    12       If I am a treating pediatrician, if I am a local

    13   pediatrician, I make a referral, have I caused it?  I don't

    14   know.

16:00:07 15      If I am a pastor, and I suggest that these things are

    16   available, have I caused it?  I don't know.

    17       The vagueness undercuts its constitutionality for those

    18   additional reasons.

    19       Your Honor, we respectfully request that the Court enjoin

16:00:28 20  the enforcement of this Act.

    21           THE COURT:  Are you going to talk to me about Brumby?

    22           MR. DOSS:  That was the Eleventh Circuit --

    23           THE COURT:  Grimm?

    24           MR. DOSS:  That was the --

16:00:36 25          THE COURT:  Bostock?
```

1              MR. DOSS:  Bostock.

2              THE COURT:  Three of those.

3              MR. DOSS:  Bostock recognized in the Title VII context

4   that discrimination against transgender people would be

16:00:46 5   sufficient to qualify as a violation of Title VII.  It's

6   discrimination on the basis of sex.

7         Under Bostock, we think the same logic would apply when

8   you're looking at either the ACA anti-discrimination provision

9   or you're looking at the Equal Protection Clause, which would

16:01:02 10  be consistent with Brumby, which was the Eleventh Circuit case

11  I was referencing.  I apologize I didn't mention the name.

12        But Brumby was the Eleventh Circuit opinion where the

13  Eleventh Circuit recognized that both Title VII, as well as the

14  Equal Protection Clause, protected against discrimination on

16:01:20 15  the basis of transgender status.

16             THE COURT:  So obviously Grimm is not binding

17  precedent here.

18        And Bostock, the majority said, you know, we shouldn't

19  prejudge what we might say about several other things,

16:01:39 20  including the conduct in Grimm.  And yet, they denied cert.

21        Do you want to read any tea leaves on that?

22             MR. DOSS:  I don't, Your Honor.  Only because I don't

23  know -- it could have been a waiver issue.  It could have

24  been -- as to the denial of cert.

16:01:56 25             THE COURT:  All right.  Anything else?

```
 1              MR. DOSS:  That's all, Your Honor.

 2         We respectfully request that the Court issue the

 3    injunction.  We think that we've proven a substantial

 4    likelihood of success on the merits, as well as the other

 5    factors as laid out in our brief.

 6         Thank you, Your Honor.

 7              THE COURT:  All right.  United States.

 8              MS. MONTAG:  Good afternoon, Your Honor.  Can you hear

 9    me?

10              THE COURT:  I can.

11              MS. MONTAG:  I'm Coty Montag on behalf of the United

12    States.  I intend to be brief.

13         At the outset of this hearing, the United States posed a

14    single question to the Court.  Does criminalizing certain

15    medical treatments for transgender youth and only transgender

16    youth constitute a form of discrimination that's barred by the

17    Equal Protection Clause?

18         The testimony the Court has heard clearly demonstrates

19    that the answer is yes.  And failing to enjoin Senate Bill 184

20    before it goes into effect in two days will immediately and

21    irreparably harm youth, families, and providers.

22         The balance of the equities strongly favors preliminary

23    relief.

24         The testimony the Court has heard demonstrates that we

25    have met the requirements for preliminary relief on the Equal
```

16:02:09
16:02:25
16:02:39
16:02:58
16:03:14

16:03:29

16:03:46

16:04:01

16:04:21

16:04:37

1  Protection claim.  And I want to briefly touch on the elements

2  there.

3      First, the testimony set forth by the plaintiffs and

4  United States demonstrates a substantial likelihood of success

5  on the merits.  Section 4 of Senate Bill 184 is subject to

6  heightened scrutiny because it discriminates on the basis of

7  sex and transgender status.

8      The law discriminates on the basis of sex by criminalizing

9  gender-affirming care only when that care is being provided to

10  transgender minors.  The law prohibits transgender minors from

11  obtaining care that has been well established as medically

12  appropriate and necessary while imposing no comparable

13  limitation on other youth for obtaining these same forms of

14  care.

15      And Your Honor asked us to address Bostock, Glenn, and

16  Grimm.  And I just want to be very clear that these cases make

17  clear the discrimination against transgender people is sex

18  discrimination.  And as Mr. Doss pointed out, in the Eleventh

19  Circuit in Glenn vs. Brumby, this was in the Equal Protection

20  context.

21      So because this is sex discrimination, heightened scrutiny

22  must apply.  And the burden is on the State to show that the

23  law serves important governmental objectives, and that the

24  means employed are substantially related to the achievement of

25  those objectives.

1     And I just want to note from Bostock, when Justice Gorsuch

2 said, Treating an individual differently because that person is

3 transgender unavoidably constitutes sex discrimination because

4 it rests on a person having one sex identified at birth, but

16:04:56 5 identifying with a different sex or gender today.

6     Your Honor, defendants' assertion that the law does not

7 discriminate based on sex is incorrect.  There is no ambiguity

8 in the law about the class of minors that it targets.  It

9 prohibits certain treatments only when used by those whose

16:05:13 10 gender identity is different from their sex assigned at birth.

11     Defendants cannot meet the standard under heightened

12 scrutiny.  They cannot show that Section 4 of Senate Bill 184

13 serves important and governmental objectives, and that the

14 discriminatory means employed are substantially related to the

16:05:32 15 achievement of those objectives.

16     And I really want to touch on the substantial relation

17 piece here, Your Honor, and make sure I'm connecting it to the

18 testimony you have heard over the last few days.

19     First, as the Court has heard, the weight of medical

16:05:46 20 evidence confirms that the medical care that Senate Bill 184

21 forbids is widely accepted, safe, effective, and medically

22 necessary treatment for the health and wellbeing of some minors

23 suffering from gender dysphoria based on individualized

24 case-by-case consideration in accordance with well-established

16:06:05 25 guidelines.

1    And for that, Your Honor, I would refer you to the

2   testimony of Dr. Ladinsky, as well as United States Exhibit 7,

3   the declaration of Dr. Antommaria at paragraphs 23 to 38.

4    The Court also heard testimony that the medical research

16:06:22 5   supporting gender-affirming care is substantial rather than new

6   or experimental, and that parents and minors are able to

7   consent or assent to the risks involved.

8    And, again, I would refer to Dr. Ladinsky's testimony, as

9   well as United States' Exhibit 7 at paragraph 16 and 21, and

16:06:42 10   Plaintiffs' Exhibit 6, Dr. Ladinsky's declaration at paragraphs

11   7 and 47.

12    The Court has also heard testimony that individualized

13   treatment is the goal here and that there is no rush to

14   treatment under established guidelines for the care and

16:06:57 15   treatment of transgender youth.

16    Again, this is from the testimony of Dr. Ladinsky,

17   Plaintiffs' Exhibit 6 at paragraphs 9 to 13.  It's very

18   important here to emphasize that serious review and

19   reconsideration at every step over a long period of time,

16:07:16 20   normally years, is involved here.  And all of the standards of

21   care require a tailored approach based on an individual's

22   needs.

23    The Court heard testimony that the medical care provided

24   improves mental health for many transgender youth and reduces

16:07:34 25   the risk of anxiety, depression, and self-harm.  As Dr. Hawkins

```
 1   testified, these youth receiving gender-affirming care not just
 2   survive, but thrive.
 3        Again, I would refer to the testimony of Dr. Hawkins and
 4   Dr. Ladinsky, as well as Plaintiffs' Exhibit 3 at paragraph 27,
 5   and Plaintiffs' Exhibit 6 at paragraph 15.
 6        The Court also heard testimony as to the many harms if
 7   these minors are not treated, including depression, anxiety,
 8   suicidal ideation, eating disorders, and substance abuse.  And
 9   we heard that from Dr. Hawkins and Dr. Ladinsky.
10        As Dr. Antommaria testified this morning, the law puts
11   clinicians in the untenable position of either having to follow
12   state law and knowingly harm their patients, or face penalties,
13   including imprisonment and loss of their medical licenses.
14        Your Honor, the standards of care for treating transgender
15   individuals and particularly youth have evolved and will
16   continue to evolve.  But at the end of the day, it is well
17   recognized that gender-affirming care can be and is an
18   appropriate treatment for gender dysphoria for some transgender
19   youth based on an individualized medical assessment in line
20   with accepted standards of care.
21        The well-recognized standards of care make clear that
22   these treatments should only be made after extensive
23   consultation with trained and qualified medical professionals,
24   informed consent of the parents and the patient, et cetera.
25        But defendants' response through Senate Bill 184 is to
```

16:07:53 (line 5)
16:08:12 (line 10)
16:08:37 (line 15)
16:08:56 (line 20)
16:09:12 (line 25)

```
 1   simply criminalize access for transgender youth and only offer
 2   counseling.
 3       At a minimum, even if there are two sides to whether this
 4   care is appropriate and effective and medically necessary,
 5   which, of course, we don't concede, that doesn't support a
 6   total ban, and a felony one at that.  Instead, it supports
 7   individualized assessments of patients, which is already the
 8   status quo.
 9       The State has repeatedly argued in its papers and during
10   oral argument that its legislative judgments are entitled to
11   deference, and that the State is not required to de facto
12   accept or adopt the conclusions or recommendations of a medical
13   association or anyone else.
14       But that's not what is at issue here under the Equal
15   Protection Clause.  It is well established that if the State
16   makes the extraordinary decision of making a distinction or
17   classification based on sex, which this law does, the burden
18   shifts to the State to justify why it needs to take such a
19   drastic step and why such a classification is necessary and
20   justified.  The weight of the evidence makes clear that the
21   State has failed to meet that standard.
22       Your Honor, I will not go into the other elements.  We
23   believe we have shown irreparable injury, the balance of the
24   equities, and the public interests, and that they all justify
25   preliminary relief.
```

16:09:28 on line 5, 16:09:45 on line 10, 16:10:01 on line 15, 16:10:20 on line 20, 16:10:37 on line 25

1    The United States seeks to preserve the status quo here

2  and ensure that transgender minors can continue to access

3  medically necessary and appropriate care while the

4  constitutionality of this law continues to be litigated.

16:10:54 5    And I will close by saying the issue before the Court

6  today is not whether someone's gender identity is fixed at

7  birth, or whether minors with gender dysphoria have a right to

8  gender-affirming care in every instance, or whether there's

9  evidence on both sides as to whether and when these treatments

16:11:11 10 are clinically indicated.  Rather, the question is whether

11 Alabama can outright ban these treatments in every single

12 instance, and not only that, make it a felony to provide or

13 cause such care.  Under the Equal Protection Clause, it cannot.

14    The United States asks this Court to maintain the status

16:11:31 15 quo, and grant its motion for temporary restraining order

16 and/or preliminary injunction.

17    THE COURT:  All right.  Thank you.

18    Before you begin, Mr. LaCour, let me ask you the one

19 question based on the original plaintiffs' closing.

16:12:03 20    So if a parent drives their child to Georgia for this

21 treatment, does that trip the statute?

22    MR. LACOUR:  Your Honor, I think the key is to look at

23 the words "engage in" or "cause, prescription, or

24 administration," not just cause in a vacuum.  You always read

16:12:22 25 statutes in context.  And "engage in" also "prescribe or

1  administer" are shedding light on cause.  I don't think just

2  driving them there would be causing the administration.  I

3  think -- another way to think about it is what would be cause?

4      So engaging in the administration of the puberty blocker

16:12:44 5  for the prohibited purposes would be, for example, if a doctor

6  used a needle and engaged in the administration.

7      Now, if the doctor ordered a nurse practitioner to do that

8  instead, the doctor might not be engaging in the

9  administration, but the doctor would be causing the

16:13:03 10  administration.

11      So I don't think buying somebody a bus pass or driving

12  them to the doctor would be that closely related such that it

13  would be causing the administration.  This is not a butterfly

14  flaps its wings in the Amazon, as the plaintiff suggested in

16:13:22 15  the reply brief.  This is, I think, much tighter to the other

16  key verbs in the statute.

17          THE COURT:  All right.  Go ahead with your closing.

18          MR. LACOUR:  Thank you, Your Honor.

19      Over the last couple of weeks, and the last two-and-a-half

16:13:42 20  days, the Court has heard about children and families facing

21  very difficult situations.  But as a matter of law, this is not

22  a difficult case.

23      As mentioned earlier, the State has wide discretion to

24  regulate areas of medical uncertainty.  This has long been the

16:14:00 25  law.  As the Supreme Court reaffirmed in Gonzalez, at 550 U.S.

 1  163, when the State, quote, undertakes to act in areas fraught

 2  with medical and scientific uncertainties, legislative options

 3  must be especially broad.

 4      So when there is competing evidence about benefits and

16:14:19 5  risks, the State can evaluate that evidence and make judgments

 6  with all five million Alabamians in mind.  That is a

 7  well-established role of the State.

 8      What this means is that in our federal system, a federal

 9  court has an important, but limited role.  It is not up to

16:14:38 10  federal courts to make the determination of the best treatment

 11  options for any particular individual.  Rather, the judge's job

 12  is to determine whether the Constitution bars states from

 13  regulating in a particular area of medical uncertainty.

 14      So plaintiffs have not only failed to bear their heavy

16:14:58 15  burden of showing a lack of medical uncertainty, they have

 16  confirmed that SB 184 does not discriminate on the basis of sex

 17  or transgender status for reasons I will address in a moment.

 18      Now, earlier -- and I apologize, Your Honor.  I had

 19  suggested that the AMA had supported the partial birth abortion

16:15:15 20  ban in Gonzalez.  It does not appear they submitted an amicus

 21  brief in this case, but numerous other medical groups did.

 22      The California Medical Association, which represented

 23  30,000 members, submitted a brief.  The American College of

 24  Obstetricians and Gynecologists submitted a brief.  The

16:15:32 25  American Medical Women's Association, which was a national

1    organization of 10,000 women physicians, surgeons, and

2    physicians in training submitted a brief, as did the American

3    Public Health Association, the Medical Students for Choice, the

4    New York Obstetrical Society, and the University of Chicago

16:15:49 5    Hospital's Department of Obstetrics and Gynecology.

6        Even so, the Gonzalez Court did not hold that Congress was

7    somehow limited in its ability to regulate in an area of

8    medical uncertainty.  Quite the contrary.

9        The Court refused to adopt a, quote, policy that would

16:16:09 10   strike down legitimate abortion regulations if some part of the

11   medical community were disinclined to follow the prescription.

12   Considerations of marginal safety, including the balance of

13   risks, are within the legislative competence when the

14   regulation is rational and in pursuit of legitimate ends.

16:16:29 15       Rational and legitimate ends.  That is the language of

16   rational basis, Your Honor.  That is not the language of strict

17   scrutiny.

18       Mr. Doss suggested it's different because it was an

19   abortion case.  Well, abortion is an area of the law where for

16:16:43 20  half a century the Court has recognized a fundamental privacy

21   right.  And there is no similar right to gender transition

22   procedures.  And these are quite new.  They're quite new on the

23   medical scene.

24       So if anything, the fact that abortion was involved in

16:16:59 25  that case cuts in the State's favor, not in favor of the

1    plaintiffs.

2        Plaintiffs' strict scrutiny rule we need to think about.

3    What are the limits of it?  I mean, it would destroy the system

4    for FDA drug approval, because anytime a plaintiff could -- who

16:17:17  5    is a parent and has a child who wants some sort of drug that

6    the FDA has decided is still experimental at this point, and it

7    is not -- if the FDA has not decided yet whether the risks

8    outweigh the benefits, or vice versa, the child would have no

9    right to the drug, the parent would have no right to the drug

16:17:37 10    for the parent's use, but the parent would have a right to get

11    it for their child.

12        But, of course, during the last two years of the pandemic

13    as the FDA was considering the safety and efficacy of the COVID

14    vaccine, there was no substantive due process right for a

16:17:53 15    parent to cut in line and sue and say, I think this is going to

16    be really helpful for my kid.  My kid is immunocompromised.

17    They really, really need it.

18        That was not -- it's not a Fourteenth Amendment issue.

19    There was not a right.  Because what they have done is the same

16:18:08 20    thing the Eleventh Circuit has rejected expressly in the

21    Morrissey case, which we discussed at opening.

22        They have defined the right with broad generality, a broad

23    right to provide medical -- to basically care for your child.

24        But as the Eleventh Circuit and the Supreme Court have

16:18:28 25    recognized, when we're dealing with substantive due process to

1   the extent that's even a thing, you need to really describe the

2   right with great specificity, and then root it in the history

3   and traditions of our nation.

4       And there is no deeply-rooted right in the history and

16:18:45  5   traditions of America that guarantees a parent the right to

6   puberty blockers or cross-sex hormones for their child,

7   particularly when the state of science is so uncertain.

8       If the plaintiffs are right, that this is a strict

9   scrutiny case, then federal judges are going to become medical

16:19:03 10   boards that are going to be adjudicating issue after issue

11   after issue.  And it is going to be difficult to imagine what

12   sort of medical judgment is going to be available, what sort of

13   medical judgment a state could still exercise, at least when it

14   comes to parents desiring the drugs for their children.

16:19:24 15       So, I mean, turning to some of the facts, I mean, for

16   years, rates of gender dysphoria in youth had remained stable,

17   as did the patient profile which was typically male.  And for

18   years, the standard treatment for gender dysphoria was watchful

19   waiting.

16:19:39 20       And that is not nothing, as Mr. Doss suggested.  That is

21   careful therapy with other types of mental health support to

22   help relieve children's distress as they explored their still

23   forming identities.  The sort of thing that would have been

24   very helpful to Ms. Wright, who you heard from earlier today,

16:19:57 25   but instead received the fast-track approach.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1           Now, all that has changed, and quite dramatically and

2     quite quickly.  If you look at Defendants' Exhibit 7 at page

3     26, there is a very telling chart showing the increase in young

4     people seeking treatment in gender clinics in the UK and

16:20:16  5     Australia from 2010 to 2020.  I mean, that data is particularly

6     useful because they have national health-care systems that

7     track all of these patients; whereas, we have a more

8     disaggregated system in the U.S., where a plaintiff -- not a

9     plaintiff -- a patient might go to a clinic and then later

16:20:33 10     never show up again, and you lose track of them.

11           So, if anything, the fact that some of these studies are

12     coming up out of Europe suggest that they should be given more

13     weight because they just have better data on the people.

14           If you look also at Defense Exhibit 7 at page 31, that is

16:20:51 15     two maps.  That's the chart, the explosion of gender clinics in

16     the last 15 years.  So as of 15 years ago, there were two

17     clinics in the entire country.

18           Now we're into the 50s or 60s.  UAB is only seven years

19     old.  And, of course, we have heard a lot about UAB, but

16:21:10 20     they're not the only place in Alabama where you can receive

21     these sorts of drugs.

22           Ms. Wright had a different situation in Georgia.  But I

23     mean, really any doctor with a script could potentially write

24     for some of these -- for some of these drugs, and there could

16:21:27 25     be other clinics in the future that open up.

1          And in light of this new evidence, many countries are

2     waking up to the grave uncertainty and the risks that this new

3     approach to treating gender dysphoria has for youth.

4          You heard from leaders from two of the prominent gender

16:21:44  5     clinics, Dr. Hawkins and Dr. Ladinsky.  Neither of them had

6     substantial familiarity with the careful assessments and

7     conclusions reached by these progressive nations.

8          Hawkins transcript page 39, 1 through 4 said, Are you

9     generally aware of it?  Response to one of these studies?  And

16:22:03 10    she said she was not.

11         Dr. Ladinsky stated at page 124 through 125, I confess

12    that I am not intimately associated with the position

13    statements of other nations.

14         But listen to what Sweden had to say.  Quote, For

16:22:18 15    adolescents with gender incongruence, the board deems that the

16    risk of puberty-suppressing treatments with puberty blockers

17    and gender-affirming hormonal treatment currently outweigh the

18    possible benefits.  And the statement further emphasized both,

19    quote, the continued lack of reliable scientific evidence

16:22:35 20    concerning the efficacy and the safety of both treatments and

21    the, quote, new knowledge that detransition occurs among young

22    adults.  It's Defense Exhibit 11 at page 3.

23         Similarly, the UK's review went through all of these

24    studies, unlike the AAP's review that the plaintiffs have

16:22:58 25    relied on.  Their conclusion was again, quote, Any potential

benefits of gender-affirming hormones must be weighed against

the largely unknown long-term safety profile of these

treatments in children and adolescents with gender dysphoria.

    And that same review found only five uncontrolled

observational studies suggesting any benefit, and it graded

those studies as, quote, a very low certainty, closed quote.

In other words, medical uncertainty.  It's Defense Exhibit 10

at page 14.

    And, again, I implore the Court to look again to the

appendix to Dr. Cantor's declaration where he has devastating

explanation of all the problems in that AAP report that

Dr. Ladinsky, I believe, had referred to.

    Finland similarly said that in light of the available

evidence, gender reassignment of minors is an experimental

practice.  It's Defense Exhibit 12 at page 8.

    In France, they said, quote, there is no test to

distinguish a structural gender dysphoria from transient

dysphoria in adolescents.  And because, quote, the risk of

overdiagnosis is real, closed quote, treatment should consist

only of, quote, psychological support as long as possible for

children and adolescents expressing a desire to transition,

closed quote.  That's Defense Exhibit 13 at 2.

    France even went on to emphasize, quote, the addictive

character of excessive consultation on social networks as

harmful to the psychological development of young people and

1  responsible for a very important part of the growing sense of

2  gender incongruence.  It's not just the French.

3       We had Ms. Wright here talking about going on Instagram,

4  seeing these images, learning these things, and it, in turn,

16:24:48  5  causing her to feel this dysphoria that she mistook for

6  transgender status with great consequences for her personally.

7       So the evidence -- what WPATH itself has said shows that

8  desistance rates are between 50 and 90 percent.  That's Defense

9  Exhibit 18, page 11.

16:25:10 10      Now, Dr. Hawkins, of course, said that unlike any other

11  gender clinic this history they are, quote, exceptional at

12  identifying who is, in her words, truly transgender.  That is

13  whose gender dysphoria is going to persist.  But they don't

14  have studies to back up this newfound certainty.

16:25:26 15      When asked to respond to evidence that only 25 percent of

16  detransitioners tell their doctors that they have

17  detransitioned, they said that they had read the study, but

18  hadn't noticed that finding.  That's Hawkins transcript page 53

19  through 54.

16:25:41 20      And I will try to make sure I'm moving quickly, Your

21  Honor.  I do want to get into some of the legal issues.

22       But, I mean, I think it's important that even if

23  plaintiffs could guarantee whose gender dysphoria is likely to

24  persist, there is still great uncertainty about whether these

16:25:59 25  treatments even provide long-term benefits.

1          On the other hand, the risks are potentially quite severe.

2     Recall Plaintiffs' Exhibit 41.  This is the informed consent

3     form from UAB.  It detailed numerous risks, including heart

4     disease, liver disease, blood disorders, loss of sexual

16:26:18  5     function, and sterility.

6          And there are still other risks that are unknown because

7     the long-term consequences of using puberty blockers and then

8     cross-sex hormones such that a child never goes through natural

9     puberty has simply not been studied with any rigor.

16:26:34 10          So in light of this uncertainty, how could plaintiffs

11     possibly -- or how could -- yeah.  How could plaintiffs

12     possibly obtain informed consent from either children or from

13     their parents?

14          The plaintiffs couldn't even explain the difference

16:26:47 15     between the refusal to take consent for a mastectomy or a

16     female circumcision for that matter, and their willingness to

17     take consent for cross-sex hormones that they agree can cause

18     equally, quote, permanent irreversible damage to basic

19     reproductive function.  That was Dr. Ladinsky's testimony,

16:27:04 20     pages 133 through 136.

21          And you also heard from Dr. Antommaria that he does think

22     that some young people could consent to mastectomy.  So even

23     some uncertainty and some conflict between the different

24     witnesses that the plaintiffs have presented.

16:27:22 25          And worse still, even if puberty blockers and cross-sex

         1  hormones would help -- and it's not clear that they do help --
         2  because we can't know if a child is likely to persist, we
         3  really are in a situation like the hypothetical RSV vaccine
         4  that was discussed with Dr. Koe that would sterilize 5 percent
16:27:43 5  of its recipients.  That treatment would never be approved by
         6  the FDA, and Dr. Koe testified quite rightly she would never
         7  recommend to that her patients.  The risks are just too great.
         8  In other words, it would be banned.
         9      And here we have sterilizing treatments with far less
16:28:02 10  guarantee of any sort of benefit at the end of the day.
        11      So turning to the Arkansas order.  I think this will be a
        12  good framework for addressing some of the legal issues, and I
        13  will try to thread some of the key facts, as well.
        14      I am going to get to Equal Protection.  I will also
16:28:20 15  address Glenn, Bostock, and Grimm.
        16      So first, at the beginning, there are statutory
        17  differences between the Arkansas law and the Alabama law.  We
        18  think the Arkansas law is perfectly constitutional.  That case,
        19  of course, is up on appeal at the Eighth Circuit.  We would
16:28:37 20  recommend Arkansas's briefing to the Court because it can
        21  explain in greater detail some of the problems with the Brandt
        22  decision.
        23      For one thing, the Arkansas law lacks extensive
        24  legislative findings that support SB 184.
16:28:51 25      Second, our law is narrower because there is no provision

1    that expressly bans referrals.

2        Third, Alabama's law also expressly leaves open

3    psychotherapy as a treatment for gender dysphoria.

4        And fourth, our law more specifically defines the

16:29:07 5    treatments that are barred by the law.

6        But turning to the opinion, first heightened scrutiny.

7    The Brandt decision said the transgender people constitute at

8    least a quasi-suspect class.

9        What the Court did not do is cite any evidence to back

16:29:23 10    that up.  They have said in Grimm, and that was it.  Contrast

11    that with the last time the Supreme Court had before it the

12    occasion to determine whether there was a new quasi-suspect

13    class, that's the Cleburne case, 1985.

14        I particularly recommend the Fifth Circuit's opinion that

16:29:42 15    was facially -- or at least the releasing of which was reversed

16    by the Supreme Court.  There the Fifth Circuit had a great

17    amount of record evidence of the discrimination against

18    intellectually disabled people from the '80s and going back.

19        Such robust evidence that Justice Thurgood Marshall, who

16:30:04 20    would have concluded that the intellectually disabled were a

21    quasi-suspect class, stated that in his view, quote, the

22    mentally retarded were, in 1985, a group that suffered eugenic

23    marriage and sterilization laws and whose treatment paralleled

24    the worst excesses of Jim Crow.  That was the record.

16:30:23 25        And even then, the Supreme Court said, this is not a

1    quasi-suspect class.  We are not going to take that very

2    dramatic step in designating a new quasi-suspect class.

3        So plaintiffs have submitted substantially no evidence to

4    try to back up their claim that there's a quasi-suspect class

16:30:40 5    here.  I think for that reason, they have not made that

6    showing, and the Brandt Court -- I have not looked all the

7    evidence that was in front of the Brandt Court, but I know the

8    analysis is incredibly thin.  That would be one grounds to

9    distinguish.

16:30:53 10        Next, the Court applied heightened scrutiny, because

11    assuming there was suspect class, the Court held that the --

12    Arkansas's law, quote, refers to gender transition which is

13    only sought by transgender individuals, closed quote.

14        Now, that's wrong as both a legal matter and a factual

16:31:12 15    matter.  And I mean, I think the facts that we have established

16    here also clearly distinguish that decision from this case.

17        But first on the law, we've discussed it.  We've briefed

18    it extensively.  The Supreme Court's 1974 decision in Geduldig,

19    that was a case where California covered many medical

16:31:33 20    treatments, did not cover pregnancy, however, in their state

21    insurance plan.

22        A group of women sued saying this is discrimination on the

23    basis of sex because only women can get pregnant.  And the

24    Supreme Court said this is not discrimination on the basis of

16:31:48 25    sex, because there are two categories here -- people who are

1   pregnant and people who are not pregnant.  While it's only

2   women in the people who are pregnant category, there are men

3   and women in the people who are not pregnant category.

4   Therefore, not discrimination on the basis of sex.

16:32:03  5       Now, we can do you one better in this case, Your Honor,

6   because there are certainly -- it's undisputed, there are

7   people who are transgender who do not seek these treatments.

8   And so in that category of people who don't seek these

9   treatments are both transgender and nontransgender persons.

16:32:20 10       But then unlike in Geduldig, in the other category, there

11  are also transgender persons and nontransgender persons who are

12  in that category.

13       Dr. Ladinsky testified that at 106, lines 3 through 8,

14  that some of her patients did start puberty blockers, but later

16:32:36 15  stopped and had their gender identity agree with their

16  biological sex.

17       So -- and Dr. Hawkins's -- in the phrasing of Dr. Hawkins,

18  these patients would not be, quote, truly transgender.  Thus,

19  as plaintiffs agree, not every person who is diagnosed with

16:32:55 20  gender dysphoria is transgender, and at least some people who

21  are not transgender receive puberty blockers and cross-sex

22  hormones.  Indeed you heard from one such person today,

23  Ms. Wright.

24       Justifications for the law.  The Brandt Court said that,

16:33:14 25  quote, defendants state that the Arkansas general assembly

1  passed Act 626 in response to a recent judicial ruling of the

2  UK High Court of Justice of England and Wales and in Arizona

3  District Court.  And then the Brandt Court found that neither

4  of these authorities were persuasive or precedential.

16:33:37  5  In contrast, as I mentioned earlier, we have extensive

6  legislative findings backing up our law.  This was not simply

7  hereto interesting Court decisions.  Let's go ahead and enact

8  this new law.

9  Then the Court further found that the reliance on the UK

16:33:53 10  court's ruling was not credible because the State allows the,

11  quote, same treatment for cisgender minors as long as the

12  desired results conform with the stereotype of their biological

13  sex.

14  Now, I don't know all the evidence that was before the

16:34:08 15  Brandt Court, but on our record here, we have shown that

16  puberty blockers for precocious puberty is not the same

17  treatment as puberty blockers for gender dysphoria.  I mean,

18  that's the whole premise of the FDA having on-label and

19  off-label distinctions.  They're different treatments, even if

16:34:25 20  similar medications might be used.

21  So here -- I mean, in the context of hormones, giving a

22  certain dose of testosterone to a boy with a measurable hormone

23  deficiency to bring him up to normal range is not the same

24  treatment as giving the same dose of testosterone to a

16:34:42 25  biological female to bring her levels up to a range that would

1  be abnormally high for females.

2       As our endocrinologist Dr. Laidlaw explained at

3  Defendants' Exhibit 3, pages 3 through 5, that first type of

4  treatment involves an endocrine diagnosis rooted in objective

16:35:00  5  testing of hormone levels.

6       In contrast, a gender dysphoria is a psychological

7  diagnosis.  The fact the treatment for one might bear some

8  passing resemblance to treatment for the other does not make

9  them the same treatment.

16:35:14 10      And further, as discussed in treating gender dysphoria

11  with hormones carries unique and serious risks, including many

12  of those risks listed on the informed consent form from UAB and

13  that are outlined by Dr. Laidlaw on pages 17 through 19 of his

14  report.

16:35:31 15      Dr. Ladinsky herself appeared to recognize this fact when

16  she was asked about two hypothetical boys.  As you might

17  recall, one of them had low testosterone and was -- needed some

18  testosterone to get up to normal levels.  The other had normal

19  testosterone and wanted more to get to abnormally high levels

16:35:51 20  so he could build more muscle mass.  She agreed on page 143 of

21  the transcript that those would be altogether different

22  treatments.

23      A fortiori, when one child is given puberty blockers or

24  hormones for an endocrine disorder, to move them into a normal

16:36:08 25  range for their age and sex, that is an altogether different

1    treatment than using similar doses of those drugs to treat a

2    psychological disorder and move them into abnormal ranges.

3    It's simply not the same.

4        Dr. Koe basically confirmed the same thing on pages 185

16:36:27  5    and 186 of the transcript from yesterday.  She stated that she

6    performed testicular exams only on males, but not on females.

7    And when she's treating transgender males for gender dysphoria,

8    she would give them testosterone, but she would not treat a

9    transgender female for gender dysphoria with testosterone.

16:36:46  10        She was asked, Are you discriminating based on sex?  And

11    she said no.  She was, quote, giving each patient the care for

12    which their sex and gender requires.  It's not discrimination

13    to recognize biological realities that you must recognize to

14    perform medicines.

16:37:03  15        For the same reasons, Alabama doesn't discriminate because

16    of sex.  This also helps illustrate why our case is much

17    different from Glenn vs. Brumby, Bostock, or Grimm, for that

18    matter.

19        To greatly simplify the Glenn, the Bostock cases, I think

16:37:24  20    a similar analysis would apply to Grimm, although Grimm was a

21    bathroom case and not an employment case.  In both Glenn and

22    Bostock, there was a biological male who was fired because he

23    wanted to show up at work presenting as a woman.  Even though

24    men and women are both able to wear dresses, only the man would

16:37:43  25    lose his job for wearing one to work.

1          But here there is no way to provide a testicular exam to

2     females.  It would be a different treatment altogether.  And

3     prescribing testosterone to a boy to get his levels up to a

4     normal boy's levels cannot be done for a girl, because she is a

16:37:59  5     girl and not a boy.  It would be a different treatment

6     altogether.

7          Second, Bostock and Brumby were premised on the notion

8     that sex is irrelevant to employment decisions.  But sex is

9     obviously relevant to medical decisions.  Dr. Koe confirmed as

16:38:17 10     much.  Dr. Ladinsky confirmed as much.

11          So either there is no discrimination here, or if there is

12     some sort of discrimination, although the Court has said in the

13     Nyugen decision that recognizing biological realities is not a

14     stereotype, like a law could not be more tailored.  Like you

16:38:37 15     have to know the sex to know what the treatment even is.  The

16     fit could not be tighter.

17          So moving on.  The Brandt Court found that Arkansas's law

18     was not substantially related to the regulation of ethics of

19     the medical profession because gender-affirming treatment is

16:38:54 20     supported by medical evidence that has been subject to rigorous

21     study.

22          Now, the record before Your Honor shows that these

23     statements are simply not accurate, at least on the record here

24     in Alabama.  The one certainty in this field is that there is

16:39:15 25     no certainty.  There are not rigorous studies, and we have

1    presented ample evidence of medical uncertainty.

2        The Brandt Court did not address similar issues.  They did

3    not address the Gonzales decision.  They did not address the

4    European reviews.  They didn't recognize the weakness of the

16:39:33 5    evidence for these interventions.

6        The Court also said, quote, Every major expert medical

7    association recognizes that gender-affirming care for

8    transgender minors may be medically appropriate and necessary.

9        The Court, of course, never addressed the international

16:39:49 10    literature reviews.

11        And another key distinction, Your Honor, not -- some of

12    these weren't even available at the time the Court was ruling

13    on August 2nd, 2021.  There's been more evidence coming to

14    light.  As Dr. Cantor said, to the extent the pendulum is

16:40:03 15    swinging, it is swinging in Alabama's direction.

16        Turning again to substantive due process, which I

17    addressed at the beginning, the Brandt Court I think made some

18    of the same errors that the plaintiffs are making here finding

19    that the plaintiffs in that case had a fundamental right to

16:40:21 20    seek medical care for their children and in conjunction with

21    their adolescent child's consent and their doctor's

22    recommendation make a judgment that medical care is necessary.

23        Of course, that, again, defines the right far too broadly

24    and misstates the right.  And the Court never identified a

16:40:41 25    history or tradition of that particular right, and similarly

```
 1    ignored the implications of the new right.  For example, every
 2    FDA decision would be subject to strict scrutiny.
 3         Turning to the First Amendment, Brandt -- there was a
 4    First Amendment claim in Brandt that the claim there centered
 5    on the physician referral provision, which we do not have one
 6    of those in Alabama's law.
 7         Now, finally, one thing -- another big thing I think that
 8    distinguishes our case from Brandt -- an issue we have with the
 9    Court's decision, it never once mentioned the risks of these
10    procedures for kids.  You will not see them mentioned at all.
11    Not a word about bone health, not a word about heart disease,
12    blood disorders, sexual disorders, or infertility.  Not a word
13    about a young women like Sydney Wright and the 13 other
14    declarants who are either detransitioners or the parents of
15    troubled youth, like not a word about any of them.  And these
16    people are suffering from having been experimented on.
17         But in this case, Your Honor, you should consider those
18    risks.  In this case, the only endocrinologist who has
19    addressed whether treating someone at Tanner Stage 2 will
20    affect fertility is Dr. Laidlaw.  This is at page 9 of Defense
21    Exhibit 3, the Laidlaw report.  He lays this out.
22         Awareness of the Tanner stage of the developing adolescent
23    is also useful to assess for maturation of sex organ
24    development leading to fertility.
25         For girls, menstruation and ovulation occurs about
```

16:41:00 (line 5)
16:41:23 (line 10)
16:41:44 (line 15)
16:42:02 (line 20)
16:42:18 (line 25)

1   two years after Tanner Stage 2, and will typically be at Tanner

2   Stage 4 or possibly 3.  For boys, the first appearance of sperm

3   is typically Tanner Stage 4.  If puberty is blocked before

4   reaching these critical stages, the sex glands will be locked

16:42:35 5   in a premature state and incapable of fertility.  His similar

6   statements addressing the problems of sexual dysfunction that

7   come from these treatments.

8       In contrast, you heard from Dr. Antommaria today.  It is

9   his view that clinics don't need to tell patients and families

16:42:55 10   that puberty blockers will almost certainly lead to cross-sex

11   hormones before kids are started on that pathway.  That is

12   their standard of care.  And these are half truths to create a

13   false consensus with the health and the lives of children on

14   the line.

16:43:09 15       And to Mr. Doss's assertion, there is no evidence of lax

16   methods in the U.S.  They are completely ignoring the 14

17   declarations from -- and the testimony of Ms. Wright, for that

18   matter.

19       There is plenty of evidence of this both in studies and in

16:43:27 20   sworn declarations.  There will be more and more of this unless

21   states step forward and protect their children, because the

22   medical community is not doing their job.

23       Now, addressing vagueness.  We touched on it briefly.

24   Again, the key language is, quote, no person shall engage in or

16:43:46 25   cause, prescribing, or administering puberty-blocking

 1  medication to stop or delay normal puberty.  Of course, the
 2  cross-sex hormones provision that follows after that.

 3       Here's how it works.  If a doctor writes a prescription
 4  for puberty blockers, that would be engaging in prescribing the
16:44:01 5  puberty blockers.  If the doctor orders the nurse practitioner
 6  at the clinic to write the prescription, the doctor would be
 7  causing the prescription of the puberty-blocking medication.

 8       Similarly, if the doctor gave a shot of testosterone for
 9  purposes of gender transition, she would be administering.  If
16:44:18 10  she ordered the nurse to do it, she would be causing.

11       But if a patient merely posted on Facebook that she had a
12  great experience at the clinic, she would not be engaging in or
13  causing the prescription of puberty blockers, even if a friend
14  read the testimony or reached out to the clinic and later got
16:44:34 15  it.

16       If Reverend Eknes-Tucker tells a congregant that she might
17  receive help for her gender dysphoria at the clinic, he hasn't
18  engaged in or caused the prescribing or administration of
19  anything.

16:44:45 20       And if a parent merely drives his child to the clinic, he
21  hasn't engaged in or caused the prescription of any drugs.

22       Now, if the parent injects the medications, I think he
23  probably has engaged in the administering the puberty blockers.
24  But merely driving him to the clinic, having conversations with
16:45:02 25  their child, being there for them, that is not administering,

1    engaging in, or causing the administration of these drugs.

2        And, Your Honor, I think that's why Reverend Eknes-Tucker

3    wasn't ready to go and file a lawsuit on April 8th like

4    Dr. Ladinsky or Mr. Jeff Walker were.  He didn't think that

16:45:23  5    this law applied to him.  But when he got a call on Monday,

6    April 16th, from one of Dr. Ladinsky's lawyers, he was excited

7    to -- I believe his phrase -- was make a difference.

8        But as we discussed earlier today, the good news and the

9    bad news for Mr. Eknes-Tucker is that while he did help SBLC

16:45:43 10    and Lightfoot get back into court, and his conduct does not

11    violate the law, so he doesn't have to worry about that, the

12    bad news is he likely doesn't have standing to be challenging

13    this law.  So he's going to have to make a difference some

14    other way going forward.

16:45:58 15        Now, one thing to equities I want to address.

16    Dr. Ladinsky stated that she would be concerned that if SB 184

17    goes into effect, her patients --

18        THE COURT:  I will say I think you have kind of run

19    through your time, but I was easy with Mr. Doss.  I will be

16:46:14 20    with you.  But I would say we are close to wrapping it up.

21        MR. LACOUR:  Very, very close, Your Honor.  I am ready

22    to go home myself.  But I appreciate all of the time and

23    consideration you have given to this very important case.

24        I will just say, Dr. Ladinsky was -- stated she was

16:46:30 25    concerned that if SB 184 went into effect, her patients would

1  have to stop taking testosterone cold turkey.

2      Now, going back to language of the statute -- and this is

3  something I have tried to emphasize in the cross-examination --

4  it says, do not engage in or cause the following practices for

16:46:47 5  the purpose of attempting to in effect cause a gender

6  transition.

7      Being responsible and tapering somebody off of these

8  artificial hormones is not for the -- would not be using the

9  hormones for that prohibited purpose.  Just like using

16:47:05 10  testosterone for that boy with the low T to get him up to a

11  normal range is not an improper purpose, either.  So we don't

12  think that's something that anyone needs to worry about.

13      Now, in closing, Mr. Doss suggested that SB 184 is somehow

14  a grand experiment.  Now, with all due respect, I mean, there

16:47:28 15  were only two of these clinics in 2007.  UAB has only been on

16  the scene for seven years.

17      In hitting the pause button, Alabama is halting an

18  experiment on our kids, and nothing in the Constitution or

19  federal law requires Alabama to expose children to these

16:47:46 20  unproven and sterilizing treatments.  For that reason, the

21  preliminary injunction motions should be denied.

22      If you have any questions, I would be happy to answer

23  them.  Otherwise, we rest.

24          THE COURT:  All right.  I thank you all for your

16:48:00 25  arguments.  Let's talk housekeeping just for a minute.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

323

 1          Obviously, in the long term, we have got to put together a

 2   discovery plan and a trial track.  Have the parties talked

 3   about that?

 4          MR. LACOUR:  We have not yet, Your Honor.

16:48:15  5          THE COURT:  Do you want to give me your 30-second idea

 6   of how long you think how long a track this should be on?  My

 7   guess is it should be expedited.

 8          MR. LACOUR:  Your Honor, there is a fair amount of

 9   discovery we think we would like to get, including some

16:48:31 10   third-party discovery.  Plaintiffs have put at issue the

11   credibility of the AAP, some of these other organizations.  We

12   have some questions about donations that the Endocrine Society

13   might be receiving from the prescription drug manufacturers who

14   are profiting off of this use of their puberty blockers and

16:48:49 15   their cross-sex hormones.  That might be relevant assessing the

16   credibility of these institutions.

17      I mean, we will certainly move with all deliberate speed,

18   but we would want a chance to fully develop the record.

19          THE COURT:  So give me a number.

16:49:06 20          MR. LACOUR:  My colleague Mr. Davis is usually a

21   little better at this.  I'm just a humble appellate attorney.

22          THE COURT:  All right.

23          MR. DAVIS:  Mr. LaCour's welcome to correct me, but

24   before we -- we would like the chance to confer about that.  We

16:49:18 25   have been so focused on getting ready for this hearing --

```
 1              THE COURT:  I get that.
 2              MR. DAVIS:  -- we really haven't thought about what
 3   all we want to do.  If we could have until the first of the
 4   week to talk about it amongst ourselves and let Your Honor know
16:49:29  5   what our thoughts are.
 6              THE COURT:  Maybe you can confer with the plaintiffs
 7   and y'all can present a joint thought on that.
 8              MR. DAVIS:  I think we could be ready for like a Rule
 9   26 conference the first of the week.  Give us a chance to talk
16:49:42 10   internally on each side, then with each other, then report to
11   Your Honor by -- well, by middle of the week or end of the
12   week.
13              THE COURT:  Let me say this.  Here is all I am trying
14   to accomplish.  You know, if we just want to put this on a
16:49:55 15   regular trial track, I will just leave it to y'all, and we will
16   go from there.  I was just guessing that somebody might want
17   this to be on an expedited track.  And so that's why I am
18   raising the issue.
19              MR. DOSS:  That would be our preference, Your Honor.
16:50:09 20   I mean, our thought just right now would be like maybe a
21   six-month discovery window.  I mean, I think we are going --
22              THE COURT:  That was the number in my mind was
23   six months.  So, you know, to the extent --
24              MR. DAVIS:  That might be fine with us after we
16:50:23 25   confer.
```

```
 1              THE COURT:  All right.

 2              MR. DAVIS:  But I would like that chance to talk about

 3     that specifically.

 4              THE COURT:  I get it.  No problem.  No problem.

16:50:29  5      I will leave it to the parties to talk.  To the extent you

 6     agree, great.  To the extent you don't agree, we can sort that

 7     out.

 8         All right.  Thank you for your arguments.  All very good.

 9     I appreciate every witness that we've had in the last two days.

16:50:47 10    Thank each of you.

11         Obviously, this was filed on April the 19th.  My staff

12     attorneys and I have done nothing since it was filed but work

13     on this case.  We will be doing nothing else but this case

14     until we get an order.

16:51:02 15      Just like all of you, I want a well-reasoned order that is

16     right on the law.  And so I just ask that everybody be patient.

17         I can't say that it's going to be out tomorrow, or the

18     next day, or the next day, except to say we are not going to

19     work on anything until we get it out and we get it right.

16:51:22 20      So I thank you all.  And we're adjourned.

21              (Whereupon, the above proceedings were concluded at

22         4:51 p.m.)

23

24

25
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

<pre>
 1                    <u>CERTIFICATE</u>

 2

 3

 4          I certify that the foregoing is a correct

 5    transcript from the record of proceedings in the

 6    above-entitled matter.

 7

 8

 9

10

11    <u>Christina K Decker</u>              <u>05-08-2022</u>

12    Christina K. Decker, RMR, CRR              Date

13    Federal Official Court Reporter

14    ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25
</pre>