No. 22-11707

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

## APPELLANTS' APPENDIX VOLUME XIII OF XIII

Christopher Mills
SPERO LAW LLC
557 East Bay St.,
#22251
Charleston, SC 29451
(843) 606-0640
cmills@spero.law

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
Thomas A. Wilson
  *Deputy Solicitors General*
James W. Davis
  *Deputy Attorney General*
Benjamin M. Seiss
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

July 5, 2022

# INDEX

**TAB**

**VOLUME I**

Civil Docket Sheet ...................................................................................A

Individual Plaintiffs' Complaint (April 19, 2022)......................................1

Order Reassigning Case to Judge Liles C. Burke (April 20, 2022).........................3

Individual Plaintiffs' Motion for Preliminary Injunction (April 21, 2022)..............7

Individual Plaintiffs' Brief in Support of Motion for Preliminary Injunction (April 21, 2022)...............................................................................8

    Exhibit 1 – Declaration of Linda A. Hawkins, Ph.D. .................................. 8-1

    Exhibit 2 – Declaration of Morissa J. Ladinsky, M.D. ................................ 8-2

**VOLUME II**

    Exhibit 3 – Declaration of Stephen M. Rosenthal, M.D. ............................ 8-3

    Exhibit 4 – Declaration of Rev. Paul A. Eknes-Tucker................................ 8-4

    Exhibit 5 – Declaration of Brianna Boe ...................................................... 8-5

    Exhibit 6 – Declaration of James Zoe ......................................................... 8-6

    Exhibit 7 – Declaration of Megan Poe ........................................................ 8-7

    Exhibit 8 – Declaration of Kathy Noe ......................................................... 8-8

    Exhibit 9 – Declaration of Jane Moe, Ph.D. ................................................ 8-9

    Exhibit 10 – Declaration of Rachel Koe, M.D. .......................................... 8-10

Answer of Defendants (April 21, 2022) ..................................................................20

Order Setting Evidentiary Hearing (April 22, 2022) ............................................. 34

United States of America's Motion for Temporary Restraining Order and
Preliminary Injunction (April 29, 2022) ...........................................................62

United States of America's Brief in Support of Motion for Temporary
Restraining Order and Preliminary Injunction (April 29, 2022) ................ 62-1

**VOLUME III**

Exhibit 1 – Declaration of Armand H. Antommaria, M.D. ........................ 62-2

Defendants' Exhibit List and Notice of Filing of Evidence in Opposition
to Plaintiffs' Motion for Preliminary Injunction (May 2, 2022) ....................69

Exhibit 1 – Alabama Vulnerable Child Compassion and
Protection Act ......................................................................... 69-1

Exhibit 2 – Expert Report of James Cantor, Ph.D.,
Clinical Psychologist and Director of Toronto
Sexuality Centre....................................................................... 69-2

Exhibit 3 – Expert Report of Michael K. Laidlaw, M.D.,
Endocrinologist....................................................................... 69-3

Exhibit 4 – Expert Report of Quentin L. Van Meter, M.D.,
Pediatric Endocrinologist and Associate Professor of
Pediatrics at Emory University................................................... 69-4

**VOLUME IV**

Exhibit 5 – Expert Report of Paul W. Hruz, M.D., Ph.D.,
Associate Professor of Pediatrics in the Division of Pediatric
Endocrinology and Diabetes at Washington University
School of Medicine................................................................. 69-5

Exhibit 6 – Expert Report of Patrick Hunter, M.D.,
Pediatrician, Bioethicist, and Former Chair of the Pediatric
Department at Scotland Memorial Hospital ............................. 69-6

Exhibit 7 – Expert Report of Dianna Kenny, Ph.D.,
        Psychotherapist and Former Professor of Psychology at
        University of Sydney .................................................................. 69-7

**VOLUME V**

Exhibit 8 – Stephen B. Levine, E. Abbruzzese & Julia M. Mason,
        *Reconsidering Informed Consent for Trans-Identified
        Children, Adolescents, and Young Adults*,
        J. OF SEX & MARITAL THERAPY (Mar. 17, 2022)....................... 69-8

Exhibit 9 – *Evidence Review: Gonadotropin Releasing Hormone
        Analogues for Children and Adolescents with Gender
        Dysphoria*, Nat'l Inst. for Health & Care Excellence (NICE)
        (Mar. 11, 2021) ....................................................................... 69-9

**VOLUME VI**

Exhibit 10 – *Evidence Review: Gender-Affirming Hormones for
        Children and Adolescents with Gender Dysphoria*,
        Nat'l Inst. for Health & Care Excellence (NICE) (Mar. 11,
        2021) ...................................................................................... 69-10

Exhibit 11 – Sweden National Board of Health and Welfare Policy
        Statement, Socialstyrelsen, *Care of Children and
        Adolescents with Gender Dysphoria: Summary* (2022) .......... 69-11

Exhibit 12 – Finland's Council for Choices in Healthcare Policy
        Statement, Palveluvalikoima, *Recommendation of the
        Council for Choices in Health Care in Finland (PALKO /
        COHERE Finland)* ................................................................. 69-12

Exhibit 13 – Académie Nationale de Médecine, *Medicine and Gender
        Transidentity in Children and Adolescents* (Feb. 25, 2022).... 69-13

Exhibit 14 – The Royal Australian & New Zealand College of
        Psychiatrists, *Recognising and Addressing the Mental
        Health Needs of People Experiencing Gender Dysphoria /
        Gender Incongruence*, Position Statement 103 (Aug. 2021) .. 69-14

3

Exhibit 15 – *Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.*
[2020] EWHC (Admin) 3274 ................................................. 69-15

**VOLUME VII**

Exhibit 16 – Centers for Medicare & Medicaid Services, Tamara Syrek
Jensen, et al., *Decision Memo for Gender Dysphoria and
Gender Reassignment Surgery* (CAG-00446N)
(Aug. 30, 2016)....................................................................... 69-16

Exhibit 17 – Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL
MANUAL OF MENTAL DISORDERS (5th ed. 2013)
(excerpts) ............................................................................... 69-17

Exhibit 18 – World Professional Ass'n for Transgender Health
(WPATH), *Standards of Care for the Health of
Transsexual, Transgender, and Gender-Conforming
People* (7th Version) (2012) (pp. 1-112)................................. 69-18

**VOLUME VIII**

Exhibit 18 (cont.) – World Professional Ass'n for Transgender Health
(WPATH), *Standards of Care for the Health of
Transsexual, Transgender, and Gender-Conforming
People* (7th Version) (2012) (pp. 113-120) ............................ 69-18

Exhibit 19 – Wylie C. Hembree et al., *Endocrine Treatment of Gender-
Dysphoric/Gender-Incongruent Persons: An Endocrine
Society Clinical Practice Guidelines*, 102 J. CLINICAL
ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017).............. 69-19

Exhibit 20 – Lisa Littman, *Parent Reports of Adolescents & Young
Adults Perceived to Show Signs of a Rapid Onset of Gender
Dysphoria*, PLOS ONE 13(8):e0202330 ................................. 69-20

Exhibit 21 – Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR No. 50, 3353-54 (Oct. 2021) ............................................................. 69-21

Exhibit 22 – Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, J. OF HOMOSEXUALITY (Apr. 30, 2021)............................................ 69-22

Exhibit 23 – Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696-704 (Oct. 2014).......................... 69-23

Exhibit 24 – Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 PEDIATRICS no. 4 (Oct. 2018) ......................................... 69-24

Exhibit 25 – Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 832 (Dec. 2015)................................... 69-25

Exhibit 26 – Declaration of Corinna Cohn  .............................................. 69-26

Exhibit 27 – Declaration of Sydney Wright  .............................................. 69-27

Exhibit 28 – Declaration of Carol Frietas  ................................................. 69-28

Exhibit 29 – Declaration of Barbara F.  .................................................... 69-29

Exhibit 30 – Declaration of John Doe ...................................................... 69-30

Exhibit 31 – Declaration of John Roe ...................................................... 69-31

**VOLUME IX**

Exhibit 32 – Declaration of Kristine W.  .................................................. 69-32

Exhibit 33 – Declaration of Yaacov Sheinfeld  ......................................... 69-33

Exhibit 34 – Declaration of Martha S. ...................................................... 69-34

Exhibit 35 – Declaration of KathyGrace Duncan ..................................... 69-35

Exhibit 36 – Declaration of Jeanne Crowley ............................................ 69-36

Exhibit 37 – Declaration of Ted H. Halley ................................................ 69-37

Exhibit 38 – Declaration of Kellie C. ....................................................... 69-38

Exhibit 39 – Declaration of Gary Warner ................................................. 69-39

Exhibit 40 – April 15, 2022 emails regarding *Ladinsky v. Ivy*
           litigation.................................................................................. 69-40

Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary
    Injunction (May 2, 2022) ..................................................................74

## VOLUME X

UAB Patient Information and Consent Form (May 3, 2022) .......................... 78-41

Defendants' Notice of Filing Corrected Exhibit 41 (May 3, 2022).......................87

Exhibit 1 – Corrected Exhibit 41 – Sydney Wright, *I Spent a Year as a
           Trans Man. Doctors Failed Me at Every Turn*, DAILY
           SIGNAL (Oct. 7, 2019). ............................................................. 87-1

Amended Intervenor Complaint (May 4, 2022) ..................................................92

Procedural Orders and Status of Forthcoming Opinion (May 8, 2022) .................94

Transcript of Preliminary Injunction Hearing - Volume I (pp. 1-149)
    (May 5, 2022) ...............................................................................104

## VOLUME XI

Transcript of Preliminary Injunction Hearing – Volume I (cont.) (pp.195-206)
    (May 5, 2022)................................................................................ 104

Transcript of Preliminary Injunction Hearing - Volume II (May 6, 2022) ..........105

**VOLUME XII**

Transcript of Preliminary Injunction Hearing - Volume I (pp. 150-170)
    (May 5, 2022) (SEALED) .............................................................................106

**VOLUME XIII**

Opinion and Order (May 13, 2022) ......................................................................107

Defendants' Notice of Appeal of Order Granting Preliminary Injunction
    (May 16, 2022) .......................................................................................108

Notice of Correction re: Opinion and Order (May 19, 2022) ..............................112

Corrected Opinion and Order (May 19, 2022) ................................................. 112-1

Transcript of Preliminary Injunction Hearing - Volume I (cont.) (pp. 170-94)
    (May 5, 2022) .........................................................................................129

Certificate of Service

# DOC. 107

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| **PAUL A. EKNES-TUCKER, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION & ORDER

Several individuals and the United States challenge the constitutionality of the Alabama Vulnerable Child Compassion and Protection Act.[1] In part, the Act restricts transgender minors from utilizing puberty blockers and hormone therapies. Because the Supreme Court and the Court of Appeals for the Eleventh Circuit have made clear that: (1) parents have a fundamental right to direct the medical care of their children subject to accepted medical standards; and (2) discrimination based on gender-nonconformity equates to sex discrimination, the Court finds that there is a substantial likelihood that Section 4(a)(1)–(3) of the Act is unconstitutional and, thus, enjoins Defendants from enforcing that portion of the Act pending trial. However, all other provisions of the Act remain in effect, specifically: (1) the

---

[1] Based on their oral representations during a May 4, 2022 hearing, Plaintiffs seek to enjoin only Section 4(a)(1)–(3) of the Act. For purposes of this opinion, all references to "the Act" refer to these subdivisions unless noted otherwise.

provision that bans sex-altering surgeries on minors; (2) the provision prohibiting school officials from keeping certain gender-identity information of children secret from their parents; and (3) the provision that prohibits school officials from encouraging or compelling children to keep certain gender-identity information secret from their parents.

## I.  BACKGROUND

Regarding a child's belief that they might be transgender, Merriam-Webster's Dictionary defines a "transgender" person as one whose gender identity is different from the sex the person had or was identified as having at birth. *Transgender*, Merriam-Webster Unabr. Dictionary (3rd ed. 2002). The Dictionary defines "gender identity" as a person's internal sense of being a male or a female. *Gender Identity*, Merriam-Webster Unabr. Dictionary (3rd ed. 2002). These terms and definitions are largely consistent with those used by the parties. Accordingly, the Court relies on these terms throughout this opinion, but recognizes that they might mean different things to different people and in different contexts.

According to the uncontradicted record evidence, some transgender minors suffer from a mental health condition known as gender dysphoria. *Tr.* at 30.[2] Gender dysphoria is a clinically diagnosed incongruence between one's gender identity and

---

[2] "*Tr.*" is a consecutively paginated transcript of the two-day preliminary injunction hearing the Court held on May 5–6, 2022. For clarity, the Court cites to the internal pagination of the transcript rather than the ECF pagination.

assigned gender. *DSM-5* (Doc. 69-17) at 4. If untreated, gender dysphoria may cause or lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. *Tr.* at 20. According to the World Professional Association for Transgender Health (WPATH), an organization whose mission is to promote education and research about transgender healthcare, gender dysphoria in adolescents (minors twelve and over) is more likely to persist into adulthood than gender dysphoria in children (minors under twelve). *WPATH Standards of Care* (Doc. 69-18) at 17.[3]

In some cases, physicians treat gender dysphoria in minors with a family of medications known as GnRH agonists, commonly referred to as puberty blockers. *Id.* at 24; *Tr.* at 103. After a minor has been on puberty blockers for one to three years, doctors may then use hormone therapies to masculinize or feminize his or her body. *Tr.* at 108–11, 131. The primary effect of these treatments is to delay physical maturation, allowing transgender minors to socially transition their gender while they await adulthood. *Id.* at 105–06, 110–11. For clarity and conciseness, the Court refers to puberty blockers and hormone therapies used for these purposes as "transitioning medications."

Like all medications, transitioning medications come with risks. *Tr.* at 121–22. Known risks, for example, include loss of fertility and sexual function. *Id.*

---

[3] Plaintiffs, the State, and the United States individually introduced the WPATH standards into evidence during the May 5–6 preliminary injunction hearing.

at 132–33. Nevertheless, WPATH recognizes transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications. *WPATH Standards of Care* (Doc. 69-18) at 19. The American Medical Association, the American Pediatric Society, the American Psychiatric Association, the Association of American Medical Colleges, and at least eighteen additional major medical associations endorse these guidelines as evidence-based methods for treating gender dysphoria in minors. *Tr.* at 97–98; *Healthcare Amici Br.* (Doc. 91-1) at 15.[4]

The Alabama Vulnerable Child Compassion and Protection Act states in pertinent part:

> Section 4. (a) . . . [N]o person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3) Prescribing or administering supraphysiologic doses of estrogen to males.

---

[4] For a full list of the twenty-two major medical associations that endorse these guidelines, see *infra* note 12.

(4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

. . .

(c)  A violation of this section is a Class C felony.

Section 5. No nurse, counselor, teacher, principal, or other administrative official at a public or private school attended by a minor shall do either of the following:

(1) Encourage or coerce a minor to withhold from the minor's parent or legal guardian the fact that the minor's perception of his or her gender or sex is inconsistent with the minor's sex.

(2) Withhold from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex.

S.B. 184, ALA. 2022 REG. SESS. §§ 4–5 (Ala. 2022). The Act defines a "minor" as anyone under the age of nineteen. *Id.* § 3(1); ALA. CODE § 43-8-1(18). The Act defines "sex" as "[t]he biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." S.B. 184, ALA. 2022 REG. SESS. § 3(3) (Ala. 2022).

In support of these prohibitions, the Legislature made several legislative findings. *Id.* § 2. The Legislature found in part that "[s]ome in the medical community are aggressively pushing" minors to take transitioning medications, which the Act describes as "unproven, poorly studied . . . interventions" that cause "numerous harmful effects for minors, as well as risks of effects simply unknown due to the new and experimental nature of these interventions." *Id.* § 2(6), (11). The Legislature went on to find that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications" of these treatments. *Id.* § 2(15). Thus, the Legislature concluded, "the decision to pursue" these treatments "should not be presented to or determined for minors[.]" *Id.* § 2(16).

Alabama legislators passed the Act on April 7, 2022.[5] Governor Kay Ivey signed the Act into law the following day.[6] In the week that followed, civil rights groups filed two lawsuits challenging the Act's constitutionality.[7] In *Ladinsky v. Ivey*, Case No. 2:22-cv-447 (N.D. Ala. 2022), several plaintiffs challenged the Act in the United States District Court of the Northern District of Alabama. The case

---

[5] Jo Yurcaba, *Alabama Passes Bills to Target Trans Minors and LGBTQ Classroom Discussion*, NBCNEWS.COM (Apr. 7, 2022, 4:22 PM), https://www.nbcnews.com/nbc-out/out-politics-and-policy/alabama-passes-bills-targeting-trans-minors-lgbtq-classroom-discussion-rcna23444.

[6] Madeleine Carlisle, *Alabama's Wave of Anti-LGBTQ Legislation Could Have National Consequences*, TIME.COM (Apr. 15, 2022, 11:40 AM), https://time.com/6167472/alabama-anti-lgbtq-legislation/.

[7] *Alabama Law Banning Transgender Medication Challenged in Two Lawsuits*, CBSNEWS.COM (Apr. 11, 2022, 10:05 PM), https://www.cbsnews.com/news/alabama-transgender-law-lawsuits/.

was randomly assigned to United States District Judge Anna M. Manasco. Judge Manasco recused, and the case was randomly reassigned to United States Magistrate Judge Staci G. Cornelius. After the parties declined to proceed before Judge Cornelius in accordance with 28 U.S.C. § 636(c), the case was randomly reassigned to the Honorable Annemarie C. Axon.

With *Ladinsky* pending, a separate set of plaintiffs challenged the Act in the United States District Court of the Middle District of Alabama. That case, styled *Walker v. Marshall*, Case No. 2:22-cv-167 (M.D. Ala. 2022), was randomly assigned to Chief United States District Judge Emily C. Marks. The *Walker* plaintiffs moved to enjoin enforcement of the Act and moved to reassign the case to United States District Judge Myron H. Thompson, alleging that he had previously presided over a similar case. The parties, however, later consented to transferring the case to the Northern District of Alabama for consolidation with *Ladinsky*. At that time, the *Walker* plaintiffs withdrew their motion to reassign.

On April 15, 2022, Chief Judge Marks transferred *Walker* to the Northern District of Alabama in accordance with the "first-filed" rule and 28 U.S.C. § 1404(a). The case was randomly assigned to this Court. Judge Axon then transferred *Ladinsky* to this Court for consolidation with *Walker*. That same day, at 6:24 p.m. CDT, the *Walker* plaintiffs filed a notice of voluntary dismissal without prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i). The *Ladinsky* plaintiffs voluntarily

dismissed their case nine minutes later. Neither the *Walker* plaintiffs nor the *Ladinsky* plaintiffs explained their respective dismissals, but counsel for *Ladinsky* informed the press: "We do plan to refile imminently[.]"[8]

Sure enough, on April 19, four transgender minors (Minor Plaintiffs), their parents (Parent Plaintiffs), a child psychologist and a pediatrician (Healthcare Plaintiffs), and Reverend Paul A. Eknes-Tucker filed this suit in the United States District Court of the Middle District of Alabama and moved to enjoin the Act's enforcement pending trial. The case was randomly assigned to United States District Judge R. Austin Huffaker, Jr. Due to this Court's familiarity with *Ladinsky* and *Walker*, Judge Huffaker reassigned the case to this Court to expedite disposition of Plaintiffs' motion for preliminary injunction. With the Act set to take effect on May 8, the Court entered an abbreviated briefing schedule and set a hearing on Plaintiffs' motion for May 5–6.

Just days before the hearing, the United States moved to intervene on behalf of Plaintiffs under Federal Rule of Civil Procedure 24.[9] In the process, the United States filed its own motion to enjoin enforcement of the Act and requested to

---

[8] Paul Gattis, *Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could be Refiled*, AL.COM, https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html (last updated Apr. 16, 2022, 9:22 PM).

[9] The United States's amended intervenor complaint does not add any additional claims, name any new defendants, or seek to expand the relief sought by Plaintiffs. *Compare Am. Intervenor Compl.* (Doc. 92) at 4–5, 13–14, *with Compl.* (Doc. 1) at 6–8, 28–35.

participate in the preliminary injunction hearing. Additionally, fifteen states moved for leave to proceed as *amici curiae*[10] and to file a brief in support of Defendants.[11] Twenty-two healthcare organizations also moved for leave to proceed as *amici curiae* and to file a brief in support of Plaintiffs.[12] Ultimately, the Court granted these motions in full, took the *amici* briefs under advisement, and gave the United States leave to participate during the preliminary injunction hearing.

During that hearing, the parties submitted hundreds of pages of medical evidence and called several live witnesses. Plaintiffs tendered Dr. Linda Hawkins and Dr. Morissa Ladinsky as experts in the treatment of gender dysphoria in minors. *Tr.* at 16, 92. Dr. Hawkins and Dr. Ladinsky testified that at least twenty-two major

---

[10] *Amici curiae*, Latin for "friends of the court," refers to a group of people or institutions who are not parties to a lawsuit, but petition the court (or are requested by the court) to file a brief in the action because they have "a strong interest in the subject matter." *Amicus Curiae*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] The State *Amici* are the States of Arkansas, Alaska, Arizona, Georgia, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

[12] The Healthcare *Amici* are the American Academy of Pediatrics; the Alabama Chapter of the American Academy of Pediatrics; the Academic Pediatric Association; the American Academy of Child and Adolescent Psychiatry; the American Academy of Family Physicians; the American Academy of Nursing; the American Association of Physicians for Human Rights, Inc. *d/b/a* Health Professionals Advancing LGBTQ Equality; the American College of Obstetricians and Gynecologists; the American College of Osteopathic Pediatricians; the American College of Physicians; the American Medical Association; the American Pediatric Society; the American Psychiatric Association; the Association of American Medical Colleges; the Association of Medical School Pediatric Department Chairs; the Endocrine Society; the National Association of Pediatric Nurse Practitioners; the Pediatric Endocrine Society; the Society for Adolescent Health and Medicine; the Society for Pediatric Research; the Society of Pediatric Nurses; the Societies for Pediatric Urology; and the World Professional Association for Transgender Health.

medical associations in the United States endorse transitioning medications as well-established, evidence-based methods for treating gender dysphoria in minors. *Id.* at 25, 97–98, 126–27. They opined that there are risks associated with transitioning medications, but that the benefits of treating minors with these medications outweigh these risks in certain cases. *Id.* at 57–58, 121–22, 136, 170. They also explained that minors and their parents undergo a thorough screening process and give informed consent before any treatment regimen begins. *Id.* at 41, 59, 132; *see also Consent Form* (Doc. 78-41) at 1–14. Finally, they testified that, without these medications, minors with gender dysphoria suffer significant deterioration in their familial relationships and educational performance. *Tr.* at 35, 112–13.

Plaintiffs also called Healthcare Plaintiff Dr. Rachel Koe (a licensed pediatrician), Plaintiff Eknes-Tucker, and Parent Plaintiff Megan Poe to testify about their personal knowledge and experiences regarding the treatment of gender dysphoria in minors. *Id.* at 150–51, 170–71, 195. Parent Plaintiff Megan Poe specifically described the positive effects transitioning treatments have had on her fifteen-year-old transgender daughter, Minor Plaintiff Allison Poe. *Id.* at 157–68.

According to Megan, Allison was born a male, but has shown evidence of identifying as a female since she was two-years-old. *Id.* at 153–54. During her early adolescent years, Allisson suffered from severe depression and suicidality due to gender dysphoria. *Id.* at 156–57. She began taking transitioning medications at the

end of her sixth-grade year, and her health significantly improved as a result. *Id.* at 163. Megan explained that the medications have had no adverse effects on Allison and that Allison is now happy and "thriving." *Id.* at 166–67. When asked what would occur if her daughter stopped taking the medications, Megan responded that she feared her daughter would commit suicide. *Id.* at 167.

Intervening on behalf of Plaintiffs, the United States tendered Dr. Armand H. Antommaria as an expert in bioethics and treatment protocols for adolescents suffering from gender dysphoria. *Id.* at 213–26. He reiterated that transitioning medications are well-established, evidence-based methods for treating gender dysphoria in minors. *Id.* at 120–21.

Defendants called two witnesses. *Id.* at 253, 337. First, Defendants tendered Dr. James Cantor—a private psychologist in Toronto, Canada—to testify as an expert on psychology, human sexuality, research methodology, and the state of the research literature on gender dysphoria and its treatment. *Id.* at 253–54. Dr. Cantor opined that, due to the risks of transitioning medications, doctors should use a "watchful waiting" approach to treat gender dysphoria in minors. *Id.* at 281. That approach, according to Dr. Cantor, "refers specifically to withholding any decision about medical interventions until [doctors] have a better idea or feel more confident" that the minor's gender dysphoria will persist without medical intervention other than counseling. *Id.* Dr. Cantor further testified that several European countries have

11

restricted treating minors with transitioning medications due to growing concern about the medications' risks. *Id.* at 296–97.

On cross examination, however, Dr. Cantor admitted that: (1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitioning medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic. *Id.* at 306–09. Accordingly, the Court gave his testimony regarding the treatment of gender dysphoria in minors very little weight. Dr. Cantor also testified that no country in Europe (or elsewhere) has categorically banned treating gender dysphoria in minors with transitioning medications. *Id.* at 326–28. Unlike the Act, Dr. Cantor added, those countries allow such treatments under certain circumstances and for research purposes. *Id.* at 327–28.

Defendants' other witness was Sydney Wright, a twenty-three-year-old woman who took hormone therapies for gender dysphoria for roughly a year beginning when she was nineteen. *Id.* at 338, 351, 357. She testified that she now believes taking the medication was a mistake and that she no longer believes gender dysphoria is a legitimate medical diagnosis. *Id.* at 348–49, 355. She also testified

that she received her treatments in Georgia and never visited a gender clinic in Alabama. *Id.* at 359–61.

## II.   LEGAL STANDARDS

The purpose of a preliminary injunction "is to preserve the positions of the parties" pending trial. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). When a federal court preliminarily enjoins a state law passed by duly elected officials, the court effectively overrules a decision "of the people and, thus, in a sense interferes with the processes of democratic government." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). This is an extraordinary and drastic remedy. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

To receive a preliminary injunction, a movant must show that: (1) he or she has a substantial likelihood of success on the merits; (2) he or she will suffer irreparable injury absent injunctive relief; (3) the threatened injury to him or her "outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The movant bears the burden of persuasion on each element. *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021).

## III.   DISCUSSION

Plaintiffs and the United States seek to enjoin Section 4(a)(1)–(3) of the Act pending trial under Federal Rule of Civil Procedure 65. *Pls.' Mot.* (Doc. 7) at 2; *Intervenor Pl.'s Mot.* (Doc. 62) at 2. Under this rule, a court may issue a preliminary injunction only after giving notice to the adverse party. FED. R. CIV. P. 65(a)(1). Where injunctive relief is appropriate, the movant must give security "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.* at 65(c). Here, Defendants have received proper notice. The Court addresses whether Plaintiffs are entitled to preliminary injunctive relief before turning to the issue of security.

### A.   Substantial Likelihood of Success on the Merits

The Court first considers whether Plaintiffs are substantially likely to succeed on their claims. When a plaintiff brings multiple claims, a reviewing court must consider the plaintiff's likelihood of success on each claim. *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008). Here, Plaintiffs bring five causes of action: four constitutional claims and one preemption claim. The Court begins with Plaintiffs' constitutional claims.

#### 1.   *Plaintiffs' Constitutional Claims*

Plaintiffs' constitutional claims arise under the Civil Rights Act of 1871, 42 U.S.C. § 1983. *Compl.* (Doc. 1) at 28–30, 33–35. That statute guarantees "a

federal forum for claims of unconstitutional treatment at the hands of state officials[.]" *Heck v. Humphrey*, 512 U.S. 477, 480 (1994). To state a claim under § 1983, a plaintiff must allege: (1) the defendant deprived him of a right secured under federal law or the Constitution; and (2) such deprivation occurred under color of state law. *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

Parent Plaintiffs claim that the Act violates their constitutional right to direct the medical care of their children under the Due Process Clause of the Fourteenth Amendment. *Compl.* (Doc. 1) at 28–29. Minor Plaintiffs assert that the Act discriminates against them based on their sex in violation of the Fourteenth Amendment. *Id.* at 29–30. Plaintiffs collectively allege that the Act is void for vagueness under the Fifth and Fourteenth Amendments. *Id.* at 34–35. Finally, Plaintiffs collectively claim that the Act unlawfully restricts their speech under the First Amendment. *Id.* at 33–34. The Court addresses Plaintiffs' claims in that order.

### i.   *Substantive Due Process Claim*

Parent Plaintiffs assert that the Act violates their constitutional right to direct the medical care of their children under the Fourteenth Amendment. *Compl.* (Doc. 1) at 28–29.[13] The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV.

---

[13] Based on the record evidence, the Court finds that Parent Plaintiffs have standing to bring their Substantive Due Process Claim. Defendants raise no opposition to this conclusion.

The Clause protects against governmental violations of "certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). Fundamental rights are "those guaranteed by the Bill of Rights as well as certain 'liberty' and privacy interests implicit in the [D]ue [P]rocess [C]lause and the penumbra of constitutional rights." *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005).

A parent's right "to make decisions concerning the care, custody, and control of their children" is one of "the oldest of the fundamental liberty interests" recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). Encompassed within this right is the more specific right to direct a child's medical care. *See Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990) (recognizing "the right of parents to generally make decisions concerning the treatment to be given to their children").[14] Accordingly, parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Parham v. J.R.*, 442 U.S. 584, 604 (1979).

Against this backdrop, Parent Plaintiffs are substantially likely to show that they have a fundamental right to treat their children with transitioning medications subject to medically accepted standards and that the Act infringes on that right. The

---

[14] *See also PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (explaining that "the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care").

Act prevents Parent Plaintiffs from choosing that course of treatment for their children by criminalizing the use of transitioning medications to treat gender dysphoria in minors, even at the independent recommendation of a licensed pediatrician. Accordingly, Parent Plaintiffs are substantially likely to show that the Act infringes on their fundamental right to treat their children with transitioning medications subject to medically accepted standards.

The State counters that parents have no fundamental right to treat their children with experimental medications. *Defs.' Br.* (Doc. 74) at 120. To be sure, the parental right to autonomy is not limitless; the State may limit the right and intercede on a child's behalf when the child's health or safety is in jeopardy. *Bendiburg*, 909 F.2d at 470. But the fact that a pediatric treatment "involves risks does not automatically transfer the power" to choose that treatment "from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.

Defendants produce no credible evidence to show that transitioning medications are "experimental." While Defendants offer some evidence that transitioning medications pose certain risks, the uncontradicted record evidence is that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. Indeed, according to Defendants' own expert, no country or state in the world categorically bans their use as Alabama

has. Certainly, the science is quickly evolving and will likely continue to do so. But this is true of almost every medical treatment regimen. Risk alone does not make a medication experimental.

Moreover, the record shows that medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria, such as central precocious puberty, a condition in which a child enters puberty at a young age. Doctors have also long used hormone therapies for patients whose natural hormone levels are below normal. Based on the current record, Defendants fail to show that transitioning medications are experimental. Thus, Parent Plaintiffs are substantially likely to show that the Act violates their fundamental right to treat their children with transitioning medications subject to medically accepted standards.

Statutes that infringe on fundamental rights are constitutional only when they satisfy the most demanding standard of judicial review, strict scrutiny. *Williams v. Pryor*, 240 F.3d 944, 947 (11th Cir. 2001). To satisfy strict scrutiny, a statute must be "narrowly tailored" to achieve "a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). The State's interest in "safeguarding the physical and psychological well-being of a minor is a compelling one." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) (cleaned up).

Defendants proffer that the purpose of the Act is "to protect children from experimental medical procedures," the consequences of which neither they nor their parents often fully appreciate or understand. *Defs.' Br.* (Doc. 74) at 129; *see also* S.B. 184, ALA. 2022 REG. SESS. § 2(13)–(15) (Ala. 2022). Defendants also allege that the Act halts medical associations from "aggressively pushing" transitioning medications on minors. *Defs.' Br.* (Doc. 74) at 114; *see also* S.B. 184, ALA. 2022 REG. SESS. § 2(6) (Ala. 2022).

But as explained above, Defendants fail to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria. Nor do Defendants offer evidence to suggest that healthcare associations are aggressively pushing these medications on minors. Instead, the record shows that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. The record also indicates that parents undergo a thorough screening and consent process before they may choose these medications for their children.

Undoubtedly, transitioning medications carry risks. But again, the fact that pediatric medication "involves risks does not automatically transfer the power" to choose that medication "from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Parents, pediatricians, and psychologists—not the State or

this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis. Defendants' proffered purposes—which amount to speculative, future concerns about the health and safety of unidentified children—are not genuinely compelling justifications based on the record evidence. For this reason alone, the Act cannot survive strict scrutiny at this stage of litigation.

But even if Defendants' proffered purposes are genuinely compelling, the Act is not narrowly tailored to achieve those interests. A narrowly tailored statute employs the "least restrictive means" necessary to achieve its purpose. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). A statute is not narrowly tailored when "numerous and less-burdensome alternatives" are available to advance the statute's purpose. *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017). Put differently, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000).

Defendants applaud the efforts of several European countries to restrict minors from taking transitioning medications, but unlike Alabama's Act, these countries allow minors to take transitioning medications in exceptional circumstances on a case-by-case basis. *Defs.' Br.* (Doc. 74) at 76–82. According to Dr. Cantor, Defendants' own expert witness, no state or country in the entire world

20

has enacted a blanket ban of these medications other than Alabama. *Tr.* at 328. The Act, unlike the cited European regulations, does not even permit minors to take transitioning medications for research purposes, even though Defendants adamantly maintain that more research on them is needed. *Id.* at 326–27; *Defs.' Br.* (Doc. 74) at 116. Because Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored at this stage of litigation.

In sum, Parent Plaintiffs have a fundamental right to direct the medical care of their children. This right includes the more specific right to treat their children with transitioning medications subject to medically accepted standards. The Act infringes on that right and, as such, is subject to strict scrutiny. At this stage of litigation, the Act falls short of that standard because it is not narrowly tailored to achieve a compelling government interest. Accordingly, Parent Plaintiffs are substantially likely to succeed on their Substantive Due Process claim.

#### ii.    *Equal Protection Claim*

Minor Plaintiffs claim that the Act discriminates against them based on their sex in violation of the Fourteenth Amendment. *Compl.* (Doc. 1) at 29–30.[15] The Equal Protection Clause provides that no State shall "deny to any person within its

---

[15] Based on the record evidence, the Court finds that Minor Plaintiffs have standing to bring their Equal Protection claim. Defendants raise no opposition to this conclusion. However, Parent Plaintiffs, Healthcare Plaintiffs, and Plaintiff Eknes-Tucker do not explain—nor is it readily apparent—how they have standing to bring an Equal Protection claim and, thus, are not substantially likely to succeed on the merits of their claim.

jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The Clause's chief purpose "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).

As the Supreme Court recently explained, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020). Governmental classification based on an individual's gender nonconformity equates to a sex-based classification for purposes of the Equal Protection Clause. *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011). Here, the Act prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity. *See* S.B. 184, ALA. 2022 REG. SESS. § 4(a)(1)–(3) (Ala. 2022). The Act therefore constitutes a sex-based classification for purposes of the Fourteenth Amendment.

The State views things differently. The State argues that the Act creates two categories of people: (1) minors who seek transitioning medications "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex";

and (2) "all other minors." *Defs.' Br.* (Doc. 74) at 93. (quoting S.B. 184, ALA. 2022 REG. SESS. § 4(a) (Ala. 2022)). Because transgender minors fall into both categories, the State reasons, the Act is not a sex-based classification. *Id.* at 94.

The fundamental flaw in this argument is that the first category consists entirely of transgender minors. The Act categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity. In this way, the Act places a special burden on transgender minors because their gender identity does not match their birth sex. The Act therefore amounts to a sex-based classification for purposes of the Equal Protection Clause. *See Glenn*, 663 F.3d at 1317 (explaining that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination").

Sex-based classifications are constitutional only when they satisfy a heightened standard of review known as intermediate scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). To satisfy this standard, a classification must substantially relate to an important government interest. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The State bears the burden to proffer an exceedingly persuasive justification for the classification. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). An exceedingly persuasive justification is one that is "genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The State again argues that the Act's purpose is to protect minors from experimental medications and to stop medical providers from "aggressively pushing" these medications on minors. *Defs.' Br.* (Doc. 74) at 109–120. As explained above, the State puts on no evidence to show that transitioning medications are "experimental." The record indicates that at least twenty-two major medical associations in the United States endorse these medications as well-established, evidence-based methods for treating gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. Finally, nothing in the record shows that medical providers are pushing transitioning medications on minors. Accordingly, the State's proffered justifications are hypothesized, not exceedingly persuasive. Thus, Minor Plaintiffs are substantially likely to succeed on their Equal Protection claim.

### iii. Void-for-Vagueness Claim

Plaintiffs collectively claim that the Act is void for vagueness under the Fifth and Fourteenth Amendments because it does not sufficiently define "what actions constitute 'caus[ing]' any of the proscribed activities upon a minor." *Compl.* (Doc. 1) at 34–35. Under the void-for-vagueness doctrine, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004) (quoting *United States v. Fisher*, 289 F.3d 1329, 1333

(11th Cir. 2002)). A federal court reviews a void-for-vagueness claim only when the litigant alleges a constitutional harm. *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349–50 (11th Cir. 2011).

In this context, constitutional harm comes in two forms: (1) where a criminal defendant violates a vague statute, comes under prosecution, and then moves to dismiss the charges on the grounds that he or she lacked notice that his or her conduct was unlawful; and (2) where a civil plaintiff is "chilled from engaging in constitutional activity" due to a vague statute. *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1241 (11th Cir. 2015). Here, Plaintiffs' void-for-vagueness claim falls into the second category.

Plaintiffs, however, are not substantially likely to succeed on their claim. Under ALA. CODE § 13A-2-5(a), a person is liable for causing a crime "if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." The fact that the Act has a scienter requirement greatly weighs against Plaintiffs' void-for-vagueness claim. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a

vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea.").

Also weighing against Plaintiffs' claim is the State's interpretation of the Act. During the preliminary injunction hearing, Alabama Solicitor General Edmund LaCour explained that a person must administer or prescribe transitioning medications to violate the Act. *Tr.* at 409–11. General LaCour opined that a person cannot violate the Act simply by advising a minor to take transitioning medications or by driving a minor to a gender clinic where transitioning medications are administered. *Id.* at 410.

Additionally, the statutory scienter requirement and the State's interpretation both align with the modern, plain-language definition of the word cause. According to Merriam-Webster's Dictionary, "cause" means to "effect by command, authority, or force" or "bring into existence" an action. *Cause*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). Based on the record evidence, Plaintiffs do not show that they have been chilled from engaging in constitutional activity due to the Act. Plaintiffs are therefore not substantially likely to succeed on their void-for-vagueness claim at this stage of litigation.

### iv.    Free Speech Claim

Plaintiffs collectively claim that the Act violates their First Amendment right to free speech by prohibiting "any 'person,' including physicians, healthcare

professionals, or even parents, from engaging in speech that would 'cause' a transgender minor to receive medical treatment for gender dysphoria." *Compl.* (Doc. 1) at 33–34. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I. At its core, "the First Amendment means that government" generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

The Amendment, however, offers no protection to words that incite or constitute criminal activity. For example, sexually derogatory remarks may violate Title VII's general prohibition of sexual discrimination in the workplace. 42 U.S.C. § 2000-e2; *see also* 29 C.F.R. § 1604.11(a) (explaining that, under certain circumstances, "[u]nwelcome sexual advances, *requests* for sexual favors, and other *verbal* or physical conduct of a sexual nature" are actionable as sexual harassment under Title VII (emphasis added)). Likewise, "[s]peech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime." *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004). More examples abound, but the point is this: Where the State "does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992).

As explained *supra* Section III.A.1.iii, the Act does not criminalize speech that could indirectly lead to a minor taking transitioning medications. Rather, the only speech criminalized by Act is that which compels the administration or prescription of transitioning medications to minors. Accordingly, the Act targets conduct (administration and prescription), not speech. Plaintiffs are therefore not substantially likely to succeed on their First Amendment claim.

## 2.   *Plaintiffs' Preemption Claim*

Parent Plaintiffs, Minor Plaintiffs, and Healthcare Plaintiffs bring their preemption claim under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. *Compl.* (Doc. 1) at 31. Section 1557, through its incorporation of the Title IX, prohibits discrimination based on sex and the denial of benefits based on sex in any health program or activity that receives federal funding. 42 U.S.C. § 18116(a); 20 U.S.C. § 1681 *et seq.* Here, Plaintiffs generally rely on the same arguments Minor Plaintiffs made in support of their Equal Protection claim. *Pls.' Br.* (Doc. 8) at 49–52; *Tr.* at 379.

At this stage of litigation, Plaintiffs' preemption claim fails. As explained *supra* Section III.A.1.ii, only Minor Plaintiffs are substantially likely to succeed on their Equal Protection claim. Additionally, Section 1557—by incorporating the enforcement mechanism of Title IX—"is enforceable against institutions and programs that receive federal funds, but does not authorize suits against individuals."

*Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015). It is presently unclear how Plaintiffs may bring their preemption claim against Defendants who are state officials, not institutions. Due to these concerns, Plaintiffs are not substantially likely to succeed on their preemption claim.

### B.   Irreparable Harm

The Court next considers whether Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm absent injunctive relief.[16] Harm "is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. An irreparable harm is one that is "actual and imminent, not remote or speculative." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013). The risk of suffering severe medical harm constitutes irreparable harm. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (explaining that a risk of suffering "a severe medical setback" is an irreparable injury); *Blaine v. N. Brevard Cnty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1306 (M.D. Fla. 2018) (finding irreparable harm where doctor plaintiffs could not provide necessary medical care to their patients).

The Act prevents Parent Plaintiffs from treating their children with transitioning medications subject to medically accepted standards. S.B. 184, ALA.

---

[16] *See Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (explaining that a court need not consider whether a plaintiff shows irreparable harm if he or she does not show a substantial likelihood of success on his or her claims).

2022 REG. SESS. § 4(a)(1)–(3) (Ala. 2022). The record shows that, without these medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality. *Tr.* at 20, 167. Additionally, the evidence shows that Minor Plaintiffs will suffer significant deterioration in their familial relationships and educational performance. *Id.* at 35, 112–13. The Court therefore concludes that Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm absent injunctive relief.

## C.   Balance of Harms & Public Interests

The Court now considers the final two elements together. To satisfy the third and fourth elements of a preliminary injunction, a plaintiff must show that the harm she will likely suffer without an injunction outweighs any harm that her opponent will suffer from the injunction and that the injunction would not disserve (or be adverse to) the public interest. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). These factors merge when the State is the opponent. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (per curiam).

This case largely presents two competing interests. On one hand, "preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other

strict legal and equitable principles that restrain courts." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. On the other hand, "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince v. Massachusetts*, 321 U.S. 158, 168–69 (1944).

Based on the record evidence, the Court finds that the imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from an injunction. The Court further finds that an injunction is not adverse to the public interest. To the contrary, enjoining the Act upholds and reaffirms the "enduring American tradition" that parents—not the States or federal courts—play the primary role in nurturing and caring for their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Accordingly, the final two factors favor injunctive relief.

## IV. SECURITY

Defendants argue that, if injunctive relief is appropriate, the Court should require each Healthcare Plaintiff to post a $1 million security. *Defs.' Br.* (Doc. 74) at 159–60.[17] Calculating the "amount of an injunction bond is within the sound discretion of the district court." *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp.*,

---

[17] According to Defendants, this amount represents that "by which [Healthcare] Plaintiffs will be unjustly enriched should they be allowed to administer profitable (and illegal) medical procedures to kids." *Defs.' Br.* (Doc. 74) at 160.

112 F.3d 1125, 1127 (11th Cir. 1997) (per curiam). Here, the Court finds that a security bond is not necessary for three reasons. First, as explained *supra* Part III, Healthcare Plaintiffs themselves are not entitled to preliminary injunctive relief. Second, Federal Rule of Civil Procedure 65 does not require the United States to pay security. FED. R. CIV. P. 65(c). Finally, Defendants do not allege that they will suffer any cost or economic harm if they are wrongly enjoined from enforcing the Act. *Defs.' Br.* (Doc. 74) at 159–60. The Court therefore relieves Plaintiffs from posting security under Rule 65.

## V.   CONCLUSION

For these reasons, the Court **GRANTS** in part Plaintiffs' motion for preliminary injunction (Doc. 7) and **ENJOINS** Defendants from enforcing Section 4(a)(1)–(3) of the Act pending trial. The Court **GRANTS** in part the United States's motion for preliminary injunction (Doc. 62) to the same degree and effect. All other provisions of the Act remain enforceable.

**DONE** and **ORDERED** May 13, 2022.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

# DOC. 108

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER,<br>    *et al.*, | ) <br> ) <br> ) |
|     *Plaintiffs*, | ) <br> ) |
| & | ) <br> ) |
| UNITED STATES OF AMERICA, | ) <br> ) |
|     *Plaintiff-Intervenor*, | ) <br> ) |
| v. | )    No. 2:22-cv-00184-LCB <br> ) |
| STEVE MARSHALL, in his official<br>capacity as Attorney General of the<br>State of Alabama,<br>    *et al.*, | ) <br> ) <br> ) <br> ) |
|     *Defendants*. | ) <br> ) |

## DEFENDANTS' NOTICE OF APPEAL OF ORDER GRANTING PRELIMINARY INJUNCTION (DOC. 107)

Notice is hereby given that all Defendants in the above-captioned case appeal

to the United States Court of Appeals for the Eleventh Circuit from this Court's May

13, 2022 Preliminary Injunction Opinion and Order (Doc. 107).

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

Christopher Mills
(SC Bar No. 101050)
(Admitted *pro hac vice*)

SPERO LAW LLC
557 East Bay St.
#22251
Charleston, SC 29451
Telephone: (843) 606-0640
cmills@spero.law

A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitors General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

*Counsel for Defendants*

MAY 16, 2022

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF

system on May 16, 2022, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
*Counsel for Defendants*

# DOC. 112

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

ONE CHURCH STREET, RM B-110

MONTGOMERY, ALABAMA 36104

DEBRA P. HACKETT, CLERK                                          TELEPHONE (334) 954-3600

May 19, 2022

## NOTICE OF CORRECTION

**From:**        **Clerk's Office**

**Case Style:**        **Eknes-Tucker et al v. Marshall et al**

**Case Number:**        **2:22-cv-00184-LCB**

**This Notice of Correction was filed in the referenced case this date to attach the correct main PDF document to correct syntax.**

**The correct PDF document is attached to this notice for your review. Reference is made to document #107 filed on 5/13/2022.**

# DOC. 112-1

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **PAUL A. EKNES-TUCKER,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>OPINION & ORDER</u>

Several individuals and the United States challenge the constitutionality of the Alabama Vulnerable Child Compassion and Protection Act.[1] In part, the Act restricts transgender minors from utilizing puberty blockers and hormone therapies. Because the Supreme Court and the Court of Appeals for the Eleventh Circuit have made clear that: (1) parents have a fundamental right to direct the medical care of their children subject to accepted medical standards; and (2) discrimination based on gender-nonconformity equates to sex discrimination, the Court finds that there is a substantial likelihood that Section 4(a)(1)–(3) of the Act is unconstitutional and, thus, enjoins Defendants from enforcing that portion of the Act pending trial. However, all other provisions of the Act remain in effect, specifically: (1) the

---

[1] Based on their oral representations during a May 4, 2022 hearing, Plaintiffs seek to enjoin only Section 4(a)(1)–(3) of the Act. For purposes of this opinion, all references to "the Act" refer to these subdivisions unless noted otherwise.

provision that bans sex-altering surgeries on minors; (2) the provision prohibiting school officials from keeping certain gender-identity information of children secret from their parents; and (3) the provision that prohibits school officials from encouraging or compelling children to keep certain gender-identity information secret from their parents.

## I.      BACKGROUND

Regarding a child's belief that they might be transgender, Merriam-Webster's Dictionary defines a "transgender" person as one whose gender identity is different from the sex the person had or was identified as having at birth. *Transgender*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). The Dictionary defines "gender identity" as a person's internal sense of being a male or a female. *Gender Identity*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). These terms and definitions are largely consistent with those used by the parties. Accordingly, the Court relies on these terms throughout this opinion, but recognizes that they might mean different things to different people and in different contexts.

According to the uncontradicted record evidence, some transgender minors suffer from a mental health condition known as gender dysphoria. *Tr.* at 30.[2] Gender dysphoria is a clinically diagnosed incongruence between one's gender identity and

---

[2] *"Tr."* is a consecutively paginated transcript of the two-day preliminary injunction hearing the Court held on May 5–6, 2022. For clarity, the Court cites to the internal pagination of the transcript rather than the ECF pagination.

assigned gender. *DSM-5* (Doc. 69-17) at 4. If untreated, gender dysphoria may cause or lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. *Tr.* at 20. According to the World Professional Association for Transgender Health (WPATH), an organization whose mission is to promote education and research about transgender healthcare, gender dysphoria in adolescents (minors twelve and over) is more likely to persist into adulthood than gender dysphoria in children (minors under twelve). *WPATH Standards of Care* (Doc. 69-18) at 17.[3]

In some cases, physicians treat gender dysphoria in minors with a family of medications known as GnRH agonists, commonly referred to as puberty blockers. *Id.* at 24; *Tr.* at 103. After a minor has been on puberty blockers for one to three years, doctors may then use hormone therapies to masculinize or feminize his or her body. *Tr.* at 108–11, 131. The primary effect of these treatments is to delay physical maturation, allowing transgender minors to socially transition their gender while they await adulthood. *Id.* at 105–06, 110–11. For clarity and conciseness, the Court refers to puberty blockers and hormone therapies used for these purposes as "transitioning medications."

Like all medications, transitioning medications come with risks. *Tr.* at 121–22. Known risks, for example, include loss of fertility and sexual function. *Id.*

---

[3] Plaintiffs, the State, and the United States individually introduced the WPATH standards into evidence during the May 5–6 preliminary injunction hearing.

at 132–33. Nevertheless, WPATH recognizes transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications. *WPATH Standards of Care* (Doc. 69-18) at 19. The American Medical Association, the American Pediatric Society, the American Psychiatric Association, the Association of American Medical Colleges, and at least eighteen additional major medical associations endorse these guidelines as evidence-based methods for treating gender dysphoria in minors. *Tr.* at 97–98; *Healthcare Amici Br.* (Doc. 91-1) at 15.[4]

The Alabama Vulnerable Child Compassion and Protection Act states in pertinent part:

> Section 4. (a) . . . [N]o person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3) Prescribing or administering supraphysiologic doses of estrogen to males.

---

[4] For a full list of the twenty-two major medical associations that endorse these guidelines, see *infra* note 12.

(4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

. . .

(c) A violation of this section is a Class C felony.

Section 5. No nurse, counselor, teacher, principal, or other administrative official at a public or private school attended by a minor shall do either of the following:

(1) Encourage or coerce a minor to withhold from the minor's parent or legal guardian the fact that the minor's perception of his or her gender or sex is inconsistent with the minor's sex.

(2) Withhold from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex.

S.B. 184, ALA. 2022 REG. SESS. §§ 4–5 (Ala. 2022). The Act defines a "minor" as anyone under the age of nineteen. *Id.* § 3(1); ALA. CODE § 43-8-1(18). The Act defines "sex" as "[t]he biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." S.B. 184, ALA. 2022 REG. SESS. § 3(3) (Ala. 2022).

In support of these prohibitions, the Legislature made several legislative findings. *Id.* § 2. The Legislature found in part that "[s]ome in the medical community are aggressively pushing" minors to take transitioning medications, which the Act describes as "unproven, poorly studied . . . interventions" that cause "numerous harmful effects for minors, as well as risks of effects simply unknown due to the new and experimental nature of these interventions." *Id.* § 2(6), (11). The Legislature went on to find that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications" of these treatments. *Id.* § 2(15). Thus, the Legislature concluded, "the decision to pursue" these treatments "should not be presented to or determined for minors[.]" *Id.* § 2(16).

Alabama legislators passed the Act on April 7, 2022.[5] Governor Kay Ivey signed the Act into law the following day.[6] In the week that followed, civil rights groups filed two lawsuits challenging the Act's constitutionality.[7] In *Ladinsky v. Ivey*, Case No. 2:22-cv-447 (N.D. Ala. 2022), several plaintiffs challenged the Act in the United States District Court of the Northern District of Alabama. The case

---

[5] Jo Yurcaba, *Alabama Passes Bills to Target Trans Minors and LGBTQ Classroom Discussion*, NBCNEWS.COM (Apr. 7, 2022, 4:22 PM), https://www.nbcnews.com/nbc-out/out-politics-and-policy/alabama-passes-bills-targeting-trans-minors-lgbtq-classroom-discussion-rcna23444.

[6] Madeleine Carlisle, *Alabama's Wave of Anti-LGBTQ Legislation Could Have National Consequences*, TIME.COM (Apr. 15, 2022, 11:40 AM), https://time.com/6167472/alabama-anti-lgbtq-legislation/.

[7] *Alabama Law Banning Transgender Medication Challenged in Two Lawsuits*, CBSNEWS.COM (Apr. 11, 2022, 10:05 PM), https://www.cbsnews.com/news/alabama-transgender-law-lawsuits/.

was randomly assigned to United States District Judge Anna M. Manasco. Judge

Manasco recused, and the case was randomly reassigned to United States Magistrate

Judge Staci G. Cornelius. After the parties declined to proceed before Judge

Cornelius in accordance with 28 U.S.C. § 636(c), the case was randomly reassigned

to the Honorable Annemarie C. Axon.

  With *Ladinsky* pending, a separate set of plaintiffs challenged the Act in the

United States District Court of the Middle District of Alabama. That case, styled

*Walker v. Marshall*, Case No. 2:22-cv-167 (M.D. Ala. 2022), was randomly assigned

to Chief United States District Judge Emily C. Marks. The *Walker* plaintiffs moved

to enjoin enforcement of the Act and moved to reassign the case to United States

District Judge Myron H. Thompson, alleging that he had previously presided over a

similar case. The parties, however, later consented to transferring the case to the

Northern District of Alabama for consolidation with *Ladinsky*. At that time, the

*Walker* plaintiffs withdrew their motion to reassign.

  On April 15, 2022, Chief Judge Marks transferred *Walker* to the Northern

District of Alabama in accordance with the "first-filed" rule and 28 U.S.C. § 1404(a).

The case was randomly assigned to this Court. Judge Axon then transferred *Ladinsky*

to this Court for consolidation with *Walker*. That same day, at 6:24 p.m. CDT, the

*Walker* plaintiffs filed a notice of voluntary dismissal without prejudice under

Federal Rule of Civil Procedure 41(a)(1)(A)(i). The *Ladinsky* plaintiffs voluntarily

dismissed their case nine minutes later. Neither the *Walker* plaintiffs nor the *Ladinsky* plaintiffs explained their respective dismissals, but counsel for *Ladinsky* informed the press: "We do plan to refile imminently[.]"[8]

Sure enough, on April 19, four transgender minors (Minor Plaintiffs), their parents (Parent Plaintiffs), a child psychologist and a pediatrician (Healthcare Plaintiffs), and Reverend Paul A. Eknes-Tucker filed this suit in the United States District Court of the Middle District of Alabama and moved to enjoin the Act's enforcement pending trial. The case was randomly assigned to United States District Judge R. Austin Huffaker, Jr. Due to this Court's familiarity with *Ladinsky* and *Walker*, Judge Huffaker reassigned the case to this Court to expedite disposition of Plaintiffs' motion for preliminary injunction. With the Act set to take effect on May 8, the Court entered an abbreviated briefing schedule and set a hearing on Plaintiffs' motion for May 5–6.

Just days before the hearing, the United States moved to intervene on behalf of Plaintiffs under Federal Rule of Civil Procedure 24.[9] In the process, the United States filed its own motion to enjoin enforcement of the Act and requested to

---

[8] Paul Gattis, *Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could be Refiled*, AL.COM, https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html (last updated Apr. 16, 2022, 9:22 PM).

[9] The United States's amended intervenor complaint does not add any additional claims, name any new defendants, or seek to expand the relief sought by Plaintiffs. *Compare Am. Intervenor Compl.* (Doc. 92) at 4–5, 13–14, *with Compl.* (Doc. 1) at 6–8, 28–35.

participate in the preliminary injunction hearing. Additionally, fifteen states moved for leave to proceed as *amici curiae*[10] and to file a brief in support of Defendants.[11] Twenty-two healthcare organizations also moved for leave to proceed as *amici curiae* and to file a brief in support of Plaintiffs.[12] Ultimately, the Court granted these motions in full, took the *amici* briefs under advisement, and gave the United States leave to participate during the preliminary injunction hearing.

During that hearing, the parties submitted hundreds of pages of medical evidence and called several live witnesses. Plaintiffs tendered Dr. Linda Hawkins and Dr. Morissa Ladinsky as experts in the treatment of gender dysphoria in minors. *Tr.* at 16, 92. Dr. Hawkins and Dr. Ladinsky testified that at least twenty-two major

---

[10] *Amici curiae*, Latin for "friends of the court," refers to a group of people or institutions who are not parties to a lawsuit, but petition the court (or are requested by the court) to file a brief in the action because they have "a strong interest in the subject matter." *Amicus Curiae*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] The State *Amici* are the States of Arkansas, Alaska, Arizona, Georgia, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

[12] The Healthcare *Amici* are the American Academy of Pediatrics; the Alabama Chapter of the American Academy of Pediatrics; the Academic Pediatric Association; the American Academy of Child and Adolescent Psychiatry; the American Academy of Family Physicians; the American Academy of Nursing; the American Association of Physicians for Human Rights, Inc. *d/b/a* Health Professionals Advancing LGBTQ Equality; the American College of Obstetricians and Gynecologists; the American College of Osteopathic Pediatricians; the American College of Physicians; the American Medical Association; the American Pediatric Society; the American Psychiatric Association; the Association of American Medical Colleges; the Association of Medical School Pediatric Department Chairs; the Endocrine Society; the National Association of Pediatric Nurse Practitioners; the Pediatric Endocrine Society; the Society for Adolescent Health and Medicine; the Society for Pediatric Research; the Society of Pediatric Nurses; the Societies for Pediatric Urology; and the World Professional Association for Transgender Health.

medical associations in the United States endorse transitioning medications as well-established, evidence-based methods for treating gender dysphoria in minors. *Id.* at 25, 97–98, 126–27. They opined that there are risks associated with transitioning medications, but that the benefits of treating minors with these medications outweigh these risks in certain cases. *Id.* at 57–58, 121–22, 136, 170. They also explained that minors and their parents undergo a thorough screening process and give informed consent before any treatment regimen begins. *Id.* at 41, 59, 132; *see also Consent Form* (Doc. 78-41) at 1–14. Finally, they testified that, without these medications, minors with gender dysphoria suffer significant deterioration in their familial relationships and educational performance. *Tr.* at 35, 112–13.

Plaintiffs also called Healthcare Plaintiff Dr. Rachel Koe (a licensed pediatrician), Plaintiff Eknes-Tucker, and Parent Plaintiff Megan Poe to testify about their personal knowledge and experiences regarding the treatment of gender dysphoria in minors. *Id.* at 150–51, 170–71, 195. Parent Plaintiff Megan Poe specifically described the positive effects transitioning treatments have had on her fifteen-year-old transgender daughter, Minor Plaintiff Allison Poe. *Id.* at 157–68.

According to Megan, Allison was born a male, but has shown evidence of identifying as a female since she was two-years-old. *Id.* at 153–54. During her early adolescent years, Allisson suffered from severe depression and suicidality due to gender dysphoria. *Id.* at 156–57. She began taking transitioning medications at the

end of her sixth-grade year, and her health significantly improved as a result. *Id.* at 163. Megan explained that the medications have had no adverse effects on Allison and that Allison is now happy and "thriving." *Id.* at 166–67. When asked what would occur if her daughter stopped taking the medications, Megan responded that she feared her daughter would commit suicide. *Id.* at 167.

Intervening on behalf of Plaintiffs, the United States tendered Dr. Armand H. Antommaria as an expert in bioethics and treatment protocols for adolescents suffering from gender dysphoria. *Id.* at 213–26. He reiterated that transitioning medications are well-established, evidence-based methods for treating gender dysphoria in minors. *Id.* at 120–21.

Defendants called two witnesses. *Id.* at 253, 337. First, Defendants tendered Dr. James Cantor—a private psychologist in Toronto, Canada—to testify as an expert on psychology, human sexuality, research methodology, and the state of the research literature on gender dysphoria and its treatment. *Id.* at 253–54. Dr. Cantor opined that, due to the risks of transitioning medications, doctors should use a "watchful waiting" approach to treat gender dysphoria in minors. *Id.* at 281. That approach, according to Dr. Cantor, "refers specifically to withholding any decision about medical interventions until [doctors] have a better idea or feel more confident" that the minor's gender dysphoria will persist without medical intervention other than counseling. *Id.* Dr. Cantor further testified that several European countries have

11

restricted treating minors with transitioning medications due to growing concern about the medications' risks. *Id.* at 296–97.

On cross examination, however, Dr. Cantor admitted that: (1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitioning medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic. *Id.* at 306–09. Accordingly, the Court gave his testimony regarding the treatment of gender dysphoria in minors very little weight. Dr. Cantor also testified that no country in Europe (or elsewhere) has categorically banned treating gender dysphoria in minors with transitioning medications. *Id.* at 326–28. Unlike the Act, Dr. Cantor added, those countries allow such treatments under certain circumstances and for research purposes. *Id.* at 327–28.

Defendants' other witness was Sydney Wright, a twenty-three-year-old woman who took hormone therapies for gender dysphoria for roughly a year beginning when she was nineteen. *Id.* at 338, 351, 357. She testified that she now believes taking the medication was a mistake and that she no longer believes gender dysphoria is a legitimate medical diagnosis. *Id.* at 348–49, 355. She also testified

that she received her treatments in Georgia and never visited a gender clinic in Alabama. *Id.* at 359–61.

## II.   LEGAL STANDARDS

The purpose of a preliminary injunction "is to preserve the positions of the parties" pending trial. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). When a federal court preliminarily enjoins a state law passed by duly elected officials, the court effectively overrules a decision "of the people and, thus, in a sense interferes with the processes of democratic government." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). This is an extraordinary and drastic remedy. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

To receive a preliminary injunction, a movant must show that: (1) he or she has a substantial likelihood of success on the merits; (2) he or she will suffer irreparable injury absent injunctive relief; (3) the threatened injury to him or her "outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The movant bears the burden of persuasion on each element. *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021).

## III.  DISCUSSION

Plaintiffs and the United States seek to enjoin Section 4(a)(1)–(3) of the Act

pending trial under Federal Rule of Civil Procedure 65. *Pls.' Mot.* (Doc. 7) at 2;

*Intervenor Pl.'s Mot.* (Doc. 62) at 2. Under this rule, a court may issue a preliminary

injunction only after giving notice to the adverse party. FED. R. CIV. P. 65(a)(1).

Where injunctive relief is appropriate, the movant must give security "to pay the

costs and damages sustained by any party found to have been wrongfully enjoined

or restrained." *Id.* at 65(c). Here, Defendants have received proper notice. The Court

addresses whether Plaintiffs are entitled to preliminary injunctive relief before

turning to the issue of security.

### A.    Substantial Likelihood of Success on the Merits

The Court first considers whether Plaintiffs are substantially likely to succeed

on their claims. When a plaintiff brings multiple claims, a reviewing court must

consider the plaintiff's likelihood of success on each claim. *See N. Am. Med. Corp.*

*v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008). Here, Plaintiffs

bring five causes of action: four constitutional claims and one preemption claim. The

Court begins with Plaintiffs' constitutional claims.

#### 1.    Plaintiffs' Constitutional Claims

Plaintiffs' constitutional claims arise under the Civil Rights Act of 1871,

42 U.S.C. § 1983. *Compl.* (Doc. 1) at 28–30, 33–35. That statute guarantees "a

14

federal forum for claims of unconstitutional treatment at the hands of state officials[.]" *Heck v. Humphrey*, 512 U.S. 477, 480 (1994). To state a claim under § 1983, a plaintiff must allege: (1) the defendant deprived him of a right secured under federal law or the Constitution; and (2) such deprivation occurred under color of state law. *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

Parent Plaintiffs claim that the Act violates their constitutional right to direct the medical care of their children under the Due Process Clause of the Fourteenth Amendment. *Compl.* (Doc. 1) at 28–29. Minor Plaintiffs assert that the Act discriminates against them based on their sex in violation of the Fourteenth Amendment. *Id.* at 29–30. Plaintiffs collectively allege that the Act is void for vagueness under the Fifth and Fourteenth Amendments. *Id.* at 34–35. Finally, Plaintiffs collectively claim that the Act unlawfully restricts their speech under the First Amendment. *Id.* at 33–34. The Court addresses Plaintiffs' claims in that order.

i.    *Substantive Due Process Claim*

Parent Plaintiffs assert that the Act violates their constitutional right to direct the medical care of their children under the Fourteenth Amendment. *Compl.* (Doc. 1) at 28–29.[13] The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV.

---

[13] Based on the record evidence, the Court finds that Parent Plaintiffs have standing to bring their Substantive Due Process Claim. Defendants raise no opposition to this conclusion.

The Clause protects against governmental violations of "certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). Fundamental rights are "those guaranteed by the Bill of Rights as well as certain 'liberty' and privacy interests implicit in the [D]ue [P]rocess [C]lause and the penumbra of constitutional rights." *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005).

A parent's right "to make decisions concerning the care, custody, and control of their children" is one of "the oldest of the fundamental liberty interests" recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). Encompassed within this right is the more specific right to direct a child's medical care. *See Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990) (recognizing "the right of parents to generally make decisions concerning the treatment to be given to their children").[14] Accordingly, parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Parham v. J.R.*, 442 U.S. 584, 604 (1979).

Against this backdrop, Parent Plaintiffs are substantially likely to show that they have a fundamental right to treat their children with transitioning medications subject to medically accepted standards and that the Act infringes on that right. The

---

[14] *See also PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (explaining that "the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care").

Act prevents Parent Plaintiffs from choosing that course of treatment for their children by criminalizing the use of transitioning medications to treat gender dysphoria in minors, even at the independent recommendation of a licensed pediatrician. Accordingly, Parent Plaintiffs are substantially likely to show that the Act infringes on their fundamental right to treat their children with transitioning medications subject to medically accepted standards.

The State counters that parents have no fundamental right to treat their children with experimental medications. *Defs.' Br.* (Doc. 74) at 120. To be sure, the parental right to autonomy is not limitless; the State may limit the right and intercede on a child's behalf when the child's health or safety is in jeopardy. *Bendiburg*, 909 F.2d at 470. But the fact that a pediatric treatment "involves risks does not automatically transfer the power" to choose that treatment "from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.

Defendants produce no credible evidence to show that transitioning medications are "experimental." While Defendants offer some evidence that transitioning medications pose certain risks, the uncontradicted record evidence is that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. Indeed, according to Defendants' own expert, no country or state in the world categorically bans their use as Alabama

has. Certainly, the science is quickly evolving and will likely continue to do so. But this is true of almost every medical treatment regimen. Risk alone does not make a medication experimental.

Moreover, the record shows that medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria, such as central precocious puberty, a condition in which a child enters puberty at a young age. Doctors have also long used hormone therapies for patients whose natural hormone levels are below normal. Based on the current record, Defendants fail to show that transitioning medications are experimental. Thus, Parent Plaintiffs are substantially likely to show that the Act violates their fundamental right to treat their children with transitioning medications subject to medically accepted standards.

Statutes that infringe on fundamental rights are constitutional only when they satisfy the most demanding standard of judicial review, strict scrutiny. *Williams v. Pryor*, 240 F.3d 944, 947 (11th Cir. 2001). To satisfy strict scrutiny, a statute must be "narrowly tailored" to achieve "a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). The State's interest in "safeguarding the physical and psychological well-being of a minor is a compelling one." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) (cleaned up).

18

Defendants proffer that the purpose of the Act is "to protect children from experimental medical procedures," the consequences of which neither they nor their parents often fully appreciate or understand. *Defs.' Br.* (Doc. 74) at 129; *see also* S.B. 184, ALA. 2022 REG. SESS. § 2(13)–(15) (Ala. 2022). Defendants also allege that the Act halts medical associations from "aggressively pushing" transitioning medications on minors. *Defs.' Br.* (Doc. 74) at 114; *see also* S.B. 184, ALA. 2022 REG. SESS. § 2(6) (Ala. 2022).

But as explained above, Defendants fail to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria. Nor do Defendants offer evidence to suggest that healthcare associations are aggressively pushing these medications on minors. Instead, the record shows that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. The record also indicates that parents undergo a thorough screening and consent process before they may choose these medications for their children.

Undoubtedly, transitioning medications carry risks. But again, the fact that pediatric medication "involves risks does not automatically transfer the power" to choose that medication "from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Parents, pediatricians, and psychologists—not the State or

this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis. Defendants' proffered purposes—which amount to speculative, future concerns about the health and safety of unidentified children—are not genuinely compelling justifications based on the record evidence. For this reason alone, the Act cannot survive strict scrutiny at this stage of litigation.

But even if Defendants' proffered purposes are genuinely compelling, the Act is not narrowly tailored to achieve those interests. A narrowly tailored statute employs the "least restrictive means" necessary to achieve its purpose. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). A statute is not narrowly tailored when "numerous and less-burdensome alternatives" are available to advance the statute's purpose. *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017). Put differently, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000).

Defendants applaud the efforts of several European countries to restrict minors from taking transitioning medications, but unlike Alabama's Act, these countries allow minors to take transitioning medications in exceptional circumstances on a case-by-case basis. *Defs.' Br.* (Doc. 74) at 76–82. According to Dr. Cantor, Defendants' own expert witness, no state or country in the entire world

has enacted a blanket ban of these medications other than Alabama. *Tr.* at 328. The Act, unlike the cited European regulations, does not even permit minors to take transitioning medications for research purposes, even though Defendants adamantly maintain that more research on them is needed. *Id.* at 326–27; *Defs.' Br.* (Doc. 74) at 116. Because Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored at this stage of litigation.

In sum, Parent Plaintiffs have a fundamental right to direct the medical care of their children. This right includes the more specific right to treat their children with transitioning medications subject to medically accepted standards. The Act infringes on that right and, as such, is subject to strict scrutiny. At this stage of litigation, the Act falls short of that standard because it is not narrowly tailored to achieve a compelling government interest. Accordingly, Parent Plaintiffs are substantially likely to succeed on their Substantive Due Process claim.

## ii.    *Equal Protection Claim*

Minor Plaintiffs claim that the Act discriminates against them based on their sex in violation of the Fourteenth Amendment. *Compl.* (Doc. 1) at 29–30.[15] The Equal Protection Clause provides that no State shall "deny to any person within its

---

[15] Based on the record evidence, the Court finds that Minor Plaintiffs have standing to bring their Equal Protection claim. Defendants raise no opposition to this conclusion. However, Parent Plaintiffs, Healthcare Plaintiffs, and Plaintiff Eknes-Tucker do not explain—nor is it readily apparent—how they have standing to bring an Equal Protection claim and, thus, are not substantially likely to succeed on the merits of their claim.

jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The Clause's chief purpose "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).

As the Supreme Court recently explained, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020). Governmental classification based on an individual's gender nonconformity equates to a sex-based classification for purposes of the Equal Protection Clause. *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011). Here, the Act prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity. *See* S.B. 184, ALA. 2022 REG. SESS. § 4(a)(1)–(3) (Ala. 2022). The Act therefore constitutes a sex-based classification for purposes of the Fourteenth Amendment.

The State views things differently. The State argues that the Act creates two categories of people: (1) minors who seek transitioning medications "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex";

and (2) "all other minors." *Defs.' Br.* (Doc. 74) at 93. (quoting S.B. 184, ALA. 2022 REG. SESS. § 4(a) (Ala. 2022)). Because transgender minors fall into both categories, the State reasons, the Act is not a sex-based classification. *Id.* at 94.

The fundamental flaw in this argument is that the first category consists entirely of transgender minors. The Act categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity. In this way, the Act places a special burden on transgender minors because their gender identity does not match their birth sex. The Act therefore amounts to a sex-based classification for purposes of the Equal Protection Clause. *See Glenn*, 663 F.3d at 1317 (explaining that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination").

Sex-based classifications are constitutional only when they satisfy a heightened standard of review known as intermediate scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). To satisfy this standard, a classification must substantially relate to an important government interest. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The State bears the burden to proffer an exceedingly persuasive justification for the classification. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). An exceedingly persuasive justification is one that is "genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The State again argues that the Act's purpose is to protect minors from experimental medications and to stop medical providers from "aggressively pushing" these medications on minors. *Defs.' Br.* (Doc. 74) at 109–120. As explained above, the State puts on no evidence to show that transitioning medications are "experimental." The record indicates that at least twenty-two major medical associations in the United States endorse these medications as well-established, evidence-based methods for treating gender dysphoria in minors. *Tr.* at 25, 97–98, 126–27. Finally, nothing in the record shows that medical providers are pushing transitioning medications on minors. Accordingly, the State's proffered justifications are hypothesized, not exceedingly persuasive. Thus, Minor Plaintiffs are substantially likely to succeed on their Equal Protection claim.

### iii.    Void-for-Vagueness Claim

Plaintiffs collectively claim that the Act is void for vagueness under the Fifth and Fourteenth Amendments because it does not sufficiently define "what actions constitute 'caus[ing]' any of the proscribed activities upon a minor." *Compl.* (Doc. 1) at 34–35. Under the void-for-vagueness doctrine, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004) (quoting *United States v. Fisher*, 289 F.3d 1329, 1333

(11th Cir. 2002)). A federal court reviews a void-for-vagueness claim only when the litigant alleges a constitutional harm. *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349–50 (11th Cir. 2011).

In this context, constitutional harm comes in two forms: (1) where a criminal defendant violates a vague statute, comes under prosecution, and then moves to dismiss the charges on the grounds that he or she lacked notice that his or her conduct was unlawful; and (2) where a civil plaintiff is "chilled from engaging in constitutional activity" due to a vague statute. *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1241 (11th Cir. 2015). Here, Plaintiffs' void-for-vagueness claim falls into the second category.

Plaintiffs, however, are not substantially likely to succeed on their claim. Under ALA. CODE § 13A-2-5(a), a person is liable for causing a crime "if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." The fact that the Act has a scienter requirement greatly weighs against Plaintiffs' void-for-vagueness claim. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a

vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea.").

Also weighing against Plaintiffs' claim is the State's interpretation of the Act. During the preliminary injunction hearing, Alabama Solicitor General Edmund LaCour explained that a person must administer or prescribe transitioning medications to violate the Act. *Tr.* at 409–11. General LaCour opined that a person cannot violate the Act simply by advising a minor to take transitioning medications or by driving a minor to a gender clinic where transitioning medications are administered. *Id.* at 410.

Additionally, the statutory scienter requirement and the State's interpretation both align with the modern, plain-language definition of the word cause. According to Merriam-Webster's Dictionary, "cause" means to "effect by command, authority, or force" or "bring into existence" an action. *Cause*, MERRIAM-WEBSTER UNABR. DICTIONARY (3rd ed. 2002). Based on the record evidence, Plaintiffs do not show that they have been chilled from engaging in constitutional activity due to the Act. Plaintiffs are therefore not substantially likely to succeed on their void-for-vagueness claim at this stage of litigation.

### iv.    *Free Speech Claim*

Plaintiffs collectively claim that the Act violates their First Amendment right to free speech by prohibiting "any 'person,' including physicians, healthcare

professionals, or even parents, from engaging in speech that would 'cause' a transgender minor to receive medical treatment for gender dysphoria." *Compl.* (Doc. 1) at 33–34. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I. At its core, "the First Amendment means that government" generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

The Amendment, however, offers no protection to words that incite or constitute criminal activity. For example, sexually derogatory remarks may violate Title VII's general prohibition of sexual discrimination in the workplace. 42 U.S.C. § 2000-e2; *see also* 29 C.F.R. § 1604.11(a) (explaining that, under certain circumstances, "[u]nwelcome sexual advances, *requests* for sexual favors, and other *verbal* or physical conduct of a sexual nature" are actionable as sexual harassment under Title VII (emphasis added)). Likewise, "[s]peech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime." *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004). More examples abound, but the point is this: Where the State "does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992).

As explained *supra* Section III.A.1.iii, the Act does not criminalize speech that could indirectly lead to a minor taking transitioning medications. Rather, the only speech criminalized by Act is that which compels the administration or prescription of transitioning medications to minors. Accordingly, the Act targets conduct (administration and prescription), not speech. Plaintiffs are therefore not substantially likely to succeed on their First Amendment claim.

### 2. *Plaintiffs' Preemption Claim*

Parent Plaintiffs, Minor Plaintiffs, and Healthcare Plaintiffs bring their preemption claim under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. *Compl.* (Doc. 1) at 31. Section 1557, through its incorporation of the Title IX, prohibits discrimination based on sex and the denial of benefits based on sex in any health program or activity that receives federal funding. 42 U.S.C. § 18116(a); 20 U.S.C. § 1681 *et seq.* Here, Plaintiffs generally rely on the same arguments Minor Plaintiffs made in support of their Equal Protection claim. *Pls.' Br.* (Doc. 8) at 49–52; *Tr.* at 379.

At this stage of litigation, Plaintiffs' preemption claim fails. As explained *supra* Section III.A.1.ii, only Minor Plaintiffs are substantially likely to succeed on their Equal Protection claim. Additionally, Section 1557—by incorporating the enforcement mechanism of Title IX—"is enforceable against institutions and programs that receive federal funds, but does not authorize suits against individuals."

*Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015). It is presently unclear how Plaintiffs may bring their preemption claim against Defendants who are state officials, not institutions. Due to these concerns, Plaintiffs are not substantially likely to succeed on their preemption claim.

## B.     Irreparable Harm

The Court next considers whether Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm absent injunctive relief.[16] Harm "is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. An irreparable harm is one that is "actual and imminent, not remote or speculative." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013). The risk of suffering severe medical harm constitutes irreparable harm. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (explaining that a risk of suffering "a severe medical setback" is an irreparable injury); *Blaine v. N. Brevard Cnty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1306 (M.D. Fla. 2018) (finding irreparable harm where doctor plaintiffs could not provide necessary medical care to their patients).

The Act prevents Parent Plaintiffs from treating their children with transitioning medications subject to medically accepted standards. S.B. 184, Ala.

---

[16] *See Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (explaining that a court need not consider whether a plaintiff shows irreparable harm if he or she does not show a substantial likelihood of success on his or her claims).

2022 REG. SESS. § 4(a)(1)–(3) (Ala. 2022). The record shows that, without these medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality. *Tr.* at 20, 167. Additionally, the evidence shows that Minor Plaintiffs will suffer significant deterioration in their familial relationships and educational performance. *Id.* at 35, 112–13. The Court therefore concludes that Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm absent injunctive relief.

## C.   Balance of Harms & Public Interests

The Court now considers the final two elements together. To satisfy the third and fourth elements of a preliminary injunction, a plaintiff must show that the harm she will likely suffer without an injunction outweighs any harm that her opponent will suffer from the injunction and that the injunction would not disserve (or be adverse to) the public interest. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). These factors merge when the State is the opponent. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (per curiam).

This case largely presents two competing interests. On one hand, "preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other

strict legal and equitable principles that restrain courts." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. On the other hand, "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince v. Massachusetts*, 321 U.S. 158, 168–69 (1944).

Based on the record evidence, the Court finds that the imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from an injunction. The Court further finds that an injunction is not adverse to the public interest. To the contrary, enjoining the Act upholds and reaffirms the "enduring American tradition" that parents—not the States or federal courts—play the primary role in nurturing and caring for their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Accordingly, the final two factors favor injunctive relief.

## IV. SECURITY

Defendants argue that, if injunctive relief is appropriate, the Court should require each Healthcare Plaintiff to post a $1 million security. *Defs.' Br.* (Doc. 74) at 159–60.[17] Calculating the "amount of an injunction bond is within the sound discretion of the district court." *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp.*,

---

[17] According to Defendants, this amount represents that "by which [Healthcare] Plaintiffs will be unjustly enriched should they be allowed to administer profitable (and illegal) medical procedures to kids." *Defs.' Br.* (Doc. 74) at 160.

112 F.3d 1125, 1127 (11th Cir. 1997) (per curiam). Here, the Court finds that a security bond is not necessary for three reasons. First, as explained *supra* Part III, Healthcare Plaintiffs themselves are not entitled to preliminary injunctive relief. Second, Federal Rule of Civil Procedure 65 does not require the United States to pay security. FED. R. CIV. P. 65(c). Finally, Defendants do not allege that they will suffer any cost or economic harm if they are wrongly enjoined from enforcing the Act. *Defs.' Br.* (Doc. 74) at 159–60. The Court therefore relieves Plaintiffs from posting security under Rule 65.

## V.   CONCLUSION

For these reasons, the Court **GRANTS** in part Plaintiffs' motion for preliminary injunction (Doc. 7) and **ENJOINS** Defendants from enforcing Section 4(a)(1)–(3) of the Act pending trial. The Court **GRANTS** in part the United States's motion for preliminary injunction (Doc. 62) to the same degree and effect. All other provisions of the Act remain enforceable.

**DONE** and **ORDERED** May 13, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

# DOC. 129

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                     NORTHERN DIVISION

3

4     REV. PAUL A. EKNES-TUCKER,    *
      et al.,                       *
5                                   *
              Plaintiffs,           *  2:22-cv-00184-LCB
6                                   *  May 5, 2022
      vs.                           *  Montgomery, Alabama
7                                   *  9:00 a.m.
      KAY IVEY, in her official     *
8     capacity as Governor of the   *
      State of Alabama, et al.,     *
9             Defendant.            *
      *****************************

10

11

12              **TESTIMONY OF RACHEL KOE, MD**

13         TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                          VOLUME I
14         BEFORE THE HONORABLE LILES C. BURKE
                UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23    pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
         and Procedures Vol. VI, Chapter III, D.2.  Transcript
24               produced by computerized stenotype.

25

                    *CHRISTINA K. DECKER, RMR, CRR*
                    Federal Official Court Reporter
                 256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                              APPEARANCES

2

        FOR THE PLAINTIFFS:
3       Melody Eagan, Esq.
        Jeff Doss, Esq.
4       LIGHTFOOT, FRANKLIN & WHITE, LLC
        The Clark Building
5       400 20th Street North
        Birmingham, Alabama 35203
6
        Brent Ray, Esq.
7       KING & SPALDING
        353 N. Clark Street
8       12th Floor
        Chicago, Illinois 60654
9
        Michael Shortnacy, Esq.
10      KING & SPALDING
        633 W. Fifth Street
11      Suite 1600
        Los Angeles, California 90071
12
        Jason R. Cheek, Esq.
13      US ATTORNEYS OFFICE, NDAL
        1801 Fourth Avenue North
14      Birmingham, Alabama 35203

15      John Michael Powers, Esq.
        DOJ-Crt
16      Civil Rights Division
        950 Pennsylvania Avenue
17      Washington, DC  20530

18

19      FOR THE DEFENDANT:
        James W. Davis, Esq.
20      Edmund LaCour, Esq.
        Barrett Bowdre, Esq.
21      Benjamin Seiss, Esq.
        Christopher Mills, Esq.
22      OFFICE OF THE ATTORNEY GENERAL
        501 Washington Avenue
23      P.O. Box 300152
        Montgomery, Alabama 36130-0152
24      (334) 242-7300

25

1

2          COURTROOM DEPUTY:  Deena Harris

3

4          COURT REPORTER:  Christina K. Decker, RMR, CRR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3   RACHEL KOE, MD,                                          170
    DIRECT EXAMINATION                                       171
4   BY MR. RAY
    CROSS-EXAMINATION                                        184
5   BY MR. MILLS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          **P R O C E E D I N G S**

2                          (In open court.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22              MR. RAY:  We call Dr. Rachel Koe.

23                          RACHEL KOE, MD,

24   having been first duly sworn by the courtroom deputy clerk, was

15:49:22 25   examined and testified as follows:

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                         DIRECT EXAMINATION
 2   BY MR. RAY:
 3   Q     Good afternoon, Doctor.
 4   A     Hey.
 5   Q     Are you using a pseudonym here today?
 6   A     I am.
 7   Q     What is that pseudonym?
 8   A     Dr. Rachel Koe.
 9   Q     Dr. Koe, would you please introduce yourself to the Court?
10   A     Yes.  I am a pediatrician in southeast Alabama.  I did my
11   medical school and graduate school in Alabama.  During which
12   time, I met my husband, and we spent a short time out of the
13   state of Alabama when I completed my pediatric training as a
14   resident physician at a large children's hospital.
15        And then after that, we looked for a place to start our
16   career and our family.  And southeast Alabama was that place.
17   So we moved back to southeast Alabama where I have been a board
18   certified pediatrician and a licensed physician in Alabama for
19   the last ten years.
20   Q     Would you please describe your current practice to the
21   Court?
22   A     Yeah.  So I practice in a rural town in southeast Alabama.
23   But I see patients from all over southeast Alabama.  And I see
24   patients from birth until they graduate my practice at 19 and
25   364 days.
```

1          And I take care of all conditions.  So I take care of

2    children when they're well, and that's how we like to keep

3    them.  But I also take care of children with any kind of

4    medical or mental health disorder.

15:51:07  5    Q    Do you sometimes encounter conditions that you cannot

6    treat yourself?

7    A    Absolutely.  So I would say frequently pediatricians

8    encounter conditions that we can't treat ourselves, and I am no

9    exception.

15:51:25 10         So while general pediatricians are experts in a wide

11   variety of things, we cannot stay up to date on every single

12   topic.  And so when we are presented with a condition that is

13   rare, we usually rely upon specialists to help us out.

14         But also if there are conditions that require more

15:51:47 15   comprehensive care that I cannot provide all those levels of

16   care in my office -- for example, if a patient has cystic

17   fibrosis, those patients require not only to see a

18   pediatrician, but also a pulmonologist, and a GI doctor, and

19   nutritionist.  And we like to send those patients -- you can

15:52:05 20   imagine that seeing all those different physicians is easier

21   done if it's done in the same place.  So we like to send those

22   patients to centers where they can receive all of that care in

23   the same place.

24   Q    So could you give an overview, then, of the process that

15:52:19 25   you go through when you are considering referring or presenting

1  the option of a referral to a patient and their family?

2  A    Absolutely.  So when I need to make a referral for a

3  patient -- which I don't like to do if I don't have to because

4  you know that means extra travel and extra cost for my

15:52:39  5  patients, as well.

6      When I need to make a referral for my patient, first and

7  foremost, I want to make sure that the level of care that they

8  are getting or the quality of care that they're getting is at

9  least as good as the quality of care that I am giving them in

15:52:53  10  my office.

11      I, you know, pride myself on being a physician who

12  attempts to provide highest quality evidence-based care for all

13  of my patients, regardless of how they present to me.  And so I

14  want to make sure those patients get that same quality of care.

15:53:12  15      And so when I am considering a referral, you know, I --

16  the first -- I have to present the referral to the family.  And

17  I usually will explain why I think they need a referral to

18  somebody else, why I cannot provide all of the care that they

19  need.  And if there are options of multiple places where I can

15:53:33  20  refer them, I will give them multiple options.

21      Some cases there are no options, there's just one place

22  that I can refer, and then I will tell them that.

23      But I also try to ensure that whoever I am making that

24  referral to, whoever I am recommending a referral to or

15:53:48  25  suggesting a referral to is someone that I -- that I trust.

1   And so I am looking for a specialist who has, you know,

2   adequate training, that has experience taking care of the

3   condition that -- for which I'm making the referral, and that

4   has -- has had good outcomes.  And so that their reputation is

15:54:10   5   that they've had good outcomes treating that -- treating that

6   condition.

7   Q    When was the first time that you treated a transgender

8   patient?

9   A    Yeah.  It's a -- much to my surprise, the first time that

15:54:23   10   I treated a transgender patient was about two years into my

11   career.  It was eight years ago.  Although to be fair, I had

12   been treating him since I moved to southeast Alabama.  I just

13   did not know that he was transgender.

14        And so I had a patient that I had developed a relationship

15:54:45   15   with right when I moved to southeast Alabama.  He was one of my

16   first patients that I had an encounter with.  We developed a

17   relationship over time.

18        And I was caring for him for a variety of conditions, so I

19   saw him for his well-child checkups.  But he was also

15:55:02   20   presenting to me with migraines.  And so I took care of him for

21   his migraine disorders.  And he presented to me with anxious

22   thoughts and depressed thoughts and thoughts of self-harm.  And

23   so I was caring for him, as well.

24        Initially for those things, I referred him to what -- he

15:55:20   25   was already seeing his pastor for some pastoral care, and I

1   referred him to a counselor.  And I started him on some medical

2   treatments for migraines and depression.  But those medical

3   treatments were proving ineffective.  And he continued to have

4   escalating concerns.

15:55:37 5       And so I eventually referred him to a psychiatrist and a

6   neurologist, as well.  And it was about that time, you know, a

7   year or so into seeing the psychiatrist and neurologist and he

8   was still not getting anywhere that he and his parents came to

9   me and revealed to me that he was transgender.

15:55:58 10  Q    Let me stop you there.

11  A    Yeah.

12  Q    So just to sum up, this particular patient you had seen

13  for two years at this point in time?

14  A    Uh-huh.

15:56:07 15  Q    And they were -- this patient was seeing a therapist, a

16  psychiatrist, and a pastoral counselor; is that right?

17  A    That's correct.

18  Q    And were they on the psychiatric medication at this time,

19  as well?

15:56:21 20  A    Yeah.

21  Q    What were they on?

22  A    By this point, they were on Zoloft and Topamax.

23  Q    And how would you describe the dosages of these

24  medications at this time?

15:56:30 25  A    The doses were higher than I would have felt comfortable

```
 1  with.  Those are not medications -- those are medications that
 2  I have prescribed, but not at those doses.
 3  Q    Despite these treatments, was care and the level -- was
 4  the mental health of this patient improving?
 5  A    No.  In fact, when he presented to me at that time, you
 6  know, two years into our relationship, that was the concern
 7  that he and his mom presented to me with was that we weren't
 8  getting anywhere.  And they could see the medicines he was on,
 9  and they could see that, you know, he had all these different
10  doctors' appointments, but they were concerned that he was
11  still suffering from thoughts of self-harm and he was not
12  making any -- any gains.
13  Q    And so at this time, did the patient express to you --
14  what did the patient say about thoughts of self-harm?
15  A    Yeah.  It was actually -- well, he told me that he was
16  thinking that he would be better off dead.  But it was his mom
17  that really first told me that he was thinking of hurting
18  himself.  And she was really concerned.
19       They had a good relationship, and she said, you know, I
20  think I'm going to lose my son.  But he said he wasn't trying
21  -- he didn't want to commit suicide.  But he wished he was
22  better off dead.
23  Q    At the time that this patient's issues around gender were
24  revealed to you, what else did you learn about their history
25  with these issues?
```

1   A    So this was the time when kind of all of the pieces of the

2   puzzle started to come together for me.  I had learned from his

3   mom that he had been saying he was a boy since he was a young

4   child, even wishing on his fourth birthday candles that people

15:58:40 5   would know that he was a boy.  She had allowed him to present

6   this way at home.  It just made him look like a tomboy, and

7   that, you know, wasn't problematic in their community.

8        But over time as he approached puberty, it had been

9   getting worse.  And that's when I had come into the picture.

15:59:00 10  But, again, not knowing the gender concerns, I didn't have that

11  piece of the puzzle at the time.

12       And he -- but it had been getting worse since puberty

13  started.  They had actually taken him out of school, and he was

14  being home schooled because he did not feel comfortable

15:59:16 15  presenting as a female at school.  And so they were trying to

16  home school.  But his grades were in decline.  And so was his

17  mental health.

18  Q    At this point in time, then, did you consider referring

19  the patient and the family to the specialist?

15:59:37 20  A    Absolutely.

21       So at this time is when I began to make the diagnosis of

22  gender dysphoria.  Gender dysphoria obviously is a diagnosis

23  that is not a snapshot in time, but he presented with those --

24  the pieces that we had been seeing for years.

15:59:55 25       And with that history of long-standing gender dysphoria

1    and really was able to put that together for me, that that was
2    where -- why his mental health -- or may have been one of the
3    reasons why his mental health was in decline.
4         I had heard about transgender medicine when I was in
5    residency, but the --
6              THE COURT:  Ma'am, you're kind of getting into answers
7    that his questions are not calling for.
8              THE WITNESS:  I'm so sorry.
9              THE COURT:  That's okay.  Just listen very carefully
10   to what he's asking you.  Make sure you are not giving a
11   narrative response.  Just answer just what he asks you, okay.
12             THE WITNESS:  Absolutely.
13   BY MR. RAY:
14   Q    So you choose at this point in time to engage in a
15   referral process.  How did that conversation go with the
16   family?
17   A    Yes.  So I told the family that I understood that this
18   patient was transgender, but that I -- and I knew that that was
19   not in and of itself pathological.  So I reassured them of
20   that.  But I did not know what other help to offer them because
21   that was not my specialty.  And, but I told them that I could
22   find someone who did know more about gender health if they were
23   interested in learning more about transgender medicine.
24   Q    And to whom did you -- and what was the family's reaction
25   to this?

```
 1   A     The parent at the time said, absolutely, we want to know

 2   as much as we can because we're not getting anywhere right now.

 3             THE COURT:  Mr. Ray, how much longer is your direct

 4   going to be?

 5             MR. RAY:  It will be another ten minutes, Your Honor.

 6             THE COURT:  Okay.

 7   BY MR. RAY:

 8   Q     And to whom did you then refer this patient?

 9   A     I referred the patient to Dr. Latif at UAB.

10   Q     So did you keep up with your patient after the referral?

11   A     Absolutely.  I --

12   Q     And from your perspective as the primary pediatrician, how

13   did the condition of the patient change after they began going

14   to the UAB clinic?

15   A     Over time, he was able to come off of medication for his

16   migraines.  He was able to come off of medication for his

17   depression.  And he was able to see his counselor less and less

18   frequently over the years.  And he graduated from high school

19   with honors and did well.

20   Q     During this time, as well, did you administer any care to

21   this patient regarding their gender dysphoria?

22   A     Yes.  He did not feel comfortable giving himself the

23   testosterone injections, and so our clinic provided -- we did

24   not prescribe the testosterone, but we gave the testosterone

25   injections, and we performed any labs that the gender clinic
```

```
 1  needed.  And I would review those labs before sending any

 2  information on to the gender clinic and kept up with his blood

 3  pressure and basic health.

 4  Q    Have you kept up with this patient in recent months or

 5  years?

 6  A    Yes.  I -- I see his mother frequently because she brings

 7  in her other grandchildren to see me.

 8  Q    And what is -- what do you understand about how this

 9  experience has been for your patient at the gender clinic?

10  A    So he is a thriving healthy adult and has no regrets and

11  is doing well.

12  Q    In subsequent experiences, have you had occasion to

13  encounter patients who at least are expressing ideas of gender

14  diversity?

15  A    Yes.

16  Q    And how do you deal with those patients who express those

17  ideas, but without, you know, demonstrating severe distress?

18  A    Yeah.  So in, especially in prepubertally, we simply talk

19  to the families and reassure them that gender diversity is not

20  pathological.

21       We talk about allowing children to present as however they

22  feel comfortable in dress and name and pronouns, however they

23  feel comfortable, and if -- even if there's not a significant

24  amount of psychological distress, if there is some distress

25  within the family, then we make a referral for -- so that they
```

1    can receive mental health care, see a counselor.

2    Q    So when you have a patient who is experiencing these types

3    of symptoms, you don't automatically refer them to the gender

4    clinic?

16:04:58 5    A    No.

6    Q    When you, however, have a different situation, what are

7    you seeing in some of the patients who you believe are

8    experiencing gender dysphoria?

9    A    Yeah.  So when a patient -- typically at the time that

16:05:18 10    they're entering puberty or during or after puberty is

11    experiencing significant mental health concerns and they

12    have -- they are transgender, and they explain to me that that

13    is related and that's part of why they are suffering from their

14    depressed and anxious thoughts, then I will share with them and

16:05:41 15    their family that there are gender experts out there that can

16    help guide them if they need more information or want to pursue

17    other options.

18    Q    Have you ever had a patient with gender dysphoria that

19    later desisted?

16:05:56 20    A    No, I have not had that experience.

21    Q    Have you ever had any of your transgender patients express

22    regret over gender-affirming treatment?

23    A    No.

24    Q    Dr. Koe, what will happen to your transgender patients if

16:06:20 25    the law SB 184 goes into effect?

122

```
 1   A     So I have patients -- or a patient that is on hormone

 2   therapy right now.  I am -- that therapy has been very

 3   effective for her.

 4         I am concerned that because it is so effective that she is

16:06:41 5   not going to stop therapy, but she's going to find some other

 6   not great ways to get the therapy.  And that -- you know, less

 7   safe.

 8         So, you know, she may get estrogen from a source that is

 9   not reputable.  She is not going to be followed by a physician

16:07:01 10  for side effects or for efficacy or even for dosing.  And so I

11   am concerned about that.

12         And then future patients, I'm concerned that I won't have

13   more than that I can do for them when they come to me with

14   dysphoria that is not being effectively treated by mental

16:07:20 15  health therapy alone.

16   Q     And specifically to the parents of your patients, how do

17   you perceive the enactment of this law will affect them?

18   A     I -- I can't read minds, of course.  But my first family,

19   when they came to me for -- to express to me that gender

16:07:43 20  dysphoria was the issue, the mom felt lost and hopeless, and

21   that's what she told me.  She said, you know, I don't know what

22   else I can do.  I don't know where to go from here.

23         And so I -- if they don't have other options, and they

24   don't have experts in the state that they can talk to about

16:08:04 25  this issue, or options for other treatments that have been
```

 1  shown to be effective, I imagine that they will stay feeling

 2  hopeless and lost.

 3  Q    Final question.

 4  A    Uh-huh.

16:08:16  5  Q    Doctor, what do you believe this law will do to you in

 6  your practice?

 7  A    Well, as I already mentioned, I strive to provide the

 8  highest level of evidence-based care that I can.  And I imagine

 9  that I will continue to see transgender patients.  I have had

16:08:35 10  five in my ten years.  And I don't see that stopping.

11       And so I imagine that I will be stuck in a place where I

12  don't know how to proceed.  Do I counsel them on therapies that

13  exist in other states?  Do I make those referrals?  What are

14  the legal consequences to that?  Do I, you know, do I not

16:09:02 15  provide them what is known to be evidence-based care?  Am I

16  providing discriminatory care in that situation?

17       You know, I don't -- I won't know what to do with these

18  patients.  And I'm afraid --

19            THE COURT:  Hold on just a minute.

16:09:19 20       So I have got a question for Mr. LaCour, whoever wants to

21  field it on your end.  We may have covered this yesterday, and

22  maybe I am not clear on it.

23       But does the State of Alabama consider a referral to trip

24  the law?

16:09:35 25            MR. LACOUR:  Your Honor, I don't think simply

1   referring someone to another doctor would be causing treatment.

2   There would still be -- the cause would still ultimately be

3   whatever the other doctor does at the end of the day.  So...

4           THE COURT:  Is there anything that you have seen in

16:10:00 5   what she's just described on the record that she does in her

6   practice that would trip the law?

7           MR. LACOUR:  Well, administering could -- I mean, that

8   would be directly -- directly administering the drugs would be

9   covered by the law.  But...

16:10:19 10           THE COURT:  Anything other than that?

11           MR. LACOUR:  No.  Your Honor, I don't believe so.

12           THE COURT:  Okay.  All right.  Sorry to interrupt.

13           MR. RAY:  That's all right.

14       Thank you, doctor.  No further questions.

16:10:40 15           THE COURT:  Who is handling cross?

16           MR. MILLS:  I am, Your Honor.

17           THE COURT:  Are we tendering the witness?  Hello?

18           MS. EAGAN:  I'm sorry, Your Honor.  May I consult with

19   him just a minute, please?

16:10:57 20           THE COURT:  You can.

21           MS. EAGAN:  Thank you.

22           MR. RAY:  Nothing further.

23                         CROSS-EXAMINATION

24   BY MR. MILLS:

16:11:25 25   Q    Good morning, Doctor.  My name is Christopher Mills, and I

```
 1   represent the State defendants.  I have just a few questions
 2   for you.  If any of them are not clear, please just let me
 3   know.
 4        Have you been a plaintiff in any other cases involving
 5   this law?
 6   A    No.
 7   Q    In your practice, do you discriminate against patients
 8   based on their sex?
 9   A    No.
10   Q    In one of your declarations in this case -- we can pull it
11   up if you want, but I don't think we need to -- you said, My
12   practice group recommends that parents vaccinate their
13   children.  Why do you recommend vaccination?
14   A    Because it is evidence based and proven to be safe and
15   effective.
16   Q    And the FDA has approved those vaccinations?
17   A    And the FDA has approved those vaccinations.
18   Q    Are you familiar with RSV?
19   A    I am familiar with RSV.
20   Q    What is it?
21   A    RSV is respiratory syncytial virus.  It is a virus that
22   causes the common cold in most people, but occasionally can put
23   children in the hospital.
24   Q    Can it result in children dying?
25   A    Yes.
```

1  Q     Is there a vaccine?

2  A     Yes.  But it is not a vaccine actually.  It's an

3  immunologic agent, but people call it a vaccine.

4  Q     Is that recent?

16:12:41  5  A     There has been a vaccine for a some time.  There -- so it

6  is not recent.  I mean --

7  Q     And --

8  A     -- there's been a vaccine -- as long as I have been in

9  practice, there has been some sort of a vaccine.

16:12:56 10  Q     Starting at what age can that be given?

11  A     At birth.  I mean, so it depends.  But it depends on what

12  the situation is.

13  Q     And does it prevent RSV?

14  A     It does not prevent RSV.  Again, it is not an actual

16:13:10 15  vaccine.  It is a like an antibody against RSV.  So if you are

16  exposed to RSV, then it stops -- it attacks the RSV for you.

17  Q     Sure.  So I'm just going to ask you to -- sort of a

18  thought question.

19     If there were a vaccine that would completely prevent RSV

16:13:29 20  in young children under five, but sterilized 5 percent of

21  children who got it, would you give the vaccine?

22  A     Probably not.  And I don't think it would be routinely

23  recommended.

24  Q     You are not aware of any FDA-approved vaccine like that?

16:13:47 25  A     I'm not aware of any FDA-approved vaccine like that.

1    Q    I'd like you to look -- and I will put it up on the

2    monitor for you.  This is Plaintiffs' Exhibit 4.  This was the

3    declaration you submitted.  And I have underlined a line there.

4         Would you be able to read that line for me?

16:14:10   5    A    Yes.  If I were to comply with the Act, I would be limited

6    to referring her for counseling and psychiatry -- or and a

7    psychiatrist.

8    Q    So you would agree if the Act went into effect, you could

9    refer patients for counseling and psychiatric help?

16:14:24  10    A    Correct.

11    Q    You choose to accept federal funding through Alabama

12    Medicaid; is that right?

13    A    Correct.

14    Q    You are not required to accept federal funding?

16:14:34  15    A    No.

16    Q    In your well-child visits, do you give testicular exams to

17    teens who are biological males?

18    A    Yes.

19    Q    Do you give testicular exams to teens who are biological

16:14:48  20    females?

21    A    Yes.  Sorry.  No.  Obviously.  I apologize.  I did not

22    listen to the question correctly.

23    Q    And, okay.  Do you perform Tanner stage assessments?

24    A    I do perform Tanner stage assessments.

16:15:02  25    Q    What are you looking for in biological males?

1  A    In biological males, I am looking for pubic hair where

2  pubic hair is located and the description of the pubic hair and

3  I am looking for the size of the testicles.

4  Q    And what are you looking for in biological females?

16:15:18 5  A    In -- I would be looking for absence of testicles in

6  females.  But I am also looking for breast staging.  And so

7  breast growth.  And I am looking for pubic hair development.

8       And then signs of estrogenation, which are like increased

9  thickness of the labia and increased thickness of the vaginal

16:15:45 10  walls, and things like that.

11  Q    The declaration you submitted in this case, you were

12  talking about your current patient, your current transgender

13  patient.  You mentioned that that patient is prescribed

14  estrogen; is that right?

16:15:58 15  A    Uh-huh.

16  Q    Why aren't you administering testosterone to this patient?

17  A    I'm sorry.  I did not understand the question.

18  Q    Sure.  Why are you administering estrogen and not

19  testosterone to this patient?

16:16:15 20  A    The patient is a transgender female.

21  Q    And your original -- your first patient who we talked

22  about a few minutes ago?

23  A    Right.

24  Q    You talked about they came to your office to have

16:16:27 25  testosterone administered.  Why was testosterone administered

1  and not estrogen?

2  A     Because they are a transgender male.

3  Q     So for each of the treatments we just talked about --

4  testicular exams, Tanner stage assessments, cross-sex

16:16:43  5  hormones -- do you consider your treatment to be discrimination

6  based on sex?

7  A     I do not.

8  Q     Why is that?

9  A     Discrimination is not a medical term.  So I -- I don't

16:17:04 10  know if I'm applying it correctly, but I am using -- I am

11  giving each patient the care for which their -- their sex and

12  gender requires.

13        I still do Tanner stage patients with -- that are

14  transgender.  I still do examinations on those patients.  I do

16:17:26 15  not -- not do -- you know, general exams on those patients.

16        But understanding that they are transgender and so their

17  genital exam is going to look different than somebody else's

18  genital exam.

19  Q     I apologize.  These seem a bit silly.

16:17:41 20        Have you been investigated for discrimination on the basis

21  of sex because you only give biological males testicular exams?

22  A     Nope.

23  Q     Have you been sued for that basis?

24  A     No.

16:17:52 25  Q     Has the federal government threatened to revoke your

```
  1   funding for that reason?

  2   A     No.

  3   Q     Do you agree that this Act that we're talking about here

  4   today prohibits you from prescribing or administering puberty

16:18:08  5   blockers for purposes of gender transition to both boys and

  6   girls?

  7   A     Can you repeat that for me, please?

  8   Q     Sure.  The Act we're here today talking about --

  9   A     Uh-huh.

16:18:16 10   Q     -- do you agree that that would prohibit you from

 11   prescribing or administering puberty blockers to biological

 12   males or females?

 13   A     Yes.

 14   Q     So both your original patient and your newest patient?

16:18:29 15   A     Yes.

 16   Q     And the same is true for a cross-sex hormones; is that

 17   right?

 18   A     Yes.

 19   Q     You talked about your first patient was struggling with

16:18:41 20   gender dysphoria, but you didn't know that originally.  So how

 21   old was that patient when you started seeing them?

 22   A     About 12.

 23   Q     And then how old were they when you determined that they

 24   were transgender?

16:18:54 25   A     When they told me they were transgender was at 14.
```

```
 1   Q     And you hadn't seen a sign of that beforehand?

 2   A     Well, he presented himself as a male, but often we expect

 3   gender diverse presentation among children.  And so it did

 4   not -- it shows my ignorance that it did not occur to me to ask

 5   him if he was transgender.

 6   Q     Your declaration mentions four more transgender patients

 7   since that first one.

 8         You said, when those patients first came to see me, most

 9   had just started expressing that they were transgender.  About

10   how old were they at those points?

11   A     So there have been four.  So one already was actually

12   transitioning.  But another was 14.  Another was 12.  And then

13   the other is -- gosh.  I have to count.

14         So about 12.

15   Q     And what was the biological sex of those patients?

16   A     Their natal sex was male, male, female, sorry.  My -- I'm

17   trying to think through all my patients now.

18         So female, male, male, male.

19   Q     You mentioned in your declaration that not all those

20   patients went for experimental procedures at the UAB gender

21   clinic.  What happened to those patients who did not go for

22   these procedures?

23   A     Well, one is no longer -- was -- I only was able to see

24   briefly as they were in the care of the State, and I do not

25   know what happened to her.
```

```
 1        One was -- is still in counseling.
 2   Q    And is that -- would you consider that patient to be
 3   healthy?
 4   A    Currently, yes.
 5   Q    So counseling has been sufficient to address that
 6   patient's gender dysphoria?
 7   A    Yes, which speaks to the diverse nature, the diverse
 8   trajectory of gender dysphoria in all children.
 9   Q    Your declaration mentions the necessity of regular blood
10   tests and lab work for individuals using these treatments.  Why
11   is that necessary?
12   A    All medications can have side effects.  So it really
13   depends on their medication.  Some of the lab work is actually
14   for their psychiatric medications they were on prior to
15   starting -- starting the gender treatments.  But to, you know,
16   monitor normal things, kidney function and lipids that we know
17   change during puberty.  So when we start somebody on puberty,
18   we need to monitor those things.
19             THE COURT:  Mr. Mills, how long do you think the
20   continuation of your cross will be?
21             MR. MILLS:  Four minutes.
22             THE COURT:  That's a good number.
23   BY MR. MILLS:
24   Q    And are there particular risks of estrogen or testosterone
25   in this context?
```

```
        1   A    There are risks of estrogen and testosterone always.

        2   Q    You would agree that at least some childhood gender

        3   dysphoria desists by adulthood, right?

        4   A    If it presents prepubertally, yes.

16:22:49 5   Q    And you would agree that some individuals who transition

        6   their gender choose to detransition; is that right?

        7   A    I have never had that experience.

        8   Q    You think no -- you think no person like that exists?

        9   A    No, I don't -- I have not met such a person, but I don't

16:23:06 10   know if they exist.

       11   Q    You have never heard of that happening?

       12   A    I have heard of that happening, but by reputation only.  I

       13   don't know.  And I don't know anything about that person's

       14   medical care.

16:23:16 15   Q    Because you don't treat patients past the age 19, you

       16   wouldn't necessarily know if one of your patients decided to

       17   detransition, right?

       18   A    Correct.  Except that we live in southeast Alabama, and I

       19   know my patients for a very long time.

16:23:30 20   Q    Do you think that children have the same decision-making

       21   abilities as adults?

       22   A    No.

       23   Q    Are they better or worse?

       24   A    That's a good question.  But they're different.  They do

16:23:49 25   not have executive functioning, so they do not always think
```

1    through consequences.  And that is why we rely upon their

2    parents to help consent for them.

3  Q    Okay.

4          MR. MILLS:  No more questions.

16:24:04  5          THE COURT:  Any further redirect?

6          MR. RAY:  No, Your Honor.

7

8          (End of testimony of Dr. Rachel Koe, MD.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11                                              <u>05-08-2022</u>

12   Christina K. Decker, RMR, CRR                 Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I certify that on July 5, 2022, I electronically filed this document using the

Court's CM/ECF system, which will serve all counsel of record.


s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for State Defendants*