No. 22-11707

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

PAUL A. EKNES-TUCKER, et al.,
Plaintiffs-Appellees,

&

UNITED STATES OF AMERICA
Intervenor-Plaintiff-Appellee

v.

GOVERNOR, OF THE STATE OF ALABAMA, et al.,
Defendants-Appellants.

On Appeal from the United States District Court
for the Middle District of Alabama
No. 2:22CV00184-LCB (Hon. Liles C. Burke)

**Brief of the States of Arkansas, Alaska, Arizona, Georgia, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia as Amici Curiae Supporting Defendants-Appellants**

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

MICHAEL A. CANTRELL
  Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

The Amici States are governmental entities that are not required to file a corporate disclosure statement.  Fed. R. App. P. 26.1(a).  The Amici States are not aware of additional interested persons.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT............................................................................................ ii

TABLE OF CONTENTS ............................................................................. iii

TABLE OF CITATIONS .............................................................................. iv

STATEMENT OF ISSUES ..............................................................................1

IDENTITY AND INTEREST OF AMICI AND SUMMARY OF ARGUMENT ...........................2

ARGUMENT .................................................................................................4

    I.   Plaintiffs pretend the international controversy doesn't exist, even as it continuously spills out into the news media....................................4

    II.   Plaintiffs and their allies are not motivated by an objective assessment of what is best for vulnerable young people...............................11

    III.  Contemporary best practices and multiple systematic reviews of the evidence contradict Plaintiffs' claims.......................................17

    IV.  Plaintiffs wrongly invoke the specter of suicide. .........................................23

CONCLUSION ...........................................................................................25

# TABLE OF CITATIONS

**Cases**                                                                 **Page**

*Bellotti v. Baird,*
  443 U.S. 622 (1979) .................................................................16

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.,*
  462 U.S. 416 (1983) .................................................................17

*EMW Women's Surgical Ctr., P.S.C. v. Beshear,*
  920 F.3d 421 (6th Cir. 2019) ..................................................17

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) .................................................................17

*Miller v. Alabama,*
  567 U.S. 460 (2012) .................................................................12

*Reno v. Am. C.L. Union,*
  521 U.S. 844 (1997) .................................................................16

*Roper v. Simmons,*
  543 U.S. 551 (2005) .................................................................12

*Sable Commc'ns of Cal., Inc. v. F.C.C.,*
  492 U.S. 115 (1989) .................................................................16

*Stenberg v. Carhart,*
  530 U.S. 914 (2000) .................................................................17

## STATEMENT OF ISSUES

This appeal presents the issue whether Alabama may act to protect its young people and regulate the medical profession by prohibiting life-altering gender-transition procedures, for which there is medical and scientific uncertainty.

### IDENTITY AND INTEREST OF AMICI AND SUMMARY OF ARGUMENT

Amici are the States of Arkansas, Alaska, Arizona, Georgia, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

The Amici States, like Alabama, are concerned by the surge of gender-related psychological issues among adolescents (especially girls) and the rush by practitioners to supply vulnerable young people with life-altering drugs and procedures. Indeed, at many facilities, hormones are provided on demand to children who say they are transgender, without any psychological assessment. Alabama's legislation is a commonsense response to this troubling surge in unnecessary intervention.

Nor is Alabama alone in recognizing the danger posed by this unregulated industry and its life-altering interventions. To the contrary, systematic reviews from multiple European nations—where similar interventions have been studied—have shocked those nations' medical professionals and led to greater restrictions on the medical interventions that Plaintiffs argue should be unregulated. Yet Plaintiffs and their allies simply ignore those facts. Instead, they fraudulently trot out debunked claims that chemical and surgical interventions lower suicide rates and lead to better overall health outcomes. But that is hardly surprising given that

Plaintiffs and their allies are more concerned with politics than making an objective assessment of what is best for Alabama's vulnerable young people.

Therefore, it is no wonder that States like Alabama have been forced to step in to protect vulnerable kids from the practitioners who would subject them to dangerous, life-altering procedures. The Amici States submit this brief in hearty support of Alabama's right to exercise its historic power to do that here.

ARGUMENT

**I.    Plaintiffs pretend the international controversy doesn't exist, even as it continuously spills out into the news media.**

There is a raging controversy in the international medical community concerning the safety and effectiveness of using pharmaceuticals and surgeries to address gender-related psychological issues in still-maturing adolescents.  But one would never guess that from Plaintiffs' filings.  It is as if they are urging a crowd of concerned spectators, "Move on!  Nothing to see here!" against a background of spectacular explosions and pyrotechnics.  It would be humorous except that the consequences of diminishing the devastating, lifelong harms to children are shockingly serious.

This intensely boiling medical controversy is continuously spilling out into the news media.  Most recently the *New York Times Magazine* published an article titled, "The Battle Over Gender Therapy," which recognized that "[m]ore teenagers than ever are seeking transitions, but the medical community that treats them is deeply divided about why—and what to do to help them."[1]

---

[1] Emily Bazelon, The Battle Over Gender Therapy, *The New York Times Magazine* (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html.

This comes shortly after *The New York Times* itself covered the controversy.[2]  Discussing guidelines from the World Professional Association for Transgender Health (WPATH), the *Times* explains that "experts in transgender health are divided on these adolescent recommendations, reflecting a fraught debate over how to weigh conflicting risks for young people, who typically can't give full legal consent until they are 18 and who may be in emotional distress or more vulnerable to peer influence than adults are."[3]

Indeed, *The Economist* reports that medical "treatments seem to do little good, and may be harmful," explaining that last June:

> Finland revised its guidelines to prefer psychological treatment to drugs.  In September Britain launched a top-down review of the field. . . .  [I]n April the Astrid Lindgren Children's Hospital in Stockholm, a part of the Karolinska Institute, announced that it would stop prescribing puberty blockers and cross-sex hormones to those under 18, except in clinical trials.[4]

We've reached the tipping point where even clinicians at the center of efforts to provide pharmaceuticals and surgeries for gender-related psychiatric issues have

---

[2] A. Ghorayshi, Doctors Debate Whether Trans Teens Need Therapy Before Hormones, *New York Times* (January 13, 2022), https://www.ntimes.com/2022/01/13/health/transgender-teens-hormones.html.

[3] *Id.*

[4] Doubts are Growing About Therapy for Gender-dysphoric Children, *The Economist* (May 15, 2021), https://www.economist.com/science-and-technology/2021/05/13/doubts-are-growing-about-therapy-for-gender-dysphoric-children.

begun sounding the alarm.[5] *Medscape* reports that child and adolescent psychia-

trist Angela Sämfjord, MD, who started the Lundstrom Gender Clinic in Sweden

resigned "because of her own fears about the lack of evidence for hormonal and

surgical treatments."[6] Further, "many of the staff at UK GIDS have now left that

service," including Sue Evans, "a psychotherapist who resigned from GIDS be-

cause she felt 'deeply concerned' about the fast-tracking of young people into

medical treatment."[7]

The *Washington Post* published an essay, "The Mental Health Establishment

is Failing Trans Kids."[8] The authors of that piece were Dr. Laura Edwards-Leeper,

founder of the first pediatric transgender clinic in the United States and Dr. Erica

---

[5] *See* Anatomy of a Scandal: Opinion on the Use of Puberty Blockers in America is Turning, *The Economist* (October 16, 2021), https://www.economist.com/united-states/2021/10/16/opinion-on-the-use-of-puberty-blockers-in-america-is-turning ("too few teens undergo crucial mental-health assessments before starting treatment."); Becky McCall and Lisa Nainggolan, Transgender Teens: Is the Tide Starting to Turn?, *Medscape* (April 26, 2021), https://www.medscape.com/viewarticle/949842.

[6] Becky McCall and Lisa Nainggolan, Transgender Teens: Is the Tide Starting to Turn?, *Medscape* (April 26, 2021), https://www.medscape.com/viewarticle/949842.

[7] *Id.*

[8] L. Edwards-Leeper and E. Anderson, The Mental Health Establishment is Failing Trans Kids, *The Washington Post* (November 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/; *see* L. Littman (2021) Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners, *Archives of Sexual Behavior* 50(8), doi: 10.1007/s10508-021-02163-w

Anderson, a clinical psychologist and former WPATH president.  They highlighted clinician reports of "the rising numbers of detransitioners" who regret receiving pharmaceutical and surgical treatments as adolescents.[9]  They note the absence of "[l]onger-term longitudinal studies [that] are needed to better understand the role of medical interventions on lifetime psychological health . . . .  Research is needed to help determine whether quick medical treatment or a more cautious approach is best in these cases."[10]  They point out that *three quarters* of detransitioners do not tell their doctors that they have reversed their transitions, and they warn that "we may be harming some of the young people we strive to support."[11]

Current WPATH president Dr. Marci Bowers has joined Dr. Anderson to decry the "sloppy healthcare work" of gender clinics."[12]  This includes "[r]ushing people through the medicalization" and "failure—*abject* failure—to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing decision."  "In my over 40 years as a psychologist," Dr. Anderson explains, "I've seen psychotherapeutic phenomena come and go.  Eating

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] A. Shrier, Top Trans Doctors Blow the Whistle on "Sloppy" Care, *Common Sense with Bari Weiss* (October 4, 2021), https://bariweiss.substack.com/p/top-trans-doctors-blow-the-whistle

disorders, multiple personality disorders and repressed memory syndrome have in retrospect spread through subgroups of adolescents and the professionals who have treated them." She continues: "This spread is like wildfire through vulnerable underbrush, clearly borne in an environment of contagion. Why is this phenomenon distinctly different than previous ones?"[13] It's not.

*CBS News*'s Lesley Stahl covered the growing phenomenon of detransitioner regret in a high-profile *60 Minutes* episode.[14] Other reports highlight a recent study of one hundred detransitioners who informed researchers of discoveries that their dysphoria was caused by underlying trauma, abuse, or a mental-health condition for which they did not receive adequate psychiatric treatment.[15] A woman named Carol who took testosterone and transitioned to living as a man, for example, later discovered that "I needed the antidepressants; I didn't need to transition."[16]

---

[13] E. Anderson, When it Comes to Trans Youth, We're in Danger of Losing Our Way, *San Francisco Examiner* (January 4, 2022), https://www.sfexaminer.com/opinion/are-we-seeing-a-phenomenon-of-trans-youth-social-contagion/ (omitting paragraph break).

[14] *See* Keith Zuborw, Inside the 60 Minutes Report on Transgender Health Care Issues, *CBS News* (May 23, 2021), https://www.cbsnews.com/news/transgender-health-care-60-minutes-2021-05-23/.

[15] Portrait of a Detransitioner as a Young Woman, *The Economist* (November 6, 2021), https://www.economist.com/united-states/2021/11/06/portrait-of-a-detransitioner-as-a-young-woman.

[16] *Id.*

Medicalizing adolescents' gender-related psychological issues invests these young people in a treatment pathway that leads to more consequential interventions over time. Writing in the *Washington Post*, Corinna Cohn—a man who testified below concerning his sex-reassignment surgery, DE 69-26—explains that, "[t]he callow young man who was obsessed with transitioning to womanhood could not have imagined reaching middle age," yet "that was the person who committed me to a lifetime set apart from my peers."[17] "From the day of my surgery," he says, "I became a medical patient and will remain one for the rest of my life."[18] Pursuing what he deemed as "wholeness," he knows now that "[he] wasn't old enough to make that decision."[19] He never experienced intercourse before his surgery, which thereafter deprived him of the ability to experience it with any pleasure. "When I tell friends, they're saddened by the loss, but it's abstract to me," he says, finding it difficult to "grieve the absence of a thing I never had."[20] Cohn's teenage self "was

---

[17] Corinna Cohn, What I Wish I'd Known When I was 19 and had Sex Reassignment Surgery, *Washington Post* (April 11, 2022), https://www.washingtonpost.com/opinions/2022/04/11/i-was-too-young-to-decide-about-transgendersurgery-at-nineteen/.

[18] *Id.*

[19] *Id.*

[20] *Id.*

repelled by the thought of having biological children."[21]  He says that "[t]he sacri-
fices I made seemed irrelevant to the teenager I was," but "[y]ears later, I was sur-
prised by the pangs I felt as my friends and younger sister started families of their
own."[22]

As a teen in the 1990s, Cohn found "an inexhaustible source of validation
and acceptance" participating in Internet Relay Chat, a "rudimentary online form"
that allowed him to meet "like-minded strangers."[23]  He "shutter[s] to think of how
distorting today's social media is for confused teenagers.[24]  Indeed, given the iPh-
one's ubiquity, teens today hardly need to go looking for information about cross-
sex hormones or even surgeries, which are aggressively marketed by surgeons
themselves using viral TikTok videos.[25]

Finally, writing in the *New York Times*, Ross Douthat notes the "increas-
ingly vigorous debate around adolescent medical interventions" and "widespread

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Lisa Selin Davis, Yes, Kids are Getting Gender Surgeries, *Broadview with Lisa Selin Davis* (April 19, 2022); *see* Dr. Sidhbh Gallagher, *TikTok*, https://www.tik-tok.com/@gendersurgeon?lang=en.

doubts that they are actually supported by the data."[26]  He predicts that "Within not too short a span of time, not only conservatives but most liberals will recognize that we have been running an experiment on trans-identifying youth without good or certain evidence, inspired by ideological motives rather than scientific rigor, in a way that future generations will regard as a grave medical-political scandal."[27]

## II.    Plaintiffs and their allies are not motivated by an objective assessment of what is best for vulnerable young people.

Plaintiffs rely on a purported "consensus" of statements published by American professional and advocacy organizations, including the American Medical Association (AMA).  But these organizations are demonstrably motivated by politics, not science or the best interests of young people.  In an April 26, 2021 letter to the National Governors Association (NGA), for example, the AMA wrote to urge the NGA to "oppose state legislation that would prohibit the provision" of "gender transition-related care to minor patients."[28]  But this statement is flatly inconsistent with the position the AMA has taken concerning adolescents' abilities in contexts where the political calculus was different.  For example, in 2005, the AMA and

---

[26] Ross Douthat, How to Make Sense of the New L.G.B.T.Q. Culture War, *New York Times* (April 13, 2022), https://www.nytimes.com/2022/04/13/opinion/transgender-culture-war.html

[27] *Id.*

[28] *See* AMA to States: Stop Interfering in Health Care of Transgender Children, *American Medical Association* (April 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children.

other amici waded into a case before the U.S. Supreme Court concerning capital punishment for crimes committed by minors.  Br. of the Am. Med. Ass'n, Am. Psychiatric Ass'n, et al., *Roper v. Simmons*, 543 U.S. 551 (2005), (No. 03-633), 2004 WL 1633549.  The organizations asserted there that "[a]dolescents' behavioral immaturity mirrors the anatomical immaturity of their brains.  To a degree never before understood, scientists can now demonstrate that adolescents are immature not only to the observer's naked eye, but in the very fibers of their brains." *Id.* at 10.  "[T]he regions of the brain associated with impulse control, risk assessment, and moral reasoning develop last, after late adolescence." *Id.* at 11.

In a 2012 brief similarly concerning mandatory life sentencing for minors, the American Psychological Association and other amici recognized that minors are "less capable of mature judgment than adults" and "more vulnerable to negative external influences."  Br. for the Am. Psych. Ass'n, Am. Psychiatric Ass'n, and Nat'l Ass'n of Social Workers ("APA Br."), *Miller v. Alabama*, 567 U.S. 460 (2012) (Nos. 10-9646, 10-9647), 2012 WL 174239, at 7, 15.  "Sound judgment requires both cognitive and psychosocial skills" that minors lack because "the brain continues to develop throughout adolescence and young adulthood in precisely the areas and systems that are regarded as most involved in impulse control, planning, and self-regulation." *Id.* at 10, 14.

12

Plaintiffs' allies have recognized that adolescents use a "risk-reward calculus" that undervalues risks, *id.* at 10, and "overvalue[s] short-term benefits and rewards." Br. for the Am. Med. Ass'n and the Am. Acad. Of Child and Adol. Psychiatry ("*Miller* AMA Br."), *Miller*, 567 U.S. 460 (Nos. 10-9646, 10-9647), 2012 WL 121237, at 2. "[A]dolescents are less able than adults to envision and plan for the future, a capacity still developing during adolescence." APA Br. at 12. Therefore, they have less "ability to foresee and take into account the consequences of their behavior." *Id.* Further, "adolescents have less life experience on which to draw, making it less likely that they will fully apprehend the potential negative consequences of their actions." *Id.* "In short," the amici concluded, "the average adolescent cannot be expected to act with the same control or foresight as a mature adult." *Miller* AMA Br. at 3.

When it comes to criminal activity, Plaintiffs' allies have no problem recognizing that minors struggle to navigate peer pressure, weigh costs and benefits of life-altering decisions, or make clear-headed judgments about their adult lives. But when it comes to adolescents' decisions concerning dangerous and life-altering gender-related therapies, those concerns become politically inconvenient and are swept under the rug.

13

If more evidence were needed, the activities of the AMA further illustrate that politics, not science, often dictate the positions these professional organizations take on controversial issues. Among the largest spenders on political lobbying in the United States over the past two decades, the AMA takes fourth place.[29] The organization's efforts to influence policy have been linked historically to its financial connections to pharmaceutical and even tobacco manufacturers.[30] Further, as the organization's membership has recently skewed "younger and less conservative," the AMA has leaned into the culture wars. Thus, although in a previous generation "the AMA led the fight to outlaw abortion," it now files amicus briefs on behalf of abortion providers.[31] The AMA has also recently published a language guide for "advancing health equity."[32] According to that guide, physicians

---

[29] Top Spenders, *Open Secrets*, https://www.opensecrets.org/federal-lobbying/top-spenders?cycle=a.

[30] *See generally* Julia Lurie, The Untold Story of Purdue Pharma's Cozy Relationship with the American Medical Association, *Mother Jones* (Aug. 5, 2021), https://www.motherjones.com/politics/2021/08/purdue-pharma-american-medicalassociation-relationship-opioid-crisis-public-health/.

[31] Julie Rovner, American Medical Association Wades into Abortion Debate with Lawsuit, *National Public Radio* (July 2, 2019), https://www.npr.org/sections/healthshots/2019/07/02/738100166/american-medical-association-wades-into-abortiondebate-with-lawsuit.

[32] Am. Med. Ass'n and Ass'n of Am. Med. Colleges, Advancing Health Equity: A Guide to Language, Narrative and Concepts (2021), http://ama-assn.org/equity-guide.

should employ "equity-focused language."[33]  Thus, the guide suggests, instead of saying, "Factors such as our race, ethnicity or socioeconomic status should not play a role in our health," a physician should say, "Social injustices including racism or class exploitation, e.g., social exclusion and marginalization, should be confronted directly, so that they do not influence health outcomes."[34]  Like the AMA's language guide, its statement on medical transition treatments for minors is clearly a work of politics, not medicine.

Although the AMA frequently purports to speak for "substantially all physicians, residents, and medical students," that is hardly the case.  *See, e.g.*, Brief of Am. Acad. of Pediatrics and Add'l Orgs., *Brandt v. Rutledge*, No. 4:21CV00450-JM, ECF 30 (E.D. Ark. June 24, 2021), at 23.  After suffering a precipitous decline in membership since the 1970s, even with subsidized student memberships still only 12.6% of physicians belong to the organization.[35]  Nor should it be assumed that Plaintiffs' allies speak with the backing of even the majority of their membership.  In March 2021, for example, a proposed resolution was submitted to

---

[33] *Id.* at 20.

[34] *Id.*

[35] Miriam J. Laugesen, How the American Medical Association's Rent-Seeking Strategy Compensated for Its Loss of Members, 44 *J. of Health Politics, Policy, & Law* 67-85 (2019), https://doi.org/10.1215/03616878-7206731.

the American Academy of Pediatrics (AAP), asking that it "re-evaluate its commit-
ment to affirmative care in light of the growing international skepticism about this
treatment protocol for children and adolescents."[36]  Even though 80% of respond-
ing pediatricians voted in support of the resolution, the AAP's leadership took no
action.[37]  Instead, it continues to misrepresent the evidence and gloss over dissent-
ing views in its own ranks.

In our system of government, States serve as a necessary safeguard to pro-
tect the public, and especially young people, from the dangers of medical practices
advocated on the basis of politics or ideology rather than evidence.  States like Ala-
bama have a "compelling interest in protecting the physical and psychological
well-being of minors."  *Reno v. Am. C.L. Union*, 521 U.S. 844, 869 (1997) (quot-
ing *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)).  Legislat-
ing to protect these young people is especially justified given both their "peculiar
vulnerability" and "their inability to make critical decisions in an informed, mature
manner."  *Bellotti v. Baird*, 443 U.S. 622, 634 (1979).  This compelling interest in
protecting young people is independent of, but overlaps with, Alabama's important

---

[36] Abigail Shrier, A Pediatric Association Stifles Debate on Gender Dysphoria,
*Wall Street Journal* (August 9, 2021), https://www.wsj.com/articles/pediatric-asso-
ciation-gender-dysphoria-children-transgender-cancel-culture-11628540553.
[37] *Id.*

interest deriving from the State's "significant role" in "regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).

Indeed, where, as here, "there is medical and scientific uncertainty," the Court has properly given States—not practitioners or professional and advocacy organizations—"wide discretion" to regulate the practice of medicine. *Id.* at 163. Nothing requires Alabama to defer to the views of Plaintiffs' amici. *See City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 456 (1983) (O'Connor, J., dissenting) (criticizing rule requiring courts "to revise [their] standards every time the American College of Obstetricians and Gynecologists (ACOG) or [a] similar group revises its views about what is and what is not appropriate"); *Stenberg v. Carhart*, 530 U.S. 914, 1018 (2000) (Thomas, J., dissenting) (same). States get to make their own policy judgments about appropriate medical care. *Gonzales*, 550 U.S. at 163. And the Court itself has rejected positions taken by such organizations. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438 (6th Cir. 2019) (recounting how *Casey* and *Gonzales* upheld laws that "conflicted with official positions of ACOG").

## III. Contemporary best practices and multiple systematic reviews of the evidence contradict Plaintiffs' claims.

Despite the raging international controversy over the known and unknown dangers of cross-sex hormones and life-altering surgical procedures on teenagers, Plaintiffs and their allies urge, "Nothing to see here!" We have been here before:

17

"Pain management" was formerly advocated as a "fundamental human right," with some physicians dismissing as "opioidphobic" others' concern that "raising pain treatment to a 'patient's rights' issue could lead to overreliance on opioids."[38] New consensus-based standards assured doctors that prescribing more opioids was largely risk free. "However, no large national studies were conducted to examine whether the standards improved pain assessment or control."[39] The U.S. opioid epidemic, with its continuing fallout for millions of shattered lives, was the tragic result.[40]

Plaintiffs similarly rely on a purported "consensus" of statements published by American professional and advocacy organizations. Certainly, there was a time when recommending medical treatment based on mere consensus was considered a best practice. But "[i]n the 1990s, the rise of evidence-based medicine cast doubt on the reliability of expert consensus. Since then, medicine has increasingly relied on systematic reviews, as developed by the evidence-based medicine movement."[41]

---

[38] David W. Baker, The Joint Commission's Pain Standards: Origins and Evolution, 4, 9 (May 5, 2017), https://perma.cc/RZ42-YNRC.

[39] *Id.*

[40] *See* U.S. Health & Human Servs., What is the U.S. Opiod Epidemic? (October 27, 2021), https://www.hhs.gov/opioids/about-the-epidemic/index.html.

[41] K. Kendler and M. Solomon (2016), Expert Consensus v. Evidence-based Approaches in the Revision of the DSM, *Psychological Medicine* 46, doi:10.1017/S003329171600074X; *see id.* at 2258 ("Evidence hierarchies typically rank expert consensus at the bottom.").

And the systematic reviews show that Plaintiffs' claims of safety and effectiveness are unsupported by the scientific literature:[42]

- The Endocrine Society commissioned systematic reviews for its 2017 guidelines and evaluated evidence quality using the GRADE system.[43]  Relying on the single Dutch study discussed above, it recognized that only "very low-quality" or, at best, "low quality" evidence supports the use either of puberty blockers or cross-sex hormones.[44]  The guidelines could not "recommend" using puberty blockers, indicating skepticism concerning whether those "who receive" them "derive, on average, more benefit than harm."[45]

- Sweden's December 2019 systematic review of the literature found a lack of evidence that medical interventions reduce gender distress.[46]  Its updated February 2022 National Board of Health and Welfare guideline based on that review declares that "for those under 18," the risks of puberty blockers

---

[42] In addition to the reviews described below, under the Obama Administration, the Centers for Medicare & Medicaid Services conducted a 2016 review that concluded, "there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."  T. Jensen, J. Chin, J. Rollins, E. Koller, L. Gousis, and K. Szarama, Gender Dysphoria and Gender Reassignment Surgery, Centers for Medicare & Medicaid Services (August 13, 2016), https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282.

[43] See G.H. Guyatt, et al., GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations, 336 British Md. J. 924 (2008).

[44] Wylie C. Hembree, et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. Clinical Endocrinology & Metabolism 3869, 3872 (November 2017).

[45] Id. at 3879; see id. at 3872 (explaining strength and quality-of-evidence indicators)).

[46] Swedish Agency for Health Tech. Assessment and Assessment of Soc'l Servs., Gender Dysphoria in Children and Adolescents: An Inventory of the Literature, https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-theliterature/.

and cross-sex hormones "currently outweigh the possible benefits" and should be used only in research settings for exceptional cases of patients who have reached age 16 with long-lasting, prepubertal-onset gender dysphoria and have no significant mental-health comorbidities.[47]

- In June 2020, Finland conducted a systematic review and published new guidelines that broke with WPATH, stating that, "[a]s far as minors are concerned, there are no medical treatment[s] that can be considered evidence-based."[48]  It recognized that for adolescents with gender dysphoria, "[t]he first-line treatment" is "psychosocial support and, as necessary, psychotherapy and treatment of possible comorbid psychiatric disorders."  It concluded that because "reduction of psychiatric symptoms cannot be achieved with hormonal and surgical interventions, it is not a valid justification for gender reassignment."[49]

- In October 2020, the UK National Institute for Health and Care Excellence (NICE) published two systematic reviews of the evidence, finding that the studies supporting the use of puberty blockers and hormone therapy were "either of questionable clinical value" or otherwise "not reliable," and in any case showed little effect on gender dysphoria or mental health.[50]

---

[47] Updated Recommendations for Hormone Therapy for Gender Dysphoria in Young People, *Swedish National Board for Health and Welfare* (February 22, 2022), https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/ uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/; *see* SEGM Summary of Key Recommendations from the Swedish National Board of Health and Welfare (Socialstyrelsen/NBHW), *Society for Evidence Based Gender Medicine* (February 27, 2022), https://www.segm.org/segm-summary-sweden-prioritizes-therapy-curbs-hormones-for-gender-dysphoric-youth.

[48] Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland)*, https://segm.org/sites/default/files/Finnish_ Guidelines_2020_Minors_Unofficial%20Translation.pdf.

[49] *Id.*

[50] National Institute of Health & Care Excellence, Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria, at 13 (Mar. 11, 2021), https://www.evidence.nhs.uk/document?id=2334888&returnUrl= search%3fq%3dtransgender%26s%3dDate; National Institute of Health & Care Excellence, Evidence Review: Gender-affirming

- In November 2020, the international research network Cochrane published a systematic review "aimed to assess the efficacy and safety of hormone therapy" for male-to-female transitioners.[51]  Reviewing 1057 studies, it concluded that "[d]espite more than four decades of ongoing efforts to improve the quality of hormone therapy," no "[randomized controlled trials] or suitable cohort studies have yet been conducted to investigate the efficacy and safety of hormonal treatment approaches."  It agreed with the "repeatedly emphasized" problem of "a gap between current clinical practice and clinical research."[52]

- In April 2021, the *British Medical Journal Open* published a systematic review analyzing guidelines for treatment of blood-borne infections and medical interventions for gender dysphoria.[53]  It found that guidelines recommending hormonal interventions for gender dysphoria (including the WPATH guidelines) were "lower quality," "lack[ing] methodological rigor," and "linked to a weak evidence base."[54]

Note that these are not single studies with limitations but independent, comprehensive reviews of the scientific literature *at large*.[55]  Each systematic review provides

---

Hormones for Children and Adolescents with Gender Dysphoria, at 47 (Mar. 11, 2021), https://www.evidence.nhs.uk/document?id=2334889&returnUrl=search%3ffrom%3d2021-03-10%26q%3dEvidence%2bReview%26to%3d2021-04-01.

[51] Claudia Haupt, et al., Antiandrogen or Estradiol Treatment or Both during Hormone Therapy in Transitioning Transgender Women, *Cochrane Database of Systematic Reviews* (November 28, 2020).

[52] *Id.* at 10.

[53] Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment. *BMJ Open*, 11(4), e048943. https://doi.org/10.1136/bmjopen-2021-048943

[54] *Id.*

[55] Relatedly, in February 2022, the Cass Review submitted its interim report to the U.K. National Health Service, in which it stated that "the clinical approach and overall service design" in the U.K. "has not been subjected to some of the normal quality controls that are typically applied when new or innovative treatments are

21

an objective evaluation concluding that using pharmaceuticals and surgeries to address adolescents' gender-related psychological issues is not an evidence-based practice.[56]

Since the 1990s, it has been recognized that actual *evidence* is what matters. If Plaintiffs' purported consensus of statements by American professional and advocacy organizations (where not evidence but political forces hold sway) conflicts with multiple independent and objective reviews of the evidence, then so much the worse for that wayward consensus. Because the use of pharmaceuticals and surgeries to address adolescents' gender-related psychological issues is not evidence-

---

introduced," and that "there are major gaps in the research base underpinning the clinical management of children and young people with gender incongruence and gender dysphoria, including the appropriate approaches to assessment and treatment." Independent Review of Gender-Identity Services for Children and Young People: Interim Report, *The Cass Review* (February 2022), https://cass.independent-review.uk/publications/interim-report/. The review noted a "lack of an agreed consensus" whether gender-related distress calls for medical intervention "or whether it may be a manifestation of other causes of distress." *Id.*

[56] In February 2022, the National Academy of Medicine, France, similarly adopted a statement advising "great medical caution must be taken in children and adolescents, given the vulnerability, particularly psychological, of this population and the many undesirable effects and even serious complications that can be caused by some of the therapies available." Medical Care of Children and Adolescents with Transgender Identity, *National Academy of Medicine, France* (February 28, 2022), translated into English by the Society for Evidence-based Gender Medicine (March 2, 2022), https://segm.org/sites/default/files/English%20Translation_22.2.25-Communique-PCRA-19-Medecine-et-transidentite-genre.pdf. It further warned of "the addictive role of excessive engagement with social media, which" is "responsible for a very significant part of the growing sense of gender incongruence." *Id.*

based, practitioners lack a proper basis for believing that they will provide these young people more benefit than harm.  And that is precisely where the State of Alabama's important—even compelling—interests in protecting children and regulating the practice of medicine becomes all-important.

## IV.    Plaintiffs wrongly invoke the specter of suicide.

Plaintiffs repeatedly invoke the specter of suicide, claiming that medical procedures to change teenagers' bodies are the only way to address the tragically high rate of suicide among those who identify as transgender.  But there is no good evidence for those claims.

The only long-term treatment-outcome study purporting to show that these procedures improve mental-health outcomes was roundly debunked by multiple researchers.[57]  That study in fact showed "a spike in suicide attempts" in the year after surgery.[58]  Indeed,  the data "could be interpreted as showing that masculinizing

---

[57] Richard Bränström and John E. Pachankis, Reduction in Mental Health Treatment Utilization among Transgender Individuals after Gender-affirming Surgeries: A Total Population Study, 177 Am. J. of Psychiatry 727 (2020).

[58] David Curtis, *Study of Transgender Patients: Conclusions Are Not Supported by Findings*, 177 Am. J. Psychiatry 766, 766 (Aug. 2020); see Mikael Landén, *The Effect of Gender-Affirming Treatment on Psychiatric Morbidity Is Still Undecided*, 177 Am. J. Psychiatry 767 (Aug. 2020).

or feminizing surgeries were the actual cause of increased mental health utilization."[59]  In fact, "the risk of being hospitalized for a suicide attempt was 2.4 times higher if [participants] had undergone . . . surgery than if they had not."[60]

The journal published a "Correction" that explained, "[T]he results demonstrated *no* advantage of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts in that comparison."[61]  And the authors admitted that "individuals diagnosed with gender incongruence who had received gender-affirming surgery were *more* likely to be treated for anxiety disorders compared with individuals diag-

---

[59] William J. Malone and Sven Roman, *Calling Into Question Whether Gender-Affirming Surgery Relieves Psychological Distress*, 177 Am. J. Psychiatry 766, 766 (Aug. 2020).

[60] Agnes Wold, *Gender-Corrective Surgery Promoting Mental Health in Persons With Gen-der Dysphoria Not Supported by Data Presented in Article*, 177 Am. J. Psychiatry 768, 768 (Aug. 2020).  In addition to the letters already cited, see Avi Ring and William J. Malone, *Confounding Ef-fects on Mental Health Observations After Sex Reassignment Surgery*, 177 Am. J. Psychiatry 768 (Aug. 2020).

[61] *Correction to Bränström and Pachankis*, 177 Am. J. Psychiatry 734 (Aug. 2020), https://ajp.psychiatryonline.org/doi/10.1176/appi.ajp.2020.1778correction (emphasis added).

nosed with gender incongruence who had not received gender-affirming surgery."[62]  Consequently, the only long-term treatment-outcome study of these procedures demonstrates, if anything, actual harm to the mental health of persons undergoing surgery.

## CONCLUSION

Plaintiffs and their allies are not motivated by objective assessment of the evidence concerning what is best for Alabama's vulnerable young people.  Plaintiffs can close their eyes and plug their ears to the reality of what is plainly recognized by physicians and researchers in Sweden, Finland, the United Kingdom, and France; by many here in the United States; and by the news media.  But the State of Alabama, with its responsibility to protect its young people, cannot ignore the truth.  It must take action to protect kids from the practitioners who would foist these harmful procedures upon them with the empty promise of wholeness and wellbeing.  Indeed, by enacting the Alabama Vulnerable Child Compassion and Protection Act, it has done precisely that.  For these reasons, the Amici States respectfully ask the Court to reverse.

---

[62] Richard Bränström and John E. Pachankis, *Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender Affirming Care and Transgender Individuals' Mental Health: Response to Letters*, 177 Am. J. of Psychiatry 769, 771 (Aug. 2020) (emphasis added).

Dated: July 5, 2022

Respectfully submitted,

*/s/ Dylan L. Jacobs*

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

MICHAEL A. CANTRELL
  Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

26

## ADDITIONAL COUNSEL

TREG R. TAYLOR
Alaska Attorney General

MARK BRNOVICH
Arizona Attorney General

CHRIS CARR
Georgia Attorney General

TODD ROKITA
Indiana Attorney General

JEFF LANDRY
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

ERIC SCHMITT
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

DOUG PETERSON
Nebraska Attorney General

JOHN M. O'CONNOR
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

KEN PAXTON
Texas Attorney General

SEAN D. REYES
Utah Attorney General

PATRICK MORRISEY
West Virginia Attorney General

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6486 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This PDF file was scanned for viruses, and no viruses were found on the file.

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

The Amici States are authorized to file this brief without the consent of the parties or leave of the Court. Fed. R. App. P. 29(a)(2).

/s/ *Dylan L. Jacobs*
Dylan L. Jacobs

**CERTIFICATE OF SERVICE**

I certify that certify that on July 5, 2022, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  I certify that the foregoing document is being served on this day on all counsel of record registered to receive a Notice of Electronic Filing generated by CM/ECF.

/s/ *Dylan L. Jacobs*
Dylan L. Jacobs