No. 22-11707

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

PAUL EKNES-TUCKER, *et al.*,

Plaintiffs-Appellees

&

UNITED STATES OF AMERICA,

Intervenor-Appellee

v.

GOVERNOR OF THE STATE OF ALABAMA, *et al.*,

Defendants-Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
_____

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE
_____

PRIM F. ESCALONA
 United States Attorney
 Northern District of Alabama

PRAVEEN KRISHNA
 Assistant United States Attorney
 Northern District of Alabama

KRISTEN CLARKE
 Assistant Attorney General

BONNIE I. ROBIN-VERGEER
ELIZABETH P. HECKER
BARBARA SCHWABAUER
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 305-3034

*Eknes-Tucker, et al.* v. *Governor of Ala., et al.*, No. 22-11707

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 to 26.1-3 and 28-1(b), counsel for

Intervenor-Appellee United States hereby certifies that in addition to those

identified in the briefs filed by appellants and plaintiffs-appellees, the following

individual has an interest in the outcome of this case:

1.    Clarke, Kristen, U.S. Department of Justice, Civil Rights Division,

      counsel for Intervenor-Appellee United States.


                                        s/ Barbara Schwabauer
                                        BARBARA SCHWABAUER
                                        Attorney


Date:  August 10, 2022

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests oral argument in this case.  At the direction of this Court, the Clerk's office has tentatively assigned this case to the oral argument calendar for the week of November 14, 2022.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

STATEMENT REGARDING ORAL ARGUMENT

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES.................................................... 4

STATEMENT OF THE CASE........................................................ 4

    *1.*    *Factual Background* ...........................................................4

        *a.*    *Gender Dysphoria In Transgender Children
And Adolescents* .....................................................4

        *b.*    *Treatment With Gender-Affirming Care
For Gender Dysphoria*................................................6

        *c.*    *SB184* ........................................................................12

    *2.*    *Procedural History*...........................................................13

        *a.*    *Gender-Affirming Care For Minors In Alabama* ....................15

        *b.*    *The District Court's Order Granting
A Preliminary Injunction* ..........................................18

    *3.*    *Standard Of Review*...........................................................21

SUMMARY OF THE ARGUMENT ....................................................21

**TABLE OF CONTENTS (continued):**                    **PAGE**

ARGUMENT

I       THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION BY GRANTING
        A PRELIMINARY INJUNCTION ....................................................23

        A.      Standard Of Review ................................................................24

        B.      The District Court Did Not Abuse Its Discretion
                By Finding That Plaintiffs Are Likely To Succeed
                On Their Equal Protection Claim............................................24

                1.      SB184 Is Subject To Heightened Scrutiny ....................25

                        a.      The District Court Correctly Found That
                                SB184 Discriminates On The Basis Of Sex..........25

                        b.      SB184 Also Triggers Heightened Scrutiny
                                Because Transgender Persons Constitute
                                At Least A Quasi-Suspect Class ...........................28

                        c.      Defendants' Arguments That Heightened
                                Scrutiny Does Not Apply Are Meritless ..............32

                2.      The District Court Did Not Abuse Its
                        Discretion In Holding That SB184 Cannot
                        Withstand Heightened Scrutiny ....................................37

                        a.      The District Court Did Not Clearly Err By
                                Finding That Evidence Did Not Support
                                Defendants' Purported Justifications
                                For SB184............................................................38

                                i.      Defendants Failed To Substantiate
                                        Their Claim That The Banned
                                        Treatments Are Experimental
                                        And Harmful...............................................38

**TABLE OF CONTENTS (continued):**                           **PAGE**

     ii. *Defendants Failed To Substantiate Their Claim That Providers Are "Aggressively Pushing" The Banned Treatments* ..................................................44

    b. *Defendants' Claim That Gender-Affirming Care Is Harmful Because The "Majority Of Gender Dysphoric Youth" Will Not Persist In Their Gender Dysphoria Is Speculative* ..........46

    c. *Evidence Shows That SB184's True Purpose Is To Give Legal Effect To Moral Disapproval Of Transgender Persons* ................48

  C. *The District Court Did Not Abuse Its Discretion By Finding That Transgender Adolescents, Including The Minor Plaintiffs, Will Suffer Irreparable Harm Absent Injunctive Relief* ............................................................51

  D. *The District Court Did Not Abuse Its Discretion In Determining That The Balance Of Harms And The Public Interest Favored An Injunction* .....................................53

 II THE SCOPE OF THE DISTRICT COURT'S INJUNCTION IS NOT AN ABUSE OF DISCRETION ............................................55

  A. *Standard Of Review* ................................................................55

  B. *The District Court Did Not Abuse Its Discretion By Fashioning An Injunction That Ensures Complete Relief For Private Plaintiffs And The United States* ................55

CONCLUSION .................................................................................... 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

- iii -

# TABLE OF CITATIONS

**CASES:**                                                                                  **PAGE**

*Anderson* v. *Bessemer City*, 470 U.S. 564 (1985) ....................................................24

*Angel Flight of Ga., Inc.* v. *Angel Flight Am., Inc.*,
    522 F.3d 1200 (11th Cir. 2008) ......................................................55

*\*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020)...............................26-28, 32, 36

*Bowen* v. *City of New York*, 476 U.S. 467 (1986) ....................................................51

*Bowen* v. *Gilliard*, 483 U.S. 587 (1987) ........................................................... 29, 31

*Brandt* v. *Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021),
    appeal pending, No. 21-2875 (8th Cir. docketed Aug. 23, 2021) ......... *passim*

*Brown* v. *Zavaras*, 63 F.3d 967 (10th Cir. 1995) ....................................................29

*City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432 (1985) ............................29

*Cooper* v. *Harris*, 137 S. Ct. 1455 (2017) ..............................................................24

*Craig* v. *Boren*, 429 U.S. 190 (1976)......................................................................32

*Cumulus Media, Inc.* v. *Clear Channel Commc'ns, Inc.*,
    304 F.3d 1167 (11th Cir. 2002) ......................................................24

*Cuviello* v. *City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) .......................................51

*Department of Agric.* v. *Moreno*, 413 U.S. 528 (1973)...........................................48

*Dobbs* v. *Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ................... 35-36

*Flack* v. *Wisconsin Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wisc. 2018) ......................................................29

*Florida* v. *Department of Health & Human Servs.*,
    19 F.4th 1271 (11th Cir. 2021)....................................................56

**CASES (continued):**                                                                      **PAGE**

*Garrido* v. *Dudek*, 731 F.3d 1152 (11th Cir. 2013)...................................................55

*Geduldig* v. *Aiello*, 417 U.S. 484 (1974) ......................................................... 35-36

*Georgia Latino All. For Hum. Rts.* v. *Deal*, 691 F.3d 1250 (11th Cir. 2012).........51

*\*Glenn* v. *Brumby*, 663 F.3d 1312 (11th Cir. 2011).................................... 27-28, 37

*\*Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020),
    cert. denied, 141 S. Ct. 2878 (2021)....................................................... *passim*

*Karnoski* v. *Trump*, 926 F.3d 1180 (9th Cir. 2019)..................................................29

*KH Outdoor, LLC* v. *City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ..............54

*Lyng* v. *Castillo*, 477 U.S. 635 (1986) ............................................................... 29, 31

*M.A.B.* v. *Board of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704 (D. Md. 2018).....31

*Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718 (1982) ................................37

*NetChoice, LLC* v. *Attorney General*, 34 F.4th 1196 (11th Cir. 2022) ............. 23-24

*Nguyen* v. *Immigration & Naturalization Serv.*, 533 U.S. 53 (2001).....................36

*Nken* v. *Holder*, 556 U.S. 418 (2009) .....................................................................23

*Odebrecht Constr., Inc.* v. *Secretary, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ......................................................................52

*Personnel Adm'r* v. *Feeney*, 442 U.S. 256 (1979)...................................................33

*Pursuing Am.'s Greatness* v. *Federal Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016).......................................................................23

*United States* v. *Alabama*, 691 F.3d 1269 (11th Cir. 2012),
    cert. denied, 569 U.S. 968 (2013).......................................................... 23, 54

**CASES (continued):**                                                           **PAGE**

*United States* v. *Virginia*, 518 U.S. 515 (1996) ........................................ 21, 28, 37

*Whitaker By Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017),
    cert. dismissed, 138 S. Ct. 1260 (2018) ............................................ 27-28, 30

**CONSTITUTION AND STATUTES:**

U.S. Const. Amend. XIV ............................................................................. 54

42 U.S.C. 2000h-2 ........................................................................... 13, 54, 56

Ala. Code § 13A-4-4 (2022) ....................................................................... 52

Ala. Code § 13A-5-6(a)(3) (2022) ............................................................. 13

Ala. Code § 13A-5-11(a)(3) (2022) ........................................................... 13

Ala. Code § 13A-6-4(c) (2022) .................................................................. 50

Ala. Code § 13A-6-21(b) (2022) ................................................................ 50

Ala. Code § 13A-6-41(b) (2022) ................................................................ 50

Ala. Code § 13A-6-66(b) (2022) ................................................................ 50

Ala. Code § 13A-8-43(b) (2022) ................................................................ 50

Ala. Code § 26-1-1(a) (2022) ..................................................................... 13

2022 Ala. Legis. Serv. 289 (2022) (SB184) ..................................... *passim*

**MISCELLANEOUS:**

Am. Psych. Ass'n, *Diagnostic and Stat. Man. of Mental Disorders*
    (5th ed. text revision 2022) ...................................................................... 5

**MISCELLANEOUS (continued):** **PAGE**

APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2012), https://perma.cc/FM78-QMZ2 ............31

Kiara Alfonseca, *Alabama Governor Signs 'Don't Say Gay,' Trans Care, and Bathroom Ban Bills*, ABC News (Apr. 8, 2022), https://perma.cc/6ESP-A8E9 .........................................................................49

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016), https://perma.cc/5CL3-RG9E ........................................................................30

The Trevor Project, *Research Brief: LGBTQ Youth in the Workplace* (Mar. 30, 2021), https://perma.cc/TG7W-E4J3 .......................................................................30

Tony Perkins, *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable Child Compassion and Protection Act*, YouTube (Feb. 15, 2021) ..................................................49

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
————————————

No. 22-11707

PAUL EKNES-TUCKER, *et al.*,

Plaintiffs-Appellees

&

UNITED STATES OF AMERICA,

Intervenor-Appellee

v.

GOVERNOR OF THE STATE OF ALABAMA, *et al.*,

Defendants-Appellants
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
————————————

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE
————————————

## INTRODUCTION

Alabama's Vulnerable Child Compassion and Protection Act, 2022 Ala.
Legis. Serv. 289 (2022) (SB184) makes it a felony punishable by up to 10 years'
imprisonment for any person to "engage in or cause" a minor to receive certain
medical treatments for purposes of affirming a gender identity that differs from the

minor's sex assigned at birth, while leaving the same medical treatments available to other minors. No other regulatory body considering the safety and efficacy of gender-affirming care has taken such a drastic approach to limit transgender minors' access to evidence-based treatments for gender dysphoria. The district court preliminarily enjoined Alabama officials from enforcing Section 4(a)(1)-(3) of SB184, which bans puberty-delaying medications and hormone replacement therapies for transgender minors, pending trial.

The district court's injunction was not an abuse of discretion. By denying transgender minors access to gender-affirming care, SB184 violates the Equal Protection Clause of the Fourteenth Amendment. The law unjustifiably prohibits transgender minors from accessing medically necessary and appropriate care, while imposing no such limitation on cisgender minors. SB184 facially discriminates on the basis of sex and transgender status because the law describes the medical interventions it bans in explicitly sex-based terms and bans transgender minors—and only transgender minors—from undergoing these treatments. Accordingly, SB184 is subject to heightened scrutiny, but Alabama cannot show that SB184's criminalization of medically necessary gender-affirming care for transgender minors substantially serves an important government objective. The record evidence demonstrates that gender-affirming care for adolescents with gender dysphoria is safe and effective and can greatly improve their lives.

- 3 -

In contrast, Alabama offers only speculative harms to justify SB184, while failing to confront the district court's factual findings and the real and serious threat that denying medical treatment for gender dysphoria poses to the physical and mental wellbeing of transgender youth. Far from serving an important government objective, the State's purported justifications for SB184 are a pretext for the law's true purpose—moral disapproval of people who are transgender. Because the United States has a duty to ensure that States respect their obligations under the Constitution, the Attorney General has certified that this is a case of general public importance and intervened in the proceedings below to make certain that transgender youth, their families, and healthcare providers receive the equal protection of law.

By its terms, SB184 forces transgender youth with gender dysphoria either to forgo evidence-based medical care or put their parents, guardians, and healthcare providers under threat of felony prosecution. Either scenario creates an imminent threat of irreparable harm. Enforcement of an unconstitutional law that inflicts an injury this grave does not serve the public interest. For these reasons, this Court should find that the district court did not abuse its discretion in enjoining defendants from enforcing Section 4(a)(1)-(3) of SB184 pending trial.

## STATEMENT OF THE ISSUES

1.  Whether the district court abused its discretion by granting a preliminary injunction against the enforcement of Section 4(a)(1)-(3) of SB184, which criminalizes the provision of puberty-delaying medications and hormone replacement therapies for transgender minors.

2.  Whether the district court abused its discretion by not limiting the terms of the injunction to the parties in this litigation.

## STATEMENT OF THE CASE

*1.    Factual Background*

*a.    Gender Dysphoria In Transgender Children And Adolescents*

Gender identity is a person's "inner sense of belonging to a particular gender, such as male or female," which is "innate." Doc. 8-1, at 7-8; see also Doc. 112-1, at 2; Doc. 8-3, at 7.[1]  Transgender people are individuals whose gender identity does not conform with their sex assigned at birth. Doc. 112-1, at 2.  By contrast, cisgender persons have a gender identity that conforms with their sex assigned at birth.  Some transgender persons experience a condition known as "gender dysphoria," a diagnostic term for clinically significant distress resulting

---

[1] "Doc. ___, at ____" refers to the docket entry and page number of documents filed on the district court's docket. "Tr. __" refers to the consecutively paginated transcript from the preliminary injunction hearing. Docs. 104-105. "Br. ___" refers to page numbers in defendants' opening brief.

from the incongruence between one's gender identity and one's sex assigned at birth.  Doc. 112-1, at 2-3; Doc. 8-1, at 10-11; Doc. 8-3, at 8-9; Doc. 62-1, at 2.

To be diagnosed with gender dysphoria, the incongruence between one's sex assigned at birth and one's gender identity must persist for at least six months. Doc. 112-1, at 2-3; Doc. 8-3, at 9.  This incongruence must also be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning.  Doc. 8-3, at 9; Am. Psych. Ass'n, *Diagnostic and Stat. Man. of Mental Disorders* (5th ed. text revision 2022), https://perma.cc/FM78-QMZ2.  For transgender youth, this distress manifests in myriad ways.  Younger children may experience sleep difficulties, gastrointestinal issues, depression, anxiety, and suicidal ideation.  Tr. 61.  For some adolescents (youth who have entered puberty) experiencing gender dysphoria, the onset of puberty can trigger or exacerbate this distress because their bodies are changing in ways incompatible with their gender identity.  That distress may manifest as anxiety and depression, academic decline, self-harming behaviors, and withdrawal from relationships and activities.  Doc. 112-1, at 3; Tr. 21, 102; see also, *e.g.*, Doc. 8-1, at 18-19; Doc. 8-5, at 3.

Clinical approaches to treating gender dysphoria differ for young children (before puberty) versus adolescents because gender dysphoria is more likely to persist into adulthood for the latter group.  Doc. 112-1, at 3; Doc. 69-18, at 11, 17;

- 6 -

see also Tr. 102; Doc. 69-19, at 3876, 3879.  For young children whose gender

dysphoria does not persist, their gender dysphoria typically abates before

adolescence.[2]  Tr. 51-53, 81-82, 181, 226-229, 329.  By contrast, research and

clinical experience strongly suggest that if gender dysphoria begins in or continues

into adolescence, it is more likely to persist into adulthood.  Doc. 112-1, at 3; Tr.

330; Doc. 78-18, at 11; see also Doc. 69-19, at 3879 (noting that "clinical

experience suggests that persistence  *  *  *  can only be reliably assessed after the

first signs of puberty"); Tr. 51-53, 81-82, 102, 181, 226-229; Doc. 8-1, at 9.  As

discussed below, the prevailing standards of care take this distinction into account

when recommending any medical interventions.

      *b.*   *Treatment With Gender-Affirming Care For Gender Dysphoria*

"Gender dysphoria is highly treatable and can be effectively managed" by

helping people experiencing this condition live in alignment with their gender

identity.  Doc. 8-3, at 8-9.  Left untreated, however, gender dysphoria can cause

serious mental and physical harm, including anxiety, depression, eating disorders,

substance use and abuse, self-harm, and suicidality.  Doc. 112-1, at 3, 30; Tr. 20;

Doc. 8-1, at 19-20; Doc. 8-3, at 9, 18-21; Doc. 78-36, at 5; Doc. 78-37, at 12; Doc.

78-43, at 8-9.

---

     [2]  Defendants refer to the experience of no longer experiencing gender dysphoria as "desistance."  See Br. 11.

- 7 -

The prevailing standards for treating gender dysphoria are set out in the World Professional Association for Transgender Health (WPATH) Standards of Care and the Endocrine Society's clinical practice guidelines.  Doc. 112-1, at 4; Tr. 220; Doc. 8-3, at 8-9; Doc. 62-2, at 17-18; see Doc. 69-18; Doc. 69-19.  The development of these standards "followed well-established methods for developing standards of care," and they "reflect the consensus of experts in the field of transgender medicine, based on the best available science and clinical experience" over more than 40 years.  Doc. 8-3, at 9-11; see also Doc. 62-2, at 12-16; Tr. 220-221.  They are also taught as part of the standard curriculum in American medical schools.  Tr. 113.

Treatment for gender dysphoria is often referred to as gender-affirming care (or transition), which facilitates a transgender minor's ability to live consistent with their gender identity.  Gender-affirming care for minors can include (i) "social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents"; and (ii) medical interventions, including, as relevant here, "puberty-delaying medication and hormone-replacement therapy."  Doc. 8-3, at 11; see also Doc. 62-2, at 13-15.[3]

---

[3] Plaintiffs do not challenge SB184's surgical ban (*e.g.*, genital or other gender-affirming surgeries) because the surgeries at issue are not performed on transgender minors in Alabama, irrespective of SB184, and because the prevailing standards do not recommend any genital surgeries for transgender minors.  Tr. 113-114, 130; see also Doc. 62-2, at 17-18.

- 8 -

Which types of gender-affirming care are appropriate for transgender youth with gender dysphoria depends on the patient's age and other medical and mental health needs.  Doc. 8-3, at 11.  Before puberty's onset, no medical interventions are recommended as gender-affirming care.  Tr. 25, 101-102; Doc. 8-1, at 12-15; Doc. 8-3, at 12; Doc. 69-18, at 17-18; Doc. 69-19, at 3869-3870.  Once a transgender minor enters puberty, however, healthcare providers may consider further options for care, including medical interventions along with social transition.  Tr. 101-102; Doc. 8-3, at 12; Doc. 62-2, at 11, 14.

Under the prevailing standards, if treatment is sought, providers may prescribe medical interventions for transgender youth only after conducting an individualized, robust assessment of the patient, including examining the length and intensity of their gender dysphoria; ensuring proper management of any other health needs; and confirming there are no medical contraindications for the treatment.  Doc. 112-1, at 10; Doc. 62-2, at 20-21; Doc. 8-3, at 16-17; Doc. 69-18, at 14-15, 18; Doc. 69-19, at 3869-3870, 3878.  As clarified in the guidelines, no medical interventions are appropriate without the informed assent of the patient and consent of their parents or guardians.  Doc. 69-19, at 3869-3870, 3878; Doc. 8-3, at 16-18; Doc. 62-2, at 20-22; Tr. 222-223.

Once a patient begins puberty, puberty-delaying medications—also called "puberty blockers"—may become medically necessary and appropriate to treat

gender dysphoria in some cases. Doc. 112-1, at 3; Tr. 101-102; Doc. 8-3, at 12;

Doc. 62-2, at 11, 13-14, 17-18. This treatment temporarily pauses the physical

changes associated with puberty and thereby avoids the severe distress of

developing permanent, unwanted physical characteristics that do not align with the

patient's gender identity. Doc. 8-3, at 12-13.

Puberty blockers have been used for decades to delay puberty for cisgender

children with early onset or "precocious puberty." Doc. 112-1, at 18; Tr. 104, 224-

225; Doc. 8-3, at 14; Doc. 62-2, at 11, 16-17. Their effects are generally

reversible, and "the risks of any serious adverse side effects  *  *  *  are

exceedingly rare." Doc. 8-3, at 13; Tr. 104-105; Doc. 91-1, at 11. Possible side

effects include weight gain, mood changes, injection-site pain or reactions, and a

slight decrease in the rate of bone mineral acquisition, the latter of which typically

resolves once puberty completes. Tr. 106. Puberty blockers do not cause any

long-term loss of sexual function or fertility. Tr. 131; Doc. 78-19, at 25-26.

Puberty blockers provide a "pause button" that extends the time during

which young people, their families, and healthcare providers can determine an

appropriate treatment plan. Doc. 69-18, at 18; Doc. 69-19, at 3880. For some

transgender youth, this treatment will be discontinued because their gender

dysphoria does not persist; these adolescents will resume puberty consistent with

their sex as assigned at birth. Tr. 105-107; Doc. 8-3, at 13. For most others, this

treatment provides additional time to determine whether and when additional gender-affirming care is warranted.  Tr. 101-102; Doc. 8-3, at 13; Doc. 69-19, at 3880.  Treatment with puberty blockers typically continues for one to three years. Doc. 112-1, at 3; Tr. 106; see also Doc. 8-3, at 13.

For older adolescents whose gender dysphoria persists, hormone-replacement therapy with masculinizing or feminizing hormones may also become medically necessary and appropriate.  Doc. 112-1, at 3-4.  Typically, evaluation for these hormone therapies starts around age 14.  Doc. 62-2, at 21-22.  Hormone therapy initiates certain physical changes of puberty associated with the adolescent's gender identity.  Tr. 108-110; Doc. 8-3, at 13-14; Doc. 62-2, at 14, 17-18.  For example, a transgender girl will experience breast growth, and a transgender boy will develop a lower voice as well as facial hair.  Doc. 8-3, at 13. If hormone therapy is stopped, the production of hormones consistent with the adolescent's sex assigned at birth will resume.  Doc. 8-3, at 14.

Healthcare providers regularly use hormones to treat not only transgender patients with gender dysphoria but also cisgender and intersex patients whose hormone levels vary from normal.  Doc. 112-1, at 18; Tr. 110-111; Doc. 78-19, at 24.  The possible side effects of hormone therapies vary depending on the hormone at issue.  Potential risks associated with feminizing hormones, such as estrogen, include blood clots, liver damage or disease, loss of upper body strength, diabetes,

heart disease, increased blood pressure, gallstones, and breast cancer.  Doc. 78-41, at 2-4.  Potential risks of masculinizing hormones, such as testosterone, include acne, emotional changes, blood clots, inflamed liver, weight gain, high blood pressure, diabetes, and male pattern baldness.  Doc. 78-41, at 9-11; Doc. 69-18, at 39-40.  These medical risks are generally the same for transgender persons and cisgender persons.  Doc. 78-19, at 27.  Both hormones also carry some risk of impaired fertility and lost sexual function.  Doc. 112-1, at 3; Doc. 78-41, at 3, 10; Doc. 69-18, at 42; Doc. 69-19, at 3879-3880; Tr. 132-134, 231; Doc. 78-19, at 25-26.  These potential effects are not inevitable, but the risk exists.  Thus, the prevailing standards recommend providing minor patients (and their parents) with information about options for preserving fertility and about potential changes in sexual function.  Doc. 62-2, at 22; Doc. 78-41, at 3, 10; Doc. 69-18, at 42; Doc. 69-19, at 3879-3880.

The American Academy of Pediatrics and 21 other major medical associations agree that gender-affirming care is safe, effective, and evidenced-based care that is necessary to the health and wellbeing of transgender youth with gender dysphoria.  Doc. 112-1, at 4, 9 & n.12 (listing associations); Tr. 25, 97-98, 104-105; Doc. 91-1, at 15; Doc. 62-2, at 11-12, 13-15.  Gender-affirming care "significantly improve[s] a transgender young person's mental health" by ensuring that "their physical appearance more closely aligns with their gender identity."

Doc. 8-3, at 14; see also Doc. 8-3, at 18-19.  Observational studies show that gender-affirming care is associated with meaningful benefits for adolescents, including better mental health outcomes (including lower odds of lifetime suicidal ideation), improved psychosocial functioning, and overall increased quality of life. See Doc. 62-2, at 13-15; Doc. 78-33, at 703; Doc. 78-34, at 2212-2213; Doc. 78-35, at 46; Doc. 78-36, at 5, 7; Doc. 78-37, at 9-11; Doc. 78-42, at 4; Doc. 78-43, at 8-9; Doc. 78-44, at 308.  Clinical experience confirms these benefits.  Tr. 112; Doc. 8-2, at 6; Doc. 8-9, at 6; Doc. 8-10, at 4-5.  Gender-affirming care can also reduce the likelihood of persons with gender dysphoria needing surgery in adulthood.  Doc. 8-3, at 13, 15.

    *c.*    *SB184*

    SB184 was signed into law on April 8, 2022, and became effective May 8, 2022.  See SB184, § 11.  The statute prohibits any person, including a parent or medical professional, from "engag[ing] in or caus[ing]" certain practices

> to be performed upon a minor if the practice is performed for the purposes of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that perception is inconsistent with the minor's sex as defined in this act.

*Id.* § 4(a).  The statute defines "sex" as the "biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."  *Id.* § 3(3).  As relevant here, the statute specifically precludes

- 13 -

administering puberty blockers or hormone therapies to minors[4] for the purpose

prohibited by the Act.  *Id.* § 4(a)(1)-(3).  However, SB184 makes an exception for

these procedures if they are "undertaken to treat a minor born with a medically

verifiable disorder of sex development."  *Id.* § 4(b).

A violation of Section 4 is a Class C felony punishable by up to 10 years'

imprisonment and up to a $15,000 fine.  SB184, § 4(c); Ala. Code §§ 13A-5-

6(a)(3), 13A-5-11(a)(3) (2022).

## 2.    *Procedural History*

Private plaintiffs filed suit in the Middle District of Alabama against

Alabama state and local law enforcement officials, including the Attorney General

and five district attorneys.  Doc. 1, at 6-7.[5]  Among other claims, private plaintiffs

challenged SB184 under 42 U.S.C. 1983, alleging that the statute violates the

Equal Protection Clause.  Doc. 1, at 29-30.  They immediately sought a temporary

restraining order and preliminary injunction to enjoin defendants' enforcement of

the statute before it became effective.  Doc. 8.

The United States sought to intervene to bring its own equal protection claim

against the defendants pursuant to 42 U.S.C. 2000h-2.  Doc. 58.  The United States

---

[4]  The age of majority is 19 in Alabama.  Ala. Code § 26-1-1(a) (2022).

[5]  Plaintiffs also sued Governor Kay Ivey, who was subsequently dismissed
from the lawsuit by agreement of all parties.  Doc. 117.

- 14 -

also moved for a temporary restraining order and preliminary injunction to block

enforcement of SB184.  Doc. 62.  After a hearing, the district court granted the

United States' motion to intervene.  Doc. 94; Doc. 103.

Before SB184 took effect, the district court held a three-day hearing on the

preliminary injunction motions.  Docs. 104-105.[6]  Plaintiffs presented expert

testimony regarding the prevailing standards of treatment for gender dysphoria,

how providers treat transgender youth with gender dysphoria in Alabama, the

evidence supporting gender-affirming care for transgender minors, and the

potential impact of SB184 on transgender minors in Alabama.  Doc. 112-1, at 9.

This included testimony from Dr. Linda Hawkins, a licensed professional

counselor who co-directs the Gender & Sexuality Program at The Children's

Hospital of Philadelphia and who has worked with more than 4,000 transgender

children and adolescents.  She testified as an expert in the treatment of gender

dysphoria in children and adolescents.  Tr. 11-12, 16; Doc. 8-1, at 2-3.

Additionally, Dr. Morissa Ladinsky, who treats transgender youth at the University

of Alabama-Birmingham (UAB) gender health clinic, testified as an expert on

pediatric transgender care in Alabama.  Tr. 92, 95-96.  Finally, Dr. Armand

Antommaria, a pediatrician, bioethicist, and director of the Ethics Center at the

---

[6]  At the hearing, all parties agreed that the challenges to SB184 would be
limited to Section 4(a)(1)-(3), the provisions banning puberty blockers and
hormone therapies for transgender minors.

- 15 -

Cincinnati Children's Hospital Medical Center, testified as an expert in bioethics and treatment protocols for adolescents with gender dysphoria.  Doc. 112-1, at 11; Tr. 215-216; Doc. 62-2, at 3-6.[7]

Alabama presented expert testimony from Dr. James Cantor, a clinical psychologist and neuroscientist in private practice in Toronto.  Tr. 253.  Although Dr. Cantor has clinical experience treating gender dysphoria in adult patients, he has never provided clinical care to or diagnosed transgender minors with gender dysphoria, he has no experience monitoring patients who are undergoing puberty blockers or hormone therapy, and he has no personal knowledge of the treatment protocols in place at any Alabama gender clinic.  Doc. 112-1, at 12; Tr. 306-308.[8]

Private plaintiffs and defendants also offered additional evidence from fact witnesses, including some who testified in person at the hearing.  See Docs. 8-4 to 8-10; Docs. 69-26 to 69-39; Tr. 151-205, 337-363.

a.    *Gender-Affirming Care For Minors In Alabama*

Plaintiffs presented the only evidence in the record about the practice of gender-affirming care for transgender minors in Alabama, including testimony

---

[7]  Private plaintiffs also submitted an expert declaration from Dr. Stephen Rosenthal, a pediatric endocrinologist and the medical director of The Child and Adolescent Gender Center at the University of California, San Francisco.  Doc. 8-3, at 3.

[8]  Defendants also submitted declarations from several other expert witnesses.  Docs. 69-3 to 69-7; see p. 40, *infra*.

from Dr. Ladinsky (Doc. 8-2; Tr. 93-149), plaintiffs Dr. Jane Moe (Doc. 8-9) and

Dr. Rachel Koe (Doc. 8-10; Doc. 129, at 1-30), and plaintiff parents of transgender

patients seeking or receiving gender-affirming care in Alabama (Docs. 8-5 to 8-8).

Dr. Ladinsky testified about UAB's multidisciplinary gender health clinic,

which is the only one of its kind in Alabama. Tr. 96-97, 100. The clinic is run by

a team of specialists, including a pediatric endocrinologist, pediatricians,

psychologists, gynecologists, social workers, and a chaplain, who provide

individualized care to children and adolescents with gender dysphoria. Tr. 96-97,

100. The clinic follows the prevailing standards and guidelines for care established

by the American Academy of Pediatrics in 2018. Tr. 99; see Doc. 78-32.

Since the UAB clinic opened in 2015, between 400 and 450 pediatric

patients have used its services, but only one third of those patients have received

medical interventions for gender dysphoria. Tr. 96, 128-129. The vast majority

(80%) of the clinic's pediatric patients were referred to the clinic by their local

primary care provider. Tr. 97; Doc. 129, at 13-14; Doc. 8-10, at 3-5. The

remainder are transgender youth who have required emergency psychiatric or other

inpatient care, including due to "severe eating disorders[] or suicidal ideation." Tr.

97. Most of the pediatric patients have already been working long term with a

mental health professional. The clinic has a six-month wait. Tr. 100.

- 17 -

During a patient's first visit, the clinic's psychology team conducts a

comprehensive assessment for gender dysphoria and other underlying mental

health conditions.  Tr. 100, 158-160; Doc. 8-7, at 4-5.  The clinic also provides

resources and support to families and responds to questions and concerns.  Tr. 100,

158-160; Doc. 8-7, at 4-5.  After that, the clinic treats most pediatric patients for

one to three years before initiating any medical therapy.  Tr. 102, 161-163; Doc. 8-

2, at 4; Doc. 8-7, at 6-8.  After this extended observation and assessment period

and before prescribing any medical treatment, the clinic conducts a robust

assessment of the patient and an in-depth informed consent process with patients

and their parents, consistent with the prevailing standards of care.  Tr. 101-102,

107-108, 133-136, 161-163; Doc. 8-2, at 3-5; Doc. 8-7, at 6-8; Doc. 8-9, at 3-4.

Other healthcare providers who work with transgender minors in Alabama follow

similarly cautious evaluation processes before making referrals for gender-

affirming care.  Doc. 129, at 10-13.

If the clinic prescribes puberty blockers, a patient will receive them for no

longer than 2.5 years.  Tr. 106.  The clinic generally does not prescribe hormone

therapy to adolescents younger than 15.  Tr. 135.  Once any medical treatment

begins, the clinic monitors a patient's progress at "regular intervals" to assess the

"efficacy of the prescribed treatment through a physical examination or laboratory

tests," to evaluate "a patient's mental health," and "to address any questions the

patient or their parents may have." Doc. 8-2, at 5; see also Doc. 8-10, at 3-4.
Providers continually inform patients "that exit ramps are available at each age
[and] each stage" of the process.  Tr. 103.

Alabama healthcare providers' clinical experience with transgender youth
poignantly illustrates that for most patients with gender dysphoria, the benefits of
gender-affirming care far outweigh the risks.  Doc. 112-1, at 10; Tr. 112; Doc. 8-2,
at 6; Doc. 8-9, at 6; Doc. 8-10, at 4-5.  These providers have witnessed patients
receiving this care make significant improvements in their mental health and
overall wellbeing.  Tr. 112-113, 179-180; Doc. 8-9, at 6; Doc. 8-10, at 4-5.  With
gender-affirming care, Dr. Ladinsky's patients, for example, exude "a radiance, a
self-confidence," and she has seen their "[a]cademic prowess soar[]."  She has seen
teenagers who were "sullen" and "withdrawn" "join the world in ways they hadn't
before" and cease self-harming behaviors.  Tr. 112.  None of the clinic's patients
who received gender-affirming care have "express[ed] regret" or sought to
"retransition[] to their birth sex."  Tr. 112-113; see also Tr. 180-181.

b.    *The District Court's Order Granting A Preliminary Injunction*

The district court granted in part the motions for a preliminary injunction.
Doc. 107; Doc. 112-1.[9]  As relevant here, the court found that private plaintiffs and

---

[9]  Doc. 112-1 is a revised version of the court's original order (Doc. 107)
with a minor correction.

the United States were substantially likely to succeed on the merits of their equal protection challenge to SB184.  Doc. 112-1, at 24.

The district court first held that SB184 constitutes a sex-based classification because it "prohibits transgender minors—and only transgender minors"—from receiving puberty blockers and hormone therapies "due to their gender nonconformity."  Doc. 112-1, at 22.  That sex-based classification triggered heightened scrutiny.  Doc. 112-1, at 23.

Applying heightened scrutiny, the district court found that Alabama could not satisfy its burden to demonstrate "an exceedingly persuasive justification" for SB184.  Doc. 112-1, at 23-24.  In making this determination, the court gave "very little weight" to the testimony of defendants' expert Dr. Cantor because he had never diagnosed or treated a child or adolescent with gender dysphoria, he lacked "personal experience monitoring patients" receiving gender-affirming care, and he had "no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic."  Doc. 112-1, at 12.  The court found that defendants produced no evidence that puberty blockers and hormone therapies "are experimental" or "jeopardize the health and safety of minors," and emphasized that "nothing in the record shows that medical providers are pushing [these] transition medications on minors."  Doc. 112-1, at 19, 24.  Instead, the court found that defendants' justifications were "hypothesized [and] not exceedingly persuasive,"

- 20 -

and accordingly, that plaintiffs had established a substantial likelihood of success on their equal protection claim.  Doc. 112-1, at 24.

The district court also concluded that the minor plaintiffs "will suffer irreparable harm absent injunctive relief."  Doc. 112-1, at 30.  The court found that without access to the prohibited treatments, "Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality."  Doc. 112-1, at 30 (citing Tr. 20, 167).  The court also found that "Minor Plaintiffs will suffer significant deterioration in their familial relationships and educational performance."  Doc. 112-1, at 30 (citing Tr. 35, 112-113).

Finally, considering together the balance of harms and the public interests at stake, the district court concluded that the "imminent threat of harm" to minor plaintiffs, including "severe physical and/or psychological harm  *  *  *  outweighs the harm the State will suffer from an injunction."  Doc. 112-1, at 31.  The court also found that a preliminary injunction was "not adverse to the public interest." Doc. 112-1, at 31.  Finding that all of the relevant factors favored an injunction, the district court granted all the relief requested—a preliminary injunction enjoining the defendants from enforcing Section 4(a)(1)-(3) of the statute pending trial.  Doc. 112-1, at 32-33.

Defendants timely appealed on May 16, 2022.  Doc. 108.

- 21 -

*3.    Standard Of Review*

Defendants' challenges to the district court's order granting a preliminary injunction and to the scope of that injunction are subject to an abuse-of-discretion standard of review.  See p. 24, *infra*.

## SUMMARY OF THE ARGUMENT

1.  The district court did not abuse its discretion by preliminarily enjoining defendants, pending trial, from enforcing SB184's ban on puberty blockers and hormone therapies for transgender minors.

The district court properly concluded, as relevant here, that the United States and private plaintiffs are likely to succeed on the merits of their equal protection challenge.  As the court recognized, SB184 discriminates on the basis of sex because the law's prohibitions are stated in sex-based terms and because it targets transgender minors based on their gender non-conformity.  Accordingly, as the court held, heightened scrutiny applies.  Heightened scrutiny also applies because transgender persons constitute at least a quasi-suspect class.

Applying heightened scrutiny, the district court correctly concluded that defendants failed to show that SB184 "serves important governmental objectives" and that it is "substantially related to the achievement of those objectives."  *United States* v. *Virginia*, 518 U.S. 515, 533 (1996).  For example, the court did not err, much less clearly err, in finding that defendants failed to show that SB184 would

protect minors from "experimental" treatments.  Rather, as the court recognized,
the record shows that puberty blockers and hormone therapies are evidence-based,
safe, and effective for those adolescents with gender dysphoria for whom they are
prescribed.  Nor, as the court found, did defendants substantiate their claim that
healthcare providers are aggressively pushing gender-affirming care on
transgender minors—in Alabama or elsewhere.  Accordingly, the court did not
abuse its discretion in determining that the State's proffered justifications were
"hypothesized, not exceedingly persuasive."

Finally, the district court did not abuse its discretion in concluding that
transgender adolescents, including the minor plaintiffs, will suffer irreparable
harm, including severe medical and psychological harms, in the absence of a
preliminary injunction.  The court also properly weighed the imminent threat of
harm to plaintiffs against the speculative harm to Alabama and the public interest,
and readily determined that the balance favored a preliminary injunction.

2.  Nor did the district court's decision not to limit the injunction to the
parties constitute an abuse of discretion.  Such a limited injunction would not have
afforded complete relief to the United States, which seeks to ensure the equal
protection of the law for all transgender minors in Alabama, or to the private
plaintiffs.  Thus, the court acted well within its discretion in issuing a preliminary
injunction enjoining defendants from enforcing Section 4(a)(1)-(3) pending trial.

## ARGUMENT

## I

## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING A PRELIMINARY INJUNCTION

A district court may grant a preliminary injunction if the moving party establishes:  "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *United States* v. *Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012), cert. denied, 569 U.S. 968 (2013).  Of these, "likelihood of success on the merits is generally the most important factor."  *NetChoice, LLC* v. *Attorney General*, 34 F.4th 1196, 1209 (11th Cir. 2022) (citation and internal quotation marks omitted). The final two factors—the balance of equities and the public interest—are inherently intertwined when governmental parties are involved.  See *Nken* v. *Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am.'s Greatness* v. *Federal Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Upon consideration of these factors, the district court did not abuse its discretion by granting a preliminary injunction prohibiting defendants from enforcing Section 4(a)(1)-(3) of SB184 pending trial.

A.     *Standard Of Review*

This Court reviews the "grant of a preliminary injunction for abuse of discretion." *NetChoice*, 34 F.4th at 1209. This deferential standard of review applies because "preliminary injunctions are, by their nature, products of an expedited process" and therefore, are based on an abbreviated record without the benefit of full discovery. *Cumulus Media, Inc.* v. *Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002). Because "the trial court is in a far better position [than the reviewing court] to evaluate" such a record, this Court "will not disturb factual findings unless they are clearly erroneous." *Ibid.* Under this standard, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper* v. *Harris*, 137 S. Ct. 1455, 1465 (2017) (quoting *Anderson* v. *Bessemer City*, 470 U.S. 564, 574 (1985)). Similarly, judgments about the "viability of a plaintiff's claims and the balancing of equities and the public interest are the district court's to make," and this Court "will not set them aside unless the district court abused its discretion in making them." *Cumulus Media, Inc.*, 304 F.3d at 1171. The district court's legal conclusions are reviewed de novo. *NetChoice*, 34 F.4th at 1209.

B.     *The District Court Did Not Abuse Its Discretion By Finding That Plaintiffs Are Likely To Succeed On Their Equal Protection Claim*

The district court did not abuse its discretion by finding that private plaintiffs and the United States established a substantial likelihood of success on

the merits of their equal protection claim.  SB184 discriminates on the basis of sex

and transgender status and cannot withstand heightened scrutiny.

    *1.*    *SB184 Is Subject To Heightened Scrutiny*

The district court correctly held that SB184 is subject to heightened scrutiny

because it targets only transgender minors, and thus discriminates on the basis of

sex.  Doc. 112-1, at 23.  The court's holding is also correct because transgender

persons constitute at least a quasi-suspect class, which also triggers heightened

scrutiny.

    *a.*    *The District Court Correctly Found That SB184 Discriminates*
        *On The Basis Of Sex*

As the district court correctly found, SB184 discriminates on the basis of sex

because it targets "transgender minors—and only transgender minors" by

prohibiting them from receiving puberty blockers and hormone therapies "due to

their gender nonconformity."  Doc. 112-1, at 23.  The law unjustifiably prohibits

transgender minors from obtaining care that has been well established as medically

appropriate, while imposing no comparable limitation on cisgender minors seeking

the same forms of care.

Section 4(a) of SB184 expressly discriminates against transgender minors by

defining its prohibitions in terms of a transgender minor's nonconformity with

their sex assigned at birth.  This provision states that minors cannot obtain medical

treatments "for the purpose of attempting to alter the appearance of or affirm the

- 26 -

minor's perception of his or her gender or sex, *if that appearance or perception is inconsistent with the minor's sex as defined in this act*." SB184, § 4(a) (emphasis added). "Sex" is defined as "[t]he biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* § 3.

By its own terms, Section 4(a)'s prohibitions apply only to transgender minors by prohibiting certain medical treatments only when they are sought by transgender minors. For example, SB184 prohibits a transgender girl (who was assigned male at birth) from receiving puberty blockers or estrogen to treat her gender dysphoria—*i.e.*, for the purpose of altering her appearance in a way that is inconsistent with being male or that would affirm her perception of being female. SB184, § 4(a)(1), (3). However, a cisgender girl can access the same treatments that Section 4 prohibits to treat other conditions because they affirm her gender identity consistent with her sex assigned at birth.[10]

The Supreme Court has recognized that "it is impossible to discriminate against a person for being * * * transgender without discriminating against that individual based on sex." *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020); see also Doc. 112-1, at 22. This is true because such discrimination rests on a

---

[10] Likewise, Section 4(a)'s prohibitions do not apply if the procedures are "undertaken to treat a minor born with a medically verifiable disorder of sex development." SB184, § 4(b).

- 27 -

person identifying with a different sex or gender "than their sex identified at birth."

*Bostock*, 140 S. Ct. at 1746.  If "changing the [minor's] sex would have yielded a

different" outcome under the law, then the minor's sex is a but-for cause of that

outcome, and the law discriminates on the basis of sex.  *Id.* at 1741.  The

application of this principle to SB184 is straightforward—if an adolescent who was

assigned female at birth seeks to obtain testosterone therapy to affirm his gender

identity as a boy, SB184 bans it.  But change the minor's sex assigned at birth to

male, and SB184 does not.  Thus, because SB184 discriminates against

transgender minors, it inherently discriminates on the basis of sex.

Similarly, this Court's own precedent establishes that discrimination on the

basis of "gender nonconformity" is "sex-based discrimination" within the meaning

of the Equal Protection Clause.  *Glenn* v. *Brumby*, 663 F.3d 1312, 1317 (11th Cir.

2011).  And other courts of appeals have agreed.  See *Grimm* v. *Gloucester Cnty.*

*Sch. Bd.*, 972 F.3d 586, 608-610 (4th Cir. 2020) (concluding that discrimination

against transgender persons is sex discrimination under the Equal Protection

Clause, including because transgender persons "fail[] to conform to sex

stereotype[s]"), cert. denied, 141 S. Ct. 2878 (2021); *Whitaker By Whitaker* v.

*Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir.

2017) (same), cert. dismissed, 138 S. Ct. 1260 (2018).

Furthermore, Section 4(a) facially discriminates because it uses explicitly sex-based terms to criminalize certain treatments based on a minor's "sex" as defined by SB184.  In addition to using the term "sex" as discussed above, Section 4(a) bars "prescribing or administering  *  *  *  testosterone or other androgens to *females*" and "estrogen to *males*."  SB184, § 4(a)(2)-(3) (emphasis added).  Thus, SB184's prohibition on certain medical treatments cannot be stated, let alone enforced, "without using the words man, woman, or sex (or some synonym)." *Bostock*, 140 S. Ct. at 1746.  Because SB184 "cannot be stated without referencing sex," it is "inherently based upon a sex-classification." *Whitaker*, 858 F.3d at 1051.  Indeed, defendants admit that SB184 classifies on the basis of sex:  "The Act *uses sex* only to determine who would benefit from certain drugs and who would not."  Br. 53 (emphasis added).  That is obviously a sex-based distinction. Accordingly, the law is subject to heightened scrutiny.  *United States* v. *Virginia*, 518 U.S. 515, 555 (1996); *Glenn*, 663 F.3d at 1315-1316.

> b.    *SB184 Also Triggers Heightened Scrutiny Because Transgender Persons Constitute At Least A Quasi-Suspect Class*

SB184 also triggers heightened scrutiny because it discriminates against transgender persons, who constitute at least a quasi-suspect class.  The Supreme Court has analyzed four factors to determine whether a group constitutes a "suspect" or "quasi-suspect" class:  (1) whether the class historically has been

- 29 -

subjected to discrimination, see *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986);

(2) whether the class has a defining characteristic that "frequently bears no relation

to [the] ability to perform or contribute to society," *City of Cleburne* v. *Cleburne*

*Living Ctr.*, 473 U.S. 432, 440-441 (1985) (citation omitted); (3) whether the class

has "obvious, immutable, or distinguishing characteristics that define them as a

discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the class lacks political

power, see *Bowen* v. *Gilliard*, 483 U.S. 587, 602 (1987).  If these factors are

satisfied, then the classification warrants heightened scrutiny.

After analyzing these factors, the Fourth and Ninth Circuits (and numerous

district courts) have concluded that "transgender people constitute at least a quasi-

suspect class."  *Grimm*, 972 F.3d at 610 (collecting district court cases reaching

same conclusion); *Karnoski* v. *Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); see

also, *e.g.*, *Brandt* v. *Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021), appeal

pending, No. 21-2875 (8th Cir. docketed Aug. 23, 2021); *Flack* v. *Wisconsin Dep't*

*of Health Servs.*, 328 F. Supp. 3d 931, 952 (W.D. Wisc. 2018).[11]

First, "[t]here is no doubt" that transgender persons, as a class, "historically

have been subjected to discrimination on the basis of their gender identity,

---

[11]  The Tenth Circuit in *Brown* v. *Zavaras*, 63 F.3d 967, 971 (1995), held
that a transgender plaintiff was "not a member of a protected class," but that
decision "reluctantly followed a since-overruled Ninth Circuit opinion."  *Grimm*,
972 F.3d at 611.

including high rates of violence and discrimination in education, employment, housing, and healthcare access." *Grimm*, 972 F.3d at 611 (citation omitted); see also *Whitaker*, 858 F.3d at 1051. And there is ample evidence that transgender people experience higher levels of physical and sexual violence, harassment, and discrimination than their non-transgender counterparts based on their transgender status. For example, the 2015 U.S. Transgender Survey, which represents "the largest nationwide study of transgender discrimination," *Grimm*, 972 F.3d at 597, found that 47% of respondents reported being sexually assaulted. See Doc. 62-1, at 14 n.15 (citing Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 96 (Dec. 2016), https://perma.cc/5CL3-RG9E (USTS Survey)). The USTS Survey also found that 77% of respondents who had a job the previous year "hid their gender identity at work, quit their job, or took other actions to avoid discrimination." USTS Survey, 154. Another recent study found that 61% of employed transgender respondents ages 13-24 reported experiencing discrimination in the workplace. Doc. 62-2, at 14 n.15 (citing The Trevor Project, *Research Brief: LGBTQ Youth in the Workplace* (Mar. 30, 2021), https://perma.cc/TG7W-E4J3).

Second, whether a person is transgender bears no relation to their ability to contribute to society. As the Fourth Circuit has found, "[s]eventeen of our foremost medical, mental health, and public health organizations agree that being

- 31 -

transgender 'implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.'" *Grimm*, 972 F.3d at 612 (citing APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2012), https://perma.cc/ES7D-YVG2).

Third, there is no reasonable dispute that transgender persons share "obvious, immutable, *or* distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638) (emphasis added). Transgender persons are distinguishable as a group because their gender identities do not align with their sex assigned at birth. Courts have also held that transgender status is immutable because it "is not a choice" but is "as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-613; see also, *e.g.*, *M.A.B.* v. *Board of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 720-721 (D. Md. 2018) (collecting district court cases).

Finally, transgender persons lack meaningful political power. They are "underrepresented in every branch of government" and "constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process." *Grimm*, 972 F.3d at 613 (citing data). Furthermore, the continued proliferation of laws and governmental policies targeting transgender persons for discrimination, particularly transgender youth, is further evidence of the limited

- 32 -

power that transgender people have in the political process.[12]

All four factors confirm that transgender persons constitute at least a quasi-suspect class, which requires heightened scrutiny. See *Grimm*, 972 F.3d at 613. Consequently, the district court's decision to apply heightened scrutiny (Doc. 112-1, at 24-25) was also correct because SB184 discriminates on the basis of transgender status.

      c.     *Defendants' Arguments That Heightened Scrutiny Does Not Apply Are Meritless*

Defendants' arguments that heightened scrutiny does not apply to SB184 are unpersuasive. First, defendants argue that SB184 does not discriminate on the basis of sex (or transgender status), but on the basis of procedure.[13] As proof, the defendants argue that no minor, male or female, can obtain the prohibited procedures. Br. 46-47; see also Br. 5. But the Supreme Court has squarely rejected this argument. *Bostock*, 140 S. Ct. at 1741-1742. A law that discriminates

---

[12] In Alabama alone, on the same day the Governor signed SB184 into law, the State enacted another law targeting transgender youth in public schools (grades K-12) by banning them from using bathrooms and locker rooms that align with their gender identity; the law also restricts classroom instruction about transgender persons and gender identity. Doc. 62-1, at 16 n.19.

[13] Defendants also argue that SB184 draws distinctions on the basis of age rather than sex. Br. 47. To be sure, SB184 applies only to medical care provided to minors. But that does not preclude finding that it also discriminates on the bases of sex and transgender status. See *Craig* v. *Boren*, 429 U.S. 190 (1976).

- 33 -

against *both* transgender girls and boys "*doubles* rather than eliminates" liability for sex discrimination.  *Id.* at 1742 (emphasis added).

Defendants also argue that instead of drawing a sex-based distinction, SB184 creates two neutral categories:  minors who seek "certain experimental procedures for the purposes" prohibited by the statute and "all other minors."  Br. 47-48.  To start, this argument ignores the fact that the first category cannot even be described (or enforced) without referencing sex since SB184 prohibits treatments based on whether they are "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex."  SB184, § 4(a).[14] And nowhere does Section 4(a) differentiate between these two groups of minors by use of the term "experimental procedure," which also is not defined in the statute.

Regardless, as the district court correctly observed, "the fundamental flaw in [defendants'] argument is that the first category consists entirely of transgender minors."  Doc. 112-1, at 23.  In response, defendants argue that there are

---

[14]  For this same reason, defendants' reliance on *Personnel Administrator* v. *Feeney*, 442 U.S. 256 (1979), is also unavailing.  Br. 49.  SB184 is not a facially neutral statute "affect[ing] certain groups unevenly."  *Feeney*, 442 U.S. at 271-272. The veteran's preference at issue in *Feeney* can be described without referring to sex; the medical procedures criminalized by SB184 cannot.  Furthermore, unlike in *Feeney*, the evidence here reflects that SB184 was passed "because of, not merely in spite of," its effects upon an identifiable group.  *Id.* at 279; see pp. 48-50, *infra*.

- 34 -

transgender minors in both categories described above because not all transgender

minors seek the medical care that SB184 criminalizes.  Br. 46, 48.  This fact makes

no difference—SB184 discriminates against transgender minors by criminalizing

treatments when provided for purposes for which *only* transgender minors with

gender dysphoria would seek them (even if not all do so).  Indeed, SB184's

legislative findings confirm its goal of targeting transgender minors by expressing

a commitment to criminalize medical care for youth who experience "discordance

between their sex and their internal sense of identity" and "reveal signs of gender

nonconformity," including those diagnosed with "gender dysphoria."  SB184

§ 2(2), (3), (5) and (16).

Defendants also wrongly argue that both categories created by SB184

contain "non-transgender individuals" because some minors "who seek the

experimental procedures (and *identify as transgender* now)" will not identify as

transgender in adulthood.  Br. 48 (emphasis added).  But defendants' argument

depends on a sleight of hand.  Regardless of whether most transgender minors who

seek the prohibited treatments will persist in their gender identity into adulthood,

the fact remains that the minors seeking the banned treatments identify as

transgender when they pursue them.  If they did not, these minors would not be

diagnosed with gender dysphoria, a prerequisite for obtaining the care SB184

criminalizes.  In any event, defendants' premise—that most transgender minors

who seek prohibited treatments will *not* persist in their gender identity into adulthood—is flawed.  As explained, pp. 5-6, above, that is not the case; research and clinical experience show that transgender *adolescents*—the only minors who are eligible for the banned medical treatments under the prevailing standards—are more likely to persist into adulthood.  See, *e.g.*, Tr. 222-223, 226-228.

Still, analogizing SB184 to laws regulating pregnancy and abortion, which the Supreme Court has held do not inherently involve sex-based classifications, defendants contend that SB184 does not discriminate on the basis of sex.  Br. 49-50 (citing *e.g.*, *Geduldig* v. *Aiello*, 417 U.S. 484 (1974), and *Dobbs* v. *Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)).  But this precedent is inapposite.  For example, in *Geduldig*, the Court upheld a state insurance program that excluded pregnancy as a covered disability because "[t]here is no risk from which men are protected and women were not" under the program.  417 U.S. at 496-497.  The same is true of abortion:  States do not typically prohibit the exact same abortion services for one particular disfavored class while permitting it for everyone else.

But SB184 does not address "a medical procedure that only one sex can undergo."  *Dobbs*, 142 S. Ct. at 2245.  Instead, the law prohibits only transgender minors from accessing medical treatments that are available to *everyone else*.  Indeed, SB184 cannot describe which medical treatments it bans *without* explicitly

- 36 -

referencing a minor's sex (or transgender status). And even if SB184 regulated a

medical procedure that only one sex can undergo—which is manifestly incorrect—

the Court still recognized in *Dobbs* that where (as here), regulation of a medical

procedure is a "mere pretext[t] designed to effect an invidious [sex-based]

discrimination," it violates the Equal Protection Clause. 142 S. Ct. at 2246

(quoting *Geduldig*, 417 U.S. at 497 n.20). As explained below, see pp. 48-50, the

record reflects that SB184's true purpose is to give legal effect to moral

disapproval of transgender persons.

Finally, defendants argue that, even if SB184 discriminates against

transgender minors, it does not count as sex discrimination because SB184 is based

on "unavoidable biological differences between sexes." Br. 50-51. For this same

reason, defendants argue that the holdings of *Bostock* and *Glenn* do not "translate

to the medical context." Br. 52. Defendants are wrong. Biological differences

between the sexes may potentially be relevant to the State's purported *justification*

for the law, but they do not bear on the analysis of whether a classification is sex-

based. See *Nguyen* v. *Immigration & Naturalization Serv.*, 533 U.S. 53, 60, 64

(2001) (applying heightened scrutiny to a sex-based classification and holding the

law was *justified* because of the biological differences between men and women).

SB184 draws sex-based distinctions; therefore, heightened scrutiny applies.

2.    *The District Court Did Not Abuse Its Discretion In Holding That SB184 Cannot Withstand Heightened Scrutiny*

To satisfy heightened scrutiny, defendants bear the "demanding" burden of showing that "the [challenged] classification serves important governmental objectives" and that it is "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533.  This justification must be "exceedingly persuasive." *Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718, 723-724 (1982) (citation omitted).  Accordingly, the justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation" and "must not rely on overbroad generalizations." *Virginia*, 518 U.S. at 533; see also *Glenn*, 663 F.3d at 1321.  Importantly, a classification does not withstand heightened scrutiny when the "alleged objective" differs from its "actual purpose."  *Hogan*, 458 U.S. at 730.

Defendants argue that SB184 protects children from puberty blockers and hormone therapies that are experimental and harmful and are being aggressively pushed on minors by medical providers.  Br. 40-41; see also SB184, § 2(5) and (7). The district court did not err, let alone clearly so, in finding that these purported justifications were "hypothesized, [and] not exceedingly persuasive."  Doc. 112-1, at 24.  Defendants' justifications for SB184 also fail because they are a pretext for discrimination based on moral disapproval of transgender people.

        a.     *The District Court Did Not Clearly Err By Finding That*
            *Evidence Did Not Support Defendants' Purported Justifications*
            *For SB184*

The district court did not clearly err in finding that Alabama's purported

justifications for SB184 are hypothesized.  Doc. 112-1, at 24.

        i.     *Defendants Failed To Substantiate Their Claim That The*
             *Banned Treatments Are Experimental And Harmful*

The district court did not clearly err in finding that defendants failed to

demonstrate that "transitioning medications" are "experimental" or that the risks

associated with these treatments endanger the health of minors with gender

dysphoria.  Doc. 112-1, at 18, 24; see also *Brandt*, 551 F. Supp. 3d at 891 (finding

that, in banning gender-affirming care for minors, Arkansas had not shown that

such treatment was experimental, and concluding that the State's purported health

concerns were pretextual).

    As the district court found here, the "uncontradicted record evidence is that

at least twenty-two major medical associations in the United States," including the

American Academy of Pediatrics, the American Medical Association, the

American Pediatric Society, the Association of Medical Colleges, "endorse

transitioning medications as well-established, evidence-based treatments for

gender dysphoria in minors."  Doc. 112-1, at 17 (citing Tr. 25, 97-98, 126-127);

Doc. 112-1, at 4; Doc. 91-1, at 15; accord *Brandt*, 551 F. Supp. 3d at 891.

Moreover, in determining that these treatments are not experimental, the court

recognized that healthcare providers have used puberty blockers to treat "central precocious puberty" since the 1980s and that "[d]octors have also long used hormone therapies for patients whose natural hormone levels are below normal." Doc. 112-1, at 18; see also Tr. 104, 110-112, 224-225; Doc. 8-3, at 14; Doc. 62-2, at 11, 16-17.  Indeed, the same procedures that SB184 prohibits for transgender minors seeking to affirm their gender identity remain permissible for all other purposes.  And although the risks and side-effects defendants decry can affect cisgender and intersex minors, too, Alabama leaves the decision whether to obtain such treatments to treating physicians, parents, and minors.  The law's selective "concern" undercuts the State's profession of a legitimate purpose.

Most significantly, gender-affirming care is "supported by medical evidence that has been subject to rigorous study." *Brandt*, 551 F. Supp. 3d at 891.  There have been ample observational studies, including federally-funded research trials, supporting the safety and efficacy of puberty blockers and hormone therapies for treating gender dysphoria.  Doc. 62-2, at 11-15; Tr. 220-221, 241-242.  See also pp. 11-12, *supra*.  WPATH and the Endocrine Society have followed well-established methods for developing the standards of care that guide treating minors with gender dysphoria, using the best available scientific evidence in conjunction with the clinical experience of experts in transgender medicine.  Doc. 8-3, at 9-11; see also Doc. 62-2, at 12-16.

The district court found that defendants, by contrast, produced "no credible evidence to show that transitioning medications are experimental" or that they "jeopardize the health and safety of minors" with gender dysphoria.  Doc. 112-1, at 18-19.  First, the court accorded "very little weight" to defendants' expert Dr. Cantor's testimony "regarding the treatment of gender dysphoria in minors."  Doc. 112-1, at 12.  The court did not clearly err in making this determination about Dr. Cantor's credibility and the relevance of his testimony, given that Dr. Cantor himself admitted:

> (1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving [gender-affirming care]; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic.

Doc. 112-1, at 12 (citing Tr. 306-309).

Defendants' other expert declarations suffer from the same infirmities.  Among them, only that of Diana Kenney, Ph.D., a psychologist in Australia, reflects direct experience with transgender minors, but like Dr. Cantor, she has not worked with any minors receiving gender-affirming care.  Doc. 69-7, at 55-57, 61-62.  Similarly, Sydney Wright's testimony that she regrets her testosterone treatments has little, if any, relevance to the State's claim that gender-affirming care is experimental and harmful to minors.  See Br. 41.  Ms. Wright was not a

minor when she received testosterone to treat her gender dysphoria; nor did she receive any treatment in Alabama.  See Doc. 112-1, at 13.  Furthermore, she now "believes [that] gender dysphoria is not a legitimate diagnosis" (Doc. 112-1, at 13), an extreme position that not even defendants adopt, see Br. 10-11; SB184, § 2(2).

Even taking defendants' evidence at face value, the district court did not clearly err in finding that Alabama failed to substantiate its purported concern that gender-affirming care is experimental or unsafe.  First, defendants generally critique the studies supporting the use of puberty blockers and hormone therapies because they are uncontrolled observational studies rather than randomized, placebo-controlled trials.  Br. 21-22.  But as Dr. Antommaria explained, although observational studies are considered lower quality evidence than randomized controlled trials, observational studies "can be sufficient to justify treatment recommendations."  Doc. 62-2, at 12-13, 17-18.  And as reflected in other medical guidelines, "medical treatment in pediatrics" is "commonly based on lower quality evidence, including observational studies."  Doc. 62-2, at 19-20.  Controlled trials would also provide "lower quality evidence" here because it would be impossible to "blind" the investigators (or participants) from knowing whether they were receiving a placebo due to the physical changes associated with these treatments.  Doc. 62-2, at 14-15; Tr. 241.  Equally important, "randomized, placebo-controlled trials" on minors with gender dysphoria, which would require withholding

- 42 -

treatment from some participants, would be "unethical," given that "prospective

observational trials * * * demonstrate the efficacy of puberty blockers and

gender-affirming hormone therapy."  Tr. 241.

Next, defendants argue that treatment of gender dysphoria with puberty

blockers is experimental because the Food and Drug Administration (FDA) has not

approved their use specifically for that purpose.  Br. 15-16.  Their concern is

misplaced.  FDA approval is not required for all uses of a medication, and off-label

use is in fact common in many areas of medicine, including pediatrics.  Tr. 240;

Doc. 62-2, at 8-10.  Indeed, even when there is "substantial evidence of safety and

efficacy" for a new use of a medication, "a sponsor may not seek FDA approval

because doing so is not economically beneficial."  Doc. 62-2, at 10.

Defendants also highlight developments in the United Kingdom, Sweden,

Finland, France, and New Zealand regarding gender-affirming care for minors,

including calls for additional research and the placement of some limits on access

to this care.  Br. 23-24; Docs. 69-9 to 69-15.  Although entities in these countries

are assessing the efficacy of gender-affirming care, defendants' own expert admits

that "no country or state in the world categorically bans their use as Alabama has."

Doc. 112-1, at 17-18; see also Tr. 326-328.  The district court did not err in finding

that these developments in a handful of other countries do not outweigh the

conclusions of 22 major medical associations and the clinical experience of

practitioners and experts in the United States, including in Alabama, that gender-affirming care is evidence-based, safe, and effective. And, as plaintiffs' experts have testified, Alabama clinicians treating adolescents with gender dysphoria undertake thorough and considered assessments before recommending medical interventions for gender-affirming care. See pp. 17-18, *supra*.

Although the research supporting the benefits of gender-affirming care is "quickly evolving and likely will continue to do so," the district court emphasized that this does not mean that gender-affirming care is experimental or that it imperils the health or safety of minors with gender dysphoria. Doc. 112-1, at 18-19, 21; see also *Brandt*, 551 F. Supp. 3d at 891 (finding defendants' reliance on international developments "not credible").

Finally, defendants argue that the risks of gender-affirming care, including the potential for loss of fertility and sexual function with hormone therapies, demonstrate that these treatments are unsafe for minors. Br. 17, 43-44. The district court again did not clearly err in finding that these risks do not justify SB184. See Doc. 112-1, at 10, 19-20. These are *risks*—not guaranteed outcomes—and patients and their parents are counseled about them in detail and about options for preserving fertility. Doc. 78-41, at 3, 10; Doc. 69-18, at 42; Doc. 69-19, at 3879-3880. Moreover, as the court explained, "risk alone does not make a medication experimental," as almost every medical regime carries some form of

- 44 -

risk.  Doc. 112-1, at 18.  Indeed, these risks are ones that doctors, patients, and

parents must confront when considering the propriety of medical treatment in

many pediatric health contexts.  Tr. 223.  Based on these considerations, the court

did not clearly err in finding that defendants presented no credible evidence that

gender-affirming care is experimental or that the treatments "jeopardize the health

and safety of minors."  Doc. 112-1, at 19.

> ii.    *Defendants Failed To Substantiate Their Claim That*
> *Providers Are "Aggressively Pushing" The Banned*
> *Treatments*

Similarly, the district court did not clearly err in concluding that "nothing in

the record shows that healthcare providers are pushing transitioning medications

on minors."  Doc. 112-1, at 24.  Instead, as the court found, based on testimony

from Dr. Ladinsky and Dr. Hawkins, "minors and their parents undergo a thorough

screening process and give informed consent before any treatment regime begins."

Doc. 112-1, at 10 (citing Tr. 41, 59, 132; Doc. 78-41, at 1-14).  This robust

screening process for minor patients includes, among other things, assessing the

length and intensity of their gender dysphoria as well as managing any other co-

existing psychological or medical problems.  Doc. 62-2, at 21-22; Doc. 8-3, at 16-

17.  Additionally, the process for informed assent for minor patients and informed

consent for parents involves a comprehensive explanation of the potential risks and

- 45 -

benefits of any treatment.  Tr. 100-102, 161-163; Doc. 8-2, at 4-5; Doc. 8-3, at 16-17; Doc. 8-9, at 3-4; Doc. 78-41, at 1-14.

Defendants assert that the district court's finding is contradicted by evidence from parents supporting SB184 who say that such treatments were pushed on their children.  Br. 41.  Not so.  Many of these parents describe, through declarations, situations in which their children *did not receive* a medical intervention because the parents did not consent, which means that the protections built into the prevailing standards of care worked as intended.  See Docs. 69-29, 69-32, 69-38. Other parents describe situations in which their children obtained the medical intervention as *adults*, which is not relevant as to whether these treatments are being pushed on *minors*.[15]  See Docs. 69-31, 69-33, 69-34, 69-39.  The district court did not err, let alone clearly err, by failing to find that providers are "aggressively pushing" medical interventions onto minors when at most, the testimony described circumstances in which minors did not actually receive them.[16]  As such, the court did not clearly err by crediting the testimony of

---

[15]  Several parent declarations reference care that children received at the age of 18, but conspicuously fail to specify the State in which the medical intervention was obtained.  *E.g.*, Doc. 69-33, at 3; Doc. 69-34, at 3; Doc. 69-39, at 3-4.  Thus, these children may have obtained care in a State in which 18 is the age of majority. See, *e.g.*, Doc. 69-39, at 3-4.

[16]  Nor did the district court clearly err by evidently discounting the declarations from two other parents, whose adolescent children received gender-

plaintiffs' experts and fact witnesses, including Drs. Ladinsky, Koe, and Moe, all of whom are Alabama clinicians, to find that gender-affirming care is not being "aggressively pushed" on transgender adolescents in Alabama.

> ### b.    Defendants' Claim That Gender-Affirming Care Is Harmful Because The "Majority Of Gender Dysphoric Youth" Will Not Persist In Their Gender Dysphoria Is Speculative

Defendants also argue that even if gender-affirming care "is beneficial to youth whose gender dysphoria persist[s] into adulthood," the "majority of gender dysphoric youth will not persist" and thus, providing gender-affirming care to those who do not is harmful.  Br. 41-42.  Because this claim is misleading and speculative and it weighs future, potential harm more heavily than the existing profound harms currently faced by transgender minors with gender dysphoria (Doc. 112-1, at 3, 29-30), this justification for SB184 is not "exceedingly persuasive."

Defendants' assertion that the "majority of gender dysphoric youth will not persist" (Br. 42) obscures the differences between minors with gender dysphoria in early childhood versus those in adolescence.  As the district court properly found, "gender dysphoria in adolescents  *  *  *  is more likely to persist into adulthood than gender dysphoria in children."  Doc. 112-1, at 3; see also Doc. 78-18, at 11;

---

affirming care with consent, but not in Alabama.  Doc. 69-30, at 2; Doc. 69-36, at 2-3.

Doc. 69-19, at 3879.  The court did not clearly err in making this finding, which is drawn from the WPATH Standards of Care and supported by clinical experience, as presented at the preliminary injunction hearing.  Doc. 112-1, at 3 n.3 (citing Doc. 78-18, at 17); Tr. 51-53, 81-82, 181, 222-223, 226-229.  Even Dr. Cantor admits that the rates of "desistance" he discusses do not directly speak to outcomes for *adolescents* with gender dysphoria.  Tr. 329-330.  This distinction between early childhood and adolescence is significant because the prevailing standards of care account for this consideration by reserving medical interventions for those adolescents diagnosed with gender dysphoria that persists into puberty.  In other words, the patients who are eligible to receive medical intervention as gender-affirming care are the ones who are more likely to persist in their gender incongruence or gender dysphoria.

Defendants' argument also entirely disregards the benefits of gender-affirming care for adolescents with gender dysphoria.  As Dr. Ladinsky testified, gender-affirming care has greatly benefited her teenage patients:

> To see gender dysphoria averted, abated, you will see a radiance, a
> self-confidence, but most importantly, we see teenagers who have
> been sullen, withdrawn, failing academically, not interested in the
> activities and peer groups they used to be in, join the world in ways
> they hadn't before.  Academic prowess soars.  We see graduation.
> We see higher education.  But most importantly, we also see youth
> who manifested severe anxiety and depression sometimes even self-
> harm and cutting[–]to see that long gone is incredible.

Tr. 112.  Dr. Koe and Dr. Moe also observed improved mental health and overall

well-being for their patients receiving gender-affirming care.  Tr. 179-180; Doc. 8-

9, at 6; Doc. 8-10, at 4-5; see also Tr. 156, 163, 165-167.  Moreover, clinical

experience and scientific research suggest that transgender adolescents who receive

gender-affirming care also benefit from that care as adults.  See pp. 11-12, *supra*.

Because SB184 gives more weight to preventing an entirely speculative future

harm (potential regret) rather than addressing the present and acute harm to the

health and wellbeing of transgender youth diagnosed with gender dysphoria, the

district court did not clearly err in finding that the State's justification is

hypothetical at best.

      *c.*    *Evidence Shows That SB184's True Purpose Is To Give Legal
Effect To Moral Disapproval Of Transgender Persons*

The record below shows that SB184 cannot survive heightened scrutiny for

the additional reason that its purported justifications are a pretext for

discrimination based on moral disapproval of transgender persons.  The "desire to

harm a politically unpopular group cannot constitute a legitimate government

interest." *Department of Agric.* v. *Moreno*, 413 U.S. 528, 534 (1973).  For this

reason, SB184 cannot withstand even rational basis scrutiny.  *Ibid.*

SB184's targeting of transgender minors, as well as their parents and

healthcare providers, was no accident.  Several of the law's proponents made

comments reflecting moral disapproval of transgender persons and hostility toward

the medical needs of transgender youth.  Representative Wes Allen, a sponsor of

SB184, explained that a motivation behind legislation banning gender-affirming

care for transgender youth is to affirm that if children "are born male, that they're a

male and if they're born female, they're a female."  Doc. 62-1, at 6-7 (citing Tony

Perkins, *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable Child

Compassion and Protection Act*, YouTube at 4:14 (Feb. 15, 2021)).[17]  Governor

Kay Ivey expressed similar sentiments when signing SB184 into law:

> I believe very strongly that if the Good Lord made you a boy, you are
> a boy, and if He made you a girl, you are a girl  *  *  *  [L]et us all
> focus on helping them to properly develop into the adults God
> intended them to be.

Doc. 62-1, at 8 (citing Kiara Alfonseca, *Alabama Governor Signs 'Don't Say Gay,'

Trans Care, and Bathroom Ban Bills*, ABC News (Apr. 8, 2022),

https://perma.cc/6ESP-A8E9).

Defendants offer no justification for why Alabama took the unprecedented

step of turning to the criminal law to address its concerns, rather than the civil and

regulatory measures States traditionally use to regulate medical practice.  SB184

treats the provision of gender-affirming care to transgender adolescents as a crime

---

[17]  Available at https://www.youtube.com/watch?v=E9Q_b22cUWw.

on par with aggravated assault, first-degree sexual abuse, or robbery,[18] and indeed as more serious than criminally negligent homicide or unlawful imprisonment.[19] Defendants cannot establish an "exceedingly persuasive" reason to equate medically necessary care for treating gender dysphoria with a violent crime; nor can they reconcile SB184's severity with the record evidence demonstrating the benefits of gender-affirming care.

This evidence taken as a whole, combined with the weak and misleading justifications defendants have advanced for prohibiting the treatments at issue *only* for transgender minors, strongly suggests that the justifications for SB184 are a pretext for discrimination.

\* \* \*

For all of these reasons, the district court did not abuse its discretion by finding that the United States and private plaintiffs were substantially likely to succeed on the merits of their equal protection claims.  Doc. 112-1, at 24.

---

[18]  See Ala. Code § 13A-6-21(b) (2022) (defining second-degree assault as Class C felony); Ala. Code § 13A-6-66(b) (2022) (same for first-degree sexual abuse); Ala. Code § 13A-8-43(b) (2022) (same for third-degree robbery).

[19]  See Ala. Code § 13A-6-4(c) (2022) (defining criminally negligent homicide as Class A misdemeanor); Ala. Code § 13A-6-41(b) (2022) (same for unlawful imprisonment).

C.    *The District Court Did Not Abuse Its Discretion By Finding That*
*Transgender Adolescents, Including The Minor Plaintiffs, Will Suffer*
*Irreparable Harm Absent Injunctive Relief*

The district court also did not abuse its discretion in concluding that without

injunctive relief, the enforcement of SB184 would cause irreparable harm to

transgender adolescents in Alabama, including to the minor plaintiffs.  Doc. 112-1,

at 30; see also *Brandt*, 551 F. Supp. 3d at 892 (finding transgender minors will

suffer irreparable harm without access to gender-affirming care).  First, the risk of

suffering severe medical harm constitutes an irreparable harm.  *Bowen* v. *City of*

*New York*, 476 U.S. 467, 483 (1986).  The court found that the minor plaintiffs

"will suffer severe medical harm, including anxiety, depression, eating disorders,

substance abuse, self-harm, and suicidality."  Doc. 112-1, at 30.  Indeed, the record

is replete with examples of how the minor plaintiffs and other transgender minors

with gender dysphoria will suffer severe medical harm if they must forego gender-

affirming care.  See, *e.g.*, Tr. 181-182; Doc. 8-7, at 8-9; Doc. 8-9, at 6.  For

example, Dr. Moe testified that following SB184's enactment, she had patients for

whom she had to "develop safety plans to prevent them from attempting suicide."

Doc. 8-9, at 6.

Additionally, the risk of criminal penalties that private plaintiffs face is also

a form of irreparable harm.  *Cuviello* v. *City of Vallejo*, 944 F.3d 816, 832 (9th Cir.

2019); see also *Georgia Latino All. For Hum. Rts.* v. *Deal*, 691 F.3d 1250, 1268-

- 52 -

1269 (11th Cir. 2012) (affirming preliminary injunction based in part on threat of criminal prosecution to plaintiffs).  The families and healthcare providers of these transgender minors face criminal charges and up to 10 years' imprisonment and a hefty fine if they continue to ensure that these minors receive medically necessary care.  Even if they leave Alabama for treatment, families still face the risk of prosecution.  See Ala. Code § 13A-4-4 (2022) (conspiracy offense to plan in Alabama to engage in conduct elsewhere that would be illegal in Alabama).

Defendants do not dispute the accuracy of the district court's factual findings that the minor plaintiffs will suffer severe medical harm without injunctive relief. Br. 56.  Instead, they argue that the court did not properly weigh their assertion that because some transgender youth do not persist in their gender incongruence or gender dysphoria into adulthood, gender-affirming care would cause those unknown youth "significant harms."  Br. 56-57.  Even if this argument were not founded on a faulty premise—which it is—the irreparable harm that the minor plaintiffs and other Alabama youth with gender dysphoria will suffer right now in the absence of an injunction is "actual and imminent" and not the kind of "remote or speculative" harm described by defendants here.  *Odebrecht Constr., Inc.* v. *Secretary, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013).

As a result, defendants have not shown that the district court abused its discretion in finding irreparable harm.

D.    *The District Court Did Not Abuse Its Discretion In Determining That The Balance Of Harms And The Public Interest Favored An Injunction*

The district court correctly concluded that the balance of harms and the public interest weigh in favor of injunctive relief.  The court did not abuse its discretion by holding that "the imminent threat of harm" to the minor plaintiffs "outweighs the harm the State will suffer from an injunction" and that "an injunction is not adverse to the public interest."  Doc. 112-1, at 31.

The district court found, and defendants do not dispute, that the minor plaintiffs would suffer "severe physical and/or psychological harm" in the absence of an injunction.  Doc. 112-1, at 31; see Br. 56-57.  Meanwhile, Alabama points only to protecting minors from harms that may or may not happen in the future— *potential* regret over gender-affirming care in adulthood and the *potential* for lost fertility or sexual function.  See Br. 55-56.  These types of speculative harms cannot outweigh the actual, imminent harm to transgender minors in Alabama if defendants enforce SB184.  See Doc. 112-1, at 31.

Nor did the district court abuse its discretion in finding that the public interest favors a preliminary injunction.  The court found that Alabama's interest in opposing interference with its democratically enacted law did not outweigh the public interest in ensuring the "healthy, well-rounded growth of young people into full maturity as citizens," upon which the future of "democratic society rests," given "the imminent threat of harm" to transgender youth in the absence of an

injunction.  Doc. 112-1, at 30-31.  The court's weighing of the equities is also

supported by the public interest represented by the United States in this proceeding

to ensure that Alabama does not "deny to any person within its jurisdiction the

equal protection of laws."  U.S. Const. Am. XIV; see also 42 U.S.C. 2000h-2.

Finally, given the substantial likelihood of success on the merits of the private

plaintiffs' and the United States' equal protection claim, Alabama's interest in

enforcing constitutionally "invalid legislation" is not "in the public interest."

*Alabama*, 691 F.3d at 1301; see also *KH Outdoor, LLC* v. *City of Trussville*, 458

F.3d 1261, 1271-1272 (11th Cir. 2006) (holding government "has no legitimate

interest in enforcing an unconstitutional ordinance").[20]

---

[20]  Defendants contend that the private plaintiffs' alleged "judge shopping
delayed the current suit" and thus "undermin[ed] any claim that they needed
emergency relief."  Br. 55-56.  Not so.  The district court expressly considered the
facts surrounding this allegation (Doc. 112-1, at 6-8), and nonetheless found that
all factors favored injunctive relief.  Regardless, this contention does not apply to
the United States, which separately requested and was granted the same
preliminary injunction as private plaintiffs.  Doc. 112-1, at 32; see 42 U.S.C.
2000h-2 ("[T]he United States is entitled to the same relief as if it had instituted"
the instant case.).

**II**

**THE SCOPE OF THE DISTRICT COURT'S INJUNCTION IS NOT AN ABUSE OF DISCRETION**

A.    *Standard Of Review*

This Court reviews the "scope of an injunction for abuse of discretion."

*Angel Flight of Ga., Inc.* v. *Angel Flight Am., Inc.*, 522 F.3d 1200 (11th Cir. 2008).

B.    *The District Court Did Not Abuse Its Discretion By Fashioning An Injunction That Ensures Complete Relief For Private Plaintiffs And The United States*

The district court did not abuse its discretion by preliminarily enjoining

defendants from enforcing Section 4(a)(1)-(3) of SB184 against all persons,

pending trial, because the injunction is "limited in scope to the extent necessary to

protect the interests of the parties."  *Garrido* v. *Dudek*, 731 F.3d 1152, 1159 (11th

Cir. 2013) (citation omitted).

First, the preliminary injunction is narrowly tailored to block enforcement of

the specific provisions of SB184 that all parties agree are at issue here—those

pertaining to puberty blockers and hormone therapies.  Doc. 112-1, at 32-33.  The

injunction does not prevent the defendants from enforcing the provisions of SB184

prohibiting surgical interventions as gender-affirming care for minors or

prohibiting school personnel from withholding information from parents regarding

their children's gender identity.  SB184, §§ 4(a)(4)-(6), 5.

- 56 -

Second, a more limited injunction would not provide complete relief to United States, which seeks to enforce the Constitution's guarantee of equal protection for all transgender minors in Alabama who need gender-affirming care, and not just these minor plaintiffs. See 42 U.S.C. 2000h-2 (United States entitled to the same relief it could obtain had it instituted the action itself).

Finally, an injunction barring enforcement against only the private plaintiffs would not "provide complete relief to the plaintiffs." *Florida* v. *Department of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021). All the minor and parent plaintiffs, as well as one healthcare provider plaintiff, are proceeding anonymously in this litigation. A preliminary injunction limited in scope to enforcement against the private plaintiffs would, at a minimum, require revealing their identities to avoid enforcing SB184 against them. Similarly, even if the minor plaintiffs were not proceeding anonymously, any nonparty medical providers from whom they might seek gender-affirming care in Alabama would still be bound by SB184, thereby preventing plaintiffs from obtaining appropriate relief. Defendants have not explained how the court could have fashioned the more limited relief they suggest and still provide complete relief to the minor plaintiffs.

# CONCLUSION

This Court should affirm the district court's order preliminarily enjoining

enforcement of Section 4(a)(1)-(3) of SB184 pending trial.

Respectfully submitted,

PRIM F. ESCALONA                              KRISTEN CLARKE
  United States Attorney                        Assistant Attorney General
  Northern District of Alabama

                                              BONNIE I. ROBIN-VERGEER
PRAVEEN KRISHNA                               ELIZABETH P. HECKER
  Assistant United States Attorney            BARBARA SCHWABAUER
  Northern District of Alabama                  Attorneys
                                                Department of Justice
                                                Civil Rights Division
                                                Appellate Section
                                                Ben Franklin Station
                                                P.O. Box 14403
                                                Washington, D.C.  20044-4403
                                                (202) 305-3034

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

1. This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 12,612 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2019 in Times New Roman, 14-point font.

s/ Barbara Schwabauer
BARBARA SCHWABAUER
 Attorney

Date:  August 10, 2022

**CERTIFICATE OF SERVICE**

I certify that on August 10, 2022, I electronically filed the foregoing BRIEF

FOR THE UNITED STATES AS INTERVENOR-APPELLEE with the Clerk of

the Court for the United States Court of Appeals for the Eleventh Circuit by using

the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

s/ Barbara Schwabauer
BARBARA SCHWABAUER
 Attorney
