No. 22-11707

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

PAUL A. EKNES-TUCKER, REV., *ET AL.*,

PLAINTIFFS-APPELLEES,

v.

GOVERNOR OF THE STATE OF ALABAMA, *ET AL.*,

DEFENDANTS-APPELLANTS

———————————

**On Appeal from the United States District Court
for the Middle District of Alabama**
No. 2:22-cv-00184-LCB-SRW
Hon. Liles C. Burke, Judge

———————————

**BRIEF OF AMICUS CURIAE STATE OF CALIFORNIA AND 20
OTHER STATES IN SUPPORT OF PLAINTIFFS-APPELLEES**

———————————

ROB BONTA
Attorney General of California
RENU R. GEORGE
Senior Assistant Attorney General
KATHLEEN BOERGERS
NANCY BENINATI
Supervising Deputy Attorneys
General

NIMROD PITSKER ELIAS
LILY WEAVER
ALLISON ELGART
GABRIEL MARTINEZ
CHRISTINA RIEHL
State Bar No. 213530
1515 Clay Street, 20th Floor
Oakland, CA  94612
Telephone: (510) 879-0011
Email:
Kathleen.Boergers@doj.ca.gov
*Attorneys for Amicus Curiae
State of California*

August 17, 2022

## CERTIFICATE OF INTEREST PARTIES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following persons and parties may have an interest in the outcome of this case:

1. Abdul-Latif, Hussein – Amicus Curiae;

2. Academic Pediatric Association – Amicus Curiae;

3. Alabama Ch. of the American Academy of Pediatrics – Amicus Curiae;

4. Alaska, State of – Amicus Curiae;

5. Alstott, Anne – Amicus Curiae;

6. Am. Academy of Child and Adolescent Psychiatry – Amicus Curiae;

7. Am. Academy of Family Physicians – Amicus Curiae;

8. Am. Academy of Pediatrics – Amicus Curiae;

9. Am. Academy of Nursing – Amicus Curiae;

10. Am. Ass'n of Physicians for Human Rights, Inc. – Amicus Curiae;

11. Am. Coll. of Obstetricians & Gynecologists – Amicus Curiae;

12. Am. Coll. of Osteopathic Pediatricians – Amicus Curiae;

13. Am. College of Physicians – Amicus Curiae

14. Am. Med. Ass'n – Amicus Curiae;

15. Am. Pediatric Soc'y – Amicus Curiae;

16. Am. Psychiatric Ass'n – Amicus Curiae;

17. Ass'n of Am. Med. Coll. – Amicus Curiae;

18. Ass'n of Med. School Pediatrics Dep't Chairs – Amicus Curiae;

19. Anderson, Tom – Defendant;

20. Arizona, State of – Amicus Curiae;

21. Arkansas, State of – Amicus Curiae;

22. Baia, Eizabeth – Counsel for Medical Amici;

23. Bailey, Daryl D. – Defendant;

24. Baylock, C. Wilson – Defendant;

25. Becker, Laura – Detransitioner Amicus;

26. Boe, Brianna – Plaintiff (pseudonym);

27. Boulware, Susan D. – Amicus Curiae;

28. Bowdre, Alexander Barrett – Counsel for the Defendants;

29. Broyles, Vernadette R. – Counsel for Detransitioner Amici;

30. Burke, Liles C. – U.S. District Court Judge;

31. Burleigh, Billy – Detransitioner Amicus;

32. Cantrell, Michael A. – Counsel for Amici States;

33. Carr, Danny – Defendant;

34. Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

35. Davis, James William – Counsel for Defendants;

36. Doss, Jeffrey P. – Counsel for Plaintiffs;

37. Eagan, Melody Hurdle – Counsel for Plaintiffs;

38. Endocrine Society – Amicus Curiae;

39. Eknes-Tucker, Paul A. – Plaintiff;

40. Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

41. G., C. (pseudonym) – Detransitioner Amicus;

42. Georgia, State of – Amicus Curiae;

43. Indiana, State of – Amicus Curiae;

44. Isasi, William – Counsel for Medical Amici Curiae;

45. Ivey, Kay – Defendant;

46. Kamody, Rebecca – Amicus Curiae;

47. Kerschner, Helena – Detransitioner Amicus;

48. Koe, Rachel (pseudonym) – Plaintiff;

49. Kuper, Laura – Amicus Curiae;

50. LaCour, Edmond G. – Counsel for Defendants;

51. Lannin, Cortlin H. – Counsel for Medical Amici Curiae;

52. Lanosa, Michael – Counsel for Medical Amici Curiae;

53. Lareau Alyssa C. – Counsel for Intervenor-Plaintiff;

54. Levi, Jennifer L. – Counsel for Plaintiffs;

55. Louisiana, State of – Amicus Curiae;

56. Marshall, Steve – Defendant;

57. McAlister, Mary E. – Counsel for Detransitioner Amici;

58. McCoy, Scott D. – Counsel for Plaintiffs;

59. McNamara, Meredithe – Amicus Curiae;

60. Medical Ass'n of Pediatric Nurse Practitioners – Amicus Curiae;

61. Mills, Christopher E. – Counsel for Defendants;

62. Mississippi, State of – Amicus Curiae;

63. Missouri, State of – Amicus Curiae;

64. Moe, Jane (pseudonym) – Plaintiff;

65. Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

66. Montana, State of – Amicus Curiae;

67. Nebraska, State of – Amicus Curiae;

68. Noe, Kathy (pseudonym) – Plaintiff;

69. Oklahoma, State of – Amicus Curiae;

70. Oladeinbo, Gilbert O. – Counsel for Plaintiffs;

71. Olezeski, Christy – Amicus Curiae;

72. Orr, Asaf – Counsel for Plaintiffs;

73. Pediatric Endocrine Soc'y – Amicus Curiae;

74. Peterson, Misty L. – Counsel for Plaintiffs;

75. Poe, Megan (pseudonym) – Plaintiff;

76. Powers, John Michael – Counsel for Intervenor-Plaintiff;

77. Pratt, James Andrew – Counsel for Plaintiffs;

78. Ragsdale, Barry Alan – Counsel for Medical Amici;

79. Ray, Brent P. – Counsel for Plaintiffs;

80. Reinke, Adam – Counsel for Plaintiffs;

81. Reynolds, Laura – Detranisitioner Amicus Curiae;

82. Schwabauer, Barbara – Counsel for Intervenor-Plaintiff (USA);

83. Seiss, Benjamin Matthew – Counsel for Defendants;

84. Shortnacy, Michael B. – Counsel for Plaintiffs;

85. Smalts, Laura Perry – Detransitioner Amicus curiae;

86. Smith, John (pseudonym) – Detransitioner Amicus curiae;

87. Societies for Pediatric Urology – Amicus Curiae;

88. Soc'y of Adolescent Health & Medicine – Amicus Curiae;

89. Soc'y for Pediatric Research – Amicus Curiae;

90. Soc'y of Pediatric Nurses – Amicus Curiae;

91. Soto, Diego Armando – Counsel for Plaintiffs;

92. South Carolina, State of – Amicus Curiae;

93. Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

94. Stone, Jessica L. – Counsel for Plaintiffs;

95. Szilagyi, Nathalie – Amicus Curiae;

96. Terry, Abigail Hoverman – Counsel for Plaintiffs;

97. Texas, State of – Amicus Curiae;

98. Thornton, Joel H. – Counsel for Detransitioner Amici Curiae;

99. Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

100. United States of America – Intervenor-Plaintiff;

101. Utah, State of – Amicus Curiae;

102. Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

103. Warbelow, Sarah – Counsel for Plaintiffs;

104. West Virginia, State of – Amicus Curiae;

105. Wilkerson, Mark Douglas – Counsel for Amici States;

106. Williams, Renee – Counsel for Intervenor-Plaintiff;

107. Wilson, Thomas Alexander – Counsel for Defendants;

108. Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

109.   World Professional Ass'n for Transgender Health – Amicus Curiae;

110.   Vague, Amie A. – Counsel for Plaintiffs;

111.   Vance, Robert S. – Counsel for Medical Amici;

112.   Ventiere, Jessica – Defendant;

113.   Veta, D. Jean – Counsel for Medical Amici;

114.   Walker, Susan R. – Magistrate Judge;

115.   Waver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

116.   Zoe, James (pseudonym) – Zoe, James.

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ...............................................1

SUMMARY OF ARGUMENT ........................................................3

ARGUMENT ....................................................................4

I.  Discrimination Against Transgender People
    Significantly Harms Amici States and Their Residents........4

    A.  The Act Directly Harms Transgender Teens
        Traveling to Alabama and Imposes Spillover Costs
        on Amici States ................................................4

    B.  The Act Would Exacerbate the Effects of
        Discrimination and Inadequate Access to
        Healthcare Suffered by Transgender Teens..................8

II. Amici States Protect Access to Gender-Affirming
    Healthcare Based on Well-Established Medical
    Standards ................................................... 11

    A.  Amici States Have Longstanding Anti-
        Discrimination Laws and Policies Guaranteeing
        Access to Gender-Affirming Medical Care ................. 12

    B.  Amici States' Policies Are Based on Well-
        Established Medical Standards and Leave
        Decisions Made Between Doctors and Their
        Patients Undisturbed ................................... 17

    C.  Ensuring Access to Gender-Affirming Medical Care
        Has Improved Health Outcomes for Transgender
        People, Including Teenagers ........................... 21

III. The Act Discriminates Based on Sex, Ignores Medical
     Standards, and Interferes With Decisions Made
     Between Doctors and Their Patients.................................. 25

    A.  The Act Violates Equal Protection By Prohibiting
        Only Transgender Youth From Taking Certain
        Medications ............................................. 25

    B.  Amici Arkansas's Arguments Lack Merit .................. 27

i

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION.................................................................................. 33

CERTIFICATE OF COMPLIANCE........................................... 34

CERTIFICATE OF SERVICE...................................................... 35

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bostock v. Clayton County*
   140 S. Ct. 1731 (2020)...................................................... 26

*Eknes-Tucker v. Marshall*
   __ F. Supp. 3d __, 2022 WL 1521889, (M.D. Ala. 2022). ...........3

*Grimm v. Gloucester Cnty. Sch. Bd.*
   972 F.3d 586 (4th Cir. 2020)................................................... 26

*J.D. v. Lackner*
   80 Cal. App. 3d 90 (1978) ...................................................... 13

*United States v. Virginia*
   518 U.S. 515 (1996)................................................................ 26

## U.S. CONSTITUTION

Equal Protection Clause.................................................... 2, 3, 26

## STATUTES

Alabama Vulnerable Child Compassion and
   Protection Act.................................................................*passim*

Conn. Gen. Stat. § 46a-71(a) .......................................... 14

Haw. Rev. Stat. § 431:10A-118.3(a) ............................... 14

Haw. Rev. Stat. § 432:1-607.3 ....................................... 14

Haw. Rev. Stat. § 432D-26.3 .......................................... 14

Ill. Adm. Code, tit. 50, § 2603.35................................... 14

N.J. Laws 176 N.J. (2017) ...............................................1

N.J. Stat. Ann. § 17B:26-2.1ii ........................................ 15

N.J. Stat. Ann. § 17B:27-46.1oo ..................................... 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

N.J. Stat. Ann. § 26:2J-4.40 ........................................................... 15

N.J. Stat. Ann. § 52:14-17.29x ...................................................... 15

N.Y. Comp. Codes R. & Regs. tit. 18 § 505.2(l)(3)-(4)  ................ 15

Wash. Admin. Code § 182-501-0060 ................................................8

Wash. Admin. Code § 182-531-1675 ........................................... 15

Wash. Admin. Code § 182-531-1675(b)(ii) ................................... 16

Wash. Rev. Code § 48.43.0128(3) .......................................... 20, 21

### REGULATIONS

Cal. Code Regs. Title 10 § 2561.2, subd. (a) ................................ 13

Cal. Code Regs. Title 22 § 51301 *et seq.*...........................................8

### COURT RULES

Federal Rule of Appellate Procedure 29(a)....................................1

Eleventh Circuit Rule of Practice 29-2 ...........................................1

### ARTICLES

Adam Stern, Sports Business Journal, Talladega
    Sees Strong Crowd for NASCAR Cup (April 25,
    2022),
    https://www.sportsbusinessjournal.com/Daily/Closi
    ng-Bell/2022/04/25/Talladega.aspx ...........................................5

Alabama Tourism Department, U.S. Space & Rocket
    Center is Alabama's Number One Tourism
    Attraction (Feb. 5, 2016)
    https://tourism.alabama.gov/2016/02/u-s-space-
    rocket-center-is-alabamas-number-one-tourism-
    attraction/....................................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page

Ali Zaker-Shahrak et al., Cal. Dep't of Ins., Economic
Impact Assessment: Gender Nondiscrimination in
Health Insurance 10 (2012),
https://transgenderlawcenter.org/wp-
content/uploads/2013/04/Economic-Impact-
Assessment-Gender-Nondiscrimination-In-Health-
Insurance.pdf .............................................................................9

Amy E. Green et al., *Association of Gender-Affirming
Hormone Therapy with Depression, Thoughts of
Suicide, and Attempted Suicide Among
Transgender and Nonbinary Youth*, 70 J.
Adolescent Health 643, 647–48 (2022),
https://doi.org/10.1016/j.jadohealth.2021.10.036 ................... 22

Ann P. Haas et al., Am. Found. For Suicide
Prevention & The Williams Inst., Suicide
Attempts Among Transgender and Gender Non-
Conforming Adults: Findings of the National
Transgender Discrimination Survey 2 (2014),
https://williamsinstitute.law.ucla.edu/wp-
content/uploads/Trans-GNC-Suicide-Attempts-
Jan-2014.pdf ..............................................................................9

Anna I. R. van der Miesen et al., *Psychological
Functioning in Transgender Adolescents Before
and After Gender-Affirmative Care Compared with
Cisgender General Population Peers,* 66 J.
Adolescent Health 699, 703 (2020) ......................................... 23

Annelou L.C. de Vries et al., *Young Adult
Psychological Outcome After Puberty Suppression
and Gender Reassignment*, 134 Pediatrics 696, 702
(2014), https://doi.org/10.1542/peds.2013-2958 ...................... 25

# TABLE OF AUTHORITIES
## (continued)

Page

Ashley Austin et al., Suicidality Among Transgender
    Youth: Elucidating the Role of Interpersonal Risk
    Factors, 37 J. of Interpersonal Violence 2696
    (2022) ..........................................................................9

Brian McKenzie, *Out-Of-State and Long Commutes:
    2011*, American Community Survey Reports,
    Table 6,
    https://www2.census.gov/library/publications/2013/
    acs/acs-20.pdf (last visited July 26, 2022) ..................5

Cal. Dep't of Health Care Servs., All-Plan Letter 16-
    013, Ensuring Access to Medi-Cal Services for
    Transgender Beneficiaries (Oct. 6, 2016),
    http://www.dhcs.ca.gov/formsandpubs/Documents/
    MMCDAPLsandPolicyLetters/APL2016/APL16-
    013.pdf ...................................................................... 13

Chester A. McPherson, D.C. Dep't of Ins., Bulletin 13-
    IB-01-30/15, Prohibition of Discrimination in
    Health Insurance Based on Gender Identity and
    Expression 3–4 (2014),
    https://disb.dc.gov/sites/default/files/dc/sites/disb/p
    ublication/attachments/Bulletin-
    ProhibitionDiscriminationBasedonGenderIdentity
    orExpressionv022714.pdf .......................... 1, 2, 19, 21

Conn. Comm'n On Human Rights And Opportunities,
    Declaratory Ruling on Petition Regarding Health
    Insurers' Categorization of Certain Gender-
    Confirming Procedures as Cosmetic 9 (2020),
    https://www.chlpi.org/wp-
    content/uploads/2013/12/Dec-Rule_04152020.pdf.................. 19

# TABLE OF AUTHORITIES
## (continued)

Page

Conn. Ins. Dep't, Bulletin IC-34, Gender Identity
  Nondiscrimination Requirements (Dec. 19, 2013),
  https://portal.ct.gov/-
  /media/CID/BulletinIC37GenderIdentityNondiscri
  minationRequirementspdf.pdf ................................................. 14

Diana M. Tordoff, et al., *Mental Health Outcomes in
  Transgender and Nonbinary Youths Receiving
  Gender-Affirming Care*, 5 J. Am. Med. Ass'n
  Network Open 1, 6 (2022),
  https://jamanetwork.com/journals/jamanetworkope
  n/fullarticle/2789423. ....................................................... 22, 31

Dominic J. Gibson et al., *Evaluation of Anxiety and
  Depression in a Community Sample of
  Transgender Youth*, 4(4) J. Am. Med. Ass'n Open
  1, 1–2 (2021),
  https://jamanetwork.com/journals/jamanetworkope
  n/fullarticle/2778206 ................................................................. 31

Emily Newfield et al., *Female-to-Male Transgender
  Quality of Life*, 15(9) Quality of Life Research
  1447 (2006),
  https://www.ncbi.nlm.nih.gov/pubmed/16758113 ..................... 6

Gabriel R. Murchison et al., *School Restroom and
  Locker Room Restrictions and Sexual Assault Risk
  Among Transgender Youth*, 143 Pediatrics 1, 1
  (2019),
  https://publications.aap.org/pediatrics/article/143/6
  /e20182902/76816/School-Restroom-and-Locker-
  Room-Restrictions-and .......................................................... 11

**TABLE OF AUTHORITIES**
**(continued)**

Page

Gary D. Anderson, Mass. Comm'r of Ins., Bulletin
    2021-11, Continuing Applicability of Guidance
    Regarding Prohibited Discrimination on the Basis
    of Gender Identity or Gender Dysphoria Including
    Medically Necessary Gender Affirming Care and
    Related Services 3 (2021),
    https://www.mass.gov/doc/bulletin-2021-11-
    prohibited-discrimination-on-the-basis-of-gender-
    identity-or-gender-dysphoria-including-medically-
    necessary-gender-affirming-care-and-related-
    services-issued-september-9-2021/download .......................... 16

Gina M. Sequeira et al., *Impact of Gender Expression*
    *on Disordered Eating, Body Dissatisfaction and*
    *BMI in a Cohort of Transgender Youth*, 60 J.
    Adolescent Health s87 (2017),
    https://doi.org/10.1016/j.jadohealth.2016.10.352 ................... 22

Healthcare Law and Policies,
    https://www.lgbtmap.org/equality-
    maps/healthcare_laws_and_policies (last visited
    Dec. 23, 2021) .......................................................................... 12

Ill. Dep't of Human Rights, Ill. Dep't of Healthcare
    and Family Servs., and the Ill. Dep't of Ins.,
    Guidance Relating to Nondiscrimination in
    Healthcare Services in Illinois (June 26, 2020),
    https://www2.illinois.gov/dhr/Documents/Joint%20
    Nondiscrimination%20Guidance.pdf ...................................... 14

Ill. Dep't of Ins., Bulletin 2020-16, Health Insurance
    Coverage for Transgender and Gender
    Nonconforming Individuals (June 15, 2020),
    https://insurance2.illinois.gov/cb/2020/CB2020-
    16.pdf ....................................................................................... 14

**TABLE OF AUTHORITIES**
**(continued)**

Page

Jack L. Turban et al., *Access To Gender-Affirming
    Hormones During Adolescence and Mental Health
    Outcomes Among Transgender Adults* 17 PLOS
    One 1, 8 (2022),
    https://journals.plos.org/plosone/article?id=10.1371
    /journal.pone.0261039............................................................ 23

Jack L Turban et al., *Pubertal Suppression for
    Transgender Youth and Risk of Suicidal Ideation*,
    145 Pediatrics 1, 5 (2020),
    https://doi.org/10.1542/peds.2019-1725(adjusted
    odds ratio = 0.3). ................................................................ 23

Jaime M. Grant et al., Nat'l Ctr. For Transgender
    Equal. & Nat'l Gay and Lesbian Task Force,
    National Transgender Discrimination Survey
    Report on Health & Health Care 8 (2010),
    https://cancer-network.org/wp-
    content/uploads/2017/02/National_Transgender_D
    iscrimination_Survey_Report_on_health_and_heal
    th_care.pdf..................................................................................7

Jennifer Coelho et al., *Eating Disorder Diagnoses and
    Symptom Presentation in Transgender Youth: A
    Scoping Review, 21 Current Psychiatry Reps. 1, 6
    (2019), https://doi.org/10.1007/s11920-019-1097-
    x*......................................................................................... 22

Julia C. Sorbara et al., *Mental Health and Timing of
    Gender-Affirming Care*, 146 Pediatrics 1, 5 (2020),
    https://publications.aap.org/pediatrics/article/146/4
    /e20193600/79683/Mental-Health-and-Timing-of-
    Gender-Affirming-Care............................................................ 24

# TABLE OF AUTHORITIES
## (continued)

Page

Kellan Baker et al., Ctr. for Am. Progress, The
  Medicaid Program and LGBT Communities:
  Overview and Policy Recommendations (2016),
  https://www.americanprogress.org/article/the-
  medicaid-program-and-lgbt-communities-
  overview-and-policy-recommendations/.....................................7

Kerith J. Conron & Kathryn K. O'Neill, Univ. of Cal.
  Los Angeles, Food Insufficiency Among
  Transgender Adults During the COVID-19
  Pandemic 2 (2021),
  https://williamsinstitute.law.ucla.edu/wp-
  content/uploads/Trans-Food-Insufficiency-Dec-
  2021.pdf ...................................................................................7

Kristina R Olson et al., *Mental Health of Transgender
  Children Who Are Supported in Their Identities*,
  137(3) Pediatrics 1, 1 (2016),
  https://pubmed.ncbi.nlm.nih.gov/26921285............................ 32

L. Edwards-Leeper and E. Anderson, The Mental
  Health Establishment is Failing Trans Kids, The
  Washington Post (November 24, 2021),
  https://www.washingtonpost.com/outlook/2021/11/
  24/trans-kids-therapy-psychologist.......................................... 28

Letter from Lisa K. Maguire, Esq., State Appeals, to
  Blue Cross Blue Shield Member (Aug. 11, 2014),
  https://www.outfront.org/sites/default/files/Dept%2
  0of%20Commerce%20external%20review.pdf ........................ 18

Letter from Mike Kreidler, Office of the Ins. Comm'r
  of Wash. State to Health Ins. Carriers in Wash.
  State (June 25, 2014),
  https://www.insurance.wa.gov/sites/default/files/do
  cuments/gender-identity-discrimination-letter.pdf ............... 15

# TABLE OF AUTHORITIES
## (continued)

**Page**

Lily Durwood et al., *Social Support and Internalizing Psychopathology in Transgender Youth*, 50 J. of Youth and Adolescence 841 (2021), https://link.springer.com/article/10.1007%2Fs1096 4-020-01391-y ........................................................ 31

Louise Morales-Brown, *What to Know About Mental Health Among Transgender Individuals*, Medical News Today (May 20, 2021), https://www.medicalnewstoday.com/articles/transg ender-mental-health ............................................... 10

Marijn Arnoldussen et al., Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood, 9 LGBT Health 238 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2 020.0494 .................................................................. 25

Michael Zaliznyak et al., Effects of Gender-Affirming Hormone Therapy on Sexual Function of Transgender Men and Women, 206 J. of Urology 637, 638 (2021), https://www.auajournals.org/doi/epdf/10.1097/JU.0 000000000002045.06 .............................................. 28

Michelle M. Johns et al., U.S. Ctrs. for Disease Control & Prevention, *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students*, 68 Morbidity Mortality Weekly Report 67, 69 (2019), http://dx.doi.org/10.15585/mmwr.mm6803a3. ........................ 10

Minn. Dep't of Commerce, Admin. Bulletin 2015- Gender Identity Nondiscrimination Requirements (2015), https://mn.gov/commerce-stat/pdfs/bulletin- insurance-2015-5.pdf .................................................. 14, 18, 20

# TABLE OF AUTHORITIES
## (continued)

Page

Morning Consult & The Trevor Project, How COVID-
19 is Impacting LGBTQ Youth 21 (2020),
https://www.thetrevorproject.org/wp-
content/uploads/2020/10/Trevor-Poll_COVID19.pdf .................9

Movement Advancement Project et al., Separation
and Stigma: Transgender Youth and School
Facilities 4 (2017),
https://www.glsen.org/sites/default/files/2019-
11/Separation_and_Stigma_2017.pdf ..................................... 11

N.Y. Dep't of Fin. Servs., Ins. Circular Letter No. 7,
(2014)
https://www.dfs.ny.gov/insurance/circltr/2014/cl20
14_07.htm .......................................................................... 15, 20

Or. Health Auth., Prioritized List: Guideline for
Gender Dysphoria 1 (2019),
https://www.oregon.gov/oha/HPA/DSI-
HERC/FactSheets/Gender-dysphoria.pdf ......................... 16, 20

Pa. Dep't. of  Human Servs., CHIP Transmittal
2016-5 (2016) ................................................................... 15, 20

Pa. Ins. Dep't., Notice Regarding Nondiscrimination,
Notice 2016-05, 46 Pa.B. 2251 (2016),
https://www.pacodeandbulletin.gov/Display/pabull
?file=/secure/pabulletin/data/vol46/46-18/762.html ............... 15

Pay Byington, Newsbreak, 2022 SEC Baseball
Tournament Drew 140,000 Fans at the Hoover
Met, Locks in Event Two More Years (June 1,
2022),
https://www.newsbreak.com/news/2621373376996/
2022-sec-baseball-tournament-drew-140-000-fans-
at-the-hoover-met-locks-in-event-two-more-years, ....................5

# TABLE OF AUTHORITIES
## (continued)

**Page**

Press Release, Cal. Dep't of Ins., Commissioner Lara
　　Takes Proactive Step to Ensure Transgender
　　Youth Have Access to Gender Affirming Medical
　　Care for Gender Dysphoria (Dec. 30, 2020),
　　https://www.insurance.ca.gov/0400-news/0100-
　　press-releases/2020/release140-2020.cfm ................... 17, 18, 21

Press Release, Colo. Dep't of Regulatory Agencies,
　　Division of Insurance Announces a New Resource
　　for LGBTQ Coloradans (Jun. 1, 2020),
　　https://doi.colorado.gov/press-release/division-of-
　　insurance-announces-a-new-resource-for-lgbtq-
　　coloradans; .................................................................... 19

Press Release, EqualityMaine, Maine Transgender
　　Network, GLAD and Maine Women's Lobby
　　Announce Health Coverage for Transgender
　　Individuals Under MaineCare, LGBTQ Legal
　　Advocates & Defs. (Oct. 3, 2019),
　　https://www.glad.org/post/equalitymaine-maine-
　　transgender-network-glad-and-maine-womens-
　　lobby-announce-health-coverage-for-transgender-
　　individuals-under-mainecare/ ................................... 19

R.I. Health Ins. Comm'r, Health Ins. Bulletin 2015-3,
　　Guidance Regarding Prohibited Discrimination on
　　the Basis of Gender Identity or Expression 1
　　(2015), http://www.ohic.ri.gov/documents/Bulletin-
　　2015-3-Guidance-Regarding-Prohibited-
　　Discrimination.pdf ................................................... 20

Sandy E. James et al., Nat'l Ctr. For Transgender
　　Equal., The Report of the 2015 U.S. Transgender
　　Survey103(2016),
　　http://www.transequality.org/sites/default/files/doc
　　s/usts/USTS%20Full%20Report%20-
　　%20FINAL%201.6.17.pdf ............................................ 8

## TABLE OF AUTHORITIES
### (continued)

**Page**

Sharita Gruberg et al., Ctr. for Am. Progress, The
State of the LGBTQ Community in 2020 (2020),
https://www.americanprogress.org/article/state-
lgbtq-community-2020/ ............................................................... 7

UA Demographics & Diversity Report, College
Factual,
https://www.collegefactual.com/colleges/the-
university-of-alabama/student-
life/diversity/#:~:text=67.63%25%20of%20UA%20s
tudents%20come,from%20out%20of%20the%20cou
ntry .............................................................................................. 4

U.S. Dep't of Educ., Office for Civil Rights, Education
in a Pandemic: The Disparate Impacts of COVID-
19 on America's Students iv, 27–30 (2021),
https://www2.ed.gov/about/offices/list/ocr/docs/202
10608-impacts-of-covid19.pdf .................................................... 11

Vt. Dep't of Health Access, Medical Policy re: Gender
Affirmation Surgery for the Treatment of Gender
Dysphoria 2 (2019),
http://vels.staging.vermont.gov/sites/dvha/files/doc
uments/providers/Forms/1gender-affirmation-
surgery-w-icd-10-coded-110119.pdf ......................................... 15

Vt. Dep't of Fin. Reg., Div. of Ins., Ins. Bulletin No.
174, Guidance Regarding Prohibited
Discrimination on the Basis of Gender Identity
including Medically Necessary Gender Dysphoria
Surgery and Related Health Care 1 (2013),
https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-
bulletin-insurance-174-gender-dysphoria-
surgery.pdf ................................................................................. 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

World Professional Organization for Transgender
    Health: Standards of Care for the Health of
    Transsexual, Transgender, and Gender
    Nonconforming People at 14, available at
    https://www.wpath.org/media/cms/Documents/SO
    C%20v7/SOC%20V7_English2012.pdf?_t=1613669
    341 ............................................................................................ 29

Ximena Lopez et al., *Statement onGender-Affirmative*
    *Approach to Care from the Pediatric Endocrine*
    *Society Special Interest Group on Transgender*
    *Health*, 29 Current Op. Pediatrics 475, 480 (2017) ............... 24

OTHER AUTHORITIES

Colo. Bull. No. B-4.49 (2013) ..............................................................1

Conn. Bull. IC-34 (2013) ....................................................................1

D.C. Bull. 13-IB-01-30/15 (2013).......................................................1

Del. Bull. No. 86 (2016) .....................................................................1

Haw. HB 2084 (2016).........................................................................1

Ill. Bull. 2014-10 (2014) ....................................................................1

Mass. Bull. 2014-03 (2014) ................................................................1

Me. LD 1/SP 10 (2019).......................................................................1

Mich. Bull. 2016-10-INS (2016) ........................................................1

Minn. Admin. Bull. 2015-5 (2015) .....................................................1

Nev. Bull. No. 15-002 (2015); ............................................................1

N.J. 2017 N.J. Laws 176 (2017); ........................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page**

N.M. Bull. No. 2018-013 (2018);........................................................1

N.Y. Comp. Codes R. & regs. Title 18, § 505.1 *et seq.*....................8

N.Y. Comp. Codes R. & Regs. Title 18 § 505.2(l)(2)(i)-
    (ii) ...................................................................................... 16

N.Y. Ins. Reg. 62 (2018);.................................................................1

Or. D.C.B.S. Bull. 2012-1 (2012) ....................................................1

R.I. Health Ins. Bull. 2015-3 (2015) ...............................................1

Vt. Bull. 174 (2013, revised 2019)...................................................1

Wash. RCW 48.30.300 (2006);.........................................................2

## INTERESTS OF AMICI CURIAE

Amici Curiae States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, and the District of Columbia strongly support transgender people's right to live with dignity, be free from discrimination, and have equal access to healthcare.[1] Discrimination and exclusion on the basis of transgender status cause direct economic, emotional, and health harms including an increased risk of depression, anxiety, substance abuse, and suicide. To support the dignity of transgender people and prevent these injuries, amici States have adopted laws and policies to combat discrimination against transgender people in healthcare, including policies that guarantee non-discriminatory insurance coverage of gender-affirming medical care for transgender minors.[2]

---

[1] Amici States submit this amicus brief pursuant to Federal Rule of Appellate Procedure 29(a) and Eleventh Circuit Rule of Practice 29-2 in support of Plaintiffs-Appellees and affirmance of the preliminary injunction.

[2] *See, e.g.*, Colo. Bull. No. B-4.49 (2013); Conn. Bull. IC-34 (2013); Del. Bull. No. 86 (2016); Haw. HB 2084 (2016); Ill. Bull. 2014-10 (2014); Me. LD 1/SP 10 (2019); Mass. Bull. 2014-03 (2014); Md. Bull. 15-33 (2015); Mich. Bull. 2016-10-INS (2016); Minn. Admin. Bull. 2015-5 (2015); Nev. Bull. No. 15-002 (2015); N.J. 2017 N.J. Laws 176 (2017); N.M. Bull. No. 2018-013 (2018);

(continued…)

These policies assure that amici States do not unduly interfere with decisions made between physicians and their patients when those decisions adhere to evidence-based and medically accepted standards of care. The amici States' experience has proven that our laws and policies result in better health outcomes for our transgender residents and safeguard their physical, emotional, and financial well-being. More generally, amici States have a profound interest in the proper application of the Equal Protection Clause to protect transgender individuals throughout our nation from unconstitutional discrimination, and to mitigate the injuries from such discrimination that transgender individuals have suffered for too long.

Amici States have a strong interest in advocating for the well-being of our residents, including teenagers receiving gender-affirming medical care, who travel to, attend school in, or work in Alabama. If Alabama's law is allowed to take effect, those teenagers in Alabama will face an untenable choice:  risk severe criminal penalties for those who provide them with

---

(…continued)

N.Y. Ins. Reg. 62 (2018); Or. D.C.B.S. Bull. 2012-1 (2012); R.I. Health Ins. Bull. 2015-3 (2015); Vt. Bull. 174 (2013, revised 2019); Wash. RCW 48.30.300 (2006); D.C. Bull. 13-IB-01-30/15 (2013).

medically necessary puberty blockers or hormone therapies,[3] including their parents, or forego medically necessary care and suffer potentially devastating harms to their physical, emotional, and psychological health. In addition to injuries directly inflicted on transgender teens, laws like Alabama's impose costs on state programs that provide gender-affirming care. Amici states' experience has shown that the abrupt termination of gender-affirming healthcare can require state programs to compensate for the disruption by providing different or additional treatments.

## SUMMARY OF ARGUMENT

The Alabama Vulnerable Child Compassion and Protection Act (the Act) is an extreme law that harms, not protects, transgender youth.[4] Alabama's categorical ban on gender-affirming healthcare for transgender individuals under the age of 19 ignores broad medical consensus, interferes with medical decisions that providers reach with individual patients and their families, and violates the Equal Protection Clause. In contrast, the experience of amici States demonstrates that safeguarding access to

---

[3] The District Court referred to puberty blockers and hormone therapies collectively as "transitioning medications." *Eknes-Tucker v. Marshall*, __ F. Supp. 3d __, 2022 WL 1521889, at *2 (M.D. Ala. 2022).

[4] *See* S.B. 184, No. 2022-289 (Ala. 2022).

3

healthcare protects transgender people, their families, and their communities and avoids disrupting doctor-patient decisions. The amici States therefore urge this Court to affirm the preliminary injunction.

## ARGUMENT

I. **DISCRIMINATION AGAINST TRANSGENDER PEOPLE SIGNIFICANTLY HARMS AMICI STATES AND THEIR RESIDENTS**

### A. The Act Directly Harms Transgender Teens Traveling to Alabama and Imposes Spillover Costs on Amici States

Denying gender-affirming care harms transgender teenagers, including teenaged residents of amici States who travel to Alabama. Amici States' teenage residents travel to Alabama for school, vacation, and work. For example, the University of Alabama (UA) enrolls 27,750 undergraduate students.[5] Nearly 68% of UA's students come from out-of-state, including 464 undergraduates from Illinois, 304 from California, 217 from New Jersey, 197 from North Carolina, 181 from New York, and 173 from Pennsylvania.[6] College freshmen are often 17-18 years old and considered "minors" under the Act. (*See* S.B. 184, ALA. 2022 REG. SESS. § 3(1) (Ala.

---

[5] *See* UA Demographics & Diversity Report, College Factual, https://www.collegefactual.com/colleges/the-university-of-alabama/student-life/diversity/#:~:text=67.63%25%20of%20UA%20students%20come,from%20out%20of%20the%20country (last visited July 6, 2022).

[6] *Id.*

2022) (defining "minor" as anyone under age 19). Similarly, events and attractions bring hundreds of thousands of out-of-state visitors, including "minors" under the Act, to Alabama each year.[7] And approximately 47,000 people work in Alabama but live in a different state.[8]

---

[7] Nearly 1.3 million people visit Alabama's national parks annually, including the Birmingham Civil Rights and Freedom Riders National Monuments. *See* Alabama, National Parks Service, https://www.nps.gov/state/al/index.htm (last visited July 6, 2022). Over one million people attend Mobile's Mardi Gras each year, over 600,000 people visit the U.S. Space and Rocket Center in Huntsville, and over 500,000 people flock to the Robert Trent Jones Golf Trail in Birmingham. *See* Alabama Tourism Department, U.S. Space & Rocket Center is Alabama's Number One Tourism Attraction (Feb. 5, 2016) https://tourism.alabama.gov/2016/02/u-s-space-rocket-center-is-alabamas-number-one-tourism-attraction/. The SEC Baseball Tournament in Hoover drew nearly 140,000 fans and the Talladega Superspeedway attracted a crowd of 60,000 people for the NASCAR Cup Series Race. *See* Pay Byington, Newsbreak, 2022 SEC Baseball Tournament Drew 140,000 Fans at the Hoover Met, Locks in Event Two More Years (June 1, 2022), https://www.newsbreak.com/news/2621373376996/2022-sec-baseball-tournament-drew-140-000-fans-at-the-hoover-met-locks-in-event-two-more-years; Adam Stern, Sports Business Journal, Talladega Sees Strong Crowd for NASCAR Cup (April 25, 2022), https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/04/25/Talladega.aspx.

[8] See Brian McKenzie, *Out-Of-State and Long Commutes: 2011*, American Community Survey Reports, Table 6, https://www2.census.gov/library/publications/2013/acs/acs-20.pdf (last visited July 26, 2022).

Yet the Act would force some transgender college students under age 19 who had been receiving gender-affirming healthcare in amici States to discontinue their prescribed medications while in Alabama. If they continue to take their medication, their providers and parents could risk imprisonment for up to ten years. Teens traveling to Alabama, even on a temporary basis, may lack access to gender-affirming medical care if they are hospitalized for an injury or need to refill a lost prescription. And Amici State's residents working in Alabama, like college students and visitors, would be expected to cease medical treatment.

Denying medically necessary care to transgender teens harms their physical, emotional, and psychological health. *See infra* pp. 7–8 & Part II.C. Many transgender teens suffer from gender dysphoria: the intense, debilitating distress and anxiety that can result from incongruence between a person's gender identity and sex assigned at birth. If unaddressed, gender dysphoria can impact quality of life, cause fatigue, and trigger decreased social functioning, including reliance on drugs and alcohol.[9] Those harms

---

[9] *See* Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15(9) Quality of Life Research 1447 (2006), https://www.ncbi.nlm.nih.gov/pubmed/16758113 (observing that transgender men who received transition-related care reported having a higher health-related quality of life than those who had not).

can also lead to significant economic consequences for transgender individuals. A recent survey shows that over half of transgender people report economic insecurity due to gender identity discrimination.[10]

Apart from the direct harms inflicted on amici States' residents in Alabama, the Act threatens spillover effects that extend far beyond Alabama's borders. For example, transgender people who experience income insecurity are more likely to be uninsured and to rely on state-run programs such as Medicaid.[11] Thus, state programs are likely to bear the

---

[10] Sharita Gruberg et al., Ctr. for Am. Progress, The State of the LGBTQ Community in 2020 (2020), https://www.americanprogress.org/article/state-lgbtq-community-2020/ (showing more than half [54 percent] of transgender respondents reported that discrimination moderately or significantly affected their financial well-being).

[11] Jaime M. Grant et al., Nat'l Ctr. For Transgender Equal. & Nat'l Gay and Lesbian Task Force, National Transgender Discrimination Survey Report on Health & Health Care 8 (2010), https://cancer-network.org/wp-content/uploads/2017/02/National_Transgender_Discrimination_Survey_Report_on_health_and_health_care.pdf (23 percent of transgender women and 13 percent of transgender men report relying on public health insurance); *see also* Kellan Baker et al., Ctr. for Am. Progress, The Medicaid Program and LGBT Communities: Overview and Policy Recommendations (2016), https://www.americanprogress.org/article/the-medicaid-program-and-lgbt-communities-overview-and-policy-recommendations/ ("The high prevalence of poverty in LGBT communities, especially among transgender people and LGBT people of color, makes Medicaid a critical program for the health and well-being of LGBT communities."); Kerith J. Conron & Kathryn K. O'Neill,

(continued…)

financial burden of addressing the significant consequences that result from denying transgender teenagers medically necessary care.[12]

### B. The Act Would Exacerbate the Effects of Discrimination and Inadequate Access to Healthcare Suffered by Transgender Teens

The Act would exacerbate discrimination and harms from inadequate healthcare access already suffered by transgender teens. Transgender people often suffer from severe distress due to the stigma, persecution, and violence inflicted because of their gender identity.[13] Among transgender people, suicide attempts are nine times more common than in the overall U.S. population (41% versus 4.6%).[14] The risks are especially high among

---

(…continued)

Univ. of Cal. Los Angeles, Food Insufficiency Among Transgender Adults During the COVID-19 Pandemic 2 (2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Food-Insufficiency-Dec-2021.pdf (over a quarter of transgender people experience food insufficiency, making it three times as common among transgender people as cisgender (i.e., non-transgender) people).

[12] *See, e.g.*, Wash. Admin. Code § 182-501-0060 (listing program's benefits); Cal. Code Regs. tit. 22 § 51301 *et seq.* (same); N.Y. Comp. Codes R. & regs. tit. 18, § 505.1 *et seq.* (same).

[13] *See* Sandy E. James et al., Nat'l Ctr. For Transgender Equal., The Report of the 2015 U.S. Transgender Survey (2016), http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf.

[14] Ann P. Haas et al., Am. Found. For Suicide Prevention & The Williams Inst., Suicide Attempts Among Transgender and
(continued…)

transgender minors.[15] One study found that 56% of transgender youth reported a previous suicide attempt and 86% reported suicidal thoughts.[16] Bullying significantly contributed to lifetime suicide attempts while a lack of school belonging, familial emotional neglect, and internalized self-stigma contributed to suicidal thoughts.[17]

Transgender people also face significant barriers to receiving both routine and gender-affirming care.[18] Access to gender-affirming healthcare

---

(…continued)

Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey 2 (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf.

[15] *See, e.g.*, *id.*; Ali Zaker-Shahrak et al., Cal. Dep't of Ins., Economic Impact Assessment: Gender Nondiscrimination in Health Insurance 10 (2012), https://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf ("A recent systematic review of largely American samples gives a suicide attempt rate of approximately one in every three individuals with higher rates found among adolescents and young adults.").

[16] Ashley Austin et al., Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors, 37 J. of Interpersonal Violence 2696 (2022).

[17] *Id.*

[18] James et al., *supra* note 13, at 93; *see also* Morning Consult & The Trevor Project, How COVID-19 is Impacting LGBTQ Youth 21 (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/10/Trevor-Poll_COVID19.pdf (finding that 25 percent of trans and nonbinary youth and 25 percent of

(continued…)

and other interventions that improve mental health are especially important to transgender and nonbinary teenagers, who already experience stress from discrimination, harassment, stigma, and violence in their daily lives.[19]

The Centers for Disease Control and Prevention found that transgender students are more likely to report feeling unsafe at or going to and from school, being bullied, threatened, or injured with a weapon at school, being forced to have sex, and experiencing physical and sexual dating violence.[20] Transgender students who experienced higher levels of victimization due to their gender identity were three times more likely to have missed school in a given month than other students.[21] Transgender

---

(…continued)

LGBTQ youth overall reported wanting mental health care and not being able to receive it, compared with only six percent of white cisgender heterosexual youth).

[19] "People who identify as transgender have higher rates of mental health complications than those in the general population due to stigma and discrimination.".

[20] *See* Michelle M. Johns et al., U.S. Ctrs. for Disease Control & Prevention, *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students*, 68 Morbidity Mortality Weekly Report 67, 69 (2019), http://dx.doi.org/10.15585/mmwr.mm6803a3.

[21] Movement Advancement Project et al., Separation and Stigma: Transgender Youth and School Facilities 4 (2017), https://www.glsen.org/sites/default/files/2019-

(continued…)

youth whose restroom and locker room use was restricted to their sex

assigned at birth were more likely to experience sexual assault compared to

those without such restrictions.[22] These harms have been further exacerbated

by the COVID-19 pandemic and limited healthcare resources.[23]

## II.  AMICI STATES PROTECT ACCESS TO GENDER-AFFIRMING HEALTHCARE BASED ON WELL-ESTABLISHED MEDICAL STANDARDS

In amici States' experience, ensuring access to gender-affirming

healthcare has improved health outcomes for transgender teenagers. Amici

States' laws and policies protect transgender teenagers by guaranteeing their

access to healthcare, including gender-affirming healthcare. To prevent the

direct economic, emotional, and health consequences of excluding

individuals from necessary healthcare, amici States ensure that their

residents, including transgender teenagers, have access to gender-affirming

---

(…continued)

11/Separation_and_Stigma_2017.pdf.

[22] Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, 143 Pediatrics 1, 1 (2019), https://publications.aap.org/pediatrics/article/143/6/e20182902/76816/School-Restroom-and-Locker-Room-Restrictions-and.

[23] *See generally* U.S. Dep't of Educ., Office for Civil Rights, Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students iv, 27–30 (2021), https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-covid19.pdf (summarizing research findings).

11

healthcare and allow doctors to practice medicine consistent with well-accepted medical standards and anti-discrimination laws. Robust data confirm that such policies result in better health and economic outcomes.

### A. Amici States Have Longstanding Anti-Discrimination Laws and Policies Guaranteeing Access to Gender-Affirming Medical Care

Several amici States explicitly prohibit insurers from excluding gender-affirming care from their insurance policies. These protections increase access to healthcare by barring discriminatory health insurance coverage that contravenes best medical practices. Of particular concern are barriers to healthcare erected against transgender patients for care that is otherwise accessible to cisgender patients. Since 2012, at least 24 States and the District of Columbia have prohibited health insurance discrimination against transgender people.[24] These laws promote sound medical practices and increase equity in healthcare.

In California, for instance, longstanding laws and regulations ensure that transgender patients are not denied or limited coverage for care available to others. California's Medicaid program ("Medi-Cal") has

---

[24] Healthcare Law and Policies, https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies (last visited Dec. 23, 2021).

required gender-affirming coverage since 2001.[25] In 2012, the California

Insurance Commissioner adopted regulations prohibiting private insurers

from denying coverage for "services related to gender transition . . .

including but not limited to hormone therapy" if the same services are

available when unrelated to gender transition.[26] The regulation also forbids

plans from requiring a premium based on the insured's identity as a

transgender person.[27] These rules apply regardless of the beneficiary's age.

Other amici States are equally committed to treating transgender

people with dignity and respect when accessing healthcare, and ensuring that

they are not denied needed care. For example, in 2015, the Minnesota

Departments of Commerce and Health confirmed that health plans subject to

---

[25] *See* Cal. Dep't of Health Care Servs., All-Plan Letter 16-013, Ensuring Access to Medi-Cal Services for Transgender Beneficiaries (Oct. 6, 2016), http://www.dhcs.ca.gov/formsandpubs/Documents/MMCDAPLsandPolicyLetters/APL2016/APL16-013.pdf (Medi-Cal managed care health plans must provide covered services to all Medi-Cal beneficiaries, including transgender beneficiaries); *see also J.D. v. Lackner*, 80 Cal. App. 3d 90, 95 (1978) (recognizing that gender-affirming care may be medically necessary and ordering Medi-Cal coverage).

[26] Cal. Code Regs. tit. 10 § 2561.2, subd. (a), http://www.insurance.ca.gov/01-consumers/110-health/60-resources/upload/CDI-Gender-Nondiscrimination-Regulations.pdf.

[27] *Id.*

13

their jurisdiction may not exclude coverage for gender dysphoria treatment when medically necessary.[28] Many of amici States' laws, regulations, and bulletins likewise prohibit insurers from gender identity discrimination in healthcare.[29] Taken together, these laws and policies reflect our core

---

[28] Minn. Dep't of Commerce, Admin. Bulletin 2015-5, Gender Identity Nondiscrimination Requirements (2015), https://mn.gov/commerce-stat/pdfs/bulletin-insurance-2015-5.pdf.

[29] *See, e.g.*, **Connecticut**: Conn. Gen. Stat. § 46a-71(a) (state agency services); Conn. Ins. Dep't, Bulletin IC-34, Gender Identity Nondiscrimination Requirements (Dec. 19, 2013), https://portal.ct.gov/-/media/CID/BulletinIC37GenderIdentityNondiscriminationRequirementspdf.pdf (private insurers); **Hawai'i**: Haw. Rev. Stat. § 431:10A-118.3(a) (accident and health or sickness insurance); Haw. Rev. Stat. § 432:1-607.3 (hospital and medical service policies); Haw. Rev. Stat. § 432D-26.3 (health maintenance organization policies); **Illinois**: Ill. Adm. Code, tit. 50, § 2603.35 (health insurance plans); Ill. Dep't of Human Rights, Ill. Dep't of Healthcare and Family Servs., and the Ill. Dep't of Ins., Guidance Relating to Nondiscrimination in Healthcare Services in Illinois (June 26, 2020), https://www2.illinois.gov/dhr/Documents/Joint%20Nondiscrimination%20Guidance.pdf; Ill. Dep't of Ins., Bulletin 2020-16, Health Insurance Coverage for Transgender and Gender Nonconforming Individuals (June 15, 2020), https://insurance2.illinois.gov/cb/2020/CB2020-16.pdf; **Massachusetts**: Mass. Div. of Ins., Office of Consumer Affairs & Bus. Regulation, Bulletin 2014-03, Guidance Regarding Prohibited Discrimination on the basis of Gender Identity 1 (June 20, 2014), https://www.mass.gov/doc/bulletin-2014-03-guidance-regarding-prohibited-discrimination-on-the-basis-of-gender-identity/download (prohibiting private insurers from denying coverage); **New Jersey**: N.J. Stat. Ann. § 26:2J-4.40 (health maintenance organizations); N.J. Stat. Ann. § 17B:26-2.1ii

(continued…)

14

commitment to protecting the equality of all people, regardless of their

gender identity, and ensuring that people with gender dysphoria are not

denied necessary healthcare.

_____

(…continued)

(individual health insurance policies); N.J. Stat. Ann. § 17B:27-46.1oo (group health insurance policies);   N.J. Stat. Ann. § 52:14-17.29x (State Health Benefits Commission contracts); **New York**: N.Y. Comp. Codes R. & Regs. tit. 18 § 505.2(l)(3)-(4) (covering gender-affirming surgery under Medicaid); N.Y. Dep't of Fin. Servs., Ins. Circular Letter No. 7 (2014), https://www.dfs.ny.gov/insurance/circltr/2014/cl2014_07.htm (eliminating exclusions); **Pennsylvania**: Pa. Ins. Dep't., Notice Regarding Nondiscrimination, Notice 2016-05, 46 Pa.B. 2251 (2016), https://www.pacodeandbulletin.gov/Display/pabull?file=/secure/pabulletin/data/vol46/46-18/762.html (prohibiting discrimination and requiring coverage); Pa. Dep't. of Human Servs., CHIP Transmittal 2016-5 (2016) (eliminating exclusions and requiring coverage); **Vermont**: Vt. Dep't of Fin. Reg., Div. of Ins., Ins. Bulletin No. 174, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity including Medically Necessary Gender Dysphoria Surgery and Related Health Care 1 (2013), https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-bulletin-insurance-174-gender-dysphoria-surgery.pdf (eliminating exclusions); Vt. Dep't of Health Access, Medical Policy re: Gender Affirmation Surgery for the Treatment of Gender Dysphoria 2 (2019), http://vels.staging.vermont.gov/sites/dvha/files/documents/providers/Forms/1gender-affirmation-surgery-w-icd-10-coded-110119.pdf (covering gender-affirming surgery under Medicaid); **Washington**: Wash. Admin. Code § 182-531-1675 (describing Apple Health's "gender dysphoria treatment program"); Letter from Mike Kreidler, Office of the Ins. Comm'r of Wash. State to Health Ins. Carriers in Wash. State (June 25, 2014), https://www.insurance.wa.gov/sites/default/files/documents/gender-identity-discrimination-letter.pdf.

Beyond these general protections, some amici States have issued explicit guidance prohibiting insurers from denying minors' treatment for gender dysphoria solely based on age, recognizing the importance of gender-affirming interventions for this vulnerable population.[30] The Massachusetts Division of Insurance advises insurers that "[f]or minors seeking access to gender-affirming medical or surgical procedures, [insurance carriers] must undertake case-by-case review of individual circumstances and authorize coverage for these treatments when such treatments are determined to be medically necessary."[31] California's guidance expressly acknowledges the

---

[30] **New York**: N.Y. Comp. Codes R. & Regs. tit. 18 § 505.2(l)(2)(i)-(ii) (hormone replacement therapy for minors); **Oregon:** Or. Health Auth., Prioritized List: Guideline for Gender Dysphoria 1 (2019), https://www.oregon.gov/oha/HPA/DSI-HERC/FactSheets/Gender-dysphoria.pdf (approving youth puberty suppression coverage based on "extensive testimony/debate from experts at various public meetings" and "relevant evidence and literature"); **Washington**: Wash. Admin. Code § 182-531-1675(b)(ii) (coverage for puberty suppression); *id.* § 182-531-1675(f) (payment for gender-affirming care for those under 20).

[31] Gary D. Anderson, Mass. Comm'r of Ins., Bulletin 2021-11, Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services 3 (2021), https://www.mass.gov/doc/bulletin-2021-11-prohibited-discrimination-on-the-basis-of-gender-identity-or-gender-dysphoria-including-medically-necessary-gender-affirming-care-and-related-services-issued-september-9-2021/download.

need for coverage for transgender minors, noting that "[s]ocial stigma, misconceptions about gender dysphoria and its treatment, and outdated medical criteria create barriers to necessary medical care that can lead to tragic results," especially for transgender youth.[32]

### B.  Amici States' Policies Are Based on Well-Established Medical Standards and Leave Decisions Made Between Doctors and Their Patients Undisturbed

Amici States' policies are grounded in well-accepted medical standards of care and designed to respect the doctor-patient relationship. For example, the Minnesota Department of Commerce, which has an external review process for insurance appeals, has ruled that insurers must use medical standards set forth by the World Professional Association for Transgender Health (WPATH), an international professional association that provides evidence-based standards of care for transgender people.[33] Insurers

---

[32] Press Release, Cal. Dep't of Ins., Commissioner Lara Takes Proactive Step to Ensure Transgender Youth Have Access to Gender Affirming Medical Care for Gender Dysphoria (Dec. 30, 2020), https://www.insurance.ca.gov/0400-news/0100- press-releases/2020/release140-2020.cfm.

[33] Letter from Lisa K. Maguire, Esq., State Appeals, to Blue Cross Blue Shield Member (Aug. 11, 2014), https://www.outfront.org/sites/default/files/Dept%20of%20Commerce%20external%20review.pdf (Overturning denial of coverage as inconsistent with WPATH standards); *see also* Minn. Dep't of Commerce, Admin. Bulletin 2015-5, *supra* note 28, at 2 ("Determination of medical necessity and prior authorization

(continued...)

may not substitute their own, more restrictive standards for providing
coverage for gender-affirming healthcare.[34] A California opinion letter about
coverage for transgender minors expressly cites to the WPATH standards as
well.[35] Massachusetts similarly recommends insurance carriers "consult the
most up-to-date medical standards set forth by nationally recognized medical
experts in the transgender health field, including but not limited to those
issued by the [WPATH]."[36] Many other amici States have relied on
prevailing professional standards of care set forth by nationally recognized
medical experts in crafting laws and guidance on coverage of gender-
affirming medical care to treat gender dysphoria.[37]

---

(…continued)

protocols for gender dysphoria-related treatment must be based
on the most recent, published medical standards set forth by
nationally recognized medical experts in the transgender health
field.").

[34] *Id.*

[35] Press Release, Cal. Dep't of Ins., *supra* note 32.

[36] Anderson, Bulletin 2021-11, *supra* note 31, at 2.

[37] *See, e.g.*, **Colorado**: Colo. Code Regs. § 4-2-62
(prohibiting "[d]en[ial], exclu[sion], or otherwise limit[ing]
coverage for medically necessary services, in accordance with
generally accepted professional standards of care, based upon a
person's . . . gender identity"); Press Release, Colo. Dep't of
Regulatory Agencies, Division of Insurance Announces a New
Resource for LGBTQ Coloradans (Jun. 1, 2020),
https://doi.colorado.gov/press-release/division-of-insurance-

(continued…)

(…continued)

announces-a-new-resource-for-lgbtq-coloradans; **Connecticut**:
Conn. Comm'n On Human Rights And Opportunities,
Declaratory Ruling on Petition Regarding Health Insurers'
Categorization of Certain Gender-Confirming Procedures as
Cosmetic 9 (2020), https://www.chlpi.org/wp-
content/uploads/2013/12/Dec-Rule_04152020.pdf (insurers shall "
pay 'covered expenses' for treatment provided to individuals with
gender dysphoria where the treatment is deemed necessary
under generally accepted medical standards"); **District of
Columbia**: Chester A. McPherson, D.C. Dep't of Ins., Bulletin
13-IB-01-30/15, Prohibition of Discrimination in Health
Insurance Based on Gender Identity and Expression 3–4 (2014),
https://disb.dc.gov/sites/default/files/dc/sites/disb/publication/attac
hments/Bulletin-
ProhibitionDiscriminationBasedonGenderIdentityorExpressionv0
22714.pdf (medical necessity determination requires referring to
"recognized professional standard of medical care for transgender
individuals" and citing WPATH standards); **Maine**: Press
Release, EqualityMaine, Maine Transgender Network, GLAD
and Maine Women's Lobby Announce Health Coverage for
Transgender Individuals Under MaineCare, LGBTQ Legal
Advocates & Defs. (Oct. 3, 2019),
https://www.glad.org/post/equalitymaine-maine-transgender-
network-glad-and-maine-womens-lobby-announce-health-
coverage-for-transgender-individuals-under-mainecare/ (criteria
for determining medical necessity "will be based on consensus
professional medical standards" and citing to WPATH
standards); **Minnesota**: Minn. Dep't of Commerce, Admin.
Bulletin 2015-5, *supra* note 28, at 2 (medical necessity "must be
based on the most recent, published medical standards set forth
by nationally recognized medical experts"); **New York**: N.Y.
Dep't of Fin. Servs., Ins. Circular Letter No. 7, *supra* note 29
(citing the American Psychiatric Association Diagnostic and
Statistical Manual of Mental Disorders' recognition of gender
dysphoria); **Oregon**: Or. Health Auth., Prioritized List: Guideline
for Gender Dysphoria, *supra* note 30, at 1 (approving youth
puberty suppression coverage based on extensive testimony "from
(continued…)

Amici States' policies also recognize that well-established medical standards require individualized determinations of medical necessity based on individual patients' needs. In contrast to Alabama's categorical ban on gender-affirming care for anyone under 19, best medical practices require an *individualized* assessment to determine whether—and to what extent— gender-affirming care is medically necessary for an individual patient.[38] Accordingly, the District of Columbia, for example, has instructed that determinations of "medical necessity" for insurance coverage purposes

_____

(…continued)

experts at various public meetings," "reviewing relevant evidence and literature," and citing WPATH standards); **Pennsylvania**: Pa. Dep't. of Human Servs., CHIP Transmittal 2016-5 (2016) ("In determining medical necessity for gender transition services, the Department and CHIP Contractors will utilize [WPATH] Standard of Care as guidelines."); **Rhode Island**: R.I. Health Ins. Comm'r, Health Ins. Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression 1 (2015), http://www.ohic.ri.gov/documents/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf ("[A] growing body of scientific and clinical evidence regarding the potential harm to consumers arising from the denial or exclusion of services on the basis of gender identity" prompted reexamination of exclusions); **Washington**: Wash. Rev. Code § 48.43.0128(3) (for health plans issued on or after January 1, 2022, Washington forbids insurers from "deny[ing] or limit[ing] coverage for gender-affirming treatment" when it is medically necessary and "prescribed in accordance with accepted standards of care").

[38] *See infra* notes 60–63 and accompanying text.

"must also be guided by providers in communication with individual patients."[39] Washington forbids insurers from "deny[ing] or limit[ing] coverage for gender affirming treatment" when it is medically necessary and "prescribed in accordance with accepted standards of care."[40] California encourages health insurance companies to evaluate coverage criteria for gender-affirming care in order "to avoid needlessly delaying and interfering with medical care recommended by a patient's doctor."[41]

### C. Ensuring Access to Gender-Affirming Medical Care Has Improved Health Outcomes for Transgender People, Including Teenagers

Amici States' policies ensure that residents have access to these best medical practices, including gender-affirming care, which has improved health outcomes for our transgender teenage residents.

Studies overwhelmingly show that mental health for transgender teenagers improves when they have access to early treatment.[42] A 2021 analysis of a survey of nearly 12,000 transgender and nonbinary teens and

---

[39] McPherson, Bulletin 13-IB-01-30/15, *supra* note 37, at 4.

[40] Wash. Rev. Code § 48.43.0128(3).

[41] Press Release, Cal. Dep't of Ins., *supra* note 32.

[42] *See* DE80–11:11–16. "DE" refers to "docket entry." The number immediately following "DE" is the specific entry, and the number following the colon indicates the pin cite based on the ECF-stamped pagination.

young adults found that, for teens under the age of eighteen, use of gender-affirming hormone therapy was associated with 39% lower odds of recent depression and 38% lower odds of attempting suicide in the past year compared to adolescents who wanted, but did not receive, such therapy.[43] Another recent study found that for teenagers ages thirteen to twenty, receiving gender-affirming care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of having suicidal thoughts over a twelve-month follow-up.[44] Gender-affirming hormone treatment is also associated with a reduction in disordered eating in transgender adolescents.[45]

---

[43] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647–48 (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036.

[44] Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, 6 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

[45] Gina M. Sequeira et al., *Impact of Gender Expression on Disordered Eating, Body Dissatisfaction and BMI in a Cohort of Transgender Youth*, 60 J. Adolescent Health s87 (2017), https://doi.org/10.1016/j.jadohealth.2016.10.352; Jennifer Coelho et al., *Eating Disorder Diagnoses and Symptom Presentation in Transgender Youth: A Scoping Review*, 21 Current Psychiatry Reps. 1, 6 (2019), https://doi.org/10.1007/s11920-019-1097-x.

Another 2020 study found that transgender adolescents who receive gender-affirming care, including puberty blockers, have fewer emotional and behavioral problems than transgender adolescents who have not received treatment, and that transgender adolescents receiving gender-affirming medical care had similar rates of mental health problems, self-harm, and suicidality as their cisgender peers.[46] A survey of over 3,500 transgender adults found that individuals who received pubertal suppression during adolescence had almost 20 percent lower odds of lifetime suicidal thoughts compared to individuals who wanted this treatment but did not receive it.[47]

---

[46] Anna I. R. van der Miesen et al., *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers,* 66 J. Adolescent Health 699, 703 (2020); *see also* Jack L. Turban et al., *Access To Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults* 17 PLOS One 1, 8 (2022), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0261039 ("After adjusting for demographic and potential confounding variables, access to [gender-affirming hormones] during adolescence (ages 14–17) was associated with lower odds of past-month severe psychological distress […], past-year suicidal ideation […], past month binge drinking […], and lifetime illicit drug use […] when compared to access to [gender-affirming hormones] during adulthood.").

[47] Jack L Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 5 (2020), https://doi.org/10.1542/peds.2019-1725(adjusted odds ratio = 0.3).

Conversely, withholding or delaying gender-affirming treatment can have negative effects on teens' psychological wellbeing, psychosocial development, and quality of life.[48] Undergoing puberty that does not align with one's gender identity and developing permanent undesired secondary sex characteristics is "often a source of significant distress" for transgender adolescents.[49] A 2020 study found that adolescents who begin gender-affirming treatment at later stages of puberty were over five times more likely to have been diagnosed with depression and over four times more likely to have anxiety disorders than adolescents who seek treatment in early puberty.[50]

In addition to improved mental health outcomes, access to gender-affirming treatment improves overall well-being in transgender teenagers and young adults. A longitudinal study that followed transgender adolescents from their intake at a gender clinic into young adulthood found

---

[48] DE8–3:20–21; *see also* DE8–1:14, 16, 19–20, 21.

[49] Ximena Lopez et al., *Statement on Gender-Affirmative Approach to Care from the Pediatric Endocrine Society Special Interest Group on Transgender Health*, 29 Current Op. Pediatrics 475, 480 (2017); *see also* DE8-3:13.

[50] Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics 1, 5 (2020), https://publications.aap.org/pediatrics/article/146/4/e20193600/79683/Mental-Health-and-Timing-of-Gender-Affirming-Care.

that gender-affirming treatment resulted in significant improvement in global functioning and psychological wellbeing.[51] The study reported that post-treatment, participants had "rates of clinical problems that are indistinguishable from general population samples," and that their life satisfaction, quality of life, and subjective happiness were comparable to their same-age cisgender peers.[52] Another study found significant improvement in teens' self-worth and perceived physical appearance after starting hormone replacement therapy.[53] In short, removing discriminatory barriers to healthcare improves health outcomes for transgender residents, especially teenagers.

### III.  THE ACT DISCRIMINATES BASED ON SEX, IGNORES MEDICAL STANDARDS, AND INTERFERES WITH DECISIONS MADE BETWEEN DOCTORS AND THEIR PATIENTS

#### A.  The Act Violates Equal Protection By Prohibiting Only Transgender Youth From Taking Certain Medications

---

[51] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 702 (2014), https://doi.org/10.1542/peds.2013-2958.

[52] *Id.*

[53] Marijn Arnoldussen et al., Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood, 9 LGBT Health 238 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.0494.

The district court correctly determined that the Act imposes a sex-based classification that violates the Equal Protection Clause because "the Act prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity." DE107:22.[54] That categorical prohibition "places a special burden on transgender minors because their gender identity does not match their birth sex." *Id*. at 23. And as the district court explained, that classification cannot satisfy intermediate scrutiny because "the State puts on no evidence to show that transitioning medications are 'experimental'" and because "nothing in the record shows that medical providers are pushing transitioning medications on minors."[55] *Id*. at 24.

---

[54] As in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741–42 (2020), it is unnecessary for this Court to even define "sex" or "gender" in order to conclude that the Alabama statute impermissibly discriminates on the basis of sex, gender, and transgender status. *Accord United States v. Virginia*, 518 U.S. 515, 532–33 (1996) (state laws that discriminate based on "sex" and "gender" subject to heightened scrutiny); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (applying heightened scrutiny where challenged policy "cannot be stated without referencing sex.").

[55] The Act fails under any standard of review. Categorically banning all gender-affirming medications for all transgender minors, regardless of their individual circumstances and in defiance of well-established medical standards, is not rationally related to any legitimate government interest.

### B.    Amici Arkansas's Arguments Lack Merit

Alabama's complete ban on puberty-blockers and hormone therapy for all teenagers (including 18-year-olds)—regardless of their age, maturity, clinical situation, and in contravention of a doctor's evidence-based recommendation—unlawfully deprives some transgender adolescents of necessary gender-affirming healthcare. Some States, led by Arkansas, attempt to support the Act with two primary arguments. Neither has merit.

First, Arkansas asserts that there is an "intensely boiling medical controversy" over the safety and effectiveness of providing puberty blockers and hormone therapies to teenagers. Arkansas Amicus at 4. But Arkansas cites no article, study, or recommendation to substantiate its claim that gender-affirming healthcare for teenagers is *never* appropriate. As Alabama's own expert conceded in the district court, "no country or state in the world categorically bans" transitioning medications for transgender teenagers like the Act. DE107:18. While standards for gender-affirming healthcare are, like all other forms of medical treatment, refined and updated as new evidence becomes available, Arkansas offers no support for its view that gender-affirming care can be categorically banned consistent with medical standards.

Arkansas, moreover, is misleadingly selective about which studies and articles it emphasizes and omits key context from many of the studies it cites.[56] For example, Arkansas cites a recent *Washington Post* article published by the founding psychologist of the first pediatric transgender clinic in the United States and by a former President of the U.S. Professional Association for Transgender Health to contend that gender-affirming care may be harmful. Arkansas Amicus at 6–7. But that article did not support a ban on all gender-affirming care. It merely urged "comprehensive assessment for all dysphoric youth before starting medical interventions" in accordance with WPATH standards of care.[57] Indeed, the authors stated that they "enthusiastically support the appropriate gender-affirming medical care

---

[56] In another example, Arkansas's cherry-picked cite regarding the sexual experiences of transgender adults, Arkansas Amicus at 8–9, is contradicted by scientific evidence. *E.g.*, Michael Zaliznyak et al., Effects of Gender-Affirming Hormone Therapy on Sexual Function of Transgender Men and Women, 206 J. of Urology 637, 638 (2021), https://www.auajournals.org/doi/epdf/10.1097/JU.0000000000002045.06. Categorical bans on medical treatment cannot be justified by selective and misleading citations.

[57] L. Edwards-Leeper and E. Anderson, The Mental Health Establishment is Failing Trans Kids, The Washington Post (November 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist.

for trans youth" and "are disgusted by the legislation trying to ban it."[58] The

authors further explained that attempts to "deny medical treatment to all

transgender young people . . . are unacceptable, and medically unsound."[59]

Second, Arkansas relies on fears about medical providers failing to

comply with standards of care to justify a categorical ban on gender-

affirming healthcare. Arkansas asserts that "at many facilities, hormones are

provided on demand to children who say they are transgender, without any

psychological assessment." Arkansas Amicus at 2. If true, such a practice

would be wholly inconsistent with current standards of care. According to

WPATH, mental health professionals working with children and adolescents

with gender dysphoria should: (1) "directly assess gender dysphoria in

children and adolescents"; (2) "provide family counseling and supportive

psychotherapy to assist children and adolescents with exploring their gender

identity, alleviating distress related to their gender dysphoria, and

ameliorating any other psychosocial difficulties"; and (3) "assess and treat

any coexisting mental health concerns of children or adolescents."[60] At that

---

[58] *Id.*

[59] *Id.*

[60] *See* The World Professional Organization for
Transgender Health: Standards of Care for the Health of
Transsexual, Transgender, and Gender Nonconforming People at
(continued...)

point, if adolescents are referred for additional physical interventions such as puberty blockers, the "referral should include *documentation of an assessment of gender dysphoria and mental health*, the adolescent's eligibility for physical interventions (outlined below), the mental health professional's relevant expertise, and any other information pertinent to the youth's health and referral for specific treatments" (emphasis added).[61]

Moreover, Arkansas's position ignores a State's substantial authority to oversee and regulate providers. States have an obligation to ensure that medical providers are following appropriate standards of care and gender-affirming care is subject to oversight like other medical practices. And, in any event, it is plainly overreach to impose a categorical ban of well-established, evidence-based medical treatment to address allegations that some small number of providers do not always follow the standards of care. Amici States rely on their regulators and licensing boards to address improper medical care and prevent harm to their residents. Even Arkansas acknowledges the power of States to address substandard medical care,

---

(…continued)

14, available at https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341.

[61] *Id.*

pointing to the overprescribing of opioids. *See* Arkansas Amicus at 17–18.
But States did not react to that crisis by completely banning the use of
opioids and depriving many patients of medications to manage pain. Instead,
as Arkansas concedes, States adopted legislation or regulations to curb the
amount of opioids that physicians could prescribe. Arkansas offers no reason
to regulate gender-affirming care more stringently and provides no basis for
supporting a blanket ban on medical care.

Evidence in the record and amici States' own experience
overwhelmingly shows that transgender teenagers who have access to
gender-affirming healthcare experience better health outcomes—including
mental health outcomes equivalent to their cisgender peers.[62] Arkansas's

---

[62] *See, e.g.*, DE78-11:41, 45, 52–55 (discussing studies);
DE78-19:14–17 (discussing studies); *see also* Tordoff, *supra* note
44 (gender-affirming care for 13 to 20 year-olds "associated with
60% lower odds of moderate or severe depression and 73% lower
odds of suicidality"); Dominic J. Gibson et al., *Evaluation of
Anxiety and Depression in a Community Sample of Transgender
Youth*, 4(4) J. Am. Med. Ass'n Open 1, 1–2 (2021),
https://jamanetwork.com/journals/jamanetworkopen/fullarticle/27
78206 (finding "no significant group differences in self-reported
depressive symptoms, self-reported anxiety symptoms, or parent
reported depressive symptoms" among "socially transitioned
transgender youth, their siblings, and age- and gender-matched
control participants" ages eight to fourteen); Lily Durwood et al.,
*Social Support and Internalizing Psychopathology in
Transgender Youth*, 50 J. of Youth and Adolescence 841 (2021),
https://link.springer.com/article/10.1007%2Fs10964-020-01391-y

(continued…)

arguments that gender-affirming care harms transgender teens

mischaracterize the scientific literature and the record below.[63]

Amici States have taken seriously their obligation to protect

transgender youth by ensuring their access to gender-affirming healthcare,

---

(…continued)

("Parents who reported higher levels of family, peer, and school support for their child's gender identity also reported fewer internalizing symptoms."); Kristina R Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics 1, 1 (2016), https://pubmed.ncbi.nlm.nih.gov/26921285 ("Socially transitioned transgender children who are supported in their gender identity have developmentally normative levels of depression and only minimal elevations in anxiety, suggesting that psychopathology is not inevitable within this group.").

[63] DE62-2:7 (explaining that "the use of puberty blockers to treat gender dysphoria is not research or experimentation"); DE62-2:11 (gender-affirming care is "neither poorly studied nor unproven"); DE62-2:17–18 (describing standards of care for gender dysphoria in teenagers); DE78-19:7–11 (describing standards of care for transgender children, teenagers, and adults); DE78-19:11–13 (discussing harms from untreated gender dysphoria); DE78-19:13–15 (listing health benefits of gender-affirming care); DE78-19:21–27 (contextualizing alleged risks from puberty blockers and hormone replacement therapy); DE62-2:21 (adolescents have sufficient capacity to make informed treatment decisions); DE62-2:22 (fertility planning is part of informed consent); DE78-19:17–21 (rebutting arguments about "detransition," "social contagion," and "rapid onset"); DE78-19:15–16 (rebutting arguments concerning 2011 Swedish study); DE78-19:16 (rebutting arguments concerning 2016 Centers for Medicare & Medicaid Services decision).

preventing discrimination against them, and respecting the decisions reached between these patients, their doctors, and their parents. The Alabama law is unconstitutional, puts the well-being and lives of transgender minors at risk, and should be enjoined.

## CONCLUSION

The preliminary injunction should be affirmed.

Dated:  August 17, 2022        Respectfully submitted,

ROB BONTA
Attorney General of California
RENU R. GEORGE
Senior Assistant Attorney General
KATHLEEN BOERGERS
NANCY BENINATI
Supervising Deputy Attorneys
General

/S/ KATHLEEN BOERGERS

LILY WEAVER
NIMROD PITSKER ELIAS
ALLISON ELGART
GABRIEL MARTINEZ
CHRISTINA RIEHL
Deputy Attorneys General
*Attorneys for Amicus Curiae State of
California*

PHILIP J. WEISER
Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
Attorney General, State of
Connecticut
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
Delaware Attorney General
820 N. French Street
Wilmington, DE 19801

KARL A. RACINE
Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

HOLLY T. SHIKADA
Attorney General of Hawai'i
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601

AARON M. FREY
Attorney General for the State
of Maine
6 State House Station
Augusta, Maine  04333

BRIAN E. FROSH
Attorney General of Maryland
200 Saint Paul Place, 20th
Floor
Baltimore, Maryland  21202

MAURA HEALEY
Attorney General
Commonwealth of
Massachusetts
One Ashburton Place
Boston, MA  02108

KEITH ELLISON
Attorney General, State of
Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King
Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
Attorney General of Nevada
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
Acting Attorney General of
New Jersey
Richard J. Hughes Justice
Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
New Mexico Attorney General
Po Drawer 1508
Santa Fe, New Mexico 87504-
1508

LETITIA JAMES
Attorney General, State of New
York
28 Liberty Street
New York, NY 10005

34

JOSHUA H. STEIN
Attorney General, State of
North Carolina
114 W Edenton Street
Raleigh, NC 27603

JOSH SHAPIRO
Attorney General
Commonwealth of
Pennsylvania
Strawberry Square
Harrisburg, PA 17120

SUSANNE R. YOUNG
Attorney General, State of
Vermont
109 State Street
Montpelier, Vermont 05609

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
Attorney General of Rhode
Island
150 South Main Street
Providence, Rhode Island
02903

ROBERT W. FERGUSON
Attorney General, State of
Washington
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6477 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, 14 point Times New Roman font.

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

/s/ Kathleen Boergers
*Attorneys for Amici*
*Curiae State of California*

## CERTIFICATE OF SERVICE

I certify that on August 17, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I further certify that four paper copies identical to the electronically filed brief will be mailed to the Clerk of the Court by certified mail.

/s/ Kathleen Boergers
*Attorneys for Amici*
*Curiae State of California*
