# No. 22-11707

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

PAUL A. EKNES-TUCKER, Rev., BRIANNA BOE, individually and on behalf of her minor son, Michael Boe, JAMES ZOE, individually and on behalf of his minor son, Zachary Zoe, MEGAN POE, individually and on behalf of her minor daughter, Allison Poe, KATHY NOE, *et al.*, individually and on behalf of her minor son, Christopher Noe,

*Plaintiffs-Appellees*,

v.

GOVERNOR OF THE STATE OF ALABAMA, ATTORNEY GENERAL, STATE OF ALABAMA, DISTRICT ATTORNEY FOR MONTGOMERY COUNTY, DISTRICT ATTORNEY FOR CULLMAN COUNTY, DISTRICT ATTORNEY FOR LEE COUNTY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Alabama, No. 2:22-cv-00184-LCB-SRW
The Honorable Liles C. Burke, U.S. District Judge

## CORRECTED RESPONSE BRIEF FOR APPELLEES

Kelly Perigoe                     Melody H. Eagan
Anne M. Voigts                    Jeffrey P. Doss
Yusuf Saei                        Amie A. Vague
KING & SPALDING LLP               LIGHTFOOT FRANKLIN
633 West 5th Street               & WHITE LLC
Suite 1600                        400 20th Street North
Los Angeles, CA 90071             Birmingham, AL 35203
(213) 443-4355                    (205) 581-0700

*Counsel for Plaintiffs-Appellees*

August 15, 2022          *(Additional counsel listed on inside cover)*

Brent P. Ray
Abigail H. Terry
KING & SPALDING LLP
110 North Wacker Drive
Suite 3800
Chicago, IL 60606
(312) 995-6333

David Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

Adam Reinke
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, GA 30309
(404) 572-4600

Asaf Orr
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street
Suite 370
San Francisco, CA 94102
(415) 365-1326

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Blvd.
Suite 3750
Miami, FL 33131
(334) 224-4309

Jennifer L. Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
(617) 426-1350

*Counsel for Plaintiffs-Appellees*

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Appellees / Plaintiffs Paul A. Eknes-Tucker; Brianna Boe (individually and on behalf of her minor son, Michael Boe); James Zoe (individually and on behalf of his minor son, Zachary Zoe); Megan Poe (individually and on behalf of her minor daughter, Allison Poe); Kathy Noe (individually and on behalf of her minor son, Christopher Noe); Jane Moe; and Rachel Zoe state that (1) they are individuals and, therefore, have nothing to disclose pursuant to Eleventh Circuit Rule 26.2(a); and (2) the following amended list of persons and parties may have an interest in the outcome of this case:

1.     Academic Pediatric Association – Amicus Curiae;

2.     Alabama Chapter of the American Academy of Pediatrics – Amicus Curiae;

3.     Alaska, State of – Amicus Curiae;

4.     American Academy of Child and Adolescent Psychiatry – Amicus Curiae;

---

*With the exception of Jane Moe who has an amended entry, additional parties have been marked with an asterisk.

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

5.    American Academy of Family Physicians – Amicus Curiae;

6.    American Academy of Nursing – Amicus Curiae;

7.    American Academy of Pediatrics – Amicus Curiae;

8.    American Association of Physicians for Human Rights, Inc. – Amicus Curiae;

9.    American College of Obstetricians and Gynecologists – Amicus Curiae;

10.    American College of Osteopathic Pediatricians – Amicus Curiae;

11.    American College of Physicians – Amicus Curiae;

12.    American Medical Association – Amicus Curiae;

13.    American Pediatric Society – Amicus Curiae;

14.    American Psychiatric Association – Amicus Curiae;

15.    Anderson, Tom – Defendant;

16.    Arizona, State of – Amicus Curiae;

17.    Arkansas, State of – Amicus Curiae;

18.    Association of American Medical Colleges – Amicus Curiae;

19.    Association of Medical School Pediatric Department Chairs – Amicus Curiae;

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

20.  Austin, Heather, Ph.D., previously proceeding under pseudonym Jane Moe, Ph.D.*

21.  Baia, Elizabeth – Counsel for Amici Curiae;

22.  Bailey, Daryl D. – Defendant;

23.  Baylock, C. Wilson – Defendant;

24.  Boe, Brianna – Plaintiff (pseudonym);

25.  Bowdre, Alexander Barrett – Counsel for Defendants;

26.  Burke, Liles C. – U.S. District Court Judge;

27.  Cantrell, Michael A. – Counsel for Amici Curiae;

28.  Carr, Danny – Defendant;

29.  Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

30.  Clark, Kristen, U.S. Department of Justice, Civil Rights Division, counsel for Intervenor-Appellee United States;

31.  Davis, James William – Counsel for Defendants;

32.  Doss, Jeffrey P. – Counsel for Plaintiffs;

33.  Eagan, Melody Hurdle – Counsel for Plaintiffs;

34.  Eknes-Tucker, Paul A. – Plaintiff;

35.  Endocrine Society (The) – Amicus Curiae;

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

36.   Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

37.   Georgia, State of – Amicus Curiae;

38.   Hecker, Elizabeth P. – Appellate Counsel for Intervenor-Plaintiff;

39.   Indiana, State of – Amicus Curiae;

40.   Isasi, William – Counsel for Amici Curiae;

41.   Ivey, Kay – Defendant;

42.   Koe, Rachel – Plaintiff (pseudonym);

43.   LaCour, Edmund G. (Jr.) – Counsel for Defendants;

44.   Lannin, Cortlin H. – Counsel for Amici Curiae;

45.   Lanosa, Michael – Counsel for Amici Curiae;

46.   Lareau, Alyssa C. – Counsel for Intervenor-Plaintiff;

47.   Levi, Jennifer L. – Counsel for Plaintiffs;

48.   Louisiana, State of – Amicus Curiae;

49.   Marshall, Steve – Defendant;

50.   McCoy, Scott D. – Counsel for Plaintiffs;

51.   Medical Association of Pediatric Nurse Practitioners – Amicus Curiae;

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

52.  Mills, Christopher Ernest – Counsel for Defendants;

53.  Mississippi, State of – Amicus Curiae;

54.  Missouri, State of – Amicus Curiae;

55.  Moe, Jane – Plaintiff (pseudonym);

56.  Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

57.  Montana, State of – Amicus Curiae;

58.  Nebraska, State of – Amicus Curiae;

59.  Noe, Kathy – Plaintiff (pseudonym);

60.  Oklahoma, State of – Amicus Curiae;

61.  Oladeinbo, Gilbert Olusengun – Counsel for Plaintiffs;

62.  Orr, Asaf – Counsel for Plaintiffs;

63.  Pediatric Endocrine Society – Amicus Curiae;

64.  Peterson, Misty L. – Counsel for Plaintiffs;

65.  Poe, Megan – Plaintiff (pseudonym);

66.  Powers, John Michael – Counsel for Intervenor-Plaintiff;

67.  Pratt, James Andrew – Counsel for Plaintiffs;

68.  Ragsdale, Barry Alan – Counsel for Amici Curiae;

69.  Ray, Brent P. – Counsel for Plaintiffs;

70.  Reinke, Adam – Counsel for Plaintiffs;

71.  Robin-Vergeer, Bonnie – Appellate Counsel for Intervenor-Plaintiff;

72.  Roe, Melissa*

73.  Roe, Rebecca*

74.  Schwabauer, Barbara – Appellate Counsel Intervenor-Plaintiff;

75.  Seiss, Benjamin Matthew – Counsel for Defendants;

76.  Shortnacy, Michael B. – Counsel for Plaintiffs;

77.  Societies for Pediatric Urology – Amicus Curiae;

78.  Society for Pediatric Research – Amicus Curiae;

79.  Society of Adolescent Health and Medicine – Amicus Curiae;

80.  Society of Pediatric Nurses – Amicus Curiae;

81.  Soto, Diego Armando – Counsel for Plaintiffs;

82.  South Carolina, State of – Amicus Curiae;

83.  Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

84.  Stone, Jessica Lynn – Counsel for Plaintiffs;

85.  Terry, Abigail Hoverman – Counsel for Plaintiffs;

86.  Texas, State of – Amicus Curiae;

87.  Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

88.    United States of America – Intervenor-Plaintiff;

89.    Utah, State of – Amicus Curiae;

90.    Vague, Amie A. – Counsel for Plaintiffs;

91.    Vance, Robert S. (III) – Counsel for Amici Curiae;

92.    Ventiere, Jessica – Defendant;

93.    Veta, D. Jean – Counsel for Amici Curiae;

94.    Voe, April*

95.    Voe, Robert*

96.    Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

97.    Walker, Susan Russ – Magistrate Judge;

98.    Warbelow, Sarah – Counsel for Plaintiffs;

99.    Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

100.    West Virginia, State of – Amicus Curiae;

101.    Wilkerson, Mark Douglas – Counsel for Amici Curiae;

102.    Williams, Renee – Counsel for Intervenor-Plaintiff;

103.    Wilson, Thomas Alexander – Counsel for Defendants;

104.    Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

105.    World Professional Association for Transgender Health – Amicus Curiae;

*Paul Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707

106.  Zoe, James – Plaintiff (pseudonym).

Date: August 15, 2022

*s/ Jeffrey P. Doss*

Jeffrey P. Doss

*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request oral argument in this case. At the direction of this Court, the Clerk's office has tentatively assigned this case to the oral argument calendar for the week of November 14, 2022.

## TABLE OF CONTENTS

AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF AUTHORITIES ..................................................... iv

INTRODUCTION ................................................................ 1

COUNTERSTATEMENT OF THE ISSUES ........................................... 6

STATEMENT OF THE CASE .................................................... 7

    A.    Gender Dysphoria and Standards of Care ............................ 8

    B.    The Act ..................................................... 13

    C.    Plaintiffs-Appellees. ......................................... 15

    D.    The Evidentiary Hearing ...................................... 17

    E.    The Preliminary Injunction. ................................... 20

SUMMARY OF ARGUMENT ..................................................... 23

STANDARD OF REVIEW ...................................................... 25

ARGUMENT ................................................................ 27

I.    The District Court Correctly Held That the Act Likely Infringes on the Parent Plaintiffs' Right to Direct the Medical Care of Their Children Subject to Accepted Medical Standards ........................................................ 27

    A.    A Century of Precedent Establishes That Due Process Protects Parental Decisionmaking, Including the Right of Parents to Obtain Established Medical Care for Their Children ............................................. 27

    B.    Defendants' Efforts to Redefine This Deeply Rooted Constitutional Right Fail ..................................... 30

C.     The Act's Substantial Infringement on Parental Rights Requires, and Fails, Strict Scrutiny ........................ 39

1.     The District Court Correctly Found There Is No Compelling Justification for the Act ........................... 39

a.     The district court correctly found that transitioning medications are not experimental ....................................................... 40

b.     The district court correctly found that transitioning medications are not unduly risky and do not jeopardize the health and safety of minors suffering from gender dysphoria ................................................. 43

c.     The district court found no evidence that treatment is being "aggressively pushed" on minors ...................................................... 46

2.     The Act Is Not Narrowly Tailored ............................... 49

II.     The District Court Correctly Held That the Act Likely Violates the Equal Protection Clause ............................................ 50

A.     The Act Facially Targets Transgender Individuals and Thus Discriminates Based on Sex ................................ 50

B.     The District Court Correctly Found That the Act Is Subject to and Fails Heightened Scrutiny ........................... 58

III.     The Act Fails Even Rational Basis Scrutiny ................................. 59

IV.     The Other Preliminary Injunction Factors Overwhelmingly Support the District Court's Injunction ............ 61

V.     The District Court Did Not Abuse Its Discretion in Issuing a Facial Injunction ........................................................ 63

CONCLUSION ......................................................................... 67

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES*

## Cases

*Abigail All. for Better Access to*
    *Developmental Drugs v. Eschenbach,*
    495 F.3d 695 (D.C. Cir. 2007) ............................................................ 35

*Adams v. Sch. Bd. of St. Johns Cnty.,*
    3 F.4th 1299 (11th Cir. 2021) ........................................................... 56

*Andino v. Middleton,*
    141 S. Ct. 9 (2020) (mem.) ................................................................. 29

*Arnold v. Bd. of Educ. of Escambia Cnty.,*
    880 F.2d 305 (11th Cir. 1989),
    *overruled on other grounds by*
    *Leatherman v. Tarrant Cnty.*
    *Narcotics Intel. & Coordination Unit,*
    507 U.S. 163 (1993); ......................................................................... 28

*BellSouth Telecomms., Inc.*
    *v. MCIMetro Access Transmission Servs., LLC,*
    425 F.3d 964 (11th Cir. 2005) ........................................................... 26

*Bendiburg v. Dempsey,*
    909 F.2d 463 (11th Cir. 1990) ...................................................... 28, 34

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ............................................................ 5, 52, 54

*Brandt v. Rutledge,*
    551 F. Supp. 3d 882 (E.D. Ark. 2021),
    *appeal docketed,* No. 21-2875 (8th Cir. Aug. 23, 2021) ...................... 29

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ........................................................................... 55

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*City of Cleburne v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) ................................................................. 59

*Craig v. Boren*,
 429 U.S. 190 (1976) ................................................................. 57

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
 304 F.3d 1167 (11th Cir. 2002) ........................................ 26, 48

*Dobbs v. Jackson Women's Health Organization*,
 142 S. Ct. 2228 (2022) ........................................ 37, 38, 55, 56

*Doe ex rel. Doe v. Pub. Health Tr.*,
 696 F.2d 901 (11th Cir. 1983) .............................................. 33

*Doe v. Moore*,
 410 F.3d 1337 (11th Cir. 2005) ............................................ 29

*Echols v. Lawton*,
 913 F.3d 1313 (11th Cir. 2019) ............................................ 29

*FTC v. On Point Cap. Partners LLC*,
 17 F.4th 1066 (11th Cir. 2021) ........................................ 26, 27

*Ga. Advoc. Off. v. Jackson*,
 4 F.4th 1200 (11th Cir. 2021),
 *vacated*, 33 F.4th 1325 (11th Cir. May 13, 2022) .............. 65

*Garrido v. Dudek*,
 731 F.3d 1152 (11th Cir. 2013) ............................................ 65

*Geduldig v. Aiello*,
 417 U.S. 484 (1974) ................................................................. 55

*Glenn v. Brumby*,
 663 F.3d 1312 (11th Cir. 2011) ................................... *passim*

*Globe Newspaper Co. v. Super. Ct. for Cnty. of Norfolk*,
 457 U.S. 596 (1982) ................................................................. 62

*Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*,
 503 U.S. 653 (1992) ................................................................. 63

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020)...........................................................52

*Heller v. Doe ex rel. Doe*,
   509 U.S. 312 (1993)........................................................................59

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*,
   927 F.3d 396 (6th Cir. 2019)..........................................................28

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
   358 F.3d 804 (11th Cir. 2004)....................................................28, 39

*Louisville Gas & Elec. Co. v. Coleman*,
   277 U.S. 32 (1928)..........................................................................60

*Mathews v. Lucas*,
   427 U.S. 495 (1976)........................................................................59

*Meyer v. Nebraska*,
   262 U.S. 390 (1923)........................................................................34

*Morrissey v. United States*,
   871 F.3d 1260 (11th Cir. 2017).......................................................36

*Nguyen v. INS*,
   533 U.S. 53 (2001)....................................................................53, 54

*Parham v. J.R.*,
   442 U.S. 584 (1979).....................................................................4, 34

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)........................................................................56

*Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*,
   268 U.S. 510 (1925)...................................................32, 34, 64, 65

*PJ ex rel. Jensen v. Wagner*,
   603 F.3d 1182 (10th Cir. 2010).......................................................28

*Prince v. Massachusetts*,
   321 U.S. 158 (1944)........................................................................37

*Raich v. Gonzales,*
  500 F.3d 850 (9th Cir. 2007) .............................................. 35

*Reno v. Flores,*
  507 U.S. 292 (1993) ............................................................ 39

*Revette v. Int'l Ass'n of Bridge,*
  *Structural & Ornamental Iron Workers,*
  740 F.2d 892 (11th Cir. 1984) ........................................... 26

*Rodgers v. Bryant,*
  942 F.3d 451 (8th Cir. 2019) ............................................. 66

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
  490 U.S. 477 (1989) ............................................................ 39

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) ........................................................... 29

*Romer v. Evans,*
  517 U.S. 620 (1996) ............................................................ 60

*Rutherford v. United States,*
  616 F.2d 455 (10th Cir. 1980) ........................................... 35

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
  411 U.S. 1 (1973) ................................................................ 32

*\*Sessions v. Morales-Santana,*
  137 S. Ct. 1678, 1690 (2017) ....................................... 53, 54

*Statewide Detective Agency v. Miller,*
  115 F.3d 904 (11th Cir. 1997) ..................................... 64, 65

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
  402 U.S. 1 (1971) ................................................................ 64

*\*Troxel v. Granville,*
  530 U.S. 57 (2000) ...................................................... passim

*United States v. Virginia,*
  518 U.S. 515 (1996) ......................................... 22, 53, 58

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
412 U.S. 609 (1973) ............................................................. 35

*Whalen v. Roe*,
429 U.S. 589 (1977) ............................................................. 32

*Williams v. Att'y Gen.*,
378 F.3d 1232 (11th Cir. 2004) ........................................... 36

\*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ..................................................... *passim*

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017) ........................................... 30

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016) ................................ 3, 26, 63

## Statutes

Ala. Code § 13A-5-6 ...................................................... 13, 14, 64

Ala. Code § 13A-5-11 .................................................... 13, 14, 64

Ala. Vulnerable Child Compassion & Protection Act,
S.B. 184, 2022 Reg. Sess. (Ala. 2022) ........................ *passim*

## Other Authorities

Am. Academy of Pediatrics Comment Letter
on Proposed Rule to Prohibit Gender-Affirming
Care in the State's Medicaid Program (July 7, 2022) ........................ 43

Juliana Bunim,
*First U.S. Study of Transgender Youth Funded by NIH*,
UCSF.edu (Aug. 17, 2015), https://perma.cc/URA6-CERX ............... 43

Meredithe McNamara et al.,
A Critical Review of the June 2022 Florida Medicaid Report
on the Medical Treatment of Gender Dysphoria (2022) ................... 43

Merriam-Webster Unabridged Dictionary (3d ed. 2002) ........................ 50

## INTRODUCTION

The district court properly enjoined Alabama's unprecedented effort to criminalize the provision of transitioning medications to transgender minors based on "well-established, evidence-based" medical standards of care. Doc. 107 ("Op.") 17. Plaintiffs/Appellees ("Plaintiffs") include parents of minor children who have been prescribed these medications or may require them in the future, as well as their children. Defendants/Appellants ("Defendants") concede that gender dysphoria is a real and serious medical condition that, if left untreated, can result in serious harms. As the district court found: "without these medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality," as well as "significant deterioration in their familial relationships and educational performance." Op. 30. With these prescribed medications, however, adolescents with gender dysphoria, like the Minor Plaintiffs here, can thrive.

Despite these facts, Alabama enacted an extraordinary law making the provision of transitioning medications to transgender minors a felony. S.B. 184 (or "the Act") does not bar designated medications for all

minors. Instead, the Act criminalizes their provision only to minors whose "perception of [their] sex . . . is inconsistent with the minor's [birth] sex"—the dictionary definition of a transgender minor. Ala. Vulnerable Child Compassion & Protection Act, S.B. 184, 2022 Reg. Sess. § 4(a) (Ala. 2022). Based on its plain language, "the Act prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity." Op. 22 (citing S.B. 184 § 4(a)(1)–(3)).

The Act claims to seek protection of minors from "experimental" and unduly "risk[y]" treatments, as well as from medical providers who allegedly "are aggressively pushing" the treatments on minors. S.B. 184 § 2 (6), (11). After a two-day evidentiary hearing and consideration of extensive documentary evidence, the district court properly found that Defendants did not support these justifications: "the State put[] on no evidence to show that transitioning medications are 'experimental,'" that they "jeopardize the health and safety of minors suffering from gender dysphoria," or "that medical providers are pushing transitioning medications on minors." Op. 18, 19, 24.

"Appellate review of a preliminary-injunction decision . . . is exceedingly narrow," and this Court will not reverse a district court's decision absent a clear abuse of discretion. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Defendants do not meet that stringent standard.

The district court's findings of fact are well-supported by the record. Defendants cannot point to any credible evidence that contradicts them, much less to show that they are "clearly erroneous." *Id.* at 1247. Defendants provided no evidence that a single minor has been harmed by being prescribed transition-related medication from an Alabama medical provider. Nor did they present evidence to corroborate their claim that transitioning medications—treatments endorsed by more than twenty-two major medical associations and by well-established medical standards of care—are "new and experimental." S.B. 184 § 2(11). To the contrary, Defendants' own expert witness acknowledged that the "most widely-respected and utilized method for the treatment of children who present with gender dysphoria" includes the prescription of puberty-blockers at age 12 and hormones at age 16—both of which are banned by the Act. Doc. 105 at 325–26.

Defendants fail to demonstrate that the district court's legal conclusions, which track well-settled and controlling law, are erroneous. The Act impedes parents' fundamental right to make medical decisions for their minor children, a well-recognized and central aspect of parents' broader right to "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 68–69 (2000). The Supreme Court has recognized that parents "retain plenary authority to seek [medical] care for their children, subject to a physician's independent examination and medical judgment." *Parham v. J.R.*, 442 U.S. 584, 602, 604 (1979). Because the Act substantially and unjustifiably intrudes upon the right of parents to care for their children, the Act is subject to, and fails, strict scrutiny.

Furthermore, the Act on its face bars treatments for transgender minors; the district court correctly held that it is a sex-based classification subject to intermediate scrutiny under the Equal Protection Clause. Op. 1 (holding that discrimination against a transgender person "equates to sex discrimination" and is therefore subject to heightened review under the Equal Protection Clause); *see also Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011); *Bostock v. Clayton County*, 140 S. Ct.

1731, 1741 (2020) (holding that discrimination because a person is transgender is sex discrimination). As the district court noted, the Act fails intermediate review because "the State's proffered justifications are hypothesized, not exceedingly persuasive." Op. 24.

The district court correctly found that Plaintiffs are substantially likely to prevail on their due process and equal protection claims and that the other preliminary injunction factors weigh in Plaintiffs' favor. Based on the extensive record evidence, the district court determined that the "imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from an injunction." Op. 31. In addition, "enjoining the Act upholds and reaffirms the 'enduring American tradition' that parents—not the States or federal courts—play the primary role in nurturing and caring for their children." *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)). This Court should affirm the district court's ruling.

5

## COUNTERSTATEMENT OF THE ISSUES

1.    Did the district court abuse its discretion in concluding that Plaintiffs demonstrated a substantial likelihood of success on the merits in showing that:

> a. The Due Process Clause protects the right of parents to direct the medical care of their children subject to medically accepted standards?

> b. The Equal Protection Clause prohibits states from banning transgender minors from taking transitioning medications because they are transgender?

2.    Did the district court abuse its discretion in finding that absent a preliminary injunction, Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm, the threatened harm outweighs any damage to Defendants, and a preliminary injunction would serve the public interest by upholding "the 'enduring American tradition' that parents— not the States or federal courts—play the primary role in nurturing and caring for their children"? Op. 31 (citing *Yoder*, 406 U.S. at 232).

6

3.    Did the district court abuse its discretion by enjoining Defendants from enforcing an unconstitutional criminal law?

## STATEMENT OF THE CASE

The district court considered "hundreds of pages of medical evidence," Op. 9, including dozens of exhibits and thirty witness declarations, and conducted a two-day hearing at which eight witnesses testified. Based on that extensive record, the district court found the uncontradicted evidence proved that gender dysphoria, a condition marked by a "clinically diagnosed incongruence between one's gender identity and assigned gender," is a real and serious condition which, if left untreated, may be debilitating, Op. 2–3, and that the use of transitioning medications to treat gender dysphoria in minors is a "well-established, evidence-based treatment[]" endorsed by "at least twenty-two major medical associations in the United States." Op. 17. The district court found that "no credible evidence . . . show[s] that transitioning medications are 'experimental'" or "jeopardize the health and safety of minors suffering from gender dysphoria." Op. 4, 17, 18, 19. The district court also found no evidence "that healthcare associations are aggressively pushing these medications on minors." Op. 19. With respect

to harm, the district court found that "without these medications, Minor Plaintiffs will suffer severe medical harm," as well as "deterioration in their familial relationships and educational performance." Op. 30.

## A.    Gender Dysphoria and Standards of Care

The district court found that the uncontradicted evidence showed that gender dysphoria is a recognized mental health diagnosis that if left untreated, "may cause or lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide." Op. 2–3 (citing Doc. 104 at 30); Doc. 8-1 ¶¶ 25–26, 39 (Hawkins Decl.); Doc. 8-3 ¶¶ 23–24, 26, 36, 45, 55 (Rosenthal Decl.); *see also* Doc. 105 at 293 (confirming that Defendants do not dispute that gender dysphoria is a real medical condition).

Uncontradicted evidence also demonstrated that "at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors." Op. 17 (citing Doc. 104 at 25, 97–98, 126–27). Those include the American Medical Association, the American Pediatric Society, the American Psychiatric Association, the Association of American Medical Colleges, and eighteen others. Op. 4; Doc. 8-1 ¶ 38 (Hawkins Decl.); Doc. 8-3 ¶¶ 23, 28–30 (Rosenthal Decl.);

Doc. 8-2 ¶ 7 (Ladinsky Decl.); Doc. 106 at 27, 97–99. Medical schools across the United States include the diagnosis and medical treatment of gender dysphoria as an established part of the curriculum; Alabama requires all physicians to be knowledgeable about transgender medicine to pass medical board exams. Doc. 8-2 ¶ 8 (Ladinsky Decl.); *see* Doc. 69-18 (WPATH Report Exhibit); Doc. 78-19 at 7–10, 13 (Boulware Report Exhibit); Doc. 106 at 113.

Transitioning medications include puberty-blocking medications and hormone therapy. Puberty-blocking medications, which are only prescribed after the onset of puberty, Op. 8–11, pause endogenous puberty when the treatment begins, thereby preventing a transgender adolescent from continuing to undergo puberty in their birth sex and developing permanent physical characteristics that conflict with their gender identity. Doc. 8-3 ¶¶ 35–38 (Rosenthal Decl.); Doc. 106 at 23–35. Later in adolescence, a transgender minor may be prescribed hormone therapy. Doc. 8-3¶ 39; Doc. 106 at 23–35. As the district court explained, "[t]he primary effect of these treatments is to delay physical maturation, allowing transgender minors to socially transition their gender while they await adulthood." Op. 3 (citing Doc. 104 at 105–06, 110–11).

The evidence also established that transitioning medications are not experimental but are instead part of "well-established, evidence-based treatments for gender dysphoria." Op 17; *see also* Doc. 106 at 113. The district court found that while Defendants presented some evidence of risk from transitioning medication, "[r]isk alone does not make a medication experimental." Op. 18. Plaintiffs' experts testified that as with any medication, "there are risks associated with transitioning medications," but that "the benefits of treating minors with these medications outweigh these risks in certain cases." Op. 10 (citing Doc. 104 at 57–58, 121–22, 136, 170).

The district court also found "that medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria," Op. 18; Doc. 8-3 ¶ 42 (Rosenthal Decl.); Doc. 106 at 110–12, and those medications are part of gender dysphoria treatment standards that have existed for more than four decades. *See* Doc. 8-2 ¶ 7 (Ladinsky Decl.); Doc. 8-3 ¶¶ 23–24, 27–31 (Rosenthal Decl.). The World Professional Association for Transgender Health's standard of care, which is followed by all major medical associations, represents an expert consensus based on the best available science about transgender

healthcare. Doc. 8-2 ¶ 7 (Ladinsky Decl.); Doc. 8-3 ¶¶ 28–29 (Rosenthal Decl.); Doc. 106 at 27–28. That standard confirms that "transition"—which can include adopting a new name and pronouns, changing clothes and physical appearance, and correcting identity documents, as well as puberty blockers and hormone therapy where appropriate—is widely accepted as the safe and effective treatment for gender dysphoria. Doc. 8-1 ¶¶ 27–29, 38 (Hawkins Decl.); Doc. 8-3 ¶¶ 23, 32 (Rosenthal Decl.); Doc. 69-18 at 15–20.

Finally, the district court found that there was no "evidence to suggest that healthcare associations are aggressively pushing these medications on minors." Op. 19. To the contrary, minor patients and their parents "undergo a thorough screening process and give informed consent before any treatment regimen begins." Op. 10 (citing Doc. 104 at 41, 59, 132); Doc. 8-1 ¶ 36 (Hawkins Decl.); Doc. 8-2 ¶¶ 9–10 (Ladinsky Decl.); Doc. 8-3 ¶¶ 48–51 (Rosenthal Decl.); Doc. 8-6 ¶¶ 10, 12 (Zoe Decl.); Doc. 8-8 ¶¶ 14–16 (Noe Decl.); Doc. 106 at 103. In addition, treatment cannot begin without the signed consent of both parents with legal medical decision-making authority and the assent of the patient. Doc. 106 at 107–10; Doc. 8-7 ¶¶ 18–19 (Poe Decl.); Doc. 78-41 (Consent Form).

Medical intervention to treat gender dysphoria occurs, if at all, only after comprehensive evaluation by a multidisciplinary team based on the individual's medical and mental health needs. Doc. 8-2 ¶¶ 10–12 (Ladinsky Decl.); Doc. 8-3 ¶¶ 5, 33, 46 (Rosenthal Decl.); Doc. 106 at 25, 100. This evaluation includes a robust assessment of information from the patient's pediatrician, mental health provider, and a pediatric endocrinologist, as well as in-depth consultation with the patient and their family. Doc. 106 at 25–26, 105; Doc. 8-7 ¶¶ 18–19, 21 (Poe Decl.).

For example, before a transgender adolescent can begin hormone therapy, a mental health professional must: (1) confirm the persistence of gender dysphoria; (2) ensure that any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed and the minor's situation and functioning are stable enough to start treatment; and (3) verify that the minor has sufficient mental capacity to understand the consequences of the treatment. Doc. 8-3 ¶¶ 48–51 (Rosenthal Decl.); Doc. 8-1 ¶ 36 (Hawkins Decl.); Doc. 8-2 ¶¶ 9–11 (Ladinsky Decl.); Doc. 106 at 25–26, 106–10.

Once treatment begins, parental education and counseling continues alongside ongoing monitoring by, and communication among,

the patients' physicians. Doc. 106 at 25–26, 77, 102–03; Doc. 8-7 ¶¶ 18–19, 21 (Poe Decl.); Doc. 8-1 ¶¶ 36–37 (Hawkins Decl.); Doc. 8-2 ¶¶ 10–12 (Ladinsky Decl.); Doc. 8-3 ¶ 47 (Rosenthal Decl.). Transitioning medication is not made available "on demand" or prescribed over the objection of the patient, their parent, or their doctor. Doc 106 at 107–10.

### B.    The Act

On April 8, 2022, Defendant Governor Kay Ivey signed into law S.B. 184, a first-of-its kind categorical and criminal ban. The Act makes it a felony punishable by up to 10 years imprisonment and fines up to $15,000 for any person, including parents or doctors, who obtains or provides medical treatments prescribed for a transgender minor consistent with the current medical standard of care. S.B. 184 § 4(a), (c); Ala. Code §§ 13A-5-6(a)(3), 13A-5-11(a)(3). The Act became effective on May 8, 2022 and was in force for five days before the district court preliminarily enjoined it on May 13, 2022.

The Act prohibits a range of medical treatments from being "performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent

with the minor's sex as defined in this act." S.B. 184 § 4(a). Those prohibitions include:

(1)    Prescribing or administering puberty blocking medication to stop or delay normal puberty.

(2)    Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.

(3)    Prescribing or administering supraphysiologic doses of estrogen to males.

(4)    Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

(5)    Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's biological sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6)    Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

*Id.* § 4(a). A violation of this provision is a Class C felony. *Id.* § 4(c); Ala. Code §§ 13A-5-6, 13A-5-11. This appeal concerns only the administration of puberty blockers and estrogen or androgens (prohibitions (1)–(3) above).

According to Section 2 of the Act, the Act was based on a legislative finding that "[s]ome in the medical community are aggressively pushing" minors to take transitioning medications, which, despite the widely accepted standards of care, the Act describes as "experimental" and

14

"unproven, poorly studied. . . interventions" that allegedly cause "numerous harmful effects for minors." S.B. 184 § 2(6), (11). The Legislature asserted that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications" of these treatments, and thus, "the decision to pursue" these treatments "should not be presented to or determined for minors[.]" *Id.* § 2(15)–(16). The Act provides for no exceptions to these prohibitions.

### C.    Plaintiffs-Appellees.

Plaintiffs are parents of transgender children, medical providers who care for those children, and adolescents who have been prescribed or are being evaluated for transitioning medications to alleviate severe distress from gender dysphoria, and for whom precluding transitioning medications would have serious harmful effects.[1]

Plaintiff-Appellees Brianna Boe, James Zoe, Megan Poe, and Kathy Noe are parents of adolescent children who have been diagnosed with

---

[1] Plaintiff-Appellant Reverend Paul Eknes-Tucker, a pastor who brought a First Amendment challenge to the Act on the ground that he faces potential felony conviction and imprisonment for providing pastoral counseling to congregants and community members who are parents of transgender adolescents, does not appeal from the district court's ruling as to the First Amendment claim.

gender dysphoria. Doc. 8-5 ¶¶ 9, 15 (Boe Decl.); Doc. 8-6 ¶¶ 8, 10–11 (Zoe Decl.); Doc. 8-7 ¶¶ 10–12 (Poe Decl.); Doc. 8-8 ¶ 14 (Noe Decl.). They want their children to receive the medically accepted and necessary prescribed medical care that, absent the district court's injunction, the Act would criminalize.

For example, Parent Plaintiff Megan Poe "specifically described the positive effects transitioning treatments have had on her fifteen-year-old transgender daughter, Minor Plaintiff Allison Poe." Op. 10; Doc. 106 at 166–67. In "her early adolescent years, Allison suffered from severe depression and suicidality due to gender dysphoria." Op. 10 With transitioning medications, her daughter is "happy and 'thriving,'" and she "fear[s] her daughter would commit suicide" if she stops taking the medications. Op. 11 (citing Doc. 104 at 166–67).

Plaintiff-Appellees Dr. Jane Moe, a licensed clinical psychologist, and Dr. Rachel Koe, a pediatrician, are healthcare providers who face felony convictions and imprisonment under the Act if they continue to provide medically appropriate and necessary medical care to their patients. Doc. 8-9 ¶¶ 1, 4, 12–14 (Moe Decl.); Doc. 8-10 ¶¶ 1, 2, 11–14 (Koe Decl.).

Plaintiffs filed a motion for a preliminary injunction on April 19, 2022, less than two weeks after the Act was signed. They asserted that the Act violated the Due Process and Equal Protection Clauses, the First Amendment, and the Affordable Care Act (the "ACA"). The Department of Justice ("DOJ") intervened to assert an Equal Protection claim, and the court held a preliminary injunction hearing on May 5 and 6, with opening statements being heard on May 4.

### D.    The Evidentiary Hearing

The district court held a two-day evidentiary hearing, at which Plaintiffs called six witnesses, DOJ called one, and the State called two. Plaintiffs' witnesses testified about the medical necessity and benefits of transitioning medications, the harm caused by stopping treatment, and the ethical quandary for medical providers for whom following the accepted standards of care now comes at the cost of a potential felony conviction.

Plaintiffs' expert, Dr. Morissa Ladinsky, testified about the stark contrast in outlooks for adolescents who receive treatment for gender dysphoria and those who do not. When gender dysphoria is abated through this standard medical treatment, a minor's anxiety, depression,

and self-harm diminish; adolescents exhibit "a radiance, a self-confidence," and "teenagers who have been sullen, withdrawn, failing academically . . . join the world in ways they hadn't before." Doc. 106 at 112.

Based on testimony from medical experts and parents alike, the district court recognized that withdrawing treatment from patients to whom it has been prescribed wreaks havoc on their mental health, resulting in severe mood swings, potential self-harm, and possible suicidality. Op. 30; *see also* Doc. 106 at 118 ("That will take these youth to very dark places. And we are fully aware of many of those places from which they came.").

Provider Plaintiff Dr. Jane Moe testified that the Act forces her to choose between complying with the Act and adhering to her professional and ethical obligations by following prevailing standards of care when caring for her current and future transgender patients. Doc. 8-9 ¶ 14 (Moe Decl.); *see also* Doc. 8-10 ¶¶ 11–13 (Koe Decl.) (same); *see also* Doc. 106 at 117–18. Dr. Armand H. Antommaria, the United States' bioethicist expert, testified that the Act places providers "in the untenable position of either violating their ethical obligations to their

patients to conform with the law, or fulfilling their professional duties to their patients and being criminally charged." Doc. 105 at 225.

Defendants also put on evidence at that hearing, which the district court carefully weighed. But that evidence did not prove the points Defendants were trying to make. Defendants' primary witness to support their argument that prescribing transitioning medication to transgender minors is experimental and harmful was Dr. James Cantor, a private psychologist in Toronto, Canada. Yet, Cantor admitted that he: (1) has never provided care to a transgender minor under age 16; (2) has never diagnosed or treated a child or adolescent for gender dysphoria; (3) has no personal experience monitoring patients receiving transitioning medications; and (4) has no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic. Op. 12; Doc. 105 at 306–08. Given this, the district court rightly "gave his testimony regarding the treatment of gender dysphoria in minors very little weight." Op. 12.

While stating his own view that there are no circumstances in which he would "affirm a [transgender] child or an adolescent," Doc. 105 at 305, Cantor conceded that the "most widely-respected and utilized

19

method for the treatment of children who present with gender dysphoria" includes the prescription of "puberty-blockers . . . at age 12" and "hormones at age 16." Doc. 105 at 326. Despite suggesting that Alabama should follow the lead of other countries in their approach to transitioning medications, Cantor conceded that "no state or country in the entire world has enacted a blanket ban of these medications other than Alabama." Op. 20–21 (citing Doc. 105 at 328).

Alabama's only other witness was Sydney Wright, a 23-year-old who received hormone therapies for gender dysphoria as an adult in Georgia for about a year before stopping treatment. Op. 12; *see also* Doc. 105 at 338, 351, 357. Wright began treatment at age 19, after the age of majority; thus, if she had received treatment in Alabama, her treatment would not have been covered by the Act. In other words, whatever perceived harm Wright's testimony depicts, the Act does nothing to prevent it. Doc. 105 at 338, 351, 357.

## E.    The Preliminary Injunction.

On May 13, the court issued an order granting Plaintiffs' motion as to Sections 4(a)(1)–(3) of the Act on both Due Process and Equal Protection grounds. As a result of the ruling, Minor Plaintiffs may

continue to receive transitioning medication while the case proceeds to trial, consistent with the status quo before the law went into effect. The district court's ruling leaves in effect the provisions of the Act that ban "sex-altering surgeries on minors," Op. 1–2; S.B. 184 § 4(a)(4)–(6), or prohibit school officials from "[w]ithhold[ing] from a minor's parent or legal guardian," or "[e]ncourag[ing] or coerc[ing] a minor to withhold from the minor's parent or legal guardian[,] the fact that the minor's perception of his or her gender or sex is inconsistent with the minor's sex." S.B. 184 § 5(1), (2).[2]

In granting a preliminary injunction, the district court found that all factors weighed in favor of injunctive relief. The district court found that the Act likely violated Parent Plaintiffs' "fundamental right to direct the medical care of their children," which "includes the more specific right to treat their children with transitioning medications subject to medically

---

[2] The district court held Plaintiffs are not likely to succeed on their void for vagueness and First Amendment claims, Op. 25, 28, based, in part, on Defendants' statements that a person cannot "violate the Act simply by advising a minor to take transitioning medications or by driving a minor to a gender clinic where transitioning medications are administered," Op. 26. Relatedly, the court explained "the Act does not criminalize speech that could indirectly lead to a minor taking transitioning medications." Op. 28. These portions of the district court's opinion are not subjects of this appeal.

21

accepted standards." Op. 21. The district court held that the Act could not survive strict scrutiny, finding that "Defendants' proffered purposes—which amount to speculative, future concerns about the health and safety of unidentified children—are not genuinely compelling justifications based on the record evidence," and that, even if they were, the Act is not narrowly tailored to achieve them. Op. 20.

The district court also held that the Minor Plaintiffs were substantially likely to prevail on their claim under the Equal Protection Clause because "[t]he Act categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity." Op. 23. By singling out transgender minors, the Act "places a special burden on transgender minors because their gender identity does not match their birth sex." *Id*. Because Alabama offered no more than "hypothesized" justifications for the law and failed to show an exceedingly persuasive justification to discriminate based on sex, the district court held that the Act likely violated the Minors Plaintiffs' rights under the Equal Protection Clause. *Id*. (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

The district court also found that permitting enforcement of the Act would irreparably harm Plaintiffs. It reasoned that the Act would stop "Parent Plaintiffs from treating their children with transitioning medications subject to medically accepted standards," Op. 29, and that without this treatment, "Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality." Op. 30.

Finally, the district court found that "the imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from an injunction." Op. 31. Balancing the factors, the district court granted a preliminary injunction in part and enjoined Alabama from enforcing Section 4(a)(1)–(3) of the Act pending trial.

This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly held that Plaintiffs are likely to succeed on their due process claim. "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case

basis." Op. 19–20. The district court's conclusion flows ineluctably from the Constitution, which protects parents' rights to make decisions about how to raise and care for their children free from unwarranted interference by the state. *Troxel*, 530 U.S. at 66. Indeed, those due process rights are "perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court. *Id*. at 65; *Yoder,* 406 U.S. at 232. And those interests include parents' right "to direct a child's medical care." Op. 16.

The Act supplants parental judgment in favor of the state's categorical prohibition. As the district court found, none of Defendants' asserted justifications for this infringement pass constitutional muster. They are based on "speculative, future concerns about the health and safety of unidentified children." Op. 20. As such, they "are not genuinely compelling justifications based on the record evidence." *Id*. And even if they were, the Act is not narrowly tailored to advance them. *Id*.

The district court also correctly held that Plaintiffs are likely to succeed on their Equal Protection claim because the Act singles out transgender minors. Op. 22. Discrimination because a person is transgender "equates to sex discrimination." Op. 1; *Brumby*, 663 F.3d at

1320. Accordingly, the district court correctly held that "[t]he Act therefore constitutes a sex-based classification for purposes of the Fourteenth Amendment." Op. 22. A sex-based law may be upheld only when supported by an "exceedingly persuasive justification," Op. 23, but Defendants proffered none. *Id.*

The district court also correctly found that Plaintiffs would suffer irreparable injury absent the injunction. The Act cuts off adolescents' medically needed care and exposes parents and medical professionals to criminal consequences for the parents' exercise of their constitutional rights to seek established care for their minor children.

Finally, the district court also correctly found that the last two preliminary injunction factors—balancing of the harms and consideration of the public interest—also weigh in favor of an injunction. While Plaintiffs face irreparable injury due to the interruption of their medical care should the injunction be lifted, Defendants suffer no harm from maintaining the status quo while this litigation proceeds.

## STANDARD OF REVIEW

"Appellate review of a preliminary-injunction decision . . . is exceedingly narrow because of the expedited nature of the proceedings in

the district court." *Wreal*, 840 F.3d at 1248. "The district court's decision will not be reversed unless there is a clear abuse of discretion." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (quoting *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984) (per curiam)). This Court reviews "the preliminary injunction's underlying legal conclusions *de novo* and its findings of fact for clear error." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1078 (11th Cir. 2021).

The "deferential" standard this Court applies in reviewing a district court's grant of a preliminary injunction recognizes that "the trial court is in a far better position than this Court to evaluate th[e] evidence, and [the Court of Appeals] will not disturb its factual findings unless they are clearly erroneous." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002). Similarly, "judgments . . . about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and [this Court] will not set them aside unless the district court has abused its discretion in making them." *Id.* Such deference is particularly warranted when the

district court's balancing of the equities is "supported by factual findings drawn from two full days of evidentiary hearings." *On Point Cap. Partners*, 17 F.4th at 1080.

## ARGUMENT

**I.  The District Court Correctly Held That the Act Likely Infringes on the Parent Plaintiffs' Right to Direct the Medical Care of Their Children Subject to Accepted Medical Standards**

### A.  A Century of Precedent Establishes That Due Process Protects Parental Decisionmaking, Including the Right of Parents to Obtain Established Medical Care for Their Children

The district court concluded that the Act likely violates the Parent Plaintiffs' "fundamental right to direct the medical care of their children subject to accepted medical standards." Op. 1. None of Defendants' arguments warrants reversal of the district court's conclusion.

The Fourteenth Amendment protects parents' rights to make decisions "concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. The "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder,* 406 U.S. at 232. Because the right of parents to care for their children is fundamental, any substantial infringement of parental autonomy is subject to strict scrutiny. *Lofton v. Sec'y of Dep't of*

27

*Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004); *see also Troxel*, 530 U.S. at 80 (Thomas, J., concurring).

A core aspect of this fundamental right is a parent's ability to make medical decisions for a child. This Court has explained that the Due Process Clause prohibits a state, "concerned for the medical needs of a child," from "willfully disregard[ing] the right of parents to generally make decisions concerning the treatment to be given to their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990); *see also Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989) ("The Supreme Court has addressed this right in cases involving parent-state conflicts in the areas of medical care and education."), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993); *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) ("[P]arents' substantive due process right 'to make decisions concerning the care, custody, and control' of their children includes the right to direct their children's medical care." (quoting *Troxel*, 530 U.S. at 72)); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *appeal docketed*, No.

21-2875 (8th Cir. Aug. 23, 2021) (concluding that "Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary").

Because courts have recognized medical decision-making as a parental right for so long, Defendants' attempted reliance on *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) and *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005) has no merit. Those cases urge caution in recognizing new fundamental rights. In this case, however, the fundamental right to parent is "perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court, *Troxel*, 530 U.S. at 65, and its application to medical decision-making is well established.

Defendants' attempted reliance on *Andino v. Middleton*, 141 S. Ct. 9 (2020) (mem.), also misses the mark. Although states are "principally entrust[ed]" to ensure "the health and safety of the people," *see* Opening Br. 27 (quoting *Andino*, 141 S. Ct. at 10 (Kavanaugh, J., concurring)), they must do so within constitutional limits and based on credible evidence. *See*, *e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam) (enjoining public health

order where the government "has not shown that public health would be imperiled" and the measure infringed upon religious liberty); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1316 (11th Cir. 2017) (holding that the mere assertion of "the need to regulate the medical profession in order to protect the public" was not sufficient to justify an otherwise unconstitutional law).

### B.    Defendants' Efforts to Redefine This Deeply Rooted Constitutional Right Fail

Both on appeal and below, Defendants concede that Supreme Court precedent recognizes that parents have a fundamental right to make decisions concerning the care of their children. Opening Br. 37; Doc. 74 at 108 (Resp. to Mot. for Prel. Inj.). Having made that concession, Defendants' arguments below focused principally on trying to distinguish those cases by arguing that the parental right to obtain medical treatment for their children does not encompass a right to obtain treatments that are experimental. Doc. 74 at 102–11 (arguing there is no "substantive-due-process right to experimental medical procedures"); 106 ("In sum, no fundamental right to access particular medical procedures exists."); 110–11 (arguing in conclusion that Plaintiffs are unlikely to succeed on their due process claim because "Alabama's law seeks to

protect children from experimental medical procedures"). That argument failed because, as the district court found, Defendants produced no credible evidence to show that transitioning medications are experimental. Op. 17.

Defendants find themselves between a rock and a hard place. They concede, as they must, that the Constitution protects parents' rights to care for their children, but Defendants cannot show clear error in the district's courts factual findings. They instead fall back on an alternative argument that Plaintiffs' claim is not rooted in parental rights but instead creates some new derivative claim to an "individual, personal right" to obtain gender transition-related medical treatments. Opening Br. 32.

Plaintiffs, however, do not assert any such derivative claim. Nothing in the long line of precedent holding that the Due Process Clause protects parents' rights to make decisions about their children's medical care dictates that this right is dependent on or derivative of a right to obtain a specific medical treatment. To the contrary, the Supreme Court's precedents establish that parental rights to make decisions concerning their children's care stand on their own. For example, parents have a

fundamental right to determine whether their child attends a public or private school, *Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), even though children do not have a fundamental constitutional right to a public education. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). Similarly, parents' fundamental right to seek medical care for their children exists irrespective of whether the child has an underlying right to that medical care.

*Whalen v. Roe*, 429 U.S. 589 (1977), which addresses a reporting requirement, not a prohibition of treatment, is not to the contrary. In *Whalen*, doctors alleged that a law requiring them to report the name and address of patients to whom they prescribed Schedule II drugs violated "their right to practice medicine free of unwarranted state interference." *Id.* at 604. Because doctors do not have an independent right to administer medical care, the Supreme Court held that the doctors' claim was "derivative from, and therefore no stronger than, the patients'." *Id.* In sharp contrast, the Parent Plaintiffs are asserting an independent parental right that has been recognized in decades of jurisprudence.

*Doe ex rel. Doe v. Public Health Trust*, 696 F.2d 901, 903 (11th Cir. 1983) (per curiam) is no more helpful to Defendants. In *Public Health Trust*, a father of a voluntarily committed mental health patient argued that the hospital's rule barring communication between the minor and her parents violated the Constitution. Far from undermining Plaintiffs' claims here, *Public Health Trust* accepted that "parents have the right to decide what medical attention should or should not be provided for their children," but held that the parents "exercised their rights to decide what medical treatment should or should not be provided [their daughter] when they decided voluntarily to admit her to [the] Hospital." *Id*. The Court's observation that a parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself" referred to the fact that, like an adult who voluntarily commits himself to a hospital, a parent who voluntarily commits a child is free to withdraw consent to treatment at any time. *Id*. Because the parents were free to withdraw their consent, there was no infringement of "their rights to decide what medical treatment should or should not be provided." *Id*. Here, by contrast, the Act categorically bars parents from exercising their right to make medical decisions for their children.

Defendants also erroneously argue that *Parham* addressed only procedural due process. Opening Br. 38. *Parham* held that "parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations'" including "a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602 (quoting *Pierce*, 268 U.S. at 535) (citing *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923)). It was the Court's recognition of this substantive constitutional interest of parents in the medical care of their children that led the Court to hold that parents, not the state, retain the primary decision-making role in such care. *Parham*, 442 U.S. at 602.

Defendants' effort to distinguish *Bendiburg* is equally unavailing. Contrary to Defendants' argument, *Bendiburg* merely recognized that parents' fundamental right to make medical decisions for their children is not without limits and that the government may, subject to appropriate procedural safeguards, intercede on a child's behalf when the child's physical or mental health is jeopardized. *See Bendiburg*, 909 F.2d at 470; *Parham*, 442 U.S. at 603. Plaintiffs do not claim, as Defendants argue, an unlimited right to parental autonomy. Opening Br. 30–31. Instead,

34

the evidence is that the Parent Plaintiffs wish to decide, with oversight from medical professionals, whether the Minor Plaintiffs should receive widely accepted medical treatments.

Defendants also cite to cases holding that there is no constitutional right to specific experimental or unproven medical treatments. These cases are inapplicable, as the district court found that the prescribed treatments are neither experimental nor unproven in their therapeutic efficacy. Op. 17–19, 24. Moreover, none of these cases involved either parental decisionmaking or "well[ ]established, evidence-based" medical care. Op. 17. *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007) (holding that there is no fundamental right of "access to experimental drugs"); *Rutherford v. United States,* 616 F.2d 455, 457 (10th Cir. 1980) (holding that there is no fundamental right to obtain drugs "for which there is no affirmative, reliable evidence of effectiveness") (quoting *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 622 (1973)); *Raich v. Gonzales,* 500 F.3d 850, 865 (9th Cir. 2007) (holding that there is no fundamental right to medical marijuana because it is not yet accepted in the medical community as a treatment for particular illnesses).

Defendants' attempted reliance on *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017), is also misplaced. *Morrissey* did not concern parental rights, but instead a claim that the fundamental right of adults to procreation encompassed a right to father a child through in vitro fertilization (IVF). *Id.* The plaintiff in *Morrissey* was challenging a tax policy that prevented him from deducting the cost of IVF, not a law that barred him from using assisted reproduction to have children. *Id.* at 1262. In contrast, the Act completely bars Plaintiffs from obtaining accepted medical care.

*Williams v. Attorney General*, 378 F.3d 1232 (11th Cir. 2004) is also irrelevant to the very different issue presented here. *Williams* held that adults do not have a constitutional right to obtain certain devices for private sexual activity because no such right is either deeply rooted in our nation's history and tradition or implicit in the concept of ordered liberty. *Id.* at 1238. In stark contrast, a parent's right to obtain accepted medical care for a child is woven deeply into the fabric of our nation's history.

None of these cases suggests, let alone holds, that the longstanding right of parents to provide for their children's medical care requires a

36

parent to prove that the specific treatment being sought is rooted in the nation's history and tradition. Were that the standard, states would be free to ban all manner of medical treatments—including life-saving treatments for childhood cancers or other deadly diseases—merely because the technology and science used to develop such treatments are of relatively recent origin. Under Defendants' theory, the state would be the sole arbiter of all such matters and could ban any medication it pleases, regardless of well-supported by evidence of safety and effectiveness and wide acceptance of the treatments within the medical profession. Such a regime is incompatible with the Supreme Court's repeated admonishment, through decades of case law, that there is a "private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944).

Finally, nothing in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), alters the past century of precedent establishing parents' right to seek and obtain medical care for their children. The majority opinion in *Dobbs* cited *Pierce, Meyer,* and other precedents holding that the Due Process Clause provides substantive protection against the deprivation of fundamental rights, including the right of

37

parents to make decisions concerning the welfare of their children. The Supreme Court expressly stated that its decision in *Dobbs* "does not undermine [these precedents] in any way." *Id*. at 2258. The Court repeatedly emphasized that the right to abortion addressed in *Dobbs* is "critically different from any other right that this Court has held to fall within the Fourteenth Amendment's protection of 'liberty,'" a difference that the Court attributed to the presence of "'fetal life'" in the abortion context. *Id*. at 2243. The Court also emphasized that its decision does not affect its precedents recognizing other fundamental liberty interests, including parental rights. *Id*. at 2243. The right of parents to choose widely accepted medical treatments for their transgender children falls squarely within the heartland of fundamental liberty precedents unaltered by *Dobbs*.

Defendants' contrary argument would require this Court to conclude that in *Dobbs*, the Supreme Court—despite its express disavowal of any intent to do so—implicitly overruled a century of precedent. But as the Supreme Court has cautioned: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow

the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). That caution is even more warranted here, where the Supreme Court specifically stated that its opinion does not undermine other fundamental rights.

## C. The Act's Substantial Infringement on Parental Rights Requires, and Fails, Strict Scrutiny

Because the right of parents to care for their children is fundamental, any substantial infringement on that right is subject to strict scrutiny. *Lofton*, 358 F.3d at 815; *see also Troxel*, 530 U.S. at 80 (Thomas, J., concurring). To satisfy this standard, a law must be "narrowly tailored" to achieve "a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Defendants have failed to show that the Act satisfies either prong.

### 1. The District Court Correctly Found There Is No Compelling Justification for the Act

Defendants assert that the Act was intended to protect children from "experimental" medical procedures that are unduly risky and being "aggressively push[ed]" on minors. Opening Br. 40, 41; *see also* S.B. 184 § 2(13)–(15); § 2(6). But as the district court found, Defendants failed to present credible evidence to support their claims. Op. 17–20.

### a. The district court correctly found that transitioning medications are not experimental

The district court found that "Defendants produce[d] no credible evidence to show that transitioning medications are 'experimental.'" Op. 17. Instead, "the uncontradicted record evidence is that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors." *Id.* (citing Doc. 104 at 25, 97–98, 126–27); Doc. 69-18 (WPATH Report Exhibit); Doc. 78-19 at 7–10, 13 (Boulware Report Exhibit). Extensive record evidence corroborates that overwhelming medical consensus. *See* Doc. 62-2 ¶¶ 23–29 (Antommaria Decl.); Doc. 78-14 (Endocrine Treatment Exhibit); Doc. 78-19 at 13–15 (Boulware Report Exhibit); Doc. 8-3 ¶ 45 (Rosenthal Decl.). Even Cantor, Defendants' own expert, testified that the "most widely-respected and utilized method for the treatment of children who present with gender dysphoria" includes the prescription of puberty blocking medication at age 12 and hormone therapy at age 16. Doc. 105 at 326.

Defendants also failed to identify any safe or effective alternative treatment for adolescents. They point to so-called "watchful waiting," but

as Defendants' expert acknowledged, watchful waiting refers only to prepubescent children, not to adolescents. Doc. 69-2 ¶¶ 44, 46. Defendants produced *no* evidence that *any* experts in the field advocate "watchful waiting" as a treatment for transgender adolescents. And as the record demonstrates, "delaying or denying" treatment—"as contemplated by the wait-and-see approach—can have severe" negative consequences. Doc. 8-3 ¶ 55 (Rosenthal Decl.); Doc. 106 at 35.

Defendants relied heavily on claims that other countries have allegedly restricted the use of transitioning medications to justify the Act. Yet, their own expert conceded that "no country or state in the world categorically bans their use as Alabama has." Op. 17–18; *see also* Doc. 106 at 79.

In fact, the documentary evidence on which Defendants relied regarding foreign standards of care *supports* the careful approach to the care and treatment of gender dysphoria already used by Alabama providers. For example, as Dr. Ladinsky explained, the recommendations issued by the United Kingdom "are quite applicable to refining best practices," Doc. 106 at 114, and ensuring "stronger and better assessments for the mental health to assure that the right kids are

getting the right medicine at the right time." Doc. 106 at 80, 114. The Swedish documents similarly urge treatment when there has been "persistence of gender incongruence until puberty and a marked psychological strain in response to pubertal development." Doc. 69-11 at 4 (stating that treatment is authorized). *Accord* Doc. 69-12 at 8–9 (Finland) (providing that "hormonal interventions may be considered before reaching adulthood in those with firmly established transgender identities"); Doc. 69-13 at 1–2 (France) (authorizing treatment); Doc. 69-14 at 4 (Australia & New Zealand) (same).

Faced with the uncontradicted evidence in the record undermining Defendants' purported justification for prohibiting puberty blockers and hormone treatments in transgender youth, Defendants instead cite to the use of the word "experimental" in a recent document from the State of Florida. Opening Br. 24 (quotation marks omitted). Defendants, however, did not produce or rely on that publication below, nor can they otherwise show that its conclusions have any validity.[3]

---

[3] The Florida report's methods and conclusions have been criticized in detail by the American Academy of Pediatrics and other experts. Am. Academy of Pediatrics Comment Letter on Proposed Rule to Prohibit Gender-Affirming Care in the State's Medicaid Program (July 7, 2022), https://custom.cvent.com/EDE603C5145F48C8BBC5477DB676A0EB/fil

Similarly, Defendants cite to a news article about a 2015 study of transitioning treatments for transgender youth by the National Institutes of Health (NIH), which they misleadingly characterize as "a five-year *experiment*." Opening Br. 34. Defendants did not present this study to the district court, but even if they had, it does not support Defendants' argument. To the contrary, the NIH did not fund the study because these medications are "experimental," but for the opposite reason: To generate longitudinal data to better guide doctors and others in providing this established care. Juliana Bunim, *First U.S. Study of Transgender Youth Funded by NIH*, UCSF.edu (Aug. 17, 2015), https://perma.cc/URA6-CERX.

> **b.** **The district court correctly found that transitioning medications are not unduly risky and do not jeopardize the health and safety of minors suffering from gender dysphoria**

The district court found that Defendants also "fail[ed] to produce evidence showing that transitioning medications jeopardize the health

---

es/9c275465fc9e4807bc613ca62d5b3863.pdf; *See also*, Meredithe McNamara et al., A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria (2022), https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/florida-medicaid/.

and safety of minors suffering from gender dysphoria." Op. 19. Defendants' claim that transitioning medications are akin to eugenics or lobotomies or the misuse of opioids, Opening Br. 36, is specious. The record demonstrates they are essential to the well-being of a small group of Alabama minors, and Defendants offered no evidence of widespread abuse of this care in Alabama or substantiated their inflammatory claim in any other credible way. As the district court explained, the relevant question is not whether there is any risk, since that "is true of almost every medical regime," Op. 18, but rather whether the benefits of treatment outweigh those risks.

The substantial evidence before the district court established:

(1)    "medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria," Op. 18; Doc. 8-3 ¶ 42 (Rosenthal Decl.); Doc. 62-2 ¶ 43 (Antommaria Decl.)[4]; Doc. 106 at 104, 110–11;

---

[4] Defendants' rebuttal—that these medications may be established for purposes of treating one condition but not necessarily for another, Opening Br. 34–35—misses the point. What matters is that there is a long and well-established track record of prescribing these medications for children and adolescents, which has shown them to be generally safe.

(2)     parents and minor patients are counseled extensively

regarding potential risks, Doc. 8-3 ¶ 47–51 (Rosenthal Decl.);

Doc. 62-2 ¶¶ 39–42 (Antommaria Decl.); Doc. 106 at 107–08;

(3)     the effects of puberty blocking medications are reversible

and the effects of hormone therapy are mostly so, Doc. 8-3

¶ 40 (Rosenthal Decl.); Doc. 106 at 105, 107[5]; and

(4)     substantial clinical literature shows that adolescents with

gender dysphoria benefit from these treatments. Doc. 8-3

¶ 45 (Rosenthal Decl.); Doc. 78-19 at 13–17 (Boulware

Report Exhibit).

Defendants attempt to cast doubt on the safety of these medications

because they are prescribed off-label for the treatment of gender

dysphoria. Yet, off-label use of FDA-approved drugs is specifically

authorized under both Alabama and federal law and does not mean that

a drug is unsafe. Ala. Code § 27-1-10.1(c)(1). *See also* Doc. 62-2 ¶¶ 19–22

(Antommaria Decl.); and Doc. 78-19 at 23–24 (Boulware Report Exhibit).

---

[5] For this reason, contrary to Defendants' assertion, Opening Br. 16
n.5, the record fully supports the district court's finding that "[t]he
primary effect of these treatments is to delay physical maturation,
allowing transgender minors to socially transition their gender while
they await adulthood." Op. 3.

### c. The district court found no evidence that treatment is being "aggressively pushed" on minors

The district court also found that "nothing in the record shows that medical providers are pushing transitioning medications on minors." Op. 24. Instead, the record demonstrated that both minors and their "parents undergo a thorough screening and consent process before they may choose these medications for their children." Op. 19 (citing Doc. 104 at 41, 59, 132); Doc. 8-1 ¶ 36 (Hawkins Decl.); Doc. 8-2 ¶¶ 9–10 (Ladinsky Decl.); Doc. 8-3 ¶¶ 48–51 (Rosenthal Decl.); Doc. 8-6 ¶¶ 10, 12 (Zoe Decl.); Doc. 8-8 ¶¶ 14–16 (Noe Decl.).

Defendants assert that "the majority of gender dysphoric youth will *not* persist." Opening Br. 42. Yet, the uncontradicted record evidence demonstrates that statement applies (if at all) only to prepubescent children. Doc. 78-19 at 17–19. It has no applicability to transgender adolescents. *Id.* When asked if he agreed that "the majority of kids who continue to feel trans after puberty rarely cease," Dr. Cantor answered: "That does seem to be the case, yes." Doc. 105 at 330; *see also* Doc. 106 at 31, 81–82; Doc. 78-19 at 17–18 (Boulware Report Exhibit).

Defendants' assertion that there is a "new and rapidly growing group" of adolescents who are mistakenly receiving transitioning medications is also not supported by the record. Opening Br. 13; 42–43. The source of Defendants' claim is a single, highly controversial study that does not purport to show that this "new and rapidly growing group" is receiving medications, either in Alabama or anywhere.[6]

At the hearing, Defendants did not present a single witness who could corroborate Defendants' claim that medical providers aggressively push transitioning medications on minors in Alabama. Defendants' expert, Dr. James Cantor, admitted that even after soliciting Alabama parents with complaints about this alleged behavior, he was unaware of a single instance. Doc. 105 at 331–32. Defendants' only other witness was a twenty-three-year-old woman who received hormone therapy as an adult in Georgia and "never visited a gender clinic in Alabama." Op. 12–13.

---

[6] The article on which Defendants' experts rely consists of survey results gleaned from parents recruited through websites for groups opposing medical care for transgender adolescents, in addition to other "serious methodological errors." Doc. 78-19 at 19–21 (Boulware Report Exhibit).

Defendants contend they submitted other declarations to support their claim, but none do so. Most of the declarations submitted by Defendants do not identify the patient's age or the location where the patient sought or received care. Of those that do, with one irrelevant exception, the patients are not minors or are not alleged to have received transitioning medications in Alabama. For example, one of Defendants' witnesses presented through declaration is from a person who started hormone therapy at age 50. Doc. 69-37 ¶ 5. Others are from parents who declined to have their children initiate transitioning medications. Doc. 69-31 ¶ 14; Doc. 69-32 ¶ 11; Doc. 69-38 ¶ 7. The only declaration from a parent who alleged that a minor child in Alabama received transitioning medication provides no information about where or by whom that treatment was prescribed. Doc. 69-39. Moreover, the declaration relates to alleged hormone use by an 18-year-old from almost ten years ago. Doc. 69-39 ¶¶ 8–12.

Regardless, the mere existence of countervailing evidence in the record does not establish that the district court committed error; rather, the district court was free to weigh the evidence and disregard any evidence that was not compelling or credible. *See Cumulus Media*, 304

F.3d at 1171. According to Defendants' logic, anytime there is countervailing evidence in the record, this Court should reverse. Of course, that is not the standard.

In sum, "Defendants' proffered purposes—which amount to speculative, future concerns about the health and safety of unidentified children—are not genuinely compelling justifications based on the record evidence." Op. 20. "For this reason alone, the Act cannot survive strict scrutiny at this stage of the litigation." *Id*.

## 2.    The Act Is Not Narrowly Tailored

"[E]ven if Defendants' proffered purposes are genuinely compelling, the Act is not narrowly tailored to achieve" them. Op. 20. Defendants cannot demonstrate otherwise and have made no real effort to do so.

For example, to the extent Defendants have concerns about minors being rushed to diagnosis or treatment, there are many ways to address that short of criminalizing all care. The State could mandate medical protocols like those supported by the American Medical Association and the Pediatric Endocrine Society. It could require the kind of informed consent documents used by the gender clinic at the University of Alabama at Birmingham. Doc. 78-41 (Consent Form). The State or

professional boards could investigate complaints of medical malfeasance. Instead, Defendants took the extreme step of entirely banning established medical treatments for all transgender minors even though, as the district court noted, "Defendants themselves offer[ed] several less restrictive ways to achieve their proffered purposes." Op. 21.

## II.    The District Court Correctly Held That the Act Likely Violates the Equal Protection Clause

The district court correctly held that Plaintiffs are also likely to succeed on their claim that the Act violates the Equal Protection Clause because it discriminates against them based on their sex.

### A.    The Act Facially Targets Transgender Individuals and Thus Discriminates Based on Sex

The Act criminalizes the provision of designated medications *only* when prescribed to "affirm the minor's perception of his or her gender or sex, if that appearance . . . is inconsistent with the minor's sex." S.B. 184, § 4(a)(1)–(3). As the district court noted, the dictionary definition of a transgender person is one "whose gender identity is different from the sex the person had or was identified as having at birth." Op. 2 (citing *Transgender*, Merriam-Webster Unabridged Dictionary (3d ed. 2002)). By limiting its prohibition to such minors, the Act facially discriminates against individuals for being transgender.

50

Both this Court and the Supreme Court have held that similar classifications are sex-based. This Court has said that "[g]overnmental classification based on an individual's gender nonconformity equates to a sex-based classification for purposes of the Equal Protection Clause." Op. 22 (citing *Brumby*, 663 F.3d at 1320). Nearly a decade later, the Supreme Court agreed, concluding that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," *Bostock*, 140 S. Ct. at 1741.

The language of the Act itself—which Defendants all but ignore— confirms the inherent link between disparate treatment based on transgender status and disparate treatment based on sex. Op. 22. Throughout the Act, its operative provisions refer to "sex" in order to define the targeted class of transgender minors. The Act prohibits procedures that "alter the appearance" of a person's biological sex, "if that appearance or perception is inconsistent with the minor's sex [at birth]." S.B. 184, § 4(a); *see also id.* pmbl. (noting purpose of statute to prohibit treatment "that is intended to alter the minor child's gender"); *id.* § 2 (noting the intention to prohibit treatment that would "induce the development of secondary sex characteristics of the other sex").

51

The law's prohibition "cannot be stated without referencing sex," and "[o]n that ground alone, heightened scrutiny should apply." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (quotation marks omitted); *see also Bostock*, 140 S. Ct. at 1741–42 (where the state "intentionally penalizes a person identified as male at birth for . . . actions that it tolerates in [someone] identified as female at birth . . . sex plays an unmistakable and impermissible role").

Defendants offer no meaningful response to *Brumby*'s and *Bostock*'s clear application to the Act's text. Defendants hardly grapple with *Brumby* at all, asserting—with no support—that it does not apply "where the law's classifications are tied to meaningful biological differences between the sexes." Opening Br. 51; *see also id.* 54. In fact, biological differences are relevant, if at all, to the question of whether the law *withstands* heightened scrutiny, not whether heightened scrutiny applies in the first place.

Defendants' argument conflates two distinct questions: whether a law contains a sex-based classification, and whether that sex-based classification survives heightened review. As to the former, a sex-based classification is still a sex-based classification regardless of whether it is

52

based on biological characteristics. And as to the latter question, a sex-based classification may be upheld under heightened review only if it has an "exceedingly persuasive justification," and the mere invocation of biological differences is never sufficient to meet that demanding test. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690, 1693–94 (2017) (quoting *Virginia*, 518 U.S. at 531) (holding that biological differences between maternity and paternity did not justify disparate treatment of unmarried mothers and fathers under U.S. immigration law).

Notably, the primary case Defendants rely upon to support their argument that heightened scrutiny does not apply to laws based on "meaningful biological differences" in fact "applied heightened scrutiny," as Defendants are forced to concede. Opening Br. 52–54 (citing *Nguyen v. INS*, 533 U.S. 53, 59 (2001)). The Supreme Court applied heightened review in both *Nguyen v. INS* and *Sessions v. Morales-Santana*, cases about laws that imposed different immigration rules on children depending on whether they were born to U.S. citizen mothers or fathers. *Morales-Santana*, 137 S. Ct. at 1690; *Nguyen*, 533 U.S. at 59–60. In both cases, the federal government sought to justify the law based on the biological differences between mothers and fathers. *Morales-Santana*,

53

137 S. Ct. at 1694–96; *Nguyen*, 533 U.S. at 63–64. In *Nguyen*, the restrictions survived scrutiny. *Nguyen*, 533 U.S. at 70. In *Morales*, they failed. *Morales-Santana*, 137 S. Ct. at 1698. That the sex-based distinctions turned on biological distinctions did not preordain the outcome, nor did it mean (as Defendants erroneously argue here) that only rational basis scrutiny applied.

As for *Bostock*, Defendants meekly observe that *Bostock* analyzed Title VII of the Civil Rights Act, rather than the Equal Protection Clause. Opening Br. 51. But nothing about *Bostock's* reasoning that transgender discrimination *is* sex discrimination, *Bostock*, 140 S. Ct. at 1741, is limited to that statutory context. Defendants offer no explanation why that reasoning should not apply in an equal protection case, and, in any event, this Court has already held that it does. *See Brumby*, 663 F.3d at 1320.

Defendants seek to evade these precedents. According to Defendants, the Act creates two categories: minors who seek transitioning medications, and "all other minors," and because transgender minors are in both groups, the Act cannot be said to discriminate against them. Opening Br. 47–48.

The problem with Defendants' framing, as the district court observed in rejecting it, is that the "first category consists entirely of transgender minors." Op. 23. By barring certain treatments only for transgender minors, the Act places a "special burden on transgender minors because their gender identity does not match their birth sex." *Id.* On its face, the Act draws a classification that applies only to transgender minors.

Defendants also try to sidestep the Act's overt targeting of a particular group by comparing the Act to insurance policies that exclude coverage for pregnancy, *Geduldig v. Aiello*, 417 U.S. 484 (1974), or to statutes prohibiting abortion, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993), and *Dobbs*, 142 S. Ct. 2228. Opening Br. 49–50. None of those cases, however, involved a facially sex-based classification as does the Act. The policies and laws at issue in those cases involved "regulation of a medical procedure that only one sex can undergo." *Dobbs*, 142 S. Ct. at 2245 (discussing *Geduldig* and *Bray*). They do not on the face of the challenged provision target the group itself. In such a case, the regulation "does not trigger heightened constitutional scrutiny unless the

regulation is a mere pretext designed to effect an invidious discrimination against members of one sex." *Id* at 2245–46 (cleaned up).

The situation here is distinct. Unlike in cases challenging regulation of pregnancy or abortion coverage, the Act here targets on its face—by the words of the statute—the intended group. The Act bars the use or prescription of medications *when used by transgender minors*. There is no need to do a pretext analysis; the intention is clear on the face of the Act. S.B. 184 § 4(a). As the district court explained, the Act "prohibits transgender minors—and only transgender minors—from taking" the designated medications. Op. 22. Unlike *Geduldig* or *Bray*, the disparate treatment of transgender minors is stated expressly in the law itself.[7]

For similar reasons*, Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), is also inapt. *See* Opening Br. 49. *Feeney* concerned a state law that, by favoring veterans, had a disparate impact

---

[7] Defendants' reliance on the dissent in *Adams v. School Board of St. Johns County*, 3 F.4th 1299, 1331–32 (11th Cir. 2021) (Pryor, C.J. dissenting), is similarly misplaced because Chief Judge Pryor would have applied *Geduldig* to a policy that, in his view, did "not facially classify on the basis of transgender status." Here, by contrast, the Act facially prohibits transgender minors—and only transgender minors—from taking transitioning medications.

on women, who are less likely to be veterans. The law at issue said nothing about women and, in fact, permitted those few women who were veterans to receive the same hiring preferences as men. Here, the issue is not that the Act might "affect certain groups unevenly"—in the way a hiring preference for veterans favors men. Opening Br. 49. Instead, the Act *does* affect certain groups unevenly—indeed, that is the entire point. It creates a facial classification, applying *only* to a minor whose "perception of his or her gender or sex . . . is inconsistent with the minor's [birth] sex," S.B. 184 § 4(a)—*i.e.*, a transgender minor.

Defendants' only remaining argument seeks to reframe the Act as an age-based classification. Opening Br. 47. But it is well-settled that when a law facially discriminates on a suspect basis, it is subject to heightened scrutiny even if the law applies only to an age-defined subset of the targeted group. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 192 (1976) (analyzing a law banning the sale of 3.2% beer to males under the age of 21 and to females under the age of 18 as a "gender-based" classification). The district court thus correctly characterized the Act as containing a sex-based classification.

**B.    The District Court Correctly Found That the Act Is Subject to and Fails Heightened Scrutiny**

The law is clear: "[A]ll gender-based classifications today warrant heightened scrutiny." *Virginia*, 518 U.S. at 555 (cleaned up); *Brumby*, 663 F.3d at 1315–16. Accordingly, the district court correctly held that the Act must "satisfy a heightened standard of review." Op. 23.

Under heightened scrutiny, the burden "rests entirely on the State" to demonstrate an "'exceedingly persuasive'" justification for the disparate treatment. *Virginia*, 518 U.S. at 533. Accordingly, the classification must substantially relate to an important governmental interest and the justification must be "genuine"—not "hypothesized or invented *post hoc* in response to litigation." *Id*. Here, Defendants failed to meet any part of that burden.

Rather than address the application of heightened scrutiny, Defendants incorrectly argue that heightened scrutiny does not apply when a biological difference between the sexes is "meaningful." Opening Br. 50–54. As set forth above, biological differences may relate to the justifications offered in defense of a sex-based law, but they do not insulate it from heightened review.

58

Defendants make no separate argument that the Act can meet heightened scrutiny, asserting the same unsupported justifications addressed above. Opening Br. 55. As the district court found, those "proffered justifications are hypothesized, not exceedingly persuasive," Op. 24, and unsupported by the record. The Act fails heightened scrutiny.

## III.   The Act Fails Even Rational Basis Scrutiny

Though the district court properly applied both strict and heightened scrutiny, the Act fails under rational basis as well. Even under rational basis, the scrutiny required "is not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). The government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

As set forth above, *see supra* pp. 40–49, the district court rejected each of the stated justifications for the Act, finding that Defendants advanced "no credible evidence" to support them. Op. 17. To pass muster even under rational basis review, a law "must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993). This Act does not.

In addition, because the Act sweeps so broadly—criminalizing the provision of medical care to transgender adolescents no matter how great their medical need or how carefully it is provided—and inflicts harms that are so severe, it lacks even a rational basis. Like the law struck down in *Romer v. Evans*, the Act "has the peculiar property of imposing a broad and undifferentiated disability on a single named group"—in this case, on transgender minors. 517 U.S. 620, 632 (1996). In addition, "its sheer breadth"—criminalizing all care rather than, for example, requiring certain protocols be followed before prescribing medications—"is so discontinuous with the reasons offered for it" that it is difficult to credit them. *Id.*

Alabama stands alone in taking such extreme measures to prevent transgender minors from obtaining transitioning medications. "The absence of precedent for [the Act] is itself instructive." *Id.* at 633. Even under rational basis review, such an extreme measure calls for "careful consideration," which the Act cannot withstand. *Id.* (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37 (1928)).

60

## IV. The Other Preliminary Injunction Factors Overwhelmingly Support the District Court's Injunction

The district court correctly concluded that the other preliminary injunction factors weigh heavily in favor of maintaining the status quo. Op. 29–31. Specifically, the district court found "that the imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from an injunction," and "that an injunction is not adverse to the public interest" because "enjoining the Act upholds and reaffirms the 'enduring American tradition' that parents—not the States or federal courts—play the primary role in nurturing and caring for their children." Op. 31 (quoting *Yoder*, 406 U.S. at 232). Defendants' arguments to the contrary ignore the cascade of physical and psychological harms to transgender adolescents and the public harm the Act would cause.

*First*, the district court correctly found that Minor Plaintiffs would be irreparably harmed by the Act because without transitioning medications, they "will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality" and "significant deterioration in their familial relationships and educational performance." Op. 30 (citing Doc. 104 at 20, 167).

Defendants do not even attempt to argue that this finding—supported by evidence from parents and medical providers—is clearly erroneous. Instead, Defendants pivot and repeat unfounded assertions about transitioning medications being unduly risky and providers being unable to make careful diagnoses and treatment plans. Opening Br. 40–44. Neither assertion finds support in the record, as set forth above, *see supra* pp. 40–49.

*Second*, the district court correctly found that an injunction is in the public interest. Op. 31. Contrary to Defendants' assertions, Opening Br. 57, the court did not discount the public interest in enforcing the law. Rather, the district court explicitly and repeatedly acknowledged that concern. Op. 13, 30–31. The court also acknowledged the State's interest in "safeguarding the physical and psychological well-being of" minors. *Id.* at 18 (quoting *Globe Newspaper Co. v. Super. Ct. for Cnty. of Norfolk*, 457 U.S. 596, 607 (1982)). Taking those interests into account, the district court properly concluded that Defendants' proffered purposes were nothing more than "speculative, future concerns" about unidentified children's health and safety—"not genuinely compelling justifications based on the record evidence." *Id.* at 19–20.

*Finally*, Plaintiffs did not delay seeking injunctive relief. *See* Opening Br. 55–56. The State made these same arguments to the district court, which nevertheless enjoined enforcement of the Act. *See* Doc. 74 at 135–36. Defendants do not even acknowledge that the district court rejected this argument, nor can they show that doing so was an abuse of discretion.

Plaintiffs filed a lawsuit only eleven days after the Act was signed and filed a motion for a preliminary injunction only two days later, nearly two-and-a-half weeks before the Act was set to take effect. That timeline is a far cry from the facts of the only cases the State cites, Opening Br. 56—*i.e.* waiting five months after filing suit to seek a preliminary injunction, *Wreal*, 840 F.3d at 1248, or engaging in an "abusive delay" of more than a decade before making a "last-minute" application to stay execution, *Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam).

## V.  The District Court Did Not Abuse Its Discretion in Issuing a Facial Injunction

The district court did not abuse its discretion by enjoining Defendants "from enforcing Section 4(a)(1)–(3) of the Act pending trial." Op. 32. When a law is determined to be facially unconstitutional, a court

ordinarily enjoins the state defendants from enforcing it in its entirety, not merely in its application to the plaintiff. *See Statewide Detective Agency v. Miller*, 115 F.3d 904, 906 (11th Cir. 1997) (affirming statewide preliminary injunction against law determined to be likely unconstitutional); *Pierce*, 268 U.S. 534–36 (affirming injunction enjoining enforcement of a state education statute).

The district court's issuance of a facial injunction is even more appropriate here because it was necessary to afford Plaintiffs complete relief. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971) ("The nature of the violation determines the scope of the remedy."). Minor Plaintiffs depend on a host of individuals to receive care: their parents, teams of doctors, including pediatricians, endocrinologists, and psychiatrists, mental health providers, and social workers. *See* Doc. 8-2 ¶¶ 15–16; Doc. 8-7 ¶¶ 19–23; Doc. 106 at 95, 100, 105, 108, 158–59. Without the protection of the district court's injunction, any provider involved in prescribing, monitoring, or revising these children's treatment would violate the Act and be subject to criminal penalties. *See* S.B. 184 § 4; *see also* Ala. Code §§ 13A-5-6(a)(3), 13A-5-11(a)(3). The district court was well within its discretion in determining

that a facial injunction was necessary to protect the parental rights of all Parent Plaintiffs and to ensure that all Minor Plaintiffs are not unconstitutionally denied care.

The single case cited by Defendants is beside the point. That case addressed an entirely different issue about whether a preliminary injunction regulating prison conditions expired by operation of law, which this Court held that it did. Opening Br. 57–58 (citing *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021), *vacated*, 33 F.4th 1325 (11th Cir. May 13, 2022)). While factually and legally distinct, *Georgia Advocacy Office*, 4 F.4th at 1209, cites to other authority showing that where necessary to provide full relief, courts may extend relief to non-parties. *See Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013) (modifying a facial injunction to clarify its intended scope but affirming that facial relief was appropriate and extends to non-parties).

Defendants also argue that plaintiffs cannot secure statewide relief without a class action. Defendants, however, cite no case supporting that claim, nor could they, given the volume of non-class action litigation in which courts have properly issued statewide relief. *See*, *e.g.*, *Pierce*, 268 U.S. 510; *Statewide*, 115 F.3d 904. As one court explained in rejecting the

argument Defendants make here, "that cannot be the law." *See Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).

In sum, the district court did not abuse its discretion in enjoining the State "from enforcing Section 4(a)(1)–(3) of the Act pending trial." To the contrary, doing so was consistent with more than a century of precedent and necessary to afford Plaintiffs full relief.

## CONCLUSION

The district court's order granting a preliminary injunction should be affirmed.

Respectfully submitted,

*s/Jeffrey P. Doss*

Kelly Perigoe
Anne M. Voigts
Yusuf Saei
KING & SPALDING LLP
633 West 5th Street, Ste. 1600
Los Angeles, CA 90071
(213) 443-4355

Brent P. Ray
Abigail H. Terry
KING & SPALDING LLP
110 North Wacker Dr., Ste. 3800
Chicago, IL 60606
(312) 995-6333

David Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

Adam Reinke
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, GA 30309
(404) 572-4600

Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT FRANKLIN
& WHITE LLC
400 20th Street North
Birmingham, AL 35203
(205) 581-0700

Asaf Orr
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street
Suite 370
San Francisco, CA 94102
(415) 365-1326

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Blvd.
Suite 3750
Miami, FL 33131
(334) 224-4309

Jennifer L. Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
(617) 426-1350

*Counsel for Plaintiffs-Appellees*

August 15, 2022

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,813 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Century Schoolbook size 14-point font with Microsoft Word 365Plus.

Date: August 15, 2022

*s/ Jeffrey P. Doss*
Jeffrey P. Doss
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Jeffrey P. Doss*
Jeffrey P. Doss
*Counsel for Plaintiffs-Appellees*