*No. 22-11707*

IN THE
# UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

⸻⸻⸻➤⸻⸻⸻

PAUL A. EKNES-TUCKER, *et al.,*

*Plaintiffs-Appellees,*

&

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-Appellee,*

*v.*

GOVERNOR OF THE STATE OF ALABAMA, *et al.,*

*Defendants-Appellants.*

⸻⸻⸻⸻

*On Appeal from the United States District*
Court for the Middle District of Alabama
*Honorable Liles C. Burke*
Case No. 2:22-cv-00184-LCB

## Brief On Behalf Of Amici Parents Of Transgender Adolescents In Support Of Plaintiffs-Appellees Seeking Affirmance

Carmine D. Boccuzzi, Jr.
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999
cboccuzzi@cgsh.com
*Attorney for* Amici Curiae

Howard S. Zelbo, Of Counsel
JD Colavecchio, Of Counsel
Julia H. Wenck, Of Counsel

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following persons and parties may have an interest in the outcome of this case:

1. Abdul-Latif, Hussein – Amicus Curiae;

2. Academic Pediatric Association – Amicus Curiae;

3. Alabama Ch. of the American Academy of Pediatrics – Amicus Curiae;

4. Alaska, State of – Amicus Curiae;

5. Alstott, Anne – Amicus Curiae;

6. Am. Academy of Child and Adolescent Psychiatry – Amicus Curiae;

7. Am. Academy of Family Physicians – Amicus Curiae;

8. Am. Academy of Pediatrics – Amicus Curiae;

9. Am. Academy of Nursing – Amicus Curiae;

10. Am. Ass'n of Physicians for Human Rights, Inc. – Amicus Curiae;

11. Am. Coll. of Obstetricians & Gynecologists – Amicus Curiae;

12. Am. Coll. of Osteopathic Pediatricians – Amicus Curiae;

13. Am. College of Physicians – Amicus Curiae

14. Am. Med. Ass'n – Amicus Curiae;

15. Am. Pediatric Soc'y – Amicus Curiae;

16. Am. Psychiatric Ass'n – Amicus Curiae;

17. Ass'n of Am. Med. Coll. – Amicus Curiae;

18. Ass'n of Med. School Pediatrics Dep't Chairs – Amicus Curiae;

19. Anderson, Tom – Defendant;

20. Arizona, State of – Amicus Curiae;

21. Arkansas, State of – Amicus Curiae;

22. Baia, Eizabeth – Counsel for Medical Amici;

23. Bailey, Daryl D. – Defendant;

24. Baylock, C. Wilson – Defendant;

25. Becker, Laura – Detransitioner Amicus;

26. Boccuzzi, Carmine D. – Counsel for Amici Parents of Transgender
    Adolescents;

27. Boe, Brianna – Plaintiff (pseudonym);

28. Boulware, Susan D. – Amicus Curiae;

29. Bowdre, Alexander Barrett – Counsel for the Defendants;

30. Broyles, Vernadette R. – Counsel for Detransitioner Amici;

31. Burke, Liles C. – U.S. District Court Judge;

32. Burleigh, Billy – Detransitioner Amicus;

33. Cantrell, Michael A. – Counsel for Amici States;

34. Carr, Danny – Defendant;

35. Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

36. Coe, Brian – Amicus Curiae (pseudonym);

37. Coe, Laura – Amicus Curiae (pseudonym);

38. Colavecchio, JD – Counsel for Amici Parents of Transgender
    Adolescents;

39. Davis, James William – Counsel for Defendants;

40. Doss, Jeffrey P. – Counsel for Plaintiffs;

41. Eagan, Melody Hurdle – Counsel for Plaintiffs;

42. Endocrine Society – Amicus Curiae;

43. Eknes-Tucker, Paul A. – Plaintiff;

44. Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

45. Fuller, David – Amicus Curiae;

46. G., C. (pseudonym) – Detransitioner Amicus;

47. Georgia, State of – Amicus Curiae;

48. Indiana, State of – Amicus Curiae;

49. Isasi, William – Counsel for Medical Amici Curiae;

50. Ivey, Kay – Defendant;

51. Kamody, Rebecca – Amicus Curiae;

52. Kerschner, Helena – Detransitioner Amicus;

53. Koe, Rachel (pseudonym) – Plaintiff;

54. Kuper, Laura – Amicus Curiae;

55. LaCour, Edmond G. – Counsel for Defendants;

56. Lamar-Hart, Cynthia – Amicus Curiae;

57. Lannin, Cortlin H. – Counsel for Medical Amici Curiae;

58. Lanosa, Michael – Counsel for Medical Amici Curiae;

59. Lareau Alyssa C. – Counsel for Intervenor-Plaintiff;

60. Levi, Jennifer L. – Counsel for Plaintiffs;

61. Loe, Sarah – Amicus Curiae (pseudonym);

62. Loe, Tom – Amicus Curiae (pseudonym);

63. Louisiana, State of – Amicus Curiae;

64. Marshall, Steve – Defendant;

65. McAlister, Mary E. – Counsel for Detransitioner Amici;

66. McCoy, Scott D. – Counsel for Plaintiffs;

67. McNamara, Meredithe – Amicus Curiae;

68. Medical Ass'n of Pediatric Nurse Practitioners – Amicus Curiae;

69. Mills, Christopher E. – Counsel for Defendants;

70. Mississippi, State of – Amicus Curiae;

71. Missouri, State of – Amicus Curiae;

72. Moe, Jane (pseudonym) – Plaintiff;

73. Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

74. Montana, State of – Amicus Curiae;

75. Nebraska, State of – Amicus Curiae;

76. Noe, Kathy (pseudonym) – Plaintiff;

77. Oklahoma, State of – Amicus Curiae;

78. Oladeinbo, Gilbert O. – Counsel for Plaintiffs;

79. Olezeski, Christy – Amicus Curiae;

80. Orr, Asaf – Counsel for Plaintiffs;

81. Pediatric Endocrine Soc'y – Amicus Curiae;

82. Peterson, Misty L. – Counsel for Plaintiffs;

83. Poe, Megan (pseudonym) – Plaintiff;

84. Powers, John Michael – Counsel for Intervenor-Plaintiff;

85. Pratt, James Andrew – Counsel for Plaintiffs;

86. Ragsdale, Barry Alan – Counsel for Medical Amici;

87. Ray, Brent P. – Counsel for Plaintiffs;

88. Reinke, Adam – Counsel for Plaintiffs;

89. Reynolds, Laura – Detranisitioner Amicus Curiae;

90. Schwabauer, Barbara – Counsel for Intervenor-Plaintiff (USA);

91. Seiss, Benjamin Matthew – Counsel for Defendants;

92. Shortnacy, Michael B. – Counsel for Plaintiffs;

93. Smalts, Laura Perry – Detransitioner Amicus curiae;

94. Smith, John (pseudonym) – Detransitioner Amicus curiae;

95. Societies for Pediatric Urology – Amicus Curiae;

96. Soc'y of Adolescent Health & Medicine – Amicus Curiae;

97. Soc'y for Pediatric Research – Amicus Curiae;

98. Soc'y of Pediatric Nurses – Amicus Curiae;

99. Soe, Melissa – Amicus Curiae (pseudonym);

100. Soto, Diego Armando – Counsel for Plaintiffs;

101. South Carolina, State of – Amicus Curiae;

102. Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

103. Stone, Jessica L. – Counsel for Plaintiffs;

104. Szilagyi, Nathalie – Amicus Curiae;

105. Terry, Abigail Hoverman – Counsel for Plaintiffs;

106. Texas, State of – Amicus Curiae;

107. Thornton, Joel H. – Counsel for Detransitioner Amici Curiae;

108. Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

109. United States of America – Intervenor-Plaintiff;

110. Utah, State of – Amicus Curiae;

111. Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

112. Warbelow, Sarah – Counsel for Plaintiffs;

113. West Virginia, State of – Amicus Curiae;

114. Wilkerson, Mark Douglas – Counsel for Amici States;

115. Williams, Renee – Counsel for Intervenor-Plaintiff;

116. Wilson, Thomas Alexander – Counsel for Defendants;

117. Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

118. World Professional Ass'n for Transgender Health – Amicus Curiae;

119. Vague, Amie A. – Counsel for Plaintiffs;

120. Vance, Robert S. – Counsel for Medical Amici;

121. Ventiere, Jessica – Defendant;

122. Veta, D. Jean – Counsel for Medical Amici;

123. Walker, Susan R. – Magistrate Judge;

124. Waver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

125. Wenck, Julia H. – Counsel for Amici Parents of Transgender Adolescents;

126. Zelbo, Howard S. – Counsel for Amici Parents of Transgender Adolescents;

127. Zoe, James (pseudonym) – Zoe, James.

# TABLE OF CONTENTS

<u>Page</u>

INTERESTS OF *AMICI CURIAE* ............................................................ 1

ARGUMENT ........................................................................................... 3

I.   Upon Learning That Their Children Are Transgender, *Amici* Sought
     To Obtain The Best Possible Medical Care For Them ...........................4

     A.  The Fuller Family ........................................................................5

     B.  The Lamar-Hart Family ...............................................................7

     C.  The Coe Family...........................................................................11

     D.  The Soe Family ...........................................................................15

     E.  The Loe Family............................................................................18

II.  *Amici* And Their Children Will Suffer Irreparable Harm If They
     Cannot Obtain Transition-Related Care In Alabama............................21

CONCLUSION......................................................................................... 26

CERTIFICATE OF COMPLIANCE.......................................................... 28

CERTIFICATE OF SERVICE .................................................................. 29

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are parents of transgender adolescents from five families living in Alabama.  Each of them are raising or had raised their children in Alabama. *Amici* have witnessed firsthand that transition-related care for transgender adolescents under the guidance and supervision of trained healthcare professionals is vital to their child's wellbeing and safety.  Based on their own experiences, they know that criminalizing such care for transgender adolescents would cause devastating harm to transgender adolescents and their parents.

**David Fuller** has a 22-year-old daughter, Jessica, a transgender woman, who first began receiving transition-related care as an adolescent while growing up in Alabama.

**Cynthia Lamar-Hart** has a daughter in her late twenties, Gwendolyn, a transgender woman, who first began receiving transition-related care as an adolescent while growing up in Alabama.

**Laura Coe** and **Brian Coe (each proceeding anonymously)** have a 15-year-old son, Matthew, who is a transgender boy and is currently receiving transition-related care.

**Sarah Loe** and **Tom Loe (each proceeding anonymously)** have a 13-year-

---

[1] The parties have consented to the filing of this brief and do not object to *amici curiae* whose children are minors proceeding anonymously.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici curiae* states that no counsel for a party authored this brief in whole or in part, and no person—other than the *amici* and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

old daughter, Emily, who is a transgender girl and is currently receiving transition-related care.

**Melissa Soe (proceeding anonymously)** has a 15-year-old teenager, Taylor, who is transgender and is currently receiving transition-related care.

\*    \*    \*

Alabama's Vulnerable Child Compassion and Protection Act (the "Act") makes it a felony to prescribe or administer transition-related medical care for minors.  If permitted to stand, the Act would interfere with a parent's ability to make decisions—based on well-established standards of care to treat gender dysphoria—about their children's healthcare in close consultation and coordination with experienced medical professionals.  Early access to transition-related care is essential for adolescents with gender dysphoria, and several *amici* credit this care with paving the way for their children to flourish and even saving their lives. Because the Act would effectively prohibit parents, including three *amici* whose transgender children are still minors, from accessing necessary medical care for their children and would potentially subject them to investigation and prosecution for seeking necessary medical care, *amici* have a strong interest in asking this Court to consider their experiences before rendering its decision.

**ARGUMENT**

*Amici* are parents of transgender children who are growing up (or who grew up) in Alabama.  They, like any fit parent, strive to lay a foundation for their children to lead healthy, fulfilling, and productive lives.  As any fit parent would do, they want to keep their children healthy, and for transgender adolescents, that often means having transition-related care available.  *Amici* have seen firsthand the importance of accessing transition-related care for the children who need it.  Each of them has sought the advice of medical professionals, and alongside these medical professionals, made carefully-considered decisions concerning the proper course of treatment for their children upon a diagnosis of gender dysphoria, in accordance with well-established standards of care.  Transition-related care has been hugely beneficial for the children of *amici* who have been fortunate enough to receive it.

With respect to those *amici* whose transgender children are still minors, if they are unable to obtain transition-related care for their children in Alabama as a result of this Act, they would have to leave the State—moving away from their extended families, churches, and schools—to maintain their children's access to that necessary care.  *Amici* are willing to make this sacrifice for the sake of the health and well-being of their children, but this would cause enormous harm not only to the parents, who would need to uproot their lives, but also for their minor

3

children, who like their parents, have deep roots in their Alabama communities. *Amici* submit that the Act would make it impossible for parents with minor children suffering from gender dysphoria to protect the health and wellbeing of their children while they live in Alabama. Accordingly, *amici* respectfully ask this Court to take their stories into account as it considers whether to allow the Act to go into effect.

## I.    Upon Learning That Their Children Are Transgender, *Amici* Sought To Obtain The Best Possible Medical Care For Them

*Amici* know from experience that transition-related care has been critical to their children's well-being. When their children came out to them as transgender, each one of these parents was surprised, scared, and confused. Their very first step was to make sure their child knew that they would never stop loving and supporting them, and then they set out to determine what they needed to do to protect and ensure their child's health and safety. This included seeking professional medical assistance to determine whether their child was, in fact, suffering from gender dysphoria and, if so, to devise a treatment plan. They made appointments at clinics with expertise in transition-related care for minors, and there began to work with doctors to understand and address their children's medical needs. The process has been careful and deliberate, in accordance with established standards of care. *Amici* have seen first-hand how transition-related

care has greatly benefitted their children, and understand that it would be devastating if their care were disrupted.

### A.    The Fuller Family

David Fuller's daughter Jessica is in her twenties.  David has been a police officer for over 28 years and is a widower.  He has lived in Alabama for thirty years and presently lives in Etowah County.  Jessica is currently living with him and working on her writing.  These days, they are very close.  They have traveled around the world together and have gone to many classic rock concerts.  Most days they lunch together.

Jessica had appeared to have a happy childhood until she hit puberty.  When puberty began, David could see that she was suffering and her mood was darkening.  He recognized it as depression, but he was not sure what was causing it, until about six years ago, when she was 16, she left a note on his desk coming out to him as transgender girl.  He was shocked and at a loss over what to do.  He had never met someone who was transgender and did not know anything about transgender people.  He told Jessica that he loved her and would support her, but he had no idea what his next steps should be.  So, he began researching.  Figuring out how to care for a transgender child was a steep learning curve for David.

It took David several months after Jessica came out as transgender for David to learn about the issue and to identify a clinic in Alabama that David felt

comfortable with and that could provide Jessica the care that she needed. During this period, Jessica's depression was worsening, to the point that David feared her life was at risk. He began racing home if Jessica did not answer the phone, and he once found her looking for a gun in the house. They both were under tremendous stress, fearing that accessing effective treatment would be impossible and that there would be no path forward for her. Eventually, David was able to find a clinic in Alabama that provided transition-related care for adolescents. After investigating the doctors and their credentials—applying the same critical eye he uses every day in his investigative police work—he booked their first appointment.

Jessica had her first visit at the gender-specialty care clinic, about six months after she came out to David. She was still 16. The clinic's process was careful and deliberate, and the pacing was set by the doctors, in consultation with David and Jessica. At their first appointment, David spoke with an endocrinologist and pediatrician for over an hour. The doctors explained to him what sorts of treatments Jessica would or would not be eligible for given her age, and ultimately Jessica did not receive any medication for several months. The care team, moreover, assured David and Jessica that, when the time did come for Jessica to begin receiving medication, if either of them had any concerns, they could stop and reverse course immediately. As David explains: "The medical professionals wanted to make sure that this was the right path. All they cared about was taking

care of the kid."  David and Jessica visited the clinic every few months so that the care team could continue to monitor her progress and wellbeing.

David saw Jessica slowly beginning to turn a corner by the second appointment, as a result of being in an affirming environment and Jessica knowing that there was a path ahead to treat her.  But, it was not until Jessica started on puberty blockers that she started to blossom and "her whole world changed" for the better.  This positive change accelerated once Jessica eventually began estrogen treatment.  Witnessing the effect of transitioning medications on his daughter, David came to understand that, while affirmation was necessary and important, that alone would not have been enough to save his daughter's life.  "I could call her 'Jessica' all day and let her wear dresses, but physically, she was growing into a man, and that's what she couldn't stand to see every day."

With her transition behind her, Jessica no longer suffers from life-threatening depression, and lives a normal and happy life.  She enjoys writing, meeting new people, visiting new places, and, of course, spending time with her dad.  She is "like a totally different human being"—confident and easygoing in a way she never had been, even before puberty.

### B.    The Lamar-Hart Family

Cynthia Lamar-Hart's daughter Gwendolyn is in her late twenties and came out as transgender over ten years ago.  Cynthia was born in Alabama and has lived

there her entire life, all but the years she was attending Yale Law School.  Today, she is an attorney and a mother of four, living in Jefferson County with her husband.  Gwendolyn is Cynthia's eldest child and today she is a software engineer in the game design industry—a job she has wanted since the third grade.

Gwendolyn began to withdraw socially at the onset of puberty.  Cynthia and her husband were concerned, but were uncertain as to the cause.  They later came to understand from Gwendolyn that when she hit puberty, she knew "at an excruciating level that this was wrong," and that that feeling was all-consuming. When Gwendolyn was 15 years old, she came out to Cynthia as transgender. Though Cynthia was surprised, she reassured Gwendolyn that her family would love and support her.  Ultimately, Cynthia and her husband would come to view this as an opportunity for their family to "put their values to action"—to show Gwendolyn, and all their children, that they would always love and accept them, come what may.

But that night, after Gwendolyn went to bed, Cynthia allowed herself to feel absolutely terrified.  She had two thoughts on her mind:  First, how would the world treat her daughter?  And, second, could she do a good job as a parent helping her daughter through this experience?  Cynthia did not know anything about being transgender or how to support a transgender child, so she sat down to research.

The next day, Cynthia reached out to a local pediatrician and psychologist about locating a clinic that could provide an assessment for gender dysphoria and, if necessary, transition-related care for her daughter.  Because there was no specialist treating transgender children in Alabama ten years ago, the family had to travel out of state for Gwendolyn's care and pay for it out of pocket.  The family was fortunate enough to be able to afford this, and to be able to work on flexible schedules that allowed them to travel out of state regularly for medical treatment.  As Cynthia acknowledges, not many families have that privilege, but even with the means to afford and make time for out-of-state treatment, Cynthia witnessed how not having access to necessary, experienced care providers in-state caused months of delays in Gwendolyn's care, resulting in suffering that she would not have experienced had she been able to visit a clinic in-state.

Gwendolyn went through a four-year treatment plan at an out-of-state gender-specialty care clinic consisting of pediatric endocrinologists, another psychologist, and a social worker.  At the family's first visit to the clinic, at which time Gwendolyn was 16, the care team explained to Gwendolyn and her parents that the process would be careful and deliberate.  Six months later, the care team diagnosed her with gender dysphoria, and Gwendolyn's local pediatrician and psychologist concurred with that diagnosis.  While the care team was evaluating, observing, counseling, and working with Gwendolyn, they were simultaneously

9

educating Gwendolyn and her parents about gender dysphoria, including by providing information on the benefits and risks of transition-related treatment, and providing sound advice to Cynthia and her husband every step of the way. The Lamar-Harts concluded, with the advice of and in close consultation with doctors, that it was appropriate for Gwendolyn to start puberty blockers at age 16, and then later hormones at age 17.

As part of the treatment plan, Gwendolyn first lived in her identified gender for six months prior to beginning any medical interventions. After many months of treatment and evaluation, Gwendolyn began taking puberty blockers at age 16. She then underwent an additional months-long period of observation, evaluation, and counseling before beginning estrogen. Gwendolyn and her parents worked with her local psychologist in Alabama from the outset, and that psychologist maintained regular contact with the multidisciplinary team throughout the course of treatment. Every step taken to advance Gwendolyn's care was methodical and thorough, and the family felt educated and supported throughout the process by both the multidisciplinary care team and her local pediatrician and psychologist.

Cynthia quickly saw a change in Gwendolyn after she began receiving transition-related care. Once Gwendolyn began the process of transitioning, she was no longer withdrawn, and became more confident and engaged socially and at school. Puberty blockers were particularly critical for Gwendolyn. They provided

her "an extraordinary, palpable release" from her distress.  When Gwendolyn eventually started on estrogen, she transformed, like a butterfly "coming out of her chrysalis."  To Cynthia and her husband, it was as if Gwendolyn's body knew "this is the direction in which I should be heading."  Cynthia could see that Gwendolyn was coming into her own.  She later excelled in college and has been happy and successful in her career in the gaming industry—all of which was made possible by her ability to transition as an adolescent.

### C.    The Coe Family

Laura and Brian Coe have a 15-year-old son, Matthew, who is transgender. The Coes were college sweethearts who met at the University of Alabama and have lived in Alabama for much of their lives.  Laura is a physician's assistant, and Brian is a former middle school English teacher and now a stay-at-home parent and fiction writer.  They are raising their two sons in Jefferson County.  Their youngest is in elementary school, and their oldest, Matthew, is in high school.  At school, Matthew participates in the jazz band, school band, the pep band, and the drama department.  He presently plays the tuba and is teaching himself piano.  He also has recently started painting, and the walls of their house are now covered in his art.

Prior to Matthew coming out as transgender, Laura could sense that something was weighing on him.  Growing up, Matthew resisted wearing "girly"

clothes or dresses and stopped wearing them altogether as he got older.  He also spent a lot of time alone.  He had a small group of friends at school, but no close friends.  In fifth grade, Matthew told Laura that he felt like people did not like him and that something "wasn't right."  This was puzzling to Laura because it was clear to her that, despite what her son said, his teachers and friends adored him.  The Coes could tell that something was weighing on Matthew, but whenever Laura tried to get him to open up or offered words of encouragement, he only became more upset.  It was very difficult as parents watching him go through something without knowing the cause or how to solve it.

Then, when he was 11, Matthew came out as a transgender boy to his parents, shortly after he figured it out for himself.  He sent his parents a text early in the morning telling them that he is a boy and wants to go by Matthew.  Brian shared the text with Laura, and they went to Matthew's room to wake him up so that they could let him know that they loved him.  Matthew had also mentioned in his text that he wanted to cut his hair to be short.  So later that day, Laura took Matthew to get his hair cut at Supercuts, the only place she could find on short notice, and while it was "the most jacked up haircut," it left Matthew with the biggest smile on his face.  While it was easy and instinctual for the Coes to reassure their son that they love and accept him no matter what, it was difficult at first to let go of their prior expectations and to figure out what all of this meant.

12

Faced with many unknowns—whether their child would be accepted, how to support him, and what this would mean for his well-being—the Coes were "feeling really scared." But they were committed to finding "the best experts, going to trainings, and keeping an open mind."

Fortunately, Laura had once helped a transgender patient obtain transition-related care in her work as a physician's assistant, so she knew how to research and locate a clinic for her son to obtain an assessment for gender dysphoria. Laura and Brian discussed their options and agreed that the best course of action was to obtain guidance and care from medical professionals. Once they identified a clinic, they made an appointment with a doctor and a psychologist. The first appointment lasted hours. A psychologist met with Matthew and diagnosed him with gender dysphoria, and the broader care team, comprised of doctors and mental health providers, began to put together a treatment plan.

The doctors at the clinic educated the Coes on the process of providing transition-related care and the range of future treatments that could be prescribed to address Matthew's gender dysphoria. In particular, the doctor explained to them the risks and benefits of taking medications and provided the Coes an overview of the transition process. Given that Matthew was only 12 when he first started visiting the clinic, his doctor recommended that he socially transition first and live life openly as a boy for some time before starting testosterone. Ultimately,

13

Matthew's doctor determined that Matthew would not be able to start on testosterone at least until he turned 15, once his medical team determined that he was psychologically mature enough for the medication. Laura and Brian understood the need to wait, as did Matthew. "They gave us time to process, think on it, do research, and ask questions. We had no concern that they would do anything that was not in the best interests of our kid." The Coes continue to consult regularly with Matthew's doctor every few months, as well as his psychologist, to monitor the course of his treatment plan.

When Matthew was approaching his fifteenth birthday, he and his parents conferred with a psychologist to ensure he would be ready to begin testosterone. The Coes, in consultation with Matthew's doctors, concluded this would greatly benefit Matthew, and the medical team approved Matthew to begin this treatment upon his fifteenth birthday. The Coes have been impressed with Matthew's maturity and are looking forward to the start of his medical transition so that he can begin to look and feel like himself. Since obtaining the medical care that he needs, Laura and Brian have seen Matthew begin to "come to life."

As much as Matthew has benefitted simply from being accepted and affirmed by his family, school, doctors, and friends, his medical transition is a critical measure for his wellbeing. As Laura noted, "He's definitely better, but he still has issues with his body." His voice pitch and lack of facial hair, for instance,

are distressing for him.  It took some time for Brian to understand that it is not enough for other people to treat Matthew as a boy, or for other people to think Matthew looks like a boy.  Matthew has explained to him that it is stressful to feel uncomfortable with his body.  The problem is what he feels when he looks in the mirror—regardless of what other people may be thinking.  Given that physical development continues to be a source of distress even for a transgender adolescent who has largely met love and acceptance, the Coes are greatly concerned and frightened about the impact the Act could have on Matthew and others like him if it were to interfere with his necessary care.

### D.    The Soe Family

Melissa Soe and her husband have a 15-year-old, Taylor, who is transgender.  Melissa and her husband moved to Alabama over twenty years ago. Melissa obtained her Master's Degree from the University of Alabama and her PhD from New York University.  She now works for the University of Alabama, where she focuses on improving successful outcomes for all students and faculty development initiatives.  Her husband is an episcopal priest, and the entire family is very closely connected with their church community.  Taylor has been attending the church's summer camp in Alabama since they were a baby, and the church has been extremely supportive of their transition.  Taylor loves the outdoors and "rambling through the woods."  They also enjoy reading novels and learning

history, and hope to one day be a graphic designer.

Taylor first began struggling with their gender identity at ten years old. They initially came out as gay, but something still did not sit right with them. When Taylor eventually came out as transgender at age 12, Melissa was "very rattled" and "trying to make sense of what she was hearing." At first, she was skeptical because Taylor recently had been diagnosed as autistic. She knew that autistic children can have challenges in communicating about themselves, and wanted to do everything to be sure, as a parent, she was getting Taylor the right care. At the same time, she could see that her child was growing more and more depressed as their puberty progressed. "There was just this heaviness to them, and this feeling of hitting a wall, that they can't be themselves." She felt that she desperately needed professional guidance. When Taylor was 13, the Soes brought them to a mental health professional.

Taylor's therapist diagnosed them with gender dysphoria and provided a reference for a clinic that treats transgender adolescents. Taylor was 13-years-old at the time of their first appointment at the gender-specialty care clinic. When the family arrived at the clinic and met Taylor's doctors, they were "blown away" by the attentiveness of the care and the scope of services. Taylor would primarily see an endocrinologist and pediatrician, but also would have access to nutrition and mental health specialists. At their first visit, the doctors spent hours getting to

know Taylor and the family and began formulating a treatment plan built around their needs, explaining "these are all the things we could do, but don't have to do, and that we will only do at the time that is right for you."  Based on their observations of Taylor, the care team determined that no transition-related medications were necessary at that point.  Taylor has since been visiting the clinic multiple times each year and regularly sees their therapist.  Though Taylor is now 15 and potentially eligible to begin testosterone, the doctors do not think testosterone is medically necessary at this time.

Since coming out and receiving care, Taylor has gone from "an anxious, sad kid who had a hard time getting up in the morning, to a kid who is up and out on their bike, in the woods, and going to camp."  Taylor is finally beginning to remind their parents of the happy-go-lucky kid they were when they were younger, prior to puberty taking its toll.  Melissa has been heartened to see that they are back to being the center of attention in their group of friends, telling stories and making everyone around them laugh.

Ultimately, Taylor's medical team, along with Melissa, her husband, and Taylor may decide that testosterone treatment is in Taylor's best interest, and that treatment would be administered in accordance with well-established standards of care.  While Taylor is not currently receiving treatments banned under the Act, it is "very important to Taylor to have continuity of care," which would be disrupted by

17

implementation of the Act.  Simply knowing that such care is accessible has significantly decreased Taylor's distress.

### E.    The Loe Family

Sarah and Tom Loe have a 13-year-old daughter, Emily, who is transgender, and another, younger, daughter.  Sarah and Tom have been married and living in Alabama for over fifteen years and each received degrees from the University of Alabama—Sarah for her Doctor of Physical Therapy, and Tom for his undergraduate, Master's, and PhD.  Sarah is a physical therapist, and Tom is a communications scholar, with a focus on narrative storytelling and identity.  Their daughter Emily has always been creative and particularly enjoys writing and drawing comics.  She also enjoys community events with their church.  When they get the chance, the Loes take their daughters camping, swimming, and boating— what they call "forced family fun."  Though it is typically a challenge to drag the kids out of the house, they never want to go home once they are outdoors.

Family life was not so easy prior to Emily coming out.  For most of her early childhood, Emily acted out, but her parents could not figure out why.  Since Emily was about 3 years old, she had expressed a preference for more feminine things. She chose girl avatars in video games and female characters in board games like "Guess Who."  Emily also dressed up in girls' clothes and costumes at home.  The Loes, at the time, had perceived all of this to be imagined.  She was a creative child

18

who liked to play pretend and make up stories.  As a result, they would let Emily express herself through play at home but did not allow Emily to present as a girl outside the house.

However, the Loes changed their thinking when Emily, around the age of 6 or 7, began developing behavioral issues and became "inexplicably sad."  Around this time, Emily's language began to shift.  As a younger child, she typically would speak in the future tense, stating that she wanted to be a "mommy" or a "queen" when she grew up.  But then, Emily began speaking in the present tense, telling her parents that she *is* a girl.  At this point, Sarah and Tom connected Emily's behavioral issues with her inability to express her gender freely and started allowing her to present as a girl in public and referring to Emily as their daughter. Emily quickly "blossomed into a happy kid."

Despite all this, Emily did not use the term transgender to describe herself, and did not quite understand how to communicate what she was experiencing, until she found a copy of the children's book *I Am Jazz*, a book based on the experiences of Jazz Jennings, television personality and transgender rights activist.  Emily ran to her parents with the book and said, "This is me! What is this?" pointing to the word "transgender," which she could not yet read.  By that time, the Loes suspected that their daughter was transgender—it was Emily who had not yet found the language to communicate what she was experiencing.  On the one hand,

19

the Loes were relieved to finally have an answer as to the source of Emily's struggles, but on the other hand, they felt "lonely and fearful," worrying that their extended family and the rest of the world might not accept their daughter. Fortunately, their family, school, and church have all been supportive.

After Emily had spent a couple of years living as a girl, the Loes obtained a referral from Emily's pediatrician to a gender-specialty care clinic, where they would consult with an endocrinologist and pediatric specialist. At the time of her first appointment, Emily was 10 years old. At that appointment, the care team diagnosed Emily with gender dysphoria based on information they had gathered from Emily, her parents, her therapist, and her pediatrician. The diagnosis was based on the care team's determination that Emily's assertion of her female identity was "consistent, insistent, and persistent." After explaining what the timeline and course of treatment might entail, the care team worked with her parents to develop a personalized treatment plan. The Loes were glad that Emily could access this care in Alabama and were impressed by the quality of care they received. Emily visits the clinic multiple times each year, but until recently, had not been prescribed medication. Additionally, as part of her treatment plan, Emily continues to regularly see her child-specialist therapist.

When Emily turned 12 and began puberty, the doctors at the clinic prescribed her puberty blockers. Emily is now 13 and has been taking puberty

blockers for over a year, and they have helped her tremendously. Because she was able to start the blockers early enough, she has avoided unwanted changes that would have resulted from a male puberty. For the moment, Emily's medical team has determined that the administration of puberty blockers is sufficient care, and she will be ineligible to begin estrogen until she is at least 15 or 16 years old, at which point her care team will assess based on psychological evaluations whether she is mature enough to begin such treatment. Emily's doctors have been "wonderful," and the Loes are grateful that the medical team was there to provide them support and guidance throughout the process and to provide Emily the care that was in her best interest.

## II.    *Amici* And Their Children Will Suffer Irreparable Harm If They Cannot Obtain Transition-Related Care In Alabama

If accessing transition-related care for minors is effectively banned because provision of such care is criminalized in Alabama, *amici* whose children are still minors will suffer irreparable injury. As demonstrated in Point I, *supra*, the care accessed and obtained by *amici* for their children has been critical to their well-being and has allowed each of them to flourish and to begin to live meaningful and productive lives. Each parent is able to recount how their child spent years unsure of themselves, depressed, and withdrawn, until they began receiving transition-related care. Parents whose children are still adolescents are relieved to see them finally getting to be themselves and to find a true sense of belonging with their

friends, family, churches, and schools. And *amici* parents whose children are now in their twenties have had the privilege of watching their children go through the process and come out on the other side happy and successful adults. None of this would have been possible if not for the advice and treatment these families received from medical professionals providing transition-related care.

In the event the law does not remain enjoined, the only real alternative left for *amici* whose children are minors—moving out of the state—would also work irreparable injury. *Amici* have gone to great lengths to learn about the medical condition experienced by their children. They have sought out experts for guidance, thought seriously about those recommendations, and have made decisions in support of their children so that they may thrive. They have made relationships with medical providers and have worked with professionals each step of the way. If the Act were to go into effect, families with children who are minors would have no choice but to move and begin again from a blank slate, and it is unclear when or how their children could resume their transition-related care. Delays in care have had, and will continue to have, consequences for these adolescents, and *amici* would be attempting to find new care in places where they have no community, no family, and no job.

The Loes, for instance, are feeling the pressure that the Alabama law has put on their family and their 13-year-old daughter Emily. Emily's school has been an

affirming space for her, and the Loes' church has also been a supportive community.  When Emily began transitioning, a group at their church that sews baby blankets for expecting families sewed Emily a pink blanket and gave her a bible inscribed with her new name.  "Everything about living in Alabama has been good for us, except for this law."  With the passage of the Act, they feel like they are living in "fight or flight" trying to secure the medical care that Emily needs.  They are planning on moving if the Act goes into effect, even though it would mean leaving their extended family, church, schools, jobs, and their home of many years.  All of Tom's family lives in Alabama, and Sarah would be giving up her physical therapist practice that she "built from scratch" and has maintained for seven years.  Notwithstanding their deep ties to home, remaining in Alabama would be out of the question for the Loes if the Act were to go into effect because it would prevent them from obtaining the care that Emily needs.

Melissa Soe's 15-year-old, Taylor, would also experience a disruption of care if the Act were to go into effect.  They, too, would have no choice but to leave Alabama, despite their close ties to their church community.  When they lost their first child to a heart condition, "our church community was there for us, and that sealed our sense of belonging in Alabama."  Since Taylor came out, their church has "grown with the family" and been supportive of them during Taylor's transition.  "That's our tie here—our church.  We can't imagine leaving.  We don't

23

want to leave.  We don't want to start over with a community somewhere else.  If we had to leave to get Taylor medical care, that would be a heart wrenching decision."

The Coes likewise know from their son's experience transitioning that consistent, professional advice on transition-related care is critical to their child's wellbeing.  Matthew, who is 15 years old, needs to start taking testosterone so that he can begin to feel more himself and less distressed.  The Coes are most worried about the impact the Act could have on Matthew and adolescents like him if it were to disrupt their continuity of care.  It has already been difficult for him to watch other adolescents near the end of their puberties while he has yet to begin the correct puberty for himself.  The Coes would "worry for Matthew's safety" if there were a disruption to his care.  They are "simply trying to support their child and provide him with the best care possible."

Both Laura and Brian Coe's families have deep roots in Alabama.  "My heart is intertwined with Alabama," Laura said, "from the family I came from and the family I created."  But if the Act goes into effect, the Coes would have to seriously consider moving out of state in order to continue providing Matthew with his treatment.  This would be a serious hardship for Matthew, too, whose school is like an extended family to him.  Moving would also create difficulties for the Coes' employment.  Nevertheless, they would move if they needed to because

providing Matthew with transition-related treatment, healthcare, and support is critical to being able to protect and love their son, and their children "come first in all things."

Cynthia Lamar-Hart's daughter Gwendolyn, on the other hand, was fortunate enough to receive transition-related care as an adolescent growing up in Alabama years ago, and she is now a happy and healthy adult enjoying her life and career. Without this care, Cynthia does not know where Gwendolyn would be today, but she is certain that it would have been devastating for Gwendolyn and for the entire family if Gwendolyn had not been able to access transition-related care. Cynthia cannot imagine how distressing it would be for parents raising transgender adolescents in Alabama today who would be blocked by the legislation from obtaining this care for their child, particularly in light of the fact that the medical protocols and standards for such care have been accepted for decades.

These sentiments are echoed by David Fuller, whose daughter Jessica also transitioned years ago and is now a happy and healthy adult. Given that his own daughter was at high risk of suicide while awaiting treatment, David is very afraid for the children who may have their care prevented under the Act. Had his daughter's treatment been delayed by even another six months, David believes that Jessica likely would have found a way to end her life. If Jessica had had to wait

until she was an adult to receive transition-related medical care, David believes that it would have been too late for her altogether.

## CONCLUSION

*Amici* have submitted this brief to bring to the Court's attention the experiences of parents of transgender adolescents who, like any fit parent, are seeking necessary medical care for their children.  The Act would criminalize the provision and administration of transition-related care for minors, effectively banning their access to such care in the State of Alabama.  In doing so, the Act would irreparably harm *amici* with minor children.  Accordingly, *amici* respectfully request that the Court affirm the decision of the District Court for the Middle District of Alabama.

Dated:  August 17, 2022
       New York, New York

                     Respectfully submitted,

                     /s/ *Carmine D. Boccuzzi, Jr.*
                     Carmine D. Boccuzzi, Jr.
                     CLEARY GOTTLIEB STEEN & HAMILTON LLP
                     One Liberty Plaza
                     New York, New York 10006
                     T: 212-225-2000
                     F: 212-225-3999
                     cboccuzzi@cgsh.com

                     *Attorney for* Amici Curiae

Howard S. Zelbo, Of Counsel
JD Colavecchio, Of Counsel
Julia H. Wenck, Of Counsel

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. Rule 32-4, this brief contains 6,309 limit words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ *Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. The participants in the Case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.