No. 22-11707

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

PAUL A. EKNES-TUCKER, et al.,

*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA

*Intervenor-Plaintiff-Appellee,*

vs.

GOVERNOR OF THE STATE OF ALABAMA, et al.,

*Defendants-Appellants.*

———————————————————

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

BRIEF FOR *AMICI CURIAE* UNITARIAN UNIVERSALIST
ASSOCIATION, UNION FOR REFORM JUDAISM, CENTRAL
CONFERENCE OF AMERICAN RABBIS, SOUTHEAST
CONFERENCE OF THE UNITED CHURCH OF CHRIST,
UNIVERSAL FELLOWSHIP OF METROPOLITAN COMMUNITY
CHURCHES, *ET AL*. IN SUPPORT OF PLAINTIFFS-APPELLEES

SUSAN KAY WEAVER
  susankayweaver@gmail.com
ERIC ALAN ISAACSON
  ericalanisaacson@icloud.com
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone:  619-368-4562

*Counsel for Amici Curiae*

*Eknes-Tucker v. Gov. of Alabama,* No. 22-11707

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1), 26.1-2(b), and 26.1-3, the undersigned counsel certifies that the following listed persons and entities not already included in the CIP contained in the first brief filed and in any other brief filed have an interest in the outcome of this case:

1. Arnold, Rev. Stephanie York – *Amicus Curiae*

2. Barham, Rev. Richard – *Amicus Curiae*

3. Barnhart, Jr., Rev. Dr. David. L. – *Amicus Curiae*

4. Blakemore, Rev. Robin – *Amicus Curiae*

5. Bridges, Rev. Dr. Rebecca L. – *Amicus Curiae*

6. Central Conference of American Rabbis – *Amicus Curiae*

7. Conrady, Rev. Julie – *Amicus Curiae*

8. Cooper, Rev. Erica – *Amicus Curiae*

9. Dingus, Rev. Jaimie – *Amicus Curiae*

10. Finney II, Rev. Johnny R. - *Amicus Curiae*

11. Foster, Rev. Carolyn – *Amicus Curiae*

12. Genau, Rev. Joseph – *Amicus Curiae*

13. Gibson, Rev. Henry N. – *Amicus Curiae*

14. Global Justice Institute, Inc. – *Amicus Curiae*

15. Hamilton-Poore, Rev. Dr. Samuel F.– *Amicus Curiae*

*Eknes-Tucker v. Gov. of Alabama,* No. 22-11707

16.  Hamilton-Poore, Rev. Terry - *Amicus Curiae*

17.  Henkin, Rabbi Steven – *Amicus Curiae*

18.  Hopkins, Rev. C. Lynn. – *Amicus Curiae*

19.  Hutchinson, Rev. Laura – *Amicus Curiae*

20.  Isaacson, Eric Alan – Counsel for *Amici Curiae*

21.  Isner, Rev. Shane – *Amicus Curiae*

22.  Jimmerson, Rev. Dr. Ellin – *Amicus Curiae*

23.  Loper, Rev. Dr. Helene – *Amicus Curiae*

24.  Men of Reform Judaism – *Amicus Curiae*

25.  Newton, Rev. Nicole – *Amicus Curiae*

26.  Renner, Rev. Steven S.– *Amicus Curiae*

27.  Rothbauer, Rev. Chris – *Amicus Curiae*

28.  Sanders, Rev. Jennifer – *Amicus Curiae*

29.  Southeast Conference of the United Church of Christ, Inc. – *Amicus Curiae*

30.  Strickland, Bishop Kevin L. – *Amicus Curiae*

31.  Thomas, Rev. Dr. Kevin L. – *Amicus Curiae*

32.  Thomason, Rev. Beth – *Amicus Curiae*

33.  Union for Reform Judaism – *Amicus Curiae*

34.  Unitarian Universalist Association – *Amicus Curiae*

*Eknes-Tucker v. Gov. of Alabama,* No. 22-11707

35.    Universal Fellowship of Metropolitan Community Churches – *Amicus Curiae*

36.    Weaver, Susan Kay – Counsel for *Amici Curiae*

37.    Women of Reform Judaism – *Amicus Curiae*

38.    Wood, Rev. Kimberly – *Amicus Curiae*


The organizations Unitarian Universalist Association, Southeast Conference of the United Church of Christ, Union for Reform Judaism, Central Conference of American Rabbis, Women of Reform Judaism, Men of Reform Judaism, Universal Fellowship of Metropolitan Community Churches, and the Global Justice Institute all are not-for-profit organizations that issue no stock and that are not controlled by any publicly traded corporation.


Respectfully submitted this 17th day of August 2022.


/s/Susan Kay Weaver
Susan Kay Weaver
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
     DISCLOSURE STATEMENT ..................................................... C-1

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ........................................................ ii

I.     ISSUES PRESENTED ...................................................... 1

II.    IDENTITY AND INTEREST OF *AMICI CURIAE* ........................ 2

III.   RULE 29(a)(2) & 29(a)(4)(E) STATEMENTS ................................. 8

IV.   SUMMARY OF ARGUMENT ............................................. 8

V.    ARGUMENT ................................................................. 10

     A.    The Act Interferes with Parents' Fundamental Liberty
         Right to Seek and Follow Expert Medical Advice for
         Their Children............................................................. 10

     B.    The Act Violates Equal Protection Because It
         Discriminates on the Basis of Gender and Is Not
         Substantially Related to the Asserted Governmental
         Interest of Protecting Minors ................................... 14

     C.    Theological Arguments Concerning "Natural Law"
         Cannot Block Parents Seeking to Provide their
         Children with Medical Treatment. ....................... 20

VI.   CONCLUSION ............................................................. 35

CERTIFICATE OF COMPLIANCE ....................................... 37

CERTIFICATE OF SERVICE ............................................... 38

# TABLE OF AUTHORITIES

## CASES

*Agostini v. Felton,*
 521 U.S. 203 (1997)...................................................................13

*Bendiburg v. Dempsey,*
 909 F.2d 463 (11th Cir.1990)..................................................12

*\*Bostock v. Clayton Cnty.,*
 140 S.Ct. 1731 (2020)..............................................................15

*Bosse v. Oklahoma,*
 137 S.Ct. 1 (2016)................................................................12-13

*Calder v. Bull,*
 3 U.S. 386 (1798).....................................................................33

*Dobbs v. Jackson Women's Health Org.,*
 142 S.Ct. 2228 (2022)..............................................8-9, 10, 12-13

*Estelle v. Gamble,*
 429 U.S. 97 (1976)...................................................................33

*Evans v. Sec'y, Florida Dep't of Corr.,*
 699 F.3d 1249 (11th Cir.2012).................................................13

*\*Glenn v. Brumby,*
 663 F.2d 1312 (11th Cir.2011).................................................15

*Helling v. McKinney,*
 509 U.S. 25 (1993)...................................................................33

*Hohn v. United States,*
 524 U.S. 236 (1998).................................................................13

ii

*Hutto v. Finney,*
    437 U.S. 678 (1978)........................................................................33

*J.E.B. v. Alabama,*
    511 U.S. 127 (1994)........................................................................16

*Kennedy v. Bremerton School District,*
    142 S.Ct. 2407 (2022)....................................................................20

*Keohane v. Florida Dep't of Corr. Sec'y,*
    952 F.3d 1257 (11th Cir.2020), *reh'g denied*
    981 F.3d 994 (11th Cir. 2020)........................................................34

*Kirchberg v. Feenstra,*
    450 U.S. 455 (1981)........................................................................16

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971)........................................................................20

*\*Meyer v. Nebraska,*
    262 U.S. 390 (1923)..............................................8, 10, 11, 12, 35

*Mississippi Univ. for Women v. Hogan,*
    458 U.S. 718 (1982)........................................................................15

*\*Parham v. J.R.,*
    442 U.S. 584 (1979)...........................................................8, 10-12

*Personnel Adm'r v. Feeney,*
    442 U.S. 256 (1979)........................................................................16

*\*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925)................................................8, 10, 11, 12

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l*
    *Presbyterian Church,*
    393 U.S. 440 (1969)...............................................................21

*Prince v. Massachusetts,*
    321 U.S. 158 (1944)..............................................................11

*Serbian Eastern Orthodox Diocese for U. S. of Am. &*
    *Canada v. Milivojevich,*
    426 U.S. 696 (1976).........................................................20-21

*Sessions v. Morales-Santana,*
    137 S.Ct. 1678 (2017).......................................................15-16

\*Troxel v. Granville,*
    530 U.S. 57 (2000).........................................................8, 10

*United States v. Virginia,*
    518 U.S. 515 (1996)..............................................................16

\*Washington v. Glucksberg,*
    521 U.S. 702 (1997).................................................8-9, 10, 13, 14

*Watson v. Jones,*
    80 U.S. 679 (1871)...............................................................21

*Wengler v. Druggists Mutual Ins. Co.,*
    446 U.S. 142 (1980)..............................................................15

\*Wisconsin v. Yoder,*
    406 U.S. 205 (1972)...........................................................1, 11

**CONSTITUTIONAL PROVISIONS**

U.S. Const., First Amendment Establishment Clause...........................29

U.S. Const., Fourteenth Amendment Due Process Clause.............*passim*

U.S. Const., Fourteenth Amendment Equal Protection Clause......*passim*

**STATUTES**

Alabama S.B. 184...............................................................................*passim*

**RULES**

Federal Rule of Appellate Procedure 29(a)(2)...........................................8

Federal Rule of Appellate Procedure 29(a)(4)(E)......................................8

**OTHER MATERIALS**

Brief of *Amici Curiae* Hussein Abdul-Latif, et al., in Support of
    Plaintiffs-Appellees, *Ecknes-Tucker v. Gov. of Alabama,*
    No. 22-11707 (filed August 12, 2022)..............................................17

Brief of *Amici Curiae* American Academy of Pediatrics et al.,
    in Support of Plaintiffs' Motion for Temporary Restraining
    Order and Preliminary Injunction, *Ecknes-Tucker v. Gov. of
    Alabama,* No. 2:22-cv-184-LCB (filed May 4, 2022)......................19

American Unitarian Association,
    *First Annual Report of the Executive Committee of the American*
    *Unitarian Association* (Boston: Isaac R. Butts and Co., 1826)(Vice
    President 1826-1827), https://bit.ly/3ITlxpa ..................................26

American Unitarian Association,
    *Tenth Annual Report of the American Unitarian Association*
    (Boston: Charles Bowen, 1835)(Vice President 1835-36),
    https://bit.ly/3OlO2wP ...................................................................26

American Unitarian Association,
    *Nineteenth Report of the American Unitarian Association,*
    in 17 Tracts of the American Unitarian Association
    (Boston: James Monroe and Co., 1844)..........................................26

2015 Biennial Assembly of Union for Reform Judaism,
    *Resolution on the Rights of Transgender and Gender Non-*
    *Conforming People,* Union for Reform Judaism (November 5,
    2015), https://bit.ly/3civUqs & https://perma.cc/DE8Y-NR8D ........4

William Blackstone,
    1 *Commentaries on the Laws of England*
    (Oxford: Clarendon Press, 1765)................................................31-32

William Blackstone,
    1 *Commentaries on the Laws of England*
    (St. George Tucker, ed.; Philadelphia: 1803)............................31-32

Susan D. Boulware, et al.,
    *Biased Science: The Texas and Alabama Measures*
    *Criminalizing Medical Treatment for Transgender*
    *Adolescents Rely on Inaccurate and Misleading Scientific*
    *Claims* (April 28, 2022)..................................................................17

Ed Browne,
    *Mom 'Forced' to Leave Alabama as Ban Prohibits Trans
    Healthcare for Son,* Newsweek (April 14, 2022),
    https://bit.ly/3QrvRaO & https://perma.cc/3QMN-NKC6 ............18

Central Conference of American Rabbis,
    *The Rights of Transgender and Gender Non-Conforming
    Individuals* (March 16, 2015), https://bit.ly/3yvGAcv &
    https://perma.cc/8E34-63VJ ......................................................4, 24

Central Conference of American Rabbis,
    *Statement on Laws that Endanger Transgender Youth*
    (May 5, 2022), https://bit.ly/3uManNi &
    https://perma.cc/QG2M-PCQJ ......................................................25

George Willis Cooke,
    *Unitarianism in America: A History of Its Origin and
    Development* (Boston: American Unitarian Association,
    1902)........................................................................................26, 27

John C. Dorhauer, et al,
    *Trans-Nonbinary Pastoral Letter,* United Church of Christ
    (June 8, 2022), https://bit.ly/3z7vWuf &
    https://perma.cc/XCX2-AUSN ......................................................23

Susan Frederick-Gray,
    *Alabama's Anti-Trans Legislation is Dangerous and
    Dehumanizing,* Unitarian Universalist Association
    Press Releases (April 7, 2022), https://bit.ly/3Q55KOB &
    https://perma.cc/U5RV-LUCB ......................................................22

Greg Garrison,
    *Alabama clergy sign letter of support for transgender
    children,* AL.com (May 6, 2022), https://bit.ly/3AGDS6I &
    https://perma.cc/X74Y-GA4C ......................................................22

Alisa Gold,
>   *Choose Life: A Jewish Way to Affirm Coming Out Day,* Reform
>   Judaism.org (October 10, 2019), https://bit.ly/3C5OCME &
>   https://perma.cc/SKW4-H2HX ...................................................4, 24

Russell K. Osgood,
>   *Supreme Court Justice Story,* 71 Cornell L.Rev. 726 (1986)..........30

Linda Olson Peebles,
>   *We Dedicate This Child,* UUA pamphlet (1999),
>   https://www.uuabookstore.org/Assets/PDFs/3559.pdf ...................2

William H. Pryor, Jr.,
>   *Against Living Common Goodism,*
>   23 Federalist Soc'y Rev. 24 (2022)............................................32-33

The Rabbinical Assembly,
>   *Rabbinical Assembly Rejects Texas Governor's Assault on
>   Transgender Children and Families* (March 1, 2022),
>   https://bit.ly/3zOuwnu & https://perma.cc/J8RB-HLPS ..............25

The Rabbinical Assembly,
>   *Resolution Affirming the Rights of Transgender and Gender
>   Non-Conforming People* (April 6, 2016), https://bit.ly/3QD6WOo
>   & https://perma.cc/MG89-9QHW ..................................................25

Jennie W. Scudder,
>   *A Century of Unitarianism in the National Capital, 1821-1921*
>   (Boston: Beacon Press, 1922)........................................................27

*Speeches of the Hon. Judge Story, Before the American Unitarian
>   Association,* 1 *The Spirit of the Pilgrims for the Year 1828,* at
>   343-47 (Boston: Pierce and Williams, July 1828),
>   https://bit.ly/3v0vZFO ...................................................................26

viii

Joseph Story,
    3 *Commentaries on the Constitution of the United States* (Boston: Hilliard, Gray, and Co., 1833)..........................................................29

Joseph Story,
    *A Discourse Pronounced Upon the Inauguration of the Author as Dane Professor of Law in Harvard University* (Boston: Hilliard, Gray, Little and Wilkins, 1829)................................................26-29

[Joseph Story],
    *Natural Law,* in 9 *Encyclopedia Americana* 150 (Francis Lieber, ed.; Philadelphia: Carey and Lea, 1832)............30

1 William Wetmore Story, ed.,
    *Life and Letters of Joseph Story* (Boston: Charles C. Little and James Brown, 1851)................................................................29-30

2 William Wetmore Story, ed.,
    *Life and Letters of Joseph Story* (Boston: Charles C. Little and James Brown, 1851)........................................................................27

Savannah Tryens-Fernandez,
    *Alabama families with transgender children crowdsource to 'flee' to 'safer state' for medical care,* AL.com (April 15, 2022), https://bit.ly/3SMPOdQ & https://perma.cc/2MY9-24T5 ..............18

Union of American Hebrew Congregations,
    *Jewish Family Rituals* Union for Reform Judaism (1989), https://bit.ly/3PtNOEh & https://perma.cc/AYC7-REU3 ..............24

Union for Reform Judaism,
    *Engaging Families with Young Children*, https://bit.ly/3QpiUyt & https://perma.cc/83G5-XL73 ..................24

ix

Unitarian Universalist Association,
    *Diversity of Sexuality and Gender is a Gift*,
    UUA Press Releases (February 25, 2022),
    https://bit.ly/3C5zizH & https://perma.cc/P9T8-TEJN ........2, 16, 23

*A Washington Church Completed,*
    27:43 *The Universalist Leader* 19 (October 25, 1924)...................27

Josh Weaver,
    *New Poll Illustrates the Impacts of Social and Political Issues*
    *on LGBTQ Youth,* The Trevor Project (January 10, 2022)
    https://bit.ly/3QrwyAX & https://perma.cc/936P-AD6F ...............19

Kimberly Wood & R. Ugena Whitlock,
    *Statement Opposing Legislation Attacking Children and*
    *Youth Who Are Transgender,* Southeast Conference, United
    Church of Christ (April 8, 2022), https://bit.ly/3NZxVFd &
    https://perma.cc/89R9-MMNQ ............................................3, 17, 23

x

## I.    ISSUES PRESENTED

1.    Did the district court abuse its discretion in concluding that Plaintiffs demonstrated a substantial likelihood of success on the merits in showing that:

>   a. The Due Process Clause protects the right of parents to direct the medical care of their children subject to medically accepted standards?
>
>   b. The Equal Protection Clause prohibits states from banning transgender minors from taking transitioning medications because they are transgender?

2.    Did the district court abuse its discretion in finding that absent a preliminary injunction, Parent Plaintiffs and Minor Plaintiffs will suffer irreparable harm, the threatened harm outweighs any damage to Defendants, and a preliminary injunction would serve the public interest by upholding "the 'enduring American tradition' that parents— not the States or federal courts—play the primary role in nurturing and caring for their children"? Op.31, 13Appx.79(DE112-1:31)(quoting *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972)).

## II.    IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amicus curiae* the **Unitarian Universalist Association**

**("UUA")** is a religious denomination formed in 1961 by the union of the American Unitarian Association and the Universalist Church of America, two denominations with deep roots in American history. Its membership today comprises more than 1,000 congregations nationwide, ranging from those recently organized to many of America's founding churches, first gathered by the Pilgrims and Puritans in the 1600s. The UUA has an abiding interest in the worth and dignity of each person. In ceremonies of dedication, many Unitarian Universalist congregations acknowledge a child's sacred life and commit to support the family in its key role of guarding the child's life, freedom, and opportunities.[1] The UUA opposes interference with the right of parents to support their children who need gender-affirming care. "A parent or guardian who is taking their child to a health care provider to offer gender-affirming care is providing love and support."[2]

---

[1] Rev. Linda Olson Peebles, *We Dedicate This Child,* UUA pamphlet (1999), https://www.uuabookstore.org/Assets/PDFs/3559.pdf.

[2] UUA, *Diversity of Sexuality and Gender is a Gift*, UUA Press Releases (February        25,        2022),        https://bit.ly/3C5zizH        &

-2-

*Amicus curiae* **Southeast Conference of the United Church of Christ** is the regional body of the United Church of Christ within the states of Alabama, northwestern Florida, Georgia, Mississippi, South Carolina, and Tennessee (except the city of Memphis). The United Church of Christ ("UCC") comprises some 4700 congregations in the United States and 16 in Alabama. The Southeast Conference has spoken out in opposition to the Alabama legislation at issue, calling it an attack on "[the] very existence" of transgender and nonbinary children and youth, "beloved children created by God."[3]

*Amicus curiae* **Union for Reform Judaism,** founded in 1873, leads the largest Jewish Movement in North America, comprising some 850 congregations.  Commitment to social justice for all is a key pillar of the Reform Movement. Biblical tradition teaches Reform Jews that all beings are created *b'tselem Elohim*—in the Divine Image. The Union is

---

https://perma.cc/P9T8-TEJN (responding to Texas officials' mischaracterization of gender-affirming care as "child abuse").

[3] Kimberly Wood & R. Ugena Whitlock, *Statement Opposing Legislation Attacking Children and Youth Who Are Transgender,* Southeast Conference, United Church of Christ (April 8, 2022), https://bit.ly/3NZxVFd & https://perma.cc/89R9-MMNQ.

committed to the full equality, inclusion, and acceptance of people of all gender identities and gender expressions.[4] Parents in the Reform Jewish movement who seek medical treatment for a transgender child, in consultation with medical professionals and according to established medical standards, are following their values as Jewish parents.[5]

*Amicus curiae* **Central Conference of American Rabbis ("CCAR")** is an organization Reform Judaism's rabbinic leadership. CCAR has called for "legislation and policies that prevent discrimination based on gender identity and expression," including "equal access to medical, legal, and social services for people of all gender identities and expressions."[6]

*Amicus curiae* **Women of Reform Judaism ("WRJ")** is a network of Jewish women working to empower women and communities through the bonds of sisterhood, spirituality and social

---

[4] 2015 Biennial Assembly of Union for Reform Judaism, *Resolution on the Rights of Transgender and Gender Non-Conforming People,* Union for Reform Judaism (November 5, 2015), https://bit.ly/3civUqs & https://perma.cc/DE8Y-NR8D.

[5] Alisa Gold, *Choose Life: A Jewish Way to Affirm Coming Out Day,* citing Deuteronomy 30:19-20, Reform Judaism.org (October 10, 2019), https://bit.ly/3C5OCME & https://perma.cc/SKW4-H2HX.

[6] Central Conference of American Rabbis, *The Rights of Transgender and Gender Non-Conforming Individuals* (March 16, 2015), https://bit.ly/3yvGAcv & https://perma.cc/8E34-63VJ.

justice.  WRJ works for a more just and compassionate world for people of all backgrounds and identities. *Amicus curiae* **Men of Reform Judaism ("MRJ")** is an organization of Jewish men who affirm their obligation to their Jewish heritage and values and serve Reform Judaism and its local congregations.

*Amicus curiae* **Universal Fellowship of Metropolitan Community Churches ("MCC"),** founded in 1968, is the world's largest Christian denomination ministering primarily to LGBT persons, with affiliated and emerging congregations across the United States, including in Alabama.  MCC believes everyone is included in the family of God and is committed to working for their civil and human rights. *Amicus curiae* **Global Justice Institute,** the social-justice arm of MCC, works with faith-based activists around the globe to support projects that further human rights and equality.

*Amicus curiae* **Rev. Kevin L. Strickland,** joining in his individual capacity, serves as Bishop of the Southeastern Synod of the Evangelical Lutheran Church in America which includes emerging and established congregations in Alabama, Georgia, Mississippi and Tennessee.

*Amici curiae* also include the following Alabama clergy, joining as individuals (with their organizational  or denominational affiliations indicated in parenthesis, for identification purposes only):

-5-

Rev. Stephanie York Arnold (Birmingham First United Methodist Church);

Rev. Richard Barham (Spirit of the Cross Church (United Church of Christ), Huntsville);

Rev. Dr. David L. Barnhart, Jr. (Saint Junia United Methodist Church, Hoover);

Rev. Robin Blakemore (First Christian Church Birmingham (Disciples of Christ);

Rev. Dr. Rebecca L. Bridges (St. Stephen's Episcopal Church, Vestavia Hills);

Rev. Julie Conrady (Unitarian Universalist Church of Birmingham);

Rev. Erica Cooper (Baptist Church of the Covenant, Birmingham);

Rev. Jaimie Dingus (Unitarian Universalist Church of Huntsville);

Rev. Johnny R. Finney II (Covenant Community Church, United Church of Christ, Birmingham);

Rev. Carolyn Foster, Deacon (St. Mark's Episcopal Church, Birmingham);

Rev. Joseph Genau (Edgewood Presbyterian Church, Homewood);

Rev. Henry N. Gibson (United Methodist);

Rev. Dr. Samuel F. Hamilton-Poore (Montevallo Presbyterian Church);

Rev. Terry Hamilton-Poore (First Presbyterian Church of Birmingham);

Rabbi Steven Henkin (Temple Beth-El, Birmingham);

Rev. C. Lynn Hopkins (Unitarian Universalist Fellowship of Montgomery);

Rev. Laura Hutchinson (First Christian Church (Disciples of Christ), Anniston);

Rev. Shane Isner (First Christian Church (Disciples of Christ), Montgomery);

Rev. Dr. Ellin Jimmerson (Baptist);

Rev. Dr. Helene Loper (God's House, Tuscaloosa);

Rev. Nicole Newton (First Presbyterian Church, Birmingham);

Rev. Steven S. Renner (Messiah Lutheran Church, Montgomery);

Rev. Chris Rothbauer (Auburn Unitarian Universalist Fellowship);

Rev. Jennifer Sanders (Beloved Community Church, United Church of Christ, Birmingham);

Rev. Dr. Kevin L. Thomas (Forest Lake United Methodist, Tuscaloosa);

Rev. Beth Thomason (First Christian Church, Birmingham (Christian Church, (Disciples of Christ));

Rev. Kimberly Wood (Southeast Conference, United Church of Christ).

*Amici* are united in believing that loving parents must be free to seek medically accepted gender-affirming care for their transgender children.

## III.  RULE 29(a)(2) & 29(a)(4)(E) STATEMENTS

All parties have consented to the filing of this brief in support of Plaintiffs-Appellees and urging affirmance of the judgment below. This brief was written in whole by the *amici curiae*'s counsel, Susan Kay Weaver and Eric Alan Isaacson, working with *amici* and their representatives. No counsel for the parties in this matter authored any portion of the brief, nor did any party or its counsel contribute money that was intended to fund preparing or submitting the brief. No person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## IV.  SUMMARY OF ARGUMENT

Alabama's law criminalizing the provision of transitioning medications to transgender minors (S.B. 184, or the "Act") interferes with the fundamental Due Process right of parents to seek and follow expert medical advice to care for their children. *See Parham v. J.R.,* 442 U.S. 584, 602 (1979). High-court precedents recognizing parents' fundamental liberty interest in the "care, custody, and control of their children," *Troxel v. Granville,* 530 U.S. 57, 65 (2000)(plurality opinion), stretch back a century, to *Meyer v. Nebraska,* 262 U.S. 390, 399-401 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925). This right thus is "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.,* 142 S.Ct. 2228, 2242 (2022)(quoting *Washington v.*

-8-

*Glucksberg,* 521 U.S. 702, 721 (1997))(cleaned up); *see Glucksberg,* 521 U.S. at 727 n.19.

The Act fails both strict scrutiny under the Due Process Clause, and heightened scrutiny under the Equal Protection Clause. Far from being narrowly tailored or even substantially related to advancing Alabama's claimed goal of protecting minors, the Act hurts the very children that it supposedly protects. It not only deprives at-risk minors of medical treatments that for some may be life-saving, it will force many families with a transgender child to consider leaving the state, cutting both parents and vulnerable children off from the love and support of extended family, friends, and faith communities here in Alabama.

Although the Alabama Center for Law and Liberty ("ACLL") purports to speak on behalf of people of faith in this matter, *amici* filing this brief are people of faith who affirm the right of parents, in consultation with medical professionals, to support their transgender child with transitioning medications according to medically accepted standards—so that their child may flourish. The Fourteenth Amendment does not codify ACLL's version of a Christian "natural law" theology to interefere with long-recognized parental rights. Neither does it arrest medical science in the nineteenth century to limit parents'

right to seek gender-affirming care for their children according to modern medically accepted standards.

## V.    ARGUMENT

### A.    The Act Interferes with Parents' Fundamental Liberty Right to Seek and Follow Expert Medical Advice for Their Children.

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by th[e Supreme] Court." *Troxel v. Granville,* 530 U.S. 57, 65 (2000)(plurality opinion); *see id.* at 68-69. Given the century of high-court precedents recognizing that right, stretching back to *Meyer v. Nebraska,* 262 U.S. 390, 399, 401 (1923), and *Pierce v. Society of Sisters,* 268 U.S. 510, 534-535 (1925), it is readily apparent that no right is more "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs,* 142 S.Ct. at 2242 (quoting *Glucksberg,* 521 U.S. at 721)(cleaned up); *see Glucksberg,* 521 U.S. at 727 n.19.

At its very core is parents' right and duty to seek and follow expert medical advice to care for their children. The Court in *Parham v. J.R.,* 442 U.S. 584, 602 (1979), held:

> [O]ur constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Pierce v. Society of Sisters,* 268 U.S. 510, 535 (1925). See also *Wisconsin v. Yoder,* 406 U.S. 205, 213 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 400 (1923). Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice.

*Parham,* 442 U.S. at 602.

Alabama's legislation directly interdicts parents' fundamental right and "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham,* 442 U.S. at 602. It effectively rejects "the traditional presumption that the parents act in the best interests of their child" in seeking medical treatment, and it does away with parents' "plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Id.* at 604. This is a gross violation of parents' most basic rights to secure the medical care that their children need to flourish.

Although the parents' decision at issue in *Parham*—whether to commit a child to a mental hospital—involved real risks, the

Court held that factor "does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603. "[T]he same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure." *Id.*

Bound by the foregoing high-court precedents, this Court naturally holds that the Due Process Clause prohibits a state from "willfully disregard[ing] the right of parents to generally make decisions concerning the [medical] treatment to be given to their children." *Bendiburg v. Dempsey,* 909 F.2d 463, 470 (11th Cir.1990).

Neither does the Supreme Court's recent decision in *Dobbs* undermine the foregoing precedents' status as controlling law. Time and again the *Dobbs* Court warns: "Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion." *Dobbs,* 142 S.Ct. at 2277-78; *see also id.* at 2280. The Supreme Court's decisions on parental rights, stretching back nearly a century to *Meyer* and *Pierce,* remain controlling law whatever Alabama or its *amici* might think of them. The Supreme Court is clear, moreover, that its decisions "'remain binding precedent until we see fit to reconsider them,

-12-

regardless of whether subsequent cases have raised doubts about their continuing vitality.'" *Bosse v. Oklahoma,* 137 S.Ct. 1, 2 (2016)(quoting *Hohn v. United States,* 524 U.S. 236, 252-253 (1998)); *see Agostini v. Felton,* 521 U.S. 203, 237 (1997); *Evans v. Sec'y, Florida Dep't of Corr.,* 699 F.3d 1249, 1263-64 (11th Cir.2012).

A parent seeking medical care and advice to alleviate their child's gender dysphoria clearly is exercising a fundamental right "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs,* 142 S.Ct. at 2242 (quoting *Glucksberg,* 521 U.S. at 721). Nothing in *Dobbs* or *Glucksberg* operates to undermine that right—quite the contrary. Reviewing over 700 years of common law in *Glucksberg,* the Court held that assisted-suicide bans "are longstanding expressions of the States' commitment to the protection and preservation of all human life." *Id.* at 710, 710-719. But Alabama's attack on gender-affirming care for transgender youth undermines parents' efforts to protect their children from potential suicidal ideation.

Based on the evidence presented below in this case, Judge Burke correctly found that if left "untreated, gender dysphoria may cause or

lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide." 13Appx.51(DE112-1:3). The record shows that one of the plaintiff minors in this case "suffered from severe depression and suicidality due to gender dysphoria," but with gender-affirming care she "is now happy and 'thriving.'" 13Appx.58-59(DE112-1:10-11). "When asked what would occur if her daughter stopped taking the medications," the child's mother "responded that she feared her daughter would commit suicide." 13Appx.59(DE112-1:11).

Alabama's criminalization of evidence-based care for gender dysphoria not only violates parents' right and duty to protect their children's lives by seeking and following medical advice, it undermines the very interest in fighting suicide so central to *Glucksberg*.

**B.    The Act Violates Equal Protection Because It Discriminates on the Basis of Gender and Is Not Substantially Related to the Asserted Governmental Interest of Protecting Minors**

The district court sensibly held the Act is a sex-based classification under the Fourteenth Amendment because it prohibits transgender minors—and only transgender minors—from receiving

puberty-blocking medications and hormones due to their nonconformity to gender stereotypes. 13Appx.70-71(DE112-1:22-23).

That the statute involves discrimination on the basis of sex is beyond question. The Supreme Court held in *Bostock v. Clayton Cnty.,* 140 S.Ct. 1731, 1741 (2020), a Title VII employment-discrimination case, that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." And this Court held in *Glenn v. Brumby,* 663 F.2d 1312, 1320 (11th Cir.2011), that classification based on an individual's gender non-conformity amounts to a sex-based classification regulated by the Equal Protection Clause.

Subject to "intermediate scrutiny," such sex-based classifications may be sustained only when the government proves that its discriminatory regulation serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives*." Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)(quoting *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150 (1980)). "Today, laws of this kind are subject to review under the heightened scrutiny that now attends 'all gender-

based classifications,'" *Sessions v. Morales-Santana,* 137 S.Ct. 1678, 1689 (2017)(quoting *J.E.B. v. Alabama*, 511 U.S. 127, 136 (1994)), and the Supreme Court's decisions "'reveal[] a strong presumption that gender classifications are invalid.'" *United States v. Virginia,* 518 U.S. 515, 532 (1996)(quoting *J.E.B.*, 511 U.S. at 152 (Kennedy, J., concurring)). "Successful defense of legislation that differentiates on the basis of gender, we have reiterated, requires an 'exceedingly persuasive justification.'" *Morales-Santana,* 137 S.Ct. at 1690 (quoting *Virginia,* 518 U.S. at 531 (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)); *accord J.E.B.,* 511 U.S. at 136; *Personnel Adm'r v. Feeney,* 442 U.S. 256, 273 (1979).

Appellants say that even if heightened scrutiny applies to the Act's sex-based classification, the discriminatory law survives because depriving transgender youth of gender-affirming care advances the State's compelling interest of protecting children from harm. *Amici* believe, in accord with their religious values, that the lives of transgender youth are sacred and their well-being is indeed deserving

of protection.[7] Yet the Act is not substantially related to serving Appellants' asserted goal of protecting minors and hurts precisely the children the State of Alabama claims it protects.

Transgender minors suffer when Alabama denies their parents the opportunity to obtain for them evidence-based medical treatment for gender dysphoria, administered in consultation with medical professionals, and according to established medical standards.[8] The evidence demonstrates such treatment's benefits that, for some youth, may be critically needed and even life-saving.[9] And the district court

---

[7] *See, e.g.,* UUA, *Diversity of Sexuality and Gender is a Gift, supra* note 2, https://bit.ly/3C5zizH & https://perma.cc/P9T8-TEJN (gender-affirming care recognizes every life is sacred); Wood & Whitlock, *supra* note 3 (recognizing transgender minors as "beautiful expressions of God's own image").

[8] *See* Brief of *Amici Curiae* Hussein Abdul-Latif, et al., in Support of Plaintiffs-Appellees 10-11 (filed August 12, 2022)*(*the district court properly recognized the scientific and medical authority of the WPATH Guidelines).

[9] Susan D. Boulware, et al., *Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Adolescents Rely on Inaccurate and Misleading Scientific Claims* (April 28, 2022) (DE78-19:11-17)("The best scientific evidence shows that gender dysphoria is real, that untreated gender dysphoria leads predictably to serious, negative medical consequences, and that gender-affirming care significantly improves mental health outcomes, including reducing rates of suicide.").

found there is no evidence to show transitioning medications are "experimental." 13Appx.72(DE112-1:24).

The Act fails to protect transgender youth who currently rely on puberty blockers or hormones to alleviate their gender dysphoria, and for whom loss of treatment can lead to physical and emotional harm.[10] As a result, Alabama families with a transgender child are considering whether they must leave the state.[11] To do so would mean pulling their transgender child (and any siblings) from school and abandoning friends and extended family in Alabama, all to ensure their transgender child receives needed medical care. Clergy, called upon to provide pastoral counseling and support to families with transgender youth, may find the only way to responsibly minister to these families is to

---

[10] Landinsky Declaration, 1Appx.225(DE8-2:6[ECFp.7]¶15) (denying patients access to puberty-blocking medication and hormone replacement therapy will cause mental health to regress and increase patients' suicidality).

[11] Savannah Tryens-Fernandez, *Alabama families with transgender children crowdsource to 'flee' to 'safer state' for medical care,* AL.com (April 15, 2022), https://bit.ly/3SMPOdQ & https://perma.cc/2MY9-24T5; Ed Browne, *Mom 'Forced' to Leave Alabama as Ban Prohibits Trans Healthcare for Son,* Newsweek (April 14, 2022), https://bit.ly/3QrvRaO & https://perma.cc/3QMN-NKC6.

suggest they seek such care by removing to states where it is legal—an option that uproots the families, cutting them off from the love and support of their Alabama-based faith communities.

The Act compounds rather than alleviates psychological stresses on transgender youth. Transgender youth untreated for gender dysphoria are recognized as a vulnerable to mental health challenges.[12] In poll results released this year by The Trevor Project, a suicide-prevention organization for LGBTQ youth, 85% of transgender and nonbinary youth said publicity concerning anti-trans bills had negatively impacted their mental health.[13]

*Amici* unequivocally support the full equality of transgender people under the law and oppose the Act's blatant and targeted discrimination against transgender youth that threatens their well-being.

---

[12] Brief of *Amici Curiae* American Academy of Pediatrics et al., in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, *Eknes-Tucker v. Gov. of Alabama,* No. 2:22-cv-184-LCB (filed May 4, 2022), DE91-1:6.

[13] Josh Weaver, *New Poll Illustrates the Impacts of Social and Political Issues on LGBTQ Youth,* The Trevor Project (January 10, 2022) https://bit.ly/3QrwyAX & https://perma.cc/936P-AD6F.

**C.    Theological Arguments Concerning "Natural Law" Cannot Block Parents Seeking to Provide their Children with Medical Treatment.**

The Alabama Center for Law and Liberty ("ACLL") amicus brief charts a bizarre course from William Blackstone to Joseph Story and the Fourteenth Amendment, asserting that if Christianity is part of the common law, as they contend Blackstone and Story asserted, the Fourteenth Amendment necessarily incorporates a Christian theology concerning "natural law" that forecloses parents from seeking gender-affirming care for their children. ACLL insists that the Supreme Court's recent overruling of *Lemon v. Kurtzman,* 403 U.S. 602 (1971), in *Kennedy v. Bremerton School District,* 142 S.Ct. 2407 (2022), requires this Court to adjudicate the meaning of the Fourteenth Amendment according to ACLL's notions of sound theological doctrine concerning Christian "natural law." ACLL Brief at 11.

The ACLL's position is contrary to settled law. Nothing in the Constitution authorizes federal courts to adjudicate cases on the basis of theological inquiries. The First Amendment's religion clauses flatly preclude any such approach to constitutional decision-making. "'The law knows no heresy, and is committed to the support of no dogma, the

-20-

establishment of no sect.'" *Serbian Eastern Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 710-11 (1976)(quoting *Watson v. Jones,* 80 U.S. 679, 728 (1871)). Judicial inquiries into theological doctrine are precluded even in cases involving religious schism and resulting disputes over church property. *See id.* The First Amendment "enjoins the employment of organs of government for essentially religious purposes," and "commands civil courts to decide [those] disputes without resolving underlying controversies over religious doctrine." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449 (1969).

And although the ACLL purports to speak on behalf of people of faith, *Amici*—as people of faith—affirm the right of parents, in consultation with medical professionals, to treat their transgender child with transitioning medications subject to medically accepted standards, so their child may flourish. The Act interferes with parents' right to do so, as part of their duty to support and nurture their children.

Alabama clergy from diverse religious traditions have written an open letter expressing concern for families suffering a "devastating" loss of access to critically needed comprehensive medical care and mental-

health services for their transgender children in safe clinical spaces.[14]
The letter's signatories include clergy in Baptist, Methodist, Episcopal,
Presbyterian Church (U.S.A.), Christian Church (Disciples of Christ),
United Church of Christ, Evangelical Lutheran Church and Unitarian
Universalist faith communities.[15]

Denominations comprising New England's founding churches, the
Unitarian Universalist Association ("UUA") and the United Church of
Christ ("UCC"), both oppose the Act's interference with parental
support for their transgender children. The President of the UUA, Rev.
Susan Frederick-Gray, has criticized Alabama's "cruel and invasive
actions will threaten the health and well-being of trans youth."[16] The
UUA opposes interference with parents' right to support their children
who need gender-affirming care. "A parent or guardian who is taking

---

[14] Greg Garrison, *Alabama clergy sign letter of support for transgender children,* AL.com (May 6, 2022), https://bit.ly/3AGDS6I & https://perma.cc/X74Y-GA4C.

[15] *Id.*

[16] Rev. Susan Frederick-Gray, *Alabama's Anti-Trans Legislation is Dangerous and Dehumanizing,* Unitarian Universalist Association Press Releases (April 7, 2022), https://bit.ly/3Q55KOB & https://perma.cc/U5RV-LUCB.

their child to a health care provider to offer gender-affirming care is providing love and support."[17]

United Church of Christ ("UCC") President John C. Dorhauer and other UCC leaders have condemned state laws, including Alabama's, that are "depriving parents of the right to make medical decisions for their children."[18] "The harm done when governments seize control from parents of their own freedom to provide care for their own children is obvious."[19] Joining this brief, the Southeast Conference of the UCC opposes Alabama's legislation as harmful to transgender and nonbinary youth and to "their families and beloveds and the healthcare professionals who care for them."[20]

---

[17] UUA, *Diversity of Sexuality and Gender is a Gift, supra* note 2 (responding to Texas officials' mischaracterization of gender-affirming care as "child abuse").

[18] John C. Dorhauer, et al, *Trans-Nonbinary Pastoral Letter,* United Church of Christ (June 8, 2022), https://bit.ly/3z7vWuf & https://perma.cc/XCX2-AUSN.

[19] *Id.*

[20] Wood & Whitlock, *supra* note 3.

-23-

Reform Judaism's biblical tradition teaches that all human beings are created *b'tzelem Elohim*—in the Divine Image.[21] The Jewish family is the "primary vehicle" by which children are nurtured in character to adulthood.[22] The URJ supports the important role of Jewish parents in raising their children.[23] Parents in the Reform Jewish movement who seek medical treatment for a transgender child, in consultation with medical professionals and according to established medical standards, are following their values as Jewish parents.[24]

Reform Judaism's rabbinic arm, the Central Conference of American Rabbis ("CCAR"), has voiced its concern for many of its members and families in communities they serve whose children are hurt by the Act. "Judaism's highest value is *pikuach nefesh,* saving a life. Given the terrifying rate of suicide and suicidal ideation in

---

[21] Central Conference of American Rabbis, *The Rights of Transgender and Gender Non-Conforming Individuals, supra* note 6.

[22] Union of American Hebrew Congregations, *Jewish Family Rituals* Union for Reform Judaism (1989), https://bit.ly/3PtNOEh & https://perma.cc/AYC7-REU3.

[23] Union for Reform Judaism, *Engaging Families with Young Children*, https://bit.ly/3QpiUyt & https://perma.cc/83G5-XL73.

[24] Gold, *supra* note 4.

transgender youth, particularly when they are not affirmed in their gender identity, combating these laws is a religious obligation as well as a matter of life and death."[25]

The Rabbinical Assembly, the international association of rabbis serving institutions of Conservative Judaism, also recognizes the Torah's teachings that all humanity are created in God's Divine Image.[26]  In a public statement, the Rabbinical Assembly has strongly opposed state action that "punishes the parents of LGBTQ+ children seeking gender-affirming medical procedures."[27]

ACLL ignores the convictions of the foregoing faiths when it asserts that the Constitution somehow incorporates its particular theological views concerning sound Christianity and "natural law." That

---

[25] Central Conference of American Rabbis, *Statement on Laws that Endanger Transgender Youth* (May 5, 2022), https://bit.ly/3uManNi & https://perma.cc/QG2M-PCQJ.

[26] The Rabbinical Assembly, *Resolution Affirming the Rights of Transgender and Gender Non-Conforming People* (April 6, 2016), https://bit.ly/3QD6WOo & https://perma.cc/MG89-9QHW.

[27] The Rabbinical Assembly, *Rabbinical Assembly Rejects Texas Governor's Assault on Transgender Children and Families* (March 1, 2022), https://bit.ly/3zOuwnu & https://perma.cc/J8RB-HLPS.

is not how the Constitution works. The Constitution protects **all** faiths, and precludes any from imposing its will as law.

ACLL relies on yet gravely misapprehends the writings of Justice Joseph Story. Story was a prominent Unitarian who served as a Vice President of the American Unitarian Association for its first decade, [28] and as the denomination's President from 1844-1845,[29] and who was

---

[28] George Willis Cooke, *Unitarianism in America: A History of Its Origin and Development* 134-35 & 143 (Boston: American Unitarian Association, 1902) (noting that "Joseph Story, the great jurist, who had been vice-president of the Association from 1826 to 1836, was elected president in 1844"). *See, e.g., First Annual Report of the Executive Committee of the American Unitarian Association* 31 (Boston: Isaac R. Butts and Co., 1826)(Vice President 1826-1827), https://bit.ly/3ITlxpa; *Tenth Annual Report of the American Unitarian Association* *52(280) (Boston: Charles Bowen, 1835)(Vice President 1835-36), https://bit.ly/3OlO2wP. For a contemporaneous but hostile review of Justice Story's earnest work for Unitarianism see *Speeches of the Hon. Judge Story, Before the American Unitarian Association,* in the anti-Unitarian periodical 1 *The Spirit of the Pilgrims for the Year 1828,* 343-47 (Boston: Pierce and Williams, July 1828), https://bit.ly/3v0vZFO.

[29] *See* Cooke, *supra* note 28, at 143; *Nineteenth Report of the American Unitarian Association,* in 17 Tracts of the American Unitarian Association *7(343) (Boston: James Monroe and Co., 1844).

active in Unitarian congregations in Salem[30] and Cambridge,[31]

Massachusetts, and in Washington, D.C.[32]

ACLL's brief quotes Story speaking at his installation in 1829, as

Harvard Law School's Dane Professor of Law, for the proposition that

"Christianity is a part of the common law." ACLL Brief at 12. Reading

to the end of Story's paragraph, however, one finds him elaborating on

what he called the great "error of the common law":

> It tolerated nothing but Christianity, as taught by its own
> established church, either Protestant or Catholic; and with
> unrelenting severity consigned the conscientious heretic to
> the stake, regarding his very scruples as proofs of incorrigible
> wickedness. Thus, justice was debased, and religion itself
> made the minister of crimes by calling in the aid of the secular
> power to enforce that conformity of belief, whose rewards and
> punishments belong exclusively to God.

---

[30] Cooke, *supra* note 28, at 381.

[31] 2 William Wetmore Story, ed., *Life and Letters of Joseph Story* 550
(Boston: Charles C. Little and James Brown, 1851)(mentioning "the
Unitarian Church at Cambridge, of which my father was a member").

[32] Jennie W. Scudder, *A Century of Unitarianism in the National Capital,
1821-1921,* at pp. 27-28, 82, 113 (Boston: Beacon Press, 1922); *A
Washington Church Completed,* in 27:43 *The Universalist Leader* 19, 19
(October 25, 1924)("Joseph Story and Samuel F. Miller, Associate
Justices of the Supreme Court, were members of the Unitarian Church
in Washington.").

-27-

Joseph Story, *A Discourse Pronounced Upon the Inauguration of the Author as Dane Professor of Law in Harvard University* 21 (Boston: Hilliard, Gray, Little and Wilkins, 1829). Story deemed it inappropriate for courts to inquire into matters of theology in order to impose any particular religious doctrines as law. *See id.* That is exactly the opposite of ACLL's position.

ACLL's insistence that the Fourteenth Amendment is imprisoned within a common law arrested in 1868 conflicts, moreover, with Story's understanding that the common law "must for ever be in a state of progress, or change, to adapt itself to the exigencies and changes of society." Story, *Discourse,* at 9. "In truth, the common law, as a science, must be for ever in progress; and no limits can be assigned to its principles or improvements." *Id.* at 33. "In this respect it resembles the natural sciences, where new discoveries continually lead the way to new, and sometimes astonishing results." *Id.* "It is its true glory, that it is flexible, and constantly expanding with the exigencies of society; that it daily presents new motives for new and loftier efforts; that it holds out for ever an unapproached degree of excellence; that it moves onward

in the path towards perfection, but never arrives at the ultimate point." *Id.*

ACLL asserts that "Story agreed with Blackstone that Christianity clarified any doubts as to what natural law is." ACLL Brief at 12. Yet Story held only that Christianity "seems to concentrate all morality in the simple precept of love to God and love to man," while elevating "the advocate of rational liberty." Story, *Discourse,* at 43. That amounts to no endorsement of ACLL's theological assertions. Far from contending that the Constitution embraces any particular version of Christian theology in his *Commentaries,* Story praised the First Amendment's Establishment Clause for ensuring that "the Catholic and Protestant, the Calvinist and the Arminian, the Jew and the Infidel, may sit down at the common table of the national councils, without any inquisition into their faith, or mode of worship."[33] For Story and other

---

[33] 3 Joseph Story, *Commentaries on the Constitution of the United States* §1873, at p.731 (Boston: Hilliard, Gray, and Co., 1833). Justice Story's biographer and son, the sculptor William Wetmore Story, described him as

> free from a spirit of bigotry and proselytism. He gladly allowed every one freedom of belief, and claimed only that it should be a genuine conviction and not a mere theologic

Unitarians of his generation, "natural law was a set of possible legal choices that was consistent with their views as to the perfectibility of mankind."[34] "So defined, Story's natural law provided few specific answers to particular questions but was rather an affirmation of a framework of rationality for answering questions."[35] He thought it imposed "[o]n the part of parents, the duty of maintaining, educating, and otherwise providing for the intellectual, moral and physical improvement of their children."[36] But nothing in Story's writings

_____

opinion, considering the true faith of every man to be the necessary exponent of his nature, and honoring a religious life more than a formal creed. He admitted within the pale of salvation Mahommedan and Christian, Catholic and Infidel. He believed that whatever is sincere and honest is recognized of God; —that as the views of any sect are but human opinion, susceptible of error on every side, it behooves all men to be on their guard against arrogance of belief; —and that in the sight of God it is not the truth or falsity of our views, but the spirit in which we believe, which alone is of vital consequence.

1 William Wetmore Story, ed., *Life and Letters of Joseph Story* 57-58 (Boston: Charles C. Little and James Brown, 1851).

[34] Russell K. Osgood, *Supreme Court Justice Story,* 71 Cornell L.Rev. 726, 730 (1986).

[35] *Id.*

[36] [Joseph Story], *Natural Law,* in 9 *Encyclopedia Americana* 150, at p.152 (Francis Lieber, ed.; Philadelphia: Carey and Lea, 1832).

suggests that parents may not honor this high duty by seeking gender-affirming care for their children's gender dysphoria.

Perplexing, too, are ACLL's assertions that the Fourteenth Amendment's Due Process and Equal Protection Clauses together codify William Blackstone's common-law doctrines. ACLL Brief at 7-10. Blackstone wrote that "[b]y marriage, the husband and wife are one person in law; that is, the very being or legal existence of the woman is suspended during the marriage," and Blackstone's common-law doctrine accorded the husband a right even "to restrain a wife of her liberty." 1 William Blackstone, *Commentaries on the Laws of England* 430, 433 (Oxford: Clarendon Press, 1765), and 1 William Blackstone, *Commentaries on the Laws of England* 441(*442), 444(*445) (St. George Tucker, ed.; Philadelphia: 1803). Needless to say, that is not the law of our Constitution.

ACLL insists that Blackstone's "law of nature" nonetheless imposes ACLL's own specific theological doctrines of what is right and proper. ACLL Br. at 7-8, 10-11. Yet Blackstone insisted, to the contrary, that the Creator

-31-

has not perplexed the law of nature with a multitude of abstracted rules and precepts, referring merely to the fitness or unfitness of things, as some have vainly surmised; but has graciously reduced the rule of obedience to this one paternal precept, "that man should pursue his own happiness." This is the foundation of what we call ethics, or natural law.

1 Blackstone, *Commentaries*, 1765 ed. at 40-41; 1803 ed. at 40(*40-*41). Blackstone's eighteenth-century presentation of "natural law" says nothing that would bar twenty-first century parents from seeking the medical care needed for their transgender children to thrive.

Citing Chief Judge Pryor's article *Against Living Common Goodism,* 23 Federalist Soc'y Rev. 24, 26 (2022), ACLL says that imploring the Court to impose ACLL's version of "natural law" does not amount to "asking the Court to engage in results-based adjudication that lines up with individual judges' view of the common good." ACLL Brief at 14. Yet Chief Judge Pryor's article clearly rejects the notion that constitutional texts should "be read in the light of the natural law—or, more accurately, what a judge believes is the natural law." Pryor, *Against Common Goodism,* at 29. Quoting Justice James Iredell: "The ideas of natural justice are regulated by no fixed standard: the

ablest and the purest men have differed upon the subject." *Id.* at 38 (quoting *Calder v. Bull*, 3 U.S. 386, 399 (1798)(Iredell, J.)).

Neither does the Fourteenth Amendment arrest medical science in the nineteenth century. The Supreme Court has held that the Eighth Amendment's proscription of "cruel and unusual punishment" requires both state and federal prisons to provide medical care to prisoners. *See Estelle v. Gamble,* 429 U.S. 97 (1976). In *Hutto v. Finney,* 437 U.S. 678, 682 (1978), the Court "noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." *Helling v. McKinney,* 509 U.S. 25, 33 (1993).

On the ACLL's view, since the Eighth Amendment was adopted in 1791, it cannot encompass medical treatments beyond those then available—such as leeches, purges, and bloodletting. As applicable to the states through the Fourteenth Amendment, ACLL might concede that the medical science of 1868 defines the boundaries of the

-33-

constitutional right. Still, if ACLL is right, treatments unknown to the Fourteenth Amendment's framers cannot be recognized as within the scope of anyone's constitutional rights—whether parents or prisoners: no antibiotics, no insulin, no dialysis, no modern anesthetics. Courts considering constitutional rights relating to medical care also would have to ignore new diseases or medical conditions that were not recognized in 1791 or in 1868—such as Lyme disease, HIV, or gender dysphoria.

That conclusion is inconsistent with decisions of this Court concerning gender dysphoria. This Court has acknowledged gender dysphoria as a medical condition that the Eighth Amendment may, through the Due Process Clause of the Fourteenth Amendment, require state prisons to treat. *See Keohane v. Florida Dep't of Corr. Sec'y,* 952 F.3d 1257, 1266 (11th Cir.2020).

Gender dysphoria and COVID were unknown to the Fourteenth Amendment's framers. But neither parents nor courts can pretend today that they don't exist. Gender-affirming puberty blockers and hormone therapy were unknown to the Fourteenth Amendment's framers. But so were the antibiotics and insulin that are often essential

-34-

to saving children's lives today. Parents are entitled under a century-long string of decisions, beginning with *Meyer,* to seek the medical care they and their physicians believe their children need. The State of Alabama cannot be permitted to block them.

## VI.    CONCLUSION

*Amici* oppose the Act as an unconstitutional invasion of longstanding liberties rooted in the history and traditions of the American people. The Act denies parents their fundamental liberty to obtain medical care for their children subject to medically accepted standards. It denies transgender youth equal protection under the law. The Fourteenth Amendment cannot be understood, on the basis of Blackstone's common law or theological arguments incorporating "natural law" theories, to arrest medical science and deny families and transgender youth access to needed gender-affirming care.


DATED:  August 17, 2022          Respectfully submitted,


                                                /s/Susan Kay Weaver
                                          _____
                                                SUSAN KAY WEAVER

SUSAN KAY WEAVER
  susankayweaver@gmail.com
  (619) 368-4562
ERIC ALAN ISAACSON
  ericalanisaacson@icloud.com
  (858) 263-9581
6580 Avenida Mirola
La Jolla, CA 92037


Attorneys for *Amici Curiae*:
Unitarian Universalist Association,
Union for Reform Judaism, Central
Conference of American Rabbis,
Southeast Conference of the United
Church of Christ, Universal
Fellowship of Metropolitan
Community Churches, *et al*.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief, which has been prepared in proportionally space Century Schoolbook 14-point font, complies with the type-volume limitation of Fed.R.App.P. 29(a)(5), the typeface requirements of Fed.R.App.P. 32(a)(5), and the type requirements of Fed.R.App.P. 32(a)(6). It contains 6,483 words as counted by Microsoft Word for Mac (version 16.61.1 (22071301)) word-processing system used to prepare the Brief, exclusive of the parts of the Brief exempted from the type-volume limitation by Fed.R.App.P. 32(f) and 11 Cir. Rule 32-4.


/s/Susan Kay Weaver
Susan Kay Weaver

6580 Avenida Mirola
La Jolla, CA   92037-6231
Phone: (619) 368-4562
email: susankayweaver@gmail.com

-37-

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2022, I am electronically filing the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will send notice of this filing to all parties through their counsel of record as indicated on the electronic filing receipt.


/s/Susan Kay Weaver
Susan Kay Weaver

6580 Avenida Mirola
La Jolla, CA   92037-6231
Phone: (619) 368-4562
email: susankayweaver@gmail.com