No. 22-11707

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

PAUL A. EKNES-TUCKER, et al.,
*Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA
*Intervenor-Plaintiff-Appellee*,

v.

GOVERNOR OF THE STATE OF ALABAMA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:22-cv-184-LCB

## REPLY BRIEF OF STATE DEFENDANTS

<table>
<tr><td>

Christopher Mills
SPERO LAW LLC
557 East Bay St.,
#22251
Charleston, SC 29451
(843) 606-0640
cmills@spero.law

</td><td>

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
Thomas A. Wilson
  *Deputy Solicitors General*
James W. Davis
  *Deputy Attorney General*
Benjamin M. Seiss
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

</td></tr>
<tr><td>August 31, 2022</td><td></td></tr>
</table>

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.    Abdul-Latif, Hussein – Amicus Curiae;

2.    Academic Pediatric Association – Amicus Curiae;

3.    Alabama Center for Law and Liberty – Amicus Curiae;

4.    Alabama Chapter of the American Academy of Pediatrics – Amicus Curiae;

5.    Alaska, State of – Amicus Curiae;

6.    Alstott, Anne – Amicus Curie;

7.    America First Legal Foundation – Amicus Curiae;

8.    American Academy of Child and Adolescent Psychiatry – Amicus Curiae;

9.    American Academy of Family Physicians – Amicus Curiae;

10.    American Academy of Pediatrics – Amicus Curiae;

11.    American Academy of Nursing – Amicus Curiae;

12.    American Association of Physicians for Human Rights, Inc. – Amicus Curiae;

13.    American College of Obstetricians and Gynecologists – Amicus Curiae;

14.    American College of Osteopathic Pediatricians – Amicus Curiae;

15.    American College of Physicians – Amicus Curiae;

16.    American Medical Association – Amicus Curiae;

17.    American Pediatric Society – Amicus Curiae;

18.    American Psychiatric Association – Amicus Curiae;

19.    Arnold, Stephanie York – Amicus Curiae;

20.    Association of American Medical Colleges – Amicus Curiae;

21.    Association of Medical School Pediatric Department Chairs – Amicus Curiae;

22.    Andersen, Alison L. – Counsel for Amici Curiae;

23.    Anderson, Tom – Defendant;

24.    Arizona, State of – Amicus Curiae;

25.    Arkansas, State of – Amicus Curiae;

26.    Austin, Heather – Plaintiff;

27.    Australian Professional Association for Trans Health (The) – Amicus Curiae;

28.    Baia, Elizabeth – Counsel for Amici Curiae;

29.    Bailey, Daryl D. – Defendant;

30.    Barday, Shireen A. – Counsel for Amicus Curiae;

31.    Barham, Richard – Amicus Curiae;

32.    Barnes, Brian W. – Counsel for Defendants;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

33.    Barnhart, Dr. David L. (Jr.) – Amicus Curiae;

34.    Becker, Laura – Amicus Curiae;

35.    Beninati, Nancy – Counsel for Amici Curiae;

36.    Blakemore, Robin – Amicus Curiae;

37.    Blaylock, C. Wilson – Defendant;

38.    Boccuzzi, Carmine D, (Jr.) – Counsel for Amici Curiae;

39.    Boe, Brianna – Plaintiff (pseudonym);

40.    Boergers, Kathleen – Counsel for Amici Curiae;

41.    Bonta, Rob – Counsel for Amici Curiae;

42.    Boulware, Rebecca Kamody – Amicus Curiae;

43.    Bowdre, Alexander Barrett – Counsel for Defendants;

44.    Bundesverbrand Trans* e.V. – Amicus Curiae;

45.    Bridges, Dr. Rebecca L. – Amicus Curiae;

46.    Bronni, Nicholas J. – Counsel for Amici Curiae;

47.    Broyles, Vernadette R. – Counsel for Amici Curiae;

48.    Bryan, Chad W. – U.S. Magistrate Judge;

49.    Burke, Liles C. – U.S. District Court Judge;

50.    Burleigh, Billy – Amicus Curiae;

51.    California, State of – Amicus Curiae;

52.    Cantrell, Michael A. – Counsel for Amici Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

53.  Carr, Danny – Defendant;

54.  Central Conference of American Rabbis – Amicus Curiae;

55.  Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

56.  Child & Parental Rights Campaign, Inc. – Counsel for Amicus Curiae;

57.  Clark, Matthew J. – Counsel for Amicus Curiae;

58.  Clarke, Kristen – Counsel for Intervenor-Plaintiff;

59.  Coe, Brian – Amicus Curiae (pseudonym);

60.  Coe, Laura – Amicus Curiae (pseudonym);

61.  Colavecchio, J.D. – Counsel for Amici Curiae;

62.  Colorado, State of – Amicus Curiae;

63.  Connecticut, State of – Amicus Curiae;

64.  Conrady, Julie – Amicus Curiae;

65.  Cooper, Erica – Amicus Curiae;

66.  Davies, Andrew Rhys – Counsel for Amici Curiae;

67.  Davis, James William – Counsel for Defendants;

68.  Delaware, State of – Amicus Curiae;

69.  Dermody, Eliza – Counsel for Intervenor-Plaintiff;

70.  Dingus, Jaimie – Amicus Curiae;

71.  District of Columbia – Amicus Curiae;

72.  Doss, Jeffrey P. – Counsel for Plaintiffs;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

73.   Eagan, Melody Hurdle – Counsel for Plaintiffs;

74.   Elgart, Allison – Counsel for Amici Curiae;

75.   Elias, Nimrod Pitsker – Counsel for Amici Curiae;

76.   Endocrine Society (The) – Amicus Curiae;

77.   Eknes-Tucker, Paul A. – Plaintiff;

78.   Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

79.   Ethics and Public Policy Center – Amicus Curiae;

80.   Federación Colectivo Hombres XX, AC – Amicus Curiae;

81.   Finney, Johnny R. (II) – Amicus Curiae;

82.   Foster, Carolyn – Amicus Curiae;

83.   Fuller, David – Amicus Curiae;

84.   G. C. – Amicus Curiae (pseudonym);

85.   Genau, Joseph – Amicus Curiae;

86.   George, Renu R. – Counsel for Amici Curiae;

87.   Georgia, State of – Amicus Curiae;

88.   Gibson, Henry N. – Amicus Curiae;

89.   Global Justice Institute – Amicus Curiae;

90.   Hamilton, Gene – Counsel for Amicus Curiae;

91.   Hamilton-Poore, Dr. Samuel F. – Amicus Curiae;

92.   Hamilton-Poore, Terry – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

93.    Hasson, Mary Rice – Amicus Curiae;

94.    Hawaii, State of – Amicus Curiae;

95.    Health Professionals Advancing LGBTQ Equality – Amicus Curiae;

96.    Hecker, Elizabeth P. – Appellate Counsel for Intervenor-Plaintiff;

97.    Henkin, Steven – Amicus Curiae;

98.    Hopkins, C. Lynn – Amicus Curiae;

99.    Hutchinson, Laura – Amicus Curiae;

100.    Illinois, State of – Amicus Curiae;

101.    Indiana, State of – Amicus Curiae;

102.    Isaacson, Eric Alan – Counsel for Amici Curiae;

103.    Isasi, William – Counsel for Amici Curiae;

104.    Isner, Shane – Amicus Curiae;

105.    Ivey, Kay – Defendant;

106.    Jacobs, Dylan L. – Counsel for Amici Curiae;

107.    Jimmerson, Dr. Ellin – Amicus Curiae;

108.    Kerschner, Helena – Amicus Curiae;

109.    Koe, Rachel – Plaintiff (pseudonym);

110.    Kuper, Laura – Amicus Curiae;

111.    Krishna, Praveen S. – Appellate Counsel for Intervenor-Plaintiff;

112.    LGBT+ Denmark – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

113.  LaCour, Edmund G. (Jr.) – Counsel for Defendants;

114.  Lamar-Hart, Cynthia – Amicus Curiae;

115.  Lannin, Cortlin H. – Counsel for Amici Curiae;

116.  Lanosa, Michael – Counsel for Amici Curiae;

117.  Lareau, Alyssa C. – Counsel for Intervenor-Plaintiff;

118.  Levi, Jennifer L. – Counsel for Plaintiffs;

119.  Loe, Brian – Amicus Curiae (pseudonym);

120.  Loe, Sarah – Amicus Curiae (pseudonym);

121.  Loper, Dr. Helene – Amicus Curiae;

122.  Louisiana, State of – Amicus Curiae;

123.  Maine, State of – Amicus Curiae;

124.  Marshall, Margaret L. – Counsel for Intervenor-Plaintiff;

125.  Marshall, Steve – Defendant;

126.  Martinez, Gabriel – Counsel for Amici Curiae;

127.  Martinez, Michael Rodriguez – Counsel for Amici Curiae;

128.  Maryland, State of – Amicus Curiae;

129.  Massachusetts, State of – Amicus Curiae;

130.  Mattern, David P. – Counsel for Plaintiffs;

131.  McAlister, Mary E. – Counsel for Amici Curiae;

132.  McCoy, Scott D. – Counsel for Plaintiffs;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

133.  McNamara, Meredithe – Amicus Curiae;

134.  Medical Association of Pediatric Nurse Practitioners – Amicus Curiae;

135.  Men of Reform Judaism – Amicus Curiae;

136.  Mills, Christopher Ernest – Counsel for Defendants;

137.  Mississippi, State of – Amicus Curiae;

138.  Missouri, State of – Amicus Curiae;

139.  Mitchell, Jonathan F. – Counsel for Amicus Curiae;

140.  Moe, Jane – Plaintiff (pseudonym);

141.  Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

142.  Montana, State of – Amicus Curiae;

143.  Morrison, Rachel N. – Counsel for Amicus Curiae;

144.  National Association of Pediatric Nurse Practitioners – Amicus Curiae;

145.  Nebraska, State of – Amicus Curiae;

146.  Nevada, State of – Amicus Curiae;

147.  New Jersey, State of – Amicus Curiae;

148.  New Mexico, State of – Amicus Curiae;

149.  New York, State of – Amicus Curiae;

150.  Newton, Nicole – Amicus Curiae;

151.  Noe, Kathy – Plaintiff (pseudonym);

152.  North Carolina, State of – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

153.    Norwegian Organization for Sexual and Gender Diversity (The) – Amicus Curiae;

154.    Oklahoma, State of – Amicus Curiae;

155.    Oladeinbo, Gilbert Olusengun – Counsel for Plaintiffs;

156.    Olezeski, Christy – Amicus Curiae;

157.    Oregon, State of – Amicus Curiae;

158.    Ormand, Justin L. – Counsel for Amici Curiae;

159.    Orr, Asaf – Counsel for Plaintiffs;

160.    Patterson, Peter A. – Counsel for Defendants;

161.    Pediatric Endocrine Society – Amicus Curiae;

162.    Pennsylvania, State of – Amicus Curiae;

163.    Perigoe, Kelly – Counsel for Plaintiffs;

164.    Peterson, Misty L. – Counsel for Plaintiffs;

165.    Poe, Megan – Plaintiff (pseudonym);

166.    Powers, John Michael – Counsel for Intervenor-Plaintiff;

167.    Pratt, James Andrew – Counsel for Plaintiffs;

168.    Professional Association for Transgender Health Aotearoa New Zealand (The) – Amicus Curiae;

169.    Ragsdale, Barry Alan – Counsel for Amici Curiae;

170.    Ramer, John D. – Counsel for Defendants;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

171. Ray, Brent P. – Counsel for Plaintiffs;

172. Riehl, Christina – Counsel for Amici Curiae;

173. Reinke, Adam – Counsel for Plaintiffs;

174. Renner, Steven S. – Amicus Curiae;

175. Reynolds, Laura – Amicus Curiae;

176. Rhode Island, State of – Amicus Curiae;

177. Robin-Vergeer, Bonnie – Appellate Counsel for Intervenor-Plaintiff;

178. Roe, Rebecca – Plaintiff (pseudonym);

179. Rothbauer, Chris – Amicus Curiae;

180. Rutledge, Leslie – Counsel for Amici Curiae;

181. Saei, Yusuf – Counsel for Plaintiffs;

182. Sanders, Jennifer – Amicus Curiae;

183. Seiss, Benjamin Matthew – Counsel for Defendants;

184. Seta ry / Seta rf / Seta Lgbtiq Rights in Finland – Amicus Curiae;

185. Shortnacy, Michael B. – Counsel for Plaintiffs;

186. Schwabauer, Barbara – Appellate Counsel for Intervenor-Plaintiff;

187. Societies for Pediatric Urology – Amicus Curiae;

188. Society for Adolescent Health and Medicine – Amicus Curiae;

189. Society for Pediatric Research – Amicus Curiae;

190. Society of Pediatric Nurses – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

191.  Soe, Melissa – Amicus Curiae (pseudonym);

192.  Soto, Diego Armando – Counsel for Plaintiffs;

193.  South Carolina, State of – Amicus Curiae;

194.  Southeast Conference of the United Church of Christ – Amicus Curiae;

195.  Smalts, Laura Perry – Amicus Curiae;

196.  Smith, John – Amicus Curiae;

197.  Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

198.  Strickland, Kevin L. – Amicus Curiae;

199.  Stone, Jessica Lynn – Counsel for Plaintiffs;

200.  Stonewall UK – Amicus Curiae;

201.  Swedish Federation for Lesbian, Gay, Bisexual, Transgender, Queer and Intersex Rights (The) – Amicus Curiae;

202.  Szilagyi, Nathalie – Amicus Curiae;

203.  Terry, Abigail Hoverman – Counsel for Plaintiffs;

204.  Texas, State of – Amicus Curiae;

205.  Thomason, Beth – Amicus Curiae;

206.  Thompson, David H. – Counsel for Defendants;

207.  Thornton, Joel H. – Counsel for Amici Curiae;

208.  Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

209.  Trevor Project (The) – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

210. Union for Reform Judaism – Amicus Curiae;

211. United States of America – Intervenor-Plaintiff;

212. Unitarian Universalist Association – Amicus Curiae;

213. Universal Fellowship of Metropolitan Community Churches – Amicus Curiae;

214. Utah, State of – Amicus Curiae;

215. Vermont, State of – Amicus Curiae;

216. Voe, Robert – Plaintiff (pseudonym);

217. Voights, Anne M. – Counsel for Plaintiffs;

218. Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

219. Warbelow, Sarah – Counsel for Plaintiffs;

220. Washington, State of – Amicus Curiae;

221. Weaver, Lily – Counsel for Amici Curiae;

222. Weaver, Susan Kay – Counsel for Amici Curiae;

223. Wenck, Julia H. – Counsel for Amici Curiae;

224. West Virginia, State of – Amicus Curiae;

225. Wilkerson, Mark Douglas – Counsel for Amici Curiae;

226. Williams, Renee – Counsel for Intervenor-Plaintiff;

227. Wilson, Thomas Alexander – Counsel for Defendants;

228. Wood, Kimberly – Amicus Curiae;

*Eknes-Tucker v. Gov. of Ala.*, No. 22-11707

229.  Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

230.  Women of Reform Judaism – Amicus Curiae;

231.  World Professional Association for Transgender Health – Amicus Curiae;

232.  Vague, Amie A. – Counsel for Plaintiffs;

233.  Vance, Robert S. (III) – Counsel for Amici Curiae;

234.  Ventiere, Jessica – Defendant;

235.  Veta, D. Jean – Counsel for Amici Curiae;

236.  Walker, Susan Russ – U.S. Magistrate Judge;

237.  Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

238.  Zelbo, Howard S. – Counsel for Amici Curiae;

239.  Zoe, James – Plaintiff (pseudonym).

Respectfully submitted this 31st day of August 2022.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................. C-1

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................. 7

    I.    The Due Process Clause Does Not Give Parents An Unbounded Right To Access Unapproved Medical Interventions For Their Children. ............................................................................. 7

    II.    Prohibiting Transitioning Treatments For Minors Does Not Violate The Equal Protection Clause. .................................................. 13

        A.    The Act Does Not Create a Sex-Based Classification Subject to Heightened Scrutiny. .............................................. 14

            1.  The Act Treats Transgender and Non-Transgender Minors the Same. ............................................ 14

            2.  *Bostock* Does Not Control. ................................ 17

        B.    Transgender People Are Not a Quasi-Protected Class Under the Equal Protection Clause. ...................................... 20

    III.    The Act Survives Any Level Of Scrutiny. ....................... 22

    IV.    The District Court Erred In Weighing The Equities And Crafting The Scope Of Relief. ............................................... 26

CONCLUSION .............................................................................. 28

CERTIFICATE OF COMPLIANCE ........................................................ 29

CERTIFICATE OF SERVICE ............................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001) ............................................................21

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020) .................................... 5, 14, 17, 18

*Brandt v. Rutledge*,
    No. 21-2875 (8th Cir. Aug. 25, 2022) ................................19

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ............................................................14

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 (2021) .......................................................25

*Cleburne Living Ctr. v. Cleburne*,
    726 F.2d 191 (5th Cir. 1984) .............................................20

*Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ..................................................... 20, 21

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 228l (2022) ................................................ passim

*Doe By and Through Doe v. Public Health Trust of Dade Cnty.*,
    696 F.2d 901 (11th Cir. 1983) ................................. 8, 10, 11

*Doe v. Moore*,
    410 F.3d 1337 (11th Cir. 2005) .......................................7, 8

*Flanigan's Enters., Inc. v. Fulton Cnty.*,
    596 F.3d 1265 (11th Cir. 2010) .........................................13

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ............................................................20

*Geduldig v. Aiello*,
 417 U.S. 484 (1974)............................................................... 14, 15, 19

*Georgia v. President of the United States*,
 No. 21-14269, 2022 WL 3703822 (11th Cir. Aug. 26, 2022)............................27

*Glenn v. Brumby*,
 663 F.3d 1312 (11th Cir. 2011) ..........................................................14

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
 358 F.3d 804 (11th Cir. 2004) ..........................................................10

*Morrissey v. United States*,
 871 F.3d 1260 (11th Cir. 2017) ...........................................................9

*Otto v. City of Boca Raton*,
 981 F.3d 854 (11th Cir. 2020) ..........................................................12

*Pierce v. Soc'y of Sisters*,
 268 U.S. 510 (1925)......................................................................11

*Prince v. Massachusetts*,
 321 U.S. 158 (1944).......................................................................9

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
 411 U.S. 1 (1973)..................................................................... 11, 20

*U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*,
 138 S. Ct. 960 (2018)....................................................................12

*United States v. Bajakajian*,
 524 U.S. 321 (1998)......................................................................12

*United States v. Virginia*,
 518 U.S. 515 (1996)......................................................................18

*Whalen v. Roe*,
 429 U.S. 589 (1977).......................................................................8

**Statutes**

42 U.S.C. §2000h-2.................................................................................27

Ala. Code §26-26-2........................................................................ 13, 28

Ala. Code §26-26-4(a)(1)...................................................................6, 18

Ala. Code §26-26-4(a)(1)-(3)..................................................................18

Ala. Code §26-26-4(a)(2).........................................................................6

Ala. Code §26-26-4(a)(3).........................................................................6

Ala. Code §26-26-4(b)...........................................................................14

Miss. Code Ann. §41-41-191(3)(f) ........................................................15

**Regulations**

Nondiscrimination in Health and Health Education Programs or Activities,
     Delegation of Authority, 85 Fed. Reg. 37,160, 37,198 (June 19, 2020) .............13

**Other Authorities**

Br. of Amici Curiae Am. College of Obstetricians and Gynecologists,
     Am. Medical Ass'n, Am. Academy of Pediatrics et al.,
     *Dobbs v. Jackson Women's Health Org.*, No. 19-1392 (U.S. Sept. 20, 2021)......4

Daniella Diaz & Annie Grayer, *House passes Equality Act aimed at ending
     discrimination based on sexual orientation and gender identity*, CNN
     (March 16, 2021), https://www.cnn.com/2021/02/25/politics/equality-act-
     passes-house/index.html .......................................................................21

FDA, *FDA cautions against use of hydroxychloroquine or chloroquine for
     COVID-19* (Jul. 1, 2020),  https://www.fda.gov/drugs/drug-safety-and-
     availability/fda-cautions-against-use-hydroxychloroquine-or-chloroquine-
     covid-19-outside-hospital-setting-or..................................................17

## INTRODUCTION

In their response briefs, Plaintiffs and the United States continue their journey through a distorted looking glass. The United States makes the astounding claim, unsupported by evidence and uncredited by the district court, that the "true purpose" of the Vulnerable Child Compassion and Protection Act is "moral disapproval of people who are transgender," U.S. Resp. 3—as though only a bigot could be concerned (as much of Europe is) about using sterilizing hormones to "treat" children suffering from gender dysphoria. And in response to drastic, lifelong harms these "treatments" can inflict, the United States (like the district court) dismissively assures that "every medical regime carries some form of risk," *id.* at 43-44—as though the sterilizing realities of what it euphemistically calls "gender-affirming care" are comparable to those for treating strep throat.

They are not. If an 11-year-old girl begins puberty blockers at the first signs of puberty, as Plaintiffs' experts recommend, Tr.129, and later moves on to testosterone injections—"hormone replacement therapy," in another of the United States' assaults on language, *id.* at 22—she will likely become infertile. DE69-8:9 ("[P]uberty blockade followed by cross-sex hormones leads to infertility and sterility."). That is not the kind of risk that "almost every medical regime carries." Worse, as the United States' own expert testified, many doctors (like the expert himself) do not

1

tell children or their families that most gender dysphoric youth who begin puberty blockers proceed to cross-sex hormones. Tr.228-30.

Yet to those who think it unfair to ask an 11-year-old girl feeling uncomfortable in her body to "assent" (U.S. Resp. 8) to such "care" on incomplete information, or who question whether a young girl in psychological pain can know whether she will want to experience intimate relations or have children in twenty years, the United States says only to stop handwringing over "an entirely speculative future harm (potential regret)," *id.* at 48. But these harms are not "speculative." Just ask the increasing number of detransitioners, who were promised "gender-affirming care" and found instead that the hormones were sex denying, forever taking their "right away to have children." Tr.351; *see generally* Amicus Br. of Detransitioners. The United States can continue to deny these individuals' existence, but the Alabama Legislature did not have to.

Indeed, soberly weighing the risk of future harm versus present benefit is precisely the role of good government. As the United States knows from its review of COVID treatments, doctors may want to provide interventions *now* that the government may nevertheless restrict. This same process for transitioning treatments is playing out in countries like the UK, Finland, and Sweden. After reviewing the evidence, Sweden concluded that the risks of these treatments "currently outweigh the possible benefits." DE69-11:3. The United States responds (at 42) that these

countries have not yet "categorically ban[ned]" the treatments, as though that changes their risk-benefit calculus or limits Alabama's response. But States have long had the authority to determine that certain drugs and procedures are too dangerous for general use—even when a patient (or her parents, or her doctor, or her doctor's medical interest group) disagrees. It is not animus to offer help with the broader picture in view.

For their part, the private Plaintiffs respond that *parents* have the ultimate say over how a State regulates medicine. Notably, Plaintiffs do not claim that children (or adults for that matter) have a personal constitutional right to transitioning treatments, and they expressly *disclaim* any argument that parents can exercise such a right on a child's behalf. Pls' Resp. 31. Rather, Plaintiffs contend that the Due Process Clause affords parents "the right to seek medical care for their children … irrespective of whether the child has an underlying right to that medical care." *Id.* at 32. But if this were true, parents could unlock treatments that literally no one else could. No personal right to medical marijuana (or transitioning surgeries)? No matter—parents can assert their "fundamental right to seek medical care for their children" and subject a state's medical law to strict scrutiny. The Due Process Clause does not contain this unbounded right.

Perhaps realizing their theory's weakness, Plaintiffs try to temper the absurdity by pairing their statements of the claimed right with never-defined modifiers like

"accepted medical care" (at 36) and "accepted medical standards" (at 27). But this simply raises another problem: accepted by whom? The State Legislature? The FDA? Plaintiffs never directly say, but their answer is clear: those governmental bodies won't do. For Plaintiffs, as for the district court, what matters is what some nebulous number of medical interest groups think. *E.g.*, DE112-1:17 ("at least twenty-two major medical associations in the United States endorse transitioning medications"). Yet this is no answer either (even putting aside the dubious subordination of our law to self-interested groups that supported eugenics, among other things). Under Plaintiffs' theory, parents could subject Alabama's abortion law to heightened scrutiny simply by (1) claiming the right to seek medical "care" in the form of an abortion for their children, and (2) invoking their "twenty-two major medical associations" to claim that abortion is "widely accepted" medical care, as many of the same organizations recently told the Supreme Court.[1] The high court did not defer; it held instead that "laws regulating or prohibiting abortions are … governed by the same standard of review as other health and safety measures": rational basis. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2281, 2246 (2022). The Court did not recognize an if-parents-and-some-medical-interest-groups-say-otherwise loophole.

---

[1] *See* Br. of Amici Curiae Am. College of Obstetricians and Gynecologists, Am. Medical Ass'n, Am. Academy of Pediatrics et al. at 26-27, *Dobbs v. Jackson Women's Health Org.*, No. 19-1392 (U.S. Sept. 20, 2021).

As for their Equal Protection claims, Plaintiffs and the United States make two main arguments. The first is that transitioning a girl by giving her supraphysiologic doses of testosterone to dramatically elevate her testosterone above normal levels (which the State prohibits) is the "same medical treatment[]" as treating an endocrine disorder by giving testosterone to a boy to bring his levels up to a normal range (which the State allows). U.S. Resp. 2. In this way, Plaintiffs say (at 55), Alabama "bar[s] certain treatments only for transgender minors" while allowing others to access the same treatments. Even beyond that non-transgender youth also seek the prohibited treatments (and some transgender youth do *not*), the treatments are *not* the same—just as administering morphine to treat a patient's pain is not the "same medical treatment" as using morphine to assist a patient's suicide. This part of Plaintiffs' argument thus fails.

For their second argument, Plaintiffs and the United States seek to extend *Bostock*'s employment test (whether changing a person's sex would yield a different outcome) to medicine so that any procedure that depends on biological differences between the sexes—testicular exams, IVF treatments, abortions—is subject to heightened scrutiny. *See* U.S. Resp. 27, Pls' Resp. 52-53. This argument fares no better. For starters, the Act's prohibition on "administering puberty blocking

medication to stop or delay normal puberty," Ala. Code §26-26-4(a)(1),[2] is unaffected: changing the child's sex changes nothing. As for the other relevant provisions, the Act speaks of two separate medical procedures: administering "supraphysiologic doses of testosterone" to transition a female, and prescribing "supraphysiologic doses of estrogen" to transition a male. *Id.* §26-26-4(a)(2), (3). Both are "medical procedure[s] that only one sex can undergo" by definition, so Alabama's regulation "does not trigger heightened constitutional scrutiny unless the regulation is a mere pretext designed to effect an invidious discrimination against members of one sex or the other." *Dobbs*, 142 S. Ct. 2245-46 (cleaned up). Because the Act treats both sexes equally—doctors may not prescribe transitioning treatments for girls *or* boys—that is clearly not the case. The Act is subject only to rational-basis review, though it survives any level of scrutiny.

As to the equities, Plaintiffs say not one word about the reason for their delay (judge shopping) and argue instead that this Court should not penalize their inequitable behavior because the district court did not. Pls' Resp. 63. If that were the standard, this Court need not stand in review of *anything*. The United States, in turn, argues that Alabama's interest in "protecting minors from harms that may or may not happen in the future … cannot outweigh the actual, imminent harm" that transgender

---

[2] The codification of the Act changed after Defendants filed their opening brief, altering the title and chapter designations but not the section designation.

minors face now. U.S. Resp. 53. But under that view, because "risk" is inherently future-oriented, no amount of risk could ever carry the equities. We know that is not true. We also know that children are being sterilized *now*; that an untold number of them will be permanently, irreparably harmed by the "care" they receive; and that States like Alabama can protect children from that fate by regulating medicine, just as they always have. This Court should reverse.

## ARGUMENT

### I.    The Due Process Clause Does Not Give Parents An Unbounded Right To Access Unapproved Medical Interventions For Their Children.

As explained in Defendants' opening brief (at 30-39), the district court erred when it found in the Due Process Clause a right for parents to give their children sterilizing transitioning treatments determined to be unsafe by the State. Rather than "first crafting a careful description of the asserted right" that is "narrowly frame[d]" to the "specific facts" of the case, *Doe v. Moore*, 410 F.3d 1337, 1343-44 (11th Cir. 2005) (cleaned up), the court broadly framed the right as one of parents "to direct the medical care of their children," and from there reasoned that "[t]his right includes the more specific right to treat their children with transitioning medications subject to medically accepted standards." DE112-1:21.

This was legal error. First, the court did not ask, let alone answer, whether the Fourteenth Amendment protects an individual right for *anyone*, adult or child, to obtain transitioning interventions for themselves. Without an answer to that

7

antecedent question, the court could not help but err when determining whether a parent can claim that purported right on behalf of a child. *See Whalen v. Roe*, 429 U.S. 589, 604 (1977); *Doe By and Through Doe v. Public Health Trust of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983). Second, the court never analyzed whether the more carefully defined right it identified—the purported right of parents "to treat their children with transitioning medications subject to medically accepted standards"—is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Moore*, 410 F.3d at 1344. To ask the question is to answer it. Third, the court deferred to the wrong authority, finding that the Constitution forbids States from banning dangerous medical interventions if parents and "twenty-two major medical associations" prefer the treatments. DE112-1:19. It should have deferred to the Legislature.

Plaintiffs go all in defending the court's errors. They concede that their only argument concerns parental rights qua parental rights; they do not claim children have an "individual, personal right to obtain gender transition-related medical treatments," and they "do not assert any such derivative claim" by parents acting on a child's behalf. Pls' Resp. 31 (cleaned up). So, they jettison as irrelevant the caselaw on personal access to medical treatments—those cases did not involve "parental decisionmaking," *id.* at 35—and claim instead that *parents* can unlock access to drugs that no one else can obtain, *id.* at 32. Plaintiffs imply (but never explain) that the

8

only limitation to this power is that the treatments the parents pick must be "subject to medically accepted standards," *id.* at 6—meaning, apparently, that they carry the imprimatur of an undefined number of medical interest groups. Once that standard is met, Plaintiffs say, the parents' decision fits within their general right to obtain "medical care for a child [that] is woven deeply into the fabric of our nation's history" and thus becomes part of the "'private realm of family life which the state cannot enter.'" *Id.* at 36-37 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

This is a remarkable expansion of substantive due process. It is also profoundly wrong. First, it defines the relevant right far too broadly. *Cf. Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) ("The pertinent question" is "specifically" "whether a man has a fundamental right to procreate via an IVF process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate."). Plaintiffs' complaint (at 37) that they should not have to show a parental right "rooted in the nation's history and tradition" to obtain transitioning treatments for their children is foreclosed by precedent. *E.g.*, *Dobbs*, 142 S. Ct. at 2258 (purported substantive due process rights may not be defined "at a high level of generality"); *Morrissey*, 871 F.3d at 1269.

Second, while the Due Process Clause may protect the important role parents play in making certain "decisions concerning the care, custody, and control of their

children," *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 816 (11th Cir. 2004) (cleaned up), that protection at most affords parents the right to choose from the medical options available to their children. It does not mean parents may whip up a new buffet of choices. This is apparent from this Court's *Public Health Trust* decision, which Plaintiffs try mightily to distinguish. Pls' Resp. 33. There, a father voluntarily admitted his daughter to an adolescent psychiatric unit and agreed to the hospital's treatment rule barring parental communications. 696 F.2d at 902 (maj. op.), 905-06 (Hatchett, J., concurring). The father later claimed the rule violated his parental right to direct the medical care of his child. This Court disagreed, explaining that a "voluntary patient carries the key to the hospital's exit in her hand," and thus so did the father, whose "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself." 696 F.2d at 903. Because nothing "guarantee[d] voluntary patients the treatment of their choice," *id.*, the father could choose only from the options the State made available to his daughter—to enter the no-contact program or leave it. He had no right to order off menu.

The same reasoning applies here. Plaintiffs, like the father in *Public Health Trust*, demand not only the options available to their children (the entire range of health care, including counseling and psychotherapy, *except for* transitioning treatments), but additional options too: puberty blockers and cross-sex hormones for the purpose of transitioning. It is the same logic this Court rejected.

Plaintiffs try to evade *Public Health Trust* and similar cases by noting that (1) parents have a right to choose whether they send their children to public or private school, even though (2) "children do not have a fundamental constitutional right to a public education." Pls' Resp. 31-32 (discussing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925), and *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973)). "Similarly," Plaintiffs reason, "parents' fundamental right to seek medical care for their children exists irrespective of whether the child has an underlying right to that medical care." Pls' Resp. 32.

Not quite. *Pierce* holds that parents have the right to choose a suitable private school instead of public school. The Court held that forcing children from the particular plaintiff private schools into public schools "ha[d] no reasonable relation to some purpose within the competency of the state." 268 U.S. at 535; *see also id.* at 532-33 (noting that the schools provided "courses of study [that] conform to the requirements of the state board of education"). The Court did *not* hold that parents may force the State to offer public education in the first place, which is the corollary Plaintiffs need to show to establish that parents have a non-derivative right to public education for their children that their children themselves do not. Here, the question is whether a parent's purported "parental right" permits something (transitioning treatments) that *no one* has a right to obtain.

Because there is no deeply rooted parental right to obtain transitioning treatments for children, it makes no difference whether those treatments are "experimental." Pls' Resp. 31. But even on Plaintiffs' theory that such a right exists if the treatments are *not* experimental, the district court's holding was error. And contra Plaintiffs' suggestion (at 31), the district court's view that these treatments are not experimental is *not* a factual finding subject to clear error review. Instead, "the application of a constitutional standard to the facts of a particular case" is reviewed "*de novo*." *United States v. Bajakajian*, 524 U.S. 321, 337 n.10 (1998); *see U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 n.4 (2018) (collecting cases).

Thus, if Plaintiffs are right in their implication that the only limit to their parental power is that the medical procedures they unlock be "widely accepted," "well established," "evidence-based," and not "experimental," Pls' Resp. 31, 35, the application of this constitutional standard to transitioning treatments should be reviewed *de novo*. And though the district court accepted Plaintiffs' invocation of their 22 medical interest groups as sufficient to satisfy that standard, DE112-1:17, this Court should not. Evidence is still "necessary when the relevant professional organizations are united" because their "institutional positions cannot define the boundaries of constitutional rights." *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020); *id.* ("we cannot rely on professional organizations' judgments" to set the

constitutional standard). That is particularly true where, as here, the district court's conclusion rested almost exclusively on medical "guidelines" promulgated by an organization that the Department of Health and Human Services recognized as "an advocacy group (WPATH)." *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,198 (June 19, 2020).

The Court should instead examine for itself the "core constitutional facts that involve the reasons the [Legislature] took the challenged action." *Flanigan's Enters., Inc. v. Fulton Cnty.*, 596 F.3d 1265, 1276 (11th Cir. 2010). When it does, the answer will be clear: the risks of using sterilizing transitioning interventions to treat gender dysphoria in youth currently outweigh the possible benefits. *See* Ala. Code §26-26-2 (legislative findings); DE74:26-86; Opening Br.7-25, 41-44. There is nothing unconstitutional about that determination.

## II.    Prohibiting Transitioning Treatments For Minors Does Not Violate The Equal Protection Clause.

Plaintiffs and the United States also repeat the district court's errors when it comes to their Equal Protection claims. Both rely on the district court's conclusion that the Act "constitutes a sex-based classification" by "prohibit[ing] transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity." DE112-1:22; *see* Pls' Resp. 2, 56; U.S. Resp. 2, 19, 25. That conclusion is wrong. The Act is not a sex-based classification subject to

heightened scrutiny, and it prohibits doctors from administering transitioning treatments to *anyone*, regardless of sex or transgender status.

## A.    The Act Does Not Create a Sex-Based Classification Subject to Heightened Scrutiny.

Plaintiffs and the United States make two main arguments for why the Act is subject to heightened scrutiny even though it treats the sexes the same. The first relies on conflating the treatments the Act allows and disallows. The second is *Bostock*. Neither is persuasive.

### 1.    The Act Treats Transgender and Non-Transgender Minors the Same.

As Defendants explained in their opening brief (at 47-49), the Act treats transgender and non-transgender minors the same because no one—transgender or not—may access transitioning treatments. While the district court thought only transgender minors would seek the treatments, that would not matter even if true: all that matters is the undisputed fact that some transgender minors do *not* seek these treatments. *See* Opening Br.46-50 (discussing *Dobbs*, *Bray*, and *Geduldig*). Relatedly, a child who identifies as transgender could obtain treatment to address "a medically verifiable disorder of sex development," just like a child who does not identify as transgender. *See* Ala. Code §26-26-4(b). Thus, the Act is *not* "a classification based on an individual's gender nonconformity," *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011), but a classification based on the State's risk-benefit calculus.

14

The United States and Plaintiffs have no real response, merely noting that this law "involve[s] a facially sex-based classification" while the laws in *Dobbs* and *Geduldig* turned on pregnancy. Pls' Resp. 55. Putting aside that *Dobbs* too "involve[d] a facially sex-based classification," *see* Miss. Code Ann. §41-41-191(3)(f) ("the pregnant woman"), this is a distinction without a difference. Plaintiffs concede that pregnancy-related medical regulations implicate a status "that only one sex can" attain. Pls' Resp. 55. Thus, just as abortion regulations are not proxy regulations on all women, the Act is not a proxy regulation on all transgender youth. And *Dobbs* is binding precedent that contradicts Plaintiffs and the United States' refrain that any reference to sex "alone" mandates "heightened scrutiny." Pls' Resp. 52; *see* U.S. Resp. 36.

Further, the district court's supposition about non-transgender youth clearly is not true: both transgender and non-transgender minors have sought the treatments and will continue to do so because many, if not most, gender dysphoric youth will not identify as transgender as adults. DE69-2:17; DE69-18:17; DE69-19:11. The United States responds that, "[r]egardless of whether most transgender minors who seek the prohibited treatments will persist in their gender identity into adulthood, the fact remains that the minors seeking the banned treatments identify as transgender *when they pursue them*." U.S. Resp. 34 (emphasis added). This argument is impossible to square with the federal government's assertion (at 31) that "transgender

status is immutable," and conflicts with Plaintiffs' no-true-Scotsman claim that anyone whose gender dysphoria naturally resolved after entering puberty had merely been "misdiagnose[d]" and was never "truly" transgender, Tr.31, 368. That inconsistency is understandable given that the term "transgender" can "mean so many different things" (as Alice complained to Humpty Dumpty). According to Plaintiffs' preferred medical interest groups, "transgender" covers everyone from the "genderqueer" and "pangender" to the "genderless," "third gender," and "genderfluid." *See* DE69-19:7; DE69-26:31; DE69-18:103. If a child can hop in and out of the category based on her "fluid" identity, it makes no sense to use the category for Equal Protection purposes.

Plaintiffs and the United States next argue that the Act discriminates because it prohibits certain treatments for transgender minors, "while leaving the same medical treatments available to other minors." U.S. Resp. 2; *see* Pls' Resp. 55. But this quite obviously conflates the *drugs* at issue with the *treatment* involved. *See* Opening Br.5-6, 28-29, 52-53 (implanting a fertilized egg in a male is *not* the same treatment as implanting it in a female). Plaintiffs' expert Dr. Ladinsky had it right when she recognized that giving testosterone to a boy for bodybuilding is a "different treatment altogether" from giving testosterone to a boy suffering from a testosterone deficiency. Tr.144. This is also why the FDA differentiates between "approved treatments" for drugs and "off-label" use. Off-label use may be appropriate in some

16

circumstances, but it remains true, for instance, that using hydroxychloroquine to treat COVID (an off-label use the FDA discourages) is a different treatment from using it to treat malaria (which the FDA approves).[3] Such is the case here. *See* Opening Br.34-35.

### 2. *Bostock* Does Not Control.

Plaintiffs, the United States, and the district court all heavily rely on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which they interpret as requiring heightened scrutiny in this case. As explained in Defendants' opening brief (at 51-55), that is not so.

In *Bostock*, the Supreme Court held that an employer that "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" discriminates based on sex under Title VII. 140 S. Ct. at 1740-41. At the core of the Court's reasoning was a "simple test": "if changing the employee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex." *Id.* at 1741. Applied here, the United States argues that "if an adolescent who was assigned female at birth seeks to obtain testosterone therapy to affirm his gender identity as a boy,

---

[3] *See* FDA, *FDA cautions against use of hydroxychloroquine or chloroquine for COVID-19* (Jul. 1, 2020), https://www.fda.gov/drugs/drug-safety-and-availability/fda-cautions-against-use-hydroxychloroquine-or-chloroquine-covid-19-outside-hospital-setting-or.

SB184 bans it," "[b]ut change the minor's sex assigned at birth to male, and SB184 does not." U.S. Resp. 27. If this is right, this would be a drastic extension of *Bostock* that would subject the regulation of any medical procedure that depends on sex to heightened scrutiny. To take but one example from the preliminary injunction hearing, "[i]f an adolescent who was assigned female at birth seeks to obtain [a testicular exam]," Plaintiff Dr. Koe would not provide one, "but change the minor's sex assigned at birth to male," and she would. Tr.187. According to the United States, such a distinction by the State must be subject to heightened scrutiny.

Fortunately, this is not right. At a fundamental level, the United States' argument fails because it does not recognize that—unlike generally in the employment context—men and women are not medically interchangeable. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring"). It also ignores the text of the Act. The Act forbids (as relevant) "[p]rescribing or administering" (1) "puberty blocking medication to stop or delay normal puberty," (2) "supraphysiologic doses of testosterone … to females," and (3) "supraphysiologic doses of estrogen to males" for the purpose of transitioning. Ala. Code §26-26-4(a)(1)-(3).

The provision concerning puberty blockers makes no sex-based classification. To plug it into *Bostock*'s "simple test," changing the child's sex changes nothing.

18

As for the provisions concerning cross-sex hormones, here sex is important. But it is important because only one sex can undergo the procedure—just like testicular exams or abortions. Only males can be prescribed estrogen *to transition*, and only females can be prescribed testosterone *to transition*. Rational-basis review thus applies: "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2246 (alteration in original) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).

The Eighth Circuit recently ignored the Supreme Court's reaffirmation of this principle and instead applied heightened scrutiny to Arkansas's similar statute in *Brandt v. Rutledge*, No. 21-2875, slip op. at 7-8 (8th Cir. Aug. 25, 2022), which Plaintiffs and the United States invoke in their notices of supplemental authority. That court also made the "same treatments" conflation that Plaintiffs and the United States repeat here. Given those blatant deficiencies, this Court should have no hesitation in following the Supreme Court, not the Eighth Circuit, in holding that the Act is not subject to heightened scrutiny. And the Act prohibits doctors from prescribing cross-sex hormones to *anyone*—boy or girl, transgender or not—so there is no "invidious discrimination against members of one sex or the other." The district court erred by applying heightened scrutiny.

19

**B.    Transgender People Are Not a Quasi-Protected Class Under the Equal Protection Clause.**

Falling back, the United States contends that the Act "triggers heightened scrutiny because transgender persons constitute at least a quasi-suspect class." U.S. Resp. 28. The district court did not credit this claim, and neither should this Court. Nearly 40 years ago, the Supreme Court held that "mental retardation," though often spurring discrimination, was not a "quasi-suspect classification calling for a more exacting standard of judicial review." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985). The Court so held despite robust evidence that mentally handi-capped individuals had been "subjected to … grotesque mistreatment," including exclusion from public schools and compulsory sterilization. *Cleburne Living Ctr. v. Cleburne*, 726 F.2d 191, 197 (5th Cir. 1984), *aff'd in part, vacated in part sub nom. Cleburne*, 473 U.S. 432.

In contrast, here the United States urges this Court to identify a new suspect classification based on two surveys it did not submit into evidence and barely dis-cussed in a footnote in its preliminary injunction motion. U.S. Resp. 30. That is in-sufficient "proof … to support their allegations." *Rodriguez*, 411 U.S. at 26.

Nor is transgender status "an immutable characteristic." *Frontiero v. Richard-son*, 411 U.S. 677, 686 (1973). The recent explosion in individuals who identify as transgender makes this clear. *See* Opening Br.12-14; DE69-6:29. So does the fact that many "minors seeking the banned treatments identify as transgender when they

pursue them," U.S. Resp. 34, and later de-identify. Then there is the problem of defining a class that includes people who "experience their gender identity as fluid," DE69-25:5—meaning, presumably, individuals who at times identify with their biological sex and at times do not.

Last, the assertion (at 31) that transgender individuals lack "meaningful political power" does not square with reality. "[S]ome degree of prejudice from at least part of the public at large" is not enough. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001). The question is whether transgender individuals are "politically powerless in the sense that they have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at 445. That clearly is not the case—as is evident by the Department of Justice's presence here and the passage of the "Equality Act" in the House of Representatives last year, among other things.[4] The proposition that transgender Americans today are further from "full equality" than "the mentally retarded" were in 1985—a group that suffered "eugenic marriage and sterilization laws" and whose treatment "paralleled[] the worst excesses of Jim Crow"—is self-refuting. *Cleburne*, 473 U.S. at 461-64 (Marshall, J., concurring in the judgment in part and dissenting in part).

---

[4] Daniella Diaz & Annie Grayer, *House passes Equality Act aimed at ending discrimination based on sexual orientation and gender identity*, CNN (March 16, 2021), https://www.cnn.com/2021/02/25/politics/equality-act-passes-house/index.html.

## III.     The Act Survives Any Level Of Scrutiny.

In all events, as explained in prior briefing, *see* Opening Br.39-45, DE74:109-20, the Act survives any level of scrutiny. Plaintiffs and the United States fail at their attempts to show otherwise.

For instance, both the United States (at 47) and Plaintiffs (at 46) resist the conclusion arrived at by every major study and medical organization that gender dysphoria will not persist into adulthood for most minors afflicted by it. *See* DE69-17:7; DE69-18:17; DE69-19:11; DE69-2:17. Plaintiffs say this statistic has "no applicability to transgender adolescents," and claim that Dr. Cantor concurs because he agreed that "'the majority of kids who continue to feel trans after puberty rarely cease.'" Pls' Resp. 46 (citing Tr.330). But the difference between "after puberty" (which Dr. Cantor was asked about) and "at the very beginning of puberty" (when Plaintiffs' experts recommend starting hormones, Tr.58, 227) is a critical one. At some point "after puberty"—at or near adulthood—some of the traditional cohort of children who suffer from gender dysphoria from a very young age will likely persist in a transgender identity. But that says nothing about the persistence rate when puberty is just beginning. As Dr. Cantor explained, a child dealing with gender dysphoria needs to go *through* puberty, not merely arrive at its doorstop, to determine whether the dysphoria is likely to continue. Tr.294-96.

Notably, Plaintiffs' experts could not cite *any* study showing that desistance becomes unlikely at the beginning of puberty, or at any other time until "after" puberty concludes. Tr.228-29, 67. Nor could they point to one supporting their claim that doctors can identify the children whose gender dysphoria will *not* desist; the most Dr. Hawkins could offer was her hope that "soon we will have one from us." Tr.69.

As for the new cohort of adolescents, primarily girls, who first experience gender dysphoria *after* puberty begins, Dr. Cantor explained that "[t]here has never been any such study" looking at their rates of persistence. Tr.298-99. Plaintiffs now push back on the idea that there even *is* a "new and rapidly growing group of adolescents" presenting with gender dysphoria, claiming that "[t]he source of Defendants' claim is a single, highly controversial study." Pls' Resp. 47. That's not true. As Defendants explained below, DE74:40, the study in question theorizes about *why* "clinicians have reported [seeing more] post-puberty presentations of gender dysphoria in natal females that appear to be rapid in onset." DE69-20:1. But the underlying phenomenon that there *are* drastically more adolescent girls presenting with (and receiving transitioning treatments for) gender dysphoria is one that has been felt the world over. DE69-7:18-31. In the UK, the number of adolescent girls seeking sex transitioning grew over 4,000% in the last decade. *Id.* at 18. Sweden reported a 1,500% increase in the same period. *Id.*

23

Then there are the harms transitioning treatments bring. The United States claims (at 9) that "[p]uberty blockers do not cause any long-term loss of sexual function or fertility." That may generally be true when puberty blockers are used to treat precocious puberty, but it is emphatically *not* true when they are used to treat gender dysphoria and followed by cross-sex hormones—which is, as Dr. Ladinsky testified, usually the case, Tr.129; *see also* DE69-3:16. According to the Endocrine Society and Plaintiffs' experts, puberty blockers should be administered when "girls and boys first exhibit physical changes of puberty." DE69-19:12; Tr.58, 105, 227. That is before fertility. DE69-19:11; DE69-3:14. Thus, as Defendants' expert endocrinologist Dr. Laidlaw explained, if children taking puberty blockers "remain blocked in an early pubertal stage," "the addition of opposite sex hormones will not allow for the development of fertility." DE69-3:14. Dr. Hruz, a pediatric endocrinologist, concurred: "It is generally accepted … that hormonal treatment impairs fertility and often result[s] in sterility, which in many cases is irreversible." DE69-5:64. Plaintiffs claim (at 45) that cross-sex hormones are "mostly" reversible, but that "mostly" caveat does a lot of work. Just ask Sydney Wright, for whom hormones took her "right away to have children." Tr.351.

Plaintiffs and the United States reject Defendants' reliance on Wright's testimony and others like hers. *See generally* Amicus Br. of Detransitioners. According to the United States, "Wright's testimony that she regrets her testosterone treatments

24

has little, if any, relevance" because she "was not a minor when she received testosterone" (she was 19), "nor did she receive any treatment in Alabama" (she received them in Georgia). U.S. Resp. 40-41; *see* Pls' Resp. 20. But "it should go without saying that a State may take action to prevent" harm to children "without waiting for it to occur and be detected within its own borders." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021). Nor does it make sense to trust *children* to "assent" to these treatments while discounting harms those same treatments cause adults. And Plaintiffs' claim (at 61) that *not* providing these harmful treatments would be even worse is misleading in two important respects. First, the evidence simply does not support Plaintiffs' narrative of suicides that only transitioning treatments can stem. DE74:64-67; DE69-2:34-37. Second, psychotherapy and mental health counseling, which the State encourages, largely has the same track record as transitioning treatments in providing relief—without leaving the patient sterilized. Tr.257-59.

Last, Plaintiffs and the United States discount the growing international reckoning and urge this Court to trust their "22 major medical associations" over "a handful of other countries" like "the United Kingdom, Sweden, Finland, France, and New Zealand." U.S. Resp. 42. They imply that these countries are fully on board with the Dutch protocol—"puberty blockers at age 12 and [cross-sex] hormones at age 16," Pls' Resp. 20 (cleaned up)—and fault Alabama for prohibiting the

25

treatments because "no state or country in the entire world has enacted a blanket ban," *id.* (citation omitted).

These arguments could not be more deceptive. Restricting the administration of transitioning treatments in children to "exceptional cases" and future research settings, as Sweden has done, DE69-11:4, and emphasizing the need for "a great deal of caution" because "gender reassignment of minors is an experimental practice," as Finland recently noted, DE69-12:8, are not signs that these countries agree with Plaintiffs' approach. And in any event, that these countries have not banned the treatments does not impact Alabama's ability to respond to the same risk-benefit calculus: that the risks of these treatments "*currently outweigh the possible benefits*." DE69-11:3 (emphasis added). Plaintiffs and their amici have no response to that central conclusion, which confirms that the Act survives any level of scrutiny.

## IV.    The District Court Erred In Weighing The Equities And Crafting The Scope Of Relief.

Reversal is also warranted because the district court abused its discretion in weighing the equities and erred in crafting relief. For one, the court rewarded Plaintiffs' unclean hands in judge shopping (detailed at DE74:147-53), which at the least should have barred Plaintiffs and former plaintiff-turned-expert-witness Dr. Ladinsky from relief. Plaintiffs say not one word in their response brief denying they went judge shopping; their tack instead is to reason that they did so quickly and thus

(they imply) harmlessly: they were able to file their second "lawsuit only eleven days after the Act was signed." Pls' Resp. 63. That is hardly a sign of clean hands.

Plaintiffs are also wrong to suggest (at 64) that universal injunctions are "ordinarily" entered. In fact, such injunctions "are rare" because the "traditional scope of injunctive relief" is to "protect the interests *of the parties*." *Georgia v. President of the United States*, No. 21-14269, 2022 WL 3703822, at *13 (11th Cir. Aug. 26, 2022) (emphasis added). The United States, in turn, contends the universal injunction was proper because (1) the United States is present and (2) some of the individual plaintiffs are proceeding under pseudonyms. U.S. Resp. 56. But the United States points to no case suggesting that its presence in litigation mandates a universal injunction. Plus, it expressly told the district court when it sought to intervene that it was "seeking the same relief as the private plaintiffs." Tr.5. Nor could it do otherwise since it intervened under 42 U.S.C. §2000h-2, which permits the federal government to obtain only "the same relief as if it had instituted the action." Because there is no basis on which the United States could have brought this action itself, that leaves only the relief available to the private plaintiffs—who cannot force a universal injunction on States merely by proceeding pseudonymously. The district court thus impermissibly rewarded "gamesmanship" through "indiscriminate relief … issued by default." *Georgia*, 2022 WL 3703822, at *15.

27

Finally, the district court recognized that "[t]he risk of suffering severe medical harm constitutes irreparable harm." DE112-1:29. Despite this, it enjoined enforcement of Alabama's law that was enacted to halt medical harm to vulnerable children. *See* Ala. Code §26-26-2. That harm—permanent sterilization of children—is occurring now thanks to the injunction. This Court should reverse.

## CONCLUSION

The Court should reverse the district court's preliminary injunction.

Respectfully submitted,

Steve Marshall
  *Alabama Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*

Christopher Mills

SPERO LAW LLC
557 East Bay Street
#22251
Charleston, SC 29451
Telephone: (843) 606-0640
cmills@spero.law

A. Barrett Bowdre
Thomas A. Wilson
  *Deputy Solicitors General*

James W. Davis
  *Deputy Attorney General*

Benjamin M. Seiss
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for State Defendants*

AUGUST 31, 2022

28

**CERTIFICATE OF COMPLIANCE**

1.     I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(ii). This brief contains 6499 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.     In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I certify that on August 31, 2022, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for State Defendants*
