RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

L. W., by and through her parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; REBECCA ROE; SUSAN N. LACY, on behalf of herself and her patients; RYAN ROE, by and through his parent and next friend, Rebecca Roe,

           *Plaintiffs-Appellees*,

    *v.*

JONATHAN THOMAS SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, et al.,

           *Defendants-Appellants*,

UNITED STATES OF AMERICA,

           *Intervenor-Appellee*.

> No. 23-5600

On Emergency Motion for Stay of Preliminary Injunction Pending Appeal
United States District Court for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00376—Eli J. Richardson, District Judge.

Decided and Filed:  July 8, 2023

Before:  SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

———————————

## COUNSEL

**ON EMERGENCY MOTION FOR STAY OF PRELIMINARY INJUNCTION PENDING APPEAL and REPLY:**  Clark L. Hildabrand, Steven J. Griffin, Brooke A. Huppenthal, OFFICE OF THE TENNESSEE ATTORNEY GENERAL & REPORTER, Nashville, Tennessee, Adam K. Mortara, LAWFAIR LLC, Nashville, Tennessee, Cameron T. Norris,

Tiffany H. Bates, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellants.  **ON RESPONSE:** Joshua A. Block, Chase Strangio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Stella Yarbrough, Lucas Cameron-Vaughn, ACLU FOUNDATION OF TENNESSEE, Nashville, Tennessee, Sruti J. Swaminathan, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., New York, New York, Tara Borelli, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Decatur, Georgia, Christopher J. Gessner, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellees.  **ON AMICUS BRIEF:**  Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas, Edmund G. LaCour, Jr., A. Barrett Bowdre, OFFICE OF THE ALABAMA ATTORNEY GENERAL, Montgomery, Alabama, for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which THAPAR, J., joined. WHITE, J. (pp. 16–17), delivered a separate opinion concurring in part and dissenting in part.

––––––––––––––––––

## OPINION

––––––––––––––––––

SUTTON, Chief Judge.  Tennessee enacted a law that prohibits healthcare providers from performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors.  After determining that the law likely violated the Equal Protection and Due Process Clauses, the district court facially enjoined the law's enforcement as to hormones and puberty blockers and applied the injunction to all people in the State.  Tennessee appealed and moved for an emergency stay of the district court's order.  Because Tennessee is likely to succeed on its appeal of the preliminary injunction, we grant the stay.

I.

In March 2023, Tennessee enacted the Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity.  Tenn. Code Ann. § 68-33-101.  It was scheduled to go into effect on July 1, 2023.  Seeking to "protect[] minors from physical and emotional harm," *id.* § 68-33-101(m), the legislature identified several concerns about recent treatments being offered by the medical profession for children with gender dysphoria.  It was concerned that some treatments for gender dysphoria "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering adverse and sometimes fatal psychological consequences."  *Id.* § 68-33-101(b).  It was concerned that the long-term costs of these treatments remain unknown and outweigh any near-term benefits because they are "experimental

in nature and not supported by high-quality, long-term medical studies." *Id.* And it noted that other helpful, less risky, and non-irreversible treatments remain available. *Id.* § 68-33-101(c).

These findings convinced the legislature to ban certain medical treatments for minors with gender dysphoria. A healthcare provider may not "administer or offer to administer" "a medical procedure" to a minor "for the purpose of" either "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." *Id.* § 68-33-103(a)(1). Prohibited medical procedures include "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs" and "[p]rescribing, administering, or dispensing any puberty blocker or hormone." *Id.* § 68-33-102(5).

The Act contains two relevant exceptions. It permits the use of these medical procedures to treat congenital defects, precocious puberty, disease, or physical injury. *Id.* § 68-33-103(b)(1)(A). And it has a "continuing care" exception until March 31, 2024, which permits healthcare providers to continue administering a long-term treatment, say hormone therapy, that began before the Act's effective date. *Id.* § 68-33-103(b)(1)(B).

The Act authorizes the Tennessee Attorney General to enforce these prohibitions. *Id.* § 68-33-106(b). It permits the relevant state regulatory authorities to impose "professional discipline" on healthcare providers that violate the Act. R.1 ¶ 56; Tenn. Code Ann. § 68-33-107. And it creates a private right of action, enabling an injured minor or nonconsenting parent to sue a healthcare provider for violating the law. Tenn. Code Ann. § 68-33-105(a)(1)–(2).

Three transgender minors, their parents, and a doctor sued several state officials, claiming the Act violated the United States Constitution's guarantees of due process and equal protection. The plaintiffs challenged the Act's prohibitions on hormone therapy and its surgery prohibitions, but they did not challenge its private right of action. They moved for a preliminary injunction to prevent those features of the Act from going into effect on July 1, 2023.

On June 28, the district court granted the motion in part. It concluded that the challengers lacked standing to contest the ban on surgeries but could challenge the ban on hormones and puberty blockers. As to due process, the court found that the Act infringes the parents'

"fundamental right to direct the medical care of their children."  R.167 at 14.  As to equal protection, the court reasoned (1) that the Act improperly discriminates on the basis of sex and (2) that transgender persons constitute a quasi-suspect class and that the State could not satisfy the necessary justifications that come with this designation.  The district court concluded that the Act was facially unconstitutional (with the exception of the surgery and private enforcement provisions), and it issued a statewide injunction against its enforcement.  Tennessee appealed.  It unsuccessfully sought a stay in the district court and moves for a stay here.

II.

A request for a stay pending appeal prompts four questions:  "Is the applicant likely to succeed on the merits?  Will the applicant be irreparably injured absent a stay?  Will a stay injure the other parties?  Does the public interest favor a stay?"  *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020).  As is often the case in a constitutional challenge, the likelihood-of-success inquiry is the first among equals.  *Id.* at 416.  In this instance, it is largely dispositive.  While we assess "the district court's ultimate decision whether to grant a preliminary injunction for abuse of discretion," we assess "its legal determination, including the likelihood of success on the merits, with fresh eyes."  *Arizona v. Biden*, 40 F.4th 375, 381 (2022) (quotation omitted).

There are two merits-related problems with the district court's order.  One relates to its scope.  The other relates to its assessment of plaintiffs' chances in challenging the Act on due process and equal protection grounds.

A.

*Scope.*  The district court rested its preliminary injunction on a facial invalidation of the Act, as opposed to an as-applied invalidation of the Act, and it assumed authority to issue a statewide injunction.  We doubt each premise.

The challengers claim that Tennessee's law facially violates the Constitution.  But litigants raising "a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'"  *United States v. Hansen*, 2023 WL 4138994, at *5 (U.S. June 23, 2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745

(1987)).  That's a "strict standard" that we have no authority to "dilute[]."  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 (2022).  The district court questioned whether the test applied and declined to engage with Tennessee's arguments that it could lawfully apply the Act in some settings.  But it is not for lower-court judges to depart from *Salerno*, meaning that plaintiffs must show no set of valid applications of a law before we may declare it invalid in all of its applications.  *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (noting that the Supreme Court alone exercises "the prerogative of overruling" its decisions).  Consistent with the point, we have many cases adhering to the *Salerno* test.  *See, e.g.*, *Oklahoma v. United States*, 62 F.4th 221, 231 (6th Cir. 2023); *United States v. Fields*, 53 F.4th 1027, 1038 (6th Cir. 2022); *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 826 (6th Cir. 2012); *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (en banc); *Aronson v. City of Akron*, 116 F.3d 804, 809 (6th Cir. 1997).

Turn to the nature of the injunction.  District courts "should not issue relief that extends further than necessary to remedy the plaintiff's injury."  *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  The court's injunction prohibits Tennessee from enforcing the law against the nine challengers in this case *and* against the other seven million residents of the Volunteer State.  But absent a properly certified class action, why would nine residents represent seven million?  Does the nature of the federal judicial power or for that matter Article III permit such sweeping relief?  A "rising chorus" suggests not.  *Doster v. Kendall*, 54 F.4th 398, 439 (6th Cir. 2022); *see, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas, J., concurring); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring); *see also* Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 457–82 (2017).

Article III confines the "judicial power" to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  Federal courts may not issue advisory opinions or address statutes "in the abstract."  *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quotation omitted).  They instead must operate in a party-specific and injury-focused manner.  *Id.*; *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power.

No. 23-5600 *L. W., et al. v. Skrmetti, et al.* Page 6

Even if courts may in some instances wield such power, the district court likely abused its discretion by deploying it here. *See, e.g.*, *Biden*, 57 F.4th at 557; *see also United States v. Texas*, 2023 WL 4139000, at *17 (U.S. June 23, 2023) (Gorsuch, J., concurring) (considering the systemic harms of overbroad injunctions as part of the abuse-of-discretion review). In particular, it did not offer any meaningful reason for granting such relief, creating considerable doubt about the survival of this overriding feature of the decision on appeal.

B.

The challengers also are unlikely to prevail on their due process and equal protection claims. Start with several considerations that apply to both claims. *First,* the challengers do not argue that the original fixed meaning of either the due process or equal protection guarantee covers these claims. That prompts the question whether the people of this country ever agreed to remove debates of this sort—about the use of new drug treatments on minors—from the conventional place for dealing with new norms, new drugs, and new technologies: the democratic process. Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable federal constitution to occupy the field.

*Second,* while the challengers do invoke constitutional precedents of the Supreme Court and our Court in bringing this lawsuit, not one of them resolves these claims. In each instance, they seek to extend the constitutional guarantees to new territory. There is nothing wrong with that, to be sure. But it does suggest that the key premise of a preliminary injunction—likelihood of success on the merits—is missing. The burden of establishing an imperative for constitutionalizing new areas of American life is not—and should not be—a light one, particularly when "the States are currently engaged in serious, thoughtful" debates about the issue. *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

*Third,* the States are indeed engaged on these issues, as the recent proliferation of legislative activity across the country shows. *Compare* Ga. Code Ann. § 31-7-35 (banning gender-affirming treatments for minors) *and* Idaho Code § 18-1506C (similar), *with* Cal. Penal Code § 819 (prohibiting cooperation with other states as to gender-affirming care provided to

out-of-state minors in California), Colo. Rev. Stat. § 12-30-121(1)(d) (designating gender-affirming care as "legally protected health-care activity"), *and* Minn. Stat. § 260.925 (refusing to enforce out-of-state laws that would limit a parent's custody rights for consenting to gender-affirming care). *See also* Ala. Code § 16-1-52 (restricting sports participation by transgender students); Wyo. Stat. Ann. § 21-25-102 (similar); Mont. Code Ann. § 40-6-7X1(1)(f) (requiring parental consent for changes in a child's pronouns). Leaving the preliminary injunction in place starts to grind these all-over-the-map gears to a halt. *Glucksberg*, 521 U.S. at 720. Given the high stakes of these nascent policy deliberations—the long-term health of children facing gender dysphoria—sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches. To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side of the debate under the U.S. Constitution does not further these goals.

That many members of the medical community support the plaintiffs is surely relevant. But it is not dispositive for the same reason we would not defer to a consensus among economists about the proper incentives for interpreting the impairment-of-contracts or takings clauses of the U.S. Constitution. At all events, the medical and regulatory authorities are not of one mind about using hormone therapy to treat gender dysphoria. Else, the FDA would by now have approved the use of these drugs for these purposes. That has not happened, however, giving us considerable pause about constitutionalizing an answer they have not given or, best we can tell, even finally studied.

*Due process.* The challengers argue that the Act violates their due process right to control the medical care of their children. "No State," the Fourteenth Amendment says, shall "deprive any person of life, liberty, or property, without due process of law." The provision over time has come to secure more than just procedural rights. It also includes substantive protections "against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720. Courts identify such rights by looking for norms that are "fundamental" or are "deeply rooted in this Nation's history and tradition." *Id.* at 720–21 (quotation omitted); *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019) (same). Experience has shown that substantive due process is "a treacherous field." *Moore v. City of E. Cleveland*, 431 U.S.

494, 502 (1977). Increasingly appreciative of that danger, the federal courts have become ever more "reluctant to expand the concept of substantive due process" to new areas. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

Parents, it is true, have a substantive due process right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). But the Supreme Court cases recognizing this right confine it to narrow fields, such as education, *Meyer v. Nebraska*, 262 U.S. 390 (1923), and visitation rights, *Troxel*, 530 U.S. 57. No Supreme Court case extends it to a general right to receive new medical or experimental drug treatments. In view of the high stakes of constitutionalizing areas of public policy, any such right must be defined with care. *Glucksberg*, 521 U.S. at 721 (requiring "a 'careful description' of the asserted fundamental liberty interest" (quotation omitted)). The challengers have not shown that a right to new medical treatments is "deeply rooted in our history and traditions" and thus beyond the democratic process to regulate. *Id.* at 727.

Constitutionalizing new parental rights in the context of new medical treatments is no mean task. On the one side of the ledger, parents generally can be expected to know what is best for their children. On the other side of the ledger, state governments have an abiding interest in "preserving the welfare of children," *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019); *Dobbs*, 142 S. Ct. at 2284, and "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731. These interests give States broad power, even broad power to "limit[] parental freedom," *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944); *see Parham v. J. R.*, 442 U.S. 584, 606 (1979), particularly in an area of new medical treatment. We doubt, for example, that there are many drug-regulatory agencies in the world that, without satisfactory long-term testing, would delegate to parents and a doctor exclusive authority to decide whether to permit a potentially irreversible new drug treatment.

More generally, state legislatures play a critical role in regulating health and welfare, and their efforts are usually "entitled to a 'strong presumption of validity.'" *Dobbs*, 142 S. Ct. at 2284 (quotation omitted); *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006). As a result, federal courts must be vigilant not to "substitute" their views for those of

legislatures, *Dobbs*, 142 S. Ct. at 2284, a caution that is particularly apt when construing unenumerated guarantees, *see Collins*, 503 U.S. at 125.

Judicial deference is especially appropriate where "medical and scientific uncertainty" exists. *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *see also Marshall v. United States*, 414 U.S. 417, 427 (1974); *Collins v. Texas*, 223 U.S. 288, 297–98 (1912). In this respect, consider the work of the Food and Drug Administration. Under a highly reticulated process that requires considerable long-range testing, the FDA determines when new drugs are safe for public use, including use by minors, and when new drugs are safe for certain purposes but not others. In making these decisions and in occasionally frustrating those who would like to have access to new drugs sooner, the Constitution rarely has a say over the FDA's work. There is no constitutional right to use a new drug that the FDA has determined is unsafe or ineffective. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703 (D.C. Cir. 2007). And that is true even if the FDA bars access to an experimental drug that a doctor believes might save a terminally ill patient's life. Invoking our nation's long history of regulating drugs and medical treatments, the D.C. Circuit correctly held that the Constitution does not take over this field. *Id.* at 711; *see also id.* at 710 & n.18 (collecting similar cases).

Today's case has many parallels to that one. Gender-affirming procedures often employ FDA-approved drugs for non-approved, "off label" uses. Tennessee decided that such off-label use in this area presents unacceptable dangers. Tenn. Code Ann. § 68-33-101(b), (e), (g). Many medical professionals and many medical organizations may disagree. But the Constitution does not require Tennessee to view these treatments the same way as the majority of experts or to allow drugs for all uses simply because the FDA has approved them for some. *Cf. Taft*, 444 F.3d at 505 (explaining off-label use is legal "[a]bsent state regulation"); *Gonzales v. Raich*, 545 U.S. 1, 27–28 (2005) (explaining that Congress may prohibit marijuana use even when doctors approve its use for medical purposes). It is well within a State's police power to ban off-label uses of certain drugs. At the same time, it is difficult to maintain that the medical community is of one mind about the use of hormone therapy for gender dysphoria when the FDA is not prepared to put its credibility and careful testing protocols behind the use.

*Kanuszewski v. Michigan Department of Health and Human Services* does not alter this conclusion. 927 F.3d 396. A Michigan health program collected blood samples from newborns and stored the samples for future use. *Id.* at 403–04. This compulsory storage program, we held, violated nonconsenting parents' rights "to make decisions concerning the medical care of their children." *Id.* at 418. This case differs from that one in at least two material ways. Unlike the Michigan program, the Tennessee Act rests on the legislative judgment that it will protect "the health of the child." *Id.* at 421; *see* Tenn. Code Ann. § 68-33-101(a), (b); *Parham*, 442 U.S. at 603 (noting that States retain authority, notwithstanding parental rights, to protect children's health). And the Michigan program *compelled* medical care, while the Tennessee Act law *prohibits* certain medical care. Although individuals sometimes have a constitutional right to refuse treatment, the Supreme Court has not handled affirmative requests for treatment in the same way. *See Glucksberg*, 521 U.S. at 725–26. Most circuits have drawn the same line, "reject[ing] arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government." *Eschenbach*, 495 F.3d at 710 & n.18 (collecting cases).

*Glucksberg* illuminates the point. 521 U.S. 702. Harold Glucksberg claimed that Washington State's ban on physician-assisted suicide violated his patients' due process rights. *Id.* at 708. The Court held that the Constitution did not bestow an affirmative right to physician assistance in committing suicide. *Id.* at 725–26. The State could prohibit individuals from receiving care they wanted and their physicians wished to provide, all despite the "personal and profound" liberty interests at stake. *Id.* at 725. As in that case, so in this one, indeed more so in this one. There's little reason to think that a parent's right to make decisions for a child sweeps more broadly than an adult's right to make decisions for herself. *Cf. Whalen v. Roe*, 429 U.S. 589, 604 (1977); *Prince*, 321 U.S. at 166. All told, the plaintiffs' efforts to expand our substantive due process precedents to this new area are unlikely to succeed.

*Equal protection.* "No state," the Fourteenth Amendment says, "shall . . . deny to any person within its jurisdiction the equal protection of the laws." Statutory classifications are ordinarily valid if they are rationally related to and further a legitimate state interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 55 (1973). More exacting scrutiny applies

when a law implicates protected classes. *See Reed v. Reed*, 404 U.S. 71, 76 (1971); *United States v. Virginia*, 518 U.S. 515, 533 (1996).

It's highly unlikely, as an initial matter, that the plaintiffs could show that the Act lacks a rational basis. The State plainly has authority, in truth a responsibility, to look after the health and safety of its children. In this area of unfolding medical and policy debate, a State has more rather than fewer options. Tennessee could rationally take the side of caution before permitting irreversible medical treatments of its children.

The challengers pin their main claims for likelihood of success on the assumption that heightened scrutiny applies. They first argue that the Tennessee Act discriminates on the basis of sex and thus requires the State to satisfy intermediate scrutiny. We are skeptical.

The Act bans gender-affirming care for minors of both sexes. The ban thus applies to all minors, regardless of their biological birth with male or female sex organs. That prohibition does not prefer one sex to the detriment of the other. *See Reed*, 404 U.S. at 76. The Act mentions the word "sex," true. But how could it not? That is the point of the existing hormone treatments—to help a minor transition from one gender to another. That also explains why it bans procedures that administer cross-sex hormones but not those that administer naturally occurring hormones. Tenn. Code Ann. § 68-33-103(b)(1)(A). A cisgender girl cannot transition through use of estrogen; only testosterone will do that. A cisgender boy cannot transition through use of testosterone; only estrogen will do that. The reality that the drugs' effects correspond to sex in these understandable ways and that Tennessee regulates them does not require skeptical scrutiny. *Dobbs*, 142 S. Ct. at 2245–46; *see Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *see also Reed*, 404 U.S. at 76. "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against the members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20). No such pretext has been shown here. If a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs*, a law equally appliable to all minors, no matter their sex at birth, does not require such scrutiny either.

The plaintiffs separately claim that the Act amounts to transgender-based discrimination, violating the rights of a quasi-suspect class. But neither the Supreme Court nor this court has recognized transgender status as a quasi-suspect class. Until that changes, rational basis review applies to transgender-based classifications. In the context of a preliminary injunction and the need to establish a likelihood of success on the merits, that should be nearly dispositive given the requirement of showing a "clear" right to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted); *see Winter v. NRDC*, 555 U.S. 7, 22 (2008); *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021).

The bar for recognizing a new quasi-suspect class, moreover, is a high one. The Supreme Court has recognized just two such classes, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) (gender and illegitimacy), and none in recent years. The Court "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015); *Cleburne*, 473 U.S. at 442 (holding that mental disability is not a quasi-suspect class); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam) (holding that age is not a quasi-suspect class); *see Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay individuals qualify as a suspect class).

That hesitancy makes sense here. Gender identity and gender dysphoria pose vexing line-drawing dilemmas for legislatures. Plenty of challenges spring to mind. Surgical changes versus hormone treatment. Drugs versus counseling. One drug versus another. One age cutoff for minors versus another. Still more complex, what about sports, access to bathrooms, definitions of disability? And will we constitutionalize the FDA approval rules in the process? Even when accompanied by judicial tiers of scrutiny, the U.S. Constitution does not offer a principled way to judge each of these lines—and still others to boot. All that would happen is that we would remove these trying policy choices from fifty state legislatures to one Supreme Court. Instead of the vigorous, sometimes frustrating, "arena of public debate and legislative action" across the country and instead of other options provided by fifty governors and fifty state courts, we would look to one judiciary to sort it all out. *Glucksberg*, 521 U.S. at 720. That is not

how a constitutional democracy is supposed to work—or at least works best—when confronting evolving social norms and innovative medical options.

*Bostock v. Clayton County* does not change the analysis. 140 S. Ct. 1731 (2020). Title VII's prohibition on employment discrimination "because of . . . sex" encompasses discrimination against persons who are gay or transgender, the Court concluded. *Id.* at 1743; 42 U.S.C. § 2000e-2(a)(1). But that reasoning applies only to Title VII, as *Bostock* itself and our subsequent cases make clear. *Bostock*, 140 S. Ct. at 1753; *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (refusing to apply *Bostock* to the Age Discrimination in Employment Act); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX); *see also Students for Fair Admissions v. Harvard Coll.*, 2023 WL 4239254, at *59–60 (U.S. June 29, 2023) (Gorsuch, J., concurring) (explaining that Title VI differs from the Equal Protection Clause).

*Smith v. City of Salem* does not move the needle either. 378 F.3d 566 (6th Cir. 2004). It was an employment case, it involved an adult, and it concerned "sex stereotyping," not whether someone's body is male or female. *Id.* at 574–75. In that setting, it held that a transgender employee fired for dressing as a woman established a cognizable equal protection claim. *See id.* at 573, 577 (resting the holding on "[t]he facts Smith has alleged"). It did not hold that every claim of transgender discrimination requires heightened scrutiny, least of all in the fraught context of whether a State may limit irreversible medical treatments to minors facing gender dysphoria. And *Dobbs* prevents us from extending *Smith* that far, as it held that medical treatments that affect only one sex receive rational-basis review. *Dobbs*, 142 S. Ct. at 2245–46; *see Geduldig*, 417 U.S. at 496 n.20.

We recognize that other courts and judges have taken different approaches to these issues. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (differential treatment of transgender person triggers intermediate scrutiny); *id.* at 627–28 (Niemeyer, J., dissenting); *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022) (ban on gender-transition procedures constituted sex-based discrimination); *Brandt ex rel. Brandt v. Rutledge*, 2022 WL 16957734, at *1 & n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissental); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801, 803 n.5 (11th

Cir. 2022) (sex-based bathroom policy did not violate equal protection); *id.* at 823 (Wilson, J., dissenting).

We recognize, too, that several district courts have addressed similar laws in other States and assessed those laws in much the same way as the district court did in this case.  *See Brandt v. Rutledge*, 2023 WL 4073727 (E.D. Ark. June 20, 2023); *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 2023 WL 4054086 (S.D. Ind. June 16, 2023); *Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022).   And our thoughtful colleague has reached a similar conclusion. We appreciate their perspectives, and they give us pause.  But they do not eliminate our doubts about the ultimate strength of the challengers' claims for the reasons just given.

All told, the challengers lack a "clear showing" that they will succeed on the merits, *Mazurek*, 520 U.S. at 972 (emphasis omitted), and that is particularly so in view of the burdensome nature of a facial attack and the fraught task of justifying statewide relief.

## III.

The other stay factors largely favor the State as well.  If the injunction remains in place during the appeal, Tennessee will suffer irreparable harm from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children.   As for harm to others, the Act's continuing care exception permits the challengers to continue their existing treatments until March 31, 2024. That feature of the law lessens the harm to those minors who wish to continue receiving treatment.  But we appreciate that it does not answer the concerns of those who might wish to continue treatment after that date or to those minors who might seek treatment for the first time in the future.  That creates an irreversible problem of its own, one that lies at the crux of the case. Both sides have the same fear, just in opposite directions—one saying the procedures create health risks that cannot be undone, the other saying the absence of such procedures creates risks that cannot be undone.  What makes it bearable to choose between the two sides is the realization that not every choice is for judges to make.  In this instance, elected representatives made these precise cost-benefit decisions and did not trigger any reasons for skeptical review in doing so.

As for the public interest, Tennessee's interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture.

***

These initial views, we must acknowledge, are just that: initial. We may be wrong. It may be that the one week we have had to resolve this motion does not suffice to see our own mistakes. In an effort to mitigate any potential harm from that possibility, we will expedite the appeal of the preliminary injunction, with the goal of resolving it no later than September 30, 2023. In the interim, the district court's preliminary injunction is stayed.

No. 23-5600                     *L. W., et al. v. Skrmetti, et al.*                     Page 16

---

### CONCURRING IN PART AND DISSENTING IN PART

---

WHITE, Circuit Judge, concurring in part and dissenting in part.

Because I believe that Tennessee's law is likely unconstitutional based on Plaintiffs' theory of sex discrimination, I would not stay the district court's injunction, although I would narrow its scope. I do not find it necessary to address Plaintiffs' alternative theories of constitutional injury at this time.

Tennessee's law likely discriminates against Plaintiffs on the basis of sex in violation of the Equal Protection Clause, thus triggering intermediate scrutiny. Although the state argues that the act "appl[ies] equally to males and females," Appellant's Br. 8-9, the law discriminates based on sex because "medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex," *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). To illustrate, under the law, a person identified male at birth could receive testosterone therapy to conform to a male identity, but a person identified female at birth could not.[1] *See* Tenn. Code Ann. § 68-33-103(a)(1). Indeed, until today, every federal court addressing similar laws reached the same conclusion as *Brandt*.[2]

In the Title VII context, the Supreme Court has made clear that sex discrimination occurs when an "employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020). That principle is directly on point here and highly persuasive.

---

[1]Defendants raise in their reply brief the argument that "[b]oth sexes use the same puberty blockers, so prohibiting them for gender dysphoria does not even consider sex." Reply Br. 3. But this does not solve the problem. Under Tennessee's law, someone identified male at birth could take puberty blockers consistent with a treatment plan that contemplates development consistent with a male identity, but someone identified female at birth could not. *See* Tenn. Code Ann. § 68-33-103(a)(1).

[2]*See Brandt*, 47 F.4th at 669; *Doe 1 v. Thornbury*, No. 3:23-CV-230-DJH, 2023 WL 4230481, at *3 (W.D. Ky. June 28, 2023); *Brandt v. Rutledge*, No. 4:21CV00450 JM, 2023 WL 4073727, at *31 (E.D. Ark. June 20, 2023); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, No. 123CV00595JPHKMB, 2023 WL 4054086, at *7 (S.D. Ind. June 16, 2023); *Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023); *see also Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. 2022).

*Cf. Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) (finding transgender plaintiff raised Title VII claim based on sex-stereotyping and concluding that the facts supporting the Title VII claim "easily constitute[d] a claim of sex discrimination grounded in the Equal Protection Clause"); *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("We review § 1983 discrimination claims brought under the Equal Protection Clause using the same test applied under Title VII.").

"Like racial classifications, sex-based discrimination is presumptively invalid." *Vitolo v. Guzman*, 999 F.3d 353, 364 (6th Cir. 2021). "Government policies that discriminate based on sex cannot stand unless the government provides an 'exceedingly persuasive justification,'" *id.* (quoting *United States v. Virginia*, 518 U.S. 515, 531 (1996)), which requires showing that the "classification serves 'important governmental objectives,' and . . . is 'substantially and directly related' to the government's objectives," *id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Applying this standard, I fail to see how the state can justify denying access to hormone therapies for treatment of minor Plaintiffs' gender dysphoria while permitting access to others, especially in light of the district court's robust factual findings on the benefits of these treatments for transgender youth.

However, I agree that the district court abused its discretion in granting a statewide preliminary injunction. As the majority observes, "District courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" Maj. Op. at 5 (quoting *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). I would uphold the stay as it applies to Plaintiffs and also Vanderbilt University Medical Center.

Lastly, I reiterate the majority's caveat that today's decision is preliminary only.

I CONCUR in part and DISSENT in part.