# No. 22-11707

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

PAUL A. EKNES-TUCKER, Rev., BRIANNA BOE, individually and on behalf of her minor son, Michael Boe, JAMES ZOE, individually and on behalf of his minor son, Zachary Zoe, MEGAN POE, individually and on behalf of her minor daughter, Allison Poe, KATHY NOE, *et al.*, individually and on behalf of her minor son, Christopher Noe,

*Plaintiffs-Appellees*,

v.

GOVERNOR OF THE STATE OF ALABAMA, ATTORNEY GENERAL, STATE OF ALABAMA, DISTRICT ATTORNEY FOR MONTGOMERY COUNTY, DISTRICT ATTORNEY FOR CULLMAN COUNTY, DISTRICT ATTORNEY FOR LEE COUNTY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Alabama, No. 2:22-cv-00184-LCB-SRW
The Honorable Liles C. Burke, U.S. District Judge

## CORRECTED PETITION FOR REHEARING EN BANC

Kelly Perigoe
Anne M. Voigts
Michael B. Shortnacy
Yusuf Saei
KING & SPALDING LLP
633 West 5th Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355

Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, AL 35203
(205) 581-0700
jdoss@lightfootlaw.com

*Counsel for Plaintiffs-Appellees*

September 12, 2023     *(Additional counsel listed on inside cover)*

Brent P. Ray
Abigail H. Terry
KING & SPALDING LLP
110 North Wacker Drive
Suite 3800
Chicago, IL 60606
(312) 995-6333

David Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

Adam Reinke
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
(404) 572-4600

Christopher F. Stoll
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street
Suite 370
San Francisco, CA 94102
(415) 365-1326

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Blvd.
Suite 3750
Miami, FL 33131
(334) 224-4309

Jennifer Levi
GLBTQ LEGAL ADVOCATES
& DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
(617) 426-1350

*Counsel for Plaintiffs-Appellees*

### AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiffs-Appellees Paul A. Eknes-Tucker; Brianna Boe (individually and on behalf of her minor son, Michael Boe); James Zoe (individually and on behalf of his minor son, Zachary Zoe); Megan Poe (individually and on behalf of her minor daughter, Allison Poe); Kathy Noe (individually and on behalf of her minor son, Christopher Noe); Jane Moe; and Rachel Zoe state that (1) they are individuals and, therefore, have nothing to disclose pursuant to Eleventh Circuit Rule 26.2(a); and (2) the following amended list of persons and parties may have an interest in the outcome of this case:

1.      Abdul-Latif, Hussein* – Amicus Curiae;

2.      Alabama Center for Law and Liberty* – Amicus Curiae;

3.      Academic Pediatric Association – Amicus Curiae;

4.      Advancing LGBTQ Equality* – Amicus Curiae;

5.      Alabama Chapter of the American Academy of Pediatrics – Amicus Curiae;

---

* Additional counsel and amici curiae have been marked with an asterisk.

6.      Alaska, State of – Amicus Curiae;

7.      Alscott, Anne* – Amicus Curiae;

8.      American Academy of Child and Adolescent Psychiatry – Amicus Curiae;

9.      American Academy of Family Physicians – Amicus Curiae;

10.     American Academy of Nursing – Amicus Curiae;

11.     American Academy of Pediatrics – Amicus Curiae;

12.     American Association of Physicians for Human Rights, Inc. – Amicus Curiae;

13.     American College of Obstetricians and Gynecologists – Amicus Curiae;

14.     American College of Osteopathic Pediatricians – Amicus Curiae;

15.     American College of Physicians – Amicus Curiae;

16.     America First Legal Foundation* – Amicus Curiae;

17.     American Medical Association – Amicus Curiae;

18.     American Pediatric Society – Amicus Curiae;

19.     American Psychiatric Association – Amicus Curiae;

20.     Anderson, Tom – Defendant;

21. Arizona, State of – Amicus Curiae;

22. Arkansas, State of – Amicus Curiae;

23. Arnold, Stephanie York, Rev.* – Amicus Curiae;

24. Association of American Medical Colleges – Amicus Curiae;

25. Association of Medical School Pediatric Department Chairs – Amicus Curiae;

26. Austin, Heather, Ph.D., previously proceeding under pseudonym Jane Moe, Ph.D.

27. Baia, Elizabeth – Counsel for Amici Curiae;

28. Bailey, Daryl D. – Defendant;

29. Barham, Richard, Rev.* – Amicus Curiae;

30. Barnhart, L., Jr., Rev.* – Amicus Curiae;

31. Baylock, C. Wilson – Defendant;

32. Becker, Laura* – Amicus Curiae;

33. Blakemore, Robin, Rev.* – Amicus Curiae;

34. Boe, Brianna – Plaintiff (pseudonym);

35. Boulware, Susan D.* – Amicus Curiae;

36. Bowdre, Alexander Barrett – Counsel for Defendants;

37. Burke, Liles C. – U.S. District Court Judge;

38. Burleigh, Billy* - Amicus Curiae

39. Bundesverband Trans E.V.* – Amicus Curiae;

40. C.G.* – Amicus Curiae;

41. California, State of* – Amicus Curiae;

42. Cantrell, Michael A. – Counsel for Amici Curiae;

43. Carr, Danny – Defendant;

44. Central Conference of American Rabbis* – Amicus Curiae;

45. Cheek, Jason R. – Counsel for Intervenor-Plaintiff;

46. Clark, Kristen, U.S. Department of Justice, Civil Rights Division – Counsel for Intervenor-Appellee United States;

47. Coe, Brian* – Amicus Curiae;

48. Coe, Laura J.* – Amicus Curiae;

49. Colorado, State of* – Amicus Curiae;

50. Connecticut, State of* – Amicus Curiae;

51. Conrady, Julie, Rev.* – Amicus Curiae;

52. Davis, James William – Counsel for Defendants;

53. Delaware, State of* – Amicus Curiae;

54. District of Columbia* – Amicus Curiae;

55. Doss, Jeffrey P. – Counsel for Plaintiffs;

56.     Eagan, Melody Hurdle – Counsel for Plaintiffs;

57.     Eknes-Tucker, Paul A. – Plaintiff;

58.     Endocrine Society (The) – Amicus Curiae;

59.     Ethics and Public Policy Center* – Amicus Curiae;

60.     Escalona, Elizabeth Prim Formby – Counsel for Intervenor-Plaintiff;

61.     Federacion Estatal de Lesbianas, Gais, Trans, Bisexuales, Intersexuales y Mas* – Amicus Curiae;

62.     Fuller, David* – Amicus Curiae;

63.     Fundacion Colectivoo Hombres XX, AC* – Amicus Curiae;

64.     Georgia, State of – Amicus Curiae;

65.     Global Justice Institute* – Amicus Curiae;

66.     Hawaii, State of* – Amicus Curiae;

67.     Hecker, Elizabeth P. – Appellate Counsel for Intervenor-Plaintiff;

68.     Illinois, State of* – Amicus Curiae;

69.     Indiana, State of – Amicus Curiae;

70.     Isasi, William – Counsel for Amici Curiae;

71.     Ivey, Kay – Defendant;

72.   Kamody, Rebecca* – Amicus Curiae;

73.   Kerschner, Helena* – Amicus Curiae;

74.   Koe, Rachel – Plaintiff (pseudonym);

75.   Krishna, Praveen S.* – Appellate Counsel Intervenor-Plaintiff;

76.   Kuper, Laura* – Amicus Curiae;

77.   LGBT+ Denmark* – Amicus Curiae;

78.   LaCour, Edmund G. (Jr.) – Counsel for Defendants;

79.   Lamar-Hart, Cynthia G. * – Amicus Curiae;

80.   Lannin, Cortlin H. – Counsel for Amici Curiae;

81.   Lanosa, Michael – Counsel for Amici Curiae;

82.   Lareau, Alyssa C. – Counsel for Intervenor-Plaintiff;

83.   Levi, Jennifer L. – Counsel for Plaintiffs;

84.   Loe, Sarah* – Amicus Curiae;

85.   Loe, Tom* – Amicus Curiae;

86.   Louisiana, State of – Amicus Curiae;

87.   Maine, State of* – Amicus Curiae;

88.   Marshall, Steve – Defendant;

89.   Maryland, State of* – Amicus Curiae;

90.   Massachusetts, State of* – Amicus Curiae;

91.   Mattern, David P.* – Counsel for Plaintiffs;

92.   McCoy, Scott D. – Counsel for Plaintiffs;

93.   McNamara, Meredithe* – Amicus Curiae;

94.   Medical Association of Pediatric Nurse Practitioners –
      Amicus Curiae;

95.   Men of Reform Judaism* – Amicus Curiae;

96.   Mills, Christopher Ernest – Counsel for Defendants;

97.   Minnesota, State of* – Amicus Curiae;

98.   Mississippi, State of – Amicus Curiae;

99.   Missouri, State of – Amicus Curiae;

100.  Moe, Jane – Plaintiff (pseudonym);

101.  Montag, Coty Rae – Counsel for Intervenor-Plaintiff;

102.  Montana, State of – Amicus Curiae;

103.  Nebraska, State of – Amicus Curiae;

104.  Nevada, State of* – Amicus Curiae;

105.  New Jersey, State of* – Amicus Curiae;

106.  New Mexico, State of* – Amicus Curiae;

107.  New York, State of* – Amicus Curiae;

108. Noe, Kathy – Plaintiff (pseudonym);

109. North Carolina, State of* – Amicus Curiae;

110. Norwegian Organization for Sexual and Gender Diversity, The* – Amicus Curiae;

111. Oklahoma, State of – Amicus Curiae;

112. Oladeinbo, Gilbert Olusengun – Counsel for Plaintiffs;

113. Olzeski, Christy* – Amicus Curiae;

114. Oregon, State of* – Amicus Curiae;

115. Orr, Asaf – Former counsel for Plaintiffs;

116. Pediatric Endocrine Society – Amicus Curiae;

117. Pennsylvania, State of* – Amicus Curiae;

118. Perigoe Kelly* – Counsel for Plaintiffs;

119. Perry Smalts, Laura* – Amicus Curiae;

120. Peterson, Misty L. – Counsel for Plaintiffs;

121. Poe, Megan – Plaintiff (pseudonym);

122. Powers, John Michael – Counsel for Intervenor-Plaintiff;

123. Pratt, James Andrew – Counsel for Plaintiffs;

124. Professional Association for Transgender Health Autearoa New Zealand* – Amicus Curiae;

125.  Ragsdale, Barry Alan – Counsel for Amici Curiae;

126.  Ray, Brent P. – Counsel for Plaintiffs;

127.  Reinke, Adam – Counsel for Plaintiffs;

128.  Reynolds, Laura* – Amicus Curiae;

129.  Robin-Vergeer, Bonnie – Appellate Counsel for Intervenor-
      Plaintiff;

130.  Roe, Melissa;

131.  Roe, Rebecca;

132.  Rhode Island, State of* – Amicus Curiae;

133.  Saei, Joseph (Yusuf)* – Counsel for Plaintiffs;

134.  Schwabauer, Barbara – Appellate Counsel Intervenor-
      Plaintiff;

135.  Seiss, Benjamin Matthew – Counsel for Defendants;

136.  Seta Ry / Seta Rf / Seta Lghtiq Rights in Finland* – Amicus
      Curiae;

137.  Shortnacy, Michael B. – Counsel for Plaintiffs;

138.  Smith, John* – Amicus Curiae;

139.  Society for Adolescent Health and Medicine* – Amicus
      Curiae;

140. Societies for Pediatric Urology – Amicus Curiae;

141. Society for Pediatric Research – Amicus Curiae;

142. Society of Adolescent Health and Medicine – Amicus Curiae;

143. Society of Pediatric Nurses – Amicus Curiae;

144. Soe, Melissa* – Amicus Curiae;

145. Soto, Diego Armando – Counsel for Plaintiffs;

146. Southeast Conference of the United Church of Christ* – Amicus Curiae;

147. South Carolina, State of – Amicus Curiae;

148. Stewart, Sandra Jean – Counsel for Intervenor-Plaintiffs;

149. Stoll, Christopher F. – Counsel for Plaintiffs;

150. Stone, Jessica Lynn – Counsel for Plaintiffs;

151. Stonewall UK* – Amicus Curiae;

152. Swedish Federation of Lesbian, Gay, Bisexual, Transgender, Queer and Intersex Rights, The* – Amicus Curiae;

153. Terry, Abigail Hoverman – Counsel for Plaintiffs;

154. Texas, State of – Amicus Curiae;

155. Toyama, Kaitlin – Counsel for Intervenor-Plaintiff;

156. Trevor Project, The* – Amicus Curiae;

157.  Union for Reform Judaism* – Amicus Curiae;

158.  Universal Fellowship of Metropolitan Community Churches*
      – Amicus Curiae;

159.  Unitarian Universalist Association* – Amicus Curiae;

160.  United States of America – Intervenor-Plaintiff;

161.  Utah, State of – Amicus Curiae;

162.  Vague, Amie A. – Counsel for Plaintiffs;

163.  Vance, Robert S. (III) – Counsel for Amici Curiae;

164.  Vermont, State of* – Amicus Curiae;

165.  Ventiere, Jessica – Defendant;

166.  Veta, D. Jean – Counsel for Amici Curiae;

167.  Voe, April;

168.  Voe, Robert;

169.  Voigts, Anne M.* – Counsel for Plaintiffs;

170.  Wadsworth, Stephen D. – Counsel for Intervenor-Plaintiff;

171.  Walker, Susan Russ – Magistrate Judge;

172.  Warbelow, Sarah – Counsel for Plaintiffs;

173.  Washington, State of* – Amicus Curiae;

174.  Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs;

175. West Virginia, State of – Amicus Curiae;

176. Wilkerson, Mark Douglas – Counsel for Amici Curiae;

177. Williams, Renee – Counsel for Intervenor-Plaintiff;

178. Wilson, Thomas Alexander – Counsel for Defendants;

179. Women of Reform Judiasm* – Amicus Curiae;

180. Woodke, Lane Hines – Counsel for Intervenor-Plaintiff;

181. World Professional Association for Transgender Health – Amicus Curiae;

182. Zoe, James – Plaintiff (pseudonym).

Date: September 12, 2023

*s/ Jeffrey P. Doss*

Jeffrey P. Doss

*Counsel for Plaintiffs-Appellees*

# STATEMENT OF COUNSEL

I, Jeffrey P. Doss, express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:

1. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020).

2. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

3. *Geduldig v. Aiello*, 417 U.S. 484 (1974).

4. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).

5. *Nguyen v. INS*, 533 U.S. 53 (2001).

6. *Parham v. J.R.*, 442 U.S. 584 (1979).

7. *Sessions v. Morales-Santana*, 582 U.S. 47 (2017).

8. *United States v. Virginia*, 518 U.S. 516 (1996).

9. *Washington v. Glucksberg*, 521 U.S. 702 (1997).

10. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,* 57 F.4th 791 (11th Cir. 2022).

11.     *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305 (11th Cir. 1989)

12.     *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990).

13.     *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).

I also express a belief, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance:

1.     Whether the long-recognized fundamental right of parents under the Due Process Clause to direct their children's upbringing includes the right "to follow and seek medical advice." *Parham*, 442 U.S. at 603.

2.     Whether a law that facially creates sex-based classifications is exempt from heightened scrutiny under the Equal Protection Clause if such sex-based regulations apply to both males and females or the classification is assertedly based on biological differences between males and females.

3.     Whether the definition of sex discrimination differs under the Equal Protection Clause and Title VII of the Civil Rights Act of 1964.

Date: September 12, 2023

s/ Jeffrey P. Doss
Jeffrey P. Doss

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .............................. C-1

STATEMENT OF COUNSEL ...................................................... i

TABLE OF AUTHORITIES ....................................................... v

STATEMENT OF THE ISSUES MERITING EN BANC CONSIDERATION ............................................................ 1

COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE ................................................................................. 2

STATEMENT OF FACTS ........................................................... 4

ARGUMENT ............................................................................ 5

I.  The Panel's Parental Rights Holding Conflicts With Supreme Court and Eleventh Circuit Precedent ............................ 5

II.  The Panel's Equal Protection Holding Conflicts With Decisions of the Supreme Court and this Court ............................ 10

III. This Appeal Involves Questions of Exceptional Importance ...................................................................... 16

CONCLUSION ...................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES*

**Cases**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th at 791, 801 (11th Cir. 2022)................................ 12

*Arnold v. Bd. of Educ. of Escambia County*,
880 F.2d 305 (11th Cir. 1989)........................................ 5, 7

*Bendiburg v. Dempsey*,
707 F. Supp. 1318 (N.D. Ga. 1989) ................................. 8

*Bendiburg v. Dempsey*,
909 F.2d 463 (11th Cir. 1990)...................................... 5, 7, 8

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731, 1741 (2020)..................................... 4, 14, 15

*Brandt ex rel. Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) ........................................ 1, 13

*Brandt v. Rutledge*,
No. 4:21CV00450 JM,
2023 WL 4073727 (E.D. Ark. June 20, 2023) ..................... 2

*City of Los Angeles v. Manhart*,
435 U.S. 702 (1978)................................................ 13

*Craig v. Boren*,
429 U.S. 190 (1976)................................................ 11

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)............................................. 13

*Doe v. Ladapo*,
No. 4:23CV114-RH-MAF,
2023 WL 3833848 (N.D. Fla. June 6, 2023)....................... 2

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Doe v. Thornbury,*
  No. 3:23-CV-230-DJH,
  2023 WL 4230481 (W.D. Ky. June 28, 2023) ...................................... 2

*Ex Parte E.R.G.,*
  73 So. 3d 634 (Ala. 2011) ....................................................... 6

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) ............................................................. 14

*GE Co. v. Gilbert,*
  429 U.S. 125 (1976) ............................................................. 14

*Geduldig v. Aiello,*
  417 U.S. 484 (1974) ............................................................. 13

*\*Glenn v. Brumby,*
  663 F.3d 1312 (11th Cir. 2011) ............................................... 4, 14

*J.E.B. v. Alabama ex rel. T.B.,*
  511 U.S. 127 (1994) ........................................................ 14, 15

*K.C. v. Individual Members of Med. Licensing Bd.,*
  No. 23-595,
  2023 WL 4054086 (S.D. Ind. June 16, 2023) ...................................... 2

*L.W. ex rel. Williams v. Skrmetti,*
  No. 3:23-CV-00376,
  2023 WL 4232308 (M.D. Tenn. June 28, 2023) .................................... 2

*L.W. ex rel. Williams v. Skrmetti,*
  73 F.4th 408 (6th Cir. 2023) .................................................. 13

*Meyer v. Nebraska,*
  262 U.S. 390 (1923) ............................................................ 10

*Miss. Univ. for Women v. Hogan,*
  458 U.S. 718 (1982) ............................................................ 14

*\*Nguyen v. INS,*
  533 U.S. 53 (2001) ............................................................. 12

*Parham v. J.R.*,
442 U.S. 584 (1979).................................................... *passim*

*Pierce v. Society Soc'y of Sisters
of the Holy Names of Jesus & Mary*,
268 U.S. 510, 535 (1925)...................................................... 6

*R.J.D. v. Vaughn Clinic, P.C.*,
572 So. 2d 1225 (Ala. 1990) ............................................ 5, 6

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017) .......................................................... 12

*Snyder v. Commonwealth of Mass.*,
291 U.S. 97 (1934) ............................................................ 5

*Troxel v. Granville*,
530 U.S. 57 (2000).............................................................. 7

*United States v. Virginia*,
518 U.S. 515 (1996)......................................................... 11

*Washington v. Glucksberg*,
521 U.S. 702 (1997)........................................................ 5, 9

## Statutes

Ala. Code § 26-26-4.................................................. 3, 4, 11, 13

## STATEMENT OF THE ISSUES
## MERITING EN BANC CONSIDERATION

This appeal arises from a district court decision preliminarily enjoining the portions of Alabama's S.B. 184 (or "the Act") that criminalize the provision of transitioning medications to transgender adolescents. Plaintiffs-Appellees ("Plaintiffs") include parents of minor children who have been prescribed these medications or may require them in the future ("Parent Plaintiffs"), as well as the children ("Minor Plaintiffs"). After an extended evidentiary hearing, the district court found that the provision of such medications is established medical care and that being deprived of them would cause Minor Plaintiffs severe harm.

The panel's opinion departs from centuries of precedent regarding parental authority and decades of precedent requiring the application of heightened scrutiny to sex-based laws. These issues are of exceptional importance because they affect all parents of minor children and reverse bedrock principles of sex discrimination law, as evidenced by the fact that the Eighth Circuit and every federal district court to rule in similar cases has held that similar laws are sex-based and, as such, require heightened scrutiny. *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022);

*Koe v. Noggle,* No. 1:23-CV-2904-SEG, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023); *Doe v. Thornbury*, No. 3:23-CV-230-DJH, 2023 WL 4230481 (W.D. Ky. June 28, 2023); *L.W. ex rel. Williams v. Skrmetti*, No. 3:23-CV-00376, 2023 WL 4232308 (M.D. Tenn. June 28, 2023), *appeal docketed*, No. 23-5600 (6th Cir. June 29, 2023); *Brandt v. Rutledge*, No. 4:21CV00450 JM, 2023 WL 4073727 (E.D. Ark. June 20, 2023); *K.C. v. Individual Members of Med. Licensing Bd.*, No. 23-595, 2023 WL 4054086 (S.D. Ind. June 16, 2023); *Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023). This Court should grant rehearing.

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

Plaintiffs moved for a preliminary injunction in the district court on the grounds that the Act (1) infringes the Parent Plaintiffs' fundamental rights under the Due Process Clause to obtain established medical care for their children, and (2) discriminates based on sex in violation of the Minor Plaintiffs' rights under the Equal Protection Clause. After a two-day evidentiary hearing and consideration of extensive documentary evidence, the district court granted a preliminary injunction, finding that the Act likely violated Parent Plaintiffs' "fundamental right to direct the medical care of their children," which

"includes the more specific right to treat their children with transitioning medications subject to medically accepted standards." Doc. 107 at 21. The district court also held that the Minor Plaintiffs were substantially likely to prevail on their equal protection claim because the Act bars medications only if prescribed or administered "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this [act]." Ala. Code § 26-26-4(a). Doc. 107 at 23.

A panel of this Court vacated the preliminary injunction, ruling that "Plaintiffs have not shown it to be likely that the Due Process Clause of the Constitution guarantees a fundamental 'right to treat [one's] children with transitioning medications subject to medically accepted standards,'" (Opinion at 34) and that although the Act bars treatment only for minors who perceive their sex to differ from their birth sex, it does not require heightened scrutiny because it "does not establish an unequal regime for males and females" and "refers to sex only because the medical procedures that it regulates ... are themselves sex-based," (Opinion at 42).

The panel further concluded that the Supreme Court's decision in *Bostock v. Clayton County,* holding that it "is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex," 140 S. Ct. 1731, 1741 (2020), was inapplicable to an equal protection case. (Opinion at 44.) The panel also ruled that this Court's decision in *Glenn v. Brumby,* holding that, under the Equal Protection Clause, "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination," 663 F.3d 1312, 1317 (11th Cir. 2011), also did not apply because it concerned employment. (Opinion at 45.)

## STATEMENT OF FACTS

The Act prohibits puberty-delaying medications and hormone therapy from being prescribed to a minor "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act." Ala. Code § 26-26-4(a). A violation of this provision is a Class C felony. *Id.* § 26-26-4(c). This appeal does not involve the Act's prohibition of surgical treatments for minors.

**ARGUMENT**

## I. The Panel's Parental Rights Holding Conflicts With Supreme Court and Eleventh Circuit Precedent.

The panel's holding that parents have no substantive due process interest in directing their children's medical care conflicts with centuries of common law and Supreme Court precedent and with decisions of this Court. Parents' authority to care for their children is a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 105 (1934) (cited in *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). In *Parham v. J.R.*, 442 U.S. 584, 602 (1979), the Supreme Court held that this principle includes the right "to seek and follow medical advice." This Court followed *Parham* in *Arnold v. Board of Education of Escambia County*, 880 F.2d 305, 313 (11th Cir. 1989), and *Bendiburg v. Dempsey,* 909 F.2d 463, 470 (11th Cir. 1990), both of which affirmed "the right of parents to generally make decisions concerning the treatment to be given to their children."

Our nation's history and traditions have long recognized that "parental care for children [is] not only an obligation, but also an inherent right." *R.J.D. v. Vaughn Clinic, P.C.*, 572 So. 2d 1225, 1227 (Ala. 1990).

"The parents' common law duty to care for their children is widely recognized: 'It is ordinarily for the parent in the first instance to decide ... what is actually necessary for the protection and preservation of the life and health of his child,'" including "'[i]n such matters as deciding on the need for surgical or hospital treatment … except in those extreme instances whether the state takes over to rescue the child from parental neglect or to save its life.'" *Id*. at 1228 (cleaned up); *see also Ex Parte E.R.G.*, 73 So. 3d 634, 665 (Ala. 2011) (same).

*Parham* followed this traditional common law rule:

[O]ur constitutional system long ago rejected any notion that that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations."

442 U.S. at 602-03 (quoting *Pierce v. Society Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925)). "Surely, this includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." 442 U.S. at 602.

The panel's holding that *Parham* involved only *procedural* due process cannot be squared with the express articulation of a *substantive* parental right "to seek and follow medical advice." *Id*. That conclusion is

confirmed by *Parham*'s reliance on other parental rights cases, *id.* at 602-03, the Supreme Court's comparison of the parent's medical decision making in *Parham* to the parents' educational decision making in *Myer* and *Pierce*, *id.* at 603-04, and the Supreme Court's conclusion that "[n]either state officials nor federal courts are equipped to review such parental decisions," *id.* at 604.

In the four decades since *Parham* was decided, both the Supreme Court and this Court have recognized its importance as a *substantive* parental rights case. *Troxel v. Granville*—a decision about whether the state could override a parent's judgment about grandparent visitation—cited *Parham* extensively. 530 U.S. 57, 66, 68, 69 (2000). *Arnold* found that *Parham* "established the parental right to decide whether to commit one's own child to a mental institution." 880 F.2d at 313. And *Bendiburg* affirmed a district court's reliance on *Parham* to uphold "the right of parents to generally make decisions concerning the treatment to be given to their children." 909 F.2d at 470.

The panel's decision conflicts with this controlling Eleventh Circuit law. The panel decision states that *Bendiburg* recognized only a procedural, not a substantive due process right. That is flatly wrong:

*Bendiburg* affirmed the district court's denial of summary judgment "*on both the substantive and procedural due process claims*," 909 F.2d at 469 (emphasis added), where the district court concluded that parents have a substantive due process right to determine "whether to pursue non-emergency extraordinarily intrusive medical treatment for one's child." *Bendiburg v. Dempsey*, 707 F. Supp. 1318, 1339 (N.D. Ga. 1989) (citing *Parham*, 442 U.S. at 602-04).

The panel alludes to *Bendiburg*'s holding on this critical issue in a footnote, stating: "To the extent that *Bendiberg* supports the proposition that parents have a substantive due process right relating to the medical treatment that their children receive, its reasoning is not equally applicable to situations involving parents' ability to *affirmatively* obtain certain medical treatment for their children that the State prohibits." (Opinion at 33 n.17.) *Bendiburg*, however, makes no such distinction and affirmed the district court's reliance on *Parham*, which involved the right to obtain care for a child, not to refuse it.

The panel decision also departs from Supreme Court and Circuit law by holding that Plaintiffs must show that parents in 1868 had a right to obtain puberty blockers and hormones, notwithstanding that their use

"did not occur until well into the twentieth century." (Opinion at 27.) If that were the relevant test, the government could dictate parents' decisions about antibiotics, most forms of anesthesia, and treatments for childhood cancers, asthma, and diabetes, none of which existed in 1868. Parents would have no substantive due process right to raise their children in contemporary religious faiths or to send them to many contemporary private schools, which similarly did not exist in their current form in 1868.

Nothing in *Parham* or the Supreme Court's other parental rights decisions supports that myopic approach. Rather, as the Supreme Court has made clear, courts must consider history and tradition in determining how to describe a fundamental right *at the appropriate level of generality*. *Washington*, 521 U.S. at 722-25. Here, the right of parents rather than the government to make medical decisions for their children is based on "centuries of legal doctrine and practice." *Id*. at 723. Following that tradition, the Supreme Court has held that parents have a right "to recognize symptoms of illness [in their children] and to seek and obtain medical advice," *Parham*, 442 U.S. at 602, which recognizes that the

specifics of such advice will evolve as medical knowledge and practice develop.

The panel's decision also conflicts with precedent in asserting that parents do not have a protected right to obtain medical care for their children because adults do not have any such right for themselves. That disregards the bedrock principle that parental rights and duties are flipsides of the same coin. *Parham*, 442 U.S. at 602-03. Because parents have a *duty* to provide their children with housing, sustenance, education, and medical care, parents have a corresponding *right* to be free from unjustified governmental interference in obtaining these necessities for their children, even if adults have no right to them. For example, adults have no right to education, but parents have a substantive due process right to "control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923).

## II. The Panel's Equal Protection Holding Conflicts With Decisions of the Supreme Court and this Court.

The panel opinion marks the first time this Court has applied rational basis review to a law that, on its face, classifies based on sex. The decision is a dramatic departure from Eleventh Circuit precedent and conflicts with controlling Supreme Court caselaw.

The panel decision acknowledges that the Act "refers to sex," and regulates "sex-based" treatments. (Opinion at 42 (emphasis omitted).) Despite this acknowledgment, and without citing any authority, the panel opinion applied only rational basis review because "it is difficult to imagine" how a state might regulate in this area "*without* referencing sex in some way." (*Id.* at 43.) In fact, the Act could do so by barring the proscribed medications for all adolescents; instead, it does so based on sex, barring treatment only when "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act." Ala. Code § 26-26-4(a). Even if the state could justify this selective restriction of medications only when prescribed for transgender adolescents, that would not transform an expressly sex-based law into one that is sex-neutral. The panel's conclusion that the Act is not subject to heightened scrutiny merely because it regulates medical treatments conflicts with relevant Supreme Court and Eleventh Circuit precedents, which consistently hold that *all* sex-based classifications require heightened scrutiny. *See, e.g., United States v. Virginia*, 518 U.S. 515, 555 (1996); *Craig v. Boren*, 429 U.S. 190 (1976);

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th at 791, 801 (11th Cir. 2022).

As the Supreme Court has made clear, there is no exception to this rule. The mere invocation of sex-based biological differences does not immunize a sex-based law from heightened review. *See, e.g., Sessions v. Morales-Santana*, 582 U.S. 47, 58-59 (2017); *Nguyen v. INS*, 533 U.S. 53, 59 (2001). In *Nguyen* and *Morales-Santana*, the government argued that heightened scrutiny should not apply because the laws drew sex-based distinctions based on biological differences between mothers and fathers, but the Court applied heightened scrutiny in both cases, strongly affirming that heightened scrutiny applies to all sex-based laws.

This Court has agreed. In *Adams*, 57 F.4th at 801, this Court reviewed a school bathroom policy based on a student's "biological sex." *Id*. This Court applied heightened scrutiny because the policy's classification of "sex determined at birth ... is a sex-based classification." *Id*. The same is true here, where the Act's prohibition turns expressly on a minor's sex. For example, under the Act, "a person identified as male at birth could receive testosterone therapy to conform to a male identity, but a person identified female at birth could not." *L.W. ex rel. Williams v.*

*Skrmetti*, 73 F.4th 408, 422 (6th Cir. 2023) (White, J., concurring in part and dissenting in part); *see also Brandt*, 47 F.4th at 669 ("[U]nder the act, medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex.").

For that reason, the panel opinion's reliance on *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), is misplaced. The laws there drew classifications based on pregnancy and abortion; in contrast, the Act *facially* discriminates based on sex, barring treatment if—and only if— "performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex" at birth. Ala. Code § 26-26-4(a). As the Supreme Court held of a similarly facially sex-based policy in in *City of Los Angeles v. Manhart*, 435 U.S. 702, 715 (1978), "[o]n its face, this [law] discriminates on the basis of sex whereas the General Electric plan [like the plan in *Geduldig*] discriminated on the basis of a special physical disability."

The opinion also conflicts with the Supreme Court's holding that it "is impossible to discriminate against a person for being … transgender

without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. *Bostock* confirmed what this Circuit held a decade earlier in *Glenn*, 663 F.3d at 1317. Contrary to the panel's opinion, neither the Supreme Court nor this Court has held that whether a law classifies based on sex varies from one context (such as employment) to another (such as education, medical benefits, or jury service). *See*, *e.g.*, *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982); *Frontiero v. Richardson*, 411 U.S. 677 (1973); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).

The panel also attempts to distinguish *Bostock* because it concerned sex discrimination under Title VII rather than under the Equal Protection Clause. (Opinion at 44.) But that approach directly conflicts with both Supreme Court and Eleventh Circuit precedents, which have applied the same standard in equal protection and Title VII cases to determine whether a law treats individuals differently based on their sex. *See*, *e.g.*, *GE Co. v. Gilbert*, 429 U.S. 125 (1976) (relying on equal protection analysis to resolve a sex discrimination claim under Title VII); *Glenn*, 663 F.3d at 1316-17 (relying on Title VII precedents to hold that discrimination against transgender employees violates equal protection).

The panel's opinion also conflicts with clear precedent that equal application of a sex-based rule to both males and females does not render it sex-neutral. As Supreme Court precedent recognizes, such a policy is sex-based even if it subjects all males and females to the same rule. *See Bostock*, 140 S. Ct. at 1744 ("[A]n employer who intentionally fires an individual … transgender employee … violates the law *even if the employer is willing to subject all male and female … transgender employees to the same rule*." (emphasis added)); *J.E.B.*, 511 U.S. at 140-41 (holding peremptory challenges based on a juror's sex are unconstitutional, even though they can be applied equally to both sexes, because the Equal Protection Clause protects *each person*—not merely women as a group or men as a group—from disparate treatment based on sex). That is especially clear here, where the only way to determine whether the rule applies is to know the person's sex. Before passage of the Act, the only information a doctor needed to prescribe hormones or puberty blockers was the patient's medical need. After passage, a doctor must also know the person's sex.

## III. This Appeal Involves Questions of Exceptional Importance.

This panel's holding that parents have *no* constitutionally protected interest in making medical decisions for their children runs counter to ordinary citizens' most deep-seated expectations and leaves millions of parents vulnerable to laws, policies, and bureaucratic decisions that dictate what medical care their children may receive. It is difficult to overstate the degree to which that holding threatens "Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham*, 442 U.S. at 602.

The panel's holding that facially sex-based laws are subject only to rational basis review if they apply equally to both sexes or are assertedly based on biological differences between male and females would exempt countless facially discriminatory laws and policies from meaningful review—as would the panel's holding that a law or policy that facially classifies based on sex under Title VII does not necessarily facially classify based on sex under the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, the Court should rehear this appeal en

banc.

|  | s/Jeffrey P. Doss |
|---|---|
| Kelly Perigoe | Melody H. Eagan |
| Anne M. Voigts | Jeffrey P. Doss |
| Michael B. Shortnacy | Amie A. Vague |
| Yusuf Saei | LIGHTFOOT FRANKLIN & WHITE LLC |
| KING & SPALDING LLP | 400 20th Street North |
| 633 West 5th Street | Birmingham, AL 35203 |
| Ste. 1600 | (205) 581-0700 |
| Los Angeles, CA 90071 | jdoss@lightfootlaw.com |
| (213) 443-4355 | |

*Additional Counsel for Plaintiffs-Appellees*
*continued on next page*

Brent P. Ray
Abigail H. Terry
KING & SPALDING LLP
110 North Wacker Dr.
Ste. 3800
Chicago, IL 60606
(312) 995-6333

David Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

Adam Reinke
KING & SPALDING LLP
1180 Peachtree Street NE
Ste. 1600
Atlanta, GA 30309
(404) 572-4600

Christopher F. Stoll
NATIONAL CENTER
FOR LESBIAN RIGHTS
870 Market Street, Ste. 370
San Francisco, CA 94102
(415) 365-1326

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Blvd., Ste. 3750
Miami, FL 33131
(334) 224-4309

Jennifer Levi
GLBTQ LEGAL ADVOCATES
& DEFENDERS
18 Tremont Street, Ste. 950
Boston, MA 02108
(617) 426-1350

*Counsel for Plaintiffs-Appellees*

September 12, 2023

# CERTIFICATE OF COMPLIANCE

1. This petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) and Eleventh Circuit Rule 35-1 because this petition contains 3,198 words, excluding the parts of the brief exempted by Eleventh Circuit Rule 35-1.

2. This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Century Schoolbook size 14-point font with Microsoft Word 365Plus.

3. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Date: September 12, 2023

*s/ Jeffrey P. Doss*
Jeffrey P. Doss
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Jeffrey P. Doss*

Jeffrey P. Doss

*Counsel for Plaintiffs-Appellees*

# ADDENDUM

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11707

_____

PAUL A. EKNES-TUCKER,
Rev.,
BRIANNA BOE,
individually and on behalf of her minor son, Michael Boe,
JAMES ZOE,
individually and on behalf of his minor son, Zachary Zoe,
MEGAN POE,
individually and on behalf of her minor daughter, Allison Poe,
KATHY NOE, et al.,
individually and on behalf of her minor son, Christopher Noe,

Plaintiffs-Appellees,

_versus_

GOVERNOR, OF THE STATE OF ALABAMA,
ATTORNEY GENERAL, STATE OF ALABAMA,

DISTRICT ATTORNEY, FOR MONTGOMERY COUNTY,
DISTRICT ATTORNEY, FOR CULLMAN COUNTY,
DISTRICT ATTORNEY, FOR LEE COUNTY, et al.,

                                               Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cv-00184-LCB-SRW

_____

Before LAGOA, BRASHER, Circuit Judges, and BOULEE,[*] District
Judge.

LAGOA, Circuit Judge:

     This appeal centers around section 4(a)(1)–(3) of Alabama's
Vulnerable Child Compassion and Protection Act (the "Act"). Sec-
tion 4(a)(1)–(3) of the Act states that "no person shall engage in or
cause" the prescription or administration of puberty blocking med-
ication or cross-sex hormone treatment to a minor "for the purpose
of attempting to alter the appearance of or affirm the minor's per-
ception of his or her gender or sex, if that appearance or perception
is inconsistent with the minor's sex." Thus, section 4(a)(1)–(3)

_____

[*] Honorable J. P. Boulee, United States District Judge for the Northern District
of Georgia, sitting by designation.

makes it a crime in the State of Alabama to take part in providing puberty blockers or cross-sex hormone treatment to a minor for purposes of treating a discordance between the minor's biological sex and sense of gender identity.

Shortly after the Act was signed into law, a group of transgender minors, their parents, and other concerned individuals challenged the Act's constitutionality, claiming that it violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. As part of that lawsuit, the district court issued a preliminary injunction enjoining Alabama from enforcing section 4(a)(1)–(3) of the Act pending trial, having determined that the plaintiffs are substantially likely to succeed on both of the aforementioned claims. Specifically, as to the due process claim, the district court held that there is a constitutional right to "treat [one's] children with transitioning medications subject to medically accepted standards" and that the restrictions of section 4(a)(1)–(3) likely impermissibly infringe upon that constitutional right. As to the equal protection claim, the district court held that section 4(a)(1)–(3) classifies on the basis of sex by classifying on the basis of gender nonconformity and likely amounts to unlawful discrimination under the intermediate scrutiny standard applicable to sex-based classifications.

On review, we hold that the district court abused its discretion in issuing this preliminary injunction because it applied the wrong standard of scrutiny. The plaintiffs have not presented any authority that supports the existence of a constitutional right to

"treat [one's] children with transitioning medications subject to
medically accepted standards." Nor have they shown that section
4(a)(1)–(3) classifies on the basis of sex or any other protected char-
acteristic. Accordingly, section 4(a)(1)–(3) is subject only to ra-
tional basis review. Because the district court erred by reviewing
the statute under a heightened standard of scrutiny, its determina-
tion that the plaintiffs have established a substantial likelihood of
success on the merits cannot stand. We therefore vacate the pre-
liminary injunction.

## I.     BACKGROUND

The Act was passed by the Alabama Legislature on April 7,
2022, and signed into law by Governor Kay Ivey the following day,
thereby set to become effective on May 8, 2022.

### A.     *The Text of the Act*

The Act contains eleven sections. For the sake of complete-
ness, each section is described below.

**Section 1** establishes the title of the Act.

**Section 2** sets forth the following findings by the Alabama
Legislature:

> (1)    The sex of a person is the biological state of
> being female or male, based on sex organs, chromo-
> somes, and endogenous hormone profiles, and is ge-
> netically encoded into a person at the moment of
> conception, and it cannot be changed.

(2)     Some individuals, including minors, may experience discordance between their sex and their internal sense of identity, and individuals who experience severe psychological distress as a result of this discordance may be diagnosed with gender dysphoria.

(3)     The cause of the individual's impression of discordance between sex and identity is unknown, and the diagnosis is based exclusively on the individual's self-report of feelings and beliefs.

(4)     This internal sense of discordance is not permanent or fixed, but to the contrary, numerous studies have shown that a substantial majority of children who experience discordance between their sex and identity will outgrow the discordance once they go through puberty and will eventually have an identity that aligns with their sex.

(5)     As a result, taking a wait-and-see approach to children who reveal signs of gender nonconformity results in a large majority of those children resolving to an identity congruent with their sex by late adolescence.

(6)     Some in the medical community are aggressively pushing for interventions on minors that medically alter the child's hormonal balance and remove healthy external and internal sex organs when the child expresses a desire to appear as a sex different from his or her own.

(7)     This course of treatment for minors commonly begins with encouraging and assisting the

child to socially transition to dressing and presenting as the opposite sex. In the case of prepubertal children, as puberty begins, doctors then administer long-acting GnRH agonist (puberty blockers) that suppress the pubertal development of the child. This use of puberty blockers for gender nonconforming children is experimental and not FDA-approved.

(8)     After puberty blockade, the child is later administered "cross-sex" hormonal treatments that induce the development of secondary sex characteristics of the other sex, such as causing the development of breasts and wider hips in male children taking estrogen and greater muscle mass, bone density, body hair, and a deeper voice in female children taking testosterone. Some children are administered these hormones independent of any prior pubertal blockade.

(9)     The final phase of treatment is for the individual to undergo cosmetic and other surgical procedures, often to create an appearance similar to that of the opposite sex. These surgical procedures may include a mastectomy to remove a female adolescent's breasts and "bottom surgery" that removes a minor's health reproductive organs and creates an artificial form aiming to approximate the appearance of the genitals of the opposite sex.

(10)    For minors who are placed on puberty blockers that inhibit their bodies from experiencing the natural process of sexual development, the overwhelming majority will continue down a path toward cross-sex hormones and cosmetic surgery.

(11)    This unproven, poorly studied series of interventions results in numerous harmful effects for minors, as well as risks of effects simply unknown due to the new and experimental nature of these interventions.

(12)    Among the known harms from puberty blockers is diminished bone density; the full effect of puberty blockers on brain development and cognition are yet unknown, though reason for concern is now present.  There is no research on the long-term risks to minors of persistent exposure to puberty blockers.  With the administration of cross-sex hormones comes increased risks of cardiovascular disease, thromboembolic stroke, asthma, COPD, and cancer.

(13)    Puberty blockers prevent gonadal maturation and thus render patients taking these drugs infertile. Introducing cross-sex hormones to children with immature gonads as a direct result of pubertal blockade is expected to cause irreversible sterility.  Sterilization is also permanent for those who undergo surgery to remove reproductive organs, and such persons are likely to suffer through a lifetime of complications from the surgery, infections, and other difficulties requiring yet more medical intervention.

(14)    Several studies demonstrate that hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual. For example, individuals who undergo cross-sex cosmetic surgical procedures have been found to suffer from elevated mortality rates higher than the general

population.    They experience significantly higher rates of substance abuse, depression, and psychiatric hospitalizations.

(15)    Minors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications, including permanent sterility, that result from the use of puberty blockers, cross-sex hormones, and surgical procedures.

(16)    For these reasons, the decision to pursue a course of hormonal and surgical interventions to address a discordance between the individual's sex and sense of identity should not be presented to or determined for minors who are incapable of comprehending the negative implications and life-course difficulties attending to these interventions.

**Section 3** provides definitions for the terms "minor," "person," and "sex." Section 3(1) incorporates the definition of "minor" established in section 43-8-1 of the Alabama Code, first enacted in 1975, which is "[a] person who is under 19 years of age." Ala. Code § 43-8-1(18). Section 3(2) defines the term "person" to include "[a]ny individual"; "[a]ny agent, employee, official, or contractor of any legal entity"; and "[a]ny agent, employee, official, or contractor of a school district or the state or any of its political subdivisions or agencies." Section 3(3) defines the term "sex" to mean "[t]he

biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."

**Section 4**, in broad terms, makes it a felony to perform certain medical practices on minors for certain purposes, and reads as follows:

> (a)     Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
>> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>>
>> (2) Prescribing or administering supraphysiologic[1] doses of testosterone or other androgens to females.
>>
>> (3) Prescribing or administering supraphysiologic doses of estrogen to males.
>>
>> (4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

---

[1] Supraphysiologic means of or pertaining to an amount "greater than normally present in the body." *See Supraphysiologic, Merriam-Webster*, https://www.merriam-webster.com/medical/supraphysiological.

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

(b)    Subsection (a) does not apply to a procedure undertaken to treat a minor born with a medically verifiable disorder of sex development, including either of the following:

(1) An individual born with external biological sex characteristics that are irresolvably ambiguous, including an individual born with 46 XX chromosomes with virilization, 46 XY chromosomes with under virilization, or having both ovarian and testicular tissue.

(2) An individual whom a physician has otherwise diagnosed with a disorder of sexual development, in which the physician has determined through genetic or biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female.

(c)    A violation of this section is a Class C felony.

**Section 5**, in broad terms, prohibits certain school employees from withholding certain information about minor students from their parents and from encouraging or

coercing minor students to do the same.  The section reads
as follows:

> No nurse, counselor, teacher, principal, or other ad-
> ministrative official at a public or private school at-
> tended by a minor shall do either of the following:
>
> (1)    Encourage or coerce a minor to withhold from
> the minor's parent or legal guardian the fact that the
> minor's perception of his or her gender or sex is in-
> consistent with the minor's sex.
>
> (2)    Withhold from a minor's parent or legal guard-
> ian information related to a minor's perception that
> his or her gender or sex is inconsistent with his or her
> sex.

**Section 6** clarifies that, except as provided for in section 4,
nothing in the Act shall be construed as "limiting or preventing"
certain mental health professionals from "rendering the services
for which they are qualified by training or experience involving the
application of recognized principles, methods, and procedures of
the science and professional of psychology and counseling."

**Section 7** similarly clarifies that "[n]othing in this section
shall be construed to establish a new or separate standard of care
for hospitals or physicians and their patients or otherwise modify,
amend, or supersede" certain other laws of the State of Alabama.

**Section 8** is a severability clause.  It provides that, "[i]f any
part, section, or subsection of [the Act] or the application thereof
to any person or circumstance is held invalid, the invalidity shall
not affect parts, sections, subsections, or applications of this act

that can be given effect without the invalid part, section, subsection, or application."

**Section 9** clarifies that the Act "does not affect a right or duty afforded to a licensed pharmacist by state law."

**Section 10** clarifies that, "[a]lthough this bill would have as its purpose or effect the requirement of a new or increased expenditure of local funds," it is "excluded from further requirements and application under Amendment 621, as amended by Amendment 890 . . . because [it] defines a new crime or amends the definition of an existing crime."

**Section 11**, the final section, establishes that the Act "shall become effective 30 days following its passage and approval by the Governor, or its otherwise becoming law."

### B.    *Procedural History*

On April 19, 2022, a group of plaintiffs initiated this challenge to the Act seeking declaratory and injunctive relief. The group consisted of transgender minors (the "Minor Plaintiffs"), the parents of those transgender minors (the "Parent Plaintiffs"), healthcare providers who regularly treat transgender youth (the "Provider Plaintiffs"), and Reverend Paul A. Eknes-Tucker, the Senior Pastor at Pilgrim Church in Birmingham, Alabama, who

frequently counsels parents of transgender children (collectively, "Plaintiffs").[2]

The original complaint generally alleged that: (1) the Act violates the Due Process Clause of the Fourteenth Amendment by depriving the Parent Plaintiffs of their right to direct the upbringing of their children (Count I); (2) the Act violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against the Minor Plaintiffs on the bases of sex and transgender status (Count II); (3) the Act is preempted by section 1557 of the Affordable Care Act (Count III); (4) the Act violates the Free Speech Clause of the First Amendment (Count IV); and (5) the Act is void for vagueness under the Due Process Clause of the Fourteenth Amendment (Count V). That complaint named the Attorney General of Alabama and several state officials (collectively, "Alabama") as defendants.[3]

Two days later, Plaintiffs filed a motion for preliminary injunction, seeking a ruling preventing the enforcement of the Act in advance of its May 8, 2022, effective date.[4] In light of that request,

---

[2] Reverend Eknes-Tucker is not included as a plaintiff in the operative pleading, the Second Amended Complaint, nor does he take part in this appeal.

[3] The original complaint also included Governor Ivey as a defendant, but the parties subsequently moved to dismiss her from the action on May 3, 2022, pursuant to a joint understanding that she and her office would be bound by any forthcoming injunctive relief. The district court granted that request.

[4] The motion is styled as a "motion for a temporary restraining order and/or preliminary injunction." However, because Alabama received notice of the

the district court expedited the briefing schedule and scheduled a hearing for the first week of May.

On April 29, 2022, the United States filed a motion to intervene, as well as its own motion for preliminary injunction similarly seeking to prevent enforcement of the Act. Shortly thereafter, fifteen states moved for leave to file an amicus brief in support of Alabama. That was followed by a group of at least twenty-two professional medical and mental health organizations jointly moving for leave to file an amicus brief in support of Plaintiffs. The district court ultimately granted the motion to intervene and the motions to file amicus briefs, giving the United States permission to participate in the preliminary injunction hearing and taking the amicus briefs under advisement.

The three-day hearing on Plaintiffs' motion for preliminary injunction began on May 4, 2022. On that first day, the district court discussed the motion for intervention and heard opening arguments from the parties. At that time, Plaintiffs represented that they were no longer challenging the portions of section 4 that ban surgical intervention, i.e., subsections (a)(4)–(6), and were instead focusing on the portions of section 4 that ban puberty blockers and cross-sex hormone treatment, i.e. subsections (a)(1)–(3). The following day, the parties commenced their presentation of the evidence.

_____

request for injunctive relief, the motion subsequently was addressed only as a motion for preliminary injunction.

Plaintiffs first tendered Dr. Linda Hawkins and Dr. Morissa Ladinsky as experts in the treatment of gender dysphoria in minors. Dr. Hawkins is the director of the Gender and Sexuality Development Clinic at the Children's Hospital of Philadelphia. She has specialized in treating LGBT youth for roughly twenty-two years and worked with over 4,000 transgender youth. During her testimony, Dr. Hawkins defined "gender identity" as "the internal authentic hardwired sense of one's self as male or female." She further testified that a blanket prohibition on puberty blockers and hormone treatment would be "devastating" for transgender youth, comparing it to "removing somebody's cancer treatment and just expecting them to be okay."

Dr. Ladinsky is an associate professor of pediatrics at the Heersink School of Medicine at the University of Alabama at Birmingham ("UAB") and a board-certified pediatrician at the affiliated hospital. Dr. Ladinsky opened a gender clinic at UAB in the fall of 2015 and, at the time of her testimony, had worked with an estimated 400 to 450 minors suffering from gender dysphoria. Dr. Ladinsky discussed the guidelines on the treatment of gender dysphoria in youth that the UAB gender clinic follows and noted that those guidelines are endorsed by the American Academy of Pediatrics. She also noted that consent forms must be signed by all legal parents and guardians before a minor's hormonal therapy can begin. According to Dr. Ladinsky, puberty blockers pose some risks but, overall, are safe and reversible. She described the risks posed by puberty blockers and cross-sex hormones, related to fertility and sexual function, as "small side effect risks." Dr. Ladinsky also

testified that the youngest minor for which she prescribed puberty blockers was an eleven-year-old female and that about 85 percent of her patients who have taken puberty blockers have gone on to take cross-sex hormones. In her opinion, it is "uncommon" for a minor patient taking puberty blockers to stop experiencing gender dysphoria and begin identifying with their biological sex.

Plaintiffs then called Megan Poe (one of the Parent Plaintiffs), Dr. Rachel Koe (one of the Provider Plaintiffs), and Reverend Eknes-Tucker to testify about their personal knowledge and experience regarding gender dysphoria.

Poe is the mother of a biological male who identifies as a female. When asked how her child presents as a female, Poe testified that her child "is very over the top girly," "loves makeup and hair," and "[is] always worried about her clothes." The child began showing signs of a female gender identity at the age of two, according to Poe, by wanting girl toys and girl clothes. The child started puberty blockers in sixth grade and then started hormone therapy at the age of fourteen. Poe reported that her child now is "so happy" and "thriving" and has not experienced any side effects from the treatment. She insisted that her child is "definitely not [experiencing] a phase" and is "never going to grow out of this." Poe also said she was afraid that her child would commit suicide if the treatments were no longer available.

Dr. Koe is a pediatrician in southeast Alabama. Dr. Koe reported that she treats transgender adolescents but has never treated a patient with gender dysphoria who later desisted or expressed

regret about receiving these types of treatments.  She also testified that, if the Act takes effect, it will leave her "stuck in a place where [she doesn't] know how to proceed" nor how to provide care for patients with gender dysphoria.

Reverend Eknes-Tucker is the Senior Pastor at Pilgrim Church in Birmingham, Alabama, and has been a pastor for 45 years.  Reverend Eknes-Tucker testified that there have been transgender individuals in every congregation that he has served and that he has given advice to parents of transgender children on numerous occasions.  He clarified that he has not given medical advice but that he has helped connect parents of transgender children with doctors who provide gender-affirming care.

In addition to this live testimony, Plaintiffs produced as evidence various organizational medical guidelines, sworn declarations, research articles, and other documents.

Next, the United States, as an intervenor on behalf of Plaintiffs, tendered Dr. Armand H. Antommaria as an expert in bioethics and treatment protocols for adolescents suffering from gender dysphoria.  Dr. Antommaria is the chair of pediatric ethics and an attending physician at Cincinnati Children's Hospital Medical Center.  During his testimony, Dr. Antommaria addressed the dearth of randomized controlled trials for the treatment of minors with puberty blockers and cross-sex hormone therapy and expressed his concern that such trials "would be unethical," given the lack of confidence that the control group and the experimental group would receive equally efficacious treatment.  He also expressed concern that any

such trials "would have substantial methodological limitations," given the need to recruit enough participants and conduct a blind study. When asked for his opinion regarding the ability of parents and adolescents to adequately understand and give informed consent to the provision of puberty blockers and hormone therapy, Dr. Antommaria answered that those treatments are "comparable to other decisions that parents and their children make in pediatric healthcare on a frequent basis." He further testified that there are no equally effective alternative medical treatments for adolescents with gender dysphoria and that there is not an ethical basis for distinguishing between minors experiencing precocious puberty[5] and minors experiencing gender dysphoria with respect to the provision of puberty blockers and hormone treatment.

Along with Dr. Antommaria's testimony, the United States presented, among other things, various organizations' medical policy statements and guidelines, some research and news articles, and Dr. Antommaria's declaration and curriculum vitae. For example, the United States presented the Standards of Care of the World Professional Association for Transgender Health ("WPATH"), which endorse the use of puberty blockers and cross-sex hormone treatment for minors when certain criteria are met. The United States also offered statements by the Alabama Psychological Association and the American Academy of Pediatrics supporting the use of puberty blockers and cross-sex hormone treatment for minors and opposing the Act. The full record reveals that at least twenty-

---

[5] Precocious puberty is the premature initiation of puberty.

two professional medical and mental health organizations support the use of such medications.

On cross-examination, Dr. Antommaria acknowledged that "[t]here are risks involved in the treatment course for the treatment of gender dysphoria." He went on to note that, for puberty blockers and cross-sex hormones generally, there is a risk of impaired fertility, and that, for estrogen therapy, there is a risk of change in sexual function. When asked whether he agrees that more research is needed to study the efficacy and the costs and benefits of gender-affirming care, Dr. Antommaria responded that "more research is needed in all areas of health care."

Alabama, for its part, first tendered Dr. James Cantor. Dr. Cantor is a clinical psychologist and neuroscientist who was called as an expert on psychology, human sexuality, research methodology, and the state of research on gender dysphoria. In response to Dr. Antommaria's testimony, Dr. Cantor confirmed that none of the existing studies on puberty blockers and hormone therapies are randomized and opined that there are alternative methodologies that would be more reliable than observational trials, which he described as the lowest quality of evidence. Dr. Cantor also testified that the existing research does not support the conclusion that the use of puberty blockers and hormone therapy is "the only safe and effective treatment for gender dysphoria." In his opinion, gender dysphoria can be treated with a "watchful waiting approach" whereby decisions about medical interventions are withheld, but therapy is continued, until more information becomes available.

According to Dr. Cantor, clinical guidelines suggest that comorbidities, including mental health issues, should be resolved prior to pursuing puberty blockers and cross-sex hormone treatment. He also noted that some cases of gender dysphoria have turned out to be prepubescent children misinterpreting their same-sex attraction and that blocking puberty in such cases prevents those children from understanding their sexuality.

On cross-examination, Dr. Cantor acknowledged that he is not a medical doctor and that he has not provided care to transgender adolescents under the age of sixteen.

Alabama then called Sydney Wright to testify about her personal experience with gender dysphoria. Wright is a biological female who is married to another woman. At the time of her testimony, Wright was twenty-three years old. She testified that she began identifying as transgender and receiving related treatment when she was seventeen years old, which culminated in testosterone therapy for approximately one year when she was nineteen years old. According to Wright, the testosterone treatment put her at a greater risk of heart attack or stroke and caused her to develop tachycardia. She explained that, after a significant discussion with her grandfather, she stopped identifying as transgender and receiving testosterone therapy. She now believes that her doctors mishandled her treatment and that she simply needed counseling during her teenage years. She also reported that her digestive system is "still messed up" and that she may have fertility issues as a result of the testosterone therapy that she received over three-and-a-half

years earlier.  When asked what she would tell a young person struggling with gender dysphoria, Wright stated that she would advise them to take "a lot of time," "love [themselves]," and understand that they can act and dress like the opposite sex without "hav[ing] to transition."

In addition to these two witnesses, Alabama produced, among other things, research papers, foreign countries' medical guidelines, and the declarations of various healthcare professionals and individuals with experience related to gender dysphoria.  For example, in terms of healthcare professionals, Alabama produced a declaration in which Dr. Quentin L. Van Meter[6] states that comparing the use of puberty blockers for precocious puberty with the use of puberty blockers for gender dysphoria is like "comparing apples to oranges," given the evidence that "normal bone density can't be fully reestablished" in the latter case and the lack of long-term data on bone, gonad, and brain health.  Alabama also produced a declaration in which Dr. Patrick Hunter[7] attests that "there is currently no established standard of care for transgender-identified youth" and that "[t]he medical risks of 'gender-affirming' interventions are substantial."  In terms of individuals with personal experience related to gender dysphoria, Alabama produced the

---

[6] Dr. Van Meter is a board-certified pediatrician and pediatric endocrinologist who currently works in private practice.

[7] Dr. Hunter is a board-certified pediatrician with a master's degree in bioethics who currently holds academic positions at the University of Central Florida and Florida State University.

declaration of Corinna Cohn, a biological male who underwent sex reassignment surgery at the age of nineteen—which included the removal of testicles, penectomy, and vaginoplasty—and who, looking back, claims to have been "unprepared to understand the consequences" of seeking such medical interventions as a teenager. Alabama also produced a declaration in which Carol Freitas, a biological female who previously experienced gender dysphoria, claims that "[transitioning] was the biggest mistake [that she] ever made" and that she instead should have been treated for depression and post-traumatic stress disorder related to her "internalized homophobia and childhood abuse." Lastly, in terms of medical opinions from foreign countries, Alabama produced documents showing that public healthcare entities of Sweden, Finland, France, Australia, New Zealand, and the United Kingdom have raised concerns about the risks associated with puberty blockers and cross-sex hormone treatment and supported greater caution and/or more restrictive criteria in connection with such interventions.

On May 13, 2022, the district court granted in part and denied in part the motions for preliminary injunction, enjoining Alabama from enforcing section 4(a)(1)–(3) but allowing the rest of the Act to remain in effect. The ruling was based on, among other things, a determination that Plaintiffs had shown a substantial likelihood of success on the merits as to their substantive due process claim and equal protection claim (Counts I and II), but not as to their other claims. With respect to the substantive due process claim (Count I), the district court recognized a fundamental right of parents to "treat their children with transitioning medications

subject to medically accepted standards," held that the Act infringes upon that fundamental right and concluded that Alabama had not sufficiently demonstrated that the Act is narrowly tailored to achieve a compelling state interest.  With respect to the equal protection claim (Count II), the district court held that the Act "amounts to a sex-based classification" and concluded that Alabama had not proffered a sufficiently persuasive justification for that classification.

Alabama filed a timely notice of appeal on May 16, 2022.[8]

## II.     STANDARD OF REVIEW

"We review the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error."  *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous."  *Id.* (quoting *United States v. Estrada*, 969 F.3d 1245, 1261 (11th Cir. 2020)).

## III.     ANALYSIS

A district court may grant injunctive relief only if the moving party demonstrates that: "(1) it has a substantial likelihood of

---

[8] The operative pleading—the second amended complaint—was filed on September 19, 2022.  In terms of counts, the second amended complaint contains only the substantive due process claim and the equal protection claim.

success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "In considering these four prerequisites, [courts] must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion" as to these four prerequisites. *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *accord Siegel*, 234 F.3d at 1176.[9]

As previewed, the district court determined that these four prerequisites are met with respect to section 4(a)(1)–(3) and thus enjoined Alabama from enforcing that part of the Act. The district court dedicated the bulk of its analysis in the preliminary injunction order to the first prerequisite and ultimately found that Plaintiffs had established a substantial likelihood of success as to their substantive due process claim and equal protection claim. Because the parties' arguments on appeal similarly focus on the likelihood-of-success prerequisite, we do the same. We begin with the substantive due process claim and then turn to the equal protection claim.

### A. Substantive Due Process

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held that this language guarantees both procedural and substantive rights. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). Those substantive rights include a "great majority" of the rights guaranteed by the first eight Amendments vis-à-vis the federal government, as well as "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id.*; *see also McDonald v. City of Chicago*, 561 U.S. 742, 760–66 (2010) (reviewing the history of the Supreme Court's incorporation of "almost all of the provisions of the Bill of Rights" against the States).

To determine whether a right at issue is one of the substantive rights guaranteed by the Due Process Clause, courts must look to whether the right is "deeply rooted in [our] history and tradition" and "essential to our Nation's 'scheme of ordered liberty.'" *Dobbs*, 142 S. Ct. at 2246 (alteration in original) (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019)). The outcome of this analysis determines the amount of leeway that states have to enact laws that infringe upon the right at issue. "Laws that burden the exercise of a fundamental right require strict scrutiny and are sustained only if narrowly tailored to further a compelling government interest." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004). Conversely, laws that do not burden the exercise of a fundamental right (and do not discriminate against a suspect class under the Equal Protection Clause) are subject to rational

basis review and need only "be rationally related to a legitimate governmental interest." *Jones v. Governor of Florida*, 950 F.3d 795, 809 (11th Cir. 2020). Although not "toothless," rational basis review is "highly deferential to government action." *Id.* (quoting *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981)).

In other words, every time a court recognizes an asserted right as a fundamental right protected by the Constitution, the court, "to a great extent, place[s] the matter outside the arena of public debate and legislative action." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). For that reason, the Supreme Court has instructed courts addressing substantive due process claims to "engage[] in a careful analysis of the history of the right at issue" and be "'reluctant' to recognize rights that are not mentioned in the Constitution." *Dobbs*, 142 S. Ct. at 2246–47 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)).

In this case, the district court determined that the "right to treat [one's] children with transitioning medications subject to medically accepted standards" is one of the substantive rights guaranteed by the Due Process Clause and that, therefore, section 4(a)(1)–(3) is subject to strict scrutiny. But the use of these medications in general—let alone for children—almost certainly is not "deeply rooted" in our nation's history and tradition. Although there are records of transgender or otherwise gender nonconforming individuals from various points in history,[10] the earliest-

---

[10] *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 822 n.1 (11th Cir. 2022) (Wilson, J. dissenting) (noting that Justinian's Code, from the

22-11707                Opinion of the Court                27

recorded uses of puberty blocking medication and cross-sex hor-
mone treatment for purposes of treating the discordance between
an individual's biological sex and sense of gender identity did not
occur until well into the twentieth century.[11, 12] Indeed, the district

---

early sixth century AD, contains discussion of "hermaphrodites"); Mary Beth
Norton, *Founding Mothers & Fathers: Gendered Power and the Forming of American
Society* 183–202 (1996) (discussing the case of Thomasine Hall, also known as
Thomas Hall, an intersex individual who alternated between identifying as a
man and as a woman and who was ordered by a Virginia court in 1629 to wear
dual-gendered apparel); Genny Beemyn, *U.S. History*, in *Trans Bodies, Trans
Selves: A Resource for the Transgender Community* 501, 501–53 (Laura Erickson-
Schroth ed. 2014) (discussing multiple prominent transgender individuals born
between 1882 and 1926, including Lili Elbe, formerly known as Einar We-
gener; Laurence Michael Dillon, formerly known as Laura Maud Dillon; and
Christine Jorgensen, formerly known as George William).

[11] Puberty blockers first began being used in the 1980s. *See* Victoria Pelham,
*Puberty Blockers: What You Should Know*, Cedars-Sinai Blog (Jan. 16, 2023),
https://www.cedars-sinai.org/blog/puberty-blockers-for-precocious-pu-
berty.html; Simona Giordano & Søren Holm, *Is Puberty Delaying Treatment 'Ex-
perimental Treatment'?*, 21(2) Int'l. J. Transgend. Health 113 (2020),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7430465/.

[12] Estrogen and testosterone were not discovered and characterized until the
1920s and 1930s. *See* Jamshed R. Tata, *One Hundred Years of Hormones*, 6 EMBO
Rep. 490, 491 (2005), https://www.ncbi.nlm.nih.gov/pmc/arti-
cles/PMC1369102/pdf/67400444.pdf. Laurence Michael Dillon, formerly
known as Laura Maud Dillon, began receiving testosterone treatment for pur-
poses of treating the discordance between biological sex and sense of gender
identity in 1939 and is thought by some to be the first biological female to
receive such treatment. *See* Pagan Kennedy, *The First Man-Made Man: The Story
of Two Sex Changes, One Love Affair, and a Twentieth-Century Medical Revolution*
(2007). According to the WPATH Standards of Care offered by both Plaintiffs
and the United States, health professionals began using hormone therapy as a

court's order does not feature any discussion of the history of the use of puberty blockers or cross-sex hormone treatment or otherwise explain how that history informs the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868.[13]  *See Morrissey v. United States*, 871 F.3d 1260, 1269–70 (11th Cir. 2017) (rejecting the notion that the Constitution protects a right to procreate via in vitro fertilization procedures based on the fact that such procedures are "decidedly modern phenomena" that did not come about until 1978).

Rather than perform any historical inquiry specifically tied to the particular alleged right at issue, the order on appeal instead surmises that the "right to treat [one's] children with transitioning medications subject to medically accepted standards" falls under the broader, recognized fundamental right to "make decisions concerning the care, custody, and control of [one's] children." *E.g.*, *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Lofton*, 358 F.3d at 812. *But see Morrissey*, 871 F.3d at 1269 (emphasizing that a substantive due process analysis must focus on the specific right asserted, rather than simply rely on a related general right).  However, there is no binding authority that indicates that the general right to "make decisions concerning the care, custody, and control of

---

treatment for gender dysphoria "[i]n the second half of the 20th century." Doc. 78-17 at 14.

[13] *See* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 6–7 (2015) ("[T]he original meaning ('communicative content') of the constitutional text is fixed at the time each provision is framed and ratified.").

[one's] children" includes the right to give one's children puberty blockers and cross-sex hormone treatment.

The fundamental right to "make decisions concerning the care, custody, and control of [one's] children," as it is recognized today, traces back in large part to *Meyer v. Nebraska*, 262 U.S. 390 (1923). There, the Supreme Court held that a Nebraska law restricting the teaching of foreign languages violated the Due Process Clause. *Id.* at 400–03. In doing so, the Court recognized that the "liberty" guaranteed by the Due Process Clause includes the right "to engage in any of the common occupations of life, to acquire useful knowledge, *to marry, establish a home and bring up children*, . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness of free men." *Id.* at 399 (emphasis added).

The Supreme Court elaborated on the fundamental liberty of parents two years later in *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925). That case addressed Oregon's Compulsory Education Act of 1922, which mandated that parents send their school-aged children to public school (as opposed to private school). *Id.* at 530–31. Citing its decision in *Meyer*, the Court concluded that the Oregon law violated the Due Process Clause on the basis that it "unreasonably interferes with the liberty of parents and guardians to *direct the upbringing and education of children under their control*." *Id.* at 534–35 (emphasis added).

*Meyer* and *Pierce* ushered in a line of Supreme Court decisions that recognized, and further defined the contours of, parents'

liberty interest to control the upbringing of their children.[14] The majority of those cases, however, pertain to issues of education, religion, or custody.  The Supreme Court's most extensive discussion of parents' control over the medical treatment received by their children came in *Parham v. J. R.*, 442 U.S. 584 (1979).

In *Parham*, a group of minors brought a Due Process challenge to Georgia's procedures for committing children to mental hospitals.  *Id.* at 587–88.  At the time, Georgia law provided for the voluntary admission of children upon application by a parent or

---

[14] *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166–69 (1944) (recognizing that "the custody, care and nurture of [children] reside[s] first in the parents," but nevertheless upholding Massachusetts child labor laws that restricted the ability of children to sell religious literature in accordance with their parents' wishes based on the state's "authority over children's activities" and "the crippling effects of child employment, more especially in public places" (footnote omitted)); *Stanley v. Illinois*, 405 U.S. 645, 646–59 (1972) (holding that Illinois could not automatically designate the children of unwed parents as wards of the state upon the death of the mother because fathers of children born out of wedlock have a "cognizable and substantial" "interest in retaining custody of [their] children" under the Constitution); *Wisconsin v. Yoder*, 406 U.S. 205, 213–234 (1972) (holding that Wisconsin could not compel school attendance beyond the eighth grade because doing so would "grave[ly] interfere[] with important Amish religious tenets" and "the traditional interest of parents with respect to the religious upbringing of their children"); *Troxel*, 530 U.S. at 60–75 (striking down Washington's nonparental visitation statute, which would have permitted any person to petition for visitation rights at any time and courts to grant such rights whenever in the best interest of the child, on the basis that it contravened "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" and "the traditional presumption that a fit parent will act in the best interest of his or her child").

22-11707                Opinion of the Court                31

guardian.  *Id*. at 590–91.  Thus, the question at issue was whether
the minors had a *procedural* due process right to greater procedural
safeguards, e.g., a judicial hearing, before their parents could com-
mit them.  *Id*. at 610.  The Supreme Court concluded that "some
kind of inquiry should be made by a 'neutral factfinder' to deter-
mine whether the statutory requirements for admission are satis-
fied," but that the inquiry could be "informal," e.g., conducted by
a staff physician, and did not require an adversarial proceeding with
a judicial or administrative officer.  *Id*. at 606–10.  "[R]equiring a
formalized, factfinding hearing," according to the Supreme Court,
would "[p]it[] the parents and the child" against each other and rep-
resent a "significant intrusion into the parent-child relationship."
*Id*. at 610; *see also id*. ("It is one thing to require a neutral physician
to make a careful review of the parents' decision in order to make
sure it is proper from a medical standpoint; it is a wholly different
matter to employ an adversary contest to ascertain whether the
parents' motivation is consistent with the child's interests.").  In so
ruling, the Supreme Court recognized, as a general matter, that
"[m]ost children, even in adolescence, simply are not able to make
sound judgments concerning many decisions, including their need
for medical care or treatment," *id*. at 603, and that parents retain
"plenary authority" as well as "a substantial, if not the dominant,
role" in deciding to pursue lawfully available treatment, like insti-
tutionalization, for their children, *id*. at 604; *see also id*. at 609 (con-
cerning "treatment that is provided by the state").  *Parham* was con-
cerned about the procedures a state must afford a child prior to in-
stitutionalization when the parent believes such treatment—which

is not only lawful but provided by the state itself—is necessary. Notably, *Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law. *Parham* therefore offers no support for the Parent Plaintiffs' substantive due process claim.

This Court has issued its own series of decisions outlining the contours of parents' liberty interest to control the upbringing of their children,[15] with the most relevant decision being *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990). In that case, the State of Georgia had obtained temporary custody of a fifteen-year-old boy who was injured in an automobile accident. As the boy's custodian

---

[15] *See, e.g., Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 312–14 (11th Cir. 1989) (holding that the parent plaintiffs sufficiently alleged a cause of action under 42 U.S.C. § 1983 for violation of the fundamental right to direct the upbringing of one's children against two school officials who allegedly coerced a minor female into undergoing an abortion), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993); *Lofton*, 358 F.3d at 811–15 (declining to extend the parental right of control protected by the Due Process Clause to foster parents); *Robertson v. Hecksel*, 420 F.3d 1254, 1255–60 (11th Cir. 2005) (declining "to further expand the substantive protections of the Due Process Clause" by recognizing that a mother whose son was killed by police during a traffic stop "suffered a deprivation of [a] constitutionally-protected liberty interest in a continued relationship with [him]"); *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1281–86 (11th Cir. 2008) (holding that Florida's Pledge of Allegiance statute, which requires students to recite the Pledge in the absence of a written request to the contrary by a parent, is constitutional despite restricting the students' freedom of speech because it advances the fundamental rights of parents to direct the upbringing of their children).

and over the father's wishes,[16] Georgia consented to the use of a Hickman catheter on the boy, which allegedly caused a massive pulmonary embolus and ultimately the boy's death. *Id*. at 466–67. This Court allowed the father's *procedural* due process claims against certain defendants to proceed to trial, noting that "neither the state nor private actors, concerned for the medical needs of a child, can willfully disregard the rights of parents to generally make decisions concerning the treatment to be given to their children" and that "[t]he Due Process Clause prevents government from abusing its power, or employing its power as an instrument of oppression." *Id*. at 470.  But, as relevant here, this Court affirmed the determination that the father had no *substantive* due process claim and recognized that "[t]he state has an interest in protecting the health, safety, and welfare of children residing within its borders."[17] *Id*. at 468, 470.

    In sum, none of the binding decisions regarding substantive due process establishes that there is a fundamental right to "treat [one's] children with transitioning medications subject to medically

---

[16] The child's mother had been killed in the same automobile accident. *Bendiburg*, 909 F.2d at 466.

[17] It bears emphasizing that *Bendiburg* dealt with a situation wherein a State interfered with a single parent's ability to *refuse* certain lawful medical treatment for his child. *Id*. at 466–67.  To the extent that *Bendiberg* supports the proposition that parents have a substantive due process right relating to the medical treatment that their children receive, its reasoning is not equally applicable to situations involving parents' ability to *affirmatively obtain* certain medical treatment for their children that the State prohibits.

accepted standards." Instead, some of these cases recognize, at a high level of generality, that there is a fundamental right to make decisions concerning the "upbringing" and "care, custody, and control" of one's children. *See Pierce*, 268 U.S. at 534–35; *Troxel*, 530 U.S. at 66. And those decisions applying the fundamental parental right in the context of medical decision-making do not establish that parents have a derivative fundamental right to obtain a particular medical treatment for their children as long as a critical mass of medical professionals approve. Moreover, all of the cases dealing with the fundamental parental right reflect the common thread that states properly may limit the authority of parents where "it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Wisconsin v. Yoder*, 406 U.S. 205, 233–34 (1972); *see also Prince v. Massachusetts*, 321 U.S. 158, 168–69 (1944); *Parham*, 442 U.S. at 604; *Bendiburg*, 909 F.2d at 470. Against this backdrop, and without any historical analysis specifically tied to the medications at issue, Plaintiffs have not shown it to be likely that the Due Process Clause of the Constitution guarantees a fundamental "right to treat [one's] children with transitioning medications subject to medically accepted standards."[18] *See L.W. v. Skrmetti*, 73 F.4th 408, 416–17 (6th Cir. July 8, 2023) (recognizing that parents "have a substantive due process

---

[18] This is consistent with the fact that there has been no showing of any historical recognition of a fundamental right of adults to obtain the medications at issue for themselves. As Alabama points out, it would make little sense for adults to have a *parental* right to obtain these medications for their children but not a *personal* right to obtain the same medications for themselves.

right 'to make decisions concerning the care, custody, and control of their children'" but noting that "[n]o Supreme Court case extends it to a general right to receive new medical or experimental drug treatments" (quoting *Troxel*, 530 U.S. at 66)).

Because the Due Process Clause does not guarantee the described right, state regulation of the use of puberty blockers and cross-sex hormone treatment for minors would be subject only to rational basis review and thus afforded "a 'strong presumption of validity.'" *Dobbs*, 142 S. Ct. at 2284 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). "Under this deferential standard," the question that we ask "is simply whether the challenged legislation is rationally related to a legitimate state interest." *Lofton*, 358 F.3d at 818. Such a relationship may merely "be based on rational speculation" and need not be supported "by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *accord Jones*, 950 F.3d at 809 ("When we review a statute for rationality, generally we ask whether there is *any* rational basis for the law, even if the government's proffered explanation is irrational, and even if it fails to offer any explanation at all.").

We are highly doubtful that section 4(a)(1)–(3) would not survive the lenient standard that is rational basis review. It is well established that states have a compelling interest in "safeguarding the physical and psychological well-being of . . . minor[s]." *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)). In the same vein, states have a compelling interest in protecting children from drugs,

36                       Opinion of the Court                    22-11707

particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects.[19]   Although rational speculation is itself sufficient to survive rational basis review, here Alabama relies on both record evidence and rational speculation to establish that section 4(a)(1)–(3) is rationally related to that compelling state interest.  First, the record evidence is undisputed that the medications at issue present *some* risks.  As the district court recognized, these medications can cause "loss of fertility and sexual function."  The district court also acknowledged testimony that "several European countries have restricted treating minors with transitioning medications due to growing concern about the medications' risks."  Second, there is at least rational speculation that some families will not fully appreciate those risks and that some minors experiencing gender dysphoria ultimately will desist and identify with their biological sex.  Section 4(a)(1)–(3) addresses these risks by prohibiting the prescription and administration of puberty blockers and cross-sex hormone treatment to a patient under the age of nineteen for purposes of treating discordance between biological sex and sense of gender identity so that children will have more time to develop their identities and to consider all of the

_____

[19] As Alabama suggests, the opioid epidemic has shown firsthand the need to be skeptical and exercise caution when there is a sudden uptick in prescriptions of powerful, off-label medications, even when some medical and pharmaceutical organizations defend their safety.  *See also Skrmetti*, 73 F.4th at 418 ("[I]t is difficult to maintain that the medical community is of one mind about the use of hormone therapy for gender dysphoria when the FDA is not prepared to put its credibility and careful testing protocols behind the use.").

potential consequences before moving forward with such treat-
ments. That connection would be sufficient under rational basis
review.

In sum, Plaintiffs' assertion that the Constitution protects
the right to treat one's children with puberty blockers and cross-
sex hormone therapy is precisely the sort of claim that asks courts
to "break new ground in [the] field [of Substantive Due Process]"
and therefore ought to elicit the "utmost care" from the judiciary.
*See Collins*, 503 U.S. at 125. The district court held that there is a
specific right under the Constitution "to treat [one's] children with
transitioning medications subject to medically accepted standards,"
but did so without performing any analysis of whether that specific
right is deeply rooted in our nation's history and tradition. Instead,
the district court grounded its ruling in an unprecedented interpre-
tation of parents' fundamental right to make decisions concerning
the "upbringing" and "care, custody, and control" of one's chil-
dren. *See Pierce*, 268 U.S. at 534–35; *Troxel*, 530 U.S. at 66. That was
error. Neither the record nor any binding authority establishes that
the "right to treat [one's] children with transitioning medications
subject to medically accepted standards" is a fundamental right
protected by the Constitution. And, assuming it is not, then section
4(a)(1)–(3) is subject only to rational basis review—a lenient stand-
ard that the law seems to undoubtedly clear. Because the district
court erroneously reviewed section 4(a)(1)–(3) with heightened
scrutiny, its determination regarding the Parent Plaintiffs' likeli-
hood of success does not justify the preliminary injunction.

**B.      Equal Protection**

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

"In considering whether state legislation violates the Equal Protection Clause . . . we apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). All statutory classifications must, at a minimum, satisfy rational basis review. *Id.* Classifications based on race or national origin, however, are reviewed under the "most exacting" level of scrutiny: strict scrutiny. *Id.* Between rational basis review and strict scrutiny lies "a level of intermediate scrutiny," which applies to classifications based on sex or illegitimacy. *Id.*

Thus, a government policy that distinguishes on the basis of sex is permissible under the Equal Protection Clause "only if it satisfies intermediate scrutiny." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022). Under that standard, the party seeking to uphold the policy carries the burden of "showing that the [sex-based] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'"

*Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980)).

"For a government objective to be important, it cannot 'rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.'" *Adams*, 57 F.4th at 801 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). And for a policy's means to be substantially related to a government objective, there must be "enough of a fit" between the means and the asserted justification. *Id.* (quoting *Danskine v. Mia. Dade Fire Dep't*, 253 F.3d 1288, 1299 (11th Cir. 2001)). However, "the Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex." *Id.*; *see also Nguyen v. INS*, 533 U.S. 53, 70 (2001) ("None of our gender-based classification equal protection cases have required that the [policy] under consideration must be capable of achieving its ultimate objective in every instance.").

In this case, the district court first held that section 4(a)(1)–(3) of the Act classifies on the basis of gender nonconformity and therefore classifies on the basis of sex. In determining that section 4(a)(1)–(3) classifies on the basis of gender nonconformity, the district court reasoned that section 4(a)(1)–(3) "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity." And, in holding that a classification on the basis of gender nonconformity necessarily constitutes a classification on the basis of sex, the district court cited the reasoning of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).

After determining that section 4(a)(1)–(3) of the Act amounts to a sex-based classification subject to intermediate scrutiny, the district court then found that Alabama had not offered any exceedingly persuasive justification for the classification and thus concluded that that the Minor Plaintiffs are substantially likely to succeed on their equal protection claim.

On appeal, Alabama maintains that section 4(a)(1)–(3) classifies on the bases of age and procedure, not sex or gender nonconformity, and is therefore not subject to any heightened scrutiny above rational basis review. *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) ("[A]ge is not a suspect classification under the Equal Protection Clause."); *Clark*, 486 U.S. at 461 (listing suspect classifications and making no reference to classifications based on procedures). Alabama further argues that section 4(a)(1)–(3) would survive at any level of scrutiny because it "serves the compelling [state] interest of protecting children from unproven, life-altering medical interventions" and because "no other approach would offer children in Alabama adequate protection."

In response, the Minor Plaintiffs argue that section 4(a)(1)–(3) classifies on the basis of sex both directly, by using sex-based terms, and indirectly, by classifying on the basis of gender nonconformity, and that the district court therefore properly applied intermediate scrutiny. The Minor Plaintiffs also argue that, even if the more lenient rational basis standard applies, section 4(a)(1)–(3) does not pass muster. For its part, the United States makes the argument that section 4(a)(1)–(3) "triggers heightened scrutiny" because it

"discriminates against transgender persons, who constitute at least a quasi-suspect class" by themselves, distinct from sex.

Having carefully considered all of these positions, we agree with Alabama that section 4(a)(1)–(3) is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause. Section 4(a)(1)–(3) is therefore subject only to rational basis review—a standard that it almost undoubtedly satisfies for the reasons discussed. *See supra* Section III.A; *see also Skrmetti*, 73 F.4th at 419 (finding it "highly unlikely" that the plaintiffs could show that Tennessee's substantially similar law "lacks a rational basis"). Because the district court erroneously departed from that standard, its assessment regarding the Minor Plaintiffs' likelihood of success as to their equal protection claim cannot support the preliminary injunction. We reason as follows.

To begin, we reject the view that section 4(a)(1)–(3) amounts to a sex-based classification subject to intermediate scrutiny. As mentioned, one of the Minor Plaintiffs' arguments is that section 4(a)(1)–(3) directly classifies on the basis of sex because it "uses explicitly sex-based terms to criminalize certain treatments based on a minor's 'sex.'" Of course, section 4(a)(1)–(3) discusses sex insofar as it generally addresses treatment for discordance between biological sex and gender identity, and insofar as it identifies the applicable cross-sex hormone(s) for each sex—estrogen for males and testosterone and other androgens for females. We

nonetheless believe the statute does not discriminate based on sex
for two reasons.

First, the statute does not establish an unequal regime for
males and females. In the Supreme Court's leading precedent on
gender-based intermediate scrutiny under the Equal Protection
Clause, the Court held that heightened scrutiny applies to "official
action that closes a door or denies opportunity to women (or to
men)." *Virginia*, 518 U.S. at 532. Alabama's law does not distin-
guish between men and women in such a way. *Cf. Adams,* 57 F.4th
at 800–11. Instead, section 4(a)(1)–(3) establishes a rule that applies
equally to both sexes: it restricts the prescription and administra-
tion of puberty blockers and cross-sex hormone treatment for pur-
poses of treating discordance between biological sex and sense of
gender identity for *all* minors. *See Skrmetti*, 73 F.4th at 419 (explain-
ing that this sort of restriction on puberty blockers and cross-sex
hormone treatment "does not prefer one sex to the detriment of
the other").

Second, the statute refers to sex only because the medical
procedures that it regulates—puberty blockers and cross-sex hor-
mones as a treatment for gender dysphoria—are themselves sex-
based. The Act regulates medical interventions to treat an incon-
gruence between one's biological sex and one's perception of one's
sex. The cross-sex hormone treatments for gender dysphoria are
different for males and for females because of biological differences
between males and females—females are given testosterone and
males are given estrogen. With regards to puberty blockers, those

medications inhibit and suppress the production of testosterone in males and estrogen in females. For that reason, it is difficult to im-agine how a state might regulate the use of puberty blockers and cross-sex hormones for the relevant purposes in specific terms *with-out* referencing sex in some way. Thus, we do not find the direct sex-classification argument to be persuasive.

The Minor Plaintiffs' other sex-based argument is that sec-tion 4(a)(1)–(3) indirectly classifies on the basis of sex by classifying on the basis of gender nonconformity. This is the position that the district court adopted, citing *Bostock* and *Brumby*. Neither of those cases, however, dealt with the Equal Protection Clause as applied to laws regulating medical treatments.

*Bostock* dealt with Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C. § 2000e *et seq.*, in the context of employment discrimination. *See* 140 S. Ct. at 1737–41, 1754 (hold-ing that "[a]n employer who fires an individual merely for being gay or transgender defies [Title VII]"). After noting that "only the words on the page constitute the law adopted by Congress and ap-proved by the President," *id.* at 1738, the Court in *Bostock* relied exclusively on the specific text of Title VII. The Court "pro-ceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female." *Id.* at 1739. But the Court reasoned that the combined ordinary meaning of the words "be-cause of," *id.*, "otherwise . . . discriminate against," *id.* at 1740, and "individual," *id.*, led to the conclusion that Title VII makes "[a]n

individual's homosexuality or transgender status . . . not relevant to employment decisions," *id.* at 1741.

The Equal Protection Clause contains none of the text that the Court interpreted in *Bostock*.  It provides simply that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV.  Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case.  *See Skrmetti*, 73 F.4th at 420 (finding that the reasoning of *Bostock* "applies only to Title VII"); *see also Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc) (expressing skepticism that *Bostock*'s reasoning applies to the Equal Protection Clause of the Fourteenth Amendment because the Fourteenth Amendment "predates Title VII by nearly a century" and contains language that is "not similar in any way" to Title VII's); *see Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring) (noting the different language in Title VI and the Equal Protection Clause and explaining "[t]hat such differently worded provisions should mean the same thing is implausible on its face.")

*Brumby*, on the other hand, did deal with the Equal Protection Clause; but, like *Bostock*, *Brumby* concerned gender stereotyping in the context of employment discrimination.  *See* 663 F.3d at 1313–20 (holding that "a government agent violates the Equal Protection Clause's prohibition of sex-based discrimination when he

or she fires a transgender or transsexual employee because of his or her gender non-conformity"). So, while *Brumby* did involve the same law at issue here—the Equal Protection Clause—it discussed that law as applied to a particular factual scenario, i.e., one where an employer fired an employee for failing to adhere to certain expectations and stereotypes associated with the employee's sex. That is not the scenario presented here. Section 4(a)(1)–(3) targets certain medical interventions for minors meant to treat the condition of gender dysphoria; it does not further any particular gender stereotype. Insofar as section 4(a)(1)–(3) involves sex, it simply reflects biological differences between males and females, not stereotypes associated with either sex.

To be sure, section 4(a)(1)–(3) restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive. But just last year, the Supreme Court explained that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (alteration in original) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)); *see also id*. at 2246 (recognizing that "the 'goal of preventing abortion' does not constitute 'invidiously discriminatory animus' against women" (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273–74 (1993))). By the same token, the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation

were a pretext for invidious discrimination against such individuals. And the district court did not find that Alabama's law was based on invidious discrimination.

We similarly reject the United States' view that section 4(a)(1)–(3) is subject to heightened scrutiny because it classifies on the basis of transgender status, separate from sex. As we recently explained, "we have grave 'doubt' that transgender persons constitute a quasi-suspect class," distinct from sex, under the Equal Protection Clause. *Adams*, 57 F.4th at 803 n.5. Even if they did, for the reasons discussed with respect to gender nonconformity, section 4(a)(1)–(3)'s relationship to transgender status would not trigger heightened scrutiny. Chiefly, the regulation of a course of treatment that, by the nature of things, only transgender individuals would want to undergo would not trigger heightened scrutiny unless the regulation is a pretext for invidious discrimination against such individuals, and, here, the district court made no findings of such a pretext. For these reasons, we conclude that section 4(a)(1)–(3)'s relationship to transgender status does not warrant heightened scrutiny.

Apart from sex, gender nonconformity, and transgender status, the Minor Plaintiffs and the United States do not claim any other suspect classification. All the parties agree that section 4(a)(1)–(3) draws distinctions on the basis of age. However, "age is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). As a result, "[s]tates may discriminate on the basis of age without offending the

Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest."  *Id.*  And "[t]he rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they serve with razorlike precision."  *Id.*

Here, it seems abundantly clear that section 4(a)(1)–(3) classifies on the basis of age in a way that is rationally related to a legitimate state interest.  As discussed, Alabama has a legitimate interest in "safeguarding the physical and psychological well-being of . . . minor[s]," and notably that interest itself distinguishes minors from adults.  *Otto*, 981 F.3d at 868 (quoting *Ferber*, 458 U.S. at 756–57); *see supra* Section III.A.  Section 4(a)(1)–(3) furthers that interest by restricting the prescription and administration of puberty blockers and cross-sex hormone treatment to minors for purposes of treating discordance between biological sex and sense of gender identity based on the rational understanding that many minors may not be finished forming their identities and may not fully appreciate the associated risks.  Moreover, Alabama's decision to draw the line at the age of nineteen sufficiently approximates the divide between individuals who warrant government protection and individuals who are better able to make decisions for themselves; it is neither too over- nor under-inclusive.  For these reasons, it is exceedingly likely that section 4(a)(1)–(3) satisfies rational basis review as a classification on the basis of age.

Section 4(a)(1)–(3) is therefore subject only to rational basis review—a standard that it is exceedingly likely to satisfy for the

reasons discussed.  *See supra* Section III.A.  The district court erred
as a matter of law by applying heightened scrutiny, and that error
tainted its assessment of Plaintiffs' likelihood of success.  Because
that is true with respect to both the due process claim and the equal
protection claim, we vacate the preliminary injunction.

★ ★ ★ ★

This case revolves around an issue that is surely of the ut-
most importance to all of the parties involved: the safety and well-
being of the children of Alabama.  But it is complicated by the fact
that there is a strong disagreement between the parties over what
is best for those children.  Absent a constitutional mandate to the
contrary, these types of issues are quintessentially the sort that our
system of government reserves to legislative, not judicial, action.

Faced with this difficult and delicate set of circumstances,
the district court granted the "extraordinary and drastic remedy"
that is a preliminary injunction and enjoined Alabama from enforc-
ing part of the law in dispute.  *See Callaway*, 489 F.2d at 573.  In
doing so, the district court determined that section 4(a)(1)–(3) of
the Act is subject to heightened scrutiny on due process and equal
protection grounds and therefore the parties challenging the law
had a substantial likelihood of success on the merits as to those
claims.  That was erroneous.  With respect to the Parent Plaintiffs'
substantive due process claim, the district court divined, without
adequate historical support, that the Due Process Clause of the
Fourteenth Amendment protects the right to "treat [one's] children
with  transitioning  medications  subject  to  medically  accepted

standards." And with respect to the Minor Plaintiffs' equal protection claim, the district court determined that the law classifies on the basis of sex, when in reality the law simply reflects real, biological differences between males and females and equally restricts the use of puberty blockers and cross-sex hormone treatment for minors of both sexes. Because the district court reviewed the law under the wrong standard of scrutiny in connection with both claims, the issuance of the preliminary injunction constituted an abuse of discretion. *See Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) ("[A] court abuses its discretion in granting a preliminary injunction if, in determining whether success is likely, it incorrectly or unreasonably applies the law.").

## IV.    CONCLUSION

For these reasons, we vacate the district court's preliminary injunction on the enforcement of section 4(a)(1)–(3) of the Act.

**VACATED.**

22-11707                BRASHER, J., Concurring                1

BRASHER, Circuit Judge, concurring:

I concur in the Court's opinion. I write separately to focus on the plaintiffs' equal protection claim.

The resolution of an equal protection claim often turns on the level of scrutiny that we apply—rational basis, intermediate, or strict. The plaintiffs argue that the statute classifies based on sex, which warrants intermediate scrutiny. The Court rejects that argument, and, after much deliberation and research, I agree. Alabama's statute does not treat one sex differently than the other. It does not use sex as a proxy for some more germane classification. And it is not based on a sex stereotype. Instead, I think the law is best read to classify—not based on sex—but as between minors who want puberty blockers and hormones to treat a "discordance between their sex and their internal sense of identity," Ala. Code § 26-26-2(2), and those minors who want these drugs to treat a different condition.

But even if the statute did discriminate based on sex, I think it is likely to satisfy intermediate scrutiny. If Alabama's statute involves a sex-based classification that triggers heightened scrutiny, it does so because it is otherwise impossible to regulate these drugs differently when they are prescribed as a treatment for gender dysphoria than when they are prescribed for other purposes. As long as the state has a substantial justification for regulating differently the use of puberty blockers and hormones for different purposes, then I think this law satisfies intermediate scrutiny.

### I.

I'll start with the level of scrutiny that applies to this law. We should be cautious when we are asked to extend heightened scrutiny to novel facts like these. As Justice Stevens explained in one of the Court's leading cases on sex discrimination, the text of the Equal Protection Clause does not subject state laws to different levels of judicial scrutiny. *See Craig v. Boren*, 429 U.S. 190, 211–12 (1976) (Stevens, J., concurring). The Clause "requires every State to govern impartially," and it "does not direct the courts to apply one standard of review in some cases and a different standard in other cases." *Id.*; *see also United States v. Virginia*, 518 U.S. 515, 570 (1996) (Scalia, J., dissenting) (calling tiers of scrutiny "made-up tests"); *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 638 (2016) (Thomas, J., dissenting) (calling tiers of scrutiny "increasingly meaningless . . . formalism"). Moreover, some of the Supreme Court's most recent (and significant) equal protection precedents don't apply the tiers of scrutiny. *E.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 672–76 (2015).

Nonetheless, the Supreme Court has established the tiers of scrutiny, and lower courts must apply that doctrine the best we can. In doing so, I think we must appreciate that the tiers of scrutiny are "no more scientific than their names suggest." *Virginia*, 518 U.S. at 567 (Scalia, J., dissenting). They should be "guidelines informing our approach to the case at hand, not tests to be mechanically applied." *Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 457 (2015) (Breyer, J., concurring). To that end, when we are asked to apply

heightened scrutiny on novel facts, we need to ensure that the purposes of the doctrine warrant that approach.

In my view, many judges have mechanically applied intermediate scrutiny to laws like Alabama's without considering the reasons we subject sex classifications to heightened scrutiny. Consider the Eighth Circuit's decision in *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022). There, the court concluded that Arkansas's comparable law discriminates based on sex because, referring to cross-sex hormones, it said that "medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex." *Id.* at 669. But the court ignored the law's ban on puberty blockers, which applies the same way to both sexes. And, more fundamentally, the court did not explain how applying heightened scrutiny to a law that regulates sex-specific medical interventions is consistent with the reasons the Supreme Court created that standard.

Turning back to this case, Alabama's law is replete with sex-related language. But, even though the statute uses sex-related language, I think it is wrong to say that the statute *classifies* based on sex. The law regulates drugs that treat a "discordance between [an individual's] sex and their internal sense of identity." Ala. Code § 26-26-2(2). The law defines "sex" as "[t]he biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* § 26-26-3(3). Then the law prohibits various treatments "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or

4                      BRASHER, J., Concurring                22-11707

her gender or sex, if that appearance or perception is inconsistent
with the minor's sex as defined in this [act]." *Id.* § 26-26-4(a).

I see the word "sex" in this law. But I don't see a sex *classifi-
cation*—at least, not as the idea of a sex classification appears in our
equal-protection caselaw. Instead, it seems to me that this sex-re-
lated language classifies between, on the one hand, those minors
who want these drugs to treat a "discordance between their sex and
their internal sense of identity" and, on the other hand, those mi-
nors who want these drugs to treat a different condition. The Equal
Protection Clause "is essentially a direction that all persons simi-
larly situated should be treated alike." *City of Cleburne, Tex. v.
Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). So the right question
under the Equal Protection Clause is whether these two groups—
those who want to use these drugs to treat a discordance between
their sex and gender identity and those who want to use these
drugs to treat other conditions—are similarly situated.

That question isn't one that seems suited to heightened scru-
tiny. The Equal Protection Clause prohibits "giv[ing] a mandatory
preference to members of either sex over members of the other."
*Reed v. Reed*, 404 U.S. 71, 76 (1971). We apply heightened scrutiny
to sex classifications because of an intuition that, "[r]ather than rest-
ing on meaningful considerations, statutes distributing benefits and
burdens between the sexes in different ways very likely reflect out-
moded notions of the relative capabilities of men and women." *City
of Cleburne*, 473 U.S. at 441. When we apply heightened scrutiny to
a statute that classifies based on sex, the point is to ascertain

22-11707            BRASHER, J., Concurring            5

whether the classification is based on "traditional, often inaccurate, assumptions about the proper roles of men and women." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725–26 (1982). We are also seeking to ensure that sex is not being used as an "inaccurate proxy for other, more germane bases of classification." *Craig*, 429 U.S. at 198.

None of these rationales apply to the line drawn in Alabama's statute. It doesn't distribute benefits or burdens between men and women or arguably use sex as a proxy for other interests. It bans a course of treatment—puberty blockers and hormones— for a particular condition that affects both boys and girls. Another way to think about it: an injunction against the enforcement of Alabama's law under equal-protection principles will not equalize burdens or benefits between girls and boys. It will not require the government to treat boys and girls the same. It will merely force Alabama to *either* ban puberty blockers and hormones for all purposes *or* allow them for all purposes.

For its part, the district court applied heightened scrutiny on the theory that Alabama's statute discriminates based on a sex stereotype because it targets medical interventions for transgender people, i.e., those who feel a "discordance between their sex and their internal sense of identity." The district court cited *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011), for this proposition, but I think it misread that precedent.[1] In *Glenn*, we concluded that

---

[1] I don't fault the district court for reaching the conclusion that it did. The district court did an admirable job with a difficult case on an expedited

6                    BRASHER, J., Concurring                    22-11707

a public employer engaged in sex discrimination by firing a transgender employee who was born a man because the employee began wearing stereotypical women's clothing. *Id.* at 1314. The employer allowed biological women to wear stereotypical women's clothing, but not biological men. We held that the employer had engaged in sex discrimination under the Equal Protection Clause—not because it fired a transgender employee—but because it fired an employee "on the basis of gender-based behavioral norms." *Id.* at 1316–17. By ruling against that practice under the circumstances of that case, we required the employer to treat men and women equally, no matter their clothing choices.

Unlike the employer's decision in *Glenn*, Alabama's statute does not fit the mold of a sex-based stereotype. The statute isn't based on a socially constructed generalization about the way men or women should behave. It does not reinforce an "assumption[] about the proper roles of men and women" in our society. *Hogan*, 458 U.S. at 725–26. And it doesn't reflect society's "notions of the relative capabilities of men and women." *City of Cleburne*, 473 U.S. at 441. To be sure, the statute's classification reflects the government's recognition that, without medical intervention, a healthy child will mature in accord with his or her biological sex. But the recognition of biological reality is "not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68 (2001).

_____

timeframe. One of the benefits of the appellate process is that we have more time and resources to assess a legal question, which sometimes yields a different result.

22-11707          BRASHER, J., Concurring          7

The district court—viewing this case through the lens of sex stereotyping—did not make any findings on whether the state was justified in treating people differently because they want these drugs to treat a discordance between their sex and gender identity instead of some other condition. But the state has identified many reasons for drawing that line. For example, the record reflects that other countries are regulating the drugs differently for these purposes, and the FDA has not approved them for this purpose although it has for others. I cannot say that those reasons fail the lenient standard of rational basis review. *See Jones v. Gov. of Fla.*, 975 F.3d 1016, 1034–35 (11th Cir. 2020).

## II.

Although I believe rational basis scrutiny likely applies, I also think that, even if Alabama's statute triggered intermediate scrutiny, it would likely survive that heightened scrutiny.

Intermediate scrutiny under the Equal Protection Clause does not require us to ask whether a law is good or bad policy, but whether a government has a good reason for using a sex-based classification in a law. The relevant question is whether "*the classification* serves 'important governmental objectives and that *the discriminatory means* employed' are 'substantially related to the achievement of those objectives.'" *Hogan*, 458 U.S. at 724 (quoting *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 150 (1980)) (emphasis added). As I discuss above, the purpose of this heightened scrutiny is to ensure that laws based on sex classifications aren't using those classifications because of "outmoded notions of the relative

8                           BRASHER, J., Concurring                      22-11707

capabilities of men and women." *City of Cleburne*, 473 U.S. at 441. Instead, the use of sex must reflect that it is a "meaningful consideration[]" on which the law is based. *Id.* And so, under intermediate scrutiny, the government's burden is to establish "an 'exceedingly persuasive justification' *for the classification*." *Hogan*, 458 U.S. at 724 (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)) (emphasis added).

      Assuming the classification in this law is subject to intermediate scrutiny, I believe the state probably has an "exceedingly persuasive justification" for regulating these drugs differently when they are used to treat a discordance between an individual's sex and sense of gender identity than when they are used for other purposes. *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531). The record reflects that the use of puberty blockers and hormones for this purpose specifically carries potentially uncertain risks. The record also reflects that there is uncertainty about how to tell which patients need these interventions for this purpose and which don't. Although further fact finding in this litigation will test the plausibility of those concerns, Alabama doesn't have to conclusively prove these things to have an important governmental interest. Intermediate scrutiny permits "the legislature [to] make a predictive judgment" based on competing evidence. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799–800 (2011) (discussing relative burdens of intermediate and strict scrutiny).

Likewise, I think the state's interest is sufficiently related to the sex classification in the law to the extent there is one. Assuming this statute involves a sex-based classification, it does so because there is no other way to regulate treatments for a "discordance between [an individual's] sex and their internal sense of identity" without drawing such a distinction. Alabama would have to use sex-based language to regulate those treatments even if it wanted to subsidize them instead of banning them. So, if intermediate scrutiny applied here, the "sufficiently related" question collapses into the state interest question: it is whether Alabama has an important governmental interest in regulating the use of puberty blockers and hormones for a "discordance between [an individual's] sex and their internal sense of identity" but not for other uses. Because the record reflects that the state has that kind of interest, the statute's classification likely satisfies intermediate scrutiny.

The plaintiffs argue, in part, that Alabama is not justified in *banning* these treatments because there are less restrictive alternatives to a ban. But I don't think that is how intermediate scrutiny works under the Equal Protection Clause. Consider how the Supreme Court applied intermediate scrutiny in *Craig v. Boren*, 429 U.S. 190 (1976). There, a state law prohibited sales of alcohol to men between the ages of eighteen and twenty but not women in that age range. *Id.* at 191–92. The Court accepted that the goal of this law—"the enhancement of traffic safety"—is an important interest. *Id.* at 199–200. But it held that the government did not have sufficient evidence that a "gender-based distinction closely serves to achieve that objective." *Id.* at 200. The Court in *Craig* never

asked whether the state's decision to *ban* under-21-year-old men from drinking alcohol was justified as compared to some less restrictive, but equally sex-based, alternative—such as making men take additional driving classes or the like. Instead, the Court assessed only whether the *sex-based classification* fit closely enough to the purposes of the law. Likewise, here, I think we can resolve the plaintiffs' equal protection claim by assessing whether the state has an interest in classifying based on sex without also asking whether, even if the state were allowed to classify based on sex, the state could achieve its objective with some lesser restriction.

In short, assuming this law is subject to intermediate scrutiny, I think it likely passes. On this record, it seems clear that the state has an interest in regulating these drugs differently when they are prescribed to treat a discordance between sex and gender than when they are prescribed to treat other conditions. And the state cannot do that without drawing the lines it has drawn in this statute.

### III.

Whether rational basis or intermediate scrutiny applies, I believe this appeal comes out the same way: the state will likely prevail on the merits. Future findings of fact in the district court may establish otherwise. But at this stage, the plaintiffs have not carried their burden entitling them to a preliminary injunction. I concur.