In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11707

_____

PAUL A. EKNES-TUCKER,
Rev.,
BRIANNA BOE,
individually and on behalf of her minor son, Michael Boe,
JAMES ZOE,
individually and on behalf of his minor son, Zachary Zoe,
MEGAN POE,
individually and on behalf of her minor daughter, Allison Poe,
KATHY NOE, et al.,
individually and on behalf of her minor son, Christopher Noe,

Plaintiffs-Appellees,

*versus*

GOVERNOR, OF THE STATE OF ALABAMA,
ATTORNEY GENERAL, STATE OF ALABAMA,
DISTRICT ATTORNEY, FOR MONTGOMERY COUNTY,
DISTRICT ATTORNEY, FOR CULLMAN COUNTY,

2                    Order of the Court                    22-11707

DISTRICT ATTORNEY, FOR LEE COUNTY, et al.,

Defendants-Appellants.

————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cv-00184-LCB-SRW

————————————

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges.*

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, it is ORDERED that this case will not be reheard en banc.

————————————

* Judge Nancy Abudu recused herself and did not participate in the en banc poll.

21-11707        WILLIAM PRYOR, C.J., respecting denial        1

WILLIAM PRYOR, Chief Judge, respecting the denial of rehearing en banc:

I agree with the decision not to rehear this appeal en banc and write only to respond to a dissenting opinion. Our respected colleague argues that the "complex[]" doctrine of substantive due process is "hard," Jordan Dissent at 1, but the difficulty is inevitable. The doctrine of substantive due process does violence to the text of the Constitution, enjoys no historical pedigree, and offers judges little more than shifting and unilluminating standards with which to protect unenumerated rights. Unmoored from text and history, the drift of the doctrine—"neither linear nor consistent," *id.* at 20— is predictable. So too is its patchy legacy: unelected judges with life tenure enjoin enforcement of laws enacted by elected representatives following regular procedures, all in the name of fundamental rights that the Constitution never names but allegedly secures. In the absence of clear guidance from the Supreme Court, we should hesitate to expand the reach of this flawed doctrine. And our Court wisely declines to do so here.

As John Hart Ely famously put it, the phrase "substantive due process" is a "contradiction in terms," like "'green pastel redness.'" JOHN HART ELY, DEMOCRACY AND DISTRUST 18 (1980). The Fifth and Fourteenth Amendments prohibit the federal and state governments from depriving any person of life, liberty, or property "without due process of law." That constitutional guarantee is about legal procedures, not the substance of laws. For that reason, the Supreme Court has declared—unanimously—that the

"language" of the Due Process Clauses does not "suggest[]," let alone support, the "substantive content" that courts often have poured into them. *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985) (citation and internal quotation marks omitted). So, the Due Process Clauses are a "most curious place" to ground all-but-indefeasible protections for fundamental rights. *McDonald v. City of Chicago*, 561 U.S. 742, 809 (2010) (Thomas, J., concurring in part and in the judgment). Yet the doctrine of substantive due process shields individuals from even "general and prospective legislation enforced with all proper procedure." Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1792 (2012).

In addition to incorporating against the States most of the protections that the Bill of Rights guarantees against the federal government, the doctrine bars state infringement of "fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). That bar is not absolute, at least in theory; a challenged law may deprive an individual of a fundamental right if it satisfies strict scrutiny. *See Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017). But strict scrutiny does not pertain to either the form of adjudication that must accompany the deprivation or the procedures that the adjudication must observe—that is, to *process*. *See* Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 YALE L.J. 408, 419 (2010). The condition rests instead on the importance of the goal of the law and the narrowness of its means—that is, on nonprocedural grounds. *See Waldman*, 871 F.3d at 1292. And even when no

fundamental interest is at stake, the doctrine bars *any* "arbitrary and oppressive exercise of government power" and *all* government conduct that "shocks the conscience." *Id.* (citation and internal quotation marks omitted).

The doctrine of substantive due process has "long been controversial," *Dobbs*, 142 S. Ct. at 2246, because its potent strictures on democratic self-governance have "no footing in constitutional text" or history. *Sosa v. Martin County*, 57 F.4th 1297, 1305–06 (11th Cir. 2023) (en banc) (Newsom, J., concurring). Under the "traditional view," the Founders would have understood the Due Process Clause of the Fifth Amendment either not to "constrain the legislature at all" or to "limit the legislature's discretion in prescribing certain modes of judicial procedure." Williams, *supra*, at 454. That traditional view remains dominant. *See, e.g.*, MICHAEL STOKES PAULSEN & LUKE PAULSEN, THE CONSTITUTION 216 (2015) (due process required "executive branch and judicial officials [to] act in accordance with the legal rules—laws—that ha[d] been made in advance of the events at hand"); Chapman & McConnell, *supra*, at 1679; Timothy M. Tymkovich, Joshua Dos Santos & Joshua J. Craddock, *A Workable Substantive Due Process*, 95 NOTRE DAME L. REV. 1961, 1966–67 (2020). Disagreement on the edges of the scope of the right should not obscure the bottom line: substantive due process is an ahistorical "legal fiction." *McDonald*, 561 U.S. at 811 (Thomas, J., concurring in part and in the judgment). And nothing relevant had changed by 1868. Even then, there was almost no historical support for the policy-second-guessing function that the doctrine performs today. *See* Chapman & McConnell, *supra*, at

1679–80, 1801, 1807; Williams, *supra*, at 499; Tymkovich et al., *supra*, at 1972–73.

Some scholars argue that the phrase "due process of law" was a "legal term of art with substantive content" when the Fourteenth Amendment was ratified in 1868. *See, e.g.*, Williams, *supra*, at 496 (presenting the argument). But that argument is "hardly airtight," *id.*, and "[n]o evidence" establishes that the word "process" "meant something different" in 1868, set aside 1791, from what it does now, *see* ELY, *supra*, at 18. To trained observers no less than the ordinary man, the choice of the phrase "due process of law" to afford constitutional protection to substantive rights would have seemed "very odd." Chapman & McConnell, *supra*, at 1725.

A constitutional doctrine that lacks foundation in text or history must draw its content from another source, and substantive due process has offered judges little more than "scarce and open-ended" platitudes. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The doctrine has been said to protect rights that comprise the "essence of a scheme of ordered liberty," *McDonald*, 561 U.S. at 760 (plurality opinion) (citation and internal quotation marks omitted), or to bar state action that "shocks the conscience," *Waldman*, 871 F.3d at 1292 (citation and internal quotation marks omitted). These "vague shibboleths" clarify little. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1128 (11th Cir. 2021) (Newsom, J., concurring). That feature of substantive due process sits dangerously alongside the power that the doctrine gives life-tenured judges: to

declare unconstitutional, and enjoin enforcement of, duly enacted laws of elected representatives of the People.

Unconstrained power tempts usurpation. The history of substantive due process bears out that plain truth. In many decisions, the Supreme Court has stated that the approach to constitutional decision-making typified by *Lochner v. New York*, 198 U.S. 45 (1905), was "illegitimate," an "intrusion by the courts into a realm properly reserved to the political branches of government." Cass R. Sunstein, Lochner's *Legacy*, 87 COLUM. L. REV. 873, 874 (1987). The "freewheeling judicial policymaking" that marked "discredited" decisions like *Lochner* and *Roe v. Wade*, 410 U.S. 113 (1973), *see Dobbs*, 142 S. Ct. at 2248, is a feature, not a bug, of substantive due process. And it discredits the judiciary itself. *See, e.g., Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857).

Because the doctrine can empower judges to "usurp" authority that the Constitution leaves to elected representatives, *see Dobbs*, 142 S. Ct. at 2247, the Supreme Court has sought to discipline its application. The Court has stated, for example, that a right or liberty must be "deeply rooted" in our "history and tradition" to be immune from legislative encroachment. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation and internal quotation marks omitted). In this analysis, "liberty" must be defined "in a most circumscribed manner," in reference to "specific historical practices." *Obergefell v. Hodges*, 576 U.S. 644, 671 (2015). That is, the asserted right must be "careful[ly] descri[bed]." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

Sometimes courts have defined the asserted unenumerated right at a specific level. In *Reno*, for example, the Supreme Court rejected the proposed general description of the right at issue—"freedom from physical restraint"—and defined the right instead more specifically as the "right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* (quotation marks omitted). And in *Doe v. Moore*, we rejected a "broad framing" of the rights at issue—including the rights "to family association" and to "be free of threats to their persons and members of their immediate families"—for a more "careful" description: the "right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and [to] prevent publication of this information on Florida's Sexual Offender/Predator website." 410 F.3d 1337, 1343–44 (11th Cir. 2005).

To be sure, the *Glucksberg* test has proved occasional. In *Lawrence v. Texas*, the Supreme Court endorsed the uncircumscribed view that the Due Process Clause protected a "liberty of the person both in its spatial and in its more transcendent dimensions." 539 U.S. 558, 562 (2003). And in *Obergefell*, the Court set aside the *Glucksberg* test and defined the right to marry in a more "comprehensive sense." 576 U.S. at 671.

Yet what judicial creativity gives, a measure of judicial restraint can take away. For example, *Dobbs* did not mention the alternative *Obergefell* method. So I agree with our dissenting colleague that binding precedents like these are "not . . . reconcilable" on the key question of how narrowly to define the liberty interest. Jordan Dissent at 20.

This inconsistency is unsurprising. It is inevitable. The "controversial nature" of the doctrine of substantive due process—its lack of footing in text or history and the absence of consistent and meaningful legal standards to guide judicial analysis—*make* the caselaw "contradictory" and "imprecise." Tymkovich et al., *supra*, at 1963.

With good reason, the Supreme Court has long counseled "reluctan[ce] to expand the concept of substantive due process." *Collins*, 503 U.S. at 125. Judicial restraint, with its respect for the separation of powers and for federalism, demands "utmost care" before courts interfere. *See id.* We must "guard against the natural human tendency" to conflate what due process requires with "our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 142 S. Ct. at 2247. And we must remember that the amorphous doctrine of substantive due process does not shield every "important, intimate, and personal decision[]" from legislative impairment. *Glucksberg*, 521 U.S. at 727. So, when we consult "jurisprudence as a whole" to glean guidance, Jordan Dissent at 20, we should be skeptical about any argument to extend this misguided doctrine, with its checkered past, to define an unenumerated right

8          WILLIAM PRYOR, C.J., respecting denial          21-11707

at a high level of generality and enjoin enforcement of a law en-
acted by representatives of the People. Difficult questions of mo-
rality, parental rights, and medicine are properly left to democracy,
and we should not pretend that the Due Process Clauses give une-
lected judges the authority to second-guess public policy.

Lagoa, Circuit Judge, Concurring in the denial of rehearing en banc:

Sydney Wright took large doses of cross-sex hormones for a year. In Wright's words, her grandfather "saved [her] life" when he persuaded her to stop. As a teenager, Wright's father kicked her out of the house after he learned that she was attracted to women, and Wright began questioning if she "was really a man" because she "was attracted to girls." Wright saw a counselor who recommended that she begin taking testosterone and undergo a double mastectomy. The counselor never explored the negative effects of Wright's relationship with her parents or the years of sexual molestation that she endured as a child. Wright started testosterone injections after a ten-minute appointment with a physician who told her to learn "on YouTube" how to "give [herself] the shots."

Testosterone caused Wright's voice to deepen, permanently. She also gained fifty pounds and became pre-diabetic. After a year, her blood thickened, her red-blood-cell count increased, and she developed a blood disorder that could lead to heart attack and stroke. She also began experiencing excruciating abdominal pain, which she continues to suffer from. One day, her grandfather—who Wright describes as "the most important man in [her] life"—had a "down-to-earth" talk with her. With "tears in his eyes," he expressed concern about her treatment and asked her to take a three-year break to reevaluate her decision. According to Wright, her grandfather was "worried about [her] health," and he "never cared how [she] looked." Wright agreed to take a break, and on

further reflection, realized that she needed counseling, not hormone medications. Wright still suffers negative side effects from cross-sex hormones, including digestive problems, tachycardia, and an increased red-blood-cell count. Her gynecologist also told her that she may never be able to have children.

The record contains many stories of others who were irreversibly harmed by similar medications.[1] The Alabama Legislature decided to respond through Alabama's Vulnerable Child Compassion and Protection ("Act"). In relevant part, section 4(a)(1)–(3) of the Act provides that "no person shall" prescribe or administer puberty blocking medication or cross-sex hormones to a minor "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex." A federal district court preliminarily enjoined enforcement of part of the Act under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. But we reversed. Now, a majority of the active judges on this Court have correctly determined not to

---

[1] *See, e.g.*, Appendix A (KathyGrace Duncan), Appendix B (Carol Frietas), Appendix C (Corinna Cohn). One of the dissents argues that we should disregard Wright's testimony and the testimonies of Duncan, Frietas, and Cohn because all of them were at least eighteen years old when they started to medically transition and because "their 'treatment' did not follow WPATH Standards of Care." Rosenbaum Dis. Op. at 10–11, 10 n.8. But that is not a reason to disregard their testimony, which demonstrates that those who are eighteen or older may fail to understand the dangerous, long-term effects cross-sex hormones and puberty blockers can have. If anything, these testimonies show why a legislative body may choose to restrict the use of these drugs by minors.

rehear this case en banc. The Act, "like other health and welfare laws, is entitled to a 'strong presumption of validity.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022) (quoting *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993)).

Judge Rosenbaum's dissent characterizes the panel opinion as holding that parents do not have a constitutional right to access "life-saving medical care" for their children. Rosenbaum Dis. Op. at 4; *see also* Jordan Dis. Op. at 22 (describing the asserted right as "the right of parents to obtain medically-approved treatment for their children"). But frankly, whether puberty blockers and cross-sex hormones qualify as "life-saving" treatment—or even "medical care"—is a policy question informed by scientific, philosophical, and moral considerations. Neither an unelected district judge nor unelected circuit judges should resolve that debate for the State of Alabama. *See Kadel v. Folwell*, 100 F.4th 122, 196 (4th Cir. 2024) (en banc) (Wilkinson, J., dissenting) ("Self-governance is notably absent when the many voices seeking to provide answers are silenced by federal judges shrouded in an authority of their own design.").

Indeed, "when a legislature 'undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997) (quoting *Jones v. United States*, 463 U.S. 354, 370 (1983)). And this case only serves to underscore why. While we must evaluate the district court's work on the record it had in front of it at the time,

recent revelations confirm the danger that comes from hastening to afford constitutional protection in this area.

For example, in April 2024, Dr. Hillary Cass—the chair of a policy group commissioned by England's National Health Service ("NHS")—published the results of her four-year review of the use of puberty blockers and cross-sex hormones on minors.[2]  Cass found no evidence that puberty blockers improve gender dysphoria and no evidence that cross-sex hormones reduce suicide risk for children suffering from gender dysphoria.  *See* The Cass Review, *supra* n.2, at 179, 186, 195.  Cass also documented the extensive risks associated with puberty blockers.  *See, e.g.*, *id.* at 177–78.  In conjunction with the Cass Review, NHS announced "that there is not enough evidence to support the safety or clinical effectiveness of [puberty suppressing hormones] to make the treatment routinely available at this time."[3]  And, on May 29, 2024, the United Kingdom's Secretary of State for Health and Social Care and Northern Ireland's Minister for Health issued a temporary emergency order that "prohibits"—with limited exceptions—puberty blockers

---

[2] The Cass Review, *Independent review of gender identity services for children and young people* (2024), https://cass.independent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf [https://perma.cc/9F73-D7BW] (hereinafter, "The Cass Review").

[3] *Clinical Policy: Puberty suppressing hormones (PSH) for children and young people who have gender incongruence/gender dypsphoria [1927]*, Nat'l Health Serv., Eng. (Mar. 12, 2024), https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-gender-affirming-hormones-v2.pdf [https://perma.cc/383H-LBVX] (hereinafter, "NHS Clinical Policy").

for people under the age of 18. *See TransActual CIC v. Sec'y of State for Health and Social Care* [2024] EWHC 1936 (Admin), ¶¶ 2, 142–48. On July 29, 2024, the UK's High Court dismissed a legal challenge to the emergency order, citing the Cass Review as "powerful scientific evidence in support of restrictions on the supply of puberty blockers on the grounds that they were potentially harmful." *See id.* ¶¶ 210, 257.

Also, in March 2024, a whistleblower leaked documents and recordings impugning the credibility of the World Professional Association for Transgender Health (WPATH),[4] which promulgates the "Standards of Care" that the district court relied on in its order. *Eknes-Tucker v. Marshall* ("*Eknes-Tucker I*"), 603 F. Supp. 3d 1131, 1138–39 (M.D. Ala. 2022). The leaked documents suggest that WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks. *See, e.g., infra* at 47–49. Again, I highlight these developments only to demonstrate the ill-suitedness of this area for judicial intervention.

The propriety of the medications at issue is a quintessential legislative question, not a constitutional one. Judges Jordan and Rosenbaum would have this Court end the debate by judicially fencing off these questions from state legislatures. But our

---

[4] Mia Hughes, *The WPATH Files*, Environmental Progress (2024), https://static1.squarespace.com/static/56a45d683b0be33df885def6/t/65ea1c1ea42ff5250c88a2f5/1709841455308/WPATH+Report+and+Files%28N%29.pdf [https://perma.cc/5HLY-TSUR] (hereinafter, "The WPATH Files").

experience with the intersection of the Constitution and these types of issues suggests that this is a misguided effort. *See Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs*, 597 U.S. at 302 ("return[ing]" "authority to the people and their elected representatives" to regulate abortion). *Compare Buck v. Bell*, 274 U.S. 200 (1927), *with Box v. Planned Parenthood Ind. & Ky., Inc.*, 587 U.S. 490, 499–500 (2019) (Thomas, J., concurring) (noting that *Buck v. Bell* "gave the eugenics movement added legitimacy and considerable momentum"). Our panel opinion correctly declined to remove these issues from the political process by rejecting a novel reading of the Fourteenth Amendment that is unmoored from text, history, and tradition.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The panel opinion provides a thorough summary of the factual background and procedural history. *See Eknes-Tucker v. Governor of Alabama* ("*Eknes-Tucker II*"), 80 F.4th 1205, 1211–19 (11th Cir. 2023). Here, I provide a summary of the relevant provisions of the Act and a brief overview of the procedural history.

### A.  The Act

The Alabama Legislature passed the Act on April 7, 2022, and Governor Ivey signed it the next day. Section 3(1) incorporates the definition of "minor" found in another part of the code, which is a "person who is under 19 years of age." Ala. Code § 43-8-1(18). And section 3(3) defines "sex" to mean "[t]he biological state of being male or female, based on the individual's sex organs,

chromosomes, and endogenous hormone profiles." Section 4(a) then states, in part, that "no person shall engage in or cause" the prescription or administration of (1) "puberty blocking medication to stop or delay normal puberty," (2) "supraphysiologic[5] doses of testosterone or other androgens to females," or (3) "supraphysiologic doses of estrogen to males," "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex."[6] Section 4(b), however, provides an exception if "a procedure [is] undertaken to treat a minor born with a medically verifiable disorder of sex development," and includes some examples of such disorders.[7]

---

[5] Supraphysiologic means of or pertaining to an amount "greater than normally present in the body." *See Supraphysiologic*, *Merriam-Webster*, https://www.merriam-webster.com/medical/supraphysiological [https://perma.cc/QW8K-882J].

[6] Section 4 also forbids performing surgeries that sterilize, performing surgeries that "artificially construct tissue with the appearance of genitalia that differs from the individual's sex," and removing "any healthy or non-diseased body part or tissue, except for a male circumcision." Act § 4(a)(4)–(6). Plaintiffs originally challenged these portions of the Act also, but represented at the beginning of the preliminary-injunction hearing below that they were no longer seeking a preliminary injunction with respect to them. *See Eknes-Tucker I*, 603 F. Supp. 3d at 1139 n.5.

[7] These disorders include: (1) "[a]n individual born with external biological sex characteristics that are irresolvably ambiguous, including an individual born with 46 XX chromosomes with virilization, 46 XY chromosomes with under virilization, or having both ovarian and testicular tissue"; and (2) "[a]n individual whom a physician has otherwise diagnosed with a disorder of sexual development, in which the physician has determined through genetic or

## B. Procedural History

Shortly after the Governor signed the Act, the Plaintiffs—including transgender minors (the "Minor Plaintiffs") and their parents (the "Parent Plaintiffs")—sued several Alabama state officials (collectively, "Alabama"). Relevant to this appeal, the Plaintiffs alleged that the Act violated the Due Process Clause of the Fourteenth Amendment by depriving the Parent Plaintiffs of their right to direct the upbringing of their children, and alleged that the Act violated the Equal Protection Clause by discriminating against the Minor Plaintiffs on account of their sex and transgender status.

The Plaintiffs then moved for a preliminary injunction.[8] After a three-day hearing—at which the district court heard evidence from both sides about the efficacy of the treatments proscribed by the Act, *see Eknes-Tucker II*, 80 F.4th at 1215–18—the district court granted the Plaintiffs' motion with respect to Section 4(a)(1)–(3), *see Eknes-Tucker I*, 603 F. Supp. 3d at 1138, 1151. The district court concluded that the Plaintiffs had a substantial likelihood of success on the merits as to their due-process and equal-protection claims. With respect to the due-process claim, the district court concluded

---

biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female." Act § 4(b).

[8] The United States moved to intervene on behalf of the Plaintiffs under Federal Rule of Civil Procedure 24 and filed its own motion to enjoin enforcement of the Act on equal-protection grounds. The district court granted intervention and the United States's motion for injunctive relief to the same extent it granted the Plaintiffs' motion. *Eknes-Tucker I*, 603 F. Supp. 3d at 1151.

that the Parent Plaintiffs were substantially likely to show that they have a "fundamental right to treat their children with transitioning medications subject to medically accepted standards," and that section 4(a)(1)–(3) violates this right, triggering strict scrutiny. *Id.* at 1144–45. And, in the eyes of the district court, section 4(a)(1)–(3) likely failed to satisfy strict scrutiny. *Id.* at 1146. With respect to the equal-protection claim, the district court concluded that the Act "amounts to a sex-based classification," meaning it needed to satisfy intermediate scrutiny. *Id.* at 1147. Again, the district court found that the Act likely failed to meet this burden. *Id.* at 1148. Alabama subsequently appealed.

## II.    ANALYSIS

On appeal, the panel unanimously concluded that the district court abused its discretion by preliminarily enjoining Alabama officials from enforcing section 4(a)(1)–(3) of the Act. *Eknes-Tucker II*, 80 F.4th at 1210. We held that the Due Process Clause does not secure "a constitutional right to 'treat [one's] children with transitioning medications subject to medically accepted standards,'" and that the Act does not discriminate "on the basis of sex or any other protected characteristic." *Id.* at 1210–11, 1219–31 (alteration in the original). Thus, we concluded that section 4(a)(1)–(3) was subject only to rational-basis review, and, as a consequence, the district court's "determination that the plaintiffs have established a substantial likelihood of success on the merits [could not] stand." *Id.* at 1210–11; *see id.* at 1231. We therefore vacated the preliminary injunction. *Id.* at 1211, 1231.

Some of my dissenting colleagues interpret the Fourteenth Amendment differently.  I respectfully disagree.  Below, I first explain why the panel's understanding of the Fourteenth Amendment is consistent with text, history, tradition, and existing precedent.  I then explain why Alabama's decision is a rational exercise of its police power.

## A. Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Because this Clause makes no express mention of a parent's right to access cross-sex hormones and puberty blockers on behalf of a child, the Parent Plaintiffs "must show that the right is somehow implicit in the constitutional text." *Dobbs*, 597 U.S. at 235.

"The most familiar office of [the Due Process] Clause is to provide a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  But the Supreme Court has said that the Due Process Clause protects "two categories of substantive rights"—a great majority of those enumerated in the first eight Amendments as well as "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 597 U.S. at 237.  The Supreme Court has long been "reluctant" to add a new right to this list, *Collins*, 503 U.S. at 125, because "[i]dentifying unenumerated rights carries a serious risk of judicial overreach," *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1821–22 (2024);

*cf. United States v. Johnson*, 921 F.3d 991, 1021 (11th Cir. 2019) (en banc) (Rosenbaum, J., dissenting) (recognizing that "the 'doctrine of judicial self-restraint requires us to exercise the utmost care whenever we . . . break new ground'" (alteration in the original) (quoting *Collins*, 503 U.S. at 125)). Otherwise, "the liberty protected by the Due Process Clause" would simply reflect the "policy preferences" of the federal judiciary. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

Out of this cautious approach grew the requirement that a substantive-due-process analysis "must begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Heeding this directive, the panel opinion's description of the right claimed here came directly from the district court, which concluded that the Parent Plaintiffs likely have a "fundamental right to treat their children with transitioning medications subject to medically accepted standards." *Eknes-Tucker I*, 603 F. Supp. 3d at 1144.

The dissents take issue with this framing. Judge Jordan describes our analysis as "too simple" and says that we "ignore[] many Supreme Court cases that define fundamental rights at a much more general level without requiring established and precise historical pedigrees." Jordan Dis. Op. at 2. He "cite[s] with confidence to the dissent of Justice Stevens in *McDonald*," *id.* at 7, where Justice Stevens suggested that courts need not "define the asserted right at the most specific level, thereby sapping it of a universal valence and moral force it might otherwise have," *McDonald v. City of Chicago*,

561 U.S. 742, 882 (2010) (Stevens, J., dissenting). Judge Jordan would instead define the right as a parent's right "to obtain medically-approved treatment for their children." Jordan Dis. Op. at 22.

Judge Rosenbaum defines the right at stake as "parents' fundamental right to direct that their child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment." Rosenbaum Dis. Op. at 1. Her opinion also faults our panel for "hyper-narrowly describ[ing] the asserted right." *Id.* at 31.

And Judge Wilson argues that en banc review is justified because of Judges Jordan and Rosenbaum's disagreement with our framing of the supposed right at stake, as well as the fact that the district court also framed the right at a higher level of generality. Wilson Dis. Op. at 1–2.

Respectfully, the panel's framing of the right is squarely within the approach taken by our Circuit, as Judge Jordan acknowledges. *See* Jordan Dis. Op. at 1 (recognizing that "[t]here is admittedly some support in our cases for the panel's approach"). For example, in *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005), the plaintiffs challenged, among other things, Florida's sex offender registration/notification scheme. *Id.* at 1339. The plaintiffs argued that this scheme—under which sex offenders registered and then the state published their information on the internet—violated substantive due process. *Id.* at 1342. Specifically, the plaintiffs alleged that it infringed their "rights to family association, to be free of

threats to their persons and members of their immediate families, to be free of interference with their religious practices, to find and/or keep any housing, and . . . to find and/or keep any employment." *Id.* at 1343.

But instead of accepting this broad framing of the supposed rights at stake, this Court "endeavor[ed] to create a more careful description of the asserted right in order to analyze its importance." *Id.* A "careful description of the fundamental interest at issue here," we explained, "allows us to narrowly frame the specific facts before us so that we do not stray into broader 'constitutional vistas than are called for by the facts of the case at hand.'" *Id.* at 1344 (quoting *Williams v. Att'y Gen. of Ala.,* 378 F.3d 1232, 1240 (11th Cir. 2004)). This did not mean, we said, that "cases involving other privacy interests or burdens on those interests" were irrelevant, only that "we must quantify the claimed right in narrow terms before analyzing its historical importance in the second prong where discussion of prior case law is more appropriate." *Id.* at 1344 n.4. So, after reviewing the law and the parties' arguments, we determined that that supposed right at issue there was "the right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website." *Id.* at 1344.

Similarly, in *Morrissey v. United States*, 871 F.3d 1260 (11th Cir. 2017), the plaintiff alleged that the IRS's disallowance of a claimed deduction for IVF-related costs infringed "his fundamental

right to reproduce." *Id.* at 1268.  We recognized that the Supreme Court had "referred to procreation as 'fundamental to the very existence and survival of the [human] race' and as a 'basic civil right[] of man.'"  *Id.* (alterations in the original) (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)).  But the question in *Morrissey*, we said, was "not whether the Constitution protects a right to 'procreation' generally."  *Id.* at 1269.  Rather than rest at this level of generality, this Court went further, providing that the pertinent question in the case was "whether a man has a fundamental right to procreate via an IVF process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate."  *Id.*

The approach taken by these cases explains our framing of the alleged "right" at issue here.[9]  And while it is true that a plurality of the Supreme Court has recognized, at a high level of generality, "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion), there is no accompanying suggestion from the Court that plaintiffs asserting a supposed right under this umbrella are exempt from the "careful description" requirement found elsewhere in the case law.  To the contrary, as a recent decision makes clear, the Court has continued to define

---

[9] As I discuss below, even if we were to accept the framing offered by either Judge Jordan or Judge Rosenbaum, both still fail to "engage[] in a careful analysis of the history of the right at issue."  *Dobbs*, 597 U.S. at 238.

alleged unenumerated rights narrowly so as to maintain fidelity to the facts before it in each case. *See Muñoz*, 144 S. Ct. at 1822.[10]

There is also the fact that most of the cases concerning parental rights "pertain to issues of education, religion, or custody." *Eknes-Tucker II*, 80 F.4th at 1222. In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court set aside a schoolteacher's conviction, which was predicated on the violation of a state law forbidding the teaching of most foreign languages before the eighth grade. *Id.* at 396–97, 401–403. Among other things, the Court reasoned that the "liberty" guaranteed by the Due Process Clause included the right to "establish a home and bring up children." *Id.* at 399. Two years later, in *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925), the Supreme Court concluded that an Oregon law—which required children from ages eight to sixteen to attend public school—"unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id.* at 530, 534–35; *see also id.* at 535 ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.").

Child labor laws were at issue in *Prince v. Massachusetts*, 321 U.S. 158 (1944). The petitioner, a Jehovah's Witness, was the aunt

---

[10] In *Muñoz*, the respondent invoked the "fundamental right of marriage," but the Court pushed further, concluding that the respondent actually "claim[ed] something distinct: the right to reside with her noncitizen spouse in the United States." 144 S. Ct. at 1822 (emphasis omitted).

and custodian of a nine-year-old girl. *Id.* at 159, 161. After allowing the girl to assist with sidewalk preaching efforts, the petitioner was charged with furnishing the girl with magazines to sell and permitting her to work in violation of the law. *Id.* at 160, 162. Pointing to *Meyer* and *Pierce*, the Court said that it "is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 166. At the same time, the Court recognized "that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare" and that the "state's authority over children's activities is broader than over like actions of adults." *Id.* at 167–68.

In *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Supreme Court held that Wisconsin's compulsory-school attendance law for students up to the age of sixteen violated the First and Fourteenth Amendments. *Id.* at 234. The Court described the interest at stake as "the fundamental interest of parents . . . to guide the religious future and education of their children." *Id.* at 232; *see id.* at 233 ("[T]he Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children."). But even in *Yoder*, the Court made clear that "the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 233–34.

The Supreme Court's other parental-rights cases mostly involve custody issues. *Stanley v. Illinois*, 405 U.S. 645 (1972), for example, concerned an unwed father's challenge to Illinois's procedure for custody determinations upon the death of the mother. *Id.* at 646–47. The Court held that the procedure—which presumed unwed fathers are unfit to raise their children—was at odds with the Fourteenth Amendment. *Id.* at 657–58. Along the way, the Court recognized that the father's interest in "retaining custody of his children is cognizable and substantial" and that a parent's interest "in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" *Id.* at 651–52 (alteration in the original) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 95 (1949) (Frankfurter, J., concurring)). At issue in *Quilloin v. Walcott*, 434 U.S. 246 (1978), was the constitutionality of the application of Georgia's adoption law "to deny an unwed father authority to prevent adoption of his illegitimate child." *Id.* at 247. While the Court recognized that "the relationship between parent and child is constitutionally protected" and said that "it is now firmly established that 'freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment,'" it concluded that Georgia's law was not unconstitutional as applied. *Id.* at 255 (alteration in the original) (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639–640 (1974)).

In *Santosky v. Kramer*, 455 U.S. 745 (1982), the Supreme Court considered the constitutionality of New York's statutory scheme governing the termination of parental rights in cases of permanent neglect. *Id.* at 748–52. The Court held that the parents in that case were deprived of due process, as the statute at issue required only a "fair preponderance of the evidence" to support a finding of permanent neglect. *Id.* at 747, 768. Along the way to that conclusion, the Court referenced the "fundamental liberty interest of natural parents in the care, custody, and management of their child." *Id.* at 753.

And *Troxel* concerned the constitutionality of Washington's statute that afforded "[a]ny person" the ability to petition a court for visitation rights. 530 U.S. at 61 (plurality opinion). A plurality of the Court said that this statute—which allowed a state court to grant such rights if in the best interest of the child, even if the child's parent opposed—unconstitutionally infringed on "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," as applied to facts of the case at issue. *Id.* at 66–67.

We are not free to divorce the facts of these cases from the rules they set forth. *See, e.g., Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("[R]egardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."); *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are

announced."); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 333 (1827) (Marshall, C.J., dissenting) ("[T]he positive authority of a decision is co-extensive only with the facts on which it is made."). As the Supreme Court recently reminded, judicial "opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023); *accord Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (explaining that courts should "read general language in judicial opinions . . . as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering"). Therefore, without an accompanying historical showing justifying such a move, we cannot extend the holdings of these cases to the facts here.

Both Judge Jordan and Judge Rosenbaum rely most heavily on another case, *Parham v. J. R.*, 442 U.S. 584 (1979). But no matter how many times they turn to *Parham*, it does not "control[] the analysis." Rosenbaum Dis. Op. at 29. As we explained in the panel opinion, *Parham* does not provide that the Fourteenth Amendment guarantees parents the ability to disregard state regulations on available medical care. *Eknes-Tucker II*, 80 F.4th at 1222–23. And a sister circuit agrees. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 477 (6th Cir. 2023) ("Nothing in *Parham* supports an affirmative right to receive medical care, whether for a child or an adult, that a state reasonably bans.").

In *Parham*, a group of minors brought a procedural-due-process challenge to Georgia's statutory scheme governing the admission of children to mental hospitals. 442 U.S. at 587–88. Importantly, this scheme allowed parents to apply for their child's hospitalization. *Id*. at 590–91. Judges Jordan and Rosenbaum are correct that the Court considered the interests of the parents in reaching a conclusion as to the procedural protections owed to the plaintiffs under the Due Process Clause. *Id*. at 601–04. Drawing from its precedents, the Court said that a parent's "high duty . . . to recognize and prepare [their children] for additional obligations" includes a duty to "recognize symptoms of illness and to seek and follow medical advice." *Id*. at 602 (second alteration in the original) (quoting *Pierce*, 268 U.S. at 535). Because of this, the Court said that the presence of disagreement between parent and child as to the proper course of treatment "does not diminish the parents' authority to decide what is best for the child," and does not provide cause for governmental intervention. *Id*. at 603–04. With respect to voluntary commitment, the Court concluded that its precedents "permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply." *Id*. at 604. But, in light of "the child's rights and the nature of the commitment decision," the Court also cautioned that "parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized." *Id*. Instead, the Court said, any decision is "subject to a physician's independent examination and medical judgment." *Id*.

The Court ultimately concluded that "some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied," but it rejected a "formalized, factfinding hearing" because that could lead to a "significant intrusion into the parent-child relationship." *Id.* at 606, 610. "Pitting the parents and child as adversaries," said the Court, "often will be at odds with the presumption that parents act in the best interests of their child." *Id.* at 610.

In determining *Parham*'s relevance to this case, context is again key. *See Nat'l Pork Producers*, 598 U.S. at 373–74. In other words, we must not "rely[] on general statements from [*Parham*] dealing with governmental actions not even remotely similar to those involved here." *Parham*, 442 U.S. at 608 n.16. While this case is about a conflict between the Parent Plaintiffs and Alabama over substantive-due-process requirements, *Parham* was concerned with procedural-due-process requirements in a context that could pit parents and children "as adversaries." *Id.* at 610. And in *Parham*, the question before the Court involved a Georgia law *permitting* institutionalization as a state-approved form of medical treatment. As we pointed out in the panel opinion, the question in *Parham* was not whether, under the Fourteenth Amendment, a Georgia law *barring* institutionalization had to give way in light of a parent's desire to institutionalize their child. *See Eknes-Tucker II*, 80 F.4th at 1223. *Parham* did not say, for example, that Georgia was constitutionally forbidden from ending its voluntary commitment scheme if parents disagreed with that decision. In fact, the Court indicated that the opposite was true. *See Parham*, 442 U.S. at 604 ("Parents in

Georgia in no sense have an absolute right to commit their children to state mental hospitals; the statute requires the superintendent of each regional hospital to exercise independent judgment as to the child's need for confinement."). The *Parham* Court also recognized that "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.* at 603.[11]

Importantly, the Supreme Court later rejected an attempt to turn *Parham* into the decision some of the dissenters want it to be. In *Cruzan ex rel. Cruzan v. Director, Missouri, Department of Health*, 497 U.S. 261 (1990), the Court refused to read *Parham*, "a decision which allowed a State to rely on family decisionmaking," as setting forth "a constitutional requirement that the State recognize such

---

[11] Judge Rosenbaum states that this analysis "elementally misunderstands the nature of a fundamental right," as "[c]onstitutional protections are not so susceptible to state-law abrogation." Rosenbaum Dis. Op. at 24; *see also* Jordan Dis. Op. at 23–25. In the abstract, she is of course correct that a state law cannot trump an individual right afforded by the federal constitution. But here, we are tasked with the antecedent question: whether the Parent Plaintiffs are substantially likely to show that they have such a right in the first place. To do so, we must consult text, history, and tradition, as informed by binding precedent, to determine whether the Due Process Clause affords such a right and strips Alabama of the authority to enforce the Act. *See United States v. Comstock*, 560 U.S. 126, 159 (2010) (Thomas, J., dissenting) ("The States . . . are free to exercise all powers that the Constitution does not withhold from them."). The point we made in the panel opinion, *Eknes-Tucker II*, 80 F.4th at 1223, is that *Parham* does not recognize the right claimed by the Parent Plaintiffs, and thus does not stand for the proposition that Alabama lacks the authority to enforce the Act in light of parental dissent.

decisionmaking." *Id.* at 286. "[C]onstitutional law," according to the Court, "does not work that way." *Id.*

Attempts to distinguish away *Cruzan* come up empty. Judge Rosenbaum reads *Parham* to recognize a fundamental right and then says that *Cruzan*, with its different facts, did not limit that right. *See* Rosenbaum Dis. Op. at 19–23. But *Cruzan* did not distinguish *Parham* on any of the grounds offered by Judge Rosenbaum. Instead, the Court in *Cruzan* disagreed with the petitioner's view of "constitutional law," as evidenced by the petitioner's reading of *Parham*, which is like the reading offered by Judges Jordan and Rosenbaum. *See Cruzan*, 497 U.S. at 286. The panel's refusal to adopt a view of constitutional law rejected by the Supreme Court is hardly "sidestep[ping]" Supreme Court precedent. Rosenbaum Dis. Op. at 23.

In short, while some of the dissenters chant *Parham* "like a mantra," they "cannot give [*Parham*] substance that it lacks." *Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117, 2138 (2024). *Parham* does not lead to the conclusion that the Parent Plaintiffs have a constitutional right to override Alabama's decision regarding the availability of the medications prohibited for use by minors under the Act.

Thus, though purporting to simply apply Supreme Court precedent, both Judge Jordan and Judge Rosenbaum would have us mark out new terrain.[12] While the Supreme Court's substantive-

---

[12] This Court's decisions similarly provide no support for the understanding of the Due Process Clause shared by Judges Jordan and Rosenbaum, the district

due-process precedents do not rule out such a move, they do de-mand a showing that a right is "deeply rooted in [our] history and tradition" and "essential to our Nation's 'scheme of ordered lib-erty.'" *Dobbs*, 597 U.S. at 237 (alteration in the original) (quoting *Timbs v. Indiana*, 586 U.S. 146, 150 (2019)).  To conduct this inquiry, we must engage "in a careful analysis of the history of the right at issue." *Id.* at 238.  This analysis is "essential whenever we are asked to recognize a new component of the 'liberty' protected by the Due Process Clause because the term 'liberty' alone provides little guid-ance." *Id.* at 239.  It also guards against "usurp[ing] authority that the Constitution entrusts to the people's elected representatives" and engaging in "freewheeling judicial policymaking." *Id.* at 239–40.

The approach taken by the district court—and by extension those defending its decision—does not pay "careful 'respect [to] the teachings of history.'" *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 501 (1965) (Harlan, J., concurring in the judgment)).  The Supreme Court's opinion in *Timbs* traced the right at issue in that case "back to [the] Magna Carta, Blackstone's Commentaries, and 35 of the 37 state constitutions in effect at the ratification of the

---

court, and the Appellees. *Eknes-Tucker II*, 80 F.4th at 1223–24, 1223 n.15.  Judge Jordan criticizes the panel's characterization of *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990), Jordan Dis. Op. at 3–5, but I do not see how his criticism ultimately supports his argument.  In other words, even if we assume *Bendi-burg* is "largely irrelevant," *id.* at 5, this does not change the fact that this Court's cases do not support Judge Jordan's reading of the Due Process Clause.

Fourteenth Amendment." *Dobbs*, 597 U.S. at 238 (citing *Timbs*, 586 U.S. at 151–54). And the Supreme Court's opinion in *Glucksberg* "surveyed more than 700 years of 'Anglo-American common law tradition.'" *Id.* at 239 (quoting *Glucksberg*, 521 U.S. at 711). But the district court failed to point to any ratification-era support for its decision—"no state constitutional provision, no statute, no judicial decision, [and] no learned treatise." *Id.* at 251; *see Eknes-Tucker II*, 80 F.4th at 1221 ("[T]he district court's order does not feature any discussion of the history of the use of puberty blockers or cross-sex hormone treatment or otherwise explain how that history informs the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868.").[13]

Judges Jordan and Rosenbaum similarly fail to supply the needed historical support. This holds true even if we assume that they correctly framed the alleged right at stake. Finding the proper level of specificity does not exempt one from "engag[ing] in a careful analysis of the history of the right at issue." *Dobbs*, 597 U.S. at 238. And neither Judge Jordan nor Judge Rosenbaum has demonstrated that the ability to obtain medically-approved or non-experimental treatment, despite state regulation to the contrary, is

---

[13] A word about the so-called "1868 Methodology." *See* Rosenbaum Dis. Op. at 1–2, 32–37. Judge Rosenbaum mischaracterizes the panel opinion as concluding that parents have the fundamental right to direct that their children receive "medical treatments in existence as of 1868." *Id.* at 1. That issue, of course, was not before the panel. And the panel opinion merely notes the absence of any historical support for the position reached by the district court—a deficiency not cured on appeal.

"deeply rooted in [our] history and tradition." *Id.* at 237 (alteration in the original) (quoting *Timbs*, 586 U.S. at 150). If their understanding of the Due Process Clause was correct, we would expect to see some evidence of such a right's existence before and after the Fourteenth Amendment's ratification. But, at least on the arguments presented in this case, no one comes close to demonstrating the existence of a right "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id.* at 231 (quoting *Glucksberg*, 521 U.S. at 721).

This lack of history should not be surprising given that "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (quoting *Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756 (1985)); *cf. Muñoz*, 144 S. Ct. at 1823 (refusing to recognize a right under *Glucksberg* when "the through line of history" is recognition of the government's power to regulate). Included within these police powers is the authority to legislate to "preserv[e] and promot[e] the welfare of the child," *Santosky*, 455 U.S. at 766, and to "safeguard[] the physical and psychological well-being of a minor," *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982), even if, in some cases, this limits parental discretion, *see Prince*, 321 U.S. at 167. Indeed, the Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982).

Importantly, a state's exercise of this authority is not contingent on the approval of the expert class. The Constitution's contours are not shaped by expert opinion. *See Dobbs*, 597 U.S. at 272–73 (suggesting that the position of groups like the American Medical Association does not "shed light on the meaning of the Constitution"); *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) (explaining that "institutional positions cannot define the boundaries of constitutional rights"). "[F]rom time immemorial," the states have regulated those who practice medicine. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889); *see Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). And the Due Process Clause does not mandate the opposite arrangement.

Additionally, neither Judge Jordan nor Judge Rosenbaum has assembled a historical record demonstrating that adults themselves possess the constitutional right to access the medications at issue, or any specific medication, for that matter. And the weight of the authority indicates that the opposite is true. Many of our sister circuits "have rejected arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710 (D.C. Cir. 2007) (en banc); *see id.* at 710 n.18 (collecting cases); *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993) ("[M]ost federal courts have held that a patient does not have a constitutional right

to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider."). Instead, "our Nation's history evidences increasing regulation of drugs as both the ability of government to address these risks has increased and the risks associated with drugs have become apparent." *Abigail All.*, 495 F.3d at 711. Because we have recognized that a parent's right to "make decisions for his [son or daughter] can be no greater than his rights to make medical decisions for himself," *Doe ex rel. Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983), these cases strongly support the result reached by the panel opinion. This is especially true because the "state's authority over children's activities is broader than over like actions of adults." *Prince*, 321 U.S. at 168.

For all these reasons, the panel was correct to conclude that the Parent Plaintiffs have failed to establish the existence of a fundamental right. I write further, though, to highlight additional doubts that I have about the Parent Plaintiffs' arguments.

First, even if the historical record lent credence to the idea that there was a parental right to obtain medically approved or non-experimental medications in the face of governmental prohibition, I am skeptical that this right would be implicated here. "[I]n areas where there is medical and scientific uncertainty," state legislatures are afforded "wide discretion to pass legislation." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). And with this wide discretion comes an exceedingly narrow role for federal courts. If it were

otherwise, we would often find ourselves answering questions that should be answered by the political branches.  Instead of merely "say[ing] what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), we would be "decid[ing] the proper balance between the uncertain risks and benefits of medical technology," *Abigail All.*, 495 F.3d at 713, and imposing a "constitutional straightjacket" in the process, *Skrmetti*, 83 F.4th at 473.  That is not our role.

Below, the district court extended the Constitution's protections despite considerable uncertainty, based in part on its conclusion that Alabama failed to produce "evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria." *Eknes-Tucker I*, 603 F. Supp. 3d at 1145.  But that statement is not quite right.[14]  As I explain in my discussion of rational-basis review, Alabama did in fact produce evidence to that effect.[15]  *See infra* at 43–47.  And recent revelations only serve to confirm the impropriety of the district court's intervention.  I make note of them not because they change our review of the district court's order, but because they highlight the issues

_____

[14] Indeed, elsewhere in its order, the district court recognized that "transitioning medications" come with "[k]nown risks," including "loss of fertility and sexual function." *Eknes-Tucker I*, 603 F. Supp. 3d at 1139; *see also id.* at 1145 (recognizing that the "Defendants offer some evidence that transitioning medications pose certain risks").

[15] For example, studies suggest that significant health risks may stem from the use of these medications, including sterility, sexual dysfunction, lower bone density, high blood pressure, breast cancer, liver disease, cardiovascular disease, and weight gain.

that often arise when courts extend the Constitution's protections to areas subject to all sorts of uncertainty.

For example, when the district court entered the order under review, it concluded that "no country or state in the world categorically bans the[] use" of puberty blockers and cross-sex hormones "as Alabama has." *Eknes-Tucker I*, 603 F. Supp. 3d at 1145. But other countries have started to adopt Alabama's position. In March 2024, England's NHS announced that puberty blockers are no longer available as a routine treatment for English minors suffering from gender dysphoria. NHS "concluded that there is not enough evidence to support the safety or clinical effectiveness" of such drugs "to make the treatment routinely available at this time."[16] NHS Clinical Policy, *supra* n.3, at 3. And as noted earlier, the UK has also temporarily banned puberty blockers (with limited exceptions) through an emergency order, which the UK's High Court recently sustained. *See TransActual CIC* [2024] EWHC 1936 (Admin), ¶¶ 142–48, 257.

The district court also relied heavily on the Standards of Care promulgated by WPATH, *Eknes-Tucker I*, F. Supp. 3d at 1138–39, 1145, which one dissenter considers the "leading authority" in

---

[16] NHS has also placed severe restrictions on "gender affirming hormones," allowing for their use only after a child has turned sixteen and meets several other criteria. *See Prescribing of Gender Affirming Hormones (masculinising or feminising hormones) as part of the Children and Young People's Gender Service*, Nat'l Health Serv., Eng., (Mar. 21, 2024), https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-prescribing-of-gender-affirming-hormones.pdf [https://perma.cc/Q2TX-5KWP].

this area.  Rosenbaum Dis. Op. at 29.  But recent revelations indicate that WPATH's lodestar is ideology, not science.  For example, in one communication, a contributor to WPATH's most recent Standards of Care frankly stated, "[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits."  This only reinforces the district court's improper reliance on the scientific claims of an advocacy organization to craft constitutional law.  Indeed, as others have recognized, WPATH's Standards of Care "reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery."  *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see also Edmo v. Corizon, Inc.*, 949 F.3d 489, 497 (9th Cir. 2020) (O'Scannlain, J., opinion respecting the denial of rehearing en banc) ("The WPATH Standards are merely criteria promulgated by a controversial private organization with a declared point of view.").[17]

These revelations only further underscore the reality that a judge is not fit, in a preliminary posture and on a limited record, to remove matters like this one from an ongoing public debate.  Even assuming parents possessed a right to compel access to certain

---

[17] As the Fifth Circuit went on to explain, one of the doctors who helped draft a previous edition of WPATH's Standards of Care testified that the Standards of Care "is not a politically neutral document."  *Gibson*, 920 F.3d at 222 (emphasis omitted) (quoting *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014) (en banc)).  Instead, "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered."  *Id.* (quoting *Kosilek*, 774 F.3d at 78).

medical treatments for their children, this right certainly does not include the ability to access substances that gravely threaten a child's development. *Cf. Prince*, 321 U.S. at 165 ("It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens."). And if it turns out that the substances at issue here have such effects, a judicial ruling to the contrary would facilitate, rather than prevent, irreparable harm.

Some substantive-due-process cases may be hard. Jordan Dis. Op. at 1. This one is not. Judge Jordan reminds us "that it is a constitution we are expounding." Jordan Dis. Op. at 2 (alteration adopted) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 443 (1934)).[18] But "[p]recisely because 'it is a constitution we are expounding,' we ought not to take liberties with it." *Nat'l Mut. Ins. Co. of Dist. Of Col. v. Tidewater Transfer Co.*, 337 U.S. 582, 647 (1949) (Frankfurter, J., dissenting) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819)). Our legal tradition rightly entrusts parents with broad authority in the lives of their children. But that

---

[18] As Justice Scalia explained, this line from Chief Justice Marshall has long been misread to justify interpreting the Constitution in a way that is unmoored from its text and history. *See* Antonin Scalia, *Essay: Assorted Canards of Contemporary Legal Analysis*, 40 Case W. Res. L. Rev. 581, 594–96 (1989); *see also Ogden*, 25 U.S. (12 Wheat.) at 332 (Marshall, C.J., dissenting) (The Constitution's words "are to be understood in that sense in which they are generally used by those for whom the instrument was intended [and] its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers.").

tradition also provides no basis for concluding that this authority extends to the circumstances presented by this case. The district court thus erred by applying heightened scrutiny. The Act need only satisfy the rational-basis test, and the Parent Plaintiffs do not have a substantial likelihood of success in arguing that it does not. *See infra* at 42–52.

## B. Equal Protection

Judge Rosenbaum's and Judge Wilson's dissents also disagree with our equal-protection holding, arguing that the Act discriminates based on sex and transgender status. Rosenbaum Dis. Op. at 46–63; Wilson Dis. Op. at 3–5. But the Act applies equally to everyone regardless of their sex or transgender status. And transgender status is not a classification protected by the Equal Protection Clause. These points are discussed in turn below.

### 1. *The Act does not discriminate based on sex.*

Supposedly, the Act unconstitutionally discriminates based on sex because "but for the Minors' birth-assigned sex," they could access puberty blockers and cross-sex hormones. Rosenbaum Dis. Op. at 49. For example, Judge Rosenbaum notes that the Act prohibits a "birth-assigned boy" from "tak[ing] estrogen" for the proscribed purpose while a "birth-assigned girl" can take estrogen to cure "an estrogen deficiency." *Id.* In other words, Judge Rosenbaum argues that the Equal Protection Clause requires Alabama to make cross-sex hormones and puberty blockers available for the

proscribed purpose so long as Alabama allows the use of puberty blockers and cross-sex hormones for other purposes.

Therein lies the problem with her reasoning: The Act discriminates based on purpose, not sex. The Act prohibits everyone under the age of nineteen—regardless of their sex—from using cross-sex hormones or puberty blockers "for the *purpose* of attempting to alter the appearance of or affirm [their] perception of [their] gender or sex, if that appearance or perception is inconsistent with [their] sex." Act § 3–4(a) (emphasis added); Ala. Code § 43-8-1(18). Likewise, the Act allows everyone under the age of nineteen—regardless of their sex—to use cross-sex hormones and puberty blockers for other purposes, such as treating central precocious puberty. Act § 4(b)(2).

True, the Act uses sex-specific terminology. *See* Wilson Dis. Op. at 4–5. The Act prohibits prescribing or administering "supraphysiologic doses of testosterone . . . to females" and prescribing or administering "supraphysiologic doses of estrogen to males." Act § 4(a)(2)–(3). But this sex-specific language actually preserves evenhandedness. Because of biological realities, the cross-sex hormone regimen that one undergoes is necessarily dependent on one's sex. Males cannot use testosterone for the prohibited purpose, and females cannot use estrogen for the prohibited purpose. To the extent that the Act includes provisions that reference only one sex, *see id.*, it simply reflects these realities to equally proscribe cross-sex hormones for both males and females. If the Act restricted only the use of testosterone—but not estrogen—for the

proscribed purpose, it would discriminate against females. And if the Act restricted only the use of estrogen—but not testosterone—for the proscribed purpose, it would discriminate against males. In other words, the Act uses sex-specific language because it regulates sex-specific medications. And, as noted in our panel opinion, "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Eknes-Tucker II*, 80 F.4th at 1229 (alterations in the original) (quoting *Dobbs*, 597 U.S. at 236).

Judge Rosenbaum and Judge Wilson both invoke *Bostock v. Clayton County*, 590 U.S. 644 (2020). Rosenbaum Dis. Op. at 50, 54–56; Wilson Dis. Op. at 3–4. But the meaning of the Equal Protection Clause was not at issue in *Bostock*, and the Supreme Court expressly declined to "prejudge" whether its reasoning applied to other laws "that prohibit sex discrimination." *Bostock*, 590 U.S. at 681. Notwithstanding *Bostock*'s limited holding, Judge Rosenbaum reads *Bostock* to announce a new principle that applies to every anti-discrimination provision in federal law, including a constitutional provision that was ratified in 1868. Supposedly, after *Bostock*, all classifications "based on transgender status" are classifications "based on sex." Rosenbaum Dis. Op. at 54. That reading ignores the reasoning in *Bostock*.

*Bostock* relied heavily on the unique text of Title VII—particularly, the words "because of," "otherwise . . . discriminate

against," and "individual." *Eknes-Tucker II*, 80 F.4th at 1228–29 (alteration in the original) (quoting *Bostock*, 590 U.S. at 656–58); *see* 42 U.S.C. § 2000e-2(a)(1). The Equal Protection Clause does not include any of this language. *See* U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). As Justice Gorsuch—the author of *Bostock*—observed when comparing the text of Title VI and the text of the Equal Protection Clause, it "is implausible on its face" that "such differently worded provisions should mean the same thing." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring). Justice Gorsuch's point is no less relevant to Title VII and the Equal Protection Clause. *See Skrmetti*, 83 F.4th at 484 (finding that the reasoning of *Bostock* "applies only to Title VII"); *Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc) (expressing skepticism that *Bostock*'s reasoning applies to the Equal Protection Clause because the Fourteenth Amendment "predates Title VII by nearly a century" and contains language that is "not similar in any way" to Title VII's); *cf. Fowler v. Stitt*, 104 F.4th 770, 801–02 (10th Cir. 2024) (Hartz, J., dissenting in part) (disagreeing with the majority's reflexive application of *Bostock* to the Equal Protection Clause). Because the language of the Equal Protection Clause does not resemble the language of Title VII, *Bostock*'s reasoning does not apply here.

Next, two dissents cite *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), and both claim that we distinguished *Brumby* by

confining it to employment discrimination. Rosenbaum Dis. Op. at 57; Wilson Dis. Op. at 3–4. Respectfully, the majority opinion and Judge Brasher's concurrence explained that *Brumby* is distinguishable because *Brumby* dealt with sex-based stereotypes about how men should dress, not biological realities. *Eknes-Tucker II*, 80 F.4th at 1229 ("Insofar as section 4(a)(1)–(3) involves sex, it simply reflects biological differences between males and females, not stereotypes associated with either sex."); *id.* at 1234 (Brasher, J., concurring) ("Unlike the employer's decision in [*Brumby*], Alabama's statute does not fit the mold of a sex-based stereotype. The statute isn't based on a socially constructed generalization about the way men or women should behave.").

Judge Rosenbaum responds that it is a form of stereotyping to prohibit minors from taking transitioning medications. *See* Rosenbaum Dis. Op. at 52–53. But there is a difference between prohibiting biological men from wearing dresses, *see Brumby*, 663 F.3d at 1314, 1318–19, and prohibiting minor boys from taking estrogen "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his . . . gender or sex, if that appearance or perception is inconsistent with [his] sex," Act § 4(a). The former restriction is a stereotype about how men should dress, the latter restriction is based on physical differences between males and females. And, as the Supreme Court has recognized, "[p]hysical differences between men and women . . . are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The recognition of those physical differences, which are inherent in the biology of every man and woman, "is not a stereotype." *Nguyen v. I.N.S.*, 533 U.S. 53, 68

(2001); *see also Eknes-Tucker II*, 80 F.4th at 1234 (Brasher J., concurring).

Overall, the Act applies equally to minor males and minor females. Both sexes *can* use puberty blockers and cross-sex hormones to treat a medical disorder, Act § 4(b)(2), but neither sex may use puberty blockers and cross-sex hormones "for the purpose of attempting to alter the appearance of or affirm [their] perception of [their] gender or sex, if that appearance or perception is inconsistent with [their] sex." *Id.* § 4(a). Thus, our panel correctly held that the Act is subject to rational-basis scrutiny, not intermediate scrutiny. *Eknes-Tucker II*, 80 F.4th at 1230.

> ## 2. *The text of the Act is neutral as to transgender status, and transgender status is not a quasi-suspect classification.*

Judge Rosenbaum also claims that the Act triggers intermediate scrutiny because transgender status is a quasi-suspect classification. Rosenbaum Dis. Op. at 58–63. But as our panel opinion explained, even if transgender status is a quasi-suspect classification, the Act would not trigger heightened scrutiny because it discriminates solely based on "purpose." Act § 4(a); *Eknes-Tucker II*, 80 F.4th at 1228. Under the plain terms of the Act, any minor *can* access puberty blockers and cross-sex hormones for an acceptable purpose, such as treating central precocious puberty. Act § 4(b)(2).[19] To be sure, a facially evenhanded regulation can be

---

[19] Judge Rosenbaum also states that people are not truly "transgender" if they "experience some form of gender incongruence" but "ultimately embrace their birth-assigned gender or detransition." Rosenbaum Dis. Op. at 59. But

subject to heightened scrutiny if it is a mere pretext for invidious discrimination against a protected class. *See Shaw v. Reno*, 509 U.S. 630, 643–44 (1993). But the district court made no findings of such a pretext here. Judge Rosenbaum's argument fails on this point alone.

More generally, transgender status is not a quasi-suspect classification in the first place. While sitting en banc, we already declined to recognize transgender status as a quasi-suspect classification. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc) (expressing "grave 'doubt' that transgender persons constitute a quasi-suspect class"). Further, the Supreme Court "has not recognized any new constitutionally protected classes in over [five] decades, and instead has repeatedly declined to do so." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). Since 1973, the Supreme Court has declined to recognize poverty, age, and mental disability as suspect or quasi-suspect classifications. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty); *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (mental disability); *see also Lyng*

---

if that's true, then not everyone who seeks medications "for the purpose of attempting to alter the appearance of" their "sex," is, in fact, transgender. Act § 4(a). Thus, if Judge Rosenbaum is correct, then the Act does not discriminate based on transgender status—not everyone who seeks the relevant medication for the relevant purpose would, in fact, be transgender.

*v. Castillo*, 477 U.S. 635, 638 (1986) ("Close relatives are not a 'suspect' or 'quasi-suspect' class.").

Judge Rosenbaum would chart new territory by treating transgender status as a quasi-suspect classification. The district court never held that, *see Eknes-Tucker I*, 603 F. Supp. 3d at 1146–48, and neither Judge Rosenbaum's dissent nor Judge Wilson's dissent cite any record evidence suggesting that transgender persons are a "discrete group" defined by "obvious, immutable, or distinguishing characteristics" and that they are "politically powerless." *Lyng*, 477 U.S. at 638. Unlike race, sex, or national origin, transgender status is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Studies show that 61% to 88% of children with gender dysphoria become comfortable with their sex "over the course of puberty." A trait is not "immutable" if it is "subject to . . . change." *Adams*, 57 F.4th at 807 (quoting *Immutable*, *Oxford English Dictionary* (2d ed. 1989)).

Furthermore, transgender persons are not a "discrete group" that exhibits "obvious" or "distinguishing" characteristics. *Lyng*, 477 U.S. at 638. WPATH itself defines "transgender" as an "[a]djective" used to describe anyone "who cross[es] or transcend[s] culturally defined categories of gender." Possible gender identities described by WPATH and the American Psychological Association include "boygirl," "girlboy," "genderqueer," "bigender," "pangender," "androgyne," "genderless," "gender neutral," "neutrois," "agender," and "genderfluid," just to name a few.

According to the American Psychological Association, possible gender identities exist on a "wide spectrum" that defies the binary nature of sex. That theory has no practical limits. Also, one of the dissents argues that people are not truly "transgender" if they "experience some form of gender incongruence" but "ultimately embrace their birth-assigned gender or detransition." Rosenbaum Dis. Op. at 59. But if that's true, then someone who currently identifies as a "boygirl," for example, might not actually be transgender based on their future self-perceptions or actions. A classification is neither "obvious" nor "distinguishing" if it turns on a future that is presently unknown. Like *Rodriguez*, this case "comes to us with no definitive description of the classifying facts or delineation of the disfavored class." 411 U.S. at 19.

Finally, transgender people are not "politically powerless." *Lyng*, 477 U.S. at 638. "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and "[f]ourteen States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. The White House recognizes an annual "Transgender Day of Visibility." *See* Proclamation No. 10724, 89 Fed. Reg. 22901 (March 29, 2024). The Department of Justice is devoting considerable time and resources as an intervenor plaintiff in this litigation. Twenty states and the District of Columbia filed an amicus brief in support of the Plaintiffs. And every major law firm that has participated in this litigation has supported the Plaintiffs. All of these facts contradict a notion of political powerlessness. True, Judge Rosenbaum cites statistics about the lamentable harassment that transgender people

experience, Rosenbaum Dis. Op. at 60–61, but *Cleburne* is clear that "some degree of prejudice from at least part of the public at large" is not sufficient. 473 U.S. at 445. Significantly, in *Cleburne*, the Supreme Court rejected the argument that mental disability is a suspect classification, *id.* at 442–46, despite a history of compulsory sterilization, exclusion from public schools, and a system of "state-mandated segregation and degradation" "that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow," *id.* at 462–63 (Marshall, J., concurring in the judgment and dissenting in part). And since *Cleburne*, the Supreme Court has never recognized a new suspect or quasi-suspect classification. Neither the Plaintiffs, nor the district court, nor the dissenters have provided a basis for us to do so here.

Because the Act does not discriminate based on a suspect or a quasi-suspect classification, the Act is subject to rational-basis review. *Id.* at 440, 446. To satisfy rational-basis review, Alabama needs only one "conceivable basis" to proscribe cross-sex hormones and puberty blockers for minors. *See Jones v. Governor of Florida*, 975 F.3d 1016, 1034 (11th Cir. 2020) (en banc) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). As explained in the next section, there are many conceivable bases for the Act, and thus, the Plaintiffs lack a substantial likelihood of success on their due process and equal protection claims.

### C. Rational-Basis Review

Under rational-basis review, the question "is simply whether the challenged legislation is rationally related to a legitimate state

interest." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 818 (11th Cir. 2004). Alabama satisfied this remarkably lenient standard for at least five reasons.

*First*, Alabama provided significant evidence that the medications covered by the Act are dangerous and ineffective. Although the district court disagreed with that evidence, it acknowledged that Alabama "offer[ed] some evidence that transitioning medications pose certain risks." *Eknes-Tucker I*, 603 F. Supp. 3d at 1145. That is sufficient to satisfy the rational-basis test. The Alabama legislature is entitled to look at the competing evidence and draw its own conclusions. *Heller*, 509 U.S. at 319 ("[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" (quoting *Beach Commc'ns*, 508 U.S. at 313)). To be sure, Alabama did not need to cite any "evidence or empirical data" supporting the Act. *Beach Commc'ns*, 508 U.S. at 315. "[R]ational speculation" would have been sufficient. *Id.* Even so, Alabama's evidence of the dangers of cross-sex hormones and puberty blockers was legion.

Alabama provided declarations from six medical experts— three endocrinologists (including two pediatric endocrinologists), a clinical psychologist, a psychotherapist, and a pediatrician—who testified to the acute dangers posed to children by these medications. Alabama also submitted six journal articles and public-health reports that documented concerning data and evidence about the proscribed treatments. And Alabama provided written testimony from detransitioners, including Sydney Wright (discussed above),

KathyGrace Duncan (Appendix A), Carol Frietas (Appendix B), and Corinna Cohn (Appendix C). Although the district court's order discussed the testimony of Dr. James Cantor and Sydney Wright, the district court never mentioned any of the other evidence described in this paragraph. *See Eknes-Tucker I*, 603 F. Supp. 3d at 1142–43, 1145–46.

Alabama also presented evidence that healthcare authorities and medical organizations in several countries—including England, Finland, and Sweden—urge (and, in some cases, mandate) that doctors rarely prescribe puberty blockers and cross-sex hormones. In Sweden, for example, doctors can provide minors with puberty blockers and cross-sex hormones in "exceptional cases" only. Sweden's National Board of Health and Welfare determined that "the risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."

The information that has emerged since the panel's opinion only confirms what the panel already concluded: Alabama has a rational basis for the Act. As discussed earlier, in March 2024, for example, England's NHS announced "that there is not enough evidence to support the safety or clinical effectiveness of [puberty suppressing hormones] to make the treatment routinely available" in England. NHS Clinical Policy, *supra* n.3, at 3. And, in April 2024, Dr. Hillary Cass published the results of a four-year review of puberty blockers and cross-sex hormones in minors. *See* The Cass Review, *supra* n.2. While formulating her report, Cass chaired a

policy working group that the NHS commissioned in January 2020. *Id.* at 75. The policy working group systematically examined "the published evidence on the use of puberty blockers and [cross-sex] hormones in children and young people" with the goal of "inform[ing] [NHS's] policy position on their future use." *Id.* Cass found "no evidence that puberty blockers improve body image or dysphoria, and very limited evidence for positive mental health outcomes." *Id.* at 179. Cass also concluded that puberty blockers may negatively impact "neurocognitive development" and will likely compromise a patient's "bone density." *Id.* at 178. Regarding cross-sex hormones, Cass's "systematic review" found inadequate evidence supporting the "widespread" view—expressed in Judge Rosenbaum's dissent—that cross-sex hormones "reduce[] suicide risk" for children suffering from gender dysphoria. *Id.* at 186, 195. Cass also provided multiple reasons to question the reliability of WPATH and concluded that the most recent iteration of the Standards of Care "overstates the strength of the evidence" supporting its recommendations. *Id.* at 132; *see also id.* at 129–30 (concluding that WPATH's Standards suffer from a low "[r]igour of development" and the lack of "[e]ditorial independence," among other things).

*Second*, Alabama had a rational basis to prohibit cross-sex hormones and the other proscribed medications for minors because minors cannot appreciate the life-altering nature of the medical treatments. The law frequently limits the ability of minors to consent to certain activities. And evidence in the record suggests that minors are incapable of knowingly consenting to the use of the

proscribed medications.  Alabama presented evidence from many detransitioners who uniformly testified that they were not aware of the long-term impacts of the treatments they underwent.  Next, Alabama provided declarations from several parents who testified to the negative effects of cross-sex hormones and puberty blockers on their children, even if their children suffered from gender dysphoria and desired medical transition.  Furthermore, Alabama presented written testimony from nine parents who said that doctors, therapists, and other practitioners pressured them to start their children on cross-sex hormones and puberty blockers or otherwise circumvented their wishes.  For example, when one mother's twelve-year-old daughter said that she was a boy, the mother asked her daughter's gender clinic for a counseling referral before hormone therapy.  But an endocrinologist rebuffed the mother's request, stating in front of the twelve-year-old daughter that the mother needed "to get on board" with providing puberty blockers and hormones if she did not "want [her] daughter to commit suicide."

This record evidence is consistent with information that has come to light after the district court issued its order.  As Dr. Cass found in her April 2024 study, we know very little about the long-term risks of these medications, which makes the idea of "informed consent" nearly impossible for anyone, but especially for children and adolescents.  *See* The Cass Review, *supra* n.2, at 193–97.

*Third*, as discussed above, studies show that most children with gender dysphoria grow out of it.  As one of Alabama's experts

testified, "every study without exception has come to the identical conclusion: Among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance across the large, prospective studies." Alabama also presented evidence that children are starting to identify as transgender because of social contagion, not gender dysphoria. Teenage girls, in particular, are starting to suddenly identify as transgender even if they have no history of gender dysphoria as children. And, according to one of Alabama's experts, "[t]he majority of cases appear to occur within clusters of peers and in association with increased social media use and especially among people with autism or other neurodevelopmental or mental health issues." Even the Plaintiffs' expert, Dr. Linda Hawkins, testified that gender clinics are "seeing an increase in youth . . . who are exploring gender . . . . [T]hat is something that is gaining popularity right now." Alabama has a legitimate interest in preventing harm to children who often do not suffer from gender dysphoria, and even if they do, likely will grow out of it. It is thus rational to require children to wait to undergo this type of medical treatment until they are adults.

Fourth, notwithstanding assurances from organizations like WPATH, there are significant unknowns about these treatments, which recent developments only serve to highlight. The district court's order relied on WPATH's Standards of Care, *Eknes-Tucker I*, 603 F. Supp. 3d at 1138–39, which claim to provide "the highest standards" for "safe," "effective," and "evidence-based" treatment for people suffering from gender dysphoria. Judge Rosenbaum also

suggests that courts should look to WPATH's Standards of Care for narrow tailoring purposes.  Rosenbaum Dis. Op. at 44.  But a March 2024 leak of documents and audio recordings suggests that WPATH is not genuine in its claim that these treatments are safe, effective, and well understood, particularly for minors.  *See* The WPATH Files, *supra* n.4, at 72–241.

For instance, in a leaked recording of a WPATH Panel, Dr. Daniel Metzger—an endocrinologist—frankly discussed the difficulties of helping children and adolescents understand the effects of cross-sex hormones and puberty blockers.  *Id*. at 184–85.  He acknowledged, "the thing you have to remember about kids is that we're often explaining these sorts of things to people who haven't even had biology in high school yet."  *Id*. at 184.  Later at the same panel, he said, "it's always a good theory that you talk about fertility preservation with a 14 year old, but I know I'm talking to a blank wall."  *Id*. at 192.  Another provider at the same panel discussed the difficulty in helping nine-, ten-, and eleven-year-olds understand the long-term effects of puberty blockers on their fertility.  *Id*. at 193.  "I'm definitely a little stumped," she admitted.  *Id*.

In one of the leaked documents, Dr. Marci Bowers—a gynecological surgeon and WPATH's President—states: "[A]cknowledgement that de-transition exists to even a minor extent is considered off limits for many in our community."  *Id*. at 111.  Bowers agreed with this practice, continuing, "I do see talk of the [detransition] phenomenon as distracting from the many challenges we face."  *Id*.  These recent revelations only further confirm the

unsettled nature of this field, the risks involved for Alabama's youth, and the need for judicial caution.

*Finally*, it is rational for Alabama to conclude that there are alternatives to childhood use of cross-sex hormones and puberty blockers. Although the suicide rate is high in the transgender community, Dr. Cass's April 2024 study concluded that "there is no evidence that gender-affirmative treatments reduce [suicidality.]" *See* The Cass Review, *supra* n.2, at 195. The report continued that the available evidence "suggests that these deaths are related to a range of other complex psychosocial factors and to mental illness." *Id*. Alabama could rationally conclude that suicidality—which is a mental-health problem—should be treated with counseling, medication, and other forms of psychotherapy.

Comparatively, none of the studies that Judge Rosenbaum's dissent relies on provide a solid basis for her claim that "studies have repeatedly shown that gender-affirming hormone therapy markedly decreases suicidality and depression among transgender minors who want such care." Rosenbaum Dis. Op. at 41 n.22. Start with the Tordoff study. Judge Rosenbaum claims that puberty blockers and "gender-affirming" hormones led to a "60% decrease in depression" and a "73% decrease in suicidality." *Id; see* Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, (2022). But this is misleading, as almost all the participants who did not take puberty blockers or cross-sex hormones dropped out of the study before its conclusion, weakening any potential

conclusions.  Tordoff, et al., *Mental Health Outcomes*, 5 J. Am. Med. Ass'n Network Open at at 1; Tordoff, et al.*, Mental Health Outcomes*, Supplemental Online Content, eTable 2, eTable 3.

Next is the Green study.  Judge Rosenbaum claims that this study demonstrates a "40% decrease in depression and suicidality." Rosenbaum Dis. Op. at 41 n.22.  It is true that the study represented that receipt of hormone therapy was associated with lowered odds of recent depression and the serious consideration of suicide in the past year.  Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide* Among *Transgender and Nonbinary Youth*, 70 J. of Adolescent Health 643, 647 (2022).  But significantly, the authors also noted that, because of the study's cross-sectional design, "causation [could not] be inferred." *Id.* at 648.

Judge Rosenbaum next relies on the Turban study, which she claims demonstrates a "statistically significant decrease in suicidal ideation."  Rosenbaum Dis. Op. at 41 n.22; *see* Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 5–6 (2020).  This study pulled data from the 2015 US Transgender Survey, but out of the 3,494 participants in the study, only 89 reported that they received puberty blockers. *Id.* at 3–4.  The authors reported that "[t]reatment with pubertal suppression among those who wanted it was associated with lower odds of lifetime suicidal ideation when compared with those who wanted pubertal suppression but did not receive it." *Id.* at 5.  But near the end of their paper, the authors admit that the design of

their study "does not allow for determination of causation." *Id.* at 7. Further, as detailed in a review of the study, there are good reasons to question the data set used by the authors, for it "included older respondents who, in fact, had no opportunity to obtain these drugs and so cannot be used for comparison." Michael Biggs, *Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria*, 49 Archives of Sexual Behav. 2227, 2228 (2020). The Turban study also fails to control for preexisting psychological problems. In order to provide true insight, the study would need to measure "the respondent's psychological problems before [the puberty blockers were] prescribed or withheld." *Id.* (emphasis omitted). Without this information, "a negative association found many years after treatment is compatible with three scenarios: puberty blockers reduced suicidal ideation; puberty blockers had no effect on suicidal ideation; [or] puberty blockers increased suicidal ideation, albeit not enough to counteract the initial negative effect of psychological problems on eligibility." *Id.* And finally, England's National Institute for Health and Care Excellence excluded the Turban study from its evidence report because the data for puberty blockers was "not reported separately from other interventions." Therefore, the Turban study, as with the others already discussed, provides no probative causal connection between suicidality and the use of puberty blockers.

Finally, Judge Rosenbaum turns to the Allen study, which she claims documents a "75% decrease in suicidality." Rosenbaum Dissenting Op at 41 n.22; *see* Luke Allen et al., *Well-being and Suicidality Among Transgender Youth after Gender-affirming Hormones*, 7

Clinical Practice in Pediatric Psychology 302, 306 (2019). But like the other studies, the Allen study's authors could not conclude that the hormone treatments were "causally responsible for the beneficial outcomes observed," because, in this case, the study lacked a control group. *Id.* at 309. The authors also did not screen for whether the patient was actively receiving psychotherapy, which further weakens any inference of causation. *See id.* at 308.

In all, none of these studies provides real support for Judge Rosenbaum's discussion of the supposed benefits of cross-sex hormones and puberty blockers. Nor do they undermine Cass's four-year independent review of the available evidence, which concluded that "there is *no evidence* that gender-affirmative treatments reduce [suicidality.]" *See* The Cass Review, *supra* n.2, at 195 (emphasis added). All of this underscores that this is an issue for the political branches, not the judicial branch.

Ultimately, the Alabama legislature is entitled to review all the available evidence and decide whether to circumscribe cross-sex hormone and puberty blocking medications for the purposes set forth in the Act. On rational-basis review, our role is not "to judge the wisdom, fairness, or logic of [that] legislative choice[]." *Beach Commc'ns*, 508 U.S. at 313. Our role is to simply ask whether there is a "conceivable basis" for Alabama's law. *Id.* at 315. Under this lenient standard, the existing evidence overwhelmingly suggests that Alabama has a rational basis for the Act. Our panel opinion correctly determined that the Act likely satisfies rational-basis scrutiny.

### III.    CONCLUSION

Alabama enacted an entirely rational law.  The Fourteenth Amendment, as informed by text, history, tradition, and our precedents, does not prevent Alabama from doing so.  Instead of acting as a "super-legislature," *Day-Brite Lighting Inc. v. Missouri*, 342 U.S. 421, 423 (1952), our Court has correctly allowed Alabama to "safeguard[] the physical and psychological well-being" of its minors, *Globe Newspaper Co.*, 457 U.S. at 607.  I therefore concur in the decision to deny rehearing en banc.

**Appendix A: KathyGrace Duncan[20]**

1.      I am over the age of 18 years and am not a party to this action.  I have actual knowledge of the following facts and if called upon to testify to them could and would do so competently.  I am submitting this Declaration in support of Defendants' opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

2.      Alabama's Vulnerable Child Compassion and Protection Act ("VCCAP") is a necessary, potentially life-saving law that will protect vulnerable children and their parents from the heartbreaking regret, irreversible physical changes, sexual dysfunction and emotional pain that I have experienced after undertaking medical and surgical interventions aimed at "transitioning" me from a female to a "male."

3.      From a very young age, I was what is called today "gender non-conforming."  I preferred male clothing, I thought I was a "boy" and I wanted to live as one.

4.      I grew up in a dysfunctional family in which my mother was often the victim of my father's emotional and verbal abuse.  As a result I internalized the message that "my dad would love me if I were a boy."

---

[20] The following appendices are reproductions of written declarations submitted by Alabama.

5.      Sexual abuse by a family member between the ages of 10 and 12 further convinced me that being a girl meant being unsafe and unlovable.

6.      In sixth grade, I learned about female to male transsexuals. I believed that my distress was caused by not having the "right" body and the only way to live a normal life was to medically transition and become a heterosexual male.

7.      At age 19, I began living as a man named Keith and went to a therapist who formally diagnosed me with gender dysphoria. I began testosterone and a year later had a mastectomy. At the time, I believed it was necessary so that what I saw in the mirror matched what I felt on the inside.

8.      I never viewed my condition as touching on mental health issues, and neither did the therapist who diagnosed me. The question of whether my self-perception and desire to transition was related to [my] mental health issues was never explored.

9.      After 11 years passing as a man and living what I thought was a relatively "happy" and stable life (which included having a number of girlfriends), I realized that I was living a lie built upon years of repressed pain and abuse. Hormones and surgery had not helped me resolve underlying issues of rejection, abuse, and sexual assault. I came to understand that my desire to live as a man was a symptom of deeper unmet needs.

10.      With the help of life coaches and a supportive community, I returned to my female identity and began addressing the underlying issues that had been hidden in my attempt to live as a man. I

experienced depression that I had repressed for years and grieved over the irreversible changes to my body.

11.     If someone had walked with me through my feelings instead of affirming my desire to transition, then I would have been able to address my issues more effectively and not spend so many years making and recovering from a grave mistake.

12.     Alabama's VCCAP Act is necessary and essential because it will give children and adolescents a chance to walk through their feelings and address their underlying issues effectively without being pulled onto the affirmation conveyor belt.  Hormones and surgery are irreversible decisions that children and adolescents are incapable of making.

**Appendix B: Carol Frietas**

1.      I am over the age of 18 years and am not a party to this action.  I have actual knowledge of the following facts and if called upon to testify to them could and would do so competently.  I am submitting this Declaration in support of Defendants' opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

2.      Alabama's Vulnerable Child Compassion and Protection Act ("VCCAP") is a necessary, potentially life-saving law that will protect vulnerable children and their parents from the heartbreaking regret, irreversible physical changes, and emotional pain that I have experienced after undertaking medical and surgical interventions aimed at "transitioning" me from a female to a "male."

3.      As a youth, I was what today is called "gender non-conforming," but I lived in a household where gender expression was strictly aligned with cultural stereotypes.  I was not allowed to wear boys' clothes or play boys' sports.

4.      At puberty I realized I was same-sex attracted with crushes on girls.  I became depressed and anxiety-ridden as I feared what "being gay" might mean to how I lived my life and my family relationships.  I dropped out of school.

5.      At age 20, I began to meet other LGBT youth and my life stabilized.  However, I also learned that many masculine females, like me, felt that they were "born in the wrong body" and were transitioning, so I adopted that persona.

6.      I went to a gender therapist who diagnosed me with gender dysphoria and told me that transition was the only treatment that would alleviate my discomfort and anxiety.

7.      However, at that time there were gatekeeping standards for gender transition, which required that I first live as man for six months, including using a male name, showing a male appearance, and using male spaces.  I had very large breasts and could not pass for a male in male spaces, so I did not pursue testosterone at that time.  I viewed myself as a male trapped in the "wrong body," but my mental health otherwise was stable.

8.      In 2014, I revisited the idea of transitioning, believing it would make me feel better because I was undergoing trauma in various forms.  My grandmother who had practically raised me died.  I had suffered severe abuse and neglect in childhood, and in retrospect believe I was experiencing symptoms of PTSD from that.  I had just become a new mother a couple of months before my brother-in-law committed suicide.

9.      I spiraled downward and wanted out.  I couldn't commit suicide because I was a mother, so I returned to the idea of transition, believing it would help me feel better.  By that time the requirements for testosterone had lessened.  I went to Planned Parenthood for testosterone and was given it right away, with no information.  I was not given any information on uterine atrophy, vaginal atrophy, or other effects of testosterone and the staff did not talk about any of my emotional or mental health issues.

10.     Four months after starting testosterone, I went to a plastic surgeon for a mastectomy.  I needed a letter from a therapist and received one from the therapist who had affirmed me and originally recommended transition.  As was true with testosterone, I was not given any information about the procedure.  Instead I had a consultation with the surgeon, who said "this is what we are going to do," drew on my chest, took pictures and asked me what I wanted out of the surgery.  He said "we'll create a masculine looking chest, you'll look great."

11.     During the first four months on testosterone menstruation stopped, my sex drive went way up, my voice deepened, and facial and body hair came in.  As I continued on testosterone, my personality changed drastically and my verbal abilities declined.  Testosterone lowered and muted my emotions and empathy, but also gave me a lot of energy and a sense of a high.  My depression and anxiety worsened to the point that I was having such severe panic attacks that I could not leave home.  I told my doctors that I thought the testosterone was making the anxiety worse, but they said no.

12.     I went to a psychiatrist . . . specifically to deal with the depression and I was provided with an anti-depressant that really worked.  I felt mentally stable and able to address the trauma that led me to transition.

13.     Within a month of starting the anti-depressant, I realized that I had not needed to transition.  It was the biggest mistake I had ever made.  I did not detransition for a year because I couldn't

believe that it was so easy, *i.e.*, that anti-depressants alleviated my depression and enabled me to think clearly and reason better. This allowed me [to] address my internalized homophobia and childhood abuse through therapeutic means.

14.     Meanwhile, my health began going downhill. Before going on testosterone, I had no health problems. After being on it for four years, I was pre-diabetic, had high cholesterol, and had a high red blood cell count to the point that doctors were recommending that I donate blood to reduce the volume.

15.     I stopped taking testosterone and four months later my blood work was back down to normal. I thought to myself "How do they [doctors] not know about this?" Going off testosterone allowed me to finally sleep. I felt like I never slept all the time that I was taking testosterone. Going off testosterone also helped with empathy and other emotions. My personal relationships, including my relationship with my wife, were better.

16.     I believe that healthcare providers did not ask me about mental health issues because they believed that those issues were caused by gender dysphoria and that transitioning would fix the problem. In fact, the opposite was true.

17.     I would have been spared physical, psychological, and emotional losses if I had received a proper diagnosis and treatment for PTSD and depression before undergoing years of medical and surgical interventions. Alabama's VCCAP Act is necessary and essential because it will give children and adolescents the chance to work through and address their underlying issues such as depression or

PTSD effectively without being pulled onto the affirmation con-
veyor belt. Hormones and surgery are irreversible decisions that
children and adolescents are incapable of making.

### Appendix C: Corinna Cohn

My name is Corinna Cohn.  I am over the age of 19, I am qualified to give this declaration, and I have personal knowledge of the matters set forth herein.

In or about 2nd grade, I saw a psychologist for problems related to being bullied and emotional regulation.  After less than a year, my parents chose to discontinue therapy.  I continued to be bullied and had problems forming friendships.  Other boys excluded me from social activities.  Later in elementary school I began to pray to be made into a girl, which I thought would allow me to fit in better.  This became a fixation for me.

In high school, I confessed to my parents that I wanted to become a woman.  They brought me to see the same psychologist I'd had as a child, and she diagnosed me with having gender identity disorder.  Upon receiving my diagnosis, my parents again chose to discontinue my therapy.  I continued to have problems socializing at school and experienced depression and anxiety on a daily basis.

At the age of 17, I gained access to the Internet.  This was prior to the popularization of the World Wide Web, but I was able to use message boards . . . in order to find other members of what today would be called the "trans community."  Adult transgender women befriended me, supplied me with validation and support, and provided information on how I could transition to become a transgender woman.

22-11707                    Lagoa, J., Concurring                    63

At the age of 18, I resumed my sessions with my psychologist with the goal of receiving a prescription for cross-sex hormones and eventual sex reassignment surgery. Due to my prior relationship with my psychologist, I was able to gain a letter of recommendation to an endocrinologist and was prescribed estrogen. The endocrinologist was referred to me by transgender friends on the Internet. I began living as a woman and had my legal identification updated to reflect my chosen name.

I had sex reassignment surgery in Neenah, Wisconsin in 1994. I was only 19 years old. Securing the appointment required letters from two therapists along with a letter from my endocrinologist. My surgeon told me I was the second-youngest patient he had operated on. The surgery involved the removal of my testicles, penectomy, and vaginoplasty. It was successful and without complication.

After healing from my sex change surgery I thought that my transition journey was over. I discontinued therapy, and I began focusing on my career. I found it was easier to socialize and make new friends with my new confidence and feelings of being my authentic self. As I reached my late twenties, my friends began pairing off and starting families. I discovered that it was very difficult to find a partner who wanted to do the same with me.

Although I was in denial for several years, I eventually realized that my depression and anxiety related to my gender identity had not resolved. It was not unusual for me to spend entire weekends in my room crying and entertaining thoughts of suicide.

In my mid-thirties I became interested in radical feminism. I am not a feminist, nor have I ever been, but I wanted to reconcile how feminist concepts applied to people like myself: males who try to turn ourselves into women. One of the concepts I found pivotal was the feminist criticism of biological essentialism, which challenges the idea that men and women are destined to fulfill rigid sex roles. Once I understood this criticism I realized that my more stereotypically feminine attitudes and behaviors did not therefore make me a woman, but rather a feminine man. In retrospect, my self-perception of being a woman also required that I overlook or discount traits that are more stereotypically masculine. Although it took time for this realization to fully sink in, a side effect was that I stopped having bouts of depression and anxiety related to my gender identity. I have not had any depressive episodes related to gender identity in ten years. As a teenager I was unprepared to understand the consequences of my decision to medicalize my transition despite the rigorous controls that were in place to ensure that patients would not be harmed from gender affirming care.

. . .

I wish I could persuade other boys who wish to become women that the changes they seek are only superficial. Hormones and surgery are unable to reveal an authentic self, and anyone who promises otherwise is, in my opinion, deliberately misleading young people to follow a one-way track to a lifetime of medicalization. Although some people may choose to transition, and may even enjoy a higher quality of life, there is no reason why this

22-11707                    LAGOA, J., Concurring                    65

irreversible decision needs to be made in adolescence.  Adults who advocate for adolescent transition do so without understanding what tradeoffs early transition entails, which includes the loss of fertility, the likelihood of sexual dysfunction, and the likelihood of surgical complication inflicted at an early age from elective procedures.  Unfortunately, I do understand some of these tradeoffs

WILSON, Circuit Judge, dissenting from the denial of rehearing en banc, joined by JORDAN, Circuit Judge:

This case presents numerous questions "of exceptional importance" worthy of en banc review. Fed. R. App. P. 35(a)(2). Seeing that this case implicates the contours of substantive due process, fundamental rights, and equal protection, it is difficult to envision issues of greater importance.

I.        Substantive Due Process

The divergent descriptions of the fundamental right at issue and disagreement over whether substantive due process protects that right demonstrate a need for rehearing en banc.

The district court relied on the Supreme Court's decision in *Troxel v. Granville*, among others, which recognized the fundamental right of parents to "make decisions concerning the care, custody, and control of their children." 530 U.S. 57, 66 (2000) (plurality opinion); *see also Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The district court then determined that this recognized fundamental right *includes* the "right to treat [one's] children with transitioning medications subject to medically accepted standards." *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1144 (N.D. Ala. 2022). Judge Rosenbaum takes a parallel approach in her dissent from denial of rehearing. She identifies the fundamental right at issue as one that sits within *Parham v. J.R.*'s more general fundamental right. *See* 442 U.S. 584, 602 (1979). However, her articulation is more specific; she describes the fundamental right at issue as the

"right to direct that [one's] child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment." Rosenbaum Dissent at 1. Meanwhile, Judge Jordan broadly describes the fundamental right as "the right of parents to obtain medically-approved treatment for their children." Jordan Dissent at 22. In contrast, the panel describes the fundamental right at issue as *only* "the right to treat [one's] children with transitioning medications subject to medically accepted standards," which it views as separate and distinct from the fundamental right to "make decisions concerning the 'upbringing' and 'care, custody, and control' of one's children." *Eknes-Tucker v. Governor of Alabama,* 80 F.4th 1205, 1224 (11th Cir. 2023). All four opinions articulate the fundamental right at issue with varying degrees of specificity. Rehearing en banc would have provided us with an opportunity to clarify the fundamental right at issue and the protections guaranteed by the Due Process Clause.[1]

_____

[1] Incidentally, I note several inconsistencies in Judge Lagoa's Statement. For one, the Statement discusses the facts and introduces new factual material. See Judge Lagoa's Statement at 4–6, 29–31, 44, 48–49. We must respect the district court as the finder of fact. *See Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020). Neither the panel nor Judge Lagoa can reevaluate factual determinations or consider materials not before us, as the Statement does. *See also* Rosenbaum Dissent at 8 n.7. Further, I struggle with Judge Lagoa's discussion of medical findings, given her pronouncement that "[n]either an unelected district judge nor unelected circuit judge should resolve" policy questions informed by scientific, philosophical, and moral considerations. If this case presents policy questions that courts are ill-suited to resolve, a

## II.    Equal Protection

Like Judge Rosenbaum, I am also concerned with the panel's equal protection analysis—particularly its quick and improper dismissal of *Bostock* and *Brumby*. The panel concludes that because *Bostock* and *Brumby* involved gender stereotyping in the context of employment discrimination, their holdings are irrelevant here. I am not so sure.

In *Brumby*, we explained that "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes," and accordingly held that "discrimination against a transgender individual because of her gender-noncomformity is sex discrimination." *Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011). Our analysis drew from "foundational cases" in which the Supreme Court "concluded that discriminatory state action could not stand on the basis of gender stereotypes." *Id.* at 1319. But these cases were not limited to the employment context and included examples of gender stereotyping in the provision of social security benefits, military benefits, education, and child support payments. *Id.* at 1319–20. The same is true of *Bostock*, which held that "discrimination based on . . . transgender status necessarily entails discrimination based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020). In reaching this holding, the Supreme Court also relied on precedent describing instances of discrimination more broadly. *See id.* at 677–78. The

_____

statement for denial of rehearing en banc is not the place for credibility determinations regarding evidence.

panel looks only to *Bostock* and *Brumby*'s employment outcome, rather than drawing from the underlying reasoning in each case to determine when gender and sex stereotyping rises to the level of a constitutional violation.[2]  *See Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024) ("Although that was the only question the Supreme Court decided, the Court did not indicate that its logic concerning the intertwined nature of transgender status and sex was confined to Title VII.").

Judge Brasher's concurrence, in which he states that the Act does not contain a sex classification, is also indicative of the need for en banc review.  *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring).  The Act is aimed at addressing the treatment of minors who experience "a discordance between the individual's sex and sense of identity."  Ala. Code § 26-26-2(16).  The word "sex" is not only, as Judge Brasher concedes, riddled throughout the Act, it is used to separate minors who experience a "discordance" between their birth-assigned sex and gender identity from those who do not

---

[2] *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (explaining that gender stereotyping can play a role in gender-based discrimination); *City of L.A., Dep't of Water and Power v. Manhart*, 435 U.S. 702, 709–10 (1978) (stating that employment practices which classify people based on sex often "preserve traditional assumptions about groups rather than thoughtful scrutiny of individuals"); *Stanton v. Stanton*, 421 U.S. 7, 14–15 (1975) (finding that "'old notions'" of the traditional roles of men and women did not support Utah's sex-based classification of child support payments).

experience such a "discordance." This seems like a sex-based classification.[3]

The Act as it stands now shapes the way parents of transgender children may care for their children, while parents of cisgender children remain unaffected. Should a parent of a child be prevented from seeking medical care *because of* the sex of their child? *See Stanton*, 421 U.S. at 14–15 ("A child, male or female, is still a child."). Reading the Act as though it does not distinguish and classify minors will only lead to future confusion and contradictory results in the interpretation of similar state statutes across the circuit.

\*     \*     \*

For these reasons, it is difficult to envision issues of greater importance than those presented here. We should have reheard this case en banc. Accordingly, I respectfully dissent from our refusal to do so.

---

[3] *See Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) (en banc) ("[G]ender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it. The excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status.").

22-11707                    JORDAN, J., Dissenting                    1

JORDAN, Circuit Judge, joined by ROSENBAUM and JILL PRYOR, Circuit Judges, dissenting from the denial of rehearing en banc.

Substantive due process is hard. Acknowledging the complexity of the doctrine, I write to discuss what I perceive to be some analytical flaws in the panel's opinion.

## I

In this case, the panel characterized the liberty interest in part by asking whether there is a history of recorded uses of transitioning medications for transgender individuals (e.g., puberty blockers and cross-sex hormone treatments) as of 1868, when the Fourteenth Amendment was ratified. Finding no such history, the panel concluded that there is no fundamental right for parents to treat their children with such medications. *See Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1220–21, 1224 (11th Cir. 2023).

The panel's decision necessarily means that the fundamental right of parents to obtain medical treatment for their children extends only to procedures and medications that existed in 1868, and not to modern advances like the polio vaccine (developed in the 1950s), cardiac surgery (first performed in 1893), organ transplants (first successfully completed in 1954), and treatments for cancer like radiation (first used in 1899) and chemotherapy (which started in the 1940s). *See* Judge Rosenbaum Dissent at Part II.A.2. There is admittedly some support in our cases for the panel's approach, *see Morrissey v. United States*, 871 F.3d 1260, 1269–70 (11th Cir. 2017) (holding that a man does not have a substantive due process right to procreate through in-vitro fertilization because that technology

was only successfully developed in the 1970s), but that analysis is too simple and ignores many Supreme Court cases that define fundamental rights at a much more general level without requiring established and precise historical pedigrees. *Cf. Obergefell v. Hodges*, 576 U.S. 644, 664 (2015) ("The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning."); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 442–43 (1934) ("It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means today, it is intended to say that the great clauses of the Constitution must be confined to the interpretation of the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning: 'We must never forget, that it is a constitution we are expounding[.]'") (internal citations and quotations omitted).

Some have said that in constitutional law the "[l]evel of generality is everything[.]" *L.W. v. Skrmetti*, 83 F.4th 460, 475 (6th Cir. 2023), *cert. granted*, --- S.Ct. ----, 2024 WL 3089532 (2024). Even if it is not everything, the level of generality is very important and often determinative. In my view, the panel asked the wrong question by

22-11707            JORDAN, J., Dissenting                3

defining the asserted right in too granular a way, and as a result reached the wrong answer. *Cf. Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 279 (2015) ("Asking the wrong question may well have led to the wrong answer."). In the pages that follow, I try to explain why.

## II

When it comes to challenges to legislation, the substantive component of the Due Process Clause "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed[.]" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations and internal quotation marks omitted). But substantive due process also sometimes protects against abusive executive action. In that context the question is whether the conduct at issue constitutes an "abuse of power . . . which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The panel here in part relied on the substantive due process aspect of our decision in *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990), calling it the "most relevant" Eleventh Circuit precedent dealing with "parents' liberty interest to control the upbringing of their children." *Eknes-Tucker*, 80 F.4th at 1223. I think the panel incorrectly characterized *Bendiburg* and mistakenly viewed it as the "most relevant" of our cases.

In *Bendiburg*, a father asserted a substantive due process claim based on the involuntary insertion of a certain catheter on

4                    JORDAN, J., Dissenting                    22-11707

his son by private parties allegedly acting in concert with state offi-
cials. The district court in *Bendiburg* characterized the substantive
due process claim as one alleging abusive *executive* action, and re-
jected it: "The most widely accepted view is that substantive due
process is violated by government conduct that 'shocks the con-
science' or when the government engages in action 'which offends
those canons of decency and fairness which express the notions of
justice of English speaking peoples.' The question before the court
is thus whether the evidence of record suggests state conduct that
was so shocking or egregious as to give rise to a claim for damages
under the concept of substantive due process. The court finds that
it does not." *Bendiburg v. Dempsey*, 707 F. Supp. 1318, 1324 (N.D.
Ga. 1989) (citations omitted).

On appeal, the *Bendiburg* panel affirmed the district court's
decision and rejected the father's substantive due process claim.
But it too viewed the claim as based on allegedly abusive executive
action, and not as a challenge to enacted legislation. So it too ap-
plied the "shocks the conscience" standard in rejecting the father's
claim, agreeing with the district court that the "circumvention of
parental authority for a five day period [to install the catheter] did
not rise to a level sufficiently egregious or shocking to sustain a
substantive due process claim with respect to severance of the par-
ent-child relationship." 909 F.2d at 468.[1]

_____

[1] That the district court and the panel in *Bendiburg* analyzed the case under the
"shocks the conscience standard" is not surprising, as the full Eleventh Circuit
had held just five years earlier that in the realm of abusive police (i.e.,

The panel here should not have viewed *Bendiburg* as the "most relevant" of our cases. First, the "shocks the conscience" standard governs substantive due process claims based on abusive executive action, and not challenges to legislation like we have in this case. Second, we have explained that the "shocks the conscience" standard can apply even when there is no fundamental right at stake: "Where a fundamental liberty interest does not exist, substantive due process nonetheless protects against the arbitrary and oppressive exercise of government power. Executive action is arbitrary in a constitutional sense when it 'shocks the conscience.'" *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (citing *Lewis*, 523 U.S. at 845–46). Third, *Bendiburg* simply did not address whether a parent has a protected liberty interest to determine the medical care for his child, rendering it largely irrelevant for the purposes of the fundamental right analysis.

### III

In cases involving substantive due process challenges to legislation, the Supreme Court has required a "careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (citation and internal quotation marks omitted). But "[t]his does not mean that [courts] must define the asserted right at the most specific level, thereby sapping it of a universal valence and moral force it might otherwise have. It means, simply, that we must

---

executive) conduct the relevant inquiry is whether the conduct "shocked the conscience." *See Gilmere v. City of Atlanta*, 774 F.2d 1495, 1500 (11th Cir. 1985) (en banc).

pay close attention to the precise liberty interest the litigants have asked us to vindicate." *McDonald v. City of Chicago*, 561 U.S. 742, 882 (2010) (Stevens, J., dissenting) (footnote omitted). If we "narrow[ ] the asserted right [to the most specific level available]," we "'load[ ] the dice' against its recognition." *Id.* at 882 n.25. *See also* Geoffrey R. Stone, et al., Constitutional Law 919 (8th ed. 2018) ("If the tradition is defined very narrowly, the legislation at issue will almost always simply illustrate the tradition, thereby depriving the appeal to tradition of any power to check legislative action. But if the tradition is defined very broadly, judges will be able to appeal to it to invalidate whatever legislation they choose to characterize as inconsistent with tradition.").

In *Michael H. v. Gerald D.*, 491 U.S. 110, 128 n.6 (1989), Justice Scalia, joined only by Chief Justice Rehnquist, advocated for an approach that focused on the "most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified." The other Justices in *Michael H.*, whether concurring in or dissenting from the judgment, either refused to join that aspect of Justice Scalia's plurality opinion or rejected it outright. *See id.* at 132 (O'Connor, J., joined by Kennedy, J., concurring in part); *id.* at 133 (Stevens, J., concurring in the judgment); *id.* at 138–40 (Brennan, J., joined by Marshall & Blackmun, JJ., dissenting). Justice Scalia's "most specific level" formulation is therefore not binding. And, as I will discuss, is not an accurate reflection of the Supreme Court's actual framing of fundamental rights.

The Supreme Court has described the rights of parents vis-à-vis their children generally. It has, for example, referred to those rights as "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion of four Justices) (collecting cases of "extensive precedent" to highlight that "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" is beyond doubt); *id.* at 77 (Souter, J., concurring in the judgment) ("[T]he right of parents to 'bring up children,' and 'to control the education of their own,' is protected by the Constitution.") (citations omitted). *See also Glucksberg*, 521 U.S. at 720 (referring to the right "to direct the education and upbringing of one's children"). This general framing is consistent with the Supreme Court's long-standing approach to defining the liberty interest at issue in other substantive due process cases. What's more, this approach holds even where the Supreme Court has found that the relevant liberty interest was not, in fact, fundamental.

Accordingly, I cite with confidence to the dissent of Justice Stevens in *McDonald*, 561 U.S. at 882, because what he said is demonstrably correct. Over the last 100 years, the Supreme Court has—in more substantive due process cases than not—described the liberty interest in general terms without limiting it to the very specific factual circumstances presented. If the interests in those cases had been defined at a very narrow and specific level—the approach the panel in this case followed—"many a decision would have reached a different result." *Michael H.*, 491 U.S. at 139–40

(Brennan, J., dissenting) (citing a number of illustrative cases). *See also id.* at 132 (O'Connor, J., concurring in part) ("On occasion the Court has characterized relevant traditions protecting asserted rights at levels of generality that might not be 'the most specific level available.'").

## A

Let's now review some of the relevant substantive due process cases, starting with *Meyer v. Nebraska*, 262 U.S. 390 (1923), in which the Supreme Court vacated the conviction of an elementary school teacher at a parochial school in Nebraska for teaching the subject of reading in German to a 10-year-old student. The teacher had been convicted of violating a Nebraska law which (a) prohibited the teaching of any subjects in languages other than English, and (b) allowed foreign languages to be taught as languages only to schoolchildren who had graduated from eighth grade. *See id.* at 396–97.

The Supreme Court held that the law—which the Nebraska Supreme Court had interpreted to apply only to so-called modern languages such as Spanish, French, German, and Italian—violated a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment. The Court concluded that the teacher's "right . . . to teach [German] and *the right of parents to engage him so to instruct their children* . . . are within the liberty of the [Fourteenth] [A]mendment." *Id.* at 400 (emphasis added). It came to this conclusion without examining the historical record to see if

there was an enshrined practice and tradition in the United States in 1868 of teaching German to elementary school students.

Having identified a fundamental right, the Court in *Meyer* then turned to Nebraska's justification for the law. The Court thought it insufficient that "the purpose of the legislation was to promote civic development by inhibiting training and education of the immature in foreign tongues and ideals before they could learn English and acquire American ideals." *Id*. at 401. Though "the state may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, . . . the individual has certain fundamental rights which must be respected. The protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on the tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited means." *Id*. The law was invalid because there was not a sufficient justification for its restrictions: "No emergency has arisen which renders knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed. We are constrained to conclude that the statute as applied is arbitrary and without reasonable relation to any end within the competency of the state." *Id*. at 403.

Next is *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). In that case the Supreme Court addressed the constitutionality of

Oregon's compulsory education act, which required the attendance in public schools of all children aged 8–16 (save for some limited exceptions).  The Society of Sisters, a Catholic corporation which in part operated religious elementary and high schools, and Hill Military Academy, which ran a private military academy, sued to enjoin the enforcement of the act as violative of the Due Process Clause of the Fourteenth Amendment.  *See id*. at 530–33.

Applying *Meyer*, the Court held that the act violated a fundamental liberty interest of the Society of Sisters, of the Hill Military Academy, and of parents:

> Appellees are engaged in a kind of undertaking not inherently harmful, but long regarded as useful and meritorious. Certainly there is nothing in the present records to indicate that they have failed to discharge their obligations to patrons, students, or the state. And there are no peculiar circumstances or present emergencies which demand extraordinary measures relative to primary education. . . . [W]e think it entirely plain that the Act of 1922 unreasonably interferes with *the liberty of parents and guardians to direct the upbringing and education of children under their control.* As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the state. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only.

22-11707            JORDAN, J., Dissenting            11

*Id.* at 534–35 (emphasis added).

As in *Meyer*, the Court in *Pierce* did not perform a laser-focused historical analysis to see if Catholic or private military schools were ingrained in the fabric of the Republic as of 1868. Indeed, had the Court engaged in such an analysis, it would have discovered that there was no accepted or ingrained practice of Catholic schools at the time the Fourteenth Amendment was ratified. To the contrary, although American Catholics in the 19th Century had "long maintained their own schools," they had to contend with anti-Catholic sentiment and discrimination and had to fight to protect their ability to maintain independent and sectarian religious schools. *See* Matthew Steilen, *Parental Rights and the State Regulation of Religious Schools*, 2009 B.Y.U. Educ. & L.J. 269, 318–30 (2009); Brandi Richardson, *Eradicating Blaine's Legacy of Hate: Removing the Barrier to State Funding of Religious Education*, 52 Cath. U. L. Rev. 1041, 1050–54 (2003); Joseph P. Viteritti, *Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law*, 21 Harv. J.L. & Pub. Pol'y 657, 669 (1998). The Blaine Amendments to the United States Constitution (which failed) and to many state constitutions (which generally passed) both before and after the ratification of the Fourteenth Amendment were generally meant to prevent government financial aid to Catholic schools. *See* Toby Heytens, *School Choice and State Constitutions*, 86 Va. L. Rev. 117, 137–38 (2000) ("The Blaine Amendments arose out of this historical context, and the conclusion that they were driven by the Protestant/Catholic divide is unmistakable, despite the fact that none of the amendments refer specifically to Roman Catholics or Catholic schools.

This appears to be the scholarly consensus.").  Had the Court in *Pierce* defined the right as that of a Catholic organization to run its own religious schools in place of otherwise compulsory public education, or to the right of parents to send their children to a Catholic school, it would not and could not have found a fundamental liberty interest, much less a substantive due process violation.

**B**

Lest anyone think that *Meyer* and *Price*—and their non-specific characterizations of the liberty interests at issue—are relics of a bygone era, there are modern substantive due process cases which engage in the same type of analysis and describe the right at issue in more general terms.  I discuss four such cases as examples.

In *Loving v. Virginia*, 388 U.S. 1 (1967), the Supreme Court struck down, on equal protection and substantive due process grounds, a Virginia criminal law prohibiting inter-racial marriages. The Court's substantive due process analysis was short and to the point.  Rather than asking whether inter-racial marriages were deeply rooted or ingrained in the fabric of the United States as of 1868, the Court focused more generally on whether marriage—regardless of the races of the spouses—is a fundamental right:

> These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men. Marriage is one of the 'basic civil rights of man,' fundamental to our very

existence and survival. To deny this fundamental
freedom on so unsupportable a basis as the racial clas-
sifications embodied in these statutes, classifications
so directly subversive of the principle of equality at
the heart of the Fourteenth Amendment, is surely to
deprive all the State's citizens of liberty without due
process of law. The Fourteenth Amendment requires
that the freedom of choice to marry not be restricted
by invidious racial discriminations. Under our Consti-
tution, the freedom to marry or not marry, a person
of another race resides with the individual and cannot
be infringed by the State.

*Id.* at 12 (citations omitted).  Needless to say, *Loving* would have
been decided differently if the right at issue had been framed spe-
cifically as of 1868, for "interracial marriage was illegal in most
[s]tates in the 19th century[.]" *Planned Parenthood of S.E. Pa. v. Casey*,
505 U.S. 833, 847–48 (1992) (plurality opinion).[2]

The Supreme Court conducted the same type of analysis in
*O'Connor v. Donaldson*, 422 U.S. 563 (1975), a substantive due pro-
cess case involving the continued involuntary commitment of a
person with mental illness who posed no harm to himself or others.
The Court identified the fundamental right generally as the liberty
interest of a person to not be confined against his will, and not spe-
cifically as the liberty interest of a harmless mentally ill person

_____

[2] I recognize that *Casey* has been overruled by *Dobbs v. Jackson Women's Health
Org.*, 597 U.S. 215 (2022), insofar as abortion is concerned, but the quoted state-
ment from *Casey* is historically unassailable.  I discuss *Dobbs* later.

whom authorities had refused to release to be free of involuntary confinement. *See id.* at 575. After identifying the fundamental right at stake in general terms, the Court addressed and rejected the state's justifications for the continued confinement. *See id.* at 575–76. It concluded that "a [s]tate cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *Id.* at 576.

Another relevant case is *Lawrence v. Texas*, 539 U.S. 558 (2003), in which the Supreme Court set aside, on substantive due process grounds, the Texas criminal convictions of two adult gay men who had engaged in consensual sodomy in the privacy of the home. In so doing the Court overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986), and said that *Bowers* had "misapprehended" the pertinent liberty interest as the "'fundamental right [of] homosexuals to engage in sodomy.'" *Lawrence*, 539 U.S. at 566–67 (quoting *Bowers*, 478 U.S. at 190). Instead, the proper framing of the issue was whether the "majority may use the power of the [s]tate to enforce [its] views [condemning homosexual conduct as immoral] on the whole society through operation of its criminal law." *Id.* at 571. The Texas statute was violative of substantive due process because it sought "to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." *Id.* Here is how the *Lawerence* Court—which notably relied on 20th-century developments and decisions by courts in other countries—summarized its holding:

> The case . . . involve[s] two adults who, with full and
> mutual consent from each other, engaged in sexual
> practices common to a homosexual lifestyle. The pe-
> titioners are entitled to respect for their private lives.
> The State cannot demean their existence or control
> their destiny by making their private sexual conduct a
> crime. Their right to liberty under the Due Process
> Clause gives them the full right to engage in their con-
> duct without intervention of the government.

*Id.* at 578.  Had the pertinent liberty interest in *Lawrence* been de-
fined at a "very specific level" (as in *Bowers*), there is no way the case
would have been decided the way it was.  *See* William J. Rich, Mod-
ern Constitutional Law: Liberty and Equality § 11.7 (3d ed. 2011)
("In the sexual orientation context . . . a majority of the Justices
resolved the doctrinal tension by defining the liberty interest in
broad terms that included a right to private choices about sexual
intimacy regardless of sexual orientation.").[3]

Then there is *Obergefell*, where the Supreme Court held that
same-sex couples have a fundamental right, protected by substan-
tive due process, to marry.  The Court recognized that "[h]istory
and tradition guide and discipline [the fundamental rights] in-
quiry," but cautioned that they "do not set its outer boundaries.

---

[3] One of the decisions *Lawrence* relied on was *Griswold v. Connecticut*, 381 U.S.
479 (1965).  *See Lawrence*, 539 U.S. at 564–65.  Commentators have noted that
before *Griswold* "no specific, court-defined right to engage in private acts had
existed[.]"  4 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional
Law § 18:27 (5th ed. 2013 & 2023 supp.).

That method respects our history and learns from it without allowing the past alone to rule the present." *Obergefell*, 576 U.S. at 664. The Court explained that the limitation of marriage to opposite-sex couples "may long have seemed natural and just, but its inconsistency with the central meaning of the right to marry is now manifest." *Id.* at 670–71. It also specifically addressed and rejected the argument that the liberty interest at issue had to be framed at a very different and specific level:

> Objecting that this does not reflect an appropriate framing of the issue, the respondents refer to . . . *Glucksberg*, 521 U.S. [at] 721, . . . which called for a "'careful description'" of fundamental rights. They assert the petitioners do not seek to exercise the right to marry but rather a new and nonexistent "right to same-sex marriage." *Glucksberg* did insist that liberty under the Due Process Clause must be defined in a most circumscribed manner, with central reference to specific historical practices. Yet while that approach may have been appropriate for the asserted right there involved (physician-assisted suicide), it is inconsistent with the approach this Court has used in discussing other fundamental rights, including marriage and intimacy. *Loving* did not ask about a "right to interracial marriage"; *Turner* did not ask about a "right of inmates to marry"; and *Zablocki* did not ask about a "right of fathers with unpaid child support duties to marry." Rather, each case inquired about the right to marry in its comprehensive sense, asking if there was a sufficient justification for excluding the relevant class from the right. That principle applies here. If

> rights were defined by who exercised them in the
> past, then received practices could serve as their own
> continued justification and new groups could not in-
> voke rights once denied. This Court has rejected that
> approach, both with respect to the right to marry and
> the rights of gays and lesbians.

*Id.* at 671 (citations omitted and paragraph structure altered).
Thus, the Court in *Obergefell* "focused on the individual right to
marry" and not on the right of gay persons to marry. *See* Stone, et
al., Constitutional Law, at 917.

## C

In each of the cases discussed above, the Supreme Court did
in fact find that there was a fundamental right. So, for the sake of
completeness, I'll discuss two Supreme Court decisions in which
the Court did *not* find a fundamental right and yet still defined the
rights at issue generally rather than granularly, as done by the panel
here.

I'll start with *Glucksberg*. In *Glucksberg*, the Supreme Court
was called upon to determine whether a state may constitutionally
ban and criminalize physician-assisted suicide. *See Glucksberg*, 521
U.S. at 707–08. Five physicians, three terminally ill patients, and a
nonprofit organization sued the state of Washington, seeking a
declaration that a state statute criminalizing the promotion of sui-
cide—where a defendant "knowingly causes or aids another person
to attempt suicide"—was facially unconstitutional. *See id.* at 707
(citing Wash. Rev. Code § 9A.36.060(1) (1994)). Before the Supreme
Court, the physicians and the Ninth Circuit propounded various

definitions of the liberty interest at stake, including a "liberty to choose how to die," "a right to die," and a "right to choose a humane, dignified death." *Id*. at 722 (internal quotations omitted). The Court in *Glucksberg* rejected those purported definitions as overly broad and instead held that the question was "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id*. at 723. It did not, however, define the right as "a right to commit suicide with another's assistance" via a legal dosage of morphine or other opioids, barbiturates, or benzodiazepines, (such as pentobarbital or secobarbital), or other cardiotoxic agents. Thus, even the more precise formulation in *Glucksberg* of the right at issue—a formulation later Supreme Court cases deemed "circumscribed," *see Obergefell*, 576 U.S. at 671—maintained a level of generality absent from the panel's opinion here.

The Court in *Glucksberg* then went on to address whether the right to suicide and its inherent right to assistance in doing so was deeply rooted in this nation's history, and held that it was not. *See* 521 U.S. at 723–28. The Court's analysis emphasized that what *was* ingrained into this nation's history was a traditional abhorrence of suicide—assisted or not—thus undercutting the idea that such a liberty interest could be deemed fundamental under the Due Process Clause. *See id*. But the Court did not look to 1868 to see what methods of suicide were then prevalent.

Let me next turn to *Dobbs*, the Supreme Court's most recent substantive due process decision. In *Dobbs*, the Court revisited the

abortion question once more. In overruling two of its decisions—*Roe v. Wade*, 410 U.S. 113 (1973), and *Casey*—the Court reconsidered its previous decisions that the right to an abortion was a constitutionally protected fundamental right. *See Dobbs*, 597 U.S. at 231–33. It concluded that it was not. *See id.* As in *Glucksberg*, the Court analyzed the historical treatment of abortion and found that throughout the course of our Nation's history, abortion—like suicide—had been condemned and criminalized. *See id.* at 240–50.

But even in *Dobbs*—which overruled previous cases finding a fundamental right to abortion—the Court nonetheless framed the liberty interest at issue generally. Simply put, the right was characterized as the right to obtain an abortion, and the not the right to obtain an abortion through methods common in 1868. *See id.* at 234. In fact, *Dobbs* inherently rejected the notion that the right should be tied to the medical specificity utilized by the panel here. For example, *Dobbs* rejected the *Roe* timeline of viability and made no delineations about whether there is a fundamental right to an abortion via mifepristone and misoprostol (medical abortion), aspiration, or dilation and evacuation. *See id.* at 229–30, 277–80.

The Supreme Court also engaged in an additional step: it "consider[ed] whether a right to obtain an abortion is part of a broader entrenched right that is supported by other precedents." *Id.* at 234. Though it found that the right to obtain an abortion was not in fact entrenched in the broader rights of autonomy and privacy espoused in cases like *Meyer*, *Pierce*, *Loving*, and *Obergefell*, it did so on specific grounds. *See id.* at 256–57. The Court "sharply"

distinguished the abortion right from the rights recognized in those cases by noting that abortion "destroys . . . potential life." *Id.* at 257 (internal quotations omitted). Therefore, though the non-abortion cases did not support the right to obtain an abortion, the Court's "conclusion that the Constitution does not confer such a right d[id] not undermine [the non-abortion cases] in any way." *Id.* That the Court engaged in such an inquiry—considering whether abortion was part of a broader entrenched right—gives credence to the notion that proposed rights should not be formulated at their most granular level of specificity.

## D

I have selectively chosen the cases summarized above, but have done so for a reason—to make the point that the Supreme Court's substantive due process cases are not always reconcilable and that trying to make sense of them requires consideration of the jurisprudence as a whole. The lower federal courts generally do not have the luxury of picking and choosing their preferred Supreme Court decisions. Our job, difficult as it may sometimes be, is to try to make sense of a jurisprudential landscape which often is neither linear nor consistent. And to do that, we must consider all of the relevant Supreme Court precedent in a given area of law, not just those cases that support a given proposition. Sometimes that may require choosing one set of Supreme Court decisions over another. But if that is the case, we have a dual obligation—an obligation to admit that we are indeed choosing, and an obligation to explain why we have exercised that choice in a certain way. Constitutional adjudication is necessarily an exercise in judgment. *Cf.*

Erwin Chemerinsky, *Foreword—The Vanishing Constitution*, 103 Harv. L. Rev. 43, 99 (1989) ("The Court must explain why the value choice made by the constitutional claimant is unworthy of judicial protection and why the particular decision is better left to the elected branches of government.").

If the panel here was going to demand that the right at issue be defined at a "very specific level" to include the use of specific transitioning medications for transgender individuals—medications which did not exist in 1868—it had to account for how the fundamental right was framed generally in *Meyer* and *Pierce*. And it had to explain why it chose not to follow cases like *Loving*, *O'Connor*, *Lawrence*, and *Obergefell*, and their more general approach to defining liberty interests protected by substantive due process.[4]

## IV

As I see this case, the ultimate resolution of the plaintiffs' substantive due process claims depends on two questions. The first is whether parents have a fundamental right, protected by substantive due process, to obtain medically-approved treatment for their children. If the answer to that question is yes, the second inquiry is whether Alabama has shown that its laws are narrowly tailored

---

[4] Judge Lagoa, in her statement regarding the denial of rehearing en banc, adds a new and lengthy discussion of substantive due process in an attempt to defend the panel's decision. The problem, of course, is that this new discussion is nowhere to be found in the panel opinion and does not constitute precedent. All we have in terms of binding law is the panel's opinion, which is short on analysis and wrong in rationale.

to serve a compelling interest. *See Glucksberg*, 521 U.S. at 721
("[T]he Fourteenth Amendment 'forbids the government to in-
fringe . . . "fundamental" liberty interests *at all,* no matter what
process is provided, unless the infringement is narrowly tailored to
serve a compelling state interest.'").

But we are reviewing only the grant of a preliminary injunc-
tion, and not a permanent injunction issued after a full trial on the
merits. In this procedural posture we do "not concern [ourselves]
with the merits of the controversy. . . . No attention is paid to the
merits of the controversy beyond that necessary to determine the
presence or absence of an abuse of discretion." *Di Giorgio v. Causey*,
488 F.2d 527, 528–29 (5th Cir. 1973). Our task is to determine
whether the district court abused its discretion in, for example, con-
cluding that the plaintiffs demonstrated a substantial likelihood of
success on the merits. *See, e.g., Ashcroft v. Am. Civ. Liberties Union*,
542 U.S. 656, 666, 669 (2004) (concluding that the district court's
determination as to likelihood of success was not an abuse of dis-
cretion); *LSSI Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1120
(11th Cir. 2012) ("The first question . . . is whether the [d]istrict
[c]ourt abused its discretion in concluding that LSSI has shown a
'substantial likelihood of success' on the merits of its claim.").

The asserted fundamental right here, properly described, is
the right of parents to obtain medically-approved treatment for
their children. In my view, the district court did not abuse its dis-
cretion in concluding that this right is a fundamental liberty inter-
est that the substantive component of the Due Process Clause

protects. *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (the rights of parents "include[ ] a 'high duty' to recognize symptoms of illness and to seek and follow medical advice"); *Kanuszewski v. Mich. Dept. of Health & Human Servs.*, 927 F.3d 396, 418 (6th Cir. 2019) ("Parents possess a fundamental right to make decisions concerning the medical care of their children."); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197–98 (10th Cir. 2010) ("we do not doubt that a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right about the child's medical care," as *Parham* "reasonably suggests that the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care," though those rights are not absolute); Alexander Van Zijl, *Parens Patriae or Government Overreach: Do Parents Have a Fundamental Right to Control their Children's Medical Care?*, 58 Wake Forest L. Rev. 769, 796 (2023) ("Parents' right to control their children's medical care is deeply rooted in the country's history and traditions, as the survey of Blackstone, tort restatements, Supreme Court precedent, and the common law demonstrate.").

Some courts have incorrectly framed the right as the right of parents to seek medical treatments that the state has banned. *See L.W.*, 83 F.4th at 475 (holding, in a 2-1 decision, that "there is no historical support for an affirmative right" of parents to obtain "banned medical treatments for their children"); *Doe v. Governor of New Jersey*, 783 F.3d 150, 156 (3d Cir. 2015) ("While the case law supports [the] argument that parents have decision-making authority with regard to the provision of medical care for their children,

the case law does not support the extension of this right to a right of parents to demand that the state make available a particular form of treatment that the state has reasonably deemed harmful."); *Pickup v. Brown*, 740 F.3d 1208, 1235 (9th Cir. 2014) (the "precise question . . . is whether parents' fundamental rights include the right to choose for their children a particular type of provider for a particular medical or mental health treatment that the state has deemed harmful").  Respectfully, I think these courts have mistakenly conflated "the right with the deprivation."  *Abigail Alliance for Better Access to Devel. Drugs v. von Eschenbach*, 495 F.3d 695, 714 (D.C. Cir. 2007) (en banc) (Rogers, J., dissenting).

One cannot describe the fundamental right at stake (the first step in the substantive due process analysis) by attaching to it the challenged restriction which, at the end of the day, might (or might not) be narrowly tailored to serve a compelling state interest (the second step in the substantive due process analysis).  The asserted risks or detriments associated with the right in this context of transgender treatments "[are] properly considered only after the right is deemed fundamental."  *Id*. at 716 (Rogers, J., dissenting).

If the right could be defined as including the legal prohibition being challenged under substantive due process, *Meyer* would have characterized the liberty interest as the right to teach a school subject in German when the state had deemed such teaching inappropriate and harmful to the social fabric.  But that is not how *Meyer* was decided.  The Supreme Court framed the liberty interest more generally as the right to teach a subject in German, and only

after identifying that right as fundamental did it consider whether Nebraska had sufficiently justified its prohibition. *See Meyer*, 262 U.S. at 400–01, 403. The same goes for *Pierce, Loving, O'Connor, Lawrence,* and *Obergefell. See generally Griswold*, 381 U.S. at 500 (Harlan, J., concurring in the judgment) ("In my view, the proper constitutional inquiry . . . is whether the . . . statute infringes the Due Process Clause of the Fourteenth Amendment because [it] violates basic values 'implicit in the concept of ordered liberty[.]'") (citation omitted).

Again, I see no abuse of discretion by the district court. "[P]arents have, in the first instance, a fundamental right to decide whether their children should (or should not) undergo a given treatment otherwise available to adults, and the government can take the decisionmaking reins from parents only if it comes forward with sufficiently convincing reasons to withstand judicial scrutiny." *L.W.*, 83 F.4th at 510 (White, J., dissenting). As the Supreme Court wrote in *Parham*, "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make the decision from the parents to some agency or officer of the state. . . . Neither state officials nor federal courts are equipped to review such parental decisions." 442 U.S. at 603–04.[5]

---

[5] Given the strong language used by the Supreme Court, I do not understand how the panel here said that *Parham* "offers *no* support" for the parents' substantive due process claim. *See Eknes-Tucker*, 80 F.4th at 1223 (emphasis added).

I do not doubt the general authority of the government to take legislative action with respect to the medical care of children. *See Otto v. City of Boca Raton*, 41 F.4th 1271, 1280–82 (11th Cir. 2002) (Jordan, J., dissenting from the denial of rehearing en banc). But a "state cannot simply deem a treatment harmful to children without support in reality and thereby deprive the parents of the right to make medical decisions on their children's behalf." *L.W.*, 83 F.4th at 511 (White, J., dissenting).

To repeat, we are here on appeal of a preliminary injunction. As explained by Judge Rosenbaum in her dissent, the district court made extensive factual findings. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1141–43 (M.D. Ala. 2022); Judge Rosenbaum Dissent at Part I & II.B.2. The panel in this case should have applied clear error review to the district court's factual findings and, once the factual landscape was settled, should have then considered whether the district court abused its discretion in preliminarily concluding that Alabama had not shown that its laws were narrowly tailored to serve a compelling state interest. *See Lebron v. Secretary*, 710 F.3d 1202, 1218–19 (11th Cir. 2013) (Jordan, J., concurring) (citing Supreme Court and Eleventh Circuit cases for the proposition that generally an appellate court does not decide the merits of a case when reviewing a preliminary injunction). The panel, however, did neither.

By framing the right in a too-specific way, the panel was able to default to the rational basis test, which in turn allowed it to ignore the district court's factual findings and not demand any real

22-11707                    JORDAN, J., Dissenting                    27

justification from Alabama for its laws. And, to compound this er-
ror, Judge Lagoa's statement regarding the denial of rehearing en
banc now engages in its own evaluation of non-record evidence,
provides its own characterization of the facts, and conducts its own
weighing of the evidence. That, in my view, is upside-down appel-
late review.

## V

In *Adams v. School Board of St. Johns County*, 57 F.4th 791 (11th
Cir. 2022) (en banc), we convened as a full court to address whether
a school board's bathroom policy violated the rights of transgender
students. If that case was important enough to go en banc, this
case is too. I respectfully dissent from the court's decision to not
rehear this case en banc.

22-11707                Rosenbaum, J., Dissenting                1

Rosenbaum, Circuit Judge, joined by Jill Pryor, Circuit Judge, and joined as to Sections I and II by Jordan, Circuit Judge, dissenting from the denial of rehearing en banc:

If ever a case warranted en banc review, this is it. The panel opinion's reasoning strips every parent in this Circuit of their fundamental right to direct that their children receive *any* medical treatment (no matter how well-established and medically endorsed)—except for those medical treatments in existence as of 1868. Yes, 1868—before modern medicine. So in the states of Alabama, Florida, and Georgia, blistering, blood-letting, and leeches are in, but antibiotics, antivirals, and organ transplants are out.

Yet nothing in the law handcuffs us to nineteenth-century medicine. To the contrary, Supreme Court precedent recognizes parents' fundamental right to direct that their child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979). Treatments that do not meet these demanding criteria fall outside the *Parham* right. But for treatments that do, the State cannot interfere with parents' fundamental right to access those treatments for their children without meeting a demanding constitutional burden.

The district court's factual findings—that the treatment at issue here is well-established, evidence based, medically, endorsed, and non-experimental—place that treatment squarely within *Parham*'s fundamental right. *See Eknes-Tucker v. Marshall*, 603 F. Supp.

3d 1131, 1144–46 (M.D. Ala. 2022) ("*Eknes-Tucker I*"). And the panel opinion didn't find any of the district court's factual findings to be clearly erroneous. So the panel opinion should have—but did not—apply strict scrutiny in conducting its due-process review. Had the panel opinion done so, it would have had to conclude that it is substantially likely that Alabama's law does not pass muster under the Due Process Clause. Yet the panel opinion neither applies strict scrutiny nor reaches the answer that strict scrutiny demands.

The panel opinion is not just bad for Plaintiffs here. It is disastrous for *all* parents in the Eleventh Circuit. That's so because, in reaching its result, the panel opinion applies an unprecedented methodology that requires us to consider how the particular treatment at issue "inform[ed] the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868." *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1221 (11th Cir. 2023) ("*Eknes Tucker II*"). I refer to this as the "1868 Methodology."

But of course, no treatment that didn't exist or wasn't discovered by 1868 could hope to "inform[] the meaning of the Fourteenth Amendment at the time it was ratified." *Id.* So the 1868 Methodology imposes a standard that no modern medical treatment can satisfy. And despite its claim to history and tradition, the 1868 Methodology breaks from precedent and the reality of scientific development. It is unsupportable. But because we did not rehear this case en banc, the 1868 Methodology is the law of this Circuit.

The panel opinion does not stop there. Compounding its legal errors, the panel opinion then turns a blind eye to the Alabama law's sex-based classifications, just because they arise in the context of medical treatment. But precedent contains no such exception. To the contrary, it subjects sex-based classifications to heightened constitutional scrutiny. *See, e.g., Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). And it extends that scrutiny to discrimination based on transgender status. *See Bostock v. Clayton County*, 590 U.S. 644, 660–61 (2020); *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011). So in its equal-protection analysis, the panel opinion should have—but did not—apply intermediate scrutiny. Again, had it done so, it would have had to conclude that it is substantially likely that the law is unconstitutional under the Equal Protection Clause. But once again, the panel opinion did neither.

It's substantially likely that the Fourteenth Amendment tolerates neither the due-process nor equal-protection threats that Alabama's law poses and that the panel opinion permits. But the panel opinion distorts the due-process and equal-protection analyses, stacking the deck in the Alabama law's favor. And once the panel opinion concludes (wrongly) that parents have no fundamental right at stake (because transitioning medications weren't around in 1868) and that the Alabama law doesn't discriminate on the basis of sex or transgender status, it deals the rational-basis review card rather than subjecting the Act to strict or intermediate scrutiny, respectively. Then, the game is in the bag for Alabama because the Alabama law—like most legislation—satisfies rational-basis review.

What's more, the Lagoa Statement now tries to engage in a do-over—in some places retreating from and in other places compounding the panel opinion's legal errors. And it relies heavily on materials that were before neither the district court nor the panel. Not only that, but the Lagoa Statement substitutes its own factual findings based on these extraneous and untested outside sources for the district court's factual findings, which the panel opinion did not find to be clearly erroneous. The proper mechanism for a do-over is the en banc process—not using a statement respecting the denial of rehearing to paper over the panel opinion's flawed reasoning, reinvent the factual record, and disclaim the panel opinion's repercussions.

In short, the panel opinion is wrong and dangerous. Make no mistake: while the panel opinion continues in force, no modern medical treatment is safe from a state's misguided decision to outlaw it, almost regardless of the state's reason. Worse still, if a state bans a post-1868 treatment, no parent has legal recourse to provide their child with that necessary, life-saving medical care in this Circuit. And if an individual can't access a medical treatment because of their sex or transgender status, they are similarly without legal recourse.

Because of the life-altering and unconstitutional consequences the panel opinion inflicts on the parents and children of this Circuit, I respectfully dissent from denial of rehearing en banc.

22-11707                 Rᴏsᴇɴʙᴀᴜᴍ, J., Dissenting                    5

## I.    BACKGROUND

Alabama's Vulnerable Child Compassion and Protection Act ("Act") criminalizes the administration of puberty blockers and hormone therapy to minors—but only if that treatment is "performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex" and even in that case, only "if *that appearance or perception is inconsistent with the minor's sex*" at birth.  S.B. 184, Ala. 2022 Reg. Sess. § 4(a) (Ala. 2022) (emphasis added).  Otherwise, administration of puberty blockers and hormone therapy to minors is legal.  I refer at times in this dissent to these drugs as "transitioning medications" because that is what the district court called them.  *See Eknes-Tucker I*, 603 F. Supp. 3d 1131 at 1139.

Plaintiffs, a group of transgender[1] minors and their parents as well as medical providers and a reverend whose congregation includes transgender minors and their families ("Parents" and

---

[1] The district court relied on the following definition of "transgender": "one whose gender identity is different from the sex the person had or was identified as having at birth."  *Eknes-Tucker I*, 603 F. Supp. 3d at 1138 (citing *Transgender*, Merriam-Webster Unabr. Dictionary (3d ed. 2002)).  We have elaborated on the meaning of "transgender," recognizing that a "transgender" person "consistently, persistently, and insistently identifies as . . . a gender that is different than the sex . . . assigned at birth."  *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (cleaned up).  Because the panel opinion did not find the district court's definition clearly erroneous and the parties do not challenge it on appeal, my dissent employs the same definition, as informed by our precedent's definition of the term.

"Minors"[2]), sued to challenge the Act.  *Id.* at 1141.  The United
States intervened on behalf of the Parents and Minors.  Also in sup-
port of the Parents and Minors, twenty-two healthcare organiza-
tions filed an amicus brief.[3]  *Id.*  As for Alabama,[4] fifteen states filed
an amicus brief in support of its position and the Act.  *Id.*

The Parents and Minors sought a preliminary injunction to
halt the Act's operation while the suit was pending.  *Id.*  Following
an evidentiary hearing where the district court received and re-
viewed reams of medical evidence and heard from several wit-
nesses, the district court concluded that the Parents and Minors

---

[2] For ease of reference, I refer collectively to Plaintiffs as "Parents" when dis-
cussing the Parents' asserted due-process right and "Minors" when discussing
the Minors' asserted equal-protection right.

[3] These organizations included the American Academy of Pediatrics; the Ala-
bama Chapter of the American Academy of Pediatrics; the Academic Pediatric
Association; the American Academy of Child and Adolescent Psychiatry; the
American Academy of Family Physicians; the American Academy of Nursing;
the American Association of Physicians for Human Rights, Inc. *d/b/a* Health
Professionals Advancing LGBTQ Equality; the American College of Obstetri-
cians and Gynecologists; the American College of Osteopathic Pediatricians;
the American College of Physicians; the American Medical Association; the
American Pediatric Society; the American Psychiatric Association; the Associ-
ation of American Medical Colleges; the Association of Medical School Pedi-
atric Department Chairs; the Endocrine Society; the National Association of
Pediatric Nurse Practitioners; the Pediatric Endocrine Society; the Society for
Adolescent Health and Medicine; the Society for Pediatric Research; the Soci-
ety of Pediatric Nurses; the Societies for Pediatric Urology; and the World Pro-
fessional Association for Transgender Health.  *Eknes-Tucker I*, 603 F. Supp. 3d
at 1141 n.13.

[4] For ease of reference, I refer to Defendants collectively as "Alabama."

were "substantially likely to succeed on their Substantive Due Process claim" and "on their Equal Protection claim." *Id.* at 1146, 1148. Based on these conclusions and the determination that the Parents and Minors had shown each of the other preliminary-injunction factors (they would suffer irreparable harm without an injunction, and the balance of harms and public interests favored the Parents and Minors), the district court preliminarily enjoined the Act. *Id.* at 1151.

In reaching this decision, the district court made several factual findings based on the evidence it saw and heard. I summarize those findings below.

The World Professional Association for Transgender Health ("WPATH") considers "transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications." *Id.* at 1139.[5]

---

[5] The Lagoa Statement maligns WPATH because, among other functions, WPATH advocates for transgender individuals. Lagoa St. at 30–31. But many healthcare professionals view an important part of their job as advocating for their community of patients. *See* Mark A. Earnest et al., *Physician Advocacy: What Is It and How Do We Do It?*, 85 Acad. Med. 63, 63 (2010) (noting "widespread acceptance of advocacy as a [medical] professional obligation"). That doesn't mean they don't also take the best possible care of their patients. And in the case of WPATH—"an international interdisciplinary, professional organization"—its stated mission is "[t]o promote ***evidence based*** care, education, ***research***, public policy, and respect in transgender health." *See* World Prof. Ass'n for Transgender Health, *Mission and Vision* (last visited Aug. 19, 2024), https://www.wpath.org/about/mission-and-vision [https://perma.cc/KVJ3-WKDN] (emphases added). At least 22 major medical organizations with the professionals, means, and motivation to evaluate

And as the district court found, at least 22 major medical organizations—the American Medical Association, the American Academy of Pediatrics, the American Pediatric Society, the Association of American Medical Colleges, and the Association of Medical School Pediatric Department Chairs, to name just a few[6]—in the United States "endorse [the WPATH] guidelines as evidence-based methods for treating gender dysphoria in minors." *Id.* Indeed, the district court noted, Dr. Armand H. Antommaria, an expert in bioethics and treatment protocols for adolescents suffering from gender dysphoria, emphasized that "transitioning medications are well-established, evidence-based methods for treating gender dysphoria in minors." *Id.* at 1142. Not only that, but at the time of the hearing, "according to [Alabama's] own expert, no country or state in the world categorically ban[ned] their use as Alabama ha[d]."[7] *Id.* at 1145.

---

WPATH's work believe it has done just that, and they endorse and rely on the WPATH Standards of Care. The Lagoa Statement's wholesale dismissal of WPATH's work fails to reckon with the professional medical community's embrace of WPATH as an evidence-based expert in the area of transgender medicine.

[6] These organizations are listed in footnote 3 of this dissent.

[7] The Lagoa Statement now tries to refute this finding by pointing to guidance from England's National Health Service ("NHS"). Lagoa St. at 4–5, 30–31, 44–45. Three responses. First, fact-finding in a statement respecting the denial of rehearing en banc is improper, and that is especially the case when the panel opinion did not find even one of the district court's factual findings to be clearly erroneous. Second, the UK's actions do not undermine the district court's findings, in any case. The district court's point was that no other countries have "categorically ban[ned]" the use of transitioning drugs. That is still

22-11707                ROSENBAUM, J., Dissenting                9

Besides considering the medical community's views, the district court also recounted that Parent Plaintiff Megan Poe

_____

the case. The Lagoa Statement points to only the United Kingdom's revised guidelines to argue otherwise. But even in the UK, "gender affirming hormones" "are available as a routine commissioning treatment option for young people with continuing gender incongruence/gender dysphoria from around their 16th birthday." *Clinical Commissioning Policy: Prescribing of Gender Affirming Hormones (masculinising or feminising hormones) as part of the Children and Young People's Gender Service*, Nat'l Health Serv. Eng. (Mar. 21, 2024), https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-prescribing-of-gender-affirming-hormones.pdf [https://perma.cc/TB32-VHCV]. Plus, the UK's temporary ban on puberty blockers that will dissolve in September permits current patients to continue their preexisting course of treatment and allows doctors to conduct clinical trials, *TransActual CIC v. Sec'y of State for Health and Social Care* [2024] EWHC 1936 (Admin), ¶ 148—but Alabama's law has no exceptions. Third, it's not clear that the "Cass Review" that the UK relies on would satisfy our courts' evidence-reliability standards. *See* FED. R. EVID. 702, 803(8)(B). "Most of the Review's known contributors have neither research nor clinical experience in transgender healthcare." Meredithe McNamara et al., An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria 3 (July 1, 2024), https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf [https://perma.cc/N9Q7-AHKS]. Also, at least one commentator has noted that the Review's conclusions are "deeply at odds with the [its] own findings . . . . Far from evaluating the evidence in a neutral and scientifically valid manner, the Review obscures key findings, misrepresents its own data, and is rife with misapplications of the scientific method." *Id.* at 36; *see also* Chris Noone et al., *Critically Appraising the Cass Report: Methodological Flaws and Unsupported Claims*, OSFPREPRINTS (June 9, 2024), https://osf.io/preprints/osf/uhndk [https://perma.cc/H9N9-N2XK]; D.M. Grijseels, *Biological and Psychosocial Evidence in the Cass Review: A Critical Commentary*, INT. J. TRANSGENDER HEALTH, June 8, 2024, at 1. But then again, the point isn't that the Lagoa Statement relies on inaccurate information—it's that it's not our role to fact-find in the first place.

"specifically described the positive effects transitioning treatments have had on her fifteen-year-old transgender daughter, Minor Plaintiff Allison Poe." *Id.* at 1142. As the court explained, "[d]uring her early adolescent years, Allis[]on suffered from severe depression and suicidality due to gender dysphoria." *Id.* But after she started taking transitioning medications at the end of sixth grade, "her health significantly improved as a result." *Id.* Indeed, Megan said her daughter was now "happy and 'thriving.'" *Id.* But Megan "feared her daughter would commit suicide" if she were no longer able to take the medications. *Id.*

For its part, Alabama presented an expert psychologist witness, but after reviewing his testimony, the district court was not impressed. *See id.* at 1142–43. Rather, the district court gave "very little weight" to his testimony, noting that he practiced in Canada (not the United States); that his patients were, on average, thirty years old, and he had never treated minors with gender dysphoria; that he had no personal experience monitoring patients receiving transitioning medications; and that he lacked personal knowledge of the assessments or treatment methodologies any Alabama gender clinic employed. *Id.*

As for Alabama's other live witness,[8] Sydney Wright—the woman whose malpractice story the Lagoa Statement tells, *see*

---

[8] Alabama also submitted eleven declarations. Of the declarations, three were from patients (Corinna Cohn (Appendix C to Lagoa Statement), Carol Freitas (Appendix B to Lagoa Statement), and KathyGrace Duncan (Appendix A to Lagoa Statement)). Freitas and Duncan were adults when they began transitioning medications, and Cohn was eighteen. None of the patients' parents

Lagoa St. at 1–2—the district court found she took transitioning medications for about a year, beginning when she was nineteen years old. *See Eknes-Tucker I*, 603 F. Supp. 3d at 1143. Her parents were not involved in her decision to start taking transitioning medications. And even though she was an Alabama citizen, she received none of her treatment in Alabama. *See id.* It's also clear from her testimony (as the Lagoa Statement describes) that the "treatment" Wright received did not come close to following the WPATH Standards of Care. *See, e.g.*, Lagoa St. at 1 (noting that

_____

were involved in their decisions to begin transitioning medications. But the point here is that, crediting their declarations, their "treatment" did not follow WPATH Standards of Care. *See, e.g.*, Freitas Decl. ¶ 9 (stating she received testosterone just by asking, and the provider gave her "no information" about the medication, its risks, and its side effects; nor did the provider address her underlying "emotional or mental health issues"). In other words, all three involve malpractice cases, a fact the Lagoa Statement ignores, Lagoa St. at 2 n.1. But given that the administering practitioners violated WPATH standards—including by failing to obtain informed consent—it makes little sense to rely on these three patients' statements for the proposition that they did not understand the effects of cross-sex hormones and puberty blockers. As for the remaining eight declarations, they are from parents (Barbara F., John Doe, John Roe, Kristine W., Martha S., Jeanne Crowley, Kellie C., and Gary Warner). Some of those also relate stories where the providers did not follow WPATH Standards of Care. *See, e.g.*, Warner Decl. Another concedes that no gender-affirming care has been administered to her child because she declined to consent. *See* Decl. of Barbara F. That declaration and others also complain that, because their states don't outlaw transitioning medications, it falls on them to tell their children "no." *See, e.g.*, Decl. of Kristine W.; Decl. of John Roe; Decl. of Martha S. Of the eleven declarants, only two state that they were residents of Alabama. And several others admit that they are not from Alabama and that the events they recount did not occur in Alabama.

Wright saw a counselor who never explored her underlying mental-health and emotional issues but instead told her to begin testos-terone and undergo a double mastectomy).[9]

Turning to Alabama's "proffered purposes" for the Act, the district court found them to be "speculative, future concerns about the health and safety of unidentified children." *Eknes-Tucker I*, 603 F. Supp. 3d at 1146. For starters, the district court noted that Alabama justified the Act by describing transitioning medications as "experimental." *Id.* at 1140. But the district court found that, in fact, Alabama "produce[d] no credible evidence to show that transitioning medications are 'experimental.'" *Id.* at 1145; *see also id.* ("[Alabama] fail[s] to show that transitioning medications are experimental."). And more broadly, the district court found that Alabama's stated purposes for the Act were "not genuinely compelling justifications based on the record evidence." *Id.* at 1146.

To the contrary, based on all the evidence, the district court determined that the use of transitioning medications adhered to "medically accepted standards." *Id.* Though the district court recognized that "transitioning medications carry risks," the court reiterated the Supreme Court's determination that "the fact that

---

[9] In contrast, the WPATH Standards of Care seek to ensure that the minor's "mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed" before the minor begins to use transitioning medications. *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, INT. J. TRANSGENDER HEALTH, Sept. 15, 2022, at S62 [hereinafter WPATH Standards] [https://perma.cc/FQD7-YSFJ].

pediatric medication 'involves risks does not automatically transfer the power' to choose that medication 'from the parents to some agency or officer of the state.'" *Id.* (quoting *Parham*, 442 U.S. at 603). Rather, in the district court's view, "[p]arents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis." *Id.*

We must accept the district court's factual findings—all of them—as true unless they are clearly erroneous. *See, e.g.*, *Hargray v. City of Hallandale*, 57 F.3d 1560, 1567 (11th Cir. 1995). In vacating the district court's preliminary injunction, the panel opinion found none of the district court's factual findings to be clearly erroneous. Yet it still concluded that the Parents were not likely to succeed on the merits of either their due-process or equal-protection claim, departing from both the record and binding precedent. *See Eknes-Tucker II*, 80 F.4th at 1231. In doing so, the panel committed both legal and factual error.

The Lagoa Statement doubles down on this error. Of course, a statement respecting the denial of rehearing cannot find a district court's factual findings to be clearly erroneous, especially when the panel opinion did not. But that doesn't stop the Lagoa Statement from relying on unvetted sources from outside the record to argue, contrary to the district court's factual findings, that transitioning medications are not well-established, evidence-based, or non-experimental treatment. This attempted do-over is just as wrong as the panel opinion, as I detail below.

**II.      The panel opinion wrongly concludes that the Parents are not substantially likely to succeed on the merits of their due-process claim.**

The Fourteenth Amendment's Due Process Clause prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  It guarantees both procedural and substantive rights. *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997).  Among those guaranteed substantive rights are "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 721 (cleaned up).

A law that burdens a fundamental right must survive strict scrutiny, or it is unconstitutional. *See, e.g., Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004).  Strict scrutiny requires the law to be "narrowly tailored to further a compelling government interest." *Id.*  It is hard for laws to survive strict scrutiny's tightly woven filter.

In contrast, we apply rational-basis review to evaluate the constitutionality of a law that interferes with a right that is not fundamental.  Rational-basis review is a sieve.  It asks only whether "there is any reasonably conceivable state of facts that could provide a rational basis" for the burden. *FCC v. Beach Commcn's, Inc.*, 508 U.S. 307, 313 (1993); *see also Jones v. Governor of Fla.*, 975 F.3d 1016, 1034 (11th Cir. 2020) (holding that under rational-basis

review, "we must uphold [a law] if there is any conceivable basis that could justify it"). So it is no surprise that courts "hardly ever strik[e] down a policy as illegitimate under rational basis scrutiny." *Jones*, 975 F.3d at 1034 (quoting *Trump v. Hawaii*, 585 U.S. 667, 705 (2018)); *see also* Lagoa St. at 43 (characterizing rational-basis review as "remarkably lenient").

With this framework in mind, Section A shows that parents' liberty interest in directing that their child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment, is a fundamental right, "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," *Glucksberg*, 521 U.S. at 721 (cleaned up). Section B explains why the treatment the Parents seek here falls within that right's scope. And because the Parents' right is a fundamental one, Section C applies strict scrutiny and shows why it is substantially likely that the Act violates substantive due process.

A.    *Parents' liberty interest in directing that their children receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment is a fundamental right.*

1.  The panel opinion erroneously dismisses Supreme Court precedent recognizing the fundamental right that the Parents assert.

Due-process jurisprudence requires "a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). The Supreme Court has long recognized that "[i]t is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

As a result, the Due Process Clause provides parents with "the fundamental right . . . to make decisions concerning the care, custody, and control of their children," which is "perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *see also*, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) ("the right of the individual to . . . bring up children"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) ("the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("freedom of personal choice in matters of . . . family life" (quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640 (1974)); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("the fundamental liberty interest of natural parents in the care, custody, and management of their child").

The Supreme Court has recognized that the umbrella of this fundamental right shelters other, more specific rights. This is where the "careful description" of the right comes in. For instance,

the Court has held that a parent's narrower, more carefully de-scribed fundamental right to direct the education of his child falls within the fundamental right "of the individual to . . . bring up chil-dren." *Meyer*, 262 U.S. at 399; *Pierce*, 268 U.S. at 534–35. The Lagoa Statement dismisses this carefully described right as irrelevant to the issue before us, *see* Lagoa St. at 13–15, but it misses the point: that the Supreme Court has recognized several carefully described fundamental rights that live under the "the fundamental right . . . to make decisions concerning the care, custody, and control of their children," *Troxel*, 530 U.S. at 66.

Another carefully described fundamental right that the Su-preme Court has recognized is parents' fundamental right to direct that their child receive well-established, evidence-based, non-exper-imental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment. *See Parham*, 442 U.S. at 602.

In *Parham*, minors sought a declaratory judgment that Geor-gia's voluntary-commitment procedures for children under the age of 18 violated due process, and the minors requested an injunction against the future enforcement of these procedures. *Id.* at 587–88. Under the procedures, a parent could apply for her child's admis-sion for hospitalization. *Id.* at 591. The *Parham* minors challenged these procedures as a violation of their own procedural-due-pro-cess rights. *See id.* at 588.

In determining whether the procedures satisfied procedural due process, the Supreme Court first identified the nature of the

interests at stake. *See id.* at 599–606. After all, the process due depends largely on the nature of the interest affected. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

Among other parties' interests to factor into the process-due calculation, the Supreme Court identified "the interests of the parents who have decided, on the basis of their observations and independent professional recommendations, that their child needs institutional care." *Parham*, 442 U.S. at 601–02. To evaluate the weight of that interest—and thus the process due—the Court discussed the interest in more detail.

The Court first observed that "our constitutional system long ago . . . asserted that parents generally have the right, coupled with the high duty, to recognize and prepare their children for additional obligations." *Id.* at 602 (cleaned up). In other words, the Court invoked the umbrella fundamental right of parents to direct the care, custody, and control of their children.

The Court continued, "Surely, this includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* Indeed, the Court explained, the law "historically . . . has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id.* Thus, "[s]imply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to . . . the state." *Id.* at 603.

To illustrate this principle, the Court pointed to parents' right to have "tonsillectom[ies], appendectom[ies], or other

medical procedure[s]" performed on their children.  *Id.*  These examples show that the Court understood a parent's fundamental right to direct the medical care of her child to refer to the category of well-established, evidence-based, non-experimental medical treatments.  They also show that, with respect to this category of medical treatments, the Court recognized that a state's invocation of risks, standing alone, does not justify a state's decision to outlaw the treatment.

Ultimately, the Court concluded that parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Id.* at 604. Thus, the Court recognized parents' fundamental right to direct that their child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment.

And the right that *Parham* recognized is the very fundamental right that the Parents here invoke.

That the Supreme Court recognized such a fundamental right makes perfect sense when we consider the principles animating substantive due process.  Substantive due process protects only those rights "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 721 (cleaned up).  It is hard to imagine a right less amenable to sacrifice while liberty and justice still exist than a parent's right to save her child's life with well-established, evidence-based, non-

experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment. And what are liberty and justice if not the right of a parent to protect her child from death with a non-experimental medical treatment, based on a physician's recommendation?

Yet the panel opinion and the Lagoa Statement wave off *Parham* for six reasons. None stands up to examination.

*First*, the panel opinion dismisses *Parham* as a procedural-due-process case, not a substantive-due-process case. *See Eknes-Tucker II*, 80 F.4th at 1223. But *Parham* was necessarily both. Only after the Court recognized the nature of the parental right involved could the Court assess the process due to protect against violations of that right. So the Supreme Court's acknowledgment of parents' fundamental right to direct the medical care of their children was just as necessary to the Court's due-process holding as was its analysis of the voluntary-commitment procedures. And we are bound equally by both. *See Powell v. Thomas*, 643 F.3d 1300, 1305 (11th Cir. 2011) ("[H]olding is comprised both of the result of the case and those portions of the opinion necessary to that result by which we are bound." (cleaned up)). As a result, the panel opinion wrongly marginalizes *Parham* as merely a procedural-due-process case.

*Second*, the Lagoa Statement asserts that a later case undermined *Parham*'s clear application here. Lagoa St. at 22 (citing *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990)). *Cruzan* did no such thing.

In support of its (mistaken) contention, the Lagoa State-ment quotes *Cruzan*'s remark, *id.* at 22–23, referring to *Parham*, that the petitioners there sought "to turn a decision which allowed a State to rely on family decisionmaking into a constitutional re-quirement that the State recognize such decisionmaking." *Cruzan*, 497 U.S. at 286.  But the Lagoa Statement takes this passage out of context.

In *Cruzan*, the parents of an adult woman who was injured in a car accident and had "virtually no chance of regaining her men-tal faculties" sought, on the woman's behalf, to terminate her nu-trition and hydration.  497 U.S. at 267.  The state prohibited them from doing so because the right to refuse treatment was the woman's—not her parents' or any other family members'—and she had not sufficiently memorialized her desire to decline treat-ment rather than live in a vegetative state.  *See id.* at 280, 287 n.12.

In the Supreme Court, the parents argued that the state "must accept the 'substituted judgment' of close family members even in the absence of substantial proof that their views reflect the views of the patient."  *Id.* at 285–86.  The Supreme Court rejected that because, among other reasons, "[a] State is entitled to guard against potential abuses" by family members who "will not act to protect a patient."  *Id.* at 281, 286.  Only in that context did the Court dismiss the family members' *Parham* argument as "seek[ing] to turn a decision which allowed a State to rely on family deci-sionmaking into a constitutional requirement that the State recog-nize such decisionmaking."  *Id.* at 286.

In context, *Cruzan* bears no resemblance to this case. So it makes no difference that *"Cruzan* did not distinguish *Parham* on any of the grounds"* I point out. Lagoa St. at 23.

To start, *Cruzan* concerned close family members' rights to direct an *adult's* medical care, not parental rights concerning a minor child. But *Parham* did not purport to recognize a fundamental right of family members of an adult. Indeed, the *Parham* right lives under the more general, "perhaps . . . oldest of the fundamental liberty interests recognized by th[e] Court": "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 65–66. This right by its terms and by the precedent it has begotten applies solely to a parent's fundamental right to make decisions about their minor children. And unlike with the right at stake in *Cruzan*, the law "historically . . . has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602. In contrast, no constitutional grounds existed for deferring to a relative's decision on behalf of an adult, at least without "competent and probative evidence establish[ing] that the patient herself had expressed a desire that the decision to terminate life-sustaining treatment be made for her by that individual." *Cruzan*, 497 U.S. at 287 n.12. In other words, *Cruzan*, and the grounds on which it distinguished *Parham*, had nothing to do with a minor child's parent's right to access medical care that falls within *Parham's* scope.

And *Cruzan* involved the right to *withdraw* medical treatment to allow the adult patient to die, not the parents' right to direct potentially *life-saving* medical treatment.

Given these two significant differences, the Court concluded that *Parham* did not control *Cruzan*'s novel facts—the petitioners' asserted right to direct the withdrawal of their adult relative's medical care. But the Court did not purport to limit *Parham*'s fundamental right of a parent to direct that her child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment. *See Parham*, 442 U.S. at 602. That issue was not even before the Court.

So it is no answer that *Parham* did not elevate familial decision-making—by any close family member—in all circumstances. Here, *Parham* directly applies. And "when a precedent of the Supreme Court has direct application, we must follow it." *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc) (cleaned up). We cannot, as the Lagoa Statement does, sidestep it.

*Third*, the panel opinion says, "*Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law." *Eknes-Tucker II*, 80 F.4th at 1223; *see also* Lagoa St. at 20–23. Wrong again. That's exactly what it stands for: parents have a fundamental right to direct the care of their child with any medical treatment that satisfies the *Parham* category's requirements. In other words, *Parham* answers what the Lagoa Statement refers to as the "antecedent

question": whether parents have a fundamental right to direct the care of their child with certain medical treatments. Lagoa St. at 22 n.11. And states cannot trample that right unless they have a compelling reason to do so and their legislation is narrowly tailored to address that compelling reason.

Nowhere did *Parham* purport to qualify its right with a state-law limitation. Nor would that limitation make sense, or fundamental rights would be meaningless. If the Lagoa Statement were correct, any "fundamental right" would evaporate instantly upon a state's banning of a particular treatment. That is, it would enjoy no protection. And what's a fundamental right if the state can abrogate it at will?

The Lagoa Statement's contrary contention elementally misunderstands the nature of a fundamental right. Constitutional protections are not so susceptible to state-law abrogation.

*Fourth*, the Lagoa Statement invokes Circuit precedent to suggest we have somehow cabined *Parham*'s right. Lagoa St. at 12–14 (first citing *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005); and then citing *Morrissey v. United States*, 871 F.3d 1260 (11th Cir. 2017)). We haven't, and we couldn't. We are bound by *Parham*. In any case, the precedent the Lagoa Statement invokes does not bear on the analysis here.

In *Doe*, the plaintiffs made only "broad claims that the [challenged law] infringe[d] their liberty and privacy interests." 410 F.3d at 1343. We rejected a "broad category" of due-process rights for which "any alleged infringement on privacy and liberty will be

subject to substantive due process protection." *Id.* at 1344. And because the plaintiffs' asserted right was so "broad," we had "to define the scope of the claimed fundamental right" in the first instance. *Id.* By contrast, the Parents do not rely on a "broad category." Rather, they rely on the careful description of the right that *Parham* has already recognized.

*Morrissey* is similarly uninstructive. There, the plaintiff claimed to assert the "fundamental right to procreate," but he really asserted a right to enlist the state to assist him in procreation—by providing a tax write-off for *in vitro* fertilization. *See* 871 F.3d at 1269. The plaintiff there relied on *Skinner v. Oklahoma*, 316 U.S. 535, 536 (1942), which invalidated a law authorizing forced sterilization of individuals with certain criminal convictions. But *Skinner* implicated the right not to have the state affirmatively destroy one's right to procreate (at least not on an inequitable basis). *See id.* at 541–43. The rights at issue were not the same right, even at the highest level of abstraction. So *Morrissey* does not bear on the case here or on *Parham*. Rather, unlike in *Morrissey*, *Parham* recognized the fundamental right here. And as an inferior court, we lack the power to narrow a fundamental right that the Supreme Court has already recognized.

*Fifth*, the Lagoa Statement points to yet another inapposite case—this time from outside our Circuit: *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695 (D.C.

Cir. 2007) (en banc).  *See* Lagoa St. at 27–28.[10]  *Abigail Alliance* held that terminally ill patients do not an enjoy a fundamental "right of access to experimental drugs that have passed limited safety trials but have not been proven safe and effective." 495 F.3d at 697. But for the reasons I explain below, that case does not undermine *Parham*'s applicability or the Parents' fundamental right here.

Of course, *Abigail Alliance* does not bind us.

But even if it did, the claimed right in *Abigail Alliance* was different from the right *Parham* recognizes and the Parents here invoke.  In *Abigail Alliance*, the terminally ill patients asserted the right to use experimental new drugs that the U.S. Food and Drug Administration ("FDA") had not approved for any use, that were not widely accepted, and that were not the standard of medical care.  *See id.* at 700.  In contrast, the fundamental right *Parham* recognizes is parents' right to direct the care of their children with well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment.

And as a factual matter, the medical treatment here differs from those at issue in *Abigail Alliance*.  The district court here found that transitioning medications (1) were not new drugs, as "medical

---

[10] The panel opinion itself does not cite *Abigail Alliance*, though it cites *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 477 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, ___ S. Ct. ___, 2024 WL 3089532 (June 24, 2024), which relies in part on *Abigail Alliance* to reach a similar conclusion to the panel here.  *See Eknes-Tucker II*, 80 F.4th at 1224, 1225 n.19.

providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria"; (2) Alabama "produce[d] no credible evidence to show that transitioning medications are 'experimental'"; (3) "the uncontradicted record evidence is that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors"; and (4) the use of transitioning medications to treat gender dysphoria in minors is "subject to medically accepted standards." *Eknes-Tucker I*, 603 F. Supp. 3d at 1145. Not only that, but unlike the new and experimental drugs at issue in *Abigail Alliance*, which were not FDA-approved for any purpose, the FDA has approved puberty blockers to treat central precocious puberty, a condition that involves early sexual development in girls and boys.[11] It has also approved the use of hormone therapy for various conditions other than gender dysphoria.[12]

---

[11] *See* Cleveland Clinic, *Precocious Puberty/Early Puberty* (last visited Aug. 19, 2024) https://my.clevelandclinic.org/health/diseases/21064-precocious-early-puberty [https://perma.cc/UM5B-BBTK].

[12] *See, e.g.*, U.S. Food & Drug Admin., *Menopause: Medicines to Help You* (Aug. 22, 2019), https://www.fda.gov/consumers/free-publications-women/menopause-medicines-help-you [https://perma.cc/UKV5-U6UQ]; U.S. Food & Drug Admin., *FDA Approves Weekly Therapy for Adult Growth Hormone Deficiency* (Sept. 1, 2020), https://www.fda.gov/drugs/news-events-human-drugs/fda-approves-weekly-therapy-adult-growth-hormone-deficiency [https://perma.cc/75VU-T28M]. Besides these FDA-approved uses of hormones in adults, hormone therapies are widely prescribed and administered off-label for minors for intersex pubertal development and conditions such as gynecomastia (the overdevelopment or enlargement of the breast tissue in

Plus, in pediatric medicine, off-label drug use[13] (such as using FDA-approved puberty blockers and hormones to treat severe gender dysphoria) is not "improper, illegal, contraindicated, or investigational."[14]  Kathleen A. Neville et al., *Off-label Use of Drugs in Children*, 133 Pediatrics 563, 563 (2014).  Nor is it considered "experiment[al] or research."  *Id.* at 565.  In fact, off-label medication use by minors is especially common and often necessary because an "overwhelming number of drugs" have no FDA-approved instructions for use in pediatric patients.  *Id.* at 563.  That is so because the child patient population is "frequently excluded from clinical trials."  Furey & Wilkins, *supra* n.13, at 589.  And even the Alabama legislature has recognized that "[o]ff-label use of an FDA-approved drug is legal when prescribed in a medically appropriate manner

---

boys).  *See, e.g.,* Garry L. Warne et al., *Hormonal Therapies for Individuals with Intersex Conditions*, 4 Treatments in Endocrinology 19, 19–29 (2012); Ronald S. Swerdloff et al., *Gynecomastia: Etiology, Diagnosis, and Treatment* (last updated Jan. 6, 2023), https://www.ncbi.nlm.nih.gov/books/NBK279105/ [https://perma.cc/EVU2-8C8H].

[13] "'Off-label' drug use commonly refers to prescribing currently available medication for an indication (disease or symptom) for which it has not received FDA approval.  Off-label use also includes prescribing a drug for a different population or age range than that in which it was clinically tested and using a different dosage or dosage form."  Katrina Furey & Kirsten Wilkins, *Prescribing "Off-Label": What Should a Physician Disclose?*, 18 AMA J. Ethics 587, 588 (2016) (internal citations omitted).

[14] *See also* H. Christine Allen et al., *Off-Label Medication Use in Children, More Common than We Think: A Systematic Review of the Literature*, 111 J. Okla. State Med. Ass'n 776, 781 (2018).

and is often necessary to provide needed care." ALA. CODE § 27-1-10.1(a)(5) (2022).

So neither *Abigail Alliance*'s holding nor its reasoning carries persuasive weight here. Rather, *Parham* controls the analysis. And as I've explained, *Parham* recognizes the Parents' asserted right as fundamental.

*Sixth* and finally, unable to show that *Parham*'s right doesn't remain intact, the Lagoa Statement tries to remove this case from *Parham*'s reach by suggesting that gender-affirming treatment is not "medical care." *See* Lagoa St. at 3–5. But the record evidence, the medical consensus, the district court's factual findings, and common sense all rebut that. Under the leading authority—the WPATH Standards of Care—treatment "involv[es] holistic inter- and multidisciplinary care between endocrinology, surgery, voice and communication, primary care, reproductive health, sexual health and mental health," including the provision of "hormone therapy."[15] This treatment is indisputably "medical." The Lagoa Statement can't use a patently incorrect characterization to remove this case from *Parham*'s reach.

So it pivots, arguing instead that whether gender-affirming care qualifies as "life-saving" or even as "medical care" is itself a "policy" question for the state. *See* Lagoa St. at 3–5. But that maneuver fails just as certainly. For starters, Alabama does not assert—nor could it—that the Act does not prohibit "medical" care.

---

[15] WPATH Standards, *supra* n.9, at S7.

And no one could rationally claim that medical care that reduces rates of "suicidality" (as well as "self-harm") is not "life-saving." *Eknes-Tucker I*, 603 F. Supp. 3d at 1150.

But more to the point, courts do not defer to the legislature when the question is whether the conduct at issue falls within the "the scope of [a plaintiff's] constitutional rights." *United States v. Mills*, 138 F.3d 928, 937 (11th Cir.), *opinion modified on reh'g*, 152 F.3d 1324 (11th Cir. 1998). That medical care "involves risks does not automatically transfer the power to make" a medical "decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Rather, to transfer that power, the facts must show that the conduct at issue falls outside the scope of Plaintiffs' constitutional rights—that is, that it is not a well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment (or the state's solution must survive strict scrutiny).

It is very much the courts' responsibility to assess whether the state has proved that a treatment it seeks to regulate falls within or outside the fundamental *Parham* category. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468–471 (2010) (placing the burden on the government to show that the speech it is attempting to regulate is unprotected); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 18 (2022) (placing the burden on the government to show that the challenged regulation falls outside to scope of the Second-Amendment right). Alabama failed to show that the use of

transitioning medications isn't within the protected *Parham* category. And the panel opinion didn't find the district court's factual finding to that effect to be clearly erroneous. The Lagoa Statement can't dodge these inconvenient legal realities by trying to make the state the unchecked fact-finder of what qualifies as "medical care."

In sum, *Parham* recognizes parents' fundamental right to direct the medical care of their children with well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment. And it's the Lagoa Statement's machinations to avoid being bound by *Parham*—not this dissent—that "mark out new terrain." Lagoa St. at 23.

### 2. The panel opinion unjustifiably imposes an historical requirement that no modern medical treatment could satisfy.

Besides incorrectly sidelining *Parham* itself, the panel opinion and the Lagoa Statement mischaracterize the fundamental right that *Parham* recognizes. First off, the panel opinion and the Lagoa Statement hyper-narrowly describe the asserted right the Parents invoke here as the parents' "right to treat one's children with transitioning medications subject to medically accepted standards."[16] *Eknes-Tucker II*, 80 F.4th at 1224 (cleaned up).

---

[16] The Lagoa Statement justifies this mischaracterization by deflecting blame on the district court. *See* Lagoa St. at 11 ("[T]he panel opinion's description of the right claimed here came directly from the district court . . . ."). But in context, the district court found that the Parents had a "fundamental right to

Then, the panel opinion imposes the 1868 Methodology on our jurisprudence governing parents' fundamental right to direct the medical care of their children. *See id.* at 1220–21. It criticizes the district-court order for failing to "feature any discussion of the history of the use of [transitioning medications] or otherwise explain *how that history informs the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868.*" *Id.* at 1221 (emphasis added); *see also* Lagoa St. at 25–26. Finding no "historical analysis specifically tied to [transitioning medications]," the panel opinion declares parents have no "fundamental right to treat one's children with transitioning medications subject to medically accepted standards." *Eknes-Tucker II*, 80 F.4th at 1224 (cleaned up).

Two responses: first, a by-now old refrain—in *Parham*, the Supreme Court already recognized the fundamental right at issue

---

treat their children with transitioning medications subject to medically accepted standards" only as the natural conclusion of its findings that transitioning medications satisfied *Parham*'s categorical requirements. *Eknes-Tucker I*, 603 F. Supp. 3d at 1144–45 (finding "the uncontradicted record evidence is that at least twenty-two major medical associations in the United States *endorse* transitioning medications as *well-established, evidence-based treatments* for gender dysphoria in minors," that Alabama "fail[ed] to show that transitioning medications are *experimental*," and that "parents 'retain plenary authority to seek [medical] care for their children, *subject to a physician's independent examination and medical judgment*'" (emphases added) (citations omitted)). In other words, the district court did not establish a new framework for carefully describing the right at issue; it simply applied *Parham*. But even if the district court had narrowly described the right at issue, that wouldn't have fenced in the panel opinion. The point of appellate review is to ensure that the lower court got the analysis right.

(parents' fundamental right to direct that their child receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment).  So our recognition of that right is not optional.  For that reason, retreading history to show that *Parham*'s right is, in fact, fundamental is neither necessary nor appropriate.

And second, as I've explained, it's impossible for any historical discussion of transitioning medications to have "inform[ed] the meaning of the Fourteenth Amendment at the time it was ratified," *id.*, because medicine hadn't discovered transitioning medications as of July 9, 1868, and didn't do so until the twentieth century.  The same is, of course, true of all modern medicine.  So under the panel opinion's framing of the asserted right—by specific medical treatment sought—parents have only the fundamental right to direct their child's medical treatment with those treatments existing as of July 9, 1868.

Obviously, the 1868 Methodology is wrong.  The Framers of the Fourteenth Amendment did not forever tie parents' fundamental right to direct the medical care of their children to nineteenth-century medical treatments.  And we don't assess a parent's fundamental right to direct her child's medical care treatment by treatment.  *Cf. Vidal v. Elster*, 602 U.S. 286, 311 (2024) (Barrett, J., concurring in part) ("hunting for historical forebears on a restriction-by-restriction basis is [not] the right way to analyze the constitutional question").

Rather, we view constitutional rights at a high enough level of generality to ensure "the basic principles" that define our rights "do not vary" in the face of "ever-advancing technology." *Moody v. NetChoice*, LLC, 144 S. Ct. 2383, 2403 (2024) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011)); *see, e.g., Carpenter v. United States*, 585 U.S. 296, 305 (2018) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). So if a medical treatment falls within the category of well-established, evidence-based, non-experimental treatment, subject to medically accepted standards and a physician's independent examination and judgment, a parent has a fundamental right to direct that her child receive it, regardless of when the treatment was invented or discovered. Otherwise, the right is meaningless.[17]

---

[17] In arguing that the state enjoys police powers to outlaw whatever medical treatments it wants that haven't been shown to have "inform[ed] the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868," the Lagoa Statement proves our point. It relies on precedent that shows that a state's police power isn't plenary when it implicates a fundamental right. *See* Lagoa St. at 24–27. In *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607–08 (1982), for instance, the Court recognized that States have a compelling interest in "safeguarding the physical and psychological well-being of a minor" but concluded that such an interest does not alone "justify a mandatory . . . rule." Rather, when state police powers clash with a fundamental right, a "trial court can determine on a case-by-case basis whether" the state action "is necessary to protect the welfare of a minor victim." *Id.* at 608. In other words, the state must establish a sufficient evidentiary record. Alabama did not do that here, and the panel opinion did not find that the district court clearly erred. The Lagoa Statement cannot engage in a do-over while denying en banc review.

The Lagoa Statement tries to run from the consequences of the panel opinion's plain language imposing the 1868 Methodology. According to the Lagoa Statement's retcon version of the panel opinion, the panel opinion merely "notes the absence of any historical support for the position reached by the district court" because whether parents have the fundamental right to direct that their children receive medical treatments in existence after 1868 "was not before the panel." Lagoa St. at 25 n.13.

I can understand why the Lagoa Statement would like to forget what the panel opinion expressly says—(1) that we must characterize the right at issue as the parent's right to direct the medical treatment of their child with the specific treatment at issue— here, transitioning medications, *Eknes-Tucker II*, 80 F.4th at 1220 (characterizing and analyzing the right as the "right to treat one's children ***with transitioning medications*** subject to medically accepted standards" (cleaned up) (emphasis added)); (2) that the parent must point to "historical support" in the form of "history of ***the use of***" the particular medical treatment, *id.* at 1221, 1231 (emphasis added); and (3) that, for a parent to have a fundamental right to direct the medical care of their child with any particular medical treatment, "***the use of***" the medical treatment must have "***inform[ed] the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868***," *id.* at 1221, 1231 (emphases added).

But whether the Lagoa Statement owns up to it or not, the panel opinion's express statements and reasoning undeniably mean that, to be covered by the parents' fundamental right to direct their child's medical care, a medical treatment must have existed as of

1868.  Even the Lagoa Statement offers no suggestion as to how a medical treatment could have "inform[ed] the meaning of the Fourteenth Amendment at the time it was ratified" if that treatment did not yet exist then.  The 1868 Methodology is so clearly wrong that its own author now denies the words she wrote.  Unfortunately, it can't be undone that easily.  Only this Court sitting en banc (or the Supreme Court) can clean up the panel opinion's mess.  But because we will not rehear this case en banc, the 1868 Methodology now governs all of us in the states of Florida, Georgia, and Alabama—despite its author's attempt to disavow it.

The Lagoa Statement also tethers the 1868 Methodology's required analysis to *adults*' historical access to the treatment at issue.  *See id.* at 27.  But that argument fails for the same reason the panel opinion and the Lagoa Statement's attempts to impose a treatment-by-treatment framework fail:  *Parham* has already established that we don't evaluate a parent's fundamental right to direct the medical care of their child treatment by treatment.  Rather, under *Parham*, we ask only whether a given treatment falls into the category of well-established, evidence-based, non-experimental medical treatments, subject to medically accepted standards and a physician's independent examination and medical judgment.  And if it does, that is the end of the matter because *Parham* recognizes a parent's fundamental right to direct such a treatment for their child's medical care.

Our "venerable and accepted tradition" of parental due-process rights, including *Parham*'s carefully described right, "'is not to

22-11707                ROSENBAUM, J., Dissenting                37

be laid on the examining table and scrutinized for its conformity to some abstract principle' of 'adjudication devised by this Court.'" *See United States v. Rahimi*, 144 S. Ct. 1889, 1918 (2024) (Kavanaugh, J., concurring) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 95–96 (1990) (Scalia, J., dissenting)); *cf. also Vidal*, 602 U.S. at 324 (Barrett, J., concurring in part) ("[T]he Court's laser-like focus on the history of this single restriction misses the forest for the trees."). Because the 1868 Methodology defies this principle and contravenes precedent, we should have reheard this case en banc and overruled it.

B.     *The use of transitioning medications is a well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment.*

To put the district court's decision in context, I note that in the United States, roughly 300,000 thirteen-to-seventeen-year-olds identify as transgender.[18]   Some of those teenagers—like Plaintiff Megan Poe's daughter—experience severe mental-health effects—including suicidal thoughts—associated with gender dysphoria. *See Eknes-Tucker I*, 603 F. Supp. 3d at 1138 ("If untreated, gender dysphoria may cause or lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide."); *see also* Am. Psychiatric

---

[18] Williams Institute, UCLA School of Law, *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/ [https://perma.cc/3SJF-KGWB].

Ass'n, Diagnostic and Statistical Manual of Mental Disorders 454 (5th ed.) (same).  And to put a sharper point on it, in 2022, 58%—more than half—of transgender and non-binary youth in Alabama reported seriously considering suicide in the year before, and about one in five attempted suicide.[19]

Some of these kids inevitably will succeed.  That makes effective treatment of severe gender dysphoria critical.

Given these potentially devastating effects of severe gender dysphoria, "[i]n some cases, physicians treat gender dysphoria in minors with . . . puberty blockers" to delay the onset of puberty while the minor socially transitions or decides whether to do so. *Eknes-Tucker I,* 603 F. Supp. 3d at 1138.  After between one and three years on puberty blockers, minors whose gender dysphoria persists may receive hormone therapies from their doctors to "masculinize or feminize" their bodies.  *Id.*

As I've recounted, the district court's factual findings underscore the widespread medical consensus that using transitioning medications to treat severe gender dysphoria in minors is a well-established, evidence-based treatment that follows medical standards.  Yet the panel opinion and Lagoa Statement focus myopically on the treatment's potential (and undisputed) risks.

---

[19] The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health by State* 3 (2022), https://www.thetrevorproject.org/wp-content/uploads/2022/12/The-Trevor-Project-2022-National-Survey-on-LGBTQ-Youth-Mental-Health-by-State.pdf [https://perma.cc/2UWR-NY25].

To be sure, and as the district court recognized and the WPATH Standards of Care acknowledge, transitioning medications—likely nearly every medical treatment—are not without risks. But as the Supreme Court recognized, and as the district court found, the fact that a treatment "'involves risks does not automatically transfer the power' to choose that medication 'from the parents to some agency or officer of the state.'" *Eknes-Tucker I*, 603 F. Supp. 3d at 1146 (quoting *Parham*, 442 U.S. at 603). Here, after considering the record, the district court concluded that Alabama "fail[ed] to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria." *Id.* at 1145.

The Lagoa Statement now questions that factual finding and others. *See, e.g.*, Lagoa St. at 43 ("Alabama provided significant evidence that the medications covered by the Act are dangerous and ineffective."). But the panel opinion never found even one of the district court's factual findings to be clearly erroneous. And given that we have denied en banc rehearing, the Lagoa Statement can't do that now. That is improper.

Worse still, the Lagoa Statement relies on unvetted material from outside the factual record to try to justify its newfound conclusion that the district court clearly erred.[20] Ours is an adversarial

---

[20] For instance, the Lagoa Statement invokes a document called the *WPATH Files* "report," which it characterizes as a whistleblower's leak of several internal documents impugning the credibility of the WPATH. Lagoa St. at 3–5, 30–31, 47–49. That document was prepared by an organization whose policy platform includes "Escape the Woke Matrix," which, among other things,

40                    ROSENBAUM, J., Dissenting                    22-11707

system of justice, so if the Lagoa Statement wishes to rely on these materials, the parties must receive the opportunity to test them, and the district court must determine their admissibility[21] and

_____

denies climate change and refers to mask-wearers as "narcissists and psychopaths." Environmental Progress, *Escape the Woke Matrix* (last visited Aug. 19, 2024), https://environmentalprogress.org/escape-the-woke-matrix [https://perma.cc/84D8-89SA]. Environmental Progress does not perform medical research. And a review of the purported WPATH communications does not reveal why the Lagoa Statement asserts that they "impugn[] the credibility of the [WPATH]." Lagoa St. at 5. Nor does it suggest that WPATH officials are "mischaracterizing and ignoring information about" transitioning medications. *Id.* at 5. To the contrary, the WPATH Standards of Care expressly state that a "careful discussion" of "all potential risks and benefits" is a "necessary step in the informed consent/assent process." WPATH Standards, *supra* n.9, at S61–63. And they also caution that the parent or "legal guardian is integral to the informed consent process." *See id.* But in any case, the bottom line is that fact-finding is the district court's job, not ours—and certainly not in a statement respecting the denial of en banc rehearing.

[21] For example, the Lagoa Statement cherry-picks quotations from the *WPATH Files* "report" that don't accurately characterize the working group's conversation as a whole. *See* Lagoa St. at 4–5, 47–49. And beyond that, it's not even clear that the "report" includes or accurately summarizes the complete source material, *see* FED. R. EVID. 106, 1006, or satisfies any of the hearsay exceptions that secure the reliability of out-of-court statements, *id.* 801–03. If the Lagoa Statement offers the "report" to impeach WPATH's "genuine[ness]," Lagoa St. at 48, the declarants normally must have a chance to explain or deny the statements, FED. R. EVID. 613. Of course, trial courts are in the best position to consider these evidentiary questions in the first instance—a point that the Lagoa Statement's uncritical use of out-of-court statements aptly shows.

relevance.[22]  And it must make factual findings about their credibility.  None of those things occurred here.

---

[22]  Plus, the parties and the district court might find other extra-record evidence more relevant and instructive.  For instance, several studies have shown that transitioning medications have, in fact, improved the lives of many teens with gender dysphoria.  More specifically, studies have repeatedly shown that gender-affirming hormone therapy markedly decreases suicidality and depression among transgender minors who want such care.  *See, e.g.*, Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open 1, 6 (2022) (60% decrease in depression and 73% decrease in suicidality); Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647 (2022) (40% decrease in depression and suicidality); Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 5–6 (2020) (statistically significant decrease in suicidal ideation); Luke Allen et al., *Well-being and Suicidality Among Transgender Youth After Gender-affirming Hormones*, 7 Clinical Practice in Pediatric Psychology 302, 306 (2019) (75% decrease in suicidality).  Similarly, 98%—nearly all—of the over-18-year-old respondents to the 2022 U.S. Transgender Survey who were receiving transitioning medications at response time "reported that [the treatment] made them either 'a lot more satisfied' (84%) or 'a little more satisfied' (14%) with their life." Sandy E. James et al., *Early Insights: A Report of the 2022 U.S. Transgender Survey*, at 18 (Feb. 2024),  https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf [https://perma.cc/ZHW2-GAK7].  The 2022 U.S. Transgender Survey, which included 92,329 respondents (84,170 people 18 and older, and the remainder 16 or 17 years old), is the largest survey ever conducted of transgender individuals in the United States.  *Id*. at 4, 6.  It's not clear whether the survey asked 16- and 17-year-old respondents about their satisfaction with hormone treatment.  But in any case, transitioning medications have been so beneficial for transgender individuals that 47% of Survey respondents considered moving to another state because their state's government considered or passed legislation

Not only that, but the panel opinion and Lagoa Statement effectively substitute their medical judgment for that of the major medical organizations, not to mention the individual clinicians prescribing transitioning medications. Medical professionals have extensive scientific and clinical training. Doctors attend four years of medical school, three to seven years of residency, potential fellowships or research positions, and beyond. And then they practice medicine every day.

We, on the other hand, receive no medical training in law school. We don't go through residencies or fellowships. We don't engage in medical research. And we don't practice medicine at all. In fact, many of us went into the law because, among other reasons, we weren't good at math or science. Given our lack of medical expertise, we have no business overriding either the medical consensus that transitioning medications are safe and efficacious or clinicians' ability to develop individualized treatment plans that follow the governing standards of care. "The Constitution's contours" may not be "shaped by expert opinion," Lagoa St. at 27, but medical practice certainly is.

And to the extent that some "particular medical treatments [may] reasonably [be] prohibited by the Government," *Abigail All.*,

---

like the Act, and 5% had actually moved out of state because of such legislation. *Id.* at 23. All three states in this Circuit—Alabama, Florida, and Georgia—are among the top ten states that respondents reported leaving. *Id.* So if extra-record sources are considered, the parties must have the chance to present whatever other sources they think relevant. And they should have the chance to show why any new proposed sources should not be relied on.

495 F.3d at 710, medical expertise plays an important role in our scrutiny of whether the State exercised its powers reasonably. After all, it "would certainly be arbitrary to exclude . . . dentists, osteopaths, nurses, chiropodists, optometrists, pharmacists, and midwives" from the options of healthcare providers available to patients. *England v. Louisiana State Bd. of Med. Examiners*, 259 F.2d 626, 627 (5th Cir. 1958) (per curiam).[23]  At a minimum, courts must "hear[] the evidence" to scrutinize the State's determination. *Id.* We should not ignore expert consensus. And that's especially so here—where the panel opinion did not conclude the district court's findings were clearly erroneous. To do otherwise would threaten fundamental parental rights and put the lives of their children at risk.

Because parents have a fundamental right to direct that their children receive well-established, evidence-based, non-experimental medical treatment, subject to medically accepted standards and a physician's independent examination and medical judgment, *see Parham*, 442 U.S. at 602, and transitioning medications meet those criteria, the Parents have alleged a colorable substantive-due-process claim.

---

[23] All Fifth Circuit decisions issued by the close of business on September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

C.      *It is substantially likely that the Act does not survive strict scrutiny.*

Having carefully identified the right at stake here as fundamental, we must apply strict scrutiny to the Act. That means the Act must be "narrowly tailored" to achieve "a compelling state interest." *Reno*, 507 U.S. at 302. The Parents are substantially likely to show that the Act cannot satisfy that standard.

As I've noted, the district court rejected each of the State's purported justifications for the Act. The district court found that the State "fail[ed] to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria." *Eknes-Tucker I*, 603 F. Supp. 3d at 1145. And it determined that the State's "proffered purposes—which amount to speculative, future concerns about the health and safety of unidentified children—are not genuinely compelling justifications based on the record evidence." *Id*. at 1146.

But even if the State's "speculative" justifications were sufficiently "compelling," the Act is not narrowly tailored to achieve those state interests. A categorical ban on gender-affirming medical care for *all* minors is hopelessly overbroad. If the State is concerned with minors' health and safety or with the rigor of the approval process for treatment, it can mandate medical protocols in line with the WPATH Standards of Care and other guidelines. And if it fears that some healthcare professionals have committed malpractice by failing to obtain informed consent or otherwise comply with the governing standards of care, the State can take tailored

enforcement action.  Similarly, if a State is worried about minors' ability to consent, *see* Lagoa St. at 45–46, it can require parental consent or otherwise mandate informed-consent procedures like the WPATH Standards of Care require.

In fact, the district court cited record evidence of other less restrictive alternatives, including "allow[ing] minors to take transitioning medications in exceptional circumstances on a case-by-case basis." *Eknes-Tucker I*, 603 F. Supp. 3d at 1146.  And if we defer to these findings of fact—as we must because the panel opinion did not rule that they were clearly erroneous—the record supports the district court's conclusion that the Parents are substantially likely to show that the Act fails strict scrutiny.

That does not mean that a state could never prohibit a particular medical treatment for minors.  If a state sought to outlaw a course of treatment that was not medically accepted or efficacious and that posed serious risks without benefits, that prohibition would likely clear even strict scrutiny.  But that is not the case here.  To the contrary, the record shows that *denying* gender-affirming medical care to transgender minors with severe gender dysphoria is more likely to "jeopardize [their] health or safety," *id.* at 1145, by compromising their mental health and putting them at increased risk of suicide.

In sum, when we properly frame the parents' right at issue and apply strict scrutiny, the Parents are substantially likely to succeed on their claim that the Act violates the Fourteenth Amendment's substantive-due-process guarantee.  The panel opinion's

contrary conclusion is not only legally wrong but dangerous for minors with severe gender dysphoria and their parents—and for every parent seeking modern medical care for their child in Alabama, Florida, or Georgia.

**III.    The panel opinion wrongly concludes that the Minors are not substantially likely to succeed on the merits of their equal-protection claim.**

The Fourteenth Amendment's Equal Protection Clause guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  To evaluate whether a law violates the Equal Protection Clause, "we apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

For classifications that disadvantage a "suspect class," we apply strict scrutiny. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976).  As I've explained in the due-process context, strict scrutiny asks whether the state law is narrowly tailored to further a compelling state interest.  The Supreme Court has applied strict scrutiny to classifications based on race, color, and national origin. *See Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 308–09 (2023) (Gorsuch, J., concurring); *Clark*, 486 U.S. at 461.  And the Court has explained that a suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from

the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).

The second, or middle, tier of review is "intermediate scrutiny." *Clark*, 486 U.S. at 461. To survive intermediate scrutiny, the classification "must be substantially related to an important governmental objective." *Id.* Intermediate scrutiny applies to classifications based on sex or another quasi-suspect class. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–42 (1985). Quasi-suspect classes (1) "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *cf. City of Cleburne*, 473 U.S. at 442–43; (2) have historically endured discrimination, "antipathy," or "prejudice," *City of Cleburne*, 473 U.S. at 440; *Lyng*, 477 U.S. at 638; (3) are a "politically powerless" minority, *City of Cleburne*, 473 U.S. at 445; *Lyng*, 477 U.S. at 638; and (4) have a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne*, 473 U.S. at 440–41 (citation and internal quotation marks omitted).

Third, if a classification qualifies as neither suspect nor quasi-suspect under the Equal Protection Clause, we apply rational-basis review. *See Clark*, 486 U.S. at 461. And again, that means the statute must simply be "rationally related to a legitimate governmental purpose." *Id.* Or as our Court has put it, "we must uphold [a law under rational-basis review] if there is any conceivable basis that could justify it." *Jones*, 975 F.3d at 1034.

As I explain below, the Act discriminates based on two quasi-suspect classifications: sex and transgender status.  So either classification requires us to apply intermediate scrutiny.  When we do that, the Act cannot survive.

But the panel opinion fails to recognize as quasi-suspect the classifications the Act makes.  Instead, it incorrectly applies rational-basis review to uphold the Act.

Section A shows that the Act relies on sex-based classifications.  Section B explains that the Act also employs the quasi-suspect classification of transgender status.  Because the Act uses quasi-suspect classifications, Section C then applies intermediate scrutiny to the Act.

A.     *The panel opinion fails to recognize that the Act classifies based on sex.*

The Act prohibits the prescription or administration of transitioning medications "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex."  S.B. 184 § 4(a).  In its operation, the Act classifies based on sex in three ways.  First, the Act restricts minors' access to puberty blockers and hormones based on the minors' sex.  Second, the Act relies on gender stereotyping.  And third, the Act discriminates against transgender individuals because they are transgender, and that is necessarily discrimination because of sex.

*First*, the Act conditions minors' access to puberty blockers and hormone therapy on their sex.  The upshot of the Act, then, is

that transgender boys and girls are forced to conform to Alabama's view of what birth-assigned girls and boys, respectively, should look like at their ages.

For example, suppose a transgender girl (birth-assigned boy), after consulting her parents and doctors, decides to take estrogen so her biological development reflects her gender identity. Under the Act, she cannot access that medication. But a cisgender girl (birth-assigned girl) with an estrogen deficiency who is prescribed estrogen for the same reason—so her biological development matches her gender identity—can. Both seek to alter their appearance to match their gender identities, but only the transgender girl is prohibited from using the medication because the desired appearance "is inconsistent with the minor's sex" as assigned at birth. S.B. 184 § 4(b). And a medical professional cannot determine whether the Act prohibits such a treatment "without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *See Kadel v. Folwell*, 100 F.4th 122, 147 (4th Cir. 2024) (en banc).

In other words, but for the Minors' birth-assigned sex, they could access the same treatment to delay puberty or to ensure that their appearances reflect their gender identities. *See Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669–70 (8th Cir. 2022). So "[s]ex plays a necessary and undisguisable role" in the Act's operation. *Bostock*, 590 U.S. at 652. That is "textbook sex discrimination." *Kadel*, 100 F.4th at 153.

The panel opinion seeks to avoid this straightforward conclusion by asserting that the Act "applies equally to both sexes." *Eknes-Tucker II*, 80 F.4th at 1228. But that the Act discriminates against both transgender boys *and* transgender girls based on sex does not change the fact that the Act discriminates based on sex.

In fact, the Supreme Court rejected a variety of that same argument in *Bostock*. There, the Court considered whether, under Title VII, an employer could lawfully "fire[] a woman . . . because she is insufficiently feminine and also fire[] a man . . . for being insufficiently masculine"—that is, whether the employer could lawfully discriminate, "more or less equally," against both men and women under Title VII. *Bostock*, 590 U.S. at 659. The Court had no trouble rejecting that defense. *See id.* As the Court explained, "in *both* cases the employer fires an individual in part because of sex." *Id.* So "[i]nstead of avoiding Title VII exposure, this employer doubles it." *Id.*

True, *Bostock* dealt with Title VII, not the Fourteenth Amendment. But *Bostock* concluded that discriminating against both men and women is no defense to Title VII because Title VII prohibits discrimination against "individual[s]," rather than "against women [or men] as a class." *See id.* at 658–59. So too with the Fourteenth Amendment, which guarantees that "[n]o State shall . . . deny *to any person* within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added).

Without citation to any authority, the panel opinion also contends that the Act does not discriminate based on sex because

it "refers to sex only because the medical procedures that it regulates . . . are themselves sex-based." *Eknes-Tucker II*, 80 F.4th at 1228. This attempt to avoid the Act's sex-based classifications fails. First, the Act refers to sex apart from the medical procedures when it restricts use of puberty blockers and hormone therapy for only those minors trying to change their appearance in a way "inconsistent with their sex." S.B. 184 § 4(b). But second, even if we accept the panel opinion's incorrect premise, the mere fact that a law refers to sex-based medical procedures does not somehow insulate it from equal-protection scrutiny. As the Act shows, a law can both "refer[] to sex only because the medical procedures that it regulates . . . are themselves sex-based," *Eknes-Tucker II*, 80 F.4th at 1228, and still discriminate on the basis of sex. Our constitutional protections are not so easily circumvented.

Similarly, the panel opinion invokes *Dobbs*'s pronouncement that "the regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a mere pretext designed to effect an invidious discrimination against members of one sex or the other." *Id.* at 1229 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022)) (cleaned up). This argument fails.

Unlike abortion, treatment with transitioning medications is not "a medical procedure that only one sex can undergo," *id.* Both boys and girls have sex hormones. And as they have for decades for medical conditions other than gender dysphoria, doctors can prescribe puberty blockers and hormones for both boys and girls. In

fact, both male and female bodies produce and use both testosterone and estrogen, though in different quantities.[24] That the hormones doctors prescribe for birth-assigned boys and girls may not be precisely the same does not somehow make the administration of puberty blockers and hormone therapy "a medical procedure that only one sex can undergo," *id.*

*Second*, the Act employs sex-based classifications through its use of gender stereotypes. Gender stereotypes "presume that men and women's appearance and behavior will be determined by their sex." *Brumby*, 663 F.3d at 1320. The Act prohibits the use of transitioning medications only when they are prescribed or administered to "affirm the minor's perception of his or her gender or sex, *if that appearance . . . is inconsistent with the minor's sex,*" S.B. 184 § 4(a) (emphasis added)—or to put it more bluntly, if that appearance deviates from Alabama's view of what the minor's appearance should be, based on the minor's birth-assigned sex. We've held that "the Equal Protection Clause does not tolerate gender stereotypes." *Brumby*, 663 F.3d at 1320. Yet that's exactly what the Act's classifications do: they force transgender minors to present as Alabama's view of what boys and girls, respectively, should be and look like. *See Kadel*, 100 F.4th at 153 ("conditioning access to [gender-

---

[24] Rex A. Hess, *Estrogen in the Adult Male Reproductive Tract: A Review*, 1:52 Reproductive Biology & Endocrinology 1, 1 (2003) ("Testosterone and estrogen are no longer considered male only and female only hormones. Both hormones are important in both sexes.").

affirming care] based on a patient's sex assigned at birth stems from gender stereotypes about how men or women should present").

The Lagoa Statement's attempts to pin Alabama's discrimination on "physical differences" falls short.  Lagoa St. at 37.  In fact, the very case it cites, *United States v. Virginia*, 518 U.S. 515, 533 (1996), makes plain its error.  There, the Virginia Military Institute argued it could exclude women because the "psychological and sociological differences" between men and women prevented women from succeeding in its strenuous curriculum.  *Id.* at 549. Virginia proffered that those biological differences were "real" and "not stereotypes." *Id.*  But the Court rejected that argument.  Although Virginia identified some physical differences, the Court explained, its "generalizations" from those differences were stereotypes about "the way most women are" or "what is appropriate for most women." *Id.* at 550 (emphasis omitted).

The Lagoa Statement contains the same flaw.  Sure, § 4(a) mentions "physical differences" between boys and girls.  But as I've noted, it recognizes those differences only because they conform to Alabama's view of "what is appropriate" for boys and girls, *id.*[25]

---

[25] This case is a far cry from those where the Court has recognized real, physical differences that survive intermediate scrutiny.  In *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001), for example, under intermediate scrutiny, the Court upheld a statutory scheme that automatically granted citizenship to a child born out of wedlock if the mother was the parental citizen but that required proof of paternity if the father was the parental citizen.  The Court found that the real difference—that a mother gives birth to her child, and that paternity is not so simply established at the time of birth—justified the

*Third*, the Act classifies based on transgender status and gender non-conformity, which the Supreme Court and we have found indirectly discriminates based on sex. *See Bostock*, 590 U.S. at 660–61; *Brumby*, 663 F.3d at 1316. The panel opinion seeks to sidestep *Bostock* and *Brumby* by cabining them to the Title VII and employment-discrimination contexts. Those attempts are unavailing.

Again, the Act prohibits the use of transitioning medications only if prescribed to "affirm the minor's perception of his or her gender or sex, if that appearance . . . is inconsistent with the minor's sex." S.B. 184 § 4(a). In other words, the Act proscribes transitioning medications for transgender minors only. *See Eknes-Tucker I*, 603 F. Supp. 3d at 1138.

As the Supreme Court explained in *Bostock*, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. at 660. Because "transgender status [is] inextricably bound up with sex," *id.* at 660–61, discrimination "against . . . transgender [individuals] necessarily and intentionally applies sex-based rules," *id.* at 667. *Bostock*'s rule governs here: because the Act classifies based on transgender status, it classifies based on sex, so it must clear intermediate scrutiny.

———————————

statutory distinction in presumed parentage. *Id.* In contrast, the Lagoa Statement identifies a biological difference but does not explain how or why that difference "substantially relate[s]" to Alabama's "important governmental interest." *Id.*

The Lagoa Statement aims to circumvent this precedent by conclusorily stating that "[b]ecause the language of the Equal Protection Clause does not resemble the language of Title VII, *Bostock*'s reasoning does not apply here." Lagoa St. at 36; *see also Eknes-Tucker II*, 80 F.4th at 1229. But the Lagoa Statement fails to grapple with the Supreme Court's explanation for why Title VII's text demands *Bostock*'s answer: that Title VII's text prohibits discrimination against "any individual." *See Bostock*, 590 U.S. at 658–59. In comparison, the Fourteenth Amendment prohibits discrimination against "any person." U.S. Const. amend. XIV, § 1. So there's no meaningful difference from the text that motivated the Supreme Court's decision in *Bostock*. The Lagoa Statement has no answer for this.

Rather, the Lagoa Statement blindly pulls out-of-context quotations from Justice Gorsuch's concurrence in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 308 (2023). But in fact, Justice Gorsuch's concurrence supports my point. Justice Gorsuch distinguished Title VII and the Equal Protection Clause because they apply "different degrees of judicial scrutiny" and cover "different kinds of classifications." *Id*. at 308. But he did not suggest that they have different definitions of discrimination. Nor could he. Both forbid "treating someone differently because of" a protected characteristic. *Id*. at 220 (Roberts, C.J., majority) (defining discrimination under the Equal Protection Clause); *see Bostock*, 590 U.S. at 658 ("treat[ing] a person worse because of sex . . . discriminates against that person in violation of Title VII").

So whether an employee is fired for being transgender, or a teenager is denied healthcare for being transgender, "[s]ex plays a necessary and undisguisable role in the decision." *Bostock*, 590 U.S. at 652. Indeed, it makes little sense to conclude that discrimination against transgender persons "necessarily and intentionally applies sex-based rules," *id.* at 667, in the Title VII context but has no relation to sex in the Equal Protection Clause context. *See Kadel*, 100 F.4th at 180–81 (Richardson, J., dissenting) (for both Title VII and the Equal Protection Clause, "*Bostock* tells us that to discriminate on the basis of [transgender status] is necessarily to discriminate 'because of' sex").

After all, the Court did not say that "transgender status [is] inextricably bound up with sex" in the workplace alone. *See Bostock*, 590 U.S. at 660–61. Nor did it say that it is "impossible to discriminate" based on transgender status in the workplace "without discriminating . . . based on sex," *id.* at 660, but possible and acceptable to do so outside the workplace. No doubt *Bostock*'s holding was limited to Title VII and employment discrimination, but its reasoning was not. And the "portions of [an] opinion['s rationale that are] necessary to [its] result" are just as binding as the holding itself. *See Powell*, 643 F.3d at 1305.

Plus, *Bostock* is not the only precedent on point here. *Brumby*—which concerned the Fourteenth Amendment's Equal Protection Clause and which we decided before *Bostock*—also controls this analysis. In *Brumby*, we held that "discriminating against [a transgender person] on the basis of his or her gender non-

conformity constitutes sex-based discrimination under the Equal Protection Clause." 663 F.3d at 1316. In so concluding, we found a "congruence between discriminating against transgender . . . individuals and discrimination on the basis of gender-based behavioral norms." *Id.* And we held that discrimination based on gender non-conformity or transgender status is "subject to heightened scrutiny." *Id.* at 1319. *Brumby*'s logic applies with equal force in this context.

The panel opinion tries to avoid this fact by cabining *Brumby*'s reading of the Fourteenth Amendment to "the context of employment discrimination." *See Eknes-Tucker II*, 80 F. 4th at 1229. But *Brumby* suggests no such limitation. And in any case, constitutional protections are not context-specific. For example, it would be absurd to hold that, because *Mississippi University*, 458 U.S. at 733, declared that the Equal Protection Clause protects men from sex discrimination in state-operated nursing schools, the Equal Protection Clause provides men with no protection against sex discrimination in other state programs. But the panel opinion does just that: it asserts that discrimination against transgender persons is unconstitutional sex discrimination only in the workplace. By extension, then, we would afford protection to an employee facing the loss of a job but spurn such protection for a teen facing the loss of medical care that could mean the difference between life and death. Constitutional rights are not so easily disposable.

Finally, the Lagoa Statement perpetuates the fiction that the Act discriminates on the basis of "purpose," not sex or transgender

identity.  Lagoa St. at 34–35.  But in the context of this case, "discriminating on the basis of [purpose] *is* discriminating on the basis of gender identity and sex."  *Kadel*, 100 F.4th at 141.  That's because gender dysphoria is "a condition that is bound up in transgender identity," and so too is treatment for that condition.  *Id*. at 142.  And the Act prohibits puberty blockers and hormone therapy for only the "purpose" of treating gender dysphoria.  *See* S.B. 184 § 4(a).  We cannot suborn sex and gender-identity discrimination by calling it by a different name.

In short, *Bostock* and *Brumby* are binding precedents that show why the Minors have a substantial likelihood of success on the merits of their equal-protection claim.[26]

B.    *The panel opinion fails to recognize that the Act classifies based on transgender status, a quasi-suspect class in its own right for purposes of equal-protection analysis.*

The previous section explains why the Act discriminates based on sex.  But the panel opinion also fails to recognize that transgender status is itself a quasi-suspect classification.  *See Eknes-Tucker II*, 80 F.4th at 1230.  And the Act's discrimination on the basis

---

[26] Applying *Bostock* and *Brumby* does not mean that prohibiting a particular medical treatment based on sex is automatically unconstitutional.  As I've mentioned, if a state prohibited a course of treatment for transgender minors that was not medically accepted and that posed serious risks without benefits, that prohibition would likely survive even strict scrutiny.  Of course, the Act does not impose that type of a prohibition.  And even if we had such a law before us here, we still should have opted to correct the panel opinion's perilous equal-protection analysis.

of transgender status is an independent ground for applying intermediate scrutiny.

To be sure, a majority of this Court previously expressed "grave 'doubt' that transgender persons constitute a quasi-suspect class," *Adams*, 57 F.4th at 803 n.5, but this dictum is not a binding holding. And even if it were, most respectfully, it is incorrect, and we should correct it in en banc proceedings. In fact, as my colleague Judge Jill Pryor has shown, transgender individuals meet all four criteria for quasi-suspect-class status, triggering intermediate scrutiny. *Id*. at 848–50 (J. Pryor, J., dissenting). I summarize why below.

First, transgender status is immutable, or, as we have defined it, "consistent[], insistent[], and persistent[]." *See id*. at 807. And those that take puberty blockers or gender-affirming hormones necessarily have a "consistent[], insistent[], and persistent[]" transgender identity. *See id*. That some individuals who experience some form of gender incongruence ultimately embrace their birth-assigned gender or detransition does not alter this reality because those individuals are not "transgender" as our precedent (and medical science) defines the term. *See id*.

Transgender status is also "distinguishing." In fact, it's a specific basis on which the Act distinguishes. The Act prohibits the use of puberty blockers and hormone therapy only "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex,"—in other words, only when the

minor is transgender.  *See* S.B. 184 § 4(a).  Contrary to the Lagoa Statement's assertions, the fact that a "wide spectrum" of non-binary individuals may identify as "transgender," Lagoa St. at 40–41, does not mean that it is not a "distinguishing" label.  For instance, a diverse group of individuals may identify with a particular race, religion, or national origin, but precedent firmly establishes that race, religion, and national origin are suspect classes.  *See Clark*, 486 U.S. at 461; *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  The same is true of transgender identity and quasi-suspect-class status.  And in any event, even if the umbrella term "transgender" encompasses a "wide spectrum" of diverse people, we can still distinguish those who are "transgender" (those who consistently, persistently, and insistently identify with their non-birth-assigned sex, *see Adams*, 57 F.4th at 807) from those who are not (those who don't).

Second, as the Fourth Circuit has observed, "there is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access."  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (cleaned up).  And that prejudice and discrimination persist today.  For instance, 30% of respondents to the 2022 U.S. Transgender Survey reported being "verbally harassed" in the last year because of their gender identity or expression, 9% reported being denied equal treatment or service, and 3% reported being physically attacked.  And as relevant here, 80% of adult respondents and 60% of 16- or 17-year-old

respondents who were out or perceived as transgender in school experienced bullying, harassment, physical attacks, or other forms of "mistreatment or negative experience."[27]

Third, transgender persons are no doubt a minority lacking in political power. "Even when we take into account the small proportion of the population transgender individuals comprise, they are underrepresented in political and judicial office nationwide." *Adams*, 57 F.4th at 850 (J. Pryor, J., dissenting).[28]  The very passage

---

[27] *See* James et al., *supra* n.22, at 21–22. These numbers are roughly comparable to the 2015 Survey.  *See* Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey*, at 5, 13 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf [https://perma.cc/5CL3-RG9E].  And while broad-scale quantitative data from prior periods may not exist, anecdotal evidence of discrimination against transgender persons dates back to the Founding era and beyond. *See, e.g.*, Genny Beemyn, *Transgender History in the United States*, *in* Trans Bodies, Trans Selves (Laura Erickson-Schroth ed., Oxford Univ. Press 2022).

[28] More than 1.3 million transgender adults—roughly 0.5% of the adult population—live in the United States.  *See* Williams Institute, *supra* n.18.  Yet in 2022, only 45 elected officials—across all political levels in the country, including the local, state, and federal levels—identified as transgender.  LGBTQ+ Victory Institute, *Out for America 2022: A Census of LGBTQ Elected Officials Nationwide* (Aug. 2022), https://victoryinstitute.org/out-for-america-2022/ [https://perma.cc/4WQM-D6W3].  And there is not (nor has there ever been) a single openly transgender judge on the federal bench.  Lambda Legal, *In a Record-Breaking Year for Judicial Nominations, the Biden Administration Fell Short on LGBTQ+ Representation* (Feb. 1, 2022), https://lambdalegal.org/publication/us_20230412_biden-admin-still-fell-short-on-lgbtq-representation-in-federal-judicial-nominations/ [https://perma.cc/AFG9-7NBR].

of the Act, along with similar legislation in other states[29] and governmental action disadvantaging transgender people in other contexts (i.e., executive directives barring transgender individuals from military service), evidence this reality. And the fact that a minority of states and the current Presidential administration have acted to support transgender individuals, *see* Lagoa St. at 41–42, cannot efface this widespread and invidious discrimination.[30]

Fourth and finally, transgender status bears no "relation to ability to perform or contribute to society." *Grimm*, 972 F.3d at 612 (cleaned up). Transgender individuals have achieved success across industries, contributed to the American economy, served in the U.S. military, built families, and beyond. Indeed, "[s]eventeen of our

---

[29] Since Alabama passed the Act, more than twenty other states have enacted legislation restricting the provision of gender-affirming hormone therapy and other procedures for transgender minors. *See* Arkansas S.B. 199 (2023); Florida S.B. 254 (2023); Georgia S.B. 140 (2023); Idaho H.B. 71 (2023); Indiana S.B. 480 (2023); Iowa S.F. 538 (2023); Kentucky S.B. 150 (2023); Louisiana H.B. 648 (2023); Mississippi H.B. 1125 (2023); Missouri S.B. 49 (2023); Montana S.B. 99 (2023); Nebraska L.B. 574 (2023); North Carolina H.B. 808 (2023); North Dakota H.B. 1254 (2023); Ohio H.B. 68 (2024); Oklahoma S.B. 613 (2023); South Carolina H.B. 4624 (2024); South Dakota H.B. 1080 (2023); Tennessee S.B. 1 (2023); Texas S.B. 14 (2023); Utah S.B. 16 (2023); West Virginia H.B. 2007 (2023); Wyoming S.F. 0099 (2024).

[30] Nor is it at all relevant which law firms have "supported the Plaintiffs." Lagoa St. at 41. It is not our role to determine which law firms are "major" or "powerful." And it is not the case that a group with (pro bono) legal representation is not otherwise disenfranchised. To the contrary, many of the preeminent legal organizations in this country (e.g., the NAACP and ACLU) have dedicated themselves to representing minorities lacking in political power.

foremost medical, mental health, and public health organizations agree that being transgender 'implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.'" *Id.* (quoting Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* 1 (2012)).

So all four factors show that transgender persons are a quasi-suspect class, and intermediate scrutiny applies. *See Adams*, 57 F.4th at 848–50 (J. Pryor, J., dissenting); *Grimm*, 972 F.3d at 613; *cf. Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019) ("[T]he district court reasonably applied the factors" when determining that transgender persons are a "quasi-suspect class."). Although the Supreme Court has not recently recognized a new quasi-suspect class, *see* Lagoa St. at 39, its precedent does not preclude it or lower courts from doing so when warranted. To that end, the panel opinion's summary dismissal of this argument was error.

C.      *It is substantially likely that the Act fails intermediate scrutiny.*

Because intermediate scrutiny applies, we ask whether the Act serves "important governmental objectives" and employs means "substantially related to the achievement of those objectives." *Miss. Univ.*, 458 U.S. at 724 (quotations omitted). That justification must be "exceedingly persuasive," *id.*, and cannot be "hypothesized," *Virginia*, 518 U.S. at 533.

Alabama invokes the interest of protecting children's safety. And of course, I agree that "[i]t is indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 868

(11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)).  But when we apply the district court's factual findings—as we must—we cannot conclude that the Act is "substantially related" to that interest.

Just as it is substantially likely that the Act cannot survive strict scrutiny, it is substantially likely that the Act fails intermediate scrutiny as well.  Again, the district court found that gender-affirming medical care is not "experimental"—to the contrary, it is widely-endorsed, "well-established, evidence-based treatment[]." *Eknes-Tucker I*, 603 F. Supp. 3d at 1145.  So Alabama's interest in "safeguarding the physical and psychological well-being," *Otto*, 981 F.3d at 868, of its minors does not itself permit Alabama to outlaw transitioning medications on the basis of sex or transgender status. In fact, across-the-board prohibition of access to transitioning medications itself compromises the "physical and psychological well-being" of minors with severe gender dysphoria—putting them at greater risk of suicidality and depression.[31]

What's more, the Act permits the use of the very puberty blockers and hormones it outlaws for treatment of gender dysphoria in Minors, for treatment of minors with other conditions.  The continued availability of this medication to cisgender minors undercuts the State's purported safety rationale and renders the Act over- and under-inclusive.  When we account for the State's asserted rationale, the Act is over-inclusive, as it prohibits gender-

---

[31] *See supra* n.22.

affirming hormone therapy for all transgender minors regardless of their medical circumstances.  And it is under-inclusive because it does not altogether bar the medications.  Rather, it concedes that puberty blockers and hormone therapy are safe and medically advisable in other circumstances.  Simply put, the Act's ends and means are not substantially related, and the Minors are substantially likely to show that it fails intermediate scrutiny.

Because the Act unlawfully discriminates against the Minors based on their sex and transgender status, it must satisfy a more exacting standard than rational-basis review.  The panel opinion's contrary conclusion essentially rubber-stamps the Act's denial of healthcare to transgender minors despite the State's failure to meet its burden.  The consequences will be profound.

## IV.

The panel opinion jettisons precedent to wrongly conclude that the Parents and Minors are not substantially likely to show that Alabama's law violates two different constitutional rights:  parents' fundamental right to direct their children's medical treatment and all individuals' right to equal protection regardless of birth-assigned sex or gender conformity.  These legal and constitutional errors are more than academic.  They sanction the denial of well-established, medically accepted treatment and leave parents helpless to prevent life-threatening harm.  Neither precedent nor the record supports that result.  Worst of all, it will needlessly cause parents and their children in the state of Alabama to suffer grievously.

66                    ROSENBAUM, J., Dissenting                22-11707

I respectfully dissent from the denial of rehearing en banc.